# 25-2986

## In the United States Court of Appeals for the Second Circuit

---

UNITED STATES OF AMERICA,
APPELLEE

*v.*

MARINA KUYAN, KEMAL SARKINOVIC, JOSHUA MARKOVICS,
DEFENDANTS,

DAVID MOTOVICH,
DEFENDANT-APPELLANT

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE EASTERN DISTRICT OF NEW YORK (CRIM. NO. 21-497)*
*(THE HONORABLE WILLIAM F. KUNTZ, II, J.)*

---

**BRIEF OF DEFENDANT-APPELLANT**

---

KANNON K. SHANMUGAM
MASHA G. HANSFORD
ABIGAIL FRISCH VICE
ANNA J. LUCARDI
KRISTA A. STAPLEFORD
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.*
*Washington, DC 20006*
*(202) 223-7300*
*kshanmugam@paulweiss.com*

# TABLE OF CONTENTS

Introduction................................................................................................1

Statement of jurisdiction.........................................................................4

Statement of the issues ...........................................................................4

Statement of the case ..............................................................................5

        A.      Background.........................................................................5

        B.      The indictment...................................................................6

        C.      The trial...............................................................................8

        D.      The jury instructions .....................................................13

        E.      The verdict and post-trial proceedings........................17

Summary of argument ...........................................................................19

Standard of review..................................................................................23

Argument..................................................................................................24

I.     The money transmitting business conviction should be reversed, or at a minimum vacated, because the government did not establish that Mr. Motovich ran a business that 'transmitted' funds....................24

        A.      Operating a 'money transmitting business' requires transferring money from one person or place to another............25

        B.      The evidence was insufficient to sustain a conviction on Count 1 because the government presented no evidence that Mr. Motovich transferred funds.................................................30

        C.      At a minimum, vacatur is warranted because the jury instruction on Count 1 omitted the transferring requirement....31

Page

Table of contents—continued:

II.   The currency reporting conviction should be vacated because the District Court plainly erred by omitting the willfulness instruction required by Supreme Court precedent......................................................34

    A.   The jury should have been required to find that Mr. Motovich acted with specific intent to violate Section 5322 ..........................34

    B.   The District Court prejudicially erred by failing correctly to instruct on the mens rea necessary under Section 5322 ..............36

III.  The *Klein* conspiracy count must be vacated because of a substantial danger that the conviction was based on a non-unanimous verdict ......43

    A.   The jury was required to be unanimous as to the specific object of the *Klein* conspiracy .........................................................43

    B.   The prosecution created a substantial danger that Mr. Motovich's conviction was based on a non-unanimous verdict, which the District Court did nothing to cure................................49

IV.   The convictions on Counts 3-7 and 16 should be reversed because they are premised on a right-to-control theory of fraud ........................52

Conclusion.................................................................................................................56

## TABLE OF AUTHORITIES

### CASES

*Braverman* v. *United States*, 317 U.S. 49 (1942) ...............................................44

*Bryan* v. *United States*, 524 U.S. 184 (1998) ........................................................35

*Ciminelli* v. *United States*, 598 U.S. 306 (2023)........................................*passim*

*Loughrin* v. *United States*, 573 U.S. 351 (2014)............................................53, 54

*Manrique* v. *United States*, 581 U.S. 116 (2017)................................................18

ii

Page

Cases—continued:

*Ramos* v. *Louisiana*, 590 U.S. 83 (2020)................................................43

*Ratzlaf* v. *United States*, 510 U.S. 135 (1994).............................................*passim*

*Richardson* v. *United States*, 526 U.S. 813 (1999) ..............................................44

*Saint-Jean* v. *Emigrant Mortgage Co.*, 129 F.4th 124 (2d Cir. 2025),
  *cert. denied*, 2026 WL 79895 (U.S. Jan. 12, 2026) ........................................38

*Shaw* v. *United States*, 580 U.S. 63 (2016)................................................... 52-53

*United States* v. *Bah*, 574 F.3d 106 (2d Cir. 2009) ....................................*passim*

*United States* v. *Berger*, 224 F.3d 107 (2d Cir. 2000)........................................45

*United States* v. *Bernstein*, 533 F.2d 775 (2d Cir.),
  *cert. denied*, 429 U.S. 998 (1976) ................................................44, 45

*United States* v. *Cole*, 158 F.4th 113 (2d Cir. 2025) ..........................................45

*United States* v. *Estevez*, 961 F.3d 519 (2d Cir.),
  *cert. denied*, 141 S. Ct. 388 (2020) ................................................50

*United States* v. *Ferguson*, 676 F.3d 260 (2d Cir. 2011)....................................39

*United States* v. *Gallerani*, 68 F.3d 611 (2d Cir. 1995) ........................40, 44, 47

*United States* v. *George*, 386 F.3d 383 (2d Cir. 2004) .................................36, 39

*United States* v. *Goklu*, No. 24-767, 2026 WL 932952
  (2d Cir. Apr. 7, 2026) ................................................27, 28

*United States* v. *Helmsley*, 941 F.2d 71 (2d Cir. 1991),
  *cert. denied*, 502 U.S. 1091 (1992) ................................................50, 51

*United States* v. *Klein*, 247 F.2d 908 (2d Cir. 1957),
  *cert. denied*, 355 U.S. 924 (1958) ................................................*passim*

*United States* v. *Kukushkin*, 61 F.4th 327 (2d Cir. 2023) ................................39

iii

Page

Cases—continued:

*United States* v. *Lapier*, 796 F.3d 1090 (9th Cir. 2015).....................................50

*United States* v. *Lebedev*, 932 F.3d 40 (2d Cir. 2019),
  *cert. denied*, 589 U.S. 1224 (2020) ...................................................54

*United States* v. *Leslie*, 103 F.3d 1093 (2d Cir. 1997),
  *cert. denied*, 526 U.S. 1030 (1999) ...................................................55

*United States* v. *Mazza-Alaluf*, 621 F.3d 205 (2d Cir.),
  *cert. denied*, 562 U.S. 1035 (2010) ......................................15, 28, 30

*United States* v. *Omotayo*, 132 F.4th 181 (2d Cir. 2025)..........................38, 40

*United States* v. *Pauling*, 924 F.3d 649 (2d Cir. 2019).....................................23

*United States* v. *Prado*, 815 F.3d 93 (2d Cir. 2016) ................................*passim*

*United States* v. *Quattrone*, 441 F.3d 153 (2d Cir. 2006) ................................32

*United States* v. *Rosenblatt*, 554 F.2d 36 (2d Cir. 1977)...........................*passim*

*United States* v. *Sabhnani*, 599 F.3d 215 (2d Cir. 2010),
  *cert. denied*, 562 U.S. 1194 (2011) ...................................................36

*United States* v. *Sampson*, 898 F.3d 287 (2d Cir. 2018).....................................35

*United States* v. *Sharpsteen*, 913 F.2d 59 (2d Cir. 1990)...........................45, 46

*United States* v. *Velastegui*, 199 F.3d 590 (2d Cir. 1999),
  *cert. denied*, 531 U.S. 823 (2000) .....................................14, 24, 30, 32

## CONSTITUTION, STATUTES, REGULATION, AND RULE

U.S. Const. Amend. VI.......................................................5, 22, 43, 51

18 U.S.C. § 2(b).........................................................7, 15, 34, 35, 40

Page

Statutes, regulation, and rule—continued:

18 U.S.C. § 371 ..................................................................*passim*

18 U.S.C. § 874 ................................................................47

18 U.S.C. § 1028A............................................................52

18 U.S.C. § 1028A(a)(1) .....................................................7

18 U.S.C. § 1344 ..........................................................7, 52

18 U.S.C. § 1344(1)-(2).....................................................52

18 U.S.C. § 1349 ..........................................................7, 52

18 U.S.C. § 1512(b)(3) ........................................................7

18 U.S.C. § 1956(h)............................................................7

18 U.S.C. § 1957(a)........................................................7, 8

18 U.S.C. § 1960 ...............................................................*passim*

18 U.S.C. § 1960(a)..............................................20, 24, 25

18 U.S.C. § 1960(b)............................................14, 20, 25, 26

18 U.S.C. § 1960(b)(1) ...................................................25, 27

18 U.S.C. § 1960(b)(1)(A) .....................................................29

18 U.S.C. § 1960(b)(1)(B) .................................................28, 29

18 U.S.C. § 1960(b)(1)(C) .....................................................27

18 U.S.C. § 1960(b)(2) ...................................................26, 27

18 U.S.C. § 2073 ..............................................................47

18 U.S.C. § 3231 ...............................................................4

26 U.S.C. § 7201 .........................................................47, 48

v

Page

Statutes, regulation, and rule—continued:

26 U.S.C. § 7202 ......................................................................48

28 U.S.C. § 1291 ........................................................................4

31 U.S.C. § 5313(a)........................................................7, 35, 39

31 U.S.C. § 5322 ................................................................*passim*

31 U.S.C. § 5322(a)..................................................................15

31 U.S.C. § 5322(b)..................................................2, 7, 34, 35

31 U.S.C. § 5330 ...............................................................*passim*

31 U.S.C. § 5330(a)..................................................................30

31 U.S.C. § 5330(d)........................................................15, 28, 30

31 U.S.C. § 5330(d)(1)..............................................................28

31 U.S.C. § 5330(d)(1)(A) .......................................................28

31 U.S.C. § 5330(d)(2)..............................................................15

31 C.F.R. § 1010.311 ...............................................................35

Fed. R. Crim. P. 29 ..................................................................17

## MISCELLANEOUS

Judge Leonard Sand et al., *Modern Federal Jury Instructions* (2026):

§ 3A.01......................................................................................42

§ 50B.02....................................................................................36

*Webster's Third New International Dictionary* (1986)..................27

**INTRODUCTION**

For over 25 years, David Motovich helped run Midwood Lumber, his family's Brooklyn hardware store. Midwood sold construction supplies to local contractors that were often strapped for cash. To address that need and compete with big-box hardware stores, Mr. Motovich let customers buy on credit. He also loaned money to customers and others starting businesses. Mr. Motovich took checks in return, which he later cashed. Like many other business owners, he executed transactions through incorporated entities. Mr. Motovich also used bank accounts that were not in his name.

On that basis, the government charged Mr. Motovich with violating a litany of federal laws. The government alleged that Mr. Motovich ran an illegal check-cashing scheme to help customers evade payroll and income taxes, and it further alleged that Mr. Motovich committed bank fraud and related offenses in order to obscure that activity. A jury subsequently convicted Mr. Motovich of operating an unlicensed money transmitting business; failing to file currency transaction reports; money laundering; bank fraud and related conspiracy; aggravated identity theft; and conspiring to defraud the United States.

That judgment should be reversed in part, or at a minimum vacated and the case remanded, for four principal reasons. *First*, the district court wrongly

(1)

broadened the scope of conduct that can violate 18 U.S.C. § 1960, which criminalizes the operation of an unlicensed money transmitting business. As this Court explained in *United States* v. *Bah*, 574 F.3d 106 (2009), the plain language of the statute criminalizes only a business that transfers funds by accepting them from one person and relinquishing them elsewhere. The government introduced no evidence of such a transfer, and there was thus insufficient evidence to support Mr. Motovich's conviction as a matter of law. At a minimum, the court erred in its instructions on this count because they permitted the jury to convict Mr. Motovich of running a "money transmitting business" even if his business did not transfer funds from one person or place to another. That instruction cannot be squared with the plain language of Section 1960 or this Court's precedents interpreting it.

*Second,* the district court erred by failing to require proof that Mr. Motovich acted with the intent to violate the law by causing a financial institution not to file a currency transaction report. The relevant provision, 31 U.S.C. § 5322(b), criminalizes a financial institution's "willful" failure to file currency transaction reports. In *Ratzlaf* v. *United States*, 510 U.S. 135 (1994), the Supreme Court held that a defendant acts "willfully" under Section 5322 only if he both knows of the reporting requirements *and* acts with specific intent to violate the law requiring him to report. But the jury was here instructed that the government was required to prove only that Mr. Motovich "will[ed]" the

2

reports not to be filed. That error was prejudicial because the government presented no evidence that Mr. Motovich knew his conduct placed him within the domain of the reporting requirements, much less that he knew failing to follow those requirements would be criminal under federal law.

*Third*, the district court erred by failing to address the substantial risk that the jury convicted Mr. Motovich of a conspiracy to defraud, commonly known as a *Klein* conspiracy, without unanimously agreeing on the specific object of that conspiracy. The government charged a broad conspiracy to defraud, centered around the check-cashing scheme, that allegedly had two objects: defrauding the government as to the check-cashing customers' *payroll* taxes and defrauding the government as to Mr. Motovich's *personal* income taxes. Yet the court did not specifically instruct the jury as to the need for unanimity as to the object. Given the breadth of the indictment, as well as the evidence and theories presented at trial, that failure produced a substantial danger that the jury convicted on conspiracy while splintering on the essential nature of the plan that the conspirators had agreed to carry out.

*Fourth*, the government's evidence was insufficient to support a bank-fraud conviction (and the bank-fraud conspiracy and aggravated-identity-theft convictions predicated on it) as a matter of law. The government's theory of bank fraud was premised on the right-to-control theory of fraud that the Supreme Court rejected in *Ciminelli* v. *United States*, 598 U.S. 306 (2023). The

3

government presented no evidence that Mr. Motovich schemed to deprive the banks of *property*. Its evidence at most showed that he deprived the banks of the right to control their assets by misrepresenting potentially valuable economic information—precisely what *Ciminelli* held is insufficient as a matter of law.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered final judgment on November 24, 2025. S.A. 1. Appellant filed a timely notice of appeal on the same day. J.A. 1105. The jurisdiction of this Court rests on 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether a conviction for operating a "money transmitting business" in violation of 18 U.S.C. § 1960 requires a showing that the business transmitted, or transferred, funds by accepting them from one person or place and relinquishing them to another.

2. Whether the district court plainly erred by failing to instruct the jury that Mr. Motovich could be liable for failing to file currency transaction reports only if he knew about the relevant legal requirement and acted with the specific intent to violate the law.

4

3.     Whether there is a substantial risk that the conviction for a *Klein* conspiracy was based on a non-unanimous verdict in violation of the Sixth Amendment.

4.     Whether the government failed to present sufficient evidence as a matter of law that Mr. Motovich committed bank fraud.

## STATEMENT OF THE CASE

### A.     Background

At the time of the relevant conduct, Mr. Motovich helped run Midwood Lumber, his family's construction store in Brooklyn, and had worked there for more than 25 years. J.A. 867. At Midwood, Mr. Motovich focused on cultivating relationships with customers, many of whom were construction contractors likely to bring repeat business. J.A. 844-845. Midwood could not compete on cost with Home Depot, Lowe's, or other big-box stores that can trim expenses through high-volume purchasing and thus sell products at lower prices. J.A. 844-845. As a small local business, however, Midwood could offer its customers other advantages that big-box stores could not. Midwood gave its customers the option to buy construction supplies on credit. J.A. 344, 552, 844. The store also became a natural clearinghouse for construction jobs in the area. Through his role at Midwood, Mr. Motovich became familiar with developers and local contractors, which allowed him to connect contractors to job opportunities. J.A. 344, 846-850. As a result, many local contractors bought

5

the supplies needed for their construction work from Midwood. J.A. 344, 346, 397, 848-849.

Mr. Motovich also facilitated access to cash for contractors with whom he had longstanding personal relationships. At trial, three of those contractors—who testified as the government's witnesses pursuant to cooperation agreements, J.A. 324, 455-456, 732-733—explained that their workers often demanded cash or else walked off the job. *See* J.A. 347, 480-481, 727, 760-761. So they routinely sought cash from Mr. Motovich to make payroll, giving him checks in return. Mr. Motovich requested that the checks be made payable to entities that had been incorporated at Mr. Motovich's direction. *See, e.g.*, J.A. 329, 331, 460-461, 492, 729, 731. Each contractor testified that, when money was tight and they did not have sufficient funds for their checks to clear, Mr. Motovich would give them the cash and then hold their checks until the funds became available. J.A. 347, 486, 736-737, 761-762, 832-833. In exchange for the cash, the contractors paid Mr. Motovich a fee. J.A. 345, 458, 765. Mr. Motovich believed that, by ensuring the contractors had sufficient cash to keep their workers on the job, he was sustaining business for Midwood Lumber, which sourced the materials for those jobs. J.A. 878.

## B. The Indictment

On September 22, 2021, the government obtained an indictment against Mr. Motovich in the United States District Court for the Eastern District of

New York for his check-cashing and related activities between 2012 and 2019. *See* J.A. 61-82. The superseding indictment charged him with one count of operating an unlicensed money transmitting business under 18 U.S.C. § 1960 (Count 1); one count of causing another person to fail to file currency transaction reports under 18 U.S.C. § 2(b), 31 U.S.C. § 5313(a), and 31 U.S.C. § 5322(b) (Count 2); four counts of bank fraud and one count of bank-fraud conspiracy under 18 U.S.C. §§ 1344 and 1349 (Counts 3-7); seven counts of money laundering and one count of conspiracy to commit money laundering under 18 U.S.C. §§ 1957(a) and 1956(h) (Counts 8-15); one count of aggravated identity theft under 18 U.S.C. § 1028A(a)(1) (Count 16); one count of conspiring to defraud the United States under 18 U.S.C. § 371 (Count 17); and one count of witness tampering under 18 U.S.C. § 1512(b)(3) (Count 18). The indictment named as co-defendants Kemal Sarkinovic, a local contractor who partnered with Mr. Motovich and incorporated many of the companies at issue, as well as Mr. Motovich's assistant and another contractor with whom Mr. Motovich had close business relationships. *See* J.A. 62.

Mr. Motovich moved to dismiss the charges of bank fraud, bank-fraud conspiracy, and aggravated identity theft. *See* J.A. 184-185. He argued that the indicted conduct did not constitute federal bank fraud because bank property was not the object of any alleged misrepresentation, as required under

*Ciminelli* v. *United States*, 598 U.S. 306, 309 (2023). *See* J.A. 190-195. The district court denied the motion, and the case proceeded to trial.[1]

### C. The Trial

1. With respect to the money transmitting count under Section 1960 and the money-laundering counts under Section 1957(a), the government's theory was that, by accepting checks from the contractors, Mr. Motovich operated an unlicensed money transmitting business in violation of federal law. The government presented evidence that Mr. Motovich agreed to accept checks from several local contractors. Three of those contractors testified, pursuant to cooperation agreements, that they gave Mr. Motovich checks in exchange for cash, and they explained that they had been personal friends with Mr. Motovich or his family for years. *See* J.A. 343, 482-483, 759.

The government introduced no evidence that Mr. Motovich transferred the funds from checks he received to any other person or place. Instead, the government's evidence established that, once Mr. Motovich received the checks, he deposited them into accounts that he controlled. *See, e.g.*, J.A. 299-

---

[1] Mr. Sarkinovic and the two other co-defendants all pleaded guilty to bank fraud or bank-fraud conspiracy before Mr. Motovich's trial. Dkt. 240, Crim. No. 21-497-002 (E.D.N.Y. May 17, 2024); Dkt. 290, Crim. No. 21-497-004 (E.D.N.Y. July 2, 2024); J.A. 581. Mr. Sarkinovic served as the government's key witness at Mr. Motovich's trial.

300, 531-532, 537, 778-781, 928-930.  It further showed that Mr. Motovich himself used the funds from the checks for business and personal expenses.  J.A. 931.

2.       As for the currency transaction reporting count, the government alleged that Mr. Motovich failed to report his check cashing on currency transaction reports.  The government posited that Mr. Motovich must have intentionally failed to file the reports and must have known they were required by law because "that was the entire point of his business model."  J.A. 933.  In particular, to substantiate the claim that Mr. Motovich knew that there was a $10,000 threshold for reporting transactions, J.A. 934, the government presented an e-mail and a text message.  In the e-mail, Mr. Motovich directed an unidentified recipient to "make 2 checks from tnt for 10 each, not in the same order."  J.A. 934, 1015-1016.  The government also presented a text message from Mr. Motovich to a contractor who regularly cashed checks with him; in that message, Mr. Motovich told the contractor that he could not cash a check over "8 inch" (*i.e.*, $8,000).  J.A. 1013.  The government's evidence also showed that Mr. Motovich routinely cashed checks over $10,000.  Of the hundreds of checks it presented at trial, dozens of them were over $10,000.  *See, e.g.*, J.A. 496-497 (presenting a binder of checks, including checks for $11,500, $12,225, $12,260, $12,600, and $13,000); J.A. 730 (presenting checks for $16,000, $20,000, and $25,000).

9

Additionally, the government elicited testimony from cooperating-witness contractors regarding their reasons for seeking cash from Mr. Motovich, rather than at a check-cashing store that would charge lower fees. The first testified that he went to Mr. Motovich both because he did not want a "record" created from his cashing checks, and because Mr. Motovich helped him "get more business[], more work" and negotiate with developers when they did not pay him. J.A. 332. He also explained that Mr. Motovich would hold checks for him for a few days when he did not have sufficient funds in his account. J.A. 347. The second testified that he went to Mr. Motovich for "convenience" because he did not have to "fill out forms." J.A. 732. He also explained that, unlike a check-cashing store, Mr. Motovich would hold checks for a period of time when he lacked sufficient funds. J.A. 736-737, 761-762. When asked if he knew what a "CTR" was, he said no. J.A. 765. The third testified that he went to Mr. Motovich for "convenience" and because Mr. Motovich "was willing to hold the check[s] for a while" when he lacked sufficient funds for the checks to clear. J.A. 486. He testified that most checks he cashed—whether with Mr. Motovich or elsewhere—were for less than $10,000. J.A. 487. During his testimony, he affirmatively asked counsel to explain what a currency transaction report was. J.A. 488-489.

3. With respect to the bank-fraud counts and the aggravated-identity-theft count, which was based on the bank-fraud counts, the government's

theory was that Mr. Motovich defrauded banks by using bank accounts that were not in his name so that he could "move money through the accounts without the bank's knowing who truly controlled them." J.A. 936. The government called Mr. Sarkinovic, a co-defendant who pleaded guilty and testified against Mr. Motovich as part of a cooperation agreement in advance of his own sentencing. J.A. 514. Mr. Sarkinovic explained that Mr. Motovich directed him to incorporate a number of companies (most with titles referring to contracting or consulting work) and to open bank accounts for those businesses. J.A. 514, 524, 529, 548. The government also called a former bank employee, who testified that Mr. Motovich asked her to open various bank accounts under the names of other people. J.A. 660. Those witnesses testified that Mr. Motovich exercised exclusive control over the accounts. J.A. 514, 524, 529, 548, 660.

As for account usage, the government's evidence showed that Mr. Motovich used the accounts to deposit the contractors' checks and then used the funds in the accounts to pay his expenses. *See, e.g.*, J.A. 695-697. More specifically, a government witness testified that Mr. Motovich often used the company accounts for expenses related to real-estate investment transactions. J.A. 695-700. The witness explained that standard practice for real-estate transactions involves using incorporated entities to limit individual liability; anything else would be "unusual." J.A. 700. The government's evidence also showed that Mr. Motovich used the bank accounts to pay for his personal

11

credit cards. *See, e.g.*, J.A. 807. Bank employees testified that Mr. Motovich's identity and his intentions for the accounts would have been "relevant" to the bank's decision to permit him to open and use the accounts, because banks have rules requiring them to know who their customers are and the purpose for which they are using the accounts. J.A. 642-643, 646-647, 653.

4. Finally, as is relevant here, the government alleged that Mr. Motovich conspired with others to deceive and obstruct the United States in violation of 18 U.S.C. § 371—referred to as a "*Klein* conspiracy" after *United States* v. *Klein*, 247 F.2d 908 (2d Cir. 1957), *cert. denied*, 355 U.S. 924 (1958). The indictment charged that Mr. Motovich conspired with others to impede, impair, obstruct, and defeat the "lawful Government functions of the Internal Revenue Service of the Department of the Treasury in the ascertainment, computation, assessment and collection of revenue" related to (1) "payroll taxes"; and (2) "income taxes." J.A. 73-74. As "overt acts" in furtherance of the conspiracy, the government alleged that (1) Mr. Sarkinovic opened accounts at financial institutions for "shell companies" that he had incorporated at Mr. Motovich's direction; (2) Mr. Sarkinovic "misrepresented the true purpose of the transactions" in those accounts to at least one bank representative; and (3) Mr. Motovich's secretary requested, at Mr. Motovich's direction, that wire transfers be made to and from various bank accounts for the "shell companies." J.A. 74-75.

As to payroll taxes, the three cooperating contractors testified that they used the cash from Mr. Motovich to pay their workers without reporting those payroll payments to the IRS. J.A. 324, 455-456, 727. The contractors explained that Mr. Motovich directed them to indicate in the memo line of their checks that the checks were for either subcontracting work or supplies, and to make their checks out to the companies in which he had an interest. J.A. 341, 478, 729, 731. When the check indicated it was for subcontracting work, Mr. Motovich gave the contractors certificates of insurance that a subcontractor would be expected to provide to their general contractor as proof of insurance in the event of an audit. J.A. 335, 731. Mr. Motovich also prepared invoices for the transactions. J.A. 479, 541-542, 843. Toward the end of its case, the government introduced evidence concerning Mr. Motovich's personal income taxes. J.A. 769. The government alleged that Mr. Motovich owed taxes on the income he received from the checks but did not pay the taxes because the checks were deposited in the company bank accounts. J.A. 865-866, 940-941.

### D. The Jury Instructions

At trial, the district court adopted a consolidated approach to preserving objections. Before trial, the court instructed counsel that, "to the extent that you have made objections and they have been overruled, your record is preserved." J.A. 295. The court further explained that, "if, for example, you objected to document X, and the defense says I don't think that should come in

13

and the Government says I think it should, and I ruled in favor of the Government, your objection is preserved." *Id.* Before the charge conference, the court again reiterated that "any objections you make that are overruled are preserved for the appellate process so you don't have to burden the record with stating expressly that you're reserving your objections." J.A. 899. Ahead of the charge conference, Mr. Motovich made jury instruction requests as to three specific counts that the district court overruled.

1.      The first concerned the meaning of a "money transmitting business" under 18 U.S.C. § 1960.  Section 1960 makes it unlawful knowingly to operate "an unlicensed money transmitting business," which the statute defines as "a money transmitting business which affects interstate or foreign commerce" and is (a) operated without a state license; (b) fails to comply with the registration requirements in 31 U.S.C. § 5330; *or* (c) involves the transmission of funds tied to criminality.  18 U.S.C. § 1960(b).  Before trial, Mr. Motovich requested a jury instruction on the Section 1960 count that would have required the jury to determine that he both accepted checks *and* transferred the funds from those checks elsewhere.  Specifically, he proposed an instruction that a "money transmitting business" "receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates."  J.A. 154-155 (quoting *United States* v. *Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999), *cert. denied*, 531 U.S. 823

14

(2000)). He explained that his proposed instruction flowed directly from Section 1960's definition of money transmitting and this Court's precedents applying Section 1960. *See id.*

The district court rejected Mr. Motovich's proposed instruction, agreeing with the government that the language of the instruction should "be closer to the language in 31 U.S.C. § 5330(d)(2)." J.A. 99, 906-908. Mr. Motovich objected, explaining that this Court had already squarely rejected that approach when it held in *United States* v. *Mazza-Alaluf*, 621 F.3d 205, 210 (2d Cir.), *cert. denied*, 562 U.S. 1035 (2010), that "money transmitting business" in Section 1960 should not be defined by cross-applying the definitions from 31 U.S.C. § 5330(d). J.A. 907; *see also* J.A. 154 n.4. The district court nonetheless adopted in substance the government's proposal. J.A. 907. It instructed the jury that an unlicensed "money transmitting business" "accepts currency and/or checks for transfer." J.A. 974. At no point did the district court clarify to the jury that Mr. Motovich must have not only accepted checks for transfer, but also transferred the funds from those checks to another person or place.

2. As for the currency transaction reporting count, the government's theory was that Mr. Motovich was liable as a principal for causing his check-cashing business to violate Section 5322. J.A. 976; *see* 18 U.S.C. § 2(b). Section 5322 criminalizes only "willful" violations. 31 U.S.C. § 5322(a). So Mr. Moto-

15

vich requested that the court instruct the jury that a financial institution "willfully violates" the reporting requirements only if it "knew of [them] and acted with specific intent to violate" them. J.A. 158. Instead, the district court instructed the jury that Mr. Motovich could be guilty of violating Section 5322 if the jury found that (1) the business "failed" to file the reports; (2) Mr. Motovich "will[ed]" the business not to file the reports; and (3) he "intentionally caus[ed]" it not to do so—regardless of whether he knew that failing to file the reports violated a specific legal duty. J.A. 975-976.

3. Finally, as for the conspiracy-to-defraud count, Mr. Motovich asked that the jury be instructed that it "must unanimously agree which object of the conspiracy the members agreed to commit" in order to convict. J.A. 176. The court declined to include that proposed language in its draft instructions. At the charge conference, Mr. Motovich proposed an alternative, still aiming for an instruction that would clarify for the jury the necessity of finding that each co-conspirator agreed on the object of the conspiracy. *See* J.A. 905-906. He requested that the jury be instructed that it needed to find that "each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal," *i.e.*, that the conspirators "agreed on the essential nature of the plan." J.A. 231-232. The district court rejected both those requests, and Mr. Motovich expressly objected as to the denial of the second. *See* J.A. 905-906. The court instead instructed the jury that it needed to find

16

that "two or more persons entered into the charged agreement to defraud the U.S.," and that the "object the defendant is alleged to have agreed to accomplish is to defraud the U.S. by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS" in "computing, assessment, and collection of the revenue, specifically, payroll taxes collected pursuant to the FDIC and FICA and income tax laws." J.A. 983-984.

### E.    The Verdict And Post-Trial Proceedings

1.    On July 30, 2024, the jury acquitted Mr. Motovich of the charges of witness tampering and money-laundering conspiracy and convicted him of the remaining charges for operating an unlicensed money transmitting business, failing to file currency transaction reports, money laundering, bank fraud and related conspiracy, aggravated identity theft, and conspiring to defraud the United States. *See* J.A. 1005. Mr. Motovich moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the government's evidence was insufficient to sustain a verdict on any of the counts. J.A. 841-842, 1073-1074. The district court denied the motion. J.A. 841-842, 1075-1076.

2.    On November 19, 2025, well over a year after his conviction, the district court sentenced Mr. Motovich to 180 months of imprisonment, to be followed by two years of supervised release, as well as a $1,600 assessment. S.A. 1-15.

17

The district court also ordered Mr. Motovich to forfeit $38,298,867.85 in the form of a money judgment; that amount was based on the full value of the funds in the entities controlled by Mr. Motovich. S.A. 22-27.[2] It further ordered that Mr. Motovich forfeit the Midwood Lumber property; his family's home; and certain items seized from his home. S.A. 22-23. Finally, the district court determined that Mr. Motovich was liable for restitution based on "tax harm" to the government, but it deferred its determination of the precise amount until a later hearing. J.A. 1100.[3]

This appeal follows.

---

[2] On December 11, 2025, the government requested that the district court amend the forfeiture judgment down to $25,406,394.50. *See* J.A. 1106. The government explained that it had requested the $38 million figure based on a "value of the funds" calculation that the district court explicitly rejected at sentencing. *Id.* That issue remains pending before the district court.

[3] The district court has yet to determine the final restitution amount. Mr. Motovich reserves the right to challenge the district court's order of restitution, as well as the calculation of tax loss underpinning that order, in a separate appeal. *See Manrique* v. *United States*, 581 U.S. 116, 125 (2017).

18

## SUMMARY OF ARGUMENT

The proceedings below were riddled with error. The district court omitted essential elements from two separate jury charges. It allowed the jury to convict Mr. Motovich of running a "money transmitting business" without finding that he transmitted any funds. And it gutted the knowledge requirement for currency reporting violations by failing to instruct the jury on the correct mens rea. Moreover, it failed to give a necessary unanimity instruction to protect against a substantial risk that the jury convicted without being unanimous about the object of the conspiracy to defraud. Finally, the government sustained bank-fraud and related convictions by relying on a theory of bank fraud that is impermissible as a matter of law: the right-to-control theory of fraud that the Supreme Court has rejected. Those errors warrant reversal on the money transmitting count (Count 1) and the bank-fraud and related counts (Counts 3-7 and 16), and vacatur and a new trial on the remaining counts.

I. Mr. Motovich's conviction for operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960 should be reversed, or at a minimum vacated, because the government did not prove that Mr. Motovich ran a business that transmitted any funds.

A. Section 1960 prohibits "knowingly conduct[ing], control[ling], manag[ing], supervis[ing], direct[ing], or own[ing] all or part of an unlicensed

19

money transmitting business." 18 U.S.C. § 1960(a). This Court held in *United States* v. *Bah*, 574 F.3d 106 (2009), that the mere receipt of funds does not violate Section 1960 and that transmission of the funds is required. That follows from the statute's text: "transmitting" means that money must be transferred, not just received. And the definitions in Section 1960(b) confirm that transfer on behalf of a member of the public is required. In holding to the contrary, the district court relied on the fact that Section 5330 of Title 31 defines "money transmitting business" more broadly to include businesses, like check-cashing businesses, that simply receive funds. But this Court has consistently rejected the argument that Section 5330's definition should apply for purposes of the criminal prohibition in Section 1960.

B.     This Court should reverse the money transmitting conviction because the government presented no evidence that Mr. Motovich received funds that he subsequently transferred to another person or place. Instead, the government's theory of liability was based entirely on the funds that he received and deposited into accounts he controlled. Even viewing that evidence in the government's favor, a rational juror could not find that Mr. Motovich committed the essential elements of a Section 1960 crime.

C.     This Court should at a minimum vacate and remand for a new trial. The district court did not instruct the jury that it must find Mr. Motovich transferred funds—rather than merely accepting them—in order to convict

20

him. Thus, the instructions permitted his conviction for conduct that was not unlawful. That requires at least vacatur.

II. Mr. Motovich's conviction for "willfully" failing to file currency transaction reports in violation of 31 U.S.C. § 5322 should also be vacated. The district court plainly erred by failing properly to instruct the jury as to the mens rea necessary to sustain that conviction.

The Supreme Court held in *Ratzlaf* v. *United States*, 510 U.S. 135 (1994), that a conviction under Section 5322 requires proof that the defendant knew both of the currency transaction reporting obligation *and* that avoiding triggering that obligation is itself unlawful. The jury instruction omitted that requirement, flatly contravening *Ratzlaf*. And that omission constitutes plain error: it violates a clear requirement set out in binding precedent, and it freed the government from establishing a key element for conviction, thereby prejudicing Mr. Motovich's substantial rights and undermining the fairness of the proceedings.

III. The conspiracy-to-defraud conviction should also be vacated. The conspiracy-to-defraud count, which charged multiple possible objects of the conspiracy, created a substantial risk of a non-unanimous jury verdict. And nothing in the jury instructions mitigated the risk of that error. Vacatur of Count 17 is therefore warranted.

A.     Under the Sixth Amendment, a jury cannot convict unless it unanimously finds that the essential elements of a crime were met.  The object of a conspiracy is an essential element of the crime of conspiracy.  And when a conspiracy has multiple objects, the jury must unanimously agree which object or objects the conspirators agreed to bring about.  Here, the government alleged that the conspiracy to defraud had multiple possible objects:  to defraud the IRS as to the contractors' "payroll" taxes, Mr. Motovich's "income" taxes, or both.

B.     Given the breadth of the indictment and the government's evidence and theories at trial, there was a substantial risk that Mr. Motovich's conspiracy conviction was based on a non-unanimous jury verdict.  Some but not all of the jurors could have been persuaded that Mr. Motovich agreed to defraud the IRS with respect to the contractors' payroll-tax obligations, and some but not all could have been persuaded that Mr. Motovich did so with respect to his own income-tax obligations.  Yet the district court did nothing to remove the possibility of a non-unanimous verdict.  That too warrants vacatur.

IV.     The bank fraud, bank-fraud conspiracy, and aggravated identity-theft convictions must also be reversed.  Each was predicated on the right-to-control theory of fraud that the Supreme Court has held is insufficient.  Under *Ciminelli* v. *United States*, 598 U.S. 306 (2023), the government can sustain a

22

bank-fraud conviction only if it proves a scheme to defraud another of *property*, not of potentially valuable information necessary to make economic choices. The government's theory was that Mr. Motovich committed bank fraud by misrepresenting to banks his identity and the purpose for the accounts he sought to open. Yet the government introduced no evidence that the scheme had the purpose (or effect) of obtaining bank property. At most, the evidence showed that Mr. Motovich deprived the banks of accurate information that they would have used to determine whether they wanted to have him as a customer. It deprived them of the right to control access to their property, but not of the property itself. Under *Ciminelli*, the bank fraud and related charges should be reversed.

## STANDARD OF REVIEW

The Court reviews challenges to jury instructions de novo. *See United States* v. *Prado*, 815 F.3d 93, 100 (2d Cir. 2016). Where the defendant did not object to an instruction, the Court reviews an instructional challenge for plain error. *Id.* And in reviewing the sufficiency of the evidence, the Court asks whether, viewing the evidence in the light most favorable to the government, a rational jury could find beyond a reasonable doubt that the appellant committed each element of the crime. *See United States* v. *Pauling*, 924 F.3d 649, 656 (2d Cir. 2019).

23

## ARGUMENT

**I.    THE MONEY TRANSMITTING BUSINESS CONVICTION SHOULD BE REVERSED, OR AT A MINIMUM VACATED, BECAUSE THE GOVERNMENT DID NOT ESTABLISH THAT MR. MOTOVICH RAN A BUSINESS THAT 'TRANSMITTED' FUNDS**

Section 1960(a) makes it unlawful knowingly to conduct "an unlicensed money transmitting business." 18 U.S.C. § 1960. As this Court has explained, for a defendant to be convicted of operating an unlawful money transmitting business under that statute, the government must prove that the business "transmitted"—that is, transferred—funds. The government introduced no evidence at trial that Mr. Motovich transferred funds to another person or place. Instead, its theory was that Mr. Motovich ran an illegal check-cashing business. As a result, there was insufficient evidence to support the conviction, and this Court should reverse it.

At a minimum, the jury instruction about the meaning of "money transmitting business" under 18 U.S.C. § 1960 was incorrect. Mr. Motovich proposed that the jury should be instructed that "money transmitting" means "transferring funds on behalf of the public by any and all means" and that a "money transmitting business" "receives money from a customer and then, for a fee paid by the customer, transmits that money to a recipient in a place that the customer designates." J.A. 154-155 (quoting *United States* v. *Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999)). The court instead instructed the jury that a "money transmitting business" is "a business that, for a fee, *accepts* currency

24

and/or checks for transfer within or outside the United States," J.A. 974 (emphasis added), omitting the requirement that the funds be transferred or transmitted. That instruction permitted the jury to convict without finding that Mr. Motovich's check-cashing business *transmitted* any funds at all, as required by the plain text of Section 1960 and this Court's precedents interpreting it. That erroneous instruction warrants vacatur and remand for a new trial.

### A. Operating A 'Money Transmitting Business' Requires Transferring Money From One Person or Place To Another

1. In order to obtain a criminal conviction for operating an unlicensed money transmitting business under Section 1960, the government must prove that the defendant transferred funds to a third party or to a different place. Section 1960(a) makes it unlawful to "knowingly conduct[], control[], manage[], supervise[], direct[], or own[] all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960(a). Section 1960(b) provides that "the term 'unlicensed money transmitting business' means a money transmitting business" that affects interstate commerce and either: (1) "is operated without an appropriate money transmitting license" in violation of a state criminal law; (2) fails to comply with the federal "money transmitting business registration requirements under [31 U.S.C. § 5330]"; or (3) "otherwise involves the transportation or transmission of funds" derived from a criminal offense or supporting unlawful activity. 18 U.S.C. § 1960(b)(1). Section 1960(b) also specifies

that "the term 'money transmitting' includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." 18 U.S.C. § 1960(b)(2).

In *United States* v. *Bah*, 574 F.3d 106 (2009), this Court held that Section 1960 covers only businesses that transfer funds, not ones that merely receive money for transmission. *See id.* at 112-113. Section 1960, the Court noted, "explicitly defines 'money transmitting' as 'transferring funds on behalf of the public by any and all means.'" *Id.* at 112 (quoting 18 U.S.C. § 1960(b)(2)). The "statute does not," the Court explained, "mention the *receipt* of money for transmission." *Id.* For that reason, it rejected the argument that operating a business that received money in violation of a New York prohibition violated Section 1960. *See id.* at 112-114.

That interpretation reflects the statute's plain meaning. To "transmit" means to "cause to go or be conveyed to another person or place." *Transmit*, *Webster's Third New International Dictionary* 2429 (1986). A money transmitting business is therefore one that "convey[s]" money from one person or place to another, not one that simply receives funds, even if in furtherance of some unlawful end. Similarly, the definitions in Section 1960(b) make clear that transfer or transmission of the funds is required. Section 1960(b)(2) defines "money transmitting" to include "*transferring* funds on behalf of the

26

public by any and all means." 18 U.S.C. § 1960(b)(2) (emphasis added); *see Transfer, Webster's Third New International Dictionary* 2427 (1986) (defining "transfer" as meaning "to cause to pass from one person or thing to another"). As this Court explained in *Bah*, that "explicit" definition illustrates that transferring is required; it "does not mention *receipt* of money for transmission," and thus mere receipt is not prohibited. 574 F.3d at 112.

Further illustrating the scope of the prohibition, the catch-all clause in Section 1960(b)(1) provides that a business can be an unlicensed money transmitting business if it "otherwise involves the *transportation* or *transmission* of funds" that are derived from or used in a criminal offense. 18 U.S.C. § 1960(b)(1)(C) (emphasis added). That clause underscores that the statute aims to capture actively collecting money from one person or place and distributing that money somewhere else, beyond passive receipt. In short, as *Bah* held, a "money transmitting business" must "transfer[] funds" in order to fall within the reach of the statute. 574 F.3d at 112-113 (citation omitted).[4]

---

[4] This Court addressed meaningfully different circumstances in *United States* v. *Goklu*, No. 24-767, 2026 WL 932952 (2d Cir. Apr. 7, 2026), issued the day this brief was filed. There, the Court affirmed a conviction for operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960 based on evidence that, for a fee, the defendant accepted bitcoin transfers in exchange for cash, and cash in exchange for his transferring bitcoin. *See id.* at *1. That evidence was sufficient, the Court explained, because each bitcoin transfer "involved the movement of funds to another location" and, inde-

2.     At trial, the district court accepted the government's argument that Section 1960 does not require that the funds be "transfer[red]." J.A. 906-908; *see also* J.A. 99. The court took the view that 31 U.S.C. § 5330(d)(1)(A), the federal registration provision, specifically defines "money transmitting business[es]" to include those that "provide[] check cashing." J.A. 907. And it reasoned that, because failing to comply with the Section 5330 registration requirement can make the business unlicensed under Section 1960(b)(1)(B), the criminal prohibition in Section 1960 should be similarly expansive.

Two of this Court's decisions foreclose that interpretation. The Court has already rejected the argument that the meaning of "money transmitting business," as defined by 31 U.S.C. § 5330(d)(1) should cross-apply to Section 1960. In *United States* v. *Mazza-Alaluf*, 621 F.3d 205 (2d Cir. 2010), the Court explained that "Section 5330 states that its definitions apply only for 'purposes of th[a]t section,'" and the Court "decline[s] to apply a definition from one statutory provision to another under such circumstances." *Id.* at 210 (quoting 31 U.S.C. § 5330(d)). The Court further reasoned that Section 1960 "defin[es]

---

pendently, because the defendant's "business involved both incoming and outgoing transmissions of bitcoin." *Id.* at *5-*6. Further, the district court had correctly instructed the jury that "money transmitting" means "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or locations abroad." *Id.* at *2. This case, by contrast, presents none of the complications that inherently attend virtual currency. Moreover, Mr. Motovich requested and was denied an instruction materially similar to the one given in *Goklu*. *See* J.A. 974.

28

'money transmitting' to mean 'transferring funds on behalf of the public.'" *Id.* It thus concluded that grafting Section 5330's definition of "money transmitting business" on to Section 1960 "would render superfluous the latter statute's definition of two of the three words contained in that term." *Id.*

*Bah*, too, reached the same conclusion, rejecting the analogous argument that Section 1960 should be read to cover a business that merely receives funds to match the broader definition in a predicate state law. There, the defendant was indicted for running a "money transmitting business" in violation of Section 1960(b)(1)(A). Section 1960(b)(1)(A) prosecutions parallel Section 1960(b)(1)(B) prosecutions, with the only distinction being that (b)(1)(B) defines the licensing requirement with respect to *federal* law (namely, Section 5330), and (b)(1)(A) defines it with respect to *state* law. In *Bah*, the state licensing requirement at issue was New York's, which covered both (1) businesses that engage in the business of *receiving* money for transmission; and (2) those that actually transmitted the funds. *Bah*, 574 F.3d at 112.

The government argued that, since the defendant was indicted under Section 1960(b)(1)(A), the meaning of "money transmitting business" should be defined by looking to the two businesses covered by New York's registration scheme. *See Bah*, 574 F.3d at 109, 112. Rejecting that argument, the Court held that "the broader prohibitions of the New York statute do not expand the reach of the federal statute." *Id.* at 113. The Court noted that it is

29

"not surprising that the New York statutory prohibition is broader than the federal [one]." *Id.* It emphasized that Section 1960 "was enacted in order to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises," while the "New York statute reflects that state's broader interest in licensing and regulating financial institutions." *Id.* (quoting *Velastegui*, 199 F.3d at 593). So too here: Section 5330's registration requirements serve a broader interest in licensing and regulating, as reflected by the expansive definition Congress adopted for the specific purposes of that section. *See* 31 U.S.C. § 5330(a), (d). But that definition does not expand the reach of the criminal prohibition codified in Section 1960, which focuses on the narrower goal of "identify[ing] and monitor[ing] the *transmission*" of funds. *Bah*, 574 F.3d at 112 (emphasis added). *Mazza-Alaluf* and *Bah* thus plainly establish the error of the instruction here.

### B. The Evidence Was Insufficient To Sustain A Conviction On Count 1 Because The Government Presented No Evidence That Mr. Motovich Transferred Funds

The government resisted the "transfer" requirement, and with good reason: it had no evidence that Mr. Motovich transferred funds. Instead, the government's evidence (viewed in the light most favorable to it) established at most that Mr. Motovich ran an illegal check-cashing scheme, receiving funds in order to facilitate a scheme to defraud the IRS.

30

Indeed, the government's entire theory of the money transmitting count was that Mr. Motovich accepted checks from certain people and, in return, provided them with cash. *See, e.g.*, J.A. 325, 331, 457. Each cooperating witness uniformly testified that, in exchange for his checks, he received cash back from Mr. Motovich personally. *See, e.g.*, J.A. 331, 457, 727. The government itself characterized the scheme that way in its closing argument: "It was a check-cashing business, pure and simple." J.A. 928. The government presented no evidence that any customer designated a third-party recipient for its funds; that any customer came to Mr. Motovich to convey money to a third party; or that any customer asked him to send money to any other account or location. Advancing or loaning funds to a customer—or simply exchanging checks for cash—does not constitute operating a money transmitting business under Section 1960. Reversal of Mr. Motovich's conviction on the money transmitting count, and the money-laundering counts predicated on it, is therefore warranted. *See* J.A. 71, 912.

C. **At A Minimum, Vacatur Is Warranted Because The Jury Instruction On Count 1 Omitted The Transferring Requirement**

Even if the Court were to conclude that the government presented sufficient evidence that Mr. Motovich moved money from one person or place to another on behalf of the public, the Court should vacate Mr. Motovich's money transmitting and money-laundering convictions and remand for a new trial because the district court's instructions omitted the transfer requirement. For

31

that reason, the jury could have convicted Mr. Motovich without finding that he operated a business that transferred money, as Section 1960 requires.

Mr. Motovich's requested instruction relied on this Court's precedents to define "money transmitting" as "transferring funds on behalf of the public by any and all means" and a "money transmitting business" as one that "receives money from a customer" and, for a fee, "transmits that money to a recipient in a place that the customer designates." J.A. 154-155 (quoting *Velastegui*, 199 F.3d at 592). Yet over the defense's repeated objections, the district court instructed the jury that a money transmitting business "accepts currency and/or checks for transfer," without requiring the jury to find that Mr. Motovich did in fact transfer any funds from the checks to a third party or another location. J.A. 974.

The district court's instruction was thus deficient because it allowed the jury to convict for conduct that was not unlawful: the mere receipt of funds. That erroneous instruction justifies vacatur. Given the dearth of evidence of transfer, the government cannot show that it is clear beyond a reasonable doubt that a rational jury would have found Mr. Motovich guilty absent the error. *See United States* v. *Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006). To the contrary, the instruction was deeply prejudicial because Mr. Motovich's primary defense to the Section 1960 charge was that, although he may have *re-*

*ceived* funds, he did not transmit them. J.A. 945. Indeed, as the defense explained in its closing argument, "the question in this case isn't even was he check cashing, the question is was he running an unlicensed money transmitting business," and "not one witness said that [he] transferred money for them." J.A. 945, 951. But the jury instructions omitted that very requirement, allowing the jury to convict even if it agreed with Mr. Motovich on that critical issue.

Indeed, in that respect too, this case is indistinguishable from *Bah*, where this Court concluded that a materially identical jury instruction error justified vacatur. Just as in *Bah*, Mr. Motovich's primary defense to the Section 1960 charge was that, although he may have *received* funds, he did not transmit any. *Compare Bah*, 574 F.3d at 114, *with* J.A. 945. Just as in *Bah*, Mr. Motovich requested that the district court instruct the jury that a Section 1960 conviction requires the government to prove not just the receipt of money but also the transmission of money. *Compare Bah*, 574 F.3d at 113, *with* J.A. 154-155. Just as in *Bah*, the district court failed to offer the requested instruction, misleading the jury "as to the scope of Section 1960" and allowing the jury to convict solely if it found receipt of funds. *Compare Bah*, 574 F.3d at 114, *with* J.A. 974. And just as in *Bah*, despite the copious financial records presented at trial, the government's evidence showed only that Mr. Motovich received funds, not that he transferred anything. *Compare Bah*, 574 F.3d at

33

115-116, *with* pp. 29-30, *supra.* Finally, just as in *Bah*, Mr. Motovich's "defense at trial"—admitting that he engaged in the check-cashing transactions—"amounted to a concession of guilt" under those erroneous instructions. *Compare Bah*, 574 F.3d at 114, *with* J.A. 927. In both cases, the result should be the same: the error warrants vacatur. *See Bah*, 574 F.3d at 114-117.

## II. THE CURRENCY TRANSACTION REPORTING CONVICTION SHOULD BE VACATED BECAUSE THE DISTRICT COURT PLAINLY ERRED BY OMITTING THE WILLFULNESS INSTRUCTION REQUIRED BY SUPREME COURT PRECEDENT

In order to obtain a conviction under 31 U.S.C. § 5322, the government must establish that a defendant acted "willfully." For Section 5322, that means proving that the defendant knew both of the reporting requirement and of his duty not to avoid triggering that requirement, and so acted with the knowledge that his conduct was unlawful. The district court omitted that element from the jury instruction, allowing the jury to convict Mr. Motovich as long as it found that Mr. Motovich intended that his check-cashing business fail to file the reports. That plainly erroneous instruction prejudiced Mr. Motovich, necessitating reversal of his conviction on the Section 5322 count.

### A. The Jury Should Have Been Required To Find That Mr. Motovich Acted With Specific Intent To Violate Section 5322

Count 2 charged Mr. Motovich with causing a Section 5322 violation. *See* 31 U.S.C. § 5322(b); 18 U.S.C. § 2(b). In order to secure a conviction on that count, the government was required to prove that Mr. Motovich knew of the

34

currency transaction reporting requirements and knew that failing to file them was unlawful under Section 5322.  Federal law requires "financial institutions" to file currency transaction reports for transactions involving more than $10,000.  *See* 31 U.S.C. § 5313(a); 31 C.F.R. § 1010.311.  In turn, Section 5322 criminalizes "willfully" violating the reporting requirement while engaging in other unlawful conduct.  31 U.S.C. § 5322(b).[5]

The term "willfully" is a "word of many meanings."  *Bryan* v. *United States*, 524 U.S. 184, 191 (1998) (internal quotation marks and citation omitted).  But the Supreme Court has specifically considered the meaning of that term in Section 5322, the provision at issue here, and determined that, by using the term "willfully violating," Congress "require[d] for conviction proof that the defendant knew not only of the bank's duty to report cash transactions in excess of $10,000, but also of his duty not to avoid triggering such a report."  *Ratzlaf* v. *United States*, 510 U.S. 135, 146-147 (1994).  A defendant's "purpose to circumvent a bank's reporting obligation," the Supreme Court held, does not suffice to sustain a Section 5322 conviction.  *Id.* at 136.  Instead, the gov-

---

[5] In order to convict a defendant for causing a violation under 18 U.S.C. § 2(b), the government must prove that the defendant "caused" another to commit the requisite act with the "mental state necessary to commit the crime he aided and abetted."  *United States* v. *Sampson*, 898 F.3d 287, 304 (2d Cir. 2018) (internal quotation marks and citation omitted); *see* 18 U.S.C. § 2(b).  For that reason, relying on Section 2(b) did not alter the government's burden to prove that Mr. Motovich acted "willfully" within the meaning of Section 5322.

ernment must prove that "the defendant acted with knowledge that his conduct was unlawful," given federal reporting requirements, *id.* at 137, and with the "specific intent" to violate those requirements, *United States* v. *George*, 386 F.3d 383, 391 (2d Cir. 2004).

Judge Sand's *Model Federal Jury Instructions*, which this Court has commended as the "leading treatise" on jury instructions, *United States* v. *Sabhnani*, 599 F.3d 215, 238 (2010), *cert. denied*, 562 U.S. 1194 (2011), reflects the holding of *Ratzlaf*. Those model instructions instruct that a defendant can be found guilty of violating Section 5322 only if he had "knowledge of the reporting requirement and acted voluntarily, intentionally, and with the bad purpose to disobey or disregard the law by not filing the report as required." Judge Leonard Sand et al., *Modern Federal Jury Instructions* § 50B.02 (2026). The district court was thus required to instruct the jury that it could convict Mr. Motovich of causing a Section 5322 violation only by finding that he (1) intentionally caused the check-cashing business to fail to file the reports; and (2) knew that avoiding triggering the reporting requirement was unlawful.

### B. The District Court Prejudicially Erred By Failing Correctly To Instruct On The Mens Rea Necessary Under Section 5322

In the face of clear precedent, the district court failed accurately to instruct the jury on the mental state necessary to convict Mr. Motovich of violating Section 5322.

36

Mr. Motovich's proposed instructions contained the correct mens rea requirement, asking for an instruction that a person "willfully violates" the reporting requirements only if the person "knew of [the requirements] and acted with specific intent to violate" them. J.A. 158; *see also id.* (instructing that the requirement is satisfied if "the alleged business had knowledge of the reporting requirement and acted voluntarily, intentionally, and with the bad purpose to disobey or disregard the law by not filing the report as required"). The court instead instructed the jury that Mr. Motovich could be liable under Section 5322 if he "will[ed] that the alleged unlicensed check-cashing business would fail to file currency transaction reports" and "intentionally cause[d] the alleged unlicensed check-cashing business to fail to file currency transaction reports." J.A. 975-976. That instruction allowed the jury to convict Mr. Motovich as long as it found that Mr. Motovich intended that his check cashing business not file the required reports, omitting the requirement that Mr. Motovich must also have known that avoiding triggering the reporting requirement was itself unlawful.

Even if this Court reviews that instruction for plain error, it readily meets the standard: omitting a required element of mens rea in the face of binding Supreme Court precedent is a quintessential plain error. *See United States* v. *Prado*, 815 F.3d 93, 100-102 (2d Cir. 2016) (finding plain error where jury instruction misstated the mental state required to convict under Supreme

37

Court precedent). The omission satisfies each element of the plain-error standard: (1) the instruction "misle[d] the jury as to the correct legal standard or d[id] not adequately inform the jury on the law," and that error (2) is clear under Supreme Court and circuit precedent, (3) affected Mr. Motovich's substantial rights, and (4) significantly affected the fairness of the proceedings. *Id.* at 100 (internal quotation marks and citation omitted).

*First*, it is textbook plain error to give an instruction that misstates an element of the charged crime, as construed by the Supreme Court. *See United States* v. *Omotayo*, 132 F.4th 181, 185 (2d Cir. 2025); *Prado*, 815 F.3d at 100. The instruction given here readily falls in that category: it allowed the jury to convict as long as it found that Mr. Motovich intended that the reports not be filed, regardless of whether he knew that failing to file the reports was unlawful as required by *Ratzlaf*.

To be sure, this Court looks at jury instructions in their "entirety," rather than "strand-by-strand," to understand whether they adequately conveyed the law to the jury. *Saint-Jean* v. *Emigrant Mortgage Co.*, 129 F.4th 124, 147 (2d Cir. 2025) (internal quotation marks and citation omitted), *cert. denied*, 2026 WL 79895 (U.S. Jan. 12, 2026). That does not help the government here, however, because the district court did not "invite[] or permit[]" the jury to "rely" on another instruction that approximates the correct standard. *United States* v. *Ferguson*, 676 F.3d 260, 276 (2d Cir. 2011). Instead, for

the currency transaction reporting count, it specifically instructed the jury: "'The meaning of the term "willfully caused" can be found in the answers to the following questions,'" including whether Mr. Motovich "willed" that his check-cashing business failed to file the reports. *Id.*; *see* J.A. 976 (using identical language as in *Ferguson*, *supra*).

Even setting aside the district court's erroneous count-specific instruction, no other jury instruction adequately conveyed the specific-intent version of "willfully." For instance, the court's general instructions to the jury defined "willfully" as acting with "knowledge that one's conduct is unlawful" or "the bad purpose to disobey or disregard the law." J.A. 970. But as this Court has explained, that general definition of "willfully" holds the government to a lower burden than the "heightened willfulness standard" of *Ratzlaf*. *United States* v. *Kukushkin*, 61 F.4th 327, 333 (2d Cir. 2023). "Willfully" under Section 5322 requires proving more than that the defendant acted with "knowledge of the conduct's general unlawfulness"; it requires proving that the "defendant ha[d] specific knowledge of the particular law that he was charged with violating." *George*, 386 F.3d at 391-392.

Nor was the erroneous instruction cured by the district court's explanation that the indictment alleged that Mr. Motovich "for the purpose of evading the reporting requirements of . . . Section 5313(a) . . . did knowingly and

39

willfully cause" a domestic financial institution to fail to file currency transaction reports. J.A. 975. That is because the "willfully cause" language simply parrots the general standard for aiding-and-abetting liability under Section 2(b)—which falls short of the heightened willfulness that *Ratzlaf* requires. *See* 18 U.S.C. § 2(b). And regardless, merely reading the indictment does not relieve a court of its duty directly to instruct the jury on the required elements of the crime. *See, e.g.*, *United States* v. *Gallerani*, 68 F.3d 611, 618 (2d Cir. 1995).

*Second*, the error prejudiced Mr. Motovich's substantial rights and undermined the fairness of the proceedings. This Court has explained that an erroneous jury instruction meets those two requirements, justifying reversal, if "there is a reasonable probability that the error affected the outcome of the trial." *Prado*, 815 F.3d at 102-103 (internal quotation marks omitted). Here, that requirement is met. The jury instruction held the government to a "much less demanding standard" than the law requires. *Omotayo*, 132 F.4th at 196. Even viewing the evidence in the light most favorable to the conviction, there is a "reasonable probability that the jury would have acquitted" on the currency transaction reporting count had the jury been properly instructed. *Prado*, 815 F.3d at 103.

Mr. Motovich's knowledge that it was illegal to avoid triggering a report was in dispute throughout the trial, and indeed formed the core of his defense

40

on the money transmitting count. J.A. 951. As the defense explained in closing arguments, there was no evidence that Mr. Motovich knew he was operating a financial institution, placing him within the law's purview. *Id.* Mr. Motovich testified that he did not think he was acting like a financial institution, J.A. 843, and as the government's own evidence showed, the contractors that went to Mr. Motovich for cash had been family friends for years, J.A. 343, 482-483, 759.

Moreover, there was "no evidence he knew anything about" a reporting requirement. J.A. 951. Of the thousands of records the government reviewed, it could present only two communications, highlighted in its closing argument, that it claimed supported Mr. Motovich's knowledge that his conduct would trigger the reporting requirement. *See* J.A. 927. In the first communication, Mr. Motovich asked an unidentified recipient to "make 2 checks from tnt for 10 each, not in the same order." J.A. 934, 1015-1016. In the second, Mr. Motovich told a contractor that he could not cash a check over "8 inch," or $8,000, that day. J.A. 1013. Those documents do not establish beyond a reasonable doubt that Mr. Motovich made those directions because he knew of the $10,000 threshold—especially because the evidence showed that Mr. Motovich was routinely willing to cash checks over $10,000. *See* J.A. 496-497 (presenting a binder of checks, including checks for $11,500, $12,225, $12,260, $12,600, and $13,000); J.A. 730 (presenting checks for $16,000, $20,000, and $25,000). And

41

they certainly do not establish that Mr. Motovich knew that, if a check over $10,000 triggers a reporting requirement, it is unlawful to structure a transaction to avoid that requirement.

The testimony from cooperating witnesses that they cashed checks with Mr. Motovich because they did not want to fill out forms does not help the government either. Those witnesses did not testify that they ever discussed the forms with Mr. Motovich—let alone told him that they did not want to file them. *See* J.A. 332, 732. One even testified to the contrary, explaining that there "was never a point" at which he "discussed currency transaction reports" with Mr. Motovich. J.A. 488. And two of the cooperating witnesses testified that they did not even know what a currency transaction report was—negating the inference that even *they* knew their conduct would trigger a reporting requirement. J.A. 487-489, 765. What is more, at trial, Mr. Motovich explained that he was not "at any point [trying] to act as a financial institution" and never believed that he himself was "a financial institution," meaning that he did not think that Section 5322—which governs only "financial institutions"—imposed any legal duty on him. J.A. 843. Even if he were incorrect in that belief, such a mistaken belief negates "willfulness," and the jury should have been entitled to consider that when weighing Mr. Motovich's mental state. *See* Sand, *Modern Federal Jury Instructions* § 3A.01. The district court allowed the jury to convict Mr. Motovich without making the requisite finding of state of mind

42

under Section 5322, and that error affected Mr. Motovich's substantial rights and the fairness of the proceedings. *See Prado*, 815 F.3d at 102-103. That was plain error, justifying vacatur.

## III. THE *KLEIN* CONSPIRACY COUNT MUST BE VACATED BECAUSE OF A SUBSTANTIAL DANGER THAT THE CONVICTION WAS BASED ON A NON-UNANIMOUS VERDICT

In order to convict Mr. Motovich of the charged conspiracy to defraud the United States in violation of 18 U.S.C. § 371, commonly known as a *Klein* conspiracy, the jury needed unanimously to agree on the specific object of the conspiracy that formed the basis for the conviction. The indictment charged a broad conspiracy, centered around the check-cashing scheme, that it alleged had two criminal objects: defrauding the United States as to payroll taxes and income taxes. The existence of two possible objects, in combination with the complicated evidence at trial, created a substantial danger that the jury convicted without unanimously agreeing on which object or objects of the conspiracy Mr. Motovich agreed with others to bring about. Because the district court did nothing to cure that risk, the conviction on Count 17 should be vacated.

### A. The Jury Was Required To Be Unanimous As To The Specific Object Of The *Klein* Conspiracy

1. The Sixth Amendment guarantees a defendant's right to a unanimous jury verdict. *See, e.g., Ramos* v. *Louisiana*, 590 U.S. 83, 90-93 (2020). In

a federal criminal case, that means that a jury "cannot convict unless it unanimously finds that the Government has proved each element of the offense." *Richardson* v. *United States*, 526 U.S. 813, 817 (1999). In conspiracy cases, "the object of a conspiracy" is, "[w]ithout question," "an essential element of the conspiracy offense." *Gallerani*, 68 F.3d at 617-618 (internal quotation marks and citation omitted). As a result, in order to convict a defendant of conspiracy, the jury must find that two or more persons agreed on the "object" of the conspiracy, *i.e.* "the essential nature of the plan." *United States* v. *Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977) (internal quotation marks and citation omitted).

A single conspiracy can encompass multiple objects. *See Braverman* v. *United States*, 317 U.S. 49, 54 (1942). For example, in *United States* v. *Bernstein*, 533 F.2d 775, *cert. denied*, 429 U.S. 998 (1976), this Court held that an indictment charged a conspiracy with two objects. The overarching goal of the conspiracy was "to defraud the [Federal Housing Administration] by obtaining mortgage insurance on inner city properties." *Id.* at 791. And the two objects of the conspiracy were "brib[ing] FHA officials" to obtain favorable appraisals and "submit[ting] to the FHA false statements . . . in order to obtain approval of the mortgage insurance applications." *Id.* Those objects were "different crimes" that some or all of the co-conspirators committed in furtherance of a "common goal." *Id.* at 792.

44

When the government charges "a conspiracy with multiple objects," as in *Bernstein*, the jury may convict only if it "unanimously agrees on the object the defendant conspired to bring about." *United States* v. *Cole*, 158 F.4th 113, 129 (2d Cir. 2025) (internal quotation marks, citation, and alteration omitted). It is not enough for the jury unanimously to conclude that the defendant entered into the conspiracy scheme that was charged. The jury must also unanimously find that the defendant and one or more co-conspirators agreed on the object of that scheme, *see United States* v. *Sharpsteen*, 913 F.2d 59, 62 (2d Cir. 1990), and that "each defendant knowingly participated in [the] scheme to achieve this particular goal," *United States* v. *Berger*, 224 F.3d 107, 113 (2d Cir. 2000).

2.      That requirement remains just as stringent when the government charges a conspiracy to defraud the United States under 18 U.S.C. § 371. Indeed, this Court has explained that a court must be especially alert "when the government proceeds under the conspiracy-to-defraud clause," because that clause uses "broad, generic terms" that, "standing alone," obscure the requirement that the jury unanimously agree "on the essential nature of the fraud." *Rosenblatt*, 554 F.2d at 41-42.

As the Court explained in *Rosenblatt*, the contrast between Section 371's "offense clause" and its "defraud clause" demonstrates that risk. Section 371 criminalizes both conspiracies "to commit any offense against the United

45

States" (the "offense clause") and conspiracies "to defraud the United States" (the "defraud clause"). 18 U.S.C. § 371. When the government charges a multi-object conspiracy under the "offense clause," the multiple objects are obvious—they are the various criminal statutes that the conspirators agreed to violate. *See, e.g.*, *Sharpsteen*, 913 F.3d at 61. By contrast, when the government charges a conspiracy with multiple objects under the defraud clause, including in a case such as this where it could have instead chosen to charge multiple conspiracies in violation of specific federal statutes under the offense clause, those objects can be obscured. *See Rosenblatt*, 554 F.2d at 40. This Court thus held that, when the government proceeds under the defraud clause, it is not relieved of its obligation to prove agreement between the conspirators "concerning the type of fraud in which they were engaged." *See id.* at 37.

In *Rosenblatt*, the government brought charges under the defraud clause against two conspirators—Brooks, who falsified postal records to obtain checks, and Rosenblatt, who laundered those checks for a fee under the impression that his laundering would conceal tax evasion and illegal kickbacks. *See* 554 F.2d at 37-38. The government argued that, because it had prosecuted both defendants under the defraud clause, it was sufficient to prove that both had agreed to defraud the United States. *See id.* at 40-41. The Court described that argument as "remarkable" and rejected it. *See id.* at 40. Brooks, the Court explained, aimed to defraud the government by "obtaining payment

46

for checks which he had caused to be printed without authorization." *Id.* at 37-38. Rosenblatt, by contrast, "did not know the truth about Brooks' activities" and thought the checks were valid; instead, he thought he was defrauding the United States by "help[ing] some payees evade taxes" and others "conceal kickbacks on government contracts." *Id.* at 38. That mismatch would have been apparent had the government proceeded under the offense clause: Rosenblatt at most could have conspired to aid and abet violations of 26 U.S.C. § 7201 (tax evasion) and 18 U.S.C. § 874 (kickbacks), and he could not have conspired to violate 18 U.S.C. § 2073 (falsifying postal records). *See* 554 F.2d at 39-41. But the choice to proceed under the defraud clause obscured it.

Against that backdrop, this Court warned that "courts must be alert" to situations in which "the government proceeds under the conspiracy-to-defraud clause" where the case "could as easily have been brought under the 'offense' clause." 554 F.2d at 40 (citation omitted); *see also Gallerani*, 68 F.3d at 618 (noting the particular need for "vigilance" given the "broad range of conduct" potentially punishable under Section 371's defraud clause (internal quotation marks and citation omitted)). Such prosecutions must be "scrutinized carefully," and the government must be held to its burden of proving that the conspirators agreed to "the essential nature of the alleged fraud." *Rosenblatt*, 554 F.2d at 40, 42 (internal quotation marks and citation omitted).

47

3.      Here, the indictment charged Mr. Motovich with participating in a conspiracy to "defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions" of the IRS "in the ascertainment, computation, assessment, and collection of revenue, to wit: payroll taxes collected pursuant to the Federal Insurance Contributions Act and income taxes."  J.A. 73-74.  That conspiracy "could as easily have been brought under the 'offense' clause," *see Rosenblatt*, 554 F.2d at 40, in the form of conspiracy to commit the offense of evading payroll taxes, *see* 26 U.S.C. § 7202 (criminalizing the willful failure to pay payroll taxes), and the offense of evading income taxes, *see* 26 U.S.C. § 7201 (criminalizing the evasion of income taxes).  Giving the indictment the careful scrutiny required by this Court's precedents reveals two objectives of the asserted conspiracy:  one was to defraud the United States as to its collection of payroll taxes, and the other was to defraud the United States as to its collection of income taxes.  That means that the jury could not convict Mr. Motovich of the charged conspiracy unless it was unanimous as to which objective or objectives Mr. Motovich and his co-conspirators agreed to pursue. *See Rosenblatt*, 554 F.2d at 40.

**B.      The Prosecution Created A Substantial Danger That Mr. Motovich's Conviction Was Based On A Non-Unanimous Verdict, Which The District Court Did Nothing To Cure**

1.      Here, there was a substantial risk that Mr. Motovich's conviction for Count 17 was based on a non-unanimous jury verdict. At trial, the government presented theories and evidence supporting each objective: avoiding the contractors' payroll taxes and avoiding Mr. Motovich's income taxes.

The bulk of the government's presentation at trial focused on the payroll-tax theory. The government elicited testimony from the three cooperating contractors—who each pleaded guilty to payroll tax evasion and testified pursuant to a cooperation agreement, *see* J.A. 324, 455-456, 732-733—that they sought out this cash in part to evade payroll taxes. *See* J.A. 347, 480-481, 727, 760-761. However, the government pivoted toward the close of its case. It presented evidence that, it argued, showed that Mr. Motovich himself was avoiding paying income taxes through the asserted scheme. *See* J.A. 769, 865-866, 940-941. Mr. Motovich's personal income taxes then played a substantial role in the government's closing argument, in which the prosecutor spotlighted Mr. Motovich's tax returns and invited the jury to compare the income reported to what it argued was evidence of Mr. Motovich's lavish lifestyle. *See* J.A. 930-931, 958. And in its closing argument, the government pressed both theories, arguing that the scheme covered "what [the contractors] owed" as well as "[w]hat Motovich owed." J.A. 940.

49

2.      Given "the complexity of the evidence" and the government's dual theories, as well as the "broad and ambiguous indictment," there was "genuine danger of jury confusion" as to the need for unanimity on an essential element of the conspiracy count. *United States* v. *Estevez*, 961 F.3d 519, 527 (2d Cir.), *cert. denied*, 141 S. Ct. 388 (2020). The prosecution, from indictment to closing argument, created a genuine risk that some jurors could have been persuaded that the object of the conspiracy was to defraud the United States out of the contractors' payroll taxes, while others could have been persuaded that the object was to defraud the United States out of Mr. Motovich's income taxes— yet the jury nonetheless convicted because jurors thought it sufficient that each juror generally agreed that the conspirators had some general intent to defraud. In other words, there was a real risk that Mr. Motovich was convicted of a *Klein* conspiracy without the jury unanimously finding a conspiracy as to either object.

That risk necessitated a specific unanimity instruction on the conspiracy objective. *See Estevez*, 961 F.3d at 527; *see also United States* v. *Lapier*, 796 F.3d 1090, 1097 (9th Cir. 2015) (finding that the district court plainly erred in failing to sua sponte give a specific unanimity instruction in like circumstances). Yet the district court did nothing to "remove[]" the possibility of a non-unanimous verdict. *See United States* v. *Helmsley*, 941 F.2d 71, 91 (2d Cir. 1991), *cert. denied*, 502 U.S. 1091 (1992).

50

Mr. Motovich asked that the jury be instructed that it "must unanimously agree which object of the conspiracy the members agreed to commit" in order to convict. J.A. 176. But the district court declined to include that proposed language in its draft jury instructions; it also declined Mr. Motovich's alternative proposal at the charge conference, which would have clarified for the jury the necessity of finding that each co-conspirator agreed on the object of the conspiracy. *See* pp. 16-17, *supra*. Ultimately, the court simply gave a general instruction, at the beginning of the instructions, that "[the jury's] verdict as to each count must be unanimous." J.A. 970. But it never instructed that the jurors "must all agree on the specific object the defendant agreed to try to accomplish," *Helmsley*, 941 F.2d at 91, or more specifically, as relevant here, that they were required unanimously to agree as to whether the conspirators had agreed to defraud the United States as to payroll taxes or income taxes (or both). To the contrary, the district court instead collapsed the two objects, instructing the jury that the only "object the defendant is alleged to have agreed to accomplish is to defraud the U.S." J.A. 984. Therefore, no jury instruction guarded against the substantial risk of a non-unanimous jury verdict. The *Klein* conspiracy conviction thus was obtained in violation of Mr. Motovich's Sixth Amendment right and cannot stand.

## IV. THE CONVICTIONS ON COUNTS 3-7 AND 16 SHOULD BE RE-VERSED BECAUSE THEY ARE PREMISED ON A RIGHT-TO-CONTROL THEORY OF FRAUD

The government charged Mr. Motovich with bank fraud (Counts 3-6), bank-fraud conspiracy (Count 7), and aggravated identity theft predicated on bank fraud (Count 16). *See* 18 U.S.C. §§ 1344, 1349, 1028A. To convict Mr. Motovich of bank fraud, the government was required to prove that he knowingly executed, or agreed to execute, a scheme to deprive a bank of a traditional property interest. *See Ciminelli* v. *United States*, 598 U.S. 306, 309 (2023). Here, the most the government's proof could have demonstrated was that Mr. Motovich undertook a scheme to deprive the bank of "potentially valuable economic information necessary to make discretionary economic decisions." *Id.* (internal quotation marks and citation omitted). That is insufficient as a matter of law, and the convictions implicated by that error should be reversed.

1. The federal bank-fraud statute criminalizes knowingly executing or attempting to execute a scheme to (1) "defraud a financial institution" or (2) "obtain any of the moneys, funds  . . .  or other property owned by, or under the custody or control of, a financial institution" by means of fraud. 18 U.S.C. § 1344(1)-(2). Under either subsection, the government can sustain a conviction only if it proves the defendant made a material misrepresentation with the intent to deprive the bank of property. *See Shaw* v. *United States*,

52

580 U.S. 63, 69, 72 (2016); *Loughrin* v. *United States*, 573 U.S. 351, 355-356, 362-363 (2014).

In *Ciminelli*, the Supreme Court reiterated that "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests." 598 U.S. at 309. And it reasoned that "potentially valuable economic information necessary to make discretionary economic decisions is not a traditional property interest." *Id.* (internal quotation marks and citation omitted). For that reason, the Court held that "the right-to-control theory is not a valid basis for liability" under those statutes. *Id.*

The Supreme Court has thus drawn a line between schemes that deprive a bank of a property interest and those that merely deprive a bank of information necessary to choose with whom the banks transact business. In the former category, the Court has held that fraudulently transferring funds from the account of a bank customer to other accounts at other institutions constitutes bank fraud because the bank "had property rights in [the customer's] bank account," subject to the *customer*'s "right . . . to withdraw funds." *Shaw*, 580 U.S. at 66. That is, the bank "own[ed]" the funds and "ha[d] the right to use the funds as a source of loans that help the bank earn profits" and "the right to possess the deposited funds against all the world but for the [customer]." *Id.* at 66. Similarly, a scheme to convert forged checks into cash, involving a store depositing the fraudulent checks at banks and obtaining

53

money from customers' accounts at those banks, qualifies as a scheme to obtain bank property. *Cf. Loughrin*, 573 U.S. at 353, 356 & n.3 (taking as given the jury's finding that such a scheme involved an intent to obtain bank property).

By contrast, depriving a bank of its right to information about the true identity of its customer is a quintessential example of the right-to-control theory: it deprives the bank of "the right to make informed decisions about the disposition of [its] assets." *Ciminelli*, 598 U.S. at 315 (internal quotation marks and citation omitted). Indeed, this Court previously held as much in upholding (before *Ciminelli*) a conviction for lying to a bank about the identity of the account controller and its purpose, thereby inducing the bank to enter transactions it otherwise might have avoided. *See United States* v. *Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019). That scheme, this Court explained, amounted to bank fraud because "a reasonable jury could conclude that [the defendant] deprived the financial institutions of the right to control their assets by misrepresenting potentially valuable economic information." *Id.* After *Ciminelli*, that type of scheme is not actionable. *See* 598 U.S. at 313 (citing *Lebedev* as an example of the theory the Supreme Court was repudiating).

2.     The government advanced an impermissible right-to-control theory below, contending that Mr. Motovich committed bank fraud by withholding from banks accurate information about the beneficial owner of and reason

54

for the accounts. *See* J.A. 65. At trial, bank representatives testified, consistent with that theory, that Mr. Motovich withheld information about his identity and business that would have been relevant to their decision to permit him to open and use accounts. *See* J.A. 642-643, 646-647, 653.

But the government introduced no evidence that Mr. Motovich misrepresented his identity for the purpose of wrongfully obtaining bank property, rather than for the purpose of simply keeping his information private. Indeed, as the government explained in closing, its theory was that Mr. Motovich's scheme to defraud had one "objective": "[t]o move money through the accounts *without the bank's knowing who truly controlled them*." J.A. 936 (emphasis added). The government presented no evidence that Mr. Motovich transferred money out of other bank customers' accounts. Instead, the government's theory was that Mr. Motovich became a bank customer and that the banks would have chosen not to do business with him if they had known that the accounts held alleged proceeds of illegal activities. Accordingly, no rational trier of fact could have found that the government proved "the essential elements of [bank fraud] beyond a reasonable doubt" here. *See United States* v. *Leslie*, 103 F.3d 1093, 1100 (2d Cir. 1997) (internal quotation marks and citation omitted), *cert. denied*, 526 U.S. 1030 (1999).

This Court should therefore reverse the convictions for bank fraud (Counts 3-6), bank-fraud conspiracy (Count 7), and aggravated identity theft (Count 16).

## CONCLUSION

The district court's judgment should be reversed and remanded with instructions to enter a judgment of acquittal. In the alternative, the judgment should be vacated and the case remanded for a new trial.

Respectfully submitted,

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM
MASHA G. HANSFORD
ABIGAIL FRISCH VICE
ANNA J. LUCARDI
KRISTA A. STAPLEFORD
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  2001 K Street, N.W.
  Washington, DC 20006
  (202) 223-7300
  kshanmugam@paulweiss.com

APRIL 7, 2026

56

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellants and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1(a)(4), that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 13,096 words.

APRIL 7, 2026

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM