# 25-2986

## In the United States Court of Appeals for the Second Circuit

---

UNITED STATES OF AMERICA,
APPELLEE

*v.*

MARINA KUYAN, KEMAL SARKINOVIC, JOSHUA MARKOVICS,
DEFENDANTS,

DAVID MOTOVICH,
DEFENDANT-APPELLANT

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (CRIM. NO. 21-497)
(THE HONORABLE WILLIAM F. KUNTZ, II, J.)*

---

**JOINT APPENDIX
VOLUME II (PAGES 298-566)**

---

JOSEPH NOCELLA, JR.
ERIK D. PAULSEN
DYLAN A. STERN
ANDREW D. GRUBIN
MATTHEW SKURNIK
UNITED STATES ATTORNEY'S OFFICE,
  EASTERN DISTRICT OF NEW YORK
*271 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-7000
matthew.skurnik2@usdoj.gov*

KANNON K. SHANMUGAM
MASHA G. HANSFORD
ABIGAIL FRISCH VICE
ANNA J. LUCARDI
KRISTA A. STAPLEFORD
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com*

# TABLE OF CONTENTS

Page

### Volume I

District court docket sheet ...................................................................J.A. 1

Indictment, September 22, 2021 (Dkt. 19).......................................J.A. 61

Government's proposed jury instructions,
    May 24, 2024 (Dkt. 248).................................................................J.A. 83

David Motovich's proposed jury instructions,
    May 24, 2024 (Dkt. 251)...............................................................J.A. 148

Order denying motion to suppress and motion to dismiss,
    June 11, 2024 (Dkt. 264).............................................................J.A. 184

Letter requesting supplemental jury instructions,
    July 24, 2024 (Dkt. 318)..............................................................J.A. 231

Trial transcript, July 8, 2024 ...........................................................J.A. 236

### Volume II

Trial transcript, July 9, 2024 ...........................................................J.A. 298

Trial transcript, July 10, 2024 .........................................................J.A. 349

Trial transcript, July 11, 2024 .........................................................J.A. 408

Trial transcript, July 12, 2024 .........................................................J.A. 467

Trial transcript, July 15, 2024 .........................................................J.A. 521

### Volume III

Trial transcript, July 16, 2024 .........................................................J.A. 567

Trial transcript, July 17, 2024 .........................................................J.A. 623

Trial transcript, July 18, 2024 .........................................................J.A. 685

Trial transcript, July 19, 2024 .......................................................J.A. 738

Trial transcript, July 22, 2024 .......................................................J.A. 787

Trial transcript, July 23, 2024 .......................................................J.A. 827

## Volume IV

Trial transcript, July 24, 2024 .......................................................J.A. 861

Trial transcript, July 25, 2024 .......................................................J.A. 901

Trial transcript, July 26, 2024 .......................................................J.A. 943

## Volume V

Government exhibit 1081, email.....................................................J.A. 1013

Government exhibit 1199, extracted text messages....................J.A. 1014

Government exhibit 5003, summary of deposit accounts............J.A. 1072

Joint letter renewing oral Rule 29 motion and opposition,
    September 12, 2024 (Dkt. 357) ................................................J.A. 1073

Order denying renewed Rule 29 motion,
    September 16, 2024 (Dkt. 358) ................................................J.A. 1075

Sentencing transcript, November 19, 2025 .................................J.A. 1077

Notice of appeal, November 24, 2025 (Dkt. 454)..........................J.A. 1105

Letter revising proposed restitution and forfeiture amounts,
    December 11, 2025 (Dkt. 456)..................................................J.A. 1106

PROCEEDINGS                    249

go-without-lunch-day, but then again, do I look like I've missed a lot of meals. Thank you, everyone. We're adjourned for the day. Stay safe. And, again, you can leave everything here. We'll lock up the courtroom for you.

\* \* \* \* \*

(Proceedings adjourned at 4:20 p.m. to resume on July 9, 2024 at 9:30 a.m.)

*LEEANN N. MUSOLF, RPR*

---

250

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------x
                                21-CR-497(WFK)
UNITED STATES OF AMERICA
                                    United States Courthouse
                                    Brooklyn, New York
       -against-
                                    July 9, 2024
                                    9:30 a.m.
DAVID MOTOVICH,

       Defendant.
-----------------------------x

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES

For the Government:     UNITED STATES ATTORNEY'S OFFICE
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201
                        BY:  ERIK DAVID PAULSEN, ESQ.
                             ANDREW GRUBIN, ESQ.
                             MATTHEW CHARLES SKURNIK, ESQ.
                             ROBERT T. POLEMENI, ESQ.
                        Assistant United States Attorneys

For the Defendant:      WACHTELL, LIPTON, ROSEN & KATZ
                        51 West 52nd Street
                        New York, New York 10019-6150
                        BY:  RANDALL WADE JACKSON, ESQ.
                             JESSICA LAYDEN, ESQ.
                                 – and –
                        MEISTER SEELIG & FEIN LLP
                        125 Park Avenue – 8th Floor
                        New York, New York 10017
                        BY:  HENRY E. MAZUREK, ESQ.

Court Reporter:         LEEANN N. MUSOLF, RPR, CCR
                        Phone:  718-613-2489
                        Email:  lmusolf.edny@gmail.com
Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

---

PROCEEDINGS                    251

(In open court; jury not present.)

THE COURTROOM DEPUTY: Docket Number 21-CR-497, criminal cause on trial, United States of America versus David Motovich.

Will the attorneys please state their name for the record, beginning with the Government.

MR. POLEMENI: Good morning, Your Honor.

Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, paralegal Kavya Kannan, and Special Agent Christopher Cabane on behalf of the United States.

THE COURT: Good morning, Counsel. You may be seated.

Ladies and gentlemen of the public, you may be seated as well.

MR. JACKSON: Good morning -- the mic is not on.

Good morning, Your Honor.

THE COURT: Good morning, Mr. Jackson.

MR. JACKSON: Randall Jackson, Jessica Layden, Henry Mazurek on behalf of our client David Motovich. We're also joined by Andy Cepregi. Thank you.

THE COURT: Good morning. Please be seated and thank you all for your patience. We'll make sure your microphone is working. And, Mr. Jackson, I don't know what the issue is, but as my children always say, I'm the last person to call for any tech issues.

**J.A. 298**

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS                    252

All right. Before we bring in the jury, let me ask if there are any issues we need to address, beginning with the Government, and then I will ask defense counsel.

MR. POLEMENI: No, Your Honor.

THE COURT: Any issues?

MR. JACKSON: No, Judge.

THE COURT: All right.

I understand the jury is here if we could please bring them in, Mr. Scott.

Please rise for the jury.

(Jury enters the courtroom.)

THE COURT: Please be seated, ladies and gentlemen of the jury, members of public, counsel.

I want to thank you, ladies and gentlemen of the jury, very much for your promptness. I know it's hot, and the technical legal term is icky, out there, but I really appreciate it. So, please, be seated.

All set? Good to go? Okay. Thank you.

Ladies and gentlemen of the jury, welcome back. As I told you yesterday, we are going to discuss, just briefly, the course of the trial, yet again.

Each side will make an opening statement. And, remember, as I advised you yesterday, that opening statements are not evidence but only outlines of what each party believes the evidence will show. And I say it again, and I cannot say

*LEEANN N. MUSOLF, RPR*

OPENING STATEMENT – MR. SKURNIK     253

it too strongly, that the entire burden of proof is on the Government. The defendant need not prove anything at all. The defendant does not even need to take the witness stand at all, and defense counsel, in fact, does not even need to make an opening statement.

After opening statements, the Government will present its witnesses and the defendant may cross examine them. Then the defendant will have the opportunity to present his witnesses but only if he wishes to do so. He does not have to. If the defendant presents witnesses, the Government may cross examine those witnesses.

After that, once all the witnesses have testified and the Court has admitted into evidence everything that must be admitted into evidence, each side will present its closing argument. Remember, the closing arguments are not evidence.

I will then give you detailed instructions on the law as you are to apply it in this case, and at that point, you will retire to the jury room.

At this point, we now begin opening statements, and we will hear from the Government.

Please proceed.

MR. SKURNIK: This is a case about greed and lies. The defendant, David Motovich, ran a massive financial fraud and told lie after lie to keep it secret. At the core of his fraud, the defendant created fake companies that only existed

OPENING STATEMENT – MR. SKURNIK     254

on paper and used them to run an unlicensed, underground check-cashing operation. The defendant's check-cashing scheme was enormous, and it had one purpose, for David Motovich to get richer by hiding millions of dollars and evading taxes.

Along the way, Motovich didn't care who he had to lie to or who he had to step on to get what he wanted. The defendant lied to banks, he created phony documents, he forged people's signatures, he even stole someone's identity. All of that is why we're here today.

Members of the jury, my name is Matthew Skurnik. I'm an Assistant United States Attorney here in the Eastern District of New York. With me at counsel table are my colleagues from the U.S. Attorney's Office and a special agent from the IRS. Together, we represent the United States in this case.

Now, as you'll learn during this trial, David Motovich owns or controls businesses across Brooklyn. At the heart of this case, are three of the defendant's businesses, all located just a few miles from this courthouse on Coney Island Avenue here in Brooklyn. The first business is a hardware store called Midwood Lumber. You're going to hear a lot about Midwood Lumber during this trial.

From the outside, it looks like any other neighborhood hardware store. On the first floor, customers can walk in and buy hammers, nails, lumber, but there's also a

OPENING STATEMENT – MR. SKURNIK     255

second floor, and customers go to the second floor for a different reason. They go there to pick up stacks of cash from David Motovich which he keeps inside a safe in a secret room behind a false wall in a second-floor office. That cash is at the center of the defendant's fraud.

Now, to understand how that fraud worked, we have to talk about the second business which is just down the street from Midwood Lumber. It's called Coney Island Payroll Services. Now, Motovich didn't own Coney Island Payroll Services, but you'll learn that he was deeply involved with it. Coney Island Payroll is a check casher. If someone has a check and they want to turn that check into cash, they can go to Coney Island Payroll, hand them the check and receive cash in exchange for a fee.

You'll learn that check cashers typically charge a fee of around a couple percent. You'll also learn that whenever someone does a large transaction, anything over $10,000 in cash, check cashers, like Coney Island Payroll, have to file reports with the Government, these are called currency transaction reports. They provide information about the transaction like who's doing it and how much cash is involved to try to help prevent financial crimes.

You'll also learn that the customers of check cashers like Coney Island Payroll tend to be companies that need a lot of cash. For example, if you run a construction

OPENING STATEMENT – MR. SKURNIK     256

company and you want to pay your employees in cash, you first need access to the cash itself. Check cashers are a place to get that cash. Now, there's nothing improper about a business owner getting cash or using it to pay employees so longas the company pays taxes on those cash wages. These are what are called payroll taxes, they fund Social Security and Medicare, but some business owners don't want to pay payroll taxes. They want to pay their employees off-the-books and evade taxes, so for that reason, they don't want to go to a licensed check casher like Coney Island Payroll. They worry that any time that they get more than $10,000 in cash, the check casher will file one of those currency transaction reports and report the cash. This is where the defendant's business comes in.

You'll learn that Motovich created an underground version of Coney Island Payroll, a backroom check-cashing scheme, one that wasn't licensed and that wouldn't file currency transaction reports no matter how much cash the defendant was giving its customer. Motovich ran this operation from a second floor office at Midwood Lumber. It didn't have a name, but it was lucrative. The money was flowing.

So here's how it worked. David Motovich and people working for him created fake companies that only existed on paper. The defendant controlled these companies but he put them in other people's names so that they couldn't be traced

**J.A. 299**

OPENING STATEMENT – MR. SKURNIK    257

back to him.  When customers wanted cash, Motovich would tell them to write out checks to his fake companies and, in exchange for a fee, he would give them cash which he stored in a safe in his secret room at Midwood Lumber.  Now, Motovich's fee was way higher than the fee charged by licensed check cashers like Coney Island Payroll.  He would charge as much as 10, sometimes 15 percent.

So why would someone pay 10, 15 percent to David Motovich when they could walk down the street to a licensed check casher and pay a couple percent?  Because the defendant never reported it so his customers could get lots of cash, 20,000, 40,000, $50,000 at a time without it being reported, and then turn around, pay their employees off-the-books without paying taxes and without getting caught.  And to cover it all up, you will learn that the defendant gave his customers fraudulent documents, like phony invoices, so that they could pretend that those checks they're writing to the defendant's fake companies, were for real business expenses, not for cash.

Of course, to run a backroom check-cashing scheme, you need somewhere to get cash in the first place.  You need a source of supply.  Luckily, the defendant was deeply involved with Coney Island Payroll, the licensed check casher down the street.  The evidence will show that whenever Motovich was running low on cash, he would take tens of thousands of

*LEEANN N. MUSOLF, RPR*

OPENING STATEMENT – MR. SKURNIK    258

dollars from Coney Island Payroll and put it in a safe at Midwood Lumber so that he would be ready when the customer showed up.  You'll learn that Motovich kept his underground check-cashing scheme going for years, that he took in millions of dollars to his fake companies, you'll learn what happened with that money.  The evidence will show that Motovich used money from his fake companies to pay for millions of dollars in credit card charges, to buy diamonds, designer handbags, high-end jewelry, and that he even told some of his check-cashing customers to write out checks to pay to renovate his private indoor swimming pool inside his 47th floor penthouse apartment in Manhattan.

For the scheme to work, though, it had to stay secret.  Motovich didn't want anyone, not the banks, not the IRS, not his own accountants finding out what he was doing, so he lied.  He cheated and he stole to keep it quiet.

I mentioned that these fake companies, the defendant put them in the names of other people.  You'll learn that he promised these people jobs and work if they would open up companies and open up bank accounts and then secretly give control of them to him.  The defendant took advantage of people who relied on him for their livelihood.

The evidence will show that he also took it a step further.  To hide his fraud, the defendant stole the name of an actual, legitimate company, and without telling the owner

*LEEANN N. MUSOLF, RPR*

OPENING STATEMENT – MR. SKURNIK    259

of that company, opened up a bank account in the company's name and ran millions of dollars through it.  You'll learn that the defendant forged a different business owner's signature over and over and over again so that he could create fake documents to give to his check-cashing customers, and you'll learn that the defendant and an accomplice stole a worker's identity, used it to open up a bank account in the workers name and then funneled millions of dollars through the account without the worker knowing.

Through all of this, Motovich and his accomplices lied constantly, and when law enforcement officers started investigating, you'll learn that the defendant took steps to interfere in that investigation.

For his conduct, Motovich is charged with a number of federal crimes.  These include Operating an Unlicensed Money Transmitting Business, Failure to File Currency Transaction Reports, Bank Fraud, Money Laundering, Aggravated Identity Theft, Conspiracy to Defraud the United States, and Obstruction of Justice.

Now, as the Government, we bear the burden of proof.  We have to prove that Motovich committed these crimes beyond a reasonable doubt.  We welcome that burden, and to meet it, we're going to show you evidence that takes you inside the criminal conspiracy.  You're going to hear from some of the defendant's own accomplices.  You'll hear from some of his

*LEEANN N. MUSOLF, RPR*

OPENING STATEMENT – MR. SKURNIK    260

check cashing customers.  They'll tell you about how they would meet the defendant in his second floor office at Midwood Lumber to write out checks to his fake companies and pick up tens of thousands of dollars in cash.  You'll hear from a worker who was promised jobs and projects if he would open up companies and open up bank accounts and then secretly give control of them to him.

Now, some of these witness have pled guilty to federal crimes and are cooperating with the Government.  They're hoping that when they get sentenced, they'll get a lesser sentence because they helped the Government.  You should listen to their testimony carefully.  When you do, we expect you'll see that it's supported by the other evidence in the case, like emails and text messages between the witness and the defendant, by the records used to set up the fake companies, by the checks going to the fake companies, the payments from the fake companies for the defendant's benefit, and the fraudulent documents to cover it all up.

Finally, you're going to hear from the victims, from the people whose identities were stolen, whose signatures were forged and who were lied to over and over and over again all so David Motovich could get richer.  And at the end of the trial, after you've seen and heard all the evidence, we'll come back before you and ask you to return the only verdict consistent with that evidence, guilty on all counts.

**J.A. 300**

*LEEANN N. MUSOLF, RPR*

Case: 25-2986, 04/07/2026, DktEntry: 46.1, Page 7 of 272

OPENING STATEMENT - MR. JACKSON 261

Thank you.

THE COURT: We will now have opening argument from defense counsel. Again, I remind you, opening arguments are not evidence. They are arguments.

MR. JACKSON: Can you hear me okay, ladies and gentlemen? Thank you.

Exactly 100 years ago, one of the most famous books ever was written and published. It was a book about the subject of criminal trials and how disconnected the prosecutor's accusations can be from the actual evidence. Written by a man named Franz Kafka, that novel was called The trial. I won't spoil it for you if you haven't read it but the basic gist of it is it's about a man caught up in a trial that doesn't make any sense in terms of the prosecutor's accusations.

The first line of the book, the main character Josef K. gets arrested. He has no idea why. The prosecutors don't give any coherent explanation of the evidence or the charges against him. The trial just goes, and it gets stranger and stranger until, ultimately, Josef K. goes to an authority in the town, a priest, and he says to him he does not understand the evidence and the priest says to him that nothing, nothing has to make sense. All that's necessary is that he just accept it.

Now, there's a word for that, horror, that Josef K.

LEEANN N. MUSOLF, RPR

OPENING STATEMENT - MR. JACKSON 262

feels in that moment as he's listening to that. The word is Kafkaesque, meaning -- and you may have heard that word, maybe not -- but what it means is that nightmare-ish feeling when the prosecution is attempting to make you believe something that is not going to correspond with your experience, with your understanding of the world, or with the evidence. It's the feeling that what is being presented to you is so disconnected from the reality that you're seeing in the evidence that you begin to question your own sanity. In the modern world, there's a term that's more common for that, that a lot of people use, and that term is gaslighting.

In the time period of Kafka, gaslighting by the authorities was so common --

MR. PAULSEN: Objection.

THE COURT: It's just an argument, Kafka. Overruled.

Go ahead.

MR. JACKSON: Thank you, Judge.

It was so common that basically people in that Eastern Europe that Kafka lived in just accepted it.

Now, luckily, today, in the United States, we don't live in the world of Kafka. We don't live in the Eastern Europe of that time. We're in a federal courtroom with an honorable judge, Judge Kuntz, who is going to give you the law. That is not my job. Judge Kuntz is going to instruct

LEEANN N. MUSOLF, RPR

OPENING STATEMENT - MR. JACKSON 263

you, at the end of the case, on the law, and then at the end of case, you get to make the decision based on the actual evidence of what is fair and what is just, not the prosecutors.

We're not in the world of Kafka, that Eastern Europe of 100 years ago, but that is the world that my client's father, Boris, grew up in.

MR. PAULSEN: Objection.

THE COURT: Overruled. It is just argument. It is Kafka.

Keep going.

MR. JACKSON: He grew up in that same Eastern Europe in Ukraine, which at that time was part of Russia, part of the Russian Empire. And this was a place where total confusion about the law was about as much justice as anybody can hope for. That is not the world that Boris Motovich wanted for himself or for his family. So in the 1970s, he found a way to escape from the Ukraine, from the Russian Empire, USSR at the time, and he immigrated to the United States of America. He got here with nothing, worked as a day laborer, and he worked day and night to try to provide for his family and build a better life.

Now with the help, with the fairness and kindness of friends, eventually, he got business, he got loans from friends, and he was able to start a small family business, the

LEEANN N. MUSOLF, RPR

OPENING STATEMENT - MR. JACKSON 264

business that you heard the prosecutors talking a little bit about, Midwood Lumber.

This was a construction supplies business that was built from the ground up, and Boris and his family poured their blood and their sweat and their tears into that business building it from scratch for years. Boris got married, he had four kids, including my client David, raised them right here in Brooklyn. And Boris never allowed David or any one of his kids to forget the principles that allowed the Motovich family's tough life in a foreign country turn into incredible prosperity here in the United States.

He was taught -- David was taught from the beginning that they should take care of their friends and customers as much as they could, that they should look out for others, try to make sure that Boris -- that the opportunities that Boris got were the same opportunities that other people got, a fair day's wages for a fair day's work, opportunity and help.

As David and his siblings grew up, David tried to teach the same lessons to his four boys and he tried to practice those principles in everything that he did.

Now, the prosecution went through a bunch of stuff that we'll talk about in a second, to try to inflame you about the Motovich family's success, and there is no question, ladies and gentlemen, you're gonna hear the Motovich family got to experience, as a result of incredible hard work,

LEEANN N. MUSOLF, RPR

J.A. 301

Case: 25-2986, 04/07/2026, DktEntry: 46.1, Page 8 of 272

OPENING STATEMENT - MR. JACKSON 265

enormous prosperity. They got to basically live the American dream.

That dream turned into a nightmare in 2021 when this case was brought. Eighteen counts that you are going to see in no way match up with the evidence, in no way match up with the reality that you're gonna see when you actually watch the evidence that comes in on this witness stand.

I know that what the prosecutor just described sounded like a lot. Some of it sounded very bad, but if you're willing, if you're willing to wait, as the Judge instructed you, until all of the evidence comes in, until you've heard from all the witnesses, I'm gonna assure you that when we get to the end of the case, you will see that those accusations, each and every one of them is false and that David did not commit any of the crimes that are charged in this case.

So how is it that we got here? Well, let me just start with a question. How many of you have ever been to a Home Depot? Any of you? How many of you have ever been a local hardware store?

MR. PAULSEN: Objection.

THE COURT: Overruled. It is argument. It is opening argument. We are not going to have hands raised as to who's gone to Home Depot versus Lowes. It is argument. Please continue your argument, which is not evidence. It is

LEEANN N. MUSOLF, RPR

OPENING STATEMENT - MR. JACKSON 266

argument.

So please continue, Mr. Jackson.

MR. JACKSON: Thank you, Judge.

THE COURT: With alacrity.

MR. JACKSON: Alacrity, Judge.

Listen, the evidence -- if you've ever been in a Home Depot or even a big local family hardware store, the evidence is gonna show Motovich -- the Motovich family business, Midwood Lumber, it sells a lot of the same things that you will see in there, drywall, metal for constructions, and, yes, and a tremendous amount of lumber that is used in all kinds of big construction projects. This is what they sell. It's basically the same thing.

But the reality of the situation is that even though Midwood Lumber was a very successful family business, it, in no way, was in position to compete, in the big ways, with companies like Home Depot and Lowes. Home Depot is a company that has $132-billion dollars in revenue a year. So how does a company like Midwood Lumber, which is selling most of the same things, compete? How does a family business compete with the Fortune 500, which you're gonna learn, what the evidence is gonna show you is that the way that they competed was by providing some of the same things that if you have any local family business that you love, and we all love about them, trying to actually care about their customers, trying to

LEEANN N. MUSOLF, RPR

OPENING STATEMENT - MR. JACKSON 267

understand their customer's businesses, treating their customers like cherished friends or family and trying to bring all of that into their business everyday. It was the only way that they could compete because companies at the scale of a -- of a Home Depot or a Lowes can buy goods at a level that, just on price, local family businesses like Midwood Lumber, can't compete with. They have to try to establish close relationship with the customers. And that's what David did every single day, try to look out, understand what his customers actually needed, how could he help them.

I don't know if any of you ever had a time when you were short on money, when you needed something to get by as you're dealing with either a work or any kind of an emergency, one very important way that David tried to help his friends was that when they needed money, David, who had access through the incredible fortune of his family, would try his best to help them. He did everything that he could to provide friends and cherished customers with money when he could.

And the prosecutor eluded to this a little bit but you may be wondering why would any of these customers need money, why would customers of Midwood Lumber, friends of David, need money. Well, the reality is, if you ever looked up -- if any of you ever looked up at any of these tall skyscrapers in New York City and wondered how they actually get built, what actually goes into turning a plot that you see

LEEANN N. MUSOLF, RPR

OPENING STATEMENT - MR. JACKSON 268

in your neighborhood into a tall skyscraper, the reality of that situation is that you have huge developers who do these projects and they hire contractors, and the contractors then hire laborers. Each one of the contractors is dealing with a smaller portion of it than the big developer, and it can be weeks or months, sometimes years, before these contractors get fully paid for what they're doing from the bigger developers, which are backed by the banks and have the bigger things, okay, and in that time, the contractors still have to pay their workers. These are workers who, if you've ever seen these guys out on construction projects, they're there on these days when it's sweltering hot, you can barely take it in the subway because of how hot it is, they're out there on these construction projects when it's freezing cold, they're out there. These contractors have to pay their guys. And, so, they would often have, in between when they were getting paid and when they had to make payroll, shortfalls, and they would have to sometimes come to David for help.

Now, let me say a very brief word about just who some of these employees were. The reality is, and you're gonna see during the course of this trial, the number of these people were undocumented workers. There's no question there were a number of undocumented workers involved. You're gonna learn, during the course of this trial, that a huge percentage of the workers in New York City's construction industry are,

LEEANN N. MUSOLF, RPR

J.A. 302

OPENING STATEMENT - MR. JACKSON          269

of course, undocumented workers because they are necessary. It is an un-- it is a -- it is a market where there is an extraordinary demand for labor and they don't have enough people to do the work. So 63 percent of the people who work on construction projects in New York are immigrants, and almost half of those are undocumented. Those people working hard, these contracts often employ them and they're trying to figure out ways to pay them.

Now, how did David do it? How did David help these contractors, these friends out? Well, basically, what would occur is that sometimes, if someone came to him and they needed cash, and David often had cash because he worked with and he operated a number of businesses that dealt with significant cash including Midwood Lumber, and so if someone said that they needed $10,000 for example, David would say, write me a check, the fee would be different sometimes but it might be $10,400, okay? They would write a check for $10,400 to one of these companies and David would say, I'll hold it until you have the money. He'd hold it, he'd give them $10,000 in cash, and then whenever it was that they actually had the opportunity, he'd cash it and that was that.

Sometimes it would be days, sometimes it would be weeks, sometimes it would be more, sometimes David didn't even get paid. David never asked for more money, whatever upfront fee that they had talked about that he was using to deal with

*LEEANN N. MUSOLF, RPR*

OPENING STATEMENT - MR. JACKSON          270

his cost.

You're gonna learn during this case that, oftentimes, David lost more money. They're talking about greed. David often lost more money, the evidence is gonna show, than he made on this. David didn't need this. To David, these were friends in desperate need of money to deal with whatever it was they were dealing with in their business, maybe paying their workers, maybe something else, and David knew how badly they needed that to keep going and David knew what was going on in terms of how important it was for these businesses to keep going.

David was not, it's important for you to understand, some kind of loan shark, okay? You're never gonna hear during this trial that David ever threatened anyone or anything like that. It is a fact that many of these people asked for the money in cash. And the evidence is going show that there are a bunch of reasons for that, that the prosecutors did not explain to you, why they needed cash.

But, look, we've already talked about one of them, right, which is that many of these people were undocumented. And David did not get into the details of why people borrowing money from him needed cash specifically in each situation. He wasn't trying to get into -- he didn't know specifically which ones were using undocumented workers. He had suspicions, like anybody might have suspicions if they've ever been to a New

*LEEANN N. MUSOLF, RPR*

OPENING STATEMENT - MR. JACKSON          271

York City restaurant or ordered Grubhub, that there might be people undocumented working. All he knew -- all he knew is that they needed this money and he tried to help them out and provide it.

You're gonna learn during the course of this case, as the prosecutors said in their opening statement, it is still not illegal in this country to use cash.

Now, the prosecutors have talked about these fake, supposedly fake companies, and it is a fact that, oftentimes, when people would write these checks, they would go to different companies that David had either affiliation with or he was deeply involved with, whatever, we'll talk more about that in detail when we hear the evidence. And the prosecutors have called them fake companies, they've called them shell companies, whatever they've called them, all that is laughable because the evidence is going to show that these companies were doing real work, and you're gonna see that. And more importantly, the fact that the companies were doing transactions, you're gonna see during the course of the case, is something that is a normal part of many businesses. If any of you ever seen the work chart of a big corporation, you've seen holding companies and different subsidiaries that are used for different transactions, this is a normal part of business in America and a normal part of what a lot of individuals do in terms of using an LLC to buy a house for

**J.A. 303**

*LEEANN N. MUSOLF, RPR*

OPENING STATEMENT - MR. JACKSON          272

privacy, whatever. Nothing about this you're gonna see during the course of the case was improper from a structural standpoint.

Now, I want to tell you upfront, okay, David is a good man but he is not a perfect man. And you are going to see, during the course of this case, that there were, as the prosecutors suggested, some occasions where there were workers' comp insurance certifications they were utilizing in this case that were not authentic. And if this case was about the question of whether or not there were ever workers' comp insurance certifications that were not authentic, that were fake, this would be an extremely short trial because we're not arguing about that. But this is not going to be a short trial because that's not what the case is about. And you are going to be stunned at how many times they try to point to these documents over and over again. And when you get the instructions on the law from the Judge at the end, you're gonna see that that information was utterly irrelevant to the actual charges.

The evidence is also going to show they talked about supposed witness tampering. Well, the evidence is going to show that all that occurred is that when one of David's friends, along with a number of other people, when the IRS began harassing everyone in David's life during the course of this investigation, David suggested to someone that they

*LEEANN N. MUSOLF, RPR*

Case: 25-2986, 04/07/2026, DktEntry: 46.1, Page 10 of 272

OPENING STATEMENT - MR. JACKSON 273

should get a lawyer before getting interrogated by the IRS. He even offered to help out with money.

You're gonna see, when you hear all of the evidence and you hear the law, that is not witness tampering. That's going to be one of several attempts to gaslight you that the prosecutors are going to attempt during this case, and I'm just going to go through a few others before I wrap up.

They're going to try to gaslight you into believing that a man is guilty of bank fraud, of defrauding a bank where he didn't engage in any attempt to defraud the bank, and he didn't steal a dime from any bank.

The prosecutor used the word "greed" repeatedly in his opening statement. You're gonna see that that's a joke. They're also going to attempt you to get -- attempt to gaslight you into believing that David was running an unregistered interstate and international money transmitting business, as the prosecutor was getting at in his opening statement.

When you actually see the evidence, you're going to see that all that was occurring is David is loaning money to friends in Brooklyn, no transfer. Nevertheless, they're gonna argue that you should just accept it.

(Continued on the following page.)

LEEANN N. MUSOLF, RPR

OPENING STATEMENT - MR. JACKSON 274

(Continuing.)

MR. JACKSON: They're going to try to get you to accept that David should be held responsible for failing to file currency transaction reports. That's one of the things the prosecutor mentioned, these CTRs, the currency transaction reports. And you're going to learn that this is a requirement imposed on financial institutions. The evidence is going to show David himself, the man sitting in the courtroom, was not a financial institution, was not a bank, and this idea is ridiculous.

They're going to try to gaslight you into believing that David is a money launderer. You're not going to see any evidence like what you've seen on Ozark or Breaking Bad; no laundromats, no restaurants, no attempts to clean up dirty money. The only evidence is going to be David doing legitimate transactions with his own money.

They're going to try to gaslight you into believing that David stole a man's identity who he doesn't even know, that he may have passively met once. Doesn't even know. His friend had as a signatory on an account. And by the way, you're going to learn, the evidence is going to show there's nothing wrong with somebody being the signatory on an account that other people have involvement in. But regardless, the evidence is going to show David did not steal this man's identity at all.

Kristi Cruz, RMR, CRR, RPR, Official Court Reporter

OPENING STATEMENT - MR. JACKSON 275

Finally, they're going to try to gaslight you into believing that David somehow conspired to defraud the U.S. Government, even though they're not going to offer any evidence, zero evidence that David tried to steal any money from the U.S. Government. What they are going to attempt to show and what the judge's preliminary -- when the Judge went through the preliminary description of the charges, what you'll see is this charge is about the supposed idea of obstructing the work of IRS agents, basically somehow making IRS agents' jobs more difficult. And you're going to see when the evidence comes in that just like the rest of these charges, that charge is ridiculous. Like some kind of bad magician. Have you ever seen a bad magician?

The prosecutors are going to point at everything in the world except what matters, and they'll try to misdirect you from the actual evidence that matters to the actual charges. They're going to try to wave in front of you all of the handbags and jewelry that David bought for his wife, who he happens to love, and point that out as some kind of evidence of something and it's not going to mean anything. They're going to focus more on purses and handbags than they are on real evidence.

I'm going to wrap up, but let me just give you a few additional quick things that you're going to see.

First, as Judge Kuntz already instructed you, the

Kristi Cruz, RMR, CRR, RPR, Official Court Reporter

OPENING STATEMENT - MR. JACKSON 276

Government has an extraordinary burden in this case. It's the highest burden under the law. And under that burden, their job is to eliminate any doubts that you have about this case whatsoever as long as they are reasonable. So I'm just asking you, every time as this case goes on you hear things that don't quite make sense, things that create a doubt in your mind about some aspect of this case, please make a mental note of it. That's what's going to matter in termless of your responsibility. You should hold throughout the case the prosecutors to their burden and to answering each and every one of your doubts in this case.

Second, please, please pay close attention to what these witnesses are going to actually say during the course of the case. It's going to be wildly different from what the prosecutors are promising you. They try to downplay the supposed cooperation agreements that these witnesses have reached with the Government. You are going to see that these are people who are testifying only because they were faced with extraordinary jail time. Now, that doesn't mean that everything that they say is a lie. They're going to say a lot of things that are true. But it means if you're applying your common sense and your duty as a juror to be fair, you've got to scrutinize everything that they say very closely. You've got to look at it closely and figure out what makes sense and what you can rely on and what you absolutely cannot.

Kristi Cruz, RMR, CRR, RPR, Official Court Reporter

J.A. 304

OPENING STATEMENT - MR. JACKSON        277

Third, I'm just going to say, as Judge Kuntz already told you, we have no burden in this case. We don't have to do anything. Nevertheless, we're going to prove a lot during this case. We're going to prove a lot to you. But please do not wait for the Government's case to end for the defense case to start, okay? As Judge Kuntz alluded to, we're going to be cross-examining all of their witnesses. Most of their witnesses; some will be so irrelevant it won't be necessary. When we're doing that, that's the defense case. The prosecutors are calling some of the same people we would want to call. So the defense case is beginning now. There might not be any witnesses left by the time we get to the end of the case.

Finally, I just want to say please, please pay attention to what you are not going to see during this case. The incredible lack of evidence. The things that you would expect to see during this case, those are things that you should expect to see during this case. Don't be fooled into thinking that if you're confused about why you're not seeing something, it's because you are somehow missing it. No. Each and every one of you was picked for this jury because you have the ability to make your own determination about what you should be seeing, and I submit to you you're not going to see any of the things during the course of this case that you would expect to see if this case made sense. There is not

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

OPENING STATEMENT - MR. JACKSON        278

going to be a single witness in this supposed fraud case who's going to come in here and say that David stole money from them.

It is very easy, ladies and gentlemen, to fall into a trap of thinking because we're here, because the federal government, these nice prosecutors, is investing all of these resources, that David -- he must have done whatever it is they're saying very confidently that he did. That's not true. And I'm begging you, I am begging you to fight that temptation throughout this entire case if any of you have it. As Judge Kuntz alluded to, David is cloaked in a presumption of innocence throughout this entire case.

In this case, when you look back and you sort of contextualize what you heard during that opening statement, it's going to be like when the prosecutors -- what it's going to be like is, like, if you ever got room service, in other words, some restaurant where they bring out that tray, that silver tray with the cover, and they're promising you one thing, and then when they lift up that tray, there is going to be nothing in there but gaslighting and confusion. That's what you're going to see at the end of the case. And when you say to the prosecutors, no, no, no, I don't want to consume that, they're going to try to force that narrative down your throat anyway. They're going to try to make you just accept it. But you don't have to.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

OPENING STATEMENT - MR. JACKSON        279

David is a man who is presumed innocent by the law, who has never faced any accusations like this in his life. Please try to remember that literally thousands of people have been acquitted in had Federal Court. There's nothing magical about it. It just means the jury's held the prosecutors to their burden and to their responsibility. Sometimes the federal prosecutors just get it wrong.

The last thing I'm going to say and I'm going to stop, I just want to say we could not be, we could not be more appreciative of each and every one of you for the sacrifice and the time that you are putting in to be here. We know this is a burden. We know that this is an incredible sacrifice for you to do this. David's family couldn't be more appreciative. This case is everything to them, and they're all here supporting him.

I submit to you that if you pay close attention to the evidence, if you follow the law as Judge Kuntz is going to instruct you at the end of the case, and if you take your duties as a jury seriously, you're going to come to the only conclusion that's going to be consistent with the evidence and with the law, and that's that my client, David Motovich, is not guilty.

Thank you very much so much for your time. Greatly appreciate it.

THE COURT: We've now had argument, ladies and

**J.A. 305**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

OPENING STATEMENT - MR. JACKSON        280

gentlemen of the jury, and now we're going to have evidence.

Will the Government please call the first witness.

MR. POLEMENI: Yes, Your Honor.

The Government calls Bob Tarwacki.

THE COURT: Will the witness please come forward and be sworn by my Court Deputy.

(Pause in proceedings.)

THE COURT: Please come forward to the witness upon stand and raise your right hand and the Court Deputy will administer the oath to you, sir.

(Witness takes the stand and is sworn.)

THE COURT: Thank you, sir. Please be seated.

I'm going to ask you to pull the microphone that's in front of you, swivel it. It looks like a snake, but it won't bite you. Speak directly into it. Make sure that the jury can hear your words and your voice.

Please state your name and spell it for the reporter, and then counsel will inquire.

THE WITNESS: Robert Tarwacki, T-A-R-W-A-C- K-I.

THE COURT: Thank you.

Please proceed, counsel.

MR. POLEMENI: Thank you, Your Honor.

(Continued on next page.)

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. TARWACKI – DIRECT – MR. POLEMENI      281

(Witness takes the witness stand.)

**ROBERT TARWACKI**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. POLEMENI:

Q    Good morning, Mr. Tarwacki.

A    Good morning.

Q    Where do you work, sir?

A    I work for the New York statement Department of Financial Services.

Q    Is that also known as DFS?

A    Yes.

Q    What is DFS?

A    We are the regulator for all financial institutions in the state of New York.  That includes banking institutions as well as anything dealing with financial insurance.

Q    What is your position there?

A    I'm a criminal investigator.

Q    For how long have you been a criminal investigator?

A    Since 2008.

Q    Prior to becoming a criminal investigator for DFS, what did you do?

A    I was an investigator at the Manhattan DA's office.

Q    What did you do there?

A    The same type of work; financial crimes investigations.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. TARWACKI – DIRECT – MR. POLEMENI      282

Q    Just generally, what does your role and responsibility entail at DFS?

A    In the Criminal Investigation Bureau, we are charged with enforcing the banking laws of the State of New York.  That could pertain to any of the institutions that we regulate; banks, credit unions, mortgage servicers, check cashers, money transmitters.  We are tasked with investigating crimes that may take place at those institutions, as well as assisting prosecutors' offices, both city, state, and federal.

Q    I want to focus on one entity that you mentioned, or one type of entity that you mentioned, check cashing.

      Can you just generally explain for the jury, what is a check cashing business?

A    Check cashing business is a business that charges a fee to basically buy a check from a consumer and issue cash to them.

Q    Does DFS oversee the licensing of check cashing services?

A    Yes, it does.

Q    Generally, what does the licensing process entail?

A    In general, at first there will be an application made to the department by the individuals looking to form the company. They will be vetted via fingerprinting and background checks. There has to be a bond that's posted by the company.  There's a full vetting into their brick-and-mortar institution and how their business will be set up.  If everything is approved,

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. TARWACKI – DIRECT – MR. POLEMENI      283

they will be issued a temporary license, and then eventually a full license to operate as a check cashing institution.

Q    Are all check cashing businesses in New York State required to be licensed?

A    Yes.

Q    Once licensed, are check cashing businesses -- do they undergo examinations by DFS?

A    Yes, generally on a biannual basis.

Q    And what does that entail, generally?

A    There are individual examiners from the licensing unit in the DFS who will go to the location of the check casher, and they will check the financial records to make sure that they are actually matching up with what is being reported on the financial reports which are submitted either quarterly or annually to the department.

Q    Are you familiar, sir, with "know your customer" rules?

A    Yes.

Q    Is that also known as KYC?

A    Yes.

Q    What are "know your customer" rules?

A    KYC rules are put in place to protect both the individuals and the business, and generally it's getting an identification for each customer, whether it's a driver's license or some kind of photo identification, to establish that the customer is actually who they say they are.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

**J.A. 306**

R. TARWACKI – DIRECT – MR. POLEMENI      284

Q    Why are these rules in place?

A    It protects, one, the institution, and it protects the banking institutions that actually fall behind the check casher in this case.

Q    Are check cashers required to have KYC rules and regulations in place?

A    Yes.

Q    Rules and policies, I should say.

A    Yes.

Q    Are you familiar, sir, with the term called "Currency Transaction Report"?

A    Yes.

Q    Is that also known as a CTR?

A    Yes, it is.

Q    What is a CTR?

A    CTR is a requirement of the federal government.  It is a form that must be filled out whenever there's a cash transaction of $10,000 or more.

Q    Could you give an example of a cash transaction of $10,000 or more perhaps involving a check cashing business?

A    Could be a large payroll check, it could be a check to a contractor.  Anything in excess of $10,000, so $10,000 or more would be required to have a CTR filed.

Q    Just step by step, how does the CTR process work?

A    The filing of the CTR is the responsibility of the

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. TARWACKI – DIRECT – MR. POLEMENI          285

institution, in this case the check casher.  They would have an electronic portal which links to the U.S. Treasury, FinCEN; it's the Financial Crimes Enforcement Network.

In this portal, when the transaction is made, they would have to upload the identifying information, so in this case the KYC, which would be the name, address, and any other pedigree information related to the subject.  They would have to record where the transaction took place, how much the transaction was for, and a stated purpose of the transaction.

Q    And you said "subject."  Do you mean the person receiving the cash?

A    Correct.

Q    And does the person receiving the cash, the customer, does the customer know that the CTR is being filed?

A    In some cases, yes, but there's no obligation to inform the customer.

Q    Why do CTRs -- why do we have CTRs?  Why does the federal government require CTRs?

A    They're covered under the Bank Secrecy Act, which is a set of laws that were established to protect banking institutions.

Q    Are you familiar, sir, with an entity called Coney Island Payroll Services?

A    Yes.

Q    What is Coney Island Payroll Services?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. TARWACKI – DIRECT – MR. POLEMENI          286

A    Coney Island Payroll is a commercial check casher licensed by the DFS.

MR. POLEMENI:  At this time, Your Honor, I would ask to be published for the witness only Government Exhibits 229, 230, 231, and 232.

THE COURT:  You may publish to the witness only and show it to opposing counsel at the same time.

MR. POLEMENI:  I have, Judge, and I believe there's no objection.

THE COURT:  Well, I'm going to ask them, do you have the documents in front of you, those exhibits, counsel?

MR. MAZUREK:  Yes, Your Honor.

THE COURT:  Any objection to them be admitted in evidence?

MR. MAZUREK:  No.

THE COURT:  They're admitted.  You may publish them to the jury so they get to see them.

That's how it works.  You decide the evidence, and now you can see it.

Go ahead.

(Government Exhibit 229, 230, 231, and 232, were received in evidence.)

MR. POLEMENI:  Ms. Kannan, if we could start with Government Exhibit 231.

(Exhibit published.)

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. TARWACKI – DIRECT – MR. POLEMENI          287

THE COURT:  Ladies and gentlemen, is it legible to you or is it too faint?

Mr. Scott, do your thing and make it legible to the jurors, please.  You may need to turn down the overhead lights.  Whatever it takes.

Can you read it now, ladies and gentlemen of the jury?  Is it legible to you?

MR. POLEMENI:  Ms. Kannan, if we could maybe --

THE COURT:  Not better?

Mr. Scott, can you turn the lights down a bit?  Perhaps that will help.  Let's not turn them all the way off.  We don't want it to be that kind of a trial.

MR. POLEMENI:  May I move the TV a little?

THE COURT:  Yes.  Whatever you need to do technically.

Can you read it now, ladies and gentlemen of the jury, or is it still too small or faint?

They can't read it, counsel.  It's not going to help if they can't read it.

MR. POLEMENI:  I understand, Judge.

Ms. Kannan, if we can maybe blow up the top two lines?

THE COURT:  Can you read it now?

Now they can read it.  We did practice this, but, you know, what can you do.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. TARWACKI – DIRECT – MR. POLEMENI          288

All right.  Go ahead.

BY MR. POLEMENI:

Q    Mr. Tarwacki, what are we looking at here in Government Exhibit 231?

A    This is a screenshot from the DFS licensing database.

Q    And you see Coney Island Payroll Services; is that correct?

A    Correct.

Q    And underneath, it says Industry, Commercial Check Casher.  What does that mean?

A    It's a check casher, but there are two types of check cashers.  There is a everyday check cashing license and then the commercial check casher, and the distinction is in the fee that is able to be charged.

Q    Generally, what is a commercial check casher?

A    Commercial check casher is an institution that does large volume check cashing, and it's generally for the same customer.  So there's a large -- they will -- they will service other businesses instead of individuals, generally, and they come in with a large volume of checks when they do so.

MR. POLEMENI:  And if you scroll down to the next line, Ms. Kannan.

Q    Does it indicate that --

MR. POLEMENI:  If you can go below Status.  My

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

**J.A. 307**

R. TARWACKI - DIRECT - MR. POLEMENI                289

apologies.

Q   Does it indicate when Coney Island Payroll Services had their license?

A   Yes, it does.

Q   When is that?

A   They were originally licensed in March of 2010.

MR. POLEMENI:  Now, if we go to Government Exhibit 232.

(Exhibit published.)

MR. POLEMENI:  And you can blow up the top two lines, please.

Q   What are we looking at here in Government Exhibit 232?

A   This would be a list of the owners and executive officers of Coney Island Payroll.

Q   Do you see where it indicates the title as President?

A   Correct.

Q   Who is the president?

A   Joseph Richter.

MR. POLEMENI:  If you scroll down, Ms. Kannan, to the next set of lines.

Q   Do you see where it also indicates, Mr. Tarwacki, the title General Manager?

A   Yes.

Q   Who is indicated as the general manager?

A   Jacob Richter.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. TARWACKI - DIRECT - MR. POLEMENI                290

MR. POLEMENI:  If we can turn to Government Exhibit 229.

(Exhibit published.)

Q   What is Government Exhibit 229?

A   It's a screenshot again of the DFS database, and it lists the active employees of Coney Island Payroll.

Q   Are check cashers, including Coney Island Payroll Services, required to inform DFS who their employees are?

A   Yes.

Q   Why is that?

A   The employees must be vetted by the department before they could be hired by the company.

MR. POLEMENI:  If we look at the first line, Ms. Kannan.

Q   Do you see the name that's listed first?

A   Yes.

Q   What is that name?

A   James Cahill.

MR. POLEMENI:  And if you scroll down, Ms. Kannan, to the middle of the page.

Q   Do you see David Richter there, as well?

A   Yes.

THE COURT:  It's still a little bit blurry.  Can you sharpen that up?

Okay.  Go ahead.  Do the best you can.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. TARWACKI - DIRECT - MR. POLEMENI                291

MR. POLEMENI:  Thank you, Judge.

Q   Mr. Tarwacki, before coming here to testify, were you asked to run some searches in DFS's database?

A   Yes.

Q   Were you asked to search for an individual by the name of David Motovich?

A   Yes, I was.

Q   What were you asked to search?

A   As was the case with Coney Island Payroll, we were -- I was asked to search the database to see if Mr. Motovich had any licenses with the DFS for check cashing operations.

Q   And did he?

A   No.

Q   And were you also asked to search for any -- for an address 1169 Coney Island Avenue?

A   Yes.

Q   And what did your search find?

A   There were no licenses associated with that address.

MR. POLEMENI:  Thank you, Judge.

THE COURT:  Any further questions?

MR. POLEMENI:  Nothing further.

THE COURT:  You may cross.

MR. MAZUREK:  Thank you, Your Honor.

**J.A. 308**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. TARWACKI - CROSS - MR. MAZUREK                292

CROSS-EXAMINATION

BY MR. MAZUREK:

Q   Good morning, Agent.

A   Good morning.

Q   My name is Henry Mazurek, and I have the privilege of representing the defendant, David Motovich.

And we have never met before, correct?

A   Correct.

Q   You were just asked questions just moments ago by the prosecutor about searches that you conducted on the New York State Department of Financial Services database, right?

A   Yes.

Q   And that's part of your job as an investigator, right?

A   Yes, it is.

Q   And this database is a New York State database, right?

A   Yes.  It's an internal database.

Q   Okay.  It's an internal database to determine information that's provided to the state, correct?

A   It's provided by the examiners and by licensees, correct.

Q   Of New York State, right?

A   Yes.

Q   You are not a federal agent like from the IRS, right?

A   No, I'm not.

Q   You're not an expert in understanding all of the Treasury regulations that might apply in the United States Department

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. TARWACKI - CROSS - MR. MAZUREK          293

of Treasury, correct?

A     Not an expert.

Q     So when you were --

You were asked in this case to do specific tasks in the investigation and prosecution of Mr. Motovich, correct?

A     Yes.

Q     You were asked to run searches on the DFS database, right?

A     Yes.

Q     That's all you were asked to do, right?

A     Yes.

Q     You've never met my client before, correct?

A     No.

Q     Do you know that he is a manager and operator of a construction company or construction companies?

A     No.

Q     Do you know that he owns and operates a hardware store, a wholesale construction supply center called Midwood Lumber?

A     No.

Q     And when -- you were asked to do searches of a database for financial institutions, is that right, on the DFS website?

A     Could you rephrase the question?

Q     Sure.

THE COURT:  Read it back, please, and keep your voice up.  Madam Reporter, read the question back.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. TARWACKI - CROSS - MR. MAZUREK          294

(Record read.)

THE COURT:  Answer the question.

THE WITNESS:  Yes.

THE COURT:  Next question.

Q     And you said when you did that database search to determine if there were a financial institution that was owned by David Motovich, your answer was there was none, right?

A     Yes.

Q     Okay.  You were also asked questions on this database about Coney Island Payroll Services, right?

A     Yes.

Q     And you said this was a licensed check cashing business in the state of New York, right?

A     Correct.

Q     And your searches --

You were asked to do searches of Coney Island Payroll Services for reporting people who owned Coney Island Payroll Service, right?

A     Yes.

Q     Who were officers of Coney Island Payroll Services, right?

A     Yes.

Q     Who were directors of Coney Island Payroll Services, right?

A     Yes.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. TARWACKI - CROSS - MR. MAZUREK          295

Q     Who were employees of Coney Island Payroll Services, right?

A     Yes.

Q     And when you did all of those things, you determined that David Motovich was not listed as an owner of Coney Island Payroll, right?

A     Yes.

Q     He wasn't listed as a director of Coney Island Payroll, right?

A     Correct.

Q     He wasn't an employee of Coney Island?

A     Correct.

Q     So your investigation that you were asked to do by these prosecutors revealed that David Motovich had no responsibilities with Coney Island Payroll Services, correct?

A     In terms of licensing, correct.

Q     Okay.

Now, you were also asked questions -- I mean, you understand that based on --

How long have you been an investigator now at DFS?

A     Since 2008.

Q     I'm sorry?

A     Since 2008.

Q     Okay.  So that's about 16 years, right?

A     Your math is better than mine.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. TARWACKI - CROSS - MR. MAZUREK          296

Q     That's surprising for a lawyer.

So 16 years at DFS, you understand that there are a number of licenses that New York State provides for banking and non-banking financial institutions, right?

A     Correct.

Q     And when I say "banking and non-banking," you know, banking are the traditional commercial banks that we know about, like JPMorgan Chase or Investors Bank or Banco Popular, right?

A     Yes.

Q     And they have their own set of regulations, right?

A     Yes.

Q     Do you investigate those kinds of banking institutions?

A     Yes, I do.

Q     And then you also have responsibilities for what are called non-banking financial institutions, right?

A     Yes.

Q     And I think we talked about, on direct examination, some of that that's called check cashers, right?

A     One of them.

Q     That's just one of the licenses, right, that --

A     Yes.

Q     For non-banking --

THE COURT:  Hang on.  Don't talk over each other. He has to put the question, a beat, and then answer.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

**J.A. 309**

R. TARWACKI - CROSS - MR. MAZUREK          297

Go ahead.

MR. MAZUREK:  Thank you, Judge.

THE COURT:  You're welcome.

BY MR. MAZUREK:

Q    So non-banking financial institutions also requires licenses in the State of New York, right?

A    Yes.

Q    And one of them that you talked about on direct were check cashers, right?

A    Correct.

Q    And check cashers, let's be clear, I mean, they serve a very important purpose within our local economy.  Is that fair?

A    Yes.

Q    Because, you know, some people live in communities that are underserved by commercial banks, right?

A    Yes.

Q    May not have a local bank in a neighborhood, right?

A    Yes.

Q    So you may have to go to a check casher, correct?

A    That's the purpose of the check casher.

Q    Or, you know, another reason why people may need to go to check cashing is because they need financial flexibility. They can't wait three or four or five business days before a check is cashed, right, by the commercial bank?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. TARWACKI - CROSS - MR. MAZUREK          298

A    Correct.

Q    So you regulate or investigate check cashers as one of the licenses that are provided financial institutions by the state of -- non-banking financial institutions in the state of New York, right?

A    Yes.

Q    And then also, I think you mentioned on direct examination there's something called a money transmittal license, right?

A    Yes.

Q    That's another non-banking financial institution license that's granted by the State of New York, right?

A    Correct.

Q    And that is for non-banking institutions that are in the business of transferring funds from one location to another, right?

A    Correct.

Q    Or from one person or entity to another person or entity, right?

A    Yes.

Q    And that's a completely separate license than check cashers, right?

A    Yes.

Q    And that's called money transmitting businesses, right?

A    A money transmission license.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. TARWACKI - CROSS - MR. MAZUREK          299

Q    A money transmittal license for businesses that are in the business of money transfer or transmittal.

A    Correct.

Q    Okay.  And New York State wouldn't have two licenses for the same thing, right?

MR. POLEMENI:  Objection.

THE COURT:  Read it back.

(Record read.)

THE COURT:  Do you know?

THE WITNESS:  There are instances, such as check cashers, where we have a regular check cashing license and also a commercial check cashing license.

THE COURT:  Next question.

MR. MAZUREK:  Thank you, Judge.

BY MR. MAZUREK:

Q    And there are two separate things, right?  When you say "regular check cashing," that may be for natural persons like me, a person who has a personal check who wants to get it cashed, right?

A    Yes.

Q    And then there are commercial check cashers, which are for business checks, right?

A    Correct.

Q    So they regulate two different things, correct?

A    Yes.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

**J.A. 310**

R. TARWACKI - CROSS - MR. MAZUREK          300

Q    Okay.  Now, my question before, which was probably not artfully posed, I'll restate it:  You talked about money transmittal and check cashing licenses in the state of New York, right?

A    Yes.

Q    And they provide two -- money transmittal and check cashing provide two different sets of services, correct?

A    Correct.

Q    That's why they're two different types of licenses, right?

MR. POLEMENI:  Objection.

THE COURT:  Overruled.  He knows.

Go ahead.

A    Yes.

Q    Now, you talked about the commercial check cashing license of Coney Island Payroll Service, right?

A    Yes.

Q    And I think you said that a commercial check casher is involved in large volume of transactions, right?

A    In most cases.

Q    That is, they can cash checks of -- there are no limits to the amounts of checks except for the liquidity of the business, right?

A    Correct.

Q    So they can cash checks of 50,000, 100,000, 150,000

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. TARWACKI - CROSS - MR. MAZUREK    301

dollars, right?

A    Yes.

Q    And they can charge fees that are not capped by statute, correct?

A    Commercial check cashers do not have fees capped.

Q    Compared to, like, for personal checks where they're capped at 2.2 percent, right, by state law?

A    Correct.

Q    Okay.  But your experience is that for the commercial check cashers in the state of New York, based on all of your 16 years of experience, that the rate for commercial checks that are cashed are not too much higher than the 2.2 percent for personal checks?

A    It's dependent upon the business, from business to business.

Q    So a business could charge -- as I said, there's no regulation, the business can charge higher, right?

A    Yes.

Q    But there's competition in the commercial check cashing business, right?

A    Of course.

Q    Industry.  There are probably, what, there are more than 500 licensed commercial check cashers in New York state?

A    I don't know the exact number.

Q    There are a lot, though, right?

R. TARWACKI - CROSS - MR. MAZUREK    302

A    Yes.

Q    That keeps you busy, correct?

A    Always.

Q    And those commercial check cashers, when you say they're involved in large volume of transactions, they do literally thousands of transactions per year?

A    I couldn't speak unless it was an example.  I don't know, business to business, how much transactions each commercial check casher does.

Q    Do you know that there's more than $1 billion in commercial check cashing that goes through New York state regulated, licensed, commercial check cashers per year?

A    I wouldn't know without looking myself.

Q    You're very experienced about the volume of money that goes through these commercial check cashers based on your service as an investigator.

A    I can safely say there's a lot of money.

Q    If you may not know a billion, in the hundreds of millions of dollars; that's fair to say, right?

A    Again, I wouldn't know without examining the numbers.

Q    Okay.  Well, safe to say that you're not talking about -- when you're talking about commercial check cashers, you're not talking about people who cash, you know, a few checks in a year, right?

A    Correct.

R. TARWACKI - CROSS - MR. MAZUREK    303

Q    That's their business, right?

A    Yes.

Q    And that's their business where they have literally dozens of customers potentially per day, correct?

A    Yes.

Q    And that's what you understood Coney Island Payroll Services to be when you were asked to investigate the DFS database, right?

A    Yes.

Q    And I think as you testified earlier, you are not an expert on the U.S. Treasury regulations that govern money transmitting businesses?

A    Not an expert.

Q    That's not your job, right?

A    It's part of my job, but I am not an expert.

Q    It's part of your job to know that there are a separation between federal regulations and New York State regulations, right?

A    Of course.

Q    And when I say that, you know, it's strange we are one country, but we may have two different sets of laws that apply, correct?

A    Absolutely.

Q    There are laws that apply within New York State, correct?

A    Yes.

R. TARWACKI - CROSS - MR. MAZUREK    304

Q    And then there are laws that apply outside of New York State that govern the federal republic, right?

A    Yes.

Q    And those are the U.S. Treasury regulations, right?

A    Some of them.

Q    In your investigation and search of the DFS database for Coney Island Payroll Services, you determined that they had a license for commercial check cashing, right?

A    Yes.

Q    Did you look to see if they had a money transmittal license?

A    Yes.

Q    And they did not, correct?

A    I don't recall seeing one.

Q    If Mr. Motovich was not in the business of being a financial institution that cashed checks, you would not expect his name to appear in the DFS database, correct?

        MR. POLEMENI:  Objection.

        THE COURT:  Sustained.

Q    And, Agent, in terms of requests that you had with respect to David Motovich, the only thing you were asked by prosecutors was to search his name in the DFS database, right?

A    Correct.

Q    You know nothing else about him, correct?

A    I do not.

**J.A. 311**

R. TARWACKI – REDIRECT – MR. POLEMENI    305

MR. MAZUREK:  I have no further questions, Your Honor.

THE COURT:  Redirect?

MR. POLEMENI:  Just a couple of questions, Judge.

THE COURT:  That's what they always say.

Go ahead, counsel.

REDIRECT EXAMINATION

BY MR. POLEMENI:

Q    Mr. Tarwacki, you weren't asked to determine whether Mr. Motovich was involved in Coney Island Payroll Services, correct?

A    No.

Q    You were just asked whether or not Coney Island Payroll Services had listed him as an officer or an employee, correct?

A    That's correct.

Q    And he wasn't, right?

A    He was not.

Q    There are a lot of commercial check cashers in New York City, right?

A    Yes, there are.

Q    Fair to say there's no shortage of supply?

A    Correct.

MR. POLEMENI:  Nothing further, Judge.

THE COURT:  Thank you, sir.  You may step down.

(Witness is excused.)

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

PROCEEDINGS    306

THE COURT:  Ladies and gentlemen of the jury, it's a little past 11:00.  We are going to take our 15-minute break, as I promised you we would have our mid-morning break.

Please do not talk about the case.  You talk about the case when you get it at the end.  You can talk about Yankees, the Mets, the Red Sox, whatever, but not about the case.

So we'll take about a 15, 20-minute break, and we'll come back and break for lunch at the appointed time.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Jury exits.)

(In open court; jury not present.)

THE COURT:  The jury's left the courtroom.  You may be seated.

Before we take our break, do we have any issues we need to discuss, beginning with the Government?

MR. SKURNIK:  We do have one from the Government, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.  Thank you.

THE COURT:  Enjoy our 15- to 20-minute break, and then we will resume with the next witness.

MR. JACKSON:  Thank you, Your Honor.

MR. SKURNIK:  Judge, we do --

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

PROCEEDINGS    307

THE COURT:  Oh, we do have just one more.  The Columbo moment, just one more thing.

Go ahead.

MR. SKURNIK:  Just one issue from the Government.

As Your Honor was aware, over the weekend Your Honor granted a motion in limine from the Government to admit various third-party business records.

THE COURT:  Yes.

MR. SKURNIK:  And one set of public records pursuant to certification.  The Government was intending today, once the jury's back, to move to admit a number of these records pursuant to those certifications.  So we just wanted to flag that for Your Honor that that was something we intended to do today.

THE COURT:  Well, it's flagged.  I've already ruled.

Do you want the defense to respond to that, or are you just asking me to remember what I did over the weekend?  Because we all know about my short-term memory loss.

MR. SKURNIK:  I just wanted to make sure Your Honor was aware that we were planning to do it once jury --

THE COURT:  I don't know what you're planning to do.  I know what I ruled.

Does the defense have any response to that?

MR. JACKSON:  Not at this time, Judge.  Thank you.

THE COURT:  Okay.

**J.A. 312**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

PROCEEDINGS    308

Anything else?

MR. SKURNIK:  That's it.

THE COURT:  All right.  15 minutes, we'll see you back here.

Thank you.

(Recess was taken.)

(Continued on the following page.)

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

PROCEEDINGS                    309

(Continuing.)

THE COURT:  You maybe seated.

Do we have any issues before we bring the jury back in after the break from the Government?

MR. POLEMENI:  No, Judge.

Hopefully with your permission, we've moved the TV screen and the jurors will better be able to see the exhibits.

THE COURT:  As long as the jury can see it, because they're the finders of the facts, and it's a little bit blurry just based on my observation on the drop-down screen, that's fine.  I don't want the jury to have any problem and I don't want to make you go old school with paper, although I will if my jurors can't see your high tech screen.

MR. POLEMENI:  Understood.

THE COURT:  So, that's okay with me.

Let me ask the defense, Mr. Jackson, is that all right with you and your team?

MR. JACKSON:  Yes, your Honor.

THE COURT:  That's fine.  And what's sauce for the goose is sauce for the gander in terms of using the screen.

Ladies and gentlemen of the public, you'll be able to see the exhibits on the drop-down screen once they're admitted in evidence, so that shouldn't be a problem for the members of the public as well.

Anything else we need to talk about?

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS                    310

MR. POLEMENI:  One second, Judge.

THE COURT:  Sure.

(Pause in proceedings.)

MR. POLEMENI:  With your permission, Judge --

THE COURT:  Why don't you use the microphone?

I assure you it's better with the microphone.

MR. POLEMENI:  When the jury comes back in, we plan to read some stipulations into the record.

THE COURT:  That's fine.  Juries love having stipulations read, I assure you.  They live for that.

Any objection to that, Mr. Jackson?

MR. JACKSON:  No, your Honor.

THE COURT:  Just so the record is clear, which stipulations?

Have you marked them as exhibits so we will know for record purposes what the stipulations are?

MR. POLEMENI:  Yes, your Honor.

THE COURT:  Can you tell me in advance?

MR. POLEMENI:  Mr. Skurnik can.

THE COURT:  Make sure the green light is on the oval.

MR. SKURNIK:  Your Honor, the stipulations are going to be Government Exhibit 6003, Government Exhibit 6001, Government Exhibit 6000, Government Exhibit 6002, and Government Exhibit 6004.

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS                    311

THE COURT:  And those are stipulations that are agreed to by the defense, so there will be no objection.

Is that correct, Mr. Jackson?

MR. JACKSON:  That is correct, Judge.

THE COURT:  When we bring the jury back, I will remind the jury that one of the things I told them in preliminary instructions is that there may be stipulations between the parties and that they're now going to hear some stipulations themselves.

You'll start with a stip; is that correct?

MR. POLEMENI:  Yes, Judge.

THE COURT:  Anything else from the Government?

MR. SKURNIK:  After the stipulation, as we discussed a bit ago, we'll also move to admit some records pursuant to certifications.

THE COURT:  Let me ask you, with respect to that, Mr. Jackson, are you going to object to those documents that you just heard reference to?

MR. JACKSON:  Judge, we already made our objection on that.

THE COURT:  And they're preserved for the record and for appellate purposes, as I stated.  So, I'm going to ask you if there's any objection, you can say "no objection," but your record is preserved.

MR. JACKSON:  Thank you, Judge.

**J.A. 313**

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS                    312

THE COURT:  Is that fair enough?

MR. JACKSON:  Yes.

THE COURT:  That's fair enough for the Government?

MR. SKURNIK:  Yes, Judge.

THE COURT:  Anything else from the Government?

MR. SKURNIK:  No.

THE COURT:  Anything else from defense counsel?

MR. JACKSON:  No, Judge.

THE COURT:  Please bring the jury in and line them up so they don't have to crawl over each other like they did before, Mr. Scott.  Thank you.

(Pause in proceedings.)

MR. POLEMENI:  Your Honor, if I may?

THE COURT:  Yes, you may.  Quickly, before the jury comes in.

MR. POLEMENI:  I would ask, I don't know if you have, but I would just ask --

THE COURT:  Again, microphone.

MR. POLEMENI:  You might have already done this, Judge.  At least would remind the jury --

THE COURT:  That when they run into you and you don't look at them, you're not being rude, you're just complying with the Court's observations.

MR. POLEMENI:  Thank you, Judge.

THE COURT:  I usually wait for the lawyers to make

Linda A. Marino, Official Court Reporter

PROCEEDINGS                313

that request.  Uncharacteristically, you've been reticent in making it.

Anything else to show my great Nostradamus powers in reading your minds?

MR. POLEMENI:  Not right now.

THE COURT:  Not right now, okay.

Please stand for the jury.

(Jury enters.)

THE COURT:  Thank you, ladies and gentlemen of the jury.  Please be seated.

I just wanted to state at the request of the lawyers that I tell you that they would otherwise be incredibly friendly, they would buy you drinks, have tea with you, tell you finny stories, enjoy your funny stories, but because of the rules of engagement between lawyers and courts, when they see you, they have to look down and scurry away.

They're not being rude, it's not personal, but, as they say in certain movies, it's just business.  Don't take it amiss when you see the lawyers and they don't engage with a social smile.  You're the jurors and you're very, very special in that capacity.  So, do not take any umbrage if they look down and don't engage with you.  They have strict orders from Judge Vader not to do so and that comports with our court rules.

Please call your next witness.

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS                314

MR. SKURNIK:  Thank you, Judge.

Your Honor, at this time, before the Government calls the next witness, we're going to read some stipulations between the parties into the record.

THE COURT:  Ladies and gentlemen of the jury, you may recall the other day I said there will be some issues where the parties have agreed, to move things along, to stipulate in facts between the Government and defense counsel.

They're now going to read to you the stipulations that have been agreed to by the Government and defense counsel.

Correct, Mr. Jackson?

MR. JACKSON:  Yes, your Honor.

THE COURT:  So, this is what the parties have agreed to and you're going to hear the stipulations.  You'll be able to listen to them and will take them into the jury room when you begin your deliberations as well.

Please go ahead, counsel, and read the stipulations.  Identify them by their numbers in order and proceed.

MR. SKURNIK:  We'll start with Government Exhibit 6003.

The stipulation reads:  It is hereby stipulated and agreed by and between the United States of America, by its undersigned counsel, and the Defendant, David Motovich, by his undersigned counsel, that if called as a witness, a qualified

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS                315

representative of the Federal Deposit Insurance Corporation would testify that between January 2012 and February of 2019, Carver Federal Savings Bank, JPMorgan Chase, Astoria Bank, and Investors Bank, and any of their successor banks were all financial institutions insured by the Federal Deposit Insurance Corporation.

It says:  This stipulation is admissible in evidence as Government Exhibit 6003.

The next stipulation is Government Exhibit 6001.

It states that:  It is hereby stipulated and agreed by and between the United States of America, by its undersigned counsel, and the Defendant, David Motovich, by his undersigned counsel, that if called as a witness at trial, a duly qualified custodian for records for AT&T Wireless would testify that Government Exhibits 102-1, 102-2, and 102-3 are true and accurate copies of records kept by AT&T Wireless concerning telephone number 646-330-0861.  This stipulation marked as Government Exhibit 6001 is admissible into evidence.

The next stipulation is Government Exhibit 6000.

It states that:  It is hereby stipulated and agreed by and between the United States of America, by its undersigned counsel, and the Defendant, David Motovich, by his undersigned counsel, that if called to testify, Apple, Inc. representative Leslie Ahlberg -- that's A-H-L-B-E-R-G -- would appear before this Court and certify that records produced at

**J.A. 314**

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS                316

Bates numbers 00000055502 to 00000056176 are true and accurate copies of communications, images, videos, and documents that were recovered by law enforcement agents during a court-authorized search from the Defendant David Motovich's Apple iCloud account which was associated with the Apple ID davidmotovich@iCloud.com.  This stipulation is admissible into evidence as Government Exhibit 6000.

The next stipulation is Government Exhibit 6002.

It states that:  It is hereby stipulated and agreed by and between the United States of America, by its undersigned counsel, and the Defendant, David Motovich, by his undersigned counsel, that if called as a witness at trial, a duly qualified custodian for records for Yahoo, Inc., defined as "Yahoo," would testify that the email account mkuyan103@yahoo.com was subscribed to by Marina Kuyan; first name Marina, M-A-R-I-N-A, last name K-U-Y-A-N.

Defense states:  If called as a witness at trial, a duly qualified custodian for records for Google, LLC, would testify that the e-mail account zkcnyinc@gmail.com was subscribed to by Marina Kuyan; the email account davemidwood@good mail.com was subscribed to by the Defendant, David Motovich; the e-mail account boris19479@gmail.com was subscribed to by Boris Motovich.  This stipulation is admissible into evidence as Government Exhibit 6002.

And our final stipulation for now is Government

Linda A. Marino, Official Court Reporter

PROCEEDINGS 317

Exhibit 6004, which states that: It is hereby stipulated and agreed by and between the United States of America, by its undersigned counsel, and the Defendant, David Motovich, by his undersigned counsel, that in or about and between 2012 and 2019, Abe (Abraham) Friedman, spelled F-R-I-E-D-M-A-N, a family member of David Motovich, was employed at Midwood Lumber. Abe Friedman regularly went by the name Dave Friedman.

And that stipulation states: This stipulation is admissible into evidence as Government Exhibit 6004.

THE COURT: The Government, I take it, moves the admission of those stipulations into evidence.

Is that correct, counsel?

MR. SKURNIK: We do, your Honor.

THE COURT: Any objection.

MR. JACKSON: No, your Honor.

THE COURT: They're admitted so you can publish them to the jury.

(Government Exhibits 6000 through 6005 so marked.)

THE COURT: You've heard them, you can see them later, and we've just saved you an hour and a half of your lives if we would have had those individuals come in and testify with respect to those items. That's why we did that by stipulation with the agreement of the parties. Okay. Admitted.

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS 318

MR. SKURNIK: Thank you, Judge.

We are now moving to admit certain records pursuant to business record and public record certifications.

THE COURT: For the record, you're seeking to admit.

MR. SKURNIK: Starting with Government Exhibits 700 and 700-W and then a number of exhibits that are subsets --

THE COURT: Let's do them one at a time.

MR. SKURNIK: Yes, Judge.

Start with 700.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700 so marked.)

MR. SKURNIK: 700-W.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-W so marked.)

MR. SKURNIK: 700-A.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-A so marked.)

MR. SKURNIK: 700-B.

THE COURT: Any objection?

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS 319

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-B so marked.)

MR. SKURNIK: 700-F.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-F so marked.)

MR. SKURNIK: 700-G.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-G so marked.)

MR. SKURNIK: 700-H.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-H so marked.)

MR. SKURNIK: 700-I.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-I so marked.)

MR. SKURNIK: 700-J.

THE COURT: Any objection?

**J.A. 315**

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS 320

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-J so marked.)

MR. SKURNIK: 700-K.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-K so marked.)

MR. SKURNIK: 700-L.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-L so marked.)

MR. SKURNIK: 700-M.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-M so marked.)

MR. SKURNIK: 700-O.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-O so marked.)

MR. SKURNIK: 700-P.

THE COURT: Any objection?

Linda A. Marino, Official Court Reporter

PROCEEDINGS 321

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-P so marked.)

MR. SKURNIK: 700-Q.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-Q so marked.)

MR. SKURNIK: 700-S.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-S so marked.)

MR. SKURNIK: 700-T.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-T so marked.)

MR. SKURNIK: 700-U.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-U so marked.)

MR. SKURNIK: 700-V.

THE COURT: Any objection?

Linda A. Marino, Official Court Reporter

PROCEEDINGS 322

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 700-V so marked.)

MR. SKURNIK: Exhibit 177.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 177 so marked.)

MR. SKURNIK: 178.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 178 so marked.)

MR. SKURNIK: 179.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 179 so marked.)

MR. SKURNIK: 180.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 180 so marked.)

MR. SKURNIK: 181.

THE COURT: Any objection?

Linda A. Marino, Official Court Reporter

PROCEEDINGS 323

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 181 so marked.)

MR. SKURNIK: 182.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 182 so marked.)

MR. SKURNIK: 183.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 183 so marked.)

MR. SKURNIK: 184.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 184 so marked.)

MR. SKURNIK: 185.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 185 so marked.)

MR. SKURNIK: 186.

THE COURT: Any objection?

**J.A. 316**

Linda A. Marino, Official Court Reporter

PROCEEDINGS 324

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 186 so marked.)

MR. SKURNIK: 187.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 187 so marked.)

MR. SKURNIK: 188.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 188 so marked.)

MR. SKURNIK: 189.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 189 so marked.)

MR. SKURNIK: 190.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 190 so marked.)

MR. SKURNIK: 191.

THE COURT: Any objection?

Linda A. Marino, Official Court Reporter

PROCEEDINGS 325

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 191 so marked.)

MR. SKURNIK:  192.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 192 so marked.)

MR. SKURNIK:  193.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 193 so marked.)

MR. SKURNIK:  194.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 194 so marked.)

MR. SKURNIK:  195.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 195 so marked.)

MR. SKURNIK:  196.

THE COURT:  Any objection?

Linda A. Marino, Official Court Reporter

PROCEEDINGS 326

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 196 so marked.)

MR. SKURNIK:  197.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 197 so marked.)

MR. SKURNIK:  198.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 198 so marked.)

MR. SKURNIK:  200.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 200 so marked.)

MR. SKURNIK:  202.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 202 so marked.)

MR. SKURNIK:  203.

THE COURT:  Any objection?

Linda A. Marino, Official Court Reporter

PROCEEDINGS 327

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 203 so marked.)

MR. SKURNIK:  205.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 205 so marked.)

MR. SKURNIK:  206.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 206 so marked.)

MR. SKURNIK:  207.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 207 so marked.)

MR. SKURNIK:  208.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 208 so marked.)

MR. SKURNIK:  209.

THE COURT:  Any objection?

Linda A. Marino, Official Court Reporter

PROCEEDINGS 328

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 209 so marked.)

MR. SKURNIK:  210.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 210 so marked.)

MR. SKURNIK:  211.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 211 so marked.)

MR. SKURNIK:  212.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 212 so marked.)

MR. SKURNIK:  213.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 213 so marked.)

MR. SKURNIK:  214.

THE COURT:  Any objection?

**J.A. 317**

Linda A. Marino, Official Court Reporter

PROCEEDINGS                 329

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 214 so marked.)

MR. SKURNIK:  215.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 215 so marked.)

MR. SKURNIK:  217.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 217 so marked.)

MR. SKURNIK:  218.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 218 so marked.)

MR. SKURNIK:  219.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 219 so marked.)

MR. SKURNIK:  220.

THE COURT:  Any objection?

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS                 330

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 220 so marked.)

MR. SKURNIK:  221.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 221 so marked.)

MR. SKURNIK:  604.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 604 so marked.)

MR. SKURNIK:  605.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 605 so marked.)

MR. SKURNIK:  606.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 606 so marked.)

MR. SKURNIK:  607.

THE COURT:  Any objection?

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS                 331

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 607 so marked.)

MR. SKURNIK:  608.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 608 so marked.)

MR. SKURNIK:  609.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 609 so marked.)

MR. SKURNIK:  1081.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 1081 so marked.)

MR. SKURNIK:  1082.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 1082 so marked.)

MR. SKURNIK:  1088.

**J.A. 318**

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS                 332

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 1088 so marked.)

MR. SKURNIK:  1096.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 1096 so marked.)

MR. SKURNIK:  1159.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 1059 so marked.)

MR. SKURNIK:  1161.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 1161 so marked.)

MR. SKURNIK:  1197.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 1197 so marked.)

MR. SKURNIK:  1198.

Linda A. Marino, Official Court Reporter

PROCEEDINGS 333

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1198 so marked.)

MR. SKURNIK: 1198-A.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1198-A so marked.)

MR. SKURNIK: 1199.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1199 so marked.)

MR. SKURNIK: 1199-A.

THE COURT: Any objection?

Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1199-A so marked.)

MR. SKURNIK: 1200.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1200 so marked.)

Linda A. Marino, Official Court Reporter

PROCEEDINGS 334

MR. SKURNIK: 1200-A.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1200-A so marked.)

MR. SKURNIK: 1202.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1202 so marked.)

MR. SKURNIK: 1202-A.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1202-A so marked.)

MR. SKURNIK: 1203.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1203 so marked.)

MR. SKURNIK: 1203-A.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1203-A so marked.)

Linda A. Marino, Official Court Reporter

PROCEEDINGS 335

MR. SKURNIK: 1204.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1204 so marked.)

MR. SKURNIK: 1205.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1205 so marked.)

MR. SKURNIK: 1206.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 1206 so marked.)

MR. SKURNIK: 102-1.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 102-1 so marked.)

MR. SKURNIK: 102-2.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 102-2 so marked.)

Linda A. Marino, Official Court Reporter

PROCEEDINGS 336

MR. SKURNIK: 102-3.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 102-3 so marked.)

MR. SKURNIK: 2002.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 2002 so marked.)

MR. SKURNIK: 2002-A.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 2002-A so marked.)

MR. SKURNIK: 2002-B.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 2002-B so marked.)

MR. SKURNIK: 2003.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 2003 so marked.)

Linda A. Marino, Official Court Reporter

**J.A. 319**

PROCEEDINGS 337

MR. SKURNIK: 2004.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 2004 so marked.)

MR. SKURNIK: 2008-A.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 2008-A so marked.)

MR. SKURNIK: 2008-B.

THE COURT: Any objection?

MR. JACKSON: No Judge.

THE COURT: Admitted.

(Government Exhibit 2008-B so marked.)

MR. SKURNIK: 2008-C.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 2008-C so marked.)

MR. SKURNIK: 234.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: Admitted.

(Government Exhibit 234 so marked.)

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS 338

MR. SKURNIK: Thank you.

THE COURT: Ladies and gentlemen, you're obviously going to see those exhibits when it makes sense in terms of the testimony of witnesses, but they're all in evidence so we don't have to have foundation laid for those and then a back-and-forth about it. So, they're all in and it will be a lot smoother when you actually get to see them, in case you're wondering why I'm admitting exhibits that I'm not having the lawyers show you're not seeing now. You'll see them later and it will move along the trial.

Call your next witness, please.

MR. POLEMENI: Judge, the Government calls Roman Kretsula.

THE COURT: Please have the witness come forward and be sworn by my court deputy.

MR. POLEMENI: Your Honor, this witness will also be using an interpreter.

THE COURT: The interpreter will be sworn by my court deputy. Please have the witness come forward and be sworn and we'll have the court deputy also administer the oath to the translator.

So, please, first we'll deal with Madam Translator.

Please raise your right hand.

Please administer the oath to the translator.

THE COURTROOM DEPUTY: Do you solemnly affirm or

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS 339

swear that you will justly, truly, fairly, and impartially act as interpreter in this case before the Court, so help you had God?

THE INTERPRETER: I do.

THE COURT: Please state your name and spell it for the court reporter.

THE INTERPRETER: Isabelle Avrutin. The first name is I-S-A-B-E-L-L-E, the last name is A-V-R-U-T-I-N, like Nancy; A-V-R-U-T-I-N.

THE COURT: Thank you.

Now, ladies and gentlemen of the jury, we're going to have the witness sworn, obviously through the court reporter and through the interpreter.

Do you have simultaneous or sequential translation?

How are we going to do this?

I'm asking you, do you have simultaneous?

THE INTERPRETER: No, we don't have the equipment.

THE COURT: You don't have the equipment for simultaneous.

The way it's going to work, ladies and gentlemen of the jury, the lawyers will ask the question, the interpreter will interpret it, the witness will hear it, the witness will answer the interpreter under oath, and then the interpreter will tell us what the witness said.

So, the witness is going to be in the witness stand,

**J.A. 320**

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS 340

the interpreter will be next to the witness, and the interpreter will be the one who speaks into the microphone.

Sometimes we have equipment that allows you to have simultaneous translation, which is what I and all juries always pray for, but you can't always get what you pray for. So, we'll have sequential, which is twice as long but that's the way we're doing it.

Please raise your right hand and have witness raise right his right hand and administer the oath through the interpreter.

THE COURTROOM DEPUTY: Do you solemnly swear or affirm that the testimony that you're about to give this Court in this case shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

THE COURT: Please state your name.

THE WITNESS: Roman Kretsula.

THE COURT: Madam Interpreter, you have to tell us what he said. And you have to speak into the microphone, madam, too. My court deputy will hand you the microphone, Madam Interpreter.

THE INTERPRETER: Can you hear me?

THE COURT: When you speak into it I can.

THE INTERPRETER: Can you hear me?

THE COURT: I can hear you now.

Linda A. Marino, Official Court Reporter

PROCEEDINGS 341

THE INTERPRETER: So, the witness' name is Roman Kretsula. The first name is spelled R-O-M-A-N and the last name is spelled K-R-E-T-S-U-L-A.

THE COURT: Please be seated.

Madam Interpreter, I have a cough drop for you if you'd like. Would you like a cough drop, since your coughing?

No Government funds were expended. Personally paid for offered to both sides. What a guy.

Madam Interpreter, I'm going to ask you to keep your voice up and please speak into the microphone. Channel your inner Lord Vader, not your inner Wanda Sykes or Annie Hall.

Go ahead, inquire.

MR. POLEMENI: Thank you, Judge.

(Continued on the next page.)

Linda A. Marino, Official Court Reporter

---

Kretsula - Direct - Polemeni 342

**ROMAN KRETSULA**, having been first dully sworn, testified as follows:

DIRECT EXAMINATION

BY MR. POLEMENI:

Q   Mr. Kretsula, where were you born?

THE COURT: You have to translate. We're going to pretend that he's answering in his native language.

Madam Interpreter?

THE INTERPRETER: In Ukraine.

THE COURT: It's always going to be question, you interpret, he's going to answer, then you answer.

THE INTERPRETER: I know. I just want to know if he's going to answer in English or Russian.

THE COURT: He's going to answer in whatever language he wants. But whatever language he answers in, you're going to interpret it.

If he says "Ukraine" you're going to say "Ukraine."

THE INTERPRETER: Okay.

THE COURT: That's what I mean. We'll pretend every word is Russian, capice?

THE INTERPRETER: Si, capice.

THE COURT: Okay, let's go.

A   Ukraine.

Q   When did you come to the United States?

A   2001.

Linda A. Marino, Official Court Reporter

---

Kretsula - Direct - Polemeni 343

Q   Where do you currently live?

A   In Brooklyn, Sheepshead Bay area.

Q   How long have you lived there?

A   Seven years.

Q   Prior to living in Sheepshead Bay, where did you live?

A   Ocean Avenue, Avenue U.

Q   Is that also in Brooklyn?

A   Yes.

Q   Since coming to the United States, have you always lived in Brooklyn?

A   Yes.

Q   Mr. Kretsula, do you speak English?

A   Yes, but I don't understand all the words. So, it's better to interpreter. Sometimes I understood English, sometimes my English, I don't --

THE COURT: Translate what he just said from English to English.

This is your witness, counsel, not mine, but his English is a lot better than my Russian.

MR. POLEMENI: I understand, Judge.

Your Honor, if I may, it's 12:30. I don't know if you want to take a lunch break now. We can resolve this interpretation issue, perhaps.

THE COURT: I know you just had a slightly later than your regularly scheduled morning break. But since we now

J.A. 321

Linda A. Marino, Official Court Reporter

---

Kretsula - Direct - Polemeni 344

have the question of Russian v. English, maybe we can agree that this witness miraculously, praise the Lord, now speaks English, maybe it's appropriate for us to take our scheduled luncheon break at 12:30.

And why don't we resume at 1:30?

Because we obviously have to work out the English to Russian to English to Russian issues.

Does that work for you, ladies and gentlemen of the jury?

So we'll come back, let's say, at 1:45, luncheon recess, yes?

Okay, that's good. We'll see you then. Please do not talk about the case in English or Russian or any other language. Until then, thank you.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: The jury has left. You may be seated, ladies and gentlemen of the public.

I'll ask the witness to step down and leave the courtroom and to return after the luncheon recess. Do not talk with anyone about your testimony during the break; however, you may talk about whether you speak English or not during the break.

MR. POLEMENI: Thank you, Judge.

(Witness exits the courtroom.)

Linda A. Marino, Official Court Reporter

Kretsula - Direct - Polemeni          345

THE COURT:  You may be seated.

Do we have any other issues to address, linguistic or otherwise, before we take our luncheon recess, counsel?

MR. POLEMENI:  No, your Honor.  Thank you.

THE COURT:  Mr. Jackson, do you have any issues -- you can remain seated speak into the microphone -- that you would like to address before we take recess?

MR. JACKSON:  Super brief.

THE COURT:  I've heard that before too.  Go ahead.

MR. JACKSON:  I think we were under the understanding that everything in the certifications had extracted what your Honor had excluded per motion in limine.

I think there was one exhibit that the Government accidentally had in, GX 221, which was a business card that your Honor excluded.

THE COURT:  Let's stop with that.

Why don't you discuss that over the luncheon recess and then advise the Court as to whether we have an issue with respect to that exhibit or not.  Whatever it is, it's not been shown to the jury yet, so there shouldn't be an issue with respect to that.

So, if that's something that we will not have admitted into evidence, I will revise my earlier ruling and keep it out.  If it's something that should come in, it will come in.  If there's something there's continued dispute

Linda A. Marino, Official Court Reporter

---

Kretsula - Direct - Polemeni          346

about, I will rule on it, but I think it's better if you folks can talk about that particular item.

Fair enough, Government?

MR. POLEMENI:  Yes, your Honor.

THE COURT:  Fair enough, defense?

MR. JACKSON:  Yes.

THE COURT:  Anything else we need to address, beginning with the Government?

MR. POLEMENI:  No, your Honor.

THE COURT:  Anything from the defense?

MR. JACKSON:  No, your Honor.

THE COURT:  Have an enjoyable lunch break in whatever your chosen language is at the moment.  Thank you.

(Luncheon recess taken.)

Linda A. Marino, Official Court Reporter

---

PROCEEDINGS          347

A F T E R N O O N   S E S S I O N

(In open court; jury not present.)

THE COURT:  Thank you.  You may be seated.

Do we have any issues to address before we bring the jury in beginning with the Government?

MR. GRUBIN:  Very briefly, Your Honor.

THE COURT:  Again, please, everyone be seated and use the microphone.  Thank you.

MR. GRUBIN:  Absolutely, Your Honor.  Two just housekeeping issues.  The first is defense counsel is correct, Government Exhibit 221 was excluded by the Court.  It was part of the certified record but it was excluded.  So we'll withdraw that exhibit if that's fine for the --

THE COURT:  All right.  So 221; is that the number?

MR. GRUBIN:  Yes.

THE COURT:  Mr. Jackson?

MR. JACKSON:  Yes, Judge.

THE COURT:  All right.

So, by stipulation, Exhibit 221 is withdrawn.  The record should reflect the fact that that exhibit has not been shown to the jury.

Is there anything we need to do other than putting on the record, the jury is not here now, the fact that that document is not in evidence, it has not been shown to the jury, we'll just make sure it is not inadvertently shown to

**J.A. 322**

LEEANN N. MUSOLF, RPR

---

PROCEEDINGS          348

the jury when they ask for all of the exhibits that have been admitted.

Do we need to do anything else as far as the Government is concerned?

MR. GRUBIN:  No, Your Honor.

THE COURT:  As far as defense counsel is concerned?

MR. JACKSON:  No, Judge.

THE COURT:  Okay.  So that's clear on that point.

MR. GRUBIN:  Thank you.

THE COURT:  Now, with respect to the linguistic issues, where are we?

MR. GRUBIN:  Yes, Judge.

THE COURT:  In English, please.

MR. POLEMENI:  I'll try.  So I think if with the Court, and I believe defense counsel has no objection, we will proceed in English and have a --

THE COURT:  On both the direct and the cross?  I don't want a situation, not that this would ever happen, where suddenly we no longer understand English when the defense is examining, because I don't know whether the jury would take a dim view of that, but I know the Court would take a dim view of that.  So the witness should understand English on the takeoff, English on the landing.

Are we clear?

MR. POLEMENI:  Yes, Judge.  Would -- I was going to

LEEANN N. MUSOLF, RPR

PROCEEDINGS                    349

add that we were hoping to have a standby interpreter.  So to the extent that the witness doesn't understand a question --

THE COURT:  Well, here is my point, and I'm making this outside of the hearing of the jury, but I'm making it, the Court -- and the jury finds the facts and assesses credibility, but the Court would have serious concerns if, suddenly in the midst of a vigorous cross-examination, the witness's grasp of English goes from tenuous to nonexistent.

Now, I suspect defense counsel is more than capable of exploiting or, pursuing I should, say such a sudden lapse from English to only mother Russian tongue, but if that happens, the defense will have free reign to address the issue.  So I want to be clear, okay?  English on the takeoff, English on the landing.  Russian on the takeoff, Russian on the landing, but we don't change language mid-flight, understood?

MR. POLEMENI:  Understood, Judge.  With that, I did not know that there was an ability now to actually do simultaneous translation.  May I speak with the witness to make sure he still prefers to proceed in English then?

THE COURT:  Yes.

MR. POLEMENI:  Thank you, Judge.

THE COURT:  You're welcome.  Anything else from the Government before you have that conversation?

MR. GRUBIN:  While Mr. Polemeni is doing that, very

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS                    350

quickly, Your Honor.

THE COURT:  Can you please sit down and use the microphone.  Thank you.

MR. GRUBIN:  Sorry --

THE COURT:  -- Article Three when the jury is not here.  Use the microphone.

MR. GRUBIN:  Thank you, Your Honor.  We have the Court's copies of the binders.  It's -- there's a couple of them.  We've put them over here if Your Honor -- I just wanted to flag them for Your Honor.  If Your Honor would prefer --

THE COURT:  Why don't you have them brought to the side over here since we're done with most of our sidebars I trust, that way they'll be here and you won't have to schlep them up when the jury is here.

MR. GRUBIN:  Okay.  Thank you.

THE COURT:  Anything else from the Government?

MR. GRUBIN:  That's it.  Thank you.

THE COURT:  Okay.

From defense counsel, do you have any issues?

MR. JACKSON:  No, Judge.

THE COURT:  After they move the documents over and after the witness is clear on which language he will be testifying on, the interpreter indicated that she would necessarily have to leave by about 2:00 to be in another courtroom proceeding, so we're going to have a different

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS                    351

interpreter sworn if we're going to have the interpreter, but let's wait until we decide if we are going to need the interpreter or not, ma'am.  Thank you.

(Pause in proceedings.)

THE COURT:  Yes, we are back on the record.  The jury has not yet been brought in.  Where are we on the Russian English issue?

MR. POLEMENI:  Thank you, Judge.  I spoke with Mr. Kretsula he said he would like to proceed in English with a standby Russian interpreter.  He understands what Your Honor has said.

THE COURT:  Okay.  Let's have the jury brought back in.  We will swear the new interpreter in, in front of the jury and then we will proceed.  The standby interpreter is going to be sworn in, right?

MR. POLEMENI:  Yes.

THE COURT:  Okay.  So we are going to do that in the presence of the jury.  Thank you, ma'am.  If you wouldn't mind, just standby and the jury will be in, in a second.  Thank you.

THE INTERPRETER:  Thank you.

THE COURT:  You can come into the jury box -- no, just come forward.  That would be great.  Thank you.

THE INTERPRETER:  Thank you.

THE COURT:  And this will be simultaneous

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS                    352

translation, Counsel, Government is this going to be simultaneous translation as opposed to sequential if we need to do it.

MR. POLEMENI:  However Your Honor prefers.

THE COURT:  I would much prefer to do it in English and if we need to have any Russian, it will be simultaneous instead of sequential; is that correct?

MR. POLEMENI:  That's correct, Judge.

THE COURT:  Please stand for the jury.

(Jury enters the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen, thank you for aggressor peremptoriness.  Please be seated.  You'll be pleased to know that in your absence we've made some progress and after a crash course in English, the witness will be testifying in English, so we will not have the issue of translation here.  We have a new translator, the previous translator had another court appearance to make at 2:00.

So we're going to have this translator sworn in and we're going to have the witness return to the witness stand.  This will be a standby translator in the event that it's necessary, although as I made it clear to the lawyers, if you speak English on the takeoff, the Court expects you to speak English on the landing, to use a very old school phrase.  Okay.

Let's get the witness in, please.  And once the

*LEEANN N. MUSOLF, RPR*

**J.A. 323**

R. KRETSULA – DIRECT – MR. POLEMENI     353

witness is in, we will have the new interpreter sworn and we will proceed in English.

Please come forward, sir. You are still under oath. Sit in the witness stand. We have a new interpreter who is going to be sworn in. You can sit down, sir, in the witness chair. Thank you. You have been sworn. Please have a seat.

And now we're going to ask the interpreter to raise her right hand and Mr. Scott will administer the oath.

THE COURTROOM DEPUTY: Do you solemnly swear or affirm that you will justly, truly and fairly, impartially act as an interpreter in this case now on trial?

THE INTERPRETER: I do.

THE COURT: Thank you, ma'am. Would you please state your name and spell it out loud.

THE INTERPRETER: Elana Pick, E-L-A-N-A, first name, P as in Paul, I-C-K, last name.

THE COURT: Thank you, ma'am.

All right. Counsel, you may proceed in English.

MR. POLEMENI: Thank you, Your Honor.

DIRECT EXAMINATION (Continued)

BY MR. POLEMENI:

Q   Mr. Kretsula, what do you do for a living?

A   I own the business Unique Painting Services. I do the painting job.

Q   Unique Painting Services?

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA – DIRECT – MR. POLEMENI     354

A   Yeah, I-N-C, Inc.

Q   For how long have you owned Unique Painting Services?

A   From 2012.

Q   And can you just generally --

THE COURT: Can you pull the microphone, sir, a little closer to you? It moves to you. You can move it like this. It looks like a snake but it won't bite you. Speak right into it.

A   From 2012.

Q   What type of painting jobs do you do?

A   I do commercial, residential, like private buildings, private houses, and, also, condominiums, like the new condominiums.

Q   And in terms of the scope of the -- the size of the projects, what's the size of the projects?

A   Private houses are three, four floors, one floor, it depends what the customer want. And there's commercial job, condominiums, condo units, 200, 300 new condos, units, for renting or sale, apartment.

Q   Do you still own Unique Painting?

A   Yes.

Q   Since 2012, approximately, how many employees have you had?

A   From five to 15.

Q   From five to 15 depending on --

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA – DIRECT – MR. POLEMENI     355

A   Depending how many jobs I have, yeah.

Q   Have you pleaded guilty to any crimes, Mr. Kretsula?

A   Yes.

Q   What have you pleaded guilty to?

THE COURT: You can translate for him. What crimes have you pled guilty to?

Just translate that, please.

A   I'm not pay FICA tax, Social Security tax, and Medicare tax.

Q   And you do not pay that, those taxes, for your workers; is that correct?

A   Correct.

Q   Can you describe for the jury how you went about not paying or not -- not paying FICA taxes for your employees?

A   I pay my workers cash and I'm not reporting to the Government.

Q   Now, you said you paid your workers in cash. Where did you get the cash to pay your workers?

A   I get the cash from David Motovich.

Q   Do you see Mr. Motovich here today?

A   Yes. He's sitting over there.

Q   Can you point him out?

MR. MAZUREK: Your Honor, we would stipulate that he would be able to identify Mr. Motovich.

THE COURT: All right. So you stipulated that

**J.A. 324**

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA – DIRECT – MR. POLEMENI     356

you've identified Mr. Motovich;

Is that acceptable to the Government?

MR. POLEMENI: Yes, it is, Judge.

THE COURT: All right.

The record should reflect that the witness has pointed out the defendant, Mr. Motovich.

Please continue.

MR. POLEMENI: I am going to show, just for the witness, Your Honor, GX-7.

THE COURT: Any objection to GX-7 being in evidence?

MR. MAZUREK: No, Your Honor.

THE COURT: It is admitted. You may publish it. Let's try to move this along.

(Government Exhibit GX-7, was received in evidence.)

(Exhibit published.)

Q   Who is this, Mr. Kretsula?

A   David Motovich.

Q   Thank you. And we'll get into this in a little more detail in a bit, but can you explain for the jury how did you get cash from Mr. Motovich to pay your workers?

A   Before I get my companies, my clients, they -- they ask me, insurance, provide the insurance. If I get the job from my clients, I had insurance. So I -- so I go to David Motovich and ask him if he -- he could help me to give me the insurance -- the insurance and company so my clients

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - DIRECT - MR. POLEMENI      357

give me the jobs.  So I said yes.  So David give me insurance, insurance, working comp and Medicare insurance, and give me the company name.  So -- so I bring the insurance to my clients, clients to give me the jobs and start to work.  I get -- I get the first payment from the clients.  I'm bring the check for David Motovich and get the cash.  Sometimes, I held the full amount, sometimes the part amount.

Q   Would you bring a check to Mr. Motovich, Mr. Kretsula?

A   Yes.

Q   And in exchange, would he give you cash?

A   He'd give me the cash and charge me 15 percent fee.

Q   Did you say one five, 15 percent?

A   One five, one five --

THE COURT:  Don't talk over each other.  In English or Russian, all right?  Take your time.

MR. POLEMENI:  Yes, Judge.

Q   Did you say one five?

A   One five.

Q   Fifteen percent?

A   Fifteen percent.

Q   For how long did you get cash in this way from Mr. Motovich?

A   I don't remember exactly but, approximately, from 2008.

Q   Until?

A   2019.

---

R. KRETSULA - DIRECT - MR. POLEMENI      358

Q   How often would you go to Mr. Motovich and get cash from him?

A   Two, three times a month.

Q   Can you estimate how much cash you received from Mr. Motovich from 2008 to 2019?

A   I don't know exactly but, approximately, couple of million.

Q   A couple of million dollars in cash?

A   Yes.

MR. POLEMENI:  I am just going to show for the witness Government Exhibit 744.

THE COURT:  What's the exhibit number?

MR. POLEMENI:  Seven four four.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  You may publish.  It is admitted.

(Government Exhibit 744, was received in evidence.)

(Exhibit published.)

Q   And we're gonna look at these again in some detail in a little bit, Mr. Kretsula.

MR. POLEMENI:  But, Ms. Kannan, if you can turn to page 744-02, and if you can just blow up the check, please.

Q   What is this, Mr. Kretsula?

A   This is my check I gave to David to cash it.

Q   And what is the amount of the check?

---

R. KRETSULA - DIRECT - MR. POLEMENI      359

A   Two -- 22-thousand dollars.

Q   And Mr. Motovich would give you cash in exchange?

A   Yes, minus 15 percent fee.

Q   Minus a 15 percent fee?  Is that -- is tat what you said?

A   Yes.

Q   So I can't do math very well, but this $22,000 check that you gave to Mr. Motovich, how much cash would he give you in return?

A   Eighteen-thousand and change, something.

Q   You just told the jury that you have pled guilty to a federal crime; is that right, Mr. Kretsula?

A   Yes.

Q   Are you testifying here pursuant to a cooperation agreement with the Government?

A   Yes.

Q   What is your understanding of your obligations under that agreement?

A   So, I have to say truth and only truth.  I have to pay penalty.  It's not Judge more than five years I'm in the prison.

Q   By pleading guilty, what is the maximum term of imprisonment that you face?

A   Maximum, five years in the prison.

Q   And by cooperating with the Government, what are you hoping for?

**J.A. 325**

---

R. KRETSULA - DIRECT - MR. POLEMENI      360

A   I don't know.  The judge --

Q   Well, by cooperating with the Government, are you hoping for less -- a more lenient sentence?

A   I hope so.  Yes.

Q   Do you know what your sentence will be?

A   I don't know.

Q   Has anyone promised you what your sentence will be?

A   No.

Q   Who determines your sentence?

A   Judge.

Q   Now, Mr. Kretsula, where did you get the cash?  Did you have to go somewhere to get the cash from Mr. Motovich?

A   Most -- I go to upstairs, second floor of Midwood Lumber, his office, pick up from his office.

Q   I'm going to show you, Mr. Kretsula, what -- just for the witness, Government's Exhibit 353.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  You may publish.  It's admitted.

(Government Exhibit 353, was received in evidence.)

(Exhibit published.)

Q   What is Government Exhibits 353, Mr. Kretsula?

A   This is Midwood Lumber, first floor entrance, main entrance.

THE COURT:  Could you remove that arrow unless

R. KRETSULA - DIRECT - MR. POLEMENI    361

someone put it there for a reason?  That's adding to the arrows.  Can you take them off?  Thank you.

MR. POLEMENI:  Yes, Judge.

THE COURT:  Go ahead.

BY MR. POLEMENI:

Q    Where is Midwood Lumber located?

A    Located in the Brooklyn in Midwood area, Coney Island Avenue between Avenue I and H.

Q    Do you see the number in the left-hand corner, Mr. Kretsula?

A    1169.

Q    1169 Coney Island Avenue?

A    Correct.

Q    Did you purchase items for your painting from Midwood Lumber?

A    Yes.

Q    What type of items would you purchase?

A    I do compound, plaster, duct tape, everything that go to my painting job.

Q    And when you purchase items from Midwood Lumber, how did you pay?

A    I paid the check, a credit card.  I don't remember exactly.  Sometimes credit cards or checks, depends.  If I have money, pay check, if I don't have money, to pay credit card.

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - DIRECT - MR. POLEMENI    362

Q    And when did you start purchasing material from Midwood Lumber, approximately?

A    Maybe 2004, 2005.

Q    Do any of Mr. Motovich's family members work at Midwood Lumber?

A    Yes.

Q    Okay.  I'm going to show you, for the witness only, GX-9.

THE COURT:  Is this in evidence?

MR. POLEMENI:  Not -- not yet, Judge.

THE COURT:  All right.

Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  It's admitted.  You may publish.

(Government Exhibit GX-9, was received in evidence.)

(Exhibit published.)

Q    Who's depicted -- who is in GX-9, Mr. Kretsula?

A    Gidi Motovich.

Q    Gidi?

A    Gidi Motovich.

Q    And she works at Midwood Lumber?

A    Yes.

Q    Do you know her relationship to Mr. Motovich?

A    His sister.

Q    And what does she do there?

A    She the office worker, do paperwork.

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - DIRECT - MR. POLEMENI    363

Q    Have you had any business dealings with Gidi?

A    I've painted in his house.

Q    You've painted her house?

A    Yes.

Q    Do you have -- have you had any other business dealings with her?

A    Yes.  Sometimes, I'm come, like, come -- the envelope, in the envelope in his office.  So they'd call the Gidi to come pick up the envelope from his office.

Q    What's in the envelope?

A    Cash.

MR. POLEMENI:  I'm showing, just for the witness, GX-2.

THE COURT:  Any objection?

MR. MAZUREK:  No objection, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit GX-2, was received in evidence.)

(Exhibit published.)

Q    Who is in GX-2?

A    Alex Motovich.

Q    Do you know his relationship to David Motovich?

A    Brother.

Q    Does he work at Midwood?

A    Yes.

Q    Do you know what he does there?

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - DIRECT - MR. POLEMENI    364

A    I know he's sitting in the back in the office.  He does, also, paperwork.

Q    I'm showing you GX-31, just for the witness.

MR. POLEMENI:  It's not in evidence, Your Honor.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  You may publish.  It's admitted.

(Government Exhibit GX-31, was received in evidence.)

(Exhibit published.)

Q    Who is in -- who is in GX-31, Mr. Kretsula?

A    David Fridman.

Q    Is he related to David Motovich?

A    Yes.

Q    What is his relationship?

A    Like, I know his -- David -- David Motovich father, he's -- his David Motovich's father's sister married to David Fridman.

MR. POLEMENI:  And can you put up just for the -- GX-31, just for the witness, please.  Sorry, just a minute.  I apologize.

Q    I'm showing you, just for the witness, GX-15.

THE COURT:  What number?

MR. POLEMENI:  One five.

THE COURT:  Any objection?

**J.A. 326**

*LEEANN N. MUSOLF, RPR*

R. KRETSULA – DIRECT – MR. POLEMENI            365

MR. MAZUREK:  No, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit GX-15, was received in evidence.)

(Exhibit published.)

Q    Do you know the individual in this photograph, Mr. Kretsula?

A    Yeah, Marina.

Q    Marina?

A    Yes.  I don't know the last name.

Q    Okay.  Does she work at Midwood?

A    Yes.

Q    What does she do there?

A    She's also sitting in the same office as Gidi Motovich and do paperwork.

Q    Have you had any business dealings with Marina?

A    Yes.  I come, sometimes, to pick up insurances.  David send me to pick up insurances.  So Marina give me insurances for the company to bring to my customer or the insurances for my company.

MR. POLEMENI:  I'm showing, just for the witness, GX-21.

THE COURT:  Any objection?

MR. MAZUREK:  None, Your Honor.

THE COURT:  You may publish.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA – DIRECT – MR. POLEMENI            366

(Government Exhibit GX-21, was received in evidence.)

(Exhibit published.)

Q    Mr. Kretsula, do you recognize the person in this photo?

A    Yes.

Q    Who is it?

A    I don't know his name.  He's also -- he is also sitting in the second floor in Midwood Lumber next to David's office. He's -- I understand that he's a contractor.  He renting over there, the room, the office.

Q    I'm showing you, just for the witness, GX-20, two zero.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  You may publish.  It's admitted.

(Government Exhibit GX-20, were received in evidence.)

(Exhibit published.)

Q    Do you recognize the individual in GX-20, Mr. Kretsula?

A    No.  I saw him in Midwood Lumber but I don't know who -- his name.  I don't know.

MR. POLEMENI:  Just for the witness, showing GX-21.

THE COURT:  Any objection?

MR. MAZUREK:  What number?

MR. POLEMENI:  Two one.

MR. MAZUREK:  We already admitted this exhibit.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA – DIRECT – MR. POLEMENI            367

MR. POLEMENI:  I'm sorry, one three.

THE COURT:  Any objection to one three?

MR. MAZUREK:  No objection to one three.

THE COURT:  Admitted.  You may publish.

(Government Exhibit GX-13, was received in evidence.)

(Exhibit published.)

Q    Do you recognize the person in this photo, Mr. Kretsula?

A    Lyudmila Motovich, David's wife.

MR. POLEMENI:  And showing GX-30.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  No objection?

MR. MAZUREK:  No objection.

THE COURT:  It is admitted.  You may publish.

(Government Exhibit GX-30, was received in evidence.)

(Exhibit published.)

Q    Who's that, Mr. Kretsula?

A    That's me, Roman Kretsula.

Q    Mr. Motovich -- Mr. Kretsula, I'm going to show you what's marked as GX-4.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  Admitted.  You may publish.

**J.A. 327**

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA – DIRECT – MR. POLEMENI            368

(Government Exhibit GX-4, was received in evidence.)

(Exhibit published.)

Q    Who is depicted in GX-4?

A    Boris Motovich.

Q    Who is Boris Motovich?

A    He's father of David Motovich.

Q    Who did you meet first, Boris Motovich or David Motovich?

A    Boris Motovich.

Q    How did you meet Boris Motovich?

A    I start working myself, like self employee, so they -- they helped me a lot to grow me, give me a lot of jobs, invite me for -- his, also, house painting, and all the family, also, they gave me, all the family, so they helped me a lot to -- to my businesses to start grow up.

Q    You're talking about Boris?

A    Boris Motovich.

Q    Did he introduce you to David?

A    Yes.

Q    Why?

A    I did someone job, I don't remember, this private house, so.  I did, also, Midwood Lumber, I did maintenance in the close -- in the offices.  So he send me to David to pick up the check -- or pick up the money, pick up the payment.  So -- so he said me, go to -- go to my son, second floor in the office, and pick up the payment.

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - DIRECT - MR. POLEMENI          369

Q    Payment for work you had done for Boris Motovich?

A    Yes.

Q    And did you do that?

A    Yes.

Q    Did you have a conversation with Mr. Motovich at that time?

A    That time, no.  I meet him couple times to come pick up this -- come pick it up, like, payments, or he send me -- the father say, I'm not around so my -- my son will be around.  So if you can go over there and talk to him and pick up something.  If you need something, talk to him also.

Q    Did there come a point in time when you had a conversation with David Motovich about your business?

A    Yes.

Q    And can you tell the jury what that conversation was?

A    So for my clients to provide -- to try to give me more jobs, but, like, I don't have -- at that time, I don't have the company and any -- I don't have any insurances so I don't know how to work.  So my -- so I asked the David to -- can you help me to get the insurances and to provide me the company to get the jobs.

He say, okay, no problem.  We'll give you insurances, working comp, disability, give the company names so you can give to the clients so you can get the jobs and you can bring -- to get the checks.  After the checks, bring it to

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - DIRECT - MR. POLEMENI          370

me to give you the cash and I charge you 15 percent.

Q    Now, Mr. Kretsula, you said that you would get certificates, insurance certificates, from Mr. Motovich; is that right?

A    Correct.

Q    And what type of insurance certificates would you get?

A    You have different insurances.  One insurance is general liability insurance.  That covered the property.  If something happens, you know, I'm working, the property damage, like water damage or any damage, so the insurance, it will be covered.  And the other insurance, the workers' compensation insurance, if somebody who I bring, the workers to the job to work, if somebody fall down or somebody break their leg or something happen, the workers' compensation will be covered.

Q    At the time you received these certificates, did you know whether they were legitimate or not?  Whether they were real or not?

A    I don't know because I just pick up the insurances to give to my clients or -- or -- I'm thinking for my company, whether to give my company, I just keep it at home for secure.  But one time, it's happened, like, almost, like -- I don't remember what year, it's 2018 in the end, or 2019 start.  I have an audit every year, working comp, one audit, one audit general liability insurance.

So after I had the audit, worker compensation, my

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - DIRECT - MR. POLEMENI          371

accountant called me and say, Roman, your insurance that you provide for your subcontractors, it doesn't work.

Q    Was that a certificate that you had received --

THE COURT:  Don't talk over each over.

Have you finished your answer?

THE WITNESS:  No.

THE COURT:  Why don't you complete your answer.

A    This insurance doesn't work -- this -- number insurance does not belong to anybody, so this insurance does not work.

Q    Was that a certificate you had received from Mr. Motovich?

A    Yes.

Q    Did you tell Mr. Motovich that?

A    Yes.

Q    And what did he say?

A    He say, I'm sorry, I forgot to tell you, I stopped my insurance.  Don't worry, we'll fix it.

MR. POLEMENI:  Now, if we can go to Government Exhibit 744 again.

THE COURT:  Is that in evidence?

MR. POLEMENI:  It's in evidence, Judge.

THE COURT:  All right.  You can publish it again.

Q    Can you -- in 744-1, the first page, do you see that check, Mr. Kretsula?

A    Yes.

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - DIRECT - MR. POLEMENI          372

Q    Can you explain to the jury what we're looking at here?

A    Okay.  This is SGS Construction.  This is my client's check to give it to me and I'll bring it to David.

Q    Now, SGS Construction, where did you get that company name from?

A    David gave me the company.

Q    Was that your company?

A    No.

Q    Did you work for SGS Construction?

A    No.

Q    It says here in the bottom left, do you see where it says, For?

A    Roman painting.

Q    What did you do with this check after you received it from your client?

A    I bring it to David and David give me the cash minus 15 percent fee.

Q    Did you receive checks -- or did you receive names of other companies from Mr. Motovich?

A    Yes.

Q    Do you recall the names of those other companies?

A    Yes.  I can't remember -- Ago Alaudin, CBC, and maybe one or two more or so, but I don't remember.

Q    Did you work for any of the companies you just mentioned?

A    No.

**J.A. 328**

*LEEANN N. MUSOLF, RPR*

R. KRETSULA – DIRECT – MR. POLEMENI          373

Q    Now, we just saw a check issued from your customer to SGS Construction.  Did other customers of yours also give you checks that were issued to the names of Ago and Alaudin?

A    At the end, yes, yes, some -- a couple customers, like, three or four customers.

Q    And what would you do -- what would you do with those checks?

A    Also, I'll bring to Dave Motovich to do the cashing.

MR. POLEMENI:  We can turn the page.

Q    Now, you said you opened Unique Painting.  Can you remind us when you opened Unique Painting?

A    2012.

Q    Why?  Why did you open Unique Painting?

A    I want to grow up myself, my company, to build my company.

Q    What do you mean by that?

A    I help -- helped grow myself, and helped to grow my business.

Q    Did you continue to bring checks to Mr. Motovich to be cashed?

A    Yes.

MR. POLEMENI:  If we can go to the next page.

Q    This check -- well, it's check number 1645 from Unique Painting Services; is that right, Mr. Kretsula?

A    Yes.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA – DIRECT – MR. POLEMENI          374

Q    Can you tell the jury what this check is for?

A    This check, I write to the Ago and Alaudin and bring to David, and I get the cash minus 15 percent fee.

Q    So you wrote a check for $38,900 to Mr. Motovich; is that correct?

A    Correct.

Q    And he gave you cash in exchange minus a 15 percent fee?

A    Correct.

Q    Whose handwriting is on this check, Mr. Kretsula?

A    David.

Q    So let's start from the top right.  The date.  Who wrote that?

A    It looks like it was David.

Q    You see where it says "Pay to the order of Ago and Alaudin Construction?"

A    Yeah.  That's not my writing.

Q    Who wrote that?

A    David.

Q    Do you see where it says "$38,900?"

A    Yes.

Q    Who wrote that?

A    David.

Q    Do you see where the number -- the letters -- the words, in spelling, "thirty-eight thousand?"

A    Yes.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA – DIRECT – MR. POLEMENI          375

Q    Who wrote that?

A    David.

Q    Who signed the check?

A    I signed the check.

MR. POLEMENI:  Can we put this document side-by-side with the next document.

(Continued on the following page.)

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA – DIRECT – MR. POLEMENI          376

(Continuing.)

BY MR. POLEMENI:

Q    Now, who wrote out this check, Mr. Kretsula?

A    Me.

Q    So if we compare the two checks, the date in check number 1645, you just testified Mr. Motovich wrote that?

A    Yes.

Q    And in check number 1667, the date, whose handwriting is that?

A    That's my handwriting.

Q    And how about where it says "Ago & Alaudin" in check 1667, who wrote that?

A    I'm writing.

Q    And how about the number "33,000" that we see there, who wrote that?

A    I'm writing.

Q    And how about the words "thirty-three thousand," who wrote that?

A    I'm writing.

Q    Who signed the check?

A    I'm signed the check.

Q    Why is check number 1667 written by you and check number 1645 written by Mr. Motovich?

A    Sometimes I ask him to give him the check and if they -- if they -- if he close his table, I ask him to write the

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

**J.A. 329**

R. KRETSULA – DIRECT – MR. POLEMENI          377

checks to company, what do you need to cash the checks.

Q   So sometimes you would write the checks out and sometimes Mr. Motovich would write the check?

A   Yes.

Q   We'll look at some checks a little bit later.

MR. POLEMENI:  If we could turn back to Government Exhibit 353 in evidence.

(Exhibit published.)

Q   This is Midwood Lumber, is that right, Mr. Kretsula?

A   Correct.  Main entrance.

MR. POLEMENI:  If we can pull up, just for the witness, Government Exhibit 310.

It's not in evidence, Your Honor.

THE COURT:  Any objection?

MR. MAZUREK:   No objection, Your Honor.

THE COURT:  Admitted.

(Government Exhibit 310, was received in evidence.)

THE COURT:  You may publish.

(Exhibit published.)

Q   What is Government Exhibit 310, Mr. Kretsula?

A   Midwood Lumber inside the first floor.

Q   This is the first floor of Midwood Lumber?

A   East side, yes.

Q   Would you get cash from Mr. Motovich on the first floor?

A   No, the second floor location office.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. KRETSULA – DIRECT – MR. POLEMENI          378

MR. POLEMENI:  We're going to pull up, just for the witness, Government Exhibit 311.

MR. MAZUREK:  No objection, Your Honor.

THE COURT:  You may publish.

(Government Exhibit 311, was received in evidence.)

(Exhibit published.)

Q   What is Government Exhibit 311?

A   This is steps from first floor go to second floor to David office, and other offices, couple offices more over there.

Q   We saw on the first floor that there were things you could purchase from Midwood Lumber; is that right?

A   Correct.

Q   Was there anything on the second floor to purchase?

A   No, just be the first floor.

Q   What was on the second floor?

A   Second floor, if we meet to David Motovich to bring him the check to checking the checks, so I meet him always second floor.

MR. POLEMENI:  I'm going to show, just for the witness, Government Exhibit 312.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  You may publish.  It's admitted.

(Government Exhibit 312, was received in evidence.)

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. KRETSULA – DIRECT – MR. POLEMENI          379

(Exhibit published.)

Q   What is Government Exhibit 312, Mr. Kretsula?

A   If you look second floor to open the doors, this is sitting area in the offices before go to offices.  So it's called sitting area in the front desk.

Q   Showing you Government Exhibit 313.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  Admitted.  Publish.

(Government Exhibit 313, was received in evidence.)

(Exhibit published.)

Q   What is in Government Exhibit 313, Mr. Kretsula?

A   This is front desk.

Q   Showing you Government Exhibit 329.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  Admitted.  Publish.

(Government Exhibit 329, was received in evidence.)

(Exhibit published.)

Q   What is Government Exhibit 329?

A   David office where he's sitting his table.

Q   Showing you Government Exhibit 330.

THE COURT:  Any objection?

MR. MAZUREK:  No objection.

THE COURT:  Admitted.  Publish.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

**J.A. 330**

R. KRETSULA – DIRECT – MR. POLEMENI          380

(Government Exhibit 330, was received in evidence.)

(Exhibit published.)

Q   What is this?

A   Same thing, office, different side the office.  It's the same office, David Motovich.

Q   Showing you Government Exhibit 331.

THE COURT:  Any objection?

MR. MAZUREK:  No objection, Your Honor.

THE COURT:  Admitted.  Publish.

(Government Exhibit 331, was received in evidence.)

(Exhibit published.)

A   Same office.

Q   Same office?

A   Same office.

Q   Can you explain to the jury, what would happen when you would bring a check to Mr. Motovich's office?

A   So bring the checks, write the checks after he goes to his secret room, they open the doors and bring me the cash. So I take the cash and go away.

Q   You mentioned "room."  Where was this room?

A   In the left side doors open, no handles.

Q   Can you just press on the computer monitor before you to show the jury where it is?

A   (Indicating.)

Q   Showing you Government Exhibit 332. )

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. KRETSULA - DIRECT - MR. POLEMENI          381

THE COURT:  Any objection?

MR. MAZUREK:  No objection.

THE COURT:  Admitted.  You can publish.

(Government Exhibit 332, was received in evidence.)

(Exhibit published.)

Q    What's --

THE COURT:  Screen, please.

Go ahead.

Q    What is Government Exhibit 332, Mr. Kretsula?

A    This is now the secret door is open, it go to this room where the bathroom, sink, and safe.

Q    I show you Government Exhibit 334.

THE COURT:  Any objection?

MR. MAZUREK:  No objection.

THE COURT:  Admitted.  Publish.

(Government Exhibit 334, was received in evidence.)

(Exhibit published.)

A    This is same room and the safe.

Q    What was inside the safe, Mr. Kretsula?

A    Is the money.

Q    Do you see what's on --

Do you notice anything on top of the safe, Mr. Kretsula?

A    Yes.  There's machine to calculate the money.

Q    Can you just circle that on your screen?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - DIRECT - MR. POLEMENI          382

A    (Indicating.)

Q    Now, Mr. Kretsula, did you tell Mr. Motovich what you were doing with the cash that you received from him?

A    Yes.

Q    What did you tell him?

A    That I need the cash to pay the workers.

Q    Showing you Government Exhibit 744, page 048.

THE COURT:  Any objection?

MR. MAZUREK:  It's already in evidence, Your Honor.

THE COURT:  Publish.

(Exhibit published.)

MR. POLEMENI:  744-057.

(Exhibit published.)

Q    What are we looking at here, Mr. Kretsula?

A    This is my checks to SGS Construction, $22,000 -- $2,200.

Q    $2,200; is that right?

A    Correct.

Q    Where did you get the name SGS Construction?

A    From David Motovich.

Q    Did SGS Construction do any work for Unique Painting?

A    No.

Q    Whose handwriting is on that check?

A    David Motovich.

MR. POLEMENI:  If we can turn to Government Exhibit 744-069.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - DIRECT - MR. POLEMENI          383

(Exhibit published.)

Q    What is Government Exhibit  744-069, Mr. Kretsula?

A    This also check from my company to ZKC NYC Inc.

Q    What is ZKC NYC Inc.?

A    This is another company I wrote the check to bring to David and cashing the money.

Q    Did ZKC NYC Inc. do any work for Unique Painting Services?

A    No.

MR. POLEMENI:  Just flip to the next page.

Q    What is this, Mr. Kretsula?

A    This is also check from my company to ZKC NYC Inc., $26,660.

Q    Whose handwriting is that?

A    David Motovich.

Q    Were any of the checks that we just looked at loans, Mr. Kretsula?

A    Excuse me?

Q    Were they loans?  Were they loans?

THE INTERPRETER:  I'm sorry.  Could you speak up, please?

Q    Were they loans?

A    No, no.  These checks I write -- I bring to the check for David, give him to write to cashing me and give me the cash.

Q    Mr. Kretsula, could you have gone somewhere else to get

**J.A. 331**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - DIRECT - MR. POLEMENI          384

cash to pay your workers?

A    No.

Q    Why not?

A    I have David, so I'm cashing the checks.  I didn't have any problem with him.  He also help me to get more jobs.  He introduce me for the contractors to my company to grow out to get my jobs.  So I'm comfortable work with him.

Q    There are other check cashing businesses in New York City; is that right?

MR. MAZUREK:  Objection.

THE COURT:  Overruled.

A    Yes.

Q    And if you had gone to any of those check cashing businesses, would you have paid 15 percent?

A    No.

Q    So why did you decide to --

Well, how much would you have paid?

A    I pay, like, if I go to check cashers I know, 2, 3 percent.

Q    So why did you pay 15 percent with Mr. Motovich?

A    Couple things.  First of all, I don't want to get record, my records, so I'm cashing the checks.

Q    What do you mean by that?

A    If I'm cashing the checks, I have a record.  So the cashing company, it has my all the information with my company

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. KRETSULA - DIRECT - MR. POLEMENI        385

name, my tax ID number the company.  So they held the records from cashing the checks.  So if you have audit or something, the cash checking, so if audit -- the IRS show to check if you have cashing so much cash, so ask me where they're using this cash.  So I don't have explanation.  If I had to say, I will pay the workers.

Q    Did you understand that Mr. Motovich would not be reporting your transaction?

A    Yes.

Q    Any other reasons why you paid Mr. Motovich 15 percent?

A    He helps me to get more jobs.

Q    What do you mean by that?

A    He introduce me more contractor to get more jobs to working more, so my company more grow out.  I have more businesses, more work.

Q    Any other reason why you paid Mr. Motovich 15 percent?

A    No.

Q    Mr. Motovich, you talked about getting jobs from Mr. Motovich.

A    Yes.

Q    He would refer you --

THE COURT:  Would you read the question back, please?  Keep your voice up.

(Record read.)

Q    Mr. Kretsula, you talked about getting jobs from

R. KRETSULA - DIRECT - MR. POLEMENI        386

Mr. Motovich.

A    Yes.

Q    What do you mean by that?

A    So directly from David Motovich or from his -- he recommend me to the --

Q    Well, did he recommend you work?

A    Yes, yes.  So he recommend me couple -- couple contractors.  The contractor give me the job.  So I am more secure.  I know the contractor will pay me money.  They don't pay me the money, so talk to David, David, this guy is holding my money, so David to help me to get my -- to get the money.

MR. POLEMENI:  Just for the witness, I'm showing you Government Exhibit 11.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 11, was received in evidence.)

(Exhibit published.)

Q    Who is in Government Exhibit 11?

A    Shia.

Q    Do you know Shia's last name?

A    No.

Q    I'm going to show you Government Exhibit 16.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

R. KRETSULA - DIRECT - MR. POLEMENI        387

THE COURT:  Admitted.

(Government Exhibit 16, was received in evidence.)

(Exhibit published.)

Q    Who is in Government Exhibit 16?

A    That's Menacham.

Q    Do you know Menacham's last name?

A    No.

Q    Who is Shia?

A    Shia and Menacham is two brother.  He's working.  His only company Royal Builders.

Q    They own a company called Royal Builders?

A    Royal Builders.

Q    Did Mr. Motovich refer you to Royal Builders for work?

A    He -- he introduce me for Shia, his office.

Q    And did you eventually obtain work from --

A    After that, like couple months after that I get the job from this company.  I got like three or four job from this company.

Q    Do you know a man named Rich Pesce?

A    Yes.

Q    Who is that?

A    That's also contractor.  Also David Motovich introduce me.

Q    And did you do work for Mr. Pesce?

A    Yeah, two jobs.

**J.A. 332**

R. KRETSULA - DIRECT - MR. POLEMENI        388

Q    Do you recall the name of his company?

A    Merrick Group.

Q    Do you recall where those jobs that you did for him were located?

A    One Located 72nd Street, close to Fifth Avenue, close to Central Park, and the other job is close to Chinatown.  I forgot the others.  Downtown Brooklyn -- downtown Manhattan, sorry.

Q    Now, Mr. Kretsula, you mentioned that you would receive insurance certificates from Mr. Motovich?

A    Correct.

Q    What would you do with these certificates?

A    So before I don't have company, so I bring the certificate to my clients --

Q    This is before you opened up Unique?

A    Yes, yes, I bring to my clients because if I not bring to my client the certificate insurance, they will not pay me the money, not give me the check and not give me the jobs.  And after I'm open my company, so I'm just holding this.  When they give me certificate, I'm holding in my office.  And after I have audit, I provide this company, worker compensation company or general liability company.

MR. POLEMENI:  I'm showing just to the witness Government Exhibit 1015.

THE COURT:  Any objection?

R. KRETSULA - DIRECT - MR. POLEMENI          389

MR. MAZUREK:  No, your Honor.

THE COURT:  Admitted.

(Government Exhibit 1015, was received in evidence.)

(Exhibit published.)

Q    What is Government Exhibit 1015, Mr. Kretsula?

A    I see here --

MR. POLEMENI:  If you can blow up -- there you go.

Q    Let's start from the bottom of the email.

What is the bottom of the email?  Who is writing this email?

A    From David Motovich.

Q    Is that your email address, romausa7@gmail.com?

A    Correct.

Q    And what is the subject?

A    The subject?  I see the Marina's email, so probably I get insurance certificate.

Q    Remind us, who is Marina?

A    Marina work in the office, second floor.  He sometimes give me insurances, provide me insurances from these company.

MR. POLEMENI:  If we go to the next page.

Q    What are we looking at on the second page here, Mr. Kretsula?

A    I don't see.

MR. POLEMENI:  Can you blow up the top there?

A    This insurance from Ago Alaudin General Contracting Corp.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - DIRECT - MR. POLEMENI          390

to -- in the bottom I see my company Unique Painting Services.

Q    Did Ago & Alaudin do any work for Unique Painting Services?

A    No.

Q    Do you know whether this insurance certificate is real?

A    No.

THE COURT:  No, it's not real, or no, you don't know?

THE WITNESS:  I don't know.

THE COURT:  Go ahead.

Q    What would you do with this certificate?

A    This certificate, take this certificate and after have audit, so I show to my working compensation audit, insurance audit, or general liability audit.

Q    And why would you show it to them?

A    If I'm not show him this insurance, so every money I arrive for this company, I have to pay a penalty, around 20 to 22 percent penalty.

THE COURT:  How much longer do you have with this witness?

MR. POLEMENI:  Probably about another hour or so, Judge.

THE COURT:  We'll take our 3:00 break now as promised to the jury.  We'll be back at 3:15, and you will hold me to the 5:00 hard stop time because you see that clock

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - DIRECT - MR. POLEMENI          391

is still working.

You do not talk about the case.  We'll take a 15-minute break.  We'll be back at 3:15 and we'll stop promptly for the day at 5:00 as I promised.  Please do not talk about the case.

THE COURTROOM DEPUTY:  All rise.

(Jury exits.)

THE COURT:  You may step down, sir.  Thank you.

(Witness leaves the stand.)

THE COURT:  You can please leave the courtroom now and we'll call you back.

Ladies and gentlemen of the public, you may be seated.  Counsel, you may be seated.

(Witness leaves the courtroom.)

THE COURT:  The witness has left the courtroom.

Do we have any issue to address as we begin our break?  From the Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Okay.  Enjoy your 15-minute break. We'll resume at 3:15.

(Recess was taken.)

THE COURT:  You may be seated.

Do we have any issues to address before we bring the

**J.A. 333**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - DIRECT - MR. POLEMENI          392

jury back in?  From the Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Please bring the jury in, and the witness can come back to the stand.

(Witness enters the courtroom and resumes the stand.)

THE COURT:  Come back to the witness stand, sir. Just remain standing until the jury comes in.

And you can return to the podium, counsel, and be ready to go.

(Pause in proceedings.)

THE COURT:  Please stand for the jury.

(Jury enters.)

THE COURT:  Thank you, ladies and gentlemen. Appreciate your promptness.  Please be seated.

Ladies and gentlemen of the public, you may be seated, as well.

We will continue with the examination.  You're still under oath, sir.

Please continue, counsel.

MR. POLEMENI:  Thank you, Your Honor.

BY MR. POLEMENI:

Q    Mr. Kretsula, we were talking a little while ago about

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. KRETSULA – DIRECT – MR. POLEMENI          393

insurance certificates.  You also mentioned a man by the name of Rich Pesce.  Do you remember that?

A    Yes.

Q    Can you remind us, which company does Rich Pesce own?

A    Merrick, Merrick Group; M-E -- Merrick.

MR. POLEMENI:  Just for the witness, Your Honor, Government Exhibit 237.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 237, was received in evidence.)

(Exhibit published.)

MR. POLEMENI:  Thank you, Your Honor.

Q    What is Government Exhibit 237, Mr. Kretsula?

A    Subcontract agreement.

Q    Who is the subcontract agreement between?

A    Between Merrick Group and my company, Unique Painting Services.

Q    Was this for a project, a painting job you did?

A    Yes.

Q    Where was the property located at?

A    Is 12-14 East 72nd Street, New York, New York.

Q    And if we turn to page GX 237-7, do you see there are a punch of signatures there, Mr. Kretsula?

A    Yes.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA – DIRECT – MR. POLEMENI          394

Q    Is one of those yours?

A    In the right side.

Q    You signed on behalf of Unique Painting Services?

A    Correct.

Q    What is a subcontractor?

A    So I got the job for -- if I got the job for the contractor, so I'm called subcontractor.

Q    Let me take a step back.

Start from the top.  What is a general contractor?

A    General contractor is control the job, control the subcontractors.  You have one general contractor and you have 50 to 60 subcontractor to finish the job.  So plumber, electrician, painters, concrete guy, roofers, and other.  So this -- so the general contractor to confirm to also the owner to hire the subcontractors.

Q    And you were a subcontractor for this --

A    Yes.

Q    And you provided painting services as a subcontractor?

A    Painting and taping.

MR. POLEMENI:  If we could turn to page 237-04.  And if we could blow up paragraph 9.4, Ms. Kannan.

Q    Do you see that paragraph, Mr. Kretsula?

A    Yes.

Q    So it says that the subcontractor shall maintain no less than the limits specified for each of the following insurance

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA – DIRECT – MR. POLEMENI          395

coverages, and then it lists commercial general liability, workers compensation, and comprehensive automobile liability. Do you see that?

A    Yes.

Q    What is it that the subcontractor has to provide to a general contractor?

A    So has to -- the subcontractor has to provide insurances. If not provide insurances, we not get the jobs.  Why?  Because the first, like, commercial general liability insurance, the coverage to cover all the walls, ceilings, floors, to cover the property damage.  And the other one, B, worker compensation, if something happen with my workers in the site in the job or somebody don't bring the workers to the job, so something happen, so worker compensation help compensate him the -- his -- whatever break the leg or break the -- some --

Q    Does a general contractor require subcontractors to provide --

A    Yes, it provide --

THE COURT:  You have to let him finish the question.

Please finish the question, then you answer.  Go ahead.

MR. POLEMENI:  Thank you, Judge.

Q    Do general contractors require subcontractors to provide liability insurance and workers compensation insurance?

**J.A. 334**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA – DIRECT – MR. POLEMENI          396

A    Yes.

Q    And do they require proof of that insurance?

A    Yes.

Q    In your experience, what would happen if you don't provide proof of insurance?

A    If I'm not providing proof insurance, I will never get the job.

Q    Did Unique Painting have liability insurance?

A    Yes.

Q    Did Unique Painting have workers compensation insurance?

A    Yes.

Q    And would you provide Unique Painting's insurance to general contractors?

A    Correct.

Q    We were talking earlier about certificates of insurance that Mr. Motovich would give you.  What would you do with those certificates of insurance?

A    Same thing.  I provide to the customers before I have my insurance.

Q    Before you had Unique Painting --

A    Correct.

Q    -- you would provide those insurance certificates to your customers; is that right?

A    Yes, right.

Q    And those insurance certificates would be in the name of

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. KRETSULA - DIRECT - MR. POLEMENI     397

Ago & Alaudin?

A    Correct.

Q    SGS?

A    Yes.

Q    After you formed Unique Painting, would you provide those insurance certificates to your customers?

A    After I got insurances?  Yes, I provide only my insurance.

Q    You provided your insurance?

A    After set up the insurance, yes, I provide only my insurance.

Q    So why would you need -- why did you get from Mr. Motovich insurance certificates that we saw earlier in the name of Ago & Alaudin?  What would you do with those?

A    Can you explain to me one more time?

Q    Sure.

     What would you do with the insurance certificates that were -- that you got from Mr. Motovich that were in the name of Ago & Alaudin when you already had your own insurance?

A    I don't know.

Q    Well, would you use them for a particular --

     Would you keep them for a particular reason?

A    Probably I provide the insurance only before I got my insurances.

Q    I understand.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - DIRECT - MR. POLEMENI     398

     Would you provide, when you formed Unique --

A    Yes, correct.

     THE COURT:  Wait until he finishes the question.

     MR. POLEMENI:  Thank you, Judge.

Q    After you opened Unique Painting, you would still receive insurance certificates from Mr. Motovich; is that correct?

A    To my company.

Q    To your company.  And what would you do with those insurance certificates?

A    I provide to my insurance company.

Q    Why would you do that?

A    If I'm not provide to my insurance company, I will pay the penalty because I write the check to Ago Alaudin.  So Ago Alaudin has to give me insurance --

Q    Were you telling --

A    -- certificate.

     THE COURT:  Don't interrupt his answer.

     Please read the question again and the answer until the interruption and then let the witness finish.  And keep your voice up, Madam Reporter.  Use the microphone from my Court Deputy so everybody can hear it.

     (Record read.)

     THE COURT:  Put another question.

     MR. POLEMENI:  Thank you, Judge.

Q    What were you telling your insurance company the checks

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - DIRECT - MR. POLEMENI     399

from Unique Painting to Ago & Alaudin were for?

A    My subcontractors.

Q    And so why did you need the insurance certificates that Mr. Motovich was providing to you?

A    If I don't get that insurance, I have to pay the penalty 20 percent.

Q    And which penalty are you referring to?

A    So any company what I provide -- if -- if I provide -- if I write a check for any company, that company has to be insured.  If not insured, I have to cover it.  So I have to pay myself the coverage.  So that's coverage cost around, penalty, 20, 22 percent.

     MR. POLEMENI:  If we can pull up Government Exhibit 744.

     (Exhibit published.)

     MR. POLEMENI:  We've seen this exhibit before.

     If we can go to Government Exhibit 744-009.

     (Exhibit published.)

Q    Mr. Kretsula, have you been to check cashers in New York City?

A    Only one.

Q    And which one was that?

A    This Payroll, across the street from Midwood Lumber.

     THE COURT:  What was the answer, sir?

A    Cashing across the street from Midwood Lumber, it's

**J.A. 335**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - DIRECT - MR. POLEMENI     400

called Payroll cash checking.

Q    Government Exhibit 744-009 is a check from Unique Painting, your company, to Ago & Alaudin General Contracting, correct?

A    Correct.

Q    Would you have been able to go into a check casher in New York City and cash this check?

A    No, because that's not in my name.  This is write to Ago Alaudin, so only the owner of Ago Alaudin has to cash this check.

Q    And you weren't the owner of Ago Alaudin?

A    I'm not the owner of Ago Alaudin.

Q    Where was the only place you could have cashed this check?

A    I cash check, this, in David Motovich.

Q    Could you have cashed it with any other person?

A    No.

Q    Now, you mentioned the payroll company across the street from Midwood Lumber, right?

A    Correct.

Q    Showing you what's marked as Government Exhibit 24.

     MR. POLEMENI:  It is not in evidence, Judge.

     THE COURT:  In evidence?

     MR. POLEMENI:  It is not in evidence.

     THE COURT:  Any objection?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. KRETSULA – DIRECT – MR. POLEMENI       401

MR. MAZUREK:  No objection.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 24, was received in evidence.)

(Exhibit published.)

Q    What is Government Exhibit 24, Mr. Kretsula?

A    This is Payroll cash cashing.  This is –– see the sign here, the sign, and here the entrance door, the black door, looks like glass door.

Q    Now, to the left of the sign there's another sign ––

THE COURT:  Would you pull the microphone to you, sir?  It will move to you.  You don't have to stay there, but you've got to move it.

Go ahead.

Q    To the left of that sign, there's another sign.  Do you see it?

A    Yeah.

Q    In blue.

A    Home Care.

Q    Does it say All Health Home Care?

A    All Health Home Care.

Q    Do you know what that is?

A    Yes, probably.

Q    What is it?

A    This –– I know this is dialysis center.

(Continued on the following page.)

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

Kretsula – Direct – Polemeni       402

BY MR. POLEMENI (Continuing):

Q    There's a dialysis center at that location?

A    I remember that area, yes.

Q    Do you know who owns that dialysis center?

A    I know the part.  It's not the owner, he's like ––

THE INTERPRETER:  Oh, part.

THE WITNESS:  Part.

THE INTERPRETER:  Part owner, co-owner.

THE WITNESS:  Co-owner.

MR. POLEMENI:  Go to Government Exhibit 300, please.

THE COURT:  In evidence?

MR. POLEMENI:  Yes.

THE COURT:  Objection?

MR. MAZUREK:  No, your Honor.

THE COURT:  Admitted.  Publish.

(Government Exhibit 300 so marked and published to the jury.)

Q    What is Government Exhibit 300, Mr. Kretsula?

A    It's payroll check cashing.

Q    It's a little hard to see, but can you read the number of the address?

A    1122 Coney Island Avenue.

MR. POLEMENI:  If I can show Government Exhibit 26?

THE COURT:  Any objection?

MR. MAZUREK:  No, your Honor.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

Kretsula – Direct – Polemeni       403

THE COURT:  Admitted.  Publish.

(Government Exhibit 26 so marked and published to the jury.)

Q    If you look at the right, what are we –– what are we looking at here, Mr. Kretsula?

A    Okay.  You ask me to look at he right.  The right side is cash checking payroll and the left side, little bit far, is Midwood Lumber.  And second floor, second floor, is Dave's office.

Q    Can you circle on the screen where the payroll location is?

MR. POLEMENI:  And maybe if we can blow it up a little, Ms. Kannan.

And then if you can maybe blow up –– yes.

Q    And can you circle where Midwood Lumber is located?

Do you see where Mr. Motovich's office is?

A    Yes, second floor.

Q    Mr. Kretsula, I'll show you what's marked as Government Exhibit 301.

MR. POLEMENI:  It's not in evidence, your Honor.

THE COURT:  Clear the screen.

Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 301 so marked and published to

**J.A. 336**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

Kretsula – Direct – Polemeni       404

the jury.)

Q    Mr. Kretsula, what is Government Exhibit 301?

A    This is bill checking inside, close to front desk.  You walk inside, that's the waiting area.

Q    Showing you Government Exhibit 302?

THE COURT:  Any objection?

MR. MAZUREK:  No, your Honor.

THE COURT:  Admitted.

(Government Exhibit 302 so marked and published to the jury.)

A    This is back room in payroll, cash checking payroll.

Q    Showing you Government Exhibit 304?

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.  Publish.

(Government Exhibit 304 so marked and published to the jury.)

Q    What is Government Exhibit 304?

A    I don't know.  This looks like cash checking.

THE COURT:  If you don't know, you don't know.

Next exhibit, next question.

Don't speculate.

Q    Mr. Kretsula, do you know who owns the check cashing place?

A    Yanki.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

Kretsula – Direct – Polemeni          405

Q    Is that his first name?

A    The first name.

Q    Have you met Yanki?

A    Yes.

Q    Mr. Kretsula, how would you communicate with Mr. Motovich?

A    For I need him, I send him message:  Can I meet you?  Can I stop by?

And after a week, he reply.  He say:  Yes, I'm here in the office.  Stop by or come over or come tomorrow.

So, I will stop by.

Q    And when you said you asked if you could stop by, what were you asking?

A    Can I come now?

Q    For what?

A    To bring the checks or pick up the cash.

MR. POLEMENI:  Show just the witness Government Exhibit 1203.

THE COURT:  Any objection?

Is this in evidence?

MR. MAZUREK:  No objection, your Honor.

THE COURT:  Admitted.

(Government Exhibit 1203 so marked and published to the jury.)

Q    Have you seen these before, Mr. Kretsula?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

Kretsula – Direct – Polemeni          406

MR. POLEMENI:  Can you blow up the screen?

THE COURT:  You have to blow them up.  It's not legible.

It's still tough to read.

Can you see it, ladies and gentlemen of the jury?  Can you read it?

They can read it, go ahead.

Q    Mr. Kretsula, what are these?

A    This is text messages before me and David Motovich.

Q    It says -- do you see in the top left:  Participant, David Motovich, owner.

And is that Mr. Motovich's phone number?

A    Yes.

Q    Do you see below that, it says:  Roman Painter?

A    Yes.

Q    Is that your phone number?

A    Correct.

MR. POLEMENI:  If we can turn to Page 1203-007.

If you could blow up that middle text.

Q    Do you see that text message on January 30 of 2017, Mr. Kretsula?

A    Yes.

Q    What are you asking?

Are you asking a question there?

A    Yes, can I see you today?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

Kretsula – Direct – Polemeni          407

Q    What are you asking?

A    Ask to bring the check or pick up the money.

Q    What does Mr. Motovich respond?

A    Tomorrow.

MR. POLEMENI:  Now, if we could go, Ms. Kannan to Goverment Exhibit 744-093.

THE COURT:  Is that in evidence?

MR. POLEMENI:  It is, Judge.

THE COURT:  Go ahead.

(Exhibit published to the jury.)

MR. POLEMENI:  Actually, 744-092 Ms. Kannan, I'm sorry.

Q    What are we looking at here, Mr. Kretsula?

A    I see this check from my company to ZKC NYC Corporation, $26,200.  I write check for this company.

Q    When you were asking Mr. Motovich if you could see him, you were asking if you could bring him this check?

A    He not ask me if I'm bringing this check.  To get the cash.

MR. POLEMENI:  If you could go, Ms. Kannan, to Government Exhibit 1203-010 and that third text.  Thank you.

Q    Do you see that text message, Mr. Kretsula, dated February 13 of 2017?

A    Can I see it today?

Q    What are you asking there?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

Kretsula – Direct – Polemeni          408

A    I'd like to stop by to bring the checks or pick up the money.

Q    What does Mr. Motovich respond?

A    Yes.

MR. POLEMENI:  If you turn or go to, Ms. Kannan, Government Exhibit 744-094.

Q    What is Government Exhibit 744-094?

A    I write a check from my company to ZKC NYC Corporation of $29,000.  My sign.  So, I bring to David to get the cash.

Q    And the date of that check is what, Mr. Kretsula?

A    Excuse me?

Q    What is the date of the check?

A    2/13/17.

Q    Is that the same day we just saw you sent that text message?

A    Correct.

Q    When you gave this check to Mr. Motovich for $29,000, what did he give you?

A    He gave me minus 15 percent fee, sometimes gave me all the money, sometimes give me part of the money and I have to come back one more time to pick up the rest.

Q    Just to be clear, Mr. Kretsula, this was not a loan, right?

A    It's not a loan.

MR. POLEMENI:  If we could turn, Ms. Kannan, to

**J.A. 337**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

Kretsula – Direct – Polemeni     409

Government Exhibit 1203-013, and if we could go to the –– yes, thank you.

Q   Do you see that text message dated March 30 of 2017, Mr. Kretsula?

A   Yes.

Q   What are you asking Mr. Motovich?

A   You already back?

Q   What are you asking?

Why are you asking that?

A   If he back from probably vacation or something, if he's in the office.

Q   You're asking if he's in the office?

A   Correct.

Q   And what does Mr. Motovich say?

A   Yes, come now.

MR. POLEMENI:  I think turn, Ms. Kannan, to Government Exhibit 744-098.

Q   What are we looking at, Mr. Kretsula?

A   It's my check write to ZKC NYC, 38,000 and 200.  So, I'm bring the check to cashing.

MR. POLEMENI:  Ms. Kannan, if we could turn to Government Exhibit 1203-017, if you can pull up the first two text messages, please.

Q   Do you see, Mr. Kretsula, the top text message from you dated April 30, 2017?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

Kretsula – Direct – Polemeni     410

A   Yes.

Q   What do you write to Mr. Motovich?

A   Send me, please, your address.  I want to ––

Send me, please, your address.  I want to send to Angus.  Agnus is his first name, A-N-G-U-S.

Q   And does Mr. Motovich respond to you?

A   Yes.

Q   What does he write?

A   303 East 58th Street.

Q   And what do you ask him?

A   47th Floor, correct?

Q   And what does he respond?

A   Yes, 47-G.

Q   Why are you asking for Mr. Motovich's address here?

A   Angus, this is the people to painted probably his apartment.

Q   Did you do work for Mr. Motovich at his apartment?

A   Yes, I do painting job.

Q   What did you do?

A   I do sanding, priming, and painting.

Q   Did Mr. Motovich pay you for that?

A   No.

MR. POLEMENI:  If you can turn, Ms. Kannan, to Government Exhibit 1203-022, and if you could put that first message on top.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

Kretsula – Direct – Polemeni     411

Q   Do you see, Mr. Kretsula, that you sent Mr. Motovich a .jpeg, a picture?

A   I don't see the picture, I see only my own name.

Q   It says Image 0441; is that right?

A   Correct.

MR. POLEMENI:  Ms. Kannan, if we could turn to Government Exhibit 1203-A-006, which is not in evidence.

THE COURT:  Any objection?

MR. MAZUREK:  No, your Honor.

THE COURT:  Admitted.  Publish.

(Government Exhibit 1203-A-006 so marked and published to the jury.)

Q   What are we looking at here, Mr. Kretsula?

A   This is my insurance certificate.  It's my insurance –– copy bills of insurance; not certificate, this is copy of bill of my insurance.

Q   This is the insurance for Unique Painting Services?

A   Correct.

Q   Do you recall why you were sending this to Mr. Motovich?

A   I don't remember.

MR. POLEMENI:  Ms. Kannan, if we could turn to 1203-030 and if we could go to the bottom text.

Q   What are you writing to Mr. Motovich there, Mr. Kretsula?

A   This is $50,720 balance from Invoice 360 and $3,170 balance from Invoice 388.

**J.A. 338**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

Kretsula – Direct – Polemeni     412

MR. POLEMENI:  And then if you turn to the next page, Ms. Kannan, 1203-031.  Blow up that first top message.

Q   What do you write?

A   Only 72nd Street.

Q   What were you writing to Mr. Motovich there?

A   He recommend me to work with Mr. Pesce.  This is on 72d Street.  So, he's holding my money.  He's not pay me.  I'm almost finish the job.

So, I ask him to call him to tell him to pay me the money.

Q   Why did you ask Mr. Motovich?

A   Because he knows him.  He introduced me to Mr. Pesce.

MR. POLEMENI:  Ms. Kannan, if we can turn to 1203-041.  Go to the top text message.

Q   What do you write to Mr. Motovich there, sir?

A   Can I pick up my balance, 30?

Q   What are you asking Mr. Motovich?

A   I'm asking to pick up my money, 30,000.

Q   And what does he say to you?

A   Next week.

Q   Do you respond to him?

A   Monday, please.  Thanks.

Q   Why are you writing, "Monday, please"?

A   Because probably I need money to pay for the workers.

Q   Did Mr. Motovich know you were paying workers?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

Kretsula – Direct – Polemeni      413

A    Yes.

Q    How did he know?

A    I tell him I need to pay my workers.

Q    Showing you, Mr. Kretsula, Government Exhibit 1203-44.

(Exhibit published to the jury.)

MR. POLEMENI:  If we look at the top two text messages, please.

Q    What does Mr. Motovich write to you there, sir.

A    He has come to me.

Q    What is the next message?

A    CK cashing place.

Q    Where was Mr. Motovich telling you to go?

A    To cross the street, payroll cash check.

MR. POLEMENI:  Turning the page to Government Exhibit 1203-045 and the text message to you.

Q    What do you ask Mr. Motovich?

A    Good morning, David.  What time can I meet you today?

Q    What are you asking him?

A    I'm asking him because probably I have to pick up the money or bring the check.

Q    And what does he respond?

A    Come now to payroll.

Q    Where is he telling you to go, Mr. Kretsula?

A    Sometimes he meet me over there.

Q    Where?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

Kretsula – Direct – Polemeni      414

A    At the payroll, and I will go with him to go to his office upstairs.

Q    Sometimes he would tell you to go to the payroll place to meet him there?

A    Yes.

Q    What would you do there?

A    Excuse me?  Sorry.

Q    Why would you go there?

A    He asked me to come there because he's there.  So, I meet him over there, and after we go with him together across the street to his office.

MR. POLEMENI:  If we can turn to Government Exhibit 1203-047, the top text, please.

Q    What do you ask Mr. Motovich?

A    Can I pick up from Yanki.

Q    Can you remind the jury who Yanki is?

A    Yanki the owner of the payroll cash checking.

Q    What are you -- why are you asking Mr. Motovich if you can -- what are you asking Mr. Motovich what you can pick up from Yanki?

A    Because probably I need the money and maybe David on vacation or not around, so I'm asking can I go to Yanki and pick up the money.

Q    And Mr. Motovich told you that you can go to Yanki to pick up?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

Kretsula – Direct – Polemeni      415

A    Yes.

MR. POLEMENI:  And if you go down to Mr. Motovich's response.

Q    What does he say?

A    Go to Yanki.

Q    And what do you respond?

A    Thank you.  Thirty.

Q    What are you telling Mr. Motovich there?

A    Thank you for 30.  He has to give me 30,000.

Q    You want to go to Yanki to pick up $30,000?

A    Correct.

Q    Did you bring any of the checks that we saw earlier today to Coney Island Payroll, to the payroll place?

A    No, I'm cashing only three or four checks over there.

Q    Which checks had you cashed?

A    This is personal small checks; three, five thousand dollar checks.

Q    Why are you asking Mr. Motovich if you can go to Yanki?

A    He send me sometimes go to Yanki, pick up the money from Yanki.

Q    And what does Mr. Motovich respond?

A    No, 20.

Q    What is he telling you?

A    So, not 30,000, it's only 20,000 I can pick up.

MR. POLEMENI:  And if you turn the page, Ms. Kannan,

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

Kretsula – Direct – Polemeni      416

to GX 1203-048, the top message, please.

Q    What does Mr. Motovich say?

A    Next week.

Q    What is he telling you there?

The previous message he said:  No, 20.

Is that correct?

A    Dave say:  No, 20.  Correct.

Q    His next message is:  Next week.

Do you know what he's telling you there?

A    I don't remember.

Q    What do you respond?

A    Okay.

Q    And then that's at June 21 of 2018 at 11:44; is that correct?

A    6/21/2018.

Q    And then you send another message to him?

A    Call, please.

Q    And you send another message right after.

A    I am now payroll.

Q    What are you telling Mr. Motovich?

A    Because sometimes I go to payroll to pick up the money. And if it was one of the front desk workers, he said:  I don't know about that.  I don't know about that because nobody calls me to give you the money.

So, I texted David to send the message to payroll so

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

**J.A. 339**

Kretsula – Direct – Polemeni            417

I can pick up the money.

Q    And Mr. Motovich responds to you?

A    Okay.  Done.

Q    What was he telling you?

A    So, he already called office, Yanki, or talk to the workers to give me the money.

MR. POLEMENI:  If you turn, Ms. Kannan, to 1203-049, the middle --yup.

Q    What are you asking Mr. Motovich there, sir?

A    Hi, David.  Can I meet you now?

Q    What does he respond?

A    Yes.  Come to Yanki.

MR. POLEMENI:  If you turn, Ms. Kannan, to 1203-050. Yes, that right there.

Q    You sent a text message to Mr. Motovich on July 11 of 2018.

Do you see it?

A    Send me please now.

Q    And he responds?

What is his response?

A    His response is 7/11/20.

Q    What does he say?

A    2018.

His response:  CNBC Construction Corp.

Q    What are you asking Mr. Motovich for?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

Kretsula – Direct – Polemeni            418

A    To -- I have to write probably the check with his company, to cash in after.

Q    You were asking him for the name of a company to write a check to?

A    Yes.

MR. POLEMENI:  Ms. Kannan, if we can turn to Government Exhibit 708-C-068, which is in evidence by stipulation?

THE COURT:  Is it in evidence?

MR. POLEMENI:  It is in evidence by stipulation, I believe, but I can double-check that, Judge.

THE COURT:  Any objection?

MR. MAZUREK:  No, your Honor.

THE COURT:  It's admitted.  You may publish.

(Government Exhibit 708-C-068 so marked and published to the jury.)

Q    What is this check, Mr. Kretsula?

A    This check from my customers to CNB Construction Corp.

Q    What is the date of the check?

A    July 11, 2018.

Q    Is that the same date that we just saw earlier?

A    Correct.

Q    When Mr. Motovich texted you the name CNB Construction Corp?

A    Yes.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

Kretsula – Direct – Polemeni            419

Q    So, who is this check from?

A    This is from my customer to the company.

Q    When you say "customer," what do you mean?

A    I'm painting the job over there.

Q    You were painting --

A    A private house, Unique Painting.

Q    Unique Painting was painting the job?

A    Yes.

Q    Why did your customer write a check to CNBC Construction Corp.?

A    Because probably I need some quick money.  So, my customer write straight to David company so I'm cashing almost the same date.

I think the customer write to my company I have to go to deposit, deposit to the bank, wait couple of days to all clear, and then I write from my company to Dave company again. So, I want to be more quick to get the money.

Q    Did CNB Construction Corp. do any work for the people who wrote this check?

A    No.

Q    Who did the work?

A    Unique Painting Services.

Q    When you received this check from your customer, what did you do with it?

A    I agreed to delay it and I get the cash minus 15 percent

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

Kretsula – Direct – Polemeni            420

fee.

Q    15 percent of $30,000 is how much Mr. Kretsula?

A    It's $4,500.

MR. POLEMENI:  If you turn to Government Exhibit 708-C-703.

Q    What is this check?

A    The same exact from my clients when I'm painting the job. So, they write to CNBC Construction Corp., 30,000.

Q    Did CNBC do any work for your client for this check?

A    No.

Q    Who did the work?

A    Unique Painting Services.

Q    And what did you do with this check after you received it from your customer, your client?

A    I bring to David and I got the cash minus 15 percent fee.

MR. POLEMENI:  Turn to Government Exhibit 1203-054, please.  Go to the middle text, Ms. Kannan -- I'm sorry, go to the top text.  Thank you.

Q    This is a text message you sent to Mr. Motovich October 8 of 2018, correct?

A    Correct.

Q    And what are you asking him?

A    Can I meet you 1:40 to 2 o'clock today?

Q    What does he respond?

A    Tomorrow.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

**J.A. 340**

Kretsula - Direct - Polemeni                421

Q    Then does he send you another message right afterwards?

A    Today bank closed.

Q    What is Mr. Motovich telling you there?

A    The bank close so he can't cashing the payroll.  He don't have probably the money to pay.

Q    Why not?

A    The bank is closed.  Not delivering the money, not delivering the cash.

Q    The bank wasn't delivering cash to the payroll company?

A    Correct.

              (Continued on the following page.)

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - DIRECT - POLEMENI                422

(Continuing.)

          MR. POLEMENI:  Ms. Kannan, can we turn to Government Exhibit 1203-059, please.  And if we can just -- yeah, that one there.  Thank you.

Q    That middle text message.  Do you see, Mr. Kretsula, that you sent Mr. Motovich an image?  It's number 7382?

A    Seven eight two -- eight two, image.

Q    Seven three eight two.

A    Seven eight eight two.

          MR. POLEMENI:  And if we can go, Ms. Kannan, to Government's Exhibit 1203-A-015.

Q    What is this, Mr. Kretsula?

A    Midwood Building Corp, check to travel group.

Q    What is Midwood Building Corp?  Do you know?

A    I don't know.  It's probably -- it's one of the --

          MR. MAZUREK:  Objection, Your Honor.

          THE COURT:  Sustained.  Can you make it clearer, please?  I'm sustaining the objection.

          MR. POLEMENI:  That's fine, Judge.

          THE COURT:  You said "probably," so it's tough to read.  Can you make it clearer?  Blow it up, do something electronically to make it more legible.  There you go.

          Can you see it clearly, ladies and gentlemen of the jury?

          Okay.  Go ahead.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - DIRECT - POLEMENI                423

          MR. POLEMENI:  Thank you, sir.

          THE COURT:  Put another question.

          MR. POLEMENI:  Before I -- before I ask another question on this document, can we go, Ms. Kannan, to Government's Exhibit 744-103.

BY MR. POLEMENI:

Q    What is this check, Mr. Kretsula?

A    This is my company to Midwood Building Corp., 29-thousand dollar.

Q    Whose handwriting is on this check?

A    David.

Q    How do you know that?

A    I know his handwriting because if I give him a check, I see how he writing my check.

Q    You would watch him write the check?

A    Correct.

Q    What is this check for, Mr. Kretsula?

A    This check for -- after I give him this check, I -- I get the cash minus 15 percent fee.

Q    Do you see where it says "material" in the bottom left corner of the check?

A    Yes.

Q    Did you write that?

A    No.

Q    Did -- was this check a check from Unique to

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - DIRECT - POLEMENI                424

Midwood Building for material?

A    I don't think so.

          MR. POLEMENI:  If we turn back, Ms. Kannan, to that previous document.  Thank you.  Government's Exhibit 1203-A-015.

Q    Do you see the check is from Midwood Building Corp?

A    Yes.

Q    Do you know why -- did you receive this check?

A    But this check, not from my company, not from my company.

Q    It's not to your company.  Do you know where it's to?

A    It's from Midwood Building Corp.  This is a different company.  And Travel Group, this is travel agent company.

Q    Whose travel agent?

A    This is -- I'm using, also, this travel agent company.

Q    Do you see the signature in the bottom right?  Do you know whose signature that is?

A    No.

          MR. POLEMENI:  Can I have one moment, Judge?

          THE COURT:  You may.

          MR. POLEMENI:  Thank you, sir.

          (Pause in proceedings.)

          MR. POLEMENI:  Ms. Kannan, can we pull up, for the witness only, Government's Exhibit 247.

          THE COURT:  Any objection?

          MR. MAZUREK:  No, Your Honor.

*LEEANN N. MUSOLF, RPR*

**J.A. 341**

R. KRETSULA - DIRECT - POLEMENI          425

THE COURT:  Admitted.  Publish.

(Government Exhibit 247, was received in evidence.)

(Exhibit published.)

Q    What is this check, Mr. Kretsula?

A    This is check from CNBC Construction Corp to Unique Painting.

Q    And if you can -- it's a little hard to see, but --

MR. POLEMENI:  You know what, Ms. Kannan, it might be easier to turn to the next page, Government's Exhibit 247-002.

Q    What is -- what is this check, Mr. Kretsula?

A    This is CNBC Construction Corp, it's hard to read but looks like Unique Painting.

Q    It looks like Unique Painting, your company?

A    Yes.  Unique Inc.

MR. POLEMENI:  And if we can maybe rotate the check so we can read the back of it.

Q    And if you can just -- could you see, Mr. Kretsula, where it says, Coney Island Payroll Services on the back?

A    Yes.

Q    Did you bring this check to Coney Island Payroll Services and cash it there, sir?

A    No.

Q    Is that your signature?

A    No.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - DIRECT - POLEMENI          426

Q    How about the next two -- the document next, 247-003?  What is that check, Mr. Kretsula?

A    Check from Midwood Building Corp to Unique Painting.

Q    A check from Midwood Building to your company?

A    Correct.

Q    In the amount of $8,720?

A    Eight-thousand, seven hundred, twenty dollars.

MR. POLEMENI:  If we can blow up the back of the check, Ms. Kannan.

Q    Do you see where it says that the check was cashed at Coney Island Payroll Services?

A    Yes.

Q    Did you bring this check and cash it at Coney Island Payroll Services, Mr. Kretsula?

A    No.

Q    Is that your signature?

A    No.

Q    Government's Exhibit 247-004.  What is this check, Mr. Kretsula?

A    Check from Midwood Building Corp. to Unique Painting, $8,750.

MR. POLEMENI:  If we can blow up the back of the check, Ms. Kannan.

Q    Do you see where it says it was cashed at Coney Island Payroll Services?

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - DIRECT - POLEMENI          427

A    Yes.

Q    Did you bring this check and cash it at Coney Island Payroll Services, sir?

A    No.

Q    Is that your signature?

A    No.

Q    I'm going to ask you to look at all the checks in 247.  There are just a few.

MR. POLEMENI:  Just keep on scrolling down, Ms. Kannan.

Q    And, Mr. Kretsula, did you cash any of these checks in Government's Exhibit 247?

A    No.

Q    You said you had opened up an account at Coney Island Payroll Services at some point?

A    Correct.

Q    And do you remember when you opened the account, did you have a conversation with Yanki?

A    I don't remember that day exactly.  What day is that?

Q    Right.  I know you might not remember the day but do you remember when you opened the account, whether you had a conversation with him?

A    Yes.

Q    And what did you tell him?

MR. MAZUREK:  Objection.  Hearsay.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK          428

THE COURT:  Sustained.  You said "do you remember."

The question is:  Did you have a conversation with him?

THE WITNESS:  Yes.

THE COURT:  Tell us about the conversation.

THE WITNESS:  I told Yanki, open this.  We not cashing for now, but maybe some kind of emergency I need cashing.  But, please, I'm not allowed to cash, you, any person, any person who opened my checks.  Only me.

Q    Why did you tell him that?

A    I don't know.  I just tell him that.  So I want to make sure secure, nobody come to cash my checks.

Q    Wanted to make sure no one cashed checks in your company's name?

A    Correct.

MR. POLEMENI:  Nothing further, Judge.

THE COURT:  Your witness.  Cross-examination.

MR. MAZUREK:  Thank you, Judge.

THE COURT:  You're welcome.

CROSS-EXAMINATION

BY MR. MAZUREK:

Q    Good afternoon, Mr. Kretsula.

A    Hi.

Q    My name is Henry Mazurek and I have the privilege of representing the defendant David Motovich.  And we have never

*LEEANN N. MUSOLF, RPR*

**J.A. 342**

R. KRETSULA - CROSS - MR. MAZUREK          429

met before, correct?

A    Correct.

Q    Mr. Kretsula, you were asked a lot of questions on direct examination about my client and your relationship with my client, right?

A    Correct.

Q    You are from the Ukraine, correct?

A    Correct.

Q    And you know that Boris Motovich is also from Ukraine, right?

A    Correct.

Q    From the area of the Carpathian Mountain, that part of Ukraine, correct?

A    Yes.  Same like me.

Q    Same like you.  And you met him -- you came to the United States, I think you said about 2001, correct?

A    Correct.

Q    And you met him just a few years after you first arrived in the United States, correct?

A    Correct.

Q    You were living in similar neighborhoods in Brooklyn, right?

A    In Brooklyn, yes.  It's the Midwood -- Midwood area.

Q    In the Midwood section, right?

A    Yes.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK          430

Q    And you got to know that Boris Motovich opened a hardware store called Midwood Lumber, right?

A    Yes.

Q    That was his business, right?

A    I know this was Boris Motovich business.

Q    That was Boris Motovich's business that he opened in the Midwood section of where you were living in Brooklyn, right?

A    Correct.

Q    And he started out just like you as an immigrant and started his business there, right?

A    Correct.

Q    And you wanted to start your own business, right?

A    Correct.

Q    You wanted to be -- you started -- you had a skill as a painter, right?

A    Yes.

Q    And that's the business that you wanted to go into, right?

A    Correct.

Q    And one day Mr. Boris Motovich said, can you paint my house, Roman, right?

A    Yes.

Q    And you did and he paid you, right?

A    Correct.

Q    And, you know, when he -- when you were there, you

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK          431

realized and you had a conversation with him, right?

A    Yes.

Q    About starting your business, right?

A    Correct.

Q    And he wanted to help you, correct?

A    He helped me always.

Q    He always helped you, right?

A    Correct.

Q    And he introduced you to his son David, who you see sitting at that defense table, right?

A    Yes.

Q    And David wanted to help you too, right?

A    Yes.  Correct.

Q    David wanted to help you learn how to grow and start Unique Painting, right?

A    I meet David before Unique Painting.

Q    Even before Unique Painting, he was helping you, right?

A    Correct.

Q    And that's when you were just on your own, you didn't even have a business then, correct?

A    Yes.

Q    And, Mr. Kretsula, isn't it true that you had no idea how to open a business and do all the paperwork of that business, right?

A    I had no idea, that's why it's hard for me to open the

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK          432

business long time, and I know all the paperwork to do, I know even insurance, I scared everything.  I scared to open everything.  I don't know how to even do my steps, so -- yeah, learning day by day for this, like, from Boris, from David, from other my clients.

Q    And Boris and David Motovich put you in a position where you actually grew your business to making millions of dollars a year, right?

A    No.

Q    You had millions of dollars of revenue, correct, of the period --

A    No.

Q    No?

A    No.

Q    You had one job for $800,000, right?

A    For two years working and pay -- paid -- pay for the labor, for material.  Profit, maximum 15, 20 percent profit from the job max.

Q    Okay.  But you were starting out just painting houses by yourself, right?

A    Correct.

Q    And you said, I think on direct, you had 15 workers at one point, right?

A    Yes.  If you have a big job, I need the workers, correct.

Q    In fact, when you met with the Government in 2019, you

*LEEANN N. MUSOLF, RPR*

**J.A. 343**

R. KRETSULA - CROSS - MR. MAZUREK      433

told them it was in 2018, you had 20 to 22 workers, right?

A    I'm not say -- I don't remember I say that to the Government.

Q    Okay.  Well, you had a lot of workers by the time that you grew up Unique Painting to 2018 and 2019, right?

A    I no -- have my own -- workers.  I'm -- I don't have my own new workers, probably, I using subcontractors.

Q    Okay.  Well, we'll get into that a bit.  But when -- what -- when you -- you met Boris and David Motovich, you started from scratch, it was just yourself, right?

A    Correct.

Q    And Boris and David Motovich helped you to figure out how to start your own business, right?

A    Correct.

Q    And they did that by helping you with paperwork, right?
     Like insurance certificates, for example?

A    He give me insurance certificate, David --

Q    Yeah.  So --

A    -- not Boris.

Q    So, David gave you the insurance, correct?

A    Correct.

Q    And then, also, they were helping you with supplies that you got from Midwood Lumber, correct?

A    Correct, and gave me good price.

Q    And they gave you a good price, correct?

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK      434

A    Correct.

Q    And they gave you credit sometimes in buying those materials, right?

A    Every store I have a credit --

Q    Including Midwood Lumber?

A    Including Midwood Lumber, correct.

Q    So if you couldn't afford a certain time to pay for your materials, you could buy it on credit?

A    That's true.

Q    So they were loaning you that money, right?

A    Correct.

Q    And the other thing that David Motovich helped you with was he put you in touch with customers?

A    Yes.

Q    And that's the most important thing, wouldn't you say, right?

A    Yes.

Q    Because that's how you grew your business, right?

A    Correct.

Q    That's how you got a job where you could charge $800,000, right?

A    He introduced me, but if I -- I don't -- I don't know how to do this job, I will never make it, that job.

Q    I'm not saying that, sir.  You had to put the skill of your painting and tapers to the job, correct?

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK      435

A    Yes.

Q    But you could have all the skill in the world, sir, if you didn't have a customer, you wouldn't make any money.

A    Yes, that -- David helped me to get that job.

Q    So David introduced to Royal Builders, right?

A    Correct.

Q    That's Shida and Menacham Markovics who you saw -- you were shown photographs by the Government, right?

A    Yes.  Correct.

Q    David introduced you to Rich Pesce at Merrick Realty, right?

A    Yes.  Correct.

Q    He put you in touch to at least two big jobs you did, right?

A    He gave me, from Merrick, two jobs and from Royal Builders, four jobs.

Q    And then also there was a company called Platinum that he introduced you to, right?

A    I know Platinum before David, but David introduced me in the office, Platinum, one of the managers.

Q    So David had a meeting with the Platinum managers in his office with you, right?

A    Correct.

Q    And that was in order to say, I think that this painting company would be a good company to fit Platinum general

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK      436

contracting work, right?

A    Yes.

Q    And that's how you landed some additional jobs, right?

A    Yes.

Q    With Platinum?

A    First job for the Platinum -- for -- first job for the Platinum build -- for building, I did his painting job.  After that, he's very happy because the other customer very happy for him to help him the build, and my job for the painting, so gave him more jobs.  But David really helped me to -- to give me more jobs from the Platinum because I don't -- probably couple year-one year or two years, Platinum doesn't give me any jobs.

Q    So David was the one who, again, helped you grow that relationship with the Platinum general contractor?

A    Correct.

Q    And this was valuable to you, right?

A    Yes.

Q    And when David did that, did you pay David for those services?

A    No.  Only, I did for him, like, a couple jobs on painting.  I'm not -- he's not paid me that money.  Like, example, for his apartment and his house and the reason.

Q    Okay.  So, the question I had for you, did you ever write checks to David Motovich from Unique Painting to pay for the

**J.A. 344**

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK   437

services that he provided in helping you grow your business?

A    No.

Q    Did you do work -- did you paint different rooms at David's apartment in Manhattan for him without getting cash payment for it?

A    Sorry.  Can you explain to me one more time?

THE COURT:  Did you ever do work in his apartment painting, without getting payment for it, cash payment?

THE WITNESS:  No.  I don't have a payment from that apartment.

THE COURT:  Next question.

Q    And the reason for that is not because -- I mean, you worked there and you had workers work there, right?

A    Yes.

Q    But you owed him money because he was doing all of this service for you and growing Unique Painting services, right?

A    Correct.

Q    And you felt you owed him, right?

A    Yes.

Q    And that was one way that you paid him, right?

A    Yes.  So that's why he not pay me the money because he helped me to -- my business to grow up.

Q    So he provided services of materials from Midwood Lumber, right?

A    Correct.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK   438

Q    On credit, right?

A    Yes.

Q    He helped refer a lot of business to Unique Painting, right?

A    Correct.

Q    He helped you provide insurance certificates for your work, correct?

A    Correct.

Q    He provided cash flow for your payroll, right?

A    Correct.

Q    And all of these things, you never wrote out a check from Unique Painting to David Motovich, correct?

A    No.

Q    Instead, he would deduct certain amounts, right, from checks that you paid to companies that you believe were related to him, right?

A    Sorry.  I don't understand your question.

Q    Yes, let me say it more simply.

A    More simple, please.

Q    There were times when you needed money for payroll, right?

A    Yes.

Q    There were times when you needed money for material, right?

A    Yes.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK   439

Q    And, sometimes, David would tell you there are companies that he has an interest in, like Ago & Alaudin, right?

A    Okay.

Q    And --

Yes?  Is that "yes?"

THE COURT:  You can't say "mh-hmm."  You have to say "yes" or "no."

THE WITNESS:  Sorry?  I'm not answer --

THE COURT:  You can't say "mh-hmm."  You have to say "yes" or "no."  Read the question back.

THE WITNESS:  Read the question back, please.

THE COURT:  Please, reporter.

(Record read.)

THE COURT:  What's the answer to that question; yes or no?

THE INTERPRETER:  Repeat the question again, please.

(Record read.)

THE WITNESS:  We never talk about that.

THE COURT:  Next question.

BY MR. MAZUREK:

Q    Yes.  You've testified on direct examination about checks that you wrote out to a company called Ago & Alaudin, right?

A    Yes.

Q    And you -- do you know what Ago & Alaudin is?

A    They say -- his company.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK   440

Q    That's David Motovich's company?

A    Yes.

Q    Okay.  So that was a company that you understood he had some interest in, right?

A    David, when I worked for Ago & Alaudin, but write the check for Ago & Alaudin, I don't think David the owner of the company.

Q    Okay.  And, so, when you were writing checks out to this business Ago & Alaudin, and David, you said gave you cash, right?

A    Yes.  Correct.

Q    And that was for purposes of paying your men, right?

THE INTERPRETER:  Paying your what?

Q    And that was for the purpose of paying your workers, correct?

A    I got the cash, I pay him 15 percent from that money, I paid to the workers.

Q    Okay.  So he deducted some amounts for the checks that you gave him, correct?

A    Correct.

Q    And that is the only time that you ever paid David for all the services that he provided for Unique and your business?

A    I'm paid to David the 15 percent to the checks because he cashed me the checks.

*LEEANN N. MUSOLF, RPR*

**J.A. 345**

R. KRETSULA - CROSS - MR. MAZUREK     441

Q    That's not my question, sir.  Is that the only money that you paid David Motovich for any of the services that we've talked about today?

A    Specific from the Ago & Alaudin, what do you mean, the checks cashing?

Q    Let me try again.  David Motovich provided you a number of services for your business; is that fair to say?

A    Yeah, but it has to be more correct because, number of services, I don't know what kind of services you talking about.  Tell me about one service, I say yes or no, please.

Q    Okay.  Very good.  So he provided you referrals for business that -- for your Unique Painting company, right?

A    Yes.

Q    Did you ever pay him for that?

A    No.

Q    He provided, for you, credit on buildings -- on materials, right?

A    Correct.

Q    You only paid him for what the regular retail price was at Midwood Lumber, right?

A    That's true.

Q    Sometimes with discounts, right?

A    Always discount.

Q    Always discounts.  And he also helped you with insurance, correct?

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK     442

A    Correct.

Q    Did you pay him for that service?

A    No.

Q    Okay.  So the only time that you paid David Motovich was when he deducted amounts from checks that you gave to his companies, right?  That's the only time you paid him?

A    That only that money what I pay him.

Q    That's it, right?  That's the only time?

A    That.

Q    You didn't write separate checks out to him, right?

A    No, no.

Q    The only time is when he deducted it from checks that you wrote to him, right?

A    He get money only from these checks.

Q    Okay.  And is it fair to say that when you had trouble to collect from developers, I think you said on direct examination, for example, on the 72nd Street job, who got you paid?  Who helped get you paid from the real estate company?

A    David helped me.

Q    And he helped you because he was basically apart of your business, wasn't he?

A    He's not part of my business.

Q    I mean, not on paper and not on title, but you feel that all of the work that David Motovich does, he stands up for you to help get you paid, right?

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK     443

A    Correct.

Q    And that's what he did on 72nd Street; right?

A    Yes, he helped me.

Q    And he did that a number of times, that's not just the only time, right?

A    I don't remember but probably yes.

Q    And you went to him to help you -- you -- you could have -- there's no one else for you to go to, right?  You went to David Motovich, right?

A    Yes.  Correct.

Q    Because he was basically your silent partner in your business, right?

A    No.  He never partner in my business.

Q    Not on paper, sir, but all of the work that David Motovich did, he was the one who stood up for you and was able to get you the things you needed for Unique Painting; isn't that true?

A    Not true because in 2002, I opened the business, I didn't know even David.  I know him that day but --

Q    But you didn't put him --

        THE COURT:  Let him finish the answer.

        THE WITNESS:  Sorry, my mistake.  What I did, not in Unique Painting, I say when I start working the business, my business, to painting job, like my skills to growing up.  So I don't know that for Dave -- David.  So start working from

**J.A. 346**

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK     444

2001.  But I'm -- you're really correct, you're really right that David and David's family, even the Boris Motovich, helped me really, a lot, to get the jobs and work and grow up.  And not even the family -- not even David -- and David, Boris, all the family, they give me -- I'm painting for all the family for Motovich houses, even his friends.  So David really helped me to grow up my business.

        (Continued on the following page.)

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK    445

(Continuing.)

BY MR. MAZUREK:

Q   And if you needed anything, even after you started Unique Painting in 2012, if you needed to get paid from developers, you would go to David Motovich, right?

A   Yes.

Q   And if you needed help on credit for materials, you would go to David Motovich, right?

A   Correct.

Q   If you needed help with getting an advance for payment to your workers because the developers aren't paying, you'd go to David Motovich?

A   I'm never ask him that money.  I ask only my money that I give him before, the checks.  So he's not give me over money, like extra money to pay my workers.

Q   But sometimes if the developer's not paying you, you would try to get extra money from David to pay -- so you'd have an advance for the time when the developer --

A   Sorry, I don't remember that.

Q   You don't remember that?

A   No.

Q   Do you remember holding -- asking David to hold checks for you for a few days until you got money into the account?

A   Correct.

Q   That's a loan, right?

R. KRETSULA - CROSS - MR. MAZUREK    446

A   I don't know how to call the loan, so I didn't think this is loan.

Q   But you gave him the check, but it didn't have the money in the account at the time, right, on occasion?

A   I did remember that.

Q   Okay.  Is it safe to say, sir, that without David Motovich, Unique Painting may never have really gotten off the ground like it did.  Is that true?

A   It would be true and not.

Q   You would never be able to pay your workers without David Motovich, right?

A   Oh, that yes.

MR. MAZUREK:  Your Honor, would this be a good time to break for the day?

THE COURT:  5:00.  Keep going.  But not past 5:00.

MR. MAZUREK:  That is fine.

Q   Let me ask you about the payment of your workers, because you had mentioned it obviously a lot on direct examination. You paid them in cash, right?

A   Yes.

Q   And let's get one thing out in the open.  There's nothing wrong with paying people in cash, right?

A   Correct.

Q   Cash, as far as you understand it, sir, is legal tender in the United States, right?

R. KRETSULA - CROSS - MR. MAZUREK    447

A   Yeah, but have to report it.

Q   And you did not -- you didn't report it, right?

A   Correct.

Q   For your workers, correct?

A   Yes, yes.

Q   That's something you did, right?

A   Yes.

Q   When you pay cash to your workers, the reason you pay cash to your workers is some of them were immigrants who didn't have bank accounts, right?

A   Probably yes.

Q   They asked you to be paid in cash, right?

A   Probably yes.

Q   And you have your entire career as a painter have paid workers in cash, correct?

A   No.

Q   There were times when you didn't?

A   Of course.

Q   Well, let me ask you this:  There are times when you put some workers on payroll, right?

A   Correct.

Q   And that was after you got arrested in this case -- in the case that you pled guilty to?

A   No.  I have from 2012, I have payroll workers.

Q   So why did you need cash to pay?

R. KRETSULA - CROSS - MR. MAZUREK    448

A   Because I have cash workers and I have workers where I pay checks and I have workers I pay cash and checks.

Q   Okay.  And you -- if you didn't pay some workers in cash, would they work for you?

A   Some workers, maybe not.

Q   And so you needed to keep workers on staff, right?

A   Correct.

Q   And these workers demanded cash payments, right?

A   Yes.

Q   And if you paid them cash, you could have paid their payroll tax, right, even though you're paying them cash?

A   Again?  I'm sorry.

Q   You could have paid the payroll tax for the workers that you paid in cash, right?

A   I don't think so.

Q   You don't think so?  You don't know how to do that?

A   No.

Q   You now have an accountant, right, for your business?

A   So if I paid the workers cash, so how -- I have to report it to the Government to pay the payroll tax.

Q   That's right.  You didn't do that for the ones you paid in cash --

A   No, no, no.

Q   You could have, sir, right?  Anybody can.

A   Yes, yeah, correct.

**J.A. 347**

R. KRETSULA - CROSS - MR. MAZUREK    449

THE COURT:  What you cannot do, however, is go past 5:00 with this jury.

Because it is 5:00, we will resume the examination of this witness tomorrow morning at 9:30 a.m.  I told you, Matlock, Thurgood Marshall, John Marshall, doesn't matter, 5:00 we shut it down for the day.

Ladies and gentlemen of the jury, do not talk about the case.  We will see you here tomorrow morning bright and early, 9:30.  We'll start promptly at 9:30 and we will end promptly at 5 p.m.

Thank you.  We're adjourned for the day.

THE COURTROOM DEPUTY:  All rise.

(Jury exits.)

(In open court; jury not present.)

THE COURT:  You may step down, sir.  Please leave the courtroom.

The jury has left the courtroom.  I'm going to ask everyone to be seated.  After the witness leaves the courtroom, we'll see if we have any procedural issues to address before we adjourn for the day.

(Witness leaves the stand and the courtroom.)

THE COURT:  The witness has left the courtroom.

Do we have any issue to address?  First from the Government.

MR. POLEMENI:  No, Your Honor.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - CROSS - MR. MAZUREK    450

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  All right.  See everyone tomorrow morning bright and early, 9:30.  Thank you.  We're adjourned.

(Matter adjourned to Wednesday, July 10, 2024, at 9:30 a.m.)

*      *      *      *      *

LEEAN N. MUSOLF, RPR

---

451

I N D E X

WITNESS                                          PAGE

**ROBERT TARWACKI**

DIRECT EXAMINATION     BY MR. POLEMENI     281

CROSS-EXAMINATION      BY MR. MAZUREK      292

REDIRECT EXAMINATION   BY MR. POLEMENI     305

ROMAN KIETSULA

DIRECT EXAMINATION     BY MR. POLEMENI     353

CROSS-EXAMINATION      BY MR. MAZUREK      428

E X H I B I T S

GOVERNMENT                              PAGE

6000 through 6005                        317
700                                      318
700-W                                    318
700-A                                    318
700-B
700-F                                    319
700-G                                    319
700-H                                    319
700-I                                    319
700-J                                    320
700-K                                    320
700-L                                    320
700-M                                    320
700-O                                    320
700-P                                    321
700-Q                                    321
700-S                                    321
700-T                                    321
700-U                                    321
700-V                                    322
200                                      326
202                                      326
203                                      327
205                                      327
206                                      327
207                                      327

LEEAN N. MUSOLF, RPR

---

452

E X H I B I T S

(Continued)

GOVERNMENT                              PAGE

208                                      327
209                                      328
210                                      328
211                                      328
212                                      328
213                                      328
214                                      329
215                                      329
217                                      329
218                                      329
219                                      329
220                                      330
604                                      330
605                                      330
606                                      330
607                                      331
608                                      331
1081                                     331
1082                                     331
1088                                     332
1096                                     332
1159                                     332
1161                                     332
1197                                     332
1198                                     333
1198-A                                   333
1199                                     333
1199-A                                   333
1200                                     333
1200-A                                   334
1202                                     334
1202-A                                   334
1203                                     334
1203-A                                   334
1204                                     335
1205                                     335
1206                                     335
102-1                                    335
102-2                                    335
102-3                                    336
2002                                     336
2002-A                                   336

**J.A. 348**

LEEAN N. MUSOLF, RPR

453

E X H I B I T S

| GOVERNMENT | PAGE |
|---|---|
| 2002-B | 336 |
| 2003 | 336 |
| 2004 | 337 |
| 2008-A | 337 |
| 2008-B | 337 |
| 234 | 337 |
| 744 | 358 |
| 353 | 360 |
| GX-9 | 362 |
| GX-2 | 363 |
| GX-31 | 364 |
| GX-15 | 365 |
| GX-21 | 366 |
| GX-20 | 366 |
| GX-13 | 367 |
| GX-30 | 367 |
| GX-4 | 368 |
| 310 | 377 |
| 311 | 378 |
| 312 | 378 |
| 313 | 379 |
| 329 | 379 |
| 330 | 380 |
| 331 | 380 |
| 332 | 381 |
| 334 | 381 |
| 11 | 386 |
| 16 | 387 |
| 1015 | 389 |
| 237 | 393 |
| 24 | 401 |
| 300 | 402 |
| 26 | 403 |
| 301 | 403 |
| 302 | 404 |
| 304 | 404 |
| 1203 | 405 |
| 1203-A-006 | 411 |
| 708-C-068 | 418 |
| 247 | 425 |

LEEAN N. MUSOLF, RPR

---

454

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------x
                                  21-CR-497(WFK)
UNITED STATES OF AMERICA
                                  United States Courthouse
                                  Brooklyn, New York
     -against-
                                  July 10, 2024
                                  9:30 a.m.
DAVID MOTOVICH,

     Defendant.
-----------------------------x

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES

For the Government:     UNITED STATES ATTORNEY'S OFFICE
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201
                        BY:  ERIK DAVID PAULSEN, ESQ.
                             ANDREW GRUBIN, ESQ.
                             MATTHEW CHARLES SKURNIK, ESQ.
                             ROBERT T. POLEMENI, ESQ.
                        Assistant United States Attorneys

For the Defendant:      WACHTELL, LIPTON, ROSEN & KATZ
                        51 West 52nd Street
                        New York, New York 10019-6150
                        BY:  RANDALL WADE JACKSON, ESQ.
                             JESSICA LAYDEN, ESQ.
                             - and -
                        MEISTER SEELIG & FEIN LLP
                        125 Park Avenue - 8th Floor
                        New York, New York 10017
                        BY:  HENRY E. MAZUREK, ESQ.

Court Reporter:         LEEANN N. MUSOLF, RPR, CCR
                        Phone:  718-613-2489
                        Email:  lmusolf.edny@gmail.com
Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

---

PROCEEDINGS          455

(In open court; jury not present.)

THE COURTROOM DEPUTY:  Criminal cause on trial, Docket Number 21-CR-497, United States of America versus David Motovich.

Will the attorneys please state their name for the record, beginning with the Government.

MR. POLEMENI:  Good morning, Your Honor.

Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, paralegal Kavya Kannan, and Special Agent Christopher Cabane for the United States.

THE COURT:  Good morning.  You may be seated.

Ladies and gentlemen of the public, you may be seated as well.

MR. JACKSON:  Good morning, Your Honor.

Randall Jackson, Jessica Layden, Henry Mazurek, and we're assisted by Mr. Andy Cepregi, on behalf of the client David Motovich.

THE COURT:  Good morning.  Please be seated.  Thank you all for your prompt attendance.  We're not in a position to bring in the jury yet.  I understand there's still one juror we are waiting for.

I wanted to address one issue that came up today with respect to the security issues that have been raised.  We had talked about this before.  I have instructed the CSOs to continue to be discrete with respect to any of the ankle

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS          456

bracelet issues and I trust that they have been doing that to the satisfaction of defense counsel and the defendant.

MR. JACKSON:  Your Honor, we -- we actually were gonna raise this with you because we -- things have been going very well up until --

THE COURT:  Well, my concern, the principal concern I had is there cannot be any wanding, obviously, in the presence of the jury that can be arguably prejudicial as they were going in and out.

MR. JACKSON:  Today, we did have a slight issue.

THE COURT:  With the wanding?

MR. JACKSON:  Yes.

THE COURT:  Okay.

MR. JACKSON:  Yesterday -- yesterday and the first day, it went very well.  Today, I believe when Mr. Motovich asked if he could not be wanded publicly, the security -- and he said that he understood that the Judge had asked that, you know, that they be discrete, the securities -- the CSO who was there said, I haven't seen any order.

THE COURT:  Okay.  Well, I had a chat, or as the Brits would say, a chinwag with them, on that issue, so that will not be an issue again.

So with respect to keeping electronic devices in his presence.  This is one where I should have parsed this a bit more finely, and as they say, it's my bad.  It's important

*LEEANN N. MUSOLF, RPR*

**J.A. 349**

PROCEEDINGS 457

that any cell phones that the defendant has -- I'm not talking about your tech person, but that the defendant has -- should be held by you, Mr. Jackson, or other counsel or by the techie, not by the defendant himself.

It's not a personal thing with respect to this defendant but we have very strict rules with respect to not having defendants in the courtroom with their cell phones. So the CSOs are set up that way to make sure that a defendant doesn't have his or her cell phone in the room. You can have it -- people to his left or right can have it but, Mr. Motovich, I'm afraid you are going to have to surrender your cell phone to your colleagues, it should not be a big deal, during the time you're in the courtroom, okay?

So that was something that the CSOs also raised with me on the way in. So just make sure that you handle it that way and that shouldn't prevent any problem, okay?

MR. JACKSON: Yes, Your Honor. We greatly appreciate it. Thank you.

THE COURT: Is that acceptable to the Government as well as a way to handle these tech issues?

MR. POLEMENI: We defer to the Court and to the Marshals.

THE COURT: Okay, then fine. As I said, we are waiting for one juror to come. Do we have any other issues, other than those issues that we just addressed, that we need

PROCEEDINGS 458

to address in the absence of the jury, beginning with the Government?

MR. PAULSEN: Your Honor, for our various witnesses today, we have sent defense counsel our list of expected exhibits. I believe they reserved, at the moment, for any objection, but we're open to doing that when the parties are ready, but I don't think we're quite ready yet.

THE COURT: All right. Just at 30,000-foot level, are these exhibits that have not been stipulated to or are these exhibits that have been stipulated to?

MR. PAULSEN: It's a combination, Your Honor.

THE COURT: As always. So we'll do it old school. You'll offer the exhibit and if there's an objection, there will be an objection. If these are exhibits that I already ruled on, same rules as the other day, the objections are preserved for appellate purposes, so you don't have the burden, as defense counsel, of objecting in the presence of the jury and perhaps couriering, perhaps as one really never knows, couriering disfavor by objecting to documents that then probably come. In but if there is something that you want to object to, obviously. That's up to you but I've given you the option of having the benefit of prior rulings and not having to repeat it in front of the jury for reasons that we have discussed.

MR. PAULSEN: Yes, Your Honor. We'll talk amongst

PROCEEDINGS 459

ourselves again before the other witnesses come on to see if we can streamline things.

THE COURT: Okay. And other than the 2011, whatever it was, the business card issue was the other day, I take it that there are no other issues with respect to documents that I, quote, unquote, admitted that they haven't seen yet? Were there any others that you found overnight that perhaps fell off a truck, as we say in Brooklyn, or that can be put into that category?

MR. PAULSEN: No, Your Honor. None that we're aware of but we'll advise the Court if that comes up.

THE COURT: All right.

Defense counsel, is that the only one, whatever the business card or whatever it was?

MR. JACKSON: Yes, Your Honor. Yes.

THE COURT: Okay. That's fine.

Any other issues from the Government?

MR. GRUBIN: Yes. Good morning, again, Your Honor.

THE COURT: It will be civil to you. I know no one believes that, but it will civil to you.

MR. GRUBIN: Your Honor, for one of our witnesses today, the searching agent, we have a number of physical exhibits, including, for one thing, a large amount of currency. I just wanted to get the Court's preferences. Would that be fine to have the currency up there with the

**J.A. 350**

PROCEEDINGS 460

agent and have her handle it? It's, of course, sealed.

THE COURT: Is it sealed in some sort of bag?

MR. GRUBIN: Yes, Your Honor.

THE COURT: All right. And you've shown it to defense counsel?

MR. GRUBIN: They've had the opportunity -- I know -- I believe they've had the opportunity visit the FBI.

THE COURT: Right. Do you have the currency here in the courtroom?

MR. GRUBIN: We do, yeah.

THE COURT: Well, why don't you show them the currency now and see if they have any objection. How is it marked?

MR. GRUBIN: By government exhibit.

THE COURT: I'm sorry?

MR. GRUBIN: It's marked with a government exhibit.

THE COURT: But does it have a number?

MR. GRUBIN: Oh, yes. I believe --

THE COURT: I know it's marked as a government exhibit rather than a defense exhibit, I assume.

MR. GRUBIN: It's about 3,000, 3,001 3,002.

THE COURT: Well, why don't you show them --

MR. GRUBIN: Sure.

THE COURT: -- show them the money, it's Brooklyn, show them the money and see if they have any objection to the

PROCEEDINGS 461

exhibit. It's in a bag of some sort?

MR. GRUBIN: Yes, Your Honor.

THE COURT: So why don't you do that now while we're waiting to see if the juror has arrived.

MR. GRUBIN: That's fine, Your Honor. And then, similarly, there are several other physical exhibits that --

THE COURT: Enlighten me.

MR. GRUBIN: That we were intending to move in, about maybe half a dozen.

THE COURT: Other guns?

MR. GRUBIN: No, no, Your Honor.

THE COURT: Or bullets?

MR. GRUBIN: Just paperwork.

THE COURT: Well, you know -- okay.

MR. GRUBIN: Sorry, Your Honor.

THE COURT: That's all right. It's what I usually deal with, so it's okay.

MR. GRUBIN: And I don't think -- we're probably only gonna publish because we have scanned versions as well to make things even easier. I was simply going to -- we were thinking just having it start with the witness because I know Your Honor doesn't want me -- wouldn't -- doesn't want us to approach the --

THE COURT: You can ask me to have my court deputy to come and take the money or the cannoli or the gun or

*LEEANN N. MUSOLF, RPR*

PROCEEDINGS 462

whatever it is you need to have brought up to the witness stand that you can't do by projection on the electronics, or you can work it out with opposing counsel, in terms of what makes sense to schlep up to the witness box.

MR. GRUBIN: Makes sense to me, Your Honor.

THE COURT: So besides the cash that you're now going to show him, right, why don't you grab that now.

(Pause in proceedings.)

THE COURTROOM DEPUTY: The jurors are all in the jury room now. So let's just do whatever we need to do before we bring the jury in. And I think it would be appropriate to show the money, if nothing else, to work that out.

MR. GRUBIN: That's fine, Your Honor.

(Pause in proceedings.)

THE COURT: And you have the exhibit number for the currency read into the record so it will be clear what we will be talking about? And does everybody got their realtime working properly?

Mr. Jackson, you your team?

MR. JACKSON: Yes, Your Honor.

THE COURT: And does the Government have their realtime working properly as well?

MR. SKURNIK: Yes, we do, Your Honor.

THE COURT: Okay.

MR. GRUBIN: Your Honor, it's Government Exhibits

*LEEANN N. MUSOLF, RPR*

PROCEEDINGS 463

3,000, 3,001 and 3,002.

THE COURT: Okay.

MR. MAZUREK: Judge? I'm sorry. Over here. The monitor at my podium is not working.

THE COURT: All right. Could you assist him on that, Mr. Scott, or we can call the techies up and see what's going on before we bring in the jury.

MR. MAZUREK: Thank you, Judge.

(Pause in the proceedings.)

MR. MAZUREK: We are now working, Your Honor.

THE COURT: Great.

MR. MAZUREK: All I had to do was push the on button.

THE COURT: You know, I have never figured out that trick and I congratulate you because you are way ahead of me.

Mr. Jackson, has the Government showed you the money?

MR. JACKSON: No, Judge.

MR. GRUBIN: I believe they had to retrieve --

THE COURT: I'm sorry?

MR. JACKSON: No, Judge.

THE COURT: Do you have the money?

MR. GRUBIN: I believe they have to retrieve it. They're retrieving it from the safe, Your Honor.

THE COURT: We can do it during the break. Since

*LEEANN N. MUSOLF, RPR*

PROCEEDINGS 464

you raised it, I thought we would address it now.

MR. GRUBIN: No, I understand, Your Honor.

THE COURT: Do we have any tech issues? We've got our A-plus tech guy here, so.

You're so good you fixed it even before you got here. Marvelous. Thank you, sir.

All right. Unless there's anything else we need to address before we bring in the jury, we'll bring in the jury now.

Anything else, Mr. Jackson?

MR. JACKSON: Just very briefly, Judge.

THE COURT: Of course.

MR. JACKSON: Just related to the first issue, we have had two interchanging paralegals who are just helping us bring documents up from our room and print things downstairs.

THE COURT: Yes.

MR. JACKSON: Today, when they were bringing in their computers, they -- there was a slight issue with security initially. So we would like to submit to the Court later today an additional order to just add their name to the list of the people.

THE COURT: Absolutely. Usually so long as the individual is identified by name, that way the CSOs and Marshals know who is authorized to bring it in, we really don't have a problem with that, and it's important that both

*LEEANN N. MUSOLF, RPR*

**J.A. 351**

PROCEEDINGS 465

sides have equal access to computer facilities in the course of the trial.

MR. JACKSON: Thank you, Judge.

THE COURT: You are very welcome.

Okay. Is there anything else we need to address before we bring in the jury?

MR. GRUBIN: Not from the Government, Your Honor.

THE COURT: Why don't we have the witness come back to the witness stand and then we'll bring in the jury and we'll save time. Counsel is at the podium. I appreciate that.

Is that the money? Why don't you show it to defense counsel before we bring in the jury.

You can come back to the witness stand, sir, and remain standing. We are going to bring in the jury in a minute.

(Witness takes the witness stand.)

THE COURT: Madame interpreter, welcome back.

THE INTERPRETER: Good morning, Your Honor.

THE COURT: Before we bring in the jury, do we have any issues with respect to the currency?

MR. JACKSON: No, Judge.

THE COURT: And just to be clear, what are the exhibit numbers on the currency that you will be moving in?

MR. GRUBIN: 3,000, 3,001 and 3,002, Your Honor.

*LEEANN N. MUSOLF, RPR*

PROCEEDINGS 466

THE COURT: Okay.

Are you going to have any objections to those coming in Mr. Jackson.

MR. JACKSON: No, Judge.

THE COURT: All right. So that's fine. You'll move them in, in the presence of the jury, and if there's no objection, they will come in.

Okay. Unless there is anything else, we'll bring in the jury now.

Anything from the Government?

MR. GRUBIN: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Okay.

Why don't you bring in the jury.

THE COURTROOM DEPUTY: All rise.

THE COURT: Please rise for the jury.

(Jury enters the courtroom.)

THE COURT: Thank you, ladies and gentlemen of the jury. Please be seated. We had some meetings that I think will move things along, help the trial progress more to your satisfaction in terms of pace.

So the witness is still under oath, and we will continue with the cross-examination.

MR. MAZUREK: Thank you, Your Honor. May I inquire?

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK 467

THE COURT: You may.

CROSS-EXAMINATION (Continued)

BY MR. MAZUREK:

Q Good morning, Mr. Kretsula.

A Good morning.

Q February 2019, that was one of the worst times in your life; is that fair to say?

Do you need me to repeat the question?

A Yes, please.

THE COURT: Read it back.

(Record read.)

A I don't know what you talking about.

Q Well, in February of 2019, agents from the Criminal Division of the IRS visited your home; do you remember that?

A I don't remember exact specific time.

Q Okay. But it was at that point in time when your life changed, right?

A Correct.

Q It was at that point in time when you realized that you were going to potentially lose a lot of the things that you had in your life, right?

A Yes. Correct.

Q Because at that point in time, you knew you had been not -- intentionally not paying payroll tax for your workers, right?

R. KRETSULA - CROSS - MR. MAZUREK 468

A I'm not thinking about that time.

Q I'm sorry?

A That time, I not thinking about that.

Q You were not thinking about the crime that you had committed at that time?

A I know I do something wrong but the specific that, you know, like you say I'm not thinking about it, payroll, something, so I -- I know a paid the cash for the workers, so I know this is crime.

Q Okay. So you knew, when the agents came to your house, that things were really bad for you, right?

A Correct.

Q And at that point in time, you realized, sir, you were facing prison time, right?

A Yes. Correct.

Q And you were facing significant financial penalties?

A Yes. Correct.

Q And, sir, you are a green card holder, right?

A I'm citizen.

Q You're a naturalized citizen?

A Correct.

Q And when were you naturalized?

A 2022, April 7th.

Q Okay. So 2022. That's after the time that you were arrested, right?

*LEEANN N. MUSOLF, RPR*

**J.A. 352**

R. KRETSULA - CROSS - MR. MAZUREK    469

A    No.

Q    You were arrested in -- you pled guilty, right?  When did you plead guilty, sir?

A    I don't remember, exactly, the time.

Q    Well, you pled guilty pursuant to a cooperation agreement, correct?

A    Yes.

Q    And you signed that cooperation agreement on the same day that you pled guilty, correct?

A    I don't -- I don't remember that.

Q    Okay.

        MR. MAZUREK:  Can we put on the screen, just for the witness, what's been premarked for identification as Defense Exhibit 9928.

        THE COURT:  You may publish to the witness only.

        MR. MAZUREK:  Yes.

        (Exhibit published.)

Q    Do you see what's on the screen, sir?

A    Yes.

Q    You're familiar with this document?

A    Yes.

        MR. MAZUREK:  If we can go to the last page of this document.

Q    Do you see your signature there?

A    Yes.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK    470

Q    And you recognize this document as the plea agreement that you entered into with the Government in your case which governs your criminal case, right?

A    Yes.

        MR. MAZUREK:  Your Honor, I move for admission of Defense Exhibit 9928.

        THE COURT:  Any objection?

        MR. POLEMENI:  No objection.

        THE COURT:  It's admitted.  You may publish it to the jury.

        (Defense Exhibit 9928, was received in evidence.)

        (Exhibit published.)

        MR. MAZUREK:  Thank you.  And we're looking at the last page now, which is on the screen, hopefully everyone can see that.

BY MR. MAZUREK:

Q    Do you see, sir, in the lower left-hand corner, your signature right above the printed words "Roman Kretsula?"

A    Yes.

Q    And the date of this document is April 28, 2022, correct?

A    Correct.

Q    And that was the time that you entered a guilty plea in your criminal case, correct?

A    Probably, yes.

Q    Okay.  And you said that you were naturalized in 20 -- in

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK    471

2022 as well?

A    Yes.

Q    So, approximately, when was that?

A    April 7th.

Q    Okay.  So just a couple of weeks before you entered the guilty plea, right?

A    Twenty-one days before.

Q    Twenty-one days before.  And that was really important to you, right, to be naturalized?

A    Of course.

Q    Because if you weren't naturalized and you pled guilty to this crime three weeks later, you could have been deported back to Ukraine, right?

A    I don't know about that.

Q    Well, you were -- you knew that there were potential immigration consequences to your guilty plea, right?

A    Yes, but nobody tell me I will be deported.

        MR. MAZUREK:  Well, if we could -- on Defense Exhibit 9928, if we could turn to page seven of that exhibit and if we can expand paragraph 11 on that document.

Q    And this is the document that you signed, right?  Mr. Kretsula?  Before you read that, can you listen to what I'm --

A    I see only a little bit.  I don't -- can you show me the whole page, please?

*LEEANN N. MUSOLF, RPR*

**J.A. 353**

---

R. KRETSULA - CROSS - MR. MAZUREK    472

Q    I'm asking you a question first, sir --

A    Yes.

Q    -- before we get to the document.

        Before you signed this document, you read it or had it read to you in a language you understood, right?

A    Probably, yes.

Q    I mean, this was -- this was one of the most important documents in your life, sir, right?

A    It's important document but I don't know it's important in my life.

Q    It's important to your life, sir, because you don't want to go to prison, right?

A    Correct.

Q    You don't want to be deported to Ukraine, right?

A    But nobody promised me that I go to the prison if I signed --

Q    I understand that.  I'm just saying why it was important for you to understand this document, correct?

A    I signed this document, I read it, at the time I don't remember, but I signed this document.

Q    Yes.  And this is the document that tells you what your agreement is with the federal government, the prosecutors at this table, right?

A    Yes, but I don't know about I'm deported.  If I sign this document, I will be deported.

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK        473

Q    All right.

MR. MAZUREK:  If we can, again, expand paragraph 11.

Q    It's on page seven of your cooperation agreement, okay, and we'll read it together.  The first sentence of this paragraph says:

The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status if the defendant is not a citizen of the United States.

Do you see that?

A    Yes.

Q    Under federal law, a broad range of crimes are removable offenses including the offense to which the defendant is pleading guilty.

Do you see that?

A    Yes.  I see now.

Q    So you were told, during the process in which you were cooperating with the Government, that the crime of intentionally evading payroll tax was an offense that could cause you to be removed from the United States back to your home country, right?

A    So, it looks like, yes.

Q    Okay.  And if you did not get the opportunity to be naturalized just 21 days before you signed this agreement, then you would be facing the immigration consequence of being sent back to war torn Ukraine, correct?

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK        474

A    Yes, probably, but will be held, so --

I will be able to apply again to stay here to take, like, the lawyer to -- I don't know.  I will do something to -- I don't want to be deported.  I would like to stay here, so.

Q    That's right.  But the law was, as reported to you in your cooperation agreement, that by admitting to the felony of intentionally evading payroll tax, you would be subject to what's called removal from your country back to your home country, right?

A    Yes, the paper's saying that.

Q    Yes.  And that's what you understood at the time, correct?

A    That time, probably, yes.  I don't remember exactly.

Q    And so it was a benefit to you --

A    I'm not -- sorry, I'm not finished.  But I'm not focused about that, when the -- what explained to me because I'm already naturalized, so I'm not even focused on that.

Q    Yes.  So you were able -- and in April of 2022, you had already admitted to the crimes that you pled guilty to, right, to the Government, to the Government prosecutors?

A    I don't remember exactly what day we meet, we talk, you know, about you have to sign this paper that says you plead guilty at that time.

Q    Well, I think we discussed a little earlier today at your

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK        475

first encounter with the federal government agents was in February of 2019; you remember that?

A    Correct.

Q    And you had sessions, sir, right, you had meetings at the U.S. Attorney's Office here in the Eastern District of New York, in Brooklyn, with the prosecutors in 2019, correct?

A    Correct.

Q    Where you admitted to you crimes that you eventually pled guilty to, right?

A    No.  No.

Q    You initially denied committing the crime, right?

A    I'm not saying the truth at the time to the Government.

Q    So you lied to the prosecutors and agents initially?

A    Yes.  I not say the truth about me and about David, how was working.

Q    Okay.  So you lied initially when you were first approached to them, right?

A    Yes.

Q    And then you continued to have discussions with the Government after that, right?

A    Yes.

Q    You -- there was a global pandemic that happened, right, in 2020?  Do you remember that?

A    Yes.

Q    And then in 2021, you continued to have meetings with the

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK        476

Government, correct?

A    Correct.

Q    And at that point in time, you decided it's best for you to cooperate with the Government, right?

A    Not right.

Q    I'm sorry?

A    No.

Q    You still didn't agree at that point?

A    No.  No.

Q    You continued to have meetings with them, right?

A    Yes.  Correct.

Q    And you continued to lie to them?

A    Correct.

Q    So you lied to them in 2019, right?

A    Correct.

Q    In 2020, right?

A    Correct.

Q    In 2021, right?

A    Correct.

Q    And then you decided that this isn't working out for you, so you decided to sign this cooperation agreement and change your story in 2022?

A    Yes.  I want to say truth to plead guilty because my life is completely changed.

Q    And when you --

*LEEANN N. MUSOLF, RPR*

**J.A. 354**

R. KRETSULA - CROSS - MR. MAZUREK        477

A    Or my health is very bad, so I see worse and worse, I'm thinking about that every time, what's happening, what's happening, why I not say the truth, and always have to say another story.  So I feel bad for that.  So -- and my -- everyday, my health go down and down and down.  I lost, like, almost, like, 30 -- 30 pounds and my nerves and the rest, I go, a lot of times, to the doctor but it looks okay, but still, I'm not feeling well.  So I'm not, like, traveling a lot and I'm going anywhere, you know.

My life has completely changed.  I lose my family.  I'm divorced because I'm sitting home more.  I'm conflict because I walk to the street, I'm thinking to people thinking about me or something.  So my life is completely changed from that time, so I decided the cooperation, cooperate with the Government.

Q    And your life was torn apart by what you did with respect to evading payroll taxes, right?

A    No.  Mostly, I am worry about that because I'm saying not truth to the Government.  I'm thinking about I not say the truth.  So I worry about that, so why don't say the truth, and I have to lie, I have to lie.  This country give me a lot of things, so it's not right, so I have to say the truth, so.

Q    And what you lied about was the fact that you intentionally were evading the payment of payroll taxes for your workers, correct?

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK        478

A    Not only that.  I -- I only -- I, also, where I am -- I get -- I get the cash and how I pay my workers.

Q    But my question is, the crime that you pled guilty to was intentionally evading payroll tax for your workers, right?

A    Correct.

Q    And that is the reason you were facing prison time, correct?

A    Correct.

Q    And if we can turn to page one of your cooperation agreement, Defense Exhibit 9928, and go to the middle of the page, the subpart A, B and C.

Do you see, in subpart A on page one, the maximum term of imprisonment you were facing for intentionally evading payroll tax was five years, right?

A    Correct.

Q    That's a long time, right?

A    Long time for me.

Q    And that's what caused your health problems and your family to collapse, all of that anxiety, over the fact that you were facing five years in prison, right?

A    Yes.

Q    And it wasn't just five years.  The Government said they could go after you with crimes that had even longer terms of imprisonment, right?

A    No, did not say that.

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK        479

Q    No?  You don't remember them saying that --

A    No.

Q    -- we will limit it to a five year felony as opposed --

A    No --

THE COURT:  Hang on.  You cannot talk over each other.

Put the question and give the answer.  Put the question again, Counsel.

MR. MAZUREK:  Yes.

Q    You don't remember that there were other crimes that the Government informed you that they could charge you with that are greater than five years?

A    No.

Q    You don't remember that.  But five years was pretty significant to you, right?

A    Yes.  Correct.

Q    And that would be separated from your family, right?

A    Yes.

Q    That would lead to potential deportation to Ukraine if you did not get citizenship, right?

A    Probably, yes.

Q    And, so, what you decided to do was enter into this cooperation agreement, right?

A    Yes.  Correct.

Q    That was your only chance to try to avoid those five

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK        480

years imprisonment, sir, right?

A    Nobody knows.  The judge make decision.

Q    I understand that the judge is going to sentence you but that's what you were facing, right?

A    So I try to do my best to say the truth to maybe I have less years.

Q    And that's the reason you entered into this cooperation agreement, because you didn't have any other choice, did you?

A    I don't have other choice.

Q    And the only way that you can get below the five years is if the Government, the prosecutors right here, write to the sentencing judge to say that you gave substantial assistance to them to help reduce your sentence, right?

MR. POLEMENI:  Objection.

THE COURT:  Overruled.  His understanding of the agreement.

You can answer.  Is that your understanding, sir?

THE WITNESS:  Yes.

THE COURT:  Next question.

A    So nobody promised me --

THE COURT:  Next question.  You've answered the question.

Go on.

MR. MAZUREK:  Thank you, Your Honor.

THE COURT:  You're welcome.

**J.A. 355**

*LEEANN N. MUSOLF, RPR*

R. KRETSULA - CROSS - MR. MAZUREK          481

BY MR. MAZUREK:

Q    And let me just have you look at page five of the agreement, paragraph seven.  And the first sentence, sir, if we could read it together, it says:

"If the Office," do you see that, those first three words in paragraph seven?

A    Yes.

Q    And "if the Office" means the Office of the United States Attorney's Office, the Prosecutor's Office, right?

A    Correct.

Q    If the Prosecutor's Office determines that the defendant has cooperated fully, provided substantial assistance to law enforcement authorities and otherwise complied with the terms of this agreement, the Office, the Prosecutor's Office, will file a motion pursuant to U.S. Sentencing Guidelines Section 5K1.1 with the Sentencing Court setting forth the nature and extent of his cooperation.

And if we can continue to the next sentence:

Such a motion will allow the Court in applying the advisory guidelines to consider a range below the guidelines range that would otherwise apply.

Do you see that?

A    Yes.

Q    And, again, this was the agreement that you reviewed in

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK          482

the language most comfortable to you before you signed it, right?

A    Yes.

Q    And you understood that the only way that the judge would be able to sentence you to less time would be if the Office told the judge that you provided substantial assistance with law enforcement?

MR. POLEMENI:  Objection, Your Honor.

THE COURT:  He's asking for his understanding.  Overruled.

Is that your understanding?

THE INTERPRETER:  Can you --

THE COURT:  Put another question.  Break it down.

A    Give me the question more simple, please.

THE COURT:  Excuse me.  I told the lawyer to put another question.  There's no question pending.

MR. MAZUREK:  Thank you, Judge.

BY MR. MAZUREK:

Q    Sir, you understood that the only way that you would be able to face less time from the Sentencing Court is if the prosecutors wrote a letter to the judge that said you provided substantial assistance to them, right?

MR. POLEMENI:  Objection.

THE COURT:  Overruled.  Asking for his understanding, it may be right, it may be wrong, but it's his

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK          483

understanding.

Is that your understanding?

THE WITNESS:  I understand question.

Q    You do or don't understand --

THE COURT:  Excuse me.

You understand the question?

THE WITNESS:  I understand.  Can I repeat it?

THE COURT:  Read the question back, please, and keep your voice up.

(Record read.)

A    Like I say before, nobody knows if I have less or I have more, only judge to make decision that.  But I do my part, I say the truth, I said this, this is one steps to go to -- to the best way to -- I have something probably less, so -- but the judge only make decision but we have, so.

Q    I understand that, sir, but my question to you is if the Government doesn't write the judge, then the judge Cannot reduce your sentence based on what --

A    Yeah, if not cooperating.

Q    Can I finish my question?

THE COURT:  Finish the question.

Q    If the prosecutors don't write the judge and tell them that they believe that you gave substantial assistance, the judge wouldn't know about your cooperation, right?

A    Like I understand from this -- from this paper -- this

**J.A. 356**

*LEEANN N. MUSOLF, RPR*

---

R. KRETSULA - CROSS - MR. MAZUREK          484

paper say I'm cooperation to the Government and the judge will know I cooperate with the Government, so he will see me, like, better person, I cooperate.

Q    And who decides to write to the judge about your cooperation?  Who?

A    Government.

Q    And if the Government believes that you're not saying the things that they want you to hear, they won't write the Government, right -- they won't write the Court?

A    Can you ask me one more time, please?

THE COURT:  Read the question back.

(Record read.)

A    The Government send a letter after I say the truth.  So after I say the truth, the Government -- the Government write this letter to the judge.

Q    Who decides whether you're telling the truth?  Is it the Government who decides that, to tell the Court?

A    I decide to tell the truth and the Government, I know this -- they have agreement to send this -- send that information.  So I decide to say the truth and cooperate to send to the judge.

(Continued on the following page.)

*LEEANN N. MUSOLF, RPR*

Kretsula - cross - Mazurek    485

(Continuing.)

BY MR. MAZUREK:

Q   You don't write the Court, it's the Government that does?

A   Government writes, sorry.

Q   And if the Government doesn't believe you, they won't write the Court, right, that's your understanding?

A   The sentence say if I not say right, this -- this agreement will be ripped.

Q   Right.

    And who decides whether to rip up the agreement, you or the Government?

A   If I'm not say the right, if I not say again the truth, I will lie, so Government will be not send this letter.  This agreement will be destroyed.

Q   And who decides that, you or the Government?

A   Government.

Q   Thank you.

    Now, in this process when you were negotiating with the Government for this cooperation agreement, did you sue the Government at the same time in October of 2021?

A   I don't remember that.

Q   You didn't file a lawsuit against Homeland Security, the FBI, and the Department of Justice, in this courthouse?

A   No.

Q   Is there something that I can show you, a document I can

SAM    OCR    RMR    CRR    RPR

Kretsula - cross - Mazurek    486

show you to refresh your memory, sir?

    MR. POLEMENI:  Objection.

    THE COURT:  Overruled.

A   (No response.)

Q   Sir, let me ask you this:  Did you have a lawyer by the name of Vladislav Sirota?

A   Correct.

Q   He is the law -- well, one of the lawyers of the law firm that represents you, right?

A   Yes.

Q   And you instructed him to file a lawsuit against Alejandro Mayorkas, the secretary of Homeland Security; Mark Koumans, the head of Customs and Board Patrol; Merrick Garland, the U.S. Attorney General of the Department of Justice and Christopher Wray, the FBI director, correct?

A   I don't remember all these name, but I remember my lawyer do something to -- to -- to make it me -- my appointment to the Government to get citizenship.

Q   Okay.  So you instructed him to file a lawsuit against all these people, right?

A   I don't know all these name, but I remember that conversation with my lawyer.

Q   And that was during the period of time that you were meeting with government agents and prosecutors, right?

A   Through the -- you say the same time.  What do you mean

SAM    OCR    RMR    CRR    RPR

Kretsula - cross - Mazurek    487

is the same time?

Q   If I showed you a document with a date, would that help to refresh your memory when you sued the Government?

A   I don't remember that time exactly.

Q   So, can I show you a document?

A   Yes, no problem.

    THE COURT:  Don't talk over each other.

    MR. MAZUREK:  If we can put on the screen, just for the witness and counsel, Defense Exhibit 4519.

    THE COURT:  Any objection to 4519 being admitted?

    MR. POLEMENI:  I object --

    THE COURT:  Any objection, yes or no?

    MR. POLEMENI:  Objection.

    THE COURT:  All right.  Overruled.

    MR. MAZUREK:  Thank you.

    THE COURT:  Admitted.

    You may publish.

    (Defense Exhibit 4519, was received in evidence.)

    MR. MAZUREK:  May I publish, Your Honor?

    THE COURT:  Yes.

    MR. MAZUREK:  We are just going to put it on the ELMO, Your Honor.

    (Exhibit published.)

BY MR. MAZUREK:

Q   All right.  Do you see what's on your screen, sir?

SAM    OCR    RMR    CRR    RPR

**J.A. 357**

Kretsula - cross - Mazurek    488

A   Yes.

Q   And I am going to point to where it says plaintiff, Roman Kretsula.

    That's you, right?

A   Correct.

Q   The date this was filed was October 18th, 2021, correct?

A   Correct.

Q   And the nature of the suit was immigration actions, correct?

A   Correct.

Q   And the people that you sued are identified as defendants, right?

A   (No response.)

Q   Alejandro Mayorkas, do you see that?

A   Yes.

Q   Mark Koumans, correct?

A   Yes.

Q   Merrick Garland, correct?

A   Yes.

Q   And Christopher Wray, right?

A   Yes.

Q   And when you sued them was October of 2021, you had been cooperating with the Government, meeting with the Government since 2019, correct?

A   Correct.

SAM    OCR    RMR    CRR    RPR

Kretsula - cross - Mazurek    489

Q    And you sued them because you realized at that point in time that you needed to get your citizenship because you didn't want to be sent back to Ukraine, right?

A    No.

Q    That's the reason you were suing them, right?

A    No.

Q    You wanted to get naturalized, it was the most -- it was, again, one of the most important things in your life at that point?

A    No.

Q    Why not?

A    Because most important in my life it's my healthy.

Q    Sir, your lawyers didn't sue the Government because your lawyers wanted to, you wanted to to get citizenship, right?

A    Correct.  I wanted to get citizenship, correct.

Q    And at that point in time you were lying to the Government about your evading taxes?

A    Yes.

Q    And after you changed your story, you suddenly got your date for citizenship, right?

A    No.

Q    You got your date for citizenship in April of 2022, right?

A    April 7, 2022.

Q    And three weeks later you were in court with your signed

*SAM    OCR    RMR    CRR    RPR*

Kretsula - cross - Mazurek    490

cooperation agreement?

A    So, after I got the citizenship --

Q    Yes.  Before you pled guilty so you wouldn't be deportable, right?

A    No.

Q    You needed your citizenship before you pled guilty, sir, right?

A    I'm not thinking about that time for that.

Q    Okay.
     You didn't want to go back to Ukraine and be separated from your family, right?

A    If I go to back Ukraine, my family will leave me because that time already I'm planning to divorce.  My life in that time it's very nightmare.
     So, I am single father now and live with my daughter now.  So if I go, I go myself, because I'm ready to say the words that....

Q    So you sued the Government because you wanted to stay in the United States, right?

A    I would like to citizenship, yes.

Q    And your hope and expectation, based on the cooperation agreement, is that you don't spend a day in jail, correct?

A    I don't want to be go to jail, that's correct.

Q    Thank you.
     Now, and the only reason that you're in the

*SAM    OCR    RMR    CRR    RPR*

Kretsula - cross - Mazurek    491

courtroom today -- yesterday and today is because you have to for your cooperation agreement to apply, right?

A    I signed cooperation agreement to say the truth, that's why I'm here.

Q    Because you want the benefits of the cooperation agreement, right?

A    It's not the benefits.  I signed cooperation because I want to say the truth, like I say before.

Q    And when you met with the Government, you prepared, you know, your testimony, they asked you questions and you gave answers, right?

A    I'm not prepare anything.  I know everything in my head.  So I'm not preparing.

Q    Well, you met with the Government, you met with them a couple of months ago, right, in April of 2024, right?

A    I don't remember that.  Probably, yes.  I don't remember that.

Q    You met with them, you met with them just last week, didn't you?

A    Yes.

Q    Did you meet with them last night?

A    No.

Q    You met with them a couple nights before you started your testimony?

A    Yes.  Not night, sorry.

*SAM    OCR    RMR    CRR    RPR*

Kretsula - cross - Mazurek    492

Q    During the day?

A    Day.

Q    And when you met with them, they asked you questions just like they did, you know, in court, right?

A    Yeah, they asked me question about --

Q    About the same kinds of questions they asked you here in court, right?

A    No.  They asked me different questions -- not different, the similar questions that they asked me about how I'm still work -- how I'm working with David, how I'm working recognize the checks.

Q    Right.  You practiced your testimony, right?

A    It's not practice.  He asked me if I did that.

Q    And when you answered certain things, they suggested you say it in a different way or a similar way, right?

A    It's not in a different way.  He asked me different question and different way question, like he asked me, do you know.

Q    Right.  But --

A    But everything about this case.

Q    Everything about this case?

A    Correct, yes, yes.

Q    Right.  And how you were supposed to, you know, answer to the jury and the Court, right?

A    He not tell me about that answer.  He only ask me about

*SAM    OCR    RMR    CRR    RPR*

Kretsula - cross - Mazurek     493

all the checks, how I'm go through, if you remember how it was happened, if you remember something else. So he not -- he not telling me like how I have to say.

Q    And you did this on multiple days leading up to your testimony, right?

A    It's a couple days.

Q    Okay. And we never met before, right, we never practiced?

A    No.

Q    Now, let me -- let me ask --

MR. MAZUREK: Can we switch the ELMO back to the electronic?

Thank you, Mr. Scott .

BY MR. MAZUREK:

Q    You were asked questions yesterday on direct examination about Midwood Lumber, right?

Do you remember that?

A    Yes, correct.

MR. MAZUREK: And if we could put on the screen what's been admitted as Government Exhibit 23.

(Exhibit published.)

MR. MAZUREK: And if we could blow up the signage that -- yes, right there.

Q    Do you see what's on the screen, sir?

A    Yes.

SAM      OCR      RMR      CRR      RPR

Kretsula - cross - Mazurek     494

Q    It says Midwood Lumber and Millwork, right?

A    Correct.

Q    Is that the front of Midwood Lumber business that you know that was owned by the Motovich family?

A    No. This is the store where they take delivery, where they come the truck to pick up delivery.

Q    Okay. So this is where the --

A    What you see now on the screen.

Q    Okay. This is where the merchandise --

A    Yes.

Q    -- is presented?

THE COURT: You have to let him finish.

Q    This is where the products, the merchandise is brought into this -- into the area, correct?

A    Correct.

Q    But you know that that's the title of the company, Midwood Lumber and Millwork, right?

A    I know like Millwood Lumber.

Q    You don't know about millwork?

A    Always called Midwood.

Q    Millwork, by the way, that just means like doors and trim and moldings, right?

A    I know that, yeah.

Q    And that was another big thing that Midwood sold, right?

A    Yes, correct.

SAM      OCR      RMR      CRR      RPR

Kretsula - cross - Mazurek     495

Q    And you were familiar with that because you knew the business since way back in 2005, correct?

A    Yes.

Q    Okay. And you knew like that the company had sold all kinds of doors, right?

A    Not only doors, moldings, doors.

Q    That's right?

A    A lot of supplies.

Q    But let me just focus on doors.

Doors with handles, doors without handles, right, that's what they sold?

A    Yeah, but that's not part of my business. So really it's -- I don't understand you why you ask me about the doors.

Q    Okay.

A    I usually do the painting. I've never installed the doors. I never buy the doors.

Q    All right. I am going to show you what's been admitted into evidence as GX-331.

(Exhibit published.)

Q    Okay. Do you see what's on the screen, that's -- you identified it as Mr. Motovich's office, right?

A    Correct.

Q    And I think you testified yesterday that there are secret doors here, right?

A    Yes.

SAM      OCR      RMR      CRR      RPR

Kretsula - cross - Mazurek     496

Q    And it's secret because they didn't have a handle, is that right?

A    Correct.

Q    And you're familiar with, again, that Midwood sold all kinds of doors like these doors, doors without handles, right?

A    Really I don't know because I never buy the doors from Midwood Lumber. So, I know they sold the doors, a lot of different typing doors. A lot of hotel, you can order it, order even days, even that, but I really don't know. I never buy that, so I -- I can't say yes or no.

Q    Okay. But these are the kinds of -- some of the doors that Midwood sold, right?

A    This is -- this not like the door, this like furnishing for me. Like, you know, like it's the furnishing.

Q    Okay.

A    Not millwork.

Q    There was no secret about this, there was no passcode or key that you needed to get into that door, right?

A    No passkey, no key.

Q    Okay.

MR. MAZUREK: And if we could turn to Government Exhibit 332.

(Exhibit published.)

Q    You see that on the lower right-hand side, I'm going to just mark here, it's right here?

SAM      OCR      RMR      CRR      RPR

**J.A. 359**

Kretsula - cross - Mazurek                497

(So marked.)

A    Yes.

Q    It's a little refrigerator, correct?

A    Correct.

Q    And there's a door that leads into the refrigerator?

A    Yes.

Q    And you just press the door and it opens?

A    Correct.

Q    There's take no handle on it, right?

A    No handle.

Q    Is that a secret door?

A    (No response.)

MR. MAZUREK:  I'll withdraw the question.

And if we could, again, look inside this area (so marked) that I've just circled on Government Exhibit 332.

BY MR. MAZUREK:

Q    That's the inside area behind the door, right?

A    Correct.

Q    There is also a toilet back there, right?

A    Correct.

Q    And there are things that were stored in the -- in the back, right?

A    It has sink also there.

Q    And how do you know that?

A    A couple times I been inside.

*SAM      OCR      RMR      CRR      RPR*

---

Kretsula - cross - Mazurek                498

Q    You went inside there, right?

A    Yes.

Q    David didn't hide that from you, right, as a secret, correct?

A    I called it secret door because, like you say, it's no handles and you don't know is the door over there or not door in there.  So, that's why I call secret door.  So --

Q    But it was just a regular room in the back with a toilet, right?

A    A toilet room and you have also the safe with the money.

Q    Right.

And, again, that's not something that David kept from you, you were able to go back there without -- you know, with David's permission, correct?

A    No, I can't walk myself.  If David invite me to come, come inside, I will walk inside.

Q    Right.  He didn't hide it from you?

A    No.

Q    Okay.

MR. MAZUREK:  You could take that down.

BY MR. MAZUREK:

Q    You were asked yesterday questions about insurance.

Do you remember that?

A    Yes, I know couple questions about insurance.

Q    Okay.  And there are two types of insurance that your

*SAM      OCR      RMR      CRR      RPR*

---

Kretsula - cross - Mazurek                499

business needed, general liability and workers' comp, right?

A    Correct.

Q    And when you opened Unique Painting in about 2012, right?

A    Correct.

Q    And starting in 2012 when you opened Unique Painting, you obtained general liability and workers' comp insurance for your business, correct?

A    Not right away.  Probably working comp right away and general liability later.

Q    Okay.  Months later?  Years later?

A    Sorry, I don't remember that.

Q    But shortly thereafter, right?

A    Not day after for sure.  I think liability take me more time to get, but working comp probably short, close, couple months.  But liability take probably more time like I remember, but I don't remember exactly.

Q    Because you had -- because you had to apply for it, et cetera, right?

A    (No response.)

Q    You had to apply for it?

A    I had to apply and I had to pay because it's a lot of money cost, you know, so....

Q    Right.  And you didn't like to pay all the insurance money, correct?

A    Yes, because I'm just like starting the business.  It's

**J.A. 360**

*SAM      OCR      RMR      CRR      RPR*

---

Kretsula - cross - Mazurek                500

hard to me to pay everything.

Q    Yes.  And so, when you finally got insurance, you got it from the New York State Insurance Fund, is that right?

A    Correct.

Q    And at that point in time your workers are covered, correct?

A    Yes.

Q    And at that point in time you didn't need to use David's insurance certificates anymore, correct?

A    I had to use the certificates.

Q    You didn't have -- you used --

A    I had to use.  I'm explaining to you why because if I write the check to David for my company, I need -- I need -- I need that insurance from that company.  If I don't get insurance for that company when I write the checks, so my company, they charge me the money to pay -- to give me the penalty to why I take subcontractors without insurance.

Q    Okay.  Let's break that down a little bit.

You have to show insurance to the general contractor on the job that your workers are working on, right?

A    Yes.

Q    And that insurance that you show is the insurance that you obtain from the New York State Insurance Fund, correct?

A    Yes.

Q    And you have to tell the New York State Insurance Fund

*SAM      OCR      RMR      CRR      RPR*

Kretsula - cross - Mazurek                501

how many workers that work for Unique Painting on a job, right?

A    He has the records, yes.

Q    Okay.  And when you tell the state insurance fund how many workers, you didn't tell them all the workers that worked for Unique Painting, right?

A    It's little different way.

It's if you pay the workers a W-2, they count from -- it's not about the one workers or two workers, it's count about like payroll.  How much you payroll, that's how you pay for workers' comp.

Q    Right.  But you didn't put all your workers on --

A    Yes.

Q    -- a W-2?

A    Yes, correct.

Q    That's why --

THE COURT:  Let him finish the question.

MR. MAZUREK:  Thank you, Judge.

THE COURT:  Go ahead.

Q    That's why you pled guilty to the Court, because you evaded taxes, you didn't report all your workers, right?

A    Correct.

Q    And so, if you didn't report all your workers on W-2, you didn't report them to the state insurance fund?

A    Correct.

Kretsula - cross - Mazurek                502

Q    And so when you said you needed to show insurance certificates to the state insurance fund, it's because you were hiding the fact that you had other workers from them, right?

A    That my -- my insurance fund didn't know about that, other workers I paid in cash.

Q    The state insurance fund did not know about them, right?

A    Yes, correct.

Q    Because you lied to them?

A    I am not -- I say I not lie to him because I'm never talking insurance state fund.  Insurance state fund just send me the bill how much I paid the payroll.  If I paid payroll hundred-thousand, it would have hundred-thousand from payroll, 17 or 12 percent, I have payroll.

So I never talked to insurance fund about the workers or something.

Q    But you only told the state insurance fund the people who were on W- 2 payroll, right?

A    No.  Insurance fund only see the people who work W-2.

Q    And they only see it because that's all that you have -- you didn't show them all the other workers?

A    Correct.

Q    Thank you.

Now, let me ask you, yesterday we were talking about your relationship with David Motovich.

Kretsula - cross - Mazurek                503

In addition to him helping your business, I mean you -- you were social friends, correct?

A    Yes.  We were friends, not family friends, but we friends.

Q    Well, you attended family events together, like children's Bar Mitzvahs, right?

A    Yes, he invite me, but not -- that's only -- he invite me and other business friend also.  So, he never invite me to my house or I invite him from my house to dinner like the family, but we -- we very good friends.  We have very good relationship with David.

Q    Okay.

MR. MAZUREK:  I am going to ask just to put up for the witness and counsel what's been premarked as DX-1757.

THE COURT:  Any objection?

MR. POLEMENI:  No objection.

THE COURT:  You may publish.

It's admitted.

(Defense Exhibit 1757, was received in evidence.)

(Exhibit published.)

BY MR. MAZUREK:

Q    Do you recognize the people on the screen, sir?

A    Yes.

Q    Do you see I'm going to mark on the right-hand side.

Who are these people that I've just marked?

Kretsula - cross - Mazurek                504

A    The right side is David Motovich and Lyudmila Motovich, and the left side from what it shows is me and my wife Tetiana.

Q    And this was taken at one of the family events that you referred to?

A    Yes.  I referred to for two events.  Two.  I can't remember.  Two times.

Q    Sometimes you attended birthday parties at Midwood Lumber at the Sunflower Cafe with David and some of his friends, right?

A    Yes, correct.

Q    David sometimes took you out for your birthday, correct?

A    Yes, one time.

Q    You also would go out with them sometimes when you were in Florida during Passover, do you remember that?

A    One time, yes, this happened.

Q    Okay.

You considered David Motovich a good friend, correct?

A    Yes, he very nice to me.  He really did a lot of things to help.  He's good friend.

Q    And as we said yesterday, he helped you grow your business to where it was, right?

A    They -- they helped me to grow the business.

Q    Now, David never took any money from you, correct, he

**J.A. 361**

Kretsula - cross - Mazurek          505

didn't steal any money from you?

A    Never, never.

Q    He never stole a dime from you, right?

A    No, no.

Q    In fact, he gave you a lot, correct?

A    Gave me a lot.

Q    Thank you.

Now, you also said -- in fact, sometimes he even, I think the Government yesterday on direct examination showed you a check that was written to a travel group.

Do you remember that?

A    I remember.  Yes, I remember that.

Q    And that travel group was your travel agent, right?

A    Yes.

MR. MAZUREK:  If we could put on the screen, it's already been admitted into evidence, GX-1203-A.  And I'll give you the page number.

(Exhibit published.)

MR. MAZUREK:  Page 15.

(Exhibit published.)

BY MR. MAZUREK:

Q    This is the check that we were -- that you were talking about yesterday with the prosecutor?

A    Correct.

Q    And Travgroup is the payee on this check, right?

*SAM          OCR          RMR          CRR          RPR*

---

Kretsula - cross - Mazurek          506

A    I see Travgroup -- from Midwood Building Corp. to Travgroup.

Q    Yes.  That was a travel agent that you used, right?

A    Yes.

Q    In fact, the owner of that travel company is someone whose house you painted, right?

A    Sorry.  Can you repeat it?

Q    The owner of that travel agency is one of the jobs that Unique Painting did, you painted his house?

A    Correct.

Q    And that is, again, someone that David Motovich put you in touch with?

A    Yes, correct.

Q    And that person paid you, you know, for the project, right?

A    Correct.

Q    And this check that was for $18,000, you needed some money for purposes of travel with your -- for your family, right?

A    I remember, so this is check to pay for my travel.

Q    Yes.  $18,000 for your family travel, right?

A    No, because I tell you I don't remember this is paid for my travel.

Q    For your travel, right?

A    I don't remember for this check paid for my travel.

*SAM          OCR          RMR          CRR          RPR*

---

Kretsula - cross - Mazurek          507

Q    You don't remember that?

A    Of course not.

Q    Well, this is the travel agency that you used, right?

A    Yes, but this used not only me, you know, thousand customer.  And David also a customer that travel agency.

Q    And you don't remember that David advanced you money for your personal travel of up to $18,000?

A    I don't remember that.  I'm sorry, but I don't remember that.

Q    But you are -- you used this travel agency and you painted the guy's house, right?

A    Correct, that's true.

MR. MAZUREK:  Okay.  We can take that down.

BY MR. MAZUREK:

Q    You also remember that David helped you or lent you money for purposes of buying home appliances for your home at Home and Stone store, do you remember that?

A    Yes.

Q    He helped you pay for like an $8,000 toilet for your home, do you remember that?

A    Not $8,000 for toilet.  It's something more, not just only one toilet 8,000.

Q    All right.  For a toilet, tile, appliances --

A    Yes.

Q    -- he lent you money, right?

*SAM          OCR          RMR          CRR          RPR*

---

Kretsula - cross - Mazurek          508

A    Yeah, but it's lot of things, not just one toilet.

Q    Okay.

Whether it's one toilet or many things, David lent you money personally for that, correct?

A    Correct.

Q    Now, you also testified yesterday about when you formed the company Unique Painting, that's your company, right, you said?

A    That's me, yes.

Q    And you decided to start it and you were the sole owner of it, right?

A    Correct.

Q    And you worked out the paper work with your tax accountants, correct?

A    Correct.

Q    And you didn't share, you know, the books and records with David Motovich of your company, right?

A    Never.

Q    That was your company, and so you wouldn't show him how you calculated profits for your company, right?

A    Never.

Q    You wouldn't show him your accounting records, right?

A    Never.

Q    You wouldn't show him your tax returns, right?

A    Never.

*SAM          OCR          RMR          CRR          RPR*

**J.A. 362**

Kretsula - cross - Mazurek          509

Q   That was all on you, sir, right?

A   Correct.

Q   Let me ask you today, is it true, sir, as we sit here in 2024, your business is not nearly as good as it was before the IRS agents came to your home in 2019, right?

A   I'm staying good now.

Q   You have a difficult time getting work, isn't that true?

A   It's hard to me to get the job after 2019, from 2019 for -- to 2023 something.  But the last year-and-a-half I got many jobs, so I'm -- now I'm more feeling good.

Q   All right.  You're feeling better now that you have your cooperation agreement, and you're hoping that this case is going to end soon for you, right?

A   Not only that.

Q   I'm sorry?

A   Not.

Q   No?

A   No.

Q   Well, let me ask you this:  You never wanted to be sitting in this chair you're sitting in right now, right?

A   Correct.

Q   And you believe David Motovich helped your business a lot, right?

A   Correct.

Q   You believe that if it weren't for him, you wouldn't have

Kretsula - cross - Mazurek          510

been able to grow Unique Painting like you did, right?

A   For that time, correct.

Q   And the most important thing right now is you don't want to go to jail for five years, right?

A   Of course, I don't want.

Q   You want to get your life back in order so that you can spend more time with your daughter, correct?

A   My life will be never the same anymore.

Q   And it would be a lot worse if you go to jail for five years?

A   That's true.

Q   And what you can say, sir, is that David Motovich only made your business better, right?

A   Hundred percent right.

Q   And that's because he was helping you get new clients, correct?

A   Correct.

Q   He was helping you pay your workers on time, correct?

A   Correct.

Q   He was helping you get building supplies, correct?

A   Correct.

Q   You could say that David Motovich was a very good man to you, right?

A   Correct.

        MR. MAZUREK:  I have nothing further, Your Honor.

R. KRETSULA - REDIRECT - MR. POLEMENI          511

        THE COURT:  Redirect.

        MR. POLEMENI:  Thank you, Judge.

REDIRECT EXAMINATION

BY MR. POLEMENI:

Q   Good morning, Mr. Kretsula.

A   Good morning.

Q   I want to talk a little bit about the timing of your coming in to meet with the Government leading up to your cooperation agreement.  Okay?

A   Okay.

Q   Defense counsel asked you whether it was around February of 2019 when you were first approached by agents, is that right?

A   Yes.

Q   And I know you don't remember the exact time, but you weren't truthful with the agents when you first met with them, right?

A   Correct, I'm not truthful.

Q   And you told them that the checks that you wrote to the companies that we discussed yesterday were for subcontracting work, right?

A   Correct.

Q   And that wasn't true?

A   That's not true.

Q   Because the truth is those checks were for you to get

R. KRETSULA - REDIRECT - MR. POLEMENI          512

cash from David Motovich, right?

A   Correct.

Q   And the agents asked you where were you getting the cash, Mr. Kretsula, right?

A   He not ask me where I'm getting the cash.  I don't remember that answer.

Q   Well, they asked you who is David Motovich, right?

A   Correct.

Q   And what did you tell them initially?

A   I tell them I buy supply and that he is like friend, so he helped me something about the jobs.

Q   You didn't tell them that you were getting cash from him, right?

A   No.

Q   Why not?

A   First of all, I will not tell because I want to protect myself.  I want to protect David because I'm worried about his -- David's reaction if I say all the truth because, like we say before, he really helped me to grow my company, grow everything.  And -- and I know his -- David's family.  It's very -- very powerful family in my community, so I worry about my family, about my -- my -- my lifestyle, about my business, if I have some pressure or something.  So, I don't want to -- I don't want to make it trouble to me and I don't want to make it trouble to David.  So that's why I not say the truth.

**J.A. 363**

R. KRETSULA - REDIRECT - MR. POLEMENI          513

Q    You didn't want to get yourself in trouble, right?

A    Yes, my trouble and David trouble.

Q    Because you were concerned about what might happen if you told the Government that you were getting millions of dollars in cash from David Motovich, right?

A    I know it will be -- go to the court for sure.

Q    Eventually, though, you did tell the Government, and what you told the jury yesterday is that you received millions of dollars in cash from David Motovich, right?

A    Yes.

Q    What happened that you then told the Government the truth?

A    So, it's -- it's take me couple years to make the decision.  And like I say before, my health got worse and worse and worse.  I lose my family.  I see they lose everything.  I lose my friends.  So I can't continue like that anymore, so -- and but still I'm worried about David's reaction.  So somebody tell me in the street if you hear --

MR. MAZUREK:  Objection.

THE COURT:  Overruled.

Go ahead.

A    If you -- if I hear this, you know it's David Motovich arrested?  I'm not answer anything, but even I remember who tell me about that.  So I'm just, I'm shock.  I'm shock about that.  So I'm thinking this is the time to -- to -- to have to

SAM     OCR     RMR     CRR     RPR

R. KRETSULA - REDIRECT - MR. POLEMENI          514

go to testify.

Q    Why, what was it -- was there something about David Motovich's arrest that led you to come in and cooperate?

A    Yes, because I already know that somebody tell him about -- somebody testify about him to -- to -- to something he did, did something wrong.  So, it's not me the first to tell about David.

Q    When you first met with the agents and lied to them, did you tell Mr. Motovich that?

A    No.  I still had to go to talk to the agents, but I not -- not talk about what I talk inside.

Q    You talked a little bit about going out with David Motovich, some social events.

You met his family?

A    We go out with David, yes.  Not -- one time we go to Miami with family, my wife and David's wife.  This only one time we go with family.

The rest only we go -- go like couple times, maybe three times, four times with David, just David.

Q    Is it hard for you to be testifying about what you did with Mr. Motovich?

A    Yes.

Q    Why?

A    Because he helped me a lot before.  He -- he certainly helped me a lot before.

SAM     OCR     RMR     CRR     RPR

R. KRETSULA - REDIRECT - MR. POLEMENI          515

His father really helped me a lot before to grow up, so that -- you know, that -- I don't want to testify against him.

Q    You talked a little bit about your cooperation agreement.

Did anyone from the Government promise you anything in connection with your immigration?

A    No.  We never talk about that.

(Continued on the following page.)

SAM     OCR     RMR     CRR     RPR

R. KRETSULA - REDIRECT - MR. POLEMENI          516

(Continuing.)

BY MR. POLEMENI:

Q    What is the minimum term of imprisonment that you face?

A    Minimum, from zero to five.

Q    Is it your understanding that you could be sentenced to zero years in prison?

A    The Judge make decision.

Q    Is it your understanding that you could be sentenced to zero years in prison even if you hadn't cooperated with the Government?

A    I don't know.

MR. POLEMENI:  May I have one moment, Judge?

THE COURT:  You may.

(Pause in proceedings.)

MR. POLEMENI:  If we can pull up what's in evidence as DX 9928.

Mr. Scott, can you put -- thank you.

(Exhibit published.)

Q    I just want to go over some of the penalties you face.

It says the maximum term of imprisonment is five years.  Do you see that?

A    Yes.

Q    It says the minimum term of imprisonment is zero years?

A    Yes.

MR. POLEMENI:  If we can turn to the next page.  And

**J.A. 364**

Kristi Cruz, RMR, CRR, RPR, Official Court Reporter

R. KRETSULA - REDIRECT - MR. POLEMENI          517

then if you could blow up paragraph 2.

Q    It says:

The defendant understands that although imposition of a sentence in accordance with the United States guidelines is not mandatory, the guidelines are advisory and the Court is required to consider any applicable guidelines provisions as well as other factors enumerated in 18 U.S.C. 3553(a) to arrive at an appropriate sentence in this case.

You've said this a couple of times now, Mr. Kretsula, but who decides what your sentence will be?

A    Judge.

Q    Has anyone made any promises to you as to what your sentence will be?

A    No.

Q    Has anyone at Government's table promised you what your sentence will be?

A    No.

Q    I want to talk a little bit about what we cross-examined on yesterday --

THE COURT:  We will do that after we take our comfort break.  It's 11:00.  There was mention of $8,000 toilets, which reminded me that we should take our comfort break.

So we will see you in 15 minutes.  Do not talk about the case, and we will continue.  Thank you.

PROCEEDINGS          518

THE COURTROOM DEPUTY:  All rise.

(Jury exits.)

(In open court; jury not present.)

THE COURT:  The witness may step down.  The jury has left the courtroom.

Once the witness has left the courtroom, I'll ask everybody to be seated, and we'll address any issues that we need to address outside of the presence of the jury and the presence of the witness.

(Witness leaves the stand and exits the courtroom.)

THE COURT:  You may be seated, ladies and gentlemen. The witness has left the courtroom.

Do we have any issues to address during the break, from the Government?

MR. POLEMENI:  Yes, Your Honor, one thing.

And I understand your ruling, but the reason why I objected several times to the questions posed by defense counsel about the maximum term of imprisonment and whether Your Honor can sentence the defendant below that was because I believe that the question was premised on an inaccurate statement of the law.  The question was repeatedly, as I understood it and as I heard it at least, whether you understood that the only way that the Court can sentence you to under five years was if you cooperated with the Government, and that is not accurate.

PROCEEDINGS          519

THE COURT:  No.  The question was:  What is your understanding, and his understanding may be absolutely wrong, but it is perfectly appropriate to ask a cooperating witness what his understanding is.

MR. POLEMENI:  I understand.

THE COURT:  And that was the -- I'm glad you do because I try to be very clear.  That was the question that was asked of the witness, what is your understanding of your cooperation agreement with the Government.  Very often witnesses have an incorrect understanding of what the realities are of a cooperation agreement, and to the extent that the witness's understanding is incorrect, the Government has the opportunity to refer to the document and to make it clear in their examination as to what, in fact, the agreement provides.

But it is not inappropriate to ask a cooperating witness what his or her understanding is of their agreement. They may be 180 degrees wrong, but it is their understanding, and it is something that is important for the jury to understand what the witness's motivation might be even if the witness has an incorrect understanding of what is provided in the cooperation agreement.  And that is why your objection was overruled.

MR. POLEMENI:  And I understand, Your Honor, that --

THE COURT:  Good, I'm glad you do because I try to

J.A. 365

PROCEEDINGS          520

be very clear, and that is what the law is, okay?  The witness testifies as to his understanding of his cooperation agreement, and if he gets it wrong, you have had ample opportunity to examine him with respect to what the agreement, in fact, provides.  I know what the agreement provides, but the witness may have a different view.

Go ahead.

MR. POLEMENI:  Thank you, Judge.

THE COURT:  You're welcome.

MR. POLEMENI:  My concern is not so much as to what the witness understands.  My concern is more that the jury is now left with the misimpression that the only way that this defendant can be sentenced to less than five years is if he cooperates with the Government.

THE COURT:  That's why the Court will inform the jury with respect to what the law is.

MR. POLEMENI:  And, Your Honor, and that's why I would ask for a limiting instruction at this time, so that there is no confusion, whether it's with this witness or the rest of -- remaining cooperating witnesses, that Your Honor has discretion and can sentence within the minimum and the maximum and it is not dependent on whether the defendant -- the witness is cooperating with the Government.

THE COURT:  I give the jury their instructions at the close of the case.  Your job as counsel is to adduce

PROCEEDINGS 521

evidence. And if a witness thinks that he is subject to the death penalty because he misreads the law, he will testify I think I could be put to death, and then you have the opportunity in examining him to say look at the agreement, doesn't it say zero to five, doesn't it say it's up to the Judge. That's your opportunity. And then I will instruct the jury as to whether or not the penalties with respect to the cooperating witness is zero or five or death.

Is that clear?

MR. POLEMENI: It is, and the only reason -- and I understand. The only reason why I was asking for a limiting instruction now is that I anticipate it might come up, and I did not want the jury to be confused now. And I --

THE COURT: The jury will not be confused because the jury will be instructed at the end of the case that the law comes from the Court. And to the extent the lawyers attempt to tell the jury what the law is, whether they do it through eliciting testimony from witnesses or whether they do it by saying the law is X, I assure you they will be informed as to what the law, in fact, is.

However, I also want to make it very clear that cooperating witnesses, and this should not shock you as experienced counsel, sometimes misapprehend, or as a former president of the United States once said, misunderstand what their situation is. I'm not saying it's any fault of the

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

PROCEEDINGS 522

Government, I'm not saying it's the fault of the defense counsel, but sometimes witnesses do not understand what they're facing. And so it's very important that the jury have an understanding of what the witness understands his or her exposure to be. They may have the right understanding; they may have the wrong understanding.

I will inform the jury as to what the situation is. And to the extent that you believe your adversary is eliciting inaccurate descriptions of the exposure, you, in your redirect, have ample opportunity to point out what the real law is by going to the document and saying this is what your agreement provides, do you understand that these are the words in the agreement. You're not instructing the witness on the law. You are, however, pointing out to the witness what the document says. So if the witness thinks he's subject to the death penalty, well, you can say the agreement provides zero to five, and then I will instruct the jury at the close of case that, in fact, cooperation agreement dealt with zero to five and not lethal injection versus hanging versus firing squad.

Are we clear on this?

MR. POLEMENI: Yes, Your Honor.

THE COURT: Anything else?

MR. POLEMENI: No.

THE COURT: Okay.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

PROCEEDINGS 523

Anything else from defense counsel?

MR. JACKSON: No, Your Honor. Thank you.

THE COURT: Let's take our non-$8,000 restroom break.

MR. JACKSON: Judge, with --

THE COURT: Ah, one more thing. Go ahead.

MR. JACKSON: I just want to verify, since we took a little extra time, what time we should be back.

THE COURT: Oh, I'd say in about seven minutes.

MR. JACKSON: Thanks, Judge.

THE COURT: Give or take.

(Recess was taken.)

(In open court; jury not present.)

THE COURT: You may be seated.

Do we have any issue to address before we bring the jury in? From the Government?

MR. PAULSEN: Yes, Your Honor.

THE COURT: Yes?

MR. PAULSEN: If I could just let Your Honor know what our plan is for the rest of the morning.

THE COURT: Please.

MR. PAULSEN: After redirect of Mr. Kretsula, our next witness is a record custodian that we think will go very quickly. He, however, is in a wheelchair, and it would be somewhat difficult for him to get out of the wheelchair.

**J.A. 366**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

PROCEEDINGS 524

We would like to ask permission for him to testify while staying in his wheelchair. And if so, we wanted to get the Court's guidance on the best way to position him such that that might be possible.

THE COURT: Well, obviously he needs to be visible to the jurors and to opposing counsel and to the defendant. So what do you suggest? Do you have a suggestion?

MR. PAULSEN: We do, Your Honor. We moved our trial cart, which was right in front of Your Honor in front of the jury. We believe we can move one of the microphones over toward him, if that's acceptable to Your Honor.

THE COURT: Is that acceptable to defense counsel?

MR. JACKSON: Perfectly, Your Honor.

THE COURT: Okay. So we will do it that way.

MR. PAULSEN: Yes, Your Honor. And for this witness, because he will not be at the conventional witness spot, I have the exhibits that we're looking to authenticate through him on paper, so I will hand those to him, with your permission.

THE COURT: Well, you'll hand them to my Court Deputy, who will hand them to the witness. You will not approach the witness. Wheelchair or not, we do not have the lawyers approach the witnesses. That is done by the Court Deputy.

MR. PAULSEN: Yes, Your Honor. Understood.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

PROCEEDINGS                    525

THE COURT:  You have the documents that you wish to have the witness examine in hand?

MR. PAULSEN:  I do, Your Honor.

THE COURT:  Well, I think the thing to do, why don't you give it to my Court Deputy now.

Have you shown these documents to your adversary?

MR. PAULSEN:  We emailed them last night with a list of the exhibit numbers for them.  This is 107 through 123.

THE COURT:  Are there any objections to those exhibits coming in?

MR. JACKSON:  Your Honor, we have a -- we will not be -- we don't have substantive piece-by-piece.  The one question that we have and is, and the reason we need to hear from this witness is, we want to understand what his basis is as a records custodian.  So I would ask, Your Honor, to potentially voir dire the witness after they've been offered and he explains --

THE COURT:  Well, let's have the discussion now.

You can have a seat, counsel.

What is the issue with respect to the need to voir dire the witness with respect to the documents?

MR. JACKSON:  Your Honor, I just don't know what his basis is.

THE COURT:  Well, who is the witness?  You haven't told me who the witness is, what the documents are.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

PROCEEDINGS                    526

MR. PAULSEN:  Yes, Your Honor.

The witness's name is Barry Feerst.  He's an attorney.  He represented Coney Island Payroll in 2019.  We sent a subpoena to Coney Island Payroll, which they forwarded to Mr. Feerst.  He's the individual who communicated with me about the subpoena and then forwarded to us the documents that have been identified as 107 through 123 on a thumb drive.  These documents are four client profiles from Coney Island Payroll, as well as a number of checks.

His only role, as far as I understand it, is that he's the individual who collected the documents from his client and then provided them to the Government in connection with the subpoena.

THE COURT:  He is only going to testify in his capacity as custodian of record; is that correct?

MR. PAULSEN:  That's right, Your Honor.

THE COURT:  He has no other testimony to give with respect to the documents or with respect to anything else; is that correct?

MR. PAULSEN:  Yes, Your Honor.  He will say that he provided no particular -- he didn't cull the documents, he didn't select them.  He took them from his client and passed them on to the government.

THE COURT:  Mr. Jackson, what problem do you have with that?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

PROCEEDINGS                    527

MR. JACKSON:  Judge, I may have no problem at all.  I just want to hear what he has to say about --

THE COURT:  Well, you just heard from counsel what he's going to say.  If he says that, what is your problem with having the documents come in through him as custodian of records?

MR. JACKSON:  Only the 803(6) issue, Judge, just understanding how he understands that these are documents that are actual business records that were maintained in the way the 803 --

THE COURT:  It sounds to me that the Government's going to have him address that.

Is that correct?

MR. PAULSEN:  Your Honor, I don't think this witness can do anything other than to say he received them from his client and passed them on to us.

THE COURT:  So assuming that the witness says that, what's going to be your position, Mr. Jackson?  You want to keep the documents out at that point?

MR. JACKSON:  I just want to -- if that's all that he says, Your Honor --

THE COURT:  Well, I'm being told by the Government that's all he's going to say.  If that's all that he says, do you have any objection to the documents coming in?  That's my question to you.  And if so, tell me what that objection is

**J.A. 367**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

PROCEEDINGS                    528

now so I can rule on it.

MR. JACKSON:  If that's all that he says, Judge, I think that I would have a potential problem because --

THE COURT:  Tell me your potential problem, which we call "objections" here in Federal Court.

MR. JACKSON:  Yes, Your Honor.

THE COURT:  What's your objection?

MR. JACKSON:  Under 803(6), he needs to be able to say that the record was made at or near a time by or from information transmitted by somebody with knowledge.  And if he has knowledge of that, then we're fine with it.

THE COURT:  Can he say that, counsel?

MR. PAULSEN:  Your Honor, I don't believe so.  I believe --

THE COURT:  What can he say?

MR. PAULSEN:  I believe he will say that he communicated with his client, Coney Island Payroll, asked them for documents responsive to the subpoena, that this is what his client gave him, and that those documents were passed onward to the Government.

THE COURT:  All right.  Let's get the jury in.

MR. MAZUREK:  Just there's one other issue.

THE COURT:  I'm sorry.  Go ahead.

You can be seated.  Just use the microphone.

MR. MAZUREK:  Yes.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

PROCEEDINGS                    529

So on cross-examination, I showed in front of the jury a Government Exhibit marked 23, that was the facade of Midwood Lumber at the loading dock. It was very similar to a photograph that the Government used on direct, but that document was marked as GX 25.

So I move -- and I talked to the Government about this, they don't have any problem with it. I just want the record to be clear that we both agreed that GX 23 shall be admitted.

THE COURT: Any objection to the admission of GX 23?

MR. GRUBIN: No, Your Honor. Thank you.

THE COURT: It's admitted. I don't think there's any need to, quote/unquote, admit that in the presence of the jury.

Does the defense think that we need to have the jury here for the admission of that document?

MR. JACKSON: No, Judge.

THE COURT: Does the Government think we need to have the jury here for the admission of that document?

MR. GRUBIN: No, Your Honor.

THE COURT: It's admitted.

(Government Exhibit 23, was received in evidence.)

MR. PAULSEN: Your Honor, if I may.

THE COURT: You may.

MR. PAULSEN: One further thing.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

PROCEEDINGS                    530

Your Honor had asked about the 803(6) exception to the business records. We are not looking to enter in these documents through a hearsay exception. The only use for the Government is they are admitted as documents that were in the possession of Coney Island Payroll. They are checks and they are account opening forms that are, frankly, untrue, not true. It is not our position that we're looking to use any applicable hearsay exception.

So we would believe they're admissible just purely as the custodian of records presenting them to the Court.

THE COURT: You're not seeking to have them come in as business records; is that correct?

MR. PAULSEN: We're not looking for the business records exception to allow there be hearsay that is admitted for the truth, Your Honor.

THE COURT: Well, what is the purpose for which you are offering them?

MR. PAULSEN: These --

THE COURT: If you're not offering them as 803(6).

MR. PAULSEN: So, Your Honor, these are to show that accounts were opened at Coney Island Payroll, that they had documents indicating the accounts had been opened and they had been receiving checks for years consistent with those accounts.

THE COURT: All right. Let me hear from

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

PROCEEDINGS                    531

Mr. Jackson.

What is your objection to those documents being admitted?

MR. JACKSON: If they're not being admitted for the truth, Judge, then that gets past 803(6). And so I think that as long as the witness is not going to offer any hearsay in terms of what -- for the truth in terms of what people at Coney Island told him, then we don't have any objection to them coming in not for the truth.

THE COURT: Is that acceptable to the Government?

MR. PAULSEN: Yes, Your Honor.

THE COURT: Anything else?

MR. PAULSEN: One thing.

Because this individual is in a wheelchair and it will take me a couple of moments to get him into the courthouse, we are going to propose that during that moment, we have three stipulations that still need to be read. Mr. Skurnik, who reads with the most panache on our team, would like to read them at that moment.

THE COURT: I'm all in favor of panache.

MR. PAULSEN: We figured, Your Honor.

THE COURT: Lacking it entirely myself. It's always good to have a panache player.

MR. PAULSEN: That would be our proposal. While I'm getting the witness, Mr. Skurnik will read them, and then the

**J.A. 368**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

PROCEEDINGS                    532

moment he's done, I will bring the witness in.

THE COURT: Is that acceptable to defense counsel?

MR. JACKSON: Yes, Your Honor.

THE COURT: Anything else from the Government?

MR. PAULSEN: No, Your Honor.

THE COURT: Anything else from defense counsel?

MR. JACKSON: Lastly, Judge, because they're going to be not offered for the truth, we would just ask that the Court instruct the jury that they're not offered for the truth.

THE COURT: How about when they offer them, the Government says they're not offering them for the truth.

MR. JACKSON: Even better, Judge.

MR. PAULSEN: Yes, Your Honor. They're offered for the purpose that they were in the custody of Coney Island Payroll.

THE COURT: Is that acceptable to defense counsel?

MR. JACKSON: Yes, Your Honor.

THE COURT: Anything else from the Government?

MR. PAULSEN: No, Your Honor.

THE COURT: Anything else from defense counsel?

MR. JACKSON: No, Judge.

THE COURT: All right. Let's get the jury in and let's get the witness back.

(Witness enters the courtroom and resumes the

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. KRETSULA - REDIRECT - MR. POLEMENI          533

stand.)

THE COURT:  Please rise for the jury.

(Jury enters.)

(In open court; jury present.)

THE COURT:  Thank you again, ladies and gentlemen of the jury.  Please be seated.

Ladies and gentlemen of the public, please be seated as well.

We're going to continue with the completion of the redirect examination of the witness.

Please continue to inquire.

MR. POLEMENI:  Thank you, Your Honor.

REDIRECT EXAMINATION (Continued)

BY MR. POLEMENI:

Q    Mr. Kretsula, you were friends with David Motovich, right?

A    Correct.

Q    But he wasn't your partner in Unique Painting, right?

A    No.

Q    He wasn't a silent partner in that business, right?

A    No.

Q    That was your business.

A    That's my business.

Q    And he had his own businesses, right?

A    Correct.

R. KRETSULA - REDIRECT - MR. POLEMENI          534

Q    And when you brought him checks and he gave you cash in return, it was a business transaction, right?

A    Correct.

Q    He charged you 15 percent each time, right?

A    Yes.

Q    And that was regardless of whether he had recommended you for a project or not, right?

A    Correct.

Q    It was 15 percent each and every time.

A    Correct.

Q    Now, painting, is it hard work?

A    Depends what kind painting.

Q    Could it be physically tiring?

A    Depend what the quality of the job, so...

Q    Are you tired after a day of work?

A    Tired, yeah.

Q    Are your workers tired after a day of work?

A    Probably, yes.

Q    Now, you mentioned that you paid some of your workers with a check, right?

A    Correct.

Q    And you gave a W- 2 to them?

A    Yes.

Q    And you filed a W-2 with the IRS?

A    Correct.

R. KRETSULA - REDIRECT - MR. POLEMENI          535

Q    And you paid payroll taxes?

A    Correct.

Q    Some workers you paid a combination of check and cash, right?

A    Correct.

Q    Some workers you just paid cash, right?

A    Correct.

Q    For those workers, you didn't tell the IRS those wages, right?

A    Correct.

Q    You didn't pay into social security, right?

A    Yes.

Q    You didn't pay into Medicare, right?

A    Correct.

Q    How much were you paying those workers, the workers that you were paying in cash?

A    How much pay of --

Q    How much per day?  Were you paying them per day?

A    Hours, 40 hours, one hour around like -- that time?

Q    Yes.

A    That time, I don't remember, because they change a lot from that time.  In this country, $5 minimum payment, now it's 15.  So perhaps maybe that time, like 2005, maybe, I don't know -- I don't remember, I'm sorry.  I can't -- I can't tell --

**J.A. 369**

R. KRETSULA - REDIRECT - MR. POLEMENI          536

Q    When you had Unique Painting.

A    Yes.

Q    Do you recall?

A    Excuse me?

Q    Do you recall, when you had Unique Painting --

A    2012.

Q    From 2012 to 2019, do you recall how much you were paying your workers that you were paying in cash?

A    Of course more like minimum wage, but I don't remember exactly.  Minimum wage, like, in 2012 is 10, more like $10.

MR. POLEMENI:  Ms. Kannan, if we can bring up Government Exhibit 744-049.

THE COURT:  In evidence?

MR. POLEMENI:  Yes.

THE COURT:  You may publish.

(Exhibit published.)

Q    We looked at some checks yesterday, and I believe you testified, Mr. Kretsula, that throughout the period of time that you were getting cash from Mr. Motovich, that it was more than $2 million in cash he gave to you?

A    Approximately that.

Q    And so if you look at this, February 2016 as an example, this check, is this a check you wrote to Mr. Motovich for cash?

A    Check is my, but David wrote, yes.  This is a check from

R. KRETSULA - REDIRECT - MR. POLEMENI        537

my company to David company.

Q   How much is the check for?

A   $42,770.

MR. POLEMENI:  If you could turn to the next page, Ms. Kannan.

Q   That was on February 2nd of 2016, that check, the one we just looked at, Mr. Kretsula?

A   Yes, February -- 2/2, February 2nd.

Q   The next day -- I'm sorry, about a week later, on February --

A   February 10th.

Q   You write him -- another check is written for cash; is that right?

A   Yes.

Q   How much is that?

A   $21,414.

Q   And each time, Mr. Motovich took 15 percent of those checks, right?

A   Correct.

Q   And these weren't loans, right?

A   No loans.

Q   And you weren't writing these checks because he was your silent business partner, right?

THE COURT:  Can you read the question back, please? Keep your voice up when you read it back.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - REDIRECT - MR. POLEMENI        538

(Record read.)

A   I don't have business partner.

MR. POLEMENI:  I have nothing further, Judge.

THE COURT:  You may step down, sir.  Thank you. You're done.

(Witness is excused.)

THE COURT:  Ladies and gentlemen of the jury, we're now going to have several stipulations that the parties have agreed to read to you, to be followed by a witness who is a custodian of records.  That witness who will be brought into the courtroom is someone who is wheelchair bound.  So after the stipulations are read to you by counsel, you're going to have a witness who is going to be slightly differently positioned, but in front of you, and documents are going to be introduced into evidence through that witness.  I don't know exactly how long that will take, but we'll be approaching our luncheon recess at that point.

So we're going to do the stipulations now, then we're going to have some more documents that come in through the witness who, as I said, is wheelchair bound, and then we will be approaching our lunch hour.  Just to give you a sense of the guidance that I've gotten from the lawyers.  But we are moving along.

Go ahead, counsel, with the stipulations that have been agreed to between the parties.  And keep your voice up.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - REDIRECT - MR. POLEMENI        539

MR. SKURNIK:  Thank you, Judge.

We're starting with Government Exhibit 6005.  It states:

It is hereby stipulated and agreed by and between the United States of America, by its undersigned counsel, and the defendant, David Motovich, by his undersigned counsel, that:

If called to testify, Guardian Life Insurance Company of America, defined as Guardian, representative Greg Horvath, H-O-R-V-A-T-H, would appear before this court and testify that Government Exhibit 2000 was maintained by Guardian in the regular course of its operations, was created by Guardian at or near the time of the occurrence reflected in the records, contain information that were made by or from information transmitted by a person with knowledge of the matters described therein, or were generated by an electronic process of Guardian's record-keeping systems, was made as a regular part of Guardian's operations, and constitute records of a regularly-conducted activity within the meaning of Federal Rule of Evidence 803.

If called to testify, John Hancock Life Insurance Company, defined as John Hancock, representative Brian Latchum, L-A-T-C-H-U-M, would appear before this Court and testify that Government Exhibit 2001 was maintained by John Hancock in the regular course of its operations, was created

**J.A. 370**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - REDIRECT - MR. POLEMENI        540

by John Hancock at or near the time of the occurrences reflected in the records, contain information that were made by or from information transmitted by a person with knowledge of the matters described therein, or were generated by an electronic process of John Hancock's recordkeeping systems, was made as a regular part of John Hancock's operations, and constitute records of a regularly-conducted activity within the meaning of Federal Rule of Evidence 803.

If called to testify, Northwestern Mutual representative Joe Staszak, spelled S-T-A-S-Z -A-K, would appear before this Court and testify that Government Exhibits 2006 and 2006-A were maintained by Northwestern Mutual in the regular course of its operations, were created by Northwestern Mutual at or near the time of the occurrences reflected in the record, contain information that were made by or from information transmitted by a person with knowledge of the matters described therein, or were generated by electronic process of Northwestern Mutual's recordkeeping system, were made as a regular part of Northwestern Mutual's operations, and constitute records of a regularly-conducted activity within the meaning of Federal Rule of Evidence 803.

This stipulation is admissible into evidence as Government Exhibit 6005.

The next stipulation is marked Government Exhibit 6006.  It states:

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

R. KRETSULA - REDIRECT - MR. POLEMENI          541

It is hereby stipulated and agreed by and between the United States of America, by its undersigned counsel, and the defendant, David Motovich, by his undersigned counsel, that, if called to testify, JPMorgan Chase, defined as Chase Bank, representative Denise Clemons, C-L-E-M-O-N-S, would appear before this Court and testify that Government Exhibits 701, 702, and 704 , as well as the records produced at Bates numbers 0000064881 to 0000065208 were maintained by Chase Bank in the regular course of its operations, were created by Chase Bank at or near the time of the occurrences reflected in the records, contain information that were made by or from information transmitted by a person with knowledge of the matters described therein, or were generated by an electronic process of Chase Bank's recordkeeping systems, were made as a regular part of Chase Bank's operations, and constitute records of a regularly-conducted activity within the meaning of Federal Rule of Evidence 803.  She would further testify that Government Exhibits 701-A and 702-A are subsets of the materials included in Government Exhibits 701 and 702, respectively.

If called to testify, Carver Federal Savings Bank, defined as Carver, representative Isaac Torres, T-O-R-R-E-S, would appear before this Court and testify that Government Exhibits 705, 706, and 707, as well as the records produced at Bates numbers 0000064872 to 0000064880, and 0000065209 to

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

R. KRETSULA - REDIRECT - MR. POLEMENI          542

0000065482 were maintained by Carver Bank in the regular course of its operations, were created by Carver Bank at or near the time of the occurrences reflected in the records, contain information that were made by or from information transmitted by a person with knowledge of the matters described therein, or were generated by an electronic process of Carver Bank's recordkeeping systems, were made as a regular part of Carver bank's operations, and constitute records of a regularly-conducted activity within the meaning of Federal Rule of Evidence 803.

(Continued on the following page.)

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

PROCEEDINGS          543

(Continuing.)

MR. SKURNIK:  He would further testify that Government Exhibits --

THE COURT:  A little more Vader and a little less Chris Rock and Woody Allen, a little slower.

MR. SKURNIK:  Understood, Your Honor.

He would further testify that Government Exhibits 705-A, 705-B, 705-C, 705-D, 705-E, 706-A, 706-B, 706-C, 706-D, 706-E, 707-A, 707-B, 707-C, 707-D, 707-E, 707-F and 707-G are subsets of the materials including in Government Exhibits 705, 706 and 707, respectively.

If called to testify, Sterling National Bank, now Webster Bank, defined as Sterling Bank, representative Catherine Manzione, spelled M-A-N-Z-I-O-N-E, would appear before this Court and testify that Government Exhibit 703 was maintained by Sterling Bank in the regular course of its operations; was created by Sterling Bank at or near the time of the occurrences reflected in the records; contained information that were made by, or from information transmitted by, a person with knowledge of the matters described therein or generated by an electronic process of Sterling Bank's record-keeping systems; was made as a regular part of Sterling Bank's operations; and constitutes records of a regularly conducted activity within the meaning of Federal Rule of Evidence 803.

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS          544

She would further testify that Government Exhibits 703-A, 703-B, 703-C, 703-D, 703-E and 703-F are subsets of the materials inning in Government Exhibit 703.

If called to testify, Investors Bank, now Citizens Bank, defined as Investors Bank, representative Jackmin Quinones, J-A-C-K-M-I-N, Q-U-I-N-O-N-E-S, would appear before this Court and testify that Government Exhibits 708, 709 and 710, as well as the records produced at Bates Numbers 0000065550, and 0000065483 to 0000065549, were maintained by Investors Bank in the regular course of its operations; were created by Investors Bank at or near the time of the occurrences reflected in the records; contain information that were made by or from information transmitted by a person with knowledge of the matters described therein or were generated by an electronic process of Investors Bank's record-keeping systems; were made as a regular part of the -- of Investors Bank's operations; and constitute records of a regularly conducted activity within the meaning of Federal Rule of Evidence 803.

She would further testify that Government Exhibits 708-A, 708-B, 708-C, 708-D, 709-A, 709-B, 710-A, 710-B, and 710-C are subsets of the materials contained in the Government Exhibit 708, 709 and 710, respectively.  If called to testify, Ally Bank representative, and Ally is A-L-L-Y, so Ally Bank representative Amika Thornton, Amika is A-M-I-K-A,

**J.A. 371**

*LEEANN N. MUSOLF, RPR*

PROCEEDINGS                   545

Thornton is T-H-O-R-N-T-O-N, would appear before this Court and testify that Government Exhibit 750 was maintained by Ally Bank in the regular course of its operations; was created by Ally Bank at or near the time of the occurrences reflected in the records; contained information that were maintained by, or transmitted from a person with knowledge of the matters described therein or generated by an electronic process of Ally Bank's record-keeping systems; was made as a regular part of Ally Bank's operations; and constitute records of regularly conducted activity within the meaning of Federal Rule of Evidence 803.

This stipulation is admissible into evidence as Government Exhibit 6006.

The last one, Your Honor:

Government Exhibit 6007 states:

It is hereby stipulated and agreed by and between the United States of America, and its undersigned counsel, and the defendant David Motovich, by his undersigned counsel, that, if called to testify, Google LLC representative Brandon Swartz, Swartz is S-W-A-R-T-Z, would appear before this Court and testify that Government Exhibits 1134 and 1137 were maintained by Google LLC in the regular course of its operations; were created by Google LLC at or near the time of the occurrences reflected in the records; contain information that were made by, or from information transmitted by, a

PROCEEDINGS                   546

person with knowledge of the matters described therein or were generated by an electronic process of Google LLC's record-keeping systems; were made as a regular part of Google LLC's operations; and constitute records of a regularly conducted activity within the meaning of Federal Rule of Evidence 803.

If called to testify, Yahoo!Inc. representative Kendra Puckett, that's P-U-C-K-E-T-T, would appear before this Court and testify that records produced at Bates Numbers GOV-MVH-00000001 to GOV-MVH-00004063 were maintained by Yahoo!Inc. in the regular course of its operations; were created by Yahoo!Inc. at or near the time of the occurrences reflected in the records; contain information that were made by, or from information transmitted by, a person with knowledge of the matters described therein or were generated by an electronic process of Yahoo!Inc.'s record-keeping system; were made as a regular part of Yahoo!Inc.'s operations; and constitute records of a regularly conducted activity within the meaning of the Federal Rule of Evidence 803.

This stipulation is admissible into evidence as Government Exhibit 6007.

THE COURT:  You move the admission of all of those stipulations?

MR. SKURNIK:  We do, Your Honor.

PROCEEDINGS                   547

THE COURT:  Any objection?

MR. JACKSON:  No objection.

THE COURT:  They are all admitted.

(Government Exhibits 6005, 6006 and 6007, were received in evidence.)

THE COURT:  Ladies and gentlemen of the jury, you now know there are seven, eight or ten bankers, you won't have to give up more time of your life listening to.  Those documents are all in and you will get to see the documents at the appropriate time.

Now, I'm going to ask counsel to provide hard copy to the court reporters to facilitate their accurate recording of the stipulations, if you have not yet done that, or email it to them.

Do we have the next witness available to come in and be sworn and have the documents put in through that witness?

MR. PAULSEN:  Yes, Your Honor.

The Government calls Barry Feerst.

THE COURT:  Okay.  Please have the witness come forward and be sworn, and you will situate the witness at the appropriate part.  As I explained to you, ladies and gentlemen, you will have access to the witness, and the defendant will also be able to see -- welcome -- the witness, as well, and members of the public.

Does that work for everyone?  Can you see the

**J.A. 372**

PROCEEDINGS                   548

witness, ladies and gentlemen of the jury?  Yes?  Members of the public?  Counsel?

Mr. Jackson, can you see the witness?

MR. JACKSON:  Yes.  Thank you, Judge.

THE COURT:  And your client can see the witness. Members of the public, I see you can see the witness as well.

I am going to ask you administer the oath to the witness, Mr. Scott, and then the witness will testify.

THE COURTROOM DEPUTY:  Do you solemnly swear or affirm that the testimony you are about to give the Court in this case shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.  I do.

THE COURT:  All right.

Can we have a microphone made available to the witness, that handheld opera-like mike that wanders around? You can give it to the witness, and that way, we will hear the witness respond to the questions.  Does that work?  Yes.

THE WITNESS:  Sounds that way, Judge.

THE COURT:  Okay.

All right.  You may inquire.

MR. PAULSEN:  Thank you, Your Honor.

(Continued on next page.)

B. FEERST - DIRECT - MR. PAULSEN     549

(Witness takes the witness stand.)

**BARRY FEERST**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PAULSEN:

Q    Good afternoon, Mr. Feerst.  Can you please state and spell your name for the record?

A    Barry Feerst, F-E-E-R-S-T.

Q    What is your profession?

A    Attorney.

Q    In 2019, did you work as an attorney for Coney Island Payroll Services?

A    I did.

Q    Now, I'm not asking for any privileged information regarding your interactions with Coney Island Payroll Services.  As part of that representation, did you receive a grand jury subpoena?

A    I did.

Q    How did you get the subpoena?

A    Coney Island sent it to me.

Q    So your client sent you the subpoena?

A    Right.

Q    Who was that subpoena issued by?

A    United States, either IRS or one of the U.S. agencies.  I couldn't tell you this second without looking at it.

*LEEANN N. MUSOLF, RPR*

---

B. FEERST - DIRECT - MR. PAULSEN     550

Q    Did you facilitate the response to that subpoena?

A    Yes.

Q    What did you do to respond to the subpoena?

A    Called them up, went over the content of the subpoena with the client, asked him if he did or did not have item A, B, C, or whatever, and then arranged to assemble it, forward it to the Government.

Q    Did you, in fact, do that?

A    Yes.

Q    Did that subpoena ask for various documents relating to a number of companies and an individual named Kemal Sarkinovic?

A    It asked for that.

Q    Okay.  Now, a moment ago, did the Government showed you some documents marked for identification as Exhibits 108 through 123?

A    Yes.

        MR. PAULSEN:  May I ask the Court's deputy to show the documents to the witness?

        THE COURT:  Yes, please.  Have you previously provided these documents to opposing counsel?

        MR. PAULSEN:  Yes, Your Honor.  The electronic numbers of them and electronic versions.

        THE COURT:  Thank you.

        Is that correct, Mr. Jackson?

        MR. JACKSON:  Yes, Your Honor.

*LEEANN N. MUSOLF, RPR*

---

B. FEERST - DIRECT - MR. PAULSEN     551

        THE COURT:  Go ahead.

BY MR. PAULSEN:

Q    Mr. Feerst, are these the documents that I showed you a moment ago?

A    Looks that way, yes.

Q    And are these the documents that you provided to the Government in response to the subpoena we just discussed?

A    Yes, sir.

Q    And are these, in fact, the documents that you received from your client Coney Island Payroll Services in response to that subpoena?

A    Yes, sir.

        MR. PAULSEN:  Your Honor, the Government admission for documents 108 through 123.

        THE COURT:  Any objection?

        MR. PAULSEN:  I apologize, Your Honor.  It's 107 through 123.  My mistake.

        THE COURT:  Any objection?

        MR. JACKSON:  No objection.

        THE COURT:  They're admitted.  You may publish at the appropriate time.

        MR. PAULSEN:  Thank you, Your Honor.

        We have no further questions.

        THE COURT:  Any cross?

        MR. JACKSON:  Just a few questions, Judge.

*LEEANN N. MUSOLF, RPR*

---

B. FEERST - CROSS - MR. JACKSON     552

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good morning, sir.  How are you?

A    All right.  Fine.  How are you?

Q    Good.  Thank you.  Mr. Feerst, you described just a moment ago that you facilitated a response to the subpoena that the prosecutor was talking about, right?

A    Yeah.

Q    Just to be very clear, you yourself didn't go and collect those documents, correct?

        And, again, I'm not asking you about any -- I want to be clear, as the prosecutor was, I'm not asking about any privileged information it's just my understanding is that the documents were given to you by someone at Coney Island Payroll, correct?

A    Correct.

Q    And, Mr. Feerst, you've represented Coney Island Payroll over a number of -- over a period of time?

A    Yes, sir.

Q    Okay.  You had a good relationship with Coney Island Payroll?

A    They paid the bill.

Q    Nothing in the process of them giving you those documents led you to believe that there was any attempt not to cooperate with the subpoena, correct?

*LEEANN N. MUSOLF, RPR*

**J.A. 373**

B. FEERST - CROSS - MR. JACKSON          553

A    I never came to believe that.

Q    And -- just to be very clear, you don't have personal knowledge about any of the underlying facts related to those documents, correct, Mr. Feerst?

A    Just assembling documents. I don't know what they said for our purposes.

Q    Great. One last thing.

MR. JACKSON: Your Honor, at this time, I don't think that we got the instruction from the Government that we were discussing.

THE COURT: Do you have a question for the witness or do you want to have a colloquy with the Government?

MR. JACKSON: Your Honor, I'll have a colloquy with the Government if that's okay.

THE COURT: Why don't you have a colloquy with the Government.

(Pause in proceedings.)

MR. JACKSON: Your Honor, I think the Government will confirm --

THE COURT: Well, why don't we have them do it on redirect if you're going to confirm. So if you have any more questions, great. If not, we'll have the Government do a very, very, very brief redirect on this.

MR. JACKSON: Excellent. Thank you.

Thank you, Mr. Feerst.

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS          554

THE COURT: Anything else?

MR. JACKSON: Nothing else, Judge.

THE COURT: Okay.

Government, how about a redirect to address the issue?

MR. PAULSEN: Your Honor, a moment ago, the Government moved admission of these documents.

THE COURT: Yes.

MR. PAULSEN: To be clear, the Government is moving admission on the grounds that these documents were in the possession of Coney Island Payroll.

THE COURT: Yes.

MR. PAULSEN: And they were provided to their attorney who represented to them and conveyed to the Government.

THE COURT: Yes.

MR. PAULSEN: So we are moving admission on the grounds that these were documents that Coney Island Payroll possessed and they provided to the Government. We are not moving admission that they are true --

THE COURT: Yes.

MR. PAULSEN: -- or that they -- that the documents themselves, which are client profiles and checks, are -- are necessarily truth statements, just that they were in the possession of Coney Island Payroll and provided to their

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS          555

custodian of records.

THE COURT: The documents were admitted on that basis. No one is saying they are true. No one is saying they are false. The parties are saying they are.

MR. PAULSEN: They exist, Your Honor.

THE COURT: They exist. The lawyers agree the documents you are going to see, exist. Is that the Government's position?

MR. PAULSEN: Yes, Your Honor.

THE COURT: Is that the Defense position?

MR. JACKSON: Yes, Judge.

THE COURT: The documents exist. We got the lawyers to agree that the documents exist.

Anything else from the Government for this witness?

MR. PAULSEN: No, Your Honor.

THE COURT: Anything else from defense for this witness?

MR. JACKSON: No, Judge. Thank you.

THE COURT: Thank you, Counsel, for coming in and your patience and bringing the documents. You've completed your testimony. Thank you.

THE WITNESS: You're welcome, Judge.

(Witness excused.)

THE COURT: The witness is leaving the courtroom.

Ladies and gentlemen of the jury, by my calculation,

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS          556

both my little electronic and looking at the wall clock, it is exactly 12:28 and a half. We are now going to take our luncheon recess that was promised to you at 12:30. Get an extra minute and a half. Why don't we resume at 1:45, does that work for you, and we will power through.

I am going to continue to encourage the lawyers to stipulate without live witnesses with respect to all of these documents. I just saved you the time of ten or so human beings coming in and ascribing the fact that these documents exist, all right? I couldn't get the last one but we got that done, all right?

So we'll see you at 1:45 if that works. Thank you. Please don't talk about the case, enjoy your lunch, and we'll see you then. Thank you.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURT: The jury has left the courtroom. You may be seated, ladies and gentlemen.

Do we have any issues to address from the Government and then from defense counsel in the absence of the jury?

MR. GRUBIN: Very briefly, Your Honor. We have -- we will consistently provide to the Court as we make changes to exhibits or add any exhibits. We want to make sure we are providing them, of course, to both defense counsel and the Court.

*LEEANN N. MUSOLF, RPR*

**J.A. 374**

PROCEEDINGS 557

We have a modified version, which we've already provided to the defense, of GX-396, Your Honor. I would propose, if it's acceptable to the Court, that perhaps every day or every morning, we just provide hard copies to the clerk's or the court deputy or whatever Your Honor prefers.

THE COURT: Hand it up to the court deputy if that's acceptable, obviously if you've shown it to the other side and if that's acceptable to defense counsel.

Is that acceptable as a way to proceed, Mr. Jackson.?

MR. JACKSON: Yes, Judge.

THE COURT: So we will do that. What else do we have to address in the absence of the jury?

MR. GRUBIN: That's it from the Government.

THE COURT: From defense counsel?

MR. JACKSON: No, Judge. Thanks.

THE COURT: Okay, everyone. Enjoy your lunch. We'll see you back here at 1:45.

MR. JACKSON: Thank you, Your Honor.

THE COURT: Thank you.

(Lunch recess.)

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS 558

A F T E R N O O N   S E S S I O N

(In open court; jury not present.)

THE COURT: You may be seated.

Do we have any issues to address before we bring the jury in? Anything from the Government?

MR. GRUBIN: No, Your Honor.

THE COURT: From defense counsel?

MR. JACKSON: No, Judge.

THE COURT: Okay. We'll bring the jury in.

(Pause in proceedings.)

THE COURT: Please stand for the jury.

THE COURTROOM DEPUTY: All rise.

(Jury enters the courtroom.)

THE COURT: Good afternoon, ladies and gentlemen of the jury. Please be seated. Welcome back. We, again, appreciate your promptness.

It's time for the Government to call its next witness.

MR. GRUBIN: Yes, Your Honor. The Government calls Special Agent Maegan Rees.

THE COURT: Please have the special agent come forward and be sworn.

Please come forward to the witness box where my court deputy will administer the oath and raise your right hand when you get there.

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS 559

THE COURTROOM DEPUTY: Do you solemnly swear or affirm that the answers and testimony that you are about to give the Court in this case shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Thank you. Please be seated. Would you please state and spell your name? The microphone will swivel to you. It looks like a snake but it won't bite you. Just speak right into it, please.

THE WITNESS: My name is Maegan, M-A-E-G-A-N, Rees, R-E-E-S.

THE COURT: Thank you.

You my inquire, Counsel.

MR. GRUBIN: Thank you, Your Honor.

(Continued on next page.)

*LEEANN N. MUSOLF, RPR*

---

M. REES - DIRECT - MR. GRUBIN 560

(Witness takes the witness stand.)

**MAEGAN REES**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GRUBIN:

Q    Good afternoon.

A    Good afternoon.

Q    Where do you work?

A    I work at the Federal Bureau of Investigation.

Q    Is that also commonly referred to as the FBI?

A    It is.

Q    What is what's your position at the FBI?

A    I'm a special agent.

Q    How long have you been a special agent with the FBI?

A    Almost seven years.

THE COURT: That microphone will also swivel to you. Swivel it down. Speak into it. We will hear you much more clearly. Try it now.

THE WITNESS: Yes, Judge.

THE COURT: Hear the difference?

MR. GRUBIN: Yes, Your Honor.

THE COURT: There you go. Okay. It's for the jury, they're the finders of fact, so they have got to hear what goes on.

Go ahead.

J.A. 375

*LEEANN N. MUSOLF, RPR*

M. REES - DIRECT - MR. GRUBIN        561

Go ahead.

BY MR. GRUBIN:

Q    What unit are you currently in?

A    I currently work on national security matters.

Q    And how long have you been in that unit?

A    Approximately, two years.

Q    What did you do prior to that?

A    Prior to that, I was on a criminal squad that focused on public corruption and civil rights violations.

Q    What were some of your responsibilities as a special agent in the unit focusing on public corruption and civil rights?

A    As a special agent, you manage or oversee essentially all aspects of a criminal investigation.  That can include issuing and reviewing grand jury subpoenas, conducting surveillance, executing search warrants, arrest warrants, among other tasks.

Q    You mentioned executing search warrants.  What types of locations have you searched?

A    I've searched all types of location.  Predominately residences and businesses but we conduct searches on vehicles, on firearms, woodlands.  We can search any sort of location.

Q    And how many of those would you say, approximately, you participated in?

A    Approximately 40, maybe 50 search warrants.

Q    Have you received training for your job generally as an

*LEEANN N. MUSOLF, RPR*

M. REES - DIRECT - MR. GRUBIN        562

agent?

A    I have.

Q    And what type of training have you received?

A    So all agents go through extensive training at Quantico.  It varies but it's generally about five months of training where we learn how to carry out investigations.  Part of that training, we also learn defensive tactics, we learn how to conduct searches, the processes and procedures around that, training on the other aspects of that that are required by our jobs.

Q    Have you received any other additional specialized training for your job?

A    I have.  I am a member of the Evidence Response Team which is a smaller subset of both agents and professional staff in the Bureau that receives additional training on conducting searches, and we have a different focus or a more specialized focus on forensics as well.

Q    I'm directing your attention to August 24, 2021.  What, if anything, were you doing that day for work?

A    I assisted with the execution of a search warrant in Brooklyn, New York.

Q    What was the search of?

A    It was of Midwood Lumber.

Q    Was that pursuant to a court-authorized warrant?

A    Yes, it was.

*LEEANN N. MUSOLF, RPR*

M. REES - DIRECT - MR. GRUBIN        563

Q    At a high level, what was the purpose of the search of Midwood Lumber?

A    We were searching for evidence of crimes as detailed in the search warrant.

Q    Was the search operation in connection with a preexisting operation?

A    Yes, it was.

Q    And what, if anything, was your role in that investigation?

A    I was a searcher.

Q    So why were you participating in this search?

A    So, searches generally but searches of, you know, of a business will require more people to assist than the investigative team.  I think, in this case, maybe 12 or 15 people participated, and I was just asked -- asked to help.

Q    Were there any other federal agencies involved in this search?

A    Yes, IRS was also there.

Q    Prior to searching Midwood Lumber, did you and your team have any sort of meeting?

A    Yes.

Q    Why did you meet ahead of time?

A    We always meet before a search.  We did in this case as well.  Part of that meeting, we go over what we are looking for in the search, we also identify the roles and

*LEEANN N. MUSOLF, RPR*

M. REES - DIRECT - MR. GRUBIN        564

responsibilities of certain members of the team.

Q    And is that standard FBI practice for a search -- for these types of searches?

A    That is.

Q    You mentioned the different roles of different agents.  What are some of the different roles in a search like this?

A    So a search will always have a team leader.  In some cases, that team leader is part of the investigative team.  That is not always the case.  For this search, I believe the team leader was part of the investigative team.  You'll have a photographer.  The photographer's role is to capture the location as we enter it to photograph specific things in the -- the location and then to capture photographs as we leave the location.

You have a photo logger who essentially just describes what the photos are of.  You have an evidence custodian, this person manages, as evidence is seized, they document what is seized, where it is seized from.  They are also responsible for what we call bagging and tagging.  It's especially packaging the evidence, and there's a sketcher.  This person will sketch sort of the blueprint or a bird's-eye view of the location which will help visualize a location in a way that pictures can't necessarily capture.

Q    And are all of these roles and steps standard FBI practice for a search of this kind?

*LEEANN N. MUSOLF, RPR*

**J.A. 376**

M. REES - DIRECT - MR. GRUBIN          565

A     Yes, they are.

Q     What was your assigned role?

A     I was a searcher.  Also, roles can change throughout the day.  As searches start to conclude, we try to decrease our footprint.  I believe towards the end of the search, I also helped as the photo logger.

Q     Approximately, what time did you begin the search of Midwood Lumber?

A     I believe we began around 7:00 a.m. or 7:10 a.m.

Q     And after the pre-brief ahead of the search, what did -- what, if anything, did you and your team do?

A     Yes.  So, after the gaining access to the location, a team of agents will move methodically through the location in what we call a protective sweep or a clear.  Essentially, we are just moving through all rooms of the structure to make sure there's no one else in the building.  That's both for their safety and our safety.  You want to make sure there are no other individuals at the location.

Q     Can you just generally describe the location, Midwood Lumber?

A     Yes.  It's -- it's a large location.  So, upon entering, we entered what I understand to be the front door, but upon entering this door, you go into a hardware store.  There was maybe four or five aisles of standard hardware materials, construction materials.  Upon entering the door, if you made a

*LEEANN N. MUSOLF, RPR*

M. REES - DIRECT - MR. GRUBIN          566

right, you entered what we called a showroom which was just a very nice professional room that had different types of doors and other materials that the business would show customers.

You would then navigate up a stairwell into a reception area, and from there, there were maybe three or four stairs up to a long hallway that had, if I recall, maybe six offices and a conference room that would go off the long hallway.

MR. GRUBIN:  With the Court's permission, I would like to publish what has already been admitted into evidence as Government Exhibit 353.

THE COURT:  You may publish and show it to the jury, as well as the witness.

(Exhibit published.)

THE COURT:  Can you adjust the light so that the drop down screen is more visible, Mr. Scott.

Q     What is this photograph?

A     This is the photograph of the entry, what I understood to be the main entrance of Midwood Lumber.

Q     By the way, what is the address of Midwood Lumber?

A     1169 Coney Avenue, Brooklyn, New York.

THE COURT:  Keep your voice up a little bit.

Q     Can you generally walk us through your team search following the protective sweep?

A     So, following the protective sweep, the photographer and

*LEEANN N. MUSOLF, RPR*

M. REES - DIRECT - MR. GRUBIN          567

the team leader will be the first people to enter the location.  As stated, the photographer will take photos of the location was we found it, and the team leader will essentially assess the layout, the size, how many rooms there are.  After that initial walk-through, they will assign -- it can depend based on the size -- but generally two agents -- I'm sorry, two search personnel per room to begin searching.

Q     And where did you spend the majority of your time searching, if anywhere?

A     I spent the majority of my time in two offices on the second floor of the location.

Q     And during the search, what, if anything, did agents do?

A     I'm sorry, can you --

Q     Sure.  Was -- you had mentioned -- was evidence collected and seized?

A     Yes, evidence was located, collected and then seized.

Q     As part of the search, you testified that a sketch of Midwood Lumber was made?

A     That's correct.

Q     When was the sketch made?

A     The sketch is made throughout the search but simultaneous to the search.

Q     Why is that done?

A     It's done to help depict the lay out or as I said, the bird's-eye view or a blueprint of a location in a way that

*LEEANN N. MUSOLF, RPR*

M. REES - DIRECT - MR. GRUBIN          568

pictures can't quite capture the entirety of what a place looks like.  It's a blueprint.

Q     And what is the some of the information contained in that sketch or blueprint?

A     So when he -- when the photographer enters and starts their photographs, they will label each room.  This will help us document where things are found.  That is a major aspect of the search.  It will show the rooms as they are labeled.  It will show, again, just the general -- the general layout.

Q     I'm showing you --

MR. GRUBIN:  And this is just for the witness.

THE COURT:  Yes.

Q     What's been marked for identification as Government Exhibit 436.

THE COURT:  Ask your foundational question of the witness.

Q     Do you recognize this exhibit?

A     I do.

Q     What is it?

A     This is the sketch of Midwood Lumber.

Q     And this is a fair and accurate representation of the layout of Midwood Lumber as it existed on August 24th, 2021?

A     It is.

MR. GRUBIN:  Your Honor, the Government moves to admit Government Exhibit 436 into evidence.

**J.A. 377**

*LEEANN N. MUSOLF, RPR*

M. REES - DIRECT - MR. GRUBIN     569

THE COURT: Any objection?

MR. JACKSON: None at all, Judge.

THE COURT: It's admitted. You may publish to the jury.

MR. GRUBIN: Thank you, Your Honor.

(Government Exhibit 436, was received in evidence.)

(Exhibit published.)

MR. GRUBIN: If we could zoom in, Ms. Kannan, on the top half.

THE COURT: Do you want to remove that marking or do you want it there, the arrow?

MR. GRUBIN: There we go. Thank you, Your Honor.

THE COURT: You're welcome.

BY MR. GRUBIN:

Q   Looking at the top where it says, main door, is that the entrance you were referring to earlier?

A   That's correct.

Q   Which floor is this of Midwood Lumber?

A   This is the ground floor.

MR. GRUBIN: Ms. Kannan, if you could turn to the second page and -- yeah, if we can zoom out a little bit.

Q   What floor is this?

A   This is the second level or the second floor.

MR. GRUBIN: And, Ms. Kannan, if there's a way to just blow up just the sketch portion of this.

*LEEANN N. MUSOLF, RPR*

---

M. REES - DIRECT - MR. GRUBIN     570

Q   I see several letters on the page. What do those letters represent?

A   Yes. So, the letters are designated -- are used to identify different rooms in a given location. We use them for every search. If it's -- it helps both in communicating and documenting where certain things are and where -- where evidence is found.

Q   You testified that you seized items. Generally, what types of items did you and your team seize?

A   We seized cash, we seized documents and we seized electronics.

Q   And I know you talked about this, I know you called it bag and tag. Could you, again, just talk about the process of logging the evidence?

A   Yes. So, when an evidence item is identified and it is determined that it is within the confines of the warrant for us to seize and it is relevant, it will be brought to a staging area in which the evidence custodian will log it on an evidence collected log and then it will be put in packaging, it's generally plastic or paper bag, and the -- the items that are captured in the evidence collection log are also captured on the packaging, we call it bag and tag, and then we seal it -- we generally seal it up on the scene.

Q   And then what's done with the collected evidence?

A   It is then transported back to 26 -- I'm sorry, I -- it

*LEEANN N. MUSOLF, RPR*

---

M. REES - DIRECT - MR. GRUBIN     571

is then transported back to an FBI space. In this case, 26 Federal Plaza.

Q   You mentioned that photographs were taken during the search?

MR. GRUBIN: Your Honor, maybe the Court -- with the Court's permission, may the court deputy bring three CDs to the witness?

THE COURT: Yes. You may do that.

Please do that, Mr. Scott.

And would you identify the CDs by their number.

MR. GRUBIN: Yes, Your Honor. They are labeled CD-1, CD-2 and CD-3. And I'm -- for CD-1, it contains Government Exhibits 28 and Government Exhibits 309 through 353, including Government Exhibits 323.5, 324.5 and 343.5, and that's the CD I'll be beginning with.

THE COURT: Any objection to those items being admitted into evidence and shown to the jury?

MR. JACKSON: No objection, Judge.

THE COURT: All right. You may publish. They are admitted. CD-1.

(Government Exhibits 28, 309 through 353, 323.5, 324.5 and 343.5, were received in evidence.)

MR. GRUBIN: Thank you, Your Honor.

BY MR. GRUBIN:

Q   I'm showing you Government Exhibit 309. So, what's

*LEEANN N. MUSOLF, RPR*

---

M. REES - DIRECT - MR. GRUBIN     572

depicted in this picture?

A   This is a photo of what I've referred to as my understanding of the main door of Midwood Lumber or it is the door in which the search team entered.

MR. GRUBIN: And can we go to Government Exhibit 310.

Q   How about here?

A   That's about a step or two inside that door. It's a different angle to see the hardware store portion of Midwood Lumber.

MR. GRUBIN: And let's turn to Government Exhibit 311.

Q   What is this?

A   That's the stairwell leading up to the second floor of Midwood Lumber.

Q   And what, again, is at the top of the stairwell?

A   I think right on the left-hand side is a door that then leads into the reception area.

Q   I'm showing you Government Exhibit 313. What's this?

A   That's the reception area on the second floor.

MR. GRUBIN: Let's turn to Government Exhibit 314.5.

Q   And what's this view?

A   That's another angle of the reception area.

Q   And what is the letter C?

A   That's the room label that we applied to that room.

*LEEANN N. MUSOLF, RPR*

**J.A. 378**

M. REES - DIRECT - MR. GRUBIN    573

Q    And is that letter reflected on the sketch we looked at previously?

A    It is.

Q    I'm showing you Government Exhibit 351. Is this that same reception area?

A    Yes, it is.

Q    And what, if anything, is to the right side behind the door in the exhibit?

A    It's a safe.

Q    Okay. So we'll come back to that safe, Special Agent Rees, but for now, I want to show you Government Exhibit 312. What are we looking at here?

A    That's another angle of the reception area and you can see a couple steps that lead up to the offices.

Q    So I want to, again, show you Government Exhibit 436 at page two. And if I can do this, I want to mark with a line next to the letter C here.

Do you see where I just marked at the top left of the exhibit?

A    I do.

Q    Is that the C that we just -- does that reflect the C we just saw on a piece of paper?

A    Yes, it does.

Q    And do you see to the right of that where --

MR. GRUBIN:  If we can blow that up a little bit,

*LEEANN N. MUSOLF, RPR*

M. REES - DIRECT - MR. GRUBIN    574

Ms. Kannan.

THE COURTROOM DEPUTY:  Again, Counsel, swivel the mike.  We're loosing you.

MR. GRUBIN:  I apologize, Your Honor.

THE COURT:  All right.  Okay.  Go ahead.

Q    Do you see where it says, stairs up?

A    Yes, I do.

Q    Are those the stairs we just saw?

A    Yes, they are.

Q    And, also, do you see where it says, hallway?

A    Yes.

Q    Next to the line I just marked, to the right -- the right hallway?

A    Correct, yes.

Q    Is that the hallway you just referred to?

A    Yes, it is.

Q    You testified that you primarily focused on searching an office. Which office was that?

A    I -- I searched two offices. I searched office H which was at the bottom of the screen, and office N which was at the top.

MR. GRUBIN:  Can we show office N on the screen.

Q    Whose office do you believe you were searching?

A    I believe that to be David Motovich's office.

Q    Why is that?

*LEEANN N. MUSOLF, RPR*

M. REES - DIRECT - MR. GRUBIN    575

A    I recall finding -- or I recall a number of identification cards located in that office.

Q    Let's look at Government Exhibit 326.

THE COURT:  Clear the screen, please.

Q    What is depicted here?

A    This is the hallway on the second floor that had offices off of it and the view is into room N.

MR. GRUBIN:  Can we go to Government Exhibit 328.

Q    What's this?

A    That's the entrance into room N.

MR. GRUBIN:  And if we can now go to 329.

Q    What's in Government Exhibit 329?

A    That's a photo of room N.

Q    And this is the room you primarily participated in the search of, correct?

A    That's correct.

MR. GRUBIN:  Let's turn to Government Exhibit 330.

Q    What's here?

A    That's another angle of room N.

MR. GRUBIN:  And now let's turn to Government Exhibit 331.

Q    What's this?

A    Again, another angle of room N.

Q    And what, if anything, did you observe about this part of the office, if anything?

*LEEANN N. MUSOLF, RPR*

M. REES - DIRECT - MR. GRUBIN    576

A    Yes. So, the far wooden panel closest to the white wall was actually a door to a smaller backroom.

Q    Do you know how you got into that door? Do you recall?

A    I believe the lower panel to the -- well, my right, had a switch in it that opened that door.

Q    Did you go into that room?

A    I did.

Q    So before we discuss what was in that room, I want to go over some of the evidence that you collected from Mr. Motovich's office, or his main office.

MR. GRUBIN:  And what I would like to do, with the Court's permission, is as we review some of the photographs is review some of the evidence that was collected along the way.

THE COURT:  The photographs are all in evidence; is that correct?

MR. GRUBIN:  Yes, Your Honor.

THE COURT:  And the evidence that you are referring to, is that also in evidence?

MR. GRUBIN:  It's -- I'm about to offer it, Your Honor.

THE COURT:  Okay.

BY MR. GRUBIN:

Q    You were previously handed a second CD labeled CD-2 and it contains Government Exhibits 354, 355, 356, 365, 366, 369, 378, 386, 391, 393, and 396. Do you recognize --

*LEEANN N. MUSOLF, RPR*

**J.A. 379**

M. REES - DIRECT - MR. GRUBIN    577

THE COURT: Any objection to those items coming in?

Do you want to call out the numbers again for Counsel?

MR. JACKSON: Thank you, Judge. If you could just read --

THE COURT: Just call out the numbers.

MR. GRUBIN: Sure, yes, absolutely. And these are the scanned items for Counsel. 354, 355, 356, 365, 366, 369, 378, 386, 391, 393 and 396.

THE COURT: Any objection?

MR. JACKSON: No, Judge.

THE COURT: They are admitted. You may publish to the jury.

MR. GRUBIN: Thank you, Your Honor.

(Government Exhibits 354, 355, 356, 365, 366, 369, 378, 386, 391, 393 and 396, were received in evidence.)

(Exhibits published.)

BY MR. GRUBIN:

Q    And, Special Agent Rees, you -- what are these items by the way?

A    These are scans -- scanned copies of items that we seized from that location.

Q    And is that physical evidence here in the courtroom?

A    It is.

Q    Have you reviewed that as well?

*LEEANN N. MUSOLF, RPR*

---

M. REES - DIRECT - MR. GRUBIN    578

A    I have.

MR. GRUBIN: Your Honor, well -- I will just say for the record that those are marked as Government Exhibits 354-P, 355-P, 356-P, 365-P, 366-P, 369-P, 378-P, 386-P, 391-P, 393-P and 396-P, respectively.

THE COURT: Are you moving their admission?

MR. GRUBIN: I am, Your Honor.

THE COURT: Any objection to any of those items?

MR. JACKSON: No, Your Honor.

THE COURT: They are admitted. You may publish them to the jury.

(Government Exhibits 354-P, 355-P, 356-P, 365-P, 366-P, 369-P, 378-P, 386-P, 391-P, 393-P and 396-P, were received in evidence.)

(Exhibits published.)

MR. GRUBIN: May I ask for permission from the court deputy to bring the items to Special Agent Rees?

THE COURT: Yes.

Please do so, Mr. Scott.

(Pause in proceedings.)

BY MR. GRUBIN:

Q    Let's start with Government Exhibits 96 and 396-P?

THE COURT: By the way, what does the P stand for so the jury knows what that is?

MR. GRUBIN: Sure. Physical, Your Honor.

*LEEANN N. MUSOLF, RPR*

---

M. REES - DIRECT - MR. GRUBIN    579

THE COURT: Physical. Could have guessed but juries are not supposed to have to guess the testimony. P stands for physical.

Q    And there's an outside folder there?

A    That's --

Q    What is that folder?

A    This? The Redweld?

Q    Yes, the Redweld.

A    It is a folder that is containing -- inside that folder is our actual evidence bag.

Q    Okay. And that's the evidence bag you referred to earlier?

A    That's correct. This is what would have been filled out on-scene -- this is what was filled out on-scene.

Q    What type of information does that contain?

A    So evidence --

THE WITNESS: Your Honor, may I move this down so I can see it?

THE COURT: Yes. You can move it. I just don't want the lawyers getting in the jury's faces and spaces. Go ahead.

THE WITNESS: Thank you, Your Honor.

THE COURT: Of course.

A    So evidence bags will contain seven items: The date; the internal case number; the location or the address, so in this

*LEEANN N. MUSOLF, RPR*

---

M. REES - DIRECT - MR. GRUBIN    580

case, 1169 Coney Island Ave; it will include the room where the evidence was located; the specific location where it was found; it will include a description of the item; and then it will include the person who found it and who witnessed the location of the -- of the piece of evidence. So all of that is on this bag, as well as an item number.

(Continued on the following page.)

*LEEANN N. MUSOLF, RPR*

**J.A. 380**

Rees - direct- Grubin   581

(Continuing.)

BY MR. GRUBIN:

Q   And you mentioned there might be several different things in the bag.

But why would different items be in the same bag?

A   Yes, so we will bag like items that are found from the same location.  So, for example, if we find documents in a desk drawer, we will not bag and tag each document.  We will keep those documents together and put them in one bag.

Q   Would you remove Government Exhibit 396-P?

MR. GRUBIN:  And if we could also publish for the jury so it's easier to see, Government Exhibit 396.

THE COURT:  Yes, of course.  You may publish if they're in evidence.

(Exhibit published.)

Q   And do you have that folder there?

A   I do.

Q   And you could feel free to review the evidence there or on the screen, whatever is easiest for you, Special Agent Rees.

If we could turn to page 2.  And that's the folder you have up there?

A   That's correct.

MR. GRUBIN:  And actually, let's go to page 3. Apologize.  If we could blow up the top half.

SAM   OCR   RMR   CRR   RPR

---

Rees - direct- Grubin   582

Q   What is this?

A   This is a receipt from Van Cleef and Arpels.

Q   And who is it purchased by?

A   David Motovich, address One Kansas Place, Brooklyn, New York.

Q   And actually, what's the e-mail address?

A   I'm going to spell it.  It's DaveMidwood@gmail.com. D-a-v-e-M-i-d-w-o-o-d@gmail.com.

Q   And what's the item reflected here that's being purchased?

A   It is a 18k, P2 butterfly DI.21.

Q   And what's the amount listed?

A   11,400.

MR. GRUBIN:  And then could we look at the bottom of the exhibit for a moment.

(Exhibit published.)

MR. GRUBIN:  Let's turn, actually let's turn to page 5.  Okay, here we go.

(Exhibit published.)

BY MR. GRUBIN:

Q   What is the -- what is this?

A   This is a receipt for a credit card sale.

Q   And what's the -- what's the amount?

A   11,663.

Q   And do you see the card number?

SAM   OCR   RMR   CRR   RPR

---

Rees - direct- Grubin   583

A   I see the last 4, yes.

Q   What's the last 4 there?

A   7002.

Q   Special Agent Rees, you could put that exhibit away.  And to save time, we won't be going through every single physical exhibit.

MR. GRUBIN:  So next I'd like to publish what's been admitted as Government Exhibit 365.

(Exhibit published.)

Q   We don't need to look at the physical copy, Special Agent.

A   Okay.  Sorry.

Q   No, no.

What is this?

A   This is a check.

Q   And who is the check from?

A   Jacob Richter.

Q   And who is it to?

A   DM Investors.

Q   And what's the amount?

A   $5,000.

MR. GRUBIN:  Could we turn to page 3.

(Exhibit published.)

Q   What's this?

A   It's a check.

**J.A. 381**

SAM   OCR   RMR   CRR   RPR

---

Rees - direct- Grubin   584

Q   From whom?

A   Jacob Richter.

Q   To who?

A   DM Investors.

Q   For how much?

A   $2,500.

MR. GRUBIN:  Can we turn to page 5?

(Exhibit published.)

Q   What is this?

A   It appears to be a note.

Q   And could you read the top word there, or the letters there?

A   K-E-M-A-L-1-0-0.

Q   Two 1's or one 1, can you tell?

A   I can't tell.

Q   Okay.

And what's underneath that?

A   Oh, I'm sorry, K-E- M-A-L-1-1-0-0.  I do see that.  My apologies.

And underneath that W-A-S-H-I-N-G-T-O-N-1-2-3.

MR. GRUBIN:  And if we could turn to page 6.

Q   What is this?

A   This is a blank check.

Q   From where?

A   Coney Island Payroll Services, Inc. Expense Account.

SAM   OCR   RMR   CRR   RPR

Rees - direct- Grubin     585

Q    And what address do you see there, by the way?

A    1122 Coney Island Avenue, Brooklyn, New York.

Q    And what bank do you see is listed?

A    M&T Bank.

MR. GRUBIN:  Let's turn to page 10.

(Exhibit published.)

Q    What's this?

A    This is a check.

Q    From whom?

A    Coney Island Payroll Services, Inc. Expense Account.

Q    And what is it made out to?

A    American Express.

Q    For how much?

A    $4,672.

MR. GRUBIN:  Let's turn to Government Exhibit 354.

Can we go to page two -- or three, I apologize.

(Exhibit published.)

Q    Have you looked at this exhibit before?

A    I have.

Q    What's contained within this exhibit generally?

A    It's a check from Coney Island Payroll Services Expense Account to D. Motovich for $3,000.

Q    And are there several of these?

A    Yes.

Q    So let's just flip through a few of them.

SAM     OCR     RMR     CRR     RPR

---

Rees - direct- Grubin     586

MR. GRUBIN:  Turn to page 3.

(Exhibit published.)

MR. GRUBIN:  I'm sorry.  Let's go to page 25 actually.  I apologize.

(Exhibit published.)

BY MR. GRUBIN:

Q    What's this?

A    It's the same check from Coney Island Payroll Services, Inc. Expense Account to D. Motovich for $ 3,000.

MR. GRUBIN:  And if we go to page 29.

(Exhibit published.)

Q    What's this?

A    It's the same one, a check from Coney Island Payroll Services Inc. Expense Account to D. Motovich for $3,000.

Q    Are the dates different however?

A    Yes.

Q    Are there multiple checks like these from Coney Island Payroll Services to D. Motovich?

A    Yes.

Q    And by the way, are the checks, is this printed or handwritten?

A    It's handwritten.

Q    I'm showing you Government Exhibit 366 at page 5.

(Exhibit published.)

MR. GRUBIN:  If we could zoom in.  Thank you.

SAM     OCR     RMR     CRR     RPR

---

Rees - direct- Grubin     587

Q    What's this?

A    This is a scanned copy of a check with -- inside a checkbook.

MR. GRUBIN:  And if we could, if you're able to see that.

Q    Whose name do you see at the top left of the checkbook?

A    Kemal Sarkinovic.

MR. GRUBIN:  If we could blow it up again.  Thank you.

Q    Is there any writing on the check?

A    It's a blank check, except for the signature.

Q    Let's turn to page 1.

(Exhibit published.)

Q    What is this?

A    This is a scanned copy of the front cover of a checkbook.

Q    And who is the checkbook for?

A    IBAR Construction Corp.

Q    And if we go to page 2, what is this?

A    This is a blank check with a signature.  The check is IBAR Construction Corp.

MR. GRUBIN:  Let's go to page 6.

(Exhibit published.)

Q    And what's this?

A    This is a scanned copy of the front cover of a checkbook.

Q    And if you can, whose name is at the top left?

SAM     OCR     RMR     CRR     RPR

---

Rees - direct- Grubin     588

A    I am not sure how to accurately pronounce that name, so I am going to spell it.

Q    That's fine.

A    M-E-H-D-I-J-A, last name, D-E-M-I-R-O-V-I-C.

MR. GRUBIN:  And if we could go to page 7, and blow that up a little.

(Exhibit published.)

BY MR. GRUBIN:

Q    What's this?

A    It is a blank check in the name that I just spelled with a signature.

MR. GRUBIN:  Let's turn to page 8.

(Exhibit published.)

MR. GRUBIN:  Actually, I'm sorry, let's leave that page.

Actually, let's turn back, I apologize, Ms. Kannan.

(Exhibit published.)

Q    If we could just focus on the New York State license and the card next to it.

Whose driver's license does that belong to?

A    It's in the same name that I just read.

THE COURT:  Why don't you spell it again just so the record is clear.

You don't have to spell it all the time, but every now and then.

SAM     OCR     RMR     CRR     RPR

Rees - direct- Grubin                    589

Go ahead.

THE WITNESS:  Yes, Your Honor.

A    So the last name -- the first name listed, D-E-M-I-R-O-V-I-C, second name M-E-H-D-I-J-A.

THE COURT:  Continue, please.

BY MR. GRUBIN:

Q    And is that same name on the credit card to the right of that?

A    Yes, it is.

Q    The charge card?

A    The charge card.

MR. GRUBIN:  Let's go to page 6.  Actually, let's return for a second.  I'm sorry.  Can we zoom in on the Spark business card.

Q    What company name is on this card?

A    IBAR Construction Corp.

Q    And is it the same name that you just spelled for us on the card as well?

A    It is.

MR. GRUBIN:  Now let's turn to page 7.

(Exhibit published.)

MR. GRUBIN:  Can we zoom in on that.

Q    What is this again?

A    This is a scanned copy of a check, a blank check with a signature in the name that was previously spelled

*SAM     OCR     RMR     CRR     RPR*

---

Rees - direct- Grubin                    590

M-E-H-D-I-J-A, second name D-E-M-I-R-O-V-I-C.

Q    So these are the same, is it fair to say that the name and company on these checks and these checkbooks match the identification and card you just referred to?

A    Yes.

Q    I am showing you Government Exhibit 356.

(Exhibit published.)

MR. GRUBIN:  Can we turn to page 3.

(Exhibit published.)

MR. GRUBIN:  And zoom in on the top.

Q    What is this?

A    This is a receipt from Cartier.

Q    And what name is it addressed to?

A    Mr. David Motovich.

Q    And what's the date?

A    June 8, 2016.

Q    And what's the item -- well, actually, just what's the amount?

A    10 -- $43,700.

Q    And the total at the bottom there?

A    $33,600.

Q    And what method of payment is listed on the bottom?

A    Saks Fifth Avenue card.

MR. GRUBIN:  Let's turn to page 14.

(Exhibit published.)

*SAM     OCR     RMR     CRR     RPR*

---

Rees - direct- Grubin                    591

MR. GRUBIN:  If we could zoom in on that.

Q    Can you just read that memo, or at least the first paragraph?

A    I, Joseph Richter, reside at 1540 57th Street, Brooklyn, New York, 11219, received $200,000 December 29th, 2012, for 13 days.

MR. GRUBIN:  And let's go to page 15.

(Exhibit published.)

MR. GRUBIN:  And if we could --

Q    Well, what does it say at the top of the page?

A    Promissory Note.

Q    And what's the date?

A    January 19th, 2017.

Q    And can you just read the first paragraph?

A    For value received, Joseph Richter, an individual, with an address at 1540 57th Street, Brooklyn, New York, 11219, the borrower, promises to pay to DM Investors, LLC, with an address at 1100 Coney Island Avenue, Brooklyn, New York, 11230, its successors and/or assigns, the lender, or order or at such other place as may be designated in writing by the holder of this Note, the principal sum of $200,000 on January 18th, 2018.

Q    That's fine.  Thank you.

MR. GRUBIN:  And if we could turn to the next page and scroll to the bottom.

*SAM     OCR     RMR     CRR     RPR*

---

Rees - direct- Grubin                    592

(Exhibit published.)

BY MR. GRUBIN:

Q    Is it signed?

A    It is.

Q    And just according to the document, whose signature is that?

A    Joseph Richter.

MR. GRUBIN:  And if we could turn to the next page.

(Exhibit published.)

Q    Who notarized this document?

A    Marina Kuyan.

Q    And just to be clear, all these items are from -- were collected from Motovich's office?

A    I would have to look at the paper work, but they were seized from Midwood Lumber, yes.

MR. GRUBIN:  If we could turn to -- if we could actually turn to page 18.  And let's look at --

(Exhibit published.)

Q    What does it say on the top of the page?

A    Promissory Note.

Q    What's the date?

A    January 19th, 2017.

Q    And can you read the first paragraph?

A    For value received, Coney Island Payroll Services, Inc., a New York corporation with an address at located at 1122

*SAM     OCR     RMR     CRR     RPR*

**J.A. 383**

Rees - direct- Grubin                    593

Coney Island Avenue, Brooklyn, New York, 11230, the borrower, promises to pay to David Motovich, with an office at 1100 Coney Island Avenue, Brooklyn, New York, 11230, his successors and/or assigns, the lender, or order or at such other place as may be designated in writing by the holder of this note, the principal sum of $300,000, on December 31st, 2017.

Q    What -- would a document refresh your recollection of whether this item came from which office?

A    Yes.

Q    What document is that?

A    So, the evidence collected log or the packaging.

Q    Okay.  So this was Government Exhibit 366.  Oh, I apologize -- yes, 356.

Do you want to take a look and see which one?

MR. GRUBIN:  May I approach, Your Honor?

THE COURT:  I'm sorry.  What are you asking?

MR. GRUBIN:  I am just asking to approach my co-counsel, that I may have a moment.

I apologize, Your Honor.

THE COURT:  I can't hear you.  What are you requesting?

MR. GRUBIN:  Just may I speak with my paralegal for a moment?

THE COURT:  Yes, of course.

MR. GRUBIN:  Thank you.

*SAM    OCR    RMR    CRR    RPR*

Rees - direct- Grubin                    594

(Pause.)

MR. GRUBIN:  Thank you, Your Honor.

THE COURT:  Of course.

BY MR. GRUBIN:

Q    What room does that say?

A    Yes, so Government Exhibit 356 was seized from Room N, the desk drawer.

Q    And what was Room N again?

A    That was the primary office, my understanding was David Motovich's office.

THE COURT:  Is that Room N, as in Nancy, or M, as in Mary?

THE WITNESS:  N as in Nancy.

THE COURT:  All right.  Go ahead.

MR. GRUBIN:  Thank you, Your Honor.

Q    I am showing you Government Exhibit 391.

(Exhibit published.)

Q    What is this first page?

A    It appears to be a invoice or -- or an order.

Q    From where?

A    From Ago & Alaudin General Construction Corp.

Q    And on the bottom left -- well, first, I'm sorry.

What's the date?

A    July 24, 2013.

Q    And on the bottom left, whose name is listed?

*SAM    OCR    RMR    CRR    RPR*

Rees - direct- Grubin                    595

A    Mr. Ago Kolenovic.

Q    You can spell it if you'd like.  If we could zoom in there.

A    Yes, can we.  K-O-L-E-N-O-V-I-C, Kolenovic.

Q    And by the way, is the name of the company on the bottom the same as on the top of the page?

A    No, it appears to be slightly different.

The name on the top is Ago & Alaudin spelled A-L-A-U-D-I-N General Construction Corp.

The name on the bottom is Ago Aluadin spelled A-L-U-A-D-I-N Construction Corp.

Q    Let's turn to page 3.

(Exhibit published.)

Q    What is this?

A    This is a scanned copy of a blank check.

Q    From where?

A    Ago & Alaudin General Contracting Corp.

Q    And this was Government Exhibit 391.

Was this taken from Motovich's office?

A    I would have to check the packaging, but I believe so.  391?

Q    Yes, feel free.

A    Yes.  So Government Exhibit  391 was seized from Room N, as in Nancy, desk.

Q    Was there other evidence taken from Motovich's office we

**J.A. 384**

*SAM    OCR    RMR    CRR    RPR*

Rees - direct- Grubin                    596

didn't review here?

A    Yes.

Q    You previously testified that you went into a back room.  Is that correct?

A    That's correct.

Q    And this was in Motovich's office?

THE COURT:  Mr. Scott, could you just turn up the lights for a second?  Make them very bright so that all of the jurors can see.

Q    And I'm showing you Government Exhibit 333.

THE COURT:  That was a request from the Court who asked to turn up the lights so that all of the jurors could be alerted to the testimony.

Go ahead.

BY MR. GRUBIN:

Q    And can you describe what's in this photograph?

A    Yes.  This is the entryway into Room O.

MR. GRUBIN:  And let's turn to Government Exhibit 350.

(Exhibit published.)

Q    What's in this photograph?

A    So this is another angle of Room O, and the photograph includes the safe and on top of the safe there was a money counter.

MR. GRUBIN:  Let's turn to Government Exhibit 335.

*SAM    OCR    RMR    CRR    RPR*

Rees - direct- Grubin 597

(Exhibit published.)

Q    What's this?

A    This is another angle of Room O.  Essentially, the small, little hallway or connection between Room O and Room N.

MR. GRUBIN:  And let's, if we can, look at Government Exhibit 336 and 337 together.

(Exhibits published.)

Q    What are these?

A    So this is a closer photo of the safe that was in Room O.  There was a safe within the safe.

Q    A safe within the safe.

MR. GRUBIN:  Let's go to Government Exhibit 340.

(Exhibit published.)

Q    What is this photograph?

A    This is a photograph of cash that was found.

Q    In --

THE COURT:  Counsel, do you actually have the physical cash in the courtroom?

MR. GRUBIN:  Yes, Your Honor.

THE COURT:  That might be something that would particularly interest the jury to pique their interest.

Could you show it --

MR. GRUBIN:  Yes.

THE COURT:   -- to the witness now?  Is that an appropriate thing to do?

*SAM     OCR     RMR     CRR     RPR*

---

Rees - direct- Grubin 598

And then after we do that, we'll take a comfort break.  It's 3 o'clock and we'll take our next comfort break to energize the jury, as well as the witness, who is quite energized and the counsel and the public.

MR. GRUBIN:  That's fine.

THE COURT:  But show me the money, all right.

MR. GRUBIN:  That would be Government Exhibits 3000, 3001 and 3002.

THE COURT:  Do it, please.

MR. GRUBIN:   May it please the Court?

THE COURT:  Go ahead.

Ladies and gentlemen of the jury, you are allowed to see the money.  You'll see the pictures, you'll see the actual money which is in evidence, but you are not allowed to take the money.  That's why the phrase is " show me the money," not "give me the money," at least not in this case.

All right, go ahead.  Let's do it and then we'll take a break.

BY MR. GRUBIN:

Q    May you show each bag to the jury and just say how much money is in each one?

A    Yes.

So Government Exhibit 3000, let me find the exact amount, I'm sorry.  $62,848.

THE COURT:  All in Benjamins?

*SAM     OCR     RMR     CRR     RPR*

---

Rees - direct- Grubin 599

THE WITNESS:  No.

THE COURT:  Okay.  Next question.  Just curious.

THE WITNESS:  There are --

THE COURT:  I've never seen that much cash in one place.

THE WITNESS:  There are at least 358 one-dollar bills in here.

THE COURT:   Okay.  Go ahead.

BY MR. GRUBIN:

Q    Next exhibit.

A    Government Exhibit 3001 is $50,000.  All in 100's.

THE COURT:  Okay, good.

Q    Next exhibit.

THE COURT:  By Benjamins, ladies and gentlemen, I meant hundreds, just in case you are not familiar with that term.

Go ahead.

A    Government Exhibit 3002 is $40,760.  The breakdown is hundreds, fifties, and twenties.

Q    And approximately how much is that all together?

A    I believe that's slightly more than a hundred-fifty-two thousand dollars.

MR. GRUBIN:  Your Honor, we could take the break now, if you'd like.

THE COURT:  Are you through with the money, with the

*SAM     OCR     RMR     CRR     RPR*

J.A. 385

---

Rees - direct- Grubin 600

cash?

MR. GRUBIN:  Yes, Your Honor.

THE COURT:  Then why don't you put it back in the bag and reluctantly, because it's so near the Court, I am afraid you are going to have to secure it and then we will take our break.  Okay.

So give it to your colleague, and we'll take our break.

Thank you, Mr. Scott.  And you are not allowed to do anything other than show the money to the people who hold it.

In other kinds of cases I have, ladies and gentlemen, there are other items that wake up juries at this particular point, usually involving other kinds of items.  But this isn't that kind of case.

So we are going to take our break now, and please do not talk about the case.  The money has been seconded and returned to where it is supposed to be.

Again, do not talk about the case and we'll take our break.  Thank you.  Fifteen minutes.

THE COURTROOM DEPUTY:   All rise.

THE WITNESS:  Your Honor, I am going to move this so they don't fall.

(Jury exits.)

THE COURT:  You may step down, Special Agent.  And please leave the courtroom while we discuss items with the

*SAM     OCR     RMR     CRR     RPR*

Rees - direct- Grubin                601

lawyers.  Do not talk with anyone about your testimony during the break.

Thank you.

THE WITNESS:  Yes.

THE COURT:  Thank you.

(Witness steps down and exits courtroom.)

THE COURT:  All right.  The jury has left the courtroom.  The witness is leaving, and now has left the courtroom.

You may be seated, everyone.

I never tell distinguished counsel such as I have before me how to try their cases, but you really need to find ways to energize the finders of the facts, otherwise you will not have them energized and that is not in anyone 's interest in a case like this.

So please, figure out ways to make that happen.  I don't know if you have any more cash to show, but whatever you need to do, please do it.  Fastballs, curves, sliders, change-ups, if just keep throwing change-ups --

MR. GRUBIN:  Understood, Your Honor.

THE COURT:   -- it doesn't quite work?

Okay.  Anything else before we take our break from the Government?

MR. GRUBIN:  Not from the Government.

THE COURT:  Anything else from defense counsel?

Rees - direct- Grubin                602

MR. JACKSON:  Nothing, Judge.  Thank you.

THE COURT:  Okay.  We'll take a 15-minute break.

Thank you very much, everyone, for your attention.

(Recess taken.)

(In open court; jury not present.)

THE COURTROOM DEPUTY:   All rise.

(Judge WILLIAM F. KUNTZ, II, entered the courtroom.)

THE COURT:  You may be seated.

Off the record.

(Discussion off the record.)

THE COURT:  Back on the record.

Do we have any issues we need to discuss before we bring the jury back in and the witness back on the witness stand?

From the Government.

MR. GRUBIN:  Only, Your Honor, that I think I actually failed to move into evidence the money, Government Exhibits -- I showed the money, but I never -- Exhibits 3000 --

THE COURT:  Well, we'll do that in front of the jury.  And if the defendant objects, then I guess I'll have to take the money home to keep it safe.  Hopefully, defendant will not object to the money being admitted.

MR. JACKSON:  No, I'm going to think about it, Judge.

Rees - direct- Grubin                603

THE COURT:  Okay, there you go.

MR. GRUBIN:  Sounds fair.

THE COURT:  So we will have that motion made when the jury is back.

Anything else?

MR. GRUBIN:  That's it.

THE COURT:  Anything from defense counsel?

MR. JACKSON:  No, Judge.

THE COURT:  Okay.  Let's get the jury back.

(Witness entered and resumed the stand.)

THE COURT:  Please stand for the jury.

(Jury enters.)

THE COURT:  Welcome back, ladies and gentlemen of the jury.

And I want the record to reflect that no federal funds were expended in the modest candies that have been made available to you.

Please have a seat.  And before the break I -- you may sit as well, Special Agent -- I encouraged the Government to show me the money, but I did not encourage them to make a motion to have the money admitted into evidence.  Perhaps, in the hope that they would have me take it home, but counsel reminds me that they are going to make a motion to have the money admitted in evidence.

So, Government, please go ahead and make that

Rees - direct- Grubin                604

motion.

MR. GRUBIN:  Your Honor, the Government moves into evidence Government Exhibits 3000, 3001 and 3002.

THE COURT:  Defense counsel, any objection?

MR. JACKSON:  No objection.

THE COURT:  Easy come, easy go.

Motion is granted.

(Government Exhibit 3000, 3001 and 3002 , were received in evidence.)

THE COURT:  All right, let's go.

BY MR. GRUBIN:

Q    Let's show Government Exhibit 340 again.

MR. GRUBIN:  Can we just zoom at the top, the right side of the exhibit, zoom in there.

(Exhibit published.)

Q    What's that, Special Agent?

A    It's a money holder.

Q    Thank you.

MR. GRUBIN:  I want to show Government Exhibit 369.

(Exhibit published.)

MR. GRUBIN:  If we could turn to page 2.  And just zoom in to the middle there.

Q    According to this document, what does GIA stand for?

A    Gemological Institute of America.

MR. GRUBIN:  And can we turn to page 3?  Can we blow

Rees - direct- Grubin                605

that up?

(Exhibit published.)

BY MR. GRUBIN:

Q    And what do you see under the numbers there, what company at the top?

A    Centurion Diamonds Inc.

Q    I am showing you Government Exhibit 355.

(Exhibit published.)

MR. GRUBIN:  Oh, actually, I'm sorry, before I do that.  I apologize.

Let's --

Q    Did you -- were items recovered from other offices at Midwood Lumber?

A    Other than Office N?

Q    Correct.

A    Yes, that's correct.

MR. GRUBIN:  Can we go to Government Exhibit 343.5?

(Exhibit published.)

Q    What office is this?

A    This is Office K or Room K.

Q    And was there a safe in Room K?

A    There was.

Q    And did the FBI open that safe?

A    We did.

Q    Were items recovered from the safe?

*SAM     OCR     RMR     CRR     RPR*

---

Rees - direct- Grubin                606

A    Yes.

Q    All right.

MR. GRUBIN:  I am showing actually Government Exhibit 347.

(Exhibit published.)

Q    What are those?

A    It's a photo of documents, cash and a stamper.

MR. GRUBIN:  And now let's turn to Government Exhibit 355.

(Exhibit published.)

Q    Are those the documents that you just -- we just saw in the photograph?

A    Yes, they are.

Q    Great.  And what does it say at the top there?

A    Midwood Lumber Payroll Office.

Q    Great.

MR. GRUBIN:  And if we could --

Q    And about how many pages of this document are there, approximately?

A    If I recall, a hundred or hundred-fifty.

Q    And what is the -- and do you see -- okay, that's great.

Let's turn to --

A    Sorry.  To clarify, I did not count.  That is an estimate based on the size of the stack.

Q    I understand.

*SAM     OCR     RMR     CRR     RPR*

---

Rees - direct- Grubin                607

Were additional offices searched in addition to what was labeled as Room K?

A    Yes, that's correct.

Q    I am showing you Government Exhibit 323.5.

(Exhibit published.)

Q    What is this a picture of?

A    Room J.

Q    And I want to take a look at some of the items from Room J.

MR. GRUBIN:  If we could go to Government Exhibit 386 at page 1.

(Exhibit published.)

Q    What's this?

A    This is a New York Department of State Division of Corporations entity information document.

Q    And can you read the subject entity?

A    I'm sorry.  Could you ask the question again?

Q    I apologize, yes.

Could you read the subject entity that is listed, the selected entity?

A    Midwood Building Corp.

MR. GRUBIN:  And if we could turn to page 3.

(Exhibit published.)

Q    What is this?

A    This is an IRS document for an employer identification

*SAM     OCR     RMR     CRR     RPR*

---

Rees - direct- Grubin                608

number.

Q    And for what company?

A    Midwood Building Corp.

MR. GRUBIN:  Let's turn to page 7.

(Exhibit published.)

Q    And what's this document?

A    This is a New York State Certificate of Incorporation.

Q    Is for what company?

A    Midwood Building Corp.

Q    And if we could look at the bottom of the page.

Who is the incorporator listed there?

A    Kemal Sarkinovic.

Q    Let's turn to page 8.

MR. GRUBIN:  And if we go to the bottom of the page or, I guess, zoom out a little bit.  I apologize.

Q    Who filed the document, if you could read that there underneath "filer"?

A    Marina Kuyan.

MR. GRUBIN:  Let's go to page 9.

(Exhibit published.)

Q    What are these?

A    Bank documents from Carver Federal Savings Bank.

Q    And if we could zoom in to the top half of the page, what company is listed there?

A    Midwood USA Consulting Corp.

*SAM     OCR     RMR     CRR     RPR*

**J.A. 387**

Rees - direct- Grubin                609

Q    And what name underneath that?

A    Robert M. Lovy.

Q    Previously, when we were looking at the reception area, Special Agent Rees, you mentioned that there was a safe, is that correct?

A    Correct.

Q    Were items recovered from that safe?

A    Yes, I believe so.

Q    So let's turn to Government Exhibit 378.

     (Exhibit published.)

Q    What are these?

A    Blank checks, except for they include a signature.

Q    Except for a signature.

     And where are the checks from?

A    CNBC Construction Corp.

Q    What bank is listed?

A    Investors Bank.

     MR. GRUBIN:  Let's turn to page 14.

     (Exhibit published.)

Q    What is this?

A    This is a -- it's a returned check.

Q    Okay.  And who is the check from?

A    It's from 800 Dean Developers, LLC.

Q    Who is it made out to?

A    ZKC NYC, Inc.

---

Rees - direct- Grubin                610

Q    Is the date March 31st, 2017?

A    It is.

Q    And how much is the check for?

A    $7,000.

Q    Could we turn to the next page?

     (Exhibit published.)

     MR. GRUBIN:  Could we zoom out a little bit, Ms. Kannan.  Okay, great.

BY MR. GRUBIN:

Q    What name is listed there, who is it addressed to under ZKC New York Inc.?

A    Garcia, Reginald.

Q    Great.

     And what address do you see there?

A    1090 Coney Island Avenue, Brooklyn, New York.

Q    You previously mentioned that electronics were taken during the search, is that correct?

A    That's correct.

Q    What was done with the electronics after you took them?

A    After the electronics were seized from Midwood Lumber, they were transported back to FBI space where they were held in storage.  They are then signed over to our computer analysis team who makes an image of the device the computer, the phone, the hard drive, whatever it may be and then that image copy is what is used for review.        (Continued.)

---

M. REES - DIRECT - MR. GRUBIN        611

(Continuing.)

BY MR. GRUBIN:

Q    You were previously handed a CD labeled CD3.

     MR. GRUBIN:  And I'll just read the exhibits that are on that CD, Your Honor.

     THE COURT:  Go ahead.

     MR. GRUBIN:  They are Government Exhibits 1000, 1001, 1004, 1007, 1008, 1009, 1010, 1011, 1012, 1013, 1018, 1025, 1026, 1027, 1028, 1029, 1030, 1041, 1048, 1052, 1056, 1066, 1070, 1075, 1077, 1080, 1084, 1097, 1103, 1110, 1111, 1161, 1164, 1174, 1178, 1179, 1183, 1188, 1189, 1190, 1191, and 1196.

     THE COURT:  Do you move the admission of those documents?

     MR. GRUBIN:  Yes, Your Honor.

     THE COURT:  Any objection?

     MR. JACKSON:  Can I have just one moment.

     THE COURT:  Yes, of course.

     Would it be helpful to have counsel read the numbers out again or do you have them?

     MR. JACKSON:  No, Judge.  Just making sure that we have the exact --

     THE COURT:  Take your time.

     THE WITNESS:  I'm sorry, Your Honor, I also have --

     THE COURT:  He's going to take his time and make

---

M. REES - DIRECT - MR. GRUBIN        612

sure they have no objection to the numbered items that were read out loud.  There's motion to admit them.  Defense counsel is considering the motion.

     MR. JACKSON:  No objection, Judge.

     THE COURT:  They're admitted.  Thank you.  The motion's granted.

     THE WITNESS:  I'm sorry, Your Honor.  There's two that were listed that are not on the disk.

     THE COURT:  Which two?

     THE WITNESS:  1001 and 1030.

     THE COURT:  Okay.  Do you have 1001 and -- what's the other number?

     THE WITNESS:  1030.

     THE COURT:  1030 on another disk, or do you have them in hard copy so the jury can see it, or is that just a mythological number?

     MR. GRUBIN:  I believe we've provided those to defense counsel, so we'll see if there are there any --

     THE COURT:  I can't hear you.  You moved away.

     MR. GRUBIN:  I believe we've -- unless I made a mistake --

     THE COURT:  Well, that's possible.

     MR. GRUBIN:  Always possible.

     THE COURT:  Okay.

     MR. GRUBIN:  I believe I provided those to defense

**J.A. 388**

M. REES - DIRECT - MR. GRUBIN          613

counsel.  So I would ask if there's any objection to those.

THE COURT:  Well, hang on, hang on.  The witness has said that she does not have those two items before her on the disk.

Is that correct, ma'am?

THE WITNESS:  So I want to be clear so that we make sure that we have this right.

So I have two disks here.  One that I reviewed on 7/8.  That does include 1001, and it includes 1025 to 1029, but still not 1030.

This one does not include 1001, which is --

THE COURT:  Just so I'm clear, Special Agent, what is missing?  Tell me the numbers that's missing.

THE WITNESS:  So certainly 1030.

THE COURT:  All right.  1030, that's missing.  Is that an item that you have, counsel?

MR. GRUBIN:  We don't need to move that in at this time.

THE COURT:  No, I need to know because my friends on the 17th floor like to know that I'm paying attention.

So 1030, is that a document that exists?

MR. GRUBIN:  May I consult?

THE COURT:  You most certainly may.

(Pause in proceedings.)

THE COURT:  And I'll ask the same question of

---

M. REES - DIRECT - MR. GRUBIN          614

defense counsel to take a look and see if you've got a 1030 in your portfolio.

MR. JACKSON:  Judge, we have 1001.  We don't have a 1030.

THE COURT:  So let's deal with the 1030.  Does the 1030 exist?

MR. GRUBIN:  It does not.  That was my mistake.

THE COURT:  That's why I said.  There's always a first time.

So 1030 does not exist.  There will be no 1030 admitted.

What's the other document that we're talking about?

MR. GRUBIN:  1001, but it does --

THE COURT:  Hang on.  Does 1001 exist?

MR. GRUBIN:  It does.

THE COURT:  All right.  Are you moving its admission?

MR. GRUBIN:  No, Your Honor.

THE COURT:  You're not.  Therefore, there's nothing for me to rule on with respect to 1001.

Special Agent, are we clear now?

THE WITNESS:  Yeah.  Thank you, Your Honor.

THE COURT:  We've straightened out the lawyers.  It's nice to have a woman in charge.  So you go right ahead.

THE WITNESS:  Thank you, Your Honor.

---

M. REES - DIRECT - MR. GRUBIN          615

THE COURT:  No coincidence.

Go right ahead.

(Government Exhibits 1000, 1004, 1007, 1008, 1009, 1010, 1011, 1012, 1013, 1018, 1025, 1026, 1027, 1028, 1029, 1041, 1048, 1052, 1056, 1066, 1070, 1075, 1077, 1080, 1084, 1097, 1103 , 1110, 1111, 1161, 1164, 1174, 1178, 1179, 1183, 1188, 1189, 1190, 1191, and 1196, were received in evidence.)

BY MR. GRUBIN:

Q    Let's look at a few of the items.

Special Agent Rees, let's look at Government Exhibit 1004.

MR. GRUBIN:  And may I publish these to the jury, Your Honor?

THE COURT:  You may.  They're in evidence.

(Exhibit published.)

Q    So who is this email from?

A    Gail Motovich.

Q    And what's the date?

A    April 16, 2013.

Q    And is it to gforkosh@yahoo.com?

A    Yes, that's correct.

Q    Subject Meilech Saks?

A    Yes, that's correct.

Q    Is there an attachment?

A    Yes.

**J.A. 389**

---

M. REES - DIRECT - MR. GRUBIN          616

Q    Can you just read what the email says?

A    Hi Gail, please see attached contract for Meilech Saks.

MR. GRUBIN:  Let's turn to the attachment on page 2.

Q    What do we see here?

A    We see an invoice.

Q    Who is the invoice from?

A    Ago & Alaudin General Construction Corp., according to the header.

Q    According to the header.  And is the date September 1, 2012?

A    Yes.

MR. GRUBIN:  If we could zoom in to the bottom of the page.

Q    Who does it say that the letter it from?

A    Mr. Ago Kolenovic.

Q    And again, the company underneath, Ago & Aluadin, is that a different spelling than the top of the page?

A    Correct.  It's also missing the word "General."

MR. GRUBIN:  Let's look at Government Exhibit 1009.

(Exhibit published.)

Q    Is this another email from Gail Motovich?

A    Yes, it is.

Q    What date was it sent?

A    October 9, 2013.

M. REES - DIRECT - MR. GRUBIN          617

Q   Who is it to?

A   David Motovich.

Q   And the email that's forwarded, what date is that?

A   October 9, 2013.

Q   Who is it to?

A   It's to Kemal Sarkinovic.

Q   What email is listed?

A   Gail@midwoodlumber.com.

Q   And underneath that, if you could just read just the top part of what the email says.

A   Ago & Alaudin Contracting Corp., Kemal Sarkinovic, the balance of account 8298 as of 10/8/2013 --

Q   That's fine.  Thank you.

A   Sorry.

Q   No, no.

    I'm showing you Government Exhibit 1012.  Who is the email from?

A   Gail Motovich.

Q   And when was it sent?

A   February 10, 2014.

Q   Is it to a dn@bestdevco.com?

A   It is.

Q   Who is copied?

A   David Motovich.

Q   Let's look at the first attachment.  What company is

M. REES - DIRECT - MR. GRUBIN          618

listed on the top of this page?

A   M&M USA Consulting Corp.

Q   Is that at 1090 Coney Island Avenue?

A   Yes, it is.

Q   Is this another invoice, or appear to be another invoice?

A   Yes.

    MR. POLEMENI:  Let's go to Government Exhibit 1052.

    (Exhibit published.)

Q   Is this another email from Gail Motovich?

A   Yes, it is.

Q   What's the date?

A   February 25, 2016.

Q   Is it to a felicia@metrosteel.net?

A   Correct.

Q   What's the subject of the email?

A   Invoice.

Q   Can you just read the body of the email?

A   Hi Felicia, please see attached invoice for Joe.

Q   Great.

    MR. GRUBIN:  Let's turn the page.

Q   Another invoice from -- is this another invoice from -- saying it's from Ago & Alaudin General Construction Corp.?

A   Correct.

Q   What's the date?

A   February 22, 2016.

M. REES - DIRECT - MR. GRUBIN          619

Q   Is it to a Metro Erector, Inc.?

A   Correct.

Q   Underneath Payment Due, what name do you see listed?

A   Mr. Kemal Sarkinovic.

Q   And what company -- and is the company Ago & Alaudin Construction Corp. underneath that?

A   Yes, it is.

Q   Were there other invoices sent by Gail Motovich from Ago & Alaudin or Kemal Sarkinovic?

A   Yes.

Q   Did you review invoices that said they were from M&M USA Consulting -- excuse me, M&M Consulting?

A   I did.

Q   How about SGS Construction?

A   Yes.

Q   How about CNBC Construction?

A   Yes.

Q   I'm going to show you Government Exhibit 1097.

    (Exhibit published.)

Q   Who is this email from?

A   Gail Motovich.

Q   What's the date?

A   January 17, 2017.

Q   Is it to an Ana Pancescu at ana@midwoodlumber.com?

A   Yes.

M. REES - DIRECT - MR. GRUBIN          620

Q   What does the bottom email from Ana Pancescu to Gail Motovich say?

A   Can you send me the invoice form like for M&M Winery, please?  Thanks.

Q   What does Ms. Motovich say in response?

A   Each attached invoice is for a different company.  If David needs a bills, just change the date, customer info, order number, and items.

    MR. GRUBIN:  Let's turn to the first attachment on page 2.  Can we blow up the box on the top right there?

Q   Special Agent Rees, can you just read what's there?

A   This is the location for the unique identifier for each invoice.  If you would like to add a unique number to this invoice, click the Add a Number button on the invoice toolbar. Remember, if you want to generate sequential invoices from more than one computer on a network, go to the Customize Your Invoice sheet and choose that option.

Q   Thank you.

    MR. POLEMENI:  Let's turn to the next attachment on page 3.

Q   What company appears on the top of this invoice?

A   ZKC NYC Inc.

    MR. GRUBIN:  Let's go to page 4, the next attachment.

Q   Which company now?

M. REES - DIRECT - MR. GRUBIN          621

A    Midwood Corp.

          MR. GRUBIN:  Let's go to page 5.

Q    What company is on the top of this invoice?

A    Advertising On The Go.

Q    Were there emails other than invoices that you reviewed?

A    Yes.

Q    I'm showing you Government Exhibit 1070.

          (Exhibit published.)

Q    Who is this email from?

A    Rosa Schwartz.

Q    And is that rosa@midwoodlumber.com?

A    Yes.

Q    What's the date?

A    May 11, 2016.

Q    And who is she emailing?

A    Gail@midwoodlumber.com.

Q    What's the subject?

A    Certificate.

          MR. GRUBIN:  Can we turn to the attachment on page 2?

Q    Do you see underneath where it says Certificate of Insurance and then Producer, what name do you see under Producer?

A    Vukel Group Insurance Agency.

Q    And underneath that box, underneath Insured, what company

---

M. REES - DIRECT - MR. GRUBIN          622

do you see there, Special Agent Rees?

A    ZKC NYC Inc.

          MR. GRUBIN:  If we could go to the bottom box on the bottom left there.

Q    What company is listed there?

A    Metro Fabrication Corp.

          MR. GRUBIN:  Let's look at Government Exhibit 1103.

          (Exhibit published.)

Q    Is this another email from Gail Motovich?

A    Yes, it is.

Q    What date?

A    February 7, 2017.

Q    And who is this email to?

A    Marina Kuyan.

Q    I guess can you read the email that is being forwarded there from a Joseph Yannaco to Gail Motovich?

A    Hi Gail.  Can you please get me accord certificate for ZKC for last year and this year.  Thanks.

          MR. GRUBIN:  Can we go to the attachment on page 2?

          I apologize.  Let's just quickly look at Government Exhibit 1078.

          (Exhibit published.)

Q    Who is this email from?

A    Rosa Schwartz.

Q    Who is it to?

---

M. REES - DIRECT - MR. GRUBIN          623

A    Mkuyan1031.

Q    What's the date?

A    August 3, 2016.

Q    Is the subject Certificate?

A    It is.

          MR. GRUBIN:  Can we turn to the attachment on page 2?

Q    Is this another Certificate of Liability Insurance?

A    Yes, it is.

Q    And is the producer again Vukel Group Insurance Agency?

A    Yes, it is.

Q    And is the insured again ZKC NY Inc.?

A    Yes, it is.

Q    Special Agent Rees, can you tell us how the search at Midwood Lumber ended?

A    Yes.

          So after each room was methodically searched and the items that were determined to be in compliance with the search warrant were bagged and tagged or packaged, the photographer took exit photos which capture the location as we left it.  We ensured that the location was secured, then the evidence items were transported back to the FBI space.

Q    And besides participating in the search and reviewing materials in preparation for today's testimony that you discussed, did you have any other involvement in the case?

**J.A. 391**

---

M. REES - CROSS - MR. JACKSON          624

A    No.

          MR. GRUBIN:  No further questions, Your Honor.

          THE COURT:  Cross- examination.

          MR. JACKSON:  Thank you, Judge.

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good afternoon, Special Agent.

A    Good afternoon, sir.

Q    Special Agent, when you were going over your background, I heard you were a -- you've been working in the Terrorism Group for the last two years, right?

A    National Security, not Terrorism.

Q    Sorry.  Are those two separate units?

A    They are.

Q    Okay.  So you've been working National Security for the last two years?

A    Correct.

Q    Just let me be very clear.  This case has nothing to do with your national security work, correct?

A    That's correct.

Q    And then before that, you were working in Public Integrity?

A    Correct.

Q    How long were you in that unit?

A    About four years.

M. REES - CROSS - MR. JACKSON          625

Q    When did you come out of Quantico?

A    February of 2018.

Q    Okay.  So you spent basically from the time you came out of Quantico until a couple of years ago when you went into National Security, you spent doing public integrity work, right?

A    Correct.

THE COURT:  I'm sorry.  Just to be clear, did you say Public Corruption and Civil -- how did you describe it earlier when you were describing your background?

THE WITNESS:  So I said Public Corruption and Civil Rights.

THE COURT:  Public Corruption and Civil Rights, not Public Integrity.

THE WITNESS:  So --

THE COURT:  Just tell us -- I just made a note of what you said.  You know where you worked, but just so the record's clear, where did you work?

THE WITNESS:  Yeah, so the vernacular between DOJ and FBI is just slightly different.  So in the FBI, we call our units Public Corruption and Civil Rights and DOJ calls it Public Integrity, but those two units work together.  So they're essentially the same units focused on the same violations, we just uses slightly different terms.

THE COURT:  Thank you.  I just wanted some clarity

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

M. REES - CROSS - MR. JACKSON          626

on that.

Go ahead, counsel.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

MR. JACKSON:  And thank you, Agent.

BY MR. JACKSON:

Q    So just to be clear, what you were describing in terms of the search that we just went through, this was an investigation that was led primarily by the IRS, correct?

A    I have no knowledge of who the lead agency is.

Q    So one of the things that you described at the beginning of the search is that you guys had a search meeting before the search, right?

A    That's correct.

Q    And where did that search meeting take place?

A    So we actually have two search meetings.  We did in this case; we often do.  The first meeting happens in FBI -- in this case, it happened in FBI space.  I don't remember exactly, but I'm sure it was a day or two before the actual operation.  That's where we get a little bit of background on, you know, the violations that are detailed in the warrant, some of the names that we might see at the search location that we're focused on, the layout and how we're going to manage the actual operation.  So that's meeting one.  We call that a pre-op brief.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

M. REES - CROSS - MR. JACKSON          627

And then the morning of the operation, we also meet again before that.  We generally meet an hour or two before we're ready to move to the location, and we reiterate the same points.  Again, we review the warrant, some of the names that we're looking for while doing the search, and how we're going to go about executing the search.

So to answer your question, there were two .

Q    Okay.  Thank you, Agent.

Just in terms of your familiarity with the area, by the way, you're not -- I'm not asking you where you're from specifically, but you're not from Brooklyn, right?

A    I'm not.

Q    I noticed that when the AUSA first asked you about the address, you said Coney Avenue, didn't you?

A    I don't recall.  I believe it was 1169 Coney Island Avenue, but --

Q    Right.  It's Coney Island Avenue.

A    I'm not from New York, that's correct.

Q    You're not from New York.

Now, to be clear, just focusing in on this meeting, okay, there was a person who was leading the meeting, right?

A    Yes.

Q    A person who was giving you information about what was -- the background of the case you were talking about?

A    Correct.

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

M. REES - CROSS - MR. JACKSON          628

Q    Who was that person?

A    I don't remember the specifics, but it would have been one or two individuals from the investigative team.

Q    Okay.  Do you remember as you sit here, was it a person from the FBI or it was a person from the IRS?

A    I recall that we were briefed by FBI personnel, but that's not to say that IRS was not there.  I don't -- I don't recall.

Q    You're not a hundred percent sure as you sit here?

A    Correct.

Q    And you don't remember specifically who was the person that gave you the briefing?

A    So the search team leader was Agent Corkery.

Q    Okay.

A    Who was an FBI agent.  So she would have certainly been one of the people giving the briefing.

Q    Right.  But you don't remember specifically who was the person who gave the key details in terms of the background of the investigation, right?

A    That's correct.

Q    This was a -- this was in 2021, right?

A    Correct.

Q    That was, on my count, three years ago?

A    Correct.

Q    And, Agent, you would agree with me it's sort of one of

**J.A. 392**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

M. REES - CROSS - MR. JACKSON          629

your responsibilities as part of your job to try to remember things, in some ways?

A    We rely very heavily on our documentation.

Q    Right.  But you also know as an agent, you're often called to try to recall specific things that you observed and testify about them, right?

A    That's correct.  But it's why we, you know, document, to help refresh our memory.

Q    Right.  Documentation is critical, right?

A    Correct.

Q    In fact, one of the things that you endeavor to do and you understand is one of your obligations as an agent is to try to create the most accurate record of what happens in a search as possible, correct?

A    That's correct.

Q    Now, just focusing in on this, and I'm not -- I'm not -- I promise you I'm not beating you up about the fact that you don't remember clearly in 2021 everything that played out.  But I'm just pointing out that's one of the things that you talk about in your training at Quantico, right, is how to focus in on details that you need to remember, they talk a little bit about recording those details and about testifying about them, right?

A    That's correct.

Q    Now, even given that your training involves the fact that

M. REES - CROSS - MR. JACKSON          630

you may be called upon to testify about events, it is not easy for you to remember precisely what was said to you in a meeting like that three years ago, right?

A    Correct.  What was said, yes.

Q    Right.  You don't even have a clear picture as you sit here today, three years later, of who the person was that was talking, right?

A    At the pre-op brief, that's correct.

Q    And you understand this investigation involves conversations and events going all the way back to 2012, correct?

A    It's my understanding that emails that were seized went back to 2012, but that's only based on the review of that.  I have no other knowledge of the investigation.

Q    Right.  It's based on your briefing of the circumstances --

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Overruled.

Q    It's based on your briefing of the circumstances that was important for you to understand going into the search, correct?

A    And the search warrant, the attachment to the search warrant, which is what we rely on.

Q    Right.  So the answer's yes?

A    Correct.

M. REES - CROSS - MR. JACKSON          631

Q    And you did read the search warrant affidavit before you did the search, correct?

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Sustained.  I ruled on this.

MR. JACKSON:  Your Honor, I just want to be very clear --

THE COURT:  I've ruled on this.  I have ruled on this.  You know I've ruled on this.

MR. JACKSON:  Judge --

THE COURT:  You could ask the question, but you know I've ruled on this.  So ask your question.

MR. JACKSON:  Yes, Judge.

BY MR. JACKSON:

Q    I want to be very clear, Agent, I'm not asking you --

THE COURT:  No.  Ask a question.  Don't tell her what you're not asking.  Ask your question.  I've ruled on this.  We're not going to back door into it.

MR. JACKSON:  I'm not trying, Judge.

THE COURT:  I don't know about that.  But why don't you ask your question and then I'll rule.

MR. JACKSON:  Okay, Judge.

BY MR. JACKSON:

Q    Now, Agent Rees, let me ask you, when you got to the location, in terms of what you were -- you talked a little bit during your direct examination about the fact that during the

M. REES - CROSS - MR. JACKSON          632

meeting you guys were describing what you expected to look for, what you were going to look for at the site, right?

A    Yes.  We review what sort of evidence we are looking for, yes, correct.

Q    In terms of what you were going to be looking for, what was it that you were planning to look for at --

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Sustained.  I've ruled on this.

MR. JACKSON:  Different subject, Judge --

THE COURT:  No, it's not.

MR. JACKSON:  I defer to the Court, Your Honor.

THE COURT:  Yes, you do.  That's how we roll.

Go ahead.

BY MR. JACKSON:   \

Q    So one of the things -- actually --

MR. JACKSON:  May I -- well, I guess we're taking the cash away, right?

THE COURT:  I don't have it.  I wanted it, but --

MR. JACKSON:  Can I take a look at the cash?

THE COURT:  You can look at the pictures.

Q    Now, this is some of the cash that you seized on the day of the search, correct?

A    Correct.

Q    And just to be very clear, the cash was all inside of safes within the business, correct?

**J.A. 393**

M. REES - CROSS - MR. JACKSON 633

A    That's my recollection.

Q    As you sit here today, you don't have a perfect recollection of where things were three years ago?

A    That's correct.  I also was one of many searchers, so I only had, you know, limited exposure to various rooms.  I was not in every room.

Q    But you would agree with me that in terms of what you were looking for on that day, there is -- there was nothing surprising to you about being at a business that takes on cash and finding cash there.

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Sustained.

Q    In your experience, you described your experience before this case as having been one of being involved in many kinds of searches, right?

A    That's correct.

Q    You said you've searched woodlands and farms?

A    That's correct.

Q    You've searched a number of different kinds of businesses?

A    That's correct.

Q    It is very normal for businesses to have safes, correct?

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Overruled.

Yes or no, is it normal for business to have safes?

M. REES - CROSS - MR. JACKSON 634

Yes or no?

THE WITNESS:  In accordance with the businesses that I've searched?  Yes, yes.  That wasn't --

THE COURT:  Next question.

Q    Agent, am I correct that one of the things that the FBI does regularly in connection with its investigations is, you scour the news to see if there are there any items that could be potentially relevant to your investigation.  Am I right about that?

MR. GRUBIN:  Objection.

THE COURT:  Sustained.

Q    Am I correct that you have seen reports of bodegas being robbed for $10,000 or more --

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Sustained.

Q    One of the things that you were briefed on before the search started is the understanding of the lead agents that cash sales of construction materials were the main source of cash for Mr. Motovich, correct?

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Sustained.

MR. JACKSON:  Just one moment, Judge.

(Pause in proceedings.)

Q    Do you recall during your direct examination one of the items that you went over with us was the chart of everywhere

M. REES - CROSS - MR. JACKSON 635

that you searched, correct?

A    The sketch.

Q    Correct, the sketch.

A    Yes, correct.

Q    And the reason for that was to have a bird's eye view of what the location looked like?

A    That's correct.

Q    You also described that there was a photographer that came along for the search.

A    That's correct.

Q    And I assume, because you wanted to have as accurate a record of what was obtained during the search as possible, you also brought a videographer.

A    No.

Q    Okay.  Well, I assume one of the agents probably wore a GoPro or something that captured video even if they weren't officially the videographer.

A    No, that is not standard practice.

Q    Okay.  I think a moment ago one of the things that you told us is that you understood it was your obligation to create the most accurate record of the search possible, correct?

A    That's correct.

Q    You would agree with me that a video of the search would have created a more accurate record of where everything was

**J.A. 394**

M. REES - CROSS - MR. JACKSON 636

found and obtained than a sketch that has letters and locations in it, correct?

A    That -- that would be outside the scope of my role within the FBI to make that determination.

Q    I'm not asking you to make an official determination.  But as a person who participated in the sketch and as a Special Agent in the FBI, you agree with me a video would have been a more accurate, complete record of where everything was found in the search, where it was retrieved, than the sketch with the letters in it and whatever other notes you took, correct?

MR. GRUBIN:  Objection.

THE COURT:  Sustained.

Q    Now --

MR. JACKSON:  Could we call up Government Exhibit 312?

(Exhibit published.)

Q    This is one of the photographs that you went over during the course of your direct examination, correct, Agent?

A    That's correct.

Q    And just for my curiosity, was there any particular -- from the standpoint of what crimes you were investigating, potential money transfers and money laundering, is there any significance to a Purell hand sanitizer?

MR. GRUBIN:  Objection, Your Honor.

M. REES - CROSS - MR. JACKSON       637

THE COURT:  Sustained.

Q    What about the water fountain, is there any significance to hydration?

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Sustained.

Q    There was reference to the Van Cleef and Hermes and Cartier receipts that you located.

A    Yes.  I didn't discuss Hermes, but Van Cleef and Cartier.

Q    I'm sorry.  Van Cleef is like a luxury brand, right?

A    I believe so, but that is outside my -- my knowledge area.  But I believe so, yes.

Q    Mine too.  But Van Cleef, you recognized it as having some significance because you took it, right?

A    Yes.

Q    Why did you take it?

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Overruled.

A    It would have been determined that it fell within the confines of the warrant.

Q    Right.  But why?

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Sustained.  She said it was within the confines of the warrant.

Sustained.  Put another question.  It was answered.

Q    What does it mean to be within the confines --

M. REES - CROSS - MR. JACKSON       638

MR. GRUBIN:  Your Honor, can we approach.

THE COURT:  No.

I'm going to sustain the objections because we've gone over this in pretrial motions in limine.  The lawyer knows he's not supposed to go into this.  I've ruled on this.  If he keeps asking these questions, I'm going to keep sustaining the objections because we've already dealt with this.

MR. JACKSON:  Your Honor, I would like to request a sidebar as well.

THE COURT:  No.  The request is denied.

Stop asking questions that I've already ruled on, Mr. Jackson.  You know better than that.

Let's go.

MR. JACKSON:  Your Honor, I would never disrespect the Court --

THE COURT:  It's not disrespecting.  It's just ignoring, which I don't like.  I've ruled on this.  We've had arguments on this.  You know what you're allowed to go into. Let's not go there, okay?

MR. JACKSON:  Agree, Judge.  I'm just --

THE COURT:  Why don't you wrap up this examination.

MR. JACKSON:  I just have a few more questions, Judge.

BY MR. JACKSON:  \

M. REES - CROSS - MR. JACKSON       639

Q    Now, just to be clear, prior to the search, one of the things that you were aware of is that David Motovich's family owns a substantial amount of real estate, correct?

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Sustained.

Q    You were aware that the Motovich family owned the building, or the premises that you were searching, correct?

A    No, I was not aware of that.

Q    You didn't know who the owners of Midwood Lumber were before you did the search?

A    Not until this moment.

Q    Beyond the physical area that we saw in the sketch, did you look at any other areas within the -- within -- that were part of Midwood Lumber?

A    Me personally?

Q    Yes.

A    Yes.  I searched the storage/office that was in the back of the first floor.  It was a small, small area behind the aisles.

Q    What about the areas on the block where Midwood Lumber maintains significant amounts of lumber?

THE COURT:  What about them?

Q    Did you search those areas?

A    I did not personally, but it's my understanding from my recollection, and we can look at it, but the warrant was

**J.A. 395**

M. REES - CROSS - MR. JACKSON       640

1169 Coney Island Ave.  I don't know if they have a different address, and if they do, that would not have fallen within the warrant.

Q    Okay.  So, to your knowledge, you have no knowledge as to whether or not any of the other lumber storage facilities on that block were searched, right?

A    That's correct.

Q    Okay.

During the course of the search, did you uncover any -- did you uncover any items that would be used to secretly communicate with people in other states?

MR. GRUBIN:  Objection.

THE COURT:  Sustained.

Q    Did you uncover anything used to hide money on a person's body?

MR. GRUBIN:  Objection.

THE COURT:  Sustained.

Q    Before the search, did you -- did you look into personally how much cash on a legitimate basis Midwood Lumber --

MR. GRUBIN:  Objection.

THE COURT:  Sustained.

MR. JACKSON:  Your Honor, can I have one moment?

THE COURT:  Sure.

(Pause in proceedings.)

M. REES - CROSS - MR. JACKSON          641

MR. JACKSON:  Your Honor, I don't have any additional questions for this witness.

Thank you, Special Agent.

THE COURT:  Thank you.

Any redirect?

MR. GRUBIN:  No, Your Honor.

THE COURT:  Thank you, Special Agent.  You may step down.

(Witness is excused.)

THE COURT:  Please call your next witness.

MR. PAULSEN:  Yes, Your Honor.

The Government calls Ago Kolenovic.

THE COURT:  Please have the witness come forward and be sworn.

(Witness enters the courtroom.)

THE COURT:  Please come forward to the witness stand here and my Court Deputy will administer the oath.  Raise your right hand when you get there, sir.  Thank you.

(Witness takes the stand.)

(Witness sworn.)

THE COURT:  Thank you, sir.  Please be seated.

I'd like you to twist the microphone to you.  It will swivel to you.  Put it right near your mouth.  Looks like a snake, but it won't bite you.

State your name and spell it, and then counsel will

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

M. REES - CROSS - MR. JACKSON          642

inquire, sir.

THE WITNESS:  My name is Ago Kolenovic; A-G- O, K-O-L-E-N-O-V-I-C.

THE COURT:  You may inquire, counsel.

MR. PAULSEN:  Thank you, Your Honor.

THE COURT:  You're welcome.

(Continued on next page.)

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN          643

(Witness takes the witness stand.)

**AGO KOLENOVIC,** called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PAULSEN:

Q    Good afternoon, Mr. Kolenovic.

Where are you from, Mr. Kolenovic?

A    I'm from Montenegro, former Yugoslavia.

Q    You speak with a slight accent; is that right?

A    Yes.

THE COURT:  Everyone in Brooklyn does.  Get over it.  Let's go.

Q    So I'd just ask you to speak slowly for the court reporter.

A    Okay.

Q    Do you run a business?

A    Yes, I do have it.

Q    What is that business called?

A    It's called Ago & Alaudin General Contracting Corp.

Q    What does that business do?

A    That is doing the construction, renovation and --

Q    What sort of construction?

A    Construction of, we doing like from the ground up, like the foundation, framing, plumbing, electric, basically like everything.  They turn the key.

**J.A. 396**

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN          644

Q    Is it fair to say you're a general contractor?

A    Correct.

Q    Where did the name come from, Ago & Alaudin?

A    It come from my name is Ago and my son is Alaudin.

Q    Now I'd like to show you, just the witness, what's been marked as Government Exhibit 1.

THE COURT:  Any objection to Government Exhibit 1 being admitted?

MR. JACKSON:  No, Judge.

THE COURT:  It's admitted.

(Government Exhibit 1, was received in evidence.)

THE COURT:  You may publish it to the jury.

MR. PAULSEN:  Thank you, Your Honor.

(Exhibit published.)

Q    Mr. Kolenovic, what is that?

A    It's me.

Q    That's a fair picture of you?

Do you know an individual named Kemal Sarkinovic?

A    Yes, I do.

Q    How do you know him?

A    We came from basically like same country, Montenegro, but different time.  But I never meet him back home; I meet him in New York.

Q    So you're from the same area in Montenegro, but you didn't meet back then?

*Kristi Cruz, RMR, CRR, RPR, Official Court Reporter*

A. KOLENOVIC - DIRECT - MR. PAULSEN      645

A    Correct.  Difference about seven miles between my town and his town.

Q    Does he also work in construction in New York?

A    Yes, he did it enough.

Q    Do you know an individual named David Motovich?

A    Yes, I do.

Q    Do you recognize him in the courtroom today?

A    Yes.

Q    Can you pick him out by an article of clothing?

A    He's over there in the corner.

THE COURT:  What's he wearing?

THE WITNESS:  He wearing the, like, blue -- blue suit with the tie, next to the woman.

MR. PAULSEN:  Your Honor, let the record reflect that the witness has identified Mr. Motovich.

THE COURT:  The record will so reflect.  Please continue.

Q    Now, did there come a time, Mr. Kolenovic, when Kemal Sarkinovic put you in touch with David Motovich?

A    Yes.  He called me, he told me he has one job in Monticello, if I like to do it because he was very busy.  I say no problem, let me go and check it.

Q    Okay.  You checked out this job?

A    Yes.  There was a security guard in Monticello who was watching the building.  I looked at it insides, what need to

---

A. KOLENOVIC - DIRECT - MR. PAULSEN      646

be done.

Q    So Monticello, that's a town in Upstate New York?

A    Yeah, that's Sullivan County, Monticello.

Q    Okay.  What happened next?

A    After that I looked at it, there was need to do, like, the metal door to the entire building, also some awning, and also the -- in the closet, the shelves, poles, shelves, you know.  And I call him up.  I call also my -- Eddie is my subcontractor, he live in Tarrytown, and I ask him can he do the job for there because he's close for Monticello.  He say yes.  And after that I call Kemal to set up the meeting so this way we could go over with the job and proposal and everything.

Q    Okay.  Did that meeting get set up?

A    Yes.  My project manager, Matija Kurek, he did set it up the meeting to go to meet with Kemal and also David too.

Q    So you and your project manager met with David Motovich and Kemal?

A    Correct.

Q    What happened in that meeting?

A    That meeting we go over, and I told him I could do the job and everything.  He told me I will refer you to this job, but you have to buy material from our lumber, you know, like the door, awning and stuff.  I says fine, no problem.

Q    So is it fair to say the deal was you get the job as long

---

A. KOLENOVIC - DIRECT - MR. PAULSEN      647

as you bought your material from --

A    Correct.

Q    -- David Motovich?

A    Correct.

THE COURT:  You have to let him finish the question, sir, before you answer.

Go ahead.

THE WITNESS:  Sorry.

Q    Now, at that time, Mr. Kolenovic, where did you bank?

A    I'm sorry?

Q    What bank did you use?

A    I used Chase Bank.

MR. PAULSEN:  Your Honor, I'd like to show the witness what's been marked for identification as Government Exhibit 1002 which is already in evidence.

THE COURT:  You may publish it, and publish it to the jury as well as the witness.

(Exhibit published.)

MR. PAULSEN:  And if we can zoom in the top, please.

A    She's the branch manager of the Chase.

Q    So the top says Jumi Kim?

A    Correct.

Q    This is somebody you work with at Chase?

A    Yes.  She's like branch manager and she set up also the -- I open up the account separate for that job, and also

**J.A. 397**

---

A. KOLENOVIC - DIRECT - MR. PAULSEN      648

she sets it up also for the wiring the money to the account.

Q    I see your email is there; is that right?

A    Yeah, Matija Kurek and that's me too, yeah.

Q    And next to it is Matija Kurek?

A    That's the project manager.

Q    Mkuyan1031, do you know who that is?

A    I don't know, but I know Matija and me.

MR. PAULSEN:  Can you show me the body of the email?

Q    What are you sending in this email?

A    This like the routing number and everything, instruction for the wiring the money.

(Continued on the following page.)

A. KOLENOVIC - DIRECT - MR. PAULSEN    649

(Continuing.)

BY MR. PAULSEN:

Q    Okay.

MR. PAULSEN:  Could I show the witness Exhibit 1005, also in evidence.

THE COURT:  You may publish to the witness and the jury.

(Exhibit published.)

MR. PAULSEN:  And if you can zoom on the top, please.

BY MR. PAULSEN:

Q    Is this the same Matija Kurek that you mentioned a moment ago?

A    Yeah, correct.  That's the project manager.

Q    Okay.  And this was sent to David Midwood Lumber?

A    Correct.

Q    CC'ing to you?

A    Correct.

Q    Now, the subject is listed, liability insurance certificate for Dunbar Towers.  Is Dunbar Towers, is that the Monticello --

A    Correct.  That's the building name which we did the work in Monticello.

Q    Okay.  What is a liability insurance certificate?

A    General liability insurance is to protect myself and also

A. KOLENOVIC - DIRECT - MR. PAULSEN    650

the owner, where we working over there, just in case any damage appear in, like -- in construction, we doing the work, maybe if we damage anything, they cover that.

Q    Okay.  As a general contractor, do you need liability insurance to do any sort of job?

A    Yeah, you have to have it.  And, also, workers' compensation, too.

Q    Okay.  If I can show you the attachment to this email.  Just zooming in the top, is this a representative example of the liability insurance you just discussed?

A    Correct.  Yes.

Q    Okay.  Going to the second box from the top left --

A    Yeah, that's the -- my company.

Q    Okay.  That's the name of your company?

A    Correct.

Q    That's the exact -- the correct name, Ago & Alaudin General Contracting Corp.?

A    Correct.

Q    Okay.  Right above there, there's another name.  Can you read that company?

A    That's the Vukel Group Insurance.  That's the broker where we buy the insurance from them.

Q    Okay.  Is -- that's an insurance company that you work with?

A    Correct.

A. KOLENOVIC - DIRECT - MR. PAULSEN    651

Q    Okay.

A    That's for the general liability.  But for workmen compensation, it's from Monticello, Harris Monti Area Insurance.

Q    Okay.

MR. PAULSEN:  I would like to show the witness Government Exhibit 17 which is not in evidence.

THE COURT:  Any objection to Government's -- what's the number again?

MR. PAULSEN:  Seventeen, Your Honor.

THE COURT:  Seventeen, any objection to that coming into evidence?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 17, was received in evidence.)

(Exhibit published.)

Q    Mr. Kolenovic, do you recognize that face?

A    Yes.

Q    Who is --

A    That is the Vukel, Marcy Vukel.  She was the broker.  You know, like any time you need a certificate, she issue it and everything.

Q    Okay.  She's the person you buy your insurance from?

A    Correct.

Q    Okay.  When you need an insurance certificate like we

A. KOLENOVIC - DIRECT - MR. PAULSEN    652

just saw, you said she's the one that gives it to you?

A    Correct.

Q    Okay.

MR. PAULSEN:  If we can go back to the attachment to 005.

Q    So we looked at the top.

MR. PAULSEN:  If you could show me -- zoom in on the middle.  That section.  Thank you.

Q    What is this, Mr. Kolenovic?

A    This is, like, the liability -- insurance how much is the liability -- like, 2-million each, accidents and everything, the -- they cover up to 2-million and 1-million, also, the -- the rest of it.

Q    Okay.  So this says how much insurance you have?

A    Correct.  Correct.

Q    Okay.

MR. PAULSEN:  Now, if you can zoom in, Ms. Kannan, on the workmen's comp part.

Q    Mr. Kolenovic, there's -- is there anything written on the workmen's comp part?

A    No.  No, because it's a separate certificate from a different broker.  As I mentioned earlier, like, in Monticello, they issued a certificate, what we require.

Q    Okay.  So you get your general liability insurance from Ms. Vukel --

**J.A. 398**

A. KOLENOVIC - DIRECT - MR. PAULSEN    653

A    Correct.

Q    -- but you don't get workmen's comp from her?

A    Correct.

Q    Okay.

MR. PAULSEN:  And, now, just showing, to the bottom of the form, please.

Q    What does that say on the left?

A    This is, like, the certificate of like, all, the Dunbar, that's the building where we work.  So that's the liability insurance for that -- for that location.

Q    Okay.  So -- and that will always write down the project that you're working on?

A    Correct.  Like, every project that you work, you have to put the name and also the address and location.

Q    Okay.  And to your knowledge, whose signature would then go on the bottom right-hand corner?

A    This is the -- Marcy Vukel write.

Q    Okay.  And she's the woman whose photo we just saw a moment ago?

A    Correct.  But I -- but, like, as I mentioned, Matija did send out the email to the client for the insurance for this location, but she never issued.  She called me up to confirm if this is for this location, it's okay to issue the certificate.

Q    Okay.

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN    654

A    Because they never charged us for any certificates for any location in doing them --

Q    Okay.  So you have a good business relationship with her then?

A    Correct.

Q    Okay.  Now -- and these documents would be very -- is it fair to say you would submit something like this for every job that you're doing?

A    Correct.  Like, every location, every job site, you have to give it because, otherwise, you cannot get the job without this insurance.

Q    Okay.  So did the project go forward, the Dunbar Towers project in Monticello?

A    Yeah, it did.  So, I think -- so, like, the beginning of the March, that's when we started.  And that's the -- that's the -- that's the day when we started, like, in the beginning of the -- of the March.  But I know I did look at it, end of the February, the job, to look at it.

After that, we set it up, we agreed.  I did sign the contract, we send it out.  They signed -- the client, I forget the name, I never see him.  So after that, we send him the issuance, we open up account in the Chase Bank, they wired the money and we started the project.

Q    Okay.  Did the project continue for a time?

A    Yeah.  It did continue.  And the end, I believe in the

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN    655

middle of the August, up to the middle of the August.

Q    Okay.  So then from March when it started, to the middle of August when it stopped, did you work on Dunbar Towers?

A    Yeah, yeah, we did -- we did work.  I go there and finish up -- up to the third floor, all the doors, molding that was left, like the first floor, the second floor, because the sheetrock wasn't finished in the -- in the -- those two floors.

Q    Okay.  So is it fair to say you did a lot of work on it, but it didn't -- the project didn't finish?

A    Correct.

Q    During that time, how did you pay David Motovich for -- in connection with this project?

A    I did give him the first check.  And after that, I told him, we're gonna need the material to be able to -- to work, we do not like delay.  So he asked me to leave some blank checks signed so he can -- also, that, you know, like, whatever the materials, send it out, he will fill it out for the door, like, for like the door -- Midwood -- Midwood, and also for the lumber --

Q    Okay.  So you left -- you left him some checks --

A    Yeah, blank checks signed.

Q    Okay.

MR. PAULSEN:  Can I show the witness, Your Honor, Government Exhibit 120?

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN    656

THE COURT:  Is this in evidence?

MR. PAULSEN:  It is in evidence.

THE COURT:  You may publish it and show it to the jury, as well as the witness.  Go ahead.

(Exhibit published.)

MR. PAULSEN:  If I can just zoom in on the first one.

BY MR. PAULSEN:

Q    Mr. Kolenovic, do you recognize this check?

A    Yes.  That's -- that's my signature and I did write out the first check.  I did write out to the Midwood -- Midwood Door.

Q    Is that -- the name of the company in the check, is that an authentic check from your company?

A    Ago and Alaudin General Contracting Corp.  Yes.

Q    Okay.  And the -- that's your signature in the bottom right-hand corner?

A    Correct.  Correct.

Q    All right.  Now, did you leave a number of checks like this for David Motovich?

A    I did -- I did sign it, but not fill it up, you know, just blank checks.

Q    Okay.  And you trusted him to fill in the correct amount?

A    Yes, I did because, basically, in that account, when the money coming in, it's gonna be only for that location.  So it

*LEEANN N. MUSOLF, RPR*

**J.A. 399**

A. KOLENOVIC - DIRECT - MR. PAULSEN     657

was the trust, in the beginning, I never have any -- even any doubt of that.

Q   Okay.  I see.  Did I understand you right that you were only putting an amount of money in for the account related to the projects, you weren't worried about leaving a check?

A   Correct.  I don't put any other money from, you know, different locations.  So basically that account was only for that purpose, for the Dunbar in Monticello, like -- so whatever money come in, that's the money.  You cannot make that more than -- more than what they wired the money.

Q   Okay.

MR. PAULSEN:  If I could zoom in on the back of the check, Ms. Kannan, or if you can zoom closer on the writing if possible.

Q   Do you see where the check was cashed at Coney Island Payroll?

A   Yes, I saw it.

Q   Have you ever used Coney Island Payroll?

A   I never -- never used it.

Q   You said --

A   From my knowledge, never used it, no.

Q   Okay.  So that's not a place that you would go to?

A   Correct.

Q   Okay.  Now, you said a moment ago that the checks you gave him go from about March to August; is that right?

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN     658

A   Correct.  Yes.

Q   And has the Government showed you other checks from this exhibit that show checks like this that go through about August?

A   I --

MR. PAULSEN:  Let me rephrase, Your Honor.  If I could show -- flip through the other documents in 120 and maybe zooming in.

Q   Mr. Kolenovic --

MR. PAULSEN:  If I could zoom on the second page.

Q   Is this another check --

A   Yes.  This is my -- I signed the check, but it not my writing the line.

Q   Okay.

A   This is from, you know, Midwood Lumber, one of them write it up, David, Roman, maybe his assistant write it up.  But my signature, it is, but it's not my writing on the line.

Q   Okay.

MR. PAULSEN:  And, then, just flipping through to the final one, Ms. Kannan, zooming in, please.

Q   This check, is that your signature?

A   It's my signature, correct.

Q   But the actual Midwood Doors, did you fill that out?

A   I did not fill that out because it starts with a different line.

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN     659

Q   Okay.  Now, finally, the date, August 9, 2013.  That's about when you said you stopped --

A   Correct.  The middle of the -- I think the middle of the August, right.

Q   Okay.  Now, Mr. Kolenovic, earlier on you mentioned a guy named Eddie, right?

A   Right.

Q   Who's that?

A   That's the subcontractor who did the work in Monticello.

Q   Okay.  He's one of your subcontractors?

A   Correct.

Q   Okay.

MR. PAULSEN:  I would like to show the witness what's been marked for identification as Government Exhibit 8.

THE COURT:  Any objection to 8 being admitted?

MR. JACKSON:  No, Judge.

THE COURT:  It's admitted.  You may publish.

(Government Exhibit 8, was received in evidence.)

(Exhibit published.)

A   Yeah, that's Eddie.

Q   That's Eddie.  Do you know his last name?

A   Ruilova.

Q   So it's Eddie Ruilova?

A   Correct.

Q   This is your subcontractor?

**J.A. 400**

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN     660

A   Correct.

Q   Now, did you get contacted by Eddie Ruilova in connection with this project?

A   After we start with the work, because the money's not coming into the account, he called me, like, I -- I think so the end of the August, and he told me that one of your check has bounced.  I said, I never give it.  I called up my assistant in bookkeeping, I said did you make any check, said no.  So I called him up.  I said can we meet, and I proceeded to see that check just to verify.

When we meet, he showed me the check.  The check, it wasn't of my company.  It was also Ago & Alaudin Contracting Corp. but not the General one.  It was totally different company.  I never aware of it.

Q   All right.  So Eddie Ruilova showed you a check that looked like it was from your company but it wasn't?

A   Correct.

MR. PAULSEN:  Your Honor, if I may show the witness, and only the witness, Government Exhibit 703.

THE COURT:  Any objection to 703 being admitted?

MR. JACKSON:  No, Your Honor.

THE COURT:  It's admitted.  You may publish.

(Government Exhibit 703, was received in evidence.)

(Exhibit published.)

MR. PAULSEN:  And just, page one, if you can zoom in

*LEEANN N. MUSOLF, RPR*

A. KOLENOVIC - DIRECT - MR. PAULSEN        661

on the bottom.

Q    Mr. Kolenovic, do you recognize -- do you recognize this check?

A    Yeah.  That's the check, what he show me, right.

MR. PAULSEN:  And, Ms. Kannan, can you just zoom in to just the check part so it's a little bigger for the jury.

Q    So, first off, Mr. Kolenovic, you said Eddie Ruilova.  Is his name Edison?

A    Edison.  We call him Eddie for short, but Edison Ruilova, correct.

Q    The date at the top, it says August 30, 2013.  That's a couple of weeks after you said you stopped working.

A    Yeah.  Correct.  We stopped, I believe, like, middle of the -- of the August.

Q    Okay.

MR. PAULSEN:  Ms. Kannan, can you zoom in even tighter on the top of the check listing the name of the company.

Q    Now, Mr. Kolenovic, is that your company?

A    No.

Q    How -- what is your company's actual name?

A    My company name is Ago & Alaudin General Contracting Corp.

Q    Okay.  So there's a "General" and that word's missing?

A    Correct.  Yeah.

---

A. KOLENOVIC - DIRECT - MR. PAULSEN        662

Q    The address there, 1090 Coney Island Avenue.  Do you know that address?

A    I never know the address.  I never know.

Q    What address appeared on your checks?

A    My check is, like -- two location.  We have, like, 310 East 55th Street or 1070 Second Avenue.  And, also, in the beginning, was 2029 Route 17-B, Bethel, New York.

Q    Okay.  Now --

A    But the three location of work -- but I -- I have it.

THE COURT:  Did you ever have, is it 1090 Coney Island Avenue?

THE WITNESS:  No.

THE COURT:  Go ahead.

MR. PAULSEN:  If I could, now, zoom into the signature block, Ms. Kannan.

Q    So you mentioned earlier that you knew and you know Kemal Sarkinovic; is that right?

A    Correct.

Q    Okay.  Did you have any -- did you have any reason to understand why Kemal Sarkinovic was signing checks with your company's name?

A    I was -- I did call him up and I ask him, what is this, you know, and I told him I see somebody opened up the company with my -- my name but not the same as I have it.  You have to close the company, otherwise I will report and -- and call the

---

A. KOLENOVIC - DIRECT - MR. PAULSEN        663

Attorney General, whoever is the right --

Q    Okay.  You called him and told him he has to stop this?

A    Correct.

Q    Okay.  Did you have the same conversation with David Motovich?

A    We did call.  I don't remember, he -- he did not answer.  But also, Matija, he did call, also, his assistant.  So maybe, also, I -- I don't remember.  I don't want to, like, make sure 100 percent, but I did call him.  I did call told him to stop.

Q    Okay.  And you said, you can't do this anymore?

MR. JACKSON:  Objection, Your Honor.

THE COURT:  Sustained.  Ask it without leading.

What did you say?  What did you say to him when you talked to him?

THE WITNESS:  I did not.  The project manager Matija, he did call him and -- so he told him to stop, you cannot use somebody's name and open up the company.

THE COURT:  Go on.  Ask your questions without leading.

Matija Kurek

(Continued on the following page.)

---

Kolenovic - direct - Paulsen        664

(Continuing.)

BY MR. PAULSEN:

Q    Mr. Kolenovic, were you told that they would stop?

A    Yeah, that's -- they told me they gonna stop.  They not gonna write.  They say it's done, like you don't have to worry.

Q    Did you think it was done?

A    That's for my knowledge.

MR. PAULSEN:  Your Honor, I'd like to show what's first already in evidence as Government Exhibit  107.

THE COURT:  You may publish that, it's in evidence.

(Exhibit published.)

MR. PAULSEN:  If I could zoom in on the top.

Q    Mr. Kolenovic, I believe you said you didn't frequent Coney Island Payroll, is that right?

A    No, never used.

MR. PAULSEN:  If you could zoom on the date.

Q    The date says February  4th, 2014, is that right?

A    Correct.

Q    Okay.  The conversation that you described in which you believed that your company's name would not be used anymore, that was about six months earlier, is that fair to say?

A    Correct, not since then in August, about the time when I meet Ruilova.  I called him and I was so advised --

(Court reporter seeks clarification.)

**J.A. 401**

Kolenovic - direct - Paulsen    665

SAM    OCR    RMR    CRR    RPR

A    2014.

MR. PAULSEN:  And, Ms. Kannan, if you could go back to the just the main part of the document.

Q    Were you aware that an account had been opened at Coney Island Payroll in the name of Ago Alaudin --

A    No.

Q    -- Contracting Corp.?

A    No.

MR. PAULSEN:   Ms. Kannan, if you could move to, I think it's the third attachment.  It's the....

(Exhibit published.)

MR. PAULSEN:  It's one more page down, I think.  One more after that.  Okay.  Just zooming in there.

BY MR. PAULSEN:

Q    Again, Mr. Kolenovic, you had said that the conversation you had about your company, that was around about the time that you received that check, is that right?

A    Correct.

MR. PAULSEN:  Ms. Kannan, can you put the check next to this, which is -- it's 703.

(Exhibit published.)

Q    That check says August 30th, is that right, Mr. Kolenovic?

*SAM    OCR    RMR    CRR    RPR*

---

Kolenovic - direct - Paulsen    666

A    Correct.

Q    And am I right is that the conversation you described was after you saw that check?

A    After I saw this check I did call them and let them know to stop and to close the company, if he didn't, you know.

MR. PAULSEN:  Going back to the document before, Ms. Kannan.  And just zooming in on that document.

Q    Can you read the date in the middle of that document?

A    It's like August 23, 2013.

Q    Did you know whether a company had been opened in your name with the state around that time?

A    No.  No.  Why I have to open another company, I already have my existing company.

MR. PAULSEN:  Your Honor, I would like to show the witness Government Exhibit 1004.

THE COURT:  In evidence?

MR. PAULSEN:  It is in evidence, Your Honor.

THE COURT:  You may publish.

(Exhibit published.)

MR. PAULSEN:  Zooming in on the top.

Q    This is an e-mail from Gail Motovich.

Do you know any of the names on that e-mail, Mr. Kolenovic?

A    I never - - never knew this name.

Q    Okay.  The date, April 16th, 2013, would that have been

*SAM    OCR    RMR    CRR    RPR*

---

Kolenovic - direct - Paulsen    667

in the middle of the time you were working with David Motovich?

A    Correct.

Q    Okay.

MR. PAULSEN:  Ms. Kannan, if you could show the attachment.

(Exhibit published.)

MR. PAULSEN:  If you could zoom in on the top, please.

BY MR. PAULSEN:

Q    Is that the name of your company?

A    It is my company, but it's not logo.  I never have it -- I have only like three logo, but I never also make this kind of logo.

Q    Okay.  We talked a moment ago about the difference between Ago & Alaudin General Construction Corp. versus without the General, right?

A    Yeah, correct.

Q    But that is the name of your company?

A    Yeah, that's my company, correct.

Q    What about that address?

A    Address, that's my address.

Q    That's your address?

A    Yeah.

Q    Did you write this document?

*SAM    OCR    RMR    CRR    RPR*

---

Kolenovic - direct - Paulsen    668

A    No.

Q    Okay.

MR. PAULSEN:  If I could show the date, please.

BY MR. PAULSEN:

Q    Now, is that September 1st, 2012?

A    Correct.

Q    Am I correct that a moment ago you had testified that you didn't start working with David Motovich until approximately March of 2013, is that right?

A    Correct.

Q    Okay.  So this is even before -- this would be dated before you even knew David Motovich, is that right?

A    Correct.

Q    Okay.

MR. PAULSEN:  And if we could go down to the bottom.

THE WITNESS:  This is not my signature, and also the spelling of my son is wrong.

Q    That is your name though, right?

A    Yeah.  Ago is right, but my son Alaudin is not the right spelling.  And also, it's not my signature.

Q    Did you know this document was out there?

A    No.  This the first time I saw it when you go over it.

Q    To be fair, we've shown you these documents?

A    You showed me these.  That was the first time I saw it in my life.

*SAM    OCR    RMR    CRR    RPR*

**J.A. 402**

Kolenovic - direct - Paulsen                    669

Q    Okay.

          MR. PAULSEN:  If I could now jump to Government

Exhibit 391, which is page 1.

          This is not in evidence, Your Honor.

          THE COURT:  Any objection to Exhibit 391?

          MR. JACKSON:  No objection.

          THE COURT:  Admitted.

          You may publish.

          (Government Exhibit 391, was received in evidence.)

          (Exhibit published.)

BY MR. PAULSEN:

Q    Sir, just page 1.

          Mr. Kolenovic, zooming at the top, this is, again,

your -- the name of your company, right?

A    Correct, yes.

Q    And the address is correct as well?

A    Yes, correct.  Right.

Q    Now, the name --

          MR. PAULSEN:  If I could show the date and the

company name.  I'm sorry, the name it is addressed to.  I

apologize.

A    Yeah, that's the address where we work in Monticello.

Q    So that's the name of the project in Monticello?

A    Correct.

Q    And that date would have been during the time you were in

---

Kolenovic - direct - Paulsen                    670

Monticello, right?

A    Yeah, that's right.

Q    Did you issue anything like this document?

A    No.

Q    Okay.

          MR. PAULSEN:  If you can, skip down to the bottom

again.

A    You see I never put like Mr. Ago Kolenovic, even there

Kolenovic is wrong spelling.

          And also the Alaudin is wrong spelling on the -- on

my son.

          MR. PAULSEN:  If I could skip to Government

Exhibit 1012, which is in evidence.

          THE COURT:  You may publish.

          (Exhibit published.)

          MR. PAULSEN:  Just zooming in at the top.

BY MR. PAULSEN:

Q    We have an e-mail from -- is it fair to say, this is an

e-mail from Gail Motovich to some individuals copied to David

Motovich.

          Other than David Motovich, do you know any of those

individuals.

A    No.

          MR. PAULSEN:  And, Ms. Kannan, if you could jump to

the relevant - - skipping forward to the last -- that

---

Kolenovic - direct - Paulsen                    671

attachment.

          (Exhibit published.)

BY MR. PAULSEN:

Q    Mr. Kolenovic, you mentioned a moment ago that Dunbar

Development, that's the Monticello project, correct?

A    Correct.

Q    February in 2014, you would have long since stopped

working there at that point, is that right?

A    We stop, and our submission ending  like the middle of

August 2013 only.

Q    The logo, does that look anything like your logo?

A    No, I never -- I never do like that.

Q    You have a logo, right?

A    I have my logo and it's like the double A and, you know.

Q    All right.

          MR. PAULSEN:  Then just skipping to the bottom

again.

Q    Here your name isn't there, is that right?

A    Correct.

Q    Did Kemal Sarkinovic have any role at Ago & Alaudin?

A    Nothing to do.  I'm a hundred percent owner of the

company.

Q    Okay.

          MR. PAULSEN:  If I could show the witness Government

Exhibit 1013.

**J.A. 403**

---

Kolenovic - direct - Paulsen                    672

          THE COURT:  In evidence?

          MR. PAULSEN:  In evidence, Your Honor.

          THE COURT:  You may publish.

          (Exhibit published.)

          MR. PAULSEN:  Zooming in on the top.

Q    This is an e-mail from Gail Motovich to Merrick RE Group.

          Do you know who Merrick RE Group is, Mr. Kolenovic?

A    No.

          MR. PAULSEN:  If you could show the -- Ms. Kannan,

if you could show the relevant attachment.

          (Exhibit published.)

          MR. PAULSEN:  Now zoom in.

Q    Now, Mr. Kolenovic, does this -- this looks a little

different, is that right?

A    Yeah.  I see it's also the Coney  Island, the address, I

never live in Brooklyn.  I never -- like this first time I see

this address.

Q    Is that your logo?  You said your logo is different than

the others, is that it?

A    No, it's not.  It's not -- that's not my logo.

Q    What does your logo look like?

A    It's like double A.

Q    You have like a double A for your name and your son's

name?

A    Correct.

          SAM     OCR     RMR     CRR     RPR

Kolenovic - direct - Paulsen          673

Q    That's a different address than the 1090 Coney Island, right?

A    Correct.

Q    What about that address, do you know that address?

A    No.

Q    What about the phone number, can you read that phone number?

A    646-330-0861.

Q    Is that your cell phone number?

A    No.

Q    Do you know whose number that is?

A    I don't know.

MR. PAULSEN:  You can zoom out, Ms. Kannan.  And just zoom in on the bottom.

Q    Again, Kemal Sarkinovic had no role in your company, correct?

A    Yeah, I see the name.

MR. PAULSEN:  If I could show Government Exhibit 1018 already in evidence, Your Honor.

THE COURT:  You may publish.

(Exhibit published.)

Q    This is from Gail Motovich to Marina Kuyan.

Do you know who Marina Kuyan is?

A    No.

Q    The date, November 10th, 2014.

---

Kolenovic - direct - Paulsen          674

THE COURT:  Is that the date?

Q    Is that the date?

THE COURT:  What date did you say?

I'm sorry, what date?

MR. PAULSEN:   Oh, I'm sorry, September 10th.  You're right, Your Honor.

THE COURT:  I know.

MR. PAULSEN:  Is the date, September 10th, 2014, Your Honor?

If I could show the -- just the attachment, please.

And, Ms. Kannan , if you could zoom in.

(Exhibit published.)

BY MR. PAULSEN:

Q    The company there, Mr. Kolenovic, can you read that?

A    Yeah, that's the Ago & Alaudin General Construction Corp.

Q    And the company that the document is sent to?

A    I never -- never knew this company.  This, you know, never worked.  Never dealt with them.

Q    So have you done work for Net Power at an earlier time?

A    No, no, no, no.

Q    Do you know who Net Power is?

A    I don't know.  I was working with this guys from wiring service, that's the company what I -- what I usually use for the electrical that we need.

Q    So you have no knowledge of this document?

---

Kolenovic - direct - Paulsen          675

A    No, no, no, no.

MR. PAULSEN:  If I could show Government Exhibit 1025, also in evidence, Your Honor.

THE COURT:  You may publish.

(Exhibit published.)

MR. PAULSEN:  Zooming in the top.

BY MR. PAULSEN:

Q    Do you know either of these individuals, Gail Motovich or --

A    No.

Q    The other e-mail, does that ring a bell to you?

A    No.

Q    Okay.

MR. PAULSEN:  Ms. Kannan, if I could show the...

Q    Again, that is your company name and that is your company address, is that right?

A    It's correct, but not the logo .

Q    What about the addressee of the letter, Bridge Medical Diagnostics, do you know that company?

A    The first - - first time, you know.  No, I don't know.

Q    Okay.

MR. PAULSEN:  If you could show the bottom.

(Exhibit published.)

Q    Do you see where there's some wiring instructions, Mr. Kolenovic?

---

Kolenovic - direct - Paulsen          676

A    Yeah, I saw like Coney Island.

Q    You also banked at Chase, is that right?

A    Yeah, Chase Bank, right.  I use only Chase and TD Bank lately.

MR. PAULSEN:  If I could now show Government Exhibit 434-1.

THE COURT:  In evidence?

MR. PAULSEN:  Your Honor, it -- this is not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection.

THE COURT:  You may publish, it's admitted.

(Government Exhibit 434-1, was received in evidence.)

(Exhibit published.)

MR. PAULSEN:  And just this will be -- I think it's the first page.

Your Honor, we'll return to that one to make sure we have the right page.

If you could skip to 1026.

THE COURT:  Do that tomorrow morning because as the late Jimmy Buffet said, it's 5 o'clock somewhere, and somewhere is here.

We are adjourned for the day.  Do not talk about the case.

**J.A. 404**

*SAM      OCR      RMR      CRR      RPR*

Proceedings                677

You will be back tomorrow, sir. Do not talk with anyone about your testimony.

Have a good night, ladies and gentlemen. We'll see you tomorrow.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: You may step down, sir. Thank you. We'll see you tomorrow morning.

THE WITNESS: Thank you very much. Thank you.

THE COURT: Thank you.

(Witness steps down and exits the courtroom.)

THE COURT: The jury has left the courtroom. The witness is leaving the courtroom.

You may be seated, ladies and gentlemen. We'll deal with any issues we need to deal with outside of the presence of the jury.

Thank you.

Do we have any issues we need to deal with, beginning with the Government?

MR. PAULSEN: Not from the Government, Your Honor.

THE COURT: Anything from defense counsel?

MR. JACKSON: Two quick things, Judge.

First, just based on the nature of the way the Government is doing this direct, we believe that there is a real possibility that the jury could be confused into thinking

*SAM     OCR     RMR     CRR     RPR*

Proceedings                678

that the identity theft charge relates to what we're talking about here, and so we wanted to request a limiting instruction on that.

THE COURT: I'll give the instructions to the jury on what the law is at the appropriate time.

MR. JACKSON: Fair enough, Judge.

Secondly, and, Judge, I understand, I'm not quibbling with the Court's ruling. We appreciate that the Court is -- is attempting to deal with this case, which is very complex, in a very diligent and careful way.

The Government, we believe, is attempting to lead the Court into error with improper objections.

THE COURT: Well, with all due respect, it takes a lot to lead this Court into error. I do not believe that's what the Government is doing.

What I do believe is that you have deliberately ignored the fact that I ruled on motions in limine with respect to the validity of the warrant. You revisited it time and time again with questions and suggested there were infirmities with respect to it. You challenged the nature of the sketches versus video. You know that that is not appropriate.

And I told you, both sides, that I don't like doing certain things to lawyers in public in front of the jury, but I will do it if lawyers attempt to back-door my rulings. And

*SAM     OCR     RMR     CRR     RPR*

Proceedings                679

when you try to back-door my rulings, someone else gets back-doored.

So let me make it very clear, don't do it.

MR. JACKSON: I --

THE COURT: I made the rulings in advance. I thought about your motions. I looked at the responses. And I ruled. And you were trying to go around it. And I don't know whether or not you think that went well for you with the jury. Some lawyers think that it's worth having objections sustained over and over again and the Court saying: I ruled on this, don't do it.

And sometimes lawyers say: Well, I'll just bull ahead and get my story in front jury no matter what the judge has ruled.

I don't think that's a winning strategy, but you may think it's a winning strategy for your client. But I am not going to tolerate misleading the jury when I tell you repeatedly that I have ruled on an issue and I have warned you, both sides, not to do it.

Just as I said to the Government when they were seeking instructions with respect to the nature of plea agreements and cooperation agreements that I would deal with the question of what, in fact, was in a plea agreement or cooperation agreement. And I said to the Government that if a witness believes that his exposure or her exposure is X, that

*SAM     OCR     RMR     CRR     RPR*

Proceedings                680

defense counsel is entitled to bring that out, even if the reality is the exposure of the witness is Y. Okay. The Government didn't like that. They revisited it and I told them repeatedly that I am going to deal with it in instructions. And that their job is to, if they wish, to point to the evidence of what is stated in the cooperation agreement and/or plea agreement.

And I am telling you, do not attempt to relitigate issues such as the validity and sufficiency of the warrant, which I have ruled on. That's what you were trying to do.

Don't put up your hand, Mr. Jackson. You know you were trying to do it. I know you were trying to do it. The Government knows you were trying to do it.

MR. JACKSON: No, Judge.

THE COURT: Excuse me. Everybody knows you were trying to do it, and I am not going to have it. Okay.

I have been trying cases since the mid '70s. I don't know all the tricks, but I know a lot of them, and I am telling you now it is going to get worse for you if you do it again.

MR. JACKSON: Judge, I have --

THE COURT: And it is going to get worse for the Government if they do it again with respect to the question of what's in the mind of a cooperating witness.

The Government has already said there are going to

*SAM     OCR     RMR     CRR     RPR*

**J.A. 405**

Proceedings       681

be some more cooperators, and maybe those cooperators have an understanding that's different than what is in the document of the cooperation agreement or plea agreement. And I said, if the witness thinks they are subject to the death penalty when all they are subject to is a $50 fine and a bad milkshake, I will deal with that, I will deal with that when I give the instructions.

I have dealt with your issues on the warrant and you tried to do it, and I don't think that was in your enlightened self-interest, but I'm not the jury. Maybe it worked. Sometimes lawyers think that works. I don't know.

MR. JACKSON: Judge, this is a recurring issue because the Government is going to call additional search agents and I just want to be clear, okay, what I was --

THE COURT: No, no, what I want to be is clear. And what I want you to do is to listen. Okay.

Every time you try to relitigate the search warrant issue, they are going to object. They are going to be sustained. And the tone of the Court is going to be increasingly impatient. I am telling you this in advance. I ruled. Your objection is preserved for appellate purposes. And if the appellate court decides that there was some infirmity with the search warrant, well, good on you.

But I am telling you now if you relitigate it, today it will be Little Mary Sunshine compared to what will happen

Proceedings       682

if you keep going back to it.

MR. JACKSON: I just have one question, Judge.

THE COURT: You can have as many questions as you want.

MR. JACKSON: I'm trying -- the -- Your Honor's ruling, which we -- I know the Court doesn't believe me, but I swear on everything I believe in I was not attempting to violate the Court's order.

The Court's order was that we weren't allowed to --

THE COURT: Excuse me, you are disagreeing with what I just said.

MR. JACKSON: No, I'm not. No, I'm not, Judge. I'm just telling you my intent.

THE COURT: What is your issue?

MR. JACKSON: My question is what are we allowed to ask, Judge, about what was seized and what wasn't?

That's not about --

THE COURT: Here is how you do it.

What was seized?

You ask the witness: What was seized?

MR. JACKSON: Yes, and I was attempting to point out what was not seized.

THE COURT: No, no, that's when you start testifying.

You get to ask the witness what was seized --

Proceedings       683

MR. JACKSON: And I am --

THE COURT: And you know what was not seized, you know what was not seized?

MR. JACKSON: No, Your Honor.

THE COURT: Everything other than what was seized.

So you get to ask the witness what was seized. And when the witness says: We seized A. We seized B. We seized C.

Okay, did you seize any other letters in the alphabet?

And the witness says: No.

You don't then get to say: Oh, you didn't seize D, did you?

You didn't wear a body cam? You didn't put a chalk around the body in the outline? You didn't look for drugs. You didn't look for guns. You didn't look for this.

No, we're not doing that.

MR. JACKSON: Your Honor, the Second Circuit has said we can do that.

THE COURT: Well, you know what, you're wrong about that. But feel free to keep fighting with the Court on this, and then you'll go up to the Second Circuit and you'll see how wrong you are.

You are not allowed to relitigate the issue. If you keep do it, it's going to get worse for you.

**J.A. 406**

Proceedings       684

You litigated the issue. You lost the issue here. If you're right, you can go up on appeal and the Circuit says there was some infirmity with the search warrant, they will tell you that. But you are not allowed, having lost a motion in limine on this point, to keep coming back to it and trying to get it before the jury when I have ruled on it. Okay?

Your objection is preserved.

MR. JACKSON: I have no objection, Judge, to that. I'm not objecting to the Court's finding and I don't want to argue. I have too much respect for you, Judge.

THE COURT: Well, even if you didn't, it's okay.

MR. JACKSON: I know, Judge.

But I just want the Court to understand, if the Court will allow me, I would like to put it in writing because I feel that my articulation is failing.

I'd like to just explain the factual question I'm trying to get from the witness, which has nothing to do with the -- with the reasonableness of the search. I have no interest in relitigating that issue. I only want to be able to point out for the jury what the - what the agents searching did not find, which is a factual question, completely separate.

THE COURT: The way to ask the question without getting an objection that will be sustained is the following:

Agent X, when you went to the site, what did you

Proceedings 685

seize?

We seized A. We seized B. We seized C.

Did you seize anything else?

They will say no.

Okay. You're not allowed to ask them: Did you seize D and E and F and G? Because they've told you what they seized. They've told you what they seized.

MR. JACKSON: Your Honor, we will -- we will -- we understand the Court's position and --

THE COURT: You understand the Court's ruling. It's not a position.

MR. JACKSON: Ruling.

THE COURT: It's a ruling and it's an understanding of the law of the Circuit.

MR. JACKSON: We understand, Judge.

THE COURT: Okay, good. Because I try to be real clear about what the law of the Circuit is as this lowly judge understands it.

Okay. Anything else?

MR. JACKSON: No, Judge.

THE COURT: Okay.

MR. JACKSON: So now, I don't --

THE COURT: I'm sorry. You say no, but then you say "so now."

All right. One more thing. Go ahead, Columbo on.

*SAM OCR RMR CRR RPR*

Proceedings 686

MR. JACKSON: I just want to say, so that I don't run afoul, Judge, can I -- can I submit a very short, in anticipation of them raising this again, preview of what we would, a letter brief previewing what we understand we would do separate and apart from the Court's ruling just to make sure that I'm not - because I have no desire to run afoul of the Court, I just want the Court to know what we will try to do in advance?

THE COURT: I am telling you if you try to do what you keep saying you're going to try to do, you are going to keep getting shot down.

Do you know what insanity is?

Insanity is doing the same thing over and over again and expecting a different result.

You are going to keep trying to challenge the warrant. They are going to keep objecting. And I am going to keep sustaining the objection. Okay. I know what you're trying to do. You briefed it thoroughly in advance. We reviewed your pleadings and we ruled against you on that point. That's the ruling in the case. There is no need to supplement it. There is no new authority that comes down, okay, that changes the view of the Court.

So, you took your shot. On that issue, you lost. It happens. You take it up. And if the Circuit agrees with you on appeal, Lord love them and Lord love you. It may not

*SAM OCR RMR CRR RPR*

Proceedings 687

even get to the Circuit, you know.

MR. JACKSON: Judge, we appreciate you. Thank you.

THE COURT: Okay.

Anything else.

MR. JACKSON: Nothing from us.

THE COURT: Okay. Anything else from the Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Okay. Have a good evening, everyone.

We're adjourned.

MR. PAULSEN: Thank you, Your Honor.

(Matter adjourned to July 11, 2024 at 9:30 a.m.)

ooo0ooo

**J.A. 407**

*SAM OCR RMR CRR RPR*

Proceedings 688

I N D E X

| WITNESS | | PAGE |
|---|---|---|
| **ROMAN KRETSULA** | | |
| CROSS-EXAMINATION | BY MR. MAZUREK | 467 |
| REDIRECT EXAMINATION | BY MR. POLEMENI | 511 |
| REDIRECT EXAMINATION | BY MR. POLEMENI | 533 |
| **BARRY FEERST** | | |
| DIRECT EXAMINATION | BY MR. PAULSEN | 549 |
| CROSS-EXAMINATION | BY MR. JACKSON | 552 |
| **MAEGAN REES** | | |
| DIRECT EXAMINATION | BY MR. GRUBIN | 560 |
| CROSS-EXAMINATION | BY MR. JACKSON | 624 |
| **AGO KOLENOVIC** | | |
| DIRECT EXAMINATION | BY MR. PAULSEN | 643 |

E X H I B I T S

| GOVERNMENT | PAGE |
|---|---|
| 23 | 529 |
| 6005, 6006, 6007 | 547 |
| 436 | 569 |
| 28, 309-353, 323.5, 324.5, 343.5 | 571 |
| 54, 355, 356, 365, 366, 369, 378, 386, 391, 393, 396 | 577 |
| | 578 |
| 54-P, 355-P, 356-P, 365-P, 366-P, 369-P, 378-P, 386-P, | |

*LEEANN N. MUSOLF, RPR*

## Page 689

Proceedings                                    689

391-P, 393-P, 396-P

3000, 3001, 3002                          604

1000, 1004, 1007, 1008, 1009,             615
1010, 1011, 1012, 1013, 1018,
1025, 1026, 1027, 1028, 1029,
1041, 1048, 1052, 1056, 1066,
1070, 1075, 1077, 1080, 1084,
1097, 1103 , 1110, 1111, 1161,
1164, 1174, 1178, 1179, 1183,
1188, 1189, 1190, 1191, 1196

1                                         644

17                                        651

8                                         659

703                                       660

391                                       669

434-1                                     676

E X H I B I T S

DEFENSE                                   PAGE

9928                                      470

4519                                      487

1757                                      503

*LEEANN N. MUSOLF, RPR*

## Page 690

690

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------x
                                  21-CR-497(WFK)
UNITED STATES OF AMERICA
                                  United States Courthouse
                                  Brooklyn, New York
       -against-
                                  July 11, 2024
                                  9:30 a.m.
DAVID MOTOVICH,

       Defendant.
----------------------------x

       TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
      BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
          UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES

For the Government:      UNITED STATES ATTORNEY'S OFFICE
                         Eastern District of New York
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                         BY: ERIK DAVID PAULSEN, ESQ.
                             ANDREW GRUBIN, ESQ.
                             MATTHEW CHARLES SKURNIK, ESQ.
                             ROBERT T. POLEMENI, ESQ.
                         Assistant United States Attorneys

For the Defendant:       WACHTELL, LIPTON, ROSEN & KATZ
                         51 West 52nd Street
                         New York, New York 10019-6150
                         BY: RANDALL WADE JACKSON, ESQ.
                             JESSICA LAYDEN, ESQ.
                                  - and -
                         MEISTER SEELIG & FEIN LLP
                         125 Park Avenue - 8th Floor
                         New York, New York 10017
                         BY: HENRY E. MAZUREK, ESQ.

Court Reporter:          LEEANN N. MUSOLF, RPR, CCR
                         Phone: 718-613-2489
                         Email: lmusolf.edny@gmail.com
Proceedings recorded by mechanical stenography. Transcript
produced by computer-aided transcription.

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

## Page 691

PROCEEDINGS                                    691

(In open court; jury not present.)

THE COURTROOM DEPUTY: Case number 21-CR-497, United States of America versus David Motovich.

Will the attorneys please state their name for the record, beginning with the Government.

MR. PAULSEN: Good morning, Your Honor.

Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, paralegal Kavya Kannan, and Special Agent Christopher Cabane for the United States.

THE COURT: Good morning, Counsel. You may be seated.

Ladies and gentlemen of the public, you may be seated as well.

MR. JACKSON: Good morning, Your Honor.

Randall Jackson, Jessica Layden, Henry Mazurek on behalf our client David Motovich, and we're joined by Mr. Cepregi.

THE COURT: Good morning. Please be seated as well.

MR. JACKSON: Thank you, Judge.

THE COURT: Thank you very much.

I understand the jury is ready to be brought in. Do we have any procedural issues or timing issues or technical issues we should discuss outside of the presence of the jury and before we bring in the witness for continued examination?

MR. PAULSEN: Yes, Your Honor. One matter.

*LEEANN N. MUSOLF, RPR*

## Page 692

PROCEEDINGS                                    692

THE COURT: Yes.

MR. PAULSEN: As I noted to defense counsel last night, during the direct examination of Ago Kolenovic yesterday, I had described two exhibits, 1002 and 1005 as being in evidence. They were not. They were the documents that the defense had stipulated to the authenticity and the business records' nature of but they reserved the right to object on relevance or prejudice grounds. My understanding is they do not have any objections --

THE COURT: Let's stop right there.

Do you have any objection to the admission of those documents?

MR. JACKSON: No, Your Honor.

THE COURT: All right. So I admit them at this time without opposition and they are being admitted.

(Government Exhibit 1002 and 1005, were received in evidence.)

THE COURT: Any other issues with respect to that those documents?

MR. PAULSEN: No, Your Honor. And my apologies for the error.

THE COURT: I know there's a first time for everything, as I said yesterday, this isn't it.

Okay. Anything else from the Government?

MR. PAULSEN: No, Your Honor.

*LEEANN N. MUSOLF, RPR*

**J.A. 408**

PROCEEDINGS          693

THE COURT: Anything else from defense counsel?

MR. JACKSON: Just very briefly, Judge.

THE COURT: Yes.

MR. JACKSON: Just wanted to say, the security procedures this morning went very well, so we want to --

THE COURT: Knock on wood.

MR. JACKSON: -- we want to say thank you.

THE COURT: Take it day-to-day. My bride of many years, points out that the words travel and travail have a common route and the suspect the word "trial" is ultimately the ultimate common route. So that's good news, but let's not jinx anything, okay? Day-to-day, and if it turns out not to be the case tomorrow, you'll let me know and I will, with my customary understated persona deal with it.

MR. JACKSON: Thank you, Judge.

THE COURT: Okay. Thank you.

All right. Let's get the jury in then and get the witness back on the stand, please.

So you can go to the podium and continue your examination.

(Witness takes the witness stand.)

THE COURT: Good morning. You can remain standing until the jury comes in and then you can sit down. Thank you.

THE COURTROOM DEPUTY: All rise.

THE COURT: Please stand jury for the jury.

*LEEANN N. MUSOLF, RPR*

PROCEEDINGS          694

(Jury enters the courtroom.)

THE COURT: Ladies and gentlemen of the jury, please be seated. Thank you, again, for your promptness. We are going to proceed now. We'll continue with the examination of the witness who is still under oath. You may be seated.

(Witness takes the witness stand.)

THE COURT: Sir, have you spoken with anyone about your testimony since you left that witness stand yesterday?

THE WITNESS: No.

THE COURT: Okay. Thank you. Pull the microphone down to you it's still not a snake, it still won't bite you. Speak into it.

Go ahead, Counsel. Continue with your examination.

MR. PAULSEN: Thank you, Your Honor.

(Witness retakes the witness stand.)

(Continued on next page.)

*LEEANN N. MUSOLF, RPR*

A. KOLENOVIC - DIRECT - MR. PAULSEN     695

**AGO KOLENOVIC,** called as a witness, having been previously first duly sworn/affirmed, was examined and testified further as follows:

DIRECT EXAMINATION (Continued)

BY MR. PAULSEN:

MR. PAULSEN: Ms. Kannan, if I could bring up 431.

Q   Mr. Kolenovic, do you recall when we were talking yesterday, we were discussing some documents that had your company name on the letterhead?

A    .Correct.

MR. PAULSEN: Is it -- Ms. Kannan, if you can zoom in to the top.

Q   Now, you testified yesterday that you have a real letterhead; is that right?

A   Yeah. Correct. I. have a logo but this not my logo.

MR. PAULSEN: Your Honor, if I could show the witness what's been marked for identification as 248, and only the witness.

THE COURT: Any objection to 248 being admitted?

MR. JACKSON: No, Judge.

THE COURT: It's admitted. You may publish it.

(Government Exhibit 248, was received in evidence.)

(Exhibit published.)

MR. PAULSEN: Ms. Kannan, can you zoom into that.

BY MR. PAULSEN:

*LEEANN N. MUSOLF, RPR*

A. KOLENOVIC - DIRECT - MR. PAULSEN     696

Q    Mr. Kolenovic, what is this?

A    That's my logo.

Q    This is what your logo would have looked like back in 2013, 2014?

A    Correct.

Q    Okay. Not like the other document?

A    No.

THE COURT: You have to say "yes" or "no."

THE WITNESS: No.

THE COURT: Okay.

MR. PAULSEN: Can I put those side-by-side.

Q    Mr. Kolenovic, would you have used anything that looked like Government Exhibit 434?

A    Totally -- totally different, you know. As you see on my logo, that's all, like, I have, like the double A.

Q    Okay. The double A, that's for your name and for your son's name?

A    Correct. Yeah.

Q    All right.

MR. PAULSEN: Ms. Kannan, can I jump to Government Exhibit 1026 in evidence.

THE COURT: You may publish.

(Exhibit published.)

Q    Mr. Kolenovic, this email from Gail Motovich to David Motovich, the date is February 2015. Were you working

**J.A. 409**

*LEEANN N. MUSOLF, RPR*

A. KOLENOVIC - DIRECT - MR. PAULSEN          697

with David Motovich at this point?

A    No.  I left, as I mentioned, like, August, like, 15, 2013.

And I have to just add, I forget yesterday to mention, about the Edison.  The -- Kemal, he did call me, like, middle of the August to stop with the work because they don't have the money.  They called him, they told him.  And I did call the Edison Ruilova to stop with the work, to take out all the tools.

Q    Okay.

A    And after -- after two weeks, they called me with that check.

Q    Okay.  Got it.  So it was about two weeks after you said the job was over?

A    Correct.

Q    And that's in August 2013?

A    Correct.

Q    All right.

MR. PAULSEN:  Ms. Kannan, can you show the attachment to this?

Q    Douglas Elliman Realty, Mr. Kolenovic, have you ever done any work for Douglas Elliman Realty?

A    No.  I never did the work with Douglas Elliman.

Q    So this was not something you were involved in?

A    No.  No.

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN          698

MR. PAULSEN:  Ms. Kannan, can you jump to 1027, also in evidence.

Q    Again, this is an email from Gail Motovich to David Motovich.

MR. PAULSEN:  Can you show the attachment, one more down -- or it's the one from Ago & Alaudin.

Q    Do you recognize the name Gotham Yellow, Mr. Kolenovic?

A    I never knew this company, we never worked, no.  As you see, also, my logo it's not, so.  I never work, I never knew them.

Q    All right.  And 1090 Coney Island Avenue, that's not an address you would have used?

A    No, no.  I never live in Brooklyn.

Q    Okay.

MR. PAULSEN:  Ms. Kannan, move to 1028, also in evidence.

Q    Mr. Kolenovic, this is an email from Gail Motovich to Rich Pesce.  Do you know somebody named Rich Pesce?

A    Never meet.  I never knew this person.

Q    Okay.

MR. PAULSEN:  Can you show the attachment, Ms. Kannan.

Q    The -- I believe at the addressee is Merrick Real Estate Group.  Do you know that company?

A    I don't know.

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN          699

Q    Did you provide any work for Merrick Real Estate?

A    Never.

Q    But that is Ago & Alaudin General Contracting Construction Corp., that is your company name?

A    That is my company, correct.

Q    Okay.

MR. PAULSEN:  Ms. Kannan, can you show 1029 and zoom in to the top.

Q    Again, this is the same Rich Pesce; is that right?

A    I never meet the Rich Pesce, no.

Q    Okay.

MR. PAULSEN:  If you could show the attachment.

Q    Now, Mr. Kolenovic, what is the date of this document?

A    Pardon me?

Q    Can you read the date of the document?

A    It's, like, June 9, 2015.

Q    Okay.  Is it fair to say this is several years now after you worked with David Motovich?

A    Almost, like, two -- almost, like, two -- two years.

Q    Okay.  And this --

A    Because we stopped with the work, as I mentioned, like, August 15, 2014.  I never work, I never --

Q    Okay.

MR. PAULSEN:  Ms. Kannan, can I have 1048.  Zoom in to the top.

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN          700

Q    Now, Mr. Kolenovic, this has a name Boris Motovich.  Do you know who Boris Motovich is?

A    I never meet him.  I don't know him.

Q    You don't have any business with Boris Motovich?

A    No, no, no.

Q    What about the company Boyard.  Did you do any work for Boyard?

A    No.

Q    Okay.

MR. PAULSEN:  If you could -- Ms. Kannan, if you could show the several exhibits attached to this.

Q    First off --

MR. PAULSEN:  If you could zoom on the top, Ms. Kannan.

Q    That address, do you recognize the address underneath your company's name?

A    PO Box 255, that's my address in Bethel, New York.

Q    Okay.  So that is correct?

A    That's correct.

Q    The date there, November 23rd, 2015, that's more than two years after you had stopped working with David Motovich --

A    Correct.

Q    -- is that right?

A    Yeah.

MR. PAULSEN:  If you could highlight the name of the

*LEEANN N. MUSOLF, RPR*

**J.A. 410**

A. KOLENOVIC - DIRECT - MR. PAULSEN        701

company.

Q    The full name is Boyard Management Group.

A    I never knew, I never work, and I don't know them.

Q    Okay.

MR. PAULSEN:  Now, Ms. Kannan, if you could just show the work that is reflected in these.

Q    The first is $23,000 of various construction work.  You didn't do this work?

A    No, I did not.  As I mentioned, I don't know this company.  This is new for me.

Q    Okay.  And at the bottom, the signature line, is that how you spell your son's name?

A    No.  My son is the Alaudin Kolenovic.

MR. PAULSEN:  Ms. Kannan, if you can just briefly skip through the other attachments.

Q    This is a project at 4907 First Avenue.  Did you ever work there?

A    Never work.  Never work.

MR. PAULSEN:  Ms. Kannan, if you can show the next one.

Q    Four nine-hundred First Avenue.  Did you do that project?

A    Never.

Q    Five one -- 5301 First Avenue.  Did you provide any work there?

A    No, at all.

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN        702

Q    Did you charge $87,000 for work there?

A    Never, I did not.

Q    Okay.

A    I did not work at all -- all this new for me, you know.

Q    Okay.

MR. PAULSEN:  Ms. Kannan, just the last two.

Q    1090 and 1100 Coney Island Avenue.  Do you know those addresses?

A    I don't know.

Q    Okay.  Needless to say, you didn't provide $92,000 of work at those?

A    Nothing.  Nothing.  As mentioned, I never worked, I never --

Q    And then the last one.

A    This is new for me.

Q    And, finally, 1122 Coney Island Avenue.  Are you familiar with that address?

A    No.  I do -- I do not.  As I mentioned, I never work, you know, majority of my work was Manhattan, Queens, and also the Upstate, but I never work.

Q    Okay.  I have one final one to show you.

MR. PAULSEN:  1052, Ms. Kannan, also in evidence.

Q    Mr. Kolenovic, this is now in 2016.  Is that fair to say that's well more than two years after you stopped working with David Motovich?

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN        703

A    Yeah.  Correct.

Q    Do you know Felicia at Metro Steel?

A    No.

Q    Do you know what Metro Steel is?

A    Like -- I -- I don't know it, no.

Q    Okay.

A    It could be the steel.  Usually, all the time, I was using 786 iron steel company.

Q    So you had a steel company, just not this steel company?

A    No, no, it's not our own steel.  You know, the sub.  Only with the sub, I did use it.  But my project is 786 Ironwork.

Q    All right.

MR. PAULSEN:  Ms. Kannan, can you just show --

A    Never knew this company.

Q    Finally, the company here is Metro Erector Incorporated.  Are you familiar with that company?

A    No.

Q    Okay.  Did you provide work at --

A    No.

Q    -- 147 Street, Bronx?

A    No.

MR. PAULSEN:  Now, I'd like to go back to 1005, which is already in evidence, Your Honor.  The attachment, please.

Q    Now, Mr. Kolenovic, do you recall yesterday that we

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN        704

talked about the insurance certificates that you had to provide for every job you did?

A    Yes, correct, that's the general liability.  Before you start it, you have to give it, like, the owner of the building to be, you know, like a certificate holder.  And, also, additional insured if it's any -- anybody or maybe manager or maybe other owner.  It depend if it's a corp, you have to put it to the building owner as the certificate holder, additional insured, also the tenants of apartment you're doing the work.

Q    And this is required if you're gonna be a general contractor?

A    Correct.  As a client, without that, you cannot pull out any permit on anything.  No.

Q    Mr. Kolenovic, this is the real insurance certificate that your general -- your assistant, Matija Kurek had sent David Motovich; is that right?

A    Correct.  Correct.

MR. PAULSEN:  Ms. Kannan, if you can just zoom in on the top.

Q    Just if you could refresh the jury's recollection, who is -- what is the Vukel Group Insurance Agency?

A    Vukel Group are any brokerage.  I broker insurance from them, you know.

Q    Okay.  And that was the -- you had identified the photo of the woman, Marsiha Vukel; is that right?

*LEEANN N. MUSOLF, RPR*

**J.A. 411**

A. KOLENOVIC - DIRECT - MR. PAULSEN     705

A    Correct, yeah.  That's the one when she was dealing with the --

Q    Okay.

A    Any time we need the insurance certificate, the project manager, Matija Kurek, would send her out an email, but she called me, any time, we need to confirm it's -- it's okay to release certificate of the insurance.

Q    Okay.

MR. PAULSEN:  Your Honor, at this point, I would like to show the witness, it's nine documents, all of which are -- have been subject to one of the earlier certifications about their authenticity but are not yet in evidence.

THE COURT:  Why don't you state the document names and numbers and we'll see if there's any objection from defense counsel to any of them.  If there is no objection, you'll be able to publish them to the jury.  If there is an objection, I'll rule on the objection.

MR. PAULSEN:  Okay, Your Honor.  And just to be clear, these are all from the Yahoo account.

THE COURT:  Go ahead.

MR. PAULSEN:  Government Exhibit 1006, 1014, 1015, 1032, 1033, 1036, 1037, 1038 and 1051.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

---

A. KOLENOVIC - DIRECT - MR. PAULSEN     706

(Government Exhibit 1006, 1014, 1015, 1032, 1033, 1036, 1037, 1038 and 1051, were received in evidence.)

(Exhibits published.)

MR. PAULSEN:  Thank you, Your Honor.  If I could first show the witness 1006.

BY MR. PAULSEN:

Q    Now, first off, the subject of this email, Mr. Kolenovic, is Reliable Electric.  Do you know that company?

A    No.

MR. PAULSEN:  Ms. Kannan, if you could just highlight -- if you could go down to the bottom first.

Q    There's an individual named Mikhail Leybman who is writing davemidwood@gmail.  Do you know Mikhail Leybman?

A    No.

Q    The date, June 10th, 2013.  Is it fair to say that was when you were engaged in a project with Mr. Motovich?

A    Correct.  As I mentioned yesterday, we started, like, in March and end to the August.  That's -- those six -- five- to six-month period I was work with them.

Q    Okay.  And, so, that project's still going on at this point?

A    Correct.

Q    The message says:

Dear David.  Please arrange an insurance certificate for Reliable Electrical Contractors Corp. in 41 Clinton

---

A. KOLENOVIC - DIRECT - MR. PAULSEN     707

Avenue, Brooklyn, New York.

Are you familiar with that address?

A    No.

Q    Okay.

MR. PAULSEN:  If you could skip up, Ms. Kannan.

Q    The email from davemidwood@gmail:

Make a cert from Ago & Alaudin.

Did you empower Mr. Motovich to issue any insurance certificates in your name around that time?

A    No.

MR. PAULSEN:  Ms. Kannan, can you go to Government Exhibit 1014.

Q    Is this is an email from David Motovich to mkuyan.  The date, Mr. Kolenovic, is March 2014.  Were you working with David Motovich at this point?

A    No.

Q    Okay.

MR. PAULSEN:  You could show the attachment, Ms. Kannan, and zoom in on the top.

Q    Mr. Kolenovic, have I shown you this document before?

A    I think so, yes.

Q    Is this a real document?

THE COURT:  Well, it's a real document, but...

Q    Is this an authentic record of insurance from your company?

---

A. KOLENOVIC - DIRECT - MR. PAULSEN     708

A    That's the certificate of insurance from the Vukel Group that issue, you know, when we need it.

Q    All right.

THE COURT:  I think the word you are looking for is legitimate.

Is it a legitimate document --

THE WITNESS:  Correct, yeah.

THE COURT:  Is it?

MR. PAULSEN:  I'll rephrase, Your Honor.

THE COURT:  Okay.

MR. PAULSEN:  But I agree that your word was correct.

THE COURT:  Go ahead.

BY MR. PAULSEN:

Q    Well, I guess, first, Mr. Kolenovic, zooming in on the top, is that your company name?

A    Yes, it is.

Q    Is that your insurance broker?

A    Yes, it is.

Q    Okay.

MR. PAULSEN:  If I could zoom down to the bottom, Ms. Kannan.

Q    UEG New York Incorporated.  Is that a business you have ever done work for?

A    No, never.

**J.A. 412**

A. KOLENOVIC - DIRECT - MR. PAULSEN    709

Q    Did you ask the Vukel Group to issue this insurance certificate to UEG New York?

A    No.

Q    Why not?

A    I don't do the work.  If you don't do the work, you know, I never knew the -- the person.  I never knew -- this is the first -- first time I've seen it, this, you know.  It's like in my dream, if I'm dreaming -- coming up.  It's unbelievable, you know.

Q    If I could show you, Mr. Kolenovic, these -- the workmen's comp section on this form.  Mr. Kolenovic, is it fair to say that your real certificate did not have anything filled in workmen's comp?

A    Correct.

Q    Why is that?

A    Because it's a different broker in Monticello, Harris Monti, that's the -- my broker.  And, also, that time, 2013 was the Area Insurance.  So, basically, I was having two different broker, you know -- for the liability, it's the Vukel Group, for the working compensation, it's the Harris Monti in Monticello.

Q    Okay.  So you would never have a form with both at the same time --

A    Never.  Never.

Q    Okay.  So to borrow the Court's term, is this a

*LEEANN N. MUSOLF, RPR*

A. KOLENOVIC - DIRECT - MR. PAULSEN    710

legitimate insurance certificate from your company?

A    What -- that's a general liability -- no.  We never make them like this, never, never, never, like -- because, always, like separate, separate is general liability, separate is certificate, also, for the working comp.

Q    Okay.  So you never asked the Vukel Group to send this out?

A    No.  No.

Q    Okay.

A    They never send it.  Even, like, all the time, as I mentioned, she always call to confirm for my authorization, but never -- she did not issue this insurance.

Q    Okay.

    MR. PAULSEN:  Ms. Kannan, if I can show 1015, also in evidence.

Q    Mr. Kolenovic, do you know the email address romausa7?

A    No.

    MR. PAULSEN:  If I could show the attachment.

Q    Is it fair to say, Mr. Kolenovic, this is also the Vukel Group and your company name?

A    Correct.

    MR. PAULSEN:  Can you scan to the bottom, Ms. Kannan.

Q    Are you familiar with a company Unique Painting service?

A    No.

*LEEANN N. MUSOLF, RPR*

A. KOLENOVIC - DIRECT - MR. PAULSEN    711

Q    Have you ever done any work for Unique Painting Services?

A    No.

Q    I would like to scan in on the signature.  That would have been Mersiha Vukel's signature; is that right?

A    I don't think so.

Q    You don't think that's her signature?

A    No.

Q    Okay.  Do you know whether it's her signature?

A    I know she also wrote the first certificate that they had on the line.

Q    You suspect that's not her signature?

A    Correct.

    MR. PAULSEN:  Ms. Kannan, if you could show 1032.  Zoom in on the top.

Q    This is an email from David Motovich to mkuyan.  Do you know the company New Empire Builder Corp.?

A    No.

Q    This date, Mr. Kolenovic, this is August 2015; is that fair?

A    Yeah, that's eight -- August 12, 2015.

Q    Is that, approximately, two years after you stopped working for David Motovich?

A    Correct.

    MR. PAULSEN:  Ms. Kannan, can you show the attachment.

*LEEANN N. MUSOLF, RPR*

A. KOLENOVIC - DIRECT - MR. PAULSEN    712

Q    Is that your company name, Mr. Kolenovic?

A    It is, in the top line, and also the broker, Vukel.

Q    Okay.

    MR. PAULSEN:  Can you scan to the bottom, Ms. Kannan.

Q    Did you ever do any work for New Empire Builder Corp.?

A    No.  Never.

Q    Okay.  Is that address familiar to you at all?

A    No.

    MR. PAULSEN:  You could show you Government Exhibit 1033, also in evidence.

Q    This is an email from David Motovich to mkuyan.  Are you familiar with the company E&E Tool Manufacturing?

A    No.

    MR. PAULSEN:  Ms. Kannan, can you show the attachment.  Zoom in on the top.

Q    Mr. Kolenovic, is that your company name?

A    It is, yes.  Ago & Alaudin.

Q    Is that your insurance broker?

A    Yes, it is.

Q    Okay.

    MR. PAULSEN:  Scan to the bottom, Ms. Kannan.

Q    Did you ever do work for E&E Tool Manufacturing Co.?

A    No.

Q    Is the address 100 International Way in Winsted,

*LEEANN N. MUSOLF, RPR*

**J.A. 413**

A. KOLENOVIC - DIRECT - MR. PAULSEN    713

Connecticut, is that, at all, familiar to you?

A    No.

MR. PAULSEN:  Ms. Kannan, can you jump to 1036.

Q    This is an email from David Motovich to mkuyan.  Atlantic Equipment.  Do you know that company?

A    No.

MR. PAULSEN:  Ms. Kannan, can you jump to the second page, zoom in at the top.

Q    Is that your company, Mr. Kolenovic?

A    Yes, it is.

Q    Is that your insurance broker?

A    Yes, it is.

Q    Does this document, like the others, combine two types of insurance that you would never combine on a form?

A    Correct.

MR. PAULSEN:  Can you zoom in on the bottom, Ms. Kannan.

Q    Atlantic Equipment in Wallingford, Connecticut.  Have you ever done work for them?

A    No.

Q    Do you know whether that's Marcy Vukel's signature?

A    Yeah.  As you see, it's totally fake, fake signature, as you see it.  That's not her signature.

Q    It doesn't look like her signature to you, does it?

A    No.

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN    714

MR. PAULSEN:  If I could show 1038.  Zoom in on the top.

Q    It's an email from midwoodmill to mkuyan for Quest Partners.  Do you know that company, Quest Partners?

A    No.

Q    The date is September 2015; is that right, Mr. Kolenovic?

A    Correct, yeah.

Q    That's about more than two years after you stopped working with David Motovich?

A    Correct.

MR. PAULSEN:  Ms. Kannan, can you zoom in the attachment.

Q    That's your company?

A    Yes, it is.

Q    That's the address of your company?

A    Yeah.  Correct.  Yeah.

Q    That's your insurance broker, the Vukels?

A    Yes, it is.

MR. PAULSEN:  And if you can skip to the bottom.

Q    Do you recognize the name Quest Partners in North -- North Plains Industrial Road in Wallingford, Connecticut?

A    No.

Q    Did you do any work for that company?

A    No.

Q    Do you know whether that signature is legitimate?

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN    715

A    As you see it, is -- it's not the have signature.

Q    Okay.

MR. PAULSEN:  And just one more, Ms. Kannan, 1051.

Q    So, Mr. Kolenovic, this is now in 2016; is that right?

A    Correct.

Q    So well more than two years after you stopped working for David --

A    Almost two and a half, yeah.

MR. PAULSEN:  You can show the attachment, Ms. Kannan, and just zoom in on the top.

Q    Is that your company name, Mr. Kolenovic?

A    Yes, it is.

Q    That's the right address?

A    Yes, it is.

Q    And that's your insurance broker?

A    Yes, it is.

MR. PAULSEN:  You can scan to the bottom, Ms. Kannan.

Q    Do you know the company Unique Painting Services?

A    No.

Q    Did you do any work for that company?

A    No.

Q    Does that signature look legitimate to you?

A    No.

Q    Now, Mr. Kolenovic --

**J.A. 414**

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - DIRECT - MR. PAULSEN    716

MR. PAULSEN:  You can take the document now.  Thank you, Ms. Kannan.

Q    The Government has showed -- showed you these documents at an earlier time; is that right?

A    Correct.

Q    Okay.  Was there another occasion, though, where you learned that someone might have been using your certificates improperly?

A    Yes, I did receive, I believe in 2015, like, a lawsuits for the -- my company.  When I did receive it -- that lawsuit, I did call, also, the attorney that send it out and I told them I never work, we never have any -- any work done in the location.

Q    Okay --

A    He said.  He told me, like, I cannot talk with you because -- because it's a corporation.  You have to hire the attorney or maybe send it out to your insurance.

Q    Okay.

MR. PAULSEN:  Your Honor, if I can show the witness for identification 152, not in evidence.

THE COURT:  Any objection to the document coming in evidence?

MR. JACKSON:  Objection, Your Honor.

THE COURT:  We're going to have sidebar on this one.

(Continued on the next page.)

*LEEANN N. MUSOLF, RPR*

SIDEBAR CONFERENCE                    717

(Sidebar conference.)

(The following occurred at sidebar.)

THE COURT:  What is the basis of the objection, Mr. Jackson?

MR. JACKSON:  Your Honor, the connection is completely speculative.  This is a lawsuit that somebody filed and there is -- this witness has no information connecting to it to my client.  It's -- it's very prejudicial in an unfair way because it's just complete speculation about some lawsuit that he dealt with and we haven't been given any additional information about this besides this document.

THE COURT:  All right.

Let me ask the Government:  What is this document about?

MR. PAULSEN:  Mr. Kolenovic's insurance was attached to a project that he didn't work.  He got sued and had to hire a lawyer to defend himself which he was removed from when it was clear that his insurance certificate had been passed around improperly.

We -- Mr. Jackson is right, we -- the actual company here is not one of the ones that we've seen an email for, but it appears that we have no other reason to believe that anyone other than David Motovich was using Mr. Kolenovic's insurance certificates out in the world.

THE COURT:  So the witness can testify that he had

*LEEANN N. MUSOLF, RPR*

SIDEBAR CONFERENCE                    718

to hire a lawyer to appear in this lawsuit --

MR. PAULSEN:  Yes.

THE COURT:  -- and what was the outcome of the lawsuit from him, his point of view.

MR. PAULSEN:  He got -- he was dismissed from it.

THE COURT:  The Court dismissed him from the lawsuit?

MR. PAULSEN:  Either the Court did or the party that was suing him realized they had gotten the wrong guy --

THE COURT:  Mr. Jackson, what's your response to that?

MR. JACKSON:  Your Honor, Mr. Paulsen is still speculating.  I mean, the statement that there's no -- they don't have any other information, that anyone than Mr. Motovich was using fake certificates goes to show much this is speculation.

The fact of the matter is there were -- even in the evidence in this case, will come out there were fake certificates passed through a number of different people and it's not clear what -- where any of those ended up.  It's not clear whether there was anyone else who ever used anything, and the factual -- reason for that Mr. Paulsen gets to that background that gets to the lawsuit.  There's just gonna be speculation about there was some lawsuit and now the jury is gonna be wondering what is the connection between the lawsuit

*LEEANN N. MUSOLF, RPR*

SIDEBAR CONFERENCE                    719

and Mr. Motovich we have no way of addressing.  It's disconnected from us.

THE COURT:  I'm sustaining the objection.  The document does not come in.

(End of sidebar conference.)

(Continued on the next page.)

*LEEANN N. MUSOLF, RPR*

A. KOLENOVIC - CROSS - MR. JACKSON      720

(In open court; jury present.)

THE COURT:  The objection is sustained.  The document is not admitted.

Please continue your examination.

BY MR. PAULSEN:

Q    Mr. Kolenovic, just a couple of final questions.  You did, at some point, learned you were sued because your insurance certificates were being used at projects you didn't know about?

A    Correct.

Q    And you had to hire a lawyer to defend yourself?

MR. JACKSON:  Objection.

THE COURT:  Overruled.

MR. PAULSEN:  No further questions, Your Honor.

THE COURT:  All right.

Your witness.

MR. JACKSON:  Thank you, Judge.

Cross.

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good morning, sir.  How are you?

A    Good morning.  Fine.  Thank you.

Q    Now, Mr. Kolenovic, have you ever testified before in a courtroom?

A    It's the first time and I hope it's the last time.

**J.A. 415**

*LEEANN N. MUSOLF, RPR*

A. KOLENOVIC - CROSS - MR. JACKSON          721

Q   Okay.  I'm gonna try to -- I hope that for you also -- I'm gonna try to be as clear as I can but I will ask you, if there's anything that I say that you don't understand, please let me know if you don't understand it, and I will try to rephrase it; is that okay?

A   Okay.

Q   I also, for, probably most of my questions, I'll let you know, I'm gonna try to ask them in a yes or no format.  And if I ask you a question like that and you don't understand it or you don't think it's possible or you shouldn't answer yes or no, can you just let me know that?

A   Okay.

Q   Now --

        MR. JACKSON:  And, ladies and gentlemen, can you hear me okay on this?  Thank you.

Q   Now, I just want to make sure I understand clearly the background leading you to the witness stand here, Mr. Kolenovic.  I'm correct -- the prosecutor, when he mentioned that he showed you some of the documents before, you've met with the prosecutors a few times in the past, right?

A   Correct.

Q   About how many times have you met with them?

A   Maybe one or two times.

Q   And during those meetings, you were going over some of

---

A. KOLENOVIC - CROSS - MR. JACKSON          722

the documents they were gonna show you?

A   Yes.

Q   You were going over some of the questions they were gonna ask you?

A   Not the question.  I was shocked when they -- show me those -- those paper.

Q   You didn't go over any of the questions during the times that you met with the Government?

A   I was asked the question, you know, why he was using somebody my company.  I was shocked, you know.

Q   I understand that but my question is, when you met with the Government, you went through some questions, correct, that came up today, right?

A   Correct.  Yeah.

Q   Okay.  Now, when you met with the Government, you brought your lawyer with you, correct?

A   Correct -- no.  No attorney.

Q   No attorney at any point?

A   No attorney.  I was by myself.

Q   Okay.  And did the Government ever explain to you what the charges were in this case?

A   They did not explain the charge, only to verify if the -- my company did that work or not, you know.

Q   Okay --

A   Because the verification and all that.

---

A. KOLENOVIC - CROSS - MR. JACKSON          723

Q   Let me just ask you this:  You were asked about a number of events that took place as far as back as 12 years ago, right?

A   Correct.

Q   One of the things that you told the prosecutors and the agents is that you don't have a perfect memory of everything that happened 12 years ago, correct?

A   Yes.

Q   And, in fact, a lot of things that happened are a little bit fuzzy for you at this point, 12 years later, correct?

A   Correct.

Q   But what you do remember clearly is you knew David Motovich a little bit before any of this stuff -- any of this interaction around the businesses ever happened, right?

A   I just meet him in March of 2013.  They came out, he set up the meeting because they did have the job in Monticello.  So that's the time when I meet him.  I meet him only, like, two times and that's about it.

Q   Am I correct that prior to that meeting, you were a customer of Midwood Lumber?

A   Correct.  I was there before but I never knew the David, I never knew.

Q   Okay.  When you spoke to the agents, you told them that you had met David a few times before as a customer but you got to know him later, right?

---

A. KOLENOVIC - CROSS - MR. JACKSON          724

A   No, no, I did not -- I did not meet with David before I meet him only when the -- what's his name, Kemal, he set up a meeting to go over for the proposal.  But I did meet the counter people was sending the stuff and I was buying the supply.

Q   Okay.  So, Mr. Kolenovic, you don't -- you don't ever recall ever telling the agents that you met David Motovich when you were a customer of Midwood before these events?  You don't remember ever saying that?

A   I did -- I did buy sometimes, no.

Q   You bought, sometimes, from Midwood Lumber, right?

A   Correct.  Yeah.

Q   And you would sometimes see David Motovich there, right?

A   No, I never see him.

Q   Okay.

A   Never see him.

Q   Did you meet any of the Motovich family when you were buying supplies from Midwood?

A   No, only the counter.

Q   What kinds of things were you buying from Midwood Lumber at that time?

A   Like the -- the moldings, you know, some moldings or maybe other lumber if they have it, you know.

Q   In fact, they have a big molding show room in there, right?

**J.A. 416**

A. KOLENOVIC - CROSS - MR. JACKSON     725

A    Yeah.  Correct.

Q    Would you go in and you would take a look at all the moldings that were available, right?

A    Yeah, sometime.

Q    And you sometimes purchase actual moldings from Midwood Lumber that you would use on some of your projects, correct?

A    We did buy but not that much, you know.  Be buy, like, very limited.

Q    Now, the project that the prosecutor was talking to you about, this project Upstate New York, that's a project that David Motovich got you into, correct?

A    The project in Monticello, Kemal he called me and told me we have, like, one job in Monticello to do the work.  I cannot do it.  Can you do it.  So I said okay.  He -- we set up the -- to meet to check out the job in Monticello.  I looked at it.  I called him back.  He told me I'm gonna set up the meeting to meet -- meet the owners and --

Q    Okay.

A    -- I say okay.

Q    Right.  You learned about this from Kemal Sarkinovic, right?

A    He called me, yeah, he called me about that job, correct.

Q    And Kemal was somebody that you knew relatively well because you're from the same place, right?

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - CROSS - MR. JACKSON     726

A    He's from the same place but I never meet him back home.  I meet him here, like, you know, a couple of times.

Q    Right.  And you understood that Kemal told David that you were a person that could be trusted with this project because he knew you well, you went to the same mosque and you were friends, correct?

A    Yes.

Q    Okay.  And you understood that it was David Motovich hiring you to do the work on this project, correct?

A    No, there was -- I believe, like, a different name, but he's the one who refer.  He told me, I really, you know, like how to get this job but you have to buy the materials from me, all the doors, moldings, and also the closet shelfs.

Q    Right.  Let's take this one piece at the time.  You entered into an actual contract to do work on this project;

A    No.

Q    -- yes or no?

A    After -- after --

Q    No, I'm sorry, sir.  Yes or no; you entered into a contract to do work on that project?

A    Correct.

Q    Okay.  And the signatories on that contract included David Motovich, correct?

A    Pardon me?

Q    Was Mr. Motovich one of the signatories on that contract?

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - CROSS - MR. JACKSON     727

Yes?

A    I don't -- I don't know.

Q    You don't know at this point?

A    I don't know.

Q    Okay --

A    Because there's --

Q    No, no, sir.

THE COURT:  Just answer the question.  Do you know whether Mr. Motovich was a signatory to the contract.  The answer is you don't know, correct?

THE WITNESS:  Correct.

THE COURT:  Next question.

MR. JACKSON:  Thank you, Judge.

BY MR. JACKSON:

Q    Now, when you purchased your supplies from Midwood Lumber, you would sometimes purchase them in cash, correct?

A    Not -- not that -- not that much.  Not that many.

Q    Not that much but --

A    But I used the credit cards and, also, the checks.

Q    Okay.  Let me just repeat my questions.  You would sometimes purchase in cash?

A    Not -- not through the cash, no.

Q    You never purchase in cash or you sometimes purchase in cash?

**J.A. 417**

*LEEANN N. MUSOLF, RPR*

---

A. KOLENOVIC - CROSS - MR. JACKSON     728

A    Not -- he has the checks and also --

THE COURT:  Sir, he's asking you if -- hang on.  It's cross-examination, you have got to answer his questions.  Once in a while, maybe one time, maybe a thousand times, but did there ever come an occasion when you purchased for cash, even if it was just one time, even if it was just a penny; yes or no?

THE WITNESS:  I don't remember.

THE COURT:  You don't remember.

Next question.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

(Continued on the following page.)

*LEEANN N. MUSOLF, RPR*

Kolenovic - Cross - Jackson        729

BY MR. JACKSON (Continuing):

Q   Now, on this project that David got you into, do you know who the main developer was for the project?

A   I never meet him.  There was Matija Kurek who's the one who did all the e-mail, all the -- you know, like, proposal and, like, I sign it, see e-mail, but I never knew the owner.

Q   Let's take this in pieces.  You mentioned this guy Matija.

Matija is a guy who worked for you as a project manager, correct?

Yes or no?

A   Yes.

Q   What you're saying is Matija, the project manager, sometimes had interactions related to the developer, correct?

That's a yes or no.

A   It did with David.

Q   With David?

A   All the e-mail and everything, everything through his office.

Q   Okay.  And, so, Matija, your project manager, would have conversations with David that you were not a part of, correct?

A   Correct, because I'm --

Q   Sir, correct is fine.

Now, one of the things that happened when you agreed to do this is you entered into a contract for $300,000,

Kolenovic - Cross - Jackson        730

correct?

A   I don't remember how much was exactly, like, I forget.

Q   You remember that it was approximately a $300,000 contract, correct?

A   I don't remember, no.

Q   Sir, you previously met with the federal agents and you told them the contract was for approximately $300,000, correct?

MS. LAYDEN:  Objection, your Honor.

THE COURT:  Overruled.

A   I don't remember, no.

Q   The question I'm asking you is when you met with the federal agents, you told them this was a contract for approximately $300,000, correct?

A   That's correct, with the material and --

Q   Sir, if it's correct, that's fine.  I'll ask my next question.

A   Fine.

Q   Now, one of the things that you also told us a moment ago is that in connection with your agreement to get referred on this project by David, you agreed with him you were going to buy all of the supplies from Midwood Lumber, yes or no?

A   Yes.

Q   And, in fact, all of the supplies on this project did come from Midwood Lumber, yes or no?

Kolenovic - Cross - Jackson        731

A   Yes.

Q   And Mr. Kolenovic, you didn't pay for those supplies upfront, correct?

Yes?

A   When --

Q   Sir, sir, I'm just asking you yes or no, you did not pay for those supplies upfront?

A   I did not prepay, no.

Q   Okay.  Mr. Motovich, David Motovich, fronted you the supplies for the job, correct?

Yes or no?

A   After the --

Q   Correct?

A   After dividing the money, we paid the money.

Q   Sir, let me back up because it's important that we understand this.

You did not pay for the supplies upfront, correct?

A   But you did not --

Q   Sir --

A   Excuse me, when you receive the material you pay --

Q   Sir, if I'm incorrect --

THE COURT:  Excuse me.  He's cross-examining you. He's asking a simple question:  Did you pay for the supplies upfront?

THE WITNESS:  Upfront, no.

Kolenovic - Cross - Jackson        732

THE COURT:  That's the answer to the question.

Then he asks his next question, then the Government lawyers will get a chance to redirect.

But on cross, if he says to you, "Is the sky blue?" you answer "yes" or "no" or "I don't know because it was nighttime," okay?  But answer his question.

THE WITNESS:  Okay, okay.

THE COURT:  Then on redirect, the lawyers for the Government will ask you questions and they'll say "explain" and then you explain.

THE WITNESS:  Oh, okay.

THE COURT:  But on cross, if he says, "Is the sky blue?" you say yes or no.  That's how it works, okay.

THE WITNESS:  I'm sorry.

THE COURT:  I understand.  But like you said, you haven't testified before.  You don't want to have to do it again.

I've been doing this 50 years.  I try.  This is how we do it.

Go ahead, Mr. Jackson.

MR. JACKSON:  Thank you, Judge.

Q   Now, there was an exhibit that you went over with the Government during your direct examination where you were talking about this account that was used for this project, correct?

**J.A. 418**

Kolenovic - Cross - Jackson                733

A    Correct.

MR. JACKSON:  Can we call up Government Exhibit 1002?

THE COURT:  You may publish.  It's in evidence.

(Exhibit published to the jury.)

MR. JACKSON:  If we could zoom in, Mr. Cepregi, on the top part there.

Q    This is the exhibit that you went over with the prosecutor, right?

A    Yes.

Q    And you went over that in prep with him, when you were getting your testimony together, and you went over it in court, correct?

A    Correct.

Q    And what we see here is there's an e-mail from somebody named Jumi X. Kim, right?

A    Yes.

Q    And that is your banker at Chase, correct?

A    This is the branch manager.

Q    Right.  You have a relationship with this person Jumi Kim, right?

A    She's branch manager, yes.

Q    Yes.

And you see that Jumi Kim is e-mailing Marina Kuyan, right?

Kolenovic - Cross - Jackson                734

Do you see mkuyan1031?

A    Yes, I see it.

Q    You have no idea who that is, right?

A    No, no.

Q    Do you even remember, as you sit here today, whether you ever met Marina Kuyan?

A    No.

Q    It's possible you did, possible you didn't, you just don't remember.

A    I don't remember, no.

Q    Then we see an e-mail cc'ing kurekmatija@gmail.com correct?

A    Correct.

Q    And this is the gentleman you were talking about earlier, your project manager, right?

A    Correct.

Q    Then there's an e-mail to you, agokolenovic@hotmail.com.

A    Correct.

Q    And the reason that this is being sent, which says "wiring instructions," is because you asked Jumi Kim to send Mr. Motovich's employee Marina Kuyan an e-mail with wiring instructions for the account, correct?

A    Correct.

Q    And the reason that you asked that is because David Motovich was supplying all of the money that was going into

Kolenovic - Cross - Jackson                735

the account, correct?

A    Correct.

Q    And in fact, he did put all of the money into the account, correct?

A    Somebody was transferring but I don't know from where they come.  Like, the owner which we signed the contract, that's the money coming from him.

Q    I just want to unpack that.

You have no idea where the money came from, you just know it didn't come from you, right?

A    Correct.

Q    And you know that you asked David to fund the account and you e-mailed -- you had your banker e-mail his employee, and then all the money came into the account, correct?

A    When we --

Q    I'm asking -- if I'm incorrect, please tell me no, but I'm correct about that, right?

A    Right, right.

MR. JACKSON:  We can take that down for a second.

Q    At the point that this e-mail was sent, you had the checkbook for the account, right?

A    Yes.

Q    And that was because David essentially entrusted you with this project and what your responsibilities were on it, right?

A    Yes.

**J.A. 419**

Kolenovic - Cross - Jackson                736

Q    And your job was to put doors on an entire project throughout this development in -- this development in upstate New York, correct?

A    Correct.

Q    Now, one of the things that you have told the agents -- let me back up.

One of the things that you have said previously is that you didn't complete the job, right?

A    They told me --

Q    Sir, this is a yes or no.

A    No, no.

Q    Right.  And it is a fact that you did not complete the job that you entered this $300,000 contract on, correct?

A    It wasn't $300,000, but they did not pay the whole thing.

Q    Sir, you said you did not complete the whole thing.

A    No.  They stopped the job.

Q    We'll get to that.  I promise you, we'll get to that.

A    Okay.

Q    You did not complete the job.

A    Correct.

Q    You got $250,000, yes or no?

A    I don't remember.

Q    Okay.  You previously told the federal agents that you got paid $250,000 by David Motovich, correct?

A    Not by him.

Kolenovic - Cross - Jackson 737

As I mentioned, somebody was wiring the money and also I give the checks to David Motovich send --

Q   Sir, I'm sorry, you cannot give a narrative answer.

THE COURT:  Why don't we read the question back, please?

Reporter, please read it back.  Keep your voice up, ma'am.

(Record read back as follows:

Question, Okay.  You previously told the federal agents that you got paid $250,000 by David Motovich, correct?)

THE WITNESS:  Correct.

THE COURT:  Next question.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

Q   And one of the another things you told the agents is that you stopped working on the job when it was almost done, right?

A   They told me --

THE COURT:  Is that what you told the agents, sir?

THE WITNESS:  Correct.  They told me --

THE COURT:  Is that what you told the agents?

THE WITNESS:  Yes.

THE COURT:  Next question.

Answer his question.  I assure you when the Government lawyers get up, they'll ask you to explain, and you explain.  But not now.

*Linda A. Marino, Official Court Reporter*

---

Kolenovic - Cross - Jackson 738

Just answer his question because the jury wants to get on with their life, so let's move it along.

Q   Sir, that statement that the job was almost done, that was a lie that you told to the federal agents, correct?

Yes or no?

A   I didn't understand the question right.

THE COURT:  Was it a lie when you told the federal agents, according to counsel, that the job was almost done?

Were you telling the truth or did you lie?

THE WITNESS:  I said the truth.

THE COURT:  You said the truth.

Next question.

Q   You also told the agents that you completed one or two floors of the building, correct?

A   Left.  One or two floors was left, not finished, with the doors.

Q   Sir, it's your testimony you did not tell the agents that you completed one or two floors, yes or no?

THE COURT:  That's a convoluted question, Mr. Jackson.

MR. JACKSON:  Let me rephrase, Judge.

THE COURT:  Rephrase and make it clear.

MR. JACKSON:  Let me rephrase.

Q   Sir, yes or no, did you make this statement to the agents:  I completed one or two floors.

*Linda A. Marino, Official Court Reporter*

---

Kolenovic - Cross - Jackson 739

Yes or no?

A   Yes, did complete them.

THE COURT:  That's the answer.  You told him that.

Next question.

Q   Now, in fact, sir, the building that we're talking about, I want to?

MR. JACKSON:  Actually, your Honor, may I show just the witness a document that we have marked as DX 1013?

May I show just the witness that?

THE COURT:  Show it to your adversary and the witness.

Any objection to DX1013 being admitted, Government?

MR. PAULSEN:  Your Honor, he just --

THE COURT:  Any objection to DX1013 being admitted?

MR. PAULSEN:  Yes.

THE COURT:  You have an objection?

MS. LAYDEN:  Yes, your Honor.

THE COURT:  Hate to do it.  Sidebar, let's go.

(Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

---

Sidebar 740

(The following occurred at sidebar.)

THE COURT:  What is this document?

MR. JACKSON:  Your Honor, this is a picture of the building that he was working on.

THE COURT:  What is the objection?

MS. LAYDEN:  Your Honor, that may be true.  I have no idea, I just figured he should lay --

THE COURT:  Wait a minute.

MR. PAULSEN:  If you're asking --

THE COURT:  Take a chill pill.

Counsel has now told you this is the building he was working on and you said you have an objection.

Is the objection that a foundation has not yet been laid for what this is?

MR. PAULSEN:  That's right.

THE COURT:  Okay.  I'll let him have a foundation laid.

I'm trying to move this along because some of the jurors have been, shall we say, a little antsy.  But I'll reserve the ruling, let him go ahead and lay the foundation.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

(Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

**J.A. 420**

Kolenovic - Cross - Jackson                741

(Sidebar ends; in open court.)

THE COURT:  Go ahead, Mr. Jackson.

MR. JACKSON:  Thank you, Judge.

Now, can we show this just to the witness DX1013?

THE COURT:  You have it, sir?

THE WITNESS:  Yeah, I have it.

BY MR. JACKSON:

Q   You see that?

A   Yes.

Q   That's the Dunbar Tower site you were working on, correct?

A   Correct.

MR. JACKSON:  Your Honor, we offer DX 1013.

THE COURT:  Any objection?

MR. PAULSEN:  No, your Honor.

THE COURT:  It's admitted.  You may publish it to the jury.

(Defense Exhibit DX 1013, was received in evidence.)

(Exhibit published.)

Q   You can see, sir, that this is a building with -- you know this is a building that has, including all the floors we can see and can't, seven floors, right?

A   Correct.

MR. JACKSON:  All right.  You can take that down.

Q   You had collected $250,000 plus the cost of materials

Linda A. Marino, Official Court Reporter

Kolenovic - Cross - Jackson                742

that had been fronted to you on the project at the time that you walked off, correct?

Yes or no?

A   I did not walk away.

Q   Yes or no, sir?

A   I don't know.

Q   You don't know as you sit here whether you got a quarter million dollars or not.

A   I don't remember.

Q   Okay, great.

THE COURT:  Don't comment on the testimony.

MR. JACKSON:  Thank you, Judge.  I'm sorry.

Q   Let me just ask you some -- you know that Kemal Sarkinovic was relaying to you that he was having a number of conversations with David Motovich that you were not a part of, correct?

A   Correct.

Q   And you have no idea what Kemal Sarkinovic told David Motovich about his conversations with you, do you?

A   I don't know, no.

Q   You told the agents when you met with them that you could produce for them the written $300,000 contract that you entered into where you promised David Motovich that you would complete this job involving these doors, correct?

A   Correct.

Linda A. Marino, Official Court Reporter

Kolenovic - Cross - Jackson                743

Q   Did you ever give them the written contract?

A   Yes, we did.

Q   Okay.  And did you go over the written contract with the prosecutors when you prepared for your testimony today, yes or no?

A   No.

Q   Do you still have the written contract?

A   No.

Q   You have no idea where the written contract is today?

A   Correct.

Q   So, you gave it to the agents but now you have no idea where it is.

A   I don't know.

Q   Okay, okay?

A   But also --

THE COURT:  No, no, just answer his question.

Go ahead, next question.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

Q   Now, one of the things that actually happened leading up to you walking off of this job is that David Motovich complained to you that he was being told you were not paying the workers on the job, correct?

Yes or no.

A   No.

Linda A. Marino, Official Court Reporter

Kolenovic - Cross - Jackson                744

Q   And, in fact, in fact, you had a number -- there were a number of different workers on the job, yes?

A   Edison Ruilova, that's the guy who did work.  He's a subcontractor.

Q   Was Edison the only worker on the project, yes or no?

A   He has more guys with him.

Q   There was Edison and then all the guys working underneath Edison, correct?

A   Subcontractor, right.

Q   You basically subcontracted after you took the $250,000 the entire job to Edison, correct?

Sir, yes or no?

A   Yes.

Q   And you had promised David Motovich after Kemal vouched for you that you were going to do the job, yes or no?

A   Yes, we --

Q   Sir, sir, that's fine.

A   No, no.

THE COURT:  Excuse me, sir.  Just answer his question.  He asked you a question, you answered it "yes."

Next question?

Q   Now, at the end of the project, you knew by walking off you had left David Motovich in a terrible position, yes or no?

A   No.

Q   You knew that David's family had a close relationship

Linda A. Marino, Official Court Reporter

**J.A. 421**

Kolenovic - Cross - Jackson    745

with the developer, correct?

A    No.

Q    David Motovich told you that the developer was one of the biggest customers and that he was depending on you to not be embarrassed and have the job finished, correct?

MR. PAULSEN:  Objection your Honor.

THE COURT:  Overruled.

You can answer the question yes or no.

A    I don't remember.

Q    You don't remember as you sit here today.

A    No.

Q    Now, it is a fact that the job got finished, right?

A    I don't know.

Q    You never went to go back just out of curiosity to see if there were doors on the apartment buildings in this building?

A    No, we did the work but --

Q    I'm just asking you if you ever found out if someone else finished the job after you walked off.

A    No.

Q    You never went to check.

A    No.

Q    But you do know that this project -- you know from reports that the project was completed somehow, right?

A    Somehow, but I don't know.  I've never been --

Q    You weren't involved?

*Linda A. Marino, Official Court Reporter*

---

Kolenovic - Cross - Jackson    746

A    No, I wasn't involved.

Q    And you also know that David Motovich had to hire your subcontractor after you walked off, yes or no?

A    He did hire, yeah.

Q    And then he paid additional money to the subcontractor that you had hired to finish the job that you contracted and promised you would do, correct?

Yes or no.

A    He did not, no.

Q    So, you're saying he did not pay the subcontractor, yes or no?

A    He basically --

Q    Yes or no, sir.

A    Can you repeat the question?

THE COURT:  Read it back, madam reporter.  Keep your voice up.

Give her the microphone, please, Mr. Scott.

(The record was read back as follows:  Question, So, you're saying he did not pay the subcontractor, yes or no?)

THE COURT:  Just answer that question.

A    I don't know, I --

THE COURT:  Next question.

If you don't know, you don't know.

Next question.

THE WITNESS:  Because I wasn't involved --

*Linda A. Marino, Official Court Reporter*

---

Kolenovic - Cross - Jackson    747

THE COURT:  No, no.  Excuse me, excuse me.  Okay.

Look at me and listen very carefully.  You answer his question.  You can answer it "yes" or "no" or "I don't know."  That's your answer, okay?

THE WITNESS:  Okay.

THE COURT:  We're clear?

THE WITNESS:  We're clear.

THE COURT:  All right.  Go ahead.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

BBY MR. JACKSON:

Q    Sir, you have a history of not paying workers on your job sites, correct?

A    No.

Q    You've been sued numerous times for not paying workers on your job sites, correct?

MR. PAULSEN:  Objection, your Honor.

THE COURT:  Overruled.

What's the answer to the question, sir?

THE WITNESS:  No.

THE COURT:  He said no.  Next question.

Q    We'll come back to that.

THE COURT:  We sure will, but it's 11 o'clock and we're going to take our 15-minute break, as I promised you we would break at 11 o'clock for 15 minutes, comfort break.

*Linda A. Marino, Official Court Reporter*

---

Kolenovic - Cross - Jackson    748

Please do not talk about the case.

Do not talk with anyone about your examination during the break.

All right, ladies and gentlemen of the jury, enjoy your 15-minute comfort break and then we'll return.

THE COURTROOM DEPUTY:  All rise.

(Jury exits.)

THE COURT:  You may step down, sir.  Thank you.

Please leave the courtroom and do not discuss your testimony with anyone during the break.

The jury has left the courtroom.  Ladies and gentlemen you may be seated.

The witness is leaving the courtroom.  When he steps outside, we will ask if we have any procedural questions to address in the absence of the jury.

The witness has left the courtroom.

Beginning with the Government.  You can be seated at use the microphone.

MR. PAULSEN:  Not at this time, your Honor.

MR. JACKSON:  Not at this time, Judge.

THE COURT:  All right.  Enjoy your 15 minutes of comfort.

(Recess taken.)

(In open court; jury not present.)

THE COURT:  You may be seated.

**J.A. 422**

*Linda A. Marino, Official Court Reporter*

Proceedings 749

THE COURT: Do we have any questions we need to address before we bring the jury in?

Anything from the Government?

MR. JACKSON: Not from the us, Judge.

THE COURT: Anything from the Government?

MR. PAULSEN: Yes, your Honor. Just one thing.

We've endeavored to give the defense a list of our exhibits the day before so we can queue up any objections. We have not received a similar list from the defense.

THE COURT: Because the defense doesn't have to give you one.

MR. PAULSEN: Understandable, your Honor.

But for that reason, when we see exhibits like the one that was handed to me, we often don't have any context of what the thing is. In that particular case of that picture, I had no objection at the end, we just didn't know what it was.

THE COURT: I understand. And look, I can go old school and have the witness, under the tutelage of distinguished defense counsel, lay the foundation for all the exhibits that defense counsel wishes to bring in. I can also try to encourage youse guys to have a little pity on the jury.

And if you think you can, Mr. Jackson, while zealously defending your client, as you do, very skillfully -- I want to make that very clear, very zealous -- you can perhaps move this along so that -- and, again, the defense

*Linda A. Marino, Official Court Reporter*

Proceedings 750

doesn't have to prove anything, put on a case -- I want to make that clear for my friends on the 17th floor -- but you can perhaps facilitate matters rather than having the witness lay the foundation for a picture of the building that he worked on, okay? It will just move things along, which the jury would appreciate.

That being said, I'm perfectly prepared, as I did, to require the witness, if that's where we are, to lay the foundation for and to authenticate the document appropriately and lay the foundation for its admission.

So, I'm just trying to be a little solicitous of the jury. But if you folks don't want to go down that road, who am I to judge, as the Pope said?

MR. PAULSEN: Thank you, your Honor.

We'd like to do them mutual and do things quickly, we need a modicum of notice of what a thing is.

THE COURT: Well, as I said, you folks are trying the case. I'm just your humble and obedient Article III judge appointed by the President and voted favorably by all 100 United States senators because they didn't know what else to do.

MR. PAULSEN: Thank you, your Honor.

THE COURT: Anything else?

MR. PAULSEN: No your Honor.

THE COURT: Anything from defense?

*Linda A. Marino, Official Court Reporter*

Kolenovic - Cross - Jackson 751

MR. JACKSON: No, Judge.

THE COURT: Let's get the jury back and get the witness back on the stand, please. Thank you.

(Jury enters.)

THE COURT: Thank you, ladies and gentlemen of the jury. Please be seated. I appreciate your promptness.

We'll continue with cross-examination. Please proceed.

MR. JACKSON: Thank you, Judge.

BY MR. JACKSON:

Q   Good morning again, Mr. Kolenovic.

A   Good morning.

Q   Mr. Kolenovic, one of the things that we were talking about just before the break is that you have been sued in the past for failure to pay the people you hire to do projects, correct?

A   It's not true, no.

Q   I want to show you a document and I just want to ask you if you're familiar with what it is marked as DX4503.

MR. JACKSON: And I'm going to hand a copy to counsel and, your Honor, I would ask if I can hand a copy to Mr. Scott?

THE COURT: Please Mr. Scott, will you take the document from counsel and place it before the witness?

It's also before the witness electronically on the

*Linda A. Marino, Official Court Reporter*

Kolenovic - Cross - Jackson 752

screen. Do not show it to the jury.

And it's not in evidence. You may ask your question but do not refer to the document in any detail, counsel. You know how to do this. Go ahead.

MR. PAULSEN: Your Honor, we would object here and ask for a sidebar.

THE COURT: Not yet.

Ask your question. Carefully.

Q   Do you recognize this document, sir, yes or no?

THE COURT: The question is do you recognize the document, yes or no?

Don't read it out loud.

Do you recognize the document, yes or no?

THE WITNESS: No.

THE COURT: No is the answer. Next question.

MR. JACKSON: We'll hold on this and do another topic to keep this efficient.

THE COURT: All right, move it along.

Q   Now, let me ask you, Mr. Kolenovic, one of the things that you said during your direct examination is that when you supposedly discovered something about Ago's use of -- the Ago name, you called Mr. Motovich on his cell phone.

A   Yeah, I did call him, yeah.

Q   And by the way, you have previously told the agents that the number you would call Mr. Motovich on is 646-380-0861; is

*Linda A. Marino, Official Court Reporter*

**J.A. 423**

Kolenovic - Cross - Jackson    753

that correct?

A    I don't remember the number.  Maybe I don't have it.

Q    What was the phone number that you were using as a cell phone at the time?

A    It's 917-416-1191.

Q    During the course of your meetings with the Government, did you ever go over phone records with the prosecutors or the agents to try to identify the call that you supposedly made to Mr. Motovich?

A    No.

Q    Did the prosecutors tell you that they had Mr. Motovich's phone records?

MR. PAULSEN:  Objection, your Honor.

THE COURT:  Overruled.  Those aren't privileged.

Answer yes or no.

A    No.

Q    And at no point did any agent try to sit down with you and say, "Oh, you told us there was this phone call that was placed.  Let's try to figure out where it is in the phone records."  That never happened.

A    No phone records, no.

Q    I want to show you a document --

THE COURT:  Just for the witness?

MR. JACKSON:  Just for the witness, your Honor.

THE COURT:  We'll publish just for the witness.

Kolenovic - Cross - Jackson    754

Q    -- that has been marked as GX-102.

THE COURT:  Show it to the Government.

You said GX, correct?

MR. JACKSON:  Yes, your Honor.

THE COURT:  GX102, is that the number?

MR. JACKSON:  Yes, Judge.

THE COURT:  Any objection to GX102, which I take it is a Government-marked exhibit?

Any objection to GX102-1?

MR. PAULSEN:  No objection.

THE COURT:  It's admitted.  You may publish.  It's in evidence.

(Government Exhibit GX102-1, was received in evidence.)

Q    I just wanted to show you --

THE COURT:  Could you make it a bit more legible?

I can't read it, it's pretty small.  And the jurors clearly can't read it either.

MR. JACKSON:  Mr. Cepregi, is there any way to activate this screen?

THE COURT:  Please continue, Mr. Jackson.

MR. JACKSON:  Thank you.

Q    You can see here that what we have is a set -- what we have is some phone records, right?

A    Yes.

Kolenovic - Cross - Jackson    755

Q    You've seen phone records before, in the past, right?

A    No.

Q    Not these in particular, but you've seen -- you've gotten a phone bill and seen phone records before?

A    They don't come.

Q    You've never seen them?

A    No.

Q    Whatever the case may be, would it be possible --

MR. JACKSON:  If we could just flip through the pages of this a little bit.

Q    Would it at all be possible for you to tell us when this phone call you had with Mr. Motovich took place?

A    It's not my phone.  My phone 917-416-1191.

Q    Let's just stop here.

I'll represent to you these are Mr. Motovich's phone records.  And I'm just asking you if you could give us a date that we could look for when this phone call took place.

A    For David?

Q    Yes.

A    What I did from my phone?

Q    When was the call?

I'm just asking you, do you know when the call was?

A    I believe, like, the end of February or March -- first week of the March 2013, when we supposed to sign the contract and everything, right?

Kolenovic - Cross - Jackson    756

Q    You don't remember the exact date?

A    I don't remember.

Q    You never discussed that with the agents.

A    No.

Q    It's a fact, right, that there are no calls from you in that time period that appear in these records, correct?

A    Pardon me?

Q    If someone were to scour these records, we're not going to see a call from you; am I right?

A    I didn't see it here.

Q    Let me ask you this:  I'm going to show you one page of this that we have marked as DX2070.

MR. JACKSON:  And I'd like to show that -- I'll just represent this is a 27,000-page exhibit, your Honor.  It's already admitted because it's the same -- it's a page of this, but we made it a specific page, Judge.

THE COURT:  No objection from the Government?

MR. PAULSEN:  No objection, your Honor.

THE COURT:  All right.  You may publish it.

Just so the record is clear, it's Defense Exhibit 2070.  It's in evidence now.

(Defense Exhibit 2070, was received in evidence.)

(Exhibit published.)

THE COURT:  Go ahead.

MR. JACKSON:  Thank you, Judge.

**J.A. 424**

Kolenovic - Cross - Jackson        757

Q   When you look at this in 2016, do you see any phone calls on here including your number?

A   I didn't see my number here, 917-416-1191.

Q   Let me direct your attention to 11/24/16 at 17:37.

Do you see that?  Do you see that call?

A   This is 917-741-613.  It's not my number.  My number is 917-416-1191.

Q   Let me just try to help you out a little bit, Mr. Kolenovic.

You see there's a column for originating number. You understand that's the caller.

And then there's terminating number, which is the receiving number.

Do you see that?

Do you see in the terminating number, there's a number underneath, it right?

A   917-416-1191.

Q   That's your telephone number, correct?

A   Yes.

Q   So, you see here that what happens is Mr. Motovich is calling you and you're not answering, right?

A   I never speak with him, as I mention, after the contract is done right.

Q   You say you never spoke to him.  He's calling you in 2016 and you don't answer.

Kolenovic - Cross - Jackson        758

Do you remember that?

A   I don't remember.

Q   You still owed him hundreds of thousands of dollars on the contract you didn't complete and on the materials that you were fronted that you never paid for as of 2016, correct?

A   It's not correct.

MR. JACKSON:  Okay.  We can take that down.

Q   I just want to focus in on this phone number on this supposed phone call.

THE COURT:  Would you clear the screen?

MR. JACKSON:  Yes, your Honor.

THE COURT:  Thanks.  Go ahead.

MR. JACKSON:  Thank you, Judge.

Q   I want to focus in on this phone call that you claim that you made to Mr. Motovich.

Sir, just to be very clear, you made that up on the stand and that never happened, correct?

A   Pardon me?

Q   The phone call that you initially described and that you described again a few minutes ago to Mr. Motovich, where you claimed that you complained about what was going on in terms of your company name, that call never happened, correct?

A   Which one?  I did call him.  I did call him after I speak with Edison when he came and the check bounce.  And I did call David, I did call Kemal why they create a new company with,

Kolenovic - Cross - Jackson        759

like, my and some name.  But it wasn't General Contracting, it was Contracting Corp.

It could be the second time when it was the lawsuit.  When I receive it, I did call them, all right.

Q   I want to just unpack your answer yesterday because, am I correct, you've given six different answers about whether this call happened?

MR. PAULSEN:  Objection, your Honor.

THE COURT:  Overruled.  Cross-examination.

Q   Am I right about that?

A   Pardon me?

Q   You've given six different answers at least in terms of whether this call happened or not, correct?

A   I don't remember.

MR. JACKSON:  Your Honor, may we display a transcript page from yesterday, Page 663?

THE COURT:  Show it to the Government.  See if there's any objection to that page.

Take a look at it.  Any objection to displaying that page from yesterday's testimony?

MR. PAULSEN:  Your Honor, I'm not sure I understand the purpose for which he's using this.

THE COURT:  Never mind whether you understand the purpose.

The question is he's asked if you have an objection

**J.A. 425**

Kolenovic - Cross - Jackson        760

to displaying this page to the witness and to the jury.

MR. PAULSEN:  Yes, your Honor.

THE COURT:  You have an objection.  Sidebar.

(Continued on the following page.)

Sidebar          761

(The following occurred at sidebar.)

THE COURT:  What is the objection from the Government to Page 663, or Page 666, I don't understand it, but Page 663 of yesterday's testimony?

What's the objection?

MR. PAULSEN:  I believe the question he had asked was, "Did you give six different stories --"

THE COURT:  You don't have to believe it.  You can see it what it is.

What's the objection?

MR. PAULSEN:  The objection is I think if he is stating --

THE COURT:  What is the objection to this page coming before the jury?  What is the objection?

They heard the testimony, this is the transcript.

Is it accurate?  Is it complete?  Does it contain sidebar discussions of evidence that I've excluded?

What is the objection to this page coming into evidence before the injury?

MR. PAULSEN:  My objection, your Honor, is I don't believe he has properly set up a contradiction that would allow him to use this for impeachment testimony.

THE COURT:  What is the purpose, Mr. Jackson, for which you wish to place this before the witness and the jury?

What is the purpose of offering Page 663 of the

Linda A. Marino, Official Court Reporter

---

Sidebar          762

testimony?

MR. JACKSON:  I want to confront him, your Honor, with each of his prior inconsistent statements as reflected in the record, pursuant to Rule 613.

THE COURT:  What do you see that's quote/unquote "inconsistent"?

MR. JACKSON:  Your Honor, first, when he was asked the question --

THE COURT:  Slower.

MR. JACKSON:  I'm sorry, Judge.

First, when he's asked the question -- he answered on the prior page that he called and he had a conversation with Kemal Sarkinovic.

Then when he's asked the question by the prosecutor, "Did you have the same conversation with Mr. Motovich?" the first answer he gives is, "We did call."

Then he says, "I don't remember.  He did not answer."

Then he said, "But Matija, he did call, his assistant."

So, he's saying -- first he says he called; then he says he doesn't remember because David didn't answer, then he said that his project manager actually is the one who called Marina Kuyan, then he says, "So, maybe also I don't remember," and then he says, "I don't want to, like, make sure

Linda A. Marino, Official Court Reporter

---

Sidebar          763

100 percent."

So, he's stating, fourth, that he has no hundred percent certainty, then he says --

THE COURT:  Little slower.  Chill.

MR. JACKSON:  -- but I did call.  I did call him.

Then the prosecutor says again, "Question, Okay. And you said you can't do this anymore --"

THE COURT:  Look, this is all testimony that has been taken.  I don't see why now, at this point, you have to place the transcript of yesterday's testimony in front of the witness.

You have argued that he has given answers that have been different from time to time.  So, my humble suggestion is that you ask him:  Did there come a time when you said the answer was A, yes or no?  Did there come a time when you said the answer was not A, yes or no?

And then you go through it in that fashion rather than getting bogged down in whether Page 663 captures everything or do you have to go back to 660 or 661.  You can question him with respect to:  On day one did you say X and on day two did you say not X?

And you have a good faith basis for doing that which you've now shared with the prosecution and the Court.  With all due respect, that's the way to do it rather than getting into fights about what's consistent or not.  Ask the question

Linda A. Marino, Official Court Reporter

---

Sidebar          764

and get an answer.

And then if you need to either refresh his recollection or have to ask past testimony recorded, we can do that.  But I don't want to get bogged down if your point is going to be "You've given different answers."

There's a way to do that without taking more time off the jurors' life.

MR. JACKSON:  Wise counsel, Judge.

THE COURT:  They're getting a little bored, they're getting a little antsy.

MR. JACKSON:  I get it.

THE COURT:  There's a way to do it that's efficient that allows you to do what you want to do.

Let's step back.

MR. JACKSON:  Thank you.

(Continued on the following page.)

J.A. 426

Linda A. Marino, Official Court Reporter

A. KOLENOVIC - CROSS - MR. JACKSON    765

(Continuing.)

THE COURT:  The objection is sustained.  Please continue your questioning.

MR. JACKSON:  Thank you, Judge.

BY MR. JACKSON:

Q   Now, let me just ask you, Mr. Kolenovic, yesterday when you were asked about this supposed phone call, you were asked specifically by the prosecutor, did you have the same conversation that you had with Kemal with David Motovich, and your first answer was, we did call, right?  That's what you said, correct?

A   That call with Kemal and David, correct?

Q   When you were asked the question, did you have the same conversation with David Motovich, your first answer was, we did call, correct?

A   Yes.

Q   And then you said that actually, you don't remember, and that David didn't answer.  That's what you said second, right?

A   What --

Q   Yes or no, sir?

A   Which year is that?  Which year you're talking about?

Q   I'm talking about yesterday when you were asked this question.  After you were asked, did you have the same conversation with David Motovich, the second thing you said was, I don't remember, he did not answer, correct?

Kristi Cruz, RMR, CRR, RPR,

---

A. KOLENOVIC - CROSS - MR. JACKSON    766

A   For the yesterday, I did not call nobody.

Q   Right.  Then you said, but Matija, he did call also his assistant, right?

A   He's the project manager.  We talking about 2013, correct?

Q   Correct.

A   Yeah, so --

Q   So what you were saying is at that point you don't actually remember if you called David Motovich, but you know that your project manager had some kind of conversation with Marina.  That's what you were saying at that point, correct?

A   Correct, yeah.

Q   Right?  Then you said, so maybe also I don't remember, right?

A   For the David, I did not remember.  But for the Kemal, I did call.

Q   Right.  You remember you had a conversation with Kemal.

A   Yeah.

Q   But you don't remember whether you actually had a conversation with David Motovich, correct?

A   For stopping or the signing the contract?  We talking about before I --

Q   We're talking about the same conversation that you were being asked about by the prosecutor where you claim you called David Motovich and you said that you called him and told him

Kristi Cruz, RMR, CRR, RPR,

---

A. KOLENOVIC - CROSS - MR. JACKSON    767

to stop this.

A   Yes, yes, I did that, I did that.  We talking about by the company.  You have to be explain little more in detail, you know.

Q   When you were asked this question by the prosecutor, you said, so maybe also I don't remember, I don't want to, like, make sure 100 percent.  Right?

A   Right.

Q   And then you said, but I did call him, right?

A   I did call him, right.

Q   Then the prosecutor asked you, what did you say?  What did you say to him when you talked to him?  And your answer was, I did not, right?

A   About what?  He has to start with the company.  Why he open up, what was the reason.

Q   Right.  But when the prosecutor asked you, after you had said that you don't remember whether the call happened, but you know that Matija made some kind of call to Marina, then the prosecutor asked you again what did you say on this supposed call with David Motovich, and your answer, the first words out of your mouth were, I did not, meaning you did not ever have that call, correct?

A   I did have the call, but the second time I didn't remember right.

Q   And then --

Kristi Cruz, RMR, CRR, RPR,

---

A. KOLENOVIC - CROSS - MR. JACKSON    768

THE COURT:  Why don't we move on, Mr. Jackson.

MR. JACKSON:  Yeah, we'll move on, Judge.  Thank you.

Q   Now, one of the things that you went over with us yesterday, Mr. Kolenovic, is this checkbook that was given by you to David Motovich, right?

A   Correct.

Q   And I think it was GX, in evidence, 391, page 3.

(Exhibit published.)

Q   This is it, right?  Do you see that?  That's what you went over on direct examination, correct?

A   Correct.

Q   And you actually -- you gave the checkbook for Ago & Alaudin General Contracting Corp. Chase Bank account, you gave that to David Motovich after you had walked off of the project, correct?

A   No, before.

Q   Okay.

A   Before when we started.

Q   And the reason that you gave it to him is because you owed significant money, and you were giving him access so that he could finish the project and you would eventually pay him back.  Yes or no?

A   No.

Q   Okay.

Kristi Cruz, RMR, CRR, RPR,

**J.A. 427**

A. KOLENOVIC - CROSS - MR. JACKSON        769

Now, you will admit, sir, it is not an everyday occurrence that you gave your checkbook to someone else. Yes or no?

A    No, only to -- I give the check to David, blank check.

Q    That's the only time you've given a blank check in your life to someone for an Ago & Alaudin account. Yes or no?

A    I do not remember.

Q    But the only one that you remember as you sit here today is that occasion, correct?

A    Correct, correct.

Q    And, sir, you never put additional money into the account after this was completed, after the project was completed, correct? Yes or no?

A    I don't remember. Could be. I don't remember.

Q    As you sit here today, you don't remember. You just know that you took a quarter of a million dollars out of it, right?

A    This was --

Q    Yes or no?

A    It was paying David. David was the one who issued the check for his material.

Q    The question I'm asking you is: All you know is that you took a quarter million dollars out of --

A    I don't remember --

THE COURT:  Let him finish the question.

Finish the question, Mr. Jackson.  Put the question

---

A. KOLENOVIC - CROSS - MR. JACKSON        770

again.

MR. JACKSON:  Thank you, Judge.

THE COURT:  And then answer.

Q    All you know about the money is that you took a quarter million dollars out of the project, correct? Yes or no?

A    I don't remember.

Q    You don't remember how much you got paid. Okay. But you do remember that you told the agents that you got paid $250,000 on the approximately 300,000 --

A    Approximately --

THE COURT:  Just answer his question. Did you tell the agents --

THE WITNESS:  Yes, yes, yes --

THE COURT:  Did you tell the agents that you took $250,000 out of the project?

THE WITNESS:  Yes.

THE COURT:  Next question.

MR. JACKSON:  We can take that down.

Q    Now, it's your testimony that after you -- just to be very clear, okay, you don't know anything about what the charges are. You don't know whether there's any -- whether there's any, you know, insurance charge in this case or anything like that. You don't know, right?

A    No.

Q    You yourself, after you discovered what you claimed were

---

A. KOLENOVIC - CROSS - MR. JACKSON        771

the use of your company's name without authorization, after that, you never sued David Motovich, did you?

A    No.

Q    And the reason that you never sued him is because you owe him money, correct?

A    I don't owe him. I just say you don't owe him.

Q    Sir, it's a yes or no question.

A    No.

Q    The other reason that you didn't sue him is because you gave authorization to use Ago & Alaudin for certain purposes. Yes or no?

A    I don't have this suing -- no, no.

Q    You never sued anyone, that's what you're saying?

A    No, I never sued David.

Q    Have you sued anyone before?

A    I don't remember.

Q    You don't remember at this point. Okay.

Now, it is correct that with all of those certificates that we went through, you didn't have to pay any additional money on any of those certificates, right? Yes or no?

A    No, but is a fake. We did not make.

Q    Sir, that's fine.

And it's a fact that David Motovich did not steal money from you. Yes or no?

---

A. KOLENOVIC - CROSS - MR. JACKSON        772

A    No.

Q    I'm correct, he did not steal money from you, correct?

A    Correct.

Q    By the way, one of the things that you told the agents is that you don't do small jobs, you do only big jobs, right?

A    We doing also the apartment and big job, you know.

Q    Right. You told the agents that you do jobs minimum $150,000, correct?

A    I don't remember. Even the last one, doing the apartment renovation for the Sterling Management, sometimes maybe 100, sometimes maybe -- also big job too.

Q    You do use professional check cashing services, correct?

A    I did use it, yeah.

Q    You use a company called KHLI?

A    KH -- yeah, yes, in Manhattan.

Q    That's a check casher in Manhattan, right?

A    Correct.

Q    On First Avenue?

A    Correct.

Q    And you used that to cash checks over the years, correct?

A    Sometime, yeah.

Q    And the reasons you did is because sometimes you needed cash, right?

A    Correct.

Q    You had bank accounts, right?

**J.A. 428**

A. KOLENOVIC - CROSS - MR. JACKSON        773

A    Yes, we do.

Q    But you also used these professional check cashers, correct?

A    Sometime.

Q    And you sometimes paid people in cash, correct?

A    Depend.

Q    It depends.

A    Depend.

Q    Sometimes you did and sometimes you didn't, correct?

A    But basically --

        THE COURT:   Did you sometimes pay people in cash?

        THE WITNESS:  Yes, I did.

        THE COURT:  Okay.  Next question.

Q    When you met with the Government, did the Government talk to you at all about your potential criminal liability for any crimes?

A    No.

Q    So the Government never brought up anything like that in any of the prep?

A    No.

Q    What was the total amount of money that David Motovich had to pay Eddie Ruilova in order to complete the project that you walked off of?  I'm just asking what was the --

        MR. PAULSEN:  Objection, Your Honor --

A    No --

A. KOLENOVIC - CROSS - MR. JACKSON        774

        THE COURT:  Overruled.

        Read the question back, please.

        MR. JACKSON:  Thank you, Judge.

Q    What was the total amount of money --

        THE COURT:  No, I'm asking the reporter to read it back.

        (Record read.)

        THE COURT:  Do you know the answer to that question?

        THE WITNESS:  No.

        THE COURT:  Next question.

Q    Regardless, you said that you told Kemal at some point to close Ago & Alaudin Contracting Corporation.  That's what you said on direct.

A    Correct, yes.

Q    And after you asked him to do that, it got closed, correct?

A    That's for my knowledge, but I never check it.

        MR. JACKSON:  May I have one moment, Your Honor?

        THE COURT:  Yes.

        (Pause in proceedings.)

Q    Mr. Kolenovic, do you still have a relationship with Kemal Sarkinovic?

A    With Kemal we don't have it, but sometime maybe we see each other, but not doing any business or that.

Q    When was the last time that you spoke to him?

A. KOLENOVIC - CROSS - MR. JACKSON        775

A    Couple of months.

Q    Did you talk to him about this case?

A    No, no, no, never mention to him.

Q    So again, no conversation with him at all?

A    No, at all.

Q    But you saw him a couple of months ago?

A    Correct.

Q    And you still see him socially, correct?

A    Sometime.

Q    You still occasionally speak to him on the phone, right?

A    He did -- he did call me on line.

Q    And you had a significant relationship with him before the case.

A    Not really.

Q    By the way, you continued doing business with Kemal after the events that you were talking about during your direct examination, correct?

A    What business?

Q    Did you do any business with him?

A    In my knowledge, no.

Q    You don't remember clearly at this point?

A    I don't remember, right.

Q    It's possible that you continued doing business with him after it, but as you sit here today you just don't remember?

A    About what, the business with him?

A. KOLENOVIC - CROSS - MR. JACKSON        776

Q    Yes.

A    No, from that time we did not do any business.

        MR. JACKSON:   Your Honor, I have no further questions of this witness at this time.

        THE COURT:  Redirect?

        MR. PAULSEN:  Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. PAULSEN:

Q    Mr. Kolenovic, a moment ago defense counsel had asked you about the Monticello project.

A    Correct.

Q    You thought this was a real job, right?

A    Correct.

Q    And you did real work?

A    Yes, we did, yeah.

Q    At some point you were -- is it fair to say you were told by David Motovich that you didn't need to continue to do the work?

A    Correct.  They told me to stop.  But I have to just add we have the signed contract with the door, and after that he gave me the second, the change order for the awning and also for the closet shelves.  That's the additional money was supposed to be on the top of the contract.  But he didn't mention, so that's why I want to mention why.

Q    But you thought you were going to finish the project; is

**J.A. 429**

A. KOLENOVIC - CROSS - MR. JACKSON          777

that right?

A    That's -- that's the -- to finish up because basically I was told by Edison Ruilova to finish the project.  Basically they take him to do the same job what I'm doing with him.

Q    Now, were there any hard feelings that the job was over?

A    No hard feeling, you know, but I wish I never meet in my life.

Q    Now, you were asked some questions about the overall amount of money that you received for this project.  Do you remember that?

A    I don't remember.  I know there was the wiring and also the project manager, Matija Kurek, he was go over because he's a computer guy, it was back and forth how much money was coming in.  Basically in the end of it, he did not owe me anything, I did not owe him anything, you know, to that point because there were the additional charges for the moulding, for the closet shelves and stuff.  We finish up.  Only, as I mention before, I did not finish the first and second floor. It wasn't my fault because they did not finish up, the other company, the sheetrock to be ready to install the door.

Q    But you left with no hard feelings, right?

A    Correct, yes.

Q    Now, during that time we saw a number of checks that you had left with David Motovich; is that right?

A    Correct, yeah.

A. KOLENOVIC - CROSS - MR. JACKSON          778

Q    Is it fair to say that a good quantity of the money that you received you actually paid back to David for materials?

A    He's the one anytime I send the material, he make the check.

Q    Okay.

A    Because he has to write from six to nine checks in his office.  I will sign.  They be blank.

MR. PAULSEN:  Your Honor, can I show the witness again Government Exhibit 120.

THE COURT:  It's in evidence.  You may publish.

(Exhibit published.)

Q    These are the checks that we saw before, right, Mr. Kolenovic?

A    Yeah, those are the check I made it.

MR. PAULSEN:  Can you flip through here?

Q    The first one is 10,000.

A    Yeah.

Q    Is that correct?

A    Correct, yeah.

Q    The next one is also 10,000?

A    Correct.

Q    Is the next one also 10,000?

A    Correct.

Q    Is the next 15,000?

A    Correct.

A. KOLENOVIC - CROSS - MR. JACKSON          779

Q    10,000 again?

A    Correct.

Q    This is all your signature, right?

A    Correct.

Q    The handwriting, is that your handwriting?

A    No, no, no.

Q    The next one is 62,350; is that right?

A    Correct.

Q    The next one is 6,400?

A    Correct.

Q    The next one is 3,200?

A    Correct.

Q    The next one is 8,135?

A    Correct.

Q    And 8,965?

A    Correct.

Q    10,000 again to Midwood Doors?

A    Correct.

Q    9,226?

A    Correct.

Q    And then a 10,000.  Is that the final one?

A    Correct.

Q    These are all checks that you left with David Motovich, right?

A    Correct.

A. KOLENOVIC - CROSS - MR. JACKSON          780

Q    And the understanding was that he, as part of the deal, he would fill in the amount of money for the --

A    For account and material.  And also left American Express -- I did see also --

THE COURT:  Read the question back and we'll have an answer.

(Record read.)

A    Correct.

THE COURT:  Next question.

Q    So is it fair to say that a large percentage of the money went back to David to pay for the materials?

A    Correct.

MR. JACKSON:  Objection.

THE COURT:  Overruled.

Q    Would it surprise you that it's about $160,000?

A    Yeah, correct, yeah.

Q    Now, you said a moment ago that you left this project on good terms with David Motovich; is that right?

A    Correct.

Q    Is it fair to say that you only got on bad terms when you realized that there was a check in a false company bearing your company's name; is that right?

A    Yes.  My book --

THE COURT:  You answered the question.

THE WITNESS:  Yes, yes, yes.

**J.A. 430**

A. KOLENOVIC - CROSS - MR. JACKSON    781

Q   Now, there were some questions where defense counsel implied that somehow the taking of your company's name was the result of the relationship falling apart at the end.  Do you recall him asking you that?

A   We did not fall apart.  Only, as I mention, when they told me to stop with the work, they don't owe me money, and they just told Edison Ruilova to start with the work -- the money to come in --

Q   That would have been in August 2013?

A   Correct, August.

Q   You're not aware of this problem they talk about, though, right?

A   No.  I never be part of that.  I was shocked when he told me he was working and they give him that check and bounce, you know.

Q   I'd like to show you again Government Exhibit 1004, which is in evidence.

THE COURT:  It's in evidence.  You can publish.

(Exhibit published.)

Q   Do you recall this document?  I showed you this before, Mr. Kolenovic.  This is a -- it's from April 2013; is that right?

A   Yeah.

Q   This is just when your relationship with David Motovich started; is that right?  Around about.

*Kristi Cruz, RMR, CRR, RPR,*

---

A. KOLENOVIC - CROSS - MR. JACKSON    782

A   Yes, correct.  It was in March 7th.  This like in April 16th.

MR. PAULSEN:  Ms. Kannan, can I see the attachment to this?

Q   What's the date of this document, Mr. Kolenovic?

A   This September 1, 2012.

Q   The project was going well in April of 2013, right?

A   Correct, yeah.

Q   You were still working with David?

A   Yes, yes, that time.

Q   The relationship hadn't fallen apart such that you allegedly owed him money?

A   I don't owe him money.

Q   And September 1st of 2012 you had no relationship with David; is that right?

A   Correct.

MR. PAULSEN:  Ms. Kannan, if I could show 1006.

THE WITNESS:  This is not my --

THE COURT:  There's no question.  He'll show you a document and ask you a question.

(Exhibit published.)

MR. PAULSEN:  Zoom in the middle, Ms. Kannan.

Q   Do you remember me showing you this, Mr. Kolenovic?

A   Yes.

Q   This davemidwood@gmail, it says:  Make a cert from Ago &

*Kristi Cruz, RMR, CRR, RPR,*

---

A. KOLENOVIC - CROSS - MR. JACKSON    783

Alaudin in June 10, 2013.  Do you recall this?

A   I saw it, but I haven't -- you don't have to date the second certificate.  If you already have it, like, one certificate, it's like for one year.

Q   But during this time, this is still when the project's going on and everything --

A   Yeah.

Q   And when he's still signing checks for you that you gave him, right?

A   Correct, correct.

Q   Do you recall a moment ago that you were shown some phone records for David Motovich's phone number?

A   Yeah.  He show it like sometime maybe by mistake.  They could call and hang up.  I don't know.  But --

MR. PAULSEN:  Ms. Kannan, could you show Government Exhibit 1021.  I believe that's the...

(Exhibit published.)

MR. PAULSEN:  If you could just zoom in on the top.  I'm sorry, zoom in on the top left corner that shows the date and the phone number of this account, please.

Q   Mr. Kolenovic, do you recall him showing that 646 phone number as David Motovich's phone number?

A   Should be number.  I don't memorize.  Only know if I see it.

Q   Understood.  You see the date of the first phone record

*Kristi Cruz, RMR, CRR, RPR,*

---

A. KOLENOVIC - CROSS - MR. JACKSON    784

in this document?

A   Uh-huh.

THE COURT:  Can't say "uh-huh."  You have to say yes.

A   Yes, yes, yes.

THE COURT:  Go ahead.

Q   The conversation that you described with Kemal, or when you found out that your company's name had been stolen, when was that?

A   That was like the end of the August, when I saw the checks from Edison when he gave me.  So at that time I call --

Q   That was in 2013?

A   Correct.

Q   Would a phone call from 2013 be on phone records that start in 2014?

A   Should not be.

Q   And then finally --

MR. PAULSEN:  Ms. Kannan, if you could keep that up on the side.  If you could show Government Exhibit 1013.

(Exhibit published.)

MR. PAULSEN:  If you could zoom in on the top.

Q   Do you remember this document, Mr. Kolenovic, that I showed you during your direct examination?

A   Correct, yes.

Q   Is that the same phone number on the phone records?

**J.A. 431**

*Kristi Cruz, RMR, CRR, RPR,*

A. KOLENOVIC - CROSS - MR. JACKSON        785

A    It's the same number as the -- you show before.

Q    Did you know that David Motovich was putting his personal cell phone on the false invoices in your company's name?

A    I did not know.

MR. PAULSEN:  No further questions.

THE COURT:  You may step down, sir.  Thank you very much.  You've completed your testimony.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

(Witness is excused.)

THE COURT:  Please call your next witness.

MR. SKURNIK:  Thank you, Your Honor.

The Government calls Mersiha Vukel.

(Witness enters the courtroom.)

THE COURT:  Have the witness step forward to be sworn.

Please come forward to the witness stand here, ma'am, and raise your right hand up here.

(Witness takes the stand.)

THE COURT:  Please raise your right hand.

(Witness sworn.)

THE COURT:  Thank you, ma'am.

Please sit down and I'll ask you to speak directly into the microphone.  It will swivel to you like this.  It looks like a snake, but it won't bite you.

*Kristi Cruz, RMR, CRR, RPR,*

---

A. KOLENOVIC - CROSS - MR. JACKSON        786

Please state your name and spell it, and then counsel will inquire.

THE WITNESS:  Mersiha Vukel, also known as Marcy Vukel, and it's M- E-R-S-I- H-A, last name Vukel, V-U-K-E-L.

THE COURT:  Thank you.  I'm going to ask you to pull this microphone that you've got in front of you a little closer to you because you've got a wee voice.  Okay?  And keep your voice up.

THE WITNESS:  Okay.

THE COURT:  Thank you.

Go ahead, counsel.  You may inquire.

(Continued on next page.)

*Kristi Cruz, RMR, CRR, RPR,*

---

M. VUKEL - DIRECT - MR. SKURNIK        787

(Witness takes the witness stand.)

**MERSIHA VUKEL**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SKURNIK:

Q    Hello, Ms. Vukel.

A    Hello.

Q    Where do you live?

A    Astoria, New York.

Q    How long have you lived there?

A    For over 25 years.

Q    Are you married?

A    Yes.

Q    What's your spouse's name?

A    Backu Vukel.

Q    How long have you been married?

A    25 years.

Q    How did you meet your spouse?

A    Through family.

Q    Do you have any children?

A    Yes, four daughters.

Q    How old are they?

A    23, 20, 15, and 10.

Q    Just generally, where do they live?

A    With us in Astoria.

*Kristi Cruz, RMR, CRR, RPR,*

---

M. VUKEL - DIRECT - MR. SKURNIK        788

Q    Ms. Vukel, what do you do for work?

A    I'm an insurance broker.

Q    Do you work at a particular company?

A    For myself.

Q    What's the name of your company?

A    Vukel Group Insurance.

Q    How many people work at Vukel Group Insurance?

A    Three; myself, my husband, and our daughter that graduated recently.

Q    So it's a family business?

A    Correct, yes.

Q    Where is your business located?

A    In Astoria, New York.

Q    How long have you had that business?

A    About 16 years.

Q    How about before that, before you started the Vukel Insurance Group, what did you do for work?

A    I was an insurance broker for other companies.

Q    So what led you to start your own company?

A    My husband and I, we worked for a company, so we felt this was the time to do something for ourselves.

Q    So what type of services does the Vukel Group Insurance Agency provide?

A    Personal, commercial property and casualty insurance.

Q    So does your company actually provide insurance or do you

*Kristi Cruz, RMR, CRR, RPR,*

**J.A. 432**

M. VUKEL - DIRECT - MR. SKURNIK 789

just connect customers to insurance?

A We connect. We basically search for insurance companies that would fit their needs.

Q And how does that work?

A So I'll just give you an example. A client would come into our office, we would inquire with them what their needs are, and more so on the commercial aspect. Then we find out what they need, and then we would submit it to insurance companies for quoting and best prices available.

Q So what types of insurance do you provide to your clients?

A Auto, home, condo, car, commercial insurance, like commercial liability, commercial auto.

Q Are your clients typically individuals or companies?

A It can be either or.

Q Are your clients typically long-term clients, or do they come and go more frequently?

A I'd say long term.

Q So when someone comes in to your business and is looking for insurance, what types of questions do you ask them?

A It depends on the type of insurance. So it would all vary based on what they need. So if it's auto insurance, you'd ask, obviously, for their license information, the car, obviously where they live and where the car is going to be garaged, or if it's a business, the name of the business, tax

*Kristi Cruz, RMR, CRR, RPR,*

M. VUKEL - DIRECT - MR. SKURNIK 790

ID, address, the forms, like the type of work they would be doing for the business.

Q Are there particular insurance companies that you tend to work with?

A Yeah, I would say yes.

Q Are there some insurance companies that you don't really work with?

A Yes, correct.

Q About how many clients does your company have?

A I'd say about 2,000 or so.

Q Do you know all your clients?

A Yes.

Q Have you met them all in person?

A No, not in person. Some over the phone, but I'd say a good amount in person.

Q For all of your clients, have you either met them in person or over the phone at least?

A Yes.

MR. SKURNIK: Your Honor, I'd like to publish just for the witness Government Exhibit 12. This is not in evidence.

THE COURT: Any objection to 12 being admitted?

MR. JACKSON: No objection.

THE COURT: Admitted.

(Government Exhibit 12, was received in evidence.)

*Kristi Cruz, RMR, CRR, RPR,*

M. VUKEL - DIRECT - MR. SKURNIK 791

THE COURT: You may publish.

(Exhibit published.)

Q Ms. Vukel, do you recognize this individual?

A No, I do not.

Q Okay.

MR. SKURNIK: Your Honor, with permission, I'd like to publish just for the witness Government Exhibit 29 which is not in evidence.

THE COURT: Any objection to 29 coming into evidence?

MR. JACKSON: No objection.

THE COURT: Admitted.

(Government Exhibit 29, was received in evidence.)

THE COURT: You may publish.

(Exhibit published.)

Q Ms. Vukel, do you recognize this individual in Government Exhibit 29?

A I do not.

MR. SKURNIK: Your Honor, with permission, I'd like to publish just for the witness Government Exhibit 18 which is not in evidence.

THE COURT: Any objection to 18 being admitted?

MR. JACKSON: No, Your Honor.

THE COURT: It's admitted.

(Government Exhibit 18, was received in evidence.)

**J.A. 433**

*Kristi Cruz, RMR, CRR, RPR,*

M. VUKEL - DIRECT - MR. SKURNIK 792

THE COURT: You may publish.

(Exhibit published.)

Q Ms. Vukel, do you recognize this individual in Government Exhibit 18?

A I do not.

MR. SKURNIK: Your Honor, I'd like to put up Government Exhibit 30 which is in evidence.

THE COURT: You may publish. It's in evidence.

(Exhibit published.)

Q Ms. Vukel, do you recognize this individual?

A I do not.

MR. SKURNIK: Your Honor, with permission, Government Exhibit 19 which is not in evidence.

THE COURT: Any objection to 19?

MR. JACKSON: No objection.

THE COURT: It's admitted.

(Government Exhibit 19, was received in evidence.)

THE COURT: You may publish.

(Exhibit published.)

Q Ms. Vukel, do you recognize this individual?

A I do not.

MR. SKURNIK: Your Honor, with permission, I'd like to publish Government Exhibit 11 which is not in evidence.

THE COURT: Any objection to 11?

MR. JACKSON: No objection, Your Honor.

*Kristi Cruz, RMR, CRR, RPR,*

M. VUKEL - DIRECT - MR. SKURNIK    793

THE COURT:  You may publish.  It's admitted.

(Government Exhibit 11, was received in evidence.)

(Exhibit published.)

Q    Ms. Vukel, do you recognize this individual?

A    I do not.

Q    So all of those photographs that I just showed you, you don't recognize any of those people?

A    No, I do not.

Q    You never met them before?

A    Never.

Q    They're not clients of yours?

A    No, they're not.

THE COURT:  As far as you know, did you ever speak with any of them on the telephone?

THE WITNESS:  No, I have not.

THE COURT:  Go ahead.

Q    Ms. Vukel, have you ever had has a client someone named David Motovich?

A    I have not.

Q    Ms. Vukel, if you look over to the far table in the courtroom, is there anyone there that you recognize that you've seen before?

A    I do not.

Q    As part of your business, do you ever issue insurance certificates?

M. VUKEL - DIRECT - MR. SKURNIK    794

A    Yes.

Q    What are those?  What's an insurance certificate?

A    A certificate is to indicate, such as a company, what insurance policies they have through our office.

Q    So what's the purpose of an insurance certificate?

A    It is to provide the party requesting insurance that they have proof.  So let's say a contractor, he would request it that I provide a certificate, and he would be providing it to the person that's asking him to prove that he has coverage.

Q    So who produces the insurance certificate?  Is that the insurance company or is that your company, the broker?

A    It can be done by either or, but generally it's done through the broker.

Q    And what types of information is included on an insurance certificate?

A    It would be the broker's, producer's information, the customer, the contractor's name, their insurance companies that they have, and the forms of insurance they have.

MR. SKURNIK:  Your Honor, with permission, I'd like to pull up Government Exhibit 228 which is not in evidence.

THE COURT:  Any objection to 228?

MR. JACKSON:  No objection.

THE COURT:  It's admitted.

(Government Exhibit 228, was received in evidence.)

THE COURT:  You may publish.

M. VUKEL - DIRECT - MR. SKURNIK    795

(Exhibit published.)

MR. SKURNIK:  Thank you, Your Honor.

Ms. Kannan, if we could just zoom in at the very top of this.  Thank you.

Q    Ms. Vukel, what is this document?  Do you recognize this?

A    Yes.  It's ACORD Certificate of Insurance.

Q    Is it filled out?

A    No, it's blank, the one I see on my screen.

Q    So this form here, who creates these forms?

A    It's a company called ACORD.  They're the ones that created the form.

Q    So if someone wanted to get one of these forms, where could you find it?

A    You can find this on the internet.

Q    Does your company use these forms?

A    Yes.

Q    So I'm going to ask you to explain a few of the boxes on this form, and I'd like to start with producer.  Do you see the box sort of the top left labelled Producer?

A    Yes.

Q    What goes in that box?

A    That would be my company's name and address and phone number.

Q    How about the box underneath that says Insured, what goes in that box?

M. VUKEL - DIRECT - MR. SKURNIK    796

A    That would be the contractor's name and address.

Q    So is that the name of your client?

A    Yes, my client.

Q    How about to the right.

MR. SKURNIK:  Ms. Kannan, if we can just zoom in on the Insurers Affording Coverage box.

Q    What goes in that box there, Insurers Affording Coverage?

A    Right there would be the insurance company names that the customer has insurance through.

Q    How about, going down the page now where it says Type of Insurance, what goes there?

A    So to your far left, you would start to write down if the customer has general liability, their information would be there.  On the box below that would be auto liability if they have.  Below that would be umbrella or excess liability, and under that would be workers' comp.  And typically the blank box would be for disability insurance, if they had disability insurance through my office.

Q    And then moving to the right, the next column, Policy Number, what goes in there?

A    That would be the policy number that the insurance company assigns for each policy.  So going back to the left, which is General Liability, the policy number in that column would relate to the general liability policy.

Q    So does each policy have -- is it a unique policy number?

**J.A. 434**

M. VUKEL - DIRECT - MR. SKURNIK        797

How does that work?

A   The policy number is issued directly by the insurance company, and each customer has a policy number assigned to them.

Q   And then moving to the next column, where it says Policy EFF, what does that mean?

A   That's policy effective date.

Q   What goes in that box?

A   The date the policy is to start.

Q   How about the box to the right where it says Policy EXP, what does that mean?

A   That's the policy expiration date.  That's when the policy will end.

Q   And then moving again to the right of the document where it says Limits, what's under Limits?

A   That would be listing the coverage amounts for the policy.

Q   So does that include dollar values of the policy amount?

A   Yes, correct.

Q   So moving down on our page --

MR. SKURNIK:  Ms. Kannan, if we can focus on -- yeah, that box there.

Q   Where it says Description of Operations, what goes in this box?

A   That box basically would be -- generally, it could be

*Kristi Cruz, RMR, CRR, RPR,*

---

M. VUKEL - DIRECT - MR. SKURNIK        798

additional insureds, other parties that want to be listed on the client's policy.

Q   And then underneath Description of Operations, where it says Certificate Holder, what goes in Certificate Holder?

A   It would be generally the person asking our insured, their information would be there.  It could be a company or it could be an individual's name and address.

Q   So just to be clear, in Certificate Holder, that's not typically your client, right?  That's someone else who is asking for the document --

A   No, no, it would not be the client.  The client is up on top where the insured is.

Q   And then to the right where it says Authorized Representative, what's that for?

A   That would be where I would sign the certificate. Whoever's issuing the certificate, their signature.

Q   So for your company, who typically signs these?

A   It would be myself.

Q   How do you sign it?

A   Ink.  I would print the form and sign the certificate.

Q   So you do it with a pen?

A   Correct.

Q   After you sign it, what do you do with the certificate?

A   The typically it's put in the scanner and scan it to the insured.

*Kristi Cruz, RMR, CRR, RPR,*

---

M. VUKEL - DIRECT - MR. SKURNIK        799

Q   And then how do you typically send it to the insured?

A   By email.

Q   Who usually asks for insurance certificates?

A   It would be the insured.

Q   So that's your client?

A   Correct.

Q   What happens if someone who is not your client asks -- calls up your company and asks for one of these certificates for a client?

A   We don't release it to a third party.  It has to be the insured to call us, and even the insured we request that we get a request in writing.

Q   Okay.  I want to go through each of those.

Starting with a third party making a request, why don't you give a certificate to a third party?

A   Because I just don't know who I'm talking to on the other end.  It's to protect the insured and our business.  That's a requirement we established when we opened the office.

Q   That's for security purposes?

A   Absolutely.

Q   And then even when one of your clients calls you up and asks for an insurance certificate, why do you require an email?

A   That way we have the information that it is coming from him or her, and that way it just makes it easier, clearer, of

*Kristi Cruz, RMR, CRR, RPR,*

---

M. VUKEL - DIRECT - MR. SKURNIK        800

what needs to be written on it so we don't go back and forth.

Q   Is that also about security concerns?

A   Absolutely.

Q   Ms. Vukel, do you have clients in the construction industry?

A   Yes.

Q   Are they typically general contractors or subcontractors or both?

A   It could be either or.

Q   Do your subcontractor clients ever ask you for insurance certificates?

A   Yes.

Q   Do they ever tell you why they ask for them?

A   That they're doing a job.

Q   And who do they typically want to give the certificate to on the job?

A   It could be for a general contractor that they're working for or it could be for the individual that they're maybe doing a private job for.

MR. SKURNIK:  Your Honor, with permission, I'll pull up Government Exhibit 1 which is in evidence.

THE COURT:  You may publish it to the witness and to the jury.

(Exhibit published.)

Q   Ms. Vukel, do you recognize this individual?

**J.A. 435**

*Kristi Cruz, RMR, CRR, RPR,*

M. VUKEL - DIRECT - MR. SKURNIK     801

A   Yes.

Q   Who is that?

A   That's Ago Kolenovic.

Q   How do you know Ago Kolenovic?

A   He's a customer.

Q   He's a customer of the Vukel Insurance Agency?

A   Correct.

Q   Is he a personal customer, or does he have a company that has insurance?

A   Currently he's a personal client, personal insurance.

Q   How about in the past?

A   Commercial.

Q   Do you have the name of his company?

A   At the time he was to my office, it was Ago & Alaudin General Contracting, I believe, Corp.

Q   How long was Ago & Alaudin General Contracting Corp. a client?

A   I would say for several years.

Q   Do you know about when that company became a client of yours?

A   It was fairly after we kind of opened our own office, so maybe 2010-ish.

Q   So if that company was a client, have you met Mr. Kolenovic in person?

A   Yes, I have.

*Kristi Cruz, RMR, CRR, RPR,*

M. VUKEL - DIRECT - MR. SKURNIK     802

Q   You've spoken to him before?

A   Yes.

Q   Did you know him before he became a client of your insurance agency?

A   No, I had not.

Q   Do you recall how he became a client?

A   Just walking in.

        (Continued on the following page.)

*Kristi Cruz, RMR, CRR, RPR,*

M. VUKEL - DIRECT - MR. SKURNIK     803

(Continuing.)

Q   When his company was insured through your agency, what types of insurance did he have?

A   General liability.

Q   Was it just that, general liability?

A   Correct.

Q   Did Mr. Kolenovic ever request insurance certificates from you or from your agency?

A   Yes, he did.

Q   So I'm gonna direct your attention --

        MR. SKURNIK:  We can take that down, Ms. Kannan.

Q   Directing your attention to the year 2014.  Did anyone ask you to verify information in an insurance certificate for Ago Kolenovic?

A   Yes.

Q   What happened?

A   We received a phone call and I believe it was from another insurance office that wanted to verify the certificate and wanted to verify the information on the certificate.

Q   Is that a typical thing, to get phone calls requesting to verify information on a certificate?

A   Some -- some parties will call and request.

Q   Okay.  Was there anything significant about the phone call that day?

A   That day, yes, because the lady on the line said that she

*LEEANN N. MUSOLF, RPR*

M. VUKEL - DIRECT - MR. SKURNIK     804

received a certificate from my office the day prior for Ago which stood out to me because I didn't do anything for him the day prior.

Q   So she was asking -- just so I understand this correctly:  She's asking to confirm a certificate from the day prior but you don't recall issuing one the day before; is that right?

A   Yes.

Q   So what did you do?

A   I asked her if she could send me that because I couldn't locate a certificate that she's stating she received the day prior.

Q   Do you remember who this person was that you were speaking to on the phone?

A   It was a lady from an insurance company called Elite.

Q   Do you recall her name?

A   I believe it was Pam.

Q   Okay.  So what did you do after the phone call?

A   I had asked her to fax me a copy of the certificate that she said that she received.

Q   Did she, in fact, send you that fax?

A   She did.

Q   Did you receive it?

A   Yes.

Q   Okay.  Why did you ask her to send a copy of the certificate to you?

**J.A. 436**

*LEEANN N. MUSOLF, RPR*

M. VUKEL - DIRECT - MR. SKURNIK     805

A    I just wanted to know how she had something from our office when we didn't issue anything the day prior, so I just wanted to see it for myself because she said it had our name on it.

MR. SKURNIK:  Your Honor, just for the witness, I would like to pull up Government Exhibit 153-B which is not in evidence.

THE COURT:  Any objection to Government Exhibit -- what's the number again?

MR. SKURNIK:  135-B.

THE COURT:  135-B, as in boy.  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  It's admitted.  You may publish.  And this will be our last document before our lunch break.

(Government Exhibit 135-B, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  Thank you, Your Honor.

Ms. Kannan, can we zoom in on the top of the document.

A    Thank you.

Q    Ms. Vukel, do you recognize this?

A    Yes.

Q    What is this?

A    This is the insurance certificate that was faxed to my

LEEANN N. MUSOLF, RPR

---

M. VUKEL - DIRECT - MR. SKURNIK     806

office.

Q    What's the date listed on this document?

A    To the far left, it says December 18, 2000 -- well, 14.

Q    How about in the date box on the right --

MR. SKURNIK:  Just below it, Ms. Kannan.

Q    What date is listed?

A    12/18/2014.

Q    Who is listed as the producer on this document?

A    My company.  My agency.

Q    Okay.  So that's the name of your company?

A    Vukel Group Insurance Agency, yes.

Q    Is the address correct?

A    Yes.

Q    How about the telephone number?  Is that the telephone number for your company?

A    Yes.

Q    Who is listed as the insured, your client?

A    Ago & Alaudin General Contracting Corp.

Q    And that was a client of yours, right?

A    Correct.

Q    Okay.

MR. SKURNIK:  If we can zoom back out and focus now on insurers affording coverage.  We can zoom in on that.

Q    Ms. Vukel, does anything jump out to you about this box?

A    Yes, Company B.

LEEANN N. MUSOLF, RPR

---

M. VUKEL - DIRECT - MR. SKURNIK     807

Q    Why is that?

A    That's not a company we write with.

Q    What do you mean by that?

A    We're not an authorized representative for Erie Insurance.

Q    Did Ago & Alaudin General Contracting Corp. have insurance through your agency with Erie Insurance Company?

A    No, he did not.

MR. SKURNIK:  If we can zoom back out and zoom in on the policy effective date and expiration date, please.

Q    Does anything jump out to you about these dates?

A    Yes.

Q    What's that?

A    The effective and expiration dates.

Q    Are they correct?

A    They are not correct at that time that he had coverage through our office.

Q    So the effective dates and the expiration dates for Ago & Alaudin were not these dates here on this document?

A    No, they were not.

Q    Okay.

MR. SKURNIK:  If we can zoom out again and focus on the limits including the numbers.

Q    Does anything jump out to you as significant about these numbers?

LEEANN N. MUSOLF, RPR

---

M. VUKEL - DIRECT - MR. SKURNIK     808

A    Yes.

Q    What is that?

A    They're incorrect coverage amounts that he had on the policy.

Q    What's incorrect about them?

A    Basically he had limits of 2-million 6-million and this certificate only states 2-million 1-million.

Q    What about the placement of the numbers?  Is there anything significant about that?

A    Yes.  The font and the position of where the numbers are, it typically would be all the way to the far right and much larger.

Q    So this isn't how you would typically issue an insurance certificate, is it?

A    No, it's not.

MR. SKURNIK:  If we can zoom out again and then scroll down and, please, zoom in on the certificate holder at the bottom.

Q    The certificate holder, Royal Home Improvements.  Do you recognize that?

A    I recognize it from this piece of paper but not prior to that.

Q    Had Royal Home Improvements ever called up your agency and asked for a certificate?

A    No, they had not.

LEEANN N. MUSOLF, RPR

J.A. 437

PROCEEDINGS 809

Q   Has Mr. Kolenovic or anyone from his company ever asked you for a certificate for Royal Home Improvements?

A   No, he has not.

Q   Okay.  That signature under authorized representative, is that your signature?

A   No, it's not.

Q   How do you know?

A   It's just not my signature.

Q   Okay.

MR. SKURNIK:  If we can zoom out again.  And then, Ms. Kannan, if we can just zoom in on the writing at the bottom of the document.

Q   Ms. Vukel, can you read what that says?

A   Fraud.  Not my signature.

Q   Who wrote that?

A   I did.

Q   Why did you write that?

A   Because that's not my signature and the certificate was fraud.

Q   Okay.

MR. SKURNIK:  Your Honor, I think this is a good stopping point on this document.

THE COURT:  All right.  Ladies and gentlemen, we are going to take our luncheon recess now.  It's about 20 minutes to 1:00.  Why don't we resume here at two o'clock, if that's

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS 810

sufficient time, we will pick it up at two o'clock.  Do not talk about the case and have a good lunch.  We'll see you at two o'clock.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Jury exits the courtroom.)

THE COURT:  All right.  Thank you, ma'am.  You may step down and you may leave the courtroom.  Please do not talk with anyone about your testimony during the break, and we'll see you back here at 2:00.  You have a nice lunch, ma'am.

THE WITNESS:  Thank you.

THE COURT:  Thank you very much.

(The witness steps down.)

MR. SKURNIK:  The jury has left the courtroom and the witness is leaving the courtroom.  I'm going to ask everyone to be seated.  The witness has left the courtroom.

And let me ask the lawyers if we have any issues to address before we take our luncheon break.  Anything from the Government?

MR. PAULSEN:  No, Your Honor.  We're good.

THE COURT:  Anything from defense counsel?

MR. JACKSON:  No, Judge.

THE COURT:  All right.  Everyone have a good lunch.  We'll see you at two o'clock.

(Luncheon recess taken.)

(Continued on the following page.)

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS 811

A F T E R N O O N   S E S S I O N

(In open court; jury not present.)

THE COURT:  You may be seated.  I hope everyone had a nice lunch.

Do we have any issues to address before we bring the witness in and the witness return to the stand.

From the Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  From defense?

MR. JACKSON:  No, Judge.

THE COURT:  Okay.  Let's bring if the jury and have the witness resume the stand.

May I offer you a cough drop.  I assure you no federal if you don't remembers were expended in this exercise.

(Witness resumes the witness stand.)

THE COURT:  For the record, these are Polar seltzers you hear being snapped up here.  I don't want any of those rumors flying around.  At least until five o'clock, which is why we stop at 5:00.  After that, all bets are off.

Please stand for the jury.

(Jury enters the courtroom.)

THE COURT:  Thank you, ladies and gentlemen of the jury, for your prompt return.  Please be seated.  You see the candy man hat ones again visited you.  But not that candy man, the good candy man.  Please be seated.

**J.A. 438**

*LEEANN N. MUSOLF, RPR*

---

M. VUKEL - DIRECT - MR. SKURNIK 812

You're still under oath.  Have you spoken with anyone about your testimony since leaving the stand, ma'am?

THE WITNESS:  No, I have not.

THE COURT:  Okay.  Thank you.

Please continue your examination, Counsel.

MR. GRUBIN:  Thank you, Your Honor.

DIRECT EXAMINATION (Continued)

MR. SKURNIK:  If we can bring back up Government Exhibit 153-B in evidence.

THE COURT:  Yes.  Publish.

(Exhibit published.)

MR. SKURNIK:  And, Mr. Scott, if there's a way to turn on the screen here at the podium.

THE COURT:  Are we settled or do we need to call the techies up?  If it's not working properly, Mr. Scott call down to our tech support people.

MR. SKURNIK:  Your Honor, it's not on yet.  I think it's on, but --

THE COURT:  Why don't you call them anyway, that way we won't waste the jury's time.  And that way, they will be here for any further problems.

MR. SKURNIK:  Thank you.

THE COURT:  Can you see the document, ladies and gentlemen of the jury?  Is it before you?  All right.  The jurors have it.  The parties have it.

*LEEANN N. MUSOLF, RPR*

M. VUKEL - DIRECT - MR. SKURNIK 813

Are you able to proceed, Counsel? And do you want to turn the screen, maybe to work with the big screen?

MR. SKURNIK: I think I can just look at the big projectors.

THE COURT: Let's not waste the jury's time, so go ahead.

MR. SKURNIK: Thank you, Judge.

BY MR. SKURNIK:

Q Ms. Vukel, just before the break, I was asking you some questions about this document. Can you remind the jury how you got this document, where it came from?

A It was faxed to my office.

Q Who faxed it to you?

A Elite Insurance.

Q Do you recall the name of the person who faxed it to you?

A Pam.

Q Pam?

A Pam.

Q Okay.

MR. SKURNIK: Ms. Kannan, if we can zoom in on the very top of the document. Thank you.

Q Ms. Vukel, do you see the name Pam on that document?

A I do, upper left corner.

Q Does it say Pam Halpert fax ID?

A Yes.

*LEEANN N. MUSOLF, RPR*

M. VUKEL - DIRECT - MR. SKURNIK 814

Q Okay. And if you go all the way to the right, what's the date listed?

A 12/19/2014.

Q Okay. So if you then -- when you spoke to Pam, did she tell you when she had received this document?

A The day prior.

Q The day prior. So if you look beneath where it says Pam Halpert, is there another date listed?

A December 18, '14, it says.

Q Is that the day before the date in the upper right-hand corner?

A Yes.

Q What name is listed next to the December 18 date?

A Midwood Lumber and Millwork.

MR. SKURNIK: Ms. Kannan if we can seem out again.

Q If you told us earlier that you didn't think the information on this document was real. Why is that?

A Everything about it. Originally, it was my signature, Erie Insurance and even the way the certificate, the font, and even the certificate itself, it says certificate of insurance, ours will say certificate of liability insurance.

Q And how did you know that the information on this document was inaccurate? For example, how did you know what policies Ago & Alaudin had or what the dates of those policies were?

*LEEANN N. MUSOLF, RPR*

M. VUKEL - DIRECT - MR. SKURNIK 815

A Well, the policy he has through my office, that information, I would know and that policy ran from June to June and this says May to May.

MR. SKURNIK: If we can zoom in at the bottom of the document where it says, fraud, not my signature.

Q So just to be clear, you wrote this?

A Yes, I did.

Q When did you write this?

A The day that I got the fax from Pam.

Q Okay. Would you ever put information in an insurance certificate for an insurance policy that you didn't actually provide for a client?

A No, we would not.

Q Why not?

A Because we're not authorized to do so.

Q So after you received this document, what did you do with it?

A We looked into it and we started searching the name on top, where it came from.

Q Is that the Midwood Lumber and Millwork name?

A Correct.

Q Okay. How did you search it?

A Just by Googling.

Q Okay. What happened next?

A We found a company and it kind of matched that name.

*LEEANN N. MUSOLF, RPR*

M. VUKEL - DIRECT - MR. SKURNIK 816

Q What did you do after you found the company?

A We made a phone call to them.

Q Okay. Do you recall the name of any person you called?

A Yeah, a female answered by the name of Marina.

Q Okay. Do you recall a last name?

A No.

Q What did you say, if anything, to Marina?

A I had questioned where they had received the certificate and I told her that we're the broker for Ago and I was curious to know where she got the certificate that was presented to Elite Insurance.

Q What did she tell you?

A She just said she didn't know and she would look into it.

Q Were you concerned about that answer?

A Yes, I was.

Q Why?

A Because I didn't feel the urgency from her.

Q Why did you feel urgency, if you did?

A Because everything on that certificate was false and -- but, unfortunately, it had our name on it.

Q What did you do after the phone call with Marina?

A We called our insured.

Q Okay. Is that Ago?

A Yes.

Q Okay. What did you tell him?

*LEEANN N. MUSOLF, RPR*

**J.A. 439**

M. VUKEL - DIRECT - MR. SKURNIK    817

A    We told him that we received a fax that somebody had issued a certificate on our behalf that we never did and we recommended that he come in the office.

Q    What was his response?

A    He was shocked and he said not a problem.

Q    Did you meet with him?

A    Yes, we did.

Q    What happened at that meeting?

A    He wanted to know what document we received and I presented it to him and I explained to him that we didn't issue the certificate and he knew he didn't request it as well.

Q    He told you that?

A    Yes.

Q    Okay.  Did you ever send this document to anybody else?

A    This -- no, I don't believe so because Pam sent it to us and the only -- the only party that I would have sent it -- I sent it to Midwood.

Q    Okay.

MR. SKURNIK:  Your Honor, if we could pull up Government Exhibit 153-A which is not in evidence.

THE COURT:  Any objection to 153-A coming into evidence?

MR. JACKSON:  Just one moment, please, Judge.

No objection, Your Honor.

*LEEANN N. MUSOLF, RPR*

M. VUKEL - DIRECT - MR. SKURNIK    818

THE COURT:  Admitted.  You may publish.

(Government Exhibit 153-A, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  Ms. Kannan, if we can just zoom in at the top of the document.  Thank you.

BY MR. SKURNIK:

Q    Ms. Vukel, do you recognize this document?

A    Yes.

Q    What is this?

A    It was my fax coversheet.

Q    Is that the name of your insurance agency at the top?

A    Yes.

Q    Is that the address for your agency?

A    Yes.

Q    Is that your contact information at the top?

A    Yes.

Q    Okay.  Who were you sending this fax to?

A    To Marina at Midwood.

Q    Is that Midwood Lumber?

A    Correct.

Q    And what's the subject line on this fax?

A    Fake certificate.

MR. SKURNIK:  Ms. Kannan, if we can zoom in now on the body of the fax.

*LEEANN N. MUSOLF, RPR*

M. VUKEL - DIRECT - MR. SKURNIK    819

Q    So I'm gonna read this aloud and let me know if I read it accurately.  It says:

Marina, please see attached certificate that was sent from your office to Elite Insurance.  The certificate was issued with yesterday's date.  This certificate is fake and the signature on the certificate is fake.  I did not issue the certificate and that is not my signature.  All the information on the certificate is not valid.  I want to know who from your office issued this certificate and fraudulently signed my name.  Please look into where this certificate came from.  Please give me a call ASAP today.

Did I read that correctly?

A    Yes, you did.

Q    Did you write that language?

A    Yes, I did.

Q    Is that your name in the bottom left-hand corner?

A    Yes, it is.

Q    Is that your signature in the bottom left-hand corner?

A    Yes, it is.

Q    After you faxed this to Marina, what happened?

A    I followed up with a phone call to their office.

Q    Before you did that, did they call you at all?

A    No.

Q    Okay.  So what happened when you called their office?

A    That she was gonna look into it.  She didn't know where

*LEEANN N. MUSOLF, RPR*

M. VUKEL - DIRECT - MR. SKURNIK    820

it came from.

Q    Did you speak with Marina again?

A    Yes, I did.

Q    What did she tell you?

A    That she was just gonna look into it.

Q    From your perspective, did she seem concerned?

A    No.

Q    Did that worry you?

A    Yes.

Q    Why is that?

A    Because it represents my office and we didn't issue the certificate.

Q    Did you ever talk to Marina again after that?

A    No.

Q    Okay.  How about Pam, did you speak to Pam again?

A    I tried her but didn't get any information, which I didn't press her for it because I kind of understand her position.

Q    Has anything like this ever happened with you before?

A    No.

Q    Has anything like this happened with you since?

A    No.

Q    How about Ago, have you ever had any problems with Ago Kolenovic?

A    No.

**J.A. 440**

*LEEANN N. MUSOLF, RPR*

M. VUKEL - DIRECT - MR. SKURNIK    821

Q    Has he ever been late on payments?  Anything like that?

A    Never.

MR. SKURNIK:  So, Your Honor, I'd like to pull up Government Exhibit 1014, which is in evidence.

THE COURT:  You may publish.

(Exhibit published.)

Q    So, zooming in on the email header at the top, Ms. Vukel. Who is this email from?

A    It says David Motovich.

Q    Okay.

A    And then fax midwood@aol.com.

Q    And is it to mkuyan1013?

A    Yes.

Q    Does the subject line say, Certificate AGO-UEG?

A    Yes.

Q    Okay.

MR. SKURNIK:  If we can go to the second page of this document now and zoom in at the top.

Q    Ms. Vukel, is that the name of your insurance agency?

A    Yes, on the upper left corner.

Q    And is that one of your clients in the insured?

A    Yes.

Q    Okay.  Does this document appear to be legitimate to you?

A    No.

Q    Why not?

M. VUKEL - DIRECT - MR. SKURNIK    822

A    Because, like I said earlier, it says certificate of insurance, so the actual form itself is not something we used. And, as well, his policy effective date and expiration, and Company B in the upper right corner mentions Erie Insurance, and like I said prior, we're not authorized write Erie.

Q    So let's start with the certificate of insurance at the top.  What's wrong with certificate of insurance?

A    It's just the form we use has certificate of liability insurance.

Q    So the word liability is missing here?

A    Yes.

Q    And what's wrong with Erie Insurance Company?

A    We're not authorized representative with them, so that policy was not with my office.

Q    What's wrong with the dates?

A    This ways March to December.  His policy went from June to June.

Q    Okay.  How about the policy limits on the right.  Is there anything wrong with that?

A    Well, this one says two six but the font and the positioning of the numbers is not accurate.

MR. SKURNIK:  If we can scroll down, Ms. Kannan, to the bottom.

Q    The certificate holder, UEG New York, Inc.  Do you recognize that name?

M. VUKEL - DIRECT - MR. SKURNIK    823

A    I do not.

Q    Do you recall ever issuing a certificate to UEG New York Inc.?

A    I don't recall.

Q    Is there a signature on this form?

A    I don't see one, no.

Q    You ever issue a certificate without a signature?

A    No.

Q    Okay.  Is this a document created by your office?

A    No, it's not.

MR. SKURNIK:  Your Honor, if we could go to Government Exhibit 1015, which is in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  Ms. Kannan, if we can zoom in on the header at the top.

Q    Is this an email from romausa7@gmail.com to mkuyan1031@yahoo.com?

A    Yes, I see that.

Q    Okay.

MR. SKURNIK:  Ms. Kannan, if we can just zoom in on, same page, but the information below.

Q    Does it say, begin forwarded message?

A    Yes.

Q    What's the name of the person who was forwarding the

M. VUKEL - DIRECT - MR. SKURNIK    824

message?

A    It says from David Motovich.

Q    Okay.

MR. SKURNIK:  Ms. Kannan, if we can go to page two now.

Q    Ms. Vukel, is that your insurance agency listed?

A    Yes, it is.

Q    And is that your client, Ago & Alaudin General Contracting Corp.?

A    Yes, it is.

Q    Is this a real certificate?

A    No, it's not.

Q    How do you know?

A    Again, it's not the type of form we use, lists Erie Insurance, the font, and even the policy effective date, it says 2012, then there's a 13, that's inaccurate.

Q    I just want to focus on that policy effective date here. Does that say, 0621201213?

A    Yes.

Q    Okay.  And how about the limits on the right, is there any issue with those?

A    Yes, the font and the position, it would be all the way to the right.

MR. SKURNIK:  If we can scroll to the bottom, please, Ms. Kannan.

**J.A. 441**

M. VUKEL - DIRECT - MR. SKURNIK        825

Q    The certificate holder, Unique Painting Service Inc.  Do you recognize that name?

A    I do not.

Q    Do you recall ever issuing a certificate to Unique Painting Service Inc?

A    I do not.

Q    Is that your signature to the right?

A    No, it's not.

MR. SKURNIK:  Your Honor, if we can pull up Government Exhibit 1032, which is in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  Ms. Kannan, can we zoom in at the very top to the email information.

Q    Ms. Vukel, who is sending this email?

A    It says David Motovich.

Q    Okay.

MR. SKURNIK:  Ms. Kannan, if we can go to the second page and zoom in at the top, please.

Q    Again, this -- does this certificate list your insurance agency and Ago & Alaudin General Contracting Corp.?

A    Yes, it does.

Q    Is this a legitimate certificate?

A    No, it's not.

Q    How do you know?

*LEEANN N. MUSOLF, RPR*

---

M. VUKEL - DIRECT - MR. SKURNIK        826

A    Again, the form that it's on, Erie Insurance, the policy effective date, expiration, the policy limits, the font.  It's just not our certificate.

Q    At the very top of the page, what name is listed, sort of top center of the page?

A    Midwood Lumber and Millwork.

Q    Okay.

MR. SKURNIK:  Ms. Kannan, if we can scroll to the bottom, please.

Q    The certificate holder, New Empire Builder Corp, Ms. Vukel, do you recognize that name?

A    No, I do not.

Q    Do you recall ever issuing a certificate to New Empire Builder Corp.?

A    No, I do not.

Q    Okay.  Is that your signature?

A    No, it's not.

MR. JACKSON:  Excuse me, Your Honor?  Your Honor?

MR. SKURNIK:  Your Honor, if we could pull up Government Exhibit 1033, which is in evidence.

THE COURT:  Is there some issue we need to discuss at sidebar?

MR. JACKSON:  Your Honor, I just would say we would stipulate to the testimony.

THE COURT:  No.  We are not going to stipulate.

*LEEANN N. MUSOLF, RPR*

---

M. VUKEL - DIRECT - MR. SKURNIK        827

Go ahead.

MR. JACKSON:  Thank you, Judge.

MR. SKURNIK:  Thank you, Judge.

It's 1033, which is in evidence.  If we can zoom in at the top this email, please.  Thank you, Ms. Kannan.

BY MR. SKURNIK:

Q    Ms. Vukel, who is sending this email?

A    It says from David Motovich.

Q    Is he sending it to mkuyan1031?

A    Yes.

MR. SKURNIK:  If we can go to the second page, please.

Q    Is this, again, an insurance certificate that lists -- or is this a certificate that lists Vukel Insurance Agency and Ago & Alaudin General Contracting Corp.?

A    Yes, it is.

Q    Is this a legitimate insurance certificate?

A    No, it's not.

Q    How do you know?

A    Because, again, the form it's on, and Erie Insurance is listed which we're not authorized, the policy effective, expiration dates, the policy limits, and the font.

Q    So you didn't create this certificate?

A    No, we did not.  No.

MR. SKURNIK:  Can we scroll down, please.

**J.A. 442**

*LEEANN N. MUSOLF, RPR*

---

M. VUKEL - DIRECT - MR. SKURNIK        828

Q    Is that your signature on the right?

A    No, it's not.

Q    The company listed under certificate holder, E&E Tool Manufacturing Company.  Do you recognize that name?

A    No, I do not.

Q    How about the -- if you go up a little bit to where it says, workers' compensation and employers' liability insurance.  Does anything jump out to you about that portion of the certificate?

A    Yes, the entire column.

Q    Why is that?

A    We don't write with Erie Insurance, so that information is not accurate.

Q    Did you provide workers' compensation insurance to Ago & Alaudin General Contracting Corp.?

A    No.

MR. SKURNIK:  Your Honor, if we can pull up Government Exhibit 1036, which is in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  And if we can zoom in at the top, Ms. Kannan.

Q    Ms. Vukel, who is sending this email?

A    It says from David Motovich.

Q    Okay.

*LEEANN N. MUSOLF, RPR*

M. VUKEL - DIRECT - MR. SKURNIK          829

MR. SKURNIK:  Ms. Kannan, if we can go to the second page.

Q    Does this, again, list Vukel Insurance Group Agency and Ago & Alaudin General Contracting Corp.?

A    Yes, it does.

Q    Is this a legitimate certificate?

A    No, it's not.

Q    How do you know?

A    The form that it's on, it lists Erie Insurance, the policy effective date, the expiration, the limits, the position of the limits.

MR. SKURNIK:  If we can scroll down, Ms. Kannan.

Q    How about the workers' compensation portion of this, does that jump out to you?

A    Yes, it does.

Q    Why is that?

A    Because we didn't write with Erie so that information would not be on my certificate.

Q    Do you recognize the certificate holder, Atlantic Equipment?

A    No, I do not.

Q    You don't recall ever issuing a certificate to them?

A    No, I do not.

Q    Is that your signature?

A    No, it's not.

*LEEANN N. MUSOLF, RPR*

---

M. VUKEL - DIRECT - MR. SKURNIK          830

Q    You didn't create this certificate?

A    No, I did not.

MR. SKURNIK:  Your Honor if we can go to Government Exhibit 1038, which is in evidence.

THE COURT:  You may.

(Exhibit published.)

MR. SKURNIK:  Ms. Kannan, if we can zoom in at the top.

Q    Is this an email from midwoodmill to mkuyan1013?

A    Yes, it is.

MR. SKURNIK:  And, Ms. Kannan, if we can go to the second page, please.

Q    Is this, again, a certificate that lists your insurance agency and Ago & Alaudin General Contracting Corp.?

A    Yes, it does.

Q    Does this appear to you to be legitimate?

A    No.

Q    Why not?

A    The form it's on, again Erie Insurance, the policy effective date, expiration, the limits, the font.

MR. SKURNIK:  And, Ms. Kannan, if we can scroll down to the bottom.

Q    How about this portion of the document, does anything appear incorrect here?

A    Column B again.

*LEEANN N. MUSOLF, RPR*

---

M. VUKEL - DIRECT - MR. SKURNIK          831

Q    Is that the workers' compensation column?

A    Correct.

Q    And --

A    And --

Q    Please, go ahead.

A    And the signature that says is mine, is not.

Q    And how about Quest Partners as the certificate holder. Do you recognize that?

A    No, I do not.

Q    You don't recall ever issuing a certificate to Quest Partners?

A    No, I do not.

MR. SKURNIK:  Your Honor, I would like to pull up Government Exhibit 1051, which is in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  And, Ms. Kannan, if we can zoom in at the top.

Q    Who is sending this email, Ms. Vukel?

A    It says from David Motovich.

Q    Okay.  And is it to mkuyan1013?

A    Yes.

MR. SKURNIK:  Ms. Kannan if we can go to the second page, please.

Q    Is this, again, a certificate that lists Vukel Group

*LEEANN N. MUSOLF, RPR*

---

M. VUKEL - DIRECT - MR. SKURNIK          832

Insurance Agency and Ago & Alaudin General Contracting Corp.?

A    Yes.

Q    Does this one appear legitimate to you?

A    No.

Q    Why not?

A    The form that it's issued on, the font, Erie Insurance, effective date, expiration, the limits to the right.

Q    How about the alignment of the limits, does anything jump out to you about that?

A    Yes.

Q    What's that?

A    They're not even together going straight down.  And like I mentioned before, the font, and our certificates would never be in that position.

MR. SKURNIK:  Ms. Kannan, if we can scroll down to the bottom, please.

Q    This certificate holder, Unique Painting Service Inc., do you recognize that name?

A    No, I do not.

Q    Okay.  Is that your signature beside it?

A    No, it's not.

Q    And the workers' compensation and employers' liability; is that accurate?

A    No, it's not.

MR. SKURNIK:  Your Honor, if we could pull up

*LEEANN N. MUSOLF, RPR*

**J.A. 443**

M. VUKEL - DIRECT - MR. SKURNIK      833

Government Exhibit 1065, which is not in evidence.  This is just for the witness.

THE COURT:  Any objection to exhibit 1065?  Government Exhibit 1065, any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1065, was received in evidence.)

(Exhibit published.)

Q    Is this an email from marinak to miklosmortiz?

A    Yes.

Q    Okay.

MR. SKURNIK:  We can go to the second page, Ms. Kannan.

Q    Who is listed as the producer on this certificate?

A    My office.

Q    Okay.  Who is listed as the insured?

A    ZKC NYC Inc.

Q    Do you have a client name ZKC NYC Inc.?

A    No, we do not.

Q    Have you ever seen that name on -- do you recognize that name?

A    No, I do not.

Q    Where it says, certificate of insurance, at the top, does anything jump out to you as incorrect?

A    Yes.  The actual form, it's missing certificate of

M. VUKEL - DIRECT - MR. SKURNIK      834

liability insurance.

Q    It's missing the word liability?

A    Correct.

Q    Okay.  Is there anything else that looks inaccurate to you on this form?

A    Well, the whole form.  This is not a client we had.

Q    If you look at the limits, is there anything incorrect about the alignment of the limits?

A    Yeah.  They're not aligned straight in a row.  They're kind of left or right.

Q    And when you issue a certificate, would you typically have the limits be aligned?

A    Absolutely, and they would be much larger, the font.

MR. SKURNIK:  If we can scroll down, Ms. Kannan.

Q    The certificate holder, Production Source International.  Do you recognize that?

A    No, I do not.

Q    Is that your signature to the right?

A    No.

Q    Did you create this certificate?

A    No.

Q    Did you issue this certificate to anyone?

A    No.

Q    Are you aware of anyone else at your company creating or issuing this certificate?

M. VUKEL - DIRECT - MR. SKURNIK      835

A    No.

Q    Okay.

MR. SKURNIK:  Your Honor, if we could pull up Government Exhibit 1070, which is in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  And, Ms. Kannan, if we can zoom in at the top, please.  Thank you.

Q    Ms. Vukel, is this an email from Rosa Schwartz to gail@midwoodlumber.com?

A    Yes.

Q    Okay.

MR. SKURNIK:  If we can got second page, please, Ms. Kannan.

Q    Again, is your company listed as the producer?

A    Yes.

Q    And is ZKC NYC Inc. listed as the insured?

A    Yes.

Q    That's not a client of yours?

A    No.

Q    You didn't create this certificate?

A    No.

Q    You didn't issue this certificate?

A    No.

MR. SKURNIK:  If we can scroll to the bottom,

M. VUKEL - DIRECT - MR. SKURNIK      836

please.

Q    That's not your signature on the bottom?

A    No.

Q    Metro Fabrication Corp, under certificate holder, do you recognize that name?

A    No.

MR. SKURNIK:  Your Honor, if we can go to Government Exhibit 1074, which is not in evidence.

THE COURT:  Any objection to Government 1074?

MR. JACKSON:  No, Judge.

THE COURT:  It's admitted.  You may publish.

(Government Exhibit 1074, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  Ms. Kannan, if we can zoom in at the top.

Q    Is this an email from Rosa Schwartz to mkuyan1013?

A    Yes.

MR. SKURNIK:  If we can go to the second page, please.

Q    Is this, again, a certificate with an insured listed as ZKC NYC Inc.?

A    Yes.

Q    Who is listed as the producer?

A    My office.

Q    Did your office create this?

**J.A. 444**

M. VUKEL - DIRECT - MR. SKURNIK          837

A   No, we did not.

Q   Okay.

MR. SKURNIK:  If we can scroll to the bottom.

Q   Is that your signature?

A   No.

Q   Under, certificate holder, Antonov Stone Work Corp.  Do you recognize that name?

A   No.

Q   Do you recall ever issuing a certificate to Antonov Stone Work Corp.?

A   No.

Q   Okay.

MR. SKURNIK:  If we can scroll up to the top, please.

Q   Ms. Vukel, what's the date on this certificate?

A   June 28, 2016.

(Continued on the following page.)

*LEEANN N. MUSOLF, RPR*

---

VUKEL - DIRECT - SKURNIK          838

BY MR. SKURNIK (Continuing):

Q   Do you recall approximately when you received initially that certificate from Pam that we talked about earlier?

A   The original one?  2014.

Q   Is that two years before the date on this certificate?

A   Yes.

MR. SKURNIK:  Your Honor, if we could move to Government exhibit 1076, which is not in evidence?

THE COURT:  Any objection to Government 1076?

MR. JACKSON:  Not at all, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1076, was received in evidence.)

Q   Ms. Vukel, is this an e-mail from marinak to androntin@yahoo.com?

A   Yes.

MR. SKURNIK:  If we can go to the second page, please, Ms. Kannan.

Q   Is that your company listed at the top?

A   Yes.

Q   The insured ZKC NYC, Inc., is that a client of yours?

A   No.

Q   Is this a certificate your office issued?

A   No.

Q   The limits on the right, do they appear accurate to you?

A   No.

*Linda A. Marino, Official Court Reporter*

---

VUKEL - DIRECT - SKURNIK          839

Q   At the top where it says certificate of insurance, is anything missing?

A   Well, the certificate, the client itself, the insured, is not ours.  But the form certificate of insurance, we would generally have our certificate of liability insurance.

MR. SKURNIK:  Your Honor, if we can go to 1085, which is not in evidence.

THE COURT:  Any objection to Government 1085?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1085, was received in evidence.)

(Exhibit published.)

Q   Is this an e-mail from marinak to -- an e-mail sent by marinak?

A   Yes.

MR. SKURNIK:  If we can go to the second page, please, Ms. Kannan.

Q   Under insured, does it list ZKC NYC, Inc.?

A   Yes.

Q   Did your office issue this certificate?

A   No.

Q   Did you create this certificate?

A   No.

MR. SKURNIK:  Your Honor, if we can go to Government 1086, which is not in evidence.

**J.A. 445**

*Linda A. Marino, Official Court Reporter*

---

VUKEL - DIRECT - SKURNIK          840

THE COURT:  Any objection to 1086?

MR. JACKSON:  No, your Honor.

THE COURT:  You may publish.  It's admitted.

(Government Exhibit 1086, was received in evidence.)

(Exhibit published.)

Q   Ms. Vukel, is this e-mail from marinak to Jim Petrice?

A   Yes.

MR. SKURNIK:  If we can go to the second page, please, Ms. Kannan.

Q   Ms. Vukel, who is the insured here?

A   ZKC NYC, Inc.

Q   Is this a legitimate certificate?

A   No.

Q   Did your office issue this certificate?

A   No.

MR. SKURNIK:  Your Honor, if we can move to 1087, which is not in evidence.

THE COURT:  Any objection to 1087?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1087, was received in evidence.)

(Exhibit published.)

Q   Is this an e-mail from Rosa Schwartz to mkuyan1031?

A   Yes.

MR. SKURNIK:  If we could go to the second page,

*Linda A. Marino, Official Court Reporter*

VUKEL - DIRECT - SKURNIK                841

please, Ms. Kannan.

Ms. Vukel, is this a legitimate certificate?

A    No.

Q    Your office didn't issue this certificate?

A    No, we did not.

MR. SKURNIK:  Your Honor, if we can move to Government Exhibit 1098, which is not in evidence?

THE COURT:  Any objection to Government 1098?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1098, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  Let's go to the second page, please, Ms. Kannan, and zoom in at the top, please.

Q    Ms. Vukel, is this a legitimate certificate?

A    No, it's not.

MR. SKURNIK:  Your Honor, Government Exhibit 1100 not in evidence.

THE COURT:  Any objection to Government 1100?

MR. JACKSON:  No objection.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1100, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  If we could go to the second page, please.

Linda A. Marino, Official Court Reporter

---

VUKEL - DIRECT - SKURNIK                842

Q    Ms. Vukel, is this a legitimate certificate?

A    No.

MR. SKURNIK:  Your Honor, Government Exhibit 1104, which is not in evidence.

THE COURT:  Any objection to Government 1104?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1104, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  Second page, please.

Q    Ms. Vukel, is this a legitimate certificate?

A    No.

Q    If you look at ZKC NYC, Inc., under "insured," what address is listed?

A    It says 1090 Coney Island Avenue, Brooklyn, New York 11230.

Q    Do you recognize that address?

A    No, I do not.

MR. SKURNIK:  Your Honor, Government Exhibit 1107, not in evidence.

THE COURT:  Any objection to Government's exhibit?

MR. JACKSON:  No objection.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1107, was received in evidence.)

(Exhibit published.)

Linda A. Marino, Official Court Reporter

---

VUKEL - DIRECT - SKURNIK                843

MR. SKURNIK:  Second page, please.

Q    Ms. Vukel, is this a legitimate certificate?

A    No.

MR. SKURNIK:  Government Exhibit 1116, not in evidence, your Honor.

THE COURT:  Any objection to Government 1116?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit  1116, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  If we could go to the second page, please.

Q    Ms. Vukel, is that again a certificate purporting to be issued to ZKC NYC, Inc.?

A    Could you ask again.

Q    Under "insured," does it say ZKC NYC, Inc.?

A    Yes.

Q    Is this a legitimate certificate?

A    No.

MR. SKURNIK:  Your Honor, Government Exhibit 1117, not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection, your Honor.

THE COURT:  Admitted.  You may publish.

**J.A. 446**

Linda A. Marino, Official Court Reporter

---

VUKEL - DIRECT - SKURNIK                844

(Government Exhibit 1117, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  If we could go to the second page, please.

Q    Ms. Vukel, is this a legitimate certificate?

A    No, it's not.

MR. SKURNIK:  Your Honor, Government Exhibit 1124, not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1124, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  And second page, please.

Q    Ms. Vukel, is this a legitimate certificate?

A    No.

Q    Your office didn't issue this?

A    No.

MR. SKURNIK:  Your Honor, Government Exhibit 1132.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1132, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  If we could go to the second page,

Linda A. Marino, Official Court Reporter

VUKEL - DIRECT - SKURNIK          845

please.

Q   Ms. Vukel, in the upper right-hand corner, what date is listed?

A   May 15, 2017.

Q   Is this now three years after you initially received the document from Pam?

A   Yes.

Q   Is this a legitimate certificate?

A   No.

MR. SKURNIK:  Government Exhibit 1133.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1133, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  If we could go to the second page, please.

Q   Ms. Vukel, is this a legitimate certificate?

A   No.

MR. SKURNIK:  Your Honor, Government Exhibit 1134, not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection, your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1134, was received in evidence.)

VUKEL - DIRECT - SKURNIK          846

(Exhibit published.)

MR. SKURNIK:  Second page, please.

Q   Ms. Vukel, is this a legitimate certificate?

A   No.

MR. SKURNIK:  Your Honor, Government Exhibit 1139, not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection, your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1139, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  Second page, please.

Q   Ms. Vukel, does this one again list Ago & Alaudin General Contracting Corp.?

A   Yes, it does.

Q   So, that is a client of yours?

A   Yes, he is.  At that time.

Q   Is this a legitimate certificate?

A   No, it's not.

MR. SKURNIK:  If we can scroll down to the bottom, please?

Q   Under "certificate holder," does it say Lithos Marbleworks, Inc.?

A   Yes, it does.

Q   Do you recognize the name of that company?

VUKEL - DIRECT - SKURNIK          847

A   No, I do not.

Q   That's not your signature to the right?

A   No, it's not.

MR. SKURNIK:  Your Honor, Government Exhibit 1157, which is not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection, your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1157, was received in evidence.)

(Exhibit published.)

Q   Ms. Vukel, is this a legitimate certificate?

A   No, it's not.

MR. SKURNIK:  Government Exhibit 1162, not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection, your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1162, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  If we could go to the second page, please.

Q   Ms. Vukel, is this a legitimate certificate?

A   No, it's not.

MR. SKURNIK:  If we could scroll to the bottom, please.

**J.A. 447**

VUKEL - DIRECT - SKURNIK          848

Q   Under "certificate holder," does it say Metro Erectors, Inc.?

A   Yes, it does.

Q   Do you recognize the name of that company?

A   No, I do not.

Q   That's not your signature to the right?

A   No.

MR. SKURNIK:  Your Honor, 1165, not in evidence?

THE COURT:  Any objection?

MR. JACKSON:  No objection, your Honor.

THE COURT:  It's admitted.

(Government Exhibit 1165 , was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  Second page, please.

Q   Ms. Vukel, is this a legitimate certificate?

A   No.

MR. SKURNIK:  Your Honor, Government Exhibit 1180, not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection, your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1180, was received in evidence.)

(Exhibit published.)

MR. SKURNIK:  If we could go to the second page,

VUKEL - DIRECT - SKURNIK                849

please.

Q   Is this a legitimate certificate?

A   No.

MR. SKURNIK:  Government Exhibit 1186, not in evidence, your Honor.

THE COURT:  Any objection?

MR. JACKSON:  No objection, your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1186, was received in evidence.)

(Exhibit published.)

Q   Ms. Vukel, did your office issue this certificate?

A   No.

Q   Can you tell us what the date is in the upper right-hand corner?

A   April 12, 2018.

Q   So, is this now four years after you received that document from Pam?

A   Yes.

Q   Your Honor, the last document, Government Exhibit 1193, not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1193, was received in evidence.)

(Exhibit published.)

*Linda A. Marino, Official Court Reporter*

---

VUKEL - CROSS - JACKSON                850

MR. SKURNIK:  If we could go to the second page, please.

Q   Ms. Vukel, is this a legitimate certificate?

A   No.

Q   Did your office ever issue this certificate?

A   No.

MR. SKURNIK:  Nothing further at this time.

THE COURT:  Any cross?

MR. JACKSON:  Yes, please, your Honor.

CROSS-EXAMINATION

BY MR. JACKSON:

Q   Good afternoon, Ms. Vukel.

A   Good afternoon.

Q   Ms. Vukel, I know testifying is not the best thing in the world.  I'll try to make this as simple as possible for you.

A   No problem.

Q   If you don't understand any of my questions, please let me know.

THE COURT:  Clear the screen, Mr. Jackson, while you're there.

MR. JACKSON:  Thank you, Judge.

Q   My name is Randall Jackson.  I just have a handful of questions for you today.

A   No problem.

Q   First, Ms. Vukel, we just went through a lot of, a lot of

*Linda A. Marino, Official Court Reporter*

---

VUKEL - CROSS - JACKSON                851

Workers' Compensation insurance certificates, insurance certificates that purported to be for Workers' Compensation during your direct.

A   Through all those that we saw?  Yes.

Q   Can you explain just to the jury what Workers' Compensation insurance is?

A   It's insurance that an employer would have for his employees.  It's for the workers in case they get hurt.

Q   And you said that that's not something that you typically deal with; did I hear that correctly?

A   No.  My office does Workers Comp insurance, but we did not write anything for Ago under Erie Insurance.

Q   When you write Workers' Compensation insurance, what is the typical cost of those kinds of policy?

A   Oh, it can vary.  It can go from a few hundred dollars to thousands.

Q   Can you just explain for the jury why that varies, how it varies?

A   It depends on the type of -- class of work and how much payroll.  It all depends on the payroll for the employees.

Q   Is there sort of a metric that you use to determine what the -- you know, what it may look like in terms of cost of Workers' Compensation insurance?

A   It's done through the insurance company, so the premiums are issued by them.

*Linda A. Marino, Official Court Reporter*

---

VUKEL - CROSS - JACKSON                852

Q   You said it could be as little as a couple hundred dollars.

What would that mean in terms of what kind of payroll we're talking about?

A   It could depend on if you're talking about a real estate office that has Workers Comp for their employees because the risk in a real estate office is minimal.  So, it could vary.  Even if you have $50,000 payroll for a real estate office, the insurance could be very insignificant, I guess.

Q   Now, did you write Workers' Compensation insurances for Mr. Kolenovic?

A   No, I don't recall.

Q   Now, we looked at the document -- the prosecutor walked you through this document where you wrote the word "fraud" on it.

A   Uh-huh.

THE COURT:  You can't say "uh-huh," you have to say "yes" or "no."

THE WITNESS:  I'm sorry.

THE COURT:  It's all right.

Q   But you wrote "fraud" on that, ma'am?

A   Yes.

Q   Just to be very clear, you wrote that on there well before you knew about any of the charges in this case, correct?

*Linda A. Marino, Official Court Reporter*

**J.A. 448**

VUKEL - CROSS - JACKSON                                853

A    Absolutely.

Q    And by writing that, it was -- because of the timing, it was not your intention to indicate that you were making some sort of assessment about this particular case, correct?

A    Correct, not at all.

Q    In fact, you've been told by the prosecutors there's not an insurance fraud charge in this case at all, right?

        MR. SKURNIK:  Objection, your Honor.

        THE COURT:  Sustained.

Q    Did the prosecutors tell you at all what the charges were in this case?

A    No.

        MR. SKURNIK:  Objection, your Honor.

        THE COURT:  She answered the question.  The question is overruled.

        Read the question back, Madam Reporter.

        (Record read back.)

        THE COURT:  The answer to that question is?

        THE WITNESS:  No.

        THE COURT:  Next question.

        MR. JACKSON:  Thank you, Judge.

Q    To be very clear, Ms. Vukel, you haven't sued anyone as a result of any of the circumstances that you talked about with the prosecutors, correct?

A    No.

VUKEL - CROSS - JACKSON                                854

Q    And one of the reasons of that is that while I understand having your signature, your company's name used, is extremely frustrating and unfortunate.

        You, yourself, you didn't lose any money as a result of what you went over with the prosecutors, correct?

A    No.

Q    I'm right about that is what you mean?

A    Correct, I didn't lose any money.

Q    And you have no idea what the relevance is of, you know, 50 certificates that we went through to this case or even if it has any relevance at all.  You just don't have any personal knowledge.

        Correct?

        MR. SKURNIK:  Objection, your Honor.

        THE COURT:  Sustained.

        Do you know what the relevance is of any of this?

        THE WITNESS:  Not at all.  I just note that --

        THE COURT:  You answered the question.

        Next question.

        MR. JACKSON:  Thank you, Judge.

Q    Do you have any knowledge of the certificates that you went through with the prosecutors being used in any scheme to transfer money improperly?

        MR. SKURNIK:  Objection.

        THE COURT:  Sustained.

VUKEL - CROSS - JACKSON                                855

Q    Do you know who Kemal Sarkinovic is?

A    No.

Q    You were shown a bunch of pictures at the beginning.

        Did the prosecutors ever tell you who those specific people were that they asked you whether you knew them or not?

A    No.

Q    So, you wouldn't recognize Kemal Sarkinovic if you saw him, right?

A    Not at all.

Q    And you have no personal knowledge of any relationship, if there is one, between Ago Kolenovic and Kemal Sarkinovic.

A    No, I do not.

Q    You don't know anything about anything that they said to each other or any involvement in this case, correct?

A    Correct I don't.

Q    And just to be very clear...

        We looked at a couple of documents.

        MR. JACKSON:  Could we pull up GX1051 again really quickly?

        (Exhibit published to the jury.)

Q    You see how it says David Motovich and next to it it says faxatmidwood@aol.com?

A    Yes, I see that.

Q    You don't know what that relates to, correct?

A    No, I do not.

**J.A. 449**

VUKEL - REDIRECT - SKURNIK                                856

Q    You don't know if the fax machine at Midwood Lumber has a particular name on it, do you?

A    I do not.

        MR. JACKSON:  We can take that down.

Q    Just to be very clear, you have no awareness or belief that David Motovich, my client, stole any money from you, correct?

A    No, I have no knowledge.

Q    And, in fact, you come in here just to do your duty to answer questions, but you have no personal knowledge as it relates to David Motovich at all, correct?

A    Correct, no.

        MR. JACKSON:  Ma'am, thank you so much for your help.  I don't have any other questions.

        THE WITNESS:  Thank you.

        THE COURT:  Any redirect?

        MR. SKURNIK:  Yes, your Honor.

        Just one moment, your Honor.

REDIRECT EXAMINATION

BY MR. SKURNIK:

Q    Ms. Vukel, are there risks to your business by having certificates that you didn't create be out in the world?

A    Sure.  I mean, if anything is out there that says my company name that we didn't issue would be a risk.

Q    And what would that risk be?

VUKEL - REDIRECT - SKURNIK                857

A    Well, it's just falsifying that we --

MR. JACKSON:  Objection, your Honor.

THE COURT:  Overruled.  You opened the door on cross.

Go ahead.

MR. JACKSON:  Thanks, your Honor.

Q    Ms. Vukel, what would the risk be of having false certificates be out in the world?

A    Like I said, it would just state inaccurate information from our office, saying that somebody is insured when they're not insured through our office.

Q    So if somebody, let's say, had an accident and they needed to get compensation but their certificate was false, what kind of risk would that pose?

A    It poses a risk to the party that is looking to get coverage.  There's nonexisting coverage.

MR. SKURNIK:  No further questions, your Honor.

THE COURT:  You may step down, ma'am.  Thank you very much.  Appreciate your time.

THE WITNESS:  Thank you.

THE COURT:  You're welcome.

(Witness excused.)

THE COURT:  Please call your next witness.

MR. GRUBIN:  The Government calls Joe Russo.

THE COURT:  Please bring the witness forward to be

---

PROCEEDINGS                858

sworn.

Please come forward to the witness stand and raise your right hand here in the front of the courtroom and my court deputy will administer the oath.

THE COURTROOM DEPUTY:  Do you solemnly swear or affirm that the answers you're about to give this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE COURT:  Please be seated, sir.  I'm going to ask you to pull the microphone that's right in front of you to you just below your mouth.  It looks like a snake but won't it won't bite you.

Would you please state your name and spell it for the court reporter, and then counsel will inquire?

THE WITNESS:  Joseph Russo, J-O-S-E-P-H R-U-S-S-O.

THE COURT:  Counsel, you may inquire.

Keep your voice up when you answer.

MR. GRUBIN:  Thank you, your Honor.

(Continued on  the following page.)

---

RUSSO - DIRECT - GRUBIN                859

JOSEPH RUSSO, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GRUBIN:

Q    Good afternoon, Mr. Russo.

A    Good afternoon.

Q    Where are you originally from?

A    From Brooklyn, New York.

Q    Is that where you live now?

A    No.  I reside in Staten Island.

Q    Who do you live there with, if anyone?

A    My family.

Q    Mr. Russo, what do you do for work?

A    I do structural steel and concrete erection of buildings. We fabricate steel and we erect the structures of buildings.

Q    Steel construction?

A    Steel construction.

Q    And are you part of a company?

A    Yes, I am.

Q    What's your role in that company?

A    I'm one of the principals.

Q    And what's a principal?

A    One of the owners.

Q    Mr. Russo, did you plead guilty to a crime in this case?

A    Yes, I did.

**J.A. 450**

---

RUSSO - DIRECT - GRUBIN                860

Q    What was that?

A    Payroll tax.

Q    Not paying payroll taxes?

A    Correct.

Q    Can you generally -- was that for your business?

A    Yes, it was.

Q    Can you generally describe what you did so as to not accurately pay payroll taxes?

A    Can you rephrase that?

Q    Sure.  What did you do, exactly?

A    I paid some of my employees cash off the books and used it for everyday expenses.

Q    And where did you get that cash from?

A    I got part of it from Midwood, David Motovich, and I also went to a check cashing place.

Q    You mentioned Mr. Motovich.

Do you see that individual in the courtroom?

THE COURT:  Stand up, look around, take your time.

Do you see Mr. Motovich in the courtroom anywhere?

A    I believe --

THE COURT:  Why don't you sit down now?

You can sit down and answer the question.

THE WITNESS:  Yes, sitting in the gray suit.

THE COURT:  Would you point him out?

MR. GRUBIN:  Your Honor, may the record reflect that

RUSSO - DIRECT - GRUBIN          861

the witness identified the Defendant.

THE COURT:  The record will so reflect.

Continue your examination.

THE COURT:  Sir, you can pull the microphone to you. It will move to you, the whole thing.

THE WITNESS:  Thank you, sir.

Q    Mr. Russo, I'm going to ask you about the details of your relationship with Mr. Motovich, but I want to just take a step back first.

What's your educational background?

A    I went to elementary school and then graduated high school.

Q    Anything after that?

A    No, nothing after that.

Q    Approximately when did you graduate high school?

A    1985.

Q    And after graduating, what did you do for work?

A    Well, it was my father's business at first and I went to work for him as an apprentice and laborer and I started off there.

Q    And what was the business?

A    It was mainly steel, ironwork.  A little bit of structural steel like what we do now, but mainly ornamental railings, window guards, stuff of that nature.

Q    When you say you were a "laborer," what does that mean?

RUSSO - DIRECT - GRUBIN          862

A    A helper.  I was like an apprentice learning behind other people that knew more.

Q    And did you have a specialty?

A    Well, I learned the trade of becoming a mason from that.

Q    What's a mason?

A    Someone who lays brick, block, concrete work.

Q    And you mentioned some steel construction projects you were doing.  You mentioned railings.

What else did you do?

A    We did steel porches, like on the back of a house; cellar doors; some structural steel.

Q    You mentioned this was for your father's company?

A    Yes.

Q    Did your role change over time?

A    Yes, it did.

Q    How so?

A    I learned to do more stuff and became more responsible in the company working, from a laborer up to, you know, a foreman, then supervisor.

Q    And then did you eventually come to manage the company?

A    Yes, I did.

Q    Do you manage it with anyone else?

A    Yes, I do.

Q    Who is that?

A    My brother.

RUSSO - DIRECT - GRUBIN          863

Q    And roughly when did you and your brother take over management of the company?

A    Approximately 2006.

Q    Do you remember the name of the business at that point in time?

A    I believe it was Metro Structural Steel back then.

Q    And has the name changed since then?

A    Yes.

Q    To what?

A    Metro Erectors and Metro Fabrication.

Q    And do you -- I'm sorry, just to be clear, do you and your brother still manage Metro Erectors?

A    Yes.

Q    What are your -- I know you mentioned you're a supervisor, but what are your primary responsibilities at Metro Erectors?

A    My day-to-day basis is I go from job site to job and I supervise men and I see if there's anything that they need, material supplies, and I take care of it.  If there's any issues on the job, I go to job site meetings and talk to the general contractors.

Q    And what's a general contractor?

A    General contractor is the main contractor who takes care of the whole job.  He runs the job.

Q    I want to focus on the time period between approximately

RUSSO - DIRECT - GRUBIN          864

2012 and 2019.

About how many employees did Metro Erectors have during that period?

A    It ranged depending on how busy we were.  It could be from 40 to 70 employees.

Q    And can you talk -- I know you talked about some of the steel construction projects you did back when you were working for your father.

Had that changed at all?

What types of construction projects are you doing during this period?

A    I didn't understand that.

Q    Sorry.  Can you talk about some of the steel construction projects Metro Erectors did during this time period?

A    During 2012?

Q    2012 to about 2019, yes.

A    We do work throughout the five boroughs, so I have job sites I did in every borough.

Q    What types of projects?

A    Steel structures, where we put up the frame of a building.  We only did the outside framework.  Then there were other companies that came in and finished off the buildings.

Q    Were these mostly commercial projects?

A    Mostly, yes.

Q    And about how much money is involved in a project like

RUSSO - DIRECT - GRUBIN                865

that?

A    It could range from a couple of hundred thousand to a few million.

Q    And approximately how many projects were you typically doing in a given year during that time period?

A    I would say probably 20 to 30.

Q    You spoke before about general contractors.

What's a subcontractor?

A    A subcontractor is a contractor that works under a general contractor.  He's one of the subs.  He usually sticks to one trade of the project, whether it's steel, plumbing, electric, drywall.

Q    Using an example of, let's say, a building you're putting up, who is the general contractor and what's the subcontractor doing?

A    The general contractor is the one who takes the whole job from either an owner who wants to put the building up and then he will sub out all of the different trades of work to an electrician company, a plumbing company, a masonry company, a steel company.

Q    Was Metro Erectors ever the general contractor with subcontractors?

A    No.

Q    Was it ever a subcontractor on a larger project with a general contractor?

RUSSO - DIRECT - GRUBIN                866

A    Yes.

Q    I believe before you mentioned Metro Fabrication.

During that approximately 2012 to 2019 time period, did you manage or own any other companies besides Metro Erectors and Metro Fabrication?

A    No.

Q    And what did Metro Fabrication do?

A    Metro Fabrication is a sister company that we do the fabrication only through that company and then we feed it to Metro Erectors, who is the erecting part of the corporation.

Q    Just to be clear, what is Metro Fabrication fabricating?

A    We fabricate steel; steel beams, stairs.

Q    And how many employees, about, did Metro Fabrication have?

A    Approximately 15.

Q    Why have two separate companies?

A    For insurance purposes.

Q    Explain that.

A    Well, the way the construction industry is, your insurance rate goes on the type of work that you do; if it's something more dangerous, something that's less dangerous.

So, erecting steel is, like, one of the highest rates from insurance companies and fabricating is one of the lowest.  So, if you put everybody in the same company in the same payroll, whether they're working inside or outside I'd be

RUSSO - DIRECT - GRUBIN                867

paying the higher rate.

So, it's not fair that people that are working in a factory with less hazards that I have to pay for insurance for a higher rate.  So, we separated.  We made two companies.

Q    Is that common in the industry?

A    Very.

Q    What other companies do you manage or own, you or your brother, between 2012 and 2019?

A    We have Metro Equipment, which is one of our equipment companies where we just keep finances and insurances for the vehicles that are used to go to the job sites through that company so it's a separate liability.

And I have my realty corp.  I have a few tenants that I collect rent and I put the money into there and we pay the mortgage and taxes through that.

Q    So, let's start first with Metro Equipment.

Are there any -- do you have any employees?

A    No.

Q    And for those companies --

Just to keep things simple, Metro Equipment, Metro Erectors, Metro Fabrication, I'm just going to refer to them simply as the Metro companies; is that all right?

A    Yes.

Q    And you mentioned five -- you mentioned a realty company.

What was the name of that company?

RUSSO - DIRECT - GRUBIN                868

A    It's 5801 Realty Corp.

Q    You also mentioned some tenants.

Who are some of those tenants, if you recall?

A    I have two tenants.

I have one that's a furniture company and they rent space as a warehouse space to keep extra inventory.

And then I have another guy who does a little bit of steel work, something similar to what we do but on a smaller scale, that rents out some square footage also.

Q    Do you remember the names of these companies?

A    One is Boxwood Construction and the second one is Flatbush Furniture, I believe.

Q    Where are your companies located geographically?

A    My fabrication company is located in Brooklyn and I have an office only for Metro Erectors in Staten Island.

MR. GRUBIN:  Your Honor, with the Court's permission, I would like to publish what's already been admitted as Government Exhibit 29.

THE COURT:  You may publish.

(Exhibit published to the jury.)

Q    Mr. Russo, who is that?

A    That's myself.

MR. GRUBIN:  We can put that away.

Q    Mr. Russo, how did you come to first meet David Motovich?

A    He was -- well, I know of David for 30 plus years.  As a

**J.A. 452**

RUSSO - DIRECT - GRUBIN                    869

child, you know, but we never associated with each other, my father back then had did work for his father. We put up a couple of buildings for him along Coney Island Avenue. And I knew of him, I didn't know him personally.

And then back in 2012, I was told by somebody that David, you know, is doing what he's doing.

Q   We're going to break that up a little bit.

But just to back up, do you recall his father's name?

A   Boris.

Q   And do you remember the building -- you said Coney Island Avenue.

MR. GRUBIN: Actually let's do this: Could I show -- I don't believe this is in evidence -- what's been marked for identification as Government Exhibit 25.

THE COURT: Any objection to Government 25?

MR. JACKSON: No objection, Judge.

THE COURT: You may publish. It's admitted.

(Government Exhibit 25, was received in evidence.)

(Exhibit published.)

Q   Do you recognize this exhibit, Mr. Russo?

A   Yes.

Q   What is it?

A   Those are the buildings that we put up.

Q   And which buildings in particular?

*Linda A. Marino, Official Court Reporter*

---

RUSSO - DIRECT - GRUBIN                    870

A   The brick with the glass windows.

MR. GRUBIN: I'm marking the screen at the left and towards the center.

Q   Are those the buildings you're referring to Mr. Russo?

A   Yes.

Q   And you said this was on Coney Island Avenue?

A   Yes.

Q   Do you know if these buildings are still there?

A   I believe so.

Q   I'm also showing you, with the Court's permission, what's already been admitted at Government Exhibit 26.

THE COURT: You may publish.

(Exhibit published to the jury.)

Q   What's this?

A   That looks like the front of the building.

Q   The front of what building?

A   Of the building that I put up.

(Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

---

RUSSO - DIRECT - MR. GRUBIN                871

BY MR. GRUBIN: (Continuing.)

Q   And in relation to Midwood Lumber, do you know where this is?

A   Yes, I do.

Q   Where?

A   It's approximately one block down from Midwood Lumber on the opposite side.

Q   And then back then, how often did you and Mr. Motovich speak?

A   Just about on a weekly basis.

Q   I'm sorry, back when you put up these buildings?

A   Oh, no, I'm sorry. Back then, no, I really didn't know him then.

Q   And you mentioned there was a time when your relationship changed?

A   Yes.

Q   How so?

A   It was back in 2012.

Q   And how did it change?

A   It's when they started to go and see David.

Q   And what did you see him to do?

A   To cash checks.

Q   And you mentioned someone mentioned that he did that.

Who was that person?

A   The name is Richard Pesce.

*AVERY N. ARMSTRONG, RPR, NYRCR*

---

RUSSO - DIRECT - MR. GRUBIN                872

Q   And how did that come -- what were you doing with Rich Pesce, if anything, so that conversation came up?

A   We was doing work for Rich who was also a general contractor for someone in the City, and he brought it to our attention.

Q   Who is that someone that you were doing work for?

A   For Rich Pesce.

Q   Do you recall the name -- and what was Pesce -- was Pesce doing any work with Motovich at this time?

A   Not that I know of.

Q   And what was Pesce working on, what project?

A   It was two townhouses that were being put together in Manhattan on 5th Avenue and 72nd Street.

Q   Do you remember the owner?

A   Yes.

Q   Who was that?

A   Steven Croman.

Q   Do you recall Pesce's company's name?

A   I believe it was Merrick.

Q   And what did Merrick do, if you know?

A   He was a general contract.

Q   For construction?

A   Yes.

Q   What did you have to do for that project?

A   Well, they were joining of two townhouses together and

*AVERY N. ARMSTRONG, RPR, NYRCR*

**J.A. 453**

RUSSO - DIRECT - MR. GRUBIN    873

they needed structural steel to -- they replaced all the floors in the building and tied the buildings together, and we did the structural steel on all the floors.

Q    How long did that take, approximately?

A    It lasted a long time.  Probably two, three years.

Q    And why is that?

A    Because they were constantly making changes as they were going along.  So there was alterations being done in the process.

Q    By the way, do you happen to know a person by the name of Roman Kretsula?

A    No.  Not that I know of.

Q    So during your work on the townhouse, how did Motovich come up?

A    Well, he had mentioned to us that David, you know, cashed checks if you needed checks -- if you needed cash, that he's doing it.

Q    And were you and your brother looking to cash checks prior to Pesce's recommendation of Motovich?

A    No.

Q    What changed around you -- for you at this time in approximately 2012?

A    Back then, it started off where everybody started to become, like, cutthroat and stealing other peoples' employees offering them cash money to stay or to go and work with them.

RUSSO - DIRECT - MR. GRUBIN    874

So we were being confronted with, you know, people wanted to get paid through cash or the overtime, they wanted in cash, because they didn't want to pay additional taxes.  So that's when we got into it.

Q    Since 2012, have you and Motovich become friends?

A    No.

Q    So what's your relationship with him?

A    A business acquaintance.

Q    So Mr. Russo, why did you want cash?

A    We needed it to pay some of these people and also to -- everyday expenses that we used, you know, to do projects.

Q    And when you say, some of these people, you mean employees?

A    Yes.

Q    Do you typically -- did you typically pay your employees completely in cash?

A    No.

Q    How else did you pay them?

A    In check.

Q    Are you familiar with the IRS?

A    Yes.

Q    Did you report what you paid employees by check to the IRS?

A    Yes.

Q    What about what you paid them in cash?

RUSSO - DIRECT - MR. GRUBIN    875

A    No.

Q    And when you reported less employee wages to the IRS, what did that mean for the taxes of the Metro companies that you mentioned?

A    It was less tax responsibility.

Q    Paid less in taxes?

A    Yes.

Q    As a business owner, are you familiar with FICA or federal payroll taxes?

A    Yes.

Q    And what are those?

A    They are taxes that go towards Medicaid, Social Security, stuff like that for retirement.

Q    And between 2012 -- approximately 2012 and 2019, when you paid employees by check, how did you record those payments?

A    I just wrote it down on a piece of paper week to week and got rid of it.

Q    For checks?

A    No.  That was done through payroll company and they kept records.

Q    And were -- did Metro companies have an accountant?

A    Excuse me?

Q    Did Metro companies have an accountant?

A    Yes, we did.

Q    And were those records that you just mentioned payroll

RUSSO - DIRECT - MR. GRUBIN    876

for checks, were those provided to the accountant?

A    Yes.

Q    And how did you record the cash payments?

A    I just kept it to myself on a piece of paper, and I got rid of it week to week.

Q    Why even record the cash payments?

A    Because we weren't paying taxes on it.

Q    But why even keep a record?

A    I don't know.  No reason.

Q    Did you need to keep track?

A    Only on the week to week.  You know, once the week passed and the employee was paid, if there was no issues, I didn't keep the records anymore.

Q    Are you familiar with the term, off the books?

A    Yes.

Q    And is that what you were doing here, essentially?

A    Yes.

        THE COURT:  Speaking of books, I see it's 3:30, so we're going to take our 15-minute comfort break, and we will return after 15 minutes, and we'll go until 5:00 o'clock for the day.

        Do not talk about the case, ladies and gentlemen of the jury.  Do not talk about your testimony, sir, with anyone when you step down.  We'll continue your examination when you come back.

**J.A. 454**

PROCEEDINGS                877

Thank you ladies and gentlemen of the jury. We're going to take our break now.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURT: Thank you, sir, you may step down. Please wait outside of the courtroom, and don't talk to anyone about your testimony during the break. Thank you, sir.

(The witness steps down.)

THE COURT: The jury has left the courtroom. The witness is leaving the witness stand and leaving the courtroom.

You may be seated, ladies and gentlemen.

The witness has left the courtroom.

Did we have any issues to address in the absence of the jury and the witness, anything from the Government?

MR. PAULSEN: No, Your Honor.

THE COURT: Anything from the defense counsel?

MR. JACKSON: Very briefly, Judge.

THE COURT: Yes.

MR. MAZUREK: During Mr. Kolenovic's testimony, he stated that he had provided a -- he stated that he had provided a copy of a contract between himself and Mr. Motovich to the agents. In my brief touching base with the Government, I believe that they have said that they don't believe that there was any contract provided. I just wanted to make, on

*AVERY N. ARMSTRONG, RPR, NYRCR*

PROCEEDINGS                878

the record, a request for it and that I'd like to consult with the Government tonight about a potential stipulation around that issue.

THE COURT: What's the Government's response to what you just heard?

MR. PAULSEN: Yes, Your Honor. I spoke with Mr. Jackson privately around that time. I believe Mr. Kolenovic mentioned to us that he might have the contract, but we never did get it from him. I don't believe we ever followed up with him on that topic.

THE COURT: Well, just to be clear, has the Government ever seen such a written contract?

MR. PAULSEN: We have not, Your Honor.

THE COURT: And I take it, Mr. Jackson, you and defense counsel have never seen such a written contract?

MR. JACKSON: I don't know what he's referring to.

THE COURT: I said, you've never seen such a written contract?

MR. JACKSON: I haven't seen that, no, Your Honor.

THE COURT: Okay. Well, where is Waldo? I don't know what else to tell you. The Government says they haven't seen it, you say you haven't seen it. The witness has testified with respect to it. So I don't know what else can be done.

MR. JACKSON: Your Honor, the issue I think is

*AVERY N. ARMSTRONG, RPR, NYRCR*

PROCEEDINGS                879

there's an obligation for the Government to correct the record on the false testimony that the contract was provided, and it's a relatively --

THE COURT: I'm not sure there's any false testimony, Mr. Jackson. The witness made statement he made about a written contract. The Government has made its statement. You've made your statement. It is what it is. I'm not going to accept the characterization of it as false or not false. He said what he had to say on direct. He said what he had to say on cross. I mean, what else is there to say about it? It is what it is.

MR. JACKSON: Fair enough, Judge.

THE COURT: Anything else?

MR. JACKSON: Nothing else, Judge.

THE COURT: Okay. See you in 15.

(A recess was taken.)

THE COURTROOM DEPUTY: All rise.

THE COURT: You may be seated.

Do we have any issues to discuss before we bring the jury in for the last portion of the day? Anything from the Government?

MR. PAULSEN: No, Your Honor.

THE COURT: Anything from the defense?

MR. MAZUREK: No, Judge.

THE COURT: Okay. We can bring in the jury, and we

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN       880

can have the witness come back to the stand.

(The witness takes the stand.)

THE COURT: Please remain standing until the jury comes in and then you can sit dow. You can stay right there, but keep standing up because the jury will come in.

THE COURTROOM DEPUTY: All rise.

THE COURT: Please stand. Stand for the jury.

(Jury enters the courtroom.)

THE COURT: Thank you, ladies and gentlemen of the jury. Home stretch of the day. Please be seated.

Ladies and gentlemen of the public, please be seated, as well. Please continue your examination.

And, sir, did you speak to anyone about your testimony during the break?

THE WITNESS: No, sir.

THE COURT: Thank you. Please continue, Counsel.

MR. GRUBIN: Thank you, Your Honor.

DIRECT EXAMINATION (Continued)

BY MR. GRUBIN:

Q    Mr. Russo, before the break we were talking about the term, off books.

What does that term mean, again?

A    Off the books is when somebody is not getting paid by a check, they're getting paid cash.

Q    And what's being done, is that cash being reported?

**J.A. 455**

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN    881

A    No.  There's no records on it.

Q    Did you eventually stop paying employees off the books?

A    Yes.

Q    About when?

A    2020, January.

Q    Why did you stop?

A    It's when we -- when it all came about and we were confronted and subpoenaed, that came to a halt right there.

Q    Who confronted you?

A    The Department of Justice, the FBI, and the IRS.

Q    Mr. Russo, did you meet with any agents in the months following their approach?

A    Yes.

Q    Was that voluntary?

A    Yes.

Q    Did you accept responsibility for your actions?

A    Yes.

Q    How?

A    I paid the taxes that was owed on it and I plead guilty.

Q    Did you plead guilty pursuant to a cooperation agreement?

A    Yes.

MR. GRUBIN:  I'm showing you -- and this is just for the witness -- what has been marked as Government Exhibit 3500-JR-2 for identification.

THE COURT:  You may show it to the witness only and

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN    882

to opposing counsel.

Any objection from defense counsel to the cooperation agreement coming into evidence?

MR. JACKSON:  No objection at all.

THE COURT:  It's admitted.  You may publish.

(Government Exhibit 3500-JR-2, was received in evidence.)

(Exhibit published.)

Q    Mr. Russo, what is this document?

A    This is a cooperation agreement.

Q    Did you sign it?

A    Yes, I did.

Q    And who is the agreement between?

A    Me and the Government.

MR. GRUBIN:  And can we turn to Page 2.

If we could zoom in to the top half of the page, Ms. Kannan.

Q    Is this the restitution that you were referring to?

A    Yes.

Q    I'm going to read it, and you tell me if I say this correctly.

It says:  Restitution.  The parties agree that restitution with respect to the defendant's federal tax liabilities in the amount of $264,503.72, payable to the Internal Revenue Service should be ordered by the Court.

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN    883

Have you fully paid that amount, Mr. Russo?

A    Yes, I have.

Q    What do you understand your primary responsibility under this agreement, this cooperation agreement to be?

A    It's to tell the truth.

Q    Have you been sentenced?

A    No.

Q    What is your understanding of the Government's promise to you if you comply with the terms of this cooperation agreement by telling the truth?

A    Just that -- can you rephrase that?

Q    Sure.  Under this agreement, what do you understand the Government's responsibility to be?

A    That I'm here to speak the truth and say what happened.

Q    And what would -- what will the Government do in return if you do that?

A    The Government will write a letter that I cooperated.

Q    And who is that letter to?

A    To the judge.

Q    Who decides your sentence?

A    The judge.

Q    Does the judge have to give you a lower sentence because the Government writes a letter?

A    No.

Q    What sentence are you hoping to get?

**J.A. 456**

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN    884

A    Nothing.

Q    And what's your understanding of what happens if you lie today?

A    That the agreement will be -- no longer will be valid, will be voided out.

Q    Do you get to take your guilty plea back?

A    No.

Q    Has the Government made any promises to you outside of this agreement?

A    No.

Q    So -- okay.  Mr. Russo, let's go back to 2012, when you started bringing checks to Motovich in exchange for cash.

When you brought checks to Motovich, where did you go, physically?

A    To his office.

Q    Where was that?

A    On Coney Island Avenue.

Q    What was the name of the business?

A    It was above the Midwood Lumber office.

Q    And what was your sense of his role at Midwood Lumber?

A    The owner.

Q    Why do you say that?

A    That's what he made it look like.

Q    About when did you stop bringing checks to Motovich?

A    In approximately a year before.  So it was around 2019.

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN                    885

I think January of 2019.

Q    So between approximately 2012 and 2019, how frequently did you bring checks to Midwood Lumber?

A    If it wasn't weekly, it was bimonthly.

Q    So is it fair to say that on a weekly or biweekly basis, you were bringing checks to Mr. Motovich in exchange for cash for approximately seven years?

A    Yes.

Q    Over that approximately seven-year period, did the process change at all for you from week to week?

A    No.

Q    When you wanted to bring a check to Midwood Lumber, what did you do first?

A    I would either call or text him.

Q    Can you describe Midwood Lumber?

A    Excuse me?

Q    Can you describe Midwood Lumber?

A    Midwood Lumber is an office on one side of the street where they keep all of their hardware, tools, et cetera, and you ordered your material through there, and then they had some of the supplies on the same side, and some of the other supplies were on the opposite side in another building.

Q    And you mentioned before that Mr. Motovich's office was on the second floor.

        What was it the second floor of?

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN                    886

A    The second floor was above the hardware department.

Q    Can you walk us through what would happen when you got there?

A    I would go through the front door, go up the stairs and then there was a little window where with a door, you know, that was kept closed, and there was a receptionist behind the window, and she would buzz you in and there was a little waiting room that you would wait there in front where there was a lobby.

Q    I'm showing you, with the Court's permission, what's already been admitted as Government Exhibit 310.

        THE COURT:  You may publish.

        (Exhibit published.)

Q    What's this, Mr. Russo?

A    That's the hardware department.

Q    Did you ever meet Motovich here in the hardware department?

A    No.

Q    Who are some of the people who worked behind the counter, if you know?

A    It was just the salesmen behind the counter who took orders and took payments.

Q    Do you know any of the peoples' names?

A    I knew one of them.

Q    Who was that?

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN                    887

A    David's uncle, which is, his name was also David.

Q    Could you identify him if you saw him?

A    Yes.

Q    I'm showing what has already been admitted as Government Exhibit 28.

        MR. GRUBIN:  Permission to publish?

        THE COURT:  You may publish.

        (Exhibit published.)

        MR. GRUBIN:  Can we zoom in towards the middle.

A    Yes, that's him.

        MR. GRUBIN:  Let's look at what's already been admitted as Government Exhibit 312 and Government Exhibit 313, side by side.

Q    Mr. Russo, what are these photographs of?

A    The one on the right is where the receptionist sat, and to her left, there was a window where the stairs were to come up, and in the picture on the left was a picture of the waiting area in front of that reception area.

Q    And this is the reception area you talked about earlier?

A    Yes.

Q    Did you ever wait here to see Mr. Motovich?

A    Yes.

Q    And what would happen after waiting?

A    Well, after waiting a couple of minutes, then I would be called up into the office.

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN                    888

Q    Who called you up?

A    Well, it was either I saw David or I saw his sister.

Q    And what was on the top of those stairs?

A    On the top of the stairs was a row, a hallway with three or four offices.

Q    Whose offices, if you know?

A    One was David's, one was his sister's, and one was his brother's.

Q    And do you know what's the sister's name?

A    Gail.

Q    Do you know the brother's name?

A    No, I don't remember him.

        MR. GRUBIN:  Let's look at what's already been admitted as Government Exhibit 330 and 331, side by side.

        THE COURT:  You may publish.

        (Exhibit published.)

Q    Mr. Russo, what's this?

A    That's David's office.

Q    And what happened when you got to Motovich's office?

A    I would give him the check, which some of times he knew already how much it was going to be, and he would hand me the cash.

Q    He would hand you the cash?

A    Yes.

Q    How was the cash given to you?  What form did it come in?

**J.A. 457**

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN                889

A    Either in a rubber band or an envelope.

Q    Do you know where he took the cash from?

A    No.

Q    Did he usually have -- did he have it out?  Did he have to go somewhere for it?

A    Most of the time he had it in his desk right in front of him.

Q    And what about the other times?

A    Sometimes he would go into a room that he had over there, and he would come out with it.

Q    How do you know that?

A    I'd seen him.

Q    Did you ever meet with anyone other than Motovich when cashing checks at Midwood Lumber?

A    Just his sister.

Q    And who told you to meet with Gail Motovich?

A    David, if he wasn't around.

Q    Where would you meet Gail?

A    In her office.

Q    Aside from that -- aside from meeting Gail or aside from meeting in her office, when you met with Gail, was the check cashing process any different?

A    No.

Q    I'm showing you Government Exhibit 325.

     MR. GRUBIN:  It's already been admitted.

RUSSO - DIRECT - MR.GRUBIN                890

     THE COURT:  You may publish.

     (Exhibit published.)

Q    Whose office was this?

A    That's Gail's office.

Q    Were there other individuals who were also in the office?

A    Yes.

Q    Do you recall any of their names?

A    No, I don't.

Q    Do you recall if there were male or female?

A    No, it was two females.

Q    Two other females?

A    Yes.

Q    By the way, do you have any -- do you know what the J on the door is?

A    No, I don't.

     MR. GRUBIN:  I'm showing you what's already been admitted, with the Court's permission, Government Exhibit 324.5.

     THE COURT:  You may publish.

     (Exhibit published.)

Q    Is this the same room?

A    Yes.

Q    Whose desk is that?

A    Gail's.

Q    And when you brought checks to either David or Gail

RUSSO - DIRECT - MR.GRUBIN                891

Motovich, who did you make the checks payable to?

A    Whatever company he was asking me to make it to.

Q    Do you recall some of the names?

A    Yes.  There was one that was ZKC NYC Construction, I believe.  Another one was Ago & Alaudin.  Another one was M&M.

Q    Who do you believe owned those companies, Mr. Russo?

A    David.

Q    Why?

A    Because he told me they were his companies.

Q    Did you ever see anything on your visits to Midwood Lumber with the names of those businesses like ZKC or Ago & Alaudin?

A    No.

Q    Did Motovich ever ask you to make a check out to David Motovich?

A    No.

Q    Gail Motovich or Gail Kastner?

A    No.

Q    How much did Motovich charge you for cashing a check?

A    10 percent.

Q    Do you owe him any money?

A    No.

Q    Were these loans he was providing you?

A    No.

Q    So what was the 10 percent?

RUSSO - DIRECT - MR.GRUBIN                892

A    It was the cost behind it.

Q    Cost behind what?

A    For him cashing the check.

Q    Was the fee anything other than about 10 percent?

A    No.

Q    So just by way of example, if you handed Motovich a check for, let's say, a thousand dollars, how much cash would he hand you in exchange?

A    $900.

Q    And in that example, how much did Motovich just make?

A    One hundred.

Q    And how much would you get?

A    I got 900.

Q    So earlier, you mentioned you also went to an actual check cashing business.  I can't recall if you mentioned the name.

     What's the name of that business?

A    It was called Bay Street Check Cashing.

Q    Where was that?

A    It was in Staten Island, New York.

Q    About how much did they charge to cash checks?

A    It varied.  It was between two and three percent.

Q    So going back to our example in that scenario of the thousand dollars, you would get how much back in cash for your check, approximately?

**J.A. 458**

RUSSO - DIRECT - MR.GRUBIN          893

A     Approximately $970.

Q     And how much would the -- how much did Bay Street Checking make in that scenario?

A     $30.

Q     Is it fair to say Motovich was more expensive for you?

A     Yes.

Q     And the checks you brought to Motovich, were they typically more than a thousand dollars?

A     Yeah.

Q     So we're talking much larger fees?

A     Yes.

Q     Did one of -- did one of your customers -- what checks were you bringing to Bay Street Checking, exactly?

A     To Bay Street Checking, I was bringing checks that were made to my contract for contractors that I did work for.

Q     So it was customers who -- people who owed you money?

A     Correct.

Q     And did one of those customers ever give you a check of more than $10,000?

A     Yes.

Q     And did you ever bring that check to Bay Street Checking?

A     I have, once or twice.

Q     And what did Bay Street Checking do on those occasions?

A     They made me sign a form that they're reporting a check that was cashed over $10,000 to the IRS.

RUSSO - DIRECT - MR.GRUBIN          894

Q     Did you have to sign anything on that form?

A     Yes.

Q     You stated Bay Street Checking charged much less than Motovich, correct?

A     Correct.

Q     Did Motovich ever ask you to complete any paperwork?

A     No.

Q     Did he ever ask you to sign anything?

A     No.

Q     You testified that you would generally text Motovich when you needed cash or called him.

MR. GRUBIN:  Your Honor, with the Court's permission, if we could have the court deputy bring two binders from Ms. Kannan to the witness.

THE COURT:  Yes, please do that.

Continue, counsel.

MR. GRUBIN:  And for the record, one is labeled Binder 1 and contains excerpts of what's already been admitted as Government Exhibit 1199 and 1199A, as well as, what has not been admitted as Government Exhibit 734.  Binder 2 contains all of Government Exhibit 734.

THE COURT:  All right.  Are you moving the admission of 734?

MR. GRUBIN:  Yes, Your Honor.

THE COURT:  All right.  Any objection to 734?

RUSSO - DIRECT - MR.GRUBIN          895

MR. JACKSON:  May I have just one moment, Your Honor?

(Pause in the proceedings.)

MR. JACKSON:  No objection, Your Honor.

THE COURT:  It's admitted.

(Government Exhibit 734, was received in evidence.)

THE COURT:  It also has 734A, is that what you said?

MR. GRUBIN:  No, Your Honor, just Government Exhibit 734.

THE COURT:  What was the other?

MR. GRUBIN:  What's already been admitted, Government Exhibit 1199 and Government Exhibit 1199A.

THE COURT:  So in terms of what is in front of this witness, is there anything in front of this witness that has not been admitted?

MR. GRUBIN:  No.  Everything's been admitted, Your Honor.

THE COURT:  All right.  Is that your understanding too, Mr. Jackson?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Okay.  So you can proceed with the examination.

And just to have the record clear, everything that the witness has in front of him has been admitted and you'll refer to it by number, correct?

RUSSO - DIRECT - MR.GRUBIN          896

MR. GRUBIN:  That's correct, Your Honor.

THE COURT:  Go ahead.

Q     Mr. Russo, starting with Binder 1, did you review its contents prior to coming to court today?

A     Yes.

Q     And what's inside?

A     These are text messages that went back and forth between me and David.

THE COURT:  Could you keep your voice up, sir, and move that microphone because I'm not hearing you clearly.

Go ahead.

THE WITNESS:  Sorry.

A     I said, these are text messages that went back and forth between David and I.

Q     Is there anything behind some of those text messages if you flip the pages?

A     There's copies of checks.

Q     What are those checks?

A     These are checks that I made to David.

Q     All right.

MR. GRUBIN:  Ms. Kannan, will be also putting these documents up on the screen.  You can look at the binder or the screen.  Although, I think the screen will make it easier for you to follow along.

Q     Do you understand, Mr. Russo?

RUSSO - DIRECT - MR.GRUBIN          897

A    Yes.

MR. GRUBIN:  Your Honor, now that they're all admitted, permission to publish as we go along?

THE COURT:  Permission granted.

MR. GRUBIN:  Thank you, Your Honor.

Let's turn to Government Exhibit 1199 at Page 1.  If we could blow up the -- thank you, Ms. Kannan.

Q    So what is this, Mr. Russo?

A    This is a text message that I sent to David.

Q    Okay.  And who's sending the messages in the blue bubbles?

A    I am.

Q    And in the green bubbles?

A    David.

Q    Looking at the first message dated May 18th, 2017, what is it that you said?

A    Hey, David.  Good morning.  It's Joe from Metro --

THE COURT:  A little bit slower for the court reporter and keep your voice up.  Read a little bit slower and a little bit louder.

Go ahead.

A    Hey, David.  Good morning.  It's Joe from Metro.  What is a good time to pass by?

Q    What does Motovich say?

A    Tomorrow.

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN          898

MR. GRUBIN:  And if we could scroll down.

Q    What did you say in response?

A    Okay.  Is 9:00 o'clock okay.

MR. GRUBIN:  Turning to Page 2.

Q    What does Motovich say?

A    10:00 a.m.

Q    And do you see where you say, okay?

A    Okay.

MR. GRUBIN:  Going down one message on May 19th, 2017 at about 10:54 a.m.

Q    What do you ask Motovich?

A    Hey, Dave.  What time is good?

Q    What did you mean by that?

A    Meaning, what time is a good time for me to pass by his office.

Q    What does he say back, if we could scroll down?

A    Come 12:00, but not big, please.

Q    What did you understand Motovich to mean by, Come 12:00, but not big, please.

A    Come at 12:00 o'clock, but don't bring a big check.

Q    And what do you say in response, if we scroll down?

A    What size is good, 10?

Q    What did you mean by, What size is good, 10?

A    Meaning, if I came there with a check for $10,000, is it okay?

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN          899

MR. JACKSON:  And turning to Page 3.

Q    What did Motovich say in response?

A    Eight inch.

Q    What did you understand Motovich to mean by eight inch?

A    Make it $8,000.

Q    Were you buying lumber from Mr. Motovich?

A    No.

Q    Any other type of supplies?

A    No.

Q    So why were you and Motovich using inches to describe cashing a check?

A    Because it was a way just to describe it to camouflage what we were talking about.

Q    Why did you need to camouflage it?

A    So that if anybody saw it, they really wouldn't know what it was about.

Q    Did you use code at Bay Street Checking?

A    No.

Q    Turning back to the exhibit, what do you say in response, if we scroll down?

A    Okay.

Q    And what did Motovich ask you, scrolling down, at about 11:47 a.m.?

A    ETA.

MR. GRUBIN:  And if we keep scrolling down.

**J.A. 460**

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN          900

Q    Do you see where you say, Leaving now, 15 minutes?

A    Yes.

Q    Where were you going?

A    To his office.

MR. GRUBIN:  Let's turn to Government Exhibit 734 at Page 57.  And Mr. Russo, I'd suggest following along on the screen.  It's probably easier.

If we could zoom into the top half.  Thank you Ms. Kannan.

Q    What's this document, Mr. Russo?

A    This is a check that I made.

Q    And where is it made from?

A    Metro Erectors, Inc.

Q    What's one of your companies, right?

A    Correct.

Q    And do you see the date, May 19th, 2017?

A    Yes.

Q    Was that the same date as the text message we just looked at?

A    Yes.

Q    And who is the check made out to?

A    ZKC NYC, Inc.

Q    And why did you make the check out to ZKC NYC, Inc.?

A    Because that's who I was asked to make it to.

Q    By who?

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN          901

A   David.
Q   And what's the amount?
A   $8,000.
Q   Whose signature is that on the bottom right?
A   My brother's.
Q   Who brought the check to Mr. Motovich?
A   I did.
Q   And I'm sorry, can you say what's the number again?
    MR. GRUBIN:  If we could zoom in a little bit.
A   Oh, yeah it's a little blurry.  8,000 something.
    8800 and $50.
Q   Why is the check typed?
A   It was a computer printout check.
Q   And who did that typing?
A   Probably somebody in the office.
Q   Whose office?
A   My office.
Q   Was it always typed?
A   No.  Sometimes they were handwritten.
Q   Why is that?
A   No particular reason.  It was just a matter of, I had the check printed out already or I just took a check and wrote it out by hand.
Q   Where would you write it out by hand?
A   Either in my office before I left or there, at his

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN          902

office.
Q   What services did ZKC provide to your companies?
A   Nothing.
Q   What did you get in exchange for this check?
A   Cash.
Q   And just by looking at the check, how do you know it wasn't for lumber or hardware supplies?
A   Because we really didn't buy material from Midwood Lumber and any occasion that we did, which was few, we would purchase it with a credit card.
Q   What did you ultimately do with this check?
A   I would give it to David and David would give me the cash, minus 10 percent in return.
Q   By the way, do you know a Reginald or Reggie Garcia?
A   No, I don't.
    MR. GRUBIN:  Let's turn back to Government Exhibit 1199 at Page 4.
Q   Toward the bottom of the page in the second to last text on May 25th, 2017, what do you write?
A   Hey, Dave.  What time tomorrow?
Q   And what does Motovich say in response?
A   10:30.
Q   About how long after the last text did we look at is this one?
A   About a minute later.

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN          903

Q   I'm sorry, the last visit that you -- the earlier text we looked to where you went to Motovich, is this about a week later?
A   Oh, yes.
Q   And turning to Page 5, what do you say back?
A   For sure.  Okay.  Thanks.
Q   In the following text on May 26th, 2017, can you read what Motovich asked you?
A   Good morning.  How far are you?
    MR. GRUBIN:  If we could keep scrolling down.
Q   Do you see where you say, On the way?
A   Yes.
    MR. GRUBIN:  Let's turn now to Government Exhibit 734 at Page 58.
Q   What's the date of the check?
A   5/26.
Q   Is that the same date as the text message?
A   Yes.
Q   How much is this check?
A   $12,500.
Q   And who is the check made payable to?
A   ZKC NYC, Inc.
Q   And whose signature is there on the bottom right?
A   That's mine.
    MR. GRUBIN:  Let's turn back to Government

**J.A. 461**

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN          904

Exhibit 1199 at Page 6.
Q   And I'm not going to do this, Mr. Russo, about with every message and check here.
    But looking at the bottom of the page, what is the date of the text message?
A   June 2nd.
Q   June 2nd, 2017?
A   2017, I'm sorry.
Q   And this is about a week later?
A   Yes.
Q   And what do you say?
A   Morning Dave.
    MR. GRUBIN:  Turning to the next page, Page 7.
Q   What does Motovich say in response?
A   Good morning.
Q   I'm showing you Government Exhibit 734 at Page 59.
    Do we see the same date there, June 1st, 2017?
A   Yes.
Q   And is it, again, made out -- and who is it from?
A   It's from Metro Erectors, Inc.
Q   And is it made out to ZKC NYC, Inc.?
A   Yes.
Q   And how much is this one for?
A   $7,450.
Q   And this one is handwritten, right?

*AVERY N. ARMSTRONG, RPR, NYRCR*

RUSSO - DIRECT - MR.GRUBIN            905

A    Correct.

Q    Whose handwriting is on the check?

A    That's mine.

Q    Did you continue to go to Motovich approximately once per week to cash checks?

A    Yes.  It was on and off, once a week, every 10 days.

Q    About once a week, you said?

A    Yes.

Q    And so when you made the check, this one is out 7,450, how much approximately did you get back?

A    $750 less.  So $6,700.

Q    10 percent?

A    10 percent less.

Q    10 percent less.

     And that's what you got back in cash?

A    Correct.

Q    And the extra is the fee to Mr. Motovich?

A    Yes.

Q    You previously testified that you sometimes brought checks to Motovich's sister?

A    Yes.

     MR. GRUBIN:  Can we go to Page 9 of Government Exhibit 1199.

Q    And in the middle of the page, three messages down, on June 21st, 2017, at approximately 10:01 a.m., what is it that

*AVERY N. ARMSTRONG, RPR, NYRCR*

---

RUSSO - DIRECT - MR.GRUBIN            906

you write?

A    Be there by 11:00 o'clock.

Q    And what did Mr. Motovich say in response?

A    See my sister.

Q    And what did you understand him to mean by, See my sister?

A    To go see his sister, Gail.

Q    For what?

A    To cash the check.

Q    And what do you say?

A    Okay.

     MR. GRUBIN:  Let's go to Government Exhibit 734 at Page 62.  Keep going to the top.

Q    What's the date of this check?

A    6/21/2017.

Q    And who is it from?

A    Metro Erectors, Inc.

Q    Who is it made out to?

A    ZKC NYC, Inc.

Q    And is that your signature on the bottom?

A    Yes.

Q    How much is the check for?

A    $11,840.

Q    And you got the cash back, minus approximately 10 percent?

*AVERY N. ARMSTRONG, RPR, NYRCR*

---

RUSSO - DIRECT - MR.GRUBIN            907

A    Correct.

Q    And if we scroll down, what date was the check cleared? If you can see that on the bottom of the page.

     Do you see where it says, June 22nd, 2017?

A    Yes.  Yes.  June 22nd.

Q    And what date was the check -- what was the date of the check itself?

A    6/21.

Q    So a day earlier?

A    A day earlier.

Q    How did you decide on the amount of money you wanted, Mr. Russo?

A    It depended on how much cash I needed for the week for expenses and I'd calculate if I was going to him to minus the 10 percent.

Q    Mr. Russo, you previously testified that you sometimes went to Bay Street Checking to cash checks; is that right?

A    Yes.

Q    You said they charged much less than Motovich?

A    Yes.

Q    So why not bring this check to Bay Street Checking?

A    Because with Bay Street Checking, we would bring checks that were made to the company, and checks that went to David were checks that we made to his companies.

Q    So could you go to Bay Street and just write the name of

*AVERY N. ARMSTRONG, RPR, NYRCR*

---

RUSSO - DIRECT - MR.GRUBIN            908

a company and how much money you needed?

A    Not really.

Q    Why not?

A    Well, I could have made a check to personal and cash it, but I couldn't just make it up to any company.

Q    What would have Bay Street Checking asked you to do if you gave them had a check in the amount of $11,840?

     MR. JACKSON:  Objection.

     THE COURT:  If you know.

Q    If you know?

     THE COURT:  Do you know what Bay Street would require you to do if you gave it to them?

     THE WITNESS:  Yes.  I'd have to fill out a form that it was over $10,000.

Q    And where would that form -- where do you understand that form would go?

A    To the IRS.

     MR. GRUBIN:  Let's turn to Page 10 of Government Exhibit 1199.  At the top of the -- thank you.

Q    At the top of the page, on June 28th, 2017, what do you ask Motovich?

A    Hey, Dave.  Would you be there tomorrow afternoon?

Q    And what does he say?

A    Morning.

Q    And what do you say in response?

*AVERY N. ARMSTRONG, RPR, NYRCR*

**J.A. 462**

RUSSO - DIRECT - MR.GRUBIN          909

A    What about Gail in the afternoon?

Q    What are you asking there?

A    I was asking him if I could go there in the morning, and he couldn't see me in the morning -- he could see me in the morning.  I had wanted to go in the afternoon, so his sister was going to be around in the afternoon, he wasn't going to be there.

Q    What does Motovich say back, if we scroll down?

A    She's here until 4:30.

Q    And this is June 28th, 2017, right?

A    Correct.

         MR. GRUBIN:  Can we turn to Government Exhibit 734 at Page 63.

         (Continued on the following page.)

*AVERY N. ARMSTRONG, RPR, NYRCR*

---

J. RUSSO - DIRECT - MR. GRUBIN          910

(Continuing.)

By Mr. Grubin:

Q    Mr. Russo, what's the date of the check?

A    6/29/2017.

Q    So that's a day after the messages we just looked at, right?

A    Yes.

Q    How much is this check for?

A    $14,065.

Q    Who is the check made out to?

A    KZC NYC, Inc.

Q    What did you get in exchange for this check?

A    $1,400 less.  So about twelve six.

Q    Who signed it?

A    My brother.

Q    Did you ever bring checks to anyone at Midwood Lumber other than David or Gail Motovich?

A    No.

Q    You didn't give it to anyone -- you never handed a check to anyone in the hardware store?

A    No.

Q    Let's turn to page 17 of the Government Exhibit 1199.

         Looking at the second to last text on the bottom of the page, do you see the date, September 25, 2017?

A    Yes.

*LEEANN N. MUSOLF, RPR*

---

J. RUSSO - DIRECT - MR. GRUBIN          911

Q    And what does David Motovich say?

A    Good morning and afternoon.

Q    What did you understand him to mean?

A    For me to pass by in the afternoon.

Q    And what did you say back?

A    Okay.  Let me know what time.  Thanks.

Q    Turning to the next page, page 18.  If we can go two texts down.

         What does Motovich say at approximately 1:04 p.m.

A    Aight.  I'm in.

Q    What do you say in response?

A    Okay.  I'll leave now.

Q    And the date is September 25, 2017, correct?

A    Correct.

Q    I'm showing you Government Exhibit 734 at page 73.  What's the date of this check?

A    September 22, 2017.

Q    Mr. Russo, if you know, why would the check be dated a few days earlier than the text message?

A    It was probably pre-- preprinted out and had it ready.

Q    And who is the check from?

A    Metro Equipment Inc.

Q    That's another one of your companies?

A    Yes.

Q    How do you decide, Mr. Russo, which company to make a

*LEEANN N. MUSOLF, RPR*

---

J. RUSSO - DIRECT - MR. GRUBIN          912

check out from?

A    We just alternate it so that the checks weren't constantly coming from one company.

Q    Why is that?

A    Just to mix it up and not make it raise a red flag.

Q    How much is this check for?

A    $40,000.

Q    Who is the check made out to?

A    ZKC NYC.

Q    And in this scenario, approximately, how much would Motovich make?

A    Four thousand dollars.

Q    Let's turn back to Government Exhibit 1199 at page 22.

         Looking at the last text message on the page, do you see the date is November 10, 2017?

A    Yes.

Q    And what do you write -- or what does Motovich write, excuse me?

A    Good morning.  I'm in the office if you want to stop by.

Q    What did you understand Mr. Motovich to be asking you?

A    If I needed to stop by and pick up cash.

Q    If we look above, did you text him anything to prompt this message?

A    No, not on that day.

Q    And why do you understand Motovich texted you on that

*LEEANN N. MUSOLF, RPR*

**J.A. 463**

J. RUSSO - DIRECT - MR. GRUBIN    913

day?

A    For me to go pick up cash.

Q    Let's turn to the next page, page 23.

What did he mean by, okay, if I'll come now then. Thanks.

A    Yes.  I -- I'm asking him if it was possible for me to pass by now, if it was okay.

Q    And let's scroll down.

What do you ask there?

A    Good morning.  What time can I pass by?

MR. GRUBIN:  Could we turn to page 25, Ms. Kannan.

Q    At the top of the page, on November 27, 2017, what is it that you ask?

A    Good morning.  Let me know what time I can pass there please.

Q    What does Motovich say?

A    Good morning.  Okay.

Q    This is November 27, 2017, right?

A    Yes.

Q    Let's look at Government Exhibit 734 at page 80.

Mr. Russo, what's the date of this check?

A    11/27/2017.

Q    And, by the way, what date was the check deposited?

A    On November 28, 2017.

Q    So a day later?

J. RUSSO - DIRECT - MR. GRUBIN    914

A    A day later.

Q    What's the amount?

A    $10,000.

Q    Who signed the check?

A    My brother.

Q    And I know it's a little -- it's hard to read, but could you read the memo line there on the check?

A    Roofing.

Q    Roofing.  Did ZKC do any roofing work for -- for your company, Mr. Russo?

A    No.

Q    So why did it say roofing?

A    It was just put there in the memo just to camouflage it.

Q    If your accountant ever looked at the check, what do you understand he would think the money was for, Mr. Russo?

A    He would have thought that it was money for material to do the roof.

Q    Did Motovich ever ask you why the memo line said roofing?

A    No.

Q    Did there come a point in time, Mr. Russo, where you stopped making checks out to ZKC?

A    Yes.

Q    Why?

A    Because he said that that company was closing down and he opened up a new corporation.

J. RUSSO - DIRECT - MR. GRUBIN    915

Q    Who said that?

A    David.

Q    But do you recall when that was?

A    No, I don't.

Q    Let's turn to page 30 of Government Exhibit 1199.

Looking at the top of the page there, what's the date, Mr. Russo, the date of the check -- or, excuse me, the date of the text message?

A    The date of the text is January 9, 2018.

Q    And do you see the attachment Motovich is sending you?

A    Yes.

Q    Do you see the file name, it says, New M, and a series of numbers, Metros Lithos PDF.

A    Yes.

Q    By the way, do you know what Lithos is, Mr. Russo?

A    No, I don't.

Q    Do you know who Phillip Adamou is?

A    No, I don't.

Q    Okay.  What does Motovich text you next?

A    Let me know.

Q    What did you understand him to mean?

A    I guess to -- to ask me if the file that he sent me was okay.

Q    Scrolling down, what do you say in response?

A    I will.

J. RUSSO - DIRECT - MR. GRUBIN    916

Q    So let's take a look at that PDF.  I'm showing you what has already been admitted as Government Exhibit 1199-A at page three.

Are you familiar with this document?

A    Yes.

Q    What is it?

A    It's a certificate of insurance.

Q    And what's a certificate of insurance?

A    A certificate of insurance is to prove that you have liability insurance on your company.

Q    And are companies like Metro -- are companies like Metro companies required to have workers' compensation insurance?

A    Yes.

Q    Why is that?

A    Because you need to have insurance to cover your workers.

Q    Cover them for what?

A    God forbid of an accident or something, some sort of a liability, they're gonna be covered for it.

Q    And who -- and how do you prove you have liability insurance?

A    With a certificate like this.

Q    Have you ever received -- who, if anyone, have you ever had -- have you ever received certificates of liability insurance?

A    Yes.

**J.A. 464**

J. RUSSO - DIRECT - MR. GRUBIN                917

Q    And in relation to Metro Erectors, did you ever have to prove to someone else that Metro Erectors has insurance?

A    Yes.  On all of my jobs that I do, I have to provide them with a form like this.

Q    Who are you providing it to?

A    The contractor that we are doing the work for.

Q    Does Metro companies ever get audited to see if you have certificates of liability insurance?

A    Yes.

Q    Who does those audits?

A    The insurance companies themselves.

Q    How often does that happen?

A    Every year.

Q    What happens if your company doesn't have a certificate of liability insurance?

A    You pay a penalty and they -- they prorate -- because it's based on sales, so you pay a percentage of whatever sales you did for the year.  So if you didn't have coverage, they're gonna audit you, they're gonna look at your books and see how much money, how much business you brought in and then you pay a percentage on what you earned.

Q    Can that penalty be substantial?

A    Yes.

Q    Would you consider that a lot of money for your businesses?

*LEEANN N. MUSOLF, RPR*

---

J. RUSSO - DIRECT - MR. GRUBIN                918

A    Yes.

Q    All right.  Turning your attention back to the exhibit on the screen.  Looking at the top right corner, what's the date here?

A    January 9, 2018.

Q    And that was the same date as the text message we just saw, correct, Mr. Russo?

A    Correct.

Q    And at the top left of the exhibit, under, producer, do you see where it says, AllSure Insurance Brokerage?

A    Yes.

Q    Below that, next to Insured, do you see, New M&M Group Inc.?

A    Yes.

Q    What was new M&M Group?

A    The New M&M Group was another company that David had and that's where we were made checks to.

Q    And what were you making checks to New M&M Group for?

A    Nothing, just it was just his company.

Q    And what did you get in exchange for the checks you were making out to New M&M group?

A    Cash.

Q    So, in this example, what is this document proof of?

A    Can you say that again?

      MR. GRUBIN:  Actually, can we scroll down to the

*LEEANN N. MUSOLF, RPR*

---

J. RUSSO - DIRECT - MR. GRUBIN                919

bottom left of the page -- or, actually, I'm sorry, flip to the -- go back up.

Q    This is a document Mr. Motovich sent you, right?

A    Yes.

      MR. GRUBIN:  Scroll back up.  Go to the page before this one.

Q    So he sent you these two attachments, right?

A    Yes.

Q    You don't know what Lithos is though, correct?

A    No, I don't.

      MR. GRUBIN:  Scroll up to the top of this page.

Q    Does it have the same information on the top left?

A    Yes.

      MR. GRUBIN:  Scroll down.

Q    Who is the certificate holder here?

A    Metro Erectors, Inc.

Q    So this document that Motovich texted you, what is this proof of?

A    This is to prove that he has insurance FOR M&M Group who I was writing checks to.

Q    Did Metro Erectors ever pay New M&M Group for subcontracting work?

A    No.

Q    What about any other services?

A    No.

*LEEANN N. MUSOLF, RPR*

**J.A. 465**

---

J. RUSSO - DIRECT - MR. GRUBIN                920

Q    If you were audited by the insurance company and they asked you for proof of insurance for the work for the checks that you were writing paid to New M&M Group and you were giving to Motovich, if they ever ask you -- if the insurance company ever asked you for proof, what would you give them?

      MR. JACKSON:  Objection.

      THE COURT:  Overruled.

      What would you give them?

      THE WITNESS:  I would give them this form.

      THE COURT:  Did that, in fact, happen?  He said what would you give them.  Did it ever happen?

      THE WITNESS:  No, it ever happened.

      THE COURT:  Go ahead.

      MR. GRUBIN:  I see the time.

      THE COURT:  So do I.  Keep going.  I will let you know.

      MR. GRUBIN:  Thank you, Your Honor.

      THE COURT:  You're welcome.

BY MR. GRUBIN:

Q    Turning back to Government Exhibit 1199 at page 30.  Can you take a look at the texts at the bottom of the page.  Do you see where Motovich says, did you get a chance to CK?

A    Did you get a chance to check.

Q    And what did you say in response, scrolling down?

A    No, out all day.  Tomorrow I will but looks okay.

*LEEANN N. MUSOLF, RPR*

J. RUSSO - DIRECT - MR. GRUBIN          921

Q    Look --

A    I put "lools" but meant "looks okay."

Q    Okay.

        MR. GRUBIN:  And keep scrolling down.

A    Okay.

        MR. GRUBIN:  Keep going down.

Q    You say what?

A    Okay.  Thank you.  Talk to you tomorrow -- talk to you later.

Q    Keep scrolling down.  What do you say there?

A    It's all good.

Q    What do you mean by that?

A    The certificate he gave me was good.

Q    The following day on -- was that the only one of certificates of insurance that Motovich sent to your office or to you?

A    No, I believe there was others.

        MR. GRUBIN:  I'm showing you, and this will be just for the witness, what has been marked identification as Government Exhibit 1069.

        THE COURT:  Any objection?

        MR. JACKSON:  No objection, Judge.

        THE COURT:  Admitted.  You may publish.

        (Government Exhibit 1069, was received in evidence.)

        (Exhibit published.)

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS          922

Q    Mr. Russo, who are these emails between?

A    It's between -- the girl who works in my office and David's sister.

Q    Okay.  And the person in your office, is her name -- it's Felicia Villalona --

        THE COURT:  Don't talk over each other.  Put another question.  Put another question.

Q    What's her last name?

A    Villalona.

        THE COURT:  And speaking of last, that's the last question for the day.  It's five o'clock.  We're going to break for the day.  Please do not talk about the case with anyone, ladies and gentlemen of the jury, defer judgment. We're moving ahead, we're going to move ahead even more rapidly I assure you.

        Do not talk with anyone about your testimony, sir. We'll see you tomorrow morning at 9:30, here, to continue your testimony.

        Thank you, ladies and gentlemen of the jury.  Have a good night.

        THE COURTROOM DEPUTY:  All rise.

        (Jury exits the courtroom.)

        THE COURT:  You may step down, sir.  We'll see you tomorrow at 9:30.  Thank you very much.

        THE WITNESS:  Thank you.

*LEEANN N. MUSOLF, RPR*

---

PROCEEDINGS          923

        THE COURT:  Don't talk with anyone about your testimony.

        Ladies and gentlemen, you may be seated.  The jury has left the courtroom.

        (The witness steps down.)

        THE COURT:  The witness is leaving the courtroom.

        The witness has left the courtroom.  Do we have any issues to address, beginning with the Government?

        MR. POLEMENI:  No, Your Honor.

        THE COURT:  Anything from Defense?

        MR. JACKSON:  No, Judge.

        THE COURT:  Okay.  We'll see you tomorrow morning, 9:30.

                *    *    *    *    *

        (Proceedings adjourned at 5:01 p.m. to resume on July 12, 2024 at 9:30 a.m.)

**J.A. 466**

*LEEANN N. MUSOLF, RPR*

---

924

                    I N D E X

WITNESS                                      PAGE

**AGO KOLENOVIC**

DIRECT EXAMINATION    BY MR. PAULSEN      695

CROSS-EXAMINATION     BY MR. JACKSON      720

**MERSIHA VUKEL**

DIRECT EXAMINATION    BY MR. SKURNIK      787

DIRECT EXAMINATION    BY MR. SKURNIK      812

CROSS-EXAMINATION     BY MR. JACKSON      850

REDIRECT EXAMINATION  BY MR. SKURNIK      856

**JOSEPH RUSSO**

DIRECT EXAMINATION    BY MR. GRUBIN       859

DIRECT EXAMINATION    BY MR.GRUBIN        880

                  E X H I B I T S

GOVERNMENT                              PAGE

1002 and 1005                      692

248                                695

1006, 1014, 1015, 1032, 1033,      706
1036, 1037, 1038 and 1051

GX102-1                            754

12                                 790

29                                 791

18                                 791

19                                 792

*LEEANN N. MUSOLF, RPR*

925

| EXHIBITS GOVERNMENT | PAGE |
|---|---|
| 11 | 793 |
| 228 | 794 |
| 135-B | 805 |
| 153-A | 818 |
| 1065 | 833 |
| 1074 | 836 |
| 1076 | 838 |
| 1085 | 839 |
| 1086 | 840 |
| 1087 | 840 |
| 1098 | 841 |
| 1100 | 841 |
| 1104 | 842 |
| 1107 | 842 |
| 1116 | 843 |
| 1117 | 844 |
| 1124 | 844 |
| 1132 | 844 |
| 1133 | 845 |
| 1134 | 845 |
| 1139 | 846 |
| 1157 | 847 |
| 1162 | 847 |
| 1165 | 848 |

*LEEANN N. MUSOLF, RPR*

926

| 1180 | 848 |
|---|---|

| EXHIBITS GOVERNMENT | PAGE |
|---|---|
| 1186 | 849 |
| 1193 | 849 |
| 25 | 869 |
| 3500-JR-2 | 882 |
| 734 | 895 |
| 1069 | 921 |

| EXHIBITS DEFENSE | PAGE |
|---|---|
| DX 1013 | 741 |
| 2070 | 756 |

*LEEANN N. MUSOLF, RPR*

927

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x
                              21-CR-497(WFK)
UNITED STATES OF AMERICA
                         United States Courthouse
                         Brooklyn, New York
     -against-
                         July 12, 2024
                         9:30 a.m.
DAVID MOTOVICH,

        Defendant.
------------------------------x
     TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
     BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
        UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES

For the Government:    UNITED STATES ATTORNEY'S OFFICE
                       Eastern District of New York
                       271 Cadman Plaza East
                       Brooklyn, New York 11201
                       BY: ERIK DAVID PAULSEN, ESQ.
                           ANDREW GRUBIN, ESQ.
                           MATTHEW CHARLES SKURNIK, ESQ.
                           ROBERT T. POLEMENI, ESQ.
                       Assistant United States Attorneys

For the Defendant:     WACHTELL, LIPTON, ROSEN & KATZ
                       51 West 52nd Street
                       New York, New York 10019-6150
                       BY: RANDALL WADE JACKSON, ESQ.
                           JESSICA LAYDEN, ESQ.
                            - and -
                       MEISTER SEELIG & FEIN LLP
                       125 Park Avenue - 8th Floor
                       New York, New York 10017
                       BY: HENRY E. MAZUREK, ESQ.

Court Reporter:        LEEANN N. MUSOLF, RPR, CCR
                       Phone: 718-613-2489
                       Email: lmusolf.edny@gmail.com
Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

**J.A. 467**

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

PROCEEDINGS                928

(In open court; jury not present.)

THE COURTROOM DEPUTY: Criminal cause on trial, 21-CR-497, United States of America versus David Motovich.

Will the attorneys please state their name for the record, beginning with the Government.

MR. POLEMENI: Good morning, Your Honor.

Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, paralegal Kavya Kannan, and Special Agent Christopher Cabane for the United States.

THE COURT: Good morning, counsel. You may be seated.

Ladies and gentlemen of the public, you may be seated, as well.

MR. JACKSON: Good morning, Your Honor.

THE COURT: Good morning, Mr. Jackson.

MR. JACKSON: Randall Jackson, Henry Mazurek, I think Mr Mazurek is in the bathroom, but Henry Mazurek, Jessica Layden on behalf of our client David Motovich, and also we're joined by Mr. Cepregi.

THE COURT: Good morning, ladies and gentlemen. Please be seated. Thank you for your patience. The jury has not yet been brought in and the witness has not yet been brought in.

Do we have any issues we need to address before the witness comes in and before we bring the jury in, beginning

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

PROCEEDINGS                929

with the Government?

MR. PAULSEN: Nothing from the Government, Your Honor, but I believe defense counsel has an issue about a witness they have to raise.

THE COURT: Okay. Well, nothing from the Government. I'll hear from defense counsel.

MR. JACKSON: Thank you, Judge, and I want to try to be very brief.

I just want to preface what I am going to say, Judge, with that we have had very good relationship over the last week with the Government. So I don't want anything I'm saying to be perceived in the spirit of any accusation of bad faith. The Government's --

THE COURT: I used to have a girlfriend, before I got married, who would begin statements with, "I just want you to know, I really, really, really like you," and then things headed south pretty quickly. So I understand you have a really good relationship with the Government, but...

MR. JACKSON: Yes, this is not headed very far south, Judge.

THE COURT: Okay.

MR. JACKSON: We have had a -- an understanding with the Government that we prefaced for the Court that they would provide us with, not -- without, there's no guarantees on it, but they've given us a preview of the witnesses that they

PROCEEDINGS                930

expected, it could be the witnesses for the week --

THE COURT: Both in terms of name and order, or more order? You tell me.

MR. JACKSON: Name and I think rough order, without -- you know, we've agreed things may need to move around, things may need to change. And they have been very good, also, over the past week of, the night before, letting us know which exhibits for those witnesses.

THE COURT: Okay. But?

MR. JACKSON: So. I just want to say that this week, we had nine people that we prepared for -- eight people that we prepared for, and late last night, the Government let us know there are two additional people they would like to squeeze in today.

THE COURT: Okay.

MR. JACKSON: One of those people, completely fine.

THE COURT: Tell me about the one you're not fine with.

MR. JACKSON: The other one is a bank, I believe, officer, who, frankly, Judge --

THE COURT: From what bank?

MR. JACKSON: Webster Bank.

THE COURT: All right. Go ahead.

MR. JACKSON: A woman named Catherine Manzione. We just didn't -- I just didn't get a chance. I found out about

PROCEEDINGS                931

it back in Brooklyn, but --

THE COURT: Bottom line, you would like them to defer calling that witness until next week?

MR. JACKSON: Yes, Your Honor.

THE COURT: Would that be of help to you?

MR. JACKSON: That would be a huge help.

THE COURT: All right.

Let me ask the Government, since it's a bank witness, I assume you have other witnesses that you could fill the day with today if you had to. Is there any reason that you have to take this witness in order or would it do great violence to your case to have this witness come on Monday? Let me just ask you, as trial lawyers, what's your view?

MR. PAULSEN: Yes, Your Honor. If I may -- just echo --

THE COURT: I know, you respect him in the morning, too, I get it.

MR. PAULSEN: We did provide a list of our first eight principal witnesses which we have done and we've done in the order that we had said to him we would do.

THE COURT: Right.

MR. PAULSEN: We're trying to move things quickly and give him as much notice as possible. This witness has two pages of 3500 Material. She's here just to testify to some materiality and control issues for one of the four banks. We

**J.A. 468**

PROCEEDINGS                932

notified last night that we would like to offer today.

She took a two and a half hour Uber to get here from Suffolk County. She's here now. She will not take the stand until this afternoon I think because I imagine Mr. Russo will be on the stand --

THE COURT: Well, is there any problem with taking the witness out of order and just explaining to the jury that. For the convenience of the jury to move things along and for the convenience of the parties, we're taking a witness out of order and then we'll continue with -- I don't have a problem with that. Do you guys have a problem with that, taking the witness now?

MR. PAULSEN: No. We could take her. I think they would prefer that witness to be much later today so they could have time --

THE COURT: Well, I understand, but if all the witness is going to do is the authentication of documents and be sort of a glorified custodian of records, does that give you any comfort? Why don't we take this witness early and if you need more time, Mr. Jackson, you can her, she can stick around until the end of the day if you need to call her back at the end of the day, but you'll have a chance to see what she's going to testify to and talk with your cocounsel and your client over the lunch break and see whether or not you really need to have more time.

PROCEEDINGS 933

If it's going be a straight custodian with a little extra sauce on the side, Jack Daniels or whatever, then you can be done with her and if it's doing any great violence to the jury or to the flow of witnesses.

Does that make sense as a practical way to proceed?

MR. JACKSON: If I can defer my cross until later in the day, Judge, that's fine.

THE COURT: Yes, you can defer your cross until later in the day.

MR. JACKSON: And if we can figure out -- if it goes beyond the custodian stuff, we can figure out if I need that extra day for --

THE COURT: Well, my thought is this: If it's really a custodian of bank records and she's here today, probably by the end of the day, you'll be able to get it done. But you'll be able to talk to your client and your cocounsel and if you need to have her come back, she'll come back.

Does that work for the Government?

MR. PAULSEN: Your Honor -- no, Your Honor, if I may, she's. Not a custodian. We stipulated the custodial aspect of this.

THE COURT: Right.

MR. PAULSEN: She's here to talk about the interest that the bank has in the various accounts which are necessary for the charges in this case. It's very short and discrete

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

PROCEEDINGS 934

testimony, but it's not custodial testimony. My main interest is that she has to travel two and a half hours to get to the courthouse.

THE COURT: You know, I'm going to play the world's smallest fiddle.

MR. PAULSEN: Yes, Your Honor. I'm happy to offer her now if that's -- if that's how the Court would prefer.

THE COURT: How does that work for you, Mr. Jackson? We will offer her now, get her on, perhaps get her off. If she has to come back, she'll come back.

MR. JACKSON: That's fine, Judge. Thank you.

THE COURT: Okay. Why don't we start with her? Is she here?

MR. PAULSEN: Yes, Your Honor.

THE COURT: Are you prepared to have her testify now --

MR. PAULSEN: Yes.

THE COURT: Or do you need more time --

Why don't we do that and we will bring in the jury and I will explain to the jury we're taking a witness out of order, no big deal, and it will help speed things up, hopefully, they like that -- they like hearing that.

MR. PAULSEN: Yes, Your Honor. If I can just have a few moments to go locate her. She's not expecting to go on until midday, so I have to go find her in her room.

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

PROCEEDINGS 935

THE COURT: Yes.

MR. PAULSEN: Thank you, Your Honor.

THE COURT: Do we have any other issues in terms of scheduling that we need to address?

MR. JACKSON: No, Judge.

MR. POLEMENI: No, Judge.

(Pause in the proceedings.)

MR. PAULSEN: Your Honor, would you like me to bring the witness up right now before the jury comes in?

THE COURT: Why don't we do that. Yes. We'll bring the jury in, then we'll swear the witness, and I'll explain to the witness that we're doing this to accommodate schedules and move things along. So we'll administer the oath once the jury is in, not now, Mr. Scott.

Okay. So are we ready to proceed and bring in the jury?

MR. JACKSON: Yes, Your Honor.

MR. PAULSEN: Yes.

(Witness takes the witness stand.)

THE COURT: All right. Why don't you get the jury in, please.

And, ma'am, I offer all witnesses a cough drop and I assure you no Government funds have been expended in this.

THE WITNESS: Thank you.

THE COURTROOM DEPUTY: All rise.

**J.A. 469**

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

PROCEEDINGS 936

THE COURT: Please stand for the jury.

(Jury enters the courtroom.)

THE COURT: Welcome back, ladies and gentlemen of the jury. Please be seated. Happy Friday. You may have noticed that the witness that you see standing at the witness box is not the same witness that you saw yesterday. Let me assure you, this is designed to move things along.

One of the things we do while you're waiting in the jury room wondering what the lawyers and judges are talking about is we're figuring out ways to move things along. So we have a witness now, very focused issues, she's going to be administered the oath, she's going to be examined by the Government and then cross-examined by defense counsel, either right now or later today, but this will help to move things along. Sometimes we take witnesses out of order and it's designed to move the case more expeditiously because I am solicitous of your time, okay? It may not always seem that way, but I am solicitous of your time so, we're going to 0keep it rolling. So don't think we are in here just talking about now the Yankees aren't what they were supposed to be.

Okay. Please administer the oath and then we will proceed.

THE COURTROOM DEPUTY: Do you solemnly swear or affirm that the answers you are about the about give the Court, will be the truth, the whole truth, and nothing but

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

PROCEEDINGS                    937

the truth, so help you God?

THE WITNESS:  I do.

THE COURT:  Please be seated, ma'am.  You see this microphone you have got in front of you, it will swivel to you.  You don't have to move it.  You can move it around. See?  Swivel it, okay?  See, it looks like a snake.  It won't bite you.

Please state and spell your name, and then counsel will inquire.

THE WITNESS:  My name is Catherine Manzione, C-A-T-H-E-R-I-N-E, M-A-N-Z-I-O-N-E.

THE COURT:  Thank you, ma'am.

Counsel, you may inquire.

(Continued on next page.)

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

---

C. MANZIONE - DIRECT - MR. PAULSEN           938

(Witness takes the witness stand.)

**CATHERINE MANZIONE**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PAULSEN:

Q    Good morning, Ms. Manzione.  How are you today?

A    Fine.  Thank you.

Q    Where do you work?

A    I work at Webster Bank.

Q    What are your responsibilities at Webster Bank?

A    My responsibilities, I am the managing director of BSA governance.

Q    What does BSA mean?

A    Bank Secrecy Act.

Q    What does that entail?  What do you do?

A    The Bank Secrecy Act is regulations that govern us understanding who our client base is, the transactions that we should expect to see from them, reporting requirements and such.  I manage that process.

Q    Okay.  Did you have any previous relationship with Astoria and Sterling banks?

A    Yes, I did.

Q    Can you explain that for the jury?

A    Yes, certainly.  So, from time to time, or usually many times, banks do acquire each other.  So back, first, we were

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

---

C. MANZIONE - DIRECT - MR. PAULSEN           939

Astoria Federal Savings, and then we turned into -- we were then acquired By Sterling National Bank, and then further acquired by Webster Bank.

Q    So you work for Webster today but you used to work for Sterling and used to work for Astoria?  Okay.

A    That's correct.

Q    And to draw a finer point, if somebody had an Astoria Bank account a long time ago, it became a Sterling account and now it would be a Webster account?

A    Yes, that's correct.

Q    Now, in connection with your testimony today, did you review some records from Astoria Bank, the predecessor of your current employer?

A    Yes, I did.

MR. PAULSEN:  Your Honor, can I show Government Exhibit 703, only for the witness, now.

THE COURT:  Any objection to 703?

MR. JACKSON:  Your Honor, may we see it quickly?

THE COURT:  Of course.

Why don't you show it to your adversary electronically if you can.

MR. PAULSEN:  I'm sorry, it is in evidence.

THE COURT:  It's in evidence?

MR. PAULSEN:  Yes.

THE COURT:  703 is in evidence, then you may publish

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

---

C. MANZIONE - DIRECT - MR. PAULSEN           940

and examine.  Thank you.

MR. PAULSEN:  It's in evidence, so -- may we publish?

THE COURT:  Yes.  You may publish.

(Exhibit published.)

THE COURT:  I'm not seeing it on the screens.

Do you see it, ma'am.

THE WITNESS:  Yes, I do.

THE COURT:  And ladies and gentlemen of the jury, do you have it okay.  Let's go.

MR. PAULSEN:  Ms. Kannan, can you just zoom in on the top on one of the checks -- sorry, one of the ones that has the name of the check at the top, so the third one down.

BY MR. PAULSEN:

Q    Ms. Manzione, did you review documents relating to this Astoria account for Ago & Alaudin?

A    Yes, I did.

Q    Okay.  And these were bank records held by Astoria back when you worked there?

A    Yes.

Q    I would like to ask you some questions about what happened to funds are deposited in accounts back at Astoria during that time period.  When a customer deposits funds in a bank, can the bank use that money?

A    Yes, it can.

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

**J.A. 470**

C. MANZIONE - DIRECT - MR. PAULSEN                941

Q    What can it do with it?

A    It can lend against it, it can invest those funds.

Q    Okay.  So the bank has control of the money when it's -- when it's in the bank?

A    Yes.

Q    And it can invest it --

MR. JACKSON:  Objection.  Form.

THE COURT:  Overruled.  Go ahead.

Q    Ms. Manzione, is it fair to say that's how a bank works?

A    Yes.  That is the purpose of the bank.

Q    A bank could pay interest on accounts if it wasn't able to invest or lend out the money while it had it?

A    No, that's not -- no.

Q    When a customer wanted to open an account for Ally Bank, what kind of information and documents would typically be required to start that account?

A    So we're required to know our customer.  Within that, we have to obtain information around their identity.  So that being, their name, date of birth, address, social security number, if it's a business, we obtain documentation in regards to what the business is, with the Department of State, if it's available, articles of incorporation and things like that.

Q    Does the term, know your custodian, is there, like, an abbreviation you use a lot for it?

A    KYC.

C. MANZIONE - DIRECT - MR. PAULSEN                942

Q    Okay.  Why does the bank want to know their customer?

A    It's important for us to know the customer so we understand what's going on, what we expect from that client and so that we can actually -- we are required with OFAC to also run scans on each and every client that we have.

Q    Who does OFAC stand for?

A    The Office of Foreign Assets Control.

Q    Okay.  Is it fair to say that you're required to know your customer both as a matter of law but also just for bank policy?

A    Yes.

MR. JACKSON:  Objection.  Form.

THE COURT:  Overruled.

Q    Your answer was yes?

A    Yes.

Q    Now, are there -- if a customer gives you false information in opening an account, that false Know Your Customer information, does that create certain risks for the bank?

A    Yes, it does.

Q    What kind of risks?

A    So, it creates reputational risk, it creates financial risks, regulatory risks, and the possibilities that we are moving elicit funds.

Q    Now, when opening a bank account for a business, do you

C. MANZIONE - DIRECT - MR. PAULSEN                943

ask what kind of business the customer is in?

A    Yes.  We have to determine the nature and purpose of that business.

Q    Why?

A    Because we have to be able to build an understanding of what we should be seeing around that company.

Q    Okay.

A    Also, that there's certain businesses that are more riskier than others.

Q    Is check-cashing a business that is deemed riskier than others?

A    Yes, it is.

Q    Now, are there certain types of obligations -- are there certain obligations that a bank has to file reports to the Government based on what the bank is seeing in the account?

A    Yes.  So, there are Currency Transaction Reports, referred to as CTRs.  Those reports, when we see activities specific to cash, we have to complete those for increments of 10,000 or more for each transaction.

We also have to file regulatory reports called SARs.  Those are Suspicious Activity Reports.  So with those, we are required to file those when we see activities that are -- we deem suspicious based on it does not make sense to what we should be seeing, if it appear to potentially be engaging in criminal activities.

C. MANZIONE - DIRECT - MR. PAULSEN                944

Q    Okay.  To file a SAR, the bank has to -- is it fair to say the bank has to figure out if the activity is suspicious?

A    That's correct.

Q    Does the bank need to know what sort of business is happening in order to tell if it's suspicious?

A    Yes.  We need to be able to understand to see if it makes sense or not.

Q    You mentioned OFAC before.  How does OFAC work?

A    So, OFAC, is -- it works off of lists that are setup to understand the -- if there's a terrorist, potentially, terrorist organization, foreign governments, elicit actors, narcotic dealers, things like that.  So these are very important things.

Q    So am I correct in saying that as part of your OFAC responsibilities, there's a list of individuals who the bank is not allowed to open accounts for?

A    That is correct.

Q    Is it possible for the bank to do that job if you don't know who's really running the account?

A    No.

Q    Same question for SARs and CTRs.  Can the bank actually file a correct report if it doesn't know what's -- or who is the person who's transacting in the account?

A    No.  The main requirements on those are that we identify those individuals.

**J.A. 471**

C. MANZIONE - DIRECT - MR. PAULSEN          945

MR. PAULSEN: Your Honor, a few other questions, but I believe Government Exhibit 703 is in evidence. The Government broke 703 into some component parts which have the same materials. It's numbers A through F.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: You may publish.

MR. PAULSEN: I don't need to publish. I just want to make sure they're in evidence.

BY MR. PAULSEN:

Q   Just some final questions, Ms. Manzione. These standards that you just described for Know Your Customer, for making sure that the bank employees are submitting SARs and CTRs and following OFAC rules, are those discretionary for the employees of Astoria?

A   No. Those are not discretionary.

Q   Are they discretionary for Webster, where you work now?

A   No.

Q   So is it fair to say an employee can't decide just not to follow them?

A   They must.

Q   Can an employee, for a favored customer, decide to let that customer not follow those rules?

A   No, they cannot.

Q   Would an employee at your banks get training in those

PROCEEDINGS          946

matters?

A   Yes.

Q   Based on your position in AML, would what would be the consequences for an employee who -- who didn't follow those rules?

A   If they did not follow those rules, there would be an investigation, a termination, and, potentially, a prosecution.

MR. PAULSEN: Your Honor, no further questions.

THE COURT: Your witness.

MR. JACKSON: Your Honor, may we have a brief sidebar?

THE COURT: You want to call this witness later in the day?

MR. JACKSON: Yes, Your Honor.

THE COURT: All right.

Ladies and gentlemen, we'll call this witness back for cross-examination after the luncheon recess today. She'll be back. She's still under oath.

Do not talk with anyone about your testimony and we'll see you this afternoon, okay? Thank you. You may step down.

THE WITNESS: Thank you.

THE COURT: Thank you.

(The witness steps down.)

All right. Please call the witness who was on the

PROCEEDINGS          947

stand the other day. We will continue with that examination.

MR. GRUBIN: Sure. The Government calls Mr. Russo, Your Honor.

THE COURT: We're going to recall Mr. Russo, ladies and gentlemen of the jury, from the other day. We train roll it, that's how we do it. Okay.

MR. GRUBIN: Your Honor, may we --

THE COURT: If you use the microphone, you may, but if you don't, I can't hear you.

MR. GRUBIN: Your Honor, may we bring the binders back to the podium?

THE COURT: You may give them to my court deputy who will bring them back.

MR. GRUBIN: Thank you.

(Witness takes the witness stand.)

THE COURT: Thank you, Mr. Russo. Please have a seat. You are still under oath. And let me ask you, as I did the other day, have you spoke with anyone about your testimony since leaving the witness stand yesterday?

THE WITNESS: No, I have not.

THE COURT: Thank you.

Continue examination, Counsel.

MR. GRUBIN: Thank you, Your Honor.

THE COURT: You're welcome.

(Continued on next page.)

**J.A. 472**

J. RUSSO - DIRECT - MR. RUSSO          948

(Witness takes the witness stand.)

**JOSEPH RUSSO**, called as a witness, having been previously first duly sworn/affirmed, was examined and testified further as follows:

DIRECT EXAMINATION (Continued)

BY MR. RUSSO:

Q   Good morning, Mr. Russo.

A   Good morning.

Q   So, yesterday, we covered a number of topics. You told us about your construction business, the Metro companies, right?

A   Yes.

Q   You mentioned that your -- you and your brother took over management of that business from your father I believe?

A   Correct.

Q   When did your father -- did your father start the company?

A   Yes, he did.

Q   When was that?

A   It was back in the 60s, 1960s.

Q   So long before you started going to Mr. Motovich?

A   Yes.

Q   And we looked at a number of checks that you gave Motovich in exchange for cash minus a 10 percent fee; is that correct?

J. RUSSO - DIRECT - MR. RUSSO    949

A    Correct.

MR. GRUBIN:  So let's just, again, just turn to Government Exhibit 734 at page 73.

THE COURT:  In evidence?

MR. GRUBIN:  Yes, Your Honor.

THE COURT:  All right.  You may publish.

(Exhibit published.)

Q    And, Mr. Russo, we looked at this check yesterday; is that correct?

A    Correct.

Q    And Metro Equipment, that's one of your companies; is that right?

A    Yes, it is.

Q    What is the check made out to?

A    ZKC NY.

Q    And it's for $40,000?

A    Correct.

Q    And you gave this check to Mr. Motovich?

A    Yes, I did.

Q    And what did he give you in return?

A    He gave me the balance back in cash which is 10 percent less.

Q    So he would keep, approximately, if I'm going the math right, about $4,000?

A    Yes.

J. RUSSO - DIRECT - MR. RUSSO    950

Q    Could you have brought this check to Bay Street Checking? I believe you mentioned that the other day, Bay Street Checking.

A    Yes.

Q    You would have been able to hand them a check for ZKC?

A    Oh, no, no, no. I'm sorry.  Incorrect.

Q    Also -- but let's say you could have, let's pretend that you could have given it to them, about how much money would they have kept?

A    About three percent.

Q    So around $800?

A    No, they would have took about 1200.

Q    Okay.  And is it fair -- I apologize.

A    They would have took about 1200 from the check, three percent of 40,000 is 1200.

Q    Substantially less than what Motovich kept, correct?

A    Correct.

Q    And because this check is above $10,000, what would have Bay Street Checking required of you?

A    I would have had to fill out a form that it was over $10,000 to verify and give it to the IRS.

Q    And just to be -- just to be clear, first of all, what did you do with the cash that you got from Motovich?

A    We used it for payroll and everyday expenses to run the business.

J. RUSSO - DIRECT - MR. RUSSO    951

Q    Just to be clear, there's nothing -- I'm correct that there's nothing wrong or unlawful in paying workers in cash?

A    No.  As long as you would have claimed it, there wouldn't have been an issue.

Q    For tax purposes?

A    Correct.

Q    We left off discussing workers' compensation insurance, Mr. Russo.  Please, just remind the jury quickly what that is?

A    Workers' compensation is an insurance that all contractors have to cover their employees God forbid of an incident or accident and they're disabled, workers' compensation kicks in, picks up the medical expenses, and then in -- if they settle, you know, if they can't return back to work, they go on worker's comp and worker's comp will give them a settlement and pay them for the rest of their life.

Q    Let's say you wanted Metro Erectors, your company, to be a subcontractor on a project, would the general contractor require you to give proof of insurance?

A    Yes.

Q    Why is that?

A    Because without the insurance, you're -- you wouldn't be able to proceed with the project.  They wouldn't allow you to work.

Q    Why not?

A    Because you need to have coverage on your employees.

**J.A. 473**

J. RUSSO - DIRECT - MR. RUSSO    952

MR. GRUBIN:  So if we can turn to what's already been admitted as Government Exhibit 228.

Permission to publish, Your Honor?

THE COURT:  You may publish.

(Exhibit published.)

Q    So, I know this is a blank form, Mr. Russo.  Do you recognize this type of document?

A    Yes, I do.

Q    What is it?

A    It's a certificate of insurance.

Q    Now, if you are the subcontractor in that example we just gave and you're giving the general contractor proof of insurance, where would your company's name appear?

A    Where it says insured.

Q    And what would that be proof of?

A    Showing that proof of insurance for the company.

Q    And, presumably, the general contractor would eventually pay you for your subcontracting work, correct?

A    Yes.

MR. GRUBIN:  If we can go down to the bottom of the page.

Q    Where would the general contractor's name appear, if anywhere?

A    Where it says, certificate of holder.

Q    I see.  Now, let's turn back to the document, I believe

J. RUSSO - DIRECT - MR. RUSSO                953

we left off, Government Exhibit 1069.

So, who is this email -- and let's just -- who is this email from, Mr. Russo?

A    It's from Felicia Villalona.

Q    And you mentioned yesterday, that's your office manager?

A    Correct.

Q    And what's the date of the email?

A    May 11, 2016.

Q    And who is the email to?

A    It was sent to Gail Motovich.

Q    What does Ms. Villalona write?

A    Can you send me certificate of insurance for the following:  And Metro Fabrication Corp.

Q    Who told her to ask Motovich -- or Gail Motovich -- for a certificate of insurance?  Who would have?

A    We would have.

Q    Who is "we?"

A    Either me or my brother.

Q    Let's turn to the next page.  What does Gail Motovich ask your office manager?

A    "Do you need a job address as well for an additional insured?"

Q    Sitting here today, do you recall -- do you understand what that would have meant?

A    Yes.

---

J. RUSSO - DIRECT - MR. RUSSO                954

Q    Okay.  What does that mean?

A    That means if you would have needed to put a specific project on that insurance certificate.

Q    Okay.  How does that office manager respond?

A    "No job address or additional insured.  No."

Q    Finally, what does Gail Motovich say in response?

A    "Please see attached."

Q    All right.  Let's turn to the attachment that Gail Motovich sent to your office.

What's this document?

A    Certificate of insurance.

Q    And this one is actually filled out, correct?

A    Excuse me?

Q    And this one is actually filled out, correct?

A    Correct.

Q    What's the date?

A    May 11, 2016.

Q    And where is -- what's listed under insured this time?

A    KZC NYC.

Q    What -- and if we scroll down to the bottom, who is the certificate holder?

A    Metro Fabrication Corp.

Q    We saw, earlier, a number of checks or -- I apologize, we saw yesterday, Mr. Russo, a number of checks that you provided Motovich payable to ZKC, correct?

---

J. RUSSO - DIRECT - MR. RUSSO                955

A    Yes.

Q    What subcontracting services, if any, did ZKC provide to Metro Fabrication?

A    Nothing.

Q    Is it fair to say that that's what this certificate that Gail Motovich sent to your office indicates was done?

A    Yes.

Q    I am showing you what I believe has already been admitted as Government Exhibit 1162.

THE COURT:  Any objection?

MR. JACKSON:  No objection.

THE COURT:  It's admitted.  You may publish.

(Exhibit published.)

MR. GRUBIN:  Thank you, Your Honor.

Q    What's the date of these emails?

A    8/17/2017.

Q    Let's start at the bottom of the page going from the earliest email.  Who is this email from?

A    Rosa Schwartz.

Q    And do you see next to that it says, rosa@midwoodlumber.com?

A    Yes.

Q    And who is the email to?

A    It's emailed to mkuyan.

Q    1031@yahoo.com?

---

J. RUSSO - DIRECT - MR. RUSSO                956

A    Yes.

Q    And what's the subject?

A    Metro Erectors.

Q    All right.  Let's go to the email -- the email it's forwarded to.  And this one is from Marina K, mkuyan1031@yahoo.com, correct?

A    Correct.

Q    And is this email being sent to your office manager?

A    Yes.

MR. GRUBIN:  Let's go to the top email.  Okay.  If we can now turn to the attachment on page two.

Q    What is the date of this certificate of insurance?

A    8/17/2017.

Q    And if we scroll to the bottom, the certificate holder here is Metro Erectors, correct?

A    Correct.

Q    So this document is similar to the last one we looked at?

A    Yes.

Q    What differences, if any, do you notice?

A    Certificate holder is now Metro Erectors when it should be the opposite I believe.

Q    The certificate holder is different from the last document we looked at?

A    Yes.

Q    And do you notice if the date is different?

**J.A. 474**

J. RUSSO - DIRECT - MR. RUSSO          957

A    Excuse me?

Q    Is the date different?

A    Yes.

Q    What did Metro Erectors pay ZKC to do?

A    Nothing.

Q    So, Mr. Russo, let's return to the messages between you and David Motovich that we were looking at the other day at Government Exhibit 1199 at page 40, which is in evidence.

        MR. GRUBIN:  Permission to publish as we proceed, Your Honor?

        THE COURT:  Yes.

        (Exhibit published.)

Q    In the second text message on the page, on May 31, 2018, can you read what you said to Motovich?

A    "Good morning.  Would you be there later after 12."

Q    Can you read the next two messages -- well, what does Motovich say?

A    "Hi.  Until 11:30."

Q    And, now, let's go further down.

A    "That's it."

Q    And what do you say after that?

A    "On my way."

Q    Turning to the next page, page 41.  What did Motovich say?

A    "Okay."

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

J. RUSSO - DIRECT - MR. RUSSO          958

Q    And then what do you say to Motovich, scrolling down?

A    "M&M Group."

Q    What did you mean by "M&M Group?"

A    Is that who he wants me to make the check to.

Q    What does Motovich say in response?

A    "No.  Midwood Building Corp."

Q    What did you understand him to mean there?

A    Not to make the check to M&M but to make it to Midwood Building Corp.

Q    And to be clear, what was this check for?

A    To cash it.

Q    Let's look at Government Exhibit 734 page 84.

        What's the date of the check?

A    5/31/2018.

Q    Is that the same date we looked at a moment ago in the text message?

A    Yes.

Q    And who is the check from?

A    Metro Fabrication Corp.

Q    Who is it made out to?

A    Midwood Building Corp.

Q    And that's the company name we just saw in the message that Motovich sent to you, correct?

A    Correct.

Q    How much is the check for?

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

J. RUSSO - DIRECT - MR. RUSSO          959

A    $6,700.

Q    And who signed the check, if you can see?

A    I did.

Q    Did Motovich ever tell you -- do you recall if Motovich told you what Midwood Building Corp. was?

A    No.

Q    Did any of the Metro companies do any work with Midwood Building Corp.?

A    No.

Q    Mr. Russo, do you see the binder in front of you labeled binder two which contains, for the record, Government Exhibit 734 which is in evidence?

A    Yes.

Q    You reviewed that binder prior to coming to court, correct?

A    Correct.

Q    And what is Government Exhibit 734?

A    It's a check from Metro Fabrication to Ago & Alaudin General Contracting Corp.

Q    I apologize.  I mean what is the entire binder?

A    Oh, I'm sorry.  It's just checks that were written to them and cashed.

Q    Written to whom?

A    To David's companies.

Q    How were the checks, if you can tell, how were they

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

**J.A. 475**

J. RUSSO - DIRECT - MR. RUSSO          960

arranged there?  In what order?

A    They follow each other, like, every week or so.

Q    Chronologically?

A    Yes.

Q    So, Mr. Russo, I'm going to direct your attention to the first check, which you already referred to, and we're gonna, also, put it on the screen.  It may be easier to follow on the screen as we go along, Mr. Russo.

        MR. GRUBIN:  So if we could look at Government Exhibit 734 at page one.

Q    What's the date this of check?

A    September 5, 2014.

        (Continued on the following page.)

*LEEANN N. MUSOLF, RPR, Official Court Reporter*

RUSSO - DIRECT - MR. GRUBIN        961

BY MR. GRUBIN:  (Continuing.)

Q    And do you see who it's from?

A    Yes.  Metro Steel Fabricators.

Q    And also, you just mentioned the date of the check.  Can you tell from the top of the page when the check was actually cashed -- or when it was deposited?  Excuse me.

A    No, I can't see.

Q    Do you see where it says, five, September 14th?

A    Oh, posted September 14th?

Q    Mm-hm.

A    Yes.

         THE COURT:  You can't say "mm-hm."  You have to say yes or no.

A    Yes.

         THE COURT:  Go ahead.

         MR. GRUBIN:  And if we could zoom back out.

Q    Is that the same date as the check?

A    Yes.

Q    Who is the check made out to?

A    Ago & Alaudin General Contracting Corp.

Q    What amount?

A    $5,000.

Q    And who signed this check?

A    My brother.

Q    What's Ago & Alaudin?

*Jamie Ann Stanton, RMR, CRR, RPR,*

---

RUSSO - DIRECT - MR. GRUBIN        962

A    It was one of the -- David's companies.

Q    Why do you say that?

A    Because that's who he asked me to make the check to.

Q    Do you happen to know an Ago Kolenovic?

A    No, I do not.

Q    What did you and your brother do, or you or your brother do, with this check?

A    We cashed it.

Q    Where?

A    By David.

Q    Did Ago & Alaudin perform any services for Metro Steel Fabricators?

A    No.

         MR. GRUBIN:  Ms. Kannan, can you just flip through the first dozen or so of these pages?

         And then I'll ask you a question, Mr. Russo.

Q    Are all of these checks you gave to David or Gail Motovich in exchange for cash minus an approximately 10 percent fee?

A    Yes.

Q    Roughly, if you could tell from looking at the binder, about how many checks are in this binder or in this exhibit?

A    About a hundred.

Q    Are there other checks in the binder that you or your brother brought to Motovich?

*Jamie Ann Stanton, RMR, CRR, RPR,*

---

RUSSO - DIRECT - MR. GRUBIN        963

A    Rephrase that?

Q    Sure.  Do you recall the date of the first check here?

A    On this one here, it's 7/17/2015.

         MR. GRUBIN:  And if we could go back to the first check.

A    September 5th, 2014.

Q    You mentioned yesterday you started going to Motovich in 2012, correct?

A    Approximately.

Q    Approximately.  So is it fair to say this is a sample of the checks that you brought to Mr. Motovich?

A    Yes.

Q    Mr. Russo, did you know that there was a licensed check cashing business about across the street from Midwood Lumber?

A    I've seen it.

Q    Do you remember the name?

A    No, I don't.

Q    Have you ever --

         Do you recall ever going inside?

A    No, I haven't.

Q    I am showing you what has already been admitted as Government Exhibit 112 on page 8.

         MR. GRUBIN:  Permission to publish, Your Honor?

         THE COURT:  You may publish.

         (Exhibit published.)

**J.A. 476**

*Jamie Ann Stanton, RMR, CRR, RPR,*

---

RUSSO - DIRECT - MR. GRUBIN        964

         MR. GRUBIN:  If we could -- thank you, Ms. Kannan.

Q    Mr. Russo, what is this check?

A    It's a check from Metro Steel Fabricators.

Q    Made out to who?

A    Ago & Alaudin General Contracting.

Q    And what did you do with this check?

A    We cashed it.

Q    With whom?

A    With David.

         MR. GRUBIN:  If we could look at the other side of the check, right below it, and blow that up.

Q    I know it's faded, Mr. Russo, but can you see -- let me see if I could -- can you see what it says there at the top, Mr. Russo?

A    I can't read it clearly, but it says something-Payroll Services, Inc.

Q    And what do you see underneath the date?

A    Licensed cashier check.

Q    We'll look at another one that might be a bit clearer.

         By the way, how much was this check for?

         MR. GRUBIN:  If we could zoom out.

A    Looks like 3500.

Q    So less than 10,000?

A    Correct.

Q    To be clear, you didn't bring this to the payroll

*Jamie Ann Stanton, RMR, CRR, RPR,*

RUSSO - DIRECT - MR. GRUBIN        965

services business we just saw on the back, correct?

A    No.

MR. GRUBIN:  I just want to look at one more, what's been admitted as Government Exhibit 116 on page 9.

THE COURT:  You may publish.

MR. GRUBIN:  Thank you, Your Honor.

(Exhibit published.)

Q    Is this another check you brought to Motovich?

A    Yes.

Q    And this one is made out to SGS Contracting Corp; is that correct?

A    Yes.

Q    What's SGS Contracting Corp?

A    It was one of David's companies.

Q    Did they do any business for any of the Metro companies?

A    No.

Q    And how much was this check for?

A    $4256.

MR. GRUBIN:  Can we again look at the bottom portion of the check, the back of the check?

Q    What does it say there?

A    Coney Island Payroll Services, Inc.

Q    Did you bring this check to Coney Island Payroll Services, Inc.?

A    No, I did not.

Jamie Ann Stanton, RMR, CRR, RPR,

---

RUSSO - DIRECT - MR. GRUBIN        966

Q    You previously testified, Mr. Russo, that Motovich provided you with certificates of insurance.

Is it fair to say those were not legitimate?

A    I don't know if they were legitimate or not, but there were certificates that were given to us.

Q    Well, is it fair to say that you were not -- he was not providing you proof of insurance that one of your Metro companies had insurance?

A    Rephrase that?

Q    Sure.

MR. GRUBIN:  Let's take another, let's just look back quickly, just as an example, at the attachment of 1162.

Q    So this is one of the certificates of insurance he provided to you, correct?

(Exhibit published.)

A    Yes.

Q    And let's look, under insured, it says ZKC, correct?

A    Correct.

Q    And when you were the one with insurance, right, one of your Metro companies has insurance, what would it say under insured?

A    It would say Metro Erectors or Metro Fabrication.

Q    And what would you use that for?

A    You would give that to the contractor that you're doing the work for to show proof of insurance that you have for your

Jamie Ann Stanton, RMR, CRR, RPR,

---

RUSSO - DIRECT - MR. GRUBIN        967

employees.

Q    And here -- and you would give that to your general contractor, you said?

A    Yes.

Q    Did the insurance --

I think yesterday you said the insurance companies sometimes audit you, correct?

A    Yes.

Q    And what do you have to do when they audit you?

A    You have to show them these certificates that you have that are valid to back up whatever checks were given or you were given.

Q    To back up payments, correct?

A    Correct.

Q    And what happens if you are audited and you don't have paperwork to back up the payments of the checks?

A    They come up with how much money was given and there's a fee, there's a cost behind it, that you have to pay on every dollar that was given.

Q    And so if the insurance company came by and said, you know, there are these checks to ZKC, let's see the insurance document, what would you give them?

A    I would give them this.

Q    And to be clear, ZKC wasn't providing any New York for the Metro companies, correct?

Jamie Ann Stanton, RMR, CRR, RPR,

---

RUSSO - DIRECT - MR. GRUBIN        968

A    No.

Q    Did Motovich or his employees provide you with invoices, as well?

A    Yes.  A few.

Q    So I'm showing what's already been admitted as Government Exhibit 1052.

MR. GRUBIN:  Permission to publish, Your Honor?

THE COURT:  You may publish.

(Exhibit published.)

Q    What's this document?

A    It's an e-mail from Gail Motovich to Felecia.  It says: Please see attached invoices for Joe.

Q    And what's the date?

A    February 25, 2016.

MR. GRUBIN:  Can we take a look at the attachment?

Q    Do you see the date there, February 22, 2016?

A    Yes.

Q    What is this document, Mr. Russo?

A    This is an invoice that was produced to show to back up for the check that was given.

Q    And do you see the heading there, Ago & Alaudin General Construction Corp?

A    Yes.

Q    And if we go underneath scope of work, labor, to pour concrete.

**J.A. 477**

Jamie Ann Stanton, RMR, CRR, RPR,

RUSSO - DIRECT - MR. GRUBIN          969

Q    Did Ago & Alaudin General Contractor Corp do any labor pouring concrete for you or your companies?

A    No, they did not.

MR. GRUBIN:  If we could scroll down.

Q    It says the total costs of the above-described work is $7,500.

Do you see that?

A    Yes.

Q    Did you pay Ago & Alaudin $7,500 for any -- any construction work or concrete work?

A    No, I did not.

Q    And do you see on the bottom there, who it says the President of Ago & Alaudin Construction Corp is?

A    Yes.

Q    Kemal Sarkinovic?

A    Yes.

Q    Do you know a Kemal Sarkinovic, by the way?

A    No, I don't.

MR. GRUBIN:  Let's look, Ms. Kannan, at Government Exhibit 734 at page 24.

Permission to publish, Your Honor?

THE COURT:  You may.

(Exhibit published.)

MR. GRUBIN:  Ms. Kannan, can you put this exhibit next to the one that's already on the screen, if possible?  So

RUSSO - DIRECT - MR. GRUBIN          970

the check next to the invoice we just looked at.  We were looking at 1052, I apologize, Ms. Kannan.

Q    And if you could see that check, Mr. Russo, who is it from?

A    It's from Metro Erectors, Inc.

Q    And is that the same company name that was on the invoice?

A    Yes.

Q    And who is it made payable to?

A    Ago & Alaudin Construction.

Q    And is that the same company that it appears the invoice is from, purports to be from?

A    Yes.

Q    By the way, Mr. Russo, is that the same amount on the invoice as the check?

A    Yes, it is.

Q    It's the same.  And what does the memo line say on the check?

A    147th Street.

Q    Same thing on the invoice?

A    Yes.

Q    Mr. Russo, what do you notice about these two documents?

A    This is just an invoice to back up the check that was given.

Q    Given to whom?

RUSSO - DIRECT - MR. GRUBIN          971

A    To David.

Q    And then you got this invoice from their office, correct?

A    Correct.

Q    Is that the only invoice that Motovich's employees sent to your office?

A    I think there was a couple more.

Q    A couple more.

MR. GRUBIN:  I am showing you, and this is only for the witness, what has been marked for identification as Government Exhibit 1072.

THE COURT:  Any objection?

MR. JACKSON:  No objection.

THE COURT:  Admitted.  You may publish.

MR. SKURNIK:  Thank you, Your Honor.

(Government Exhibit 1072, was received in evidence.)

(Exhibit published.)

Q    Mr. Russo, what's the date of this e-mail?

A    June 20, 2016.

Q    From Gail Motovich to your office manager; is that correct?

A    Correct.

Q    And you see the attachment there, Metro Steel 2?

A    Yes.

MR. GRUBIN:  Let's take a look at the attachment.

Q    Is this another invoice?

**J.A. 478**

RUSSO - DIRECT - MR. GRUBIN          972

A    Yes, it is.

Q    And the date's June 20th, 2016; is that right?

A    Correct.

Q    From ZKC NYC, Inc.?

A    Yes.

Q    And who is it to?

A    It was sent to 5801 Avenue J Realty Corp.

Q    That was, you told us yesterday, your realty company, correct?

A    Correct.

Q    And under scope of work, it says -- or under the work, it says:  Waterproofing and window replacement around the building.

Do you see that?

A    Yes, I do.

Q    Did ZKC do any waterproofing, window replacement around 5801 Avenue J Realty Corp?

A    No.

Q    And how much do you see the invoice is for?

A    Forty-nine hundred seventy-five dollars.

Q    $4,975?

A    Yes.

MR. GRUBIN:  Let's look at Government Exhibit 734, page 28, and if we can pull it side by side, Ms. Kannan. Government Exhibit 734, page 78.

RUSSO - DIRECT - MR. GRUBIN      973

(Exhibit published.)

Q   What is the date of this check?

A   June 20, 2016.

Q   Is that the same date as the invoice?

A   Yes.

Q   What's the company on the check?

A   ZKC NYC, Inc.

Q   And is that the same company you saw there on the invoice?

A   Yes.

Q   And is it from, the check from 5801 Avenue J Realty Corp?

A   Yes.

Q   Also the same company on the invoice, correct?

A   Correct.

Q   And how much is the amount there you see on the check?

A   $4,975.

Q   And that's the same number on the invoice, correct?

A   Correct.

Q   And what do you get from Motovich in exchange for this cash -- or for this check?  Excuse me.

A   I get that in return minus 10 percent.

Q   Minus 10 percent.

    So why do you understand that Motovich's employees were providing your office with this invoice?

A   Just to cover the checks, to back up.

Jamie Ann Stanton, RMR, CRR, RPR,

---

RUSSO - DIRECT - MR. GRUBIN      974

    MR. GRUBIN:  Just for the witness, Your Honor, can we show just a few more of these?  They're marked for identification as Government Exhibits 1083, 1105, 1115.

    THE COURT:  Any objection?

    MR. JACKSON:  No objection.

    THE COURT:  They are admitted.  You may publish.

    (Government Exhibit 1083, 1105, 1115, were received in evidence.)

    (Exhibit published.)

    MR. GRUBIN:  If we could just flip through each of them.  The first one is 1083.

    And then I will ask you a question at the end, Mr. Russo.

    Then 1105.  Then 1115.

Q   Mr. Russo, each of these invoices mention that work was done by what you said was one of David Motovich's companies for you.

    Was any work done?

A   No, no work done.

Q   You mentioned you sometimes went to Bay Street Check Cashing, correct?

A   Correct.

Q   When you cashed a check there, did they give you a fake invoice to go along with it?

A   No, they did not.

Jamie Ann Stanton, RMR, CRR, RPR,

---

RUSSO - DIRECT - MR. GRUBIN      975

Q   Did they ever give you --

    And how much did Bay Street charge you to cash a check again?

A   Between two and three percent.

Q   And Motovich?

A   Ten percent.

Q   Approximately when did you stop bringing checks to David Motovich?

A   I believe it was the beginning of 2019.

Q   Why did you stop?

A   Because he said he couldn't do it anymore.

Q   Did you ask him why?

A   No.  I didn't want to know.

    MR. GRUBIN:  May I have a moment, Your Honor?

    THE COURT:  You may.

    (Pause.)

    MR. GRUBIN:  No further questions, Your Honor.

    THE COURT:  Ladies and gentlemen, we will take our 15-minute comfort break now, it's just a little past 11, and we will have cross-examination and then we will be done with this witness, all right?  Do not talk with anyone about the examinations during the break.  Thank you.

    THE COURTROOM DEPUTY:  All rise.

    (Jury exits.)

    THE COURT:  You may step down.  Thank you.  Please

Jamie Ann Stanton, RMR, CRR, RPR,

---

RUSSO - DIRECT - MR. GRUBIN      976

wait outside.  We will see you in 15 minutes.

    (Witness steps off the stand.)

    THE COURT:  The jury has left the courtroom.  The witness is leaving the courtroom.  You may be seated, ladies and gentlemen.

    The witness has now left the courtroom.  Do we have any issues to discuss in the absence of the jury and in the absence of the witness?

    The Government first.  Any issues?

    MR. PAULSEN:  Yes, Your Honor.  The only thing that I would add is so our witness that we offered from the bank, she will be on hand, I guess, for cross-examination.  I would just ask that when we know when she can be crossed, we can send her on her way.

    THE COURT:  Remember the story I told you about Don Howard who's the comptroller of Citibank?

    MR. PAULSEN:  Yes, Your Honor.

    THE COURT:  That's my answer.

    MR. PAULSEN:  Understood, Your Honor.

    THE COURT:  Anything else?

    MR. PAULSEN:  No, Your Honor.

    THE COURT:  Anything else from defense counsel?

    MR. JACKSON:  No, Judge.

    THE COURT:  All right.  We will see you in 15 minutes.

**J.A. 479**

Jamie Ann Stanton, RMR, CRR, RPR,

J. RUSSO - CROSS - MR. JACKSON          977

(Recess taken.)

THE COURT:  You may be seated, ladies and gentlemen.

Do we have any issues to address before we bring the witness back and bring the jury in?

MR. PAULSEN:  No, Your Honor.

MR. JACKSON:  No, Judge.

THE COURT:  Please bring the jury in and please bring the witness back for cross-examination.

(Witness resumes the stand.)

THE COURT:  Remain standing until they come in.

(Jury enters.)

THE COURT:  Thank you, ladies and gentlemen. Welcome back.  Please be seated.  We are going to have cross-examination of the witness.

Have you spoken with anyone about your testimony since leaving?

THE WITNESS:  No, Your Honor.

THE COURT:  Thank you.

Cross-examine, please, Mr. Jackson.

MR. JACKSON:  Thank you very much, Judge.

CROSS-EXAMINATION

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good morning, Mr. Russo.

A    Good morning.

---

J. RUSSO - CROSS - MR. JACKSON          978

Q    Mr. Russo, my name is Randall Jackson.  I am just going to ask you some questions today.  If there are any questions that I ask you that you don't understand, please just let me know, okay?

A    Okay.

Q    Mr. Russo, I am correct that from your perspective, putting aside recent developments that have you sitting here, you've done pretty well with your business, right?

A    I did okay.

Q    What were the revenues like of your business from 2012 to, say, 2015?  Just a range, approximate.

A    Maybe 7, 8 million.

Q    What about from 2016 to, say, 2019?

A    Probably about double.

Q    Double what you were doing before?

A    Yes.

Q    And I'm right that prior to this case, you were never in any trouble with the law before, right?

A    Before this case, no.

Q    And the construction business, it's a pretty tough business, right?

A    Yeah, you could say that.

Q    One of the things that you were describing, during your direct examination, is how, at one point, things got really competitive for employees, right?

---

J. RUSSO - CROSS - MR. JACKSON          979

A    Yes.

Q    When was that?

A    They were looking for cash.

Q    When did you start to really feel that acutely?

A    Around the time when we started this.

Q    About what year was that?

A    About 2012 or so.

Q    And you talked a little bit about your payroll, but what was your typical payroll every week?

A    What do you mean by that?

Q    Well, how big was your payroll?  How much did you have to pay out?  Let's start in the time period from, say, 2012 to 2015, how much did you have to pay out in payroll every week?

A    It varied.  It could have went anywhere from 50,000 and up per week.

Q    Your whole payroll?

A    Yeah.

Q    And then at the high point, in 2019, whenever that was, what was the payroll?

A    Probably over a hundred thousand.

Q    And you told us during your direct that throughout that entire period, there was a substantial part of that that you paid on the books, right?

A    Yes.

Q    It was only a portion of it that you were paying in cash?

---

J. RUSSO - CROSS - MR. JACKSON          980

A    Correct.

Q    And that picked up during those years, right?

A    Yes.

Q    Now, what was the typical amount of cash that you got on a weekly basis from David Motovich?

A    It varied.  It could have went anywhere from a couple of thousand dollars to over $10,000, depending on what I was needed.

Q    If you had to guess what the average was between 2012 and 2015, what would you say?

A    Weekly?

Q    Yeah.

A    Maybe 7 to $10,000.

Q    Somewhere in that range?

A    Yeah.

Q    What about from 2015 to 2019?

A    It was a little bit more.

Q    So eight to eleven?

A    Possibly.

Q    Okay.  And now, there were a bunch of reasons, I'm right, that you needed that cash that you got from David, correct?

A    Correct.

Q    The Government, Mr. Grubin, talked to you about the payroll, but it was not just payroll, right?

A    No.

**J.A. 480**

J. RUSSO - CROSS - MR. JACKSON          981

Q    One of the things that you had to deal with is that, you know, it is tough in an environment where you got a competitive environment for labor, trying to keep employees happy beyond payroll, right?

A    Yes.

Q    And your employees are maybe the most essential part of your business for what you -- the type of business that you have, right?

A    Yes.

Q    So you were buying people breakfast, right?

A    Correct.

Q    Buying lunch?

A    Correct.

Q    You were doing that with cash, right?

A    Correct.

Q    You had to, in your industry, just to get through some of the, like the basic stuff, you had to tip people, right?

A    Yes.

Q    I mean, the average person who's not in the industry has probably never even heard of some of the types of tips that you had to deal with, right?

A    Correct.

Q    I mean, one of the things you've talked about with the Government is that just to get the guy to work a crane, you had to tip the crane operator, right?

*Jamie Ann Stanton, RMR, CRR, RPR,*

J. RUSSO - CROSS - MR. JACKSON          982

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Overruled.

Is that something you told the Government?

THE WITNESS:  Yes.

THE COURT:  Next question.

Q    You had to tip the crane operator, right?

A    Yes.

Q    And for the ladies and gentlemen of the jury, the crane operator --

THE COURT:  Why don't we have the witness testify, Mr. Jackson?

MR. JACKSON:  Excellent, Judge.

THE COURT:   We will swear you in later.

Ask him the question, like what is a crane operator?

Q    Can you explain what the crane operator is?

A    The crane operator is the person who's running the crane, the actual crane.

Q    And these are these gigantic cranes that we all see that we walk underneath when we're walking through the city?

A    Yes.

Q    When you had to tip the crane operator, did he have like one of those things that you see when you go into Starbucks, where they spin the thing around and you press like which percentage you want in order to tip him?

A    No.

*Jamie Ann Stanton, RMR, CRR, RPR,*

J. RUSSO - CROSS - MR. JACKSON          983

Q    They didn't have anything like that?

A    No.

Q    Then how did you tip him?

A    In cash.

Q    You had to tip the crane operator in cash, and that was part of the reason that you needed cash, right?

A    Correct.

Q    I assume, in the industry, the crane operator wasn't the only guy you had to tip?

A    He wasn't the only one.

Q    There were other people that you had to tip?

A    Yes.

Q    Who else did you have to tip?

A    Truck drivers.

Q    Just to hope that a truck would actually show up when it showed up, right?

A    No, no, no.

Q    Okay.

A    It wasn't about that.  It was just being a good samaritan, I would tip them if they did a good job.

Q    And this is part of what is expected in the industry, right?

A    They expect it, but not everybody does it.

Q    Not everybody does it, but one of the things that is true is that for some of the people that you had to tip in the

*Jamie Ann Stanton, RMR, CRR, RPR,*

J. RUSSO - CROSS - MR. JACKSON          984

industry, work wouldn't actually get done unless you gave them those cash tips, right?

A    No.

Q    Well, didn't you describe for the Government how, on a windy day, a crane operator might tell you that if you didn't come up with "x" amount of cash for the tip, that maybe he wouldn't be able to do his job?

A    Something like that, yes.

Q    Yes, so that's a situation where you're not going to get the work done unless you could come up with the tip for the crane operator, right?

A    Correct.

Q    That's another reason you needed cash?

A    Correct.

Q    What about the elevator operators?  You had to tip these elevator operators, too, right?

A    I don't recall ever having to pay elevator operators.

Q    You don't recall telling the Government in a meeting with them that you needed cash for tipping elevator operators?

A    I may have.

Q    I want to show you something, I want to ask you if it refreshes your recollection.

MR. JACKSON:  Can I have one moment, Judge?

THE COURT:  Yes.  Publish it just to the witness to see if it refreshes his recollection.

*Jamie Ann Stanton, RMR, CRR, RPR,*

**J.A. 481**

J. RUSSO - CROSS - MR. JACKSON    985

MR. JACKSON:  Just for the witness, can we have 3500-JR-5B at page 1.

THE COURT:  Publish it to the witness.  Show it to your adversary.  Publish it to the Court, too, obviously, so I can see it.  I'm not seeing anything yet.

It popped up on the screen and then like Waldo, it vanished.  Could you pop it back?  Okay, there it is.

The question, sir, is:  Take a look at this, does this refresh your recollection with respect to the question Mr. Jackson just asked you?  And either yes, it does or no, it doesn't.  Don't read from it out loud.  Just look at it.

Feel free to highlight a portion that you want to call to the witness's attention, but, again, it's not in evidence, so don't read out loud from it.  Just read it.

The question is:  Does that refresh your recollection with respect to the question Mr. Jackson just asked you?

And Mr. Jackson, you can put the question again, if that helps.

THE WITNESS:  Yes.

THE COURT:  Ask him the question whether this refreshes his recollection about --

MR. JACKSON:  Thank you, Judge.

THE COURT:  Go ahead.

Q    Does that refresh your recollection, Mr. Russo, that you

J. RUSSO - CROSS - MR. JACKSON    986

told the Government that you sometimes had to tip elevator operators?

A    Yes.

THE COURT:  Next question.

MR. JACKSON:  Thanks.

We can take that down, Mr. Cepregi.

Q    Now, listen, I am not trying to -- just to be very clear, some of these conversations happened a long time ago, right?

A    Yes.

Q    And the events that you are talking about, these happened even longer ago, right?

A    Yes.

Q    A lot of which you're discussing during your direct examination happened in 2012, 2013, 2014, right?

A    Yes.

Q    You don't have a clear memory of everything that happened there or of what actually was spoken in all of the conversations; do you?

A    No.

Q    You are agree with me, is what you mean when you say no?

A    Yes.

Q    And -- but what you do know is that you were not telling David Motovich on a day-to-day basis how you allocated all of your different cash; were you?

A    No.

J. RUSSO - CROSS - MR. JACKSON    987

Q    You weren't telling him, I'm going to use this to pay some workers, I'm going to use this to tip elevator operators, I am going to use this to buy breakfast.  You weren't having that kind of conversation at all, right?

A    No.

Q    You agree with me?

A    Yes.

Q    Now, one of the things that you also told us yesterday is that you had two different companies for insurance purposes, right?

A    Correct.

Q    Were those the only entities that you had?

A    No.

Q    What other entities did you have?

A    I have Metro Equipment Corp and I have my realty corp, 5801 Avenue J.

Q    Why was there a separate Metro Realty Corp?

A    A separate?

Q    I'm sorry, Equipment Corp.

A    Equipment Corp was where we purchased our equipment and financed it through and kept it as a separate entity for -- for liability reasons.  If a vehicle gets into an accident, then it should sue the company, the leasing company or the financing company that owns the equipment and not Metro Erectors or Metro Fabricators.

**J.A. 482**

J. RUSSO - CROSS - MR. JACKSON    988

Q    And so, Mr. Russo, this is not something that you were doing to do anything wrong by having three different entities just for this one company, correct?

A    No.

Q    You understood it to be normal to sometimes have different entities for different purposes, right?

A    Correct.

Q    You had one for tax purposes --

Or, I'm sorry, you have one for making sure that your insurance costs weren't the same throughout all of your work, right?

A    Correct.

Q    You had another one to protect for liability reasons, right?

A    Correct.

Q    You understood this to be a normal part of the way that people structure companies and their businesses, right?

A    Yes.

Q    Now, one of the other things that the Government asked you is whether you were friends with David Motovich, right?

A    Correct.

Q    And the fact of the matter is while you said no, you guys weren't friends, you guys were certainly friendly throughout the time period that you knew him, right?

A    A business acquaintance.

J. RUSSO - CROSS - MR. JACKSON          989

Q    Right.  You were friendly business acquaintances.

A    Well, we never shared lunch or took vacations or did anything together with families to consider it to be a true friend.  It's just that it is a business acquaintance, or a friendly relationship.

Q    When you started interacting with David Motovich, he wasn't a stranger to you; was he?

A    No.

Q    Your families had known each other for 30 years?

A    Yes.

Q    And in a sense, you were something akin to, you know, loose family friends, right?

A    No.

Q    Okay.  Well, your father had a relationship with David's father that went back as far as you can remember, correct?

A    Correct.

Q    And you recognized a bunch of his family members when we were showing the pictures, his uncle, his sister, other people that you knew?

A    Yes.

Q    You texted David whenever you needed something, right?

A    Correct.

Q    We talked a little bit about this other check cashing place that you used.

      You didn't text those people on a regular basis,

*Jamie Ann Stanton, RMR, CRR, RPR,*

J. RUSSO - CROSS - MR. JACKSON          990

right?

A    No.

Q    Now, I understand you are something of a hunter?

A    Excuse me?

Q    I understand that recreationally, you're a hunter?

A    Yes.

Q    You like to hunt, you go upstate to hunt?

A    Yes.

Q    I'm right that you invited David Motovich a couple of times to come hunting with you, right?

A    Absolutely not.

Q    You don't recall ever doing that?

A    No.

Q    Are you sure, or you just don't recall?

A    I don't recall that.

Q    Okay.  It's possible it happened, but you, as you sit here today, testifying as best as you can, you don't remember it?

A    No.

Q    Okay.  And you don't remember David telling you, that you know, he appreciated it, but he's not into hunting animals?

A    No, I don't.

Q    Just doesn't ring a bell?

A    Does not ring a bell.

Q    You're not saying that it never happened casually?

*Jamie Ann Stanton, RMR, CRR, RPR,*

J. RUSSO - CROSS - MR. JACKSON          991

A    Doesn't ring a bell.

Q    Okay.  Now, your family built this entire complex of buildings on Coney Island that the Motovich family owns, right?

A    Correct.

Q    You told us about that.  You looked at these pictures of these red brick buildings, right?

A    Yes.

Q    And that was -- for your father, for your family, that was a pretty significant project, right?

A    I guess so.

Q    Do you know what the value of those buildings is?

A    No, I don't.

Q    Well, do you have a rough understanding?

A    No, I don't.

      (Continued on following page.)

*Jamie Ann Stanton, RMR, CRR, RPR,*

RUSSO - CROSS - JACKSON          992

BY MR. JACKSON (Continuing):

Q    Regardless, while you guys were not friends per se, you were certainly something more than a stranger to David Motovich before you even started doing this interaction with him, right?

A    No.

Q    Well, you had known of him for 30 years.

      You told the prosecutors that, right?

A    I had known of David for 30 years.  I didn't know him anywhere personal throughout the time that my father put the buildings up for his father and the time I started doing business with him.

Q    Did you ever meet with David in his office?

A    Yes.

Q    Sometimes you guys would have a small drink or two in the office?

A    A small what?

Q    A small drink in the office.

A    I had a drink there, yes.

Q    Just a casual drink in the office with David, right?

A    Yes.

Q    Now, another thing that the prosecutors asked you was whether the money that David was giving you was ever a loan, right?

A    Correct.

**J.A. 483**

*Linda A. Marino, Official Court Reporter*

RUSSO - CROSS - JACKSON                993

Q    This is something you had gone over repeatedly with Mr. Grubin in your prep sessions, correct?

A    Correct.

Q    By the way, how many times have you met with Mr. Grubin in preparing to testify?

A    About a half a dozen times.

Q    Total or is that over all the time that you've been meeting or is that just leading up to today?

A    No, meeting up until today about a half a dozen times.

Q    Stretching back to when?

A    It started back a couple months ago.

Q    And before that, you had had a number of proffer sessions with the Government, correct?

A    I had a couple others.

Q    You had a couple proffer sessions and then a half a dozen meetings just in preparation for this trial, right?

A    Yes.

Q    And during the course of those preparation meetings, the Government was going over with you what kind of answers you should give to questions, correct?

A    No.

Q    They were telling you when you answer a thing in a way that was not quite the way that they would have expected, here's how you might answer that, right?

A    No.

RUSSO - CROSS - JACKSON                994

Q    They never suggested to you how you might alter the answer?

A    No they said if you don't understand the question, to ask them to rephrase it.

Q    And you went over all the questions that you were going through, right?

A    I went through some questions.

Q    How long was each one of those meetings?

A    It varied; two, three hours.

Q    So in total, we're talking about somewhere between 12 and 18 hours of preparation for you to testify on the stand?

A    Possible.

Q    And your attorney was present for that?

A    Yes.

Q    Now, anyway, as you said, one of the discussions you guys were having in these meetings was whether this was a loan.

And the prosecutors told you that was very important, right?

A    Can you rephrase that?

THE COURT:  Read the question back.

(Record read.)

THE COURT:  Can you answer that question?

THE WITNESS:  No.

THE COURT:  Next question.

Q    As a matter of fact, you don't know what is important or

RUSSO - CROSS - JACKSON                995

relevant to the charges in this case, correct?

A    No.

Q    Did you -- have you looked at the charges yourself to familiarize yourself with what the charges are against David Motovich?

A    No, I have not.

Q    And, so, you have no idea what the potential relevance is or not of any of the documents that you went through during the course of your direct, right?

A    For charges for Dave?

Q    Yes.

A    No, I don't.

Q    Now, I'm right that sometimes -- there were a number of occasions over the years where David would front you money before you even gave him a check, right?

A    No.

Q    You have no recollections of any times when he fronted you money before you gave him a check?

A    No.

Q    Well, certainly there were times that you gave him a check and you asked him to hold on to it for a while, right?

A    Correct.

Q    And the reason you were asking him to hold on to it for a while is because you didn't necessarily have the money in your account at that time, you just needed some time to get

**J.A. 484**

RUSSO - CROSS - JACKSON                996

everything situated, right?

A    Right.

Q    And for a business like yours, where when you have coming outs of accounts, payments to vendors coming out of accounts, you have other stuff, it's important that you don't get overdrawn and have a bunch of checks bouncing, right?

A    Yes.

Q    So, that's one of the reasons that you would ask that favor of David, if he could hold on to it for a while, right?

A    Yes.

Q    And that's not something you would ask of the check cashing place that you would go to in Staten Island, right?

A    No.

Q    You understand -- are you an investor?

A    Excuse me?

Q    Are you an investor?

A    No, not really.

Q    Your business -- I'm not trying to get deep into your finances, but your business has made millions of dollars.

You've invested some of that, right?

A    Invested how?  Real estate or...

Q    Any way.  In anything.

A    I purchased -- what can I say -- real estate, no; besides that, no.

Q    You own any stocks or bonds?

RUSSO - CROSS - JACKSON    997

A   I have a few stocks but nothing major.

Q   Are you familiar with what's called "commercial paper," how banks will do, like, overnight lending or overnight borrowing?

A   Okay.

Q   Have you heard of that?

A   Yeah.

Q   And what that is is a bank, if it needs money, or any kind of business, right, corporations, big corporations, they need money for something very short term, they will sometimes take a loan it out from investors --

MR. GRUBIN:  Objection, your Honor.

THE COURT:  Overruled.

Q   -- they would take out a loan out from investors for as little as one night so they can get some financing and they'll pay interest on that, right?

A   Okay.

Q   You understand that, right?

A   Yes.

Q   And you understand that sometimes big corporations will take loans out with commercial paper for, like, a week, right?

A   Okay.

Q   And they pay interest on that, correct?

A   Correct.

Q   And when you asked David to hold these checks, sometimes

*Linda A. Marino, Official Court Reporter*

RUSSO - CROSS - JACKSON    998

for a week or two weeks, he never asked you for more money, correct?

A   Yes, but it was never that long.

Q   Okay.  What is the maximum amount of time that he held a check for you, Mr. Russo?

A   A few days.

Q   You don't think it ever went more than a few days?

A   Not really, no.

Q   Could it having for a week?

A   I don't recall that, but I don't think so.

Q   It's possible, but you don't think so as you sit here.

A   I don't believe so.

Q   You haven't gone through all the checks with the prosecutors and tried to figure out exactly when you -- when -- what the time period is, right?

A   No.

Q   And even if you did, it would be impossible for you looking at the checks to determine how much time David had given you just from looking at the checks, right?

A   Correct.

Q   Why is that?

A   You would have to back it up with the dates.

Q   You don't have the dates, right?

A   No.

Q   So, just looking at the checks, it's impossible to know

*Linda A. Marino, Official Court Reporter*

RUSSO - CROSS - JACKSON    999

if David gave you a few days or if he gave you a few weeks, right?

A   Correct.

Q   We have to depend on your memory, correct?

A   Correct.

Q   Which you have admitted is not a thousand percent clear from 2012, these years.

We're going back more than a decade, correct?

A   Yes.

Q   And one of the things that you guys would sometimes agree on is that you would write on the check a date that was a little bit into the future, right?

Not for any bad reason, but just so you guys could memorialize so he could remember when it was that you wanted him to hold it until, correct?

A   I don't recall that.

Q   You don't remember ever being in a situation where you were talking to David and you said to him, "This will be good on the 15th," and let's say it was the 12th, and, so, you made the check out for the 15th, he was like, "That's fine, we'll wait until the 15th," and he held it.

Do you remember that happening a few times?

A   I don't recall.

Q   You're not saying it didn't happen, you're just saying that you don't remember as you sit here, correct?

**J.A. 485**

*Linda A. Marino, Official Court Reporter*

RUSSO - CROSS - JACKSON    1000

A   Correct.

Q   It's possible, right?

A   Anything's possible.

Q   Well, not anything.  I'm not going to become President of the United States.

But that is possible, right?

A   Possible.

Q   Okay.  Now, you understand, don't you, Mr. Russo -- you're a sophisticated businessman, you're an old school guy -- you understand that when somebody fronts you money and then they give you time until you have to pay it back, that's a loan, correct?

A   You could say that.

Q   I'm not trying to say that, I want to know if you would say that.

You agree with me, don't you?

That is a loan, yes?

A   No, because the check was given.  It wasn't that the cash was given to me and I brought a check later on.  There was an exchange cash for check.  If he held it for a couple of days, it was an understanding on that.

Q   Wait, wait.  You're trying to tell me that when David Motovich handed you $6,000 and you told him -- and you gave him a piece of paper and you told him, "Don't deposit this check -- because I don't have the money in the account -- for

*Linda A. Marino, Official Court Reporter*

RUSSO - CROSS - JACKSON          1001

a week," that's not a loan for a week?

A   If that happened, it happened maybe a dozen times throughout all the years.  So, if you want --

Q   That's not my question.

A   -- if you want to claim a dozen time as a loan, okay.

Q   Okay, well, that's a good start.  Let's start there.

At least a dozen times you remember that happening, right?

A   Possibly yeah.

Q   And those were loans, we can agree now, right?

A   If that's what you want to call them.

Q   It's not what I want to call them, I want to know what you want to call them.

What word would you use other than a "loan" for that?

A   I don't know.

Q   You don't have another word, right?

That's the best word, isn't it?

It's a yes-or-no question:  It's the best word, isn't it?

A   No.

Q   What's the better word?

A   He was still giving me the money upfront.

Q   He gave you the money upfront.  You didn't have the money at that time to pay him back.  You needed a week.

RUSSO - CROSS - JACKSON          1002

That's a loan, right?

A   If that's what you want to call it.

Q   It's a yes-or-no question.

A   Yes.

Q   Thank you.

Now, to be clear, as you just said, because there's no way to look at the records and determine today how many of those times that David gave you money it was a loan, we're completely dependent on your memory to figure out which ones of these were loans and which ones of these were something else, right?

A   Yes.

Q   Now, but we do know that a number of them were loans, right?

A   If you want to call them loans.

Q   Not what I want to call them.

We do know some of them were loans, right?

A   They were not loans.

Q   Okay, Mr. Russo.

One of the things that you also told us, Mr. Russo, is that David never charged you anything other than that ten percent fee that he was charging you, right?

A   Correct.

Q   And Mr. Grubin asked you a bunch of questions about what they charged you over at -- what's this check cashing place

RUSSO - CROSS - JACKSON          1003

called?

Bay Street in Staten Island?

A   Correct.

Q   And they charged two or three percent, right?

A   Correct.

Q   Just to be clear, you're familiar with payday loan places, right.

A   With what?

Q   A payday lender?

A   No, I'm not familiar.

Q   You never heard of a short-term payday lender?

A   No.

Q   Okay.  And Mr. Grubin asked you a bunch of questions.  Some of them I didn't completely understand so I'm going to ask you about that, but he asked you a bunch of questions about if you could have gone to get checks cashed at this place Bay Street, the check casher, right?

A   Correct.

Q   And just to be clear, throughout the entire time that you were dealing with David, you were also sometimes cashing checks at this check cashing place, right?

A   Correct.

Q   And one of the things that you told -- let me just say this:  One of the reasons that you did it, one of the big reasons that you did it, it was more convenient to go to David

RUSSO - CROSS - JACKSON          1004

than it was to go to all the way to Staten Island, right?

A   Yes.

Q   And you also told the agents when you were having your earlier meetings with them, that that convenience combined with the fact that David was willing to hold the check for a while, those were the main reasons that you were going to David as opposed to going to that check cashing place, right?

A   Correct.

Q   It wasn't until later, after you had been meeting with the Government a number of times, that you started to talk about other theories about why you went to David, correct?

A   Can you explain that again?

Q   Yeah.  The Government started pressing you later on about, "Well, what about the reporting issue," right?

They started asking questions about that later, right?

A   They asked me if I filed anything.

Q   Right.  And that's when you had those discussions with the prosecutors, correct?

A   Yes.

Q   Now, by the way, how long did it take you to drive out to Staten Island to cash checks over there?

A   Depending on traffic, 45 minutes.

Q   How long did it take you to go to David's?

A   About 15 minutes.

**J.A. 486**

RUSSO - CROSS - JACKSON       1005

Q    Is your time money?

A    Yes.

Q    Mr. Grubin asked you on your direct examination what happened when you brought a check to cash that was over $10,000 to Bay Street, right?

A    Yes.

Q    And you said that they made me sign a form that they're reporting a check that was cashed over $10,000 to the IRS, right?

A    Correct.

Q    If you brought a check to Bay Street that was beneath $10,000, there was none of that, right?

A    Correct.

Q    So, you had a fair understanding at the time that whenever you cashed a check that was under $10,000, Bay Street wasn't filing anything to report to the IRS, correct?

A    Correct.

Q    And the majority of the checks that you are taking to Bay Street are under $10,000, right?

A    Correct.

Q    It was rare that you were bringing a check that was over $10,000, right?

A    Correct.

Q    And it's also true that most of the checks you were bringing to David were under $10,000, right?

RUSSO - CROSS - JACKSON       1006

A    Yes.

Q    So, every one of those checks under $10,000 you brought to David, you could have equally brought to Bay Street with no fear that they were going to be doing a notification to the IRS, right?

A    No, because those were handwritten checks.

Q    Right.  But let's engage in the hypothetical that Mr. Grubin confronted you with, where he asked you, "Let's imagine you did bring this to Bay Street."

       Let's imagine that we're talking about just the question of what -- about the money.  Because, remember, you told us you could write checks yourself to cash if you wanted to, okay?

A    Okay.

Q    Every time you needed cash that was less than $10,000, you could having to Bay Street without worrying about them notifying the IRS, correct?

A    Correct.

Q    So, that was not a major reason or a reason at all that you were cashing a check with David, correct?

A    No.

Q    You agree with me.

A    Yeah.

Q    Now, I'm right, Mr. Russo, that most of your interactions with David Motovich were, you know, very simple, like short

RUSSO - CROSS - JACKSON       1007

interactions, friendly business conversations, right?

A    Yes.

Q    You might say some pleasantries, how's your family, but for the most part when you went over there you weren't getting into deep conversations about how your businesses were operating, correct?

A    No.

Q    One of the things that the prosecutors described is how you would go into the office and they were saying that there was a secret room, this little secret room that was in David's office, right?

A    It was a closet or some room to the side.

Q    It wasn't much of a secret at all, right?

A    It was behind a paneled door.

Q    It didn't even appear to be locked, right?

A    No.

Q    You pressed it and it opened up and there was a bathroom in there, right?

A    Possibly.

Q    David ever let you use that bathroom?

A    No.

Q    But you been in there.

A    No.

Q    You never walked in there?

A    I don't think so you.

RUSSO - CROSS - JACKSON       1008

Q    You saw inside, right?

A    I seen from when the door's open.

Q    And you could see in there that it was a little closet, he has a bunch of junk stored in there too?

A    No, I just saw in there.  I didn't go inside it.

Q    And you also saw over the course of the years --

       Because you occasionally bought materials, like, a little bit of materials from Midwood Lumber, right?

A    Once in a while.

Q    So, you saw over the years all of the facilities there, right?

A    Not all of it, but a lot of it; the warehouse and the show room.

Q    I just want to go through a couple of those photographs, just ask you a couple quick questions about those.

       MR. JACKSON:  Your Honor, at this time, and I'll just direct for the Government, I would like to show the witness -- I'll just read off all of them, Judge, so that the Government can have it.

       THE COURT:  Go ahead, read them out by number.

       MR. JACKSON:  DX1070.

       THE COURT:  Any objection to DX1070?

       Any objection to 1070?

       MR. GRUBIN:  Your Honor, can the defense pull it up?

       THE COURT:  You have it in a folder as well?

**J.A. 487**

RUSSO - CROSS - JACKSON          1009

MR. JACKSON: Yes.

THE COURT: Any objection?

MR. GRUBIN: No, your Honor.

THE COURT: Admitted.

(Defense Exhibit DX1070, was received in evidence.)

THE COURT: Why don't you go through them, Mr. Jackson?

MR. JACKSON: Thank you, Judge. I'll just go through one-by-one.

Q    So, you see here this is one of the facilities --

THE COURT: You may publish to the jury. It's admitted.

MR. JACKSON: Thank you, Judge.

(Exhibit published to the jury.)

Q    You can see this is one of, like, when you're talking about the warehouse, this is like how one of the spaces around Midwood Lumber is kind of that you can see from the street on that same block there on Coney Island Avenue, right?

A    Yes.

MR. JACKSON: And can we show to the witness and to the Government DX1079?

THE COURT: Any objection to 1079?

MR. GRUBIN: No objection, your Honor.

THE COURT: You may publish. It's admitted.

(Defense Exhibit DX1079, was received in evidence

*Linda A. Marino, Official Court Reporter*

---

RUSSO - CROSS - JACKSON          1010

and published to the jury.)

Q    This is another part of the facility where you would often see guy with a forklift and there's a bunch of different sort of material that's here and on the second level?

A    Yes.

Q    And then inside of the storeroom, the showroom --

MR. JACKSON: If we could show the witness DX1221.

THE COURT: Any objection to DX -- what's the number again, 1221 did you say?

MR. JACKSON: 1221.

THE COURT: 1221, any objection.

MR. GRUBIN: No objection, your Honor.

THE COURT: Admitted. You may publish.

(Defense Exhibit DX1221, was received in evidence and published to the jury.)

Q    There were a bunch of different displays like this of different things that were for sale beyond all of the wood and the lumber and the metal.

There were fixtures like these doorknobs, right?

A    Correct.

MR. JACKSON: And if we could show the witness DX1226?

THE COURT: Any objection?

MR. GRUBIN: No objection, your Honor.

THE COURT: Admitted. You may publish.

*Linda A. Marino, Official Court Reporter*

---

RUSSO - CROSS - JACKSON          1011

(Defense Exhibit DX1226, was received in evidence and published to the jury.)

Q    And you would see in the other showroom there a bunch of the mouldings, like the crown mouldings they would use that they sold?

A    Yes.

Q    You see the ceiling up there?

The ceiling itself, that's part of the display where they would show people how the mouldings -- each part of the sealing showed different mouldings, right?

A    Yes.

MR. JACKSON: Just one more. If we could show DX1298.

THE COURT: Any objection?

MR. GRUBIN: No objection, your Honor.

THE COURT: Admitted. You may publish.

(Defense Exhibit DX1298, was received in evidence and published to the jury.)

Q    Now, the other side of the store has several different aisles, right?

A    Correct.

Q    One of the aisles is all a bunch of different tools that are used in construction, right?

A    Yes.

Q    Did you ever buy any tools from Midwood?

*Linda A. Marino, Official Court Reporter*

---

RUSSO - CROSS - JACKSON          1012

A    I may have.

Q    What do you think you might -- what type of tools might you have bought?

A    Probably hand tools, something small.

Q    These kind of tools, right, like drills, you know, nail guns, these kind of things?

A    Possibly, yes.

Q    Right. But this is basically what you saw when you went in there, right?

A    Yes.

MR. JACKSON: We can take that down, Mr. Cepregi.

Now, we talked about how upstairs there's this area you would sometimes go up to. David would give you some cash.

And by the way, you considered that something that was very helpful to you and your business, right?

A    Yes.

Q    And as you said, you weren't having deep discussions about business up there. It was exchange some pleasantries, how's your family, how's that, and then you'd exchange some cash and sometimes give him a check, right?

A    Yes.

Q    There was never a point when you were up there and you discussed currency transaction reports, correct?

A    No.

Q    That never happened, right? I'm correct about that?

*Linda A. Marino, Official Court Reporter*

**J.A. 488**

RUSSO - CROSS - JACKSON          1013

A    What do you mean by "transaction reports"?

Q    You don't even really know what I'm talking about, do you?

A    No.

Q    And you have no recollection of having a discussion like that with David, correct?

A    No.

Q    Never happened, you agree?

A    No.

Q    Just for the clarity, you have to say "I agree"?

A    I agree.

Q    Now, did you ever in your mind -- just asking in your mind -- did you ever feel like you entered into a criminal agreement to engage in obstruction of anything with David?

MR. GRUBIN:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Can you --

THE COURT:  In your mind, did you ever think you were engaging in any criminal obstruction with David?

A    Yes.

Q    But did you enter into an agreement with him?

A    No.

Q    Now, there were certificates of insurance that were the subject of discussion during the course of the direct examination, right?

*Linda A. Marino, Official Court Reporter*

RUSSO - CROSS - JACKSON          1014

A    Yes.

Q    And just so that we're very clear, you mentioned that there was -- you talked about with Mr. Grubin a couple times, he asked you what you would have done with these certificates if someone had asked for them or something like that.

Do you remember those questions?

A    Yes.

Q    To be very clear, you never provided those to someone in an audit, correct?

A    Yes.  We get audited every year and I have to show certificates of insurance to checks that were made, cashed.

Q    But you never provided those, for example, in like an IRS audit?

A    Not to an IRS audit, no.

Q    There may have been occasions where you talked about them with an insurance agent, right?

A    Correct.

Q    To be very clear, you did not view yourself through that as -- well, let me be a little bit more clear.

Those certificates, they didn't mean that your workers weren't insured if something happened, did they?

A    No.

Q    Your workers were always insured, weren't they?

A    They were always insured.

Q    Can you explain to the jury why that's the case?

*Linda A. Marino, Official Court Reporter*

RUSSO - CROSS - JACKSON          1015

A    Because I have Workers Comp under my company itself.

Q    So, the fact that you got these certificates I think you said just to sort of back up the money that you got from David, that was not in any way you attempting to avoid having your workers insured on your site, right?

A    No.

Q    You cared about making sure that your workers were safe, right?

A    Yes.

Q    And I'm correct you never intentionally did anything to compromise the safety of your workers, correct?

A    No.

Q    When you say "no," you're agreeing with me, right?

A    Yes.

Q    And you never -- you don't believe you ever discussed with David doing anything to compromise the safety of your workers, correct?

A    No.

Q    These certificates, in your mind, were just a way of having some paper so that you could explain why you had done this transaction that allowed you to get cash from David, right?

A    Correct.

Q    And just to unpack this cash thing, right, you had as a business owner something of a desperate need to get cash at that point, right?

*Linda A. Marino, Official Court Reporter*

**J.A. 489**

RUSSO - CROSS - JACKSON          1016

A    Yes.

Q    And you were not trying to steal from the insurance companies with this, you were trying to figure out a way to get cash, right?

A    Yes.

Q    By the way, do you even know whether -- the prosecutors have never told you whether there's any insurance fraud charge in this case; right, that's not something you've ever discussed with them.

MR. GRUBIN:  Objection.

THE COURT:  Overruled.

A    No.

Q    And the reason that you had a desperate need is because employees in this incredible competitive environment that you describe for employees were saying, "I need cash.  You got to give me cash," right?

A    Yes.

Q    And that wasn't just because some of them were undocumented, right?

A    No, they weren't undocumented.

Q    Were any of your workers undocumented?

A    No.

Q    None of them.  They wanted cash despite the fact they weren't undocumented, right?

A    Say it again.

*Linda A. Marino, Official Court Reporter*

RUSSO - CROSS - JACKSON          1017

Q   They wanted cash regardless.

A   Correct.

Q   And the reason that they wanted cash -- there were a bunch of different reasons they needed cash, right?

A   There were a few reasons, yes.

Q   In your mind, you were going to lose these workers if you didn't acquiesce to the demands that they have cash, right?

A   A few of them have left, yes.

Q   And, so, the reasons that some of them told you included the fact that they didn't want to show too much income because they were afraid of the impact potentially on their housing or their health insurance?

A   No, I never said that.

Q   Did any of them ever say that to you?

A   Did who?

Q   Did any of the employees ever say that to you?

A   No.

Q   None of them every told you that they would be willing to accept a certain amount on the books but not more?

    MR. GRUBIN:  Objection, your Honor.

    THE COURT:  Overruled.

A   No.

Q   There were employees you paid partially on the books and partially in cash, right?

A   Yes.

Linda A. Marino, Official Court Reporter

RUSSO - CROSS - JACKSON          1018

Q   How did you figure out how much you were going to pay them on the books versus cash?

A   We just put a number together.

Q   You sat down with the employee and you worked out a number, right?

A   I worked it out myself, yes.

Q   And by the way, that's a discussion that you were never telling David Motovich about:  Today I was talking to Employee X and worked out this much will be in cash, this much is on the books.

    That conversation never happened, right?

A   No.

Q   When you say "no," you agree with me, correct?

A   Correct.

Q   Now, there was a check that we looked at during the course of your direct examination that was for $40,000; do you remember that?

A   Yes.

    MR. JACKSON:  Can I have one moment, Judge, just to check?

    THE COURT:  Yes.

Q   Let me just ask you a couple questions about it because I don't want to hold up anything, I don't want to waste a second of the jury's time.

    The $40,000 check you looked at with Mr. Grubin,

Linda A. Marino, Official Court Reporter

RUSSO - CROSS - JACKSON          1019

that was a bigger check than most of them, right?

A   Yes.

Q   Substantially bigger, right?

A   Yes.

Q   As we talked about, most of the checks we've been looking at have been under $10,000, right?

A   Yes.

Q   Do you know why that check in particular was that big?

    Do you remember as you sit here today?

A   Because we were -- there was a holiday that was going to be in the middle and I wasn't going to be able to see him for a few weeks, so I cashed it to have it upfront.

Q   And what holiday was that?

A   I don't remember.

Q   When you say you cashed it to have it upfront, what do you mean by that?

A   I brought him the check, he gave me some of the cash -- he didn't have all of it at that time -- and then I went back a couple of days at a time to pick up the rest of it before the holiday started.

Q   So, this was an incident where, in your recollection, and this is not -- I'm not trying to do a memory test, but your recollection is you gave him the 40K check and he didn't have 40K at that time, he gave you some, and then over time you came and you got a little bit more and little bit more, right?

**J.A. 490**

Linda A. Marino, Official Court Reporter

RUSSO - CROSS - JACKSON          1020

A   Correct.

Q   And Dave is not cashing that check at that time, right?

A   Well, he's giving me cash towards the check.

Q   I understand.

    But you would not expect in that situation for him to deposit that check when he hasn't even given you all the cash yet, right?

    He was holding it until that was completed, correct?

A   No, no.

Q   Well, you don't know, do you?

A   No, he wasn't.

Q   You have no -- do you know?

A   Yes.

Q   So, you know when it was.  You believe it was cashed at that point and then it was -- and then you got money eventually over time.  That's your recollection.

A   Yes, because I had the money in the account at that time.

Q   Now, is it possible, is it possible, that it was actually the reverse; that what actually happened is David gave you money over time and then that accumulated to a point where you guys agreed to settle it by you giving him a check?

A   No.

Q   No possibility of that?

A   No.

Q   Okay.  We'll come back to that.

Linda A. Marino, Official Court Reporter

RUSSO - CROSS - JACKSON 1021

THE COURT: How much longer do you have with this witness?

MR. JACKSON: I have a few more topics, Judge.

THE COURT: How much longer in time?

MR. JACKSON: Less than an hour, Judge.

THE COURT: We're going to take our luncheon recess now. It's 12:30. We will be back at 1:45.

Ladies and gentlemen of the jury, please do not talk about the case and we'll see you after our luncheon recess. Thank you.

THE COURTROOM DEPUTY: All rise.

THE COURT: You can step down.

(Jury exits; witness leaves the stand.)

THE COURT: The jury has left the courtroom and the witness is leaving the courtroom.

You may sit down, ladies and gentlemen.

The witness has now left the courtroom. Do we have any issues to discuss in the absence of the jury, in absence of the witness, beginning with the Government?

MR. GRUBIN: No, your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Enjoy your lunch, everyone. We'll see you back here at 1:45. Thank you.

(Luncheon recess taken.)

*Linda A. Marino, Official Court Reporter*

PROCEEDINGS 1022

A F T E R N O O N   S E S S I O N

(In open court; jury not present.)

THE COURT: You may be seated. I hope everyone had a nice lunch.

Do we have any issues to address before we have the jury brought back in and the witness continues?

From the Government?

MR. PAULSEN: No, Your Honor.

THE COURT: From Defense?

MR. JACKSON: No, Judge.

THE COURT: Okay. Let's bring in the jury and we can have the witness come back to the stand and we will continue cross.

(Witness takes the witness stand.)

THE COURT: Please stand for the jury.

THE COURTROOM DEPUTY: All rise.

(Jury enters the courtroom.)

THE COURT: Welcome back, ladies and gentlemen of the jury. Please have a seat. You can see the candy man has been back, so thank you. This is the final stretch of the week. We are going to plow right ahead.

Sir, please have a seat. Did anyone discuss with you or did you discuss with anyone your testimony during the break?

THE WITNESS: No, sir.

*LEEANN N. MUSOLF, RPR*

J. RUSSO - CROSS - MR. JACKSON 1023

THE COURT: Okay. Thank you. You are still under oath.

Please continue cross-examination, Mr. Jackson.

MR. JACKSON: Thank you, Judge.

THE COURT: You are welcome.

CROSS-EXAMINATION (Continued)

BY MR. JACKSON:

Q   Mr. Russo, one of the things you discussed with the Government during your direct examination was some of the text message that you went through with Mr. Motovich?

A   Yes.

Q   Okay.

MR. JACKSON: Can we call up GX-1199.

THE COURT: In evidence?

MR. JACKSON: Yes, Your Honor, already in evidence.

THE COURT: You may publish.

(Exhibit published.)

MR. JACKSON: And if you may just blow up, Mr. Cepregi, just blow up the top part there.

Q   Do you see, at the -- in this -- the first message in this batch of the government exhibits, the first thing you say is:

Hey, Dave. GM.

By that, you mean good morning, correct?

A   Right.

*LEEANN N. MUSOLF, RPR*

J. RUSSO - CROSS - MR. JACKSON 1024

Q   And you said:

It's Joe from Metro, right?

A   Yes.

Q   Now, when you identified yourself as Joe from Metro, that was not you attempting to use some kind of code name, right?

A   No.

Q   That's how people know you because your name is Joe and your company's Metro, right?

A   Correct.

Q   And then you referred to David Motovich as Dave. That wasn't you trying to use some code name either, he goes by Dave, right?

A   Correct.

Q   So there is some messages where you guys are using this sort of loose, kind of lazy, jargon code where you talk about come twelve and stuff like that, that we went through, right?

A   Yes.

Q   In your mind, this was not some serious attempt to mask all of your communications, right? This was pretty lighthearted, correct?

A   Rephrase that question.

Q   Well, you weren't thinking, as you were going through this process, about trying to make sure you followed the top levels of operational security, were you?

A   No.

*LEEANN N. MUSOLF, RPR*

**J.A. 491**

J. RUSSO - CROSS - MR. JACKSON    1025

Q    Okay.  It was kind of a casual thing you were doing, right?

A    Yes.

Q    In fact, you made no attempt to hide who you were in these text messages, right?

A    No.

Q    You didn't once think about deleting the text messages from your phone, did you?

A    No.

Q    You didn't use a signal or any kind of app that has disappearing messages, right?

A    No.

Q    As far as you know, the agents, they viewed the actual messages, right?  These are the messages you actually sent with Mr. Motovich, right?

A    Yes.

Q    So whoever went to retrieve them years later, went to look for them, they were still there, right?

A    Correct.

Q    And the reason -- let me just ask this:  When you went to go see Mr. Motovich, did you ever wear a disguise when you walked into Midwood?

A    No.

Q    You never wore, like, a mask or something to cover up your face?

*LEEANN N. MUSOLF, RPR*

J. RUSSO - CROSS - MR. JACKSON    1026

A    No.

Q    The reason for that is you weren't really trying to engage, as you were saying, in this kind of operational security, right?

A    No.

Q    It wasn't something you were even thinking about?

A    No.

Q    And by no, you mean you agree with me?

A    Yes.

        MR. JACKSON:  Now, we can take that down.

Q    By the way, Mr. Motovich had told you that these were either his companies or that he effectively had some sort of interest that made it tantamount to being his companies because he had money in them, right?

A    Can you explain that in a different way?

Q    Well, he didn't get -- you said Mr. Motovich told you that these were his companies, right?

A    Yes.

Q    Okay.  He didn't get into the detail of what that means, right?

A    No.

Q    And, in fact, you know as a business owner that being the -- you know, when someone says, this is my company, that can mean a number of different things, right?

A    Yes or no.

*LEEANN N. MUSOLF, RPR*

J. RUSSO - CROSS - MR. JACKSON    1027

Q    That's a good answer, okay.  And I appreciate you saying that because the concept of ownership of a company itself can be a little complicated, right?

A    Yes.

Q    Right?  Sometimes somebody has bankrolled the money for a company through a loan and, therefore, they have an interest, in a sense, in a company, but they don't actually have equity in a company, right?

A    It's possible.

Q    And you've heard people refer to a company as it being sort of something that they kind of, "that's my company," in that kind of situation, as well as in a situation where someone is an actual, official owner, correct?

A    Yes.

Q    And sometimes people are apart of -- people are just a big contributed -- there's sometimes employees who really run a company who are not the actual owners of the company and they'll refer to it as the company, right?

A    Well, if they don't have no shares in it, they don't own it.

Q    Right.  But you've heard a guy who runs a company before who's the guy who runs it even if he's not the person who has the technical shares, you've heard him say, that's my company, right?

A    Yeah, and he's running it.

*LEEANN N. MUSOLF, RPR*

J. RUSSO - CROSS - MR. JACKSON    1028

Q    So these are just a couple of examples, but my point is, you never got into any kind of deep conversation with Mr. Motovich about what he meant, you just understood, basically, this was gonna be going towards his money, right?

A    Yes.

Q    Now, I just want to talk for a short bit about your cooperation agreement that the prosecutor brought up, okay?

        MR. JACKSON:  And I believe the prosecutors will correct me if I'm wrong, but I believe that was offered into evidence without objection.

        THE COURT:  What's the number?

        MR. JACKSON:  That is 3500-JR-2, Your Honor.

        THE COURT:  Any objection to that coming into evidence?

        MR. GRUBIN:  No, Your Honor.  I believe it's already in --

        THE COURT:  It's admitted.  You may publish.

        MR. JACKSON:  Thank you, Judge.

        (Government Exhibit 3500-JR-2, was received in evidence.)

        (Exhibit published.)

BY MR. JACKSON:

Q    Okay.  And this is the cooperation agreement that you were talking about with the Government, right?

A    Yes.

*LEEANN N. MUSOLF, RPR*

**J.A. 492**

J. RUSSO - CROSS - MR. JACKSON          1029

Q    That's your name there where it says, Joseph Russo, and then it says, cooperation agreement, correct?

A    Correct.

Q    And then it has a case number, it says 21-CR-364, right?

A    Yes.

Q    And it says, ENV, right?

A    Yes.

Q    And you understand that's the judge you pled guilty before?

A    I didn't know that but, okay.

Q    Do you remember the name of the judge you pled guilty before?

A    "Ditaliano," something.

Q    Vitaliano?

A    Vitaliano.

Q    You see the V there, right?

A    Yes.

Q    You put the cooperation agreement before the judge when you pled guilty, right?

A    Yes.

Q    Okay.  And you attested to the fact, before the judge, that you understood it, right?

A    Yes.

Q    And, in fact, this was a serious matter for you pleading guilty to this cooperation agreement, wasn't it?

J. RUSSO - CROSS - MR. JACKSON          1030

A    Yes.

Q    It's not a joke in your life to admit to something where you've got to plead guilty and you're potentially facing prison time, right?

A    Correct.

Q    You engaged in the best negotiations for yourself that you thought you could, correct?

A    Yes.

Q    And, so, one of the things that was attractive to you about this agreement is that it had, what you understood to be, what they refer to as a five-year cap in terms of their maximum prison sentence, right?

A    Yes.

Q    It says, maximum term of imprisonment, five years, right?

A    Correct.

Q    And you considered that something of a benefit to you, correct?

A    What do you mean by that?

Q    Well, one -- you said it was one of the reasons it made it attractive to you because you understood it was possible that they could -- if you didn't have the agreement, charge you with other things for which you could be facing much higher maximum terms of imprisonment, correct?

A    Correct.

Q    And you were trying to avoid that, correct?

J. RUSSO - CROSS - MR. JACKSON          1031

A    Yes.

Q    Your hope is you're gonna get no jail time at all?

A    Correct.

Q    And it's your understanding that a fair number of people who cooperate like yourself, if they cooperate to the satisfaction of the Government and provide substantial assistance, they can get no jail time; it's up to the judge but you understand that happens, right?

A    Yes.

Q    And, so, the swing for you, in your mind, was between this hope of no jail time if you cooperated, and if you didn't have an agreement, potentially something with the maximum term that was much higher, perhaps decades in prison, as the maximum, correct?

A    Correct.

Q    Now, there were -- I know you said, when Mr. Grubin was asking you about the technicalities of the agreement, that there were no other agreements between you and the Government, correct?

A    Correct.

Q    And I know you were -- you meant formal agreements, right?

A    What do you mean by formal agreements?

Q    Well, there are some understandings that you have about what is going to happen to you as a matter of fairness that

J. RUSSO - CROSS - MR. JACKSON          1032

aren't explicitly reflected in this cooperation agreement, correct?

A    I'm not following you.

Q    Let me try to unpack that.  First of all -- let me just ask you something --

        MR. JACKSON:  And we can take that down for one second so we can focus on what I'm talking about.

Q    You participated in some proffer agreements and some prefer meetings with the Government, right?

A    Yes.

Q    Can you explain to the jury what a proffer is?

A    No, I can't.

Q    It's a little confusing even as you sit here today?

A    Yes.

Q    Okay.  I don't want to put words into your mouth but, basically, as you understood it, these were meetings where you had to come and meet with the Government and try to explain what information you had that you thought could be substantial information to cooperate against somebody else and the Government would evaluate it and see if it was worth enough, and if it was good enough, they might agree to a cooperation agreement like that one with you?

A    Cooperation agreement was made from the beginning.

Q    Well, you had to proffer first before you got to the cooperation agreement, right?

**J.A. 493**

J. RUSSO - CROSS - MR. JACKSON     1033

A    We had a meeting before that.

Q    Right.  You had a meeting that was the proffer meeting, right?  Do you remember that?

A    Yes.

Q    Okay.  And in the proffer meeting, you and your attorney came in, you didn't have a cooperation agreement yet, you were trying to get one, right?

A    Correct.

Q    And in that meeting, your understanding was I've got to tell them everything I know and try to get a cooperation agreement by telling them as much information that could be helpful as possible, right?

A    Yes.

Q    Now.  In that meeting, in the beginning of the meeting, the very beginning of the meeting, you were nervous, right?

A    Yes.

Q    Never been in a meeting like that in your life?

A    No.  Never.

Q    And you understood this is a major moment in your life, a lot is swinging on this?

A    Yes.

Q    And one of the things at the very beginning of that meeting that they told you was that if you told any lies, that in and of itself, lying to a federal prosecutor or to a federal agent, that could be a separate charge a violation of

*LEEANN N. MUSOLF, RPR*

---

J. RUSSO - CROSS - MR. JACKSON     1034

U.S.C. 1001 for lying, right?

A    Correct.

Q    So you understood if you made a false statement there, you could be subjected to additional jail time, additional five years, just for that, correct?

A    Correct.

Q    And, so, in the meeting, one of the things that happened is you were nervous about what you were saying and how it could impact other members of your family; am I correct about that?

A    Maybe.  Yes.

Q    Okay.  One of the things that you were hoping for in cooperating is that the prosecutors would not go after your brother or your wife, correct?

A    Correct.

Q    And you told the prosecutors, basically, that your brother had done all the same things that you had done for the most part, right?

A    Yes.

Q    And they decided not to charge your brother, right?

A    That's what I understand.

Q    Okay.  That's not reflected in the agreement, correct?

A    No.

Q    But at this point, it's been years since you started cooperating and it's your basic understanding that you stood

*LEEANN N. MUSOLF, RPR*

---

J. RUSSO - CROSS - MR. JACKSON     1035

up and you don't think that your brother is getting charged, correct?

A    I don't know yet.

Q    You don't know but no one's told you that your brother is getting charged, there's no indication that he's getting charged, right?

A    No.

Q    Okay.  But by no, you mean you agree with me?

A    Yes.

Q    Okay.  And then, also, you were concerned about your wife's exposure -- I'm not trying to get into all -- everything wit your wife but it was something you were thinking about, right?

A    Yes.

Q    And your wife has not been charged, correct?

A    No.

Q    Okay.  You'd much rather you be charged than your wife be charged, right?

A    Anyone would.

Q    And, so -- well, you know.

        THE COURT:  Don't go there.

        MR. JACKSON:  Definitely not, Judge.

        THE COURT:  Some Supreme Court justices might be very up unhappy with you.  Leave it alone.

        MR. JACKSON:  I completely agree, Judge.  I

*LEEANN N. MUSOLF, RPR*

---

J. RUSSO - CROSS - MR. JACKSON     1036

completely agree.  Wise -- wise from the Court, again.

BY MR. JACKSON:

Q    Let me just ask you:  In the meeting, there comes a point in the meeting where, after you've been told you could face jail time if you tell anything that's not true, okay, and you say you told them, I understand that, right?

A    Yes.

Q    Then one of the agents who was in the meeting asked you if any employees were paid in cash at your -- at your business; do you remember that?

A    Yes.

Q    Okay.  Now -- when was this meeting, by the way?

A    When was this meeting?

Q    Yeah.

A    I don't recall.

Q    It's kind of hard to remember at this point?

A    This -- this started four and a half years ago.

Q    It's been a very long process, right?

A    Yes.

Q    And even though you haven't been to jail, this has been a very difficult and tough last four years for you psychologically dealing with all of that, right, just being under indictment?

A    Correct.

Q    Now, at this meeting, does July 21st, 2010 sound right?

*LEEANN N. MUSOLF, RPR*

**J.A. 494**

J. RUSSO - CROSS - MR. JACKSON    1037

A    Approximately.

Q    So one of the agents says to you, hey, Joe, we're any of your employees paid in cash?  Do you remember that?

A    Yes.

Q    Do you remember which agent asked you that?

A    No, I don't.

Q    Okay.  Could it have been Agent Cabane over there?

A    Possible.  I don't -- I don't remember.

Q    Do you remember if he was in the meeting?

A    Yes.

Q    Okay.  You remember he was there but you don't remember who asked you that question?

A    Correct.

Q    Okay.  So -- but you remember somebody asked you that question?

A    Yes.

Q    And when they asked you, your answer was no, right?

A    I believe so.

Q    Okay.  And it's water under the bridge, but when you said that, that was a lie and you knew it was a lie, right?

A    No.  At that point, I wasn't thinking about that.

Q    Okay.  Well, whatever the case may be, what happened at that moment is your attorney turned to you and said, Joe, can I speak to you for a second outside in the hallway, and then you and the attorney told the prosecutors and the agents in

*LEEANN N. MUSOLF, RPR*

J. RUSSO - CROSS - MR. JACKSON    1038

the room, we need a minute, right?

A    Yes.

Q    And then you guys went out in the hallway while the agents sat there with the prosecutors and waited for you to have a discussion separately with your attorney, correct?

A    Yes.

Q    And at the conclusion of that, you come back in the room and that's when you told your -- your attorney said, hey, you should ask that question again, to the agent, right?

A    Okay.

Q    Do you remember this?

A    Yes.

Q    Okay.  And then the agent asked you again, and at that point, you said, yes, I have paid employees in cash but I stopped once I got the grand jury subpoenas, right?

A    Yes.

Q    Okay.  That second answer, I'm not trying to characterize, at this point, the first answer, but that second answer was the truth, right?

A    Yes, but I was confused when I answered it the first time.

Q    That's fine.  All I'm asking you is, it was the second answer that was the truth, right?

A    Yes.

Q    Okay.  Regardless of whether you feel like you should

*LEEANN N. MUSOLF, RPR*

J. RUSSO - CROSS - MR. JACKSON    1039

have been or not, okay, you understand that by giving that answer that you had to correct, there's at least a potential for you to be charged with 1001, lying to a federal agent, correct?

A    Correct.

Q    And, so, one of the things that you were pleased with about your agreement and is that it's based on none of your statements in the proffer, the agents did not attempt and the Government did not attempt to charge you with 1001 for lying to the federal agents, correct?

A    Yes, but I also had the time when I was sitting there prior to the meeting being done to justify it or correct any of the answers that I gave that were incorrect.

Q    Okay.  Well, nowhere in the proffer agreement, right, does it say that if you lie, but then you correct it, that you're not -- you haven't violated 1001, it doesn't say that, does it?

A    No.

Q    Okay.  So that's just an implicit understanding that you felt you had, right?

A    Yes.

Q    And it's not reflected in any of these agreements, correct?

A    No.

Q    By, no, you mean I'm right?

*LEEANN N. MUSOLF, RPR*

J. RUSSO - CROSS - MR. JACKSON    1040

A    Yes.

Q    Okay.  Now, I'm also right that at a later point, there was a point where you were asked about whether or not your wife ever cashed checks at the check-cashing place in Staten Island, right?

A    Yes.

Q    And you said no, right?

A    I believe so.

Q    Okay.  And then later on, you ask your attorney after the meeting to go to the agents and give them a correction on that, that, in fact, she did sometimes cash checks at the place in Staten Island; yes or no?

A    Yes.

Q    Okay.  Now, you understand that in some situations, people get charged with multiple violations of 1001 and each one is a five-year exposure, right?

A    Yes.

Q    Okay.  So in addition to whatever crimes you were potentially concerned about, there could have been additional higher statutory maximums, the potential for these additional crimes, none of that made it into your final plea agreement which had this five-year cap, correct?

A    Correct.

Q    Okay.  And, so, you know, based on all that, you would agree with me, the agreement basically covers what your

*LEEANN N. MUSOLF, RPR*

**J.A. 495**

J. RUSSO - CROSS - MR. JACKSON    1041

agreement is with the Government but there's some implicit stuff that you understand is part of the deal that's not explicitly laid out in the agreements, correct?

A    Correct.

Q    Okay.  Now, to the extent that you, in any of these meetings, were trying to put the emphasis on yourself and not on your wife or your brother, that was not a malevolent spirit, correct?

A    Can you explain that differently?

Q    Yeah, let me try it differently.  You didn't have a bad intention in your heart when you were trying to direct the focus in your proffer meetings on you as opposed to your wife or your brother, correct?

A    Correct.

Q    What you had was in your mind somewhere you were hoping you could protect those people and put the focus on yourself, correct?

A    Correct.

Q    And that's basically what you're doing in part here today, you understand it's your obligation to tell the truth pursuant to the agreement but all of this is your hope that this ends with you and there is no additional focus on your family members that you've been asked about, correct?

A    Correct.

Q    Now, let me just ask you this:  I'm correct, aren't I,

*LEEANN N. MUSOLF, RPR*

J. RUSSO - CROSS - MR. JACKSON    1042

that David Motovich never stole a dime from you, correct?

A    Correct.

Q    And throughout the time that you knew David Motovich, the only thing he ever did in terms of your business was trying to help you with providing cash that you -- you told us about during your direct, correct?

A    Correct.

Q    And that was a big help to you at a time you felt it was a difficult situation in your business, correct?

A    Yes and no.

Q    Fair enough.

        MR. JACKSON:  Can I have one moment, Judge?

        THE COURT:  Of course.

Q    I've got just one more thing to ask you about.  There were a couple of occasions, some occasions over the years, where you gave David Motovich a check that actually bounced because you hadn't done the math quite right, right?

A    I don't recall that.

Q    It's possible you just don't remember at this point?

A    I don't recall that.

Q    Okay.

        MR. JACKSON:  No further questions.  Thank you, Judge.

        THE COURT:  Redirect?

        MR. GRUBIN:  Yes, Your Honor.

*LEEANN N. MUSOLF, RPR*

J. RUSSO - REDIRECT - MR. GRUBIN    1043

REDIRECT EXAMINATION

BY MR. GRUBIN:

Q    Good afternoon, again, Mr. Russo.

A    Good afternoon.

Q    Do you recall when Mr. Jackson stated that you didn't bring many checks to Mr. Motovich that were over $10,000?  Do you recall him suggesting that to you?

A    Yes.

        MR. GRUBIN:  Can we look at Government Exhibit 734.  And this is the binder with checks in it but I would suggest following along on the screen.

        THE COURT:  In evidence.  You may publish.

        MR. GRUBIN:  Thank you.

        (Exhibit published.)

Q    Let's take a look at page 11.  Is this a check you gave to Motovich in exchange for cash minus a fee?

A    Yes.

Q    And how much is this check for?

A    Thirteen thousand.

Q    Who is it made out to?

A    Ago & Alaudin.

Q    Let's turn to page 12.

        Is this another check from your company to -- well, to Ago & Alaudin but to Motovich in exchange for cash?

A    Yes.

*LEEANN N. MUSOLF, RPR*

J. RUSSO - REDIRECT - MR. GRUBIN    1044

Q    Is that check -- well, how much is that check for?

A    12,225.

Q    Is that over $10,000?

A    Yes.

Q    Let's go to page 14.

        Is this another check you gave to Motovich in exchange for cash minus a fee?

A    Correct.

Q    And how much is this check for?

A    13,800.

Q    Is that over $10,000?

A    Yes.

Q    Let's go page 19.

        Is this a check that you gave to Motovich in exchange for cash?

A    Yes.

Q    How much is this check for?

A    $14,895.

Q    Is that number higher than $10,000?

A    Yes.

Q    All right.  Let's go to page 20.

        Is this a check that you gave to Motovich in exchange for cash?

A    Yes.

Q    What number is there?

**J.A. 496**

*LEEANN N. MUSOLF, RPR*

J. RUSSO - REDIRECT - MR. GRUBIN        1045

A    12,600.

Q    Is that number higher than $10,000?

A    Yes.

Q    All right.

        MR. GRUBIN:  Let's go -- this was page 20, Ms. Kannan?

        Let's go to page, well, 21.

Q    Is this a check you gave to Motovich in exchange for cash minus the fee for the transaction?

A    Yes.

Q    And how much is this check for?

A    11,500.

Q    Is that number higher than $10,000?

A    Yes.

Q    All right.  Let's go to page 27.

        Who is this check from?

A    Metro Erectors.

Q    Who is it paid payable to?

A    ZKC NYC.

Q    Is this a check you gave Motovich in exchange for cash?

A    Yes.

Q    How much is this check for?

A    13,750.

Q    Is that number higher than 10,000?

A    Yes.

J. RUSSO - REDIRECT - MR. GRUBIN        1046

Q    Okay.  Let's look at page 27 -- I'm sorry, page 30.

        Is this a check you gave to Motovich in exchange for cash?

A    Yes.

Q    And what number is this -- well, how much was this check for?

A    $14,140.

Q    Is that number higher than $10,000?

A    Yes.

Q    Let's turn to page 31.

        Is it fair to say that all the checks that are in this binder in this exhibit you gave to Motovich in exchange for cash?

A    Yes.

        THE COURT:  By "this binder," which binder are you referring to?

        MR. GRUBIN:  I apologize.  It's labeled binder two. It contains Government Exhibit 734 which is what we're reading.

        THE COURT:  Continue.

        MR. GRUBIN:  Thank you, Your Honor.

        THE COURT:  You are welcome.

BY MR. GRUBIN:

Q    How much is this check for?

A    13,600.

J. RUSSO - REDIRECT - MR. GRUBIN        1047

Q    Is that number higher than $10,000?

A    Yes.

Q    Let's go to page 32.  How much is this check for?

A    12,260.

Q    Is that number higher than $10,000?

A    Yes.

Q    Would it surprise you that, if we kept going, there would be dozens and dozens and dozens of these checks that are over $10,000?

A    No, it wouldn't surprise me.

Q    So you think it's a fair statement that there were more than a few checks that were above $10,000 that you gave to Mr. Motovich?

A    Rephrase that.

Q    Sure.  Is it fair to say that there were more than a few checks that you gave to Motovich that were over $10,000?

A    Yes.

Q    All right.  I want to look at a few examples, just two examples -- two more examples of the text messages and some checks that we looked at before.

        MR. GRUBIN:  If we could turn to Government Exhibit 1199 at page 15.

Q    And do you see there, where you say, "Hey, Dave.  Are you around tomorrow?"

A    Yes.

J. RUSSO - REDIRECT - MR. GRUBIN        1048

Q    And Motovich says, "Yes?"

A    Yes.

Q    And you say, "Okay, after ten?"

A    Correct.

Q    And what are you asking there?

A    To -- to come after 10 o'clock.

Q    And this is August 15th, 2017?

A    Yes.

Q    All right.

        MR. GRUBIN:  If we could look at Government Exhibit 734 at page 68.

Q    Is this the same date?

A    Yes.

Q    And who is this check from?

A    Metro Erectors Inc.

Q    Who is it to?

A    ZKC NY.

Q    And I could -- it's for $12,635?

A    Correct.

Q    Also over $10,000?

A    Yes.

Q    And do you see the transaction date there, when it was deposited, on the bottom?

A    8/16.  The following day.

Q    So the following day.

**J.A. 497**

J. RUSSO - REDIRECT - MR. GRUBIN    1049

MR. GRUBIN:  Can we look at Government Exhibit 1199 at page eight.

Q    Do you see there on, I believe that says June 15, 2017, you say -- what do you say there?

A    "Good morning, Dave.  You working today."

Q    What does Motovich say back to you?

A    "Yes, but after one."

Q    And what do you say?

A    "Okay."

Q    What do you understand Motovich to mean there?

A    He'll be there after one o'clock.

Q    Be there in the afternoon, okay.

MR. GRUBIN:  Let's look at Government Exhibit 734 at page 61.

Q    Is the date of this check the same date of the messages we were just looking at?

A    Yes.

Q    And who -- and who is the check from?

A    It's from Metro Erectors.

Q    Who is it made out to?

A    ZKC NYC.

Q    And how much is the check for?

A    12,235.

Q    Also over $10,000, correct?

A    Correct.

*LEEANN N. MUSOLF, RPR*

---

J. RUSSO - REDIRECT - MR. GRUBIN    1050

Q    And if we look at the bottom there, what date was it deposited?

A    Same day.

Q    Same day.  Now, even on occasions where Motovich deposited a check maybe a day or two later, is that necessarily because you asked him to?

A    Yes.

Q    Every time?

A    No.

Q    So do you know exactly when Motovich was gonna be depositing every check you brought him?

A    No.

Q    And it could have been because you gave it to him in the afternoon?

MR. JACKSON:  Objection.

THE COURT:  Overruled.

A    Yeah, it's possible.

Q    The bank might have been closed?

A    It's possible, yes.

Q    Motovich might have had plans for the rest of that day?

A    Possible.

Q    Mr. Jackson suggested that the cash that Mr. Motovich was giving you were loans; do you recall that?

A    No, they weren't.

Q    But do you recall him suggesting that to you?

*LEEANN N. MUSOLF, RPR*

---

J. RUSSO - REDIRECT - MR. GRUBIN    1051

A    Oh.  Yes.

Q    And you said they weren't.  How would you describe these transactions?

A    I would give him the check and he would give me the cash.

Q    And who is benefiting from these transactions?

A    Both of us.

Q    Do you have a place you like to go for lunch or dinner, Mr. Russo?

A    Not in particular.

Q    Do you go to some places more regularly than others?

A    Yeah.

Q    Okay.  And when you go to that lunch place or dinner place or restaurant, wherever you go, and you pay, you get your food and you pay at end of a meal when you get the check --

A    Yes.

Q    -- are they loaning you the food?

A    No.

Q    Okay.  You would describe that as an exchange for payment?

A    Yes.

Q    You're getting a service or a good?

A    Correct.

(Continued on the following page.)

*LEEANN N. MUSOLF, RPR*

---

RUSSO - REDIRECT - MR. GRUBIN    1052

BY MR. GRUBIN:  (Continuing.)

Q    Mr. Jackson brought up that first meeting, where he suggested that you were less than truthful; do you recall that?

A    Yes.

Q    Do you recall that's the same meeting where you said you went to Motovich for convenience, correct?

A    Where I went to what?

Q    Where you went to Motovich for convenience; do you recall that?

A    Yes.

Q    And since that first meeting, did you meet with the Government after that several times?

A    A handful of times.

Q    And you pled guilty?

A    Yes.

Q    You accepted responsibility?

A    Yes.

Q    And you recall defense counsel saying that you went to Motovich primarily for convenience, correct?

A    For?

Q    Sorry.  You recall, Mr. Russo, defense counsel suggesting you went to Motovich purely for convenience, correct?

MR. JACKSON:  Objection, misstatements.

A    Yes.

*Jamie Ann Stanton, RMR, CRR, RPR,*

**J.A. 498**

RUSSO - REDIRECT - MR. GRUBIN    1053

THE COURT: Overruled.

Q   Because I suppose you could have gone to a bank, right?

A   Correct.

Q   You could have withdrawn $15,000 from a bank assuming you had the money in your account, correct?

A   Yes.

Q   And then that bank would have handed you a fake invoice, right?

A   No.

Q   No? Not even your local community bank?

A   No.

Q   Do you recall defense counsel asking you if you ever entered into a formal criminal agreement with Mr. Motovich?

MR. JACKSON: Objection.

A   Yes.

THE COURT: Overruled.

Q   Do you recall him asking you that?

A   Yes.

Q   Yesterday, you testified that you and Motovich used code to camouflage your conversations.

Why did you do that?

A   To simply camouflage it so that if anybody saw the text messages, they really wouldn't understand them.

Q   Defense counsel mentioned that there might be different reasons you might have several companies, right?

Jamie Ann Stanton, RMR, CRR, RPR,

RUSSO - REDIRECT - MR. GRUBIN    1054

A   Yes.

Q   Are you or your brother signatories on the bank accounts associated with your companies?

A   Yes.

Q   Do those companies do real -- have real business purposes?

A   Yes.

Q   Do you pay taxes on these companies?

A   Yes.

Q   Do you ever tell someone that you meet that you own companies that you don't own?

A   No.

Q   That you're not involved in?

A   No.

Q   Defense counsel asked you, have you ever been audited by the IRS; do you remember that?

A   Yes.

Q   And I believe you said you haven't been audited by the IRS?

A   No.

Q   And --

THE COURT: Have you been audited by the IRS?

THE WITNESS: No, I have not.

THE COURT: Okay. The question was a little convoluted, so let's just be clear.

Jamie Ann Stanton, RMR, CRR, RPR,

RUSSO - REDIRECT - MR. GRUBIN    1055

MR. GRUBIN: Thank you, Your Honor.

THE COURT: You're welcome.

Q   And in part, when you went to Motovich, right, and he gave you, let's say, a fake invoice or a certificate of fraudulent or non-legitimate certificate of insurance, that helped ensure that you weren't audited by the IRS, correct?

MR. JACKSON: Objection.

THE COURT: Overruled.

A   Correct.

Q   Mr. Russo, you've already mentioned you pled guilty to tax evasion, right?

A   Correct.

Q   You accepted responsibility?

A   Yes.

Q   Your companies now pay taxes?

A   Yes.

Q   You do things legitimately?

A   Yes.

Q   Do you still have businesses?

A   Yes, I do.

Q   How do you feel now that you are doing things the right way, you've accepted responsibility?

A   A thousand times better.

Q   Why is that?

A   I sleep with a better conscience.

**J.A. 499**

Jamie Ann Stanton, RMR, CRR, RPR,

RUSSO - REDIRECT - MR. GRUBIN    1056

MR. GRUBIN: No further questions, Your Honor.

THE COURT: You may step down, sir. Thank you.

(Witness excused.)

THE COURT: Please call your next witness.

MR. PAULSEN: Yes, Your Honor. We have two possible witnesses. We have the continuation of the earlier one and we have a short witness, as well.

THE COURT: Call your short witness.

MR. PAULSEN: Yes, Your Honor.

The Government calls Allan Miller.

THE COURT: Please have Allan Miller walk forward and be sworn.

When you get to the witness box, raise your right hand and my court deputy will administer the oath.

(Witness takes the stand.)

THE COURT: Step up there, please. Thank you. And face my court deputy and raise your right hand.

THE COURTROOM DEPUTY: Do you solemnly swear or affirm that the answers you are about to give the Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: So help me God.

THE COURT: I'm sorry, what did you say?

THE WITNESS: So help me God.

THE COURT: I couldn't hear you.

Jamie Ann Stanton, RMR, CRR, RPR,

RUSSO - REDIRECT - MR. GRUBIN          1057

THE WITNESS:  Yes, I do.

THE COURT:  Okay, yes, you do.  Please be seated.
Please have a seat.  And I am going to ask you, Mr. Miller, to
pull this microphone that's in front of you towards you, see,
it will swivel to you.  You have a wee voice.  Keep your voice
up.  State your name and spell it and then Counsel will
inquire.  So please state your name and spell it.

THE WITNESS:  Allan Scott Miller, A-L-L-A-N,
S-C-O-T-T, M-I-L-L-E-R.

THE COURT:  Thank you.

Counsel, you may inquire.

MR. PAULSEN:  Thank you, Your Honor.

(Continued on next page.)

---

A. MILLER - DIRECT - MR. PAULSEN          1058

(Witness takes the witness stand.)

**ALLAN MILLER**, called as a witness, having been first duly
sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PAULSEN:

Q    Mr. Miller, over here.  Good afternoon, Mr. Miller.

A    Good afternoon.

THE COURT:  Pull the microphone to you.  It will
move to you; you don't have to move to it.

Go ahead.

Q    Mr. Miller, are you appearing today because you were
served a subpoena for testimony?

A    Yes.

Q    Do you know an individual named David Motovich?

A    Yes.

Q    Do you recognize him in the courtroom today?

THE COURT:  Please stand up and look around.  Look
around the entire courtroom.  Do you see Mr. Motovich here?

THE WITNESS:  I have another pair of glasses.

THE COURT:  Take your time.  Look around the entire
courtroom.  Do you see Mr. Motovich here?

THE WITNESS:  That him.

THE COURT:  Who are you pointing to, sir?  Describe
him with an article of clothing.

THE WITNESS:  Light blue tie, white shirt, dark

---

A. MILLER - DIRECT - MR. PAULSEN          1059

suit.

THE COURT:  Thank you.

Please be seated.

MR. PAULSEN:  Your Honor, let the record reflect
that the witness has identified Mr. Motovich.

THE COURT:  The record will so reflect.

Please continue your examination.

BY MR. PAULSEN:

Q    Mr. Miller, I would like to show a document that's been
previously marked for identification as 722-A.

MR. PAULSEN:  Only to the witness, Your Honor.

THE COURT:  Any objection to the document, what's
the number?

MR. PAULSEN:  722-A.

THE COURT:  722-A, any objection?

MS. LAYDEN:  No objection, Your Honor.

THE COURT:  It's admitted.  You may publish it to
the jury as well as to the witness.

(Government Exhibit 722-A, was received in
evidence.)

(Exhibit published.)

Q    Mr. Miller, do you recognize this document in front of
you?

A    Yes.

Q    What is it?

**J.A. 500**

---

A. MILLER - DIRECT - MR. PAULSEN          1060

A    It's a check in payment to myself.

Q    Did you provide this check to the Government?

A    Yes, I believe I did.

Q    This check is made out to you; is that right?

A    Correct.

Q    Who paid this check to you?

A    It was given to me in payment for services by Motovich.
I recognize the contracting corp whose check it is, but I was
never introduced to them, do not know them.

Q    So that the name Ago & Alaudin Contracting Corp, sitting
here today, do you have personal knowledge of what that is?

A    What what is?  The check?

Q    No, the company.

A    The company.  I was never told, so I guess I was left to
assume that --

MR. MAZUREK:  Objection.

THE COURT:  Overruled.

A    -- that the building management wanted an insurable
contractor.

Q    Now, this is the check that David Motovich gave you; is
that right?

A    I believe so.  It's been ten years.

Q    Mr. Miller, I would like to show you page 2 of this
document.

Do you recognize this check?

A. MILLER - DIRECT - MR. PAULSEN          1061

A    Similar, yes.

Q    The handwriting is different.

Do you recognize the handwriting on this check?

A    Yes.

Q    Whose handwriting is it?

A    I believe it's mine.

Q    Did David Motovich ask you to fill out that check to yourself?

A    I don't recall.

Q    Is this a check that David Motovich paid to you?

A    Ultimately, it was paid to me, yes.

Q    What was this check -- was this check in connection with any services you provided for Mr. Motovich?

A    Yes.  I was the architect of record.

Q    Architect for what?

A    For design and expediting of Penthouse 47-G of 303 East 57th Street.

Q    This was a project that you worked on?

A    Yes.

Q    And you served as the architect; is that correct?

A    Yes.

Q    For about how long did you work for Mr. Motovich on this project?

A    I would say altogether about four years.

Q    I would like to show you the third page.

*Jamie Ann Stanton, RMR, CRR, RPR,*

---

A. MILLER - DIRECT - MR. PAULSEN          1062

MR. PAULSEN:  Ms. Kannan.

Q    Do you recognize this document, Mr. Miller?

A    Similar, yes.

Q    Is this another document that you provided the Government?

A    I believe so.

Q    And is this, yet, another payment from Mr. Motovich to you?

A    Yes.

Q    Is this also in connection with your work on the penthouse apartment that you mentioned?

A    Yes.

Q    Now, just a few other questions.

Have you performed any other work for the Motovich family besides David Motovich?

A    Yes.

Q    Did you do any work on Motovich projects on Coney Island Avenue?

A    Yes.

Q    Which ones?

A    Originally, 1090 Coney Island Avenue, 1100 Coney Island Avenue, consolidating several properties while design progressed.

Q    During the course of doing that work, did you interact with a person named Barry Miltz?

*Jamie Ann Stanton, RMR, CRR, RPR,*

---

A. MILLER - CROSS - MR. MAZUREK          1063

A    Interact?  Miltz was present on occasion.  I'm not aware of any interaction.

Q    Did you observe that Barry Miltz had a relationship with anyone in particular in the Motovich family?

A    Yes.  I think that my relationship with Boris was older, but at some point, Miltz became a frequenter of the Motovich offices.

MR. PAULSEN:  No further questions, Your Honor.

THE COURT:  Cross-examination.

MR. MAZUREK:  Thank you, Judge.

CROSS-EXAMINATION
BY MR. MAZUREK:

Q    Good afternoon, Mr. Miller.

A    Good afternoon.

Q    I'm over here, I'm over here.

My name is Henry Mazurek.  I represent David Motovich.  I am one of his attorneys.  And we have never met before, correct?

A    Correct.

Q    Mr. Miller, you are a registered architect?

A    Yes.

Q    You have been registered since 1977; is that about right?

A    About right.

Q    Okay.  And you work here in New York, right?

A    Yes.

*Jamie Ann Stanton, RMR, CRR, RPR,*

---

A. MILLER - CROSS - MR. MAZUREK          1064

Q    And you first met the Motovich family sometime in the early 2000s; is that about right?

A    Yes.

Q    And you met first with Boris Motovich, that's David's father, right?

A    Correct.

Q    And you met him just on the street on Coney Island Avenue in Brooklyn, right?

A    No.  I had an office briefly on Coney Island Avenue opposite 1090 and he crossed the street to my office to ask my services.

Q    So he walked in.  So he was a walk-in customer to your office --

A    Yeah, yeah.

Q    Just let me finish the question before you answer because there's a court reporter here who is writing everything down, and if we talk over each other, that will all get messed up, okay?

A    Yup.

Q    Okay.  So you walked into the office --

Boris Motovich walked into your office on Coney Island Avenue one day, right?

A    Yes.

Q    And you learned that he also had a business on the same street, right?

**J.A. 501**

*Jamie Ann Stanton, RMR, CRR, RPR,*

A. MILLER - CROSS - MR. MAZUREK      1065

A     Right.

Q     He had Midwood Lumber and Millwork, right?

A     Correct.

Q     And did you ever shop there, by the way?

A     Shop there?

Q     Yeah, did you ever go and buy some hammers or nails or anything?

A     No.

Q     Okay.  So you were both businesses in the same community, right?

A     Yes.

Q     And when he walked over there, he asked, you know, maybe you could help him out with some of your services, right?

A     Right.

Q     And that actually led to a lengthy relationship with the Motovich family, right?

A     Yes.

Q     You helped Boris Motovich convert some commercial buildings, insides to buildings, to residential; is that right?

A     I did residential buildings from the ground up at another site.  I redeveloped one existing commercial building, the zoning remained commercial.  And yes, that's the relationship.

Q     And through this relationship with David's father, Boris, you got to know David Motovich, right?

*Jamie Ann Stanton, RMR, CRR, RPR,*

A. MILLER - CROSS - MR. MAZUREK      1066

A     Right.

Q     And you knew David Motovich when he was a young man, right?

A     Yup.

Q     And David Motovich, you learned, became sort of the protege to his father, Boris, at Midwood Lumber, right?

A     I suppose.

Q     You maybe don't like the word "protege," but he trained under Boris Motovich and obtained a management position at Midwood Lumber?

A     Inherited a management position.

Q     Okay, inherited.

      And, I mean, you talked a little bit about the work that you did as an architect for David Motovich when the prosecutor was asking, right?

      MR. MAZUREK:  I will withdraw it.  That was a very clumsy question.

Q     Let me ask you:  When the prosecutor was asking you questions, he was asking you about a design job you did for David Motovich at his apartment in Manhattan, right?

A     Yes.

Q     And you also, prior to that, did some work for David Motovich at his office at Midwood Lumber, right?

A     Right.

Q     And at that point in time, and when you did that work at

*Jamie Ann Stanton, RMR, CRR, RPR,*

A. MILLER - CROSS - MR. MAZUREK      1067

Midwood Lumber, David was, what, about 30 years old or so?

A     I wasn't tracking his age.  I don't -- I don't know.

Q     He was a young man?

A     Yes.

Q     It was a long time ago, right?

A     Yes.

Q     Do you remember seeking a building permit for David Motovich's office at Midwood Lumber back in about 2006?

A     Yes.

Q     That's, if my math is correct, that's about 18 years ago, right?

A     Mm-hm.

      THE COURT:  You have to say yes or no.  You have to say yes or no.  You can't say "mm-hm."

A     Yes.

      THE COURT:  Go ahead.  Next question.

Q     And when you did work for his office, you helped design the interior of his office at Midwood Lumber at 1169 Coney Island Avenue, right?

A     Right.

Q     In 2006, right?

A     That was about the year, yes.

Q     Okay.

      MR. MAZUREK:  If we could put on the screen what's already been admitted into evidence as GX 331, Your Honor.

*Jamie Ann Stanton, RMR, CRR, RPR,*

A. MILLER - CROSS - MR. MAZUREK      1068

      THE COURT:  You may publish.

      (Exhibit published.)

Q     Are we looking at the handiwork of your interior architect design, Mr. Miller?

A     It was not faithfully implemented, but this is a recognizable photo, yes.

Q     So you may have had other grandiose designs, but this is how it turned out?  That's sometimes how architects work, right?

A     Actually, it's less grandiose than I -- I had intended.

Q     But you wanted -- you wanted -- you had even bigger plans than --

A     No.  Briefly, the wood selection was not mine.  I wanted a clear finished cherry, which is more appropriate for the moldings that were classic then.  And --

Q     I understand.

      THE COURT:  If you asking about architecture, that's very important.

      MR. MAZUREK:  I am just commenting --

      THE COURT:  Don't interrupt.  Don't interrupt.

      Put the question again and let the witness answer.  Read the question, ma'am reporter.  Keep your voice up.

      MR. MAZUREK:  I think that --

      THE COURT:  No.  No.  I told the reporter to read the question back and now we are going to get an answer.

**J.A. 502**

*Jamie Ann Stanton, RMR, CRR, RPR,*

A. MILLER - CROSS - MR. MAZUREK       1069

That's how we do it here.

Go ahead.

(Record read.)

THE COURT:  Answer the question, please.

A    I, of course, submit to the -- the judgment of my client.

THE COURT:  Does that complete your answer?

THE WITNESS:  Yes.

THE COURT:  Next question.

MR. MAZUREK:  Thank you, Your Honor.

THE COURT:  You're welcome.

Q    And so GX 331, this is the office as it turned out that you had helped design, right?

A    Yes.

Q    And you obtained a building permit in about 2006 to put a storage space and bathroom behind one of the wooden panels that you were looking at, right?

A    No, no.

Q    Can you explain --

A    Part of -- well, the drawings only concerned the facade.

Q    So can you explain what your drawings indicated or what you had done for this particular office space?

A    The doors covering the other spaces that you mentioned were part of this facade.  It nothing to do with the interior.

Q    Okay.  Part of the facade.  And that required a building permit with the Department of Buildings?

A. MILLER - CROSS - MR. MAZUREK       1070

A    I don't recall.

Q    Is there something that I can show you from the permits that you obtained that might refresh your memory?

A    Sure.

MR. MAZUREK:  Your Honor, if I may?  I have premarked for identification DX 9985, which I am providing a copy --

THE COURT:  You are walking away from the podium and you're talking.  You can't walk and talk.

MR. MAZUREK:  Sorry.  I just handed to the Government counsel so they have a copy of it.  And if we can put it on the screen.

THE COURT:  What is the exhibit number?

MR. MAZUREK:  DX 9985.

THE COURT:  Any objection to DX 9985 coming into evidence?

MR. PAULSEN:  No, Your Honor.

THE COURT:  It's admitted.  You may publish and put it on the ELMO.  Show it to the jury.

(Defendant's Exhibit 9985, was received in evidence.)

(Exhibit published.)

MR. MAZUREK:  Great, thank you, Your Honor.

THE COURT:  You're welcome.

MR. MAZUREK:  So if we can turn to a certain page of

A. MILLER - CROSS - MR. MAZUREK       1071

this.  One second.  Page 3 of this exhibit.  And if we can highlight the last entry on the page which is 1169 Coney Island Avenue.

Q    And that's the address of the office of Midwood Lumber; is that right?

A    Yes.

Q    And is this the permit that you obtained for the construction of the facade, as you called it, for David Motovich's office?

A    I suppose.

Q    That refreshes your memory, again.  And the date that was obtained was November 28, 2006; do you see that?

A    Yup.

MR. MAZUREK:  We can take that down.

Q    And prior to you constructing this design --

MR. MAZUREK:  And if we can put back on the screen GX 331.

Q    Before you had constructed this design, you had been in the office of Boris Motovich, right, at Midwood Lumber?

A    Yes.

Q    And he had a similar design in his office where he had paneling which led to, you know, a different room, right?

A    No.  I would not call it similar in any regard except that it was wood paneling.

Q    It was wood paneling?

A. MILLER - CROSS - MR. MAZUREK       1072

A    Yeah.  There are many differences.

Q    And wood paneling that led into a different room, right, if you recall?

A    Led into a different room.  Okay.  I don't recall any similarity like that.

Q    Okay, but when I am referring to wood paneling, is there's wood paneling -- and I am going to use the screen and circle the area where the wood paneling led into another storage area with a bathroom.

Do you see that?

A    I don't see a bathroom, but I see the wood paneling that was part of the facade that I did, yes.

Q    But you helped draw for the storage area and the bathroom that this paneled door led into, right?

A    No.  I don't remember doing a -- a room behind that door.

MR. MAZUREK:  If we can put back on the screen what's admitted into evidence as 9985, page 3.

THE COURT:  And clear the screen of the circle, please, Counsel.  Thank you.

(Exhibit published.)

MR. MAZUREK:  And, again, highlight.

Q    If you look at the alteration type that's identified for the building permit you obtained, and I'm reading just along.  It says:  Provide new storage space in the mezzanine, about

**J.A. 503**

A. MILLER - CROSS - MR. MAZUREK     1073

3835 square feet, new office space, 2050 square feet, within existing building, envelope and new office space in a proposed vertical extension of the north bay, 1400 square feet, provide one loading berth and required bathroom facilities.

Do you see that?

A    Yes.

Q    Does that refresh your memory now about what was put in behind the door?

A    Not specifically behind that door, but there was a general fit-up of the floor to accommodate other functions.

Q    Okay.  You don't remember whether that was the -- behind that door is where that bathroom was put in?

A    That door is a little more than a closet, okay.  The other functions here consume most of the floor space.

Q    Right.

A    On the mezzanine floor.

Q    All right, but you just don't remember where the bathroom was on that floor that you were obtaining the permit for back in 2006?

A    I don't think there were bathroom facilities, but, no, I had nothing to do with that.

Q    Okay, but it did say the loading berth and required bathroom facilities in the permit structure?

A    Right.

MR. MAZUREK:  We can take that down.

---

A. MILLER - CROSS - MR. MAZUREK     1074

Anyway, if we can put GX 331 back on the screen.

(Exhibit published.)

Q    So the panel door without the handle, that was part of your design, right?

A    Right.

Q    And you'd be happy to hear that there was a lot of testimony about that you were happy about how this turned out, except for the cherry finish, right?

A    Right.

Q    And 2006, when you put this in for David Motovich, I mean, you did some of the desk, as well, right?

A    I did the desk design, correct.

Q    And this was all your idea, maybe not as grandiose as it turned out, but it was your idea in terms of the design of the office, right?

A    Yeah.  Well, you're not showing the whole office here.  The ceiling is missing.

Q    But you are very proud of your work, right?

A    Very proud?  No.  I would not call this something I'm very proud of.

Q    I mean, this -- this was your handiwork, right?  How would you describe it?

A    A somewhat flawed execution of a better design.

Q    Okay, but it was your concept, at least, that was being implemented at the time?

---

A. MILLER - CROSS - MR. MAZUREK     1075

A    Concept?  There are many concepts, here.  I would not call this particularly --

Q    A concept?

A    No, indicative of my work.

Q    But it is your work?  It's the end result of your work?

A    End result.

THE COURT:  Speaking of end, it's 3 o'clock, which is our break time.  How much before you end your examination, your cross of this witness?  How much longer do you have?

MR. MAZUREK:  About five minutes, Your Honor, ten minutes most.

THE COURT:  Is it five or is it ten?

MR. MAZUREK:  Given the answer -- I don't want to predict.  Maybe we could take the break and then I will try to expedite --

THE COURT:  Why don't we push ahead and then we'll take the break, but I'll give you up to ten minutes.

MR. MAZUREK:  Very good.  Very good.

THE COURT:  I thought so.

Q    So Mr. Miller, you also said that you did some work at 303 East 57th Street for David Motovich, right?

A    Right.

Q    And you were shown a series of checks, right?

A    Right.

MR. MAZUREK:  And if we could put them back on the

**J.A. 504**

---

A. MILLER - CROSS - MR. MAZUREK     1076

screen, Government Exhibit 722-A.

(Exhibit published.)

Q    This is one of the checks that's made out to you, Allan S. Miller, R.A., right?

A    Right.

Q    Now, when you did the work for Mr. David Motovich and his wife, Lyudmila, at the apartment in Manhattan, you did not complete the work at the apartment, right?  You weren't there to see the work done to completion?

A    That's correct.

Q    In fact, it was only about ten percent of the work that was ultimately done in terms of the renovation when you left, right?

A    No.  There were drawings done for virtually all of the work.  And a lot of design executed that was never implemented.

Q    Okay.  And the Contracting Corp that you see on the check, you don't know who were the contractors that were doing the work inside the apartment, right?

A    I don't know who the contractors were.  In fact, I did know many of the workmen and supervisors.

Q    But in terms of the businesses, did you know someone by the name of Kemal Sarkinovic?

A    No.

Q    Did you know the contracting company that was doing the

A. MILLER - CROSS - MR. MAZUREK          1077

drywall in the apartment?

A    Yes.  I knew the drywall rough carpenter and his workmen.

Q    And that work was being done around the time period that's indicated in the checks, right?

A    It was being done at about this time, yes.

Q    And Mr. Motovich, David Motovich, I mean, he took an active participation in the project, obviously, because it was his home, right?

A    I'm not sure how to answer it, the question.

        MR. MAZUREK:  I will withdraw it.

A    I'm trying to be honest, but took an active participation?  I would call it obstructive in some sense and advocating in others.

Q    Because he wanted to give his view as to how the product was going to be finally turned out, right?

A    No.

        THE COURT:  Any other questions?

        MR. MAZUREK:  No.  I have nothing further, Your Honor.

        THE COURT:  Any redirect?

        MR. PAULSEN:  No, Your Honor.

        THE COURT:  You may step down, sir.  Thank you.  You're done.  Thank you very much.

        (Witness excused.)

        THE COURT:  Now, ladies and gentlemen of the jury,

A. MILLER - CROSS - MR. MAZUREK          1078

we are going to take our slightly delayed somewhere between five and ten minutes, I commend Counsel for that, break.  We will take a 15-minute break and then we will finish up for the day promptly at 5 o'clock.  You can hold me to it.  So far so good, at 5 o'clock, all right?  So thank you.  I am not about to lose that on a Friday, let me tell you.  We'll you in 15 minutes.  Thank you.  Do not talk about the case.

        THE COURTROOM DEPUTY:  All rise.

        (Jury exits.)

        THE COURT:  The jury has left the courtroom.  The witness has left the stand and completed his testimony.

        Please be seated ladies and gentlemen.

        Do we have any issues to discuss outside of the presence of the jury, beginning with the Government?

        MR. SKURNIK:  Yes, Your Honor.

        THE COURT:   Have a seat.

        MR. SKURNIK:  So the Government's next witness, Kemal Sarkinovic, will be one of our longest witnesses and will certainly carry over to Monday.  So we would just like some guidance from Your Honor on whether we should call Mr. Sarkinovic, or whether we should finish the cross-examination of Ms. Manzione.

        THE COURT:  Have you finished your direct examination of that witness?

        MR. SKURNIK:  Ms. Manzione?

A. MILLER - CROSS - MR. MAZUREK          1079

        THE COURT:  Yes.

        MR. SKURNIK:  Yes, we have, Your Honor.

        THE COURT:   Okay.  So it was a short direct.  We will have a short cross.  That's the witness we'll call next.

        MR. SKURNIK:  Thank you, Your Honor.

        And one other issue, when we do get to Mr. Mr. Sarkinovic, he will be testifying with the assistance of a Bosnian interpreter.

        THE COURT:  Will this be simultaneous or sequential?  You know my linguistic questions are simplistic, but they do go to the question of time.

        MR. SKURNIK:  So Your Honor, we have asked that it be simultaneous.

        THE COURT:  And what is the answer to that?

        MR. SKURNIK:  The answer that we have received is that the interpretation of my questions may be simultaneous, but there could be a consecutive to the answer in that the interpreter may simultaneously interpret my question, but then hear the witness's answer and then repeat that consecutively to make sure that the interpreter has the answer correctly.

        THE COURT:  I don't know what you said, but I heard words.

        Let us put it this way.  I am very much in favor of simultaneous translations.  Many of the interpreters in this building are excellent in providing simultaneous translations.

A. MILLER - CROSS - MR. MAZUREK          1080

Sequential translations, I'm not a big fan.  So do what you can to make them simultaneous.  Have a chat with the interpreters.  It will go better for all concerned, especially on a Friday afternoon with a jury.

        MR. SKURNIK:   Understood, Your Honor.

        And I would just ask if either us or Mr. Scott can place a chair next to the witness box.  And the reason is that our interpreter isn't able to stand for extended periods of time.  If that would be okay with Your Honor.

        THE COURT:  I don't have a problem with a chair next to the witness box.  That's absolutely fine.

        MR. SKURNIK:  Thank you, Your Honor.

        THE COURT:   That works.  Especially if it's simultaneous translation.

        MR. SKURNIK:  Understood.

        THE COURT:  Sequential, I might revisit my ruling.  Not to put any pressure on anyone, but you know how this works.

        Okay.  Anything from defense counsel?

        MR. JACKSON:  No, Your Honor.  Thank you.

        THE COURT:  Thank you.  We will take our 15-minute break and then we will resume.

        (Recess taken.)

        (Continued on following page.)

**J.A. 505**

PROCEEDINGS                1081

THE COURT: Thank you, ladies and gentlemen of the jury. Please be seated. Appreciate your promptness.

We will have the cross-examination of the banker witness that you saw earlier today.

Please bring the witness is.

(Witness enters the courtroom.)

THE COURT: Please come back, ma'am.

I offered you a cough drop in the morning. This afternoon, I will offer you a mint candy. Again, no federal funds were expended.

Counsel, you may cross-examine.

MR. JACKSON: Thank you, Judge.

THE COURT: You're still under oath, ma'am.

(Continued on next page.)

*Linda A. Marino, Official Court Reporter*

---

MANZIONE - CROSS - JACKSON          1082

**CATHERINE MANZIONE,** called as a witness, having been previously first duly sworn/affirmed, was examined and testified further as follows:

CROSS-EXAMINATION

BY MR. JACKSON:

A    Good afternoon.

Q    My name is Randall Jackson. I'm going to try to ask you a short set of questions as simple as possible. If there's any question that I ask that you don't understand, please let me know. I'll try to rephrase it.

A    Thank you.

Q    So Ms. Manzione, can you tell us in total how long you've been working for the bank?

A    34 years.

Q    And how long have you been in your role that you described with the prosecutor?

A    So, I've been in BSA for 20 years.

Q    And specifically within BSA, your title is what?

A    Currently managing director, BSA governance.

Q    Where are you based out of?

A    So, our corporate office is in Connecticut. I'm on Long Island.

Q    Am I correct that BSA, you sort of been -- your career sort of stretches a period that's been one of the most intense periods for the development of BSA.

*Linda A. Marino, Official Court Reporter*

---

MANZIONE - CROSS - JACKSON          1083

A    That's correct.

Q    And what that means is there have been a lot of changes in terms of the way BSA operates at banks over the last 20 years.

A    Correct.

Q    One of the things you would agree with me on is that no matter what we're talking about, there's no rule at a bank ever that a customer is not allowed to withdraw their money from their bank subject to -- unless there's some sort of freeze on it or something.

But customers are allowed to withdraw money from their own bank accounts, right?

A    They are allowed to withdraw their money.

Q    You described with the prosecutors that there are sometimes things that the bank does with the money, like it invests money, stuff like that.

Am I right about that?

A    That's correct.

Q    But it's not the bank's position that because the bank invests a pool of money that's deposited, that the people who own the money in the account cease to have an interest in that money.

MR. PAULSEN: Objection, your Honor.

THE COURT: Sustained.

Q    The bank is basically holding the customer's money,

*Linda A. Marino, Official Court Reporter*

---

MANZIONE - CROSS - JACKSON          1084

right?

MR. PAULSEN: Objection, your Honor.

THE COURT: Sustained.

Q    Am I correct, Ms. Manzione, that banks are -- if the bank detects suspicious activity, I think one of the things you described during the direct examination is that sometimes it will shut down the account.

A    That we would terminate the relationship, correct.

Q    Right what does that mean "terminate the relationship"?

A    If we determine that there's suspicious activity, activity that we do not permit, we contact the client, and the client has to come in and terminate.

Q    And when the bank terminates a relationship, what happens to the money in the account; does the bank keep it?

A    No.

Q    What does the bank do?

A    The client comes in and takes his money.

Q    Why doesn't the bank keep it?

It's not a trick question, just asking.

A    Why does it not keep it?

Q    Why doesn't the bank keep it?

A    We terminated the relationship.

Q    But why does it give it back to the customer?

MR. PAULSEN: Objection, your Honor.

THE COURT: Sustained.

*Linda A. Marino, Official Court Reporter*

**J.A. 506**

MANZIONE - CROSS - JACKSON          1085

Q    I'm correct that when you talked about terminating the relationship, there are many situations where a bank might terminate the relationship that have nothing to do with a determination that there's been fraud, correct?

A    No.

Q    Well, I mean sometimes what you're determining is you believe that there is suspicious activity or you don't like what the customer is doing, but that doesn't mean you've concluded the bank has been defrauded, correct?

A    Typically, that would be the reason.

Q    Okay.  But it's not necessarily the reason.  You agree with me on that.

A    I couldn't agree with that.

Q    Well, you're not sure as you sit here today what all the reasons might be, is what you're saying.

A    In my experience, we terminate based on suspicious activity.

Q    Okay.  That's helpful.

And it not the case -- in terms of KYC, even though this has developed a lot over the years, it's still not the case and has never been the case that the holder of a bank account is required to tell the bank about everything regarding their financial affairs, correct?

A    So, KYC refers to identifying themselves.  We do need to know that.  We do need to understand the further due diligence

MANZIONE - REDIRECT - PAULSEN          1086

around what they expect to do, the nature and purpose of that relationship.

Q    I'm just asking a very simple yes-or-no question, which is:  You agree with me the bank does not require the account holder to tell the bank everything about their financial affairs, correct?

A    Correct.

MR. JACKSON:  I don't have any further questions.  Thank you so much, ma'am.

THE COURT:  Any redirect?

MR. PAULSEN:  Very briefly, your Honor.

REDIRECT EXAMINATION

BY MR. PAULSEN:

Q    Ms. Manzione, do you remember a moment ago, defense lawyer had said to you or asked you if BSA rules have evolved over the last few decades?

A    Yes.

Q    It's fair to say they have?

A    Yes.

Q    Despite that evolution, was there ever a time that you're aware of when you could open up an account in the name of somebody else and transact business as if it were you?

A    No.

Q    Could you open up an account in a fake company?

A    No.

MANZIONE - REDIRECT - PAULSEN          1087

Q    That's always been wrong?

A    That's always been wrong.

MR. PAULSEN:  No further questions, your Honor.

THE COURT:  Thank you, ma'am.  You may step down.  Have a good trip to Long Island.  Hopefully, you'll beat some of the traffic.

THE WITNESS:  Thank you.

THE COURT:  Thank you.  Get home safe.

(Witness excused.)

THE COURT:  Next witness, please.

MR. SKURNIK:  Thank you, your Honor.  The Government calls Kemal Sarkinovic.

THE COURT:  Please have the witness come forward.

I understand the witness will need interpreter services.  We'll try to make that simultaneous rather than sequential because that cuts the time in half.

And, again, keep an eye on that clock because as it approaches five o'clock, we're all out of here.  And as I said earlier, after 5 o'clock you here a tab up here, it won't necessarily be seltzer.  All I have up here is seltzer, but after 5 o'clock it could be a different story.

Please come forward.

MR. SKURNIK:  Your Honor, I'd just ask if Mr. Scott could move the chair over next to the witness box for the interpreter.

PROCEEDINGS          1088

THE COURT:  Sure, whatever works.

We're going to have the witness come forward, ladies and gentlemen of the jury, be sworn in, and we're going to have the services of the interpreter.  Interpreter will also be sworn in as well.

So, let us first swear in the interpreter, then the witness, and we will proceed.

So, the interpreter, please raise your right hand.

THE INTERPRETER:  My name is Carmen Ess.  It's spelled C-A-R-M-E-N, last name E-S-S.

THE COURT:  Administer the oath, please.

THE COURTROOM DEPUTY:  You do solemnly swear or affirm you will well and truly interpret the proceedings in this case, so help you God?

THE INTERPRETER:  I do.

THE COURT:  Thank you.  And now we're going to have the interpreter get ready to interpret for the witness, who will raise his right hand and be sworn.

THE COURTROOM DEPUTY:  You do solemnly swear or affirm that the answers you're about to give the Court in this case will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

THE COURT:  Thank you.  Please be seated.

I see some electronics here.

PROCEEDINGS                    1089

Do these have anything to do with what we're doing?

MR. SKURNIK: They do, your Honor, but my understanding is we're going to proceed without the electronics, at least for now.

THE COURT: I'm old school. I see something, I ask.

MR. SKURNIK: Thank you, your Honor.

THE COURT: Okay, go ahead.

(Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

---

SARKINOVIC - DIRECT - SKURNIK        1090

(Witness takes the witness stand.)

**KEMAL SARKINOVIC**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SKURNIK:

Q    Mr. Sarkinovic, how are you this afternoon?

A    I'm fine.

THE COURT: Madam Interpreter, you'll be the one speaking in the microphone because you're the one we're going to hear, okay?

There you go.

A    I am fine, thank you.

Q    What language are you speaking?

A    Bosnian language.

Q    Is that your native language?

A    Yes, it is.

Q    Do you understand English?

A    I understand but not quite, not quite.

Q    Do you sometimes speak to people in English?

A    Yes, I do.

Q    Is it easier to speak in Bosnian for you?

A    I prefer Bosnian, please.

Q    What neighborhood do you live in?

A    I was born in Montenegro.

Q    Where do you live today?

*Linda A. Marino, Official Court Reporter*

---

SARKINOVIC - DIRECT - SKURNIK        1091

A    I live in Brooklyn.

Q    What do you do for work?

A    I am in the construction business.

Q    Did there come a time you met a person named David Motovich?

A    Yes, I did.

Q    Do you see Mr. Motovich in the courtroom here today?

A    I see him.

Q    Could you please identify an article of clothing he's wearing?

A    He's sitting in front of us.

THE COURT: What's he wearing?

THE WITNESS: He has a blue suit, he has a tie.

MR. SKURNIK: Your Honor, let the record reflect the witness has identified the Defendant.

THE COURT: The record will so reflect.

Q    Mr. Sarkinovic, were you ever arrested in connection with this case?

A    I was stopped at the airport. It was the first time I was stopped at the airport.

Q    Did you eventually plead guilty to a crime?

A    Yes, I did.

Q    Was that crime conspiracy to commit bank fraud?

A    Yes, it is.

Q    Did your conduct involve anyone else in the courtroom

**J.A. 508**

*Linda A. Marino, Official Court Reporter*

---

SARKINOVIC - DIRECT - SKURNIK        1092

here today?

A    David Motovich.

Q    So, before we get to your relationship with Mr. Motovich, I want to ask you some more about your background.

How old are you?

A    I'm 66 years old.

Q    When did you come to the United States from Montenegro?

A    Between 40 to 45 years ago.

Q    Are you a U.S. citizen?

A    Yes, I am.

Q    When did you become a U.S. citizen?

A    30 years ago.

Q    Since coming to the United States, have you always lived in Brooklyn?

A    90 percent of time I spend in Brooklyn.

MR. SKURNIK: Your Honor, I just ask for one moment to bring in a taller chair for our interpreter.

THE COURT: One moment, yes.

MR. SKURNIK: Thank you, your Honor.

MR. JACKSON: Excuse me, Judge. We wouldn't object if they wanted to switch.

THE INTERPRETER: Thank you, your Honor.

MR. SKURNIK: That would be fine with the Government too if that's easier.

(Pause in proceedings.)

*Linda A. Marino, Official Court Reporter*

SARKINOVIC - DIRECT - SKURNIK 1093

THE COURT: Always good to have a strong court deputy; lift chairs...

THE INTERPRETER: Thank you.

Better. Thank you, your Honor.

THE COURT: You're very welcome.

Would you put your question again, please?

MR. SKURNIK: Yes, your Honor.

BY MR. SKURNIK:

Q I asked since coming to the United States, have you always lived in Brooklyn, Mr. Sarkinovic?

A Yes.

Q Have you lived -- what sort of residence do you live in?

A I'm living in the apartment.

THE COURT: Keep on your voice up, Madam Interpreter. We've got to hear you.

Is there any way to make that louder?

A I'm living in the apartment, 2860 Ocean Avenue in Brooklyn.

THE COURT: Okay. Go ahead.

Q How many bedrooms in that apartment?

A Two bedrooms.

Q Do you have family in the United States?

A I have a wife and five children.

Q Do they all live in that apartment?

A Only my daughter and my son.

---

SARKINOVIC - DIRECT - SKURNIK 1094

Q And how far did you go in school?

A I began the university but I never finished my university studies.

Q Where was that?

A Forestry.

Q In what country?

A That was in Yugoslavia, in the city of Belgrade.

Q Mr. Sarkinovic, you said you did construction work.

What sort of construction work?

A I was working as a superintendent and was also building private houses.

Q What type of work were you doing on those houses?

A I'm working mostly carpentry and framing.

THE COURT: Can you turn it up?

Much better. Go ahead, we can hear you now, Madam Interpreter.

Go ahead, counsel.

Q Do you typically work on smaller jobs or bigger jobs?

A Whatever happens to come my way.

Q Do you ever work on smaller jobs?

A Yes, most of my work is in the smaller jobs.

Q What's an example of a small job?

A If we are painting, if we are renovating an apartment.

Q What do you usually charge for a job like that?

A It depends on the residence.

---

SARKINOVIC - DIRECT - SKURNIK 1095

Q Can you give me an example?

A If I work for the landlord, I'm charging less.

Q Do you ever charge more?

A If there's some special work that has to be done, I have to pay more for it.

Q Do you ever do a larger job?

A Yes, I did some of them but not so many.

Q Have you ever had to hire other workers for a job?

A Yes, I did.

Q On average, how much do you earn per year?

A Around $65,000 a year.

Q Who do you support on that salary?

A I have to support my wife and five children.

Q For your work, do you use a computer?

A No, I don't.

Q Do you ever use computers?

A No, I never did.

Q Do you have a computer?

A I don't.

Q How about a tablet, like an iPad?

A I don't.

Q Do you use a phone?

A Yes, I do.

Q Do you ever send e-mails on that phone?

A No, I don't.

---

SARKINOVIC - DIRECT - SKURNIK 1096

Q Do you ever have someone else send e-mails for you on the phone?

A My children when I need them.

Q But you never send e-mails yourself, right?

A No, I don't.

Q How about text messages, do you ever send text messages yourself?

A No, I never send messages myself.

Q Do you ever have your children help you with messages?

A Yes, I do.

Q For your work, do you have a company that you use?

A I used to work for the man where I was leading the group of people.

Q But did you ever own your own company?

A No, I do not.

Q Are you familiar with a company called Latek, L-A-T-E-K?

A Yes, I am.

Q What is Latek?

A This is my company that I started but I never succeeded in it.

Q So, you don't use it today?

A I don't.

Q What does that name mean, Latek?

A This is the village where I was born and it's called Latek.

**J.A. 509**

SARKINOVIC - DIRECT - SKURNIK          1097

Q   In what country is Latek?

A   It's in Montenegro.

Q   What type of business were you hoping to do with Latek?

A   I was hoping to get major jobs in construction business.

Q   Did that happen?

A   I did not succeed in it.

Q   Why not?

A   I didn't have any clients.

Q   So you had a company called Latek.

Did you advertise at all?

A   I tried to but I didn't succeed.

Q   How did you try to advertise?

A   I made my own business cards.

But nobody responded to my business cards.

Q   Did Latek have any bank accounts?

A   No, it did not.

MR. SKURNIK:  Your Honor, if we could pull up Government Exhibit 21, which is in evidence?

THE COURT:  You may publish.

(Exhibit published to the jury.)

Q   Do you recognize this individual?

A   Yes, I do.

Q   Who is it?

A   This is Zorach Gobioff.

Q   How do you know Zorach Gobioff?

SARKINOVIC - DIRECT - SKURNIK          1098

A   I was working for him.

Q   What type of work were you doing for Zorach?

A   I was building private houses for him.

Q   And what was your role in building those private houses?

A   I was the first man in charge of it.

Q   When you're building private houses for Zorach, are these smaller jobs or bigger jobs?

A   I did as much work as I can myself, but there were other people who were also working on the project.

Q   Would you say that these are bigger jobs or smaller ones?

A   Okay.  One of the jobs, there are subcontractors working on the project as well.

Q   Did you ever have to hire workers when working for Zorach?

A   Yes, I did.

Q   About how long ago did you start working for Zorach?

A   About 15 years ago.

Q   Does Zorach speak Bosnian?

THE INTERPRETER:  I'm sorry?

MR. SKURNIK:  Does Zorach speak Bosnian?

A   No, he does not.

Q   So, when you spoke with Zorach, did you use an interpreter?

A   No, I did not.

Q   What language did you speak?

SARKINOVIC - DIRECT - SKURNIK          1099

A   English.

Q   When you spoke with Zorach, were you able to understand what he was telling you in English?

A   Yes, I did, I understand enough.

Q   And based on your conversations, did it appear to you that he could understand what you were saying?

A   As much as I could understand him, he understood me.

Q   Was it enough to do business together?

A   Yes.

Q   How did Zorach pay you?

A   Cash, he was paying me in cash.

Q   Did he ever pay you in checks?

A   No, he did not.

Q   Did he ever ask you to cash any checks so you could get your cash?

A   Yes, he was giving me checks to cash.

Q   And after you cashed those checks, what did you do with the cash?

A   He knew exactly how much money I had to pay the workers, so I pay the workers.

Q   Did you get a cut as well?

A   And I also pay myself for the work I did.

Q   At the time you were working for Zorach, did he have a company?

A   Yes, he did.  I don't know which one.

SARKINOVIC - DIRECT - SKURNIK          1100

Q   You don't know the name of that company?

A   No, I don't.

Q   Did you do work for other clients as well when you were working for Zorach?

A   Maybe by doing some smalls jobs, only small jobs.

Q   Do you know whether Zorach was aware that you were doing some small jobs as well?

A   He was not interested in that, but he knew I was doing some small jobs.

Q   Were any of these jobs for Zorach's customers?

A   Sometimes I was doing some service providing for his clients.

Q   Did you ever try to get larger jobs from Zorach's customers?

A   I did.  I tried.

Q   What happened?

A   I did not succeed in it.

Q   Why is that?

A   Because these were his men and they were dealing with him directly.

Q   So, they didn't want to deal directly with you?

A   Correct.

MR. SKURNIK:  If we could pull up Government Exhibit 4, which is in evidence, your Honor.

THE COURT:  You may publish.

**J.A. 510**

SARKINOVIC - DIRECT - SKURNIK        1101

(Exhibit published to the jury.)

Q   Do you recognize this individual?

A   I do.

Q   Who is it?

A   This is Boris Motovich.

Q   Does Boris have a son?

A   Yes, he does.

Q   Who is his son?

A   David Motovich.

Q   How did you meet Boris Motovich?

A   I was buying the materials in the lumber store.

Q   Was that Midwood Lumbar?

A   Yes, correct.

Q   What happened?

A   My car was damaged while I was parked there and that's how I came in touch with Zorach -- with Boris, I'm sorry.

Q   Who damaged your car?

A   One of the workers who was working there hit my car.

Q   What happened after that?

A   They send me to speak to David in order to talk to him -- I'm sorry, they send me to speak to Boris.

        THE INTERPRETER:  My fault, sorry.

Q   What did Boris tell you?

A   He paid for damages.

Q   How did you meet David Motovich?

---

SARKINOVIC - DIRECT - SKURNIK        1102

A   I met him because he was the main person in lumber --

Q   Did anyone --

        THE COURT:  Don't interrupt her.  You have to wait for the completion of the answer.

        Again, please try to keep your voice up, ma'am.  I know it's late on a Friday.

A   I met them first in lumber -- Midwood Lumber.

Q   Did anyone introduce you to David Motovich?

A   I don't recall.

Q   Do you know whether --

        MR. SKURNIK:  Ms. Kannan, if we could just pull down that photograph.  Thank you.

Q   Do you know whether David and Zorach ever worked together?

A   I know they had an office and I don't know if they working together or not.

Q   Where was that office?

A   In Midwood Lumber on the second floor.

Q   So, David had an office at the second floor of Midwood Lumber?

A   Yes, he did.

Q   What about Zorach?

A   He also had an office next to him.

Q   So, while you were working for Zorach, where would you get materials to build these houses?

---

SARKINOVIC - DIRECT - SKURNIK        1103

A   I was picking up the material in Midwood Lumber.

Q   How would you pay for it?

A   I didn't pay for it.  There was an open account.

Q   Was this an account through Zorach?

A   Yes, it was.

Q   Did Zorach and David appear to be close to each other to you?

A   It looks that way.

Q   The Midwood Lumber store, have you been inside of it?

A   Yes, I was.

Q   Did you ever go up to the second floor?

A   Yes, I did.

Q   Other than David and Zorach, did anyone else have an office on the second floor?

A   There was his secretary and administrative staff.

        MR. SKURNIK:  If we could pull up Government Exhibit 15 in evidence.

        THE COURT:  You may publish.

        (Exhibit published to the jury.)

Q   Who's this?

A   Marina, the secretary.

        MR. SKURNIK:  And if we could pull up Government Exhibit 353 in evidence.

        (Exhibit published to the jury.)

Q   What's this?

**J.A. 511**

---

SARKINOVIC - DIRECT - SKURNIK        1104

A   This is Midwood Lumber store.

        MR. SKURNIK:  Government Exhibit 310 in evidence.

        (Exhibit published to the jury.)

Q   What's this?

A   This is the person that they sell the material, the room that they sell their material.

        MR. SKURNIK:  Government Exhibit 329 in evidence.

        (Exhibit published to the jury.)

Q   What's this?

A   This is David's office.

        MR. SKURNIK:  And Government Exhibit 331 in evidence.

        (Exhibit published to the jury.)

Q   What's this?

A   That's also David's office.

Q   Is there anything significant about those cabinets?

A   Yes.

Q   What?

A   Behind the door.

        THE COURT:  Can't hear you.

A   Behind the door, there's a bathroom.

Q   Is there anything else back there?

A   His own clothes.

Q   Anything else?

A   His safe deposit.

SARKINOVIC - DIRECT - SKURNIK   1105

MR. SKURNIK: If we could look at Government 334 in evidence.

THE COURT: Publish.

(Exhibit published to the jury.)

Q Do you recognize what's in this photograph?

A Yes, I do.

Q What is it?

A This is a safe deposit box.

MR. SKURNIK: And Ms. Kannan, if we could zoom in on the photo frame on top.

Q Mr. Sarkinovic, do you recognize anyone in that photograph?

A I recognize David and Zorach also.

Q So, where's David in that photograph?

A On my left-hand side.

Q And where is Zorach?

A On the right-hand side.

Q So, let's go back to the first floor?

MR. SKURNIK: Ms. Kannan, we can take that down.

Q Who are the people who sell things on the first floor of Midwood Lumber?

A They have salespeople who are selling the material.

THE COURT: I can't hear you.

THE INTERPRETER: Sorry, your Honor.

THE COURT: It's okay.

---

SARKINOVIC - DIRECT - SKURNIK   1106

Q Do you know if any of them are family members of David Motovich?

A David Friedman works there also.

Q Who is that?

A He's the person who will sell the material and I was picking up all my material from him.

Q Do you know how he's related to the Motovich family?

A They are family?

Q Do you know how he's related to Boris Motovich?

A Boris' sister is married to David.

MR. SKURNIK: If we could pull up Government Exhibit 31, which is in evidence.

THE COURT: Publish.

(Exhibit published to the jury.)

Q Who is that?

A This is David Friedman.

Q How long has he been working at Midwood Lumber, as far as you know?

A For a long time. I don't know exactly how long.

MR. SKURNIK: If we could pull up Government Exhibit 2 in evidence.

THE COURT: Publish.

(Exhibit published to the jury.)

Q Do you know who that is?

A I do.

---

SARKINOVIC - DIRECT - SKURNIK   1107

Q Who is it?

A This is David's brother.

MR. SKURNIK: Government Exhibit 9 in evidence.

THE COURT: Publish.

(Exhibit published to the jury.)

Q Do you know who that is?

A That's David's sister.

Q Do you know her name?

A I forgot her name.

MR. SKURNIK: Government Exhibit 13 in evidence.

Q Do you know who that is?

A I don't.

MR. SKURNIK: Government Exhibit 10, which I believe is not in evidence.

THE COURT: Any objection to 10?

MR. JACKSON: No objection, Judge.

THE COURT: Publish. Admitted.

(Government Exhibit 10, was received in evidence and published to the jury.)

Q Do you know who that is?

A This the person who is doing cash checking, cash checking.

Q Does this person work at a cash checking place?

A Yes, he does.

Q What do you know his name to be?

---

SARKINOVIC - DIRECT - SKURNIK   1108

A I don't know his name.

Q Do you know if he has a nickname?

A I don't.

Q Have you ever called him by any name?

A I don't remember.

Q Did there come a time that Zorach spoke to you about your company, Latek?

MR. SKURNIK: And Ms. Kannan, we can take that down.

A Yes, he did.

Q Where did this conversation take place?

A It was in Midwood Lumber.

Q Was anyone else there?

A No.

Q What did Zorach tell you?

A Okay. If I plan -- if I want to continue to work, I have to turn all my documents from Latek company to David.

Q Did Zorach say why David wanted the documents for your company?

A If I don't give him my company, I'm not going to get any jobs.

Q Did you ask him why he wanted the documents for your company?

A No, I did not.

Q Did you retrieve those documents?

A I did.

**J.A. 512**

SARKINOVIC - DIRECT - SKURNIK          1109

Q   And what documents are we talking about?

A   From the time I open my company, all the papers were in a folder.

Q   Who had this folder?

A   I give the folder to David.

Q   Where did you get the folder from?

A   My folder was with my bookkeeper and then I brought it over and gave it to David.

Q   Did you speak to David about those documents?

A   I didn't talk about it a lot.

Q   Where did you give him the documents?

    Where were you?

A   I gave him all these papers in his office.

Q   At Midwood Lumber?

A   Yes, yes.

Q   Was anyone else present?

A   No.

Q   Did you speak to David at all while giving him the documents?

A   I did not.

Q   Have you ever spoken to David?

A   Yes, I did.

Q   When you speak to him, what language are you speaking?

A   In English.

Q   Do you have an interpreter?

SARKINOVIC - DIRECT - SKURNIK          1110

A   I did not.

Q   Were you able to understand what David would say to you?

A   Yes, I did.

Q   Based on your conversations, did it appear to you that David could understand what you were saying?

A   Yes, he did.

Q   Did you ever ask David why he wanted these papers?

A   At that time, I did not ask him this question.

Q   Why didn't you ask him?

A   I didn't feel like asking him.

Q   Did you trust him?

    THE COURT:  Did there ever come a time that you asked him why he wanted the papers?

    THE WITNESS:  Yes, I did.

    THE COURT:  When?

    THE WITNESS:  Two years later.

    THE COURT:  I can't hear you.

    THE INTERPRETER:  Two years later.

    THE COURT:  Go ahead.

Q   When you asked him two years later, what did he say?

A   He told me that I'm not going to have any problems.

Q   Did David offer you anything in return for the papers for your company?

A   He promised me to help me to get some business.

Q   Did that happen?

SARKINOVIC - DIRECT - SKURNIK          1111

A   It did not.

Q   What did you think would happen if you didn't give those papers to David?

A   Probably I wouldn't be working for Zorach anymore.

Q   After you gave the papers to David, whose name did you understand would still be on Latek?

A   My name.

Q   Who would control the company?

A   David.

Q   So, after you gave those papers to David, were you worried about your company?

A   At that point I did not worry, but later on I did.

Q   And what did you worry about later on?

A   I was concerned who was going to pay taxes.

Q   Did you ever mention that concern to David?

A   Yes, I did.

Q   What did he say?

A   That I'm not going to have any problems.

Q   Did you ever ask David to stop using your company Latek?

A   He told me that the company didn't exist anymore, that it stopped working.

Q   Did you believe him?

A   50/50.

Q   So, you gave David the paperwork for Latek.

    Did he ever ask you to open up any other companies?

**J.A. 513**

SARKINOVIC - DIRECT - SKURNIK          1112

A   Yes, he did.

Q   How about bank accounts, did David ever ask you to open up bank accounts?

A   Yes, he did.

Q   These companies and these bank accounts, whose name were they in?

A   They were all under my name.

Q   Not David's name?

A   No.

Q   And who controlled these companies and bank accounts?

A   David.

Q   So, we'll get into the details of whose companies and bank accounts.

    But first, as a result of what you did with David, did you get arrested?

A   Yes.  I was stopped at the Kennedy -- JFK.

    THE COURT:  Were you arrested?

    You said you were stopped a couple of times.

    You know what it means to be arrested, right?

    THE WITNESS:  They stopped me and they let me go.

    THE COURT:  Were you arrested?

    THE WITNESS:  They arrested me the second time.

    THE COURT:  Go ahead.

    MR. SKURNIK:  Thank you, your Honor.

    THE COURT:  You're welcome.

SARKINOVIC - DIRECT - SKURNIK      1113

Q    After you were arrested the second time, did you plead guilty to a crime?

A    Yes, I did.

Q    And as you said earlier, that was conspiracy to commit bank fraud, right?

A    Yes, it is.

Q    And when you pled guilty, was there a written agreement with the Government?

A    Yes, I did.

        MR. SKURNIK:  If we could pull up Government Exhibit 3500-KS-3, which is not in evidence, your Honor --

        THE COURT:  Any objection?

        MR. JACKSON:  No, Judge.

        THE COURT:  Admitted.  You may publish.

        (Government Exhibit 3500-KS-3, was received in evidence.)

        (Exhibit published.)

        (Continued on the following page.)

*Linda A. Marino, Official Court Reporter*

---

K. SARKINOVIC - DIRECT - SKURNIK      1114

(Continuing.)

        MR. SKURNIK:  Ms. Kannan, if we can just kind of zoom in at the top.  Thank you.

BY MR. SKURNIK:

Q    Mr. Sarkinovic, do you recognize this document?

A    Yes, I do.

Q    What is it?

A    This the agreement with the Government.

        MR. SKURNIK:  If we can scroll to the last page, please.

Q    Is that your signature at the top left?

A    Yes, it is.

Q    Is that your attorney's signature underneath?

A    Yes, it is.

Q    Does this document contain the entirety of your agreement with the Government?

A    Yes, it is.

Q    What do you understand that you have to do under this agreement?

A    I have to tell the truth.

Q    Have you been sentenced yet?

A    No, I was not.

Q    If you hold up your end of the agreement, if you tell the truth, what do you understand the Government has to do?

A    The Government is -- is going to give the letter in order

*LEEANN N. MUSOLF, RPR*

---

K. SARKINOVIC - DIRECT - SKURNIK      1115

to give it to the judge.

Q    Do you know what that letter will say?

A    The Government has -- has to decide if I was good or not.

Q    Does the Government have to decide whether you told the truth or not?

A    The judge have to make the final decision.

Q    If you don't tell the truth, do you understand that you'll get that letter?

        THE COURT:  Could you rephrase that question?  If you don't tell the truth, do you understand that you'll get that letter?

        Put another question.

Q    Do you know, sitting here today, what sentence you will get?

A    I -- I suppose so.

Q    You know today what the judge is going to sentence you to?

A    I do.

        THE COURT:  News to me.

        Go ahead.

Q    How do you know, Mr. Sarkinovic?

A    I don't know yet.

Q    So you don't know yet?

A    No.

Q    Okay.

*LEEANN N. MUSOLF, RPR*

---

K. SARKINOVIC - DIRECT - SKURNIK      1116

        THE COURT:  I don't either.  Let's keep going.

Q    Well, what sentence are you hoping to get?

A    The judge is going to make this decision.

Q    Are you --

        THE COURT:  The question is, what sentence do you hope to get?

        THE WITNESS:  I hope to be let free.

        THE COURT:  Next question.

Q    So, you said earlier that -- actually?

        MR. SKURNIK:  Ms. Kannan, we can pull this down.  Thank you.

Q    You said earlier that in addition Latek, David also asked you to set up other companies; is that right?

A    Yes, it's correct.

Q    About how many companies did you set up?

A    Four companies.

Q    To set them up, did you have to sign paperwork?

A    Yes, I did.

Q    Where did you get the paperwork?

A    I received all the papers from the secretary.

Q    Is that Marina?

A    Yes, it is.

Q    When you signed the papers, was David present?

A    No, he was not.

Q    Was he ever present when you were signing papers?

**J.A. 514**

*LEEANN N. MUSOLF, RPR*

K. SARKINOVIC - DIRECT - SKURNIK          1117

A    I think that he was present only when we were dealing with the last company.

Q    Who would tell you that it's time to come sign papers?

A    David would tell me this.

Q    How would he tell you?

A    He would call me, he would tell me -- he would tell -- he would call me to come and sign the papers.

Q    So after you sign these papers, what do you do with them? Do you give them to someone?

A    All the paper are left with David.

Q    Did David ever ask you for identification, like a driver's license?

A    Yes, he did.

Q    Did you give it to him?

A    Yes, I did.

Q    Did he give it back?

A    Yes, he did.

Q    So you mentioned earlier that you also set up bank accounts for these companies.  Did you ever have to go into a bank to set them up?

A    Yes, I did.

Q    When you went into the bank, did anyone go with you?

A    There was a man who was waiting for me when I had to sign the papers.

Q    Who asked you to open up these bank accounts?

K. SARKINOVIC - DIRECT - SKURNIK          1118

A    David.

Q    Did you ever open up bank accounts somewhere other than a bank?

A    Yes, I did.

Q    Where?

A    I opened a companies at Eastern Parkway.

Q    In setting up the bank accounts, did you ever sign the paperwork in David's office?

A    Yes, I did.

Q    Were people from the banks ever present in Mr. Motovich's office?

A    For the last -- the last two banks, they came to David's office.

Q    Do you know the name of the first company you set up for Mr. Motovich?

A    I think that was SGS Construction.

        MR. SKURNIK:  If we could pull up Government Exhibit 110, which is in evidence.

        THE COURT:  You may publish.

        (Exhibit published.)

        MR. SKURNIK:  And go to page five, please.  And if we could zoom in on selected entity name.

        Your Honor if we could --

        Thank you.

Q    Mr. Sarkinovic, what name is listed there?

K. SARKINOVIC - DIRECT - SKURNIK          1119

A    SGS Construction.

        THE COURT:  Ma'am.

A    SGS Construction Building Corp.

        MR. SKURNIK:  And if we could zoom back out.

Q    What's the date listed underneath?

A    That was in 2009.

        THE COURT:  What's the full date?  What's the full date?

        THE WITNESS:  October 28, 2009.

        THE COURT:  Thank you.

        Go ahead.

Q    Who picked the name SGS?

A    David.

Q    Did he tell you why he picked that name?

A    He did not.

Q    Okay.

        MR. SKURNIK:  Your Honor, permission to publish just for the witness Government Exhibit 702, which is not in evidence.

        THE COURT:  Any objection to 702 being admitted?

        MR. JACKSON:  No objection, Judge.

        THE COURT:  Admitted.  You may publish.

        (Government Exhibit 702, was received in evidence.)

        (Exhibit published.)

        MR. SKURNIK:  And, Ms. Kannan, if we can go to the

**J.A. 515**

K. SARKINOVIC - DIRECT - SKURNIK          1120

third page, please.

Q    Mr. Sarkinovic, what bank is listed in the upper right-hand corner?

A    Chase bank -- Chase bank.

        THE COURT:  I can't hear you.

        THE WITNESS:  Chase bank.

        THE COURT:  I still can't hear you.  What happened?

        THE INTERPRETER:  It's not working.

        THE COURT:  Mr. Scott, would you help them out with that, please?  If the jury can't hear, they're not getting the evidence.

        THE INTERPRETER:  Thank you.

A    Chase bank.

        MR. SKURNIK:  And, Ms. Kannan, if we can zoom in on the middle of the page.

Q    Does that say SGS Construction Building Corp.?

A    Yes, it -- yes, it does.

Q    Okay.

        MR. SKURNIK:  And, Ms. Kannan, if we can zoom in on the bottom of the page.

A    This is my name and my first and last name.

        MR. SKURNIK:  And, Ms. Kannan, if we can just scroll up a little bit to the center of the page there.

Q    Is this also your name?

A    Yes, it is.

K. SARKINOVIC - DIRECT - SKURNIK     1121

Q    And what does it say under title?

A    President.

Q    So you're the president but did you control this bank account?

A    I am not controlling that account.

Q    Who controlled it?

A    David.

THE COURT:  Look.  Are you touching the button, ma'am?  Is that what's going on?  You're turning it on and off.

THE INTERPRETER:  Hello?

David.

THE COURT:  Mr. Scott, please.  That one is not going to work.  She needs the handheld.  Why don't you hand it up to me, okay?  Can you hear me?  Okay.  What you should do, ma'am, is keep the microphone equal distance from your mouth whether you're talking to the witness or talking to the Court, because what you are doing is you're moving it away and moving it back and moving it away and moving it back.  We don't mind if the two of you have a conversation that we hear.  Keep the microphone in the same place and then it won't zip in and out, okay?

THE INTERPRETER:  Thank you, Your Honor.

THE COURT:  I get a little testy when we get close to five o'clock.  Nothing personal, but let's move this along.

*LEEANN N. MUSOLF, RPR*

---

K. SARKINOVIC - DIRECT - SKURNIK     1122

What's your next question?

BY MR. SKURNIK:

Q    Mr. Sarkinovic, is that your handwriting there?

A    Yes, it is.

Q    Okay.  How did you pick Chase bank?

A    David picked out the name.

Q    Are you aware of SGS Construction doing any real construction work?

A    It has -- to my knowledge, no.

Q    Are you aware of SGS Construction hiring any real employees?

A    I don't know that.

Q    Are you aware of SGS Construction having a real office somewhere?

A    They don't.

Q    Did you ever file taxes for SGS Construction?

A    I did not.

Q    Are you aware of anyone else filing taxes for SGS Construction?

A    I don't know.

Q    Okay.  Did this bank account come with a checkbook?

A    I don't know.

Q    Did you ever sign checks for this bank account?

A    Yes, I did.

Q    Where did you sign them?

*LEEANN N. MUSOLF, RPR*

---

K. SARKINOVIC - DIRECT - SKURNIK     1123

A    In David's office.

Q    How do you know when it's time to sign checks?

A    David call me and told me to come and sign them.

Q    When you sign the checks, do you fill in the amount?

A    I did not.

Q    Do you fill in who the check is going to?

A    I did not.

Q    So before you sign it, is the check blank?

A    Yes, it was.

Q    Did you ever sign the backs of the checks or just the front?

A    I only signed in front.

Q    After you sign them, what do you do with the check?

A    They stayed with David.

Q    How often did Mr. Motovich ask you to sign checks?

A    Every 15 to 20 days.

Q    And how many checks would you sign at a time?

A    Between 30 -- between 30 to 50.

Q    And how long did this go on for?

A    A long time.

Q    Years?

A    About seven to ten years.

Q    Did Mr. Motovich ever tell you what these checks would be used for?

A    He did not.

*LEEANN N. MUSOLF, RPR*

J.A. 516

---

K. SARKINOVIC - DIRECT - SKURNIK     1124

Q    Did you ever ask him?

A    I did not.

Q    Why not?

A    I just did not ask him.

Q    So if you're signing checks for this account, do you know how money got into the account in the first place?

A    I don't know that.

Q    Okay.  So we're gonna walk through some of the checks in this account.

MR. SKURNIK:  Ms. Kannan, if we can start at page 362, and if we can zoom in on the check, please.

Q    Mr. Sarkinovic, what company is listed at the top left of this check?

A    SGS Construction.

Q    That's the company you opened for Mr. Motovich?

A    Yes, it is.

Q    Whose signature is at the bottom right of this check?

A    My -- my signature.

Q    In the recipient, does that say Boris Motovich?

A    Yes, it does.

Q    Is that your handwriting?

A    It -- it's not.

Q    Okay.  The $10,000, did you write that in?

A    I did not.

Q    When you signed this check, was it blank?

*LEEANN N. MUSOLF, RPR*

K. SARKINOVIC - DIRECT - SKURNIK 1125

A    Yes, it was.

Q    Okay.  So you didn't write a $10,000 check to Boris Motovich?

A    No, I did not.

MR. SKURNIK:  If we can go to page 294, please, and if we can zoom in on the check.

Q    Again, is this is check from SGS Construction?

A    Yes, it is.

Q    And that's your signature in the bottom right?

A    Yes, it is.

Q    Did you write a $40,000 check to M&M USA Consulting?

A    No, I did not.

Q    Okay.

MR. SKURNIK:  If we can go to page 302, and this is Government Exhibit 702 still, and zoom in on the check, please.

Q    Is that your signature in the bottom right?

A    Yes, it is.  Yes, it is.

Q    Did you write a $9,500 check to David Motovich?

A    No, I did not.

Q    Okay.

MR. SKURNIK:  And, Ms. Kannan, if we can zoom out and then zoom in on the back of the check.

Q    On the right-hand side, is that your signature?

A    It -- it is not.

*LEEANN N. MUSOLF, RPR*

---

K. SARKINOVIC - DIRECT - SKURNIK 1126

Q    So you didn't sign the back of this check?

A    I did not.

Q    Okay.  And just zooming back in on the check itself. Where it says, David Motovich, is that your handwriting?

A    No, it is not.

MR. SKURNIK:  If we can go now to page 673, again, Government Exhibit 702, and zoom in on the check, please.

Q    Mr. Sarkinovic, is that your signature in the bottom right?

A    Yes, it -- yes, it is.

Q    Did you write a $25,000 check to John Hancock?

A    I did not.

Q    Okay.

MR. SKURNIK:  Page 752, please, and if we can zoom in on the check, please.

Q    Mr. Sarkinovic, is this one your signature in the bottom right?

A    Yes, it is.

Q    Okay.  Okay.  Did you write a $26,000 check to Gail Motovich?

A    I did not.

(Continued on the following page.)

*LEEANN N. MUSOLF, RPR*

---

SARKINOVIC - DIRECT - SKURNIK 1127

BY MR. SKURNIK:  (Continuing.)

MR. SKURNIK:  We can just scroll down to the next page, please.

Q    Did you write a $55,000 check to Boris Motovich?

A    I did not.

MR. SKURNIK:  If we can scroll down to the next page, please.

THE COURT:  Go back up.  Is that your signature on that check, 1408?

THE WITNESS:  Yes, it is.

THE COURT:  Go ahead.  Go to the next one.

Q    Again, is that your signature?

A    Yes, it is.

Q    Did you write a $25,000 check to Gail Motovich?

A    I did not.

MR. SKURNIK:  If we can go to page 762 and zoom in.

Q    Is that your signature on the bottom right?

A    Yes, it is.

Q    And did you write a $52,000 check to Boris Motovich?

A    No, I did not.

MR. SKURNIK:  Page 827, please.

Q    Is that your signature?

A    Yes, it is.

Q    Did you write a $10,000 check to ZKC NY?

A    No, I did not.

*Jamie Ann Stanton, RMR, CRR, RPR,*

---

SARKINOVIC - DIRECT - SKURNIK 1128

MR. SKURNIK:  All right.  So last one from this account.  Page 852, please?

Q    Is that your signature?

A    Yes, it is.

Q    Did you write a $58,358 check to American Express?

A    No, I did not.

Q    So of all the checks you signed for Mr. Motovich, did you ever fill in the amount or the recipient?

A    I never did that.

Q    Mr. Sarkinovic, in your entire life, other than signing at the bottom, have you ever filled out a check?

A    No, I did not.

Q    Why not?

A    I don't know how to write it.

Q    In English?

A    In English.

MR. SKURNIK:  If we could pull up Government Exhibit 1, which is in evidence, please.

THE COURT:  You may publish.

(Exhibit published.)

Q    Do you recognize this person?

A    Yes, I do.

Q    Who is it?

A    This is Ago Kolenovic.

Q    How do you know Mr. Kolenovic?

**J.A. 517**

*Jamie Ann Stanton, RMR, CRR, RPR,*

SARKINOVIC - DIRECT - SKURNIK 1129

A He is in my town in Montenegro.

Q Did you meet him in Montenegro or in the United States?

A I met him in the United States.

Q Do you know what kind of work Mr. Kolenovic does?

A He's in the construction business.

Q Did you ever recommend him to anyone for business?

A Yes. I recommended him to David.

Q What job did you recommend him for?

A It was a job in Monticello.

Q Did you, yourself, ever work with Mr. Kolenovic?

A No, I did not.

Q Do you know if he owns a company?

A Yes.

Q Do you know the name of that company?

A Ago & Alaudin.

THE INTEPRETER: A-L-L-A-D-I-N.

Q So his company, Ago & Alaudin, that's a real company that does real business?

A Yes, it is.

MR. SKURNIK: If we could pull up Government Exhibit 107, which is in evidence.

(Exhibit published.)

MR. SKURNIK: And if we can go to page 4, please.

Q Is that your signature --

Let me ask this: Is that your name at the top?

*Jamie Ann Stanton, RMR, CRR, RPR,*

SARKINOVIC - DIRECT - SKURNIK 1130

A Yes, it is.

Q Did you write that?

A I don't recall.

MR. SKURNIK: Ms. Kannan, if we can scroll down a little bit. That's good. And if we can zoom in at the very top.

THE WITNESS: This is Ago & Alaudin Construction Company.

Q Is this Mr. Kolenovic's company?

A It should be.

Q Did you ever open up a company with a similar name to Mr. Kolenovic's company?

A Yes, I did.

MR. SKURNIK: If we can zoom back out. And if we can zoom in on the filed by. I know it's a little dark.

Q Does that say Marina Kuyan?

A Yes, it is.

Q So the company that you opened that had a similar name, why did you open that?

A David liked the name Alaudin Company, and that's why we opened under that name.

Q Did you ever express any concern to Mr. Motovich about using the name of Mr. Kolenovic's company?

A I did not ask him this question.

Q Why not?

*Jamie Ann Stanton, RMR, CRR, RPR,*

PROCEEDINGS 1131

A I just didn't ask him.

Q Did you feel bad about opening a company in a similar name to Mr. Kolenovic?

A Yes, I felt bad about it.

THE COURT: However, I do not feel bad about adjourning for the week, ten minutes early, and I hope you ladies and gentlemen of the jury, do not feel bad about adjourning ten minutes early.

We will resume Monday, at 9:30 a.m. Please do not talk about the case. Thank you for your patience and attention. We promise to move things along with even greater rapidity.

Thank you. Have a safe weekend, everyone.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE INTERPRETER: Thank you, Your Honor.

THE COURT: We are going to excuse the witness and the interpreter.

You may be seated, ladies and gentlemen, public.

You can leave the courtroom now. Please do not talk with anyone about your testimony.

(Witness steps off the stand.)

THE COURT: The jury has left the courtroom and the witness has left the witness stand.

Let me give some sage advice to Counsel, a couple of

*Jamie Ann Stanton, RMR, CRR, RPR,*

PROCEEDINGS 1132

points.

First of all, it's 2024, and you folks really should work out the logistics of simultaneous translations with your translator. That first point. It just literally cuts the time in half.

Secondly, to the extent that the translator is going to use the handheld mic as opposed to some sort of level rod that stays in place, you have got to work with your interpreters on the mechanics, because what was happening there that was slowing things down. And I could see the jury was only getting a portion of the testimony as she was trying to move it away from her when she was speaking with the witness, and then moving it back. And what was happening is as she was moving it back and forth, she was hitting the on/off button and that's why we were losing portions of the testimony.

These are the kind of mechanics that I expect the lawyers on both sides, you're sophisticated counsel, you have been around the block before, work out in advance so I don't have to come in and try to give you style points on how microphones should be handled back and forth. I've said it before, I will say it again. You've got the electronic toy sitting here, but they don't do any good if they're just sitting here, so please, on that ledge, please try to get to the point where your interpreter can work with whatever

**J.A. 518**

*Jamie Ann Stanton, RMR, CRR, RPR,*

PROCEEDINGS                1133

mechanics you folks have to do simultaneous translations. If you can't do simultaneous and you've got to do them sequentially, at least have the interpreter trained so that she is not, or he is not periodically turning the mics on and off. It's very frustrating to the jury when you get to a Friday afternoon, they've about had it. So it's in your interest as counsel and as parties to make sure that your finders of fact are hearing everything.

I don't want to be a buttinsky about these things, but you know how to get this done. So I am going to ask both sides, you can come in early, you can stay late today if you want to, to just work out the mechanics of the translation. If it's a problem on direct, it's even a greater problem on cross, okay? And we're going to wind up alienating the jury if you don't deal with the mechanics when it comes to translations. It's easily done, but you've got to spend the time to do it. And you are not in your respective offices anymore; you are here with the jury. Okay, first thing.

Second point, and this goes to a practice point I will give to both sides, you are very experienced lawyers, but when you ask a witness: Do you know who this is a picture of, and they say yes, and then you say who is it and they say Clem, Willy, or Samantha, you've asked two questions. You've put up the picture. Who is that? And then say it's Clem or it's Willy or Samantha. Do you know who that is? Again,

*Jamie Ann Stanton, RMR, CRR, RPR,*

PROCEEDINGS                1134

doubles the time. Why do that? If they don't know who the person in the picture is, they'll say I don't know. And that way you save a lot of time. That's a problem that the Government was having this afternoon. Defense counsel was having the problem with what I refer to as the double negative issue, particularly, Mr. Jackson, you were asking questions. You would agree with me that you did not know "x," and the witness would say no, and then you would say, so you are agreeing with me, right? We all have our verbal ticks, okay.

MR. JACKSON: Noted, Judge.

THE COURT: But I would just say think about how to get to the point where you are not having to ask twice to get the same answer, because it doesn't matter until it matters. And what you were doing, it was self-correcting, when you were getting into areas of importance, and you realized that you asked a question with a -- it's not true that blah, blah, blah. No. Oh, so you agree with me that it's not true? So isn't it true that Clem stole the bicycle? Yes. As opposed: Isn't it not true that -- just think about it, okay? Simplify your questions so when you get the one-word answer of yes or no, it's clear to the jury, it's clear to you, and you don't have to go back and clean it up.

Again, these are technical trial points, but I assure you, in the course of a day, it makes it much more efficient for the jury, much clearer for the parties so you

*Jamie Ann Stanton, RMR, CRR, RPR,*

PROCEEDINGS                1135

know what the witnesses are, in fact, testifying to. Okay? So please, you are experienced trial counsel, I am not telling you how to try your case, but there are some of these verbal ticks that we all have. So don't ask someone: Do you know "x"? Just say: Is that a picture of "x"? Did you sign the lease?

Another one to avoid, and then I will get off this high horse because it is almost 5 o'clock: Are you aware of "x" and "y" and "z"? Just say: "X" and "Y" and "Z."

MR. JACKSON: Thank you, Judge.

MR. SKURNIK: Thank you, Judge.

THE COURT: Experience, and I assure you, the late Judge Platt when I first started teaching at Practising Law Institute beat this into me about 50 years ago before most of you guys and gals were even born. I have learned from the best. I try to pass on some of these technical issues that will really help you in terms of tightening up the examinations and saving the time of the jury.

As I said before, I am old. I am going to be around for as long as I am going to be around, but the jurors would like to get back to their lives. If you could actually cut the time in half that you are conducting some of these examinations, it's to everyone's benefit. So I just throw that out there for you to think about and we will do what we can.

**J.A. 519**

*Jamie Ann Stanton, RMR, CRR, RPR,*

PROCEEDINGS                1136

Okay. Let me begin with the Government, then defense counsel.

What are the issues we need to address outside the presence of the jury and outside of the presence of witnesses? Anything from the Government?

MR. POLEMENI: No, Judge.

And I am slightly hesitant to say this, without committing us, but I think we are moving along in terms of Your Honor's concerns about timing, I think we are moving along at a very good clip as far as our case is concerned and I anticipate that we will very likely be under the three-week estimate.

THE COURT: I appreciate that. I am not holding you to that and part of it is my ability to slow things down or speed things up, but I try, again, not to undermine either side's presentation of the case. You are very good, very experienced lawyers, it's a very important cast case, but I think it's important -- and again, some of the things that I am now fine tuning will actually help you to do this without doing violence to either side in terms of the presentation of your case, whether it's the translator or the "do you know" or the double negative issues.

I really do cut time, okay, I've been doing this since the '70s. I have seen great lawyers. I had a case when I first started off with Lewis Liman's father and he gave the

*Jamie Ann Stanton, RMR, CRR, RPR,*

PROCEEDINGS 1137

best cross-examination I have ever seen. He was cross examining a professor from Wharton before the late Judge Pollak of the Eastern District of Pennsylvania and the issue was debentures and whether you want Class A or Class B stock. And the Wharton professor had gone on and on about the benefits of one class, and I could see Judge Pollak was taking it all down and Mr. Liman got up and said to this professor: I have basically one question. If you could only have one share of the other side's issue or one share of my side's issue, which would you take? And he said, well, I'd rather have one share of your side's issue. And Judge Pollak, who had been a dean at Yale and a dean at Penn, he was absolutely brilliant, his head shot up like a puppet. And after that, Mr. Liman said to the witness: And that's because one share will give you this much more money and that much more power. And he was like a pinata going yes, yes, yes, yes, yes, yes. It was a dream cross-examination.

You guys are good. I have had days when I have been fairly good as a lawyer. I've never seen a better lawyer than Arthur Liman cross examining the Wharton professor. It was stone-cold brilliant master class, okay? I have never been that good, as a lawyer or a Judge, but in my head, I still see him doing it, Judge Liman's daddy was the best, okay? Just the best.

So that's all I can say. Please, you know, work on

*Jamie Ann Stanton, RMR, CRR, RPR,*

PROCEEDINGS 1138

one's game. I still work on it, that's why it's the practice of law. That's why I have my friends on the 17th floor who tell me when I get it wrong as a trial judge. But I guarantee you, it's in your enlightened self-interest. And yes, Mr. Liman won that case.

Go ahead.

MR. JACKSON: Judge, I was just going to ask as a flier, do you happen to have a copy of that cross?

THE COURT: It goes back to the '70s, so it was the litigation between Penn Central and Colt Industries and the Hunt Brothers were involved, you know, the people who were the model for JR Ewing and Jock Ewing and Dallas. And Judge Pollak issued from the bench, I think it was about a 140-page decision, takeover litigation, and he kept us all in suspense until he got to the last page, he did it English style, where he read the decision out loud.

And I won't say that Arthur Liman was a great successful lawyer, but he had four limousines that he had bring him down from his firm, Paul Weiss, in Manhattan, and when it was time to go back, he took one limousine and he had his junior partners and associates in the second limousine and he turned to us as co-counsel from other firms that were working with him and he said, okay, you guys can have limousine number three and four to take you home. And I thought, man, this guy is really good.

*Jamie Ann Stanton, RMR, CRR, RPR,*

PROCEEDINGS 1139

MR. JACKSON: Judge, I have to share. This is a bizarre coincidence, at lunch today, I told the entire trial team that I woke up this morning, for reasons that I could not understand, with the Dallas theme music in my head. And I told everybody that. It's like the strangest thing, I haven't watched it since the '80s, my grandmother's favorite show. And I had it in my head all day and then you say, you tell us this. I want to look up this case. Thank you, Judge.

(Continued on the following page.)

*Jamie Ann Stanton, RMR, CRR, RPR,*

**J.A. 520**

PROCEEDINGS 1140

(Continuing.)

THE COURT: You can look up the case. Judge Pollak from the Eastern District of Pennsylvania and a masterful judge, and a master class given by the late great Arthur Liman, unbelievably good. And if you're there as a junior associate and you see someone that good, you go, wow, I've got a lot of work to do. And I'm 74 years old now and I go home and I go, wow, I've got a lot of work, okay? It's the way it is, folks.

Anything else I could help the Government with today?

MR. GRUBIN: No thank you, Your Honor.

THE COURT: And from defense counsel?

MR. JACKSON: No, Your Honor. Thank you. Have a good weekend.

THE COURT: You too, everyone. Be sage. Leave here what you want to leave here over the weekend. We will lock up for you. Be well.

*          *          *          *          *

(Proceedings adjourned at 5:05 p.m. to resume on July 15, 2024 at 9:30 a.m.)

*LEEANN N. MUSOLF, RPR*

1141

I N D E X

WITNESS                                          PAGE

**CATHERINE MANZIONE**

DIRECT EXAMINATION    BY MR. PAULSEN    938

**JOSEPH RUSSO**

DIRECT EXAMINATION    BY MR. GRUBIN    948

CROSS-EXAMINATION     BY MR. JACKSON    977

CROSS-EXAMINATION     BY MR. JACKSON    1023

REDIRECT EXAMINATION  BY MR. GRUBIN    1043

**ALLAN MILLER**

DIRECT EXAMINATION    BY MR. PAULSEN    1058

CROSS-EXAMINATION     BY MR. MAZUREK    1063

**CATHERINE MANZIONE**

CROSS-EXAMINATION     BY MR. JACKSON    1082

REDIRECT EXAMINATION  BY MR. PAULSEN    1086

**KEMAL SARKINOVIC**

DIRECT EXAMINATION    BY MR. SKURNIK    1090

*LEEANN N. MUSOLF, RPR*

---

1142

I N D E X

E X H I B I T S

GOVERNMENT                                       PAGE

1072                          971

1083, 1105, 1115              974

3500-JR-2                     1028

E X H I B I T S

GOVERNMENT                                       PAGE

722-A

10                            1107

3500-KS-3                     1113

702                           1119

E X H I B I T S

DEFENSE                                          PAGE

DX1070                        1009

DX1079                        1009

DX1221                        1010

DX1226                        1011

DX1298                        1011

9985                          1070

*LEEANN N. MUSOLF, RPR*

---

1143

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,     : 21-CR-00497(WFK)
                              :
                              :
      -against-               : United States Courthouse
                              : Brooklyn, New York
                              :
                              : Monday, July 15, 2024
DAVID MOTOVICH,               : 9:30 a.m.
                              :
      Defendant.              :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S :

For the Government:  BREON PEACE, ESQ.
                     United States Attorney
                     Eastern District of New York
                     271 Cadman Plaza East
                     Brooklyn, New York 11201
                 BY: ROBERT POLEMENI, ESQ.
                     ERIK D. PAULSEN, ESQ.
                     ANDREW GRUBIN, ESQ.
                     MATTHEW C. SKURNIK, ESQ.
                     Assistant United States Attorneys

For the Defendant:   WACHTELL, LIPTON, ROSEN & KATZ
                     51 West 52nd Street
                     New York, New York 10019-6150
                 BY: RANDALL WADE JACKSON, ESQ.
                     JESSICA LAYDEN, ESQ.

                     -and-

                     MEISTER SEELIG & FEIN, LLP
                     125 Park Avenue
                     8th Floor
                     New York, New York 10017
                 BY: HENRY E. MAZUREK, ESQ.

**J.A. 521**

---

1144

*Proceedings*

(In open court - jury not present.)

THE COURTROOM DEPUTY:  All rise.

(The HON. WILLIAM F. KUNTZ, II entered the courtroom.)

THE COURT:  Please call the case.

THE COURTROOM DEPUTY:  Criminal cause on trial 21-CR-497, United States of America versus David Motovich.

Will the attorneys please state their name for the record, beginning with the Government.

MR. POLEMENI:  Good morning, Your Honor.

Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, paralegal Kavya Kannan, and Special Agent Christopher Cabane, for the United States.

THE COURT:  Good morning.  Please be seated.

Ladies and gentlemen in the public, you may be seated as well.

MR. JACKSON:  Good morning, Your Honor.

Randall Jackson, Jessica Layden and Henry Mazurek on behalf of our client, David Motovich.

And we're also joined by Mr. Andy Cepregi.

THE COURT:  Good morning.  Thank you.  Please be seated.

I thank you all for your patience, and good morning.

THE INTERPRETERS:  Good morning, sir.

THE COURT:  Before we begin with the usual round of

Proceedings 1145

questions, counsel, before we bring in the jury, I am going to ask the interpreters to just sit in the public arena for a second, if you wouldn't mind.

THE INTERPRETERS: Sure.

THE COURT: And I am going to ask the Court deputy to put on the white noise machine and we are going to have a sidebar up front. Since the jury is not here, I don't think we have to cluster literally to the sidebar, we can do it here in the front of the courtroom, in front of the bench, and we will have our discussion.

Okay. So please come forward on the record for a sidebar with all counsel of record.

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

THE COURT: Can you folks all hear me?

MR. POLEMENI: No.

THE COURT: We will do it old school.

At the end of last week we had requests to my court deputy, oral requests to my court deputy repeated requests from one of the jurors to be excused from jury service.

The juror stated that in order to satisfy his personal family mortgage needs, he needs to go back to work as soon as he can, this week.

And so, he asked to meet with me and I said to my

Proceedings 1146

court deputy, not in this known universe am I having a meeting with a juror in the middle of a criminal trial, but I wanted to communicate his request to be excused from further jury service.

It is Juror Number 4, and his name is Herbert, H-E-R-B-E-R-T, Colonia, C-O-L-O-N-I-A.

And I have prepared a draft order that says:

After consultation with the parties, the Court grants the request of Juror 4 to be excused from further jury service in this case as of 9:30 a.m. today.

That is what I am intending to do, but I want to hear from the Government, from defense counsel, as to whether you have any objections with respect to that.

Let me start from the Government, and then I'll hear from defense counsel.

MR. POLEMENI: So, Judge, I'd like to confer just with counsel for a moment, but I guess my first question is do you know whether he has explained this to the other jurors?

THE COURT: Well, you know, the whole point is I am a big, as you know, proponent of the rhinoceros school of inquiry, and that if we start asking the question: Have you conveyed this to the other jurors, he will either say "not yet" or "yes, I have," which may or may not be true, or "no, I have not," which may or may not be true.

MR. POLEMENI: Right.

Proceedings 1147

THE COURT: In other words, he -- let's go off the record.

(Discussion held off the record.)

THE COURT: Back on the record.

So I understand that you want to think about it. I am not going to inquire as to whether or not he said anything -- I mean it is his situation, and that's what he's conveyed to my court deputy.

He emphasized his displeasure at being told he had to come back here today as he left on Friday I am informed by, perhaps accidentally, he tripped over a trash receptacle. So he was clearly not the happiest of jurors based on what I've talked about, but I didn't see him. Maybe it was an accident.

So, I am not going to inquire as to whether he said that or had further inquiries with other jurors. It's his situation as it's been conveyed to me through my court deputy. So I want you to think about that.

Mr. Jackson, what is your team's position?

If you want to consult with your client, I think we have one juror who has asked to be relieved, essentially.

MR. JACKSON: Your Honor, if I could just have one second.

THE COURT: Absolutely.

MR. JACKSON: But we certainly appreciate you.

THE COURT: That is my approach. And if you

Proceedings 1148

wouldn't mind talking with your team and then coming back to the sidebar.

The only reason I'm doing it at the sidebar because, obviously, it's on the record is because it deals with his personal financial situation, and as we did with the additional jury selection, we did it on the record at sidebar with the attorneys present. That's why we're keeping it consistent with that approach with the jury selection and jury management.

So why don't you step back and come back. Let me know.

(Pause in the sidebar proceeding.)

(Back on the record.)

THE COURT: Okay. We are now back on the record after the break.

What is the view of the government with respect to the request of Juror Number 4 to be relieved of further jury service from today?

MR. POLEMENI: Judge, we're going to defer to Your Honor.

THE COURT: Okay, I accept that.

Mr. Jackson.

MR. JACKSON: We as well, Your Honor.

THE COURT: Okay. I am going to enter the following order:

J.A. 522

*Proceedings* 1149

After consultation with the parties, the Court grants the request of Juror 4 to be excused from further jury service in this case as of 9:30 a.m. today. I am signing the order now. And this will be available on the public record.

And just to be absolutely clear, it is Juror Number 4, I say now sitting in the jury box, it's not the original paddle Juror Number 4.

MR. JACKSON: Just out of curiosity, are they sitting in order?

THE COURT: They are sitting in order. So what will happen is this juror will leave, and then we will, again, tighten up the box.

MR. JACKSON: Thank you, Judge.

THE COURT: Okay.

So you are now going from a total of 16 jurors to 15 jurors. Okay. And as you know, under the modified federal rules, they all referred to as jurors, rather than as to twelve jurors and four alternates as we would have characterized them under the previous regime. Now they are referred to as 16 jurors. We now have a total of 15 jurors.

What I am going to do is have my court deputy and CSO bring the Juror Number 4 back to the jury room, and that juror will process out with the regular jury clerk. And then when I'm told that that's been done, we will then bring the jury in.

*Proceedings* 1150

Is that acceptable?

MR. POLEMENI: Yes.

MR. JACKSON: Yes.

THE COURT: I appreciate it.

MR. POLEMENI: Thank you, very much.

MR. JACKSON: Thank you, Judge.

(Sidebar conclude; proceedings continued.)

(Continued on the following page.)

*Proceedings* 1151

(In open court - jury not present.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Welcome back, ladies and gentlemen of the jury. Please be seated. Thank you for your patience.

We are going to continue with the witness.

Can we have witness return to the stand, please.

I hope you had a restful weekend, despite the disturbing events that we saw in Pennsylvania. We were all relieved that President Trump survived that.

When I was 13 years old, my grammar school class was taken to see Lilies of the Field and see Sidney Poitier in the great film.

(Witness entered the courtroom and resumed the stand.)

THE COURT: It was November 22nd, 1963, and I remember to this day where I was when we heard that President Kennedy had been assassinated. Just a terrible thing.

So, please, pray for the republic, as we always do.

All right. You are still under oath, sir. Welcome back.

THE WITNESS: Thank you.

THE COURT: You may continue with the examination of the witness.

MR. SKURNIK: Thank you, Your Honor.

J.A. 523

*Proceedings* 1152

(Continued on the following page.)

Sarkinovic- direct - Skurnik                1153

**KEMAL SARKINOVIC,**

        called as a witness by the Government, having been

        previously duly sworn/affirmed by the Courtroom Deputy,

        was examined and testified further as follows:

DIRECT EXAMINATION

BY MR. SKURNIK:

Q    Mr. Sarkinovic, you told us on Friday that Mr. Motovich asked you to give him the paper work for your company, Latek, is that correct?

A    Yes.

Q    And you did give him that paper work, is that right?

A    I did.

Q    And then after that, he asked you to open up a company called SGS Construction?

A    Yes.

        MR. SKURNIK:  Ms. Kannan, if we can pull up Government Exhibit 702, page 491.

        And this is in evidence, Your Honor.

        THE COURT:  You may publish.

        (Exhibit published.)

        MR. SKURNIK:  And if we could zoom in on the check. So this is not one of the checks we looked at Friday, this is a different one.

Q    Mr. Sarkinovic, does this say SGS Construction Building Corp. on it?

Sarkinovic- direct - Skurnik                1154

A    Yes, it does.

Q    And is that your signature in the bottom right-hand corner?

A    It is.

Q    Where were you when you signed this check?

A    I was in David's office.

Q    And how often did you sign checks like this in David's office?

A    Fifteen to twenty days.

Q    When you signed checks, about how many did you sign at a time?

A    Between 30 and 50 checks at a time.

Q    And for about how long did this go on?

A    Quite a long time.

Q    Years?

A    Several years.

Q    When you signed these checks, were they otherwise blank?

A    Yes, they were blank.

Q    Is this a check written to American Express?

A    I don't know, I can't see.

        MR. SKURNIK:  Ms. Kannan, if we could zoom in on the recipient.

BY MR. SKURNIK:

Q    Does that say "American Express"?

A    Yes, it does.

Sarkinovic- direct - Skurnik                1155

        MR. SKURNIK:  And if we can zoom back out and just to the amount on the check now.

A    64,000.

Q    Mr. Sarkinovic, is that about what you make in one year?

A    Yes, it is.

Q    So, did you write a 64,319-dollar check to American Express?

A    No, I did not.

Q    Have you ever had an American Express card?

A    No, I did not.

        MR. SKURNIK:  And if we can just zoom back out again.

BY MR. SKURNIK:

Q    Mr. Sarkinovic, who controlled this bank account?

A    David did.

Q    Okay.

        So after you opened up this account, did Mr. Motovich ask you to open up any other companies or accounts?

A    Yes, he did.

        MR. SKURNIK:  If we can go to Government Exhibit 107, which is in evidence.

        THE COURT:  You may publish.

        (Exhibit published.)

        MR. SKURNIK:  And page 4, please.

Sarkinovic- direct - Skurnik                1156

        (Exhibit published.)

        MR. SKURNIK:  Ms. Kannan, if we can zoom in right under where it says "certificate of incorporation," where it has the name of the company.

BY MR. SKURNIK:

Q    Does that say Ago & Alaudin Contracting Corp.?

A    Yes, it does.

Q    Who asked you to set up this company?

A    David did.

Q    So after you set it up, what did you do with the paper work for the company?

A    David took it -- took it.

        MR. SKURNIK:  If we can zoom back out, Ms. Kannan. And where it says "filed by," if we can zoom in on that. Perfect.

Q    What name is listed here next to "filed by"?

A    Marina Kuyan.

Q    Okay.

        MR. SKURNIK:  If we can zoom back out again and then zoom in on the address beneath.

Q    Do you know this address?

A    I know it.

Q    What is it?

A    1169 Coney Island Avenue.

Q    What's located there?

**J.A. 524**

*Sarkinovic- direct - Skurnik* 1157

A    Midwood Lumber.

MR. SKURNIK:  And, Ms. Kannan, if we can go to the next page, this is going to be page 5 of Government Exhibit 107.

(Exhibit published.)

BY MR. SKURNIK:

Q    Next to initial DOS filing date, what date is listed here?

A    23rd of August, 2013.

Q    Mr. Sarkinovic, you stated on Friday that you recommended Ago Kolenovic to Mr. Motovich, is that right?

A    Yes.  It is.

Q    Do you know whether Ago ever found out about this company you owned, Ago & Alaudin Contracting Corp.?

A    Yes, he did.

Q    Did you ever talk to him about it?

A    Not with Ago.

Q    So how did you know he found out?

A    He sent me a text message.

Q    What did that text say?

A    It says what you're doing is no good.

Q    How did you respond?

A    I did not respond at all.

Q    Did you talk to Mr. Motovich about it?

A    I did.

---

*Sarkinovic- direct - Skurnik* 1158

Q    What did you tell him?

A    I told him that Ago sent me a message and that Ago found out.

Q    What did Mr. Motovich say?

A    He told me that he likes that name for the company, that he likes the name for the company.

Q    Did he say anything else?

A    No, nothing else.

MR. SKURNIK:  If we can pull up Government Exhibit 703, which is in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  And turn to page 157, please.

(Exhibit published.)

MR. SKURNIK:  And, Ms. Kannan, if we can zoom in sort of middle of the page there.  Yes, that section.

BY MR. SKURNIK:

Q    Does this say:  The undersigned hereby apply for an account with Astoria Federal Savings"?  Did I read that right?

A    Yes, it does.

Q    And is that your signature in the bottom left?

A    Yes, it is.

Q    Do you know what Astoria Federal Savings is?

A    It's a bank.

Q    Have you ever been there?

---

*Sarkinovic- direct - Skurnik* 1159

A    Yes, I was.

MR. SKURNIK:  And if we can zoom out now and just scroll down where it says Name 1.  Ms. Kannan, if we can zoom in there.

BY MR. SKURNIK:

Q    What company is listed next to Name 1?

A    Ago & Alaudin Contracting Corporation.

Q    So is this the company you opened up for Mr. Motovich?

A    Yes, it is.

Q    Okay.

MR. SKURNIK:  Ms. Kannan, if we can now zoom out and zoom in on Name 2, which is right underneath.

(Exhibit published.)

Q    Is that your name listed?

A    Yes, it is.

Q    And where it says, "Customer to account relationship," does that say "president"?

A    Yes, it does.

Q    So, Mr. Sarkinovic, you're the president, but who controlled this account?

A    David was.

MR. SKURNIK:  We can now zoom out and zoom in on far upper right corner.

Q    What date is listed here?

A    August 20th, 2013.

J.A. 525

---

*Sarkinovic- direct - Skurnik* 1160

Q    Do you recall where you were when you opened this bank account?

A    In the bank in Astoria, I think.

Q    So you went to the bank?

A    Yes, I did.

Q    Did anyone go with you?

A    Secretary Marina was with me.

Q    So we are going to show some checks now.

MR. SKURNIK:  Starting with page 1 of this exhibit, 703.

(Exhibit published.)

MR. SKURNIK:  If we can zoom in on the very first check at the top left.

BY MR. SKURNIK:

Q    Is that your signature in the bottom right?

A    It is.

Q    Did you write a 68,754-dollar check to American Express?

A    No, I did not.

Q    On the signature, that's your handwriting?

A    Yes, it is.

Q    So where would you sign these checks from the Astoria bank account?

A    In David's office.

Q    And they were blank when you signed them?

A    Yes, they were blank.

*Sarkinovic- direct - Skurnik*          1161

Q    Okay.

MR. SKURNIK:  Page 3, please, Ms. Kannan.

(Exhibit published.)

MR. SKURNIK:  And if we can zoom in at the very bottom check.

BY MR. SKURNIK:

Q    That's your signature?

A    It is.

Q    Did you write a 105,097-dollar check to American Express?

A    No, I did not.

MR. SKURNIK:  Page 12, please, Ms. Kannan.

(Exhibit published.)

MR. SKURNIK:  And if we can zoom in at the very bottom check, bottom left.

Q    That's your signature?

A    Yes, it is.

Q    Did you write a 33,466.85-cent check to American Express?

A    No.

MR. SKURNIK:  Page 13, please, Ms. Kannan.  The top left.

(Exhibit published.)

Q    That's your signature?

A    Yes.

Q    Did you write an 84,294.43-cent check to American Express?

---

*Sarkinovic- direct - Skurnik*          1162

A    No.

MR. SKURNIK:  Page 26, please, Ms. Kannan.  If we can zoom in on the very top left.

(Exhibit published.)

BY MR. SKURNIK:

Q    Is that your signature?

A    Yes, it is.

Q    Does this say check number 1100?

A    Yes, it does.

Q    Did you write a 78,845.45-cent check to American Express?

A    No, I did not.

Q    Okay.

MR. SKURNIK:  If we can go to page 16, please.  And just zoom in at the top left.

(Exhibit published.)

Q    Is that your signature?

A    Yes, it is.

Q    Is this check 1059?

A    It is.

Q    Does that say Bloomingdales in the recipient line?

A    Yes, it does.

Q    Did you write a 3,383.81-cent check to Bloomingdales?

A    No, I did not.

Q    Mr. Sarkinovic, do you ever shop at Bloomingdales?

A    No.

---

*Sarkinovic- direct - Skurnik*          1163

MR. SKURNIK:  If we can go to page 20, please, Ms. Kannan, and zoom in at the top left check.

(Exhibit published.)

BY MR. SKURNIK:

Q    Is that your signature?

A    Yes.

Q    Is this check 1077?

A    It is.

Q    In the recipient line, Saks, do you know what that is?

A    No, I don't.

Q    So you didn't write a 2,858-dollar check to Saks?

A    No, I did not.

Q    Okay.

MR. SKURNIK:  Page 27, please.  And if we can scroll down, please, the very bottom check.

(Exhibit published.)

Q    Is that your signature?

A    Yes, it is.

Q    Is this check 1108?

A    It is.

Q    Did you write a 25,000-dollar check to David Motovich?

A    No, I did not.

MR. SKURNIK:  Ms. Kannan, page 30, please.  The top check.

(Exhibit published.)

J.A. 526

---

*Sarkinovic- direct - Skurnik*          1164

Q    Is that your signature?

A    It is.

Q    Is this check 1118?

A    Yes, it is.

Q    Does the recipient line read M&M USA Consulting Corp.?

A    Yes, it does.

Q    Did you write a 25,000-dollar check to M&M USA Consulting Corp.?

A    No, I did not.

Q    Okay.

MR. SKURNIK:  Ms. Kannan, if we can zoom out and scroll down, please.  Zoom in at the bottom.

(Exhibit published.)

BY MR. SKURNIK:

Q    Is that your signature?

A    Yes, it is.

Q    Is this check 1121?

A    Yes, it is.

Q    Did you write a 40,000-dollar check to M&M USA Consulting?

A    No, I did not.

Q    Mr. Sarkinovic, this account here at Astoria bank, do you know how money got into the account in the first place?

A    I do not know.

MR. SKURNIK:  If we can do, Your Honor, Government

*Sarkinovic- direct - Skurnik* 1165

Exhibit 704, which is not in evidence.

THE COURT: To the witness.

Any objection to 704?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted. You may publish.

(Government's Exhibit 704 was received in evidence.)

(Exhibit published.)

MR. SKURNIK: And if he can take a look first page.

Thank you.

BY MR. SKURNIK:

Q    What bank is listed in the upper right-hand corner?

A    Chase.

MR. SKURNIK: And if we can zoom in on the account number, Ms. Kannan, the upper left.

(Exhibit published.)

Q    Does that say 578355732 as the account number?

A    Yes, it does.

MR. SKURNIK: If we can zoom out. And then zoom in at the account title in the upper left.

Q    Does that say Ago & Alaudin Contracting Corp.?

A    Yes, it does.

Q    So, is this a second bank account for that same company Ago & Alaudin Contracting Corp.?

A    Yes, I think so.

MR. SKURNIK: If we can zoom out and zoom in on the

*Sarkinovic- direct - Skurnik* 1166

signature and date at the bottom.

(Exhibit published.)

BY MR. SKURNIK:

Q    Is that your signature?

A    Yes, it is.

Q    What's the date listed?

A    March 26th, 2014.

Q    Who asked you to open this bank account?

A    David.

Q    Who controlled this bank account?

A    David did.

Q    Did David ever tell you why he wanted you to open a second bank account for Ago & Alaudin?

A    No, he did not tell me.

Q    The company Ago & Alaudin Contracting Corp., did it do any real construction work?

A    No, they did not.

Q    Any real contracting work?

A    I don't think so.

Q    Did it hire any real employees?

A    I don't think so. I don't know.

Q    Is there a real office somewhere for Ago & Alaudin Contracting Corp.?

A    No.

Q    Did you ever file taxes for this company?

*Sarkinovic- direct - Skurnik* 1167

A    No.

Q    Do you know whether anyone else ever filed taxes for it?

A    I don't.

Q    So, I'm going to ask now about some checks from this account.

MR. SKURNIK: We'll start with page 27, Government Exhibit 704.

(Exhibit published.)

BY MR. SKURNIK:

Q    Is that your signature, sir?

A    Yes, it is.

Q    Is this check number 7740?

A    Yes.

Q    Does that say Guardian Life Checks?

A    Yes.

Q    And is this a 2,000-dollar check?

A    Yes.

Q    If you look at the memo line, does that say Abraham Fridman?

A    Yes, it does.

Q    Do you know anyone who works at Midwood Lumber with the last name Fridman?

A    David Fridman.

MR. SKURNIK: If we can go to Government Exhibit 31, please.

*Sarkinovic- direct - Skurnik* 1168

This is in evidence, Your Honor.

THE COURT: Publish.

(Exhibit published.)

BY MR. SKURNIK:

Q    Who is that?

A    This is a photograph of David Fridman.

MR. SKURNIK: And if we can go to Government Exhibit 28, which is in evidence.

THE COURT: Publish.

(Exhibit published.)

MR. SKURNIK: Ms. Kannan, if we can zoom in on the individual in this photograph here.

Q    Who is that?

A    David Fridman.

MR. SKURNIK: And now, Ms. Kannan, if we can go to Government Exhibit 6004.

(Exhibit published.)

MR. SKURNIK: So this is one of our stipulations.

Q    In paragraph 1, does it say in the second sentence: "Abe Fridman regularly went by the name Dave Fridman"? Did I read that right?

A    Yes, that's what it says here.

MR. SKURNIK: So if we can go back now to Government Exhibit 704, page 27.

(Exhibit published.)

J.A. 527

*Sarkinovic- direct - Skurnik*  1169

BY MR. SKURNIK:

Q    Abe Fridman or Dave Fridman, is he a relative of Mr. Motovich?

A    Yes, he is.

Q    He's married to Boris Motovich's sister, is that right?

A    Yes.

Q    Did you write a 2,000-dollar check to Guardian Life for his benefit?

A    No, I did not.

MR. SKURNIK:  If we can go to page 28, please.

(Exhibit published.)

Q    Is that your signature?

A    Yes.

Q    Is this check 7739?

A    Yes.

Q    Did you write a 25,000-dollar check to John Hancock Life for Abraham Fridman?

A    No, I did not.

MR. SKURNIK:  Page 245, please.

Q    Is that your signature?

A    Yes, it is.

Q    Is this check 1090?

A    Yes, it is.

Q    Did you write a 50,000-dollar check directly to Abraham Fridman?

---

*Sarkinovic- direct - Skurnik*  1170

A    No.

MR. SKURNIK:  Page 124, please.

(Exhibit published.)

BY MR. SKURNIK:

Q    Is that your signature?

A    Yes, it is.

Q    Is this check 1039?

A    Yes.

Q    Did you write a 15,000-dollar check to David Motovich?

A    No, I did not.

MR. SKURNIK:  Page 315, please.

(Exhibit published.)

Q    Is that your signature?

A    Yes.

Q    Is this check 1107?

A    Yes.

Q    Did you write a 100,000-dollar check to Alex Motovich?

A    No.

Q    Okay.

MR. SKURNIK:  Page 516, please.

(Exhibit published.)

Q    Is that your signature?

A    Yes, it is.

Q    Is this check 1211?

A    Yes.

---

*Sarkinovic- direct - Skurnik*  1171

Q    Did you write a 5,000-dollar check to an Allan S. Miller?

A    No.

Q    Do you know who that is, Allan S. Miller?

A    No, I don't know.

MR. SKURNIK:  Page 57, please.

Q    Is that your signature?

A    Yes.

Q    Is this check 1001?

A    Yes, it is.

Q    Did you write a 44,362.67-cent check to Carriage Club North Condo Association?

A    No.

MR. SKURNIK:  Page 352, please.

(Exhibit published.)

Q    Is that your signature?

A    Yes, it is.

Q    Is this check 1132?

A    Yes, it is.

Q    Did you write a 5,000-dollar check to someone named David Unger?

A    No, I don't know.

Q    Do you know who that is, David Unger?

A    No, I don't.

MR. SKURNIK:  Page 384, please.

(Exhibit published.)

---

*Sarkinovic- direct - Skurnik*  1172

BY MR. SKURNIK:

Q    Is that your signature?

A    Yes.

Q    Is this check number 1141?

A    Yes, it is.

Q    Did you write a 125,000-dollar check to Ad on the Go?

A    No.

Q    Do you know what Ad on the Go is?

A    I don't.

MR. SKURNIK:  Page 385, please.

(Exhibit published.)

Q    Is that your signature?

A    Yes, it is.

Q    Is this check number 1142?

A    Itself.

Q    Did you write a 96,500-dollar check to M&M USA Consulting?

A    No.

Q    Do you know what that is, M&M USA Consulting?

A    I do not know.

MR. SKURNIK:  Page 412, please.

(Exhibit published.)

Q    Is that your signature?

A    It is, yes.

Q    Is this check number 1156?

J.A. 528

*Sarkinovic- direct - Skurnik* 1173

A    It is.

Q    Did you write a 300,000-dollar check to Yisroel Y. Leshkowitz?

A    No.

Q    Do you know who that is, Yisroel Leshkowitz?

A    I don't know.

Q    Okay.

    MR. SKURNIK:  And last check from this account, page 126, please.

    (Exhibit published.)

BY MR. SKURNIK:

Q    Is that your signature?

A    Yes, it is.

Q    Is this check number 1532?

A    Yes.

Q    Did you write a 26,000-dollar check to Centurion Diamonds?

A    No.

Q    All these checks that we just talked about, where did you sign them?

A    In David's office.

    MR. SKURNIK:  If we can now do Government Exhibit 108, which is in evidence.

    THE COURT:  You may publish.

    MR. SKURNIK:  And we'll do page 6.

*Sarkinovic- direct - Skurnik* 1174

    (Exhibit published.)

BY MR. SKURNIK:

Q    Where it says "the name of the corporation is," what company is listed?

A    CNBC Construction Corporation.

    MR. SKURNIK:  And if we can zoom out.

Q    Mr. Sarkinovic, did you sign documents for this company?

A    I did.

Q    Who asked you to sign those documents?

A    David.

Q    Who chose the name CNBC Construction Corp.?

A    David did.

    MR. SKURNIK:  And if we can go to the next page, please.

    (Exhibit published.)

Q    Is that your signature?

A    Yes.

Q    Do you think that looks like how you sign your signature in other places?

A    No, it does not.

Q    Is that your handwriting?

A    No, it's not.

Q    Okay.  But it's your name?

A    Yes, it is.

Q    Okay.

*Sarkinovic- direct - Skurnik* 1175

    The address underneath, 1100 Coney Island Avenue, are you familiar with that address?

A    Yes, that's Midwood Lumber address.

Q    Where it says "filed by," whose name is listed?

A    Marina Kuyan.

    MR. SKURNIK:  If we can go to page 12, please.

    (Exhibit published.)

Q    Where it says "initial DOS filing date," what date is listed?

A    January 12th, 2018.

    MR. SKURNIK:  If we can now go to Government Exhibit 109, which is in evidence.

    THE COURT:  You may publish.

    (Exhibit published.)

    MR. SKURNIK:  And page 5, please.

    (Exhibit published.)

BY MR. SKURNIK:

Q    What company is listed here under "the name of the corporation is"?

A    Midwood Building Corporation.

Q    Is this another company that you created for Mr. Motovich?

A    Yes, it is.

Q    Who picked that name, Midwood Building Corp.?

A    David.

*Sarkinovic- direct - Skurnik* 1176

    MR. SKURNIK:  If we scroll down.

Q    Whose name is listed on the bottom left?

A    My name.

Q    The signature on the right, is that your handwriting?

A    No, it's not.

Q    Okay.

    MR. SKURNIK:  If we can go to page 10, please.

    (Exhibit published.)

BY MR. SKURNIK:

Q    Where it says, "initial DOS filing date," what date is listed?

A    January 17th, 2018.

    MR. SKURNIK:  And, Ms. Kannan, if we can put this up side-by-side with Government Exhibit 108, page 7.

    (Exhibits published.)

    MR. SKURNIK:  If we can go to page, let's see -- can we scroll down, please.  The next page.  The next page.  Keep scrolling, please.  If we can go back up.  Oh, perfect. Scroll one more.

    And if we can zoom in on the date for this company, as well as the date for the other company.

A    January 12th, 2018.

Q    So, Midwood Building Corp. and CNBC Construction Corp., were they opened up five days apart?

A    Yes, they were.

J.A. 529

*Sarkinovic- direct - Skurnik* 1177

Q    Did you ever ask Mr. Motovich why he wanted to open two companies up so close to each other?

A    I don't know.

Q    Okay.

MR. SKURNIK:  Ms. Kannan, if we can just zoom in on the names of the companies.

BY MR. SKURNIK:

Q    Either of these companies, CNBC Construction Corp., Midwood Building Corp., did either of them do any real work?

A    They are not.

Q    Did you ever hire any real employees for these companies?

A    I did not.

Q    Did these companies have any real offices somewhere?

A    They did not.

Q    Did you file taxes for either of these companies?

A    I did not.

Q    Are you aware of anyone else filing taxes for them?

A    I don't know.

Q    Who controlled these companies?

A    David.

MR. SKURNIK:  If we can go to Government Exhibit 708, just for the witness.

This is not in evidence, Your Honor.

THE COURT:  For the witness.

Any objection to 708?

*Sarkinovic- direct - Skurnik* 1178

MR. JACKSON:  No objection, Your Honor.

THE COURT:  It's admitted.  You may publish.

(Government's Exhibit 708 was received in evidence.)

(Exhibit published.)

BY MR. SKURNIK:

Q    So, what company is listed at the top of this document?

A    Investors Bank.

Q    And below Investors Bank where it says "name of legal entity," what does it say?

A    CNBC Construction Corp.

Q    Okay.  In the bottom left, is that your name, Mr. Sarkinovic?

A    Yes, it is.

Q    Is this your handwriting on this page?

A    Yes.  Yes, it is.

Q    You filled this in, this is your handwriting?

A    I only wrote the first and last name.

Q    Did you write the rest of the pen on this page?

A    No, I did not.

Q    It says that you're the president here.

Did you control this bank account?

A    No, I did not.

Q    Who did?

A    David.

MR. SKURNIK:  If we can scroll to the second page,

*Sarkinovic- direct - Skurnik* 1179

please.

(Exhibit published.)

BY MR. SKURNIK:

Q    Did you fill in this information?

A    I did not.

Q    Do you recognize this handwriting?

A    I do not.

Q    Where it says "employer" in the middle of the page to the left, who is listed as your employer?

A    Midwood Building Corp.

(Continued on the following page.)

SARKINOVIC - DIRECT - SKURNIK 1180

BY MR. SKURNIK:  (Continuing.)

Q    Are you actually employed by Midwood Building Corp.?

A    No, I do not.

Q    Okay.

MR. SKURNIK:  If we could scroll down a little bit on this page.

Q    Is that your signature, Mr. Sarkinovic?

A    Yes, it is.

Q    Okay.

MR. SKURNIK:  If we can go now to Government Exhibit 708, Page 1111.  And if we can zoom in on the check on the right, please.

Q    Does that say CNBC Construction Corp. in the upper left-hand corner?

A    Yes, it does.

Q    Is that your signature?

A    Yes, it is.

Q    Is this check number 1008?

A    Yes, it is.

Q    In the memo line at the bottom left, does that say Abraham Fridman?

A    Yes, it does.

Q    You did write a $25,000.660 check to John Hancock for Abraham Fridman?

A    I did not.

J.A. 530

SARKINOVIC - DIRECT - SKURNIK       1181

Q    These checks here, when you signed them, were they blank?

A    They were blank.

Q    Where did you sign them?

A    In the David's office.

MR. SKURNIK:  Page 1122, please of this exhibit, 708, in evidence.  If we can zoom in on the bottom left check, please.

Q    Is that your signature?

A    Yes, it is.

Q    Is this check number 1058?

A    Yes, it is.

Q    Did you write an $8,500 check to Centurion Diamonds?

A    I did not.

MR. SKURNIK:  Same exhibit, Page 1152, please.  If we can zoom in on the check at the top.

Q    On the top left of this check, does that say David Motovich Lyudmila Motovich?

A    Yes, it does.

Q    Is this check dated January 27th, 2018?

A    Yes, it is.

Q    Is this a check made out to CNBC Construction Corp.?

A    Yes, it is.

Q    So this isn't a check from CNBC, this is a check to CNBC; is that correct?

A    Yes, it is.

---

SARKINOVIC - DIRECT - SKURNIK       1182

Q    Okay.  So you didn't sign this check, right?

A    No, I did not.

Q    Is this a check for $500?

A    Yes, it is.

MR. SKURNIK:  So Ms. Kannan, if we can put this check side by side with Page 2 of this same exhibit, 708.  And if we can zoom in on the second -- sorry, the top box.

Okay.  And if we can also zoom in on the check on the left.

Q    Okay.  So does it say, Initial deposit $500?

A    Yes, it does.

Q    Next to, deposit type, what is listed?

A    $500.

Q    And below the 500, what does it say?

A    I can't see.

Q    Now that it's highlighted, does it say check?

A    Yes, it does.

Q    Okay.  Okay.  Is the date of opening January 29th, 2018?

A    Yes, it was.

Q    So the date above on the check, January 27th, 2018, is that two days before?

A    Yes, it is.

Q    And is this the amount on the check the same as the amount listed under account details?

A    Yes, it is.

---

SARKINOVIC - DIRECT - SKURNIK       1183

Q    So is it fair to say that David Motovich and Lyudmila Motovich provided the initial funding for this account?

A    Yes, it does.

Q    Who controlled this account?

A    David.

MR. SKURNIK:  If we can go to Government Exhibit 193 which is in evidence.

THE COURT:  You may.

MR. SKURNIK:  This is in evidence from David Motovich's iCloud account.

Q    Is that your signature?

A    Yes, it is.

Q    Did you fill out the rest of this check?

A    I did not.

Q    In the upper left, does that say CNBC Construction Corp.?

A    Yes, it does.

Q    And is this check number 1003?

A    Yes, it is.

Q    Did you write this check to Joshua Markovics?

A    I did not.

MR. SKURNIK:  If we can go to Government Exhibit 378, Page 1, which is in evidence from the search of Midwood Lumber?

THE COURT:  You may publish.

Q    Are these your signatures on these two checks?

---

SARKINOVIC - DIRECT - SKURNIK       1184

A    Yes, they are.

Q    Are these CNBC Construction Corp. checks?

A    Yes, it is.

Q    Are the check numbers 1101, and 1102?

A    Yes, it is.

Q    When you would sign checks in Mr. Motovich's office, is this what they looked like after you would sign them?

A    Yes, they did.

Q    So when you'd leave the office, they'd just have the signature, nothing else; is that right?

A    It was empty, it was blank.

MR. SKURNIK:  Your Honor, I'd like to pull up, Government Exhibit 709, which is not in evidence.

THE COURT:  For the witness.

Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  You may.

(Exhibit published.)

Q    So looking at this first page of this document, what company is listed under company title and address?

A    Midwood Building Corp.

Q    What bank is listed at the top of the document?

A    Investors Bank.

Q    Under account owner slash signer number one, do you see your name listed?

J.A. 531

SARKINOVIC - DIRECT - SKURNIK          1185

A    Yes, it's written so.

Q    Okay.  Do you see that it says, employer, Midwood Building Corp.?

A    I was not employed by them.

MR. SKURNIK:  If we can zoom out and then scroll down and zoom in on the signature.  And the date.

Q    Is that your signature?

A    Yes, it is.

Q    Does that say January 29th, 2018?

A    January 29, 2018, yes.

MR. SKURNIK:  Ms. Kannan, if we can now put this side by side with Government Exhibit 708, Page 2, which is also in evidence.  And if we can zoom in on the dates on H, please.

Q    So are these dates for Midwood Building Corp. and CNBC Construction Corp. the same?

A    Yes, they are.

Q    Do you recall where you were when you signed your signature on these documents?

A    In David's office.

Q    Did you ask Mr. Motovich why you were opening multiple bank accounts for different companies on the same day?

A    I did not ask this.

Q    Did he ever tell you why?

A    He did not.

SARKINOVIC - DIRECT - SKURNIK          1186

Q    Okay.

MR. SKURNIK:  So if we can just go, now, to 709, Page 1, in evidence.

THE COURT:  You may publish.

(Exhibit published.)

Q    The writing that you see here on the screen, is this your handwriting?

A    It is not.

Q    Under, initial deposit, does that say $154,177.81?

A    That's what it says so.

Q    Did you provide 154,000-dollar initial deposit?

A    No, I did not.

MR. SKURNIK:  Let's go to Page 459 of Government Exhibit 709 of this document.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  And if we can scroll to the top of this page, please.

Q    Does that say, Certification of beneficial owners?

A    Yes, it does.

Q    Whose name is listed on this page?

A    Kemal Sarkinovic.

Q    Do you see David Motovich's name on this page?

A    I don't see it.

Q    Who asked to you open up this account?

SARKINOVIC - DIRECT - SKURNIK          1187

A    David.

Q    Who controlled this account?

A    David.

Q    Okay.

MR. SKURNIK:  If we can go now to Page 94 of this exhibit, 709.  And zoom in at the check on the bottom left, please.

Q    Is that your signature?

A    Yes, it is.

Q    Is this check number 1112?

A    Yes, it is.

Q    Does that say, Midwood Building Corp., in the upper left-hand corner?

A    Yes, it does.

Q    Did you write a $20,000 check to Lyudmila Motovich?

A    No, I did not.

Q    The checks for this account, where did you sign them?

A    In David's office.

Q    And when you signed them, did you leave them there or take them with you?

A    It was left in his office.

MR. SKURNIK:  If we can go to Page 94, please, of 709.

THE COURT:  You may publish.

(Exhibit published.)

SARKINOVIC - DIRECT - SKURNIK          1188

MR. SKURNIK:  And we're going to look at each of the checks on this page, starting with the top left.  Actually, sorry, the bottom two checks.  My mistake.

Q    On the left.  Is that your -- is this the check we just looked at to Lyudmila Motovich on the left?

A    Yes, it is.

MR. SKURNIK:  If we can go now to Government Exhibit 191, please.  This is in evidence from Mr. Motovich's iCloud.

THE COURT:  You may publish, and then we'll take our 15-minute break.  Go ahead.

MR. SKURNIK:  Sorry, Government Exhibit 1 --

THE COURT:  What's the number, counsel?

MR. SKURNIK:  191.

THE COURT:  In evidence?

MR. SKURNIK:  In evidence, Your Honor.

THE COURT:  You may publish and we'll take our break.  Go ahead.

(Exhibit published.)

Q    The top check, does that say CNBC Construction Corp.?

A    Yes, it does.

Q    Is that your signature on it?

A    Yes, it is.

Q    The bottom check, does that say, Midwood Building Corp.?

A    Yes, it does.

J.A. 532

SARKINOVIC - DIRECT - SKURNIK          1189

Q    Is that your signature on the bottom.

A    Yes, it is.

Q    Are these checks otherwise blank, except for your signature?

A    Yes, they were.

Q    When you signed checks for these two accounts, is this what they looked like after you signed them?

A    Yes, it did.

Q    So you never saw Mr. Motovich or anyone else fill in the rest of the check, did you?

A    I did not.

Q    Okay.

MR. SKURNIK:  That's it for this document, Your Honor.

THE COURT:  All right.  Thank you.

Ladies and gentlemen, we're going to take a 15-minute break and we'll go for our lunch break around the same time, so please do not talk about the case.  Thank you for your patience.  We're moving things along.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Jury exits the courtroom.)

THE COURT:  You may leave the courtroom, sir.

The jury has left the courtroom and the witness is leaving the courtroom.  You may be seated, ladies and gentlemen.  Do we have any issues once the witness leaves the

SARKINOVIC - DIRECT - SKURNIK          1190

courtroom, to discuss.

(The witness exits the courtroom.)

THE COURT:  Before we take our comfort break, anything for the Government?

MR. PAULSEN:  No, Your Honor.

THE COURT:  Anything from defense counsel?

MR. JACKSON:  No, Your Honor.

THE COURT:  Okay.  Thank you.  I'm going to ask the court reporter to come forward and re-hookup my realtime because it seems to have disconnected.  So thank you.  We'll see you in 15 minutes.

(A recess was taken.)

THE COURT:  Do we have any issues to address before we bring the witness back and the jury back in?

Anything for the Government?

MR. SKURNIK:  Yes, Your Honor.  One issue.  We realize that our second interpreter today has not yet been sworn.  So I'd ask if the Court could please swear her in.

THE COURT:  On a nunc pro tunc basis.

Has the second interpreter previously been sworn in any judicial proceedings in this courthouse?

THE INTERPRETER:  Not at his courthouse, Your Honor.

THE COURT:  At any other courthouse?

THE INTERPRETER:  Yes.

THE COURT:  Okay.  Which other courthouse?

SARKINOVIC - DIRECT - SKURNIK          1191

THE INTERPRETER:  Northern Virginia, I'm sorry I don't remember what it's called.  Eastern District, I think of Northern Virginia, also, Georgia.

THE COURT:  Georgia, not the Russia Georgia?

THE INTERPRETER:  That one.  There's one a couple of others.  I'm sorry, right now --

THE COURT:  No, that's okay.  That's fine.

Any objection to that being done in the presence of the jury?

MR. JACKSON:  No objection, Judge.

THE COURT:  Okay.  So we'll do that.

Anything else from the Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Anything else from defense?

MR. JACKSON:  No, Your Honor.

THE COURT:  Okay.  Why don't we bring the jury back in, please, and bring the witness back.

Would someone get the witness, please.

(Witness resumes the witness stand.)

THE COURTROOM DEPUTY:  All rise.

(Jury enters the courtroom.)

THE COURT:  Thank you ladies and gentlemen of the jury.  Appreciate your patience.  Please be seated.

Counsel pointed out to me that we have a new interpreter, and I neglected to have her sworn in.  So I'm

SARKINOVIC - DIRECT - SKURNIK          1192

going to ask the interpreter to please raise her right hand at this time and to state her name.

And do you solemnly swear or affirm that you will truly and accurately translate the testimony that you hear from this witness from one language and into the English language.

THE INTERPRETER:  I do.  And my name is Vlatka Mott.

THE COURT:  Would you spell that for the reporter, please.

THE INTERPRETER:  M-O-T-T, Mott.

THE COURT:  And have you previously been sworn as an interpreter in other courts of the United States, throughout the United States interpret.

THE INTERPRETER:  I have, Your Honor.

THE COURT:  And just generally, what other Courts.

THE INTERPRETER:  Just of the top of my head, Arizona, Georgia, Eastern District of Virginia, Tennessee, and now I'm forgetting -- oh, Southern District in New York, also.

THE COURT:  Oh, you can forget that one.  That's just across the river.  We refer to that as the Mother Court here in Brooklyn.  I won't tell you the full name of the Mother Court.  But anyway, that's how they're known.

Okay.  We accept your credentials and thank you.  I apologize for not having done that before, ladies and gentlemen of the jury.  That was done without objection from

J.A. 533

SARKINOVIC - DIRECT - SKURNIK 1193

counsel. So please proceed, counsel, with your examination of the witness.

MR. SKURNIK: Thank you, Your Honor.

We'll start with Government Exhibit 709, in evidence at, Page 90, please.

THE COURT: Please publish.

(Exhibit published.)

MR. SKURNIK: And if we can zoom in on the first check, upper left.

BY MR. SKURNIK: SAMSCOPE

Q    So this a check from the Midwood Building Corp. account I was asking you about just before the break?

A    Yes, it is.

Q    Is that your signature?

A    It is.

Q    Did you write a $5,846.22 check to Saks Fifth Avenue.

A    No, I did not.

MR. SKURNIK: If we can zoom in, now, on the top right check.

Q    Is that your signature?

A    It is.

Q    Is this check number 1094?

A    It is.

Q    Did you write a $16,250 check to Centurion Diamonds?

A    No.

SARKINOVIC - DIRECT - SKURNIK 1194

MR. SKURNIK: If we can look, now, at the bottom left check, please.

Q    Is that your signature?

A    It is.

Q    Is this check number 1096?

A    It is.

Q    Did you write a $20,000 check to Fridman?

A    No.

Q    Okay.

MR. SKURNIK: Now, the check on the bottom right, please.

Q    Is that your signature?

A    It is.

Q    Is this check number 1097?

A    Yes.

Q    Did you write a $13,200 check to Centurion Diamonds?

A    No.

Q    Okay.

MR. SKURNIK: If we can go now to Page 97 of this same exhibit, 709, in evidence.

THE COURT: You may.

MR. SKURNIK: And on the bottom left. Below up that check, please.

Q    Is that your signature?

A    Yes.

SARKINOVIC - DIRECT - SKURNIK 1195

Q    Is this check number 1124?

A    Yes, it is.

Q    Did you write a $105,626.69 check to Midwood Lumber?

A    No.

Q    And the check on the right, is that your signature?

A    Yes.

Q    Is that check number 1125?

A    Yes.

Q    Did you write a $127,130.83 check to Midwood Lumber and Millwork Inc.?

A    No.

Q    Mr. Sarkinovic, you told us before that when you were working for Zorach, you sometimes picked up materials from Midwood Lumber; is that right?

A    Yes.

Q    When you picked up those materials, did you have to write checks or could you pick them up just on an account?

A    I had an account.

Q    And whose account was that?

A    It was to the address that where I worked.

Q    Was Zorach involved in that account?

A    Yes.

MR. SKURNIK: If we can go now to Government Exhibit 710, just for the witness. This is not in evidence, Your Honor.

SARKINOVIC - DIRECT - SKURNIK 1196

THE COURT: Any objection to 710 coming into evidence?

MR. JACKSON: No objection, Your Honor.

THE COURT: Admitted. You may publish.

(Government Exhibit 710 was received in evidence.)

(Exhibit published.)

MR. SKURNIK: And at this point, Your Honor, we have admitted a number of financial records. I have eight other exhibits which are subsets of those financial records already in evidence. I can list them, and we'd like to move to admit them at this time.

THE COURT: Why don't you list them and we'll see if there's any objection.

MR. SKURNIK: They are 702 --

THE COURT: Go ahead.

MR. SKURNIK: 702-A.

THE COURT: Any objection to 702-A?

MR. JACKSON: No objection, Your Honor.

THE COURT: It's admitted.

(Government Exhibit 702-A was received in evidence.)

MR. SKURNIK: 708-A.

THE COURT: Any objection?

MR. JACKSON: No objection, Your Honor.

THE COURT: It's admitted.

(Government Exhibit 708-A was received in evidence.)

J.A. 534

SARKINOVIC - DIRECT - SKURNIK                1197

MR. SKURNIK:  708-B.

THE COURT:  Any objection?

MR. JACKSON:  No, objection.

THE COURT:  It's admitted.

(Government Exhibit 708-B was received in evidence.)

MR. SKURNIK:  709-A.

THE COURT:  Any objection?

MR. JACKSON:  No objection.

THE COURT:  Admitted.

(Government Exhibit 709-A was received in evidence.)

MR. SKURNIK:  709-B.

THE COURT:  Any objection?

MR. JACKSON:  No objection.

THE COURT:  Admitted.

(Government Exhibit 709-B was received in evidence.)

MR. SKURNIK:  710-A.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government Exhibit 710-A was received in evidence.)

MR. SKURNIK:  710-B.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government Exhibit 710-B was received in evidence.)

---

SARKINOVIC - DIRECT - SKURNIK                1198

MR. SKURNIK:  And the last one is 710-C.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government Exhibit 710-C was received in evidence.)

THE COURT:  Are there any others?

MR. SKURNIK:  Your Honor, there are actually two more --

THE COURT:  I thought there might be when I saw your colleague scurrying up there.

What are those?

MR. SKURNIK:  They are 708-C.

THE COURT:  Any objection?

MR. JACKSON:  No objection.

THE COURT:  Admitted.

(Government Exhibit 708-C was received in evidence.)

MR. SKURNIK:  And 708-D.

MR. JACKSON:  No objection.

THE COURT:  Admitted.

(Government Exhibit 708-D was received in evidence.)

THE COURT:  All right.  You may proceed.

MR. SKURNIK:  Thank you, Your Honor.

BY MR. SKURNIK:

Q    So Mr. Sarkinovic, I want to ask you about another bank account now.

---

SARKINOVIC - DIRECT - SKURNIK                1199

MR. SKURNIK:  If we can zoom in at the very top at the name of the bank on this document.

Q    What bank is listed?

A    Investor Bank.

Q    Okay.

MR. SKURNIK:  If we can zoom in now on the first box of the top left.

Q    Next to account ownership, does that say individual?

A    Yes, it does.

Q    Okay.

MR. SKURNIK:  And if we can zoom out now.  And under the next box down, account owner number one.

Q    Is that your name on this account?

A    Yes, it is my name.

Q    Okay.

MR. SKURNIK:  And if we can go to the top right, now, where it says account title and address.

Q    Is that your name?

A    Yes.

Q    So this document doesn't have a company listed on it, does it?

A    Yes.

THE COURT:  It's a double negative.  Ask it again.

Q    Does this document have a company listed on it?

A    No.

---

SARKINOVIC - DIRECT - SKURNIK                1200

Q    The handwriting on this document, is that yours?

A    No, it is not.

Q    Who asked you to open this bank account?

A    David.

Q    Did you ever ask him why you were opening an account in your own name instead of for a company?

A    No, I did not.

Q    Did he ever tell you why?

A    No.

MR. SKURNIK:  If we can zoom in on the account details box again.

Q    Does that say, Initial deposit $100?

A    Yes, it does.

Q    And beneath that, does it say, Deposit type cash?

A    Yes.

Q    Did you deposit $100 cash into this account?

A    No, I did not.

Q    Did you ever deposit money into any of the accounts we've talked about today?

A    No.

Q    Okay.

MR. SKURNIK:  You can zoom out now and please zoom in on the signature and date.

Q    Is that your signature?

A    Yes.

J.A. 535

SARKINOVIC - DIRECT - SKURNIK        1201

Q    Is the date January 29th, 2018?

A    It is.

MR. SKURNIK:  And Ms. Kannan, if we can now pull up Government Exhibit 709, Page 1 to the side.  And zoom in on the dates on both.

Q    Are these dates the same?

A    Yes, they are.

Q    Did you ever ask Mr. Motovich why you were opening up a personal account in your name on the same day you were opposing the Midwood Building Corp. account?

A    No, I did not ask.

MR. SKURNIK:  If we can go back to Government Exhibit 712 -- 710 -- excuse me.

THE COURT:  710, yes, you may publish.

Q    So even though this is a personal account, did you ever put money into this account?

A    No.

Q    Did you ever keep checks from this account?

A    No.

Q    Did you ever make payments for your own use from this account?

A    No.

Q    Who did you understand the money in this account belonged to?

A    It was David's.

---

SARKINOVIC - DIRECT - SKURNIK        1202

Q    Who controlled this account?

A    David.

MR. SKURNIK:  If we can go to Page 80, please, of Government Exhibit 710.  And zoom in at the check on the top right.

Q    So this says your name in the upper left; is that right?

A    Yes.

Q    And it says Investors Bank?

A    Yes.

Q    Is that your signature?

A    Yes.

Q    Did you write a $112,500 check to Boris Motovich?

A    No.

Q    Where did you sign the checks for this account?

A    David's office.

MR. SKURNIK:  If we can go now to Page 82, please.  On the bottom left-hand corner, if we can blow up that check.

Q    Is that your signature?

A    Yes.

Q    Is this check number 109?

A    Yes.

Q    Did you write a $100,000 check to David Motovich?

A    No.

Q    Other than your signature, did you fill out this check?

A    No, I did not.  Just the signature.

---

SARKINOVIC - DIRECT - SKURNIK        1203

Q    And what's the date?  Is that April 11th, 2018?

A    Yes, April 11, 2018.

MR. SKURNIK:  If we can go to Page 85, now.  And the check on the bottom left, please.

Q    Is that your signature?

A    Yes.

Q    Is this check number 123?

A    Yes.

Q    Did you write a $25,000 check to David Motovich?

A    No.

Q    Okay.

MR. SKURNIK:  Now Page 86, of same exhibit, 710.  We'll start in the upper left-hand corner.

Q    Is that your signature?

A    Yes.

Q    Is that check number 124?

A    Yes.

Q    Did you write a $250,000 check to DM Investors?

A    No.

Q    David Motovich, are his initials DM?

A    Yeah, I guess.

Q    Okay.

MR. SKURNIK:  If we can do the check on the upper right now.

Q    Is that your signature?

---

SARKINOVIC - DIRECT - SKURNIK        1204

A    Yes.

Q    Is this check number 126?

A    Yes.

Q    Did you write a $30,000 check to Gail Motovich?

A    No.

Q    Okay.

MR. SKURNIK:  Check on the bottom left now on this page.

Q    Is that your signature?

A    Yes.

Q    Is this check number 127?

A    Yes.

Q    Did you write a $30,000 check to Boris Motovich?

A    No.

Q    Okay.

MR. SKURNIK:  Now the check on the bottom right, please.

Q    Is that your signature?

A    Yes.

Q    Is this check number 128?

A    Yes.

(Continued on the following page.)

J.A. 536

K. Sarkinovic - Direct/Mr. Skurnik          1205

EXAMINATION

BY MR. SKURNIK:

Q    Did you write a $40,000 check to David Motovich?

A    No.

        MR. SKURNIK:  We can take this down.

Q    Just to be clear, Mr. Sarkinovic, all of the accounts we talked about today, you opened them?

A    Yes, I did.

Q    But you didn't control them, right?

A    No, I did not.

Q    Now, you told us on Friday that Mr. Motovich promised you jobs; is that correct, if you'd open these accounts?

A    Yes, he did.

Q    Did you ever get those jobs?

A    No, I did not.

Q    So you told us earlier that Zorach was the person who originally told you to talk to David about your company Latek; is that correct?

A    Yes.

Q    Was Zorach involved in these later companies SGS, CNBC, Midwood Building Corp.?

A    No, I don't know.

Q    So you're not aware of Zorach being involved in those companies?

A    No.

K. Sarkinovic - Direct/Mr. Skurnik          1206

Q    When you signed the paperwork to open these companies, was Zorach ever present?

A    No.

Q    Did you ever go to the banks with Zorach?

A    No.

Q    Did Zorach ever come tell you to sign checks in Mr. Motovich's office?

A    No.

Q    Did Zorach control these companies or these bank accounts.

A    No.

Q    Who did?

A    David.

Q    So I've asked you now about six bank accounts.  Did you ever get phone calls from any of these banks?

A    Yes, I did.

Q    What were those calls about?

A    It had to do with transfers, money transfers.

Q    When the bank would call about money transfers, what would you say?

A    I would authorize it.  I would say okay.

Q    Before the bank would call, would you talk to anyone else?

A    Yes, they called me and told me to say that it's okay.

Q    Who called you?

K. Sarkinovic - Direct/Mr. Skurnik          1207

A    Either David or his secretary.

Q    About how many times did this happen?

A    Maybe 30 times or so.

Q    Did you ever ask Mr. Motovich why he wanted to set up these accounts in your name instead of his name?

A    No, I did not ask him.

Q    Did you think you were allowed to open up accounts in your name for Mr. Motovich?

A    I did not have the right to do that.

Q    So why did you do it?

A    I don't know.

Q    If you did not do it, did you think Zorach would keep giving you work?

A    No.

Q    We can pull up now Government Exhibit 366 at Page 5.

        MR. SKURNIK:  This is in evidence, your Honor.

        THE COURT:  You may publish.

        (Exhibit published.)

        MR. SKURNIK:  And if we can zoom in on the check, please.  Thank you.

Q    Do you see this checkbook?

A    Yes, I do.

Q    Is that your signature?

A    It is.

Q    What bank is listed on this check?

K. Sarkinovic - Direct/Mr. Skurnik          1208

A    Banco Popular.

Q    Did you open an account an at Banco Popular?

A    I did.

Q    Who asked you to open that account?

A    David.

Q    Did you have to go into the bank to open it up?

A    Yes.

Q    Did anyone go with you?

A    No, I went by myself.

Q    Did Mr. Motovich tell you to meet anyone at the bank?

A    Yes.

Q    What did he say?

A    A woman is going to wait for you.

Q    Did you meet that woman?

A    Yes, I did.

Q    Do you recall her name?

A    I don't.

Q    Can you describe what she looked like?

A    She was darker, not very tall.  She was a little bit larger but that's all I remember.

Q    For this Banco Popular account, did you do the same thing where you signed checks in Mr. Motovich's office?

A    Yes, the same thing.

Q    Who controlled this account?

A    David.

**J.A. 537**

K. Sarkinovic - Direct/Mr. Skurnik          1209

Q    Okay.  So we've talked about setting up the accounts, signing the checks, and approving wire transfers.  Did Mr. Motovich or Zorach ever ask you, yourself, to cash checks?

A    Cash check.  To cash check.  When I was send to cash check, yes.

Q    So either Mr. Motovich or Zorach would give you a check to cash, did that happen?

A    Yes, that's what happened.

Q    Do you know what that's checks are for?

A    To pay my workers who work for Zorach.

Q    So how would that work?  You cashed the check, then what do you with the cash?

A    Zorach knew how much the workers were supposed to be paid.  And that's the money that I would get, and including my own payment.

Q    So after you cashed the check, some of the cash goes to the workers?

A    Yes.

Q    And you keep a portion?

A    Part went to me, part went to the workers.

Q    And were these payments for real, actual work?

A    Yes, it was for real work.

Q    When you received these checks, would you ever look at what account is on the checks?

K. Sarkinovic - Direct/Mr. Skurnik          1210

A    No, I didn't look.

Q    Why not?

A    I wasn't interested.

MR. SKURNIK:  If we can pull up Government Exhibit 24 which is in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  And zoom in at the building in the center.

Q    Do you recognize this building?

A    Yes, I do.

Q    What is it?

A    It's a cash-checking location.

Q    Did you cash checks there?

A    Yes, I did.

Q    Who were some of the people that worked there?

A    Whoever was working that particular day.

Q    Do you recall any of their names?

A    Right now I can't recall any of their names.

Q    Do you recognize the name Yanky?

THE COURT:  How is that spelled.

THE WITNESS:  Yes, I do.

MR. SKURNIK:  Y-a-n-k-y.

A    Yes, I do.

Q    Who was Yanky?

K. Sarkinovic - Direct/Mr. Skurnik          1211

A    I think he's the owner of the location.

Q    Did you ever see Yanky at this location?

A    Yes, I did.

Q    It cash checks here, did you first have to open accounts at the check-cashing place?

A    Yes, I did.

Q    Did someone ask you to open those accounts?

A    Yes.

Q    Who?

A    David.

Q    Do you recall signing documents to open them up?

A    Yes, I do.

Q    Where did you sign those documents?

A    In David's office.

MR. SKURNIK:  If we could go to Government Exhibit 110 in evidence, please.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  And the first page.  And just zoom in at the very top.

Q    Does that say, Coney Island Payroll SVC?

A    Yes, it does.

MR. SKURNIK:  If we can zoom out, please, and zoom in at the top where it says "customer."

Q    Does that say SGS Construction Building Corp.?

K. Sarkinovic - Direct/Mr. Skurnik          1212

A    Yes, it does.

MR. SKURNIK:  Okay.  And if we can now zoom out again and zoom in on the signature at the bottom.

Q    Is that your signature?

A    Yes, it is.

Q    And if we can now go to Page 7 of this document.  Is that your driver's license?

A    Yes, it is.

Q    Okay.  Now, Government Exhibit 107 in evidence.  Does this also say Coney Island Payroll SVC at the top?

A    Yes, it does.

Q    What company is listed next to customer?

A    Ness Ago & Alaudin Contracting Corp.

Q    If we can zoom in at the signature on the bottom.  Is that your signature?

A    Yes, it is.

MR. SKURNIK:  If we can go now to Government Exhibit 108 in evidence.  First page, please.

Q    Does that say Coney Island Payroll at the top?

A    Yes, it does.

Q    What company is listed next to customer?

A    CNBC Construction Corp.

Q    At the bottom of this page, whose signature is listed?

A    My signature.

Q    And if we can go now to Page 11 of this document.  Is

J.A. 538

K. Sarkinovic - Direct/Mr. Skurnik        1213

this your handwriting?

A    The signature is mine.

Q    How about the rest of it?

A    No, it's not.

Q    Do you know whose it is?

A    I do not.

Q    Okay.  If we can go to Page 15 of this document.
Is that your driver's license again?

A    Yes, it is.

      MR. SKURNIK:  Now, Government Exhibit 109 in evidence, please, first page.

Q    Does this say Coney Island Payroll at the top?

A    Yes, it does.

Q    And next to "customer," does it say Midwood Building Corp.?

A    Yes, it does.

Q    At the bottom of the page, is that your signature?

A    Yes, it is.

Q    We can go, please, to Page 2.  Is this your handwriting?

A    It is not.

Q    Page 7, please.  Other than the signature, is this your handwriting?

A    Only the signature is mine.

Q    Page 8, please.

---

K. Sarkinovic - Direct/Mr. Skurnik        1214

Does that say Coney Island Payroll at the top?

A    Yes, it does.

Q    Is that your signature?

A    Yes, it is.

Q    The handwriting above, is that yours?

A    Only the signature is mine.

Q    And Page 12, please.
Is that your driver's license?

A    Yes, it is.

Q    Did you ever provide your driver's license to Mr. Motovich or Marina?

A    Yes, I did.

      THE COURT:  Which one?

      THE WITNESS:  The driver's license?

      THE COURT:  No, which person?

      THE WITNESS:  To the secretary, Marina.

      THE COURT:  Did you give it to Mr. Motovich, directly or just to the secretary?

      THE WITNESS:  Only to the secretary.

      THE COURT:  Go ahead.

Q    Was the driver's license -- did anyone give the driver's license back to you?

A    Yes, they did.

Q    Who did?

A    Marina.

---

K. Sarkinovic - Direct/Mr. Skurnik        1215

Q    So other than Coney Island Payroll, did you ever cash checks at a different location?

A    I also check cashed at the Avenue J.

Q    Anywhere else?

A    There may be once or twice on the 18th Avenue.

Q    So I'm going to now ask about taxes.
Did you ever file taxes for SGS, Midwood, Ago & Alaudin and CNBC Construction Corp.?

A    No, I did not.

Q    Did you previously have a bookkeeper?

A    Yes, I did.

Q    Do you know whether your bookkeeper ever filed taxes for those companies?

A    He did not.

Q    Do you know whether David Motovich filed taxes for those companies?

A    I know that he did not.

Q    Were you worried about who would file taxes for the companies?

A    Yes, I was worried.

Q    Why were you worried?

A    Something wasn't done and the taxes had to be paid to the Government.

Q    Did you ever raise this issue with Mr. Motovich?

A    Yes, I did.

---

K. Sarkinovic - Direct/Mr. Skurnik        1216

Q    What did he say?

A    He said he would take care of it.

      MR. SKURNIK:  We can go now to Government Exhibit 736-A which is not in evidence.

      THE COURT:  Any objection?

      MS. JACKSON:  No objection.

      THE COURT:  Admitted.  You may publish.

      (Government's Exhibit 736-A was marked in evidence.)

      (Exhibit published.)

Q    Is that your signature on the check?

A    Yes, it is.

Q    And does it say Ago & Alaudin Contracting Corp. on the check?

A    Yes, it does.

Q    The recipient Glenwood Management, do you recognize that?

A    Yes, I do.

Q    What is Glenwood Management?

A    This is where I paid my rent.

Q    That's your landlord?

A    Yes, it is.

Q    So why is there a check from Ago & Alaudin going to your landlord?

A    Because I had to pay my rent for this amount.

**J.A. 539**

*K. Sarkinovic - Direct/Mr. Skurnik* 1217

Q   So where did you get this check from?

A   David.

Q   Did you ask him for this check?

A   Yes, I did.

Q   Who filled in the top of the check?

A   I think the secretary did that.

Q   Is the check for $1,500?

A   Yes, it is.

Q   Did you have to give Mr. Motovich anything to get this check?

A   I gave him cash. I gave him in cash $1,500 and, in return, I received the check.

Q   So why did you do this? Why not use a check from one of your own accounts?

A   Because all the checks were by him.

Q   How did you feel about the fact that to pay your rent you had to go to Mr. Motovich to get a check from an account in your name?

A   I felt very bad about it.

Q   Did you get checks from Mr. Motovich to pay your rent often or not very often?

A   Not very often.

MR. SKURNIK: If we can go now to Government Exhibit 704 at Page 192. This is in evidence.

THE COURT: You may publish.

---

*K. Sarkinovic - Direct/Mr. Skurnik* 1218

(Exhibit published.)

MR. SKURNIK: If we can zoom in on this check.

Q   Is that your signature?

A   Yes, it is.

Q   Is this a check from Ago & Alaudin Contracting Corp.?

A   Yes, it is.

Q   For $342.89?

A   Yes, it is.

Q   The recipient, Ally, do you recognize that?

A   Yes, I do.

Q   Who is Ally?

A   This is a company where I got the loan for my car.

Q   Is this the same situation where you got this check from Mr. Motovich?

A   Yes, it is.

Q   So this is a check for your car payment; is that right?

A   Yes, it is.

Q   To receive this check, did you give Mr. Motovich cash in $342?

A   Yes, I did.

Q   Again, why did you do it this way?

A   Because they were asking to pay by check.

Q   Mr. Sarkinovic, have you ever written a check in your entire life?

A   No, I did not.

---

*K. Sarkinovic - Direct/Mr. Skurnik* 1219

Q   The lease for this car, did anyone help you get it?

A   Yes.

Q   Who?

A   David Motovich.

Q   How did he help you get the lease?

A   He was a co-signer on this loan.

MR. SKURNIK: If we can go to Government Exhibit 750, please.

THE COURT: In evidence?

MR. SKURNIK: Yes.

THE COURT: You may publish.

MR. SKURNIK: Excuse me, your Honor it's not in evidence.

THE COURT: Any objection to 750?

MS. JACKSON: No objection, Judge.

THE COURT: Admitted you may publish.

MR. SKURNIK: Thank you, your Honor.

(Government's Exhibit 750 was marked in evidence.)

(Exhibit published.)

Q   At the very top of this document where it says "dealer name," does that say Security Dodge next to it?

A   Yes, it does.

Q   Under "applicant," whose initials are listed?

A   David.

Q   Under co-applicant, what initials are listed?

---

*K. Sarkinovic - Direct/Mr. Skurnik* 1220

A   Kemal.

Q   Are those your initials?

A   Yes, it is.

Q   Now, the next box down, where it says "last name" and "first name," does it say David Motovich?

A   Yes, it does.

Q   Is the address 303 East 57th Street?

A   Yes, it is.

Q   And under "employer name," does that say Midwood Lumber?

A   I was not employed by Midwood Lumber.

Q   So, my question on this document, under "employer name," does that say Midwood Lumber?

A   Yes, it does.

Q   Okay. And under underneath that, does it say a salary of $130,000?

A   No, I don't make this salary.

Q   But is $130,000 listed on this page?

A   Yes, it is.

Q   And just to clarify. This page says "David Motovich" above, right?

A   Yes, it does.

MR. SKURNIK: Okay. Can we go to the next page please.

Q   Does this page have your name on it, Mr. Sarkinovic?

J.A. 540

K. Sarkinovic - Direct/Mr. Skurnik        1221

A   Yes, it does.

Q   And who is listed as your employer?

A   Midwood Lumber.

Q   Is that accurate?

A   No, it's not.

Q   And what's listed as your salary?

A   $220,000.

Q   Have you ever made $220,000 in a year?

A   No, I never did.

Q   If we can zoom out, please.  And zoom in on the signature.

Is that your signature?

A   Yes, it is.

Q   And if we can zoom out again.

Other than your signature, did you fill in the other information on this document?

A   I did not.

Q   Did you tell anyone that you worked at Midwood Lumber and made $220,000 a year?

A   I did not.

Q   Do you know who prepared this form?

A   Secretary.

Q   Is that Marina?

A   Yes, it is.

Q   So why was Mr. Motovich a co-applicant on this form?

K. Sarkinovic - Direct/Mr. Skurnik        1222

A   Since I didn't have credit on my own, that's why he was a co-signer.

Q   Who paid for the payments on the car?

A   I was making payments.

Q   So other than the car or your rent payments, were there any other times you got checks from Mr. Motovich?

A   No, I did not.

Q   Is it possible you might have gotten checks to pay for other things?

A   It is possible.

MR. SKURNIK:  If we can go now to Government Exhibit 366, Page 8.  This is in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  And, Ms. Kannan, if you can zoom in on the driver's license, second document down.  Thank you.

Q   Do you recognize this name, Mekdijia Demirovic?

A   Yes, I do.

Q   Who is that?

A   This is my ex-colleague from the former Yugoslavia.

Q   What kind of work did he do?

A   He was working superintendent and he was also doing construction work.

Q   Did you ever speak to him about David Motovich?

A   No, I did not.

K. Sarkinovic - Direct/Mr. Skurnik        1223

Q   Did he ever speak to you about David Motovich?

A   He knew him by sight but we were not talking to each other.

Q   How do you know that Mr. Demirovic knew David Motovich by sight?

A   During the period of COVID testifying.

Q   What do you mean by that?

A   He was helping people who needed to get COVID tests.

Q   Did that involve Mr. Motovich?

A   Yes, because all the work was done through him.

Q   So I'm going to ask you now about some invoices starting with 434-1 in evidence.

THE COURT:  You may publish.

(Exhibit published.)

Q   So this is in evidence already.

Does that say Ago & Alaudin General Construction Corp. on it?

A   It does.

Q   If we scroll down to the bottom.  Whose name is listed as president?

A   Kamel.

Q   If we can zoom out again, please.  And zoom in on the scope of work and the line below.

Does that say, "demolition completed on two floors"?

A   Yes, it does.

K. Sarkinovic - Direct/Mr. Skurnik        1224

Q   If we can zoom out again, please.  Is the total amount $67,500?

A   Yes.

Q   Did you do $67,500 worth of work in demolition?

A   No.

Q   Can we zoom out, please.

Did you create this invoice?

A   No.

Q   Before you met with the Government, had you ever seen this invoice?

A   No.

MR. SKURNIK:  If we can go now to Government Exhibit 1000 in evidence.

THE COURT:  You may publish.

(Exhibit published.)

Q   Does that say from Gail Motovich to dadbmotovich@aol.com?

A   Yes.

Q   If we can go to the second page, please.

Does that say SGS Construction Building Corp.?

A   Yes, it does.

Q   Okay.  If we can zoom in on the name on the bottom left.

Is that your name?

A   It is.

J.A. 541

K. Sarkinovic - Direct/Mr. Skurnik          1225

Q    And if we can zoom out.  And zoom in on the scope of
work and the amount below.
     Did you do $63,000 worth of work described in this
document?
A    Which address, please?
Q    If we can zoom out and then zoom in on -- right there.
     Did you do $63,000 worth of work for Boyard Management
Corporation?
A    No, I did not.
Q    Do you know who Boyard Management Corporation is?
A    I don't.
Q    Have you ever heard Mr. Motovich mention that name
Boyard Management?
A    I did.
Q    Tell us about that.
A    I just heard the name, that's all I know.
Q    Who did you hear it from?
A    From David.
Q    Did you create this document?
A    No.
Q    If we can go to the next page, please.
     Is this also an SGS Construction Building Corp.
invoice?
A    Yes.
Q    Does this also say Boyard Management Corporation?

K. Sarkinovic - Direct/Mr. Skurnik          1226

A    Yes.
Q    We can zoom in on the dollar amount at the bottom.
     Did you do $52,000 worth of work for Boyard Management
Corporation?
A    No.
Q    And, at the bottom of this document, that's your name?
A    Yes.
Q    Again, before you met with the Government, had you ever
seen this document?
A    No, I did not.
     MR. SKURNIK:  Government Exhibit 1008 in evidence,
please.
     THE COURT:  You may publish.
     (Exhibit published.)
Q    Is this an e-mail from Gail Motovich to
dadbmotovich@aol.com?
A    Yes.
Q    If we can go to the second page, please.
     Does that say SGS Construction Building Corp. at the
top?
A    Yes.
Q    And if we can zoom in on the name right there and
address.
     Does that say Mr. Boris Motovich?
A    Yes.

K. Sarkinovic - Direct/Mr. Skurnik          1227

Q    If we can zoom out, please.
     At the very bottom, whose name is listed?
A    My name.
Q    And what company is listed below your name?
A    SGS Construction.
Q    If we can zoom out, please, and then zoom in on the
amount.
     Did you do $74,550 worth of work for Boris Motovich?
A    No.
     MR. SKURNIK:  If we can go now to
Government Exhibit 1010 in evidence, please.
Q    Is this an e-mail from Gail Motovich?  Is this an
e-mail from Gail Motovich?
A    Yes.
Q    Okay.  If we can go to the second page, please.
     Does this say Ago & Alaudin General Corporation Corp.?
A    Yes.
Q    On the bottom left, whose name is listed?
A    My name.
Q    If we can zoom out, please.  What is the company listed
at the top left?
A    Dunbar Development.
Q    If we can zoom out, please.  Zoom in on the work and
the amount.
     Did you do $15,000 worth of work for Dunbar

K. Sarkinovic - Direct/Mr. Skurnik          1228

Development?
A    No.
Q    Did you create this document?
A    No.
Q    Do you even use computers?
A    No.
Q    Before you met with the Government, had you ever seen
this document?
A    No.
     MR. SKURNIK:  Government Exhibit 112, please.
     THE COURT:  In evidence?
     MR. SKURNIK:  In evidence, your Honor.
     THE COURT:  You may publish.
     (Exhibit published.)
Q    Is this an e-mail from Gail Motovich?
A    Yes.
Q    Is David Motovich davemidwood@gmail.com cc'd on this
e-mail?
A    Yes, I see it.
Q    If we can go to Page 2, please, and if we can scroll
down.
     Does that say Ago & Alaudin General Construction Corp.?
A    Yes, it does.
Q    Is that your name on the bottom left?
A    It is.

J.A. 542

K. Sarkinovic - Direct/Mr. Skurnik          1229

Q   Can we zoom in on the address on the top left.
    Does that say Dunbar Development?
A   It does.
Q   And if we can now zoom in on the dollar amount.
    Did you do $25,000 worth of work for Dunbar
Development?
A   No.
Q   Okay.  Is there another page on this document?  If we
can zoom in on the amount.
    Did you do $5,800 worth of work for Dunbar Development?
A   No.
Q   Do you know what Dunbar Development is?
A   No.
Q   Next page, please.  If we can zoom in on the amount.
    Did you do $15,000 worth of work for Dunbar
Development?
A   No.
Q   You didn't create these documents?
A   No.
Q   All right.  Government Exhibit 1013, please.
    Is this also an e-mail from Gail Motovich?
A   Yes.
Q   If we can go to the second page please.
    Does that say Ago & Alaudin General Construction Corp.
at the top?

---

K. Sarkinovic - Direct/Mr. Skurnik          1230

A   Yes.
Q   At the bottom, whose name is listed?
A   My name.
Q   What does it say under your name?
A   "Prepared by."
Q   And if we can zoom out.  Did you prepare this document?
A   No.
Q   Okay.  If we can zoom in on the dollar amount.  Does
that say 135,000?
A   Yes, it says 135,000.
Q   If we can now zoom in on the top left just below that.
    Did you do $135,000 worth of work for 12-14 East 72nd
Street?
A   No, I did not.
Q   If we can zoom out, please.
    At the top, do you recognize that phone number?
A   No.
Q   Okay.  If we can go to Government Exhibit 1018, please.
    Is this an e-mail from Gail Motovich to Marina Kuyan?
A   Yes, it is.
Q   Next page, please.
    Does that say Ago & Alaudin General Construction Corp.
at the top?
A   Yes.
Q   And who is this invoice being sent from, what's listed

---

K. Sarkinovic - Direct/Mr. Skurnik          1231

here?  Does that say Net Power Electric Corp.?
A   Yes, it does.
Q   Is that your name at the bottom?
A   Yes.
Q   If we can zoom in on the dollar amount.  Does that say
20,000?
A   Yes.
Q   If we can now zoom in on just above the dollar amount
the scope of work.
    Does it say, "Completed all electrical work throughout
entire house"?
A   I don't do electric.
Q   You don't do electric work?  Have you ever done
electric work?
A   No, never.
Q   So you didn't do $20,000 worth of electric work for Net
Power Electric Corp.?
A   No.
Q   Had you ever seen this document before you met with the
Government?
A   No, I did not.
Q   Okay.  If we can go now to Government Exhibit 1025.  Is
this an e-mail from Gail Motovich?
A   Yes.
Q   Next page, please.  If we can zoom in on the signature

---

K. Sarkinovic - Direct/Mr. Skurnik          1232

on the bottom?
A   It's my signature.
Q   Is that your handwriting?
A   Yes.
Q   Does it say your name?
A   Yes, it is.
Q   Can we zoom out, please.
    Have you ever seen this document before you met with
the Government?
A   No.
Q   Do you know how your signature got on this document?
A   I don't know.
Q   Okay.  What's the dollar amount, if we can zoom in on
that.
    Is that $29,750?
A   Yes, that's what it says.
Q   If we can zoom in on the company name on the top left.
Does that say Bridge Medical Diagnostics?
A   Yes, that's what it says.
Q   Do you know what that is, Bridge Medical Diagnostics?
A   No, I don't know.
Q   If we can zoom out, please.
    Did you do $29,750 worth of work for Bridge Medical
Diagnostics?
A   No.

J.A. 543

K. Sarkinovic - Direct/Mr. Skurnik     1233

Q    All right.  Government Exhibit 1026, please.
     Is this an e-mail from David Motovich, faxmidwood@aol.com?
A    Yes.
Q    Is it to, mkuyan1031?
A    Okay, yes.
Q    Can we go to the second page, please.
     If we look under "insured," can we zoom into that box?
     Does that say Ago & Alaudin General Contracting Corp.?
A    Yes.
Q    Did you ever see a certificate of insurance for Ago & Alaudin General Contracting Corp.?
A    No.
Q    Okay.  Government Exhibit 1027, please.
     Is this an e-mail from Gail Motovich to David Motovich, davemidwood@gmail.com?
A    Yes.
Q    If we can go to the next page, please.  Does that say Midwood USA Consulting Corp.?
A    It does.
Q    Let's go to the next page, please.  The next one.  Here we go.
     Does that say Ago & Alaudin General Construction Corp.?
A    Yes.
Q    Is your name on the bottom left of this document?

K. Sarkinovic - Direct/Mr. Skurnik     1234

A    Yes.
Q    We can zoom out, please.  Zoom in on the name of the company?
     Does that say Gotham Yellow?
A    Yes.
Q    What is Gotham Yellow?
A    I don't know.
Q    If we can zoom out, please, and zoom in on the dollar figure.
     So you didn't do $75,000 worth of work for Gotham Yellow?
A    No.
Q    Before you met with the Government, had you ever seen this document?
A    No, I did not.
Q    Government Exhibit 1028, please.
     THE COURT:  That is a document that we will resume with after we take our luncheon recess, ladies and gentlemen of the jury.  It's 1:10, can we agree to resume at 2:30?  Would that work for you in terms of a reasonable break?
     Thank you very much.  I appreciate your patience.  Please do not talk about the case and we will continue to zoom along.
     Thank you.
     COURTROOM DEPUTY:  All rise.

K. Sarkinovic - Direct/Mr. Skurnik     1235

     (Jury exits courtroom at 1:10 p.m.)
     THE COURT:  You may step down, sir.  Thank you and we'll see you after lunch.
     (Witness leaves the witness stand.)
     THE COURT:  Thank you.  The witness is leaving the courtroom.
     Ladies and gentlemen, you may be seated and we'll see if we have any issues to address before we take our luncheon break.
     In the absence of the jury and in the absence of the witness, anything from the Government.
     MR. GRUBIN:  No, your Honor.
     THE COURT:  Anything from defense counsel?
     MS. JACKSON:  No, Judge.
     THE COURT:  The enjoy your lunch, everyone.  We'll see you back here at 2:30.
     MS. JACKSON:  Thank you.
     THE COURT:  Thank you.
     (Luncheon recess taken; 1:11 p.m.)
     (Continued on the next page.)

*Proceedings*     1236

     AFTERNOON SESSION
     (In open court - jury not present.)
     THE COURTROOM DEPUTY:  All rise.
     (Judge WILLIAM F. KUNTZ, II entered the courtroom.)
     THE COURT:  You may be seated.
     Do we have any issues we need to address before we bring the jury in and the witness back on the witness stand?
     First, from the Government.
     MR. SKURNIK:  Your Honor, just one minor issue.
     THE COURT:  Yes.
     MR. SKURNIK:  The microphone is running low on battery, so I just spoke to Mr. Scott and I believe we are going to call up for an extra battery.  But we can proceed for now, it hasn't died yet.
     THE COURT:  Which, the battery that the interpreters are using?
     MR. SKURNIK:  Yes, that's right.
     THE COURT:  Can we, as we used to say in my old neighborhood, borrow one from the neighboring courtroom without tell them about it?
     MR. POLEMENI:  As long as you sanction it, Judge.
     THE COURT:  I do.
     MR. POLEMENI:  Okay.  Then we'll do that.
     THE COURT:  I do.
     MR. JACKSON:  Other than that, no issues from us,

Proceedings                           1237

Judge.

THE COURT:  Not Judge Raggi's courtroom.  I mean I'm brave, but I'm not stupid.  I mean another district court judge.

MR. JACKSON:  No issues from us.

THE COURT:  Okay.  Thank you, Mr. Jackson.

We're off the record.

(Pause.)

THE COURT:  Any other issues before we bring the jury in?

From the Government.

MR. SKURNIK:  No, Your Honor.

THE COURT:  And defense.

MR. JACKSON:  No, Your Honor.

THE COURT:  Okay.  Let's get the witness back on the witness stand, and please bring in the jury.

Thank you.

(Witness entered and resumed the stand.)

THE COURT:  We will bring the jury in in a minute, so you can stand up when they come in.  Thank you.

(Pause.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please stand for the jury.  Thank you.

(Jury enters.)

THE COURT:  Please be seated, ladies and gentlemen

---

Sarkinovic - direct - Skurnik              1238

of the jury.

Again, I thank you for your patience.  And don't worry, 5 o'clock is still 5 o'clock.  I know you keep waiting for me to blow through that limit, but I won't.  We are going to stop at 5:00, and appreciate your patience.

All right.  You are still under oath, sir.

We'll continue with the examination.

MR. SKURNIK:  Thank you, Your Honor.

Ms. Kannan, if we can pull up Government Exhibit 1028.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  If we can zoom out the top of this e-mail, please.

DIRECT EXAMINATION (Continuing)

BY MR. SKURNIK:

Q    This an e-mail from Gail Motovich to Rich Pesce?

A    Yes, it is.

MR. SKURNIK:  And, Ms. Kannan, if we can go to the second page, please.

(Exhibit published.)

Q    Does that say Ago & Alaudin General Construction Corp. at the top?

A    Yes, it does.

Q    Is that your name on the bottom left, Mr. Sarkinovic?

---

Sarkinovic - direct - Skurnik              1239

A    Yes, it is.

Q    Is that your signature?

A    No, it's not.

Q    Okay.

MR. SKURNIK:  If we can zoom back out, please.  And zoom in at the name of the company on the top left.

BY MR. SKURNIK:

Q    Does that say Merrick Real Estate Group?

A    Yes, it does.

THE COURT:  Okay, zoom out, please.  And if we can zoom in on the order and the amount.

Q    Did you do $17,850 worth of work from Merrick Real Estate Group?

A    I did not.

Q    Okay.  You didn't create this document?

A    I did not.

Q    Okay.

MR. SKURNIK:  Government Exhibit 1029, please.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  If we can zoom in at the top.

Q    Is this also an e-mail from Gail Motovich to Rich Pesce?

A    Yes, it is.

Q    Is David Motovich cc'd on this e-mail?

A    Yes, he did.

J.A. 545

---

Sarkinovic - direct - Skurnik              1240

Q    And is the address DaveMidwood@gmail.com?

A    Yes, it is.

MR. SKURNIK:  Okay.  If we can go to the second page, please.

(Exhibit published.)

BY MR. SKURNIK:

Q    Does this also have your name in the bottom left?

A    Yes, it does.

Q    Does that say Ago & Aluadin construction Corp.?

A    Yes, it does.

MR. SKURNIK:  If we can zoom out.  We can highlight the company in the upper left.

Q    Does this also say Merrick Real Estate Group?

A    Yes, it does.

MR. SKURNIK:  If we can zoom out, please.  And if we can highlight the work and the amount.

Q    Mr. Sarkinovic, did you do $50,000's worth of work for Merrick Real Estate Group?

A    No, I did not.

Q    Okay.

MR. SKURNIK:  If we can go to Government Exhibit 1048, please.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  Zoom in at the top.

*Sarkinovic - direct - Skurnik* 1241

Q    Is this an e-mail from Gail Motovich to Boris Motovich?

A    Yes, it is.

MR. SKURNIK:  If we can go to the second page, please.

(Exhibit published.)

Q    Does this also say Ago & Alaudin General Construction Corp. at the top?

A    Yes, it does.

MR. SKURNIK:  And if we can zoom in on the company name.

Q    Boyard management Corp.  Is this the company you said you had heard Mr. Motovich talk about before?

A    Yes, it is.

Q    Okay.

MR. SKURNIK:  If we can zoom out, please.

Q    Is that your name on the bottom left?

A    Yes, it is.

MR. SKURNIK:  If we can zoom in on the work and the amount.

Q    Did you do $23,000's worth of moving pipes, walls, taping, painting, supply and installation for Merrick Real Estate Group?

A    I did not.

Q    Or, excuse me, for Boyard Management Corp.?

A    No, I did not.

*Sarkinovic - direct - Skurnik* 1242

Q    Okay.

MR. SKURNIK:  If we can go to Government Exhibit 1052.

(Exhibit published.)

MR. SKURNIK:  Zoom in at the top, please.

BY MR. SKURNIK:

Q    Is this an e-mail from Gail Motovich?

A    Yes, it is.

Q    The person it's being sent to, is that Felecia@metrosteel.net.

A    Yes, it is.

MR. SKURNIK:  If we can go to the second page, please.

Q    Does this have your name in the bottom left?

A    Yes, it is.

Q    Does it say Ago & Alaudin Construction Corp.?

A    Yes, it does.

MR. SKURNIK:  If we can zoom in to the top left now to the name of the company.

Q    Does that say Metro Erector Inc.?

A    Yes, it does.

Q    Do you know what that is, Metro Erector Inc.?

A    I do not know.

Q    Have you ever met someone named Joseph Russo?

A    I did not.

*Sarkinovic - direct - Skurnik* 1243

MR. SKURNIK:  Okay.  We can zoom out, please, and highlight the work and the amount.

BY MR. SKURNIK:

Q    So you didn't do $7,500's worth of work for Metro Erectors Inc.?

A    I did not.

Q    You didn't create this document?

A    I did not.

Q    Before you met with the Government, had you ever seen this document?

A    No, I did not.

MR. SKURNIK:  Government Exhibit 1196, please.

(Exhibit published.)

MR. SKURNIK:  We can zoom in at the top.

Q    Is this an e-mail from Gail Motovich?

A    Yes, it is.

Q    Does the subject say "cnbc letterhead"?

A    Yes.

MR. SKURNIK:  We can go to the second page, please.

Q    At the bottom of this document, whose name is listed?

A    My name.

Q    Does it say CNBC Construction Corp.?

A    Yes, it does.

MR. SKURNIK:  We can zoom out.

Q    Is the center of this document blank?

*Sarkinovic - direct - Skurnik* 1244

A    It is blank.

Q    Okay.

MR. SKURNIK:  And if we can zoom in at the company in the upper left.

Q    Do you recognize Neomy Dialysis Center?

A    Yes, I do.

Q    What is it?

A    A dialysis company.

Q    Do you know who owns or is a partner in that company?

A    David.

MR. SKURNIK:  If we can go to Government Exhibit 1183, please.

(Exhibit published.)

MR. SKURNIK:  And zoom in at the top.

Q    Is that an e-mail from Gail Motovich to Marina Kuyan?

A    Yes, it is.

Q    Under subject, does it say:  Forward proposal, CNBC Construction, Neromy Dialysis?

A    Yes, it does.

MR. SKURNIK:  We can go to the second page, please. If we can scroll down.  Is there another page? Okay.  If we can zoom in on the Neomy Dialysis in the top.

Q    Is this the same company you were speaking about?

A    Yes, it is.

Q    And let's look, who signed on the bottom left of this

**J.A. 546**

*Sarkinovic - direct - Skurnik* 1245

document, whose name do you see?

A    David Motovich.

Q    Okay.

MR. SKURNIK:  The last one, Government Exhibit 1056, of these invoices.

(Exhibit published.)

MR. SKURNIK:  If we can zoom in at the top, please.

BY MR. SKURNIK:

Q    Is this an e-mail from Gail Motovich to David Motovich at the e-mail address DaveMidwood@gmail.com?

A    Yes, it is.

MR. SKURNIK:  If we can go to the next page, please.

(Exhibit published.)

Q    Does this one say Ago & Alaudin General Construction Corp. at the top?

A    Yes, it does.

Q    At the bottom, whose name is listed?

A    My name.

Q    Okay.  What company is listed in the upper left?

A    Douglas Elliman Realty.

Q    Okay.  Does that address say 303 East 57th Street, apartment 47G?

A    Yes, it does.

Q    Okay.

MR. SKURNIK:  If we can zoom out, please, and

---

*Sarkinovic - direct - Skurnik* 1246

highlight the scope of work and the amount.

BY MR. SKURNIK:

Q    Mr. Sarkinovic, did you do $375,000's worth of work for Douglas Elliman Realty?

A    I did not.

Q    Have you ever done a project where you got paid $375,000?

A    No, I never did.

MR. SKURNIK:  If we can zoom out, please.

Q    In your whole life, have you ever created an invoice like this?

A    I did not.

Q    That's, in part, because you don't use a computer, do you?

A    I do not use it.

Q    Did Mr. Motovich ever tell you he was creating documents like this?

A    He did not.

Q    How about Marina, did she ever tell you she was creating documents like this?

A    She never did.

Q    Did you ever hear from Mr. Motovich's sister, Gail, about these documents?

A    No, I did not.

Q    Did anyone ever tell you about these documents?

A    No.  Nobody ever did.

---

*Sarkinovic - direct - Skurnik* 1247

Q    Is the first time you learned about these when you met with the Government?

A    Yes, it is.

Q    So, a lot of these invoices mention Ago & Alaudin on them, is that correct?

A    Yes, it is.

Q    You testified earlier today that you knew Ago Kolenovic, is that right?

A    Yes, I did.

Q    So you knew you were opening a company with a name similar to Ago Kolenovic's company, is that right?

A    Yes, I did.  I knew that.

Q    Is it fair to say you felt bad about this?

A    Yes, up today I feel bad about it.

Q    But at the time you kept signing the checks, is that right?

A    Yes, I did.

Q    But you eventually pled guilty to a crime?

A    Yes, I did.

Q    So you took responsibility, is that fair to say?

A    Yes, I did.

Q    So, where were you the first time you ever spoke to the Government about this investigation?

A    That happened at JFK Airport.

Q    Were you flying into JFK Airport or out of JFK Airport?

---

*Sarkinovic - direct - Skurnik* 1248

A    When I was flying in.

Q    Where were you flying from?

A    I was coming from Montenegro.

Q    Do you recall how long you had been in Montenegro?

A    About two weeks.

Q    Do you remember what year this was?

A    About '18, 2018.

Q    Do you recall what day of the week this happened?

A    I landed on Saturday, in January.

Q    What happened?

A    When I gave my passport, my passport was taken away to some officer in another office.

Q    What happened next?

A    They brought some papers and they asked me to talk to these two people in order to know what was happening.

Q    Did you speak to those two people?

A    Yes, I did.

Q    Who were those two people?

A    They were two agents.  The one of them was called George.

Q    Do you recall the other's name?

A    He's here.

Q    Do you see him in the courtroom today?

A    Yes, I do.

Q    Can you identify an article of clothing he's wearing?

A    He's dressed in a suit.

**J.A. 547**

*Sarkinovic - direct - Skurnik*　　1249

Q   What color is his tie?

A   Some kind of green, yellow.

MR. SKURNIK:  Your Honor, let the record reflect that the witness has identified Special Agent Cabane.

MR. JACKSON:  No objection.

THE COURT:  I'm sorry.  There's on objection.

MR. JACKSON:  No, Your Honor, I said no objection.

THE COURT:  Oh, no objection.  The record will so reflect.

BY MR. SKURNIK:

Q   So what happened when you spoke to George and Special Agent Cabane?

A   They brought along a lot of papers.

Q   Did you look at the papers?

A   I looked superficially at all the papers.  They were divided in two groups.  On one side were all the papers, my papers.  And the others were the papers of the company that they opened under my name.

Q   So, when you say companies owned under your name, do you mean Ago & Alaudin and SGS?

A   Yes.

Q   CNBC Construction Corp.?

A   Yes.

Q   Midwood Building Corp.?

A   Yes.

---

*Sarkinovic - direct - Skurnik*　　1250

Q   What did Special Agent Cabane and the other individual say about those papers?

A   I told them that the group of the people on one side, they belong to my tax returns.  And the others did not belong to me.

Q   Did you think you were in trouble?

A   Yes, I did.

Q   Why is that?

A   Because I know the taxes were not paid.

MR. SKURNIK:  If we could pull up, this is just for the witness, Your Honor, Government Exhibit 235.  It's not in evidence.

THE COURT:  Any objection to 235?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government's Exhibit 235 was received in evidence.)

THE COURT:  You may publish.

(Exhibit published.)

BY MR. SKURNIK:

Q   Mr. Sarkinovic, what is this document?

A   This is the airport -- this is the document that I signed at the JFK Airport.

Q   Did you sign this while you were speaking to Special Agent Cabane and to George?

A   Yes, I did.

---

*Sarkinovic - direct - Skurnik*　　1251

Q   Okay.

MR. SKURNIK:  Can we zoom in on the date in the upper right-hand corner?

BY MR. SKURNIK:

Q   Does that say January 12th, 2019?

A   Yes, it does.

Q   Okay.  I know you testified a couple minutes ago that you landed in 2018.

Does this change your answer on that?

A   It's '19.

Q   Okay.

MR. SKURNIK:  If we can zoom out, please.

Q   At the top of this document --

MR. SKURNIK:  If we could zoom in on the first line.

Q   -- who does it say is making a statement?

A   Kemal Sarkinovic.

Q   Is that you?

A   Yes, that's me.

MR. SKURNIK:  If we can scroll to the last page, please.

Q   Whose signature is on the right?

A   My signature.

MR. SKURNIK:  And if we can zoom out, please.  And then zoom in on the other two signatures.

Q   Are these the signatures of the agents who were in the

---

*Sarkinovic - direct - Skurnik*　　1252

room with you?

A   Yes, these are their signatures.

Q   Do you sign this document at the airport?

A   Yes, I did.

MR. SKURNIK:  If we can go back to the first page, please.  And the second line, plus the name of the companies.

BY MR. SKURNIK:

Q   Does this say "I opened the following bank accounts," and then list a number of bank accounts?

A   Yes, it does.

Q   Are these some of the bank accounts that we've spoken about today?

A   Yes, they are.

Q   So these are bank accounts that you opened for Mr. Motovich?

A   Yes they are.

Q   Who controls these accounts?

A   David.

MR. SKURNIK:  If we can zoom out, please.  And zoom in on the next section of this document.

Q   Does that say "I opened the following businesses:  SGS Construction Building Corp., Ago & Alaudin Contracting Corp., Midwood Building Corp., CNBC Construction Corp.?

A   It says so.

Q   Okay.

**J.A. 548**

*Sarkinovic - direct - Skurnik* 1253

MR. SKURNIK: If we can zoom out again. And if we can now zoom in at the bottom paragraph.

BY MR. SKURNIK:

Q    Does this say: I handed over all checkbooks to the accounts listed above to David Motovich. I signed checks for David Motovich when he asked. I wire transferred money from the accounts above when David Motovich asked?

Did I read that correctly?

A    This is accurate.

Q    Okay. Who wrote this document, was it you?

A    No, I didn't write it myself. Two agents wrote it.

Q    Okay. Why didn't you write it?

A    I don't know English.

Q    When the agents wrote this document, did they read it to you out loud?

A    Yes, they did.

Q    Did you understand what they were saying?

A    Yes, I did.

Q    Was there an interpreter in the room?

A    No, it was not.

Q    But you still understood?

A    Yes, I did.

Q    Did Special Agent Cabane or George force you to sign this document?

A    They did not.

---

*Sarkinovic - direct - Skurnik* 1254

Q    Did they pressure you to sign it?

A    They did not.

Q    Did they promise you anything if you signed it?

A    They did not.

Q    Did you sign this of your own free will?

A    Yes, I did.

Q    Beside the paragraph here, there's a marking to the left.

Do you know what that is?

A    This is my sign.

Q    Did you initial each paragraph on this document?

A    Yes, I did.

Q    Did Special Agent Cabane or George ask you about Mr. Motovich?

A    Yes, they did.

Q    What did you tell them?

A    That he's the owner of the companies.

Q    Did you give them a phone number?

A    Yes, I did.

Q    Whose phone number?

A    David's phone number.

Q    Did the agents give you anything to take with you?

A    I took a business card from George.

Q    After you signed this statement, did you have any plans to meet with the agents again?

A    Yes, I did.

---

*Sarkinovic - direct - Skurnik* 1255

Q    When was that meeting supposed to happen?

A    I was supposed to meet with them on Monday at 9:00 a.m.

Q    So this is on Saturday. So you're saying two days later on Monday?

A    Yes, this is correct.

Q    Why did you agree to meet with the agents?

A    I felt I should meet with them. I didn't have a lawyer to represent me.

Q    Did you want to cooperate with them?

A    Yes, I did.

Q    Why is that?

A    I had to get rid of this burden on my back.

Q    So after you spoke to Special Agent Cabane and the other agent, did you tell anybody that it happened?

A    Yes, I did.

Q    Who did you tell?

A    I told Zorach.

Q    What did you tell him?

A    Okay. I told him to call David and tell him that I was stopped at JFK Airport.

Q    What did Zorach say?

A    He got in touch with David.

Q    Why is Zorach the person you called?

A    Because most of the time I was working with him, and I felt that the right person I should be talking to.

**J.A. 549**

---

*Sarkinovic - direct - Skurnik* 1256

Q    Do you know whether Zorach spoke to David?

A    Yes.

Q    Did you later meet with Mr. Motovich?

THE COURT: The question you asked him was do you know if he met with him, and he said yes.

I think you want to ask him if he met with him.

BY MR. SKURNIK:

Q    Did you meet with Mr. Motovich?

A    Yes, I did.

THE COURT: Okay.

Q    When did you meet with him?

A    I think that was on Sunday in the evening.

Q    Where did you meet?

A    In his father's office.

Q    Where is that?

A    In Midwood Lumber.

Q    Who was at that meeting?

A    David was there and Arthur, David's father, and a couple of other people. I don't know who they were.

Q    So you mentioned Mr. Motovich and his father.

Who is Arthur?

A    Arthur is the lawyer.

Q    Do you recall his last name?

A    Gershfeld.

MR. SKURNIK: Could we pull up Government Exhibit 3,

*Sarkinovic - direct - Skurnik* 1257

please.

Your Honor, this is not in evidence.

THE COURT: Any objection to Government 3?

MR. JACKSON: No objection to this.

THE COURT: You may publish. It's admitted.

(Government's Exhibit 3 was received in evidence.)

(Exhibit published.)

BY MR. SKURNIK:

Q Who is this?

A Arthur Gershfeld.

Q So this is the lawyer that was at Boris Motovich's office when you went to meet on that Sunday night?

A Yes, that's him.

Q Had you ever met him before?

A Yes.

Q When did you meet him?

A About five years prior. He was defending three workers. That's all I know.

Q When you met him, five --

THE COURT: Have you completed your answer?

THE WITNESS: Yes, I have.

THE COURT: Go ahead.

Q So when Mr. Gershfeld was representing some workers, was David involved in that?

A He recommended him.

---

*Sarkinovic - direct - Skurnik* 1258

Q Did you pay Mr. Gershfeld to represent those workers?

A No. The workers paid their own bills.

Q Do you know why those workers needed to be represented?

A They were shifting building material from one site to the other and somebody called the police. So, the boss came to say that this transfer was okay, that it was a legitimate transfer. So that was all closed quickly, resolved quickly.

Q Do you know how Mr. Gershfeld knows Mr. Motovich?

A I think that they went to school together.

Q Did Mr. Motovich tell that you?

A Yes.

Q So, back to the Sunday night meeting.

What did you tell the people at that meeting?

A I told them that I was stopped by officers at -- the IRS stopped me at the -- and that's all I told them.

Q Did you tell them that you had given Mr. Motovich's phone number to the agents?

A Yes, I did.

Q Did you tell them that you had signed a statement?

A I did.

Q Did you tell them that you had planned to meet with the agents the next day?

A I did.

Q Did you tell them that you agreed to cooperate with the agents?

---

*Sarkinovic - direct - Skurnik* 1259

A I did.

Q Did you tell them that you received a business card from the agent?

A I did.

Q What did you do with the business card, if anything?

A I gave it to the attorney.

Q Why is that?

A He agreed to defend me, to represent me.

Q Did you tell them that you intended to go to the meeting the next day with the agents?

A I did.

Q Okay. So, I want to unpack what you just said about the attorney agreeing to represent you.

Did you ask him to represent you?

A No.

(Continued on the following page.)

**J.A. 550**

---

SARKINOVIC - DIRECT - MR. SKURNIK 1260

BY MR. SKURNIK: (Continuing.)

Q Did someone tell you that he would represent you?

A Yes. David told me that he would be my attorney.

Q Did Mr. Motovich say why this man would be your attorney?

A No, we did not talk about that any further.

Q Did Mr. Gershfeld say anything to you at that meeting?

A No, he did not.

Q Did Mr. Motovich ever say why Mr. Gershfeld was at the meeting in the first place?

A No. I don't know that.

Q Did anyone ask for your opinion as to whether Mr. Gershfeld should represent you?

A No, nobody asked.

Q Did you tell them whether you wanted him to represent you?

A No.

Q Did you want him to represent you?

A Maybe yes, maybe no.

Q Did you talk to Mr. Gershfeld about the meeting the next morning with the agents?

A He said that he would -- he said that he would attend in my place. He said that he would represent me at the meeting.

Q Did you feel like you had a choice about whether to go to the meeting?

A I didn't feel that I had a choice.

SARKINOVIC - DIRECT - MR. SKURNIK          1261

Q   Why is that?
A   I felt rather lost at that moment.
Q   At that Sunday night meeting, did you have any discussion about who would pay Mr. Gershfeld?
A   I knew that David would be paying.
Q   How did you know that?
A   They knew that I could not afford it.
Q   Did you go to the meeting the next morning with the agents?
A   No, I did not.
Q   Why not?
A   Because the attorney went in my place to represent my interests.
Q   Did you later speak to the attorney about that meeting?
A   Yes, I did.
Q   What did he tell you?
A   He told me that nothing happened, and that's all I heard.
Q   Did he talk to you about whether the Government still wanted to speak with you after that meeting?
A   No, he did not tell me that.
Q   Did he talk to you about whether the Government was interested in you cooperating with them?
A   No, we did not talk about that.
Q   Did you ask Mr. Gershfeld about whether you could still meet with the Government?

SARKINOVIC - DIRECT - MR. SKURNIK          1262

A   No, I did not ask him that.
Q   Did he raise it and say whether you could or could not meet with the Government?
A   No, we did not talk about that.
Q   Did Mr. Gershfeld ever bring up the idea of you cooperating with the Government after that meeting?
A   No.
Q   Did you ever pay Mr. Gershfeld?
A   No.
Q   Do you know who paid him?
A   Yes, I do.
Q   Who?
A   David Motovich.
Q   How much did he pay him?
A   50,000.
Q   How do you know that?
A   Because I brought the check and I took it to Arthur.
Q   Where did you get that check?
A   David gave it to me.
Q   Where were you when David gave it to you?
A   It was in his office.
Q   Do you recall what was written on the check?
A   It just said 50,000.
Q   Whose signature was on the check; do you remember?
A   It was my signature.

SARKINOVIC - DIRECT - MR. SKURNIK          1263

Q   Do you recall if the recipient was filled out on the check?
A   No, there was no name.
Q   Did you look and see what company or from whom the check was coming -- in the upper left-hand corner of the check, what was listed?
A   I did not look.  I don't know.  I just saw the number.
Q   What did you do with that check?
A   I took it to Arthur.
Q   Did you give it to him?
A   Yes, I did.
Q   Did he say anything?
A   He looked at it and he put it in a drawer.
Q   Did you have any additional meetings with Mr. Gershfeld?
A   Yes, I did.
Q   During those meetings, did you ever talk -- did he ever raise the idea of you cooperating with the Government?
A   No, he did not.
Q   During those meetings, did Mr. Gershfeld ever tell you it was an option to cooperate with the Government?
A   No.
Q   Is Mr. Gershfeld your attorney today?
A   No, he's not.
Q   Did you eventually get a different attorney?
A   I did.

SARKINOVIC - CROSS - MR. JACKSON          1264

Q   After you got that different attorney, did you cooperate with the Government?
A   Yes, I did.
        MR. SKURNIK:  Nothing further at this time, Your Honor.
        THE COURT:  Your witness.  You may cross.
        MR. MAZUREK:  Thank you, Judge.
CROSS-EXAMINATION
BY MR. JACKSON:
Q   Good afternoon, Mr. Sarkinovic.
A   Good afternoon.
Q   And Mr. Sarkinovic, just to be clear, my name is Randall Jackson.  I know we've never met, but I'm going to ask you some questions.
        If you don't understand any of my questions, will you please let me know?
A   Okay.  I will.
Q   And most of the questions I'm going to ask you, I'm going to try to ask you yes or no.
        If I ask you a yes-or-no question, and you can't answer yes or no, can you let me know?
A   Okay.
Q   Now, Mr. Sarkinovic, let me just ask you, you have known David Motovich and his family for more than 20 years, correct?
A   Yes.

J.A. 551

SARKINOVIC - CROSS - MR. JACKSON   1265

Q    And I'm correct that the way that that started out was you were trying to get started as a contractor and you didn't have any money, but you would go to Midwood Lumber sometimes when you did have a little bit of money to buy stuff, right?

A    I had an account.  I worked for Zorach at that time.

Q    When was it that you started working for Zorach?

A    About 15, 20 years ago.

Q    And you would sometimes go to Midwood Lumber?

A    Yes.

Q    And the purpose of going was you were trying to pick-up materials, right?

A    Yes.  I would pick up materials there.

Q    These were materials for actual construction jobs that you were doing, correct?

A    Yes.

Q    Now, there was a period when you couldn't get any work at all, correct?

A    Yes.

Q    And when that happened, you couldn't get any work at all, before you started doing any business that you've been talking about today, David Motovich would give you materials on credit so you could start to try to get things going, right?

A    These was small sums, and this would be for a week or two at the time.

Q    Right.  Small sums, but he was loaning you materials,

SARKINOVIC - CROSS - MR. JACKSON   1266

right?

A    Yes.

Q    For week or two at a time, right?

A    Yes.

Q    And he didn't owe you anything, did he?

A    I did not owe him anything either, and he did not owe me anything, no.

Q    Right.  And you mentioned that you tried to start this business called Latek, right?

A    Yes.

Q    And Latek was a complete failure, right?

A    Yes.

Q    Now, you talked a little bit about it with the prosecutor and you said that you failed.

But you were trying to get that business going for 10 years; am I right about that?

A    Yes.

Q    That was a very difficult 10 years, wasn't it?

A    Yes, still is.

Q    Okay.  And that was before you started working with David Motovich, right?

A    Yes.

Q    And you came to David and you told him that you couldn't get any clients, you couldn't figure out how to get any clients, right?

SARKINOVIC - CROSS - MR. JACKSON   1267

A    Yes, I did.

Q    And you asked him, you said, David, can you please help me?

A    Yes.

Q    Now, and David agreed that he would help you, right?

A    Yes.

Q    One of the things that David told you is that you needed to have an actual company in order to start getting clients, right?

A    Yes.

Q    And at that point, you hadn't had any real official company at all, correct?

A    No.  Yes, I did not.

Q    Okay.  And you didn't have any bank accounts, correct?

A    No, I did not.

Q    One of the difficulties that you were having is you didn't have any mechanism for people to pay you for your work, correct?

A    These were smaller jobs, and because I didn't have money to pay insurance and other things, so these were small jobs that I was able to get, only small jobs.

Q    And we're going to unpack that, but just big picture.

After David started helping you with your business, your life became much more prosperous, correct?

A    Yes, it was better.

SARKINOVIC - CROSS - MR. JACKSON   1268

Q    Now, I just want to clear up one thing, Mr. Sarkinovic.  I know you're using an interpreter today, right?

You're you using an interpreter today, right?

A    Yes.

Q    But, a second ago, you said, I don't speak English, right?

A    Yes.

Q    That's not exactly true, correct?

A    This is -- this is different kind of conversation and that is why I need assistance today.

Q    Okay.  Put that aside.

My question is, you do speak English, right?

A    Yes, I do.

Q    And, in fact, you've been speaking to my client, David Motovich, for over 20 years, exclusively in English, correct?

A    Yes.

Q    When you came into Midwood Lumber, you never had an interpreter with you, right?

A    No, I did not.

Q    You talked about your relationship with this guy, Zorach, right?

A    Yes.

Q    You and him were engaged in complex projects, right?  These were not like LEGO projects?

A    Yes.

J.A. 552

SARKINOVIC - CROSS - MR. JACKSON          1269

Q    You were building houses?

A    Yes.

Q    And you were directing crews and building houses and taking direction from Zorach, right?

A    Yeah, but this went through Zorach.  This was not my own stuff.

Q    Yes.  Zorach was giving you direction in terms of how you built houses, right?

A    Zorach was the boss and he was GC contractor, and I was a laborer.

Q    Well, Zorach only speaks English, correct?

A    Yes.

Q    And it was never a day when you say, Zorach, if we don't get an interpreter in here, it's going to be difficult for me to communicate with you, right?  That never happened, right?

A    You're right.

Q    And the reason is you understood everything that Zorach was saying, right?

A    Yes.

Q    Am I correct that you've had a bunch of meetings with the prosecutors?

A    Yes.

Q    How many meetings have you had with the prosecutors?

A    Seven or eight.

Q    Seven or eight recently, right?

---

SARKINOVIC - CROSS - MR. JACKSON          1270

A    In this whole period.

Q    This whole period, you mean since you started cooperating?

A    Yes.

Q    Okay.  And let me guess, they only told you to tell the truth, right?

A    Yes.

Q    Okay.  But they needed to meet with you each time to make sure that you were telling the truth just the right way, correct?

        MR. SKURNIK:  Objection.

        THE COURT:  Overruled.

Q    You can answer.

A    That I only have to say the truth and nothing but the truth, and that nobody needs to tell me what that truth is.

Q    So why was it that you needed to meet so many times if all you had to do is just tell the truth?

        MR. SKURNIK:  Objection.

        THE COURT:  Overruled.

A    They wanted to confirm all the evidence that they've gathered.

Q    And they've gone over some of the documents that you went over, over and over again with you, over and over again, correct?

A    I was told to answer the questions, yes.

---

SARKINOVIC - CROSS - MR. JACKSON          1271

Q    All those invoices that we went through, each one, all of those, they went through those and prepped with you each time to make sure you answered the questions correctly, right?

A    I did not make anything up.

Q    That's not my question.  All those documents that you went through today in testimony, they went through each of those documents with you, repeatedly, in prep to confirm you were going to answer the questions correctly, right?

A    Yes.

Q    And this wasn't happening in a vacuum, this is happening after you have pled guilty to a crime for which you're facing a maximum of 30 years in prison, correct?

A    No.

Q    Do you know what crime you pled guilty to?

A    Yes.

Q    What crime was that, sir?

A    Pled guilty?

Yes, I did plead guilty.

Q    To what crime?

A    For what's been done.

Q    Do you know the name -- you don't know the name of the statute you pled guilty to, do you?

A    For bank fraud and for companies that were not real.

Q    The maximum penalty for bank fraud is 30 years that you're facing, correct?

---

SARKINOVIC - CROSS - MR. JACKSON          1272

A    The judge decides on that.

Q    Sir, you don't know what the maximum penalty is?

A    Yes, yes, I do know the maximums.

Q    And it's 30 years in prison for you, correct?

A    Whatever the law says, yes.

Q    You haven't even taken a look because you know, in your belief, it's your belief you can get way less than that because you're doing what the prosecutors asked you to do, correct?

A    I had to cooperate with someone.

Q    Right.  Your hope is you're going to serve no jail time whatsoever?

A    Nobody knows that.

Q    But that's your hope, correct?

A    Yeah, that is my hope.

Q    Now, I just want to turn back to Zorach, okay.

        How many houses did you build with Zorach over the years?

A    I don't know.

Q    What is your best estimate?

A    Ten, 15.

Q    You think over all the years that you've built houses with Zorach, you only built 10 or 15 houses?

A    I did not count.

Q    You didn't count?

**J.A. 553**

SARKINOVIC - CROSS - MR. JACKSON          1273

Didn't you tell us that you made $65,000 a year?

A   Yes.  I worked for daily wages as a daily laborer.

Q   We'll come back to that.

A   Okay.

Q   The agents, we went through GX 245 a second ago.

MR. JACKSON:  Can we call up GX 235 again?

THE COURT:  It's in evidence.  You may publish.

MR. JACKSON:  Thank you, Judge.

(Exhibit published.)

Q   You see this, this is what you went through with the prosecutor, right?

A   Yes.

Q   And this is the document that when you got stopped at the airport by Agent Cabane and Agent Dietz, you basically made a confession of some sort, right?

A   Yes.

Q   And you -- this was confirmed in English, right?

A   Yes.

Q   Now, by the way, you said this is a scary moment for you, you had never -- you were sitting there and you were nervous about what happened, you thought you might be in trouble is what you said, right?

A   Yes.  Yes, I knew this was a problem.

Q   The agents explicitly asked you if you needed an interpreter before they interviewed you, correct?

SARKINOVIC - CROSS - MR. JACKSON          1274

A   Yes.

Q   And your answer was no, correct?

A   Yes.

Q   You said, specifically, I understand English fine.  That's what you said, right?

A   No that's not what I --

Q   That's not what you said, sir?

A   That's not what I said.

Q   Let me just ask you, then, have you reviewed -- when the agents had met with you, they created -- they had taken out notes, right?

A   Yes.

Q   Sometimes they've typed reports in your presence, correct?

A   Not typed, no.

Q   You never seen any computers when you were being interviewed?

A   No.

Q   You just saw the handwritten notes that they took?

A   Just by hand, yes.

Q   Okay.  And before the agents spoke to you on that day, they told you it was important that you say everything honestly and accurately, correct?

A   Yes.

Q   And it's your testimony that on that date, you did not

SARKINOVIC - CROSS - MR. JACKSON          1275

tell the agents, I speak English fine?  That's your testimony?

A   I still don't speak English very well.

Q   You didn't say, I understand English fine?

A   I can communicate.  I'm not fluent, but I can communicate.

Q   I'm only asking you, did you say to the agents, I understand English fine?

A   No.

Q   Okay.  What did you say to them, specifically, when they asked you if you were okay with this affidavit being in English?

What did you say?

A   They don't know my language, they don't know Bosnian.

Q   Not my question.  The agents asked you if you were okay with this affidavit being in English, right?

A   Yes.  Yes.

Q   What did you say in response?

A   Yeah, that it has to be in English.  They can't do it in Bosnian for me.

Q   I'm asking you what you said to the agents.

You said, I speak English, right?

A   I speak the way I speak.

Q   Regardless, this was read to you in English, you didn't have any problem understanding it, correct?

A   Yes.

SARKINOVIC - CROSS - MR. JACKSON          1276

Q   And then you signed it?

A   Yes.

Q   You initialed throughout it that you understood each thing that had been written in English and read to you in English, correct?

A   Yes.

Q   Sir, when you met with the prosecutors, did the prosecutors tell you that it would be easier for you to be cross-examined if you used an interpreter because it would slow down the cross-examination?

A   No.  I requested an interpreter.

Q   So did you discuss with the prosecutor what the impact would be of using an interpreter?

A   I need an interpreter for this setting.

Q   Let me ask you something:  During the course of your meetings with the prosecutors, did they ever play you recordings where you were meeting with a person named Roman?

THE INTERPRETER:  Excuse me, this is the interpreter asking, the name, please.

MR. JACKSON:  The name Roman as in Rome, Italy.

A   Yes.

Q   So you've heard those recordings, right?

A   Yes.

MR. JACKSON:  Your Honor, at this time, I'd like to offer a recording that is marked as 3500-KS-18.  If there's no

**J.A. 554**

SARKINOVIC - CROSS - MR. JACKSON      1277

objection for the Government, I'd like to play it for the jury.

THE COURT:  Any objection to -- what's the number again, sir?

MR. JACKSON:  Your Honor it's 3500-KS-18.

THE COURT:  3500-KS-18, any objection from the Government?

MR. SKURNIK:  We object, Your Honor.

THE COURT:  All right.  Sidebar.  Sorry.

(Continued on the next page.)

(Sidebar conference.)

---

SIDEBAR CONFERENCE      1278

(The following occurred at sidebar.)

THE COURT:  What is the objection to the exhibit?

MR. POLEMENI:  Well, I'm not sure what the purpose of it is, introducing the exhibit is.

THE COURT:  What is the exhibit?

MR. POLEMENI:  It is recordings, as I understand, if I have it correctly.

MR. JACKSON:  You introduced it to us.

THE COURT:  Well, you objected, so you must have some understanding of what it is.

MR. POLEMENI:  If I understand it correctly, it's Mr. Kretsula who was here last week and testified made recording of Mr. Sarkinovic.  There were a couple.  I don't know which one you intend to --

THE COURT:  I'm over here.  He'll get his turn.

MR. POLEMENI:  There are a few.  I'm not sure which ones Mr. Jackson intends to play.  But we would object to those coming into evidence as hearsay.

THE COURT:  All right.  And what is your response to the objection?

MR. JACKSON:  Your Honor, I have two responses. One, we're not offering these for the truth.

THE COURT:  What are you offering it for?

MR. JACKSON:  We're offering them because he's speaking perfect English on those communications.  I think

---

SIDEBAR CONFERENCE      1279

that the jury has a misinterpretation that could impact how they perceive my client's communications with him, and believe that he had a limited ability to communicate things to my client, and you can hear clearly on the two short recordings that we'd like to offer, I was going to offer next KS-19, which is another very short recording that the Government produced to us of this gentleman speaking perfect English to their other cooperator Roman Kretsula, and I think the jury should hear how well he communicates in English.

THE COURT:  Do we have the ability for the Court to hear the offered exhibits so I can hear what's being offered? On the one hand, we're dealing with the question of the confidence of a witness in English or not in English, but on the other hand, there's the substance of what's on the tape, and I don't know what's on the tape.

So it's a little bit of a vacuum for the Court to decide it.  So maybe this is an appropriate time to take our afternoon break.

How long are the tapes?

MR. JACKSON:  I think about two or three minutes, Judge.  Very short.

THE COURT:  And are there other tapes that you wish to offer?

MR. JACKSON:  Just these two.

THE COURT:  Are there other tapes that you wish to

---

SIDEBAR CONFERENCE      1280

offer in addition with this witness?

MR. JACKSON:  You, Your Honor.  It's KS-18 and 19, and they're very short.

THE COURT:  So if we give the jury their afternoon break now for 15 minutes, is that ample time for you folks to make these available for the Court to hear it, make a ruling with respect to the tapes?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Again, are there any other tapes?

MR. JACKSON:  No, Judge.

THE COURT:  Okay.  Let's tell the jury we're going to take a break, and then we will listen to the tapes, and I would make my ruling when I hear the tapes.

You have a transcript of these tapes?

MR. JACKSON:  I don't judge.

THE COURT:  That might facilitate -- do you a transcript?

MR. POLEMENI:  We don't.

MR. JACKSON:  We only got them in 3500, and we haven't been able to make a transcript.

THE COURT:  And when did you get them?

MR. JACKSON:  I think we got these within the last few weeks, couple of weeks.

THE COURT:  Well, I can understand the firm of your small size, the country lawyers.  I get it.  All right.

J.A. 555

SIDEBAR CONFERENCE                1281

We're going to give the jury a break, 15 minutes, and I will listen to the tapes, and counsel will identify who's speaking, and then you will either withdraw your objection or renew your objection. But at least, I'll know what I'm being asked to rule on, which is kind of my day job. Okay. Step back.

(End of sidebar conference.)

(Continued on the following page.)

---

*Proceedings*                     1282

(In open court; 3:57 p.m.)

THE COURT: Ladies and gentlemen of the jury, it's almost 4:00 o'clock so this is an appropriate time since we started a bit late, had lunch a bit late. My bad not yours, obviously. We'll take our 15-minute break during which time I'm going to listen to the tapes and then I will make a ruling as to whether or not they will come into evidence and you will hear them or whether or not they will come into evidence and you won't hear them. I haven't heard them, so greatest hits, you never know. Okay.

We're going to take our break now. Do not talk about the case. We'll see you in 15 minutes. Thank you.

COURTROOM DEPUTY: All rise.

(Jury exits courtroom at 3:58 p.m.)

THE COURT: The jury has left the courtroom, thank you.

Sir, please leave the courtroom.

(Witness leaves the witness stand.)

THE COURT: You may be seated, ladies and gentlemen, public and counsel.

We're still on the record. The jury has left the courtroom. The witness has left the stand.

And are you in a position to queue the audiotape, whatever the nature of the tape is.

MR. JACKSON: Yes, your Honor.

---

*Proceedings*                     1283

THE COURT: Do you want to make any prefatory remarks about who is speaking and when the tape was created or anything along those lines to give me context to what I'm listening to.

MR. JACKSON: Yes, your Honor.

THE COURT: Again, slowly, so that I can understand it. The Court reporters are good about taking things down but I'm a plodder.

MR. JACKSON: Me, too, Judge.

There are two people speaking on these recordings and we have not had any interaction with either person. One of them is Roman Kretsula.

THE COURT: Spell that for the Court reporter.

MR. JACKSON: Yes, your Honor. That's K-r-e-t-s-u-l-a.

THE COURT: Yes, sir.

MR. JACKSON: He was the Government's first cooperating witness that they called last week.

THE COURT: Yes, sir.

MR. JACKSON: The second speaker is the current witness which is Mr. Kemal Sarkinovic. And we haven't had an opportunity to brief either of those gentleman. These tapes were produced to us as 3500 material.

THE COURT: Let me stop you there. When the tapes produced were within the last several weeks; is that right?

---

*Proceedings*                     1284

MR. JACKSON: Yes, your Honor.

THE COURT: The first tape I'm going to hear was created when, do you know?

MR. JACKSON: Our understanding in February of 2019.

THE COURT: February of 2019.

MR. JACKSON: That's the representation we have.

THE COURT: We'll refer it that however you identified for the record purposes so I'll know what I'm limping to when ruling on.

MR. JACKSON: Yes, your Honor. We're using the identifier that the Government provided as 3500 material so we're keeping it as 3500-KS-18.

THE COURT: 3500-KS-18. That's the first of these two items.

MR. JACKSON: Yes, your Honor.

THE COURT: How long is that item, approximately.

MR. JACKSON: It's approximately two or three minutes.

THE COURT: Two to three minutes.

MR. JACKSON: Let me just verify, Judge. It's one minute and 5 seconds, your Honor.

THE COURT: One minute and five seconds. And who is on the tape again?

MR. JACKSON: That is Kemal Sarkinovic, the

J.A. 556

*Proceedings* 1285

current witness. And Roman Kretsula, the first cooperating witness called by the Government.

THE COURT: That's 3500-KS-18. What's the second tape?

MR. JACKSON: The second one, they both take place on the same day. They're both February 28, 2019, is our understanding, your Honor, and in this -- if the first call they're arranging to discuss something. And then, in the second one, they are actually discussing --

THE COURT: Okay. So the first one, again, 3500-KS-18 is one minute and five seconds.

MR. JACKSON: Yes, your Honor.

THE COURT: And the second one is how long? And what's the number?

MR. JACKSON: 3500-KS-19.

THE COURT: How long is that?

MR. JACKSON: The second one is, I believe, your Honor, I'm being told it's 33 seconds. I thought it was slightly longer, I believe it's 33. 33 seconds, your Honor.

THE COURT: Approximately 33 seconds. Who is on that one?

MR. JACKSON: Again, it's Kemal Sarkinovic and Roman Kretsula on both of them, your Honor.

THE COURT: All right. Now that it's been identified to the Government, do you still have an objection

*Proceedings* 1286

to the first tape, 3500-KS-18?

MR. POLEMENI: Yes, your Honor.

THE COURT: What is the objection?

MR. POLEMENI: The objection would cover both recordings which is that the witness has testified that he speaks English and that he can communicate in English, and he has communicated with the defendant in English and he communicates with others in English. Just that in this setting he prefers to have an interpreter and that's, I think, understandable.

THE COURT: What's your objection to the tape, though?

Now that you know what it is and who is on it and how long it is what's your objection to the tape?

MR. POLEMENI: I'm not sure I understand the purpose of why the tape is coming in.

THE COURT: Putting aside your limited understanding, what is your objection to the tape under the Federal Rules of Evidence? You know, those difficult things. You may not understand the purpose but the defense presumably has a purpose in offering it.

So my question to you, putting aside the intent of the defense, what is your objection to 3500-KS-18.

MR. POLEMENI: So the tapes are hearsay.

THE COURT: Are they being offered for the truth

*Proceedings* 1287

of the matter asserted?

MR. POLEMENI: I don't know.

MR. JACKSON: No, Judge.

THE COURT: Are they being offered for the truth of the matter asserted?

MR. JACKSON: No, Judge.

THE COURT: What purpose are they being offered for?

MR. JACKSON: Merely to show the witness' ability to communicate in English with the other individual.

THE COURT: Is there any question about the authenticity of the voices on the tapes? Do we have a Milli Vanilli problem?

MR. JACKSON: Zero, Judge.

THE COURT: And with respect to the second tape, is that being offered for the truth of the matter asserted?

MR. JACKSON: No, your Honor.

THE COURT: Okay. What is the exception under those wonderful exceptions under §803 to the admissibility?

MR. JACKSON: A couple of things, your Honor. First it's complete non-hearsay.

THE COURT: Can you give me a rule for my friends on the 17th floor who will definitely be taking a close look at this one.

MR. JACKSON: So under Rule 802, the rule, I'm

**J.A. 557**

*Proceedings* 1288

sorry, under Rule 801, first, the rule explicitly sets out that a statement is only hearsay under §801(c). It says, hearsay means a statement that the declarant does not make while testifying at the current hearing; and, two, the party offers in evidence to prove the truth of the matter asserted in the sentence.

So already under §801(2), there is absolutely no hearsay for this statement. It is automatic non-hearsay because it's not being offered for the truth of the matter asserted. There is nothing on it that we could even possibly want for the truth. If we were offering for the truth, it would still come in under §803 because --

THE COURT: Where under §803?

Last time I looked, there were a fair number of exceptions up to and including the catch-all exception that has been shifted from the late Pleistocene when I started to practice and I believe it's §807 according to my law clerks who kept me up to date.

MR. JACKSON: Yes, your Honor. It would come in under §803(1) and §803(3). §803(1) being a present sense impression.

THE COURT: A statement describing or explaining an event or condition made while or immediately after the declarant perceived it.

Okay. So you're offering it under §803(1), is

*Proceedings* 1289

that one of your grounds?

MR. JACKSON: Your Honor.

THE COURT: Is that one of your grounds?

MR. JACKSON: Yes, it's a backup.

THE COURT: Whether it's back-up singer or a lead singer, we'll see.

What is your response, Government, to the §803(1) argument that it comes in as a present sense impression?

MR. POLEMENI: Well, if that were the case, I think every statement could be characterized as a present sense impression.

THE COURT: He's not offering every statement, he's offering those two statements.

MR. POLEMENI: As I understand the recording, if I remember correctly, they are actually talking about past events.

THE COURT: Eventually, we're going to actually hear the recordings, I'm old school that way. But I want to know from you distinguished counsel looking at the rules, okay, you've offered §803(1).

What else, Mr. Jackson, we'll go back to you.

MR. JACKSON: Your Honor, I believe it will probably come in, again, I think it comes in automatically under §801 because we're not offering for the truth.

THE COURT: I heard you say that.

*Proceedings* 1290

MR. JACKSON: Yes thank you.

THE COURT: But we're now on §803.

MR. JACKSON: Under 803, it will come in under 803(3) as a statement of the declarant's --

THE COURT: Then existing mental, emotional, or physical condition. A statement of the declarant's then-existing state of mind such as motive, intent, or plan or emotional, sensory, or physical condition such as mental feeling, pain, or bodily health, but not including a statement of memory or belief to prove the fact remembered or believed under unless it relates to the validity or terms of the declarant.

How is the tape relevant under and admissible under §803(3)?

MR. JACKSON: Well, your Honor, this is two of the co-conspirators that the Government has alleged who were both actually -- they're both testifying witnesses. And this statement describes during the time period of the alleged conspiracy. It gives a picture into the declarants, both declarants frankly, though only one will be required under §803(3). It gives a picture into both of their existing states of mind, specifically, Mr. Sarkinovic's existing state of mind relevant to his motive, his intent at the time of the alleged conspiracy.

THE COURT: What is the Government's response to

*Proceedings* 1291

the §803(3) argument?

MR. POLEMENI: I don't believe that the communication on the tape does any of that, Judge.

§803(3), as I understand, it is meant to be a situation where the declarant says, "I feel unhappy." "I am depressed." But then as the rule clearly states, you can't say, "I am depressed because." It is just a statement that the declarant at that time feels something.

There's no -- it does not include, which I this if your Honor listens to the tape, you will see they're just talking about things that happened in the past. There's no present sense impression and there's no existing mental state being discussed.

THE COURT: Okay. Mr. Jackson, what else do you have besides §803(1) and §803(3) in your arsenal under §803?

MR. JACKSON: I that's it, Judge.

THE COURT: Now, we're going I'm going to listen to the tape and we're all going to listen to the tape.

So we're starting with 3500-KS-18. Go ahead. Restart it.

(Audio file played in open court.)

(Audio file concludes.)

THE COURT: So that was KS-18?

MR. JACKSON: Yes, your Honor.

THE COURT: Let's hear KS-19.

*Proceedings* 1292

(Audio file played in open court.)

(Audio file concludes.)

THE COURT: Is that the entirety of KS-19? 3500-KS-19?

MR. JACKSON: Yes, your Honor.

THE COURT: I'm going to overrule the objection, they're going to come in. Henry Higgins notwithstanding, this is not exactly Eliza Doolittle English but it's English. So I'm going to admit them for the purposes that they're being offered for. Not for the truth of the matter asserted but for the jury to hear the two gentleman speaking to one another in English whether or not Professor Henry Higgins would have approved it or not, but it's not my call. It is what it is and the jury are the finders of fact. So that's it.

Anything else that we need to discuss on the 3 minutes and 37 seconds that you have left on your break?

Government.

MR. POLEMENI: No, your Honor.

THE COURT: Defense counsel?

MR. JACKSON: No, Judge.

THE COURT: We'll just tee it up we'll play it for the jury when they come back in three minutes and 12 seconds.

MR. JACKSON: Thank you, your Honor.

J.A. 558

K. Sarkinovic - Cross/Mr. Jackson     1293

THE COURT:  Thank you.

(A recess in the proceedings was taken.)

THE COURT:  Counsel, are we ready to proceed?

MR. POLEMENI:  Yes, your Honor.

MR. JACKSON:  Yes, your Honor.

THE COURT:  Let's get the jury back in and get the witness back in on the witness stand.

COURTROOM DEPUTY:  All rise.

(Jury enters courtroom at 4:23 p.m.)

THE COURT:  You may be seated, ladies and gentlemen of the jury.  Thank you very much.

I am going to admit the audio evidence that we have just discussed.  But it's for the limited purpose of hearing the discussion between the two individuals in terms of their linguistics.  It's not about the truth or the non-truth of what they're talking about.  It's just for the limited purpose, and I'll give you final instructions as I give you my final jury instructions.  But it's for the limited purpose of addressing the issue, if you will, familiarity with the English language.

What I typically do in my final instructions is give an example:  If I have a menu that I show, or allow to be shown, a witness that shows at a given day, in a given diner, at a given time the luncheon special with spaghetti and meatballs, a good Brooklyn example, then that's the

K. Sarkinovic - Cross/Mr. Jackson     1294

purpose.  It's not to show that somebody had spaghetti with meatballs when they said otherwise they were vegan.  It's just goes to show that on that day at that restaurant, the luncheon special was spaghetti with meatballs.

You decide whether or not with that person ordered spaghetti with meatballs or ordered the vegan special because you are the finders of fact.

All that you're being asked to listen for and the reason I'm admitting it, is on the limited question of their ability or not ability to speak English to one another.

So I am admitting it for that limited purpose, okay?  They're very short.  And my explanation, such as it is, is probably longer than what you're going to hear.  But they're going to hear two exhibits and I'm going to have counsel describe them.  And, again, the objection of the Government was overruled but they're being admitted for that limited purpose.

Okay.  So let's roll tape.

MR. JACKSON:  Thank you, your Honor.  Mr. Cepregi, can you please play the first, 3500-KS-18.

(Audio file played in open court.)

(Audio file concludes.)

THE COURT:  That was 3500-KS-18.  Now we're going to hear KS-19.  Let's play that one.  It's about 33 seconds long, the second one.

K. Sarkinovic - Cross/Mr. Jackson     1295

Play it, please.

(Audio file played in open court.)

(Audio file concludes.)

THE COURT:  That was just audio.  You'll have to wait for Netflix for the audiovisual version but go ahead and question.

MR. JACKSON:  Thank you, Judge.

THE COURT:  It's admitted for that purpose.

(Government's Exhibits 3500-KS-18 and 3500-KS-19 were marked in evidence.)

EXAMINATION BY
MR. JACKSON:
(Continuing.)

Q    Mr. Sarkinovic, you heard those two recordings, right?

A    Yes, I did.

Q    And that's you and Roman Kretsula speaking, right?

A    Yes.

Q    Will you weren't having any difficulty communicating whenever you spoke with Roman Kretsula, were you?

A    Yes.

Q    Were you agree with me, right?

A    Yes.

Q    And, on that recording, you didn't say, can we meet with an a Bosnian interpreter.  That never happened, right?

A    No.

K. Sarkinovic - Cross/Mr. Jackson     1296

Q    Now, am I correct that over the course of your meetings with the Government, you have lied repeatedly about your finances?

A    No, I did not.

Q    Sir, before you started meeting with the Government, they told you that it was a separate violation of 18 U.S.C. 1001 if you lied to federal officers, didn't they?

A    I have no need to lie.

Q    That's not my question.

My question is, at the start of each one of your meetings with the prosecutors, and the with the agents, they told you it was a separate crime to lie to them, didn't they?

A    Yes.

Q    You know that that's a violation of what's called 18 U.S.C. 1001.

They told you that, right?

A    Yes, I know it's a violation of law.

Q    Right.  And you know it's an additional potential five years in prison for each time that you do it, maximum, right?

A    I did not know what the maximum penalty is.

Q    You just knew that you could face additional prosecution if you were lying, right?

A    Yes.

J.A. 559

K. Sarkinovic - Cross/Mr. Jackson            1297

Q    And you lied anyway about your finances, correct?

A    No, I did not.

Q    When you first met with the agents, and I'm not talking about your -- let me be specific.

On January 12, 2019, the meeting that the prosecutors asked you about at the airport, right?

A    Yes.

Q    This is at JFK?

A    Yes.

(Continued on the next page.)

---

Sarkinovic - cross - Jackson            1298

CROSS-EXAMINATION (Continuing)

BY MR. JACKSON:

Q    Was it near a landmark, anybody might know who's been to JFK, a particular restaurant or like a Bubby's or anything like that, what was it near, a McDonald's?

A    It was at the office at the JFK Airport.

Q    Okay.  So they took you as you were coming off the plane and then they took you to a little office in JFK, is that what you're saying?

A    Yes.

Q    And, again, after you said you were fine being interviewed in English, you had an extensive conversation with them, right?

A    Yes.

Q    And then in the conversation one of the first things that they asked you was how much money do you make per year on average, right?

A    Yes.

Q    And you lied, you lied?

A    Surely.

Q    Yes.  You agree with me, you lied?

A    Maybe I didn't.

Q    Well, this isn't a game show, we're not waiting for the final round to figure out whether you lied or not.

You can reveal what's behind that curtain right now,

---

Sarkinovic - cross - Jackson            1299

did you lie when they asked you how much money you make?

A    No, I did not lie.

Q    Sir, didn't you make the statement in that meeting that you earn approximately $30,000 annually, didn't you specifically make that statement?

A    Depending on the time period.

Q    This was in 2019, right?

A    Yes.

Q    The meeting happened in 2019, correct?

A    Yes.

Q    That was one of your peak periods in terms of your earnings, correct?

A    Yes.

Q    And when they specifically asked you how much money do you earn annually, your answer was:  I earn approximately $30,000 annually, correct?

A    That's at the beginning, afterwards I started earning more.

Q    Sir.  Sir, I'm not asking about what happened over the long saga of your life.  Okay?

I want you to focus on the meeting that happened at JFK after you got off the airplane.  Okay?

A    Okay.

Q    You sat down with the agents, correct?

A    Yes.

---

Sarkinovic - cross - Jackson            1300

Q    The agents told you, Kemal, you're not under arrest, you're free to leave any time, right, they told you that?

A    No, that was not the case.

Q    They never told you you were free to leave any time?

A    No, that's not how it works.

Q    Well, they did read you the advice of rights, right?

A    Yes, they did.

Q    The one that we went through, that you understood in English?

A    Yes.

Q    Right.  And you understood you didn't have to speak to them, correct?

A    No.

Q    No?

A    They were agents.  It's a state.

THE COURT:  You asked a double negative question.

Could you place the question a little differently, Mr. Jackson?  I think that's why you got a confusing response.

MR. JACKSON:  Yes, of course.  Thank you, Judge.

BY MR. JACKSON:

Q    You agree with me, don't you, Mr. Sarkinovic, the agents told you that you were free to leave any time, correct?

A    No, that's not the case.

Q    They never said that.

MR. JACKSON:  Can we just call up again, GX-235.

Sarkinovic - cross - Jackson    1301

(Exhibit published.)

BY MR. JACKSON:

Q    Do you see this?  This is the statement that you signed, correct?

A    Yes.

MR. JACKSON:  Just a moment, Your Honor.

We can take that down.  We'll come back to it.

Q    And when they asked you how much money you make, your answer was:  I make $30,000 annually, correct?

A    These were income tax reports from previous years.

Q    I'm talking about before they showed you the income tax reports.  We'll get to that in a second.

Before they showed you the income tax reports, they asked you how much money you make per year, right?

A    They asked me, yes.  This was -- these were my previous tax returns.  Afterwards, that changed.

Q    Sir, let me just focus you.  Please answer yes or no.  Yes or no.  It's very simple.

A    Yes.

Q    Okay.  So they asked you that.

Yes or no, your response was:  I make $30,000 annually?

A    Yes.

Q    That was a lie, correct?

A    No.

Sarkinovic - cross - Jackson    1302

Q    Okay.  Then they presented to you your tax returns, correct?

A    Yes.

Q    And the tax returns claim that you approximately made $35,000 annually in gross income, right?

A    Yes.

Q    And this is for the years 2012 through 2017, correct?

A    Yes.

Q    That is not how much you were making during those years, was it?

A    I was a superintendent, and that was my annual income, yes.

Q    Okay.  So your statement is that during those years you were only making $35,000 annually, correct?

A    Yes.

Q    Okay.  So your testimony today or yesterday that you make $65,000 annually --

A    Yes.

Q    -- what years does that relate to?

A    The last years when I was doing good business.

Q    What years specifically?

A    I don't know.

Q    You don't know?  You answered the question perfectly when the prosecution asked you.

Do you remember when the prosecutor got up here,

Sarkinovic - cross - Jackson    1303

Mr. Skurnik got up here and asked you, about how much do you make per year?  Do you remember him asking you that?

A    Yes, I do.

Q    And when he asked you that, you didn't say, well, what years are you talking about, Mr. Skurnik, right?  You didn't say that, did you?

A    Because that was not in question at that moment.

Q    Because you're going over repeatedly with the prosecutors we're going to present to the jury that you made $65,000 a year, correct?

A    Yes.

Q    You knew that this trial was about the years 2012 through 2019, correct?

A    Yes.

Q    And that's what you were talking about, your average earnings during those years, correct?

A    Yes.

Q    Okay.  So, was 65,000 a year the truth or was $35,000 a year the truth, which one was it?

A    Both.

Q    Both were true, you made both 65,000 and 35,000?

No, no, no, no, I want you to answer that question yes or no.

You made both 35,000 and you made 65,000, those were both your annual income, yes or no?

Sarkinovic - cross - Jackson    1304

A    65.

Q    65, we settle on it, was the truth, right?

A    Yes.

Q    And so you will agree with me when you said 35,000, that was a lie, correct?

A    No, it was not a lie.

Q    Okay.  We'll come back to that.

Now, when you say 65,000, in the report we're talking about they say gross.

Is that -- was that how much you took home or were there expenses missing from the 65,000?

A    I was earning -- I was earning -- I was earning 65,000, that's what I was making those last years.

Q    Now --

THE COURT:  Hang on.  Do we have the other backup battery?

THE INTERPRETER:  Apologize.  Thank you.

THE COURT:  Okay.

Would you read the question back and we'll have it translated and we'll keep pushing ahead?

Sorry about the Government equipment, but what are you going to do.

Go ahead.

(Question read.)

A    That was gross.

J.A. 561

*Sarkinovic - cross - Jackson*      1305

Q   And so your actual take-home was what?

A   Maximum 70,000.

Q   70?

A   65 to 70.

Q   Okay.  Okay.  All right.  All right, no understanding.

Now, let me just ask you this....

MR. JACKSON:  First, Your Honor, may I display to the witness, just the witness, a document marked as 3500-KS-5?

THE COURT:  Any objection to 3500-KS-5 being admitted?

MR. SKURNIK:  One moment, Your Honor.

THE COURT:  Sure.

(Pause.)

MR. SKURNIK:  No objection.

THE COURT:  It's admitted.

You may publish it to the jury.

MR. JACKSON:  Thank you, why.

(Government's Exhibit 3500-KS-5 was received in evidence.)

(Exhibit published.)

BY MR. JACKSON:

Q   Do you see this?  Do you see this, Mr. Sarkinovic?

Can you see it?

You've got to say yes.

A   Yes, I do.

---

*Sarkinovic - cross - Jackson*      1306

Q   Okay.  This is the Advisement of Rights document that you signed at the airport, correct?

A   Yes.

Q   And you see the very first thing it says is that you must understand your rights, you have the right to remain silent; correct?

A   I did not understand that.

Q   So this was presented to you, you read it; right?

A   Yes.

Q   And then it was read to you, correct?

A   Yes.

Q   And then you signed it, right?

A   Yes.

Q   And it's your statement that you did not understand that you had a right to not talk to the agents?

A   I was not aware.

Q   You thought you had to talk to them?

A   I did not know that I had the right, so I spoke with the agents, yes.

Q   Sir, has it been the case throughout this process that, basically, you just done whatever the Government told you to do, regardless of whether you understood it?

MR. SKURNIK:  Objection.

THE COURT:  Overruled.

You can answer that.

---

*Sarkinovic - cross - Jackson*      1307

A   No.

Q   You waited to understand it before you actually sign things and agree to do them?

A   I would like to know everything, but at that moment I did not know everything.

MR. JACKSON:  Okay.  We could take that down.

Q   Now, you already mentioned your rent that you pay to Greenwood Management, correct?

A   Yes.

Q   And that's about $1,500 a month, right?

A   Yes.

Q   How many bedrooms?

A   Two.

Q   Two bedrooms.  And that's about 20,000, 18,000 a year in rent?

A   Yes.

Q   And do you have -- we went through your cars a little bit.  We went through one of your car notes.

You got other cars too, don't you?

A   Yes.

Q   You've got a Mercedes?

A   I wish.

Q   You never had a Mercedes?

A   I did have one.

Q   You did have one.  So you didn't just wish, your wish

---

*Sarkinovic - cross - Jackson*      1308

came true, right?

A   Now I don't have a Mercedes.

Q   I see.  You had one, but now you don't.

But at some point you were paying for a lease on a Mercedes, correct?

A   Yes.

Q   What was the lease payment on the Mercedes?

A   About $400.

Q   And we went through one of your other cars.

The Government chose to pick out one of your cars that we went through where you had about, what, a $350 payment, am I correct?

A   Yes.

(Continued on the following page.)

J.A. 562

SARKINOVIC - CROSS - MR. JACKSON 1309

BY MR. JACKSON: (Continuing.)

Q    That was for the Dodge van, right?

A    Yes.

Q    And then you had a third car, right?

A    I never had three cars at one time.

Q    You never had another van?

A    Yes, I have another van.  I had another van, yes.

Q    Yes.  And what was the lease payment on the third van?

A    I didn't have three vehicles.  I had the Dodge and the van.

Q    I see.  You had the Dodge and the van, plus the Mercedes, correct?

A    No, no, no.  I had the Dodge and I had the van.

Q    Okay.  Let's take them one at a time.

You already told us $350 a month for the Dodge, right?

A    Yes.

Q    What was the payment on the van?

A    It was paid off.

Q    It was already paid off.  You paid it off in full?

A    Yes.

Q    How much did you pay for the van?

A    Before, I paid monthly, and I paid it off.

Q    How much did you pay?

A    About $500 a month, approximately.

---

SARKINOVIC - CROSS - MR. JACKSON 1310

Q    Okay.  All right.  And you told us that you had five children, right?

A    Yes.

Q    Did you feed your children?

A    Yes.

Q    What was your monthly food expense?

A    Whatever was needed.

Q    About how much did you spend on food?

A    I don't know.  I don't have a record of that.

Q    You never did a budget?

A    No.

Q    Let me ask you this:  How is it that you know -- having no bank accounts, having never written a check, how is it that you know you were only making $65,000 a year?  Please enlighten us.

A    Well, if I am earning a thousand per week, times 12 months, take away holidays, so that comes out to about that amount.

Q    So during these years, about 2012 to 2017, 2019, you were making about a thousand a week is your testimony?

A    Yes.

Q    All in cash, right?

A    Yes.

Q    Benjamins?

A    Yeah, with the big head.

---

SARKINOVIC - CROSS - MR. JACKSON 1311

Q    Yeah.  And do you have a favorite president?

A    Yes.

Q    Which one?

A    Trump.

THE COURT:  You better say Lincoln.  Just kidding.

Q    Now, let me ask you, sir, Mr. Sarkinovic, you're making a thousand dollars per week, you got five kids?

A    Yes.

Q    You got $1,500 a month in rent, and you're driving a Mercedes.

Is that -- that's your testimony, you chose to drive a Mercedes?

A    I had a Mercedes when I didn't have large expenses, and I also -- I drove the Mercedes for three years, and never again.

Q    What was your monthly gas expense for the three cars?

A    I didn't have three vehicles.  I had only two.

Q    Okay.  For the three vehicles for now.  We'll go back to two.

What was your monthly expense for gas?  How much did you spend on gas per month?

A    Two, $300.

Q    That's it?

A    I didn't travel far from Brooklyn.

Q    Well, you were always driving your crews around, right, your five guys that worked for you?

---

SARKINOVIC - CROSS - MR. JACKSON 1312

A    No.  They had a place to -- they had to show up at the site, and I would bring materials.

Q    I see.  So you would go to different sites, but you didn't give your guys a ride?

A    No.

Q    Okay.  And was this a hybrid that you were able to get two, 300 to be able to deal with the two vehicle?  Was it a hybrid?

A    No, it was not a hybrid.

Q    Okay.  And I assume your five children, given all these other expenses that we're talking about, I assume they were in public school?

A    They were in the public school, yes, when I had money.

Q    Well, were they in public school throughout the time period that we're talking about?

A    They were in the public school and then they went to private school.

Q    Oh.  I see.

So at some point, you decided to put all of your children into private school?

A    Yes.

Q    Well, you must have been getting free tuition then?

A    I had a very favorable loan.

Q    Sir, am I correct, the tuition at the private school for your children was $15,000 a year for each child; yes or no?

J.A. 563

SARKINOVIC - CROSS - MR. JACKSON                    1313

A    No.

Q    It wasn't 15,000, the actual tuition; yes or no?

A    No.

Q    No, okay.  Sir, I want to show you what has been marked as --

MR. JACKSON:  May I just display for the witness, Your Honor, 3500-KS-7, at Page 94.

THE COURT:  Any objection to KS-7 at page -- what page, Mr. Jackson?

MR. JACKSON:  Ninety-four, Your Honor.

THE COURT:  Any objection to its admission?

MR. SKURNIK:  Yes, Your Honor.  Objection.

THE COURT:  All right.  All right.  We'll have a sidebar.  And let's clear the screen on the computer, please.  It's got a mark there.

Can you clear that that arrow?  Do you see what I'm talking about?  It's still there.  Can you clear -- Mr. Jackson, can you clear it or your techy?  Can do that, clear the screen.

(Continued on the next page.)

(Sidebar conference.)

---

SIDEBAR CONFERENCE                                  1314

(The following occurred at sidebar.)

THE COURT:  May I see the exhibit, please.  I'm sorry, which is the exhibit?

MR. JACKSON:  This page.

MR. SKURNIK:  That's not the exhibit that came up on the screen.

THE COURT:  Whoa, whoa, whoa, whoa, whoa.  Chill.  Chill.

MR. SKURNIK:  Yes, Your Honor.

THE COURT:  Okay.  May I see the exhibit marked as an exhibit, please.

Does someone have that?

MR. JACKSON:  It's the Government marking.  It's 3500-KS-7 at 94.

MR. SKURNIK:  Just so --

THE COURT:  Whoa, whoa, whoa.  Chill.

I know I'm slow and old.  The old days I used to tell a joke about being slow that you can't tell anymore, as opposed to being young.

THE COURTROOM DEPUTY:  KS-7?

MR. JACKSON:  Seven, yes.

MR. PAULSEN:  Randall, it's in the document here?

MR. JACKSON:  Yes.

MR. SKURNIK:  We don't object to that one.

THE COURT:  Pretend I'm here.  Pretend I matter.

---

SIDEBAR CONFERENCE                                  1315

3500-KS-7A, which is a Department of the Treasury Internal Revenue Service Criminal Investigation Memorandum, and there's an objection to the admissibility of this document.

Is this the document that you're referring to?

MR. SKURNIK:  Yes, that's the document we saw, Your Honor.

THE COURT:  Okay.  So what is the purpose that you're offering this document for?

MR. JACKSON:  Judge, I think there was confusion --

THE COURT:  Forget about confusion.  That's why we have the sidebar.  I'm in the de-confusion business.

This is the document you were offering?

MR. JACKSON:  No, Judge.

THE COURT:  What is the document you were offering?

MR. JACKSON:  7A at 94.

THE COURT:  Show me the document.  Show it to opposing counsel.

MR. SKURNIK:  No objection to that document, Your Honor.  That's what came up on our screen.

THE COURT:  You see, that's why they pay me the big bucks, because I slowly plot towards what is it you're really offering, and I take it there's no objection to what is, in fact, being offered?  Yes?

MR. SKURNIK:  Correct.

---

SIDEBAR CONFERENCE                                  1316

THE COURT:  Okay.  So --

MR. SKURNIK:  Thank you, Judge.

MR. POLEMENI:  Your Honor, while we're up here, may I raise one point?

THE COURT:  Oh, come back.  Come back.  The Colombo moment, just one point.

Yes, counsel.

MR. POLEMENI:  I understand this is cross-examination.

THE COURT:  Rumor has it.  As my friends on the 17th floor keep reminding us --

Yes, go ahead.

MR. POLEMENI:  Mr. Jackson --

THE COURT:  Is the objection that the cross-examination is exceeding the scope of the cross-examination?

MR. POLEMENI:  Well, that's one.  Two -- and it's been done in other examinations, as well as this one -- there is a -- there's no foundation for the question of, you lied to the agents, didn't you?

THE COURT:  Well, the answer he gives is, no, which is probably not a bad answer from your point of view.

MR. POLEMENI:  I understand.

THE COURT:  As opposed to yes.

MR. POLEMENI:  Well, also as opposed to setting up

---

**J.A. 564**

SIDEBAR CONFERENCE

1317

some sort of actually inconsistent statement, as opposed to just accusing the witness of lying to agents at the forefront. That's all.

THE COURT: The thing about jurors is they really are smart, they really do get it. They've watched so much T.V. about everything. You know, the baseline is way up there. And I'll give the instructions on the law, as you know, and so we'll take care of any inadvertent, I'm sure, suggestions that either side has done anything inappropriate, because I know that your distinguished counsel on both sides. And so we're now going to have, as we approach the magic hour of 5:00 o'clock, the admission of the document that is being offered.

And again, just to be clear, what is the document that's being offered?

MR. JACKSON: Your Honor, it's 3500-KS-7A, at Page 94. Just Page 94.

THE COURT: Just Page 94?

MR. JACKSON: That's right.

THE COURT: So can I see that, again one last time?

MR. JACKSON: Yes, Your Honor.

THE COURT: Just so we're clear, there's no objection to this document being offered?

MR. POLEMENI: No objection.

MR. SKURNIK: Correct, no objection.

SIDEBAR CONFERENCE

1318

THE COURT: Thank you. You can step back and take your things.

(End of sidebar conference.)

(Continued on the next page.)

SARKINOVIC - CROSS - MR. JACKSON

1319

(In open court; Jury present.)

THE COURT: Would you proffer the document again, counsel, and say what it is you wish to have admitted into evidence.

MR. JACKSON: Yes, Your Honor. I'd like to offer the document marked as 3500-KS-7A, at 94.

THE COURT: Any objection?

MR. SKURNIK: No objection.

THE COURT: The document is admitted. You may publish.

(Government Exhibit 3500-KS-7A was received in evidence.)

MR. JACKSON: Can we just zoom in on the top part there. Right there. Thank you.

BY MR. JACKSON:

Q   Now, this is the school that your children, one of the schools that your children were attending, correct?

A   Yes, it is.

Q   It's called the Brooklyn Amity School?

A   Yes.

Q   Okay. And were there any other private schools that your children attended?

A   Only this school.

Q   Only this one.

And tuition at this school ranged over the years,

**J.A. 565**

SARKINOVIC - CROSS - MR. JACKSON

1320

correct?

A   Yes.

Q   At one point, the charged tuition in 2011 and 2012 for your three children was $8,500, $9,500, and $9,500, respectively, correct?

A   I had credit to pay this.

Q   Okay. I understand. We'll get to that.

The charged tuition in 2011 and 2012 was 8,500, 9,500 and 9,500, correct?

A   Yes, it is.

Q   And then you got what you understand to be a discount, right?

A   Yes, I did.

Q   And why is it that you got the discount?

A   Because there were not enough children in this school, so I enroll my children to this school, and I got discount for that.

THE COURT: And speaking of discounts, we're now one minute away from 5:00 o'clock, which is our hard-stop time, so I'm going to give you a one-minute discount, ladies and gentlemen of the jury. And we're adjourned for the day.

Do not talk about the case amongst yourselves. We are moving along. It may not like that way, but we are moving along. We'll see you tomorrow at 9:30 a.m. Thank you very much. Don't talk about the case and have a good evening.

PROCEEDINGS                                    1321

THE COURTROOM DEPUTY:  All rise.

(Jury exits the courtroom.)

THE COURT:  Thank you.  The jury has left the courtroom.

You may step down, sir, and we will see you tomorrow morning at 9:30 to continue examination.  The witness is leaving the courtroom.

Ladies and gentlemen, please be seated.

And now that the witness has left the courtroom, I will ask if there are any items we have to address outside of the presence of the jury and outside of the presence of the witness, beginning with the Government?

MR. SKURNIK:  Nothing from the Government, Your Honor.

THE COURT:  Thank you.  Anything from defense counsel?

MR. JACKSON:  No, Your Honor.

THE COURT:  Okay.  Thank you.  Have a good evening, everyone.  And, I guess, we'll be watching all sorts of interesting news stories as time goes by.  I don't know, VP JD has a certain onomato poetic resonance, I suppose.  But that's not the business I'm in.  Okay.  Thank you.  We're adjourned for the day.  Stay safe, everyone.

*     *     *     *     *

(Proceedings adjourned at 5:01 p.m. to resume on July 16, 2024 at 9:30 a.m.)

AVERY N. ARMSTRONG, RPR, NYRCR

---

1322

I N D E X

WITNESS                                              PAGE

KEMAL SARKINOVIC
    DIRECT EXAMINATION BY MR. SKURNIK          1153
    CROSS-EXAMINATION BY MR. JACKSON           1264

---

1323

E X H I B I T S

Exhibit                                         Page

Government's Exhibit 704                         1165

Government's Exhibit 708                         1178

Government Exhibit 710                           1196

Government Exhibit 702-A                         1196

Government Exhibit 708-A                         1196

Government Exhibit 708-B                         1197

Government Exhibit 709-A                         1197

Government Exhibit 709-B                         1197

Government Exhibit 710-A                         1197

Government Exhibit 710-B                         1197

Government Exhibit 710-C                         1198

J.A. 566

---

1324

E X H I B I T S

Exhibit                                         Page

Government Exhibit 708-C                         1198

Government Exhibit 708-D                         1198

Government's Exhibit 736-A was marked in
evidence                                        1216

Government's Exhibit 750 was marked in
evidence                                        1219

Government's Exhibit 235                         1250

Government's Exhibit 3                           1257

Government's Exhibits 3500-KS-18 and
3500-KS-19 were marked in evidence              1295

Government's Exhibit 3500-KS-5                   1305

Government Exhibit 3500-KS-7A                    1319