# 25-2986

## In the United States Court of Appeals for the Second Circuit

---

UNITED STATES OF AMERICA,
APPELLEE

*v.*

MARINA KUYAN, KEMAL SARKINOVIC, JOSHUA MARKOVICS,
DEFENDANTS,

DAVID MOTOVICH,
DEFENDANT-APPELLANT

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (CRIM. NO. 21-497)
(THE HONORABLE WILLIAM F. KUNTZ, II, J.)*

---

**JOINT APPENDIX
VOLUME III (PAGES 567-860)**

---

<br>

JOSEPH NOCELLA, JR.
ERIK D. PAULSEN
DYLAN A. STERN
ANDREW D. GRUBIN
MATTHEW SKURNIK
UNITED STATES ATTORNEY'S OFFICE,
  EASTERN DISTRICT OF NEW YORK
  *271 Cadman Plaza East*
  *Brooklyn, NY 11201*
  *(718) 254-7000*
  *matthew.skurnik2@usdoj.gov*

KANNON K. SHANMUGAM
MASHA G. HANSFORD
ABIGAIL FRISCH VICE
ANNA J. LUCARDI
KRISTA A. STAPLEFORD
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

# TABLE OF CONTENTS

Page

## Volume I

District court docket sheet ................................................................. J.A. 1

Indictment, September 22, 2021 (Dkt. 19) ....................................... J.A. 61

Government's proposed jury instructions,
    May 24, 2024 (Dkt. 248) ............................................................. J.A. 83

David Motovich's proposed jury instructions,
    May 24, 2024 (Dkt. 251) ............................................................. J.A. 148

Order denying motion to suppress and motion to dismiss,
    June 11, 2024 (Dkt. 264) ............................................................ J.A. 184

Letter requesting supplemental jury instructions,
    July 24, 2024 (Dkt. 318) ............................................................ J.A. 231

Trial transcript, July 8, 2024 ........................................................... J.A. 236

## Volume II

Trial transcript, July 9, 2024 ........................................................... J.A. 298

Trial transcript, July 10, 2024 ......................................................... J.A. 349

Trial transcript, July 11, 2024 ......................................................... J.A. 408

Trial transcript, July 12, 2024 ......................................................... J.A. 467

Trial transcript, July 15, 2024 ......................................................... J.A. 521

## Volume III

Trial transcript, July 16, 2024 ......................................................... J.A. 567

Trial transcript, July 17, 2024 ......................................................... J.A. 623

Trial transcript, July 18, 2024 ......................................................... J.A. 685

Trial transcript, July 19, 2024 ......................................................J.A. 738

Trial transcript, July 22, 2024 ......................................................J.A. 787

Trial transcript, July 23, 2024 ......................................................J.A. 827

## Volume IV

Trial transcript, July 24, 2024 ......................................................J.A. 861

Trial transcript, July 25, 2024 ......................................................J.A. 901

Trial transcript, July 26, 2024 ......................................................J.A. 943

## Volume V

Government exhibit 1081, email.....................................................J.A. 1013

Government exhibit 1199, extracted text messages.....................J.A. 1014

Government exhibit 5003, summary of deposit accounts............J.A. 1072

Joint letter renewing oral Rule 29 motion and opposition,
    September 12, 2024 (Dkt. 357) ...............................................J.A. 1073

Order denying renewed Rule 29 motion,
    September 16, 2024 (Dkt. 358) ...............................................J.A. 1075

Sentencing transcript, November 19, 2025 .................................J.A. 1077

Notice of appeal, November 24, 2025 (Dkt. 454)..........................J.A. 1105

Letter revising proposed restitution and forfeiture amounts,
    December 11, 2025 (Dkt. 456).................................................J.A. 1106

1325

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        : 21-CR-00497(WFK)
                                 :
                                 :
       -against-                 : United States Courthouse
                                 : Brooklyn, New York
                                 :
                                 : Tuesday, July 16, 2024
DAVID MOTOVICH,                  : 9:30 a.m.
       Defendant.                :
                                 :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S :

For the Government: BREON PEACE, ESQ.
                    United States Attorney
                    Eastern District of New York
                       271 Cadman Plaza East
                       Brooklyn, New York 11201
                    BY:  ROBERT POLEMENI, ESQ.
                         ERIK D. PAULSEN, ESQ.
                         ANDREW GRUBIN, ESQ.
                         MATTHEW C. SKURNIK, ESQ.
                         Assistant United States Attorneys

For the Defendant:   WACHTELL, LIPTON, ROSEN & KATZ
                     51 West 52nd Street
                     New York, New York 10019-6150
                     BY:  RANDALL WADE JACKSON, ESQ.
                          JESSICA LAYDEN, ESQ.

                     -and-

                     MEISTER SEELIG & FEIN, LLP
                     125 Park Avenue
                     8th Floor
                     New York, New York 10017
                     BY: HENRY E. MAZUREK, ESQ.

---

*Proceedings*                                              1326

(In open court - jury not present.)

THE COURTROOM DEPUTY:  All rise.

(The HON. WILLIAM F. KUNTZ, II entered the courtroom.)

THE COURT:  Please call the case.

THE COURTROOM DEPUTY:  Criminal cause on trial, 21-CR-497, United States of America versus David Motovich.

Will the attorneys please state their name for the record, beginning with the Government.

MR. POLEMENI:  Good morning, Your Honor.

Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, paralegal Kavya Kannan and Special Agent Christopher Cabane, for the United States.

THE COURT:  Good morning, counsel.  Please be seated.

Ladies and gentlemen in the public, please be seated.

MR. JACKSON:  Good morning, Your Honor.

Randall Jackson, Jessica Layden and Henry Mazurek on behalf of David Motovich.  And we are also joined by Mr. Andy Cepregi.

THE COURT:  Good morning.  Please be seated, everyone.

Thank you very much for your patience.

Do we have any issues to address before we bring in

---

*Proceedings*                                              1327

the jury and have the witness resume the stand, anything from the Government?

MR. SKURNIK:  No, Your Honor.

THE COURT:  Anything from defense?

MR. JACKSON:  Just one thing, Judge.

I just want to note the Government helpfully let us know that they made an additional discovery production to us this morning that may be relevant to this witness.

THE COURT:  What did they produce?

MR. JACKSON:  Some additional reports that they recently received from FinCEN.

THE COURT:  They recently received from?

MR. JACKSON:  FinCEN.

THE COURT:  I'm not from Washington, we don't initials here in Brooklyn.

MR. JACKSON:  Sorry, Judge.  I believe FinCEN stands for financial -- it's basically.

THE COURT:  See what I mean, you don't even know.

All right.  Let me ask the Government, what is FinCEN?  It sounds like a fish kind of cardinal sin, but I'm just an old Catholic judge.

MR. POLEMENI:  Sure.  It's the Financial Crime Enforcement Network, Your Honor.

THE COURT:  Financial Crime Enforcement Network.

Okay.  What is the document that was produced to,

---

*Proceedings*                                              1328

just generically, that was produced to defense counsel today?

MR. POLEMENI:  Yes, Your Honor.

So, they are CTRs, which are currency transaction reports --

THE COURT:  That I know.  Go ahead.

MR. POLEMENI:  -- for various entities that are the subject of the trial, including Ago & Alaudin, SGS and CNBC Corp., as well as for certain individuals.

THE COURT:  For Client Number 9, for example.  That was a while ago.

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  Counsel just represented that it might have an impact on the current witness.

Mr. Jackson, would you care to elaborate with respect to that item?

Is it something you are going to be using and hope to introduce in evidence?

Can you enlighten the Court a bit more?

I'm not very good with hopey ritual.

MR. JACKSON:  Same, Judge.  I have not had a chance to completely review it.  We got it this morning.

THE COURT:  How long is the document?

MR. JACKSON:  How long is the document, sir?

MR. POLEMENI:  I think they're a few hundred pages, Judge.

J.A. 567

*Proceedings* 1329

MR. JACKSON: So, Your Honor, I believe --

THE COURT: Go ahead.

MR. JACKSON: -- I believe that these documents, we just want to note we will probably try to review them at our breaks today, just to make sure that we understand exactly what they are.

THE COURT: Is there anything that relates in particular to this witness?

MR. JACKSON: Yes.

THE COURT: There is, right?

MR. JACKSON: Yes, Judge.

THE COURT: You are nodding, but I need --

MR. POLEMENI: Yes.

THE COURT: Okay.

Bottom line, you will review the document and if you need to prepare an exhibit or consult with the Government as to whether or not the document comes in or the documents come in without objection.

I will just note this. Many years ago I was trying a case before the late Judge Robert W. Sweet in the Southern District, and in the middle of the trial, it was maybe a ten-day trial, bank fraud case, my clients informed me that they had discovered a small cache of documents that were relevant to the case. I immediately produced them. It was a civil case, I immediately produced them to the other side.

*Proceedings* 1330

And Judge Sweet, whom I had known for many years and had a great deal of respect for and believe it was mutual respect, looked at me and he said: I'm very displeased. This is the kind of thing that can happen. It can happen when you represent large financial institutions. It can happen when you represent the Government. It's complicated and I do not ascribe any bad faith to anyone, and I appreciate the fact that upon the discovery of these documents they were turned over to defense counsel. But nevertheless, it does complicate the trial of the action, and it can compromise in some instances the fairness of the trial to defendant.

And that was Judge Sweet opining in a civil case.

And in a criminal case it's even more important that everything that is in the Government's custody that is relevant under 3500, Brady or Giglio, or Rule 5, is turned over. And the Government attorneys, I believe, have and will continue to honor their obligations.

To the Government, to put it politely, things happen, I get that, but like the late great Judge Sweet, I am not pleased.

MR. POLEMENI: If I may.

THE COURT: You may.

MR. POLEMENI: Your Honor, I believe we only received these on Friday.

THE COURT: Well, you say "we only received these on

*Proceedings* 1331

Friday," you are here as counsel representing, forgive the old-fashioned expression, the United States of America. This is an agency of the United States of America, so maybe you, as counsel, like I in this trial many years ago, only received them last week, but the Government, your client, like my banking client, had them in their possession. That's what displeases me.

I am not suggesting that the U.S. Attorney sat on these documents. I want to make it very clear you've made representations to the Court, which the Court accepts, and I gather your adversary accepts as well, and it's only recently come to your attention and you promptly produced it.

That being said, governments, banks and institutions have an ongoing and serious obligation to review their files and go back and go back and go back. And as someone who represented large institutions for 33 years before I went on the bench, I get it. Okay. I get it. And in good faith you can be in the middle of a trial and your client says: We just found this cache of documents, and you turned them over and that's the right thing to do.

That being said, I am not pleased. Okay.

Is there anything else, Mr. Jackson, before we get the witness back and the jury?

MR. JACKSON: No, Judge.

THE COURT: Anything else from the Government?

**J.A. 568**

*Proceedings* 1332

MR. POLEMENI: No, Your Honor.

THE COURT: All right. Let's get the witness back on the stand and let's get the jury in, Mr. Scott.

(Witness entered and resumed the stand.)

THE COURT: Good morning. Sir. Welcome back.

THE WITNESS: Good morning. Thank you.

(Pause.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Please rise for the jury.

(Jury enters.)

THE COURT: Good morning, ladies and gentlemen of the jury. Please be seated. Thank you for your patience. We'll try to crank up the AC.

All right. We are going to continue with this witness.

You are still under oath.

Have you spoken with anyone about your testimony since you stepped down yesterday?

THE WITNESS: I did not, Your Honor.

THE COURT: Okay.

Please continue, counsel, with your examination.

MR. JACKSON: Thank you, Judge.

(Continued on the following page.)

*Sarkinovic - cross - Jackson* 1333

KEMAL SARKINOVIC,

    called as a witness by the Government, having been previously duly sworn/affirmed by the Courtroom Deputy, was examined and testified further as follows:

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good morning again, Mr. Sarkinovic.

A    Good morning.

Q    Now, Mr. Sarkinovic, when we left off yesterday we were going through your monthly expenses, correct?

A    Yes, this is correct.

Q    Do you recall that you had told us that during the years in question you believed that you made approximately $1,000 per week?

A    Yes, I did.

Q    Now, to be very clear, you have absolutely no records memorializing exactly how much cash you were making per year, correct?

A    I know approximately.

Q    Right. My question is, do you have any records that confirm how much money you were actually making per year; yes or no?

A    I do not have it.

Q    Right. So we have to take your word for it?

A    Yes.

---

*Sarkinovic - cross - Jackson* 1334

Q    Okay.

    Now, you do agree with me that if you were making 50 -- I'm sorry, a thousand dollars per week, approximately, that would be about $50,000, right?

A    Yes, it is.

Q    Because you said minus vacations, correct?

A    Yes.

Q    You only got paid when you worked?

A    Yes.

Q    And you took at least a couple of weeks off every year, right?

A    Yes.

Q    You took time off to take your family on vacation, right?

A    Yes.

Q    You took time off to go back to your native country to visit, right?

A    Yes.

Q    Sometimes you just took time off to give yourself rest from your work, correct?

A    This is not correct.

Q    Approximately how many weeks a year did you take off for vacation and for visiting family and friends in your native country on average per year?

A    Approximately two weeks a week -- two weeks a year.

Q    So, 50,000 is about a fair estimate of what you were

---

*Sarkinovic - cross - Jackson* 1335

making during the years we've been discussing, correct?

A    Last time I mention that I make between 65 to 70,000.

Q    Okay. You told us you were making a thousand bucks a week, correct?

A    Yes, I did.

Q    All right. Let's focus on your -- let's focus a bit more on your expenses.

    We went through what you claimed to have paid in private school tuition for your children, correct?

A    Yes, I did.

Q    Now, it's your testimony that even though the charged tuition was around $10,000 per child, you were paying significantly less because you got a discount, correct?

A    Yes, I had discount.

Q    And according to you, under your discount you were only paying about 5,000 a year per kid, correct?

A    I was paying between 3,500 and 4,000 per child.

    MR. JACKSON: If we could display, again, the document that is in evidence as 3500-KS-7.

    THE COURT: You may display.

    MR. JACKSON: At page 94. Page 94 is in evidence. Sorry, KS-7A, I believe, page 94.

    (Exhibit published.)

BY MR. JACKSON:

Q    This is the document we were looking at, right?

---

*Sarkinovic - cross - Jackson* 1336

A    Yes, it is correct.

Q    Okay. Where did you get this document?

A    I received it from the school.

Q    Okay. Now, let's just focus here.

    Do you see here it says in 2011 and 2012, as well as in 2012 and 2013, after the discount you paid a total of $15,000 per year; do you see that?

A    I see this.

Q    Now, I'm correct that we don't have a check or a wire transfer or an ACH or a Venmo or a Zelle or anything like that to confirm that you actually only paid $15,000, do we?

A    Even less.

Q    We only have this piece of paper and your memory because you paid in cash, correct?

A    Yes, it is.

Q    And if we scroll down, do you see you paid in cash that's reflected on this, correct?

A    Yes.

Q    You have it memorialized exactly how much cash did you pay, right?

A    I had agreement with them I was going to pay about 4,500.

Q    You had an agreement with the school?

A    Yes, I did.

Q    Did you tip anybody in this agreement, were there any tips to anybody in the school?

*Sarkinovic - cross - Jackson* 1337

A   I did not.

Q   Whatever the case may be, according to you, it was about $15,000 in cash you were paying per year in tuition, right?

A   Yes, it is.

MR. JACKSON:  Your Honor, if I may.  I'd like to just jot this down on this board here.

THE COURT:  I would prefer -- the board, unfortunately, is partially covered by the screen, so I am going to suggest if you are going to create a new document, that you do it on the ELMO.

When we start using old school flipcharts and the jury can see it, the public can't see it, your adversary, even your client is partially screened from it, it's not a good setup.

MR. JACKSON:  You are very wise, Judge.

THE COURT:  So I am going to ask you to not do that. And why don't we just move this along, I think the jury gets the point.

MR. JACKSON:  We'll do that, Judge.  I'm just going through a few more figures.

Now, we can take that down, Mr. Cepregi.

BY MR. JACKSON:

Q   Now, your rent you claim you were paying, 1500 a month, that's $18,000 a year, right?

A   For what?

---

*Sarkinovic - cross - Jackson* 1338

Q   Rent, the rent you were paying for your apartment, your two-bedroom apartment.

A   I was paying 1,500 a month --

Q   Right?

A   -- for my apartment.

Q   That's $18,000 a year, correct?

A   Yes, it's correct.

Q   Okay.  So just between the 18,000 for your rent and the 15,000 for tuition, you were already at $33,000 a year, right?

A   Yes.

Q   Before you got to food, car notes, gas, and on your cars I think we established that you were paying about $4800 a year for your -- for your van note, right, for the lease note?

A   Yes.

Q   I were paying $3600 a year for gas for your two vehicles somehow, correct?

A   Yes.

Q   You were paying $4,000 a year for your two vehicles for car insurance to State Farm, correct?

A   Yes.

Q   You were paying for MetroCards for your kids, correct?

A   I don't recall this.

Q   You don't know if your kids road the subway?  Did they ride the subway ever?

A   In Brooklyn they didn't take any subway.  Later on they

---

*Sarkinovic - cross - Jackson* 1339

were taking subways.

Q   Okay.

Whatever the case may be, you paid at least, between the five kids and you and your wife, you paid at least a few hundred bucks a month in subway charges and train charges, correct?

A   We did not travel a lot.

Q   You didn't do any MTA at all, kids didn't do any MTA?

A   Yes.  At the very beginning, they did not go anywhere.

Q   Okay.

How much did you spend every year on clothing on average?

Is it a fair bet that you spent maybe, for your seven people, 150 bucks, at least, a month?

A   Maybe up to 100.

Q   Okay.  So that would be another $1200, right?

A   Yes.

Q   And then car insurance, how much per year?

A   (No response.)

Q   We already agreed 4,000, right?

And then your travel overseas, how much did you spend on average for your travel for your vacations?

A   Maximum, $2,000.

Q   Total for your whole family in terms of travel, 2,000 bucks?

---

*Sarkinovic - cross - Jackson* 1340

A   When we went together, it would cost more, it were 2,000 per person.  But personally, when I went on my own, I spent $2,000 for myself.

Q   Okay.  And you didn't just go on vacation by yourself usually, right, you brought your family, didn't you?

A   My family hasn't been in my country for the last seven years.

Q   I'm not talking about that.  I'm talking about your vacations.

You told us you would vacation with your family, right?

A   I didn't go anywhere with the family.

Q   You never went on vacation with the family?

A   Yes, when they were very small I did go on vacation, but later on I did not.

Q   I'm sorry.  The first thing you said was --

A   It's been -- it's been eight years since I haven't traveled a lot, unless there was an emergency.

Q   Where did you go on vacation with your family?

A   I went only to Montenegro.

Q   With your family?

A   Yes.

Q   What did that trip cost?

A   Altogether about $12,000.

Q   Okay.  Now, do you realize that just on the amounts of

J.A. 570

Sarkinovic - cross - Jackson                1341

money that you've given us, just so far, 18,000 for rent;
15,000 for tuition; another 4800 for one of your cars, car
notes; 6,000 for another car; 12,000 for a vacation; 4,000 for
car insurance; another 1200 for clothing somehow; 3600 for
gas; do you realize that that's more, substantially more than
$50,000 a year already, correct?

A    Yes, I understand.

Q    And we haven't even addressed your toiletries.

I assume you've got lotion and toilet paper and
stuff like that in your home. I'm correct about that, right?

A    Yes, we did not.

Q    You also paid for utilities, right, you paid for electric
and gas?

A    Yes, I did.

Q    Did you have cable TV?

A    Yes, I do.

Q    You had to get the sports package that lets you watch the
games from Montenegro, right?

THE COURT:  Mr. Jackson --

A    I do --

MR. JACKSON:  I'll withdraw.

THE COURT:  Mr. Jackson, are we getting into whether
he's a Netflix or Disney Plus?

I have given you great latitude.

MR. JACKSON:  Yes, Judge.

---

Sarkinovic - cross - Jackson                1342

THE COURT:  There haven't been objections, but when
get down to what cable networks he's watching or not, I think
we should move along to issues that the jury might actually
find of relevance to deciding the issues in the case.

MR. JACKSON:  I'm getting right there, Judge.

THE COURT:  Well, you are, absolutely are.

MR. JACKSON:  Yes, Judge.

THE COURT:  I assure you of that.

MR. JACKSON:  I agree.

THE COURT:  Even without objection from the
Government you are getting right here because the jury is
wondering if anyone is paying any attention, and the answer is
yes.

MR. JACKSON:  Yes, Judge.

THE COURT:  Okay.

MR. JACKSON:  Okay.  All right.

THE COURT:  So let's move beyond the cable, let's
move beyond the toiletries, let's move beyond the toilet
paper, please.

MR. JACKSON:  Yes, Judge.

THE COURT:  Okay.  Let's just flush that out and
let's just roll along.

MR. JACKSON:  A wise counsel, Judge.

THE COURT:  I could keep up with the imagery, but
I'd just as soon not, but the jury gets it.  Okay?

---

Sarkinovic - cross - Jackson                1343

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

BY MR. JACKSON:

Q    Putting aside whatever you spend in your household, okay,
you also had additional spaces, you had a second apartment,
didn't you at some point?

A    I did not.

Q    You never had a second apartment?

A    Never.

Q    Did you rent out the basement in your building as a
woodworking shop for stuff that you built, like radiator
covers?

A    I never rented it.

Q    You were given it for free?

A    Yes, I did.

Q    You turned that into a metal shop where you made doors
and radiator covers, right?

A    I only work on very small objects.

Q    Yes, but you were using that for your own shop, you were
cutting things, making things?

A    I only hold my extra tools in that area.

Q    Okay.

Now, one of the things that you told us is that you
were -- when you were working with David Motovich, you were
saying that Mr. Motovich never gave you a nickel, right?

**J.A. 571**

---

Sarkinovic - cross - Jackson                1344

A    This is correct.

Q    Apart from, obviously, the materials that he gave you on
credit that he loaned to you, right?

A    Yes, I had material.

Q    I'm correct, though, that during some of the years in
question, at least one of your kids David gave a job to,
correct?

A    Yes, it is.

Q    He's paying this -- this -- one of your children on the
books, right?

A    Yes.  Yes.

Q    Which one was that?

A    That was my daughter.

Q    And what was she getting paid to do?

A    I don't know exactly what she was doing.

Q    Well, you had involvement with it, didn't you?

A    Yes, I did.

Q    What was your involvement with it?

A    I think -- I think she was working on keeping record of
what's going on.  I wasn't interested in exactly what she was
doing.

Q    Part of what she was doing during that time period was
helping to create bills for actual work --

A    Okay.

Q    -- that you were doing, right?

*Sarkinovic - cross - Jackson* 1345

A    The bills for me?

Q    Yes.

A    I do not recall this.

Q    You don't remember your daughter making invoices related to actual work that you were doing?

A    She was -- she was working for David.

Q    Okay.  But it was for work that you were doing, correct?

A    I don't know anything about that.

Q    Well, your son was also involved, too; right?

A    He was also working for David.

Q    You have a son named Hako, right?

A    Yes.

Q    And Hako and your daughter were both coordinating with you on work on real projects that you were doing that David was helping you out with by loaning you material or fronting you money, et cetera, right?

A    My daughter -- my daughter was working for Midwood and my son was working for David.

Q    And it's your testimony you had no involvement in that?

A    She worked there a very short period of time.

Q    I'd like to show you a document.

A    Okay.

Q    Actually, let me ask you this question.

I'd like to show you a document that's been marked as DX-3515 and --

---

*Sarkinovic - cross - Jackson* 1346

THE COURT:  Is it in evidence?

MR. JACKSON:  It is not, Your Honor.

THE COURT:  Publish it to your adversary and the witness.

Any objection to -- how is it marked, counsel?

MR. JACKSON:  This is DX--3515, Your Honor.

THE COURT:  Go back to the microphone, please.

MR. JACKSON:  Your Honor, this is DX--3515.

THE COURT:  Okay.  I am not seeing that displayed on the document.

MR. JACKSON:  Your Honor, I'll use the ELMO.

THE COURT:  All right.

3515.  Any objection to this?  I don't see it anymore.

No peekaboo.  Put it up.  Keep it up.

To the Government, any objection to -- now I don't see it at all.

Display it to the witness.  Display it to the Court. Display it to your adversary.  And let's see if there is any -- the side without the blanks and the paper clip.  Flip it over.  It's on the wrong side.

MR. JACKSON:  Sorry, Judge.

THE COURT:  I know you know how to do it, but lawyers, what can you say....

Any objection to 3515 from the Government?

---

*Sarkinovic - cross - Jackson* 1347

MR. SKURNIK:  No objection.

THE COURT:  It's admitted.

(Defense Exhibit DX-3515 was received in evidence.)

THE COURT:  You may publish.

(Exhibit published.)

MR. JACKSON:  Thank you, Judge.

BY MR. JACKSON:

Q    Can you see that, Mr. Sarkinovic?

A    Yes.

Q    And --

THE COURT:  And, ladies and gentlemen of the jury, the numbers are at the bottom of the page, just so you will know what it is if you want to see it later.  Okay.  That's how it's displayed.

Go ahead.  Just move it along, please.

MR. JACKSON:  Yes, Judge.

Q    Do you see this?

A    Yes.

Q    Okay.  This is an e-mail from your son Hako, correct?

A    Yes.

Q    Okay.  And you see that he e-mails Minela@midwoodlumber.com, correct?

A    Yes.

Q    And that was an e-mail address that your daughter was using, correct?

---

*Sarkinovic - cross - Jackson* 1348

A    I suppose so, yes.

Q    Do you see that it refers to 416 East 23rd Street, Apartment 5B?

A    Okay.

Q    Do you see that?

A    Yes.

Q    That's an actual apartment building, an actual project that in 2016 David referred you for and that you were doing work on, correct, with your son?

A    My son worked there.  He had his workers and they worked for David there.

Q    And you're saying you had no involvement in it?

A    I was there, but I was not getting paid.

Q    You were there, you were at 415 East 23rd Street, but it was just your son, you had no involvement?

A    I took my children to work there, but I did not work there.

Q    Okay.  But they were being -- the project was referred to you, right?

A    No.

Q    Okay.

A    It was my son's project.

Q    Do you see the photo that's reflected here?  Do you see that?

(Exhibit published.)

Sarkinovic - cross - Jackson                    1349

A    Yes.

Q    You recall this is part of what the project was that you were working on, stoves, right, you were renovating these apartments for this client, right?

A    No.

Q    Okay.

Do you see the other photo that was sent here by Hako, you were doing trim work around this?

A    Where is this?

Q    Well, I'm asking you.

Do you recall?

A    I don't know the address.

Q    415 East 23rd Street is what it says right here, right?

A    (No response.)

Q    You remember that there was a project at 415 East 23rd Street, correct?

A    I don't recall.

MR. JACKSON:  Your Honor, I'd like to, to just speed this along, I'd like to just offer a few additional exhibits that are similar to this.

THE COURT:  All right.  Why don't you publish them to your adversary and, if necessary, to the witness for authentication, foundation.

THE INTERPRETER:  Your Honor, this is interpreter speaking.

---

Sarkinovic - cross - Jackson                    1350

The witness is asking whether this is in New York City or Brooklyn.

THE COURT:  The witness is not asking anything because there is no question pending.  So the witness doesn't get to ask questions.

THE INTERPRETER:  Apologies.

THE COURT:  Accepted.

(Pause.)

MR. JACKSON:  Your Honor, the Government last asked that I go through these one by one with the witness.

THE COURT:  All right.  So, what is the first document?

MR. JACKSON:  Your Honor, I'd like to show 3528.

THE COURT:  3528, that's DX--3528?

MR. JACKSON:  Correct, Your Honor.

THE COURT:  All right.  So DX--3528 to the witness only and to opposing counsel.

All right, any objection to 3528?

And, again, if you could please have the --
Mr. Jackson, if you could please have the number, before you start flipping through, so I can see it.

Okay.  Let's do it this way.  I want to see the document with the number and with the e-mail content together.

Can you help him out, Mr. Techie, please, on the ELMO?

---

Sarkinovic - cross - Jackson                    1351

MR. PAULSEN:  Your Honor, in the interim can we have --

THE COURT:  No, no, no, let's not have any interims. This is supposed to be worked out in advance.  Come on.

Do you want to do that from the computer?

MR. CEPREGI:  Yes.

THE COURT:  I would like that too, and so would the jury, so we can get this done before my subscription on Netflix runs out.

Okay.  This Document 3528.  Any objection from the Government?

MR. SKURNIK:  Yes, we object.

THE COURT:  All right, let's have a sidebar.  And I want to see a hard copy over at the sidebar.

White noise, please.

(Sidebar held.)

(Continued on the following page.)

---

Sidebar                    1352

(Sidebar conference held on the record in the presence of the Court and counsel, out of the hearing of the jury.)

THE COURT:  Mr. Jackson, may I have the hard copy of the document that you are offering, please, 3528?

Okay.

Are you offering the entire document, sir, or just the first page?

MR. JACKSON:  The entire document, Judge.

THE COURT:  All right, let me take a look at it.

(Pause.)

THE COURT:  So, you are offering DX-3528, pages 1 through 10, is that correct?

MR. JACKSON:  Correct, Judge.

THE COURT:  Okay.

What is the objection?

MR. SKURNIK:  So, Your Honor, the objection is to a lack of foundation.  The first e-mail, which we didn't object to, when the witness was asked about it, he didn't know what it was.  It seemed he had never seen it before.  So our concern is that --

THE COURT:  I'm asking you what your objection is to 3528, which is a ten-page document.

What is your objection?

MR. SKURNIK:  A lack of foundation, Your Honor, as

J.A. 573

to authenticity as to what these are.

THE COURT: Can you offer any comfort to the Government with respect to what this document is?

MR. JACKSON: Yes, Your Honor. This --

THE COURT: Go ahead.

MR. JACKSON: This is an e-mail that was sent by the witness's -- this is a document that was sent by the witness's daughter containing photographs of a project that the witness was working on with --

THE COURT: But he's not copied on it?

MR. JACKSON: Right. But I have additional e-mails he's admitted that his children were working on this project.

THE COURT: No, no, no, but he's not copied on this.

MR. JACKSON: That's true, Judge.

THE COURT: I'm not going to admit this document. If you want to call the daughter, call the daughter. Put a subpoena on the daughter and get her in.

They're objecting to it and that's a valid objection. I am not admitting this.

MR. JACKSON: May I offer it subject to connection?

THE COURT: No, this isn't Bankruptcy Court.

MR. JACKSON: Fair enough, Judge.

THE COURT: I am glad it's fair enough.

Okay. The objection is sustained. So this document is out.

What else you got?

MR. JACKSON: I have this one, Judge, which is 3531.

THE COURT: Is it sent to him?

MR. JACKSON: It's not. He's referenced in it.

THE COURT: He's referenced in it.

Is it sent to him?

MR. JACKSON: No.

THE COURT: Okay. What is the basis of the objection?

MR. SKURNIK: The same objection.

THE COURT: Okay. Same ruling.

What else you got?

MR. JACKSON: They're all the same actually. This is other e-mails where his children are --

THE COURT: But they're not sent to him, the e-mails are not sent to this witness?

MR. JACKSON: That's correct.

THE COURT: You're wasting time, Mr. Jackson.

I let you talk about the toilet paper. I let you talk about the household expenses and the travel because it goes to the question of his income, his knowledge.

But now you're showing documents that were sent to his adult children, that he's not copied on, with attachments. Okay.

MR. JACKSON: Totally understand.

THE COURT: Do you have any anything else?

I am glad you understand because it's pretty straight forward.

Anything else you have for this witness?

MR. JACKSON: Yes, Judge.

THE COURT: What else do you have for this witness? Show me.

MR. JACKSON: If Your Honor will let me preview, I have to get my outline.

THE COURT: I'm sorry, I couldn't hear you.

MR. JACKSON: If Your Honor would like me to preview, can I grab my outline?

THE COURT: Go get your outline.

(Pause.)

THE COURT: What other documents do you have that you want to offer through this witness?

That's my question. Answer my question.

What other documents do you have that you want to offer through this witness?

Show me the documents, and show them to the Government and see if there are any objections or not.

MR. JACKSON: Judge, I have a photograph of --

THE COURT: Show me the document that you want to offer through this witness.

Show me the document that you want to offer through

this witness.

I'll say it for the fourth and last time, show it to me now.

Do you have it? Get it.

Maybe your colleague who is hiding behind you can come forward and help you out with this. I'm pretty sure she probably knows where it is.

MR. JACKSON: Judge, the only -- the reason --

THE COURT: No, no, no, no, no, no, no.

Show me the document that you wish to introduce or documents that you wish to introduce through this witness.

Do you have other documents that you wish to question this witness about, yes or no?

MR. JACKSON: The only document, Your Honor --

THE COURT: Show me. Don't describe it. I'm back to Eliza Doolittle. Show me. Don't waste my time. Show me.

MR. JACKSON: This is a photo.

THE COURT: Number.

MR. JACKSON: 1705, which is a photograph.

THE COURT: All right.

1705. Any objection to 1705 coming in?

MR. SKURNIK: No objection, Your Honor.

THE COURT: All right. That's admitted to be able to show it.

(Defense Exhibit DX-1705 was received in evidence.)

Sidebar                                                    1357

MR. JACKSON:  Your Honor, we have --

THE COURT:  Any other documents?  Show me.

MR. JACKSON:  I can't show you, Judge, because --

THE COURT:  Then you can't question him about it.

MR. JACKSON:  I can show you on the screen.  We found a video --

THE COURT:  I want to see it.  I want to see it now.

MR. JACKSON:  We have a video, very short.

THE COURT:  I want to see the document.  I don't want to hear about it.  I want to see it.

What is the document number?

MS. LAYDEN:  DX-1702.

THE COURT:  DX.

MS. LAYDEN:  1702.

THE COURT:  1702, okay.

Do we have DX-1702?

MS. LAYDEN:  It's a video file.

MR. JACKSON:  She is going to play it on the screen.

Do you want me to play it on my computer?

THE COURT:  Do you have any objection to 1702?  Do you know what it is?

MR. SKURNIK:  I don't know what it is, Your Honor.

THE COURT:  Can you show it to your adversary now, please?

MR. JACKSON:  Yes.

---

Sidebar                                                    1358

THE COURT:  Any other documents?

MR. JACKSON:  Not at this time.  All I have is if there are certain things, and I thought about things with --

THE COURT:  I'm asking about documents, not about thoughts.

MR. JACKSON:  No.

THE COURT:  Are there any other documents at this time that you wish to question this witness about --

MR. JACKSON:  Not --

THE COURT:  -- because he's about done?

MR. JACKSON:  Not that we're aware of at this time.

THE COURT:  Not that you're aware of at this time?

MR. JACKSON:  Yes, sir.

THE COURT:  Actually, I'm not talking about the documents that the Government just found and gave over to you.  That's one reason I'm so concerned about this knowing that this witness pleaded because I have a jury here who has heard a lot about things that, perhaps, not central to the defense in this case.

Show your adversary the document, and then come back to the sidebar and let me know if there is any objection to -- what's the number again --

MR. JACKSON:  1702.

THE COURT:  -- ma'am?

MS. LAYDEN:  DX-1702.

---

Sidebar                                                    1359

THE COURT:  DX-1702.

And just for the record, would you state your name?

MS. LAYDEN:  Jessica Layden.

THE COURT:  Okay.  Thank you.

My late colleague Jack Weinstein had a rule, if you didn't have the women at counsel table speak, you weren't allowed to proceed with your case.  He actually had it in his written rules.

I thought about putting the rule in, but I know there are some firms that if you put that rule in, they won't have women come to court, which would be counterproductive to the rule.  So I sort of take the spirit of my late great colleague Jack Weinstein and I call on the women who are here, even if their male colleagues do not necessarily advance them.  I am not going beyond that.  I am just saying you're called upon because I know you know the answer.  It's not like when I was in law school and I was called on by the professor and I didn't know the answer.

MS. LAYDEN:  I understand.

THE COURT:  Okay.

(Sidebar concluded; proceedings continued.)


(Continued on the following page.)

---

SARKINOVIC - CROSS - MR. JACKSON                           1360

(Continuing.)

(In open court; Jury present.)

THE COURT:  The objection is sustained.

Let's proceed, counsel.

MR. JACKSON:  Your Honor, I haven't quite gotten to the exhibit we were just discussing, but the Government has said they will have no objection when we reach it.

THE COURT:  Continue.  Let's not waste the jury's time.

MR. JACKSON:  Thank you.

CROSS-EXAMINATION (Continued)

BY MR. JACKSON:

Q   Now, one of the things that was occurring throughout the time period that you were working with Mr. Motovich is you were working at various projects, correct?

A   Yes.

Q   And those projects, repeatedly, Mr. Motovich was referring you -- referring to you, correct?

A   Depending.  From case to case.

Q   Right.  But there were a number of occasions, many occasions, where Mr. Motovich referred you to projects, right?

A   Yes.

Q   And Mr. Motovich also was attempting to make sure that you complied with certain regulations that you were required to comply with with your crew, right?

AVERY N. ARMSTRONG, RPR, NYRCR

**J.A. 575**

SARKINOVIC - CROSS - MR. JACKSON
1361

A    Yes.

Q    On one occasion, at least, you recall doing OSHA training with your guys after Mr. Motovich connected you with someone who could do OSHA training, right?

A    Okay.

Q    You agree?

A    Yes.

Q    Okay.

MR. JACKSON:  I'd like to at this time, Your Honor, to offer and play DX 1702.

THE COURT:  Any objection?

MR. SKURNIK:  No objection.

THE COURT:  Admitted.

(Defense Exhibit 1702 was received in evidence.)

THE COURT:  You may publish and play it.

(Video recording played.)(Video recording stopped.)

Q    Okay.  Now, that was you in the video that we saw, right?  One of the people sitting at the table?

A    I did not see myself.

MR. JACKSON:  Can we just back up, just play through to the middle part.  Just pull through to the middle part there.

(Video recording played.)(Video recording stopped.)

Q    That's you, right.  Do you see yourself right here?

A    Yes.

---

SARKINOVIC - CROSS - MR. JACKSON
1362

Q    Okay.  You remember this, right?

A    Yes.

Q    And the whole point of OSHA training is that this is occupational safe and health training that workers were working on certain construction sites are supposed to go through, right?

A    Yes.

Q    And this was part of Mr. Motovich trying to help you have a business that was more in line with what you needed to do in terms of having an actual successful business, correct?

A    Yes.

Q    Okay.  Now --

A    But this was just five minutes.

Q    Okay.  Now, we went through -- on the Government's direct, they went through a bunch of different invoices for projects where you said that you didn't know or that you didn't participate in certain of those projects, right?

A    I worked on projects, yes.

Q    To be clear, all of those invoices that we went through with the Government on your direct, you don't know whether any of those related to actual work that you were doing, correct?

A    One job in Borough Park, yes.

Q    Okay.  But you don't have records of all of the projects that you did with Zorach, right?

A    No, I don't.

---

SARKINOVIC - CROSS - MR. JACKSON
1363

Q    You don't have records of all the projects that Mr. Motovich recommended you for, correct?

A    No, I don't.

Q    So as we sit here today, it's impossible for you to tell us how many projects you did or who the clients were, right?

A    I worked for Zorach.  I know the clients for David also.

Q    Right.  But I'm saying you don't specifically recall who each of the clients were that were actually paying Zorach for the projects that he hired you as a subcontractor on, correct?

A    I was a laborer.  That was not my department.

Q    Well, you were a laborer, but you were in charge of several guys, right?

A    I was -- whatever I was responsible for, I still have that responsibility.  I maintain that responsibility.

Q    My only question is, you were in charge of several guys on these projects, right?

A    Yes.

Q    Zorach didn't talk to those guys, he talked to you and directed you to direct those guys, correct?

A    He also talked to the laborers directly and as did I.

Q    Right.  But he was directing you to be the supervisor of those guys, correct?

A    Yes.  But he also supervised.

Q    Okay.  Got it.  And right now, as we sit here, you don't have any records that indicate if it was 100 projects or 50

---

SARKINOVIC - CROSS - MR. JACKSON
1364

projects or 200 projects over all those years, you don't have records of that, correct?

A    No, I do not.

Q    Now, you claimed that you were only paid in cash, right?

A    Yes.

Q    But Zorach wrote checks to you that he gave to you, correct?

A    Yes.

Q    Okay.  You took those checks and you cashed them, right?

A    Yes.

Q    And when you cashed them, you cashed them at various places, correct?

A    Yes.

Q    Told us about a place named Avenue J, right, that you cashed checks at?

A    Yes.

Q    What were the other two places you cashed checks?

A    Coney Island.

Q    Where else?

A    Once or twice, on 18th Avenue.

Q    Okay.  And when you cashed those checks at Coney Island or Avenue J, you weren't even looking at the checks, right?

A    No.

Q    You didn't care whether the checks were for more than 10,000 or less than 10,000, correct?

**J.A. 576**

SARKINOVIC - CROSS - MR. JACKSON 1365

A Yes.

Q And David Motovich never told you something like, don't cash checks for more than 10,000? He never said that, right?

A No, he did not tell me that.

Q And did you understand -- and so what would happen is after those check were written by Zorach and given to you, you took the cash for the checks and gave some to the workers that you were supervising, and then you kept the rest for yourself, correct?

A They paid me for the laborers, plus for me, yes.

Q Right. You took the check that Zorach wrote for you --

A Yes.

Q -- you cashed it, and then you paid the workers, right?

A Yes.

Q And then you kept the remainder for yourself, correct?

A Whatever my salary was for the job, yes.

Q And again, you have no records of how you divvied up the cash between the workers and yourself --

A No. No.

THE COURT: Have you to let him finish the question before you answer it.

Go ahead, put the question again, Mr. Jackson.

MR. JACKSON: Yes, Your Honor.

Q You agree with me that you have no records of how you divvied up the cash after Zorach wrote a check to you,

SARKINOVIC - CROSS - MR. JACKSON 1366

correct?

A Yes, I agree.

Q Now, we went through a bunch of -- we went through a bunch of records where the office address that was identified for you was 1100 Coney Island Ave, Brooklyn, New York, right?

A Yes.

Q And that's an address that you know is associated with the Motovich family, right?

A Yes.

Q Did David ever tell you on any document, you got to make sure don't put my -- any addresses that are connected with me on any of these documents? He never said that, correct?

A No, we never talked about that.

Q So anyone who looked at any of these documents, whether it was 1100 Coney Island Avenue, would be able to see clearly that it was connected to David Motovich, correct?

A Yes.

Q One of the things that you also told us is that you were involved in this job upstate with Ago?

A I never worked with Ago.

Q You were the person who referred Ago to David to work on this job in Monticello, right?

A Yes.

Q And you understood that at the time that that was put together, Ago had agreed that it would be Ago & Alaudin doing

SARKINOVIC - CROSS - MR. JACKSON 1367

this project after you vouched for Ago, right?

A I did not vouch for anyone.

Q Well, you recommended him to David, correct?

A Yes, I did.

Q And you told him he was a good person to do this job, correct?

A Yes.

Q Okay. I'm right that you understood that Ago agreed to buy materials at Midwood Lumber, right?

A I did not agree, but David and Ago made an agreement that they would work together. I was out of that story.

Q Right. But you told the agents that Ago used to buy materials at Midwood Lumber, right?

A Yeah. Yeah, yeah, yeah, got materials from Midwood Lumber, yes.

Q Right. You also told the agents that Ago gave the company's name to David Motovich, right?

A No. That's not what I said.

Q Okay. I want to direct you to a document marked as 3500-KS-9.

MR. JACKSON: Your Honor, may I just show the witness this document?

THE COURT: Any objection?

MR. SKURNIK: Objection.

THE COURT: Sidebar. (Continued on the next page.)

SARKINOVIC - CROSS - MR. JACKSON 1368

(The following occurred at sidebar.)

THE COURT: May I see the document, please.

THE COURTROOM DEPUTY: Is it KS-9A?

MR. JACKSON: 9B. At Page four.

THE COURT: Are you offering the entire document or just Page 4?

THE COURTROOM DEPUTY: Bates 4?

THE COURT: Are you offering the entire document or -- did you say Page 4?

MR. JACKSON: Yes, Your Honor.

THE COURT: So let me see Page 4 of this document.

MR. JACKSON: And I'm only offering just this one portion, Your Honor.

THE COURT: You're offering a document, right? Okay. What is the document you're offering?

MR. JACKSON: I want --

THE COURT: What is the document you're offering?

MR. JACKSON: I'm only -- I just want to confront the witness with this statement --

THE COURT: What is the document you are offering? If you say to a witness, did you ever say X, you can ask the witness, did you ever say X. That's how you do it. If you want to offer a document, however, as part of the examination, you have to identify what it is, show it to the adversary, the adversary has now said they have an objection.

J.A. 577

SIDEBAR CONFERENCE 1369

Okay.

What's the objection?

MR. SKURNIK: Hearsay, Your Honor.

THE COURT: What's the response?

MR. JACKSON: It's not offered for its truth, Your Honor, only for impeachment. He's denied making this statement, and I want to confront him with this statement as he made it as he affirmatively denied it.

THE COURT: What is the response you have?

MR. POLEMENI: So Your Honor, the witness said to the answer, no. He didn't say, I don't recall. He said no.

THE COURT: A little bit louder, I'm sorry.

MR. POLEMENI: The witness said, no, and now Mr. Jackson is trying to use the statement of an agent to impeach this witness.

THE COURT: I'm sustaining the objection. The document is not coming in.

Any or documents we can talk about now? Because I think the jury is getting a little frustrated.

MR. JACKSON: No.

THE COURT: How much longer do you have with this witness?

MR. JACKSON: Twenty minutes, Your Honor.

THE COURT: Twenty minutes?

MR. JACKSON: That's my guess.

SIDEBAR CONFERENCE 1370

THE COURT: Do you have any other documents you want to show this witness?

MR. JACKSON: No, Judge.

THE COURT: Step back.

(End of sidebar conference.)

(Continued on the next page.)

PROCEEDINGS 1371

(In open court; Jury present.)

THE COURT: The objection is stained.

Ladies and gentlemen, we're going to take our 15-minute break. As you may recall, I told you we take 15 minutes break at 11:00 o'clock. We're getting close to that old schedule. I'm kind of like an old relief pitcher, you know, I only come in in the bottom of the ninth, but I come in throwing high heat up and end, as they say, okay. Fifteen minutes. Do not talk about it case and stay cool.

We'll see you in 15 minutes. Thank you.

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURT: You may step down, sir.

The jury has left the courtroom. The witness is in the process of leaving the courtroom.

Ladies and gentlemen, you may be seated. The witness has left the courtroom.

(The witness exits the courtroom.)

THE COURT: Do we have any issues we need to address in the absence of the jury and in the absence of the witness?

Anything with the Government?

MR. SKURNIK: No, Your Honor.

THE COURT: Anything for the defense?

MR. JACKSON: Just one brief thing, Judge. We don't anticipate, because I'm trying to make this move as quickly as

PROCEEDINGS 1372

possible, Judge, going further into any of the witness tampering issues that the Government raised. I just wanted to verify that because we won't be going into them, that they won't be the subject of redirect, that we don't get a chance to respond to?

THE COURT: Well, no. I'm not going to require the Government to tell you now what they're going to do on redirect. If that's your inquiry of the Court, no, I'm not going to make that ruling.

MR. JACKSON: I just wanted to note that we would have a scope objection since we're not going into that issue.

THE COURT: Then you'll make the objection and I'll rule.

MR. JACKSON: Thank you, Judge.

THE COURT: Anything else?

MR. JACKSON: No.

THE COURT: All right. Fifteen minutes.

(A recess was taken.)

THE COURTROOM DEPUTY: All rise.

THE COURT: You may be seated.

Do we have any issues to address before we bring the jury back and the witness back?

Anything for the Government?

MR. SKURNIK: No, Your Honor.

THE COURT: Anything for the defense?

PROCEEDINGS 1373

MR. JACKSON: No, Judge.

THE COURT: Okay. Let's get the jury and the witness back.

Turn off the mics, unless you want to be heard by everyone.

MR. SKURNIK: Thank you, Judge.

(Witness takes the witness stand.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Please stand for the jury.

(Jury enters the courtroom.)

THE COURT: Thank you, ladies and gentlemen of the jury please. Be seated. I'm glad to see we've got the AC back to where it needs to be.

All right. Please continue your examination. I understand we have 15 minutes left with this witness on cross, that then we will have a redirect, and then we'll break for lunch.

MR. JACKSON: Thank you, Judge.

CROSS-EXAMINATION (Continued)

BY MR. JACKSON:

Q    Good morning again, Mr. Sarkinovic.

A    Good morning.

Q    Now, Mr. Sarkinovic --

MR. JACKSON: Your Honor, can we call up, already in evidence, Government Exhibit 708.

---

SARKINOVIC - CROSS - MR. JACKSON 1374

THE COURT: You may publish.

(Exhibit published.)

MR. JACKSON: Thank you.

Q    And you see here, Mr. Sarkinovic, this is one of the documents that you went over in direct examination?

A    Yes, it is.

Q    And this is a document that was used by you to open one of the accounts that you talked about, right?

A    Yes, it is.

Q    And this is your actual name that is contained in the document, correct?

A    Yes, it is.

Q    That's your actual address that's contained in the document, right?

A    Yes.

Q    It's redacted, but you put your actual date of birth your actual Social Security number?

A    Yes.

MR. JACKSON: Can we go down.

Q    And if we go to the next page, do you see here you identified some of your work, right?

Where it says, occupation, do you see how it says, construction worker?

A    Yes, I see that.

Q    Did anyone for the bank ever call you to ask you about

---

SARKINOVIC - CROSS - MR. JACKSON 1375

your work as a construction worker and how it related to any of these transactions?

A    They never did.

Q    Nobody at the bank ever said --

THE COURT: He said no. Next question.

Nobody at the bank ever called him.

MR. JACKSON: Thanks, Judge.

Q    Did anyone at the bank ever call you and ask you why you were paying David Motovich's Amex bills?

A    Nobody ever asked me.

Q    Did anybody at the bank ever call and ask why you were paying for any life insurance?

A    No.

THE COURT: Did anybody at the bank ever call you and ask you about anything?

THE WITNESS: They never did.

THE COURT: All right. Move on.

MR. JACKSON: Thank you, Judge.

Take this down.

Q    Now, I'm correct that Mr. Motovich never told you to lie if someone for the bank called to ask you any of the questions we just went over, correct?

A    He did not.

Q    And I'm also correct -- I just want to ask you about several job sites, and you just tell me yes or no, these are

---

SARKINOVIC - CROSS - MR. JACKSON 1376

actual job sites that you worked on during those years.

We'll run through them very quickly, okay?

A    Okay.

Q    921 Ocean Parkway Brooklyn. Do you remember that?

A    I do not recall.

Q    It's possible, you just don't remember --

THE COURT: He doesn't recall. Next.

Q    A Flaster job at 959 East Eighth Street, Brooklyn, New York.

Do you recall that?

A    Yes, I recall this job.

Q    And that's a big project you worked on, correct?

A    It was a private house.

Q    And then a project on Bay Street in Staten Island.

Do you recall that, working on that?

A    I should. I think I did work there.

Q    Right. And these are all actual projects that you worked on that David referred you for, right?

A    No. This is Zorach's jobs.

Q    You agree with me that through some of the companies that you talked about, a number of expenses were paid for the projects, like, materials, et cetera, through Mr. Motovich's Amex bill and through the bank accounts?

Do you understand that or do you have no knowledge of that?

J.A. 579

SARKINOVIC - CROSS - MR. JACKSON 1377

A   I received the money from all the projects that I was working on.

Q   You don't know what, if any, was being paid in terms of materials and other subcontractors for the projects through the companies?  You just don't know, correct?

A   There was an open account at Midwood Lumber and that's where the money was being -- coming from.  I do not know who was putting money into that account.

Q   Okay.  Just wrapping up, Mr. Sarkinovic, I'm correct that when you socialized with Mr. Motovich, you just had friendly socialization with him, right?

A   Yes, it is.

Q   I wanted to show you a document which is marked as GX --

THE COURT:  1705?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  No objection?

MR. SKURNIK:  No objection, Your Honor.

THE COURT:  It's admitted.

(Defense Exhibit 1705 was received in evidence.)

THE COURT:  Publish.

(Exhibit published.)

MR. JACKSON:  DX 1705, it was.

Q   And this is a photo of you and Mr. Motovich out at a social event?

A   Yes, it is.

SARKINOVIC - CROSS - MR. JACKSON 1378

Q   Both of your wives were there?

A   Yes.

Q   And who was this for?

A   I think it was the birthday of Barry Miltz.

Q   Who is Barry Miltz?

A   One of the men who was working there.

Q   One of the men who was working with you on some of these projects?

A   No, this is not correct.

Q   Okay.  Who is Barry Miltz?

A   He was working for himself.

Q   Okay.  And you had a connection with him because you worked with him, right?

A   No.  It was only his company.

Q   Okay.  Whatever the case may be, socialized there at this Barry Miltz event, correct?

A   Yes, it was.

Q   And throughout the time that you worked with David Motovich, David never stole any money from you, correct?

A   I didn't steal from him and he didn't steal from me.

MR. JACKSON:  No further questions for this witness, Judge.

THE COURT:  Your witness.

MR. SKURNIK:  Thank you, Judge.

THE COURT:  Redirect.

SARKINOVIC - CROSS - MR. JACKSON 1379

MR. SKURNIK:  Ms. Kannan, if we can pull up Government Exhibit 1056, which is in evidence.

THE COURT:  You may publish.

MR. SKURNIK:  And we can go -- actually, we'll go to the second page, please.

CROSS-EXAMINATION
BY MR. SKURNIK:

Q   Mr.-- so Mr. Jackson suggested that some of these invoices might have been for actual projects.

Do you remember that?

THE INTERPRETER:  Would you repeat, please.

Q   Mr. Jackson suggested that some of the invoices might have been for actual projects.

Do you remember that?

A   I don't know.

Q   Okay.

MR. SKURNIK:  So Ms. Kannan, if we can just zoom in at the top of this invoice.

Q   It says Ago & Alaudin General Construction Corp., right?

A   Yes.

MR. SKURNIK:  And then Ms. Kannan, the company in the upper left.

Q   Did you ever do a project at 303 East 57th Street, Apartment 47G?

A   No.

SARKINOVIC - CROSS - MR. SKURNIK 1380

Q   Did you ever do a project for Douglas Elliman Reality?

A   No.

MR. SKURNIK:  And we can zoom out.  And then zoom in where it says -- on scope of work is fine.  Thank you, Ms. Kannan.

Q   Do you see where it says, number five, completed electric, balance due 35,000?

A   Yes.

Q   Did you ever do electric work?

A   No.

Q   Are you an electrician?

A   No.

Q   Did you ever hire people to do electric work?

A   No.

Q   Okay.

MR. SKURNIK:  If we can zoom out, please.  And just zoom in at the total cost at the bottom.

Q   Have you ever done a project for $375,000?

A   Never.

Q   This invoice, had you ever seen this before you came and met with the Government?

A   No.

Q   Even though it has your name on the bottom?

A   Yes.

MR. SKURNIK:  And if we can just go up to the first

SARKINOVIC - CROSS - MR. SKURNIK      1381

page, Ms. Kannan. And zoom in at the top of the e-mail.

Q   Is this an e-mail sent to David Motovich from Gail Motovich?

A   Yes.

MR. SKURNIK:  Can we now do Government Exhibit 708, please.

THE COURT:  In evidence?

MR. SKURNIK:  In evidence, yes, Your Honor.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  And if we can just zoom in the first half of the page, please.

Q   Mr. Sarkinovic, Mr. Jackson just asked you some questions about this document, right?

A   Yes.

Q   About what it says on this page?

A   Yes.

Q   Is that your handwriting?

A   No.

Q   Do you know whose it is?

A   No.

Q   Okay.

MR. SKURNIK:  We can take this down.

Q   Now, Mr. Jackson also asked you a bunch of questions yesterday about your ability to speak English.

---

SARKINOVIC - CROSS - MR. SKURNIK      1382

Do you remember that?

A   Yes.

Q   He played a couple of tapes of you speaking in English.

A   Yes.

Q   Just to be clear, you do speak English, right?

A   Yes.

Q   Is your English perfect, though?

A   No.

Q   So for really important matters, do you prefer to speak in Bosnian?

A   Yes, indeed.

Q   So, in March of 2022, when you pled guilty to bank fraud conspiracy, was that an important matter?

A   Yes.

Q   Did that guilty plea happen here in this courthouse?

A   Yes.

Q   During that guilty plea, you had an interpreter, didn't you?

A   Yes.

Q   In fact, it's one of the same interpreters we have in the courtroom here today; is that right?

A   Yes.

Q   Now, before this trial, you and I met several times; isn't that correct?

A   Yes.

---

SARKINOVIC - CROSS - MR. SKURNIK      1383

Q   I asked you questions, I showed you documents?

A   Yes.

Q   Every single time you and I met, was there an interpreter there?

A   Yes.

Q   Now, in your everyday life, you sometimes do speak to people in English; is that right?

A   Yes, I do.

Q   So when David Motovich asked you in English to give him the papers to your company in Latek, you understood him, right?

A   Yes, I did.

Q   So when Mr. Motovich asked you in English to open up companies like SGS and Ago & Alaudin, did you understand what he was asking?

A   I did.

Q   When Mr. Motovich told you in English to open up bank accounts for those companies, did you understand what he was asking?

A   I did.

Q   When he told you in English to come to his office to sign checks for those accounts, did you understand what he was asking?

A   I did understand.

Q   When Mr. Motovich said, leave those checks here, you can

---

SARKINOVIC - CROSS - MR. SKURNIK      1384

go, did you understand him?

A   I did.

Q   When Mr. Motovich told you in English to approve wire transfers for those accounts, did you understand him?

A   I did.

Q   When you raised concerns about these accounts with Mr. Motovich and he responded in English, don't worry about it, did you understand him?

A   I did.

Q   When you raised concerns with Mr. Motovich about taking the name of Ago Kolenovic's company and he responded in English, I like the name, did you understand him?

A   I did.

Q   Now, Mr. Jackson asked a number of questions about your finances. So I want to clear up a few things. He asked you about your cars.

How many cars do you have today?

A   Yeah. I have one car now.

Q   One car?

A   Yes. It's a Ford from 2010.

Q   Do you use that 2010 Ford in your business?

A   I do.

Q   Do you drive to job sites with it?

A   I do.

Q   Ever pick up materials?

---

J.A. 581

SARKINOVIC - CROSS - MR. SKURNIK
1385

A    I do.

Q    Have you ever had more than one car at a time?

A    I had two vehicles.

Q    Did you ever have three at a time?

A    No.  Never.

Q    Okay.  That Mercedes-Benz that Mr. Jackson asked you about, how long did you have it?

A    It was leased for three years.

Q    Do you recall what model it was?

A    350, I think.

Q    Do you remember the year of that car?

A    Fifteen years ago.

Q    Do you remember the year of the car itself, the year it was manufactured?

A    It was -- it was made about 20 years ago, I believe.

Q    When you had it, was it a used car?

A    It was a new car.

Q    How much of your monthly payment went -- what was your monthly payment for that Mercedes?

A    350, I think.

Q    Is that similar to what you paid for other cars?

A    Yes.

Q    When you went on vacation with your family to Montenegro, how often did you take the whole family?

A    Every three years or so.

---

SARKINOVIC - CROSS - MR. SKURNIK
1386

Q    So it wasn't every year?

A    No.

Q    Now, for a couple of years, you sent your children to private school; is that right?

A    Yes.

Q    Why did you send them to private school?

A    I was divorced from my wife and my only solution -- the only way to protect my children and to keep the children was to sign them up for private school so these children would succeed in their lives and turn into good people.

Q    Did that private school give you a discount?

A    Yes.

Q    Even with the discount, was it easy to afford?

A    We agreed that that's as much I can afford, because the state donated some funds.

Q    Was it difficult for you to cobble the money together to pay for that private school?

A    That's what I had and that's what I was able to pay.

Q    Did you have to forego any other expenses, like, eating out?

A    Yes.

Q    Can you tell us about that?

A    I had to give up a lot and forego a lot.  I can't remember exactly what.

Q    By the way, when you paid for this private school, did

---

SARKINOVIC - CROSS - MR. SKURNIK
1387

you pay in check or cash?

A    Cash.

Q    So you didn't pay for it with a check from say, SGS Construction?

A    May have happened.  I don't recall.

Q    But you -- you recall using cash, right?

A    Yes.

Q    So you paid with your own money?

A    Yes.

Q    So I want to ask a bit about your income.

How often are you usually paid?

A    Weekly.

Q    Does the amount you get paid vary based on how much work you do?

A    Yes, it does.

Q    So some months, do you get paid more than other months?

A    Yes.

Q    Some years, do you get paid more than other years?

A    Yes.

Q    So the amount of money you make, it varies over time; is that fair to say?

A    Yes, it varies.

Q    Were there some years you made around $35,000?

A    Yes.

Q    Were there some years you made more like 65- or $70,000?

---

SARKINOVIC - CROSS - MR. SKURNIK
1388

A    Yes.

Q    All right.  So whether it's 35,000 or 65 or $70,000, how much of your salary did you spend on diamonds?

A    I don't know what diamonds are.

Q    You never bought any diamonds with your salary?

A    I don't know.

THE COURT:  Diamonds are a girl's best friend --

A    I did not.

Q    How about insurance policies for Dave Fridman, Mr. Motovich's uncle.

How much of your salary did you spend on insurance policies for Dave Fridman?

A    I did not pay that.

Q    How much of your salary did you spend at Bloomingdale's?

A    Nothing.

Q    How much of your salary did you spend at Saks Fifth Avenue?

A    Nothing.

Q    How about on American Express charges, how much of your salary went to that?

A    Nothing.

Q    And how much of your salary did you just give away to various members of the Motovich family?

A    Nothing.

MR. SKURNIK:  If we can pull up, Ms. Kannan, please,

**J.A. 582**

SARKINOVIC - CROSS - MR. SKURNIK 1389

Government Exhibit 708, the first page.

THE COURT: In evidence?

MR. SKURNIK: This is in evidence, Your Honor.

THE COURT: You may publish.

(Exhibit published.)

MR. SKURNIK: And if we can go to, please, Government Exhibit -- actually, let's do 710, Page 80.

THE COURT: In evidence?

MR. SKURNIK: In evidence, Your Honor.

THE COURT: Publish.

(Exhibit published.)

MR. SKURNIK: If we can zoom in on the upper right-hand corner check, please.

Q Is that a check for $112,500?

A Yes, it is.

Q To Boris Motovich?

A Yes.

Q So whether you made 35,000 or $65,000, is this check still more than you've made in a year?

A Three times as much, yes.

MR. SKURNIK: If we can go to Page 82, please, of this document. And the check in the bottom left, please.

Q Is that $100,000 check to David Motovich?

A Yes.

Q So whether you made 35,000 or 65,000, is this still more

SARKINOVIC - CROSS - MR. SKURNIK 1390

than you made in a year?

A It is.

MR. SKURNIK: Now, Government Exhibit 703, Page 1, please. Yeah, if we can zoom in on the top check, please.

Q Whether you made 35 or 65,000, is this still about what you made in a year, Mr. Sarkinovic?

A Yes.

Q Okay. So --

MR. SKURNIK: We can take that down.

Q I want to ask you now about what you got from your relationship with Mr. Motovich.

We saw a picture a moment ago of you and Mr. Motovich at a dinner; is that right?

A Yes.

Q Did you ever go on vacation with him?

A Never.

Q Have you ever been to his apartment in Manhattan?

A Never.

Q Can you remind the jury why you started your company, Latek?

A I started the company hoping to make a good business.

Q Were you hoping to get bigger construction jobs?

A Yes.

Q Where you can make a lot of money?

A Yes.

SARKINOVIC - CROSS - MR. SKURNIK 1391

Q Did that happen?

A Never. No.

Q Did Mr. Motovich ever help you with Latek?

A No.

Q Did he ever give you big construction jobs?

A No.

Q Instead, he told you to give Latek to him; isn't that right?

A Yes.

Q And then he asked you to open up other companies too, right?

A Yes.

Q And then he created invoices with your name on it; is that right?

A Yes.

Q And you didn't know about those invoices until you met with the Government; is that right?

A True.

Q And now you've pled guilty to a federal crime?

A Yes.

MR. SKURNIK: Nothing further, Your Honor.

THE COURT: You may step down. Thank you.

Please call your next witness.

MR. POLEMENI: The Government called Reginald Garcia.

PROCEEDINGS 1392

THE COURT: Please have the witness come forward to be sworn.

Please come forward to the witness stand, sir. My court deputy will administer the oath when you get to the step.

(The witness takes the stand.)

THE COURT: Please step up and raise your right hand. The oath will now be administered.

THE COURTROOM DEPUTY: Do you solemnly swear or affirm that answers you're about to give in this court shall be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS: Yes.

(Witness sworn.)

THE COURT: Please be seated, sir.

I'm going to ask you to swivel the microphone. You see it's right in front of you. Swivel it down to you. It will move to you. It looks like a snake, but it won't bite you. Pull it a little closer. I promise it won't bite you, okay. Put it right in front of you.

State your name and spell, and then counsel who's standing up over there will inquire.

So please state your name, spell it, and then you'll be examined.

Go ahead.

J.A. 583

PROCEEDINGS                                          1393

THE WITNESS:  My name is Reginald Garcia.  It's Reginald, R-E-N-I-N-A-L-D, Garcia, G-A-R-C-I-A.

THE COURT:  Thank you.

You may inquire, counsel.

MR. POLEMENI:  Thank you, Your Honor.

(Continued on the following page.)

---

R. GARCIA - DIRECT - MR. POLEMENI                    1394

**REGINALD GARCIA,**

called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. POLEMENI:

Q    Good afternoon.

A    Good afternoon.

Q    Where do you live?

A    I live at 2 Bunchberry Court in Dover, Delaware.

Q    In Delaware?

A    Yes.

Q    For how long have you lived in Delaware?

A    A year.

Q    Who do you live with?

A    My sister.

Q    Do you have any children?

A    Yes.

Q    Before Delaware, where did you live?

A    Before Delaware, I was in Maryland for a year.

Q    Okay.  And how about before that?

A    Before that, Pennsylvania.

Q    Have you ever lived in Brooklyn?

A    Yes.

Q    Approximately, when did you live in Brooklyn?

---

R. GARCIA - DIRECT - MR. POLEMENI                    1395

A    Possibly about six, seven years ago.

Q    Are you familiar with a company called Royal Home or Royal Builders?

A    Yes.

Q    What is Royal Home or Royal Builders?

A    My ex-employees -- ex-em -- ex-employees.

Q    Your ex-employers?

A    Yes.

Q    What type of work does Royal Home or Royal Builders do?

A    Construction.

Q    And what type of construction?

A    Building million dollar homes.

Q    And you said that they were your former ex-employer?

A    Yes.

Q    Do you recall, approximately, when you started working there?

A    I'm not too sure.

Q    Do you recall for how long you worked there?

A    Possibly another six, seven years I worked for the company.

Q    Where was Royal Home located?

A    It was in Brooklyn going towards Coney Island -- like Flatbush area.

Q    Okay.  Is that where their office was?

A    Correct.

---

R. GARCIA - DIRECT - MR. POLEMENI                    1396

Q    What was the office like?

A    It was a home.  Downstairs was setup to -- for business purposes, the basement.

Q    What did you do at Royal Home?

A    I was the supervisor.  I brung material, I hoped any other contractors, subcontractors, bringing materials to the cites.  Possibly doing errands to Shia and Menacham, whoever else is involved in the company.

Q    You mentioned Menacham and Shia.  Who are they?

A    They're the brothers of the company.

Q    Do you know their last name?

A    Markovics.

MR. POLEMENI:  Ms. Kannan, if we can pull up GX-11, which is in evidence.

Q    Mr. Garcia, who is this?

A    Shia Markovics.

Q    And you said -- what was his role at Royal Home?

A    He was one of the -- one of the managers.

MR. POLEMENI:  And, Ms. Kannan, if we can pull up GX-15, please, in evidence.  I apologize, I think I have the -- GX-18.  I think I read the wrong number.  I apologize.

THE COURT:  GX-18 in evidence?

MR. POLEMENI:  One six, sorry.  Sixteen.

THE COURT:  GX-16, which is in evidence?

MR. POLEMENI:  Yes.

J.A. 584

R. GARCIA - DIRECT - MR. POLEMENI
1397

THE COURT: All right. You may publish.

(Exhibit published.)

BY MR. POLEMENI:

Q    Who is this?

A    That's Menacham.

Q    Remind us, what was his position at Royal Home?

A    He was also a manager.

Q    And they're brothers?

A    Correct.

Q    Did their father also work for Royal Home?

A    Yes.

Q    Do you recall his name?

A    Benny.

Q    Benny?

A    Benny Markovics.

Q    Now, Mr. Garcia, you mentioned that you were a supervisor and you would -- and you would bring materials to construction sites?

A    Correct.

Q    Did you, yourself, construct anything?

A    Sometimes I would do the safety -- well, help the third parties with the jobs that they're -- the jobs that they have at task.

Q    Do you know of a company called Elite Insurance?

A    Yes.

---

R. GARCIA - DIRECT - MR. POLEMENI
1398

Q    What is Elite Insurance?

A    It's the father-in-law of Menacham, his business.

Q    Menacham's father-in-laws's business?

A    Correct.

THE COURT: Don't talk over each other. Put the question, get an answer. We don't have an interpreter here so.

Go ahead.

MR. POLEMENI: Thank you, Judge.

BY MR. POLEMENI:

Q    Do you recall his name?

A    No.

Q    How were you paid by Royal Home?

A    I was paid through a check. Sometimes it was half cash and half check, my payroll.

Q    And how often were you paid?

A    Biweekly.

Q    What does that mean?

A    Every other week.

Q    And, approximately, how much were you paid?

A    I can't recall.

Q    And you mentioned Shia Markovics, is that a nickname?

A    Yes, I believe so.

Q    Do you know his full name?

A    I don't know the full name, no.

---

R. GARCIA - DIRECT - MR. POLEMENI
1399

Q    Did there come a point in time, Mr. Garcia, when you had a conversation with Shia Markovics about how you were -- how you were paid?

A    Yes.

Q    And do you recall, approximately, when that was?

A    No.

Q    Can you tell the jury what that conversation was?

A    Well, when I did have that conversation, it was when I found the two checks that were written from the company that they had opened up an account for that they said they would pay me.

Q    Okay. We're gonna get to that --

THE COURT: Did you finish your answer?

THE WITNESS: Yes.

THE COURT: Okay.

Go ahead.

MR. POLEMENI: Thank you, Judge.

Q    We're gonna get to that, Mr. Garcia, but prior to your seeing those checks, which we'll get to, do you recall having a conversation with Shia Markovics about opening an account?

A    Yes.

Q    What do you recall about that conversation?

A    That they were gonna pay me, my payroll, through that conversation -- through that conversation. He -- he said that they would open up the account, and then from here on in, I

---

R. GARCIA - DIRECT - MR. POLEMENI
1400

would be getting paid from that account, my payroll.

Q    So you would have been paid in cash and check; is that right?

A    Well, this would eliminate that and then they would pay me from that. So it would all be from the account. Supposedly that's how it was supposed to happen.

Q    Okay. Just so we understand, instead of being paid in cash and check, Shia Markovics told you, you would now be paid from an account?

A    Correct.

Q    And were you supposed to get anything with this account?

A    Not -- not that -- no.

Q    Was there any discussion about a card?

A    Yes, a card.

Q    And if you can, tell the jury --

A    Yes. So, I would have -- I would have gotten a debit card from the account and then they would have load up the account with my payroll so I could get paid.

Q    Did you agree to do that?

A    Correct.

Q    Why?

A    Because they were my former employees and I been with them for years so I trusted them.

THE COURT: You said former employees or do you mean former employers?

J.A. 585

R. GARCIA - DIRECT - MR. POLEMENI
1401

THE WITNESS: Employers.

THE COURT: Okay. Just to be clear, employees work for you. Employer is somebody you work for, okay? So let's just be clear on that.

Go ahead.

BY MR. POLEMENI:

Q So your former employers?

A Yes. Correct.

Q Do you recall the name of the company that you were told --

A Yeah. ZKC. I'm not sure the exact -- ZKC Incorporated, something like that.

Q Did you come up with that name?

A No.

Q Who came up with that name, if you know?

A I'm not sure. It was already established.

Q After having this discussion, did you go somewhere with Mr. Markovics, Shia?

A Yes.

Q Where did you go?

A To, like, a check-cashing place or, like, a bank or something. It's -- it was a place of business that had black windows from what I know.

Q And do you recall where it was?

A It was on Coney Island Avenue.

---

R. GARCIA - DIRECT - MR. POLEMENI
1402

MR. POLEMENI: Ms. Kannan, if we can pull up GX-300, please.

THE COURT: In evidence?

MR. POLEMENI: Yes.

THE COURT: You may publish.

(Exhibit published.)

Q What is this, Mr. Garcia?

A That's the building that I went to.

Q Did you go with someone to this location?

A Yes.

Q Who?

A Shia.

Q Anyone else?

A No.

Q What happened when you got there?

A There was a guy there that had me fill out some paperwork and gave me the documents that I handed you.

Q Okay. So you went, you filled out some paperwork?

A Correct, for the account.

Q For the account. And then you provided --

A My ID, things like that, whatever they asked me.

Q Okay. And then you provided some documents to the Government that you filled out?

A Yes.

Q What did you think you were doing by filling out these

---

R. GARCIA - DIRECT - MR. POLEMENI
1403

documents?

A Exactly what they had told me, that they were gonna open the account. So I felt like they were gonna open the account, pay me my payroll and that was it. I didn't think anything else.

Q Did you sign documents while you were there?

A Yes.

Q While you were there, did you photograph those documents?

A Yes.

Q Why?

A I just felt like I should. It mad my name on it, it had my stuff on it, I just felt like I should.

Q And have you provided those documents that you photographed -- photographs of those documents to the Government?

A Yes.

MR. POLEMENI: Ms. Kannan, if we can pull up GX-155, please, not in evidence.

THE COURT: Not in evidence.

Any objection to GX-155?

MR. JACKSON: No objection, Judge.

THE COURT: You may publish. It's admitted.

(Government Exhibit 155 was received in evidence.)

(Exhibit published.)

Q What is this, Mr. Garcia?

---

R. GARCIA - DIRECT - MR. POLEMENI
1404

A One of the paperworks that I filled out.

Q Okay. One of the paperworks --

A That I signed --

Q That you signed?

A Correct.

Q Okay. So we see, at the top -- what does it say at the top? What's the name of the company?

A It says, Coney Island Payroll.

Q And is the address 1122 Coney Island Avenue?

A Correct.

Q And it says, at the top, if you see --

THE COURT: Blow it up. It's a little tough to read. I'm sure it's a little tough for the jurors to read. It's small type. Go ahead.

MR. POLEMENI: Thank you, Judge.

Can you blow up the next line, Ms. Kannan.

Q And it says, I, Reginald Garcia.

Do you see that?

A Yes.

Q And that's you?

A Yes.

Q Is that your handwriting?

A Yes.

Q And it says -- There's some redacted where you reside, but then it says, DBA. Do you know what DBA means?

J.A. 586

R. GARCIA - DIRECT - MR. POLEMENI
1405

A    No.

Q    ZKC NYC.  Do you see that?

A    Yes.

Q    Is that the name of company that and Shia Markovics gave to you?

A    Yes.

MR. POLEMENI:  And if we can blow up the signature page, the signature part, Ms. Kannan.

Q    Is that your signature?

A    Yes.

MR. POLEMENI:  Ms. Kannan, if we can pull up Government Exhibit 156, not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 156 was received in evidence.)

(Exhibit published.)

THE COURT:  It's a little tilted.  See if you can get it less topsy.

MR. POLEMENI:  That's just the photograph.

THE COURT:  I know it's the photograph.  So you can get it so it's not so like at a bar after closing hours or do you have a hard copy you can put on the Elmo so the jury doesn't have to tilt their heads?

MR. POLEMENI:  I can.

---

R. GARCIA - DIRECT - MR. POLEMENI
1406

THE COURT:  Do you have a hard copy to put up on the Elmo now, please, so the jury can see it.

MR. POLEMENI:  Yes, Judge.

THE COURT:  Do it that way.  They're the finder of facts.  I don't want them to strain their necks.

So I told you, jurors, if there were documents that were a little tough to read, I would be all over it like a duck on a June bug, as my Texas law partners used to say.

MR. POLEMENI:  Thank you.

THE COURT:  It's still kind of tipsy.  But if that's what you got, that's what you got.  All right.  Let's go.  Blow it up at least so they can see it more clearly.

BY MR. POLEMENI:

Q    So, GX-156, is this a photograph of a document that you --

THE COURT:  Twist the mic to you so they can hear you.  Let's go.

Q    Is this a document that you filled out while you were at the payroll place?

A    Yes.

Q    And you took a photograph of the document?

A    Yes.

Q    And is this the photograph?

A    Yes.

Q    And, again, can you see the date?  Is it June 10, 2016?

---

R. GARCIA - DIRECT - MR. POLEMENI
1407

A    Yes.

Q    Is that the date you went to the payroll place?

A    Correct.

Q    And that's your name, Reginald Garcia, there?

A    Yes.

Q    And if you look -- I know it's a little difficult, but do you see where it says, business phone and home phone?

A    Yes.

Q    Is that your phone number?

A    Yes, my old number.

Q    Your -- not your current number, your old?

A    Not current.  Correct.  I -- sorry about the picture.  When I took the picture --

THE COURT:  No need to apologize.  Keep rolling along.  No need to apologize.  Let's just keep rolling.  Come on.

Q    Mr. Garcia, do you see where it says, recommended by?

A    Yes.

Q    And whose name is there?

A    Shia.

Q    Shia Markovics?

A    Correct.

Q    And do you see where it says, phone number?

A    Yes.

Q    And I know it's difficult, but can you read that into the

---

R. GARCIA - DIRECT - MR. POLEMENI
1408

record?

A    917-709-9250.

MR. POLEMENI:  Ms. Kannan, if we can pull up Government Exhibit 157, please.

THE COURT:  In evidence?

MR. POLEMENI:  No.

THE COURT:  Any objection to Government Exhibit 1057?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

MR. POLEMENI:  Thank you.  157, Your Honor.

THE COURT:  157.

MR. POLEMENI:  Yes.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 157 was received in evidence.)

(Exhibit published.)

Q    What is this, Mr. Garcia?

A    This is another document that they had me fill out sign when I was at the place.

Q    You took a photograph of that document?

A    Correct.

Q    Now, we saw that the -- you went to the payroll place on June 10th of 2016, correct?

A    Correct.

Q    How were you paid after you filled out these documents?

**J.A. 587**

R. GARCIA - DIRECT - MR. POLEMENI                    1409

A    Still the same.

Q    What do you mean by that?

A    I was still being paid -- actually, I was being paid fully by paycheck on payroll.

Q    So you would receive a paycheck --

A    Yes.

Q    You didn't get a card --

A    No.

Q    -- for an account?

A    No.

Q    That you would use to withdraw your wages?

A    No.

Q    It was the same, except now, it's just a paycheck?

A    It was the same for almost a whole year before I found out.

Q    Okay.  Now, you said before you found out.  Can you tell the jury what you mean by that?

A    When I found the -- the checks that were supposedly written from the account.  So when I found the checks written from the account, I was still unsure that the company -- the account still existed because for a whole year, almost over a year, I didn't hear anything about the account or any form of payment business -- the card or anything, so I kind of just -- I kind of just forgot about it.  And then when it came up, that's when I realized that something wasn't right.

---

R. GARCIA - DIRECT - MR. POLEMENI                    1410

THE COURT:  When you said you found out, tell the jury what you found out.

THE WITNESS:  I found two checks under that company name that I didn't still know that was still active.

THE COURT:  Okay.

Next question.

Q    And how did you find that out?

A    Through another employer.

Q    What do you --

A    Another employee.

Q    What happened?

A    He -- he was sent to do an errand with the two checks, to drop off, he handed the two checks to me to do the drop off at a location, and when I went to look at the checks, I noticed the checks was written in that name, the company's name.

Q    Did you take a photograph of the check?

A    Yes.  Then I took photos of the check.

MR. POLEMENI:  If we can pull up, not in evidence, 158, please.

THE COURT:  Any objection to 158?

MR. JACKSON:  No objection.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 158 was received in evidence.)

(Exhibit published.)

Q    What's this, Mr. Garcia?

---

R. GARCIA - DIRECT - MR. POLEMENI                    1411

A    That's one of the checks.

Q    And did you take the photograph -- this photograph?

A    Yes.

Q    Is that you holding the check?

A    Correct.

Q    Where were you when you took this photograph?

A    I was in the -- the other employee's car, work car or his personal car at the time, I'm not too sure, and I took the pictures after I noticed it.  I didn't tell him anything about it.  That's why the picture looks like that because I took the pictures first before responding to him about what I saw.

Q    Okay.

MR. POLEMENI:  Ms. Kannan, if we can blow up the check, please.

Q    Now, what is the date of the check?

A    5/23/17.

Q    Is that the time -- the day when you first saw this check?

A    I'm not sure.

Q    Was it around this time?

A    I'm not sure.

Q    Okay.  It says, in the top left, do you see where it says, Dean Developers?

A    Yes, I see it.

Q    And who is the check made out to?

---

R. GARCIA - DIRECT - MR. POLEMENI                    1412

A    I'm not sure.  I can't see.

Q    Does it say, pay to the order of ZKC NYC Inc.?

A    Yes.

Q    Okay.  That's the company that you opened --

A    That is correct.

Q    -- that Mr. Markovics told you that's how you would be paid going forward?

A    Correct.

Q    And what's the amount of the check?

A    Seven thousand and thirty-five dollars.

Q    When you saw this check, how did you feel?

A    I -- a lot of things was going on.  I felt used, I felt like something -- like -- I -- I just felt discomfort.

Q    Why?

A    Because I -- it was -- it was, like, I didn't -- I didn't know that the account was still open and that these checks are still going -- these checks are going in there.  You know what I mean.  So I didn't understand.  So I had to come to an understanding by asking my boss to set up a meeting with me.

Q    Okay.  So I think you kind of eluded to it, but what did you do?

A    I had to -- I had to get -- wrap my mind around it first, so I took time -- I took time to try it elaborate how I was gonna approach the situation because this is my former payment, how I get my -- my pay to -- to take care of my

J.A. 588

R. GARCIA - DIRECT - MR. POLEMENI          1413

family, you know, so I didn't know if I was walking into losing my job by walking in there confronting what had happened. So I had to wrap my mind around all of this because I was obviously scared, nervous, didn't know what was going on.

Q Okay. So what did you do?

A So I asked to have a meeting, to schedule a meeting.

Q With whom?

A With Shia.

Q Did that meeting occur?

A Yes.

Q Did you record that meeting?

A Correct.

Q Now, why did you record the meeting?

A Like I said, I had to take time to think about it and, so, that was one of the things that I thought of, that I came up with, that I should probably record this.

Q Did -- at that time when you recorded this meeting, had you spoken to anyone else about this?

A I've been -- I've been talking to people about it because it was still in the back of my mind, like, you know, hey, they open up this account, I don't know what's going on with it, or, you know, what's -- what's the situation. And, so, people kept giving me advice, like, you know, keep your guards up, you know. So I always kept my guards up, always, like,

---

R. GARCIA - DIRECT - MR. POLEMENI          1414

watched over myself, kind of sort of.

Q Okay. Did you talk to anyone from the police?

A No.

Q Did you speak with anyone sitting here at --

A No.

Q Have you spoken to me at that time?

A No.

MR. POLEMENI: Before we get to the recording, if we can pull up, not in evidence, Government Exhibit 308, please.

THE COURT: Any objection to Government 308?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted. You may publish.

(Government Exhibit 308 was received in evidence.)

(Exhibit published.)

Q Now, Mr. Garcia, you had -- you provided documents to the Government that you filled out when you were at the payroll place, correct?

A Correct.

Q I want to show you some documents that are in Government Exhibit 308, okay?

A Okay.

Q Now, do you see the date, July 12, 2016?

A Yes, I see that.

Q I'm sorry, July 13, 2016?

A Yes.

---

R. GARCIA - DIRECT - MR. POLEMENI          1415

Q That is a different day than when you went -- than on the documents we saw earlier, correct?

A Correct.

Q And if we can go down, is that your signature at bottom of the page?

A That is my signature.

Q Okay. Mr. Garcia, do you know an individual named Jose Contreras-Guzman?

A No, not too sure.

Q Did you ever authorize anyone to allow Jose Contreras-Guzman to go and join you on a bank account or any other accounts?

A No.

Q If we can look at, it says, name of owner. Did you write that?

A No.

Q Do you see where it says, your middle initial, J. Is that your middle initial?

A Yes.

Q What does that stand for?

A Justin.

Q Do you ever use your middle initial when you're filling out documents?

A No.

MR. POLEMENI: If we can turn the page to

---

R. GARCIA - DIRECT - MR. POLEMENI          1416

Government Exhibit 308 page two.

Q Do you recognize this document?

A No.

Q Do you know who Gerardo Rodriguez is?

A No.

MR. POLEMENI: If we can turn the page, Government Exhibit 308, page six. Okay. Now, if we can blow up the top part, Ms. Kannan. Thank you.

Q Do you see it says, created June 23rd, 2016?

A Yes, I see that.

Q Is that a -- again, that's not the same day that you went to the payroll place, right?

A No.

Q And this is an account for ZKC NYC Inc. Do you see that?

A Yes, I see that.

Q Okay.

MR. POLEMENI: If we can go to Mr -- the middle of the page, Ms. Kannan.

Q And, again, it says -- that's your name, Justin --

A Yeah, that's my name.

Q -- Reginald Garcia?

A Yes.

THE COURT: Please don't talk over each other. Go ahead.

MR. POLEMENI: And if we can go to the bottom,

J.A. 589

R. GARCIA - DIRECT - MR. POLEMENI          1417

Ms. Kannan.

Q    Is that your signature, Mr. Garcia?

A    No.

Q    Did you write Reginald J. Garcia?

A    No.

Q    The date is June 23rd, 2016?

A    I see the date.

MR. POLEMENI:  And if we can go to page seven, Ms. Kannan.

Q    And this is a better version of the document we saw earlier, couldn't find it, my apologies.  Do you see, at the bottom, it says, recommended by?

A    Yes.

Q    And it says, Shia Markovics?

A    Yes.

Q    And I believe you read the phone number in before, but can you read it again?  I think there was one mistake?

A    917-709-9280.

Q    Do you know whose phone number that is?

A    I'm assuming.

THE COURT:  Don't assume.  Don't assume.  The question is do you know?

A    No.

THE COURT:  Next question.

Q    Is it yours?

---

R. GARCIA - DIRECT - MR. POLEMENI          1418

A    No.

MR. POLEMENI:  Turn to page eight, please.

Q    Do you recognize this document, Mr. Garcia?

A    No.

Q    Do you see where it says, dear taxpayer, thank you for your telephone inquiry of June 23rd, 2016?

A    Yes.

Q    Did you ever call the IRS to ask them about ZKC NYC Inc.?

A    No.

MR. POLEMENI:  If we can turn to page nine, please.

Q    Do you recognize this document, Mr. Garcia?

A    No.

Q    Did you ever contact the New York State -- New York department of state to create ZKC?

A    No.

MR. POLEMENI:  If we can turn to page 12, Ms. Kannan.

Q    Do you recognize this document, Mr. Garcia?

A    No.

Q    It says, certificate of incorporation; is that correct?

A    Yes.

MR. POLEMENI:  And if we can turn to the next page, page 13, please.

Q    Do you see where, at the top, it says, incorporator information required?

---

R. GARCIA - DIRECT - MR. POLEMENI          1419

A    Yes.

Q    And it has your name listed, Mr. Garcia?

A    Yes.

Q    Is that your signature?

A    No.

Q    Do you see the address, 248 Dumont Avenue?

A    Correct.

Q    Did you ever live there?

A    Yes.

Q    When?

A    Years ago.  I would say over -- over ten years ago.

Q    Were you living there when you filled out that paperwork in June of 2016?

A    No.

MR. POLEMENI:  And if you go to the middle of the page, Ms. Kannan.

Q    Do you see where it says, filed by Marina Kuyan?

A    Yes.

Q    Do you know who that is?

A    No.

Q    It says 1169 Coney Island Avenue?

A    Yes.

Q    Do you know where that is?

A    No.

MR. POLEMENI:  If we can go back to page 12,

---

R. GARCIA - DIRECT - MR. POLEMENI          1420

Ms. Kannan.

Q    Do you see the top heading?

A    Yes.

Q    Does that say, Midwood Lumber and Millwork?

A    Yes.

MR. POLEMENI:  And, finally, Ms. Kannan, if we can go to page 23, please.

Q    Is that your driver's license?

A    I'm not too sure.

Q    It could be an old photograph of you?

A    Yes.

Q    But it's a Maryland driver's license for Reginald Garcia?

A    Correct.

MR. POLEMENI:  Your Honor, I don't know if this is a good time for a lunch break.

THE COURT:  How much longer do you have with this witness?

MR. POLEMENI:  About 45 minutes.

THE COURT:  Then this is a great time for a lunch break.  All right.

Ladies and gentlemen of the jury, it's a little past 12:30.  Why don't we resume at let's say two o'clock.  Does that work for you?  Okay.

Let's see you at two o'clock.  Don't talk about the case, and we'll see you then.  Thank you.

J.A. 590

PROCEEDINGS 1421

THE COURTROOM DEPUTY: All rise.

(Jury exits the courtroom.)

THE COURT: You may step down, sir, and leave the courtroom, please. We'll see you at two o'clock when we resume.

THE WITNESS: Thank you.

(The witness steps down.)

THE COURT: The jury has left the courtroom. The witness is leaving the courtroom. You may be seated, ladies and gentlemen. And once the witness has left the courtroom, which he now has done, do we have any issues to address from the Government?

MR. POLEMENI: No, Your Honor.

THE COURT: From defense counsel?

MR. JACKSON: Yes, Judge. Very briefly. This has been going on for a while. I don't understand --

THE COURT: What has been going on for a while?

MR. JACKSON: This examination.

THE COURT: This examination has been going on for a while?

MR. JACKSON: Yes, sir.

THE COURT: This examination has been going on for a while?

MR. JACKSON: Relative to the --

THE COURT: I'm sorry, this examination has been

---

PROCEEDINGS 1422

going on for as long as it's been going on. And people who live in glass houses should not be throwing stones about the length of this examination. So you may proceed with caution, Mr. Jackson. And I am delivering this shot across the bow outside of the presence of the jury. The next shot across the bow may not be delivered outside of the presence of the jury, but go ahead.

MR. JACKSON: We understand what the Court is saying, Judge.

THE COURT: Good. Anything else?

MR. JACKSON: No, Judge.

THE COURT: Okay. I will see you after lunch.

(Luncheon recess taken.)

(Continued on the following page.)

---

PROCEEDINGS 1423

A F T E R N O O N   S E S S I O N

(In open court; jury not present.)

THE COURT: You may be seated.

Do we have any issues to address before we bring the jury back and have the witness back on the stand, from the Government?

MR. POLEMENI: No, Judge.

THE COURT: Why don't you sit down and use the microphone because you're saying the word no but your body language says the word yes. In the old days, you used to say you say no but your eyes say yes, but you can't say things like that anymore or you would get in a lot of trouble.

So go ahead.

MR. POLEMENI: No issues other than we just set up some speakers here to play the recording. That's all.

THE COURT: Okay. Thank you.

Anything from defense counsel?

MR. JACKSON: Nothing from us. Thank you, Judge.

THE COURT: Okay. Then let's get the jury in. Let's get the witness back on the stand. Let's roll.

(Witness takes the witness stand.)

THE COURT: Sir, while we're waiting for the jury to come back, here's a cough drop. I assure you no government funds were expended.

THE WITNESS: I appreciate that. Thank you.

J.A. 591

---

PROCEEDINGS 1424

(Pause in proceedings.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Please stand for the jury.

(Jury enters the courtroom.)

THE COURT: Welcome back, ladies and gentlemen of the jury. Again, I appreciate your promptness. I hope you had a good lunch. Please be seated. Don't worry, we're going to have that five o'clock hard stop because I promised you, we'll do that.

Please continue with the examination.

Sir, you're still under oath. Did you speak with anyone about your testimony during the break?

THE WITNESS: No.

THE COURT: That was my trick to get you to pull the microphone down too.

THE WITNESS: You did a good job.

THE COURT: Thank you. I've been doing this for a while. Maybe you could talk to my boss.

THE WITNESS: I could see.

THE COURT: Give me a raise.

THE WITNESS: I want the same.

THE COURT: Okay. You're, good.

Okay. You're on.

MR. POLEMENI: Thank you, Judge.

(Continued on the following page.)

LEEANN N. MUSOLF, RPR

R. GARCIA - DIRECT - MR. POLEMENI 1425

DIRECT EXAMINATION (Continued)

BY MR. POLEMENI:

Q   Welcome back, Mr. Garcia.

Before the break, we were talking about your going to the payroll place and if we could just bring up Government Exhibit 155 -- I'm sorry, 156.

THE COURT:  You may.

(Exhibit published.)

MR. POLEMENI:  And if we can just blow up the date again.

Q   And the date is June 10, 2016?

A   Correct.

Q   And that's the date you went to fill out this paperwork, correct?

A   Correct.

Q   And then you had also mentioned that at some point about a year later, you saw a check that was written out to ZKC, correct?

A   Correct.

MR. POLEMENI:  And if we can pull up, Ms. Kannan, Government Exhibit 158.

THE COURT:  You may publish.

(Exhibit published.)

Q   And this is the check that you saw, correct?

A   Correct.  That's one of the two.

R. GARCIA - DIRECT - MR. POLEMENI 1426

Q   Now, Mr. Garcia, remind the jury, after seeing this check, what did you decide to do?

A   When I -- when I first seen the check, I -- obviously, I was shocked, but then I decided to, as I said, continue to set a meeting with my -- with my boss Shia.

Q   And did you, in fact, set up a meeting with Shia?

A   Yes, I did.

Q   And where did this meeting take place?

A   In the office of Benny's home, downstairs in the basement, the Royal Builder's office.

Q   And remind us, who is Benny again?

A   Benny is the father of Shia and Menacham.

Q   And he's also associated with Royal Home?

A   Correct.

Q   And did you record this meeting that you had?

A   Yes, I did.

Q   And remind the jury, why did you record the meeting?

A   I just felt uncomfortable so I needed to reassure myself that I needed to have some kind of protection for myself.  And it wasn't just me.  It was other people that were informing me as well, like, you know, cover yourself, make sure you are okay.

Q   Okay.  And did you provide a copy of that recording to the Government?

A   Correct.

R. GARCIA - DIRECT - MR. POLEMENI 1427

MR. POLEMENI:  At this time, the Government moves into evidence Government's Exhibit 601.

THE COURT:  Any objection to 601?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 601, was received in evidence.)

(Exhibit published.)

Q   Who is that, Mr. Garcia?

A   That's me.

Q   And we're gonna play the recording in a moment, but can you just explain for the jury what we are gonna see in the first minute or so?

A   First minute, you're gonna see me explaining me going to -- to the meeting, you're gonna see the house which the office is located in, in the basement, I'm gonna show that, and then I am gonna put the phone in my pocket and I'm gonna continue to have a conversation with my ex-employer.

Q   That's Shia?

A   Correct.

Q   And were you and Shia the only two people involved in this conversation?

A   Yes.

MR. POLEMENI:  Ms. Kannan, if we can start the recording.  I'm sorry, could you back up again, Ms --

THE COURT:  And turn up the volume a bit if you can.

R. GARCIA - DIRECT - MR. POLEMENI 1428

I want to make sure the jury can hear it clearly.  Go ahead.

MR. POLEMENI:  It seems that's as loud as it goes, Judge.

THE COURT:  All right.  Hang on.  Maybe Mr. Scott can turn it up a bit.

All right.  Try it again.

(Video recording played.)

MR. POLEMENI:  And we can stop it there, Ms. Kannan.  Thank you.

(Video recording stopped.)

Q   Were you using just a cell phone, Mr. Garcia?

A   Yes.

MR. POLEMENI:  Now, Ms. Kannan, if we can go to 4:50, four five zero, and play from there.

(Video recording played.)

MR. POLEMENI:  Can you just stop it right there.

(Video recording stopped.)

BY MR. POLEMENI:

Q   So, who are those voices we just heard, Mr. Garcia?

A   That's Menacham and me.

Q   Menacham or --

A   I mean Shia and me.  I'm sorry.

Q   That's okay.

(Video recording played.)

MR. POLEMENI:  Can you stop right there, Ms. Kannan.

R. GARCIA - DIRECT - MR. POLEMENI 1429

(Video recording stopped.)

Q So, can you tell the jury what's -- what's happening here? What are you saying to Mr. Markovics?

A I'm trying to come to an understanding of why this account was still open and why did I find these checks that were written to this account because it's been over a year and the situation that was explained to me was not happening.

Q What do you mean?

A So they said that they were gonna pay me my payroll through that account and give me a card, like a bank card, and that's how they were gonna pay me from their own end and now -- now, I did question it maybe a few months after the account was made, but I was told, like, oh, we're in the process, you know. After a while, it -- it -- you tend to forget about it and you just go on and you continue to go on with your daily routine, so I didn't think about it.

Q And what does Shia say to you in response?

A He tells me that he had to put money into the account in order to pay me my payroll.

Q And that hadn't happened?

A And that never happened.

MR. POLEMENI: Can you continue, Ms. Kannan.

(Video recording played.)

MR. POLEMENI: Can you stop there, Ms. Kannan.

(Video recording stopped.)

LEEANN N. MUSOLF, RPR

R. GARCIA - DIRECT - MR. POLEMENI 1430

Q So, can you explain for the jury, what are you talking about there?

A So, after I found the checks, I started to Google the name of the company and things like that and I started finding things on the Internet about the company. And then as soon as I approached him about it, all the information that I've spoken to him about had disappeared.

Q So you're talking about things you had found on the website with Mr. Markovics?

A Correct.

Q And what happened?

A I assume he stumbled across one of them on -- online and he was trying to explain it. I think it says it as we go further.

MR. POLEMENI: Can you continue, Ms. Kannan.

(Video recording played.)

MR. POLEMENI: Can you stop it there.

(Video recording stopped.)

Q And what's going on here, Mr. Garcia?

A We're pointing out -- I'm pointing out to him that I seen the website and I acknowledge that that's one of the websites that I've seen. And he's saying, like, is it this one? And I'm like, yeah, that's -- that's one of them, you know what I mean, but there was -- I don't know if there was more than one, or two, I think it was two from what I said, but either

LEEANN N. MUSOLF, RPR

R. GARCIA - DIRECT - MR. POLEMENI 1431

way, both of them had disappeared.

MR. POLEMENI: Go ahead, Ms. Kannan. Can you --

Q And, Mr. Garcia, you said that both of them had disappeared. When did they disappear?

A Almost that same day or the next day after the conversation.

MR. POLEMENI: Go ahead, Ms. Kannan.

(Video recording played.)

MR. POLEMENI: We can stop it there.

(Video recording stopped.)

(Continued on the following page.)

LEEANN N. MUSOLF, RPR

Garcia - direct - Polemeni 1432

(Continuing.)

MR. POLEMENI: We can stop it there.

(Video recording stopped.)

DIRECT EXAMINATION (Continues)

BY MR. POLEMENI:

Q At some point during the conversation do you have discussion about closing down the ZKC account?

A Yes.

Q What was that discussion?

A That I was uncomfortable with the account. He said if you're uncomfortable with it, I will close it down. And I said yes, I'm uncomfortable with it. And he said all right, it's done. And he said he was gonna shut it down.

MR. POLEMENI: Can you pick up from there, Ms. Kannan?

(Video recording played.)

MR. POLEMENI: Please stop it there.

(Video recording stopped.)

MR. POLEMENI: Thank you, Ms. Kannan.

Q Mr. Garcia, after this conversation when you had asked Mr. Markovics to shut it down, did you think that it would be shut down?

A Good intention, I thought he did it.

Q What did you do after this conversation?

A I continued with my life. I moved on. I -- I went on to

J.A. 593

Garcia - direct - Polemeni                    1433

take my family to Pennsylvania and tried to put this, you know, behind me.

Q    Well, how soon after you had this conversation did you -- did you leave?

A    Not so long after the conversation.

Q    Why?

A    One was because I couldn't afford to live in New York. There was situations that were given to me that also was kinda taken away from me, if I can say.

So, I had a place to stay through Royal Builders as being their superintendent for a building. So I was their superintendent as well, so I had the free stay of living. I lived in the building and found out that the building was, basically, being sold. And during the for-selling process, they had to -- they didn't want to keep me as the super.

Q    Who's "they"?

A    The new management, whoever was buying the building. So I was forced to try to find another place.

I found another place and when I did find that place through Craigslist, it was, basically, a foreclosure. I didn't know that it was a foreclosure property. So that left me, again, with nowhere to really stay or go.

So, at this point as I was talking to Shia. I was explaining to him all the things that had happened to me after that. And being that all of this had happened, I wasn't -- I

Garcia - direct - Polemeni                    1434

wouldn't be able to stay in New York, but I still wanted to work and be with the company that I was with for so long because I already established ground. So I was trying to make negotiation with them about traveling, getting back and forth to work, living expense, things like that, you know. Like you normally do if you work for a company: Hey, listen, I need a raise. Hey, listen, you know, this is going on in my life.

Q    And what was the response?

A    They were ignoring my calls, ignoring my text messages. I wasn't really getting a straightforward answer. So I couldn't wait any longer, but they knew that the days were coming closer and closer and closer to me having to make a decision. And when that day had came, I finally said, you know what, I see that I'm not gonna get the help that I need. I need to start making plans and decisions on my own.

So I found a second -- I found another job and I moved my family out of New York.

Q    Did learning about the check and the account being open, did that have any impact on your decision?

A    Yes.

Q    How so?

A    I definitely couldn't -- I couldn't really trust, you know, no one or anything, but at the same -- at the same time I was already into this company for so long that if it -- it's like -- it's like being in a relationship. You been in a

Garcia - direct - Polemeni                    1435

relationship for about, let's say, 15 years. You're accustomed to this relationship. You're comfortable. You know what I mean. But then you find out that this relationship is abusing you, it's abusive. It's beating you down. It's not -- it's not really benefiting you. You know, but the -- the -- the company is getting benefited, and that's what I realized. I had to wake up and realize that.

And when I woke up and realized that, that's when I had to make my decision. And I gave -- I loaded the -- I loaded the van with everything that was given to me to work and I dropped the van off with a letter stating how I felt about the company and how I was been treated and everything. And that was it.

Q    Did you catch the date of this recording at the beginning?

A    Not --

MR. POLEMENI:  Ms. Kannan, can we go back to the first part?

(Video recording played.)

MR. POLEMENI:  Okay.

(Video recording stopped.)

Q    It's May 25th.

A    I left -- I left in June. So right after my kids finished school. So it had to be mid-June, so a few weeks after.

Garcia - direct - Polemeni                    1436

Q    Is that 2017?

A    Yes, same year.

MR. POLEMENI:  Ms. Kannan -- and this is not in evidence, Your Honor -- if we could pull up Government's Exhibit 308.1.

THE COURT:  Any objection to 308.1?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government's Exhibit 308.1 was received in evidence.)

THE COURT:  You may publish.

MR. POLEMENI:  Thank you, Judge.

And at this time I am not going to show 308.2 and 308.3 at this time, but I would also offer them into evidence.

THE COURT:  Well, you don't have to show them now.

Any objection to 308.2, is it, and 308. --

MR. POLEMENI:  3.

THE COURT:  -- 3?

Any objection to 308.2?

MR. JACKSON:  No objection, Judge.

THE COURT:  Any objection to 308.3?

MR. JACKSON:  No objection.

THE COURT:  They're admitted.

(Government's Exhibits 308.2 and 308.3 were received in evidence.)

**J.A. 594**

*Garcia - direct - Polemeni*　　1437

THE COURT: Whenever you want to show them, you show them.

MR. POLEMENI: Thank you, Judge.

THE COURT: By the way, do you have a transcript of that audio that we just heard, or no?

MR. POLEMENI: I have one prepared, but I obviously did not show it to the jury.

THE COURT: Well, sometimes it's useful to have a transcript where you have an audio that is, shall we say, perhaps, somewhat challenging.

And the instruction I will give to the jury is that it is the audio that is the evidence. The transcript is an aid, but if you see or hear a discrepancy between the transcript and the audio, it is the audio that controls.

But it just seems to me, and I'm not saying that the jurors didn't have much better hearing than I do, but it might be of assistance to have the transcript available and to play that audio again. You can certainly provide a copy, if you haven't, to defense counsel of the transcript.

And I think it will probably be useful for that to happen because when the jury hears the evidence again, or if they want to hear it in the jury room, it would be an assist.

But again, just to be really clear, the evidence is what you hear. The transcript is just an aid. And if there's any discrepancy between what you see and what you hear, it's

---

*Garcia - direct - Polemeni*　　1438

what you hear which is the actual evidence.

Are you prepared to do that, counsel?

MR. POLEMENI: I could do it now, Your Honor.

THE COURT: Okay.

Do you have copies available to your other side, to your adversary? Have you shown it to them?

MR. POLEMENI: They have -- they have a had a draft of it that we provided.

THE COURT: They have a draft of it?

MR. POLEMENI: Which will be --

THE COURT: Hang on, hang on.

You have a draft of it. Is this what you would offer to provide to the jury to assist them?

MR. POLEMENI: Yes.

THE COURT: Okay.

I am going to suggest that you do that.

Is there any objection to that, Mr. Jackson?

MR. JACKSON: No objection, Judge.

THE COURT: Okay.

So I'll tell the jury, again, you heard what you heard, that's the evidence. But if it's useful to have a transcript, and I think it might be, you will now have the transcript.

Have you got copies to hand up to the jury? No?

MR. POLEMENI: No.

---

*Garcia - direct - Polemeni*　　1439

THE COURT: All right. After the break, these hard working attorneys will have copies of the transcript for you to see and they will play it at least one more time, because I'm telling you to do that. And then you will hear it with the transcript as an assist to you.

So go ahead, counsel.

MR. POLEMENI: Thank you, your.

THE COURT: You're welcome.

MR. POLEMENI: Mr. Scott, could you put this on my screen? I can't. It's up now.

(Exhibit published.)

BY MR. POLEMENI:

Q　Mr. Garcia, have you ever seen this check in Government's Exhibit 308.1, the first page?

A　No.

MR. POLEMENI: If we can turn to page 6, Ms. Kannan.

(Exhibit published.)

MR. POLEMENI: If you can rotate the page.

Q　Do you see this check is from Royal Home Management?

A　Yes.

Q　It's made out to ZKC?

A　Yes.

Q　Royal Home, that's Shia and Menacham's company?

A　Correct.

Q　The company you worked for?

---

*Garcia - direct - Polemeni*　　1440

A　Correct.

Q　Have you ever seen this check, Mr. Garcia?

A　No.

MR. POLEMENI: Go to page 14, please.

(Exhibit published.)

BY MR. POLEMENI:

Q　It's another check from Royal Home, is that right, Mr. Garcia?

A　Yes, yes.

Q　In the amount of $9,700?

A　Correct.

Q　Made out to ZKC?

A　Correct.

Q　Have you ever seen this check before?

A　No.

Q　If you look at the signature on the page, is that your signature?

A　No.

MR. POLEMENI: Go to page 23.

(Exhibit published.)

Q　Is this another check from Royal Home, Mr. Garcia?

A　Yes.

Q　Made out to ZKC?

A　Correct.

Q　For $9,250?

**J.A. 595**

*Garcia - direct - Polemeni* 1441

A    Correct.

Q    Have you ever seen this check before?

A    No.

Q    Do you see where it says Coney Island Payroll Services?

A    Yes.

Q    Have you ever cashed a check at Coney Island Payroll Services?

A    No.

        MR. POLEMENI:  Go to page 44, Ms. Kannan.

        (Exhibit published.)

BY MR. POLEMENI:

Q    Do you see this check on page 44 is from a company called Metro Erector?

A    Yes.

Q    Do you know what Metro Erector is?

A    No.

Q    Do you see how it's made out to ZKC?

A    Yes.

Q    For $8200?

A    Yes.

Q    And then is it cashed at Coney Island Payroll Services?

A    Yes.

        MR. POLEMENI:  Can we go to page 176.

        (Exhibit published.)

Q    This is a check from Royal Home, is that correct,

---

*Garcia - direct - Polemeni* 1442

Mr. Garcia?

A    Correct.

Q    Now, the date of this check, what's the date?

A    October 3rd, 2017.

Q    That's when its cashed?

A    Yes.

Q    And in the top right, what's the date?

A    (No response.)

Q    It's hard to see.  Does that say September 29th, 2017?

A    Yes.  I couldn't see.  I'm sorry.  Yes.

Q    Is that approximately four months after you asked Shia Markovics to close the account?

A    Correct.

Q    And he said he would?

A    Correct.

        MR. POLEMENI:  You can take that down, Ms. Kannan.

BY MR. POLEMENI:

Q    Mr. Garcia, have you ever opened a bank account at Carver bank?

A    No.

Q    Has anyone ever asked you to?

A    No.

Q    We talked -- you went to the payroll place with Shia Markovics, is that correct?

A    Correct.

---

*Garcia - direct - Polemeni* 1443

Q    Did you go anywhere else with him to open up any other accounts?

A    No.

        MR. POLEMENI:  At this time, Your Honor, the Government would move into evidence -- put up Government's Exhibit 707.

        THE COURT:  In evidence?

        MR. POLEMENI:  Not in evidence.

        THE COURT:  Just for the witness.

        Any objection to 707?

        MR. JACKSON:  No objection, Judge.

        THE COURT:  Admitted.

        (Government's Exhibit 707 was received in evidence.)

        THE COURT:  You may publish.

        MR. POLEMENI:  Thank you, Your Honor.

        (Exhibit published.)

        MR. POLEMENI:  And I would also ask to move into evidence Government's Exhibit 707-A, B, C, D, E, F, and G.

        THE COURT:  Show them to the witness and to defense counsel and let's do them seriatim.

        Any objection to those items?

        Call out the numbers again.

        MR. POLEMENI:  707-A.

        THE COURT:  707-A, any objection to 707-A?

        MR. JACKSON:  No objection, Your Honor.

**J.A. 596**

---

*Garcia - direct - Polemeni* 1444

        THE COURT:  It's admitted.

        (Government's Exhibit 707-A was received in evidence.)

        THE COURT:  707-B, any objection to 707-B?

        MR. JACKSON:  No objection, Your Honor.

        THE COURT:  It's admitted.

        (Government's Exhibit 707-B was received in evidence.)

        THE COURT:  C, 707-C, any objection?

        MR. JACKSON:  No objection, Your Honor.

        THE COURT:  It's admitted.

        (Government's Exhibit 707-C was received in evidence.)

        THE COURT:  D, 707-D, objection?

        MR. JACKSON:  No objection, Judge.

        THE COURT:  It's admitted.

        (Government's Exhibit 707-D was received in evidence.)

        THE COURT:  E, any objection to 707-E?

        MR. JACKSON:  No objection, Judge.

        (Government's Exhibit 707-E was received in evidence.)

        THE COURT:  Is that the last one in the series?

        MR. POLEMENI:  Two more, F and G.

        THE COURT:  F and G.

*Garcia - direct - Polemeni*  1445

707-F, any objection?

MR. JACKSON:  No, Your Honor.

THE COURT:  It's admitted.

(Government's Exhibit 707-F was received in evidence.)

THE COURT:  707-G, any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  It's admitted.

(Government's Exhibit 707-G was received in evidence.)

THE COURT:  You may publish them as you see fit.

MR. POLEMENI:  Thank you, Your Honor.

Ms. Kannan, if we could pull up Government Exhibit 707-A.

(Exhibit published.)

BY MR. POLEMENI:

Q    Mr. Garcia, have you ever seen this document before?

A    No.

Q    Do you know a woman by the name of Dannette Sullivan-Hyatt?

A    No.

Q    Do you see the date of the e-mail from Ms. Stuart to the Law Department at Carver bank and Dannette Sullivan-Hyatt?

A    Yes.

Q    What is the date?

---

*Garcia - direct - Polemeni*  1446

A    April 20th, 2016.

Q    Now, is that before you went to the check cashing place with Mr. Markovics?

A    Yeah.

MR. POLEMENI:  If we can go to 707-A1 please -- I'm sorry, A2.

(Exhibit published.)

Q    And do you see the top, it's Carver Federal Savings Bank, is that correct?

A    Yes.

Q    And it says "New Account Checklist"?

A    Yes.

Q    Okay.

MR. POLEMENI:  If we can go to page 3, please.

(Exhibit published.)

MR. POLEMENI:  Can you blow up the top?

BY MR. POLEMENI:

Q    Is that your handwriting, Mr. Garcia?

A    No.

Q    Do you see where it says date, April 1st, 2016?

A    Yes.

Q    And do you see where it says "Provide detailed description of the business:  Construction company"?

A    Yes.

Q    When you had a conversation with Mr. Markovics about

---

*Garcia - direct - Polemeni*  1447

opening ZKC and the check cashing account, was there any discussion about ZKC being a construction company?

A    No.

MR. POLEMENI:  Can we go to page 4, please?

(Exhibit published.)

Q    Do you see your name at the top, Mr. Garcia?

A    Yes.

Q    And I know it's redacted, but does your Social Security number end in 2151?

A    Correct.

Q    Do you see where it says "date of birth, March 25th, 1984"?

A    Yes.

Q    Is that your date of birth?

A    No.

Q    What is your date of birth?

A    March 29th, 1984.

Q    And if you go to cell phone, do you see that cell phone, 917-709-9280?

A    Yes.

Q    Is that same phone number we saw earlier that was on the Coney Island Payroll documents?

A    Correct.

Q    That's not your cell phone number, correct?

A    No.

---

*Garcia - direct - Polemeni*  1448

THE COURT:  You say it's not correct.  Is it your cell phone number?

THE WITNESS:  It is not my cell phone number.

THE COURT:  Okay.  Thank you.

Go ahead.

MR. POLEMENI:  Thank you, Judge.

THE COURT:  You're welcome.

MR. POLEMENI:  Can we go to page 7, Ms. Kannan?

(Exhibit published.)

BY MR. POLEMENI:

Q    And what is the date on this document?

A    4/1/2016.

Q    And do you see where it says about three lines down, positions of those whom you met?  Do you see that?

A    Yes.

Q    And it says Reginald Garcia.

Did you ever meet with anyone from Carver bank?

A    No.

Q    And also it says referred by Mr. David Motovich.

Do you know who David Motovich is?

A    Now that I see the name, that's -- I think that's the -- I know that that's the stepfather of Menacham Markovics.

Q    Okay.  You believe that's the stepfather?

A    I know now.

Q    Now, if you see type of -- do you see where it says "type

J.A. 597

Garcia - direct - Polemeni                1449

of business," it says "construction company"?

A    Yeah, I see it.

Q    Okay.

MR. POLEMENI:  Now, if we can go to page 8, Ms. Kannan.

(Exhibit published.)

MR. POLEMENI:  And if we go to the middle where those signatures are.

BY MR. POLEMENI:

Q    Do you see where it says Reginald Garcia?

A    Yes.

Q    Is that your signature?

A    No.

Q    How about the one above it, is that your signature?

A    No.

Q    And does it still have your date of birth as March 25th, 1984?

A    Correct, it says that.

Q    And that's -- your date of birth is March 28th, correct?

A    Correct -- March 29th.

Q    March 29th?

THE COURT:  Why don't you tell us one more time what your birthday is.

THE WITNESS:  My birthday is March 29th, 1984.

THE COURT:  You're sure?

---

Garcia - direct - Polemeni                1450

THE WITNESS:  Correct.

THE COURT:  Okay.  Let's go.

MR. POLEMENI:  Thank you, Judge.

THE COURT:  You're welcome.

MR. POLEMENI:  Can we go to page 9, please?

(Exhibit published.)

MR. POLEMENI:  We can skip page 9.

How about page 17 -- no, no, I'm sorry.  This page, page 10.

(Exhibit published.)

BY MR. POLEMENI:

Q    Do you see where it says your name, Mr. Garcia?

A    Yes.

Q    Is that your signature?

A    No.

MR. POLEMENI:  Page 17, Ms. Kannan.

(Exhibit published.)

Q    We saw this document, I think, earlier with the Coney Island documents, correct?

A    I can't remember.

Q    Okay.  That's not your signature at the top?

A    It's not my signature.

MR. POLEMENI:  And page 25, Ms. Kannan.

(Exhibit published.)

Q    It's redacted, but is that your driver's license?

---

Garcia - direct - Polemeni                1451

A    It looks like it, yes.

MR. POLEMENI:  And go to page 24, the one above.

(Exhibit published.)

MR. POLEMENI:  Right there.

BY MR. POLEMENI:

Q    Page 25 still, is that your Social Security card, Mr. Garcia?

A    Yes.

Q    Did you authorize anyone to open a bank account in your name at Carver bank?

A    No.

MR. POLEMENI:  Ms. Kannan, if we can go to Government's Exhibit 707-C-003, please.

THE COURT:  In evidence?

MR. POLEMENI:  Yes.

THE COURT:  You may publish.

(Exhibit published.)

Q    Do you see this check is from a company called Lithos Marble Works?

A    Yes.

Q    Do you know what Lithos Marble Works is, Mr. Garcia?

A    No.

MR. POLEMENI:  Can we go to page 9?

(Exhibit published.)

Q    Is this check from Unique Painting Services, Mr. Garcia?

---

Garcia - direct - Polemeni                1452

A    Yes.

Q    Do you know what Unique Painting Services is?

A    No.

MR. POLEMENI:  Page 10, please.

(Exhibit published.)

Q    Another check from Lithos Marble Works for $18,000, is that correct?

A    Yes.

MR. POLEMENI:  Page 20, please.

(Exhibit published.)

BY MR. POLEMENI:

Q    This check is from Metro Erector to ZKC, is that correct?

A    Yes.

Q    Do you know what Metro Erector is?

A    No.

MR. POLEMENI:  Page 26, please.

(Exhibit published.)

Q    This check is from 5801 Avenue J Realty Corp., do you know what that is?

A    No.

MR. POLEMENI:  Page 30, please.

(Exhibit published.)

Q    Is this another check from Metro Erectors?

A    Yes.

Q    For $13,750?

**J.A. 598**

Garcia - direct - Polemeni                    1453

A    Yes.

        MR. POLEMENI:  Page 60, please.

        (Exhibit published.)

Q    Is this check from a company called Androntin Construction?

A    Yes.

Q    The spelling is A-N-D-R-O-N-T-I-N?

A    Correct.

Q    Do you know what that company is?

A    No.

        MR. POLEMENI:  Page 87, please.

        (Exhibit published.)

Q    This is another check from Lithos Marble Works for $28,000 to ZKC?

A    Yes.

        MR. POLEMENI:  Page 92, please.

        (Exhibit published.)

Q    How about this check from Unique Painting for $29,300, have you ever seen this before?

A    No.

        MR. POLEMENI:  119, please.

        (Exhibit published.)

Q    Is this check from a company called Boxwood Construction?

A    Yes.

Q    Do you know what that company is?

---

Garcia - direct - Polemeni                    1454

A    No.

        MR. POLEMENI:  172, please.

        (Exhibit published.)

Q    Is this another check from Metro Erectors?

A    Yes.

Q    For $14,140?

A    Yes.

        MR. POLEMENI:  613, please.

        (Exhibit published.)

Q    Is this another check from Metro Erectors to ZKC?

A    Yes.

Q    Now, do you see the date of the check, is it July 6, 2017?

A    Yes.

Q    Is that date following -- after your conversation with Shia when you asked him to close down the account?

A    Yes.

        MR. POLEMENI:  618, please.

        (Exhibit published.)

Q    Is this another check from Metro Erectors?

A    Correct.

        MR. POLEMENI:  637, please.

        (Exhibit published.)

Q    Is this -- it's a check from Lithos Marble Works for $29,900 to ZKC?

---

Garcia - direct - Polemeni                    1455

A    Yes.

Q    Do you know what this check is?

A    No.

        MR. POLEMENI:  640, please.

        (Exhibit published.)

Q    Is this a check from a company called Sherman Abrams Laboratory?

A    Yes.

Q    Do you know what that is?

A    No.

Q    Do you see where it says "construction on lab" --

A    Yes.

Q    -- in the memo line?

        Do you recognize that signature?

A    No.

        MR. POLEMENI:  Can we go to page 670, please?

        (Exhibit published.)

Q    Is this a check from a company called Midwood Dialysis?

A    Yes.

Q    To ZKC for $25,000?

A    Yes.

Q    Is the date of this check September 7th, 2017?

A    Yes.

Q    Is that approximately four months after Shia told you he closed the company down?

---

Garcia - direct - Polemeni                    1456

A    Yes.

        MR. POLEMENI:  695, please.

        (Exhibit published.)

BY MR. POLEMENI:

Q    Do you see it's a company called FireAlarm Electrical, do you know what that is?

A    No.

Q    Do you recognize the handwriting on this check by any chance?

A    No.

        MR. POLEMENI:  Government's Exhibit 705, please. I'm sorry, page 705.  Did I say 705?  My apologies, 705.

        (Exhibit published.)

        THE COURT:  Just so the record is clear, you are showing the witness which document?

        MR. POLEMENI:  It's page 705 of Government's Exhibit 707-C.

        THE COURT:  All right.  Go ahead.

Q    Is this a check from Royal Builders?

A    Yes.

Q    And the check is for $50,000, is that correct?

A    Yes.

Q    Made out to ZKC?

A    Yes.

Q    The date of this check is September 20th, 2017, is that

**J.A. 599**

*Garcia - direct - Polemeni*                    1457

correct?

A    Yes.

Q    About four months after you asked Shia to close the business?

A    Yes.

MR. POLEMENI:  Page 707, please.

(Exhibit published.)

Q    Is this another check from Metro Equipment for $40,000?

A    Yes.

MR. POLEMENI:  And then finally, 736.

(Exhibit published.)

MR. POLEMENI:  I must have the wrong page.  Don't worry about it.  We can stop there, Ms. Kannan.

If we can go now, Ms. Kannan, to Government's Exhibit 707-B, please, in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. POLEMENI:  And if we can go to page 121.

(Exhibit published.)

MR. POLEMENI:  If we could blow up that check to -- yes, that one.  Perfect.

Q    Mr. Garcia, is this a check from ZKC NY, Inc. to Reginald Garcia?

A    Yes.

Q    For $9,500?

---

*Garcia - direct - Polemeni*                    1458

A    Yes.

Q    Did you ever receive this check?

A    No.

Q    Did you ever receive any checks from ZKC?

A    No.

Q    Do you recognize the handwriting on that check?

A    No.

MR. POLEMENI:  We can --

THE COURT:  Is the check endorsed on the back side? Can you flip it?

MR. POLEMENI:  It is not.  These are just the account statements, Judge.  We don't have --

THE COURT:  So you do not have --

MR. POLEMENI:  No.

THE COURT:  -- the back side showing who, if anyone, endorsed it, is that correct?

MR. POLEMENI:  Correct.

THE COURT:  Go ahead.

MR. POLEMENI:  If you could blow it back up, though, Ms. Kannan.

BY MR. POLEMENI:

Q    Do you see the signature?

A    Yes.

Q    Is that yours?

A    Not at all.

---

*Garcia - direct - Polemeni*                    1459

MR. POLEMENI:  We can stay on this page, Ms. Kannan, and -- thank you.

Q    Do you see this is a check to an individual named Friedman or it's paid to the order of Friedman?

A    Yes.

Q    For $10,000?

A    Yes.

Q    Do you know what that check is for?

A    No.

Q    Is that your signature?

A    No.

Q    On the signature line?

A    No.

MR. POLEMENI:  Can we go to page 122, Ms. Kannan?

(Exhibit published.)

MR. POLEMENI:  And if we can just blow up the entire -- there we go.

BY MR. POLEMENI:

Q    Is this another check to Friedman for $10,000?

A    Yes.

Q    Is that your signature?

A    No.

Q    The check below it, is that a check from ZKC to Reginald J. Garcia?

A    Yes.

**J.A. 600**

---

*Garcia - direct - Polemeni*                    1460

Q    For $9,000?

A    Yes.

Q    Did you receive this check, Mr. Garcia?

A    No.

Q    Is that your signature below?

A    No.

MR. POLEMENI:  Can we go back to this page, Ms. Kannan?

Just blow up the entire page.

Q    Do you see the check to Saks Fifth Avenue?

A    Yes.

(Continued on the following page.)

GARCIA - DIRECT - MR. POLEMENI
1461

BY MR. POLEMENI: (Continuing.)

Q Did you write that check?

A No.

MR. POLEMENI: If we go to Page 119, please, Ms. Kannan. And if we go in the middle of the page where it says, Amex.

Q Do you see, Mr. Garcia, where it says Amex e-payment?

A Yes.

Q And the amount is $102,184?

A Yes.

Q Did you make that payment, Mr. Garcia?

A No.

MR. POLEMENI: If we go to Page 109, please. And if we can go right -- yes.

Q Do you see this is a check for $11,000 to David Motovich?

Do you see that, Mr. Garcia?

A Yes.

Q Did you write that check?

A No.

MR. POLEMENI: If we can go -- stay on this page, Ms. Kannan.

And if we can go to the check right next to it.

Q Is it a check for $28,000 to Y&S Diamond?

Do you see that?

A Yes.

---

GARCIA - DIRECT - MR. POLEMENI
1462

Q Did you write that check?

A No.

MR. POLEMENI: You can take that down, Ms. Kannan, and stay on that page. If we could go to the top right check, please.

You know what, take that down. That's fine. If we can go to Page 110, please.

Q Do you see there's a check to Reginald Garcia for $9,500?

A Yes.

Q Did you receive that check, Mr. Garcia?

A No.

MR. POLEMENI: Go to Page 91, please. Right there. Perfect.

Q Do you see that's a check for $5,550 to Centurion Diamonds?

Do you see that, Mr. Garcia?

A Yes.

Q Did you write that check?

A No.

Q Is that your signature on the bottom?

A No.

MR. POLEMENI: Look at the next check, Ms. Kannan.

Q And that check is it also to Centurion Diamonds for $15,400.

Did you write that check?

---

GARCIA - DIRECT - MR. POLEMENI
1463

A No.

Q And is that your signature?

A I think it says 13,400.

Q Thank you. $13,400. Did you write that check?

A No.

Q Is that your signature?

A No.

Q Do you know an individual named Yoel Braun?

A Not at all.

MR. POLEMENI: Go to Page 85, please. The check in the top left.

Q Do you see there's a check, Mr. Garcia, for $17,425 to an individual named Ralph Madeb?

A Yes.

Q Do you know who Ralph Madeb is?

A No.

Q Did you write that check?

A No.

MR. POLEMENI: Go to Page 5, please. Keep on scrolling down, Ms. Kannan. Right there, yes. No, bottom of the next one.

Sorry, the one on the left, the bottom left. My apologies. There we go.

Q Do you see there's a check for $1,500 to an individual named Zorach Gobioff?

---

GARCIA - DIRECT - MR. POLEMENI
1464

A Yes.

Q Do you know who that is?

A No.

Q Did you write that check?

A No.

MR. POLEMENI: If we go to Page 67, please.

And if you can look at the second line, please, the check on the left, please.

Q Is that another check to Zorach Gobioff for $1,000?

A Yes.

Q Did you write that check?

A No.

MR. POLEMENI: Can you take that down, Ms. Kannan.

The second row, right next to the Zorach Gobioff check.

Q Do you see that's a check for $130,000 to DM Investors?

A Yes.

Q Do you know what DM Investors is?

A No.

Q Do you recognize that handwriting?

A No.

Q Is that your signature?

A No.

MR. POLEMENI: If we can go to Page 60, please. And if we can go to that second row.

**J.A. 601**

GARCIA - DIRECT - MR. POLEMENI
1465

Q    Do you see, Mr. Garcia, that's a check for $8,350 to Joshua Markovics?

A    Yes.

Q    Did you write this check to Joshua Markovics, your boss?

A    No.

Q    Is that your signature?

A    No.

Q    Do you recognize that handwriting?

A    No.

MR. POLEMENI:  If we go to the check right next to it.  Nope.  Yes.

Q    Do you see that's a check for $8,000, Mr. Garcia?

A    Yes.

Q    Did you receive this check?

A    No.

Q    Is that your signature?

A    No.

MR. POLEMENI:  Go to Page 48, please.  And if we can look at that check -- yes, right there.

Q    Do you see that is a check for $8,350 to Menacham Markovics?

A    Yes.

Q    Did you write that check?

A    No.

MR. POLEMENI:  Go to Page 31, please.  That second

GARCIA - DIRECT - MR. POLEMENI
1466

line, please, on the left.

Q    Do you see that's a check for $23,335 to an individual named Yisroel Leshkowitz?

A    Yes.

Q    Do you know who that is?

A    No.

Q    Do you recognize that handwriting?

A    No.

MR. POLEMENI:  And just a couple of more.  Page 12. And if we can go -- yes.  Right there, Ms. Kannan.  Thank you.

Q    Do you know an individual by the name of Boris Motovich?

A    No.

Q    Do you recognize that handwriting?

A    No.

Q    Is that your signature?

A    No.

Q    Mr. Garcia, prior to meeting with the Government, did you have any idea about this bank account?

A    No.

Q    You were not aware of it at all; is that correct?

A    Not at all.

Q    You didn't authorize anyone to open up a bank account in your name at Carter Bank; is that correct?

A    Not at all.

THE COURT:  You didn't authorize anyone to open up a

GARCIA - DIRECT - MR. POLEMENI
1467

bank account and he says not at all.

Did you authorize anyone to open up a bank account for you?

THE WITNESS:  No.

MR. POLEMENI:  Nothing further.  Thank you.

THE COURT:  All right.  We're going to take a 15-minute break and then we'll have cross-examination and I trust what will be very brief cross-examination and even briefer redirect, and we'll get you out of here at 5:00 o'clock, we promise.  So take a 15-minute break now. Thank you.

Do not talk about the case.

THE COURTROOM DEPUTY:  All rise.

(Jury exits the courtroom.)

THE COURT:  The jury has left the courtroom.  You may step down, sir, and please wait outside and we will call you back when we're resuming testimony.  Thank you.

THE WITNESS:  All right.

THE COURT:  You may be seated, ladies and gentlemen. The jury has left the courtroom.  The witness is leaving the courtroom.

(The witness exits the courtroom.)

THE COURT:  Do we have any issues we need to address?  Beginning with the Government.

MR. POLEMENI:  No, Your Honor.

GARCIA - DIRECT - MR. POLEMENI
1468

THE COURT:  Defense counsel?

MR. JACKSON:  No, Judge.

THE COURT:  All right.  We'll talk our 15 minutes.

(A recess was taken.)

THE COURT:  Let's go back on the record.

Before we bring the jury in, do we have copies of the transcripts of the audio available for the jurors, or does that have to wait until tomorrow?

MR. POLEMENI:  I think they're on their way, Judge. But I don't believe we have them right this second.

THE COURT:  The transcripts are on their way, is that what you said?

MR. POLEMENI:  Yes.

THE COURT:  All right.  Can we call the jury back and proceed at this point, or do we need to delay?

Are you going to be referring to the transcripts to the audio again?

MR. POLEMENI:  I don't intend to, unless something happens on cross-examination.  But I don't intend, at this point.

THE COURT:  All right.  Well, when the transcripts are in, we will -- you've shown them to your adversary, you said; is that correct?

MR. POLEMENI:  Yes.

THE COURT:  And you have no objection to them,

J.A. 602

PROCEEDINGS 1469

Mr. Jackson?

MR. JACKSON: I'd just like to glance at the final. I haven't seen final yet, Judge.

THE COURT: All right. We'll have you see the final.

Do you have the final for Mr. Jackson?

MR. POLEMENI: We do.

THE COURT: Why don't you take a look at it before we bring the jury in so we can move this along smoothly when the actual transcripts come in. So take a look, Mr. Jackson, let me know if you have any objection to the aid to transcription.

How have you marked it?

MR. POLEMENI: It is marked as GX 601T.

THE COURT: GX 601T. Any objection to that being given to the jury as an aid to their listening to the audio? The audio is already in evidence. That's the question that I will put to you, Mr. Jackson when you finish your review.

MR. JACKSON: No, Judge. If they decide to play it again, we have no objection.

THE COURT: All right. So you're going to play the audio again and the jurors will have the benefit of having the transcript in front of them; is that correct?

MR. POLEMENI: I can do that, Judge, yes.

THE COURT: Why don't we do that, that way, if it's

PROCEEDINGS 1470

used on cross, whether or not it's used on cross, it'll just make life easier for the jury because, the audio, while not completely garbled, was to my untutored ear, less than pristine.

MR. POLEMENI: Very well.

THE COURT: All right.

MR. POLEMENI: And Judge, I believe there's -- before the jury comes out, there's one issue --

THE COURT: Yes. Go ahead.

MR. POLEMENI: -- for the following witness, but we wanted to raise it now --

THE COURT: Yes, please. Who is the following witness?

MR. POLEMENI: It's FBI Special Agent Jenna Ambrosini.

THE COURT: And what is the issue?

MR. SKURNIK: So Your Honor, Special Agent Ambrosini will talk about the search of the defendant's apartment. The parties, in advance, have discussed the exhibits that the Government intends to introduce through Special Agent Ambrosini, and we've narrowed our disputes to just three exhibits over which --

THE COURT: What are you three that you have a dispute with respect to? What's the first of the three?

MR. SKURNIK: Government's Exhibit 411.

PROCEEDINGS 1471

THE COURT: Okay. Let's stop with that.

What is Government Exhibit 411?

MR. SKURNIK: It's a photograph of the entry to a pool in the defendant's apartment.

THE COURT: All right. May I see it, please?

And what is the objection to 411 coming in?

MR. MAZUREK: The objection, Your Honor, is under Federal Rule of Evidence 401 that it is not a fact of consequence in this action for the determination of any fact of consequence in this action, and also, under 403, as seeking to elicit undue prejudice and waste the jury's time.

The area that is depicted in the photograph is not an area that was where any items were seized pursuant to the search, and the Government already has intended to introduce seven additional photographs in Government's Exhibit 404 through 410, which identify the area where items were seized within the apartment.

THE COURT: All right. So 401 reads, test for relevant evidence. Evidence is irrelevant if, A, it has any tendency to make a fact more or less probable than it would be without the evidence, and B, the fact is of consequence in determining the action.

What was the other ground of objection under 803? Did you have an 803 or 403 objection?

MR. MAZUREK: 403, Your Honor.

PROCEEDINGS 1472

THE COURT: Waste of time, probative value, waste of time? Is that what you're asserting?

MR. MAZUREK: A waste of time and unfair prejudice.

THE COURT: Right. Doesn't rise to the level of toiletries, I get it.

The objections are overruled with respect to that. 411 comes in.

What else do you have? What's the next one?

MR. SKURNIK: The next is 412.

THE COURT: Why don't you publish that and tell me what it is. What's 412?

MR. SKURNIK: This is a picture of the pool itself.

THE COURT: What's the objection to 412?

MR. MAZUREK: Same objections, Your Honor. Under rules 401, 403, and cumulative.

THE COURT: Same ruling; overruled. Next.

MR. SKURNIK: The final is 413, and this is the pool from another angle.

THE COURT: All right. What's the objection?

MR. MAZUREK: Another pool shot it cumulative, Your Honor, and 401 and 403.

THE COURT: Okay. Overruled.

Anything else we need to address before the jury comes in?

MR. SKURNIK: No. Thank you, Your Honor.

J.A. 603

PROCEEDINGS 1473

THE COURT: Anything else from defense?

MR. JACKSON: No, Judge.

THE COURT: So let's get the jury in, please.

Hang on. We have the witness back. Do we need to have colloquy outside the presence of the witness? He's back in the courtroom.

MR. PAULSEN: We just wanted to ask if you wanted us to bring the binders up?

THE COURT: Do we need to have the witness leave the courtroom?

MR. PAULSEN: No, Your Honor.

THE COURT: You were going to ask about the binders, is that what you said?

MR. POLEMENI: Yes.

THE COURT: You can put the binders in the jury box now if you've got them there, and I'll tell the jurors that that's what they have. Just put one on each of their seats, old school.

(The witness resumes the stand.)

THE COURT: You should stay standing until the jury comes in because you'll just have to pop up, again.

And again, counsel, remind me, what is the exhibits -- what have they been marked, the ones that we're giving to the jury?

MR. POLEMENI: 601-T.

PROCEEDINGS 1474

THE COURT: 601-T as in Tom?

MR. POLEMENI: Yes.

THE COURT: Okay. Thank you. And counsel, do you have the audio ready to go? You can hand one up to my law clerks or court deputy.

Do you have the transcript -- the audio teed up to play again?

MR. GRUBIN: Yes, Your Honor.

THE COURT: Why don't we start with that because they'll be holding it in their hands. Just play it straight through. They've already heard it, it's in evidence, and this way, they won't be distracted while you're taking other testimony by looking through. Just play it, we can put it aside, and then you'll continue with the witness.

MR. POLEMENI: Thank you, Judge. Judge --

THE COURT: Yes. Why don't you sit down. Use the microphone.

MR. POLEMENI: The recording -- oh.

THE COURT: Go ahead.

MR. POLEMENI: So the recording is actually longer than what we played. So we didn't play the entire recording.

THE COURT: What do we have in terms of transcript?

MR. POLEMENI: You have the entire recording in terms of the transcript.

THE COURT: Okay. So I will tell them that this is

PROCEEDINGS 1475

the entire recording, the transcript is of the entire recording. They only heard a portion of it.

MR. POLEMENI: That's fine, Judge.

THE COURT: All right. Okay. Are we good to go? Is that acceptable, Mr. Jackson?

MR. JACKSON: Yes, Your Honor.

THE COURT: Let's get the jury back in, please.

THE COURTROOM DEPUTY: All rise.

THE COURT: Please stand for the jury.

(Jury enters the courtroom.)

THE COURT: Thank you for your promptness, ladies and gentlemen of the jury. You see, every now and then I do know what 15 minutes really looks like.

We have for you to review as you -- please be seated -- a copy of the transcript of the audio that you heard earlier. What you have before you is a transcript of the entire audio. What you heard earlier played for you was a portion of the audio. So what I've instructed counsel to do is to, with you having benefit of the transcript in front of you now, just replay what it is you heard before so you have the benefit of being able to see it. Again, the evidence is the audio, itself. This, what you have before you, this transcript, is just to assist you in terms of a greater accessibility of the audio. But again, the audio is the actual evidence. So I've instructed counsel to play it again

PROCEEDINGS 1476

and please proceed to play whatever portion you wish to play while the jurors each have in front of them, their respective copies of the transcript.

So go ahead. Please do that now. And again, the items that you have before you is Government Exhibit 601-T which is admitted, without objection by defense.

Is that correct?

MR. JACKSON: Correct, Judge.

THE COURT: Okay. Go ahead.

(Government Exhibit 601-T was received in evidence.)

(Video recording played.)(Video recording stopped.)

MR. POLEMENI: Okay. And then if we can go now to 450.

THE COURT: What page is that? I'm sorry.

MR. POLEMENI: I don't have --

THE COURT: You have it in terms of timestamp. I think the jurors are now looking at the transcript. So if you could direct them to the page, that would be helpful.

MR. POLEMENI: May I approach just to get a copy, Judge.

THE COURT: You don't have a copy now?

MR. POLEMENI: I actually gave all the copies to the Court.

THE COURT: Well, why don't you give one back to counsel. And now, ladies and gentlemen of the jury, counsel

**J.A. 604**

GARCIA - CROSS - MR. JACKSON

1477

is going to direct you to the page in the transcript so you can follow along with the audio.

MR. POLEMENI: It's actually on Page 2, starting with who's Moshe.

THE COURT: Okay. So turn to Page 2, ladies and gentlemen of the jury. And role the audio, please.

(Video recording played.)(Video recording stopped.)

MR. POLEMENI: We could stop there, Judge.

THE COURT: All right. Thank you.

Ladies and gentlemen of the, you now have the added assistance, which perhaps you needed, perhaps you didn't, of what the audio says.

All right. Thanks. You can put those aside now. Thank you, Counsel. Continue about your examination of the witness.

MR. POLEMENI: I've concluded direct examination, Judge.

THE COURT: All right. Thank you. You've concluded.

Any cross?

MR. JACKSON: Yes, Judge.

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good afternoon, Mr. Garcia. How are you?

A    Good afternoon.

Q    Mr. Garcia, just to be clear, this entire conversation,

---

GARCIA - CROSS - MR. JACKSON

1478

we didn't play it all, but my client, David Motovich, never appears in this conversation, correct?

A    No.

THE COURT: He never appeared, correct? No.

Did Mr. Motovich ever appear in the conversation?

THE WITNESS: No, he never appeared in the conversation.

Q    Thank you. And you haven't had interactions with my client, David Motovich, correct?

A    What was that?

Q    You have not had any interactions with my client David Motovich?

THE COURT: Have you had any interactions with Mr. Motovich?

THE WITNESS: No.

THE COURT: Next question.

MR. JACKSON: No further questions, Judge. Thank you.

THE COURT: All right. Thank you.

Anything else?

MR. POLEMENI: No, Your Honor. Thank you.

THE COURT: Thank you, sir. You may step down. Your testimony is complete.

THE WITNESS: Thank you.

THE COURT: Have a nice day.

---

GARCIA - CROSS - MR. JACKSON

1479

THE WITNESS: You too.

THE COURT: Thank you. Okay.

Next witness, please.

MR. SKURNIK: Your Honor, the Government calls special agent Jenna Ambrosini.

THE COURT: Okay. Please have the agent come forward and be sworn.

(The witness takes the stand.)

THE COURT: Please raise your right hand, Special Agent. And my court deputy at this time will administer the oath.

THE COURTROOM DEPUTY: Do you swear or affirm that the answers you're about to give the Court shall be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS: Yes.

THE COURT: Thank you, Special Agent. Please be seated. I'm going to ask you pull that microphone down towards you. It looks like a snake, but it's not. It won't bite you, despite having a little feedback.

And please state and spell your name, and then counsel will inquire.

THE WITNESS: Okay. My name is Jenna Ambrosini, J-E-N-N-A, A-M-B-R-O-S-I-N-I.

THE COURT: Thank you. Please proceed with your examination, Special Agent.

---

GARCIA - CROSS - MR. JACKSON

1480

**JENNA AMBROSINI**, called as a witness, having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SKURNIK:

Q    Special Agent Ambrosini, where do you work?

A    I'm a special agent with the FBI.

Q    What's your position at the FBI?

A    I'm a special agent.

Q    How long have you had that position?

A    Approximately five years.

Q    Are you assigned to a particular office at the FBI?

A    Currently, I'm assigned to the Baltimore field office.

Q    Were you particularly assigned -- were you previously assigned to a different office?

A    Previously, I was assigned to the New York field office.

Q    So today in the Baltimore field office, are you in a particular unit?

A    I work public corruption.

Q    How about when you were in the New York field office, what unit were you in?

A    I also worked public corruption.

Q    Before you were a special agent, did you have any other positions at the FBI?

A    I started in our laboratory division, and I additionally

**J.A. 605**

AMBROSINI - DIRECT - MR.SKURNIK 1481

held an intel position in the San Diego field office.

Q    So in total, how long have you been employed by the Federal Bureau of Investigation?

A    Approximately 12 years.

Q    What are some of your responsibilities as a FBI Special Agent?

A    Mostly to investigate federal crimes.

Q    Do you ever execute search warrants?

A    I do.

Q    Have those ever included search warrants of premises?

A    Yes.

Q    So other than being in the public corruption unit, are you on any other particular teams at the FBI?

A    I serve on a collateral duty on our evidence response team.

(Continued on the following page.)

---

Ambrosini - direct - Skurnik 1482

(Continuing.)

BY MR. SKURNIK:

Q    What's that, the Evidence Response Team?

A    We specialize in the collection and preservation of evidence.

Q    Does that include also conducting searches of premise?

A    It does.

Q    Approximately, how many searches of premise have you conducted?

A    Approximately over 20.

Q    What sorts of locations are these?

A    I've done residences, vehicles, hotels, fields, I've done a few ships, things like that.

Q    Have you received training for your position?

A    I have.  I attended our academy in Quantico Virginia for approximately six months and I, additionally, have had specialized evidence training for about three weeks.

Q    Did that training include how to execute search warrants?

A    It did.

Q    So I'm gonna direct your attention to August 24, 2021. What, if anything, did you do for work that day?

A    I assisted in the execution of a search warrant of a residence.

Q    What residence was this?

A    It was apartment 303, East 57th Street, 47G in New York.

---

Ambrosini - direct - Skurnik 1483

Q    Was that in Manhattan?

A    It was.

Q    Whose apartment was this?

A    David Motovich.

Q    Was that search pursuant to a court-authorized search warrant?

A    It was.

Q    So just at a high level, what was the purpose of that search?

A    To collect evidence.

Q    Was that evidence related to a criminal investigation?

A    Yes, it was.

Q    Other than that search that day, did you have any other role in the investigation?

A    I did not.

Q    Approximately how many agents were involved in the search?

A    Approximately ten to 15.

Q    Other than the FBI, were there any other federal agencies involved?

A    IRS was additionally there.

Q    On the day of the search?

THE COURT:  Were there any state police officials or city police officials involved in the search or was it just federal, if you know?

---

Ambrosini - direct - Skurnik 1484

THE WITNESS:  I believe it was federal.  I don't recall.

Q    On the day of the search, what was your role?

A    I was a searcher.

Q    What does that mean?

A    My role was, specifically, just to locate evidence.

Q    Was there a particular part of the apartment that you searched personally?

A    I focused most of my time on the first floor and the master bedroom and the closet.

Q    Approximately, what time did agents arrive on-scene?

A    Approximately six a.m.

Q    Is that standard?

A    Yes.

Q    When agents arrived, was anyone present in the apartment?

A    Mr. David Motovich was present.

Q    Anybody else?

A    Additionally, his wife.

Q    Anyone else?

A    Possibly some children.

Q    Can you just generally describe the apartment that you searched?

A    It was very large, multiple levels, a lot of windows overlooking the city.  There was a large swimming pool on the top level.  I believe there was a sauna or some sort of hot

**J.A. 606**

Ambrosini - direct - Skurnik                    1485

tub, an indoor shower, and that was pretty much it.

Q    So what was the first step during the search?

A    First, the team leader and the -- the case team enter the apartment and sort of get an overview, walk around apartment to see sort of what we're working with before the rest of the team comes in, and the photographer and the sketcher will join them and they will identify rooms with room letters to label the rooms.

Q    What happens next?

A    Once the rest of the search team enters, we will begin the search.

Q    Was evidence recovered during that search?

A    Yes.

Q    What happened with that evidence?

A    It's collected and packaged and then transported back to the FBI field office in New York.

Q    Were records created about where items were found in the apartment?

A    Yes.

Q    Okay.  Do those records reflect the particular rooms where items were found?

A    Yes.

Q    As part of this search, was a sketch of the apartment made?

A    Yes.

---

Ambrosini - direct - Skurnik                    1486

Q    Did you make that sketch or someone else?

A    Someone else.

Q    Okay.

        MR. SKURNIK:  Your Honor, we would like to offer at this time Government Exhibit 439 which is not in evidence.

        THE COURT:  Any objection to 439?

        MR. MAZUREK:  No, Your Honor.

        THE COURT:  It's admitted.  You may publish.

        (Government Exhibit 439, was received in evidence.)

        MR. SKURNIK:  Thank you, Your Honor.  We're pulling it up.

        Just one moment, Your Honor.

        (Exhibit published.)

        THE COURT:  Can you see it, ladies and gentlemen of the jury?  All right.

        Please proceed.

        MR. SKURNIK:  Thank you, Judge.

BY MR. SKURNIK:

Q    Special Agent Ambrosini, can you describe what is visible in this document?

A    This is the first floor of the penthouse apartment.  At the bottom of the sketch, is the entryway, and the top left is the master bedroom and bathroom and closet.

Q    What do the letters on this sketch represent?

A    The letters represent the different bedrooms and rooms in

---

Ambrosini - direct - Skurnik                    1487

the apartment.

        MR. SKURNIK:  If we can scroll to the second page, please.

Q    What's depicted on this page?

A    This is the second floor of the penthouse.

Q    Okay.  Can you describe what's on the second floor, please?

A    Yes.  To the left of the sketch is the pool.  There are a couple of other bedrooms on the top right.  There's, additionally, a desk and sitting area sort of at the top of the sketch, and then the stairs are in the middle.

        MR. SKURNIK:  So, Your Honor, at this point, we have a number of exhibits we would like to offer into evidence.

        THE COURT:  All right.  Offer the numbers and we'll get objections, if any.

        Start with the first one.

        MR. SKURNIK:  Government Exhibit 404.

        THE COURT:  Any objection?

        MR. MAZUREK:  No.

        THE COURT:  Admitted.

        (Government Exhibit 404 was received in evidence.)

        MR. SKURNIK:  405.

        THE COURT:  Any objection?

        MR. MAZUREK:  No.

        THE COURT:  Admitted.

---

Ambrosini - direct - Skurnik                    1488

        (Government Exhibit 405 was received in evidence.)

        MR. SKURNIK:  406.

        THE COURT:  Any objection?

        MR. MAZUREK:  No.

        THE COURT:  Admitted.

        (Government Exhibit 406 was received in evidence.)

        MR. SKURNIK:  407.

        THE COURT:  Any objection?

        MR. MAZUREK:  No.

        THE COURT:  Admitted.

        (Government Exhibit 407 was received in evidence.)

        MR. SKURNIK:  408.

        THE COURT:  Any objection?

        MR. MAZUREK:  No.

        THE COURT:  Admitted.

        (Government Exhibit 408 was received in evidence.)

        MR. SKURNIK:  409.

        THE COURT:  Any objection?

        MR. MAZUREK:  No.

        THE COURT:  Admitted.

        (Government Exhibit 409 was received in evidence.)

        MR. SKURNIK:  410.

        THE COURT:  Any objection?

        MR. MAZUREK:  No.

        THE COURT:  Admitted.

J.A. 607

Ambrosini - direct - Skurnik
1489

(Government Exhibit 410 was received in evidence.

MR. SKURNIK:  411.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 411 was received in evidence.)

MR. SKURNIK:  412.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 412 was received in evidence.)

MR. SKURNIK:  413.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 413 was received in evidence.)

MR. SKURNIK:  426.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 426 was received in evidence.)

MR. SKURNIK:  415.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

---

Ambrosini - direct - Skurnik
1490

(Government Exhibit 415 was received in evidence.)

MR. SKURNIK:  416.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 416 was received in evidence.)

MR. SKURNIK:  417.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 417 was received in evidence.)

MR. SKURNIK:  418.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 418 was received in evidence.)

MR. SKURNIK:  419.

THE COURT:  Any objection?

MR. MAZUREK:  I have not seen 419, Your Honor.

THE COURT:  Show it to them.

MR. SKURNIK:  Your Honor, we're not gonna offer 419.
We'll withdraw that.

THE COURT:  All right.  Anything else?

MR. SKURNIK:  There was some more, Your Honor.  420.

THE COURT:  420.  Any objection?

---

Ambrosini - direct - Skurnik
1491

MR. MAZUREK:  No, Your Honor.

THE COURT:  All right.  Admitted.

(Government Exhibit 420 was received in evidence.)

MR. SKURNIK:  424.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 424 was received in evidence.)

MR. SKURNIK:  425.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 425 was received in evidence.)

MR. SKURNIK:  426.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 426 was received in evidence.)

MR. SKURNIK:  427.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 427 was received in evidence.)

MR. SKURNIK:  428.

THE COURT:  Any objection?

---

Ambrosini - direct - Skurnik
1492

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 428 was received in evidence.)

MR. SKURNIK:  429.

THE COURT:  Any objection?

MR. MAZUREK:  No.

MR. SKURNIK:  Admitted.

(Government Exhibit 429 was received in evidence.)

MR. SKURNIK:  430-2.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 430-2 was received in evidence.)

MR. SKURNIK:  430-4.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 430-4 was received in evidence.)

MR. SKURNIK:  430-6.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 430-6 was received in evidence.)

MR. SKURNIK:  430-7.

THE COURT:  Any objection?

J.A. 608

Ambrosini - direct - Skurnik    1493

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 430-7 was received in evidence.)

MR. SKURNIK:  430-8.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 430-8 was received in evidence.)

MR. SKURNIK:  432-1.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 432-1 was received in evidence.)

MR. SKURNIK:  432-2.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 432-2 was received in evidence.)

MR. SKURNIK:  432-3.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 432-3 was received in evidence.)

MR. SKURNIK:  433-3.

THE COURT:  Any objection?

---

Ambrosini - direct - Skurnik    1494

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 433-3 was received in evidence.)

MR. SKURNIK:  433-4.

Any objection?

No.

THE COURT:  Admitted.

(Government Exhibit 433-4 was received in evidence.)

MR. SKURNIK:  433-5.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 433-5 was received in evidence.)

MR. SKURNIK:  433-6.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 433-6 was received in evidence.)

MR. SKURNIK:  433-7.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 433-7 was received in evidence.)

MR. MAZUREK:  No.

MR. SKURNIK:  433-9.

---

Ambrosini - direct - Skurnik    1495

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 433-9 was received in evidence.)

MR. SKURNIK:  433-10.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 433-10 was received in evidence.)

MR. SKURNIK:  433-12.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 433-12 was received in evidence.)

MR. SKURNIK:  433-14.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 433-14 was received in evidence.)

MR. SKURNIK:  433-16.

THE COURT:  Any objection?

MR. MAZUREK:  No.

---

Ambrosini - direct - Skurnik    1496

THE COURT:  Admitted.

(Government Exhibit 433-16 was received in evidence.)

MR. SKURNIK:  433-17.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 433-17 was received in evidence.)

MR. SKURNIK:  And, finally, Your Honor, we have some physical evidence here in the courtroom that we have shown to defense counsel.  I would like to offer it now if possible.

THE COURT:  Have you described it by exhibit number?

MR. SKURNIK:  Yeah and I can lay those out.

THE COURT:  You're on a roll, so keep going.

MR. SKURNIK:  It's Government Exhibit 3005.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 3005 was received in evidence.)

MR. SKURNIK:  3006.

THE COURT:  Objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 3006 was received in evidence.)

**J.A. 609**

Ambrosini - direct - Skurnik

1497

MR. SKURNIK:  3007.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 3007 was received in evidence.)

MR. SKURNIK:  3008.

THE COURT:  Objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 3008 was received in evidence.)

MR. SKURNIK:  3009.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 3009 was received in evidence.)

MR. SKURNIK:  3010.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 3010 was received in evidence.)

MR. SKURNIK:  3011.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 3011 was received in evidence.)

---

Ambrosini - direct - Skurnik

1498

MR. SKURNIK:  3012.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 3012 was received in evidence.)

MR. SKURNIK:  3016.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 3016 was received in evidence.)

MR. SKURNIK:  3017.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 3017 was received in evidence.)

Admitted.  3022.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 3022 was received in evidence.)

MR. SKURNIK:  430-P.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 430-P was received in evidence.)

---

Ambrosini - direct - Skurnik

1499

MR. SKURNIK:  431-P.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 431-P was received in evidence.)

MR. SKURNIK:  432-P.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 432-P was received in evidence.)

MR. SKURNIK:  433-P.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 433-P was received in evidence.)

MR. SKURNIK:  434-P.

THE COURT:  Any objection.

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 434-P was received in evidence.)

MR. SKURNIK:  435-P.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.

(Government Exhibit 435-P was received in evidence.)

**J.A. 610**

---

Ambrosini - direct - Skurnik

1500

MR. SKURNIK:  And 428-P.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  All right.

(Government Exhibit 428-P was received in evidence.)

THE COURT:  Ladies and gentlemen of the jury, they are all admitted.  We do it like that.  You'll get to see it as counsel presents it.  We don't want to waste your time going one by one by one.  That's why you have these breaks sometimes.

Move it.

MR. SKURNIK:  Thank you, Judge.

THE COURT:  You're welcome.

BY MR. SKURNIK:

Q    So, Special Agent Ambrosini, we're gonna pull up Government Exhibit 404 in evidence.  What's depicted in this image?

A    This is an image of the entryway of the first floor of the penthouse.

MR. SKURNIK:  If we can go back to Government Exhibit 439, please, Ms. Kannan.

Q    The photograph that we were just looking at of the stairs, where is that taken from on this sketch?

A    The photographer was standing in -- near around the dining room table and facing out towards the main foyer of

Ambrosini - direct - Skurnik 1501

room A.

Q    Is that this area here?

A    Yes.

Q    Where I just drew the X.  Okay.  Did you personally participate in the search of the main floor?

A    Yes.

Q    Okay.  Was anything recovered from the main floor?

A    Yes.

     MR. SKURNIK:  So, Your Honor, we have a box of physical evidence here which has now been admitted and I ask if Mr. Scott will bring that up to the witness.

     THE COURT:  Yes, he will do that.  One reason why he's cut and buff and one reason why I'm not because I sit here and he does the heavy lifting.

Q    And Special Agent, we'll start with Government Exhibit 3007.  What is Government Exhibit 3007?

A    Cash.

Q    How much cash is it?

A    $5,371.

Q    Did that cash come from an envelope?

A    Yes.

Q    Does the envelope say anything on it?

A    CIP Services.

Q    CIP Services?

A    Yes.

Ambrosini - direct - Skurnik 1502

Q    Okay.  Where was this envelope of cash found?

A    In room A, a bag on the coatrack.

Q    If we can look now at Government Exhibit 310.  What's that?

A    This is also cash.

Q    How much cash is it?

A    Two-thousand and ninety dollars.

Q    Where was that cash found?

A    Also in room A in a bag on the coatrack in a Dave envelope.

     MR. SKURNIK:  So, Ms. Kannan, can we pull up Government Exhibit 429.

Q    What's this a photograph of?

A    Cash.

Q    Is this the same cash that you have in front of you in Government Exhibit 3010?

A    Yes.

     MR. SKURNIK:  Ms. Kannan, can we zoom in on the envelope on the top.

Q    So when you said Dave a moment ago, are you talking about where it says Dave here on the envelope?

A    Yes.

Q    Okay.

     MR. SKURNIK:  We can take that down.  Thank you.

Q    To be clear, the word Dave, was that on the envelope when

Ambrosini - direct - Skurnik 1503

agents found it?

A    Yes.

Q    If we can look now at Government Exhibit 428-P.

     THE COURT:  Is that P as in Peter or T as in Thomas?

     MR. SKURNIK:  P as in Peter, for physical.  And, Ms. Kannan, if we can pull up Government Exhibit 428 on the screen.

Q    Special Agent, what is that that you're holding?

A    An American Express business card.

Q    Is that the same American Express business card that's visible on the screen?

A    It is.

Q    Does that say Mehdija Demirovic?

A    Yes.

Q    What does the say underneath the name Mehdija Demirovic?

A    IBar Construction Co.

Q    Where was this card found?

A    In a Louis Vuitton purse on the coatrack in room A.

     MR. SKURNIK:  Ms. Kannan, if we can go back to Government Exhibit 404, please.

Q    What's depicted in the back of this photo?

A    A wardrobe or a closet piece of furniture, and to the left of it is a coatrack.

Q    Did you personally search that wardrobe?

A    I did.

Ambrosini - direct - Skurnik 1504

Q    Were items recovered from the wardrobe?

A    Yes.

     MR. SKURNIK:  Can we pull up Government Exhibit 3006, another physical item.

Q    What is Government Exhibit 3006?

A    Cash.

Q    How much cash?

A    One thousand dollars.

Q    And where was that cash found?

A    A-2 in a drawer.

Q    Is A-2 this wardrobe visible on the screen?

A    Yes.

Q    Okay.

     MR. SKURNIK:  Ms. Kannan, if we can pull up now Government Exhibit 405.

Q    What's depicted in this photograph?

A    This is the living room and the dining table.

     MR. SKURNIK:  And if we can go back to 439, please.

Q    So where was that photograph taken on this sketch?

A    Approximately the same location we pointed out before but facing room B, the living room and the dining room.

Q    So I just drew an X on the screen.  Is it about that location?

A    Yes.

Q    Thank you.

J.A. 611

Ambrosini - direct - Skurnik                    1505

MR. SKURNIK: If we can go now to Government Exhibit 406.

Q    What's depicted here?

A    This is a photo of the living room from the alternate corner.

MR. SKURNIK: Government Exhibit 407, please.

Q    What's depicted here?

A    The kitchen.

MR. SKURNIK: 408, please.

Q    What's visible in this photograph?

A    This is the master bedroom closet.

Q    Did you personally search this closet?

A    I did.

Q    Is this a photograph looking into the closet or from inside the closet looking out?

A    This photo is from inside the closet facing out. That doorway is the entry way into the closet.

Q    What's a black object on the left of the photograph?

A    A very large safe.

MR. SKURNIK: If we can go back to Government Exhibit 439, please.

Q    That closet we were just looking at, where is that on this sketch?

A    It's identified as D-2 in the top left-hand corner.

Q    Is that approximately where I just drew the X?

---

Ambrosini - direct - Skurnik                    1506

A    Yes.

MR. SKURNIK: If we can go to Government Exhibit 409, please.

Q    What's visible here?

A    This is inside the safe.

Q    What's on the top row of the safe?

A    Cash.

Q    How about in the middle of the safe?

A    Jewelry.

Q    And at the bottom of the safe?

A    More jewelry.

MR. SKURNIK: Government Exhibit 426, please.

Q    What's depicted in this photograph?

A    This is a close-up of the top shelf of the safe where the cash is and additionally some passports in the back corner.

Q    So, the closet as a whole, were items recovered from this closet?

A    Yes.

Q    How about from inside the safe?

A    Yes.

MR. SKURNIK: Government Exhibit 418, please.

Q    What's depicted here?

A    Several designer handbags.

Q    Do you know what brand these hand bags are?

A    Hermes.

---

Ambrosini - direct - Skurnik                    1507

Q    About how many handbags were found from Hermes?

A    Twenty-five.

Q    Were these found in the closet that we've been talking about?

A    Yes.

MR. SKURNIK: Your Honor, could Mr. Scott come retrieve another box of physical evidence?

THE COURT: Yes.

Q    Special Agent Ambrosini, what's in this box?

A    Multiple designer handbags.

Q    Can you please take out Government Exhibit 3016. What's this?

A    This is a Hermes purse.

Q    What color is it?

A    Pink.

Q    And was this found in that closet D-2?

A    It was.

Q    Okay.

MR. SKURNIK: Your Honor, we have one more box if Mr. Scott can come retrieve it. This is our final one.

THE COURT: He's up to it I'm sure.

MR. SKURNIK: Thank you.

THE COURT: I'm not sure pink is his color but I'm not the one to ask.

Go ahead.

---

Ambrosini - direct - Skurnik                    1508

Q    Special Agent Ambrosini, what's in this box?

A    Multiple designer handbags.

Q    Okay. Is there a red handbag labeled Government Exhibit 317?

A    Yes.

Q    Can you pull that out, please, and show it to the jury. What brand is this bag?

A    Hermes.

Q    And for the record, what color is it?

A    Red.

Q    Was this also found in that closet?

A    It was.

Q    Is there another handbag in that box labeled as an exhibit?

A    Yes.

Q    What exhibit number is on that?

A    3014.

Q    Can you hold that up and show it to the jury, please. What color, for the record, is that handbag?

A    Purple.

Q    Is that also a Hermes handbag?

A    Yes.

Q    Was that also found in the same closet?

A    Yes.

Q    Thank you. You can put that away.

J.A. 612

Ambrosini - direct - Skurnik                          1509

And if you can now pull out, from the first box, Government Exhibit 3011.

THE WITNESS:  Your Honor, may I just step down to move this box?

THE COURT:  Yes, of course.

THE WITNESS:  Thank you.

Okay.  Go ahead.  Sorry.

THE COURT:  Take your time.  No need to apologize.

BY MR. SKURNIK:

Q    Is -- can you please pull out Government Exhibit 3011. What is Government Exhibit 3011?

A    Cash.

Q    How much cash?

A    $44,518.

Q    And where was that $44,518 found?

A    The closet safe.

Q    Is that the large safe we just saw a moment ago?

A    Yes.

Q    Okay.  Now if you could pull out Government Exhibit 3012.

What's Government Exhibit 3012?

A    Cash.

Q    How much cash?

A    $28,000.

THE COURT:  How much?

THE WITNESS:  Twenty-eight thousand.

---

Ambrosini - direct - Skurnik                          1510

THE COURT:  Okay.

Go ahead.

Q    Is it 28 thousand or 28 hundred?

A    Twenty-eight hundred.  I'm sorry.

THE COURT:  Okay.  Which is it, 28 hundred or 28 thousand?

THE WITNESS:  Two thousand, eight-hundred dollars.

THE COURT:  There you go.

THE WITNESS:  I apologize.

THE COURT:  No need to apologize.  Listen, the male agents don't apologize.  You shouldn't apologize.

Go ahead.

BY MR. SKURNIK:

Q    Was that cash found inside envelopes?

A    Yes.

Q    Can you tell the jury what the envelopes say on them?

A    Sure.  Sterling National Bank and Astoria Bank.

Q    Where were these envelopes of cash found?

A    Inside the safe in room D-2.

Q    Is this the same safe we saw a moment ago?

A    Yes.

Q    Okay.  If we can do now Government Exhibit 3022.

What is Government Exhibit 3022?

A    An item of jewelry.

Q    Can you hold it up and show it to the jury, please?

---

Ambrosini - direct - Skurnik                          1511

A    Of course.

Q    Can you please describe that item of jewelry?

A    This is a gold necklace with a pink butterfly on the bottom.

Q    Do you know what brand this necklace is?

A    This is Van Cleef and Arpels.

Q    Where was that necklace found?

A    Also in the safe.

MR. SKURNIK:  Ms. Kannan, if we can go back to Government Exhibit 439 now.

Q    So we talked about the master closet.  I want to ask now about the master bedroom in room D.  Did you personally search room D.

A    Yes.

Q    Were items recovered there?

A    Yes.

Q    Can you pull out Government Exhibit 435-P.

MR. SKURNIK:  And, Ms. Kannan, if you can pull up Government Exhibit 435, please.

Q    Special Agent, what is Government Exhibit 435-P?

A    These are Coney Island Payroll Services blank checks with a signature, additionally a business card.

Q    Are these same Coney Island checks depicted on the T.V. screen here?

A    Yes.

---

Ambrosini - direct - Skurnik                          1512

Q    So is this a photograph of those checks?

A    Yes.

Q    Okay.  And these checks, other than the signature, are they blank?

A    Yes.

Q    And so these were found in room D of the master bedroom?

A    Yes.

Q    Do you know where in the master bedroom they were found?

A    In a box under the bench.

Q    If we can pull out now Government Exhibit 3008.  What is this?

A    Cash.

Q    How much cash?

A    $1,506.

Q    Where was this cash found?

A    In room D in a nightstand.

Q    That's the master bedroom?

A    Yes.

Q    Now, Government Exhibit 3009.  Can you hold that one up and show it to the jury?

A    Can you guys see?

Q    What is 3009?

A    Cash inside a Midwood receipt.

Q    Can you pull that receipt out?

A    Yes.

J.A. 613

Ambrosini - direct - Skurnik 1513

Q    Show it to the jury, please.

     What do you mean by a Midwood receipt?

A    This receipt says, Midwood Lumber and Millwork.

Q    And this was found in the master bedroom?

A    Yes.

Q    Government Exhibit 3005, please.

     What is this?

A    Cash.

Q    How much cash?

A    $3,936.

Q    Where was that cash found?

A    Room F, bedside table.

     MR. SKURNIK:  Ms. Kannan, if we could pull up Government Exhibit 439, please.

Q    Where is room F on this sketch?

A    Approximately the middle of the page, left-hand side.

Q    Is it the room I just marked with an X?

A    Yes.

Q    Thank you.

     MR. SKURNIK:  Ms. Kannan, if we can now do Government Exhibit 415, please.

Q    What's visible in this photograph?

A    This is a wallet with several identification cards.

Q    Where were these cards and this wallet found?

A    The master bedroom.

Ambrosini - direct - Skurnik 1514

Q    Do you see David Motovich's name on any of these cards?

A    Yes, approximately three places, on a driver's license, an identification card and a couple credit cards.

     MR. SKURNIK:  Ms. Kannan, if we can zoom in on the two dark colored cards at the top.

Q    Special Agent, are you able to see what company these cards are from?

A    American Express.

Q    And if you can read it, whose name is on these cards?

A    David Motovich.

     MR. SKURNIK:  Government Exhibit 417, please.

Q    What is this photograph depict?

A    Three credit cards.

     MR. SKURNIK:  If we can zoom in on the middle credit card, please.

Q    Whose name is on this credit card?

A    David Motovich.

     MR. SKURNIK:  If we can now zoom in on the bottom credit card, please.

Q    Whose name is on this credit card?

A    Mehdija Demirovic for iBar Construction Corp.

Q    Where were these cards found?

A    The master bedroom.

     MR. SKURNIK:  Government Exhibit 427, please.

Q    What's visible here?

Ambrosini - direct - Skurnik 1515

A    This appears to be contents of a bag emptied out on the floor.

Q    Do you know where that bag was found?

A    The coatrack in the entryway.

Q    What type of bag is it?

A    A Louis Vuitton bag.

Q    Do you know whether this is a men's bag or a women's bag?

A    Typically, the black Louis Vuitton is the men's line.

     (Continued on the following page.)

Ambrosini - direct - Skurnik 1516

(Continuing.)

     MR. SKURNIK:  If we can zoom out again, Ms. Kannan. And zoom in on the cash slip at the bottom.

     (Exhibit published.)

DIRECT EXAMINATION (Continuing)

BY MR. SKURNIK:

Q    Is this the cash slip with Dave written on it that you testified about earlier?

A    Yes.

Q    So was this cash slip inside the men's bag?

A    Yes.

     MR. SKURNIK:  If we can zoom out again.

Q    Do you see anything in this photograph related to Saks Fifth Avenue?

A    Yes, I see two receipts and a merchandise card to the left of the photo.

     MR. SKURNIK:  Thank you.  We can pull this one down. And now Government Exhibit 410, please.

     (Exhibit published.)

Q    What's depicted in this photograph?

A    This is the top of the stairway entry light into the second floor of the penthouse.

     MR. SKURNIK:  So let's go back to Government Exhibit 439, please.  And the second page, please.

     (Exhibit published.)

J.A. 614

Ambrosini - direct - Skurnik        1517

BY MR. SKURNIK:

Q    The photograph that we just saw, where is that shown on this sketch?

A    Approximately around the stairwell in -- it's identified as Room J on the sketch.

Q    Is that where I just drew an X on the screen?

A    Yes.

MR. SKURNIK:  So let's go back to 410 now, please.

(Exhibit published.)

Q    The desk in the back of this photo, do you know whether any items were recovered from that desk?

A    Yes.

Q    What type of items?

A    Several documents.

MR. SKURNIK:  Can we pull out, there should be a redweld marked Government Exhibits 430-P, 431-P, 432-P, 433-P and 434-P.

Q    And can you please show the jury what's inside those exhibits?

A    (Witness complies.)

Q    What are you holding up?

A    Several documents.

Q    Where were those documents found?

A    From the desk.

Q    Do you know whether those documents were later scanned?

---

Ambrosini - direct - Skurnik        1518

A    They were.

MR. SKURNIK:  If we could pull up Government Exhibit 430-2, please.

(Exhibit published.)

BY MR. SKURNIK:

Q    Is this a scan of one of the documents in front of you?

A    Yes.

MR. SKURNIK:  Can we zoom in at the top, please, the first half of the page?  Thank you.

(Exhibit published.)

Q    What is this?

A    This is an invoice from Absolute Plumbing Heating and Mechanical Corp. to Aladdin Contracting.

Q    What's the address under Aladdin Contracting?

A    303 East 57th Street, Apartment 47G, New York, New York.

Q    Is that the same apartment that you searched?

A    Yes.

MR. SKURNIK:  If we can pull up Government Exhibit 430-4, please.

(Exhibit published.)

Q    Is this also a scan of a document in front of you?

A    Yes.

Q    What does this appear to be?

A    A transaction report from BP Cooling Inc.

MR. SKURNIK:  Ms. Kannan, under "Memo," if we can

---

Ambrosini - direct - Skurnik        1519

zoom in on the names of the companies listed in the "Memo" column.

BY MR. SKURNIK:

Q    Does that say Lithos Marble?

A    Yes.

Q    Unique Painting?

A    Yes.

Q    Ago and Alau?

A    Yes.

Q    Ago and Alau?

A    Yes.

MR. SKURNIK:  Then if we can zoom out, please.  And we'll go to Government Exhibit 430-6.

Q    Is this also a scan of a document in front of you?

A    Yes.

Q    What does this document appear to be?

A    An invoice from GS Security.

MR. SKURNIK:  Is there a second page, Ms. Kannan?

(Exhibit published.)

MR. SKURNIK:  And if we can zoom in at the total at the bottom.

Q    What's the total amount of this invoice?

A    $60,250.85.

MR. SKURNIK:  And if we can scroll up please.

Where it says "bill to," sort of near the top, can

---

Ambrosini - direct - Skurnik        1520

you zoom in on that?

BY MR. SKURNIK:

Q    What does it say?

A    303 East 57th Street, 47G, New York, New York.

Q    Is this the same address of the apartment you searched?

A    Yes.

MR. SKURNIK:  If we can do now Government Exhibit 430-7.

(Exhibit published.)

Q    What does this appear to be?

A    An e-mail.

Q    And what's in the e-mail?

A    A financial statement from BP Cooling.

Q    Who is the financial statement to?

A    Penthouse 303 LLC, David Motovich, 303 East 57th Street, Apartment 47G, New York, New York.

MR. SKURNIK:  And if we can scroll down, please. That's good.

Ms. Kannan, if we can zoom in on "transactions."

Q    Do you see the transaction on January 21st, 2016?

A    Yes.

Q    Does that say payment number 1533, Ago and Alaudin Contracting Corp.?

A    Yes.

Q    And is there another payment on the same day number 1534

**J.A. 615**

Ambrosini - direct - Skurnik 1521

to Ago and Alaudin Contracting Corp.?

A   Yes.

Q   At the bottom on April 13th, 2016, does it say payment number 2192, Lithos Marble Work, and then the same date payment number it looks like -- well, what number does that look like to you for the bottom payment?

A   2-0-0 possibly 6.

Q   And what does it say next to the number?

A   Unique Painting Services.

MR. SKURNIK:  If we can zoom out, please.

Ms. Kannan, if we can zoom in just one more time just on the Lithos Marble and Unique Painting section.  Just a little higher, please.

BY MR. SKURNIK:

Q   What does it say at the top, above these payments?

A   Pool area.

MR. SKURNIK:  Okay.  If we can go to Government Exhibit 430-8, please.

(Exhibit published.)

Q   Is this another scan of a document in front of you?

A   Yes.

MR. SKURNIK:  If we could zoom in on the first half of the page.

(Exhibit published.)

Q   What does this appear to be to you?

Ambrosini - direct - Skurnik 1522

A   A letter to the Board of Directors of the Excelsior.

MR. SKURNIK:  If we can please scroll to the second page.

(Scrolling.)

BY MR. SKURNIK:

Q   Who is signing this letter?

A   David Motovich.

MR. SKURNIK:  Back up to the first page, please.

(Exhibit published.)

Q   Under "Motovich Statement," what does it say in the first two sentences?

A   David Motovich is currently president, CEO and owner of Midwood Lumber and Millwork Inc.  This is a family business that my father and I own 100 percent of that was started more than 30 years ago.

MR. SKURNIK:  If we can zoom out.  And then zoom in on "Motovich Financials."

Q   Can you please read the first two sentences of this paragraph?

A   For the March board meeting, I submitted financial statements that included my father as a guarantor on the transaction.  I was told that despite the fact that I had more than $20 million of assets, the fact that I only had about $200,000 of adjusted gross income, and the annual maintenance for the apartment is about $168,000, that I would have to

Ambrosini - direct - Skurnik 1523

bring my father in as a co-buyer.

MR. SKURNIK:  If we can now go to the second page, Ms. Kannan.

(Exhibit published.)

BY MR. SKURNIK:

Q   And in the second-to-last paragraph --

MR. SKURNIK:  If we can blow that one up.

Q   -- and please read the first two sentences of this paragraph.

A   We are currently -- we currently are partners in about 15 of these investments that include, residential and commercial properties throughout New York, but primarily in Brooklyn near our headquarters.  To that extent, we recently sold a property, 35 4th Avenue LLC, for 25 million that was under contract when we originally signed the contract with Mr. Unger in February and therefore, we have a substantial amount of our net worth in cash and marketable securities at the current time.

MR. SKURNIK:  If we can zoom out, please.

Q   Now, Government Exhibit 432-1.

(Exhibit published.)

Q   What is does this appear to be?

A   This appears to be a payroll ledger.

Q   This is a scan of a document in front of you?

A   Yes.

Ambrosini - direct - Skurnik 1524

Q   What does it say at the very top?

A   And Holy C.I payroll.

MR. SKURNIK:  And if we can zoom out.

And zoom in on the middle of the ledger, please.  A little higher.  Great.

(Exhibit published.)

BY MR. SKURNIK:

Q   Do you see the name David on this ledger?

A   Yes.

Q   Does it show it multiple times?

A   Yes.

MR. SKURNIK:  If we can go now to Government Exhibit 432-2.

(Exhibit published.)

Q   Is this a scan of a document in front of you?

A   Yes.

Q   Found in that desk on the second floor?

A   Yes.

MR. SKURNIK:  If we can zoom in on the top half of the page, please.

(Exhibit published.)

Q   What does it say at the top?

A   Promissory Note.

Q   Does it say the value of this promissory note?

A   A hundred-thousand dollars.

J.A. 616

Ambrosini - direct - Skurnik 1525

Q   So, who is loaning money to whom?

A   It appears David Motovich and/or Lyudmila Motovich to Joseph Richter and Coney Island Payroll Services.

Q   And it's a hundred-thousand dollars?

A   Yes.

Q   Okay.  What's the date of this promissory note?

A   August 10th, 2014.

MR. SKURNIK:  If we can go now to Government Exhibit 432-3, please, and zoom in at the top half.

(Exhibit published.)

BY MR. SKURNIK:

Q   What does it say at the top of this document?

A   Amended and Restated Promissory Note.

Q   Is this also a scan of a document in front of you?

A   Yes.

Q   What's the amount of this Amended and Restated Promissory Note?

A   $1.2 million.

Q   So who here is loaning $1.2 million to whom?

A   David and Lyudmila Motovich to Joseph Richter and Coney Island Payroll Services.

Q   And what's the date of this Amended and Restated Promissory Note?

A   August 10th, 2014.

MR. SKURNIK:  If we can now go to Government

---

Ambrosini - direct - Skurnik 1526

Exhibit 433-3.

(Exhibit published.)

BY MR. SKURNIK:

Q   What's visible in this exhibit?

A   Deposit slips.

Q   For what bank?

A   Chase.

MR. SKURNIK:  If we can zoom in on the first deposit slip at the top.

Q   Whose name is listed under customer?

A   David Motovich.

Q   What's the amount?

A   $900,000.

Q   The second deposit slip, whose name is listed?

A   David Motovich.

MR. SKURNIK:  If we can scroll down a little bit.

Q   What's the amount on the second deposit slip?

A   $1,020,000.

Q   Does it say loan?

A   Yes.

Q   Okay.

MR. SKURNIK:  If we can go to the bottom deposit slip.

Q   What's the -- what company is listed towards the top?

A   M&M USA Consulting Corp.

---

Ambrosini - direct - Skurnik 1527

Q   And what's the amount here?

A   $32,800.

MR. SKURNIK:  If we can go now to Government Exhibit 433-4, please.

(Exhibit published.)

MR. SKURNIK:  And zoom in at the top.

BY MR. SKURNIK:

Q   What is this?

A   A proposal and contract from Absolute Plumbing, Heating and Mechanical Corp.

Q   To whom?

A   Mr. David Motovich.

Q   And is this a scan of a document in front of you?

A   Yes.

MR. SKURNIK:  If we can scroll down, please.

Q   How does it say in handwriting on the bottom left that this was paid for?

A   A deposit of $5,000, cash for $3,000, and cash for $4,000.

MR. SKURNIK:  If we can scroll up, please.  And just zoom in where it says Mr. David Motovich on that paragraph.

Q   What does it say under Mr. David Motovich?

A   Alladin Construction.

(Continued on the following page.)

J.A. 617

---

AMBROSINI - DIRECT - MR. SKURNIK 1528

BY MR. SKURNIK:  (Continuing.)

Q   The address underneath, is that the same address of the apartment you searched?

A   Yes.

Q   How about the e-mail address, what e-mail address is listed?

A   DaveMidwood@Gmail.com.

Q   And what's the phone number.

A   (646)330-0861.

MR. SKURNIK:  If we can go now to Government Exhibit 433-5.

Q   Is this a scan of a document in front of you?

A   Yes.

Q   What is this document?

A   A cabinetry contract of Neff of Short Hills.

MR. SKURNIK:  If we can scroll to the second page, please.  The third page.  And keep going.  We can go to the last page.

Q   So in the center of the page, what does it say is the total value of the contract?

A   $137,000.

Q   And then in the bottom right in ink, how does it say this was paid?

A   Paid in $2,000 cash and paid in $55,500 in, it looks like CKS.

AVERY N. ARMSTRONG, RPR, NYRCR

AMBROSINI - DIRECT - MR. SKURNIK
1529

Q    What do you understand that to mean?

A    Checks.

MR. SKURNIK:  If we can go now to Government Exhibit 433-6.

Q    Is this also a scan of a document found in that second floor desk?

A    Yes.

Q    What are these documents?

A    Deposit slips from Chase Bank.

Q    At the very top -- if we can zoom in, please -- what company is listed on this deposit slip?

A    M&M USA Consulting Corp.

Q    And what bank?

A    Chase.

Q    What's the amount?

A    $40,000.

MR. SKURNIK:  If we can go to the next deposit slip, please.

Q    Who's listed on this one?

A    David Motovich.

MR. SKURNIK:  And if we can scroll down to the bottom, please.

Q    What does it say in the bottom left-hand corner of this deposit slip?

A    Midwood Lumber and Millwork Inc.

---

AMBROSINI - DIRECT - MR. SKURNIK
1530

MR. SKURNIK:  If we can go now to Government Exhibit 433-7.

Q    Is this a scan of a document found in that desk?

A    Yes.

Q    All right.  So let's start we check at the very top.

MR. SKURNIK:  Can we zoom in on that, please.

Q    Is this a check from Unique Painting Services?

A    Yes.

Q    For $22,220?

A    Yes.

Q    Is it going to BP Cooling?

A    Yes.

Q    And is it from Citibank?

A    Yes.

Q    Okay.

MR. SKURNIK:  If we can now zoom in on the next check below.

Q    Is this a check from Lithos Marble Works Inc.?

A    Yes.

Q    To BP Cooling?

A    Yes.

Q    For $14,000?

A    Yes.

Q    Okay.

MR. SKURNIK:  And if we can zoom out.  And zoom in

---

AMBROSINI - DIRECT - MR. SKURNIK
1531

on the writing beneath.

Q    Just to be clear, was this writing on this document when agents found it?

A    Yes.

Q    Can you read what it says?

A    Apply to pool machine 57th Street $35,957.

MR. SKURNIK:  Ms. Kannan, if we can put this document side by side with Government Exhibit 430-7, which is in evidence.

So if we can zoom in at the bottom.  Perfect.  And then zoom in on the first check on the left.

Q    What number is on this check?

A    2,006.

Q    Okay.

MR. SKURNIK:  If we can now try to zoom in, make this a little bigger on the right.

Q    On the bottom line, does that appear to be, payment, 2006?

A    Yes.

Q    Does that say Unique Painting Services?

A    Yes.

Q    On the check, does it say Unique Painting Services?

A    Yes.

Q    Is the check for $22,220?

A    Yes.

---

AMBROSINI - DIRECT - MR. SKURNIK
1532

Q    Is the payment here for $22,220?

A    Yes.

MR. SKURNIK:  If we can get rid of the check and zoom in on the other check.

Q    Is this check number 2192?

A    Yes.

Q    On the right on document -- or Government Exhibit 430-7, does it say, payment number 2192?

A    Yes.

Q    Does it say Lithos Marble Works?

A    Yes.

Q    Is the check from Lithos Marbles Works?

A    Yes.

Q    And is the amount on the check $14,000?

A    Yes.

Q    And is the amount on the invoice $14,000?

A    Yes.

MR. SKURNIK:  If we can go back to the invoice, please.  And just zoom in on the, to box.

Q    Who is this an invoice to?

A    Penthouse 303, LLC, David Motovich, 303 East 57th Street, Number 47G, New York, New York.

MR. SKURNIK:  If we can go now to Government Exhibit 433-9.

Q    Is this a scan of a document in front of you?

**J.A. 618**

AMBROSINI - DIRECT - MR. SKURNIK 1533

A   Yes.

Q   What does it appear to be?

A   Professional Grade Aluminum Corp.  It looks like a -- some sort of financial receipt or document.

MR. SKURNIK:  Can we zoom in on the handwriting on the right.

Q   What does it say here?

A   Check for $100,000 minus 4690, equals $53,000 -- $53,080 deposit for pool.  Enclosure and back guestroom.

Q   So we'll get to this in a moment, but when you were searching Mr. Motovich's apartment, did you find an enclosure around a pool?

A   Yes.

MR. SKURNIK:  If we can go to Government Exhibit 433-10, please.

Q   Is this a scan of a document in front of you?

A   Yes.

Q   What does it appear to be?

A   A receipt or purchase order from Professional Grade Aluminum Corp.

Q   To whom?  Who's listed as the client at the top?

A   David Motovich 303 -- oh, sorry -- East 57th Street, Apartment 47G, New York, New York.

MR. SKURNIK:  And, Ms. Kannan, if we can zoom out please, and then zoom in on the picture under item

AMBROSINI - DIRECT - MR. SKURNIK 1534

illustration.

Q   Did you see anything like this at the defendant's apartment?

A   Yes.  This is what the pool was enclosed in.

MR. SKURNIK:  If we can go to Government Exhibit 433-12, please.

Q   Is this a scan of a document in front of you?

A   Yes.

Q   What does it appear to be?

A   An invoice from GS Security to David Motovich.

Q   What address is listed under David Motovich?

A   1169 Coney Island Avenue, Brooklyn, New York 11230.

Q   On the bottom right-hand corner of this invoice, what's the balance due?

A   $60,250.85.

MR. SKURNIK:  If we can go now to Government Exhibit 433-14.

Q   Is this a scan of a document in front of you?

A   Yes.

Q   What does it appear to be?

A   A proposal and contract from Absolute Plumbing Heating and Mechanical Corp. to Mr. David Motovich.

Q   Under Mr. David Motovich, what company is listed?

A   Alaudin Construction.

Q   And what e-mail address is listed?

AMBROSINI - DIRECT - MR. SKURNIK 1535

A   DaveMidwood@Gmail.com.

MR. SKURNIK:  If we can scroll to the bottom, please.  And zoom in on the handwriting at the bottom.

Q   What does this appear to be to you?

A   It appears to be a ledger of how it was paid.

Q   And how was it paid?

A   A deposit for $5,000, cash for $3,000, cash for $4,000, cash for $8,000, cash for $1,000, cash for $5,000, cash for $8,000, and cash for $5,000.

MR. SKURNIK:  We can go now to Government Exhibit 433-16.

Q   Is this a scan of a document in front of you?

A   Yes.

Q   What does it appear to be?

A   A pricing for Ultra Luxury Furniture from Emporio Designs.

Q   Who's the client listed?

MR. SKURNIK:  If we can zoom in, please, Ms. Kannan?

A   David and Lyudmila Motovich, 303 East 57thth Street, Unit 47G, New York, New York.

MR. SKURNIK:  And if we can zoom out.  And then zoom in on the handwriting at the bottom.

Q   Does it say, paid check number 1169?

A   Yes.

Q   Okay.

AMBROSINI - DIRECT - MR. SKURNIK 1536

MR. SKURNIK:  If we can go now to Government Exhibit 433-17.

Q   Is this a scan of a document in front of you?

A   Yes.

Q   What does it appear to be?

A   A ledger.

MR. SKURNIK:  If we can look at the second line of this ledger, please blow that up.  Or highlight it.  That's fine.

Q   Beside the date, what does it say?

A   CH ZKC 1473.

Q   And what amounts are listed next to that?

A   $4,000 and $49,000.

MR. SKURNIK:  If we can go now to Government Exhibit 434-1.

Q   Is this a scan of a document found in that second floor desk in the defendant's apartment?

A   Yes.

Q   What does it say at the top?

A   Ago & Alaudin General Construction Corp. 1090 Coney Island Avenue, Brooklyn, New York 11230.

Q   Underneath the date, what does it say?

A   Douglas Elliman Reality, 303 East 57th Street, Apartment 47G, New York, New York.

MR. SKURNIK:  If we can zoom out, please.

**J.A. 619**

AMBROSINI - DIRECT - MR. SKURNIK    1537

Q    And highlight under scope of work and the amount, what does it say?

A    Demolition completed on two floors.  Total cost for the above-described work $67,500.

MR. SKURNIK:  And if we can zoom out, and please zoom in on the bottom.

Q    What does that say?

A    Mr. Kemal Sarkinovic President Ago & Alaudin Construct Corp.

MR. SKURNIK:  Ms. Kannan, if we can now go to Government Exhibit 411.

Q    What's depicted here?

A    This is the entryway to the rooftop pool.

Q    So is this on the second floor of the apartment?

A    Yes.

MR. SKURNIK:  Government Exhibit 412, please.

Q    What's visible in this photograph?

A    This is the pool in the top floor of the penthouse with a grill, lounge chairs, and in the corner of the pool, I believe that's a hot tub.

MR. SKURNIK:  If we can zoom in on one of the lounge chairs, please.

Q    What's visible on the lounge chair?

A    An embroidered letter M.

MR. SKURNIK:  If we can go to Government

---

AMBROSINI - DIRECT - MR. SKURNIK    1538

Exhibit 4413, please.

Q    What's depicted here?

A    This is a view for the pool for the alternate corner where you can see a shower, a bar area, and the sauna and the pool.

Q    Special Agent Ambrosini, what happens at the conclusion of a search like this?

A    The evidence is packed up like you see here and it's transported back to 26 Federal Plaza, our FBI office in New York.

Q    So other than your testimony today and reviewing evidence in preparation for that testimony, after this search, did you have any more involvement in this investigation?

A    I did not.

MR. SKURNIK:  Your Honor, nothing further at this time.

THE COURT:  All right.  Ladies and gentlemen, it's 4:48.  We're going to adjourn for the day.  Do not talk about the case.

Special Agent, take the cash, leave the cannoli. I'm only kidding.  Just make sure the cash is secured.  And we'll have cross-examination tomorrow, so do not talk with anyone about your testimony tonight, including the lawyers.

Okay.  Ladies and gentlemen of the jury, thank you for your patience.  We're adjourning a little bit early today.

---

AMBROSINI - DIRECT - MR. SKURNIK    1539

We're not going to start the cross at 4:49.  Get home safe and stay safe.  Thank you.  We'll see you tomorrow morning.

THE COURTROOM DEPUTY:  All rise.

(Jury exits the courtroom.)

THE COURT:  The jury has left the courtroom.

Special Agent, you may step down, and the other agents may help with the securing of the exhibits if they want to come forward now.  The jury is not present.  So if they want to come forward and help with packing up the boxes, that's fine.

MR. SKURNIK:  Thank you, Your Honor.

THE COURT:  Thank you.

You may be seated, ladies and gentlemen.

Thank you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  All right.  The special agent is leaving the courtroom and leaving the stand.  The exhibits have been packed up and back in the custody of the federal officials.

(The witness exits the courtroom.)

THE COURT:  Do we have any issues we need to discuss, beginning with the Government today, in the absence of the jury and the absence of the witness?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Anything for the defense counsel?

MR. JACKSON:  No, Judge.  Thank you.

**J.A. 620**

---

PROCEEDINGS    1540

THE COURT:  All right.  Thank you.

We'll see you tomorrow morning at 9:00 o'clock.

*    *    *    *    *

(Proceedings adjourned at 4:51 p.m. to resume on July 17, 2024 at 9:30 a.m.)

1541

**I N D E X**

**WITNESS**                                                        **PAGE**

**KEMAL SARKINOVIC**

    CROSS-EXAMINATION BY MR. JACKSON            1333

**REGINALD GARCIA**

    DIRECT EXAMINATION BY MR. POLEMENI          1394

    CROSS-EXAMINATION BY MR. JACKSON            1477

**JENNA AMBROSINI**

    DIRECT EXAMINATION BY MR. SKURNIK           1480

1542

**E X H I B I T S**

Exhibit                                                           Page

Defense Exhibit DX-3515                                           1347

Defense Exhibit DX-1705                                           1356

Defense Exhibit 1702                                              1361

Defense Exhibit 1705                                              1377

Government Exhibit 155                                            1403

Government Exhibit 156                                            1405

Government Exhibit 157                                            1408

Government Exhibit 158                                            1410

Government Exhibit 308                                            1414

Government Exhibit 601                                            1427

Government's Exhibit 308.1                                        1436

1543

**E X H I B I T S**

Exhibit                                                           Page

Government's Exhibits 308.2 and 308.3                            1436

Government's Exhibit 707                                          1443

Government's Exhibit 707-A                                        1444

Government's Exhibit 707-B                                        1444

Government's Exhibit 707-C                                        1444

Government's Exhibit 707-D                                        1444

Government's Exhibit 707-E                                        1444

Government's Exhibit 707-F                                        1445

Government's Exhibit 707-G                                        1445

Government Exhibit 601-T                                          1476

Government Exhibit 439                                            1486

**J.A. 621**

1544

**E X H I B I T S**

Exhibit                                                           Page

Government Exhibit 404                                            1487

Government Exhibit 405                                            1488

Government Exhibit 406                                            1488

Government Exhibit 407                                            1488

Government Exhibit 408                                            1488

Government Exhibit 409                                            1488

Government Exhibit 410                                            1489

Government Exhibit 411                                            1489

Government Exhibit 412                                            1489

Government Exhibit 413                                            1489

Government Exhibit 426                                            1489

1545

E X H I B I T S

| Exhibit | Page |
|---|---|
| Government Exhibit 415 | 1490 |
| Government Exhibit 416 | 1490 |
| Government Exhibit 417 | 1490 |
| Government Exhibit 418 | 1490 |
| Government Exhibit 420 | 1491 |
| Government Exhibit 424 | 1491 |
| Government Exhibit 425 | 1491 |
| Government Exhibit 426 | 1491 |
| Government Exhibit 427 | 1491 |
| Government Exhibit 428 | 1492 |
| Government Exhibit 429 | 1492 |

1546

E X H I B I T S

| Exhibit | Page |
|---|---|
| Government Exhibit 430-2 | 1492 |
| Government Exhibit 430-4 | 1492 |
| Government Exhibit 430-6 | 1492 |
| Government Exhibit 430-7 | 1493 |
| Government Exhibit 430-8 | 1493 |
| Government Exhibit 432-1 | 1493 |
| Government Exhibit 432-2 | 1493 |
| Government Exhibit 432-3 | 1493 |
| Government Exhibit 433-3 | 1494 |
| Government Exhibit 433-4 | 1494 |
| Government Exhibit 433-5 | 1494 |

1547

E X H I B I T S

| Exhibit | Page |
|---|---|
| Government Exhibit 433-6 | 1494 |
| Government Exhibit 433-7 | 1494 |
| Government Exhibit 433-9 | 1495 |
| Government Exhibit 433-10 | 1495 |
| Government Exhibit 433-12 | 1495 |
| Government Exhibit 433-14 | 1495 |
| Government Exhibit 433-16 | 1496 |
| Government Exhibit 433-17 | 1496 |
| Government Exhibit 3005 | 1496 |
| Government Exhibit 3006 | 1496 |
| Government Exhibit 3007 | 1497 |

1548

E X H I B I T S

| Exhibit | Page |
|---|---|
| Government Exhibit 3008 | 1497 |
| Government Exhibit 3009 | 1497 |
| Government Exhibit 3010 | 1497 |
| Government Exhibit 3011 | 1497 |
| Government Exhibit 3012 | 1498 |
| Government Exhibit 3016 | 1498 |
| Government Exhibit 3017 | 1498 |
| Government Exhibit 3022 | 1498 |
| Government Exhibit 430-P | 1498 |
| Government Exhibit 431-P | 1499 |
| Government Exhibit 432-P | 1499 |

J.A. 622

1549

**E X H I B I T S**

Exhibit                                                      Page

Government Exhibit 433-P                               1499

Government Exhibit 434-P                               1499

Government Exhibit 435-P                               1499

Government Exhibit 428-P                               1500

---

1550

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 21-CR-00497(WFK)
                               :
                               :
     -against-                 : United States Courthouse
                               : Brooklyn, New York
                               :
                               : Wednesday, July 17, 2024
DAVID MOTOVICH,                : 9:30 a.m.
                               :
     Defendant.                :
                               :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BREON PEACE, ESQ.
              United States Attorney
              Eastern District of New York
              271 Cadman Plaza East
              Brooklyn, New York 11201
          BY:  ROBERT POLEMENI, ESQ.
              ERIK D. PAULSEN, ESQ.
              ANDREW GRUBIN, ESQ.
              MATTHEW C. SKURNIK, ESQ.
              Assistant United States Attorneys

For the Defendant:    WACHTELL, LIPTON, ROSEN & KATZ
              51 West 52nd Street
              New York, New York 10019-6150
          BY:  RANDALL WADE JACKSON, ESQ.
              JESSICA LAYDEN, ESQ.

                 -and-

          MEISTER SEELIG & FEIN, LLP
              125 Park Avenue
              8th Floor
              New York, New York 10017
          BY:  HENRY E. MAZUREK, ESQ.

---

*Proceedings*                                                1551

(In open court - jury not present.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please call the case.

THE COURTROOM DEPUTY:  Criminal cause on trial 21-CR-497, United States of America versus David Motovich.

Will the attorneys please state their name for the record, beginning with the Government.

MR. POLEMENI:  Good morning, Your Honor.

Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, paralegal Kavya Kannan, and Special Agent Christopher Cabane with the United States.

And, Your Honor, we have a paralegal that's been working on the case in our office, and with Your Honor's permission, I'd ask if she can sit at counsel's table for today, just to get the experience.

THE COURT:  Be honored.

MR. POLEMENI:  Thank you, Judge.

THE COURT:  Thank you.

MR. POLEMENI:  It's Nadya Osman.

THE COURT:  Thank you.  Welcome.  Please be seated, everyone.

Thank you.

THE COURT:  And we'll hear from defense counsel.

MR. JACKSON:  Good morning, Your Honor.

Randall Jackson, Henry Mazurek, Jessica Layden on

**J.A. 623**

---

*Proceedings*                                                1552

behalf of our client David Motovich.  And also we're joined by Mr. Andy Cepregi.

THE COURT:  Good morning.  Thank you all, and thank you for your patience.

Do we have any issues we need to address before we bring in the jury and have the witness come back for cross-examination and redirect?

Anything from the Government?

MR. POLEMENI:  Judge, I don't know if we need to get to it now, but I would like an opportunity to respond to the motion that was filed earlier today.

THE COURT:  You're referring to the motion in limine dealing with the unpronounceable FinCEN document?

MR. POLEMENI:  Yes.

THE COURT:  Well, you can address it now if you wish, or you can address it with a written submission, or you can wait until such time, if ever, the document is offered. There are many options.

And, like I said, I have no life, so I, obviously, read the motion when it came in.  And I was expecting there to be a reply in the next 30, 40, or 50 or 60 seconds, but then I thought, well, maybe you'll wait until you're in court or you'll reply orally or maybe you'll ask permission to put in a written submission or maybe you'll suggest the Court wait until such time as the Government decides if and when it wants

Proceedings                    1553

to offer the document.

So, rather than create reversible error by jumping the gun, I figured I'd wait until you guys finished your presentation and then create some sort of reviewable ruling.

Now, how would you like to proceed, counsel?

And then I'll ask defense counsel how you would like to proceed in response to what they tell me.

MR. POLEMENI:  Well, Judge, I would love to submit a reply in writing, but the witness is scheduled to go on this afternoon.  So I can either do it now or right before the witness.  It's up to you.

THE COURT:  No, it's up to you.

MR. POLEMENI:  So I'll do it now then, Judge.

The exhibit that we intend to introduce, which is Government's Exhibit 236, is the FinCEN Form 107, which is the registration form that all businesses need to file with FinCEN.

THE COURT:  All right.  This is the document that was attached to Mr. Jackson's letter, case 1:21-CR-00497, Document 308-1, filed 7/17/24, pages 1 of 5 pages, and it's Government Exhibit, both exhibit in evidence, come in evidence 236.  Is that the one?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  Okay.  I just wanted to make sure.  Like I said, I have no life.

Proceedings                    1554

Go ahead.

MR. POLEMENI:  And so, we have charged Mr. Motovich in Count One with operating an unlicensed money transmitting business, which requires us to prove, the Government to prove, that Mr. Motovich failed to register that business with FinCEN, which is this form.  He failed to submit this form, provide the information that FinCEN needs to identify those individuals who are running unlicensed money transmitting businesses.

THE COURT:  Right.

MR. POLEMENI:  And it's not just Count One, which is the 1960 charge that we are all very familiar with at this point, it is also relevant for Count Two.  In Count Two, Mr. Motovich is charged with failing to file CTRs.

THE COURT:  Correct.

MR. POLEMENI:  And you can only file a CTR if you are, in fact, registered with FinCEN, which, again, requires you to submit this form.

So, the Government submits that this is a highly relevant form for the Government to prove its case --

THE COURT:  Right.

MR. POLEMENI:  -- and intends to introduce that through the FinCEN witness later today, and go through with him the requirements on the form.

THE COURT:  Okay.  Let me hear from the other side.

Proceedings                    1555

MR. JACKSON:  Thank you, Your Honor.

THE COURT:  And, again, as you may have gathered, I have read your letter, but feel free to read it again.

MR. JACKSON:  Thank you, Judge.

I won't belabor the issue, I'll just note I think that everything that AUSA Polemeni was just describing they can to elicit from the witness.  It's not a -- there's not really a dispute in this case that we didn't register with FinCEN.  That's not our defense.

And so, all that this form does, which was never -- there is no evidence that our client was ever presumed with this form.  It doesn't go to his state of mind.  All it does is just provide a bunch of information that I do think is going to be very confusing to the jury, and I do think it's going to step on the Court's instructions.

THE COURT:  Well, here is my question in response to your argument, Mr. Jackson.

And that is, what is conceivably more confusing to a jury, to have an oral discussion, which you seem to invite, of filing issues without the document where, presumably, you can get into a fight about whether or not we are having a premature discussion of what the law is because we haven't had the much anticipated charging conference yet; or is it less confusing to say this is the form, and then to have the back and forth discussion and the fight about what the law is as we

Proceedings                    1556

go through the charging conference on what I should instruct the jury with respect to requirements to file or not file.

Because what you have invited, it seems to me, is greater confusion as to what the witness is talking about by not actually having the form in front of them.

And you're probably going to have a more focused discussion about what it is the Government's position is and then you can ask questions, such as, is there any evidence that my client ever saw this document or knew what it was supposed to say or... there are a lot of things you can say on cross, and you and your colleagues will say them because you are very experienced counsel.

But I don't know that it is less confusing for the finder-of-fact to have this document in evidence, assuming that it comes into evidence, as what is, according to the Government, required to be filed.  And then you can point out all of the problems with it, such as, did Mr. Motovich, who is a businessman, ever see this document.  And then we have the issues to be fleshed out, which I reserved on obviously at the charging conference, as to whether or not there was a requirement to file.

I don't understand, and I don't really think if you think it through you really are saying it's less confusing to have the discussion without the document than with the document.  I am just an old trial lawyer, but to me — a

**J.A. 624**

*Proceedings* 1557

recovering trial lawyer, obviously — but to me it seems you probably get through it faster, neater and with a clearer record for both sides if the Government official says this is the document and this is what it provides. And then I can give the instruction as to whether or not it applies in this case as a matter of law, rather than redacting it or kind of hiding it behind the curtain.

You get a rhinoceros situation: What is this mysterious thing?

You know the old joke, you know what a camel is? A camel is a horse drafted by a committee of lawyers. Okay. I mean it's a horse. You know, let's just let them see the horse and then we can talk about whether it's Secretariat or some broken down nag.

So, that's my inclination at that point.

Obviously, they have to lay a foundation for getting it in and then you can cross-examine with respect to it, but I just don't see it as being clearer for the jury to know what the heck you're talking about if you don't have the form. And it's not like it's an 80,000 page form. You can talk about whether your client saw it. There's a lot of things you can do. I'm not going to tell you how to try your case, you're doing a fine job of that, but I just don't see it as a clarity point.

MR. JACKSON: Can I just two points?

*Proceedings* 1558

THE COURT: You can, of course, that's why we're having this discussion.

MR. JACKSON: No, Judge, because I think that you're right, Judge, that in any situation like this if we have testimony that we can back up with the actual document that will be relevant that, I completely agree with the Court, better not to have the rhinoceros problem.

In this situation, one, I don't think it is even clear under the regulations that are at issue, which it's a complex matter what is actually required under the regulations. The Government didn't submit in this case, though they have in a number of other cases, proposed instructions on the regulations if they want to get into that.

THE COURT: I think my brother Komitee just had a case involving some of these issues.

MR. JACKSON: I think you're right, Judge.

THE COURT: And my brother Garaufis has a case involving something called Boustani and Chang, which Law 360 says was over in Manhattan. So I said to my colleague Garaufis: I'm surprised, Judge, that you have recently moved from the Eastern District of New York. He privately responded that yes, he's now in the mother court.

MR. JACKSON: If it was in Law 360, Judge, it must be right.

THE COURT: If it was in Law 360, you've got to

*Proceedings* 1559

believe it. So I happen to believe that Law 360 may have on that one occasion misplaced Brooklyn with Manhattan. But not that we have any issues about that.

MR. JACKSON: Not that we have any issue.

THE COURT: But go ahead.

MR. JACKSON: Judge, I had a trial only a couple of years ago on a related registration, not related, an analogous registration issue before Judge Cogan where my client was charged with failure to register. He was charged with acting as an unregistered foreign agent.

THE COURT: Right.

MR. JACKSON: And in that case, like in this case, there is a procedure by which a person registers as a foreign agent. Nevertheless, they called a person who deals with whether there's a registration. They asked them: Was there any registration? The person said: No.

We didn't get into what would be in those forms because there was, frankly, much less potential for confusion, but I think the same potential because I don't think that the form is even required under the -- under the regulations, but that would be the subject of -- we could litigate that issue.

Here, this form presupposes a number of things that we dispute, Judge. I mean it has categories like check cashing and, you know, seller of money orders, currency dealer. All of these are things that the Government is

*Proceedings* 1560

entitled to argue are categories of people that -- that are required to register, but I think that argument should be framed not by a form that some, you know, bureaucrat at FinCEN slapped together based on a cursory understanding of the -- of the regulations, but I think it should be on the bases of Your Honor's instructions, which I think are going to be fulsome and will contextualize for the jury what it is.

I think if we use this form, the first question that the jurors are going to ask is: Should we be listening to you focused on the judge's instructions, or should we be focused on the definition of check casher, the definition of money --

THE COURT: Well, that's easily answered. They should be focusing on the judge's instruction, and they will be told that repeatedly. So that is not going to be a problem. And it's not as if this is the only document that the jury is going to have before them, the only testimony that relates to questions of responsibility.

So I am inclined to, as I indicated, to let it in, but then to let you have at it in terms of what it means, in terms of the interaction of your client, or the people that work for your client, had with the accounting department or the filing department.

So, I am going to let it in. If you folks wanted to work out, and it doesn't sound like you do, some sort of language with respect to a limited instruction with respect to

J.A. 625

Proceedings   1561

this particular document if you're going to offer it after lunch, that would be something you could talk about if you wanted to talk about it.

But if it is just going to be in or out, I'm inclined to let it in, but then I am also inclined to let you be as thorough as you wish with respect to... although it's always dangerous to walk out on ledges with certain agents, I am not suggesting you want to do that, but you can take your shot at it.

MR. JACKSON:  We appreciate that, Judge.

THE COURT:  All right.  So I am going to let it in. I am going to deny the motion in limine, but I'll give you a lot of latitude to talk about the document and to cross-examine the witness.

Yes, go ahead.

MR. JACKSON:  Judge, just one -- we appreciate the Court's ruling, Judge.

Just one additional question.

THE COURT:  Yes.

MR. JACKSON:  What the Government has attached to GX-236 is actually not just the form.  Understanding that the Court has ruled the form in, I think the form is pages 1 and 2.

THE COURT:  Well, they've got the general instruction information, though, on pages 3, 4 and 5.

Proceedings   1562

Is that correct?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Is that what you're objecting to?

MR. JACKSON:  You can see that it's -- that it's a new document because it says 1 and 2, and then it starts over at 1 for the instructions.

So, we would request that the Court admit just the form, if that's the issue for this witness.

THE COURT:  Without the instruction?

MR. JACKSON:  Without the instruction.

THE COURT:  What's the Government's response to that request, that the form go in without the general information instructions as to who must register contained on pages 3 through 5?

MR. POLEMENI:  Judge, I mean the -- these instructions go along with the form.  So they give guidance to individuals like a -- who are operating a business as to whether or not they should be registering with FinCEN.  And so, to the extent the argument is, well, my client never saw this form, that might be the case, but, you know, you can go on a website and pick -- and download this form with the instructions if you were so inclined.  And so, I think that it's important to have, you know, the full form in.

And I don't plan, Judge, so the record is clear, I don't plan to go through distinctions between check cashers

Proceedings   1563

and money transmitters and currency exchangers.  It's the point is that check cashers, people who are in the business of cashing checks, need to register with FinCEN.  And this form makes that very clear.

And so, to the extent there's a concern that there is going to be some muddying of terminology between check cashers and money transmitters, that is not my contention.  I don't believe that is going to be what the witness is going to testify about.  It is going to be focused on check cashers.

THE COURT:  Here is what I'm going to do:  I am going to let the document in, including the instructions.  I am going to give defense counsel very wide latitude, if he wishes to exercise it.  He may or may not.  Be careful what you wish for.

And this will be the preliminary battle.  We will, obviously, have the war when we get to the charge conference on the issue.  Okay.

MR. JACKSON:  Thank you, Judge.

THE COURT:  That's my ruling and that's the basis of the ruling.

MR. POLEMENI:  Thank you, Judge.

THE COURT:  Okay.

Is there anything else we need to address before we bring in the jury and have the witness return for cross-examination?

Proceedings   1564

From the Government.

MR. POLEMENI:  No, Your Honor.  Thank you.

THE COURT:  Anything from defense counsel?

MR. JACKSON:  One minor issue.

THE COURT:  Yes.

MR. JACKSON:  Yesterday the witness, and I don't think the Government was attempting --

THE COURT:  Which witness?

MR. JACKSON:  I'm sorry.  Reginald Garcia.

THE COURT:  Yes.

MR. JACKSON:  I don't believe the Government was in any way trying to elicit false testimony, but the witness, I think through something in his own mind, just made a false statement.

We conferred with the Government.  They agreed with us and --

THE COURT:  What was the statement?

MR. JACKSON:  He stated that Mr. Motovich was the stepfather of Menacham Markovics.  And Mr. Motovich is not. He has no relationship.  He's not a relative of Menacham Markovics at all.

So we agreed, we conferred with the Government and they very appropriately agreed pursuant to Napue v. Illinois the Government had an obligation to correct the record.

(Court reporter seeks clarification.)

J.A. 626

Proceedings 1565

MR. JACKSON: They agreed pursuant the Supreme Court's decision in Napue, they have an obligation to correct the record on a false statement.

And so, we have reached a stipulation that I would, at some convenient point before I do a cross, just like to read, so the jurors don't have lingering in their mind the --

THE COURT: What is the stipulation?

Why don't you read it now so the Court can hear it in advance?

MR. JACKSON: Yes, Your Honor. Would it be helpful if I passed a copy to Mr. Scott?

THE COURT: Yes.

MR. JACKSON: Thank you.

THE COURT: And this is coming in as a Defense exhibit, is that correct?

MR. JACKSON: Yes.

THE COURT: Rather than a Government exhibit?

MR. JACKSON: Yes, Your Honor.

THE COURT: All right. Why don't you read it out loud.

MR. JACKSON: Yes, Your Honor.

It says: It is hereby stipulated and agreed, by and between the United States of America --

THE COURT: A little slower for the court reporter.

MR. JACKSON: -- by and between the United States of

Proceedings 1566

America, by its undersigned counsel, and the defendant David Motovich, by his undersigned counsel, that, one, David Motovich is not the stepfather or other relative of Menacham Markovics.

And two, this stipulation is admissible into evidence as Defense Exhibit 9005.

So stipulated.

And it's signed by both parties.

And we'd just like to find a convenient point before one of our examinations to, or after one of our examinations to present this to the jury, Judge.

THE COURT: Any objection?

MR. POLEMENI: Only with the premise that there is some obligation under Napue, which deals with perjurious testimony, which we did not elicit, but no, no objection to the stipulation coming in.

THE COURT: Does it make more sense to have the stipulation come in, even though it's marked as a Defense exhibit, now since the gentleman testified the other day, as opposed to two or three days from now?

MR. JACKSON: Yes, Judge.

MR. POLEMENI: Sure.

THE COURT: Okay.

So why don't we start off with you folks reading the stipulation. The Government can read it in as a Defense

Proceedings 1567

exhibit on the point, and then we will have the witness come back and we'll have cross-examination.

Does that make sense?

MR. POLEMENI: Yes, Your Honor.

THE COURT: I'm sorry, go ahead.

MR. JACKSON: Because it's a Defense exhibit, may we read it in?

It's typically read in by us.

THE COURT: Do you want to read it in?

MR. JACKSON: Yes, Judge.

THE COURT: Do you have an objection to the defense reading it in now and then beginning the examination of --

MR. POLEMENI: No.

THE COURT: -- the witness?

MR. POLEMENI: No, Your Honor.

THE COURT: Okay. Why don't we do it this way: We'll bring in the jury. We'll bring in the witness. And defense counsel, before they begin their cross-examination of the witness, will read into the record this stipulation, Defense Exhibit 9005. And that will seem seamless to the jury because we are now having distinguished defense counsel begin their cross-examination of the witness.

MR. POLEMENI: Sounds good to us, Judge.

THE COURT: Does that sound acceptable to defense counsel?

J.A. 627

Proceedings 1568

MR. JACKSON: Yes, Your Honor. Thank you.

THE COURT: Is there anything else we need to address from the Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Anything else we need to address from defense counsel?

MR. JACKSON: Nothing, Judge.

THE COURT: Okay. Let's get the jury in. Let's get the witness back on the witness stand.

And do you have a copy, counsel, with you of the stipulation you are about to read out loud?

MR. MAZUREK: I do not, Your Honor.

THE COURT: Okay. Why don't you get it from your colleague.

Please come back Special Agent. We are going to bring in the jury in a moment.

(Witness entered and resumed the stand.)

THE COURT: I will offer you, as I offer both sides, another cough drop. Again, no government expense.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're very welcome.

(Pause.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Good morning, ladies and gentlemen of

*Proceedings* 1569

the jury. Welcome back. Please be seated.

We've made some progress while you were in the jury room waiting. And to prove it, we are now going to begin with a stipulation on a certain issue between the parties. And then we are going to have the continued cross-examination of the witness.

Counsel.

MR. MAZUREK: Thank you, Judge.

May I read into the record what has been premarked for identification as Defendant's Exhibit 9005?

THE COURT: You may, counsel.

MR. MAZUREK: Stipulation: It is hereby stipulated and agreed by and between the United States of America, by its undersigned counsel, and the defendant David Motovich, by his undersigned counsel, that, one, David Motovich is not the stepfather or other relative of Menacham Markovics.

And, two, this stipulation is admissible into evidence as Defendant's Exhibit 9005.

So stipulated.

Dated today and signed by counsel for both parties.

Your Honor, with that, I move for the admission of Defense Exhibit 9005.

THE COURT: Any objection?

MR. POLEMENI: No, Your Honor.

THE COURT: It's admitted.

*Proceedings* 1570

(Defense Exhibit 9005 was received in evidence.)

THE COURT: Thank you.

We just saved you half a day of calling the witness back and clearing that up. Okay. Trust me on this.

Let's go. Cross-examination.

Special Agent, you're still under oath.

Let me ask you, have you spoken with anyone about your testimony since leaving the witness stand yesterday?

THE WITNESS: No, Your Honor.

THE COURT: Okay. Thank you.

Please continue and begin your cross.

And, again, it's not a snake. You can move it towards you, that microphone. Speak right into it.

Go ahead, counsel.

MR. MAZUREK: Thank you, Your Honor.

THE COURT: Thank you.

(Continued on the following page.)

*Ambrosini - cross - Mazurek* 1571

JENNA AMBROSINI,
     called as a witness by the Government, having been
     previously duly sworn/affirmed by the Courtroom Deputy,
     was examined and testified further as follows:
CROSS-EXAMINATION
BY MR. MAZUREK:
Q    Agent, my name is Henry Mazurek. I have the privilege of representing David Motovich.

And we have not met before, correct?
A    Correct.
Q    But you have met my client Mr. Motovich, correct?
A    Correct.
Q    And you met him on the morning of August 24th, 2021, correct?
A    I would say I saw him, I didn't meet him.
Q    And that was during the execution of the search that you testified about yesterday, right?
A    Yes, sir.
Q    Of his apartment at 47G, at 303 East 57th Street in Manhattan?
A    Yes, sir.
Q    And when you said you didn't meet him, you saw him there because you arrived with another -- with a bunch of other agents, right?
A    Yes.

*Ambrosini - cross - Mazurek* 1572

Q    And that morning is now, and as we sit here in 2024 is approximately three years ago, correct?
A    Yes, sir.
Q    When you arrived at the apartment on August 24th, 2021, you arrived in the wee morning hours, correct?
A    Yes.
Q    Approximately at 6:00 a.m., right?
A    Yes.
Q    And prior to your arrival at the location, you had met with other agents, the search team, that were going to be conducting the search, correct?
A    Yes, sir.
Q    And you would do that as part of your standard operating procedure, right?
A    Yes.
Q    And those meetings would occur some days prior to the search, itself?
A    Sometimes, yes.
Q    Do you remember specifically when it happened on this occasion?
A    I believe the day before.
Q    Okay. The day before.

And if my review of the calendar is correct, the search took place on a Tuesday morning, so your meeting would be a Monday, the Monday before?

J.A. 628

Ambrosini - cross - Mazurek 1573

A    To the best of my recollection.

Q    Okay.

     And approximately how many agents were involved in the search of the apartment at Apartment 47G?

A    Approximately 10 to 15.

Q    Okay. And you were just one of those 10 to 15 agents, correct?

A    Yes, sir.

Q    Were you the lead agent of the search?

A    No, sir.

Q    Do you know who that was?

A    I believe it was one of the case agents from the squad.

Q    Do you see that person in court today?

A    No, sir.

Q    Okay.

     So, it wasn't Agent Cabane who is sitting at government counsel table?

A    No, sir.

Q    Was it Agent George Dietz?

A    No, sir, I don't remember.

Q    Okay.

     And when you're talking about a case agent, a case agents is a person who has knowledge and is participating in the overall investigation of the criminal investigation, correct?

Ambrosini - cross - Mazurek 1574

A    Yes, sir.

Q    That would be a person who would be intimately familiar with the evidence that's been accumulated and the issues relating to the case, itself, right?

A    They tend to have the most case knowledge, case-specific knowledge, yes.

Q    And prior to your meeting on the day before of the search, you had no knowledge of the case, correct?

A    That is correct.

Q    And after you conducted the search on Tuesday morning, August 24th, 2021, you did nothing further in the case either?

A    Correct.

Q    So you came and testified here yesterday only about what you did on one morning on August 24th, 2021, right?

A    Yes.

Q    You had no knowledge of the case before, right?

A    Correct.

Q    And you had no knowledge of the case after, correct?

A    Yes.

Q    Now, let me ask you about what happened when you arrived at the scene.

     This was an apartment building in Manhattan you arrived at, right?

A    Yes.

Q    And prior to your arriving at the scene, had you ever

Ambrosini - cross - Mazurek 1575

been in this building before?

A    No.

Q    And you had to go up to the 47th floor by elevator, obviously, right?

A    Yes.

Q    And all 15 or so agents arrived at the same time?

A    I don't recall specifically.

Q    And in terms of -- first of all, let me ask you this:

     When you arrived at the scene in order to conduct a search, you didn't alert the residents or the people in the residence prior to your arrival, right?

A    No.

Q    This was a surprise visit, right?

A    Correct.

Q    That's one of the reasons it's done so early in the morning is that you hope to find the people in the apartment when you get there, right?

A    Yes.

Q    And in this instance, you also conducted an arrest of Mr. Motovich on this case, right?

A    Yes, the team did.

Q    Were you one of the arresting agents?

A    No, sir.

Q    So when you got there and -- one of the agents knocked on the door, is that right?

**J.A. 629**

Ambrosini - cross - Mazurek 1576

A    I don't recall specifically what happened that morning at the door.

Q    Do you know how you gained entrance into the apartment?

A    Yes. I believe we knocked.

Q    Okay. And you didn't have to break the door down, is that right?

A    No.

Q    Someone answered the door? Was it David Motovich?

A    I don't recall.

Q    But you gained entry into the apartment?

A    Yes.

Q    Without force?

A    Yes.

Q    All right. And when you got into the apartment, you soon learned that there were a number of people in the apartment that early morning, right?

A    Yes.

Q    You learned that David Motovich was there, right?

A    Yes.

Q    His wife, Lyudmila, correct?

A    Yes.

Q    And four minor children, right?

A    I don't recall the specific number of children in the house.

Q    But there were children in the house, right?

Ambrosini - cross - Mazurek   1577

A    I believe so.

Q    And they were minor children, right?

A    Yes.

Q    And one of the first things you do as agents arriving on a scene in order to conduct a search is you try to identify all of the people in the residence, right?

A    Yes.

Q    And that is because for your own safety and also for the safety of the people in the apartment, right?

A    Yes.

Q    And particularly, since you -- and you've been an agent for how long?  I'm sorry.

A    Approximately five years.

Q    And you've conducted a number of arrests and search in that time?

A    Yes, sir.

Q    And so, you know, Agent, that this can be a fairly traumatic moment in the people's lives that you interrupt at 6:00 in the morning, is that fair to say?

A    It can be, yes.

Q    And because of that, it can be startling and it could create emotions in response, right?

        MR. SKURNIK:  Objection.

        THE COURT:  Overruled.  If you know.

A    It could.

Ambrosini - cross - Mazurek   1578

Q    And so when you get there, you and the other agents try, for purposes of keeping calm in the space, to identify the individuals and confront them, right?

A    We try to locate all the individuals in the residence for everyone's safety.

Q    And when you do that, do the agents fan out into the apartment looking for people?

A    I don't know if I understand the question.  Could you reask that?

        THE COURT:  Restate the question, please.

        MR. MAZUREK:  Yes.

Q    So when the agents arrive, do you all spread out into the apartment looking for any of the people that may be inside?

A    We are trained to clear the residence for our safety and for safety of the residents.

Q    Okay.

        When you say "clear the residence," meaning you want to identify the people and then remove them, correct?

A    I would say locate them and just find them so no individuals are hiding for our safety in the house.

Q    Okay.  And when you and your team of, you know, approximately 10 to 15 agents arrive, are you armed?

A    Yes, sir.

Q    What are you armed with?

A    A Glock.

Ambrosini - cross - Mazurek   1579

Q    What is a Glock?

A    It is a handgun.

Q    And each of the agents has one?

A    Yes, sir.

Q    Do you display the guns during the time of your entrance into the apartment?

        MR. SKURNIK:  Objection.

        THE COURT:  Overruled.

        Did you display your Glock when you walked in?

        THE WITNESS:  I don't recall if I specifically did. Some -- some members, yes.  It depends on the situation.

        THE COURT:  How about this situation, did you guys and gals display your Glocks when you walked in or did you just knock?  Do you know?

        THE WITNESS:  I don't recall.

        THE COURT:  Okay.  Did you display your Glock?

        THE WITNESS:  Possibly, yes.

        THE COURT:  Possibly yes, possibly no?

        THE WITNESS:  Yes.

        THE COURT:  You don't remember whether you pulled your gun out?

        THE WITNESS:  I don't really recall the moment, no.

        THE COURT:  Okay.  I always remember when I pull my Glock out, but that's neither here nor there.

        Go ahead.

Ambrosini - cross - Mazurek   1580

        MR. MAZUREK:  Yes.

BY MR. MAZUREK:

Q    So it is possible that you or other agents displayed your Glocks in the apartment when you arrived that morning?

A    It's possible, yes.

Q    And you knew, Agent, when you got there that morning that this -- because you've reviewed -- you reviewed the search warrant before you got there, right?

A    Yes.

Q    And you understood that the nature of the alleged offenses or the evidence that you were seeking to collect were based on what we call economic or business crimes, correct?

        MR. SKURNIK:  Objection.

        THE COURT:  Overruled.

A    Can you rephrase that question?

        THE COURT:  Read the question back, please.

        MR. MAZUREK:  Madam Reporter or --

        THE COURT:  Madam Reporter.

        MR. MAZUREK:  Got you.

        THE COURT:  Not you.

        (Question read back as requested.)

A    Yes, I would say financial crimes.

Q    And so, non-violent crimes, right?

A    Yes.

Q    And when you and the other agents spread out in the

J.A. 630

Ambrosini - cross - Mazurek                    1581

apartment, it's -- and you were on the first floor, is that right?

A    I -- I spent a lot of my time on the first floor, yes, sir.

Q    Okay.  And so the first floor, that's the area where there was the master bedroom, right?

A    Yes.

Q    And then also there was another bedroom where one of the children was found, correct?

A    I don't recall.

Q    Do you remember the four boys that were in the apartment at all?

A    I believe I recall two.

Q    Okay.

A    Two boys.

Q    And they're both minor children, right?

A    Yes.

Q    And do you remember whether officers displayed their Glocks in front of the children?

A    I do not recall.

Q    And because -- and when you got there at 6:00 a.m., everyone was asleep, is that your -- is that your memory?

A    I don't recall.

Q    Well, do you remember that they were all in pajamas or in -- not in day wear?

Ambrosini - cross - Mazurek                    1582

A    I don't recall that either.

Q    Do you recall whether the children and Lyudmila Motovich was given the chance to dress?

A    Yes.

Q    Okay.  So they had to change their clothes, right?

A    Yes.

Q    And an agent oversees that, I mean in terms of it has to be right in front of them when that happens?

A    Typically, yes.  Once we have made entry into a residence, an agent is -- usually stays with the individuals inside the house.

Q    So the individuals have to change in front of the agents, right?

A    Typically in the same room.

Q    In the same room, okay.

     And so when were you there that morning, do you remember that Lyudmila and her four children were then placed or taken out of their rooms where they were sleeping, right?

A    Yes.

Q    And, again, under the -- always the vision, this line of sight by an agent, right?

A    Yes.

Q    And they were then -- do you know where they were told to move to within the apartment?

A    It's my recollection, I believe we put her and the

Ambrosini - cross - Mazurek                    1583

children in a bedroom together.  So, they were all together.

Q    Was that the master bedroom?

A    I do not believe so, but I don't recall.

Q    You don't know which bedroom.  But it was a bedroom on the first floor where you were?

A    Yes.

Q    Okay.

     And did you have any interaction with Lyudmila Motovich and the four boys?

A    I believe with Lyudmila.  I don't believe with the boys.

Q    Okay.  And that interaction was what?

A    Typically, because I was a female agent, we keep a female with a female and we --

     THE COURT:  I am going to ask you --

     THE WITNESS:  Sorry.

     THE COURT:  -- to just channel your inner Lord Vader speech pattern, and not your inner Annie Hall or Wanda Sykes.  Slow it down.

     THE WITNESS:  Sorry, Your Honor.

     THE COURT:  Go ahead.

A    Typically, a woman stays with a woman in the house so she's able to get dressed in the presence of a female agent.

     So I don't recall exactly how that went, but I believe a female agent and myself were in the same vicinity of her.

Ambrosini - cross - Mazurek                    1584

Q    Okay.  And you observed her change into her clothing, her everyday clothing in order to be able to leave the apartment at some point?

A    I wouldn't say I observed, I was just in the vicinity that she was also in.

Q    In the same room?

A    Possibly.

Q    Okay.  You don't remember specifically at this point in time, three years later?

A    No, sir.

Q    And eventually were Lyudmila Motovich and the four boys allowed to leave the apartment?

A    Yes.

Q    And this was before you started conducting the search?

A    Yes.

Q    And before -- so you were responsible, or one of the agents responsible, for observing Lyudmila Motovich during the course of your initial entry into the apartment, right?

A    Yes, for everyone's safety.

Q    And before she was allowed to leave, did you search her person?

A    I don't recall if I specifically searched her person.

Q    Or another agent might have searched her?

A    Yes.

Q    Do you remember observing that agent or yourself going

**J.A. 631**

*Ambrosini - cross - Mazurek*  1585

through her purse and taking items out of her purse or wallet?

THE COURT: Which purse?

MR. MAZUREK: Lyudmila Motovich's.

THE COURT: No. I mean we saw a lot of them yesterday.

BY MR. MAZUREK:

Q   The one -- was there a purse that she was going to leave with, so that she could have car keys, ID, and that kind of thing?

A   Yes.

Q   Okay. And were you the agent who searched that before she was allowed to take it from the premises?

A   I don't recall if it was specifically me or someone else.

Q   But someone did?

A   I'm sure.

Q   And all money and cards were taken from her wallet and the purse that she was wanting to leave with?

A   I don't recall.

Q   But whatever the search warrant had indicated, that's what you would be looking for to seize, correct?

A   Correct.

Q   And, for example, cash was one of those items, right?

A   Yes.

Q   And so the agents were instructed to take all cash that was found anywhere in the apartment?

*Ambrosini - cross - Mazurek*  1586

A   I don't recall specifically what we were instructed. Just cash.

Q   Okay. But that's what you were trying to do, right, is if you found cash, you took it? We saw a whole bunch of cash seizure plastic bags yesterday, right?

A   Yes. We took cash.

Q   Do you know how long Lyudmila Motovich and her four boys were in the apartment that morning under the supervision of the agents?

A   I do not recall.

Q   But your testimony is that you conducted the search only after Lyudmila Motovich and the four boys were allowed to leave?

A   To the best of my recollection, yes.

Q   Okay.

And David Motovich was also in the apartment, right?

A   I don't remember if he was there at that time.

Q   You don't remember whether your agents conducted an arrest that morning?

A   I think I just don't understand your question.

When she was there, when I was talking to her I do not believe --

THE COURT: Lord Vader. Slow it down.

THE WITNESS: Sorry.

THE COURT: Slow it down.

*Ambrosini - cross - Mazurek*  1587

Continue your answer, please.

A   When I -- what we were just speaking about when I was talking to his wife, I do not believe he was in the residence at that time.

Q   He was already removed?

A   Yes.

Q   Based on your observations on the scene that morning, did David Motovich -- did he seem to be cooperative with the agents?

A   To the best of my recollection, yes.

Q   In fact, I think, and we'll get to this in a little bit, but one of the places that you said you or your fellow agents searched was a safe in the master bedroom.

Do you remember that?

A   Yes.

Q   That safe was locked when you arrived at the apartment, correct?

A   I don't recall.

Q   Do you recall having to get from another agent or speaking to Mr. Motovich directly to get the combination of the safe?

A   I don't recall being the agent that did that.

Q   Now, did you search the contents of the safe?

A   I did.

Q   Did you observe the agent, another agent open the safe?

*Ambrosini - cross - Mazurek*  1588

A   I don't recall.

Q   But what you can recall is that there was no need to break open the safe using any kinds of your special agent kinds of equipment, right?

A   I don't recall who got into the safe.

Q   Okay.

Now, let me ask you this: I mean yesterday you testified about the items generally that you either seized yourself or other agents on the search team seized, right?

A   Correct.

Q   And, basically, what we saw yesterday is you seized a bunch of handbags, jewelry, documents, and money; is that fair?

A   Yes.

Q   Now, I'm going to ask you some questions about some of those items that you testified about yesterday. Okay?

A   Okay.

THE COURT: You can't say uh-hum, you have to say yes or no.

THE WITNESS: Okay. Yes.

MR. MAZUREK: Thank you, Judge.

THE COURT: You're welcome.

MR. MAZUREK: And if we can put on the screen what's already been admitted into evidence as Government Exhibit 409.

THE COURT: You may publish.

**J.A. 632**

*Ambrosini - cross - Mazurek* 1589

(Exhibit published.)

MR. MAZUREK: Thank you.

BY MR. MAZUREK:

Q    And what's on your screen right now, Agent, looks to be the safe that was searched in the apartment, right?

A    Yes.

MR. MAZUREK: And if we could just zoom out so we could see the whole picture. Right.

Q    There doesn't seem to be any damage to that safe that indicated that it needed to be violently opened and entered, right?

A    No.

Q    That would seem to you, based on your experience as an agent, that you had the combination to the safe, right?

A    Possibly.

Q    Okay. And then the contents that we see there, you testified a little bit about yesterday, right?

A    Yes.

Q    Now, Agent, when you seized the items that are in that safe, do you know how long the items had been stored there?

A    No.

Q    Do you know how long, in months or years, it took to accumulate the cash in that safe?

A    No.

Q    Do you know the origin of the cash in the safe?

---

*Ambrosini - cross - Mazurek* 1590

A    No.

Q    Do you know when the jewelry was purchased?

A    No.

Q    Do you know whether the jewelry were gifts from others?

A    No.

Q    And because you can only testify about the contents of the date [sic] as of August 24th, 2021, right?

A    Yes.

MR. MAZUREK: We could take that down.

Q    Now, you also testified a bunch about documents that were seized in Apartment 47G, right?

A    Yes.

Q    And you said you were the search agent mostly responsible for the search that was conducted on the first floor of the apartment, right?

A    Yes.

Q    But there were documents that were seized from an area on the second floor of the apartment that you testified about, right?

A    Yes.

Q    That there was a desk area on the second floor, is that right?

A    Yes.

Q    And do you remember seeing how the documents were stored on the second floor by the desk area?

---

*Ambrosini - cross - Mazurek* 1591

A    No.

Q    Okay.

And, again, when you testified yesterday about the documents, you were just reading from the documents themselves, right?

A    Yes.

Q    You had no personal knowledge about what was written there, right?

A    Yes.

MR. MAZUREK: If we can now put on the screen what has been admitted into evidence as Government Exhibit 429.

THE COURT: You may publish.

MR. MAZUREK: Thank you.

(Exhibit published.)

BY MR. MAZUREK:

Q    This is one of the photographs you testified about yesterday, right?

A    Yes.

Q    And there's a bunch of cash on the screen, right?

A    Yes.

Q    Now, this is now how you -- I mean these neat rows of bills were not how you discovered them at the scene, right?

A    No.

Q    These were placed in the way it is in the photograph by one of the search agents, right?

---

*Ambrosini - cross - Mazurek* 1592

A    Yes.

Q    Okay. And I think your testimony was that the money was actually found inside the -- this envelope, which is on the top of the photograph, is that right?

A    Yes.

Q    Okay. And you were asked questions about that envelope and what was written on it, and I believe you said that you just read --

MR. MAZUREK: If we can expand just the top; yes.

Q    -- you just read from the envelope that said CIP Services, right?

A    Yes.

Q    Do you know what CIP stands for?

A    Coney Island Payroll, I believe.

Q    And had you heard of Coney Island Payroll Services prior to this?

A    No.

Q    Did you know whether they had a license to be a money check cashing business, commercial check cashing business in the State of New York?

A    I do not know.

Q    Okay.

MR. MAZUREK: We can take that down.

Q    Now, there were other places where you found items relating to Coney Island Payroll Services in the apartment

**J.A. 633**

Ambrosini - cross - Mazurek                1593

that morning, right?

A    Yes.

Q    Okay.

MR. MAZUREK:  And if we could put on the screen what has been admitted into evidence as Government Exhibit 432-1.

THE COURT:  You may publish.

MR. MAZUREK:  Thank you, Your Honor.

THE COURT:  You're welcome.

(Exhibit published.)

BY MR. MAZUREK:

Q    This is another document that you took from the or another agent took from the desk area in the apartment, right?

A    Yes.

Q    And you testified about this yesterday.

I believe your testimony --

MR. MAZUREK:  And for counsel's reference, I'm referring to transcript page 1523 at lines 22, 23.

Q    -- your testimony was that this appears to be a ledger, right?

A    Yes.

Q    And you're testifying to that, again, without any personal knowledge of what this document is, right?

A    Yes.

Q    You're just testifying it based on your -- your personal experience and what it may look like to you, right?

---

Ambrosini - cross - Mazurek                1594

A    Yes.

Q    You have no idea what any of the handwriting might indicate here, right?

A    Correct.

Q    You don't know whose handwriting it is, right?

A    No, sir.

Q    It's just that's what it looks like to you, right?

A    Yes.

Q    Now, there are some dates that are written here on the left-hand column of the document.

MR. MAZUREK:  And if we could just expand the left-hand column, the top portion is fine.  Oh, that's fine.

Q    All right.  This goes back, these dates go back to 2008, is that right?

A    Yes.

(Continued on the following page.)

---

Ambrosini - cross - Mazurek                1595

BY MR. MAZUREK:  (Continued.)

Q    And you were in the apartment in 2021; right?

A    Yes.

Q    So the information that is contained here goes back at least, you know, almost -- fourteen years; right?

A    Yes.

Q    Okay.  And, again, you don't know how long these documents were in the apartments; right?

A    No.

Q    You don't know who kept them and why they kept them there; right?

A    No.

[!EZ SPEAKER 02]:  Now, if we could -- on this document, if we could expand just the last three lines of the dated portion of the rows there?  Yes, right there.

BY [!EZ SPEAKER 02]:

Q    Do you see some handwriting there that says in the second column "Midwood bills"?

A    Yes, I see that.

Q    Do you know what Midwood Lumber & Millwork Company was?

A    No, sir.

Q    Under the "Midwood bills" portion, do you see at the far right-hand side which reads, "313,039"?  Do you see that number?

A    Yes.

---

Ambrosini - cross - Mazurek                1596

Q    And it says "owes David;" right?

A    Possibly could be what that says.

Q    Can you read that?

A    Yes.

Q    It says "owes David;" right?

A    Yes.

Q    And you knew David was the first name of the person that you were arresting that day, David Motovich; right?

A    Yes.

Q    And those -- on the second column from the left it all talks about Midwood bills, right?  It's written three times there.

A    Yes.

Q    And then the final number on the far right-hand side is a number of 386,825; right?

A    Yes.

Q    And this appears to be a ledger to you, does that appear to be indicate that there was an amount owed to David of 386,825?

A    Possibly.

Q    You can't say for sure; right?

A    Correct.

Q    Okay.

[!EZ SPEAKER 02]:  We can take that down.

BY [!EZ SPEAKER 02]:

**J.A. 634**

Ambrosini - cross - Mazurek          1597

Q    Now, connected to that or in that same folder of documents, you testified about promissory notes that were found in the folder up on the desk area; right?  Do you remember that?

A    Yes.

MR. MAZUREK:  And if we could put on the screen what has been admitted into evidence as 432-3.

THE COURT:  You may publish.

(Exhibit published.)

BY [!EZ SPEAKER 02]:

Q    This is one of the promissory notes you testified about yesterday; right?

A    Yes.

Q    And the top part of this document, the first paragraph, based on your reading of the document because that's all you can do, you don't know anything about this document; right?

A    Yes.

Q    Based on your reading of this document, who is the borrower?

A    I'm not sure.

Q    Well, let's read it together, then.  The first line says, "For value received and for value consideration" -- "consideration receipt of which is here by acknowledged, Joseph Richter, residing at 1540 57th Street, Brooklyn, New York, 11219, and Coney Island Payroll Services, Inc. located

Ambrosini - cross - Mazurek          1598

at 1122 Coney Island Avenue, Brooklyn, New York, 11220, jointly and severally, hereinafter referred to as 'makers,' do hereby absolutely and unconditionally promise to pay on or before September 1, 2015, the due date, to the order of David Motovich and Lyudmila Motovich or any other holder or holders in due course, the payees, at One Kansas Place, Brooklyn, New York, 11234 or such other place as may be designated by the holder here of in the principal sum of $1,200,000 with interest at the rate of 12 percent per annum calculated from August 10, 2014 and which shall run on the full unpaid balance until the principal sum is paid in full."

That's a long sentence, but did I read it correctly?

A    Yes.

Q    So, does that indicate to you that Joseph Richter and Coney Island Payroll Services received on or about August 10, 2014, $1.2 million and owed that amount back with interest by September 1, 2015 to David and Lyudmila Motovich?

A    It appears that way.

Q    Okay.  So the borrower in this instance is Coney Island Payroll Services and Joseph Richter; correct?

A    Yes.

Q    Okay.

[!EZ SPEAKER 02]:  And then, if we could turn to the last page of this exhibit, actually, let's go to the page before that.

Ambrosini - cross - Mazurek          1599

BY [!EZ SPEAKER 02]:

Q    Do you see some signatures on this document; right?

A    Yes.

Q    And while you can't read the signatures, you can read the print that's below it; right?

A    Yes.

Q    And it says, "Joseph Richter, individually" on the left-hand side; right?

A    Yes.

Q    And "Joseph Richter, PRES" on the right-hand side; right?

A    Yes.

Q    And above the Joseph Richter, PRES it says, "Coney Island Payroll Services, Inc.;" correct?

A    Yes.

Q    So this document appears to you, Agent, to indicate that Coney Island and Joseph Richter as of August 10, 2014, owed or agreed to pay David and Lyudmila Motovich $1.2 million plus interest; right?

A    Yes.

Q    And you testified about, again, Government Exhibit 429, the envelope that we saw with the money, right?  Do you remember that one?

A    I'm not sure which one you're referring to right now.

[!EZ SPEAKER 02]:  Can we put back on the screen, Your Honor, Government Exhibit 429?

**J.A. 635**

Ambrosini - cross - Mazurek          1600

THE COURT:  Yes.

(Exhibit published.)

BY [!EZ SPEAKER 02]:

Q    And the envelope on the top there that says "Coney Island Payroll Services," right?

A    Yes.

Q    And the cash that was neatly put in rows by the agents below it was inside that envelope; right?

A    Yes.

Q    And the last document we saw showed that Coney Island Payroll Services had borrowed significant sums of money from David and Lyudmila Motovich; right?

A    Yes.

[!EZ SPEAKER 02]:  Okay.  We can put that down.

BY MR. MAZUREK:

Q    Now, you also testified about a lot of invoices that were found in the desk area of David Motovich's second floor apartment; right?

A    Yes.

Q    And those invoices all looked to you or appeared to be contractor/construction/contracting related; right?

A    Yes.

Q    I mean you saw, like, cooling invoices, you know, HVAC people; right?

A    Yes.

Ambrosini - cross - Mazurek          1601

Q    Painting; right?

A    Yes.

Q    Interior design bills, Neff of Short Hills, for example?

A    Yes.

Q    Architecture plans, right?

A    Yes.

MR. MAZUREK:  And let's put on the screen what was admitted in evidence yesterday as GX 430-4, please.

THE COURT:  You may publish.

(Exhibit published.)

BY MR. MAZUREK:

Q    This was one of the documents you testified about yesterday; right?

A    Yes.

Q    It's BP Cooling, Inc.'s Customer Quick Report on the top center of the screen, that's what it's titled; right?

A    Yes.

Q    And you were asked questions by the prosecutor about this quick report; right?

A    Yes.

Q    I mean you called it a financial statement, I think, yesterday; right?

A    Possibly that's what I said, yes.

Q    Okay.  And, again, no personal knowledge on this one; right?

---

Ambrosini - cross - Mazurek          1602

A    No.

Q    So you were asked some questions about a couple of lines here -- I'm sorry, I'm a little bit disadvantaged because I can hardly see --

[!EZ SPEAKER 02]:  If we can highlight the top portion.

BY [!EZ SPEAKER 02]:

Q    In the memo column, do you see pretty much in the center of the page, Agent?

A    Yes.

Q    You were asked some questions about memo lines relating to Lithos Marble and Unique Painting; right?

A    Yes.

Q    And the prosecutor pointed out that there's a number under the number column, there was -- for Lithos Marble it was 2192, right?

A    Yes.

Q    And Unique Painting 2006, if I can see that correctly?

A    Yes.

Q    And within another document found within the same stack of papers there were two checks.  Do you remember those checks that you were asked to review?

A    Yes.

Q    And, again, just keep in mind those numbers 2192 and 2006; right?

---

Ambrosini - cross - Mazurek          1603

A    Yes.

[!EZ SPEAKER 02]:  Let's put on the screen what's been admitted as GX-4033-7.

THE COURT:  You may publish.

(Exhibit published.)

BY [!EZ SPEAKER 02]:

Q    And, lo and behold, the numbers match; right?  That's what the prosecutors showed you yesterday, 2006, the check from Unique Painting and 2192 from Lithos Marble; right?

A    Yes.

Q    And these were documents that were all contained within the same, like, manila folder; right?

A    I don't recall specifically.

Q    Would you want me to -- do you want to review the physical evidence or --

A    No, I remember.

Q    All right.  Thank you.

So they were all within the same set of documents, right?

A    Yes.

Q    And what this indicates is that whoever kept the documents showed that Lithos Marble and Unique Painting wrote checks to BP Cooling which matched the customer statement reports that we previously saw; right?

A    Yes.

---

Ambrosini - cross - Mazurek          1604

Q    Now, you don't know whether Unique Painting was another contractor that provided renovation work at the 57th Street apartment, do you?

A    I do not know.

Q    Do you know whether Lithos Marble provided work at that apartment?

A    I do not know.

Q    You don't know the relationship between Unique Painting, Lithos Marble and BP Cooling, do you?

A    No.

Q    The only thing you can say is that these documents were all held in the same place and they related to the renovation of 57th Street, Apartment 47-G; right?

A    I just know that they were found in the same location.

Q    Okay.

MR. MAZUREK:  We can take that down.

BY [!EZ SPEAKER 02]:

Q    There was another document and I'll put it before you as well.  You were asked about GX-433-5.

(Exhibit published.)

Q    This is another invoice, right?

A    Yes.

Q    And you were asked questions not about the typewritten portion of this invoice, but about the handwriting at the bottom of the page.

J.A. 636

Ambrosini - cross - Mazurek     1605

MR. MAZUREK:  Can we scroll down to that?  I think it's the next page.  Let's go to the part where there is handwriting.  Here we go.

BY MR. MAZUREK:

Q    Now, again, you don't know what -- whose handwriting this is; right?

A    No.

Q    And you were asked specifically about handwriting at the very bottom of the three lines of handwriting; right?

A    Yes.

Q    And you were asked to -- you were asked questions by the prosecutor about what that handwriting at the very bottom of the page meant, do you remember that?

A    Yes.

Q    And you were asked the question --

[!EZ SPEAKER 02]:  And, again, for Government counsel, I'm referring to transcript pages 1528 to the top of 1529.

BY [!EZ SPEAKER 02]:

Q    You were asked:  "What do you understand that little handwriting to mean at the bottom?"

Right?

A    Yes.

Q    And you answered "checks;" right?

A    Yes.

---

Ambrosini - cross - Mazurek     1606

Q    You're just guessing on that; right?

A    It says "CHS," I would interpret that as checks.

Q    That's your interpretation, right?

A    Yes.

Q    You have no idea what the writer of that handwriting could have meant by the initials "CHS"?

A    No.

Q    It could have been another business name; right?

A    Possibly.

Q    But you -- you're just giving your personal understanding without any knowledge of what was -- who wrote this document, when and for what purpose; right?

A    Yes.

Q    Okay.

MR. MAZUREK:  We can take that down.

Now, I'm going to ask to put on the screen what was admitted into evidence yesterday as Government Exhibit 430-8.

THE COURT:  You may publish.

MR. MAZUREK:  Thank you, Your Honor.

(Exhibit published.)

BY [!EZ SPEAKER 02]:

Q    This was another document you were asked to read from yesterday; right, Agent?

A    Yes.

Q    And at the very top of this document it says, "To the

---

Ambrosini - cross - Mazurek     1607

board of directors of The Excelsior," right?

A    Yes.

Q    And you knew because you raided and searched the apartment that morning on August 24th, 2021 that the name of the building at 303 East 57th Street was The Excelsior; right?

A    Yes.

Q    So this is a letter to the board.  And you also knew that -- that this building is a co-op as opposed to a condominium, a New York co-operative, right?

A    I did not know that.

Q    Okay.  So you were just asked to read from this document and this document, I think at the bottom of the second page --

[!EZ SPEAKER 02]:  If we could turn to that.

BY [!EZ SPEAKER 02]:

Q    -- it was written by or it says here, "yours truly, David Motovich."  Do you see that?

A    Yes.

Q    Okay.  And you were asked to read portions of this document relating to the Motovich statement on page 1.

[!EZ SPEAKER 02]:  If we could turn to that?

Q    Do you see that?

A    Yes.

Q    And I'm going to ask if we could read together the first paragraph under David -- of the Motovich statement.  Do you see that?

---

Ambrosini - cross - Mazurek     1608

A    Yes.

Q    It says, "David Motovich is currently president, CEO and owner" --

THE COURT:  Vader.

MR. MAZUREK:  Sorry.

BY [!EZ SPEAKER 02]:

Q    "David Motovich is currently president, CEO and owner of the Midwood Lumber & Millwork, Inc.  This is a family business that my father and I own one hundred percent of that was started more than thirty years ago."

Do you see that?

A    Yes.

Q    The second sentence says, "The business has been very successful as a building supplier as well as a contractor."

Right?

A    Yes.

Q    So here the document says that the business of Midwood Lumber was not just a building supplier but also a contractor, you agree with me on that?

A    That's what it says.

Q    Okay.

[!EZ SPEAKER 02]:  And then, if we could highlight the paragraph that starts just below, "As an experienced contractor."

BY [!EZ SPEAKER 02]:

J.A. 637

Ambrosini - cross - Mazurek          1609

Q    Do you see that?

A    Yes.

Q    So the Motovich statement continues to read, "As an experienced contractor, I am in a perfect position to renovate the apartment.  I have used the expertise of an award-winning architect with whom I have more than 20 years of experience."

Do you see that?

A    Yes.

Q    And, again, this was written to the board of The Excelsior building; right?

A    Yes.

MR. MAZUREK:  Okay.  If we could turn to page 2 of this document.

BY [!EZ SPEAKER 02]:

Q    And I'm going to ask you to read one more portion of this which was admitted into evidence yesterday.  And it's going to be in this first paragraph that starts with "You will understand."  If you can --

[!EZ SPEAKER 02]:  Thank you very much, Andy.

Q    And I'm going to just read what's been highlighted on your screen.  It says, "You will understand as part of our 30-year old business, we come across opportunities to acquire properties and fix them up, operate them and ultimately sell them."

Right?

Ambrosini - cross - Mazurek          1610

A    Yes.

Q    This was another part of what was described in this letter by David Motovich to the board at The Excelsior; right?

A    Yes.

Q    And do you have any knowledge as to whether the purchase of this 47-G apartment required gut renovation and large amounts of contracting works, Agent?

A    No.

MR. MAZUREK:  Okay, you can put that down.

BY [!EZ SPEAKER 02]:

Q    Okay.  So, just one more set of documents I'm going to ask you to help read for us today, and those were also documents you were asked about yesterday.

MR. MAZUREK:  If we could put up on the screen what was admitted yesterday as Government Exhibit 433-3?

THE COURT:  You may publish.

MR. MAZUREK:  Thank you, Your Honor.

(Exhibit published.)

BY MR. MAZUREK:

Q    You were asked some questions about these Chase deposit slips that were, again, found in the desk area on the second floor of Mr. Motovich's apartment; right?

A    Yes.

Q    And the prosecutor asked you about those first two deposits, one made -- I mean just reading from the document,

Ambrosini - cross - Mazurek          1611

that's all you can do; right?

A    Yes.

Q    That the first one was $900,000; right?

A    Yes.

Q    To David Motovich; right?

A    Yes.

Q    And David Motovich deposit right below that of $1,020,000; right?

A    Yes.

Q    Those are big numbers, right, even for an agent?

A    They're big numbers, yes.

Q    Okay.  And those were highlighted yesterday as part of -- as part of these reams of documents that were seized in Mr. Motovich's desk area; right?

A    Yes.

Q    All right.  Now, can you look at the date on these deposit slips.  Does that appear to you to be in the upper left of both of these deposit slips 3/24/14?

A    Yes.

Q    And it was the same day; right?

A    Yes.

Q    For both of these deposit slips?

Did you know, Agent, that Mr. Motovich was in contract -- in a contract for the purchase of the 47-G apartment right around that time?

Ambrosini - cross - Mazurek          1612

A    No.

Q    All right.  There were other documents, though, that you seized that morning August 24th, 2021, right, other than this?

A    Yes.

[!EZ SPEAKER 02]:  And if we can turn to or put on the screen what's admitted into evidence as GX-433?

THE COURT:  You may publish.

MR. MAZUREK:  Thank you, Your Honor.

And turn to page 34.

(Exhibit published.)

BY [!EZ SPEAKER 02]:

Q    And this document says "Agreement;" right?

A    Yes.

Q    And if we can read together what is on the top of that page, it says, "Agreement made as of this day of February 25, 2014, by and between this David W. Unger, residing at 303 East 57th Street, Apartment 47-G, New York, New York, hereinafter 'Unger,' and 35 Fourth Avenue, LLC having offices at 1100 Coney Island Avenue, Suite 3, Brooklyn, New York, hereinafter 'LLC.'"

Do you see that?

A    Yes.

Q    And continuing to the next line, "Whereas, Unger, as seller, and LLC, as purchaser, have entered into a contract of sale, cooperative apartment, hereinafter 'contract,' relative

**J.A. 638**

Ambrosini - cross - Mazurek 1613

to Apartment 47-G, hereinafter 'unit,' in The Excelsior 57th
Corp. hereinafter 'co-op,' located at East 57th Street, New
York, New York."
Do you see that?
A Yes.
Q So does this appear to be an agreement for the Fourth
Avenue, LLC to purchase the apartment you were in, 47-G, from
David Unger?
A It appears that way.
Q And the date is February of 2014; is that right?
A Yes.
Q Okay. And if we can turn to the second page of that
agreement -- by the way, according to this document is The
Excelsior building a cooperative apartment building?
A According to this document, yes.
Q And the signatures under purchaser of the 35th Fourth
Avenue, LLC is David and Boris Motovich; right?
A Yes.
Q And the seller is David Unger; right?
A Yes.
Q And the date of this contract of sale -- again, this was
seized as the same day as the deposit slips we looked at
earlier; right?
A Yes.
Q And the date of this document February 2014, is only

Ambrosini - cross - Mazurek 1614

about a month and a half before the deposit slips that we saw,
the Chase deposit slips, dated March 24th, 2014; right?
A Yes.
[!EZ SPEAKER 02]: And if we could now turn to the
next page of that exhibit, the very next page.
BY [!EZ SPEAKER 02]:
Q You see a letter from -- with Chase letterhead?
A Yes.
Q At the top.
And can you see the date of this letter?
A Yes.
Q What date is it?
A 3/24/2014.
Q Is that the same date as those deposit slips we looked
at?
A Yes.
Q And if we could read this letter together, "To whom it
may concern, Mr. David Motovich and Mr. Boris Motovich have
combined between their personal and business accounts a
present balance in excess of five and a half million U.S.
dollars. If you should have any questions regarding this
matter, please feel free to reach out to me." And it says,
"Sincerely, Ariel Shaltiel, Relationship Manager."
Right?
A Yes.

Ambrosini - cross - Mazurek 1615

Q So, does this appear to be a letter from a bank notifying
to whom it may concern of a minimum balance that's in the
accounts of both David and Boris Motovich?
A It appears that way, yes.
Q And it's the same date as the deposit checks, right?
A Yes.
Q That might be an explanation for why the checks were made
on March 24th or 2014?
A I don't know.
Q Because you had no personal knowledge of anything other
than the reading the documents that were seized that morning;
correct?
A Yes, sir.
Q And you were asked to testify about the information that
we've just gone over.
[!EZ SPEAKER 02]: We can take that down.
BY [!EZ SPEAKER 02]:
Q You were asked to testify about the information we just
went over by the prosecutors in this case; right?
A Yes.
Q As a searcher, I think you called yourself yesterday;
right?
A Yes, sir.
Q And I think you said yesterday or even today that there
were agents present who helped conduct the search among the 10

Ambrosini - redirect - Skurnik 1616

to 15 search agents of 57th Street who were an actual part of
the investigating team of agents in this case, right?
A Yes.
Q But you were asked to testify about the search?
A Yes.
Q Not an agent who had any knowledge about this case
whatsoever, right?
A Correct.
MR. MAZUREK: I have nothing further.
THE COURT: Any redirect?
MR. SKURNIK: Yes, Your Honor.
REDIRECT EXAMINATION
BY MR. SKURNIK:
Q Special Agent Ambrosini, was the search of Mr. Motovich's
apartment authorized by a court?
A Yes.
Q Mr. Mazurek just asked you if the defendant was arrested
that day. He was arrested; is that right?
A Yes.
Q Was that authorized by a court?
A Yes.
Q Was there a search warrant for him.
A Yes.
Q The search happened at 6:00 a.m.; is that right?
A Approximately, yes.

**J.A. 639**

Ambrosini - redirect - Skurnik          1617

Q    Was that 6:00 a.m. time also authorized by a court?
A    Yes.
Q    When agents arrived, did they knock on the door?
A    To the best of my recollection, yes.
Q    Do you remember the agents breaking down the door?
A    No.
Q    Kicking it down?
A    No.
Q    Using a battering ram?
A    No.
       THE COURT:  You say do you remember that, did the agents break down the door?
       THE WITNESS:  No.
       THE COURT:  Did they use a battering ram?
       THE WITNESS:  No.
       THE COURT:  It's not a question of remembering it, they didn't do it that way.  They knocked on the door; is that right?
       THE WITNESS:  Yes.
       THE COURT:  And the door was opened?
       THE WITNESS:  Yes.
       THE COURT:  All right.  Let's go on.
BY MR. SKURNIK:
Q    Do you know if other locations were searched that day?
A    I believe so, yes.

Ambrosini - redirect - Skurnik          1618

Q    What other locations were?
       [!EZ SPEAKER 02]:  Objection.
       THE COURT:  Overruled.  In connection with this case.  We're not talking about the FBI going after Bin Laden or something; right?
       MR. SKURNIK:  Yes, Your Honor.
       THE COURT:  Go on.
A    I recall an additional location of a business.
Q    Do you know the business?
A    I believe it was Midwood Lumbar.
Q    When agents are executing a search warrant, do they wear body armor?
A    Yes.
Q    Why is that?
A    For our safety.
Q    Do they sometimes draw their weapons during a search?
A    Yes.
Q    Why is that?
A    For our safety.
Q    Have FBI agents ever been killed while executing a search warrant?
       MR. MAZUREK:  Objection.
       THE COURT:  Overruled.  You opened the door.
       You can answer.
A    Yes.

Ambrosini - redirect - Skurnik          1619

Q    Have FBI agents ever been injured while executing a search warrant even for an economic or non-violent crime?
A    Yes.
Q    Did you understand that prior to the search that there might be large amounts of cash in the apartment?
A    Yes.
Q    In your experience as an FBI agent, are large amounts of cash sometimes protected by weapons?
A    Yes.
Q    Is there a reason, a particular reason, why agents don't notify the residents of a premises before they conduct a search?
A    For our safety.
Q    Is there also a concern about destruction of evidence?
A    Yes.
Q    Can you explain that?
A    If the subject of an investigation is aware that we are entering, they can take whatever evidence we could potentially be looking for and flush it, burn it, shred it, things like that.
       MR. SKURNIK:  Ms. Kannan, if we can pull up Government Exhibit 40-8, please.
       THE COURT:  In evidence.  You may publish.
       MR. SKURNIK:  Thank you, Judge.
       (Exhibit published.)

J.A. 640

Ambrosini - redirect - Skurnik          1620

       MR. SKURNIK:  And if we can zoom in on the sentences right above "Motovich Financials."
BY MR. SKURNIK:
Q    Can you read that, Special Agent?
A    "There are a lot of reasons why this apartment is attractive to me and my family including the fact that the building is walking distance to a private school that I would like my four children to attend."
Q    And --
       MR. SKURNIK:  We can take that down.
BY MR. SKURNIK:
Q    Mr. Mazurek asked you about some of the promissory notes that were found at the apartment.  Did you find any loan documents or promissory notes between Mr. Motovich and Lithos Marble?
A    I do not recall.  I would have to see it again.
Q    Do you remember seeing any loan documents or promissory notes between Mr. Motovich and Unique Painting?
A    I do not recall.
Q    How about any loan documents or promissory notes between Mr. Motovich and Metro Erectors?
A    I do not recall.
Q    Mr. Mazurek also asked you about the jewelry that was found in the safe in room D-2; is that right?
A    Yes.

Ambrosini - redirect - Skurnik      1621

Q    He asked you some questions about whether you knew where that jewelry came from; is that true?

A    Yes.

Q    You don't actually -- do you know where any of that jewelry came from?

A    No.

Q    You don't know how it was paid for?

A    No.

Q    All right.  Well, I want to ask you about something where I think it's clear where it was paid for?

MR. MAZUREK:  Objection.

MR. SKURNIK:  Can we pull up, please, Government Exhibit 433-7?

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  Zooming in on the top check, please.

BY MR. SKURNIK:

Q    Does that say "Unique Painting Services, Inc."?

A    Yes.

MR. SKURNIK:  If we can zoom in on the next check, please.

Q    Does that say "Lithos Marble Work, Inc."?

A    Yes.

MR. SKURNIK:  If we can zoom out and now zoom in on the handwriting on the bottom.

---

Ambrosini - redirect - Skurnik      1622

Q    Does that say "apply to pool"?

A    Yes.

Q    Does it say "57th Street"?

A    Yes.

Q    Is that the street of Mr. Motovich's apartment?

A    Yes.

MR. SKURNIK:  If we can go to Exhibit 412, please?

THE COURT:  In evidence.  You may publish.

(Exhibit published.)

BY MR. SKURNIK:

Q    Is this the pool at Mr. Motovich's apartment?

A    Yes.

Q    Were there any other pools?

A    No.

Q    It was just this one?

A    Yes.

MR. SKURNIK:  No further questions, Your Honor.

THE COURT:  You may step down, Special Agent.  Thank you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Please call your next witness after we have our 15-minuted break, if that's acceptable to the jury.  15 minutes and then we'll have our next witness.  Okay?

Do not talk about the case.  Talk about the All-Star game, if you want.

---

Proceedings      1623

THE COURTROOM DEPUTY:  All rise.

(Jury exits.)

THE COURT:  The jury is out of the courtroom.  You may be seated, ladies and gentlemen.  Do we have any questions or issues we need to address in the absence of the jury or in the absence of any witnesses.  From the Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. MAZUREK:  No, Judge.

THE COURT:  15-minute break and then we'll resume with the next witness.

(Recess taken.)

(In open court.)

THE COURT:  Do we have any issues to address before we bring the jury in and have the next witness from the Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  From defense counsel?

MR. JACKSON:  No, Your Honor.

THE COURT:  Okay.  Let's have the jury in and then you can call your next witness.

MR. SKURNIK:  Thank you, Your Honor.

THE COURT:  You're welcome.

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please rise for the jury.

---

Proceedings      1624

(Jury enters.)

THE COURT:  Welcome back, ladies and gentlemen of the jury.  Please be seated.  Thank you for your promptness.

Government, please call your next witness to the stand.

MR. SKURNIK:  The Government calls Carrie Lowis.

THE COURT:  Please have the witness come forward to be sworn.  Move forward to the witness stand, raise your right hand when you get there and my deputy will administer the oath and counsel will proceed.

(Witness takes the stand.)

THE COURTROOM DEPUTY:  Do you solemnly swear or affirm that the answers you are about to give the Court will be the truth, the whole truth and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURT:  I ask you to pull the microphone that's in front of you directly in front of you.  It will swivel to you.  You can move it up, move it down so you can be heard.  It looks like a snake, but it won't bite you.

Please state and spell your name and counsel will inquire?

THE WITNESS:  My name is Carrie Lowis.  It's C-A-R-R-I-E.  Last name is Lowis, L-O-W-I-S.

THE COURT:  Thank you.

J.A. 641

Proceedings                                    1625

Please proceed, Counsel.

(Continued on the next page.)

---

Lowis - direct - Skurnik                       1626

**CARRIE LOWIS,**

called by the Government, having been

first duly sworn, was examined and testified

as follows:

DIRECT EXAMINATION

BY MR. SKURNIK:

Q    Ms. Lowis, where do you work?

A    At Chase.

Q    What's your role at Chase?

A    I am the business banking AML executive.

Q    What does AML mean?

A    Anti-money laundering.

Q    What do you do in your role as the business banking anti-money laundering executive?

A    It's an oversight position.  I help work with business banking to make sure they're meeting their AML KYC requirements.

Q    How long have you worked at Chase Bank?

A    For thirteen years.

Q    Have you had other roles at the bank?

A    Yes.

Q    Does Chase Bank offer deposit accounts?

A    They do.

Q    Does the bank have branches in New York?

A    Yes.

---

Lowis - direct - Skurnik                       1627

Q    Are there branches here in Brooklyn?

A    Yes.

Q    When a customer deposits funds in a Chase bank account, what happens with those funds?

A    The bank does have the option to use those funds.

Q    In what ways?

A    They can invest them, they can lend them.

Q    When a customer deposits funds into an account does the bank generally pay interest on those funds?

A    Yes.

Q    So when bank then lends or invests those funds, is the bank hoping to get a greater rate of return than the interest they pay out to the depositor?

A    Correct.

Q    Is that basically the business model of a bank?

A    Yes.

Q    So, when a customer wants to open up an account at Chase Bank, what types of information or documents do you require from the customer?

A    We require identification.  So, for an individual it would be a government issued ID and for an entity, it would be articles of incorporation or verification from the Secretary of State.

Q    What do you require those documents?

A    Because we need to know who our customer is.

---

Lowis - direct - Skurnik                       1628

Q    Why is that important to know who your customer is?

A    It helps us understand the risks associated with banking that customer.

Q    So, what are some of the risks if the bank doesn't know who their customer is?

A    It could lead to financial crimes, terrorist activities.

Q    When the bank receives information from a customer, what does the bank do with that information?

A    We take it, put it into our system and create a KYC profile.

Q    And when you say KYC profile, what does that mean?

A    Know your customer.  So, in addition to identification, we collect information about the business, the type of business it is, revenue, assets.

Q    If a customer opens up an account but the account will actually be controlled by someone else, does that pose a risk to the bank?

A    Yes.

Q    What kind of risk?

A    We don't truly know who the customer is that has the account and control over the account.

Q    If the bank was aware that someone seeking to open an account was not the person who would control the account, would that be relevant to the bank's determination about whether to open the account?

**J.A. 642**

Lowis - direct - Skurnik                1629

A    Yes.

Q    If account was already existing and the bank learned that the person whose name is on the account is not the person who controls it, would that be relevant to the bank's determination about whether to keep the account open?

A    Yes.

Q    For corporate customers, are there particular types of businesses that the bank views as higher risk?

A    Yes.

Q    What types of businesses?

A    Businesses that are cash intensive such as gas stations, car washes, laundromats.

Q    How about check cashers, are they higher risk?

A    Yes.

Q    Why is that?

A    There's a lot of exchanging of money there and typically it's higher risk for money laundering.

Q    As a general matter does Chase Bank offer deposit accounts to check cashing businesses?

A    No.

Q    If the bank was aware that a customer was engaged in check cashing through a deposit account, would that be relevant to the bank's determination about whether to open the account in the first place?

A    Yes.

Lowis - direct - Skurnik                1630

Q    Would it be relevant to the bank's determination about whether to maintain that account?

A    Yes.

Q    If a customer gives false information about who owns or controls an account, can that create a risk to the bank?

A    Yes.

Q    What kind of risk?

A    We don't know who our customer is and we don't fully understand the risks associated with banking that customer.

Q    If a particular customer poses a higher risk to the bank, does the bank have any additional process it goes through to evaluate that customer?

A    Yes.  We do add points to their risk score which is a measurement of risks associated to that customer.

Q    But can that happen if the bank isn't aware of who the true customer is on that account?

A    No.

Q    If an account is for a business entity that doesn't actually conduct any legitimate business, does that raise risk to the bank?

A    Yes.

Q    Is that a relevant consideration whether to open or maintain an account?

A    It is.

Q    Are there particular types of transactions that trigger

Lowis - direct - Skurnik                1631

obligations to provide information to the Government?

A    Yes.

Q    What -- what are those transactions?

A    Cash deposits, above 10,000, we would need to file a currency transaction report.

Q    What's a currency transaction report?

A    It's filed with FinCEN and it captures information about the customer, about the transaction.

Q    If an --

THE COURT:  It's filed with what?  What was the company you said it was filed with, FinCEN?

THE WITNESS:  Yes.

THE COURT:  What is FinCEN?

THE WITNESS:  Financial Crimes Enforcement Network.

THE COURT:  Go ahead.

BY MR. SKURNIK:

Q    Is that a federal agency that's part of the Treasury Department?

A    Yes.

Q    Okay.  If an employee at a bank -- if an employee at Chase Bank was taking money out of an account for their own use, would that be against the bank's rules?

A    Yes.

Q    Would that be something the bank would want to know about at the time they opened an account?

Lowis - direct - Skurnik                1632

A    Yes.

MR. SKURNIK:  If we can pull up Government Exhibit 702, page one, please.

THE COURT:  In evidence?

MR. SKURNIK:  In evidence, Your Honor.

THE COURT:  You may publish.

(Exhibit published.)

MR. SKURNIK:  And if we can zoom in at the top.

(Continued on the following page.)

**J.A. 643**

LOWIS - CROSS - MR. JACKSON 1633

DIRECT EXAMINATION (Continued)

BY MR. SKURNIK:

Q    What is this document?

A    This is the signature card.

Q    What's a signature card?

A    We require that so we can tell who has signing authority.

Q    So whoever would have signing authority for an account, are they required to put their information on this page?

A    Yes.

Q    Okay.

        MR. SKURNIK:  If we can zoom in under, Printed name, in the bottom left.

Q    Does that say Kemal Sarkinovic?

A    Yes.

        MR. SKURNIK:  And if we can zoom out.

Q    Do you see any other names on this page listed?

A    No.

        MR. SKURNIK:  Nothing further at this time, Your Honor.

        THE COURT:  Any cross?

        MR. JACKSON:  Yes, please, Your Honor.

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good morning, ma'am.  How are you?

A    Good morning.  How are you?

LOWIS - CROSS - MR. JACKSON 1634

Q    Great.  Thank you.

        You said that you're the AML -- you've worked at AML for some time, correct?

A    Correct.

Q    Do you do annual trainings in your role?

A    Chase does, yes.

Q    And Chase does annual trainings of you related to AML issues, correct?

A    They do annual AML training that's determined by the policy group.

Q    Do you go to conferences related to your role?

A    I do not.

Q    Do you do any training throughout the year?

A    The annual training.

Q    How long is that annual training?

A    An hour.

Q    And why do you do that training?

A    It's required.

Q    One of the things that you talked about on direct is what the bank does with funds that are deposited.

        And I believe you said that the funds are sometimes invested by the bank, correct?

A    Correct.

Q    And by the way, you're talking about funds that have been deposited by customers at the bank, right?

LOWIS - CROSS - MR. JACKSON 1635

A    Yes.

Q    I'm correct that when a person deposits money, before they deposit any money, the bank is doing this sort of due diligence investigation to see if that's someone they want to deposit money?

A    At on-boarding we collect information for the customer, we take that information, and then there could be reasons that we don't onboard them at that time.

Q    You're saying that because it's not quite an investigation, right?

A    Correct.

Q    It's just sort of a check to see if there are any reasons they don't want the person opening an account, right?

A    Yes.  It's taking the information provided and determining if we can bank that customer.

Q    And if you determine that you can't bank that customer, Chase never receives the money, right?

A    Correct.

Q    Now, one of the things that you also talked about is that once it has received the money, sometimes it's investing that money, right?

A    Correct.

Q    Is it ever the case that when a customer comes to withdraw their money from their bank account, Chase will say, you can't withdraw the money, we're in the process of

LOWIS - CROSS - MR. JACKSON 1636

investing it right now?

A    No.

Q    Is a person required to put something on the memo line of a check at Chase?

A    No.

Q    So they can just put who it's to, the amounts, and not give a reason on the check, correct?

A    Correct.

        MR. JACKSON:  And can we look at GX 701A, which is in evidence.

        THE COURT:  You may publish.

        MR. JACKSON:  Thank you, Judge.

        (Exhibit published.)

Q    And this is -- I apologize.  I know that this is small writing.

        MR. JACKSON:  Maybe you can blow it up just a little bit, Mr. Cepregi, in the middle part.  Yeah, if we get a little more bigger.

Q    Can you read that, ma'am?

A    Kind of.  I don't have my readers with me.  But --

Q    I apologize for the small print here, but we're dealing with documents.

        Do you see the part here where it says, the bank is authorized to honor and pay all checks, drafts, and orders when so signed or endorsed without inquiring as to the

J.A. 644

LOWIS - CROSS - MR. JACKSON
1637

circumstances of issue or disposition of the proceeds and regardless of to whom such instruments are payable or endorsed?

A    Yes.

Q    And that's the policy of the bank, right?

A    Yes.

        MR. JACKSON:  We can take that down, Mr. Cepregi.

Q    Am I correct -- am I correct, ma'am, that in the Chase has a depository agreement that it makes with -- that it has with account holders?

A    Yes.

Q    And in the depository agreement, there's a portion that talks about business accounts, right?

A    Yes.

Q    A business account is treated somewhat in some subtle ways differently from a personal account, correct?

A    Correct.

Q    One of the things that the depository agreement notes is that if our records list a business organization as the owner of the account, the account is payable to the business organization and not to any individual director, shareholder, member, or partner.

        Am I right about that?

A    Yes.

Q    The reason for that is Chase is trying to make it clear

AVERY N. ARMSTRONG, RPR, NYRCR

---

LOWIS - CROSS - MR. JACKSON
1638

that its obligation is to the organization and not to these individual directors, shareholders, members, or partners, right?

A    Yes.

Q    And the bank understands that an individual director often will own significant stock in a company, correct?

A    Yes.

Q    A shareholder has some ownership interest in a company, correct?

A    Yes.

Q    And yet, Chase does not expect that every shareholder or every person who has some interest in the company will be identified in the opening documents for a business account, correct?

A    We do collect shareholder information at the time of on-boarding, along with beneficial owner information and authorized rep.

Q    Right.  But there are many companies for which Chase does not expect the severity of everyone who could have an ownership interest is identified in those documents, correct?

        THE COURT:  If IBM opened an account with Chase, would every shareholder with IBM have to give you their name?

        THE WITNESS:  No.

        THE COURT:  Okay.  Let's move on.  I think the jury gets it.

AVERY N. ARMSTRONG, RPR, NYRCR

---

LOWIS - CROSS - MR. JACKSON
1639

        MR. JACKSON:  Thank you, Judge.

Q    Just a couple more questions for you, ma'am.

        If the bank determines that there is suspicious activity in an account, it has the right to close the account, right?

A    Yes.

Q    When it closes the account, does the bank ever say, because this activity seems suspicious, we're just going to keep the money?

A    No.

Q    What it does is it returns the money to whoever the --

        MR. SKURNIK:  Objection.

        THE COURT:  He's asking a question.

        Is that what the bank does?  Why don't you put the question.

        MR. JACKSON:  Yes, Your Honor.

Q    It closes the account and it returns the money to the owner of the money, right?

A    In most scenarios.  I don't know if there's an instance where they would hold it.

Q    Right.  You're not aware of any scenario other than them returning it to the person who owns it, right?

A    Correct.

Q    Okay.

        MR. JACKSON:  Your Honor, I don't have any

AVERY N. ARMSTRONG, RPR, NYRCR

---

LOWIS - REDIRECT - SKURNIK
1640

additional questions.

        THE COURT:  Any redirect?

        MR. SKURNIK:  Yes, Your Honor.

        So first, an administrative matter, Your Honor.  I believe Mr. Jackson --

        THE COURT:  How about asking the witness questions before we do an administrative thing.

        Do you have a question for the witness?

        MR. SKURNIK:  Sure, Your Honor.

REDIRECT EXAMINATION

BY MR. SKURNIK:

Q    So Ms. Lowis, can any shareholder of IBM walk into a Chase Bank branch and withdraw money from an IBM account?

A    No.

Q    Now, you said that when someone applies for an account, the bank doesn't conduct a full investigation; is that right?

A    Correct.

Q    Is that because the bank relies on honest information from their customers?

A    Yes.

        MR. SKURNIK:  Nothing further, Your Honor.

        THE COURT:  Okay.  You may step down, ma'am.  Thank you very much.  Have a good day.

        THE WITNESS:  Thank you.  You too.

        (The witness was excused.)

AVERY N. ARMSTRONG, RPR, NYRCR

J.A. 645

PROCEEDINGS 1641

THE COURT: Please call your next witness.

MR. SKURNIK: Your Honor, if I could just raise one exhibit issue.

THE COURT: Why don't we do that outside the presence of the jury.

Do you need to raids it now?

MR. SKURNIK: No. We can do it later.

THE COURT: That'll be nice.

Call your next witness.

MR. SKURNIK: Your Honor, the Government calls Jackmin Quinones.

THE COURT: Okay. Please call the witness to the stand to be sworn.

Please come forward to the step here and then my court deputy will administer the oath.

(The witness takes the stand.)

THE COURT: Please raise your right hand.

THE COURTROOM DEPUTY: Do you solemnly swear or affirm that the answers you're about to give the Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, I do.

THE COURT: Thank you. Please be seated.

I'm going to ask you to state your name and spell it. See that microphone in front of you, it'll swivel to you

QUINONES - DIRECT - MR. SKURNIK 1642

like this. Why don't you grab it. It looks like a snake, but it won't bite you. Okay. Just state your name, spell it, and then counsel will inquire.

THE WITNESS: First name Jackmin, J-A-C-K-M-I-N, last name Quinones, Q-U-I-N-O-N-E-S.

THE COURT: Thank you. Counsel, you may inquire.

**JACKMIN QUINONES**,
    called as a witness, having been first duly
    sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. SKURNIK:

Q    Where do you work?

A    Citizen Bank.

Q    What's your job at Citizens Bank?

A    I'm the keeper of records single matter expert.

Q    How long have you worked at Citizens Bank?

A    Sixteen years.

Q    Have you held other positions there?

A    Yes.

Q    At some point, did Citizens Bank purchase another bank?

A    Yes.

Q    What was that other bank called?

A    The most recent one, Investors.

Q    Does Citizens Bank offer deposit accounts?

A    Yes, we do.

QUINONES - DIRECT - MR. SKURNIK 1643

Q    Do you know what -- did Investors Bank offer deposit accounts prior to the acquisition?

A    Yes.

Q    When customers --

THE COURT: The question was, do you know. Now the answer is, did they?

THE WITNESS: Yes.

THE COURT: Okay. Go ahead.

Q    When customers deposit funds at the bank, what happens to those funds?

A    The bank uses -- utilizes part of the money to invest in loans or credit cards or any other offers.

Q    So the bank has authority to transact in those funds?

A    That is correct.

Q    When a customer opens an account at the bank, what type of information do you require for the customer?

A    Government-issued ID.

Q    Why is that?

A    To identify the individual that we're conducting business with.

Q    Why is it important to identify the individual?

A    To avoid any fraud or any wrongdoings.

Q    If a customer provides false information to the bank, is that a relevant consideration for whether to open that account?

QUINONES - DIRECT - MR. SKURNIK 1644

A    Yes.

Q    If one customer is opening an account, but the account will actually be controlled by someone else, is that relevant to the bank?

A    Yes.

Q    Why?

A    We want to ensure we know who we're conducting business with.

Q    If the bank was aware that the person opening an account was not the person who would control the account, would the bank open the account in the first place?

A    No, we would not.

Q    How about for business accounts, what type of information do you require for business deposit accounts?

A    Depending on -- of course, the State-issued ID and what type of business they're running. If it's a corporate account, a LLC, we require corporate resolution.

Q    Are there some types of business that are higher risk than others?

A    Yes.

Q    How about check cashing businesses, do they present a high risk?

A    Yes, they do.

Q    Why is that?

A    We don't know what types of checks they're cashing, what

**J.A. 646**

QUINONES - DIRECT - MR. SKURNIK

1645

type of checks coming in.

Q   Does the bank generally offer deposit account to check cashers?

A   Yes, they do.

Q   Is there a additional process the bank goes through before opening an account for a check casher?

A   We do get, Know Your Customer information.  So we do request all -- what type of checks will they be cashing, what type of transactions, and how many employees.

Q   Before the bank opens an account, is it relevant whether the customer is a check casher?

A   Yes.

Q   So if a corporate customer tried to open an account and they were, in fact, a check casher and the bank didn't know, would that be relevant to the bank's decision about whether to open that account?

A   Yes.  We need to ensure that we know, again, what signers are going to be on the account, who's going to conduct business.

Q   All of these risks that we've just spoken about, do these -- were these also present for Investors Bank prior to the acquisition?

A   I can only assume so.

Q   If a person working at the bank, an employee, took money out of an account for their own use, out of a customer

QUINONES - DIRECT - MR. SKURNIK

1646

account, would that be against the bank's rules?

A   Yes.

Q   Would that be something the bank would want to know about at the time an account was opened?

A   Yes.

Q   Would it be relevant to the bank's determination about whether to maintain an account?

A   Yes.

        MR. SKURNIK:  If we can pull up Government Exhibit 708, Page 1, please.

        THE COURT:  In evidence.  You may publish.

        MR. SKURNIK:  Thank you, Judge.

        (Exhibit published.)

        MR. SKURNIK:  And if we can zoom in at the top half, please.

Q   Dos that say, Certification of beneficial owners?

A   Yes, it does.

Q   What's a certification of beneficial owners?

A   That is who owns the account.

Q   So is everybody who transacts in an account supposed to be listed here?

A   Yes.

Q   How about everybody who has control over the account, are they supposed to be listed here?

A   Yes.

QUINONES - CROSS - MR. JACKSON

1647

        MR. SKURNIK:  Can we zoom in at the name under name.  Just zoom in there.

Q   Does that say, Kemal Sarkinovic?

A   Yes.

        MR. SKURNIK:  And if we can zoom out.

Q   Are there any other names listed there?

A   No, there are not.

        MR. SKURNIK:  Nothing further at this time, Your Honor.

        THE COURT:  Your witness to cross.

CROSS-EXAMINATION

BY MR. JACKSON:

Q   Good afternoon, ma'am.

A   Good afternoon.

Q   Am I correct that you have no awareness of any money that has been stolen from your bank by my client, David Motovich?

A   For Citizens no.

Q   And you also --

        MR. JACKSON:  Actually, let me just call back up GX 708 that just was put up.

        THE COURT:  In evidence?

        MR. JACKSON:  Yes, Your Honor.

        (Exhibit published.)

Q   Okay.  You see this certification of beneficial owner?

A   Yes.

QUINONES - CROSS - MR. JACKSON

1648

Q   Okay.  You see that this isn't a form that you put together, right, ma'am?

A   No, I did not.

Q   And it says, Beneficial owner, as opposed to just owner, correct?

A   That is correct.

Q   And your understanding is that beneficial owner has some technical meaning, correct?

A   Yes.

Q   Is it the technical meaning of beneficial owner -- technical meaning of beneficial owner something that the bank trains you on?

A   Yes.  I did come from a branch, as well.

Q   You came from a branch, as well?

A   Yes.

Q   Is that information that you knew before your trainings?

A   Yes.

Q   Where did you work before the branch?

A   Well, I worked for Citizen Bank, so I started off as a teller, and I also was a tele-manager, so about account opening, I know what individuals should be on the list.

Q   Now, you have no knowledge of who any of the people in the companies are that are on this page, correct?

A   That is correct.

        MR. JACKSON:  We can take that down.

**J.A. 647**

QUINONES - CROSS - MR. JACKSON 1649

Q    And during the course of your meetings with the Government, at any point, did you discuss the specific charges that have been brought in this case?

A    No.

Q    So you have no idea whether any of the questions that you're talking about relate specifically to the charges?

A    That is correct.

MR. JACKSON:  Thank you so much.

THE COURT:  Any redirect?

MR. SKURNIK:  No, Your Honor.

THE COURT:  You may step down, ma'am.  Thank you very much.  Appreciate your time.

(The witness was excused.)

THE COURT:  Okay.  Please call your next witness.

MR. PAULSEN:  Yes, Your Honor.  The Government calls Brian Latcham.

THE COURT:  Please have witness come forward to be sworn.

Please come forward to the witness stand.  Raise your right hand and my court deputy will administer the oath. Right here.

(The witness takes the stand.)

THE COURT:  Please raise your right hand, sir.

THE COURTROOM DEPUTY:  Do you swear or affirm that the answer you're about to give the Court shall be the truth,

---

LATCHAM - DIRECT - MR. PAULSEN 1650

the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE COURT:  Thank you, sir.  Please sit down.

I'm going to ask you to sit down and pull that microphone in front of you towards you.  It looks like a snake, but it won't bite you.  Speak directly into it, state and spell your name, and then counsel will inquire.

THE WITNESS:  It's Brian Latcham, B-R-I-A-N, L-A-T-C-H-A-M.

THE COURT:  Thank you, sir.

Counsel, you may inquire.

MR. PAULSEN:  Thank you, Your Honor.

**BRIAN LATCHAM,**
    called as a witness, having been first duly
    sworn/affirmed, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. PAULSEN:

Q    Good afternoon, Mr. Latcham.

Where do you work?

A    I work for John Hancock Financial.

Q    What is John Hancock Financial?

A    It's an insurance and financial services company.

Q    And what is your particular role there?

A    For the last few years I've worked as a Director of Inforce Management which is looking after blocks of inforce

---

LATCHAM - DIRECT - MR. PAULSEN 1651

life insurance policies.

Q    Does John Hancock have an insurance policy in the name Abe Fridman?

A    Yes.

MR. PAULSEN:  I'd like to show the witness, Your Honor, what's been marked for identification as Government Exhibit 2001.

THE COURT:  Any objection to Government Exhibit 2001?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

MR. PAULSEN:  Thank you, Your Honor.

(Government Exhibit 2001 was received in evidence.)

(Exhibit published.)

MR. PAULSEN:  I'd like to turn to Page 2.

Q    Mr. Latcham, are you familiar with this policy?

A    Yes.

Q    Did you review these documents in anticipation of this trial proceeding?

A    Yes.

Q    What is this policy?

A    It's a -- what's referred to as a traditional whole life insurance policy.

Q    What is a whole life insurance policy?

Can you explain for the jury what that means?

---

LATCHAM - DIRECT - MR. PAULSEN 1652

A    Sure.  It is a permanent life insurance policy. Effectively, it has a fixed premium that is due each and every year.  By paying that premium, upon the death of the person that is insured, a death benefit will get paid.  The policy also has a cash value component to it.  So as premiums are paid, the cash value continues to grow.  It is also referred to as a participating life insurance policy, and by that, I mean, it participates or it receives dividends each year that -- to the extent that a dividend is payable, it'll be paid to the owner of the policy who can take it in a variety of different ways.

Q    Okay.  So is it fair to say that in addition to the life insurance aspect, it has some investment qualities, as well?

A    Yes.

MR. PAULSEN:  Ms. Kannan, can you zoom in on that type of top box between the black bars.

Q    What's the policy number for this account?

A    It is 56847569.

Q    And who is the beneficiary of this account?

A    The beneficiary --

Q    I'm sorry.  Rephrase.  Who's the own of the account?  Who is the person who is ensured?

A    Although it doesn't -- sorry, could you repeat the question.

THE COURT:  Let's read the question back.

**J.A. 648**

LATCHAM - DIRECT - MR. PAULSEN
1653

(Whereupon, a portion of the testimony was read back.)

MR. PAULSEN: Your Honor, if I may rephrase.

THE COURT: You may. We will withdraw the question, and put another question.

Q    Mr. Latcham, who does this policy ensure?

A    The insured is Abraham Fridman.

Q    And who owns the account?

A    As shown here, the owner are the trustees, Boris Motovich, Berta Fridman, and Simon Fridman as trustees. I recall in my preparing for my testimony, there is the actual owner of the policy is a trust and these are the trustees of the trust.

Q    And the trustees of that trust are listed on the front; is that right?

A    Correct.

Q    What's the premium every year --

MR. PAULSEN: Backing out of this, Ms. Kannan.

Q    -- approximately?

MR. PAULSEN: And at the bottom, if you can zoom in.

A    So the premium was $25,660, every year.

Q    And that's every year?

A    Yes. If memory serves, there's actually a writer component to it. So it was a waiver writer which basically would pay for premiums if the insured -- sorry, yeah, if the

---

LATCHAM - DIRECT - MR. PAULSEN
1654

insured every became disabled. But that only stays on the policy for a period of time, and at a certain point, the premium did drop down for the 25,000 to roughly 24,000.

Q    Okay. And then last question on this --

MR. PAULSEN: And I apologize, it's Ms. Osman who's doing this.

Q    What is the particular death benefit for this particular policy?

MR. PAULSEN: If you could zoom out.

A    So the face amount is a million dollars. However, as I mentioned earlier, there is a dividend that's earned each year which is affecting the actual death benefit that would be payable. It does increase over time to the extent that dividends are being paid.

Q    So for example --

MR. PAULSEN: Ms. Osman, if you can jump to Page 52. And if you could zoom in on the top.

Q    This is several years later.

Is it fair to say the death benefit grew over time?

A    Yeah. I apologize. I was maybe getting ahead of you a little bit there.

Q    No, no, that's quite all right.

So as part of your review of this policy, did you look at some checks that had been paid for this policy?

A    Yes.

---

LATCHAM - DIRECT - MR. PAULSEN
1655

MR. PAULSEN: Your Honor, I'd like to show the witness Government Exhibit 718.

THE COURT: In evidence?

MR. PAULSEN: No, not in evidence, Your Honor.

THE COURT: Any objection to Government Exhibit 718?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted. You may publish.

(Government Exhibit 718 was received in evidence.)

(Exhibit published.)

Q    Mr. Latcham, do you recognize these checks? I believe there's seven of them.

A    Yes.

MR. PAULSEN: Now, if I could just zoom in on the first check, Ms. Osman.

Q    This is a check for $25,000?

A    Correct.

Q    Did you determine that this check was payable to the account we had just been discussing, the Abe Fridman insurance policy?

A    Yes.

Q    And this is from April 2012; is that correct?

A    That's the date on the check. It might have been a little bit later that it was received by the company in cash.

Q    Can you read the company name that paid for this check?

A    It's SGS Construction Building Corporation.

---

LATCHAM - DIRECT - MR. PAULSEN
1656

MR. PAULSEN: Ms. Osman, can I jump to Page 2.

Q    Do you recognize this check?

A    Yes.

Q    This is a check for 25,660?

A    Correct.

Q    And that was the premium that you had read to the jury before?

A    Correct.

Q    The -- there's a number that's written on the check beginning with a five.

Is that the policy number that you read into the record?

A    Yes.

Q    Is -- did you determine that this check was also paid to the Abe Fridman insurance policy?

A    Yes.

Q    And can you read the name of the company that paid this check?

A    M&M USA Consulting Corporation.

MR. PAULSEN: Ms. Osman, can you go to Page 3. And zoom in.

Q    Mr. Latcham, did you review this check, as well?

A    Yes.

Q    And this is also a check paid on the same policy?

A    Yes.

**J.A. 649**

LATCHAM - DIRECT - MR. PAULSEN
1657

Q    Can you read the company name for this one?

A    It's Ago & Alaudin Contracting Corporation.

Q    Okay.  And this is for the same policy that we just saw the previous two checks?

A    Yes.

MR. PAULSEN:  Ms. Osman, can you go to the next page?

Q    Mr. Latcham, do you recognize in check, as well?

A    Yes.

Q    And this is also a check to the same insurance policy?

A    Yes.

Q    What is the issuing company on this check?

A    Similar to the last one, it's Ago & Alaudin Contracting Corporation.

Q    Okay.

MR. PAULSEN:  The next page, Ms. Osman.

Q    Mr. Latcham, did you determine that this check was also paid to the -- to the same insurance policy?

A    Yes.

Q    And, in the bottom left hand, does it say the insurance policy number?

A    Yes.

Q    And does it also say Abe Fridman?

A    Yes.

Q    What's the company that issued this check?

---

LATCHAM - DIRECT - MR. PAULSEN
1658

A    Millwood USA Consulting Corporation.  Sorry, Midwood USA Consulting Corporation.

MR. PAULSEN:  Next page, Ms. Osman.  If you can zoom in on the check.

Q    Mr. Latcham, did this check also get issued as a yearly payment for the same account?

A    Yes.

Q    This is $25,000 and 660-cent?

A    $25,660.

Q    Sixty dollars, yes.  Thank you.

And the policy number and Mr. Fridman's name are both listed on this, as well?

A    Yes.

Q    And what company was this from?

A    Midwood USA Consulting Corporation.

MR. PAULSEN:  And then the plast page, Ms. Osman.

Q    Mr. Latcham, did you review this check, as well?

A    Yes.

Q    And is this for the same policy?

A    Yes.

Q    And is this -- what company is this one from?

A    CNBC Construction Corporation.

Q    Okay.  So just briefly to summarize, is it fair to say that over a period of approximately seven years, the same insurance policy was paid with a check from SGS Construction,

---

LATCHAM - DIRECT - MR. PAULSEN
1659

M&M USA Consulting, Ago & Alaudin, Ago & Alaudin, Midwood USA, Midwood USA, and CNBC Construction Corp.?

A    Yes.

Q    Now, did you review any checks that were paid to this account after 2018, the date of the last check?

A    Yes.

MR. PAULSEN:  Your Honor, I'd like to show the witness, again, document -- Government Exhibit 2001, which is in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. PAULSEN:  Go to Page 3318.  And if it could be rotated.

Q    Mr. Latcham, do you recognize this check?

A    Yes.

Q    And where -- was this check provided to the Government by John Hancock?

A    Yes.

Q    Now, the date is what date?

A    The date of the check is April 4th, 2019.

Q    Now, this is also for the Abe Fridman insurance policy?

A    Yes.

Q    Okay.  Is it fair to say that this check is actually written by Abraham Fridman?

A    Yes.

---

LATCHAM - DIRECT - MR. PAULSEN
1660

Q    Or Abraham and Berta Fridman, two people; is that right?

A    Yes.  The signature appears to be only from Abe Fridman.

Q    And this is unlike the previous other checks which that were from companies, correct?

A    Correct.

MR. PAULSEN:  If I could show Page 313, please.

Q    Did you provide this check to the Government, as well, Mr. Latcham?

A    Yes.

Q    And is this also a check for the Abe Fridman insurance policy we discussed?

A    Yes.

Q    And this, again, is a check written by Abraham Fridman and Berta Fridman; is that right?

A    Correct.

MR. PAULSEN:  And then the last one, Page 308, please.

Q    And finally, is this also a check for the same policy?

A    Yes.

Q    And this is, again, a check from Abraham Fridman and Berta Fridman for that same account?

A    Yes.

Q    Now, was John Hancock told any reason why Mr. Abe Fridman started paying checks in his own name some time between 2018 and 2019?

J.A. 650

LATCHAM - CROSS - MR. JACKSON                    1661

A    No.  It's not something we would inquire about.

Q    Okay.  So John Hancock accepted money from those -- the companies and then later from Mr. Fridman, but it wasn't necessary for John Hancock to ask why?

A    Correct.

MR. PAULSEN:  No further questions, Your Honor.

THE COURT:  Your witness for cross.

MR. JACKSON:  Thank you, Judge.

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good afternoon, sir.

A    Hello.

Q    Just a few quick questions for you.

First, are you aware of any money, whatsoever, that was stolen from John Hancock by my client, David Motovich?

A    No.

Q    John Hancock hasn't sued David Motovich, I'm correct about that, right?

A    Correct.

Q    And you're not aware of any insurance fraud charge in this case?

A    Correct.

Q    Now, is there any rule -- you saw this company Ago & Alaudin was displayed by the prosecutor?

A    Yes.

---

LATCHAM - CROSS - MR. JACKSON                    1662

Q    Has anyone contacted John Hancock to say we're suing and we'd like to attach funds that belong to us that shouldn't have been paid for those accounts, any companies?

A    No.

Q    And is there any rule at John Hancock against paying a premium through a company?

A    No.

Q    Is there any rule at John Hancock against paying your beloved uncle's life insurance policy?

A    No.

MR. JACKSON:  I don't have any additional questions.  Thank you so much.

THE COURT:  Any redirect?

MR. PAULSEN:  No, Your Honor.

THE COURT:  Thank you, sir.  You may step down.  Thank you very much.

(The witness was excused.)

THE COURT:  All right, ladies and gentlemen.  It's 12:45.  Seems to me this might be an appropriate time to break for lunch if that's acceptable to you.  And why don't we say we'll have you back here at 2:15 for the afternoon session.

Does that work?

THE JURY:  Yes.

THE COURT:  Okay.  Thank you, ladies and gentlemen.  Do not talk about the case.  Enjoy your lunch.  We'll see you

---

LATCHAM - CROSS - MR. JACKSON                    1663

back here at 2:15.

THE COURTROOM DEPUTY:  All rise.

(Jury exits the courtroom.)

THE COURT:  The jury has left the courtroom.

You may be seated, ladies and gentlemen.  Thank you.

Do we have any issues to address outside of the presence of the jury?  Beginning with the Government.

MR. JACKSON:  No, Your Honor.

MR. SKURNIK:  One issue for the Government, Your Honor.  During Mr. Jackson's examination of Ms. Lowis, she was shown a document, 701-A, which we don't have any objection to, but we just don't believe it was in evidence, at least according to our records.  So we'd ask that the Court formally admit 701-A, and also --

THE COURT:  Let's stop with 701-A.

The Government's moving its admission; is that right?

MR. SKURNIK:  Yes, Your Honor.

THE COURT:  Any objection to 701-A?

MR. JACKSON:  We thought it was -- we had it in, Judge.  Sorry.

We don't have any objection.

THE COURT:  All right.  It's admitted.

(Government Exhibit 701-A was received in evidence.)

MR. SKURNIK:  And, Your Honor, we'd also move to

---

LATCHAM - CROSS - MR. JACKSON                    1664

admit 701.  701-A is a subset of 701.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government Exhibit 701 was received in evidence.)

THE COURT:  Anything else?

MR. SKURNIK:  No, Your Honor.

THE COURT:  Anything else from you, defense counsel?

MR. JACKSON:  No.  Thank you, Judge.

THE COURT:  All right.  Thank you.  We'll be back here at 2:15 for the afternoon session.  Enjoy your lunch, everyone.

MR. JACKSON:  Have a great lunch, Judge.

THE COURT:  Thank you.

(A recess was taken.)

(Continued on the following page.)

J.A. 651

Proceedings   1665

AFTERNOON SESSION

(In open court - jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge WILLIAM F. KUNTZ, II entered the courtroom.)

THE COURT: You may be seated. I hope everyone had a nice lunch.

Do we have any issues to address before we have the jury come back for the next witness?

Beginning with the Government.

MR. PAULSEN: Your Honor, just one brief issue.

I flagged for defense counsel the bank exhibits that we're going to be moving into evidence with this next witness.

THE COURT: Yes.

MR. PAULSEN: So we can, hopefully, do it quicker.

THE COURT: That's good.

Do you anticipate any objections?

MR. PAULSEN: I don't know yet, Your Honor.

THE COURT: You don't know yet, okay.

I'll ask Mr. Jackson. Do you anticipate any objections?

MR. JACKSON: I don't, Judge, I'm just doing it right now.

THE COURT: You don't know yet.

MR. JACKSON: But I don't anticipate any.

THE COURT: That's okay, we take them as we get

Proceedings   1666

them.

So, all right.

Anything else from the Government?

MR. PAULSEN: No, Your Honor.

THE COURT: Anything else from defense counsel?

MR. JACKSON: No.

THE COURT: Okay. Let's please bring the jury back in and then we'll call in the next witness.

(Pause.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Please rise for the jury.

(Jury enters.)

THE COURT: Mr. Scott, you have forgotten a very important duty for our jury.

THE COURTROOM DEPUTY: I'll be right back, Judge.

THE COURT: Yes.

You may be seated, ladies and gentlemen of the jury.

I apologize for this deplorable lapse in judicial attention during the luncheon recess. We are going to address that right now before we call in the witness. We have to have our standards here in the Eastern District of New York, unlike a certain court across the river that shall remain nameless — the mother court. We have a different view about that.

So just hold your horses while we make up for my judicial lapse.

Proceedings   1667

And, again, I want to emphasize that no federal funds were expended in this operation.

(Pause.)

THE COURT: Off the record.

(Discussion held off the record.)

THE COURT: All right. Back on the record.

Are you ready to call your next witness?

MR. PAULSEN: We are, Your Honor.

THE COURT: And who is your next witness?

MR. PAULSEN: We call Issac Torres.

THE COURT: Please have the witness come forward to be sworn.

MR. PAULSEN: Thank you, Your Honor.

(Witness entered the courtroom.)

THE COURT: Please come forward to the front of the courtroom and my court deputy will administer the oath to you.

Right here. I'm sorry, to the witness stand.

When you get to the witness stand, please raise your right hand, sir, and the court deputy will administer the oath.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Do you swear or affirm that the answers you are about to give the Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

J.A. 652

Proceedings   1668

THE WITNESS: I do.

(Witness sworn.)

THE COURT: Thank you, sir. Please be seated.

I am going to ask you, see that microphone, it will swivel to you, looks like a snake, but hold onto it like this. Move it up and down, pull it. Touch it. Don't worry. It looks like a snake, but it's okay.

State your name and spell it, and then counsel will inquire.

THE WITNESS: Issac Torres, I-S-A-A-C, T-O-R-R-E-S.

THE COURT: Thank you, sir.

Counsel, you may inquire.

MR. PAULSEN: Thank you, Your Honor.

(Continued on the following page.)

Torres - direct - Paulsen 1669

ISAAC TORRES,
    called as a witness by the Government, having been first
    duly sworn/affirmed by the Courtroom Deputy, was examined
    and testified as follows:

DIRECT EXAMINATION

BY MR. PAULSEN:

Q   Good afternoon, Mr. Torres.

A   Good afternoon.

Q   Where do you work?

A   General counsel of Carver Federal Savings Bank in New York City.

Q   General counsel, that means you're an attorney?

A   Yes, sir.

Q   What are your responsibilities for Carver bank as general counsel?

A   I supervise the Legal Department, compliance issues and the Human Resources Department as well.

Q   How long have you been at Carver?

A   Ten years.

Q   Did you hold any other positions at Carver prior to your current position?

A   Yeah, I was vice -- the vice president and corporate secretary in charge of governance and company records.

Q   In connection with your testimony today, did you review some records from Carver bank that the Government sent to you?

---

Torres - direct - Paulsen 1670

A   Yes, I did.

    MR. PAULSEN:  Your Honor, at this moment the Government would move into evidence Government Exhibit 706 and all of its subsections, and 705 and all of its subsections.

    THE COURT:  Any objection to 706 and the subsections?

    MR. JACKSON:  No objection, Judge.

    THE COURT:  Any objection to 705 and the subsections?

    MR. JACKSON:  No objection.

    THE COURT:  They're admitted.

    (Government's Exhibit 705 and all subsections were received in evidence.)

    (Government's Exhibit 706 and all subsections were received in evidence.)

    THE COURT:  You may publish.

Q   Mr. Torres, I'll get to those documents in a moment.

    Well, first off, you reviewed those documents prior to coming here?

A   Yes.  Yes, sir.

Q   I'd like to ask about the accounts that those documents relate to.

    When a customer deposits funds in a Carver bank account, what happens to those funds?

A   So, those funds are then recorded as part of the -- an

---

Torres - direct - Paulsen 1671

account specifically with beneficiary ownership.

Q   Does Carver use those funds while it holds them?

A   Yes.  The bank is allowed, with all deposits in general, to use those funds to make loans and other financial transactions.

Q   And that applies to the three accounts that you looked at for which I provided you paper work?

A   Yes, sir.

Q   And that's, basically, just how a bank works?

A   Yes, sir.

Q   Now, when a customer wants to open up an account, an account like the ones we presented to you, what sort of information does Carver want to know from its potential client?

A   We'd like two forms of identification for the individual opening the account.  We'd like corporate information, if it pertains to a business account.  We'd like other general information regarding who's the beneficiary owner of the account.

Q   Are you familiar with the acronym KYC?

A   Yes, sir.

Q   What does that mean?

A   That means know your customer.

Q   What does that mean to you?

A   Know your customer is a process where the bank does

---

Torres - direct - Paulsen 1672

initial due diligence and can also include an enhanced due diligence on the individual to make sure that they are the beneficiary owner and there is no fraud being undertaken in the opening of the account.

Q   Is it fair to say that it's fundamentally about the bank understanding who it's doing business with?

A   That's correct.  That's absolutely correct.

Q   Does the process of setting up an account at Carver bank rely in great part on the customer being honest?

A   Yes, it does.  Although, we supplement with the due diligence and the enhanced due diligence.

Q   These KYC rules, do they apply for business accounts as well?

A   Yes, they do.

Q   Okay.  Are there certain risk factors that would make Carver less inclined to do -- to set up an account for a given business?

A   Yes, there are.

Q   What kind of risk factors come to mind?

A   With respect to the due diligence, whether the individual is providing false documentation or an owner of an account is someone who is -- we're prohibited from doing business with.

Q   If it was -- if it was unclear if the business entity in question did any real work, would that matter to Carver?

A   To -- to some extent it would, that would factor in.

J.A. 653

Torres - direct - Paulsen                1673

Q   What if it was a check cashing business?

A   We don't do business with a check cashing business, yeah.

Q   Now, you mentioned a moment ago, or I think you were mentioning there are certain obligations the bank has to report information to the Government about its clients, is that right?

A   That's correct, legal and regulatory.

Q   What would be some examples of that?

A   So, we're required to review the proposed customer and potential customer to look -- to see if there are any Bank Secrecy Act violations, other regulatory issues with respect to whether the person is on the OFAC list or has -- is -- provided any false documentation.

Q   The OFAC list, for example, can you check to see if someone is on the OFAC list if they're not listing their correct name on the account?

A   If they're not listing their correct, we can check the list, but we won't get a hit.

Q   Now, are you familiar with the term CTR?

A   Yes, I am.

Q   What is that?

A   That's a currency transaction report, which is generated in all bank systems for a cash transaction above $10,000.

Q   So one penny more than 10,000?

A   That's correct.

Torres - direct - Paulsen                1674

Q   And same question, is it difficult for the bank to file accurate CTRs if it doesn't know who's actually transacting in an account?

A   I would say yes, that's correct.

Q   Now, I'd like to ask a question about Carver bank during the 2015 to 2018 period.

During that time period, could an employee do wire transfers by getting written permission by fax or e-mail?

A   Yes.

Q   Has that changed since?

A   That's changed somewhat, yes.

Q   But back then, that was okay?

A   Back then it was allowable, yes.

Q   Is it fair to say it was only allowable for the signatories of the account?

A   That's correct.

Q   Now, I'd like to show you what's been marked for identification as Government Exhibit 707-C.

THE COURT:  Any objection to 707-C being admitted?

MR. PAULSEN:  It is in evidence, Your Honor.  I apologize.

THE COURT:  Oh, you said -- okay.  All right.  Then you may publish.

(Exhibit published.)

Q   Mr. Torres, have you seen this -- this document of

Torres - direct - Paulsen                1675

checks?

A   Yes, I have.

Q   I'd like to show you first --

MR. PAULSEN:  Ms. Osman, if you could put page 3.

(Exhibit published.)

MR. PAULSEN:  And zoom in on this check.

BY MR. PAULSEN:

Q   Now, am I correct that the date of this check is 4/19/16?

A   Yes.

Q   Now, there's a date that's down at the bottom that says "transit" next to it.

What does that mean?

A   Transit is when the check is cashed or actually when it's deposited and cashed.

Q   Okay.

So, where the date is April 19th and the transit is April 20th, is it fair to say that means it was deposited the next day?

A   That's correct.

Q   Okay.

MR. PAULSEN:  Can you pull up page 23, please?

(Exhibit published.)

Q   Now, Mr. Torres, this check, is it fair to say this check, like the previous one, is to Lithos Marble Works?

A   This one is ZKC.  This one?

Torres - direct - Paulsen                1676

Q   No, I mean at the top.  The check -- I'm sorry, the check is from?

A   Oh, I'm sorry.

THE COURT:  Don't talk over each other.  It's not a cocktail party, it's testimony.

Put your question, pause, then answer.

Put the question, please.

BY MR. PAULSEN:

Q   Mr. Torres, is it true that this check was issued by Lithos Marble Works?

A   Yes.

Q   Okay.  What's the date of this check?

A   May 16th, 2016.

Q   And the transit date on this check?

A   It appears to be May 16th, 2016.

Q   Does that mean it was cashed the same day that it was written?

A   Yes.

MR. PAULSEN:  Can you jump to page 44 please?

(Exhibit published.)

Q   Mr. Torres, is this another check from Lithos Marble Works?

A   Yes.

Q   Is the date May 26th, 2016?

A   Yes.

**J.A. 654**

*Torres - direct - Paulsen*                   1677

Q    And the transit date is May 27th, 2016?

A    Yes.

Q    So that means it was cashed the next day?

A    That's correct.

Q    And just one more from this account.

MR. PAULSEN:  Page 61.

(Exhibit published.)

BY MR. PAULSEN:

Q    Mr. Torres, am I correct in saying that the date of this check is June 8th, 2016?

A    That's correct.

Q    Transit date is also June 8th, 2016?

A    That's correct.

Q    And this is also a check to ZKC from Lithos Marble Works?

A    Yes.

MR. PAULSEN:  If I could now turn to page 20, Ms. Kannan.

(Exhibit published.)

Q    Same questions, Mr. Torres.

Is this a check from Metro Erector?

A    Yes.

Q    It's dated May 11th, 2016?

A    Yes, that's correct.

Q    And the transit date is May 12th?

A    Yes, that's correct.

---

*Torres - direct - Paulsen*                   1678

Q    Does that mean it was cashed the next day?

A    Yes, sir.

MR. PAULSEN:  Page 30, please, Ms. Kannan.

(Exhibit published.)

BY MR. PAULSEN:

Q    Am I correct, Mr. Torres, that this is another check from Metro Erectors?

A    Yes.

Q    The date is May 18th, 2016?

A    Yes, that's correct.

Q    Transit date is May 19th, 2016?

A    Yes, correct.

Q    Is it fair to say that means it was cashed the next day?

A    Yes.

MR. PAULSEN:  And then page 172.

(Exhibit published.)

Q    Is this another check from Metro Erectors to ZKC?

A    Yes.

Q    Dated September 8th, 2016?

A    Yes.

Q    And cashed on September 9th of 2016?

A    Yes, that's correct.

Q    So that would be the next day?

A    Yes.

MR. PAULSEN:  And then finally, could I have

---

*Torres - direct - Paulsen*                   1679

page 14.

(Exhibit published.)

BY MR. PAULSEN:

Q    Mr. Torres, is this a check from Unique Painting Services?

A    Yes, it is.

Q    Dated May 4th, 2016?

A    Yes.

Q    And this one, is the transit date actually before?

A    Appears to be before, May 3rd, yes.

Q    Okay.

MR. PAULSEN:  Can I jump to page 16.

(Exhibit published.)

MR. PAULSEN:  That was the same one, I apologize. Page 24.

(Exhibit published.)

Q    Mr. Torres, is this a check from Unique Painting Services?

A    Yes, it is.

Q    On May 16th, 2016?

A    Yes, it is.

Q    Cashed the same day?

A    Yes.

Q    Is it fair to say that all the ZKC checks indicate in this manner when they were cashed?

---

*Torres - direct - Paulsen*                   1680

A    Yes.

Q    Now, getting back to the know-your-customer standards that you discussed before --

MR. PAULSEN:  Ms. Kannan, you can take this down.

BY MR. PAULSEN:

Q    Are employees permitted to excuse themselves from enforcing or applying the know-your-customer rule as you mentioned before?

A    No, they are not.

Q    Can they agree to open up accounts for people knowing that that information is false?

A    No, they cannot.

Q    Can they transact business for people other than the signatories on the accounts?

A    No, they cannot.

Q    This is not something they have discretion over?

A    No discretion, no.

Q    Now, would employees receive some training about this?

A    Yes, initial training and ongoing training.

Q    And can an employee take money out of an account that's held at Carver?

A    (No response.)

Q    Not -- can an employee take money out of a customer's account, not their own account?

A    No.

**J.A. 655**

Torres - direct - Paulsen     1681

Q    What would be the consequences for the various things that you just said an employee at Carver could not do?

A    Disciplinary action, subject to termination.

Q    And then finally, Mr. Torres, Carver periodically receives Grand Jury subpoenas, is that right?

A    That's correct.

Q    That happened in this case, as well, is that right?

A    Yes.

Q    What are the rules that Carver must follow in receiving Grand Jury subpoenas and administering them?

A    So, as soon as we receive them, we pass them through our confidential system.  The Operations Department and the Legal Department are not -- not allowed to discuss any of this -- anything with respect to the subpoena to any outside parties, including the account that is being inspected or looked at.

Q    Okay.  There's a high degree of secrecy on Grand Jury subpoenas, is that correct?

A    That is correct.

Q    Would the branch manager -- would you speculate that a branch manager of a Carver bank would know this?

A    Yes.

Q    What would be the consequences of sharing a subpoena that Carver received to the customer that it was about?

A    Disciplinary action up to termination.

MR. PAULSEN:  No further questions.

Torres - cross - Jackson     1682

THE COURT:  Cross-examination.

MR. JACKSON:  Thank you.

THE COURT:  You're welcome.

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good afternoon, sir.

A    Good afternoon.

Q    Just a few questions for you today, sir.

First, does Carver bank have any sort of program by which they will provide short-term loans to businesses with no collateral charging no interest?

A    Not generally, no.

Q    Okay.  There is a question that AUSA Paulsen asked you about whether it would matter if it was unclear if the business entity was not doing any real business.

Do you remember that question a second ago?

A    Yes, sir.

Q    In your answer you kind of hesitated and you said, to some extent it would, that would factor in, right, that was your answer?

A    Right.

Q    And the reason you hesitated and gave that answer is because Carver does do business with plenty of entities that aren't Ford Motor Company, correct?

A    Yes, correct.

Torres - cross - Jackson     1683

Q    People have holding companies that may do business with Carver bank, yes?

A    They might have, yes.

Q    Right.

You're aware some people use an LLC to purchase a home, correct?

A    Correct, could be.

Q    And Carver bank would do business with an LLC that's used just to purchase a home, to do one transaction like that, correct?

A    That's correct.

MR. JACKSON:  Now, if we could recall 707-C at page 44 that the prosecutor showed you.

THE COURT:  You may publish.

MR. JACKSON:  Thank you, Judge.

(Exhibit published.)

BY MR. JACKSON:

Q    Okay.  Do you see the prosecutor was asking you about this check, do you recall that, sir?

A    Yes.

Q    Okay.

And my question is, does Carver have any sort of system using lasers or, I don't know ink-sniffing dogs or anything that would allow you to detect when the check was actually written?

Torres - cross - Jackson     1684

A    No.

Q    Okay.

So when Carver gets this check, we went through the transit date, but you have absolutely no idea when somebody wrote the date on that check, right?

A    That's correct.

Q    So it's possible someone would write a check in the future, say on May 1st, make the check out for 5/26, and then it comes to Carver bank on 5/26, if they were using that, for example, as a method of loaning somebody money, correct?

A    Correct, could be, yes.

Q    And Carver bank would have no way, you don't have like a German Shepherd that could sniff and detect that the ink was not fresh, right?

A    We wouldn't know.

Q    Okay.  And it's also impossible for Carver bank to determine what the purpose was of the check transaction, right?

A    Other than any description that would provide -- in terms of what the check was for?

Q    Right.

When you get this check, you don't know what services or goods were being exchanged, right?

A    Unless we -- on the subject line there was a written -- a description.

J.A. 656

Torres - cross - Jackson                    1685

Q    Right.  And Carver bank doesn't require someone to write something in that subject memo line in order to do a check, right, it's not required?

A    That's correct.

Q    There were some questions about whether or not a single employee is entitled to open an account for somebody knowing that the information is false.

Do you remember those questions?

A    Yes.

Q    I am correct that the KYC function of Carver bank is not limited to any one person, correct?

A    That's correct, yes.

Q    There is an institutional apparatus in place for the bank to be able to engage about any questions that it has to engage with, correct?

A    That's correct.

Q    My last question to you, sir.

You don't have any information, I'm correct, about my client David Motovich stealing any money from Carver bank, correct?

A    I do not, no.

MR. JACKSON:  Thank you very much for your time, sir.  Thank you.

THE COURT:  Any redirect?

MR. PAULSEN:  Yes, Your Honor.

---

Torres - redirect - Paulsen                    1686

Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. PAULSEN:

Q    Mr. Torres, a moment ago I had asked you whether it would be relevant to Carver if you found out that a company didn't do anything.

Do you recall that?

A    Yes.

Q    And I believe Mr. Jackson had asked:  Well, there are obviously certain types of pass-through LLCs that probably don't do anything and would that, itself, be a problem?

Do you recall that question?

A    Right, yes.

Q    Let me rephrase my question because I think my initial question may have been a little bit clumsy.

If a customer told Carver that you had a construction business and Carver learned that the business did nothing at all, would that be relevant to Carver?

A    That would be relevant, yes.

Q    If a customer told Carver that they were involved in home renovations or some other construction, but instead were loaning money or involved in check cashing, would that be relevant?

A    Yes, that would be relevant.

MR. PAULSEN:  No further questions, Your Honor.

---

Proceedings                    1687

THE COURT:  Thank you.  You may step down, sir.  Appreciate you.

(Witness steps down and exits the courtroom.)

THE COURT:  All right.  Please call your next witness.

MR. PAULSEN:  Yes, Your Honor.  The Government calls Dannette Sullivan-Hyatt.

THE COURT:  Please have the witness come forward to be sworn.

(Witness entered the courtroom.)

THE COURT:  Please come forward, ma'am, to the front of the courtroom and my courtroom deputy will swear you in when you get to the top step right here.  He's the gentleman standing here.

(Witness takes the stand.)

THE COURT:  And please raise your right hand, ma'am, and he'll swear you in.

THE COURTROOM DEPUTY:  Do you solemnly swear or affirm that the answers you are about to give the Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

(Witness sworn.)

THE COURT:  Thank you, ma'am.  Please be seated.

And do you see that microphone in front of you?  It

**J.A. 657**

---

Proceedings                    1688

looks a little bit like a snake.  Why don't you reach out and grab it.  You can move it around.  Swivel it to you.  Swivel it down so it's right in front of you.  See, you're in charge.

And just state your name and spell it, and then counsel will inquire.  So please state your name and spell it.

THE WITNESS:  Dannette Sullivan-Hyatt, D-A-N-N-E-T-T-E, S-U-L-L-I-V-A-N dash H-Y-A-T-T.

THE COURT:  Thank you, ma'am.

Counsel, you may inquire.

And you can pull the microphone close.  You don't have to lean forward to it, it will move to you.

THE WITNESS:  Okay.

THE COURT:  Thank you.  You're the boss.

Go ahead.

(Continued on the following page.)

Sullivan-Hyatt - direct - Paulsen          1689

DANNETTE SULLIVAN-HYATT,

 called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PAULSEN:

Q Good afternoon Ms. Hyatt.

A Good afternoon.

Q Where do you live?

A In Brooklyn. Canarsie, Brooklyn.

Q Where do you work?

A Currently, I work for a not-for-profit organization in the city.

Q Before you worked there, where did you work?

A I worked at Banco Popular, and then I worked at Carver Federal Savings Bank.

Q What was your most recent job?

A Before this not-for-profit, I was a branch manager at Carver Federal Savings Bank.

Q Have you pled guilty to any federal crimes in connection with your work at Carver Federal Savings Bank?

A Yes, I have.

Q What crime is that?

A Bank fraud.

Q Did you commit that crime with other people?

---

Sullivan-Hyatt - direct - Paulsen          1690

A Yes, I did.

Q With who?

A David Motovich.

Q Do you recognize him in the courtroom today?

A Yes, I do.

Q Can you please point him out by an article of clothing?

A He's sitting there with a green and colorful tie.

Q Now, we'll get into more details about your --

 THE COURT: Are you going to ask me if the record should reflect that the witness has just identified Mr. Motovich, or you're not going to ask me that question?

 MR. PAULSEN: Your Honor, I think that would be an excellent idea.

 THE COURT: I don't have any ideas, I'm just the judge.

 The question is are you going to ask me to do that?

 MR. PAULSEN: Yes, Your Honor.

 I would ask that the record reflect that Ms. Hyatt has identified the defendant David Motovich.

 THE COURT: The record will so reflect.

 Now proceed with your next question.

 MR. PAULSEN: Thank you for the reminder, Judge.

 THE COURT: You're welcome. That's why they pay me the big bucks.

Q Ms. Hyatt, we'll get into the details of this in a

---

Sullivan-Hyatt - direct - Paulsen          1691

moment, but broadly speaking, what did you do to be convicted of bank fraud?

A Approved transactions, performed transactions for an entity or several entities that David Motovich was not a signer on that account, however, he requested those transactions. So I approved those, I performed transactions, such as wires, et cetera.

Q So is it fair to say you helped David Motovich use your bank without disclosing that he was the one doing it?

A Yes, it is.

Q Now, Ms. Hyatt --

 MR. PAULSEN: I'd like to show first the witness Government Exhibit 6.

 THE COURT: Any objection to Government 6?

 MR. JACKSON: No objection, Judge.

 THE COURT: You may publish.

 (Exhibit published.)

 THE COURT: It's admitted.

 (Government's Exhibit 6 was received in evidence.)

BY MR. PAULSEN:

Q Who is that?

A That's me.

Q What is your educational background, Ms. Hyatt?

A I went to Prospect Heights High -- I came from Jamaica in 1986. I went to Prospect Heights High School, and then I went

---

Sullivan-Hyatt - direct - Paulsen          1692

to Brooklyn College.

Q Could you tell the jury a little bit about your career in the banking industry?

A I started as a bank teller for Banco Popular. Then I became teller supervisor, assistant branch manager, and then branch manager at Banco Popular.

Q Okay.

 During the time you were at Banco Popular, did you get to know the Motovich family?

A Yes, I did.

Q Who did you get to know first?

A Boris, Boris Motovich.

Q How is Boris Motovich or is Boris Motovich related to the defendant David Motovich?

A He is his father.

Q What bank services did you provide for Mr. Motovich?

A At the commercial -- as the commercial teller, I processed all their deposits and if they had any withdrawals. But I did all their transactions.

Q During that time, did you get to know Boris Motovich's son, David Motovich?

A Yes. At that time David was the one bringing the transactions to the bank.

Q Okay.

 Now, while you were at Banco Popular, did you get to

**J.A. 658**

Sullivan-Hyatt - direct - Paulsen     1693

know or did you -- were you introduced to an individual named Kemal Sarkinovic?

A     Yes.  Even though I wasn't the branch manager, at that time David did refer Kemal -- Kemal to open a business account.

Q     Okay.

Is that something that David Motovich or his family would do sometimes, would refer individuals to open accounts with you?

A     Yes.  We would refer to someone like him as a COI, which is a center of influence, which if we need new accounts because of, you know, we know he knows folks, so we would ask him to refer business to us and he would.

Q     Okay.  I'd like to show you a couple of photos, Ms. Hyatt.

First, Government Exhibit 9, which is already in evidence.

THE COURT:  You may publish.

(Exhibit published.)

Q     Do you recognize this person?

A     Yes, that's David's sister.

Q     Do you know her name?

A     I don't remember.

Q     And now one more, Government Exhibit 20.

(Exhibit published.)

Sullivan-Hyatt - direct - Paulsen     1694

Q     Do you know who that is?

A     No.

MR. PAULSEN:  You can take that down.

BY MR. PAULSEN:

Q     So, during the time when you were at Banco Popular, did you become friendly with David Motovich?

A     Yes.

Q     How would you characterize your relationship?

A     We were casual.  It was friendly.  We would -- I had his number, his cell phone, he had mine, and we would call and text each other.

Q     Okay.  Did you attend family events with each other?

A     Yes.  When David was getting married, several of us from the bank were invited, and I did go to the wedding.

Q     Okay.  Did -- did David Motovich develop kind of a formal relationship with your daughter?

A     That -- that's way after, yes.

Q     But what was that?

A     Actually, when I got pregnant, a while after, I did ask him to become my daughter's godfather.

Q     And did he become that person?

A     Yes.

Q     Now, you mentioned that you guys were -- you would exchange jokes?

A     Yes.

Sullivan-Hyatt - direct - Paulsen     1695

Q     Were some of the jokes like dirty jokes?

A     Yeah.

THE COURT:  I hope so.  Let's go.  Come on.  They were jokes.

THE WITNESS:  Yes.

BY MR. PAULSEN:

Q     All right.  So, Ms. Hyatt, did there come a time where you were let go from Banco Popular?

A     Yes.

Q     What happened?

A     I gave an override for a transaction for a customer.  The check was still on hold and I overrode the check, the transaction, the hold.  Gave the person the money.  It was during the holiday season.  They said they wanted to go buy material to sell in their store.  They get a better discount with cash.  So, I overrode the check and then the check bounced and the person never repaid the money.  So, I was terminated.

Q     Okay.

If I understand this correctly, banks will hold a check for a couple days to make sure it clears, is that right?

A     Yes.

Q     And you made that happen faster?

A     Yes, I made an exception for it.

Q     And it ended up burning the bank?

Sullivan-Hyatt - direct - Paulsen     1696

A     Yes.

Q     So what happened because of that?

A     I was terminated.

Q     During this time when you were terminated, you had been working extensively with the Motovich family?

A     Yes.

Q     Did David Motovich know that you had been fired for this reason?

A     Yes.  I did reach out to some of my customers, and he was one of them.

Q     So he knew that you had been fired for helping a customer take a shortcut?

A     Yes.

Q     Now, where did you work next?

A     I went to Carver Federal Savings Bank.

Q     Did the people at Carver know that you had been dismissed from Banco Popular for that reason?

A     Yes.

Q     What was your first position there at Carver?

A     An assistant branch manager.

Q     Now, did there come a time when you recruited some of the Motoviches over to Carver to bring their business to your new bank?

A     Yes.  When I became a branch manager at the Flatbush Avenue branch, that was close to Coney Island where David was,

**J.A. 659**

Sullivan-Hyatt - direct - Paulsen          1697

I did reach out to him to bring some relationships over.

Q    And did that happen?

A    Yes.

Q    Now you mentioned earlier, I think you used the phrase a center of influence?

A    Yes.

Q    Can you explain that again to the jury?

A    A center of influence is like branch manager you have to make certain goals, new accounts, new money, things like that, loans.  So, you have a set of folks who have, you know, influence in the community who knows people.  And it's also called a book of business.  So you reach out to these folks, ask them to refer someone or even ask them for their business, as well.

Q    So you perceived David Motovich as somebody who could bring you more business, is that correct?

A    Yes.

THE COURT:  You can't talk over each other.  You have to wait for him to finish the question, ma'am.

Go ahead.  Put your next question.

MR. PAULSEN:  Thank you, Your Honor.

BY MR. PAULSEN:

Q    Did you understand what David Motovich did for business?

A    Yes.

Q    What was that?

Sullivan-Hyatt - direct - Paulsen          1698

A    He ran the Midwood Lumber.

Q    Was that the company that his family had established?

A    Yes.

Q    Did you know some other companies that he had in his name?

A    Yes.  He had Health -- All Health Home Care.  He had Neomy Dialysis.  Sherman Abrams Lab.  303 Penthouse, I think.  There was another one, David M, LLC; yeah.

Q    And you knew these because you were his banker, is that right?

A    Yes.

Q    Now, were these companies in his own name?

A    The ones that I mentioned, yes.

Q    Now, did there come a time when you opened up other accounts for David Motovich that were not in his own name?

A    Yes.

Q    What were those accounts that you opened up for David Motovich that were not in his own name?

A    Advertising on the Go and Midwood -- I think Midwood USA and J -- I can't remember the name the last one.  J --

Q    Was it ZKC?

A    ZKC, yes.

Q    Who administered these accounts?

A    Can you explain?

Q    Sure.  Who -- for these three accounts, who was

Sullivan-Hyatt - direct - Paulsen          1699

conducting the transactions in these accounts?

A    David Motovich or Marina, Marina Kuyan.

Q    I'd like to show you, Ms. Hyatt, Government Exhibit 15.

THE COURT:  In evidence?

MR. PAULSEN:  Yes, Your Honor.

THE COURT:  You may publish.

(Exhibit published.)

BY MR. PAULSEN:

Q    Who's this?

A    Marina Kuyan.

Q    This is the Marina you just mentioned a moment ago?

A    Yes.

Q    Can you explain to the jury Marina Kuyan's relationship to David Motovich?

A    She was his secretary.

Q    When you needed to conduct business with David Motovich, did you often reach out to her?

A    Yes.

Q    Can you describe for the jury the extent, the sort of activities you would do with Marina Kuyan on behalf of David Motovich?

A    Marina would either call or send e-mail or fax to do wire transfers, to get account balances, to get bank statements, printout of accounts, or even request to open new accounts.

Q    Was she often the one that you would deal with on behalf

**J.A. 660**

Sullivan-Hyatt - direct - Paulsen          1700

of David Motovich?

A    Yes.

Q    Now, you mentioned two accounts a moment ago, Midwood USA and Advertising on the Go.

Do you recall that?

A    Yes.

Q    Who was the signatory for those two accounts?

A    Robert Lovy.

Q    Have you met Robert Lovy?

A    Yes.

Q    About how many times?

A    Ten or less than ten.

THE COURT:  Would you pull the microphone a little closer to you?  Thank you.

Go ahead, counsel.

BY MR. PAULSEN:

Q    So ten or less than ten?

A    Yes.

Q    Is this in the past?

A    Yes.

Q    Now, how much contact, besides that, did you have with him?

A    Not much.

Q    Did he do any transactions out of those accounts?

A    Yes, but rarely.

Sullivan-Hyatt - direct - Paulsen 1701

Q Rarely?

A Yeah.

Q Who did the rest of the accounts -- the rest of the transactions in those two accounts?

A Marina would request transaction or David.

Q And this goes for both Advertising on the Go and Midwood USA?

A Yes.

Q And you knew this because you were the banker on these accounts?

A Yes.

MR. PAULSEN: I'd like to show, Your Honor, the witness Government Exhibit 1047, which is not in evidence.

THE COURT: Any objection to 1047?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government's Exhibit 1047 was received in evidence.)

THE COURT: You may publish.

(Exhibit published.)

BY MR. PAULSEN:

Q Ms. Hyatt, do you see the picture down below on this e-mail?

A Yes.

Q What is this a picture of?

Sullivan-Hyatt - direct - Paulsen 1702

A It's a screenshot of an account printout.

Q Okay.

MR. PAULSEN: Ms. Kannan, can you zoom just the top left-hand corner to see what --

Q Is it fair to say this is Midwood USA Consulting Corp.?

A Yes, it is.

Q And Robert Lovy, that's the individual you just talked about?

A Yes.

MR. PAULSEN: Can you zoom out, please, Ms. Kannan.

Can you just show the body of the screenshot to show what it is it's depicting?

(Exhibit published.)

BY MR. PAULSEN:

Q Is this just a standard account statement?

A This is a printout, not -- just a history of the account.

Q Okay. And who did you send this to?

A I believe Marina.

Q Am I correct in stating that this e-mail then was forwarded from Marina to David Motovich?

A Yes.

Q So, we saw Robert Lovy's name, but you're sending a copy of the account to Marina, not to Robert Lovy, is that right?

A Yes.

Q And that's normal, right?

Sullivan-Hyatt - direct - Paulsen 1703

A (No response.)

Q And, Ms. Sullivan-Hyatt, if I can draw --

THE COURT: Did you get an answer to the question?

Would you read the question back, please, and the answer?

I'm not sure I heard the answer.

(Question read back as requested.)

THE COURT: Did you answer the question?

THE WITNESS: No, I didn't.

THE COURT: Why don't you answer the question now.

THE WITNESS: No, that's not normal.

THE COURT: Go ahead.

You were being distracted by your colloquy with your colleague and the witness had not answered your question. So it's important to focus on the witness that you're questioning while the witness is here and the jury is here.

MR. PAULSEN: Yes, Your Honor.

THE COURT: First things first.

MR. PAULSEN: I agree.

THE COURT: Are we clear?

MR. PAULSEN: I agree, Your Honor.

THE COURT: I'm glad you do.

So, let's pay attention to the witness and the jury and you can chat with your colleague over beers later.

Let's go.

Sullivan-Hyatt - direct - Paulsen 1704

MR. PAULSEN: Thank you, Your Honor.

THE COURT: You're welcome.

MR. PAULSEN: Ms. Kannan, if you can zoom into the e-mail account in the middle.

(Exhibit published.)

BY MR. PAULSEN:

Q Ms. Hyatt, was that your e-mail at Carver bank?

A Yes.

Q And this shows that you sent this, this e-mail to Marina Kuyan?

A Yes.

Q Now, do you know what kind of businesses Advertising on the Go and Midwood USA were?

A Not really, no.

Q Do you know if they did anything?

A No.

Q Do you know where they were located?

A At Coney Island Avenue in the same building that David was located in.

Q So they had an address listed at those buildings?

A Yes.

Q But do you know whether they had employees or whether they did any particular work?

A No.

Q Did you ever meet Lovy, Robert Lovy, at any of those

**J.A. 661**

*Sullivan-Hyatt - direct - Paulsen* 1705

buildings?

A   Yes.

Q   How frequently?

A   Again, not frequent.

Q   Now, do you -- are you familiar with the term KYC?

A   Yes.

Q   What does that mean?

A   Know your customer.

Q   How does that factor into Carver bank's work?

A   KYC, know your customer, factors into the bank to ensure that you know who the customer is that you're dealing with to avoid fraudulent transactions and misappropriation of accounts.

Q   Did you perceive that the bank thought that was fairly important?

A   Yes.

Q   In setting up accounts for David Motovich in this way, were you violating the KYC rules?

A   Yes.

Q   What's a signature card?

A   A signature card is something that's signed that we use whenever a check is written or anything like that, we go by the signature on the card to -- it's like an ID for the bank.

Q   Does it also list the individuals who are allowed to transact business on the account?

---

*Sullivan-Hyatt - direct - Paulsen* 1706

A   Yes.

Q   Why is that important?

A   It's another part of the KYC enhanced due diligence to avoid, again, persons that are not on an account to access that account.

(Continued on the following page.)

---

Sullivan-Hyatt - direct - Paulsen   1707

MR. PAULSEN:  (Continuing.)

Q   Are you familiar with what a SAR is?

A   Yes.

Q   What's a SAR?

A   Suspicious activity report.

Q   Can you explain for the jury under what circumstances Carver Bank would file a SAR involving one of its accounts?

A   If someone is transacting in an account that doesn't belong to them or based on the type of business it is, the amount of activity on the account if it's unusual, then SAR would be filed as well.

Q   Can you file a SAR if the person who's transacting the business is not the name on the account?

A   No.

Q   What is CTR?

A   CTR is currency transaction report.  That's when $10,000 and a penny or more is coming in or going out of the bank, we file a currency transaction report.

Q   Same question:  Can a bank faithfully file a CTR if the name on the account is different than person who is actually doing the work?

A   No.

Q   Were David Motovich or Marina Kuyan ever listed as a signatory on the two accounts we just discussed?

A   No.

---

Sullivan-Hyatt - direct - Paulsen   1708

Q   But they were the ones that did nearly all the transactions; is that correct?

A   Yes.

Q   Was this permitted by bank policy?

A   No.

Q   Did your bosses or superiors at the bank, did they know you were doing this?

A   No.

Q   You didn't tell them?

A   No.

Q   Why not?

A   I knew it was a violation.

Q   What would have happened if you told them?

A   I would have been terminated.

Q   Now, did you have some of your coworkers help you do transactions for Mr. Motovich or Ms. Kuyan at times?

A   Yes.

Q   When they did that, did they have any idea about the relationship you had with David Motovich?

A   No.

Q   Why not?

A   I didn't tell them.

Q   Why not?

A   I know it was wrong.

Q   What would have happened, do you think, if they knew what

**J.A. 662**

Sullivan-Hyatt - direct - Paulsen          1709

you were doing?

A    They wouldn't have done it and they most likely would have reported it.

Q    Now, those two accounts that we just talked about, that's two of the three accounts that you just mentioned; is that right?

A    Yes.

Q    The third one is ZKC?

A    Yes.

Q    Are you familiar with that account?

A    Yes.

Q    Who controlled ZKC?

A    David Motovich.

Q    Who had the checkbook?

A    David Motovich or Marina.

Q    Was either one listed on the account?

A    No.

Q    Do you know whose name was on that account?

A    Robert Garcia.  Mr. Garcia.

Q    You're not sure what his name is?

A    I forget the first name.

Q    Is that because you never met him?

A    Yes.

Q    Could you pick him out of the room if he was here today?

A    No.

Sullivan-Hyatt - direct - Paulsen          1710

Q    Were you allowed to do that, to set up an account for Mr. Garcia when he had no idea that it was opened?

A    No.

Q    I would like to ask you about the opening of the account.

    MR. PAULSEN:  I would like to show for the witness Government Exhibit 1059, which is not in evidence.

    THE COURT:  Any objection to 1059 coming into evidence?

    MR. JACKSON:  No objection, Judge.

    THE COURT:  It is admitted.  You may publish.

    (Government Exhibit 1059 received in evidence.)

    (Exhibit published.)

    MR. PAULSEN:  You can zoom in at the top, Ms. Kannan.

BY MR. PAULSEN:

Q    Ms. Hyatt, is this an e-mail from Marina Kuyan to you on April 1st, 2016?

A    Yes.

Q    Does the subject say, "All papers for a new company"?

A    Yes.

Q    Is that right?

    MR. PAULSEN:  I would like to skip to page 1, please, Ms. Kannan, the first attachment and zoom in on the company.

BY MR. PAULSEN:

Sullivan-Hyatt - direct - Paulsen          1711

Q    What company name is there?

A    ZKC NY, Inc.

Q    Is that the company we were just talking about?

A    Yes.

Q    What address is that?

A    1090 Coney Island Avenue Brooklyn, New York 11230.

Q    Do you know that address?

A    Yes.

Q    Who's address is that?

A    David Motovich's office.

    MR. PAULSEN:  Ms. Kannan, if you could jump to page 4 or the third page of the attachment.  It should be page 4.

BY MR. PAULSEN:

Q    Do you recognize this document?

A    Yes.

Q    What is this?

A    That's a document that you get from the Department of State, like, a certificate of incorporation to show that it's an active entity and it was filed with the state, authorized to do business in New York State.

Q    Okay.  And this was sent to you by Marina Kuyan and not by Mr. Garcia?

A    Yes.

    MR. PAULSEN:  Now, jump to page 6, please, Ms. Kannan?

J.A. 663

Sullivan-Hyatt - direct - Paulsen          1712

BY MS. PAULSEN:

Q    What do we have here, Ms. Hyatt?

A    Social Security card and driver's license for Reginald Garcia.

Q    Is this pretty standard that you need these for opening the account?

A    Yes.

Q    You should be getting it from the person actually opening it, though; right?

A    Yes.

Q    Did Marina Kuyan tell you anything about why they wanted to open this account?

A    Yes.  She said that Mr. Garcia had a construction company and wanted to open a business with him.

Q    Okay.  Did you know whether that was true or not?

A    No.

    MR. PAULSEN:  If I can show the witness now Government Exhibit 1068, only the witness.

    THE COURT:  Any objection?

    MR. JACKSON:  To 1068?  No objection.

    THE COURT:  Admitted.

    You may publish.

    (Government Exhibit 1068 received in evidence.)

    (Exhibit published.)

    MR. PAULSEN:  You can zoom in.

Sullivan-Hyatt - direct - Paulsen          1713

BY MR. PAULSEN:

Q   Ms. Hyatt, is this an e-mail from Marina Kuyan to you?

A   Yes, it is.

Q   This is April 19th, 2016?

A   Yes.

Q   It's about, what, 18 days later from that previous e-mail?

A   Yes.

Q   Now does it say it's sent from DavidMotovich@faxmidwood.AOL?

A   Yes.

        MR. PAULSEN:  If you can turn to the next page?

BY MR. PAULSEN:

Q   What do we have here, Ms. Hyatt?

A   It's a fax cover sheet.

Q   Did you send that fax to Ms. Kuyan?

A   Yes.

        MR. PAULSEN:  Now, turning to page 6, Ms. Kannan, zooming in on the top?

BY MR. PAULSEN:

Q   Do you recognize that name, Ms. Hyatt?

A   Yes.

Q   That's the name of the person who was on the ZKC account?

A   Yes.

Q   Where did that signature come from?

---

Sullivan-Hyatt - direct - Paulsen          1714

A   I'm not sure.

Q   Did you get this signature?

A   No.

Q   You haven't -- you never met him; is that right?

        THE COURT:  What is the name so the record is clear?

        THE WITNESS:  Reginald Justin Garcia.

        THE COURT:  Go ahead.

        MR. PAULSEN:  Thank you, Your Honor.

BY MR. PAULSEN:

Q   And there's a different address down below.

        MR. PAULSEN:  Ms. Kannan, can you zoom in on the address down below, down there.  Thank you.

BY MR. PAULSEN:

Q   Ms. Hyatt, do you know that address?

A   Yes.

Q   What address is that?

A   1169 Coney Island Avenue, Brooklyn, New York 11230. That's another one of the buildings also that David operate out of.

Q   Okay.  You knew that because you're his banker and you've known him for a long time?

A   Yes.

        MR. PAULSEN:  Now, Ms. Kannan can you turn to Government Exhibit 707-A which is in evidence?

        THE COURT:  You may publish.

---

Sullivan-Hyatt - direct - Paulsen          1715

        (Exhibit published.)

        MR. PAULSEN:  Please zoom in on the top.

BY MR. PAULSEN:

Q   Ms. Hyatt, do you remember me showing you these documents?

A   Yes.

Q   Is it fair to say these are the final approval documents for the ZKC account?

A   Correct, yes.

Q   There's a number of names on this document.  Can you just explain for the jury who all of these people are?  Maybe starting from the bottom.  There's someone named Madrina Williams?

A   Madrina Williams is the banker in the branch who started the account opening process.

Q   Was she using information that you provided her?

A   Yes.

Q   What about Patricia Stewart, who is that?

A   She's the person in retail operations who reviews the accounts and they do the Lexisnexis and all the checks, security checks.

Q   What about the next name, Uscella Colada?

A   That's just the person in our IT department.

Q   And then your name is down at the bottom?

A   Yes.

---

Sullivan-Hyatt - direct - Paulsen          1716

Q   Now, did any of these other individuals have any idea about the arrangement that you had had with David Motovich?

A   No.

Q   These would be the people that you were not going to tell?

A   Yes.

        MR. PAULSEN:  If you could turn to page 2, Ms. Kannan.

BY MR. PAULSEN:

Q   What is this document?

A   That's the business account checklist.

Q   This is the document you need to generate to make a new business account?

A   Yes.

Q   Now, does your signature appear anywhere on this document?

A   Yes.  My initials at the bottom.  It says, "prepared by" that's Madrina and then "reviewed by," that's me.

Q   So you didn't write this form; is that right?

A   No.

Q   You approved it as her boss?

A   Yes.

Q   The information that was contained here, do you know how Madrina got it?

A   I gave it to her.

J.A. 664

Sullivan-Hyatt - direct - Paulsen          1717

Q    Did she know what was going on here?

A    No.

MR. PAULSEN:  If you can turn the page to page 3, Ms. Kannan, zoom in on the top.

BY MR. PAULSEN:

Q    Am I correct, Ms. Hyatt, that this account opening document says that ZKC is a construction company?

A    Yes.

Q    Where did you get that information from?

A    David Motovich.

Q    The other information, the address, the name, the tax ID, these are all things that were provided by David Motovich or Marina Kuyan?

A    Yes.

MR. PAULSEN:  If you can zoom out and then go to page 4 and zoom in there, please.  Thank you.

BY MR. PAULSEN:

Q    There's a phone number, Ms. Hyatt, in the middle of this page.  Do you see that?

A    Yes.

Q    917-709-9280.  Do you know what phone number that is?

A    No.

Q    How did you get it in order to put it on to this form?

A    It was provided by either Marina or David.

MR. PAULSEN:  Now, zooming out, Ms. Kannan, if you

---

Sullivan-Hyatt - direct - Paulsen          1718

can zoom on the bottom, over to the full bottom, please?

BY MR. PAULSEN:

Q    This document says that Reginald Garcia is the one hundred percent owner of this company; is that right?

A    Yes.

Q    How did you know to include that?

A    We have to notate the ownership percentage of -- to ensure that we have one hundred percent of the owners on this document.

Q    Did you put one hundred percent for Reginald Garcia because David Motovich told you that?

A    Yes.

MR. PAULSEN:  Now, if you could turn to page 5, please, Ms. Kannan, and just zoom in on the top to see what kind of a form this is.

BY MR. PAULSEN:

Q    What is this form, Ms. Hyatt?

A    This is like a checklist to do a rating of the new account since we don't really have any history of this.  So it's a checklist to rate certain transactions and to put them in a category, medium, low or high risk.

Q    You give every company a score based on various risk factors?

A    Yes.

Q    How did you know what to fill in for ZKC?

---

Sullivan-Hyatt - direct - Paulsen          1719

A    The questions were asked and the answers were given by either Marina or David.

Q    To be clear, all the information here would be what David Motovich or Marina would have provided to you?

A    Yes.

MR. PAULSEN:  Now, if you could turn to page 7, and zoom in on the middle, please.  Actually, right there.

BY MR. PAULSEN:

Q    Does this say, "Garcia, Reginald referred by Mr. David Motovich"?

A    Yes.

Q    Why is that there?

A    Because it does ask who -- who you met with, things like that, so I just wanted to provide clarity of who referred this business.

MR. PAULSEN:  Ms. Kannan, if you could zoom in on the "Pros" section below that.

Q    This again says "construction company," Ms. Hyatt?

A    Yes.

Q    And then below that even -- am I correct that this says, "The employee were on jobs" --

Maybe if you could read that.  I believe that's your writing?

A    Yes.  "The employees were on a job site.  Mr. Reginald was in the process of purchasing material for Mr. Motovich."

---

Sullivan-Hyatt - direct - Paulsen          1720

Q    Can you explain that?

A    So you have to do a call report for a business account. So when I went to visit, I spoke with David and he told me that the employees were at the job site.  They weren't around. And he did mention that someone over there, that's Mr. Garcia. I didn't take ID or anything like that.  I didn't confirm or verify that who David said Mr. Garcia was was actually him.

Q    Okay.  Let me make sure I understand this.  As part of a business account you're supposed to do a site visit?

A    Yes.

Q    You're supposed to go there and see the place and meet the individual?

A    Yes.

Q    You never met the person purported to be Mr. Garcia; right?

A    Never met him.

Q    But David Motovich pointed to somebody in the distance and said that's the guy?

A    Yes.

Q    You never went over to talk to them?

A    No.

Q    You just trusted David on that?

A    Yes.

MR. PAULSEN:  Now, if you could turn one more page, Ms. Kannan -- actually, if you could go back one more to where

**J.A. 665**

Sullivan-Hyatt - direct - Paulsen    1721

the date is and where the signature is.

BY MR. PAULSEN:

Q    Is that your signature?

A    Yes.

Q    And, so, this is you certifying that the site visit happened on April 1, 2016?

A    Yes.

MR. PAULSEN:  And then the next page, please, Ms. Kannan.  Can you zoom those -- yeah.

BY MR. PAULSEN:

Q    Ms. Hyatt, do you recognize those signatures?

A    It's supposed to be for Reginald Garcia.

THE COURT:  I am sorry, I couldn't hear you could you keep your voice up, please.

Read the question back and we'll have an answer. Keep your voice up, please.

MR. PAULSEN:  Yes, Your Honor.

THE COURT:  I want the reporter to read it back and the answer, if we got one.

Again, pull the microphone towards you and keep your voice up so the jury can hear you.

Question and answer, please.

(Record read.)

THE COURT:  Go on.

BY MR. PAULSEN:

Sullivan-Hyatt - direct - Paulsen    1722

Q    You received those signatures from Marina Kuyan?

A    Yes.

MR. PAULSEN:  Ms. Kannan, can you turn to page ten?

Q    Is that another signature that you received from Marina Kuyan?

A    Yes.

MR. PAULSEN:  Now, Ms. Kannan, can you do a side-by-side for this document and page 17?  If you can zoom in on both signatures.

Q    Ms. Hyatt, do the signatures look anything alike on these documents?

A    No.

Q    Was this something that you noticed at the time?

A    No.

Q    Were you watching out for any of this?

A    No.

MR. PAULSEN:  I would like to turn to page nineteen. Now, in the middle there's a reference to the Office of Foreign Assets Control.  You referenced that a moment ago; is that right.

A    Yes.

Q    What is the abbreviation for that term?

A    OFAC.

Q    Do these documents show that OFAC checks were run on ZKC?

A    Yes.

Sullivan-Hyatt - direct - Paulsen    1723

MR. PAULSEN:  Turning to page 22, Ms. Kannan.

Q    Was an OFAC check also run for Mr. Garcia?

A    Yes.

Q    I asked you this before, but is there much point of running an OFAC check on somebody who's not actually running the account?

A    No.

Q    Now, did you ever go back looking for Reginald Garcia?

A    The second time I went to visit the office, yes, yeah, I did go back a second time.

Q    Did you find him?

A    No.

Q    What happened?

A    When I got there, David told me that -- I met with David. He told me that that was during the earthquake in Haiti and he told me that because Mr. Garcia does construction he got a contract to do some building over there so I missed him.  He went on a plane.

Q    So you went looking for him and David Motovich said he's not here, he's in Haiti?

A    Yes.

Q    Did you ever go to look for him again?

A    No.

Q    Now, all told during your time working with David Motovich and ZKC you said you never ever spoke to Reggie

Sullivan-Hyatt - direct - Paulsen    1724

Garcia; is that right?

A    Right.

Q    You only CFO to David Motovich and Marina Kuyan?

A    Yes.

Q    During that time, did you assist in transactions on the account?

A    Yes.

Q    Is it fair to say there are millions of dollars worth of transactions in that account?

A    Yes.

Q    And you did this always with people who were not listed as the signatories?

A    Yes.

Q    Now, Ms. Hyatt, you understood that you couldn't do this; right?

A    Yes.

Q    You didn't let your coworkers know that you were doing this?

A    No.

Q    You didn't let your bosses know that you were doing this?

A    No.

Q    You did it anyway?

A    Yes.

Q    Now, during this time did you and David Motovich ever text with each other?

**J.A. 666**

Sullivan-Hyatt - direct - Paulsen 1725

A    Yes.

Q    You were friendly?

A    Yes.

MR. PAULSEN:  Your Honor, I would like to show only the witness Government Exhibit 1208.

THE COURT:  Any objection to Government 1208?

MR. JACKSON:  Judge, we haven't been provided this exhibit.

THE COURT:  I am sorry.  Take a look at it.  Do you have an objection?

MR. JACKSON:  We have an objection, Judge.

THE COURT:  Sidebar.  White noise.

(Sidebar held outside of the hearing of the jury.)

(Continued on next page.)

Sidebar 1726

(The following sidebar took place outside the hearing of the jury.)

THE COURT:  May I see the document?

MR. PAULSEN:  This is the first page, Your Honor.

THE COURT:  And what are you offering, Counsel?

MR. PAULSEN:  These are text messages between --

THE COURT:  This is 1208.  Is this a composite exhibit?  The entire exhibit is marked as 1208 or is it marked with subset numbers?

MR. PAULSEN:  The entire exhibit is 1208.

THE COURT:  Let me take a look at it.  And you're offering the entirety of the exhibit; is that right?

MR. PAULSEN:  Yes, Your Honor.

THE COURT:  Okay.  Let me look at it.

(Reviewing.)

MR. JACKSON:  Mr. Paulsen, do you have another copy we can look at?

THE COURT:  I keep telling you to pretend that I'm Adam.  Keep quiet while I'm looking at the exhibit.

MR. PAULSEN:  Yes, Your Honor.

THE COURT:  I knew you knew how to try cases. What's the purpose you're offering this document for, counsel?

MR. PAULSEN:  These are -- there's various statements between the defendant and Ms. Hyatt concerning both.  For example, the first page where they discuss the use

Sidebar 1727

of the ZKC bank account there's also various discussions about gratuities that were provided by Mr. Motovich in exchange for the work that Ms. Hyatt was doing.

THE COURT:  What is your opposition?  What's the basis for your opposition.

MR. JACKSON:  Both 401 and 403, Judge.  We would be happy to admit every single one of the communications that we identify as substantive.  We have a problem that they've included -- they haven't given this to us.

THE COURT:  Had you not given this document before today, yes or no?

MR. PAULSEN:  We gave it to them.

THE COURT:  When did you give it to them?

MR. PAULSEN:  In the first production --

THE COURT:  First of all, this isn't speed talking and, second of all, head nods don't count it.  When I say "this" I'm referring to 1208, when did you provide it to defense counsel?

MR. PAULSEN:  On July 8th, via AFX.

THE COURT:  July 8th of this year?

Is that true or not true, Mr. Jackson?  I know you have a lot of people in the firm.  Are you telling the Court you didn't get this document?

MR. JACKSON:  That's my information and I just confirmed it.

Sidebar 1728

THE COURT:  Ask your colleague take a look for it.

MS. LAYDEN:  I have not seen it.

THE COURT:  You are part of a firm called Wachtel, yes?

MS. LAYDEN:  Yes.

THE COURT:  And you have a lot of lawyers according to the letterhead and co-counsel?

MS. LAYDEN:  Yes.

THE COURT:  Was this document produced to defense counsel?

MS. LAYDEN:  Her not to my knowledge.

THE COURT:  Not to my knowledge doesn't cut it for me.  Yes or no.

Do you have proof that it was produced?

MR. PAULSEN:  My understanding is that my colleague --

THE COURT:  Everyone has understandings and knowledge.  I'm asking you as officers of the court in the middle of a jury trial when a man's liberty is at stake was this document that you're offering produced to defense counsel?

MR. PAULSEN:  Yes.

THE COURT:  You say July 8th?

MR. PAULSEN:  Yes.

THE COURT:  Show me.  Prove it.  And then I want

J.A. 667

Sidebar                                      1729

you, Mr. Jackson, and your colleagues to confirm that it was produced or not produced.

MR. JACKSON:  Yes, sir.  Yes, Your Honor.

MR. PAULSEN:  Your Honor, may I display our computer to you?

THE COURT:  Tell me how and when it was produced.

MR. PAULSEN:  This is USA FX --

THE COURT:  When did you produce it?

MR. PAULSEN:  July 8th.

THE COURT:  How did you produce it.

MR. PAULSEN:  USA FX, which is the DOJ's system for --

THE COURT:  Mr. Jackson, check with your colleagues and tell me if you received this document on that date or not.

MR. JACKSON:  I'm going to confirm right now, Judge.

(Pause in proceedings.)

THE COURT:  Mr. Jackson, was this document produced to you as the Government has represented on July 8th of this year?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  All right.  I'm excluding the document under 401 and 803.  It's confusing.  It's a waste of time and the nature of the document is clearly something that is designed to distract and waste the time of the jury.  There is nothing in these documents that can't be elicited and hasn't

Sidebar                                      1730

been elicited already.  And, so, the motion to exclude that exhibit is granted.

Anything else we need to talk about at sidebar?

MR. PAULSEN:  No, Your Honor.

MR. JACKSON:  No, Your Honor.

THE COURT:  Okay.

(Sidebar ends.)

(Continued on next page.)

Sullivan-Hyatt - direct - Paulsen          1731

(Continuing.)

THE COURT:  The motion to exclude the document is granted.  It's not coming in.  Please continue your examination -- pursuant to 403 and 801.

BY MR. PAULSEN:

Q    Did you communicate with David Motovich when you were out of town?

A    Yes.

Q    Why did you do that?

A    To let him know that he can only do transactions on his accounts.

Q    Is that because you couldn't ask somebody else in your bank to do the work that you were doing for David Motovich?

A    Yes.

Q    And so you had to be there for that to happen?

A    Yes.

Q    Now, what did you get out of this?

A    Sometimes he would give me some money.

Q    Okay.  He would give you how much?

A    A couple hundred dollars.

THE COURT:  Total for all of this activity, how much money did he give you over time, if you had to give a ballpark estimate?

THE WITNESS:  Less than $2,500.

THE COURT:  Less than $2,500 all in?

Sullivan-Hyatt - direct - Paulsen          1732

THE WITNESS:  Yes.

THE COURT:  For all of your activities on behalf of Mr. Motovich?

THE WITNESS:  Yes.

THE COURT:  That is what you're telling the jury?

THE WITNESS:  Yes.

THE COURT:  Go ahead.

BY MR. PAULSEN:

Q    Ms. Hyatt, was he also sort of an important customer that you wanted to keep happy?

A    Yes.

Q    Now, when you withdrew money from the account, how did you do that --

MR. PAULSEN:  Rephrase Your Honor please.  Withdraw.

BY MR. PAULSEN:

Q    How did Mr. Motovich give you that money that you were discussing?

A    He would authorize me to debit ZKC, take like $150 or $200 and I would write up a slip and do the debit.

(Continued on the following page.)

J.A. 668

Sullivan-Hyatt - direct - Paulsen          1733

(Continuing.)

MR. PAULSEN:  Ms. Kannan, if he could show Government Exhibit 707E, which is already in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. PAULSEN:  If I could go to Page 10.  Actually, Page 11.  I apologize.  You could zoom in.

BY MR. PAULSEN:

Q    What are we looking at here, Ms. Hyatt?

A    That's the debit advice.

Q    Can you explain for the jury what this is and how it works?

A    So this is dated December 20th, 2017, ZKC.  It's prepared by me.  The amount was $500.  The account number is there, the 500608206, and then I said, as per Mr. Garcia.

Q    So where it says, As per Mr. Garcia's request, there's no Mr. Garcia here, obviously, right?

A    Yes.

Q    That's David Motovich?

A    Yes.

Q    And this was you taking $500 out for yourself?

A    Yes.

Q    Did this happen on other occasions?

A    Yes.

MR. PAULSEN:  Ms. Kannan, can you show Page 2.

Sullivan-Hyatt - direct - Paulsen          1734

Q    Can you read that, please?

A    Account is being debited as per customer request, Mr. Garcia.

Q    And that's -- obviously, that's David Motovich who's okaying that?

A    Yes.

MR. PAULSEN:  Can you turn to Page 4.

Q    Can you read this one?

A    As per Mr. Garcia's request, account is being debited $150.

MR. PAULSEN:  Turn to Page 7.

Q    Can you read this please, Ms. Hyatt?

A    As per customer request, account is being debited, and this is for $300.

Q    And this is again --

A    ZKC.

THE COURT:  Don't talk over each other.  Put the question, again, and get an answer after the question.

Read it back, please, Mr. Reporter.

(Whereupon, a portion of the testimony was read back.)

THE COURT:  Continue, Counsel.  Put another question.

MR. PAULSEN:  Yes, Your Honor.

Q    Ms. Hyatt, this was again, on behalf of David Motovich?

Sullivan-Hyatt - direct - Paulsen          1735

A    Yes.

Q    Now, during this time, did you sometimes ask David Motovich for money for various uses?

A    Yes.

Q    Money for computer or money for your daughter?

A    Yes.

Q    Did you often text him about this?

A    Yes.

Q    Now, during the time that you were assisting Mr. Motovich, did he ever ask you to provide a letter stating that he had more money in an account than he did?

A    Yes.

Q    Why did he do that?

A    He was applying for a loan.

Q    And he had asked you to misrepresent how much money he had in an account?

A    Yes.

Q    Were you willing to do that?

A    Yes.

Q    Did you do it?

A    I believe so, yes.

Q    Now, finally, did there come a time where you learned that the bank had received a Grand Jury subpoena for records related to the accounts we're talking about?

A    Yes.

Sullivan-Hyatt - direct - Paulsen          1736

Q    Is it fair to say that in banks, Grand Jury subpoenas are a big deal?

A    Yes.

Q    Are they secret?

A    Yes.

Q    Can banks disclose to people that they've received Grand Jury subpoenas?

A    No.

Q    Do you know if there are laws against that?

A    Yes.

Q    Were you the bank manager at the time?

A    Yes.

Q    What did do you when your bank got the subpoena that was targeting David Motovich?

A    I did reach out to David to let him know that I received a subpoena and I have to come by to do a site visit.

Q    And then what happened?

A    I did go by to do the site visit.

Q    And you told him about it?

A    Yes.

Q    Did he ask you anything?

A    He asked me to let him know, if there were any others, to let him know if any other subpoena.

Q    You understood that this was wrong to do when it happened; is that right?

**J.A. 669**

Sullivan-Hyatt - direct - Paulsen                1737

A     Yes.

Q     You understood that you were breaking bank policy?

A     Yes.

Q     And you understood that you were breaking the law?

A     Yes.

Q     Did you do this for anybody else besides David Motovich?

A     No.

Q     Now, Ms. Hyatt, do you remember when the agents in this case first came and spoke to you?

A     Yes.

Q     Were you straight with them about what you had been doing with David Motovich?

A     No, I wasn't.

Q     Why not?

A     I was frightened and scared.

Q     Was it difficult to come clean about this?

A     Yes.

Q     When you first started meeting with the Government in this case, were you completely honest about everything you were doing with David Motovich?

A     No, I was not.

Q     For example, did you once say that Reggie Garcia called the bank sometimes?

A     Yes, I did.

Q     Was that true?

Sullivan-Hyatt - direct - Paulsen                1738

A     No.

Q     Why'd you say that?

A     I was afraid and just looking for a way to, you know, clean things up.

Q     Have you tried to be honest more recently about what happened between you and David Motovich?

A     I'm 100 percent.

THE COURT:  He said, did try to, were you more honest?

THE WITNESS:  100 percent more honest, yes.

Q     Ms. Hyatt, do you regret what you did with David Motovich?

A     Yes.

Q     Why?

A     Because things have definitely changed for me.  I was a notary public.  I could not renew that because you have to swear that you're not a felon.  I was doing my real estate.  I had to stop that, as well.  I was also licensed to sell securities.  I had to just get rid of all of those.  And I can no longer work with a financial institution.  My life is just -- I wouldn't say over, but a wreck.

Q     Now, you've pled guilty to a cooperation agreement; is that right?

A     Yes.

Q     What charges did you plead guilty to?

Sullivan-Hyatt - direct - Paulsen                1739

A     Bank fraud.

Q     Do you understand what your sentencing exposure is on that case?

A     Zero to 30 years.

Q     So you could get nothing, no years, or you could get 30 years, somewhere in between; is that fair?

A     Yes.

Q     Do you know who makes the decision on that?

A     The judge.

Q     What are your obligations as you understand them under the cooperation agreement?

A     To tell the truth.

Q     Can you say that again?

A     To tell the truth.

Q     Does your employer know what happened with -- at Carver Bank?

A     No.

Q     Are you required to tell them?

A     No.  This employer can hire you with that background, but they just require, like, two recommendation letters which I provided.

Q     Is it fair to say your current employer doesn't ask about criminal record?

A     No, they do not.

Q     Did you seek some advice from your attorney to make sure

**J.A. 670**

Sullivan-Hyatt - direct - Paulsen                1740

you were doing that correctly?

A     Yes, I did.

Q     Now, Ms. Hyatt, I'd like to get back to what you were doing for David Motovich in these accounts.

Did you engage in wire transfers for David Motovich?

A     Yes.

Q     Were these in the name of Reggie Garcia or Robert Lovy?

A     Yes.  The business accounts, yes.

Q     Okay.  But who was calling the shots and making the decisions on these accounts?

A     David Motovich.

Q     Before we get to the wire transfers, did David Motovich ever ask to have cash withdrawn from these accounts?

A     Once in a while, he would send -- when he sends deposit to the bank, he would ask -- he would send a check to be cashed, yes.

Q     But that was rare?

A     Yes.

Q     Would he come himself, ever, to get cash?

A     No.

Q     Who would come?

A     His messenger.

Q     Is it fair to say that the overwhelming majority of transaction in this account were checks in, checks out, and wire transfers?

Sullivan-Hyatt - direct - Paulsen          1741

A     Yes.

Q     All right.  I'd like it get back to the wire transfer examples.

      Did you do a lot of wire transfers for David Motovich?

A     Yes, I did.

      MR. PAULSEN:  Ms. Kannan, can you pull up Government Exhibit 707F.

      This is in evidence, Your Honor.

      THE COURT:  You may publish.

      (Exhibit published.)

      MR. PAULSEN:  And go to Page 5.  Can you zoom in, please, Ms. Kannan.

Q     What is this document?

A     That's the transmittal for a wire transfer.

Q     Okay.  Is this a document that Carver Bank generates when there's a wire transfer?

A     Yes.

Q     Does it include the amount of the wire transfer?

A     Yes.  It includes the amount, who it's going to, yes, and where it's coming from.

      MR. PAULSEN:  Ms. Kannan, can you highlight in the middle of the page, the amount.

Q     Does that say 72,000?

A     Yes.

Sullivan-Hyatt - direct - Paulsen          1742

Q     Does it say who it's sent to?

A     Yes.

      MR. PAULSEN:  Ms. Kannan, could you highlight -- could you just highlight the middle.

      Withdrawn.

Q     Ms. Sullivan-Hyatt, does it mention what the originator of the wire is?

A     Yes.

Q     What does that mean to be the originator of the wire?

A     Which bank account the funds is coming from.

Q     And it would also indicate who the recipient is?

A     Yes.

Q     Who's the recipient on this one?

A     Yisroel Leshkowitz, attorney at law.

Q     Yisroel Leshkowitz, attorney at law?

A     Yes.

Q     Now, did you sometimes send a -- withdrawn.

      Would the records of these wire transfers be reflected in ZKC's standard bank statements?

      MR. PAULSEN:  Ms. Kannan, can I show Government 707B Page 77.

Q     Ms. Hyatt, would that be the indication of the same wire on the ZKC's bank statements?

A     Yes.

Q     And that date is February 22nd, 2017?

Sullivan-Hyatt - direct - Paulsen          1743

A     Yes.

      MR. PAULSEN:  Ms. Kannan, can we go back to 707F, Page 6 through 8.  Can you please zoom in.

Q     So Ms. Hyatt, do you remember this wire transfer?

A     Yes.

Q     What happened here?

A     This one was canceled.  Rejected.

Q     Why was that?

A     The amount of this one was $390,000.  The assistant branch manager, Desire, could not approve it.  Her limit was 250,000.

Q     Was this also to Yisroel Leshkowitz?

A     Yes.

Q     From ZKC?

A     Yes.

Q     Now, how did you solve the problem of it being too big to send?

A     We divide it in two.

Q     Okay.

      MR. PAULSEN:  Ms. Kannan, can you show the next two pages.

Q     Now, Ms. Hyatt, there's two wires for $195,000.

      Is that the breaking apart in two that you just described?

A     Yes.

Sullivan-Hyatt - direct - Paulsen          1744

Q     Are these also to Yisroel Leshkowitz?

A     Yes.

Q     Also from ZKC?

A     Yes.

Q     And what is the date on this, Ms. Hyatt?

A     March 1st, 2017.

Q     Now --

      MR. PAULSEN:  Your Honor, I would now like to show the witness, Government Exhibit 1106, which is an e-mail, not in evidence.

      THE COURT:  Any objection to 1106?

      MR. JACKSON:  No objection, Your Honor.

      THE COURT:  You may publish.  It's admitted.

      (Government Exhibit 1106 was received in evidence.)

      (Exhibit published.)

      MR. PAULSEN:  You can zoom in at the top, Ms. Kannan.

Q     Ms. Hyatt, is this an e-mail from Midwood Mill to you, CC'ing DaveMidwood@Gmail.com?

A     Yes.

Q     Is this the same day, March 1st, 2017?

A     Yes.

      MR. PAULSEN:  Can you show the attachment, Ms. Kannan.

Q     What is this document -- what kind of document we're

J.A. 671

Sullivan-Hyatt - direct - Paulsen            1745

looking at here, Ms. Hyatt?

A    This is the wire transfer request form.

Q    This is the standard form that someone at Carver who wants to send a wire transfer has to fill in?

A    Yes.

Q    Is the wire that we were just discussing?

A    Yes.

Q    It's $390,000 to Yisroel Leshkowitz?

A    Yes.

Q    Whose handwriting is that?

A    David Motovich.

Q    Do you recognize his handwriting?

A    Yes.

Q    And that's because you've dealt with him for years?

A    Yes.

        MR. PAULSEN:  Ms. Kannan, can we go back to 707F. Page 11.

Q    Ms. Hyatt, is this another wire transfer record?

A    Yes.

Q    Is this also to Yisroel Leshkowitz?

A    Yes.

Q    Is this also from ZKC?

A    Yes.

Q    Is the date May 3rd, 2017?

A    Yes.

---

Sullivan-Hyatt - direct - Paulsen            1746

        MR. PAULSEN:  Now, if I could now show, Your Honor, for the witness only, Government Exhibit 1128.

        THE COURT:  Any objection to 1128?

        MR. JACKSON:  No objection, Judge.

        THE COURT:  Admitted.  You may publish.

        (Government Exhibit 1128, was received in evidence.)

        (Exhibit published.)

Q    Ms. Hyatt, is this an e-mail from Marina Kuyan to you?

A    Yes.

Q    On the same date, May 3rd, 2017?

A    Yes.

        MR. PAULSEN:  Ms. Kannan, can you show the attachment.

Q    Is this the same kind of form we just looked at a moment ago?

A    Yes.

Q    Whose handwriting is this though?

A    Marina.

Q    And you recognize her handwriting, as well?

A    Yes.

Q    And you would receive a document like this every time you do a wire transfer?

A    Yes.

        MR. PAULSEN:  Now, Ms. Kannan, can you pull up Government Exhibit 1043.5, not in evidence?

---

Sullivan-Hyatt - direct - Paulsen            1747

        THE COURT:  Any objection to its admission?

        MR. JACKSON:  No objection, Judge.

        THE COURT:  It's admitted.  You may publish.

        (Government Exhibit 1043 was received in evidence.)

        (Exhibit published.)

Q    Ms. Hyatt, is this an e-mail from Marina to you, on October 20, 2015?

A    Yes.

Q    Was it forwarded from MidwoodMill@AOL.com?

A    Yes.

        MR. PAULSEN:  And can you please go to the attachment, Ms. Kannan.

Q    This is a wire transfer request; is that correct?

A    Yes.

Q    The company listed there, that's Advertising on the Go?

A    Yes.

Q    And is that the company you said was Robert Lovy's account?

A    Yes.

Q    But all the work or essentially all the work was done by David Motovich and Marina Kuyan?

A    Yes.

        MR. PAULSEN:  Ms. Kannan, can you skip to GX 1045, only showing for the witness, Your Honor?

        THE COURT:  Any objection to its admission?

---

Sullivan-Hyatt - direct - Paulsen            1748

        MR. JACKSON:  No objection, Judge.

        THE COURT:  You may publish it.  It's admitted.

        (Government Exhibit 1045 was received in evidence.)

        (Exhibit published.)

Q    Ms. Hyatt, is this a November 12th, 2015, e-mail from Marina to you?

A    Yes.

        MR. PAULSEN:  Can you please show the attachment, Ms. Kannan.

        Oh, wait.  Going back.

Q    Who is this forwarded from?

A    David Motovich.

        MR. PAULSEN:  Can you show the attachment, please, Ms. Kannan.

Q    Is this one from Midwood USA?

A    Yes.

Q    This is the other account that you said Robert Lovy was the signatory on?

A    Yes.

Q    Is it fair to say that all the wires that you did on this account were done for David Motovich?

A    Yes.

Q    And what's the amount for this?

A    70,000.

        MR. PAULSEN:  Now, finally, if you could show

J.A. 672

Sullivan-Hyatt - direct - Paulsen          1749

Government Exhibit 1172.

Q    Is this an e-mail from Marina Kuyan to you on November 21st, 2017?

A    Yes.

MR. PAULSEN:  Ms. Kannan, can you show the attachment.

Oh, Your Honor, I apologize.  If -- before showing the attachment, this is not evidence, I would ask that --

THE COURT:  Any objection.  What's the number?

MR. PAULSEN:  1172.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

MR. PAULSEN:  Thank you, Your Honor.  I apologize.

(Government Exhibit 1172 was received in evidence.)

(Exhibit published.)

MR. PAULSEN:  If you could please show the attachment.

Q    Ms. Hyatt, is this a wire form from ZKC to Adler Rosenberg Associates for $50,000?

A    Yes.

Q    Whose handwriting is that?

A    Marina.

MR. PAULSEN:  And Your Honor, if I could now show just the witness, Government Exhibit 1173?

---

Sullivan-Hyatt - direct - Paulsen          1750

THE COURT:  Any objection to 1173 being admitted?

MR. JACKSON:  No objection, Judge.

THE COURT:  It's admitted.

(Government Exhibit 1173 was received in evidence.)

THE COURT:  You may publish.

(Exhibit published.)

Q    Ms. Hyatt, what is this document?

A    That's the wire transfer confirmation.

Q    Can you please explain that to the jury.

A    This document shows that the wire transfer was transmitted to the beneficiary at the other bank.

Q    Did you often send back to David Motovich or Marina Kuyan a screenshot of the proof that the wire had gone through?

A    Yes.

Q    Now, did you sometimes note in a wire if there was a beneficiary for the wire?

A    Yes.

THE WITNESS:  Ms. Kannan, can we show Government Exhibit 1141 just for the witness, which is not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  It's admitted.  You may publish.

(Government Exhibit 1141 was received in evidence.)

(Exhibit published.)

Q    Now, Ms. Hyatt, this is an e-mail from Marina Kuyan to

---

Sullivan-Hyatt - direct - Paulsen          1751

you on May 23rd, 2017?

A    Yes.

Q    And Ms. Kuyan says, can you please send me confirmation?

A    Yes.

MR. PAULSEN:  Ms. Kannan, can you show me the attachment.

Q    Now, this is a wire for $21,000 to ZKC -- from ZKC to Alberto Brothers Law Firm; is that right?

A    Yes.

MR. PAULSEN:  Now, Your Honor, I'd like to show the next e-mail in the sequence, which is Government Exhibit 1142, which is not in evidence yet.

THE COURT:  Any objection to its admission?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1142 was received in evidence.)

(Exhibit published.)

Q    Ms. Hyatt, is this another one of those confirmation sheets?

A    Yes.

MR. PAULSEN:  Ms. Kannan, if you could zoom in on the bottom left-hand corner of the confirmation.

Q    What does that say?

A    Originator, which would be Carver Bank, to the beneficiary.  It's the reference, David Richter.

---

Sullivan-Hyatt - direct - Paulsen          1752

Q    Do you know who David Richter is?

A    I believe he's the brother of Joseph Richter.

Q    Okay.  And who is Joseph Richter?

A    Joseph Richter is the owner of Coney Island payroll.

Q    Now, Ms. Hyatt, in discussing with the Government, did you see numerous examples like these?

A    Yes.

Q    In each case, is it fair to say there would be a sheet e-mailed to you which described the wire that was requested?

A    Yes.

Q    It would be for either ZKC, Midwood USA, or Advertising on the Go?

A    Yes.

Q    And in many cases, after you did the wire, you would send a proof back?

A    In all the cases, yes.

Q    And this each case, all the ones that you've seen, these were for David Motovich and sometimes executed by Marina Kuyan?

A    Yes.

Q    Is it fair to say there's dozens of these?

A    Yes.

MR. PAULSEN:  Your Honor, I would ask now -- I don't believe it's necessary to go through all of them, but I would like to admit the relevant documents.

J.A. 673

Sullivan-Hyatt - direct - Paulsen 1753

THE COURT: Why don't you move the admission and we'll see if there are any objections.

Call out numbers, please.

MR. PAULSEN: Yes, Your Honor. Government would admit Government Exhibit 1121.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1121 was received in evidence.)

MR. PAULSEN: 1122.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1122 was received in evidence.)

MR. PAULSEN: 1123.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1123 was received in evidence.)

MR. PAULSEN: 1152.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1152 was received in evidence.)

MR. PAULSEN: 1153.

Sullivan-Hyatt - direct - Paulsen 1754

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1153 was received in evidence.)

MR. PAULSEN: 1175.

THE COURT: Any objection?

MR. JACKSON: No objection, Your Honor.

THE COURT: Admitted.

(Government Exhibit 1175 was received in evidence.)

MR. PAULSEN: 1176.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1176 was received in evidence.)

MR. PAULSEN: 1046.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1046 was received in evidence.)

MR. PAULSEN: 1049.5.

THE COURT: Any objection?

MR. JACKSON: No objection.

THE COURT: Admitted.

(Government Exhibit 1049.5 was received in evidence.)

Sullivan-Hyatt - direct - Paulsen 1755

MR. PAULSEN: 1071.

THE COURT: Any objection?

MR. JACKSON: No objection, Your Honor.

THE COURT: Admitted.

(Government Exhibit 1071 was received in evidence.)

MR. PAULSEN: 1092.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1092 was received in evidence.)

MR. PAULSEN: 1094.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1094 was received in evidence.)

MR. PAULSEN: 1101.

THE COURT: Any objection?

MR. MAZUREK: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1101 was received in evidence.)

MR. PAULSEN: 1102.

THE COURT: Any objection?

MR. JACKSON: No objection, Your Honor.

THE COURT: Admitted.

(Government Exhibit 1102 was received in evidence.)

Sullivan-Hyatt - direct - Paulsen 1756

MR. PAULSEN: 1112.

THE COURT: Any objection?

MR. JACKSON: No objection.

THE COURT: Admitted.

(Government Exhibit 1112 was received in evidence.)

MR. PAULSEN: 1113.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1113 was received in evidence.)

MR. PAULSEN: 1143.

THE COURT: Any objection?

MR. JACKSON: No objection, Your Honor.

THE COURT: Admitted.

(Government Exhibit 1143 was received in evidence.)

MR. PAULSEN: 1146.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted.

(Government Exhibit 1146 was received in evidence.)

MR. PAULSEN: 1148.

THE COURT: Any objection?

MR. JACKSON: No objection.

THE COURT: Admitted.

(Government Exhibit 1148 was received in evidence.)

**J.A. 674**

Sullivan-Hyatt - direct - Paulsen          1757

MR. PAULSEN:  1149.

THE COURT:  Any objection?

MR. JACKSON:  No objection.

THE COURT:  Admitted.

(Government Exhibit 1149 was received in evidence.)

MR. PAULSEN:  1150.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government Exhibit 1150 was received in evidence.)

MR. PAULSEN:  1151.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government Exhibit 1151 was received in evidence.)

MR. PAULSEN:  And 1160.

THE COURT:  Any objections?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government Exhibit 1160 was received in evidence.)

THE COURT:  How much longer do you have with this witness?

MR. PAULSEN:  Two minutes.

THE COURT:  Go.

BY MR. PAULSEN:

---

Sullivan-Hyatt - direct - Paulsen          1758

Q    Ms. Hyatt, a few final questions.

You said you're familiar with Carver Bank records in general?

A    Yes.

Q    If a customer made a payment to a credit card like an American Express card, would it reflect on the bank statements?

A    Yes.

Q    I'd like to show you a couple of examples.

MR. PAULSEN:  Ms. Kannan, can I have 706B, Page 71.

THE COURT:  You may publish.

MR. PAULSEN:  Thank you, Your Honor.

Oh, this is just for the witness.

THE COURT:  Any objection?

MR. PAULSEN:  I apologize, Your Honor.  This is in evidence.

THE COURT:  I thought it was.  You may publish. Let's go.

(Exhibit published.)

MR. PAULSEN:  If you could zoom in on the $66,000 payment.

Q    Ms. Hyatt, can you please read that entry?

A    07/17/2017, Amex payment ACH payment W1090, $66,166.77.

Q    And so that would -- electronic payments of that sort would always be reflected in the ZKC statement records?

---

Sullivan-Hyatt - direct - Paulsen          1759

A    Yes.

MR. PAULSEN:  I'd just like two others.  On 707B, Ms. Kannan, Page 17.  I'm sorry, 707B, Page 17.  That's 706. Yeah.  And zooming in on the $54,000 payment.

Q    Is that a similar payment, this one on October 12, 2017?

A    Yes.

Q    Also to Amex.

MR. PAULSEN:  And then finally, Government Exhibits -- Page 3 of the same exhibit, Ms. Kannan.  The $33,000 payment.

Q    Is that, again, Ms. Hyatt, another payment to Amex?

A    Yes.

MR. PAULSEN:  Thank you, Your Honor.  No further questions.

THE COURT:  All right.  We're going to have cross-examination after we take our 15-minute comfort break, and we will have our hard stop at 5:00 o'clock.

Please do not talk about the case.  15 minutes now, and we'll come back for cross, redirect, and we'll finish up with this witness.

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please stand for the jury.

(Jury exits the courtroom.)

THE COURT:  I'm going to ask the witness to leave the courtroom and not to speak with anyone about your

---

Sullivan-Hyatt - direct - Paulsen          1760

testimony while you wait outside.  You'll come whack in 15 minutes, ma'am.  Thank you.

Ladies and gentlemen in the public you may be seated.

(The witness exits the courtroom.)

THE COURT:  The jury has left the courtroom.  And the witness has left the courtroom, as well.

I'm going to ask the court reporters and my court deputy to have the restoration of the white noise machine, and I'm going to say something to all counsel of record and -- on the record outside of the presence of the jury and outside of the presence of the witness.

You are officers of the Court.  When you present evidence in this courtroom, I expect you to do it with a certain degree of class and professionalism.  I do not expect to have frolics and detours into the realms of the sleazy that are not required to prove the case beyond a reasonable doubt. I expect the lawyers who represent the United States of America to present evidence in a way that is appropriate and dignified.  You have choices to make in the evidence you seek to present to the jury through this Court, and I give you wide latitude in how you try your cases.  But I expect you to honor the Rules of Evidence in substance and in spirit, and not to embarrass your office.  I expect you to behave, with all due respect, better.

J.A. 675

Sullivan-Hyatt - direct - Paulsen        1761

And I don't expect to have to expand on my remarks. I expect you to take them to heart and I expect you to take them to head. And I will tell you, before we take our 15-minute break, the following story from one of my former law partners. We used to have a compensation system that was in two parts, one was where every partner got to vote a number for compensation that fellow partners would receive to knock out the three highs and the three lows, and that would be your number for the year. And there was also a portion of the compensation system where you could anonymously make comments about your fellow partners.

As the firm grew, that became a little less collegial, so the firm decided it would do away with the anonymous comment part, which you could write a comment and sign your name if you wished to make a comment about your fellow partners. And one of the old guard said to one of the new guard who supported the change, he said, I'm kind of surprised that you support the change, and he said, well, you know it's kind of like when my first wife left me. He said, what do you mean? He said, I didn't mind so much that she left me, but I was very upset when she insisted on telling me exactly why.

So if counsel insists on me telling you exactly why I made the comments I just made, I'll do so. But it might be wise for you to take the admonition and take the recess.

Sullivan-Hyatt - direct - Paulsen        1762

I'll see you in 15 minutes.

MR. MAZUREK:  Thank you, Your Honor.

THE COURT:  You're welcome.

(A recess was taken.)

(Continued on the following page.)

Sullivan-Hyatt - cross - Jackson        1763

(Continuing.)

(In open court - jury not present.)

THE COURTROOM DEPUTY:  All rise.

(Jury entered.)

(Judge WILLIAM F. KUNTZ, II entered the courtroom.)

THE COURT:  Thank you, ladies and gentlemen of the jury.  You may be seated.

Thank you members of the public, as well, counsel.

And let's have the witness back in for cross-examination.

(Witness entered and resumed the stand.)

THE COURT:  And, again, no federal funds were expended on the cough drops either.  I want to make that record clear.

Please come forward, ma'am.  You are still under oath.  Resume your seat and let me ask you, did you discuss your testimony with anyone during the break?

THE WITNESS:  No, I did not.

THE COURT:  Thank you.

Please cross-examination, Mr. Jackson.

MR. JACKSON:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good afternoon, ma'am.

A    Good afternoon.

**J.A. 676**

Sullivan-Hyatt - cross - Jackson        1764

Q    Ma'am, just to be clear, the -- you you were asked by the prosecutor about a loan that it was your testimony that you communicated with Mr. Motovich about potentially getting from Carver for $2.8 million, right?

A    That letter was not for Carver bank.

Q    Okay.  Whatever the case may be, you talked about some loan, right?

A    Yes.

Q    Whatever it is that you were talking about, there was never any money obtained from a bank in connection with what you were talking about, right?

A    I don't know.

Q    Okay.

The process that you were discussing that Mr. Motovich ended up going and getting money from a different bank altogether, correct.

A    I don't know.

Q    You don't know at all?

A    No.

Q    You do know that at all the points that you were dealing with Mr. Motovich, he had accounts or you understood he had a net worth that was many millions of dollars?

A    Correct.

Q    In fact, you informed the agents you understood the Motovich's family net worth was in excess of a hundred-million

Sullivan-Hyatt - cross - Jackson                    1765

dollars, right?

A    No, I did not.

Q    Well, I want to show you -- no, we'll come back to that.
I want to keep this going.

THE COURT:  That would be nice.

MR. JACKSON:  Thanks, Judge.

THE COURT:  You are welcome.

BY MR. JACKSON:

Q    It is also, am I correct --

MR. JACKSON:  Can we call up what was presented
during the prosecutor's direct as Government Exhibit 707-E?

THE COURT:  In evidence.  You may publish.

(Exhibit published.)

MR. JACKSON:  And can we go to page 10 of this
document?

(Exhibit published.)

MR. JACKSON:  And to page 11.

(Exhibit published.)

Q    And this is the discussion that you were having with the
prosecutor about situations where Mr. Motovich would say, hey,
Dannette, it's okay if you take a few hundred dollars out of
the account, right?

A    Yes.

Q    Can you read what the date was of this particular
transaction the prosecutor went over with you?

---

Sullivan-Hyatt - cross - Jackson                    1766

A    December 20th, 2017.

Q    This is just a few days before Christmas, right?

A    Yes.

Q    And Mr. Motovich would try to take care of you on
holidays as a gift, as a friend?

A    Yes.

Q    One of the reasons that you asked Mr. Motovich to be the
godfather of your child was because you understood that he had
a generous spirit and he often tried to help people who he
didn't need anything from, correct?

A    I ask him to be the godfather of my daughter because he
was my friend and, yes, he had money.

Q    Right.
And when you came to Mr. Motovich and said you
needed money, he would try to help you out, right?

A    Could you say that again?

Q    Well, you asked him sometimes, David, can I have a few
hundred dollars, right?

A    Yes.

Q    You didn't -- I'm correct, right, that on some of the
occasions where Mr. Motovich would say, Please take a few
hundred dollars out, he asked you to distribute that money to
buy lunch for all the bankers at your bank because they were
working very hard?

A    Yes.

---

Sullivan-Hyatt - cross - Jackson                    1767

Q    And so, that was not an attempt to bribe you, that was an
attempt of him to try to have you help him facilitate them
doing something nice for the people he thought were working
hard, right?

A    Could be, yes.

Q    Now --

MR. JACKSON:  We can take that down.

BY MR. JACKSON:

Q    One of the things that you have -- that you talked about
during your direct examination was this gentleman Mr. Garcia,
right?

A    Yes.

Q    And it was your testimony that Mr. Garcia, if he walked
in here today, you wouldn't recognize him?

A    Yes.

Q    That was your testimony, right?

A    (No response.)

Q    But you started meeting with the agents a long time ago,
correct?

A    Yes.

Q    About how many times have you met with them?

A    More than five.

Q    And one of the things that they've done at meetings is
they've emphasized for you that you need to understand,
pursuant to your agreement, you are going to have to tell the

---

Sullivan-Hyatt - cross - Jackson                    1768

truth as they understand it in order for you to get credit for
substantial assistance?

MR. PAULSEN:  Objection.

THE COURT:  Overruled.

A    Initially I was not told that, but eventually I was, yes.

Q    And you understood substantial assistance meant you've
got to implicate somebody else, right?

A    I have to tell the truth.

Q    Right.
I understand that's one of the things they told you,
but you understand the term substantial assistance is in your
agreement?

A    Yes.

Q    And you understood substantial assistance means you've
got to assist them in a prosecution of another person,
correct?

A    I am being prosecuted.

Q    Sorry, ma'am.  I just want to -- I just want to be very
clear.  Let me restate my question.  I'm not asking if you're
being prosecuted.
I'm just asking you for your agreement -- you
reviewed your agreement, right?

A    Yes, I did.

Q    -- you understand that your requirement to provide
substantial assistance means that you have to provide

**J.A. 677**

Sullivan-Hyatt - cross - Jackson                    1769

information that helps them get another person, right?

A    Yes.

Q    And you have no personal animus against David Motovich, right?

A    (No response.)

Q    You've got no personal problems with him, right?

A    No, I do not.

Q    David Motovich never stole anything from you, am I right about that?

A    Yes.

Q    And -- but the prosecutors, throughout the course of your meeting, they emphasized for you the things that you need to emphasize in order to help them make their case, correct?

        MR. PAULSEN:  Objection, Your Honor.

        THE COURT:  Overruled.

A    The prosecution never emphasize.  I told what happened and that's it.  There was no emphasis on me to implicate David.  I told what happened, that's it.

Q    Now, I'm correct, aren't I, that in some of your earlier meetings with the prosecutors they showed you photographs, right?

A    Yes.

Q    And they showed you photographs of various people that you either recognized or didn't recognize?

A    Yes.

---

Sullivan-Hyatt - cross - Jackson                    1770

Q    And they told you, okay, this is a positive identification when you recognize it, this is a negative identification when you don't recognize the person; right?

A    Yes.

Q    And in one of your meetings -- and by the way, this has been going on for years, right?

A    Since 2019.

Q    So since 2019 till today, how many times have you met with the prosecutors?

A    During COVID there was like a two-year break, and then overall I would say about ten.

Q    About ten times?

A    Yes.

Q    Okay.  I want to focus your attention on a meeting on December 11th, 2019.

        Do you remember that meeting?

A    There was a lot of meeting.  Not specifically.

Q    Okay.

        MR. JACKSON:  Your Honor, may I ask Mr. Scott to pass the witness a document that I believe could potentially refresh her recollection marked as Defense Exhibit 2080?

        THE COURT:  Show it to the witness to refresh her recollection and opposing counsel either electronically or through the ELMO, but not to the jury.

        MR. JACKSON:  Yes, Your Honor.

---

Sullivan-Hyatt - cross - Jackson                    1771

        THE COURT:  So, show the document electronically to opposing counsel and to the witness, but not to the jury, it is not in evidence.

        2080.  And the question to you, ma'am, is looking at the document, it should be on your screen -- do you have it in front of you, ma'am?

        THE WITNESS:  No.

        THE COURT:  Okay.  Let's get it to the screen, please.

        And you're being asked once it's up for you to see, ma'am, whether or not this refreshes your recollection.

        You don't read the document out loud, you just read it and then counsel will continue to ask you if this refreshes your recollection with respect to the question he has asked you.

        So put your question again, Mr. Jackson.

        Read the document and answer his question as to whether or not it refreshes your recollection.

        Go ahead.

        MR. JACKSON:  Thank you, Judge.

        It's on the ELMO.

        THE COURT:  Okay.  Just read it to yourself, ma'am.

        Does this refresh your -- put your question again, Mr. Jackson.

        MR. JACKSON:  Thank you, Judge.

        THE COURT:  So she knows what she 's reading for.

**J.A. 678**

---

Sullivan-Hyatt - cross - Jackson                    1772

        MR. JACKSON:  Yes, Your Honor.

BY MR. JACKSON:

Q    So, Ms. Sullivan-Hyatt, looking at this document does this refresh your recollection that you had a meeting with the agents --

A    Yes.

Q    -- on --

        THE COURT:  He hadn't finished the question.  Let him finish.

        Go ahead.

Q    -- December 11th, 2019?

        THE COURT:  Does it refresh your recollection that you had a meeting with the agents on December 11th of 2019, yes or no?

        THE WITNESS:  Yes.

        THE COURT:  Next question.

Q    The agents showed you a series of pictures, right?

A    Yes.

Q    One of the pictures they showed you was a picture that you identified as Reggie Garcia, Reginald Garcia, right?

A    Yes.

Q    And they told you that that was a positive identification, correct?

A    Based on my recollection, the picture that I chose for Reginald Garcia was not him.      (Continued on next page.)

Sullivan-Hyatt - cross - Jackson     1773

BY MR. JACKSON:  (Continuing.)

Q    Well, ma'am, that's not my question.  My question is the agents told you, that it was a positive identification; correct?

A    I don't recall that, no.

MR. JACKSON:  Your Honor, we'd like to offer Defendant's Exhibit 2080.

THE COURT:  Any objection?

MR. PAULSEN:  Yes, Your Honor.

THE COURT:  The objection is sustained.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

BY MR. JACKSON:

Q    Have the -- have the prosecutors gone back over with you the photos that they showed you in 2019 since you -- since this meeting?

A    Yes.

Q    Okay.  So they went back with you through the exact same photos that they went through with you in 2019?

A    Some of the photos, yes.

Q    Did they go back over with you the photo of Reginald Garcia?

A    No.

Q    So you haven't seen the photo that they showed you in 2019 of Reginald Garcia since that date?

Sullivan-Hyatt - cross - Jackson     1774

A    I don't recall that, no.

Q    Do you recall as you sit here today?

A    No.

Q    But you have no recollection of them showing you that photo again?

A    No.

Q    You do recall that they told you you've made a positive identification of Reginald Garcia; correct?

A    No, I do not.

Q    Okay.  Now, you have described a fact -- just a second ago you were talking about the fact that sometimes David Motovich would ask you -- give you some money and ask you to spend it, to take others out to lunch, the other bankers who were working hard at the bank; right?

A    I said sometimes he would buy myself and the staff lunch.

Q    So David was not an unknown quantity at the bank.

A    Who didn't know him personally, knew of him.

Q    Right.  And you weren't trying to hide your relationship with David Motovich; right?

A    I did not hide my relationship with him.  However, they were not aware that he was not supposed -- he was doing the transactions on the account that I was doing for him.

Q    Okay.  My question is you were not trying to hide the fact that you were engaged in a lot of different interactions with David Motovich related to his accounts; correct?

Sullivan-Hyatt - cross - Jackson     1775

A    No, I was not.

Q    Now, it's a fact that Carver bank actually identified David as one of its centers of influence; correct?

A    Correct.

Q    And what that means is this is a designation that would be given to certain individuals at the bank considered to be particularly for customers can of the bank; right?

A    Yes.

Q    And, so, the bank knew that you were the primary person who had a contact with David Motovich; right?

A    Yes.

Q    And you described this relationship in the past as sort of warm hand to get you past the gatekeeper with regard to the sinner of influence designation; right?

A    Yes.

Q    And you said that -- your relationship with Mr. Motovich was so important that the senior levels of the bank were aware of it and it was part of the reason that you were commended and it was reflected in your bonuses; right?

A    Yes.

Q    And I'm correct, also, that the bonuses that you got were basically a reflection of how much money was maintained in the accounts that you had opened at the bank; right?

A    That's not how it works.  Bonus goes by a scorecard.  We have four or five buckets and in order to make incentive, you

Sullivan-Hyatt - cross - Jackson     1776

have to make loans, consumer loans, mortgages, home mortgages, deposits.  So it's a slew of thing.  It's not one thing.  So if I make deposits in accounts based on David and I don't get the other three, I don't get incentive.  It's a collective.

Q    I'm glad you said that.  It's a collective, but one of the most important things was how much money was in the account that you were able to open; right?

A    It was based on all the buckets.  One was not more important than the other.

Q    I'm not asking if it was more important.  I'm just asking if it was one of the buckets?

A    Yes.

Q    And you even told the agents and prosecutors that you had pressure from the bank to open more and more accounts over time; right?

A    We had a goal to meet.

Q    How many accounts were you supposed to open in your goal?

A    I don't recall, but for each quarter maybe 50 a quarter.

Q    That's a lot of accounts to open; correct?

A    Yes.

Q    That was sometimes difficult for you to do?

A    Yeah, it was difficult.

Q    And you would complain to David and say to him, David, I'm really you struggling to meet this quota.  Is there any way you can help me by opening more accounts?

**J.A. 679**

Sullivan-Hyatt - cross - Jackson          1777

A    I would not complain.  I would reach out to my centers of influence and he was one of them.

Q    You were reaching out to him to ask him to please open more accounts, right?

A    I would reach out to him to as him to open accounts for himself or if he has anyone he could refer to the bank. That's what I did with all of my centers of influence.  He wasn't the only one.

Q    Surely he was the biggest one?

A    He was one of my centers of influence.

Q    Did you have a bigger one?

A    He was one of them.

Q    Did you have a bigger one?

A    I had other organizations and customers who I reached out to.

Q    Were any of them bigger than David Motovich?

A    I wouldn't say that, no.

Q    Okay.  You interacted, you said, with David and Marina with this account that we went through, the ZKC account?

A    Yes.

Q    And there were plenty of times when you interacted with Marina and you didn't have a conversation with David; right?

A    Whenever Marina would call, she would say David is asking you to do this.  She would always preface the conversation in David's name.

Sullivan-Hyatt - cross - Jackson          1778

Q    I completely understand that.  We know --
          THE COURT:  No need to comment on the testimony. Just ask questions and get answers.  We still have our hard 5 o'clock stop.  Don't waste time.

Q    Marina -- you would often have conversations with Marina where David was not a participant in those conversations?

A    Correct.

Q    And when you did talk to David about the Carver Bank, David never told you that he wanted you to lie to car ver bank; correct?

A    Correct.

Q    And, during the time that you were working with David and these accounts, you didn't believe that there was anything fraudulent about the accounts at that time; correct?

A    I knew it was because I was doing transactions on accounts that David wasn't a signer on that he requested to be done in these accounts.

Q    Am I correct that when you previously met with the agents, you stated that at the time you had no reason to believe that the account was fraudulent; you said that, right?

A    Yes, I did.

Q    And that's the truth, isn't it?  At the time you didn't have any reason to believe that the account was fraudulent; right?

A    I broke the law.  I don't know if I was being naive to

Sullivan-Hyatt - cross - Jackson          1779

think that if I'm doing the transaction for David Motovich on ZKC that was Reginald Garcia's account, that I should not be doing it.

Q    Right.  This is what the prosecutors have said to you repeatedly you needed to acknowledge; correct?

A    I acknowledge that I made a mistake and I'm paying for it, yes.

Q    Okay.  You also told the agents and the prosecutors that you never protected David Motovich from the bank writing a suspicious activity report; correct?

A    I told them that I wasn't the one who does the suspicious activity report.  The branches would do concern reports and send it up to BSA, the Bank Secrecy Act department, and based on what's written in the concern report, they would do a, SAR which is a suspicious activity report.

               (Continued on the following page.)

J.A. 680

SULLIVAN-HYATT - CROSS - MR. JACKSON          1780

BY MR. JACKSON: (Continuing.)

Q    Ma'am, I'm just asking a yes-or-no question.

A    Could you repeat it.

Q    You told the agents and prosecutors that you never protected David from the bank writing a suspicious activity report; yes or no?

A    I don't recall that.

Q    I'd like to show you a document.
          MR. JACKSON:  Your Honor, may we display for the witness -- I'd like to ask if it refreshes the witness' recollection, 3500-DSH-8B.
          THE COURT:  Any objection to that coming into evidence.
          MR. PAULSEN:  Yes, Your Honor.  But no objection to the --
          THE COURT:  Display it to the witness and see if it refreshes her recollection.
          MR. JACKSON:  Thank you.  And can you turn to Page 5 of that, Mr. Cepregi.
          THE COURT:  Show it to your adversary, show it to the Court, show it to the witness, but not to the jury.  It's not in evidence.
          MR. JACKSON:  Page 5.  If you could zoom in here.

Q    Just take a moment and read that quietly to yourself, Ms. Sullivan-Hyatt.

AVERY N. ARMSTRONG, RPR, NYRCR

SULLIVAN-HYATT - CROSS - MR. JACKSON 1781

THE COURT: Put your question, again, Mr. Jackson.

MR. JACKSON: Thank you, Judge.

Q Ms. Sullivan-Hyatt, you previously -- does this refresh your recollection that you previously told the prosecutors and agents that you had never protected David from the bank writing a suspicious activity report?

THE COURT: Does it refresh your recollection that that's what you told them; yes or no?

THE WITNESS: Yes.

THE COURT: Next question.

Q Now, it's also the case that there were some occasions where the Bank Secrecy Act department -- there's a Bank Secrecy Act department there, right?

A Yes, sir.

Q And they would sometimes ask you questions about different things that were going on with David, right?

A Yes.

Q Including some of the accounts that we've been talking about?

A Yes.

Q And you told them that they would be better directing their questions to David, correct?

A Yes.

Q So there was nothing that was stopping the Bank Secrecy Act people from calling David Motovich, his phone number was

SULLIVAN-HYATT - CROSS - MR. JACKSON 1782

on account with the bank, correct?

A Yes.

Q Okay. And one of the things that you also talked about during your direct examination is that you stated that at some point you went looking for Reginald Garcia, right?

A I went to do a site visit, yes, at the Coney Island office.

Q Right. And I think your exact words during your direct examination is you went looking for him, correct?

A I went to do a site visit to meet with Mr. Garcia, yes.

Q You weren't looking that hard for him, right?

A When I got there, David told me that he went to Haiti.

Q That's not my question. My question is, you weren't looking that hard for him, correct?

A Correct.

THE COURT: But I am looking that hard at the clock, and it now says it's 5:00 o'clock. So ladies and gentlemen of the jury, we are adjourned for the day. We'll see you tomorrow morning at 9:30. Do not talk about the case. Have a good evening.

And do not talk about your testimony with anyone when you step down, ma'am, tonight.

Thank you, ladies and gentlemen of the jury. Have a good evening.

THE COURTROOM DEPUTY: All rise.

PROCEEDINGS 1783

(Jury exits the courtroom.)

THE COURT: Thank you, ma'am. You may step down, and we'll see you tomorrow morning at 9:30 to continue your testimony. Do not talk with anyone about your testimony. You can leave now. Thank you very much.

THE WITNESS: Okay.

THE COURT: Ladies and gentlemen, you maybe seated. The jury has left the courtroom and the witness is leaving the courtroom.

(The witness exited the courtroom.)

THE COURT: The witness has left the courtroom.

I just want to make clear with respect to my decision to exclude exhibit -- Government Exhibit 1208. It was excluded under Federal Rule of Evidence 401, and Federal Rule of Evidence 403. And the record should so reflect that was the basis for the exclusion. All right.

Is there anything else we need to talk about, from the Government, today?

MR. POLEMENI: Judge, just to give you a time -- an update on timing, like I said on Friday, I believe, we are moving at a quick pace. We will come in under the three-week estimate, I believe. And there's a good chance, projecting that we might be able to close -- finish the close of our evidence, at least, early next week.

THE COURT: Okay. Anything else?

PROCEEDINGS 1784

MR. POLEMENI: Nope.

THE COURT: All right. Defense counsel?

MR. JACKSON: Thank you, Your Honor. Just one issue, one quick issue. We offered Defense Exhibit 2080 --

THE COURT: I'm sorry, which one?

MR. JACKSON: Your Honor, this is Defense Exhibit 2080, 2-0-8-0.

THE COURT: Can I have a copy of it, please?

MR. JACKSON: Yes, of course, Judge.

THE COURT: You can hand up it to my court deputy and court deputy will hand it up to me.

Thank you. And this was objected to by the Government?

MR. JACKSON: Yes, Your Honor.

THE COURT: And I sustained the objection?

MR. JACKSON: Yes, Your Honor.

THE COURT: So I take it you're asking me to reconsider my ruling?

MR. JACKSON: Not yet judge.

THE COURT: Oh, not yet. Go ahead.

MR. JACKSON: So Judge, our issue is this -- we got the 3500 material a few weeks before trial. We've been preparing --

THE COURT: How many weeks?

MR. JACKSON: I believe four weeks before trial.

J.A. 681

PROCEEDINGS
1785

THE COURT: And how many lawyers does Wachtell have?

MR. JACKSON: We have 300, Judge.

THE COURT: You have 300 lawyers, the whole firm has 300 lawyers?

MR. JACKSON: Yes, Judge. We're smaller than I would even think.

THE COURT: There you go. Small firm, but there are those of us who love it, I guess. Go ahead.

MR. JACKSON: And we, in preparing for this witness, realized that there is this aspect of the 3500, as we heard, we had --

THE COURT: I'm sorry, there is this what? Let me give you a cough drop because you're getting a little hoarse.

MR. JACKSON: Getting a little hoarse, yeah.

We realized, as we heard the context of the identification that came in today or the lack of identification, there were a couple of questions that were asked of the witness who's on the stand now, Ms. Sullivan-Hyatt, that relate to -- that relate to --

THE COURT: The identification of Garcia --

MR. JACKSON: The identification of Garcia.

And so we went back to try to look at -- we're looking at the 3500 material to make sure that we're not misunderstanding anything. And in this, this defense exhibit says that there was a positive identification of Reginald

PROCEEDINGS
1786

Garcia. Now, from my time in --

THE COURT: I'm sorry, what items? There are 26 items in DX 2080, numbered items. And so are you referring to any one or more of the particular numbered items?

MR. JACKSON: Yes, Your Honor. I'm focused on number eight.

THE COURT: Number eight, which says, positive, colon Reginald Garcia?

MR. JACKSON: Yes, Your Honor.

THE COURT: Okay. Go ahead. You're talking about that.

Any others in this bullet-pointed document?

MR. JACKSON: No, Judge.

THE COURT: All right. Tell me about eight.

What's your concern with respect to item eight?

MR. JACKSON: So our concern with this is it appears that though the witness -- though Mr. Garcia is claiming that he never entered the bank or, I guess, his testimony suggested that he never interacted with this witness, the witness has given confusing testimony that suggests that she saw someone who was identified as Reginald Garcia, but she doesn't believe for some reason that it was Reginald Garcia, and this document that we obtained from the Government suggests that during the meeting, they presented her with the paragraph of the actual Reginald Garcia and she identified him as Reginald Garcia.

PROCEEDINGS
1787

THE COURT: I just heard the witness say this she made a mistake.

Did I not hear her say that?

MR. JACKSON: No, Judge.

THE COURT: What did she say with respect to the identification of Mr. Garcia?

MR. JACKSON: I believe what she said is she can't recall what occurred there.

With regard to this document, the way that these identifications were always done during my years as a prosecutor is exactly reflected in this document. The witness is not told who the person is. They're shown a photo of the actual Reginald Garcia, and then they're asked, do you know who that is. And a positive indicates they said that she said, oh, that's Reginald Garcia. Now --

THE COURT: Mr. Jackson, do you have any problem with showing a picture of Mr. Garcia, which is in evidence, to the witness and saying, do you know who that is, did you ever tell the agents that you knew who that was, and examining her about that? Whether she got it right, whether she got it wrong, whether she sits here tomorrow morning, she knows who this gentleman is. You got the witness. You've got the picture. What more do you want? You're going to cross-examine the witness about her current or past failures to identify Mr. Garcia from the picture. What's the problem?

PROCEEDINGS
1788

MR. MAZUREK: So Judge, you're exactly right in terms of the cross approach, and that is how we would like to approach it. But there's a *Brady* issue --

THE COURT: What is the *Brady* issue?

MR. JACKSON: The Government has not produced to us, any of these photos. We don't know --

THE COURT: Whoa, whoa, whoa. Stop right there.

Are you telling me that you don't have the paragraphs that you believe were shown to this witness back in 2019? Is that your concern?

MR. JACKSON: That's the first concern.

THE COURT: All right. So let me ask the Government, are there photos of Garcia that were shown to this witness in 2019 that the defense has not been shown?

MR. PAULSEN: Your Honor, I would have to check. But we can -- if it wasn't provided, it was a photo book that the agents had. We can easily provide it.

THE COURT: Let's back up. I'm hearing a lot of conditional, I have to check, if you don't know the answer, you can find out.

If you have photos of Mr. Garcia, one or more photos that were shown to this witness in 2019, December of 2019 when she was being interviewed, I'm ordering you to produce them tonight to defense counsel if you have them.

If you don't have them, I'm ordering you to inform

PROCEEDINGS 1789

defense counsel that you have no such photos and to make that representation to the Court tomorrow morning. So I'm ordering you to review your files and see if you have photos that you showed to this witness about Garcia in December of 2019 when you interviewed the witness, and either you do have such photos, in which case you'll give them to Mr. Jackson, or you do not have such photos and you did not produce such photos to the witness, and you'll let Mr. Jackson know that, and that'll take care of any *Brady* or *Giglio* or 3500 material issues or Rule 5 issues that would come up with respect to photographs.

Would that satisfy you, Mr. Jackson?

What else do you want with respect to the photograph that was or wasn't shown or paragraphs that were or were not shown to this witness in December of 2019?

MR. JACKSON: That's the thing that we want, Judge. We want the photos. We just want to know what was shown it her.

THE COURT: What, if anything, was shown to her in terms of photos about Garcia in December of 2019. That's your request, right?

MR. JACKSON: Yes, Judge.

THE COURT: That's your demand under *Brady*?

MR. JACKSON: Yes, Judge.

THE COURT: And I'm ordering the Government to either produce those photographs tonight to defense counsel or

AVERY N. ARMSTRONG, RPR, NYRCR

---

PROCEEDINGS 1790

to inform defense counsel in writing, copy the Court, that there are no such photos that were shown to this witness in December of 2019. Okay. So that's the order of the Court and I expect you to inform the Court tomorrow morning with respect to the fruits of your labor.

That satisfies you on that point, Mr. Jackson?

MR. JACKSON: Yes, Judge.

THE COURT: Is that doable, United States of America?

MR. PAULSEN: Yes, Your Honor.

(Continued on the following page.)

AVERY N. ARMSTRONG, RPR, NYRCR

---

*Proceedings* 1791

(Continuing.)

THE COURT: There you go.

Okay. What else do you have, Mr. Jackson?

MR. JACKSON: Nothing, Judge.

THE COURT: Anything else from the Government?

MR. PAULSEN: No, Your Honor.

THE COURT: Thanks. Have a good night, everybody.

And I am going to hand back 2080.

(Proceedings adjourned to Thursday, July 18, 2024 at 9:30 a.m. )

ooo0ooo

J.A. 683

---

1792

**I N D E X**

**WITNESS**     **PAGE**

JENNA AMBROSINI
  CROSS-EXAMINATION BY MR. MAZUREK   1571
  REDIRECT EXAMINATION BY MR. SKURNIK   1616

CARRIE LOWIS
  DIRECT EXAMINATION BY MR. SKURNIK   1626
  CROSS-EXAMINATION BY MR. JACKSON   1633
  REDIRECT EXAMINATION BY MR. SKURNIK   1640

JACKMIN QUINONES
  DIRECT EXAMINATION BY MR. SKURNIK   1642
  CROSS-EXAMINATION BY MR. JACKSON   1647

BRIAN LATCHAM
  DIRECT EXAMINATION BY MR. PAULSEN   1650
  CROSS-EXAMINATION BY MR. JACKSON   1661

1793

**I N D E X**

WITNESS                                              PAGE

ISAAC TORRES

   DIRECT EXAMINATION BY MR. PAULSEN        1669

   CROSS-EXAMINATION BY MR. JACKSON         1682

   REDIRECT EXAMINATION BY MR. PAULSEN      1686

DANNETTE SULLIVAN-HYATT

   DIRECT EXAMINATION BY MR. PAULSEN        1689

   CROSS-EXAMINATION BY MR. JACKSON         1763

1794

**E X H I B I T S**

| Exhibit | Page |
|---|---|
| Defense Exhibit 9005 | 1570 |
| Government Exhibit 2001 | 1651 |
| Government Exhibit 718 | 1655 |
| Government Exhibit 701-A | 1663 |
| Government Exhibit 701 | 1664 |
| Government's Exhibit 705 and all subsections | 1670 |
| Government's Exhibit 706 and all subsections | 1670 |
| Government's Exhibit 6 | 1691 |
| Government's Exhibit 1047 | 1701 |
| Government Exhibit 1059 | 1710 |
| Government Exhibit 1068 | 1712 |

1795

**E X H I B I T S**

| Exhibit | Page |
|---|---|
| Government Exhibit 1106 | 1744 |
| Government Exhibit 1128 | 1746 |
| Government Exhibit 1043 | 1747 |
| Government Exhibit 1045 | 1748 |
| Government Exhibit 1172 | 1749 |
| Government Exhibit 1173 | 1750 |
| Government Exhibit 1141 | 1750 |
| Government Exhibit 1142 | 1751 |
| Government Exhibit 1121 | 1753 |
| Government Exhibit 1122 | 1753 |
| Government Exhibit 1123 | 1753 |

1796

**E X H I B I T S**

| Exhibit | Page |
|---|---|
| Government Exhibit 1152 | 1753 |
| Government Exhibit 1153 | 1754 |
| Government Exhibit 1175 | 1754 |
| Government Exhibit 1176 | 1754 |
| Government Exhibit 1046 | 1754 |
| Government Exhibit 1049.5 | 1754 |
| Government Exhibit 1071 | 1755 |
| Government Exhibit 1092 | 1755 |
| Government Exhibit 1094 | 1755 |
| Government Exhibit 1101 | 1755 |
| Government Exhibit 1102 | 1755 |

**J.A. 684**

1797

**E X H I B I T S**

| Exhibit | Page |
|---|---|
| Government Exhibit 1112 | 1756 |
| Government Exhibit 1113 | 1756 |
| Government Exhibit 1143 | 1756 |
| Government Exhibit 1146 | 1756 |
| Government Exhibit 1148 | 1756 |
| Government Exhibit 1149 | 1757 |
| Government Exhibit 1150 | 1757 |
| Government Exhibit 1151 | 1757 |
| Government Exhibit 1160 | 1757 |

1798

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,     : 21-CR-00497(WFK)
                              :
                              :
    -against-                 : United States Courthouse
                              : Brooklyn, New York
                              :
DAVID MOTOVICH,               : Thursday, July 18, 2024
                              : 10:00 a.m.
        Defendant.            :
                              :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government: BREON S. PEACE, ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY:  ROBERT POLEMENI, ESQ.
ERIK D. PAULSEN, ESQ.
ANDREW GRUBIN, ESQ.
MATTHEW C. SKURNIK, ESQ.
Assistant United States Attorneys

For the Defendant:  WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019-6150
BY: RANDALL WADE JACKSON, ESQ.
JESSICA LAYDEN, ESQ.

1799

APPEARANCES - Continued

For the Defendant: MEISTER SEELIG & FEIN, LLP
125 Park Avenue
8th Floor
New York, New York 10017
BY:    HENRY R. MAZUREK, ESQ.

Court Reporter:  Nicole J. Sesta, RMR, CRR, RPR
Official Court Reporter
E-mail:  NSestaRMR@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.

*Proceedings* 1800

(In open court; jury not present.)

THE COURT:  Please call the case.

THE COURTROOM DEPUTY:  Criminal cause on trial, 21-CR-497, United States of America versus David Motovich. Will the attorneys please state your name for the record, starting with the government.

MR. POLEMENI:  Good morning, Your Honor.

Robert Polemeni, Erik Paulsen, Matthew Skurnik, Andrew Grubin, Kavya Kannan, and Special Agent Christopher Cabane for the United States.

THE COURT:  Good morning.  Please be seated.  Thank you for your patience.  Ladies and gentlemen of the public, you may be seated as well.

MR. JACKSON:  Good morning, Your Honor.

Randall Jackson, Henry Mazurek, Jessica Layden on behalf of our client, David Motovich.  We're also joined by Mr. Cepregi.

THE COURT:  Good morning.  Thank you all for your patience, as well.  Another day, another motion.  I received this morning a motion from half of the defendant to strike transcript page 1735, lines 9 through 21, where testimony that is cited in the motion was taken.  Three reasons are stated by defense counsel and this application was on notice to the government.

So let me ask the government what, if any, response

J.A. 685

*Proceedings* 1801

do you have to the motion to strike testimony. Just so the record is clear for my friends on the 17th Floor, it's 21-CR-497, Document 310, filed on 7-18-2024, four pages, document number 3272.

May I hear from the government in response?

MR. POLEMENI: Yes, Your Honor. Thank you. We would oppose the motion for a number of reasons.

First, we do not agree that this is Rule 404(b) material. This conversation, this interaction, took place between Ms. Sullivan-Hyatt and Mr. Motovich at the time during the charged conspiracy.

It just kind of goes to their relationship, which is you will do things for me that perhaps are not in the best interest of my bank. Here, the request was that Ms. Sullivan-Hyatt at Mr. Motovich's request inflate the value of the funds in a Sherman Abrams account held at Carver Bank. So we reject the notion that it's 404(b) material.

Second, the defense has been on notice of this, Judge. Governments's Exhibit 1207, which is not in evidence but which the defense has, is, in part, text message communications between Ms. Sullivan-Hyatt and Mr. Motovich where they are, in fact, discussing this very issue.

I can provide Your Honor with a copy of that, if you would like.

THE COURT: You have provided a copy to defense

*Proceedings* 1802

counsel? They have previously seen this?

MR. JACKSON: We have seen it, Judge.

THE COURT: Go ahead.

MR. POLEMENI: And we certainly reject the notion that this is a constructive amendment of the indictment. A constructive amendment of the indictment deals with situations where if someone is charged with bank fraud and the government proves up bank robbery. That is not what is happening here.

We don't intend to prove the bank fraud charges in this case relying on this evidence. That is not the theory of our case, but we also believe it's appropriate to be admitted into evidence given the reasons I stated before.

THE COURT: What is your response, Mr. Jackson?

MR. JACKSON: Thank you, Your Honor.

Three things, Judge. First, the notion that this is -- that this becomes admissible simply because it goes to their relationship represents a complete misunderstanding of Rule 404(b). There are many situations where some aspect of a relationship between two people may implicate criminal activity, allegedly criminal activity, that is outside the scope of what is charged in the indictment.

The government doesn't gain license to, therefore, bring it in just because there was a discussion between two people about that.

There is strict requirements under Rule 404(b) that

*Proceedings* 1803

they want to bring in other acts evidence, which the government is now conceding this is because they did not attempt to -- Mr. Polemeni did not attempt to say to the Court that this is part of the charged conspiracy.

It can't be because nothing in the indictment talks about this type of activity. If they want to bring that in, there is a procedure. The Court set a date. They identified certain things as 404(b). They did not identify this.

We absolutely did not have notice from GX-1207. GX-1207, the one page in that has no detail about what they're talking about. The government needed to provide us notice and it's not enough that there's some random stray comment in this -- in a voluminous set of text messages to provide 404(b) notice.

It doesn't even -- the face of 1207, while they have read it with a jaundiced perspective, does not indicate criminality. Mr. Motovich had accounts containing millions of dollars at various points for a number of his companies at Carver Bank. The only thing that they're discussing, apparently, in that text message exchange is the fact to make sure that whatever letter is sent is reflecting the right time period as it relates to whatever it is they're talking about in terms of a loan.

If they didn't have the right time period, he had many different accounts to go to to get this loan. The

*Proceedings* 1804

witness yesterday said that she didn't even know whether anything had happened. I asked her three questions about it. She didn't know whether it had ever been completed. She didn't know whether he had ever gotten the money somewhere else, the 3500 material, which includes no detail about false statements in her statements about this. Only say that he sought the loan for 2.8, which is a completely different situation.

There is nothing in there to discuss there's something coming from Carver Bank. Mr. Polemeni has now said that this is a Carver Bank situation. When I posed that question explicitly to the witness yesterday, she said it was not involving Carver Bank. So now we have no idea what bank it is. We have no idea --

THE COURT: Luckily you can ask her because she's still on cross.

MR. JACKSON: That is true, Judge, but it puts us in a perilous situation.

THE COURT: You've already questioned her about it and you can continue to question her about it.

MR. JACKSON: We defer to the wisdom of the Court, Judge.

THE COURT: Okay. The motion is denied. Anything else before we get the jury in and get the witness back from the government?

J.A. 686

*Proceedings*     1805

MR. POLEMENI: Two things, Judge. The first is there was a discussion about 3500 material from Ms. Sullivan-Hyatt and identification of Mr. Garcia.

THE COURT: Yes, the photos or non-photos, as it were.

MR. POLEMENI: Yes, Your Honor.

Yesterday evening we sent an email to defense counsel indicating that on, I believe, at least ten occasions in three productions of 3500 material for the past 4 to 5 weeks, we have provided photographs of all the individuals that witnesses have been asked to identify.

We then provided the defense with another copy of the identification of those photographs yesterday evening. Those photographs are numbered in the order in which witnesses were shown.

Mr. Garcia's photograph is also and has also been admitted into evidence.

THE COURT: How many photographs of Garcia were shown to this witness?

MR. POLEMENI: Only one, Your Honor.

THE COURT: Only one.

MR. POLEMENI: It was the photograph we've shown to each and every witness.

THE COURT: There are no other photographs of Mr. Garcia that were shown to the witness. That was, as I

*Proceedings*     1806

understood it, the heart of Mr. Jackson's concern.

Is that right, Mr. Jackson, that there may have been other photographs of Garcia?

MR. JACKSON: That's one of our concerns, Judge.

THE COURT: What was the other concern?

MR. JACKSON: The witness is claiming that she had a negative identification. The documents from the government indicate that there was a positive identification.

We can't disprove her claim on the testimony that there was a negative identification because the government has not provided us with the photo array that was actually shown.

THE COURT: So you don't just want the pictures of Garcia that were shown to the witness. You want the government to reconstruct the photo array that was presented to the witness at the time she was asked if she could pick out Garcia, is that what you're asking them to do?

MR. JACKSON: No, Judge.

THE COURT: What are you asking them to do that they haven't done?

MR. JACKSON: I want them to give us enough information --

THE COURT: Precisely what is it that you want them to do?

MR. JACKSON: I want them to provide us with the actual photo that was shown.

*Proceedings*     1807

THE COURT: Wait. They just said they've done. Is that correct?

MR. POLEMENI: Yes, Your Honor.

THE COURT: They've done that. What else?

MR. JACKSON: Tell us who the witness is that will identify that that's the photo that was shown and there was a positive identification.

THE COURT: Who was the witness who will state that that is the photograph of Garcia that was shown to Ms. Sullivan-Hyatt?

MR. JACKSON: Yes, Your Honor.

THE COURT: Why does that matter?

MR. JACKSON: Because there's a positive identification in the records.

THE COURT: But Hyatt told you she made a mistake. Right?

MR. JACKSON: How could she even know?

THE COURT: Hyatt told you that she made a mistake with respect to her identification. Isn't that what she testified to?

MR. JACKSON: Yes, Judge.

THE COURT: That's all I'm saying. She said I looked at it, I thought X, and now I think not X. Right? Isn't that what she testified, or am I misremembering, as the former president used to say?

*Proceedings*     1808

MR. JACKSON: No, Judge, your memory is exactly accurate. It's excellent. However, when she was shown the photo, what the report indicates is that they didn't tell her who it was. They just showed her a photo of Mr. Garcia and said, do you know who this is and she said it's Reginald Garcia. So it's very difficult to understand today how she could know.

THE COURT: That's why you cross-examine her on it.

MR. JACKSON: Yes, Judge. We will do that, we're happy to do that. The last piece of it is the reason that the government is required to turn over an identification like this and the procedures, and who is the witness that could tell us whether or not this identification was made and what happened, is because when she says that she never made such an identification, the fact that she did is exculpatory and we have --

THE COURT: Luckily she's here and you can call that to the jury's attention through your cross and in your summation.

So to the extent you're asking for additional productions from the government, the request is denied. You've gotten everything you're entitled to. The witness is still on examination and you can continue to ask her about the Garcia photo or non-photo.

Your application has been satisfied to the

J.A. 687

*Proceedings*                1809

satisfaction of the Court. There are no other photos of Garcia that were presented to the witness, as the government has represented. She's still on cross-examination and you can continue to ask her about her views of whether this was or wasn't someone that she had seen before.

So I've ruled on that. Anything else from the government?

MR. POLEMENI: Your Honor, one thing I would like to address, and would it be okay if we did it at sidebar. It deals with Government's Exhibit 1208.

THE COURT: The one I excluded?

MR. POLEMENI: Yes.

THE COURT: No. No sidebar.

MR. POLEMENI: I'm not asking to have the Court reconsider its decision. I just want to put on the record for posterity the kind of precise sequence of events leading up to Government's Exhibit 1208.

THE COURT: It's not coming in. So why do you need to make a record with respect to a document that's never going to come into this court.

What is the point?

Seriously. You offered a document. You stated the basis on which you wanted it admitted. The Court denied it. What else do you have to say about it?

MR. POLEMENI: Well, Judge, I understand and I

*Proceedings*                1810

appreciate that. And this is more of a situation where I, my fellow colleagues here, take our responsibilities very seriously as federal prosecutors. To the extent the Court believes that the government acted inappropriately here, I just would like to put on the record --

THE COURT: You don't believe you acted inappropriately, that's correct? That's your view?

MR. POLEMENI: That's correct.

THE COURT: Maybe the Court doesn't share that view. Would you like me to go into why the Court doesn't share that view on the record? I'd be happy to do it if you really want me to do it.

I told you the story about I wasn't upset when my first wife left me, but I got upset when she insisted on telling me why. Would you like me to tell you why or would you just be wise enough to accept the fact that I raised a pronounced eyebrow at your purported offer?

Would you like me to go on the record? Your choice. Be careful what you wish for. Your choice, sir.

MR. POLEMENI: I understand, Your Honor. I appreciate that.

THE COURT: What do you want? What do you want, the lady or the tiger? What do you want?

MR. POLEMENI: I prefer the lady, Judge.

THE COURT: Let's move on. Because the tiger awaits

*Proceedings*                1811

you.

MR. POLEMENI: Okay.

THE COURT: Anything else?

MR. POLEMENI: No.

THE COURT: Anything else from defense counsel?

MR. JACKSON: No, Judge. Thank you.

THE COURT: Let's get the jury and let's get the witness back.

(Witness resumes the stand.)

THE COURT: Good morning.

THE WITNESS: Good morning.

(Jury present.)

THE COURT: Good morning ladies and gentlemen of the jury. Welcome back. Please be seated. We thank you for your patience. Ladies and gentlemen of the public, you may be seated, as well. Please be seated.

Ms. Sullivan-Hyatt, you're still under oath. And I'm going to ask you, as I always ask witnesses, have you spoken to anyone about your testimony since leaving the witness stand yesterday, ma'am?

THE WITNESS: No, I haven't.

THE COURT: Thank you. You may examine with cross-examination, Mr. Jackson.

MR. JACKSON: Thank you so much, Judge.

(Continued on the following page.)

**J.A. 688**

*Sullivan-Hyatt - Cross - Jackson*          1812

**DANNETTE SULLIVAN-HYATT,**
called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. JACKSON:

Q   Good morning again, Ms. Sullivan-Hyatt.

A   Good morning.

Q   Ma'am, the question, when customers open an account at Carver Bank, can you tell the jurors specifically what kind of training the bank gives on KYC rules and Bank Secrecy Act regulations to customers who are opening up an account?

A   We do quarterly KYC training where we do online training, as well as we do have security training where we go through lawyer customer enhanced due diligence.

Q   Are you talking about training for employees?

A   Yes.

Q   Okay. I'm talking about regular guy comes in, opens up an account. What kinds of trainings do you do for customers who are opening up an account on bank KYC rules and on Bank Secrecy Act regulations as they apply to the bank?

A   We don't do customer training.

Q   You don't do any training on those issue for customers?

A   No.

Q   Let me ask you, you met a man named Robert Lovy, right?

Sullivan-Hyatt - Cross - Jackson                    1813

A    Robert Lovy, yes.

Q    And Mr. Lovy had accounts at the bank, right?

A    Yes.

Q    You knew that those accounts involved a business that he was involved in with Mr. Motovich?

A    I know that Robert Lovy has accounts.  I wasn't aware if David was involved with that.  David did recommend Robert Lovy to the bank to open the accounts.

Q    Just to be clear, there was never a point at which the bank had made some sort of determination that Robert Lovy couldn't open more accounts, right?

A    No.

Q    Mr. Lovy could open as many accounts as he wanted, right?

A    Right.

Q    Now, you've talked about the BSA people who did BSA kind of inquiries at the bank, right?

A    Yes.

Q    Am I correct that the BSA department at your bank, they have access to every transaction at the bank?

A    Yes.

        THE COURT:  Again, for the jury and for the Court, what does BSA stand for?

        THE WITNESS:  Bank Secrecy Act.

        MR. JACKSON:  Thank you, Your Honor.

        THE COURT:  Go ahead.

---

Sullivan-Hyatt - Cross - Jackson                    1814

BY MR. JACKSON:

Q    The bank does work with various construction companies, correct?

A    You mean open accounts, give them loans, yes.

Q    Thank you.  And have you ever been involved in any of that, any customers like that?

A    Yes.

Q    Have you ever been involved in any site visits related to construction companies that the bank had loaned money to or had accounts for, separate and apart from this case?

A    Yes.

Q    During those site visits, did you try to determine whether any of the workers at the sites were being paid in cash?

A    No.

Q    Did you ever try to determine whether any of the workers were undocumented workers?

A    No.

Q    Did the BSA people when you came back from those site visits ever say to you how many people there were being paid in cash?

A    No.

Q    That's not a question you ever heard anybody ask, correct?

A    That's not a question we would determine by seeing the

---

Sullivan-Hyatt - Cross - Jackson                    1815

workers.  That would be asked directly to the account owner.

Q    Right.  That's not something that you're aware of the bank ever trying to figure out on any site visit, correct?

A    Correct.

Q    By the way, the bank, you never had a situation where you heard that the bank was short on cash and didn't really have funding for its BSA department, right?

A    No.

Q    Now, the bank also has, apart from the BSA department, they have a legal department, right?

A    Yes.

Q    And that legal department sometimes sues people if it believes that those people owe the bank money, correct?

A    I would assume so.  I'm not privy to that side.

Q    You're not involved with the legal department?

A    No.

Q    Nevertheless, you never heard of from anyone at the bank that any lawsuit was ever filed against David, correct?

A    Correct.

Q    You never heard anybody at the bank ever say David stole our money, correct?

A    Correct.

Q    By the way, the bank didn't sue you, right?

A    Right.

Q    And you weren't surprised by that, were you?

**J.A. 689**

---

Sullivan-Hyatt - Cross - Jackson                    1816

A    No.

Q    You didn't expect to get sued by the bank, did you?

A    No.

Q    And that's because you weren't stealing money from the bank; you believe you have engaged in some sort of technical violation, right?

A    I was involved in violating bank policies, yes.

Q    One of the things that we touched on briefly yesterday that I said I would come back to is you did not recall telling the agents and prosecutors that the Motovich family was worth, your understanding, as much as $100 million, correct?

A    I said that initially he showed documentation and I said yes.

Q    So you recall now that that is the case?

A    Yes.

Q    And you talked a little bit about this situation where I asked you the question did you positively identify Mr. Garcia in a photo array, correct?

A    Right.

        MR. JACKSON:  Can we call up, I believe in evidence, GX-19.

        THE COURT:  Any objection to GX-19.

        MR. PAULSEN:  No objection.

        THE COURT:  Admitted.  You may publish.

        (Government's Exhibit GX-19 was received in

Sullivan-Hyatt - Cross - Jackson                    1817

evidence.)

Q   Can you see that there?

A   Yes.

Q   Who is depicted here?

A   I don't know.

Q   Is this a photograph that was shown to you during the course of one of your meetings with the government where they asked you who this was?

A   Yes.

Q   And your recollection is that you said what?

A   I don't remember what I said, but I don't think I said Reginald. I don't remember.

Q   Is it possible, ma'am, as you sit here today, five years after the fact, that you don't have a clear memory of what you remembered and who you were able to identify five years ago?

A   I don't remember who I identified, but I know I didn't identify Reginald.

Q   So your unequivocal testimony is that you did not identify the man in this photo as Reginald Garcia?

A   I don't remember, no.

Q   You don't remember?

A   No.

Q   So by saying you don't remember, are you saying you're certain or are you saying you don't remember whether you did or not?

---

Sullivan-Hyatt - Cross - Jackson                    1818

A   I'm saying I'm certain I don't remember if I chose this person for Reginald. I know I was shown this picture but I don't remember.

Q   We can take that down. By the way, who was the agent that was showing you these photographs?

A   George Dietz.

Q   There were other agents in the room, correct?

A   Yes.

Q   Including an agent named Mr. Pereless?

A   He was not at that initial meeting. He came afterwards. It was three people initially, the gentleman sitting at the table there.

Q   Mr. Cabane?

A   Yes. And George and a lady. I don't remember her name.

Q   Now, you talked a bit, I believe, with the prosecutors that the bank invests the money of customers, correct?

A   No, I didn't talk about that.

Q   You didn't discuss that?

A   No.

Q   Are you aware that the bank invests money?

A   Yes.

Q   Did the bank ever tell depositors what it's doing with the money?

A   That's above me. I don't know. I have no clue.

Q   Well, you're on the frontline of customer relations,

---

Sullivan-Hyatt - Cross - Jackson                    1819

right?

A   Yes. I was on the frontline. What you're discussing would be in the back office end. So I'm not privy to that.

Q   My question is, you're not aware of the bank regularly, for people that go to the ATM or something, telling the customers hey, by the way, this is how we're investing the money that is deposited at the bank?

A   No, I'm not aware.

Q   You've never heard that happening?

A   No.

Q   And the bank, vice versa, you've never had an understanding that the bank has an expectation that the customer is telling the bank about everything it's doing with its money, correct?

A   Yes.

Q   Opening up a bank account is not like walking into a confession booth, correct?

A   Correct.

Q   One of the questions you were asked about also yesterday, is that the prosecutor asked you can you file a SAR if the person who's transacting the business is not the name on the account. Do you remember that question?

    THE COURT: Again, for the Court and the jury, what is a SAR?

    THE WITNESS: Suspicious activity report.

---

Sullivan-Hyatt - Cross - Jackson                    1820

    THE COURT: Please continue.

Q   Your answer to that question was no, right?

A   Right.

Q   That's something you went over several times with the prosecutors in prep?

A   Yes.

Q   And I'm correct, though, that if we pause and just look at the question literally, the bank can file a SAR anytime the bank believes a SAR is appropriate no matter whose name is on the account, correct?

A   Correct. However --

Q   That's only my question.

    THE COURT: Let her finish. Go ahead.

A   However, the SAR is being filed on a person that the account is opened in their name and they're not the one conducting the transaction, that SAR wouldn't be correct.

Q   That's my next question. You're saying the SAR wouldn't be correct. But just to be clear, we'll get to that in one second, the bank can file a SAR anytime that it believes a SAR should be filed regardless of whose name is on the account?

A   Correct.

Q   And it is always the case whenever a bank files a SAR that there are aspects of the transaction that the bank doesn't know about, correct? That's a yes or no question.

A   I don't know.

**J.A. 690**

Sullivan-Hyatt - Cross - Jackson      1821

Q   Well, it's certainly the case that when most people write a check to someone the bank doesn't know everything about who was involved and whatever business is on the other end of the check, correct?

A   Yes.

Q   So every SAR that's filed, there's information that the bank has and information that the bank doesn't have, correct?

A   I think so, yes.

Q   And the fact that the bank doesn't have total information about everything doesn't stop it from filing a SAR, correct?

A   Correct.

Q   Now, the question was also posed to you, can a bank faithfully file a CTR if the name on the account is different than the person who is actually doing the work.

First, with the judge's wisdom, again, can you remind the jury what a CTR is?

A   Currency transaction report.

Q   And it's -- that's generated anytime there's a transaction over $10,000, right?

A   $10,000 and a penny coming in or going out.

Q   So anyone who -- no matter whose name is on the account, the question was faithfully.  But the bank can faithfully file a CTR based on the information that they have no matter whose name is on the account, correct?

A   Correct.

---

Sullivan-Hyatt - Cross - Jackson      1822

Q   And the CTR goes to potential investigating agencies, right?

A   From the front office when we file a CTR it goes to the back office.  From there they do their part.

Q   You don't even know, as you sit here today, what happens after the CTR goes to the back office, right?

A   I'm not sure what they do after that.

Q   You don't know whether the CTR goes to the federal government or to somebody else, right?

A   I don't know what happens after it's done in the branch back office takeover.

Q   You worked at a bank for how many years?

A   28 years.

Q   And you've done many trainings on CTRs and SARs, right?

A   Yes.

Q   And there's still an enormous amount that because it's not part of your job you don't know about that stuff, right?

A   I don't know about the back office, the back end.

Q   There was a question that was posed to you, was an OFAC check also run for Mr. Garcia.  Do you remember that question?

A   Yes.

Q   And the prosecutor also asked you is there much point of running an OFAC check on somebody who is not running the account.  Do you remember that question?

A   Could you repeat that, please?

---

Sullivan-Hyatt - Cross - Jackson      1823

Q   Sure.  The exact question that I believe was asked to you is, is there much point of running an OFAC check on somebody who is not actually running the account.  Do you remember that question?

A   Yes.

THE COURT:  Again, for the Court and the jury, what is OFAC?

A   Office of Foreign Assets Control.

Q   Your answer to the question was no, right?

A   Right.

Q   But, again, this is a question that you went over several times with the prosecutors in your preparation to testify before the jury, correct?

A   Correct.

Q   And you're trying to play ball with the prosecutors but you don't actually know much about OFAC, right?

A   I know OFAC is if you're sanctioned by OFAC you're not able to open an account.  However, if someone like in this case where Mr. Garcia opened an account, he was not on OFAC, he was not sanctioned.  So everything went through.  However, if the person that is actually doing the transaction on the account was sanctioned, then that, you know.

Q   You know OFAC deals with terrorism and other concerns like that?

A   Yes.

---

Sullivan-Hyatt - Cross - Jackson      1824

Q   You also know that Mr. Motovich is not sanctioned by OFAC, right?

A   I don't know that.

Q   Well, the bank dealt with Mr. Motovich for years, right?

A   Right.

Q   If Mr. Motovich was on an OFAC list, it would have popped up, don't you think?

A   Again, Mr. Motovich should not be doing transaction on Mr. Garcia's account.

Q   I totally understand what you've discussed with the prosecutors.  I understand you have to do the right thing.  My question.

MR. PAULSEN:  Objection Your Honor.

THE COURT:  Overruled.

Q   Mr. Motovich, if he was on some sort of OFAC list, the bank would not have allowed him to be a, what did you call this, a center of influence, correct?

A   Correct.

Q   And so whether Mr. Motovich's name had been on the OFAC check or Reginald Garcia, the result would have been exactly the same, correct, a negative OFAC?

A   Correct.

Q   The fact of the matter is you never worked for OFAC, right?

A   Right.

Sullivan-Hyatt - Cross - Jackson                1825

Q    You don't consider yourself an expert in OFAC?

A    No.

Q    When that question was posed to you, it's really kind of asking you to talk about something that's not really your area of expertise, correct?

A    It's not my area of expertise.  However, we still have to run OFAC whenever someone opened an account.  It's not my area of expertise, it's back office, but it's built in the system.

Q    Right.  Now, the prosecutor asked you in an earlier part of your testimony whether you told some lies throughout the time that you were proffering with them, correct?

A    Yes.

Q    And we didn't get into your direct examination what were all of the specific lies that you told during the course of your meetings with the prosecutors, right?

A    Right.

Q    Have you and the prosecutors counted how many different things that you lied about?

A    No.

Q    Do you know off the top of your head just a number, how many things you lied about when you were meeting with the prosecutors?

A    No.

Q    Could it be more than ten?

A    I don't know.

---

Sullivan-Hyatt - Cross - Jackson                1826

Q    You just don't know because that's not something that the prosecutors tried to unpack with you, right?

A    They did some, but yeah.

Q    You do know that the prosecutors, they told you they could charge you with a separate violation of 18 U.S.C. 1001 for every time that they believed you lied to them, correct?

A    Yes.

Q    And you understand that that could increase your potential penalty by five years for each count?

A    Yes.

Q    So they could have added, if they wanted to, if it were ten lies, an additional 50 years potentially in your maximum sentence on top of a max 30 that you're already facing for this bank charge, correct?

A    As I said yesterday, initially I was not told about any lies that could be used about me, but eventually I was and I have not lied.  And what I signed to is 0 to 30 years.

Q    Right.  I just want to unpack this.  You do understand that they could have added for the lies that you told, who knows, as much as an additional 50 years, correct?

A    I understand that initially if I was told that anything that I say if I told a lie could be, yes, could be used against me.

Q    And this is not reflected in your plea agreement.  You kind of understand this is part of the understanding that

---

Sullivan-Hyatt - Cross - Jackson                1827

you're here under, it's part of the reason that you're trying to testify in a way that makes the prosecutors happy, correct?

A    I understand that I broke the law and I have to take responsibility, and I'm hear taking responsibility, yes.

Q    Now, this thing that happened with Mr. Garcia, did the prosecutors tell you that you had done something wrong in terms of your dealings with Mr. Garcia?

A    They told me and I know as well.

Q    You know that as well, you believe that?

A    I know that.

Q    You understand that the prosecutors, if they wanted to, could have also charged you with aggravated identity theft carrying a mandatory minimum?

MR. PAULSEN:  Objection, Your Honor.

THE COURT:  Overruled.

A    I did not know that.

Q    You never discussed that with the prosecutors?

A    No.

Q    You did know that there is some kind of charge that could have been brought against you additionally, right?

A    I did not know.

Q    That's not something you ever discussed?

A    No.

Q    Just a few more questions for you, ma'am.

MR. JACKSON:  May I have a moment, Judge?

**J.A. 692**

---

Sullivan-Hyatt - Cross - Jackson                1828

THE COURT:  Yes.

Q    The last thing I want to discuss with you, ma'am.  Now, to be clear, you talked about with the prosecutor yesterday this -- the prosecutor asked you about some situation where you said that Mr. Motovich was attempting to tell you something about how much money was in his account related to a potential loan.

Do you remember that?

A    Yes.

Q    As you sit here today, you don't have any document that was ever submitted to whatever bank you're talking about containing false statements, correct?

A    No, I don't have any documents.

Q    You don't remember, as you sit here today, or know -- first of all, you have no knowledge that any money was obtained from any bank through any false information like this, correct?

A    From other banks besides Carver, no, I'm not aware.

Q    And you don't have any information that Mr. Motovich obtained a loan fraudulently from Carver, correct?

A    No.  David applied for a loan with Carver Bank but he didn't -- it didn't go through, a business loan.

Q    Okay.  He sought a loan from Carver Bank at some point?

A    Yes.

Q    But he withdrew his application because it was taking too

*Sullivan-Hyatt - Redirect - Paulsen*  1829

long, right?

A   Yes.

Q   So he never obtained any money from Carver Bank fraudulently, right?

A   No.

Q   And Carver Bank, for any loan that Carver Bank was going to give to Mr. Motovich, Carver Bank would have been able to see how much money was in its own accounts, that's a yes, right?

A   Yes.

MR. JACKSON:   No further questions for this witness, Judge.

THE COURT:   Your witness on redirect.

MR. PAULSEN:   Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. PAULSEN:

Q   Good morning, Ms. Hyatt.

A   Good morning.

Q   A moment ago the defense lawyer had asked you about the letter that David Motovich had requested about his account.

A   Yes.

Q   Was that the Sherman Abrams account?

A   I believe so.

Q   Will a bank generally give a client a letter stating how much money they have in their account?

---

*Sullivan-Hyatt - Redirect - Paulsen*  1830

A   Yes, we do verification letters.

Q   Those are done somewhat automatically?

A   Yes.

Q   Is it a slightly more special request to ask the bank to make up a number?

A   Yes.

Q   And that's what David Motovich asked you?

A   Yes.

Q   Now, Mr. Garcia, have you ever met Mr. Garcia in person, to your knowledge?

A   No.

Q   During the course of the cross-examination you were asked about a photo you saw; is that right?

A   Yes.

Q   And you were shown a photo that you may have identified as Mr. Garcia; is that right?

A   Yes.

Q   During the course of opening the accounts in this case, did you see Mr. Garcia's driver's license?

A   Yes.

Q   Does his driver's license have a photo on it?

A   Yes.

Q   Can I show you Government's Exhibit 1059, page 6, in evidence?   Fair to say, Ms. Hyatt, this is a lousy copy of a driver's license?

---

*Sullivan-Hyatt - Redirect - Paulsen*  1831

A   Yes.

Q   But in the course of opening up an account you see a driver's license of the people you're opening?

A   Yes.   A government issued ID, yes.

Q   Even in a situation like this when you never met the person and it was given to you by David Motovich and his secretary?

A   Yes.

MR. PAULSEN:   Can I show Government Exhibit 707-A, pages 24 and 25?

THE COURT:   You may.

Q   Do you recall -- if I could go to the first page of this section.   Do you recall this email, Ms. Hyatt?

A   Yes.

Q   This is another email about the ZKC account?

A   Yes.   That's the approval from our retail operations personnel.

Q   Jumping back to page 24, Ms. Kannan.   Is it fair to say you got a copy of his driver's license again?

A   Yes.

Q   Now, Ms. Hyatt, when you talked to Marina Kuyan, who did you understand to be directing what she was asking you to do?

A   Whenever Marina called she would say David wants you to do this or David is asking for you to do that.

Q   Marina is David's secretary; is that right?

---

*Sullivan-Hyatt - Redirect - Paulsen*  1832

A   Yes.

Q   Did you ever transact any business in the ZKC account on your own without David Motovich or Marina Kuyan's authorization?

A   No.

Q   Now, you admit that in some of the early meetings with the agents you weren't fully honest; is that right?

A   Yes.

Q   What were you hiding?

A   I was afraid and frightened, and it was just I was shocked.   So I try to kind of make everything look okay.   However, I came to the conclusion that it's not worth lying over.   You should tell the truth and accept.

Q   Is it fair to say the things you were lying about were the things you were doing with David Motovich?

A   Yes.

Q   Yesterday defense counsel showed you some of those deposit slips, which you used to withdraw money.   Do you remember that?

A   Yes.

Q   Defense counsel asked you if on occasion Mr. Motovich had provided some money for lunch for your staff.   Do you recall that?

A   Yes.

Q   Did he do that once in a while?

**J.A. 693**

Sullivan-Hyatt - Redirect - Paulsen          1833

A    Yes.

Q    The money that was reflected in those deposit slips, was that mostly for lunch?

A    Yes.  Sometimes withdrawal slips, not deposits.

Q    Much of it was for you, is that fair?

A    Yes.

Q    So when you asked for money for your daughter's computer, that was for you?

A    That was for my daughter, his goddaughter, yes.

          (Continued on next page.)

---

Sullivan-Hyatt - redirect - Mr. Paulsen          1834

BY MR. PAULSEN: (Continuing.)

Q    When you asked for money for Christmas or for your birthday, that was for you?

A    Yes.

Q    When you asked for money, you said something would cost you extra because of something that David Motovich asked for, that's for you?

A    Yes.

Q    You were asked some questions a moment ago about SARs; do you recall that?

A    Yes.

Q    And I believe defense counsel has said that you can really file a SARs whenever you want; is that right?

A    Yes.

Q    I guess I would ask you this:  Can you file a SARs accurately if the account holder is hiding who the true person is?

A    No.

Q    Is that what you meant when you said you couldn't do it right?

A    Yes.

Q    And just a few other questions, Ms. Hyatt.  Defense counsel asked if you -- if there was any training for customers; do you recall that?

A    Yes.

---

Sullivan-Hyatt - redirect - Mr. Paulsen          1835

Q    Now, did you tell David Motovich that when you traveled and you weren't at the bank, you couldn't do the business that you were doing?

A    Yes.

Q    Why is that?

A    Because I know it wasn't appropriate.  It was not policy.

Q    But is it also true because you couldn't ask anybody also at Carver Bank to do the things you were doing for David Motovich?

A    Correct.

Q    And is it fair to say that David Motovich knew that you had been removed from your prior bank for doing favors against bank policy?

A    Yes, I did tell him.

Q    He knew that?

A    Yes.

Q    He knew that when he switched over to your bank?

A    Yes.

Q    Now, finally Ms. Hyatt, you were asked if you were sued at end of all that, right?

A    Yes.

Q    You weren't sued, right?

A    No.

Q    You were fired, right?

---

Proceedings          1836

A    Yes.

Q    And then you were prosecuted?

A    No.

Q    You were prosecuted by the government for what you did?

A    This -- this -- for this one, yes.

Q    You pled guilty to bank fraud?

A    Yes.

Q    Because that's what you did?

A    Yes.

Q    With David Motovich?

A    Yes.

          MR. PAULSEN:  No further questions.

          THE COURT:  Thank you.

          You may step down, ma'am.  Thank you very much.

          (The witness steps down.)

          THE COURT:  Please call your next witness.

          MR. SKURNIK:  The Government calls Yisroel Leshkowitz.

          THE COURT:  Please have the witness come forward to be sworn.

          Please come forward to the top step and my court deputy will administer the oath and raise your right hand when you get to the top step.

          THE COURTROOM DEPUTY:  Do you solemnly swear or affirm that the answers are you about to give the Court will

J.A. 694

Proceedings                                    1837

be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I affirm.

THE COURT:  Thank you.  Please be seated.  I am going to ask you, sir, to move the microphone to you.  It will swivel, move it up and down so the jurors can hear you clearly.

Please state your name and spell your name and then counsel will inquire.

THE WITNESS:  Yisroel Leshkowitz.  Yisroel is, Y-I-S-R-O-E-L, middle initial of Y, last name is, L-E-S-H-K-O-W-I-T-Z.

THE COURT:  Shalom.

You may proceed.

(Continued on next page.)

---

Leshkowitz - direct - Mr. Skurnik          1838

YISROEL LESHKOWITZ,
        called as a witness by the Government, having been
        first duly sworn/affirmed by the Courtroom Deputy, was
        examined and testified as follows:
DIRECT EXAMINATION
BY MR. SKURNIK:
Q    Good morning, Mr. Leshkowitz.
A    Good morning.
Q    Are you appearing here today voluntarily or pursuant to a subpoena?
A    Pursuant to a subpoena.
Q    So you are required to be here?
A    Correct.
Q    Before today, did you provide the Government with any documents?
A    Yeah.  I don't remember the exact date but I had received a subpoena to provide certain information and I did that.
Q    What do you do for work?
A    I'm an attorney.
Q    Do you currently practice law?
A    Correct.
Q    How long have you been practicing law?
A    Graduated law school in December -- February of 2021 and since then, I guess.

---

Leshkowitz - direct - Mr. Skurnik          1839

Q    What type of law do you practice?
A    I have a commercial real estate corporate practice in general.  I used to do some litigation but not anymore.
Q    Do you have an office?
A    Yes.
Q    Where is it?
A    Forty-five Broadway in Manhattan.
Q    Are you engaged in any other business aside from the practice of law?
A    No.
Q    Do you know the defendant David Motovich?
A    Yes.
Q    How?
A    I have done work for him and his family over the years.
Q    What sort of work?
A    Real estate and corporate work.
Q    Can you give us more details?
A    I have represented family members, Motovich family members, in connection with purchase and sale of some properties, making of loans, two people, and what's it called and the -- and some, you know, partnership agreements and stuff like that.
Q    So what are some of the properties?
A    Oh, okay.  Specifically with respect to the defendant or with respect to the family and as a whole?

---

Leshkowitz - direct - Mr. Skurnik          1840

Q    With respect to David Motovich specifically.
A    I can't remember the address of each property right now, but -- I mean, there was an investment.  I promise you I don't remember the actual address.  I'm trying to think. I know some of them were listed on the disclosure -- the stuff that I submitted as part of the subpoena.  I mean, there was a property at 3400 -- I don't remember even which state it was in.  There was some loans that were made on a property in Queens, some up -- in Upstate New York.  I just don't remember the actual addresses.  I'm sorry.
Q    What was your role in these transactions?
A    The typical role that a real estate attorney or corporate attorney would have and that would be to prepare loan documents.  If there was a sitdown closing where the documents would get signed, I would, or someone in my office, would attend, review title reports, you know, prepare security documents and often fund the deal.
Q    When you said fund the deal, what does that mean?
A    That means that money would have been coming to my account from either, you know, for the deal, and then there would be a closing statement that -- if it was a loan, a borrower would sign, or if it were a purchase, a purchaser would sign usually.

Sometimes the title company is the one that prepares those statements, and then we would fund either to

J.A. 695

Leshkowitz - direct - Mr. Skurnik     1841

the title company and then the title company would disperse, or sometimes we would disperse, as sometimes what people call the agent, the escrow agent.

Q   So the money coming into your account, that's money from David Motovich?

A   Or from his entities or other participants or partners.

Q   For the transactions you did involving Mr. Motovich, who did you understand the money belonged to?

A   So, sometimes it came from an account clearly that I knew was his account or an account that he -- I believed he controlled, or sometimes I would, you know, it came from a partner or participant in the deal.

Q   But in each case, were you speaking to Mr. Motovich about the transaction?

A   Usually, yeah.

Q   Okay.

A   I did speak to other people.  I mean, there were participants and partners that would sometimes call and ask, hey, what's the deal, what's the security.

Q   Who did you generally understand money was coming from for the transactions you did for Mr. Motovich?

A   So, yeah.  I mean, when it came from an account that I recognized, obviously, I knew it was him.  When I say him, an account that I believed he controlled, but there were money that came from other accounts that I cannot, you know,

Leshkowitz - direct - Mr. Skurnik     1842

could of been participants.  There were other people that were involved, as well, in some of the deals.

Q   Okay.

MR. SKURNIK:  Ms. Kannan, if we can pull up Government Exhibit 707 and go to page 977.

THE COURT:  In evidence.  You may publish.

(Exhibit published.)

MR. SKURNIK:  And if we can zoom in at the top. Actually if we can zoom out, please, and just zoom in at the very top where it lists the name of the bank.

Q   What does that say?

A   Carver Federal Savings Bank.

Q   Okay.

MR. SKURNIK:  If we can zoom out, please, and zoom in on the left where it says the wire information, top left.

Q   Does that say wire number 3714?

A   Yes.

Q   So, do you recognize, in general, this document?

A   So I need to see it a little bit better.  I don't recognize what wire number 3714 is.  I don't even know what that is.

Q   Do you know what a wire transfer is?

A   Yes, of course.

Q   What's a wire transfer?

A   A wire transfer is where one person sends money through

Leshkowitz - direct - Mr. Skurnik     1843

one bank through another bank through I guess what would be called a Fedwire system.  I mean, that's -- I'm not a banker.

Q   Is the person sending the money sometimes referred to as the originator?

A   Yes.

Q   And is the person receiving the money sometimes referred to as the beneficiary?

MR. SKURNIK:  If we can zoom in on the -- next to originator.

Q   Who is listed as the originator on this wire?

A   An entity called ZKC NY Inc.

Q   What's the address?

A   1090 Coney Island Avenue, Brooklyn, New York.

MR. SKURNIK:  If we can zoom out, please.

Q   On the bottom right, who's listed as the beneficiary?

A   My attorney escrow account at Chase.

Q   What's that address, 45 Broadway?

A   That's where my office is.

Q   So this is your account at Chase Bank?

A   My attorney IOLA account at Chase.

Q   What do you use that account for?

A   Holding deposits on contracts, getting money for deals, and using it for -- we write checks for accounts.

THE COURT:  Sir, you said IOLA account.  Would you

Leshkowitz - direct - Mr. Skurnik     1844

explain to the jury what an interest attorney account is.

THE WITNESS:  100 percent.  So there's two kinds of -- you're gonna get a lesson.  I'm sorry.

THE COURT:  That's what I asked for.  So blame me, blame the judge.  Sorry but I like these kinds of things.

THE WITNESS:  There are two kinds of escrow accounts.  There an escrow account where you can set up an individual account for each client.  It's costly and it's -- I don't know if I want to say pain in the neck, but it's not something that's there.  Some clients insist on that.  And then there's an IOLA account.  And IOLA account is a pooled escrow account where you keep money from all kinds of -- for all kinds of deals.  There's obviously a recordkeeping that becomes a pain in the neck but we do it.  So it's an escrow account that will have money for it for many deals at the same time.

THE COURT:  And IOLA, it stands for?  I know it's a tough --

THE WITNESS:  And some people, Your Honor, call it IOLTA.  So you got me on that one.

THE COURT:  Interest on Attorneys --

THE WITNESS:  Yeah, and the interest doesn't go to anybody.  The interest goes to a fund.  Bank takes out, like, a $15-dollar service fee each month and the interest is transferred to what's called the IOLA fund which is there

**J.A. 696**

Leshkowitz - direct - Mr. Skurnik     1845

to protect, I guess, against attorneys who unfortunately touch their money.

THE COURT:  And don't have an insurance.  This is a state fund that was setup many years ago through bar associations to help protect members of the public, lawyers of these accounts, and the interest on lawyers' accounts goes to the state to help taxpayers.  So whenever you hear lawyers have never done anything for the public, that's not true.  Interest on Lawyer Account is something that goes to the state.  I happen to know because many years ago, I was one of the lawyers in practice who helped to set this up.  Long time ago.

Okay.  Go ahead.

BY MR. SKURNIK:

Q    Is it fair to say that this account accepts funds as part of real estate transactions from your clients?

A    Yes.

Q    Okay.

MR. SKURNIK:  If we can zoom out, please, and just zoom in on the date which is gonna be on the right under basic settlement information.

Q    Does that say the effective date is February 22, 2017?

A    Yes.

Q    Okay.

MR. SKURNIK:  If we can zoom out, Ms. Kannan, and

Leshkowitz - direct - Mr. Skurnik     1846

now zoom in on in the very center of the page where it says wire amount currency.

Q    Does that say $72,000 USD?

A    Yes.

MR. SKURNIK:  And one more thing to zoom on.  If we can zoom out, please, and then, on the left, where it says verified.

Q    Does that say verified, then a date, by Dannette Sullivan-Hyatt?

A    Yes.

Q    Okay.  Mr. Leshkowitz, who was your client for this wire transfer?

A    I dealt with Mr. Motovich.  I mean, I believe I know which deal this was for, so.

Q    What was this a deal for?

A    So I -- just I had pointed out to Andrew, my original disclosure, I think this was -- I wrote this was for one deal but it was actually -- I write -- I tell Andrew -- I think it was for the 34,000 deal.  If you look at my sheet, I think that's what it was for.

Q    Is there a document that would refresh your recollection about the purpose of this wire transfer?

A    If someone can show me the disclosure that I provided.

MR. SKURNIK:  Your Honor, if I can show, just for the witness, for purposes of refreshing recollection,

Leshkowitz - direct - Mr. Skurnik     1847

3500-YL-2.  This is not in evidence.

THE COURT:  All right.  You may publish to the witness, opposing counsel and to the Court.

(Exhibit published.)

THE COURT:  And the question, sir, is whether or not this document refreshes your recollection with respect to the question Counsel posed to you.

THE WITNESS:  It does.

THE COURT:  It does?

THE WITNESS:  Yes.

THE COURT:  Okay.

Ask your next question now that his recollection has been refreshed.

BY MR. SKURNIK:

Q    Mr. Leshkowitz, what was the purpose of this $72,000 wire transfer?

A    I am 99 percent sure it was for the investment of 3400 -- I'm trying to think of the name -- Stockard.  Indiana.

Q    What is that investment?

A    That was an investment in a healthcare facility.  But really, the way it's done, it's actually you invest in the real estate as opposed to in the healthcare facility itself.  That's just the structure of these deals.

Q    That $72,000, who did you understand they belonged to?

Leshkowitz - direct - Mr. Skurnik     1848

A    I had no -- I can't say definitively.  My understanding was that it came from my client.

Q    And that's because you were speaking to your client about this transaction; is that right?

A    Correct.

Q    All right.  Did you ever wonder why the money was coming from an account under the name ZKC NY Inc.?

A    No.

Q    Why not?

A    Because on many deals I get money from -- clients will tell me you're gonna get money from different accounts, expected amount, and then usually I'll let the client know I got it.  So -- and we have -- there's always participants and there's always partners so you never know.

Q    Did Mr. Motovich ever explain why money was being sent from that particular account?

A    No.

Q    Okay.

MR. SKURNIK:  If we can go to Government Exhibit 707 page 979 now.

Q    And just is this another wire transfer information sheet?

A    Yeah, it looks -- looks the same as what you sent me before.

Q    This one also says Carver Federal --

**J.A. 697**

Leshkowitz - direct - Mr. Skurnik          1849

MR. SKURNIK:  Your Honor, if we can put this for the jury as well.  Thank you.  It's in evidence.

THE COURT:  Yes.  You may publish.

(Exhibit published.)

Q    Does this also say Carver Federal Savings Bank at the top?

THE COURT:  I know you're a corporate guy.  You have to say yes or no.  You have to say yes or no in litigation, right?

THE WITNESS:  The answer is yes.

THE COURT:  That's okay.

Go ahead.

MR. SKURNIK:  If we can zoom in on the wire number, please, Ms. Kannan.

Q    Is this wire number 3763?

A    That's what it says.

Q    Okay.

MR. SKURNIK:  If we can zoom out, please, and look at the effective date in the upper right.

Q    Is the date March 1st, 2017?

A    Yes.

MR. SKURNIK:  If we can zoom out please and zoom in on the originator.

Q    Is this also a wire from ZKC NY Inc.?

A    Yes.

---

Leshkowitz - direct - Mr. Skurnik          1850

Q    Okay.

MR. SKURNIK:  If we can zoom out again and zoom in on the beneficiary.

Q    Who is the beneficiary?

A    That's, again, my attorney IOLA account.

Q    Okay.

MR. SKURNIK:  If we can now look at amount of the wire in the center of the page.

Q    How much is the wire?

A    $195,000.

THE COURT:  Please keep your voice up.

How much?

THE WITNESS:  $195,000.

THE COURT:  Thank you.  Just move the microphone.

MR. SKURNIK:  If we can now zoom out please and zoom in on verified on the left.

Q    Does that say it was verified by Dannette Sullivan-Hyatt?

A    Yes.

Q    Okay.  This $195,000-dollar wire, who was your client for this transaction?

A    I believe it was Mr. Motovich.

Q    And what was the money for?

A    I believe for that same deal, that 3400 -- I don't have it in front of me -- deal.

---

Leshkowitz - direct - Mr. Skurnik          1851

Q    Is that the 3400 Stockard Drive deal?

A    I believe so unless my sheets that I gave shows otherwise.

MR. SKURNIK:  If we can go now to Government -- same exhibit, page 980, please.

Q    And is this another wire transfer information sheet.

A    It looks -- it sure looks like the same thing, yes.

MR. SKURNIK:  Can we zoom in on the wire number, please.

Q    Is this one wire number 3764?

A    Correct.  Yes.

MR. SKURNIK:  And the date, Ms. Kannan, on the upper right.

Q    Is this one March 1st, 2017?

A    Yes, that's what it says.

Q    If we can zoom out, please.  The originator, is this also ZKC NY Inc.?

A    That's what it says, yes.

Q    If we can zoom out, please.  The beneficiary, who is the beneficiary?

A    My attorney IOLA account.

Q    If we can zoom out please and zoom in on the wire amount currency.  How much is that?

A    195,000.

MR. SKURNIK:  Zoom out please and if we can zoom

---

Leshkowitz - direct - Mr. Skurnik          1852

in on the verified on the left.

Q    Does that say verified by Dannette Sullivan-Hyatt?

A    Yes.

Q    Okay.

MR. SKURNIK:  If we can zoom out please.

Q    Do you recall why there are two $195,000 payments from the ZKC account?

A    I don't not.  I don't.

Q    Do you recall what the purpose of this second payment was?

A    Again, I believe it was also the same time for that same transaction that we've been discussing.

Q    This is the transaction in Indiana?

A    I believe so but, again, if you want to show me my sheet, I can look at that again.

MR. SKURNIK:  Your Honor, if we can pull up again 3500-YL-2 just for the witness.

THE COURT:  Yes, and to opposing counsel.

Does this refresh your recollection, sir, once the document is before you?

A    Yes, it does and it seems, based on this, that it went into that deal.

Q    And who was your client on that deal?

A    Again, my client, I -- was David Motovich.

Q    If we can go now back to Government Exhibit 707 and

**J.A. 698**

Leshkowitz - direct - Mr. Skurnik          1853

page 983.  Is this, again, information about a wire transfer?

A    Yes.

MR. SKURNIK:  Ms. Kannan, can we zoom in on the wire number, please.

Q    Is this wire 4008?

A    That's what it says, yes.

MR. SKURNIK:  Zoom out, please.  If we can zoom in on the date in the upper right.

Q    Is the date of this wire May 3rd, 2017?

A    Yes.

MR. SKURNIK:  If we can zoom out, please.  Zoom in on the originator.

Q    Is this again ZKC NY Inc.?

A    Yes.

Q    Zoom out, please.  Who is the beneficiary?

A    It's any attorney IOLA account again.

Q    If we can zoom out and zoom in on the wire amount.  How much is this wire?

A    $150,000.

Q    If we can zoom out please and zoom in on verified.  Who is listed as verifying this wire?

A    Dannette Sullivan-Hyatt.

MR. SKURNIK:  We can zoom out, please.

Q    Do you recall what this wire was for?

Leshkowitz - direct - Mr. Skurnik          1854

A    No, but I would have to have my sheet again.

Q    Okay.

MR. SKURNIK:  So if we can pull up, again just for defense counsel and the witness, 3500-YL-2 please, Your Honor.

THE COURT:  You may.

A    Just looking for the date.  So it was for an investment in an entity called 800fund.com.

Q    What is 800fund.com?

A    I have no idea.

Q    Who is your client for this investment?

A    I believe it was David Motovich.  It may have been through an entity but I don't recall.

Q    Did you speak to Mr. Motovich about this wire?

A    I -- I imagine I did to probably say I got a wire.

Q    Did Mr. Motovich, for this transaction, ever tell you why the funds were coming from ZKC NY Inc.?

MR. MAZUREK:  Objection, your Honor.

THE COURT:  Overruled.  You may answer.

A    I don't think I ever had a discussion why a wire came from any account.

Q    Okay.  So you've testified about several of these transactions now.  I want to ask you about a few other companies.  Did you ever receive funds from a company called Advertising on the Go?

Leshkowitz - direct - Mr. Skurnik          1855

A    Yes.

Q    Did that have to do with a transaction for Mr. Motovich?

A    For an entity called DM Investors, from what I remember.

Q    Who is DM Investors?

A    DM Investors was -- is an entity that's used to make loans to different -- different people.

Q    Who controls DM Investors?

A    So I can't say I have a signed operating agreement but my understanding is Mr. Motovich.

Q    DM, are those Mr. Motovich's initials?

A    They are but we can -- you know --

Q    So, back to Advertising on the Go.  Who did you understand controlled Advertising on the Go?

A    So, I can't say I have any understanding because in many loans, there were participants that I possibly didn't even know about and that's a typical thing in a -- in loans.

Q    Well, for transactions where you received money from Advertising on the Go, who was your client?

A    DM Investors.

Q    Okay.  And that's the company that you understand is controlled by David Motovich?

A    That was my -- at the time, yes.

Q    Has your understanding changed?

Leshkowitz - direct - Mr. Skurnik          1856

A    Well, I believe that it's now -- I haven't seen any documentation but controlled by some sort of a trust or something.  I don't know, but that's -- I don't know.

Q    How about Midwood USA Consulting Group.  Have you received funds from Midwood USA Consulting Group?

A    Yes.

Q    Who do you understand controls that entity?

A    I, again, have not reviewed any of the corporate paperwork on that entity so I can't say anything definitively.  I'm sorry.

Q    Whenever you received funds from Midwood USA Consulting Group, who was the client you were representing?

A    I was usually representing either Mr. Motovich or one of his entities.

Q    And the last one, Ago & Alaudin Contracting Corp.  Had you received funds from that entity?

A    Yes.

Q    And when you received funds from Ago & Alaudin Contracting Corp, who is the client you were representing?

A    So there was more than one client.  I think it was, most if not all of it, was for a particular deal on East 19th Street, 1661.  I just remember that deal and that was a purchase that had more than one partner in the deal.

Q    Who did you understand the money coming from Ago & Alaudin was associated with?

**J.A. 699**

Leshkowitz - cross - Mr. Mazurek          1857

A    So -- so there were other partners and I can't tell you that I specifically understood it came from a particular person.

Q    Was David Motovich involved in that transaction?

A    Yes.

Q    Okay.

MR. SKURNIK:  Nothing further at this time, Your Honor.

THE COURT:  You may cross.

MR. MAZUREK:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MAZUREK:

Q    Good morning, Mr. Leshkowitz.

A    Good morning.  I believe that's Henry.

Q    Yes.  My name is Henry Mazurek.  We have met before, correct?

A    Over the phone.

Q    Yes.  How long have you known the Motovich family?

A    Since, I believe, 2012.

Q    Okay.

A    I believe so.

Q    And --

A    Well, let me rephrase that.  One of David's brothers was my classmate in eighth grade but I think the next time I met him was -- or anyone in the family was many years later.

Leshkowitz - cross - Mr. Mazurek          1858

Q    So before you had a relationship as an attorney for David Motovich, you were friendly with him and his family?

A    I -- no, I did not.  His brother was in my class for one year and I had nothing to do with him.

Q    Okay.  So -- and then you met them on a professional basis?

A    On a professional basis.  A client of mine introduced me to David's father with regard to representing them on a sale of a property in Brooklyn.

Q    And so you got to know that David Motovich managed Midwood Lumber and Millwork, which was a building supply company, correct?

A    Correct, yeah, sure.

Q    And then you learned, obviously, that he was involved in a number of different businesses, right?

A    Absolutely.  Yes.

Q    Some of those businesses included I think what you talked about on direct examination involving real estate investments, right?

A    Yes.

Q    He also worked in that capacity in building contracting businesses in order to sell properties that he may have purchased, right?

A    I -- yeah, I've heard that over the years.

Q    Yes.  And he had other investment interests and loan

Leshkowitz - cross - Mr. Mazurek          1859

businesses that you got to know about as well?

A    Yes, over the years, sure.

Q    Okay.  And in addition to representing him as an attorney, did you socialize with him as well?

A    I wouldn't say a lot, but I did go to his sons' Bar Mitzfah.

Q    And through this interaction with him, he always was a client who you continued to represent, right?

A    Yes.

Q    There was never a time where you said I'm not representing you anymore, correct?

A    No, not at all.

Q    And you talked a little bit about entities that were used for purposes of real estate investments, right?

A    Yes.

Q    And you've been a lawyer you said since 2021, right?

A    Officially admitted in 2023 but that's a long story but, yeah, I graduated law school in 2021.

Q    Okay.  And in the conduct of your work as a real estate commercial and corporate lawyer, you're very familiar with the fact that corporations are used quite frequently, if not almost entirely, with respect to real estate transactions, right?

A    Yeah, different forms of corporate entities, limited liability companies, limited partnerships, and corporations.

**J.A. 700**

Leshkowitz - cross - Mr. Mazurek          1860

Yeah.

Q    And there's nothing unusual about that, right?

A    Not at all.  I would find it unusual if someone did a deal on their own.

Q    Why would that be?

A    You want to limit your liability, which you're able to do if it's a corporation or LLC, which is limited liability company, or even limited partnership.

Q    And, oftentimes, there may be a company that's established just for a single transaction, right?

A    Yes.

Q    And, again, that's because there are reasons under the law for an individual to protect him or herself by using the corporate protections, right?

A    Correct.  Yeah.

Q    And, so, you were asked questions on direct examination about a number of different corporate entities that you said were associated with Mr. Motovich, right?

A    Correct.

Q    And, again, with respect to those transactions, you did not find anything unusual about the fact that corporate entities were being used?

A    No, under no circumstances.

MR. MAZUREK:  I have no further questions, Your Honor.

Leshkowitz - redirect - Mr. Skurnik    1861

THE COURT:  Any redirect?

MR. SKURNIK:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. SKURNIK:

Q    Mr. Leshkowitz, as part of your job, do you sometimes set up corporations for clients?

A    Myself not, but I have a service company that I will contact and ask them to do it.

Q    So you sometimes ask another part -- another entity to sent up companies for your clients?

A    Yes.  There are plenty service companies that do that.

Q    Would you say that Mr. Motovich is a sophisticated client?

A    You make me laugh.  There are days I think all my clients are sophisticated and there are days I think they're very unsophisticated, and I'm sure I had those moments as well over here.

THE COURT:  But you don't tell them.

THE WITNESS:  No, no, no.  That would be the end of the relationship.

Q    Well, Mr. Motovich wired you a lot of money; isn't that right?

A    Yeah.

Q    From a lot of different accounts?

A    From -- yeah, a few accounts.

Leshkowitz - redirect - Mr. Skurnik    1862

Q    Did you ever ask another entity to set up a corporation for Mr. Motovich?

A    It's possible on one entity.  I don't remember any others.

Q    Did Mr. Motovich ever ask you to set up Ago & Alaudin Contracting Corp.?

A    No.

Q    ZKC NY Inc.?

A    No.

Q    Midwood USA Consulting Group?

A    No.

Q    Okay.  When is the last time you spoke to Mr. Motovich?

A    He was with -- I'm forgetting -- I know his first name, Randall.  Over there.  That's him.  He was in his office and what's it called, I ran -- they called me together.

Q    When was that?

A    Not that long ago.  Within the last two months.

MR. SKURNIK:  Nothing further, Your Honor.

THE COURT:  Before I let you step down, I will tell you one story from my private practice, sir.

Many years ago, I was with a firm that did a lot of work for a certain bank which may remain nameless, we'll call it City Bank, and the lawyers were feeling full of themselves.

One of them said to a group of lawyers, clients

Proceedings    1863

need our help, that's why we're smart lawyers and they're not.  And the chairman of City Bank called this lawyer up and said, I'm not so bright and said, I know how to spell Sullivan but could you help me with the spelling of the word Cromwell, and he immediately apologized.

So you're done, sir.  Mazeltov and thank you.  You may step down.

THE WITNESS:  Having have worked at the big law firms, I know.

THE COURT:  You know exactly.

(The witness steps down.)

THE COURT:  We're going to take our 15-minute break.  Please don't talk about the case, ladies and gentlemen, and we'll resume with another witness.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Jury exits the courtroom.)

THE COURT:  The jury has left the courtroom, the witness has left the courtroom.  You may be seated, ladies and gentlemen.

Do we have any issues to address in the absence of the jury before we bring in the next witness after our break?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Anything from the defense?

J.A. 701

Proceedings    1864

MR. JACKSON:  No, Judge.

THE COURT:  Okay.  Enjoy your 15 minutes of fame and we will be back.

(Brief recess.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please be seated.

Do we have any issues to address before we bring the jury in for the next witness?

Anything from the Government?

MR. PAULSEN:  Yes, Your Honor.  If I could just flag two matters before the next witness.

THE COURT:  You may.

MR. PAULSEN:  First off, although I don't think I have any problem talking loud enough --

THE COURT:  What did you say?

MR. PAULSEN:  This witness has a hearing aid and he has said that he expressed some concern that he'd be able to hear.  I told him that I would speak up as much as possible.  So if it seems I'm talking a little louder than normal, it's for that reason.

THE COURT:  Understood.

MR. PAULSEN:  Thank you, Your Honor.  Not a problem you have, I know.

The second issue is, although this is a short witness, one of the demonstrations is there is a spreadsheet

Proceedings                    1865

that we are gonna show this witness that is searchable and we want to him to show how the spreadsheet allows, Amex, you can search matters by date or by bank.

THE COURT: Right.

MR. PAULSEN: We think it will be fairly seamless and quick, but it's gonna involve Ms. Kannan -- I'll be getting her and showing the witness on a live document. So I wanted to flag that for the Court.

THE COURT: How do you want to mechanically do that? You want to do it through the Elmo or through the computer or?

MR. PAULSEN: No, it will be through the computer, Your Honor. It should be functionally identical to everything we've done so far. It will just be a document that's manipulable rather than static.

THE COURT: Because, like all good Jedi Masters, I do have a light saber that I keep for special occasions but we haven't had to use it yet. I'm not going to light up my court deputy unless he gives me a hard time. But that red dot does work if you wanted to go with old school laser pointers.

MR. PAULSEN: It won't be necessary, Your Honor.

And then the final thing is these American Express documents were documents that Your Honor granted our certification in limine a couple of weeks back. They are

Proceedings                    1866

not in evidence yet, so I will move admission of the American Express documents subject to any objections from the defense.

THE COURT: Do you have the numbers in mind and can we get an agreement now from defense counsel. Do you want to do that in front of jury? It's really up to you. It's just a matter of time.

MR. PAULSEN: Now is fine if it's easier.

THE COURT: All right.

Is that acceptable to you, Mr. Jackson?

MR. JACKSON: Yes, Your Honor.

THE COURT: Okay. So what are the numbers? Why don't you tell defense counsel, you'll be able to identify them by number, move them in, in front of the jury and Mr. Jackson will say he has no objection and then they'll be in.

MR. PAULSEN: Yes, Your Honor. So the numbers are, it's documents 700, and then there are a number of documents which have the prefix 700 hyphen a letter, and it's letters A through W.

THE COURT: A through W, all right.

Mr. Jackson, do you want to take a little to check to your colleagues and see if you have any objections to those?

MR. JACKSON: Judge, just to clarify, in our

Proceedings                    1867

records -- we have no objection to that but we just want to clarify, in our records, there are certain letters missing. So it's not straight through A through W. So we wanted to be clear which letters it actually is so we don't --

THE COURT: Right.

Do you know which letters are missing?

MR. PAULSEN: We do, Your Honor. Defense counsel is absolutely correct. That's true, some letters are not used. So perhaps it's easier if I read the affirmative letters into the record.

THE COURT: Why don't you do that and we'll make sure there's no problem with those. So read the letters, A through W, and just jump over the ones that you're not going to use.

MR. PAULSEN: 700-A, B, D, F, G, H, I, J, K, L, M, O, P, Q, S, T, U, V, and then finally W.

THE COURT: Okay.

Any objection to any of those documents coming in, Mr. Jackson?

MR. JACKSON: No, Your Honor.

THE COURT: All right. So they will be admitted. You will make that motion in front of the jury and that will be fine.

Anything else we need to address before we bring in the jury, from the Government's side?

Proceedings                    1868

MR. PAULSEN: No, Your Honor.

THE COURT: Defense counsel's side?

MR. JACKSON: One tiny thing, Judge. While Mr. Scott is going to retrieve the jury, would the Court mind if I ran out to make one more bathroom break?

THE COURT: The Court would mind if you didn't. That would be a serious breach of protocol.

Anyone else? You have five more minutes to, as one of my friends who is a writer, an Irish American writer said, you may shed a tear for Ireland, if you wish to do that. His expression, not mine. I try to be multicultural in all of my quotes.

(Brief recess.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Please stand for the jury.

(Jury enters the courtroom.)

THE COURT: Welcome back, ladies and gentlemen of the jury. Appreciate your time and your province. Please be seated. We are going to have another witness called to the stand now.

Please call your next witness.

MR. PAULSEN: Thank you, Your Honor. The Government calls Richard Kier.

THE COURT: Yes, please have the witness come forward to be sworn.

J.A. 702

Proceedings                          1869

Please come forward, sir, to the front, right here, and my court deputy will swear you in. Take your time and raise your right hand and he will swear you in, sir.

THE COURTROOM DEPUTY: Do you swear or affirm that the answers you are about to give the Court will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT: Please be seated, sir. Thank you.

THE WITNESS: Thank you.

THE COURT: You have this microphone in front of you and it looks a little bit like a snake but you're in charge. You can move it around. I promise it won't bite you. Put it right in front of you. Keep your voice up and that way, we can hear you, you can hear us.

Please state your name and spell it and then counsel will inquire, all right?

THE WITNESS: Thank you, Your Honor. My name is Richard Kier, K-I-E-R.

THE COURT: Thank you, sir.

Counsel, you may inquire.

(Continued on next page.)

---

Kier - direct - Paulsen                1870

(Witness takes the witness stand.)

**RICHARD KIER,**
    called as a witness by the Government, having been
    first duly sworn/affirmed by the Courtroom Deputy, was
    examined and testified as follows:

DIRECT EXAMINATION

BY MR. PAULSEN:

Q    Good afternoon, Mr. Kier.

A    Good afternoon, Mr. Paulsen.

Q    Can you hear me okay?

A    So far, yes.

Q    Where do you work?

A    I work for American Express.

Q    What do you do there?

A    I'm the assistant custodian of records.

Q    Do you, as part of that job, do you testify in court frequently?

A    Yes, I do.

Q    Are you often the authorized person from American Express to testify in places like federal court?

A    Yes.

Q    And you do that to, in part, discuss documentation that comes from American Express?

A    Yes.

MR. PAULSEN: Your Honor, at this point, the

---

Kier - direct - Paulsen                1871

Government would like to admit Government Exhibits 700 and 700-A through W with some of the missing letters that we discussed earlier.

THE COURT: Is that acceptable to defense counsel?

MR. JACKSON: Yes, Judge.

THE COURT: The letters are missing because the letters are missing. So, ladies and gentlemen of the jury, no one is hiding the ball from you. You're getting all of the evidence that is coming in.

Okay. They are admitted.

(Government's Exhibits 700, 700-A, B, D, F, G, H, I, J, K, L, M, O, P, Q, S, T, U, V and 700-W were received in evidence.)

THE COURT: Go ahead, sir.

MR. PAULSEN: Thank you, Your Honor.

THE COURT: Yes.

MR. PAULSEN: May I publish to the --

THE COURT: The jury --

MR. PAULSEN: -- the witness and the jury, 700-A.

THE COURT: You may. It's in evidence.

MR. PAULSEN: Thank you, Your Honor.

(Exhibit published.)

BY MR. SKURNIK:

Q    Mr. Kier, can you see that document well on your screen?

---

Kier - direct - Paulsen                1872

A    Yes, I can.

Q    What is this document?

A    This is the monthly statement that's sent to each cardholder.

Q    Is this a common document that American Express customers receive?

A    Yes, every month.

Q    Okay?

MR. PAULSEN: I would like to skip ahead to page 17, Ms. Kannan.

Q    Does that document show -- withdrawn, Your Honor.

Do the American Express statements indicate what purchases an individual makes?

A    Yes.

Q    Does it also indicate when you pay your bill?

A    Yes, it does.

Q    I would like to call attention to the middle of the page. Mr. Kier, do you see that online payment entry for $66,166.77?

A    I do.

Q    That would be a payment for an American Express card?

A    Correct.

Q    Now, does the payment records on these account statements say where that money came from?

A    It does not.

**J.A. 703**

Kier - direct - Paulsen          1873

Q    It just says it was paid?

A    Correct.

Q    Now, above this, are there multiple cards on this particular payment statement?

         MR. PAULSEN:  And if you can zoom in, Ms. Kannan.

A    Yes, there is.

Q    What are the names on those two cards?

A    David Motovich and Joseph Richter.

Q    Now, going back to the online payments, you mentioned a moment ago that those records don't tell you where the money came from; is that right?

A    That's correct.

         (Continued on the following page.)

---

KIER - DIRECT - MR. PAULSEN          1874

BY MR. PAULSEN: (Continuing.)

Q    Did American Express provide the Government with a document that indicates where all these payments came from?

A    Yes, they did.

Q    Was it a spreadsheet?

A    Yes, it was, Excel spreadsheet.

         MR. PAULSEN:  Ms. Kannan, can I show for the witness and for the jury, Government Exhibit 700W.

Q    Okay.  Is this the spreadsheet?

A    Yes.

Q    And have you reviewed this with the Government?

A    I did.

Q    And this is from -- is it fair to say this is for the Financial Intelligence Unit of American Express?

A    Yes.

Q    Now, does this spreadsheet allow to you search payments by date?

A    Yes.

Q    Does it also allow to you search payments by bank?

A    It does.

Q    Does it allow you to search payments by account number?

A    Yes.

Q    Okay.  I'd like to first start with some dates.

         MR. PAULSEN:  Ms. Kannan, could you search for the date of July 14th, 2017.

---

KIER - DIRECT - MR. PAULSEN          1875

A    Yes, I see it.

Q    Is that the statement we were looking at a moment -- or the payment we were looking at a moment ago?

A    Yes, the 66,000 payment, yes.

Q    Okay.  So I'm going to ask you a couple of questions about this payment.

A    Right.

Q    First off, do you see in the far left corner, there's some fields that say CM 11, 13, and 15?

A    Yes.

Q    What does CM stand for?

A    CM stand for card member.

Q    And what are those columns of information?

A    They're all variations of the same account number, a shortened version, and the 15 is the complete account number.

Q    Right.  Does the entry here for that 66000-dollar-and-change payment, does it indicate the bank that it came from?

A    Yes.

Q    What is that?

A    That would be Carver Federal Savings Bank.

         MR. PAULSEN:  Scanning to the right, Ms. Kannan.

Q    Does it also indicate the account number?

A    Yes.

Q    Can you read that into the record, please?

---

KIER - DIRECT - MR. PAULSEN          1876

A    Yes.  500593476.

Q    Okay.  I'd like to do this comparison for two more instances, Mr. Kier.

         MR. PAULSEN:  Ms. Kannan, can you put 707J, Page 57.  Oh, 700 -- yeah, 700 -- I'm sorry, 700J, Page 57.  Apologies.

Q    Do you see that online payment, Mr. Kier?

A    Yes.

Q    What is the amount there?

A    $54,033.33.

Q    What's the date on that payment?

A    The date on that payment is October 11th of 2017.

         MR. PAULSEN:  Ms. Kannan, can you switch back to 700W and search for that date, October 11th, 2017.

Q    Mr. Kier, do you say see that same payment on the -- on this Excel spreadsheet?

A    Yes, I do.

Q    What is the bank that that's from?

A    That's also Carver Federal Savings Bank.

Q    And what is the account number?

A    500608206.

Q    Going back to the first column, Mr. Kier, can you read into the record, what the CM 11 number is for that payment?

A    Yes.  37175630370.

Q    Okay.

         MR. PAULSEN:  And Ms. Kannan, I believe I neglected

**J.A. 704**

KIER - DIRECT - MR. PAULSEN          1877

to ask for that number on the previous one, so if we could just quickly backtrack to July 14th, 2017.

Q    Mr. Kier, is that the same CM 11 number for the payment that we just talked about a moment ago?

A    Yes, it is.

Q    Could you please read that, again, into the record?

A    Yes.  37175630370.

Q    Thank you, Mr. Kier.

        MR. PAULSEN:  Ms. Kannan, if I could go back to 700J, one more time.  And go to Page 83.

Q    Mr. Kier, do you see the entry on your screen?

A    Yes, I do.

Q    Is that from December 15th, 2017?

A    That's correct.

Q    It's an online payment, but not indicating from where it came?

A    Correct.

Q    And the amount is $33,341.32?

A    That's correct.

        MR. PAULSEN:  Now, Ms. Kannan, finally, if I could go back to 700W and search for that date, December 15th, 2017.

Q    Mr. Kier, is that the payment we just saw on the account statement?

A    Yes, it is.

Q    That's the same date?

---

KIER - DIRECT - MR. PAULSEN          1878

A    Same date.

Q    Thirty three thousand three hundred forty one and thirty two dollars?

A    Yes.

Q    Thirty-two cents, I'm sorry.

A    Yes.

Q    At Carver Federal Savings Bank?

A    Correct.

Q    And Ms. Kannan, if you could scan to the account number.

A    500608206.

Q    Thank you.  And then finally, just the CM 11 number.

A    Do you want me to read that one, as well.

Q    Please, sir.

A    37175630370.

Q    Thank you very much.

        MR. PAULSEN:  Ms. Kannan, if you could clear the search for that.

Q    Now, Mr. Kier, does this document allow a user to see how many payments were made from a given account to Amex?

A    Yes.

Q    And does being an Excel spreadsheet -- does it also allow to you quickly total up the amount of money?

A    Yes, it does.

Q    You sat with the Government and you reviewed this capacity of this spreadsheet, as well?

---

KIER - DIRECT - MR. PAULSEN          1879

A    Yes.

Q    I would like --

        MR. PAULSEN:  Your Honor, I would like to run the query for nine separate accounts that have been at issue in this case where the documents are in evidence.

        THE COURT:  Yes, you may do so.  They're in evidence.  Publish.

        (Exhibit published.)

        MR. PAULSEN:  Thank you, Your Honor.

        Ms. Kannan, if we could first sort by bank name Investors.  And we could choose the account number ending in 9839.

Q    Mr. Kier, do you see the number of transactions here?

A    Yes, I can.

        MR. PAULSEN:  Ms. Kannan, if you could scan to the right.  Back one step, if you could.

Q    Does it show that these are all from Investors Bank?

A    Yes, it does.

Q    And it's all from account number 1000779839?

A    That's correct.

Q    And so these would all be payments to American Express from this account?

A    That's right.

        MR. PAULSEN:  Ms. Kannan, could you total the amount.

---

KIER - DIRECT - MR. PAULSEN          1880

Q    Mr. Kier, is it fair to say that says $165,077.94?

A    Yes.

        MR. PAULSEN:  Ms. Kannan, could you go to the other investors account ending in 9820.

Q    Mr. Kier, is this, yet again, payments from Investors account?

A    Yes.

Q    Investors Bank?

A    Yes.

        MR. PAULSEN:  Ms. Kannan, if you could just confirm that the account numbers are the same on all.

Q    Is that right, Mr. Kier?

A    Yes.

        MR. PAULSEN:  And Ms. Kannan if you could just total this, as well.

Q    Is that number $566,884.29?

A    It is.

        MR. PAULSEN:  Ms. Kannan, can I now switch to Sterling Bank, please.

Q    Now, Mr. Kier, is this, again, a list of payments for the same account number?

        MR. PAULSEN:  Or if you could turn to the side, Ms. Kannan.

Q    Are these all for the account number 8310998298?

A    Yes.

**J.A. 705**

KIER - DIRECT - MR. PAULSEN                1881

MR. PAULSEN: Now, Ms. Kannan, if you could go to the farthest right column where it says, source.

Q    Mr. Kier, are you familiar with this column?

A    Yes.

Q    What information is in the source column?

A    Well, it's source -- this information comes directly for the bank with all these different names. So they could be from American Express customer or a maker, but this is what we get for a bank, and that's what's run.

Q    Okay. So it is it fair to say that the source most of the entries on the source column here say Ago & Alaudin Contracting Corp., with an address; is that right?

A    That's correct.

Q    But they don't all say that; is that right?

A    No.

Q    Despite them all being for the same account and the same bank?

A    That's correct.

Q    Am I correct in assuming that American Express is not typing anything in here, they are just receiving whatever the bank gives them?

A    They're just receiving what the bank sends.

Q    Okay. And then that gets kept in their computer and can be generated in spreadsheets like this?

A    That's correct.

KIER - DIRECT - MR. PAULSEN                1882

Q    Okay.

MR. PAULSEN: Ms. Kannan, if we could switch to clear this search and go to Chase Bank.

Oh, I apologize, if we could go back. I think we forgot -- Your Honor, may I have a moment?

THE COURT: You may.

(Pause in the proceedings.)

MR. PAULSEN: Your Honor, I think I neglected to do the total on that one. So if we could total up the payments in the Sterling Bank account.

Q    Mr. Kier, is that $542,282.11?

A    It's 542,482.11.

Q    Thank you, Mr. Kier.

MR. PAULSEN: And now I'd like to switch to the Chase account, Ms. Kannan.

And if we could start with the account ending with 4057.

Q    So Mr. Kier, is this -- these are all -- scanning to the right, these would all be JP Morgan Chase payments from the account number 810124057?

A    Correct.

Q    And does the total of these --

MR. PAULSEN: Ms. Kannan, could you please scan to the side. If you could do the total for this, Ms. Kannan.

THE COURT: Would you read the account number back,

KIER - DIRECT - MR. PAULSEN                1883

please, counsel?

MR. PAULSEN: Yes, Your Honor. It's 810 --

THE COURT: 810? I thought you might have said 820. But why don't you just read it again so we're clear what the number is.

MR. PAULSEN: Yes, Your Honor. It's 810124057.

THE COURT: Thank you. Go ahead.

Q    Mr. Kier is the total for this $130,582.17?

A    It is.

MR. PAULSEN: Ms. Kannan, can we now do a search -- oh, if you could scan to the far right, as well.

Q    Now, the source here, Mr. Kier, it says, M&M USA Consulting Corp.?

A    Yes.

Q    But not in every entry; is that right?

A    That's correct.

Q    But again, this is the information that Amex receives, it's not something that Amex types in; is that right?

A    That's correct.

MR. PAULSEN: Ms. Kannan, if I could now switch to the account that ends 5543, also in Chase Bank.

Q    Mr. Kier, are all of these payments for the account number 855335543?

A    They are.

Q    Scanning to the far right in the source, is it correct

**J.A. 706**

KIER - DIRECT - MR. PAULSEN                1884

that there's no entries on some of these, but there's information in others?

A    That's correct.

Q    And it includes terms like SGS Construction Building Corp. Or Jacob Richter?

A    That's right.

MR. PAULSEN: Ms. Kannan, could you please do the total.

Q    Mr. Kier, is the total $640,133.51?

A    Yes.

Q    So this is the number -- the total amount of Amex bills that were paid out of this account; is that right?

A    That's right.

MR. PAULSEN: Ms. Kannan, could we now go to the final Chase account which is -- ends with 5732. It's at the top there. Thank you. If you could scan to the right, Ms. Kannan.

Q    Mr. Kier, again, does the source column say the name, Ago & Alaudin Contracting Corp.?

A    Yes.

Q    But not in every entry; is that right?

A    That's right.

Q    Is the account number here 578355732?

A    That's right. Correct.

MR. PAULSEN: And Ms. Kannan, I know this one's a

KIER - DIRECT - MR. PAULSEN          1885

little bit longer, but could you total this up.

Q    Mr. Kier, does that indicate that $2,883,727.33 were paid from this account to American Express for American Express bills?

A    Yes.

Q    Now, I have one final bank that I'd like to review with you, Mr. Kier.

MR. PAULSEN:  Ms. Kannan, if you could clear the search and go to Carver bank.  And search for the account that ends 0851.

Q    Mr. Kier, are all of these payments from the account 500590851?

A    Yes.

Q    Now, does the source column list primarily, Advertising on the Go, and a address in Coney Island?

A    Yes.

Q    But not all of them; is that right?

A    Correct.

MR. PAULSEN:  Ms. Kannan, could you total up these, as well.

Q    Mr. Kier, is that total amount $320,737.76?

A    Yes.

MR. PAULSEN:  Ms. Kannan, can you try the second account which ends in digits 3476.  Also at Carver Bank.

Q    Mr. Kier, are all of these payments for the account

---

KIER - DIRECT - MR. PAULSEN          1886

500593476?

A    They are.

Q    And the source lists names like Midwood USA Consulting, among other names?

A    Yes.

Q    But, again, that is not information from Amex, that's information that Amex received for the bank?

A    Correct.

MR. PAULSEN:  Ms. Kannan, could you total up the amount of payments here.

Q    Mr. Kier, does this reflect that $2,952,440.77 in American Express bills were paid by this account?

A    Yes.

Q    Mr. Kier, one final bank -- one final account.

MR. PAULSEN:  Ms. Kannan, could you go back to the account number.  And this is the account that ends in 8206, which I believe is reflected twice here, once with a zero in front and once without.

Q    Mr. Kier, do you see that each of the accounts say 506 -- 500608206 or some of them have an extra zero in front of it?

A    Yes.

Q    And do you see that the names here include David Motovich --

MR. PAULSEN:  And scanning below, Ms. Kannan.

Q    -- Lyudmila Motovich, and various other terms?

---

KIER - CROSS - MR. JACKSON          1887

A    Yes.

Q    Are there also some IP addresses down below?

A    That's correct.

MR. PAULSEN:  Ms. Kannan, could you total this final bank account.

Q    Mr. Kier, does it indicate that $2,737,749.62 were paid to American Express from this bank account?

A    Yes.

MR. PAULSEN:  No further questions, Your Honor.

THE COURT:  Any cross?

MR. JACKSON:  Very brief, Judge.

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good morning, sir.

A    Hello.

Q    I guess it's the afternoon, isn't it?

A    Right, right.

Q    Thanks.  Just a few questions for you.

First, Mr. Kier, I'm correct that it's not uncommon in closely held businesses, family businesses, et cetera, for you to see at Amex, a combination of personal expenses and business expenses being charged on your cards, right?

A    Well, let me explain.  If it's a business card, it's only supposed to be business expenses.  But I've seen instances where what you said is correct, both are done.  But it's

---

KIER - CROSS - MR. JACKSON          1888

supposed to be just for business.

Q    Yeah.  People -- you ask when people have a business card, that they focus on business, but you've seen it commonly that when people have a personal card, they'll use it for personal experiences and business and you see the combinations, right?

A    That's correct.

Q    Now, Amex, I'm correct, keeps records of every single transaction that is done on an American Express card, right?

A    Correct.

Q    And it is not a secret that American Express is a company that takes seriously, its obligations in terms of cooperating with law enforcement?

A    Yes.

Q    In fact, you have testified on many occasions in federal court, right?

A    Yes.

Q    And that's because Amex, if the Government asks for records, will produce the records?

I'm right about that, right?

A    I'm sorry, could you repeat that?

Q    Yeah.  I'm sorry.

THE COURT:  If the Government asks for records, you will produce the records.  That's the question.

THE WITNESS:  I'm sorry, Your Honor, say it again.

**J.A. 707**

KIER - CROSS - MR. JACKSON                1889

THE COURT:  If the Government asks Amex to produce documents, Amex will produce documents?

THE WITNESS:  Oh, yes.  Yes.  Always.

THE COURT:  Next question.

MR. JACKSON:  Thank you.

BY MR. JACKSON:

Q    So you agree with me, Mr. Kier, if someone had access to large amounts of cash and they were trying to hide their transactions, it would not be a smart decision to use your Amex where everything is recorded and you're happy to produce to the Government, correct?

A    Correct.

Q    Now, I'm also correct that -- actually, I just want to look at a couple of transactions.

MR. JACKSON:  Can we call up Government Exhibit 700, please.  I believe that's -- that's not 700, correct?  Okay.

Q    And Mr. Kier, these are the -- these are American Express records that you were asked to take a look at, and then these led to the creation of that Excel spreadsheet we were talking about, right?

A    Well, these are the statements that the card member gets every month, and the Excel spreadsheet would get the information where, down a couple of pages, you'll see online payments.  If I explained that correctly.

Q    No, you explained it perfectly.  And I don't mean to

KIER - CROSS - MR. JACKSON                1890

shout, but please let me know if I'm being too loud or too quiet.

A    I'm hearing impaired.  I don't mind if you shout.

Q    Thank you, Mr. Kier.  I don't want to yell at you.

So just to be clear, you saw in these records, there's a combination of business expenses and personal expenses, correct?

A    Yes.

MR. JACKSON:  Could we go to Page 21 of this document, Mr. Cepregi.  Okay.  And scroll down a little bit.  Okay.

Q    Do you see that there's an entry here for Staples on 1/4/19?

A    Yes.

Q    To purchase a DYMO® label writer?

A    Okay.

Q    Do you see that?

A    Right.

Q    Do you see there are payments for Adobe?

Do you see that?

A    Oh, yeah.  Up on the -- you mean December 30th --

Q    Correct.  Adobe Systems?

A    Right, right.

Q    Right.  And you know Adobe systems is commonly used by businesses?

KIER - CROSS - MR. JACKSON                1891

A    That's correct.

Q    I'm correct, there are many payments to Staples containing these records, right?

A    Right.

Q    And you haven't tried to count them all up, right?

A    No, I didn't.

MR. JACKSON:  Can we go to Page 26.

Q    Do you see the entry for Finger Check?

A    What date would that be, sir?

MR. JACKSON:  Scroll down, down here on 2/4/19.

A    Oh, yes.

Q    Can you see that, Mr. Kier?

A    I do.

Q    You're aware that Finger Check is a payment system for payroll that employers use, correct?

A    Well, I've never heard of it.  I'll have to take your word on it.

Q    Don't take my word.

You are aware, from your familiarity with this matter and the customer, that Mr. Motovich runs a lab where employs more than 300 hardworking New Yorkers, correct?

A    Correct.

Q    And it wouldn't surprise you where you have personal and business expenses if someone is paying for something like various payroll things?

KIER - CROSS - MR. JACKSON                1892

A    No.

MR. JACKSON:  We can take that down.

Can we go it Page 35.

Q    Do you see there's a FedEx entry?

MR. JACKSON:  If we can zoom in on that, Mr. Cepregi, I think near the top.

A    I see it on January 12th.

Q    Right.  And you see that there's a FedEx to a Dr. Herbert Abrams?

A    Right.

Q    And there are many FedEx entries in this, correct?

A    Right.

Q    You haven't tried to count all those up, right?

A    No, I didn't.

Q    I mean, this is a 3000-page document, correct?

A    Correct.

MR. JACKSON:  And can we go to Page 1250.  If we could go down a bit.

Q    There's an entry for construction material.

Do you see that?  Do you see at the very bottom here?

A    Oh, the last entry?

Q    Yes.

A    Yes.

Q    Okay.  And there are a number of different charges for

**J.A. 708**

KIER - CROSS - MR. JACKSON          1893

materials that are needed for business in this?

A    Yes.

Q    Okay.  Do you see just above this, by the way, there's a donation to that says, charitable organization, The Joint Commission?

MR. PAULSEN:  Objection, Your Honor.

THE COURT:  Overruled.

Q    Do you see that?

A    Yes.

Q    And there's some charitable organization donations spread throughout this, correct, donations like this, et cetera?

A    Yes.

MR. JACKSON:  We can take that down.

Q    Just a couple more questions for you, Mr. Kier.

A    All right.

Q    I'm correct that no one, not any company, not any person, no one has contacted American Express and said, David Motovich stole money from me and used the Amex, and so I'm going to need Amex to come produce records for my lawsuit?

No one has said that, correct?

A    Implying that he stole money, no.

Q    Right.  And do you have any information on your -- of yourself, any information, whatsoever, that suggests that in all of these records we've been looking at, David Motovich was doing anything other than spending his own money?

---

KIER - REDIRECT - MR. PAULSEN          1894

A    I'm just authenticating the records.  No, I don't -- I don't have any indication, no.

Q    Mr. Kier, thank you so much.  Appreciate you.

A    Thank you.

THE COURT:  Redirect?

MR. PAULSEN:  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. PAULSEN:

Q    Mr. Kier, do you recall a moment ago, defense counsel had asked you if there was ever any indication that David Motovich had stolen money from Amex?

A    No, there wasn't.

Q    There isn't, right?

A    No.

Q    Is it fair to say that not only has he not stolen money, he's actually an awesome customer?

A    Yes.

Q    I think we saw approximately $11 million that he paid for Amex bills?

A    Correct.

MR. PAULSEN:  No further questions.

THE COURT:  You may step down, sir.  Thank you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  You're very welcome.

(The witness was excused.)

---

Proceedings          1895

THE COURT:  All right.  Please call your next witness.

MR. POLEMENI:  The Government calls Ted Vlahakis.

THE COURT:  Please have the witness come forward to be sworn.

Please come forward, sir, to the front of the courtroom where my courtroom deputy will swear you in in a moment.  Just stand at the top step there, right near that microphone, sir.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Raise your right hand and my deputy will administer the oath.

THE COURTROOM DEPUTY:  Do you solemnly swear or affirm that the answers you're about to give the Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

THE COURT:  Thank you, sir.  Please be seated.  I'd like you to -- good afternoon, sir.

I'd like to you state your name.  See that microphone in front of you?  It looks like a snake, but you're in charge.  You move it around, put it right in front of your mouth there, and please state your name and spell it, and then counsel will inquire.

THE WITNESS:  Thank you, Your Honor.  My name is

**J.A. 709**

---

Proceedings          1896

Theodore Vlahakis.  First name is spelled, T-H-E-O-D-O-R-E, last name, V, as in Victor, L-A-H-A-K-I-S, as in Sam.

THE COURT:  Thank you.  Counsel, you may inquire.

MR. POLEMENI:  Thank you.

(Continued on next page.)

VLAHAKIS - DIRECT - MR. POLEMENI          1897

**THEODORE VLAHAKIS**,

called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. POLEMENI:

Q   Good afternoon, sir.

A   Good afternoon.

Q   Where do you work?

A   I work at the U.S. Department of Treasury Financial Crimes Enforcement Network commonly known as FinCEN.

Q   What is FinCEN?

A   So FinCEN a bureau of the U.S. Department of Treasury tasked with protecting the U.S. financial system against money laundering and other types of financial crimes.

Q   And for how long have you worked at FinCEN?

A   Since March of 2009.

Q   What is your current title?

A   Senior compliance officer.

Q   And could you just describe for the ladies and gentlemen of the jury what your role is there?

A   Yes.  As a senior compliance officer, I assist financial institutions such as, let's say, banks and other types of institutions with understanding their anti-money laundering compliance requirements.  I provide training to financial

VLAHAKIS - DIRECT - MR. POLEMENI          1898

institutions in those requirements.  I also provide training to law enforcement agencies, internal training to new employees, and I also testify as a fact witness in criminal money laundering trials.

Q   How does FinCEN go about protecting the banking system and protecting against money laundering?

A   One way FinCEN protects the financial system is that it requires financial institutions to file certain reports with us, to keep records of certain transactions, and that enables law enforcement and FinCEN personnel to follow the paper trail, money trail, and that assists with conducting investigations.

Q   It's basically, follow the money?

A   Yes.

Q   What types of reports does FinCEN require to be filed?

A   I'll give you a few examples.  One would be called a Currency Transaction Report or a CTR.  That's filed for all transactions that are over $10,000, by or on behalf of someone during the course of a business day.  So regardless of the purpose of the transaction, whether it's legitimate or not, if that involves cash currency, then that results in a Currency Transaction Report.

Another type --

Q   Is that there is known as a CTR?

A   CTR, yes.  Shorthand is FinCEN CTR.

VLAHAKIS - DIRECT - MR. POLEMENI          1899

Another type of report is called a SAR, S-A-R, Suspicious Activity Report.  That is filed by financial institutions if they believe that one or more suspicious transactions may have occurred, regardless of the amount.

Another type of report is called an RMSB or Registration of Money Service Business, and that is filed an entity that is participating in certain activities.  For example, let's say check cashing or money transmission, they have to register for those activities by completing that report.

Q   You mentioned check casher.

What is a check casher, generally?

A   At a high level, a check casher, according to FinCEN regulations, is someone who cashes checks for more than a thousand dollars for any one person on any one day, and they -- so they're receiving the check and then they're returning cash or a combination of cash or monetary instruments.  And it has to be over a thousand dollars for one person in a day.

Q   And does FinCEN require check cashers to register with FinCEN?

A   Yes.

Q   And why?

A   Because that's how we conduct investigations.  The registration form is requesting information about the

VLAHAKIS - DIRECT - MR. POLEMENI          1900

business, where it's located, who owns it, where it has its bank account, where it keeps its records, business volumes, all that information is useful for conducting investigations. And it also helps FinCEN keep track of who is conducting these types of activities that are considered under the rubric of financial institutions.

Q   Now, you mentioned a registration form.

Is that FinCEN Form 107?

A   Yes.

MR. POLEMENI:  Ms. Kannan, if we could pull up Government Exhibit 236, not in evidence.

THE COURT:  Any objection to 236?

MS. LAYDEN:  No objection.

THE COURT:  Admitted.  You may publish it to the jury.

(Government's Exhibit 236 was received in evidence.)

MR. POLEMENI:  Thank you, Your Honor.

(Exhibit published.)

MR. POLEMENI:  So if we can blow up the top of the page there, Ms. Kannan.

Q   This is FinCEN Form 107?

A   Yes.

Q   And are all check cashers that you described required to fill out this -- required to register using this form?

A   Yes.  Only if they meet the $1,000 per person per day

J.A. 710

VLAHAKIS - DIRECT - MR. POLEMENI      1901

threshold.

Now, if they don't meet that threshold they may be required to register under any statement requirements. But we don't speak to that. Yes.

Q   As long as you meet that 1,000 a day threshold, you have to fill --

A   For check cashers, yes.

THE COURT:  What do you mean $1,000 per day?  What does that mean, in layman's terms?

THE WITNESS:  So if you're cashing a check for more than a thousand dollars, Your Honor, per person.  So if I go to you, you're a check casher, and I'm asking you to cash a check for more than a thousand dollars, you're a check casher.

THE COURT:  Okay.  Go ahead.

MR. POLEMENI:  And if we can go to part one, Ms. Kannan.

Q   What type of information is being requested here?

A   So that's very basic information regarding whether this is your first filing, it's initial registration, box 1A, and that's required within 180 days of the date the business is established.  So if I start my check cashing business today, I have 180 days to complete this form and check box 1A.

1B renewal.  If I'm continuing as a checks casher or any other type of money service business, I must renew my registration every two years.

VLAHAKIS - DIRECT - MR. POLEMENI      1902

1C.  Correcting prior filing.  If there's, let's say, any error in my initial registration or renewal, I must correct that immediately by submitting this form.

And 1D.  Reregistration just means that if you look in item two, that there's been some type of corporate reorganization such as you're reregistered under state law, more than 10 percent transfer of equity interest, or more than 50 percent increase in agents.

MR. POLEMENI:  And if we could go to part two, Ms. Kannan, where it says registrant information.

Q   What is being asked there?

A   Information about the business.  So what is the name of the business, if it's doing business as another name, we'd like to know that, as well, the address, the EIN, or SSN, Social Security number, telephone number, e-mail address.  Basic identifying information.

Q   And how about part three?

A   Part three is very similar, except we're also asking about the information relating to the owner or controlling person.  So it just allows us to drill down a little bit further.  Rather than, you know, just asking for a corporate name, we'd like to know the person behind that entity.

Q   Why is that important?

A   Again, for -- it helps for conducting investigations, and also helps us know, you know, who owns the business.  Many

VLAHAKIS - DIRECT - MR. POLEMENI      1903

businesses have the same name or similar names, even, in the same jurisdiction, so it helps us just to differentiate a bit.

MR. POLEMENI:  If we could turn to the second page, Ms. Kannan.  If you go to part five.

Q   What's being asked there?

A   So part five says primary transaction account for MSB activities.  What that's asking is, where does the MSB have its bank account.

Q   And why is that being asked?

A   Well, that's useful because, again, it's -- the theme is follow the money, and it's good for conducting investigations.

Also, the actual bank that holds the account can file reports on the MSB because both are financial institutions.  So let's say, if the MSB is not adhering to one or more of our requirements, the bank itself can actually, you know, inform the MSB, it can file reports on the MSB.

Q   So if the bank is made aware that the business is operating as a -- the account is being operated by a check cashing business, then the bank can look for potentially suspicious activities?

A   Yes.

Q   And then alert FinCEN?

A   Yes.  And also, in the case where an MSB like a check casher does not submit this form, the bank may become aware that that business is unregistered and then would let the MSB

VLAHAKIS - DIRECT - MR. POLEMENI      1904

know that they'd have to complete this form.

MR. POLEMENI:  And if you go to part seven, Ms. Kannan, at the bottom.

Q   Authorized signature, do you see that?

A   Yes.

Q   And can you see where it says -- in bold?

A   Yes.

Q   The signature of the owner, controlling person, or authorized corporate officer is mandatory.

That's in bold; why is that?

A   Because what we're saying here is, someone has to complete and submit this form on behalf of the MSB, and usually, that's the person who owns the MSB, but it doesn't have to be the owner.  Could be the controlling person, could be a corporate officer.  The reason that's in bold, to summarize, is, in some cases, the owners may plead ignorance of the requirement, and that's why they need to at least designate someone who is responsible for completing this form if it's not them.

Q   By the way, sir, registering with FinCEN, is there any cost to that?

A   No.

Q   It's free?

A   Yes.

Q   And does FinCEN provide information to individuals who

**J.A. 711**

VLAHAKIS - DIRECT - MR. POLEMENI          1905

might be wondering whether they are required to register with FinCEN?

A    Yes.

Q    How so?

A    In a number of ways.  Number one, we have a public website.  It's www.FinCEN.gov on that website.  We have a number of resources for MSBs.  There's a bold blue tab on the home page, and if you click on that tab, it's essentially resources for MSBs that would include FAQs, you know, short, like, four, five-page guides MI and MSB, requirements for MSBs, how to monitor for suspicious activity.  We have guidance.  We have advisories, rulings, and these materials are available and in up to eight different languages.

There's also -- the second point I'd like to make is there's a helpline, and that helpline is available five days a week and that may be contacted via telephone or e-mail, and a response is usually received within 24 hours.

Q    Now, prior to testifying here today, sir, was FinCEN asked to run certain searches through its database?

A    Yes.

Q    I'm going to show you what's marked for identification only as Government's Exhibit 253.

THE COURT:  Any objection to 253 being shown to the jury?

MS. LAYDEN:  No objection, Your Honor.

VLAHAKIS - DIRECT - MR. POLEMENI          1906

THE COURT:  It's admitted.  You may publish.

(Government's Exhibit 253 was received in evidence.)

(Exhibit published.)

Q    What is Government's Exhibit 253, sir?

A    This exhibit is an official certification of a record search for FinCEN Form 107 Registration of Money Service Business.

Q    And what is Government's Exhibit 253 indicating?

A    It's indicating that this -- we performed a search for FinCEN Form 107 Registration of Money Service Business for the subject Midwood Lumber and Millwork Incorporated with that EIN below, and we did not find any forms filed by or on behalf of this entity from January 1st, 2012, through -- and if you could please -- yes, thank you -- July 1st, 2024.

Q    So does that mean that Midwood Lumber and Millwork is not registered to serve as a money service business, including as a check casher?

A    Correct.

MR. POLEMENI:  If we can turn to page -- excuse me, Government Exhibit 249, please, not in evidence.

THE COURT:  Any objection to 249?

MS. LAYDEN:  No objection, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 249 was received in evidence.)

(Exhibit published.)

VLAHAKIS - DIRECT - MR. POLEMENI          1907

Q    What's Government's Exhibit 249?

A    So this is very similar, and it's an official certification of a records search for FinCEN Form 107 Registration of Money Service Business for the entity subject David Motovich, and we -- it says that we did not find this form in our system filed by or on behalf of in subject from January 1st, 2012 through July 1st, 2024.

Q    Does that mean that David Motovich is -- was not registered with FinCEN to serve as a money service business, including being a check casher?

A    Yes.

MR. POLEMENI:  Government's Exhibit 250, not in evidence.

THE COURT:  Any objection to 250?

MS. LAYDEN:  No objection, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 250 was received in evidence.)

(Exhibit published.)

Q    What's Government Exhibit 250?

A    This is similar.  It's a certified records search.  However, it pertains to a different type of form.  And rather than pertaining to Form 107 Registration of Money Service Business, this is a search for FinCEN Form 104 Currency Transaction Report, which, as I referred to earlier, is a report filed by financial institutions for any currency

VLAHAKIS - DIRECT - MR. POLEMENI          1908

transactions over $10,000 by or on behalf of a person or entity during the course of a business day.

Q    And this is filed for individual named Marina Kuyan; is that right?

A    Correct.  And it indicates that we could not locate any forms filed on or behalf of this subject between January 1st 2012, and May 31st, 2024.

MR. POLEMENI:  If we could turn to Government Exhibit 251, not in evidence.

THE COURT:  Any objection?

MS. LAYDEN:  No objection, Your Honor.

THE COURT:  2-5-1 is admitted.  You may publish.

(Government's Exhibit 251 was received in evidence.)

(Exhibit published.)

Q    What is Government's Exhibit 251?

A    This is similar to the previous report.  It's an official certification of a records search for FinCEN Form 104 Currency Transaction Report, and it indicates that after a search, no Currency Transaction Reports were filed by or behalf of the entity name Lithos Marble Works Incorporated between the dates of January 1st, 2012, and May 31st, 2024.

Q    None at all for that period?

A    No CTRs, correct.

MR. POLEMENI:  And finally, if we could turn to Government Exhibit 252, please.

**J.A. 712**

VLAHAKIS - DIRECT - MR. POLEMENI                    1909

THE COURT:  Any objection?

MS. LAYDEN:  No objection, Your Honor.

THE COURT:  Admit.  You I may publish.

(Government's Exhibit 252 was received in evidence.)

Q    What is Government Exhibit 252?

A    Okay.  This is similar, except that it is a certified records search for a Currency Transaction Reports, and in this case, we did locate a CTR filed on or on behalf of the entity, Unique Painting Services Incorporated, between January 1st, 2012, and May 31st, 2024.

Q    Okay.

MR. POLEMENI:  And if we can turn the page.

Q    What is this page, sir?

A    Okay.  So this is the first page of a CTR.  So this is -- what you see here is, this contains a transcript of all of the fields on the Currency Transaction Report.  So this is what we would see once it's entered into our database.  It's not necessarily what the form looks like, it just contains all essential fields from that form.

MR. POLEMENI:  And if we go to transaction one of two.  Could we just blow up the -- yeah.  I might need you to -- thank you.

Q    Who is it filed on?

A    Okay.  It is filed on -- okay.  Roman Kretsula.

Q    Okay.  And where it says, persons involved in transaction

---

VLAHAKIS - DIRECT - MR. POLEMENI                    1910

2 of 2.  What does that mean?

THE COURT:  Could you keep your voice up.

MR. POLEMENI:  Apologies.

Q    Where it says below, person involved in transaction two of two, what does that indicate?

A    Right.  If I may just add to my previous answer.

So when it says, person involved in transaction, and you'll see two fields above that, person involved type, person conducting transaction for another, what that means is this individual, Roman Kretsula, was actually physically conducting a transaction for someone else.  They were not necessarily benefiting.  They were, like, conducting the transaction.  That's what that means.

Q    Thank you for that clarification.

A    Sure.

Q    Does two of two indicate who the transaction was being performed for?

A    Yes.

Q    And what does that indicate?

A    Unique Painting Services Incorporated.

MR. POLEMENI:  And if we can go to activity location, the next page.

Q    What's being indicated there?

A    Okay.  This is where the transaction took place that triggered or generated this Currency Transaction Report.

---

VLAHAKIS - DIRECT - MR. POLEMENI                    1911

Q    Where you see, Legal name of financial institution, what does that indicate?

A    Coney Island Payroll Services.  So that's the financial institution where this transaction occurred.

(Continued on the following page.)

---

Vlahakis - Cross - Layden                    1912

DIRECT EXAMINATION (Continued)

BY MR. POLEMENI:

Q    Does this mean that Coney Island Payroll Services was registered with FinCEN at this time?

A    Most likely because a financial institution can only file these reports.  So, yes.

MR. POLEMENI:  Nothing further.  Thank you.

THE COURT:  Any cross?

MS. LAYDEN:  Very briefly, Your Honor.

CROSS-EXAMINATION

BY MS. LAYDEN:

Q    Good afternoon, Mr. Vlahakis.

A    Good afternoon.

Q    I apologize if I mispronounced your name.  My name is Jessica Layden.  I just have a few quick questions for you today.

A    Okay.

Q    One of the things that you went over with the prosecutors is that part of your job at FinCEN is to assist banks and financial institutions with their understanding of the requirements under the Bank Secrecy Act and its regulations, correct?

A    Yes.

Q    I believe you stated that in support of that mission you provide FAQs, you provide guidance, you provide advisories; is

J.A. 713

*Vlahakis - Cross - Layden*　　　1913

that right?

A   I don't actually provide those documents.  So those documents are written by a different division called our policy division.  And, as I mentioned, they're explained by a regulatory helpline.

So the training that I provide would be, for example, financial institutions writing in maybe with specific questions or training events, but the type of training that you reference, I don't write those.

Q   Thank you, Mr. Vlahakis.  That's a helpful answer.  Is it fair to say that part of the reason that FinCEN provides these types of trainings and guidance, the reason why you have a helpline is because these rules and regulations may not be within the common understanding of an average person?

A   I would not characterize it as being within or without the common understanding of someone.  I would just say that we have certain requirements, for example, the requirement to register as an MSV if you're engaged in check cashing or you're a money transmitter or various other activities.

And if you engage in that activity it triggers the registration requirement, whether you are aware of it or not.  And so we have those guides up there just to explain the requirements, but whether someone is actually aware of it, it doesn't, from a regulatory perspective, it doesn't have an impact on their requirements to file these forms, to have an

---

*Vlahakis - Cross - Layden*　　　1914

anti-money laundering program.  The reason is because these financial institutions are the first line of defense against money laundering.

Q   Thank you.  But financial institutions do utilize that helpline that you operate; is that right?

A   They have the option to, yes.

Q   Do you believe that people access your web site and look at these FAQs and guidances and advisories that you issue, is that why you put them up online?

A   Yes.  I don't have --

Q   Thank you.  Is it fair to say that some banks and financial institutions may spend millions of dollars a year in ensuring that they're complying with their regulations under the Bank Secrecy Act?

A   They may.

Q   Is it fair to say that many financial institutions also have in-house compliance teams that help make sure that they're complying with their obligations under the Bank Secrecy Act?

A   Some of the larger ones certainly might, but these requirements certainly may be satisfied regardless of the size of the financial institution, or the number of people charged with following our requirements.

For example, if you're referring to a large bank, many large banks do have in-house compliance groups,

---

*Vlahakis - Cross - Layden*　　　1915

attorneys, but for money service businesses such as check cashers and money transmitters, it's more rare for those entities to be large in size.

Some of them are, like let's say Western Union, most of them aren't.  And so our guides are tailored to individuals who just want to have a very high level understanding of the regulations.  That is not needed to comply with, for example, the registration requirement.

Q   Thank you, Mr. Vlahakis.  The guidance is not needed to comply with the registration requirement, but is it fair to say that FinCEN provides these different resources because people might need help understanding what their obligations are under the law?

A   Let me clarify.  I'll answer your question.  Let me just clarify.  What I meant was the large in-house compliance committees that you might find in a larger institution, those would not be needed, for example, by a mom and pop check casher to understand the registration requirements or the form filing requirements.  That's what I meant.

Yes, the guidance is tailored to let's say a sole proprietor who is just starting off, let's say a cash checking business or any other type of money service business just to say you have to register with us within 180 days, you're considered a financial institution, we're making you do this because this information is used to protect the financial

---

*Vlahakis - Cross - Layden*　　　1916

system.

And even assuming let's say they missed that deadline or they missed the deadline to file certain reports, generally what happens is they are provided with reminders so it's not a strict liability type of situation.

Q   Thank you, Mr. Vlahakis.  I can get you out of here a little bit quicker if you could focus on my questions.  I appreciate it.

A   That's what I'm doing.

Q   Can we please pull up GX-236?

THE COURT:  In evidence.  You may publish.

(Exhibit published.)

Q   Mr. Vlahakis, this was a form you were going over with the government?

A   Yes.

Q   You have no personal knowledge of whether my client, David Motovich, ever saw this form or was ever presented this form, correct?

A   Correct.

Q   And you have not reviewed the criminal statute that the jury will have to assess in this case pursuant to the judge's instructions to determine whether Mr. Motovich committed a crime in this case, correct?

MR. POLEMENI:  Objection.

THE COURT:  Overruled.

**J.A. 714**

*Vlahakis - Cross - Layden*     1917

A    I'm familiar with all the banks.

Q    Please answer my question.

THE COURT:  Don't interrupt the answer.  You asked the question.  What's your answer?

A    Yes.  I'm familiar with all the statutes and regulations concerning the Bank Secrecy Act.  I've been in the field since 2009.

Q    Thank you, Mr. Vlahakis.  My question is, you are not familiar with the facts and circumstances of this case and the instructions that the judge will be providing the jury; is that correct?

A    That's correct.

Q    Thank you.  In fact, the Count 1 statute charge in this case, 18 U.S.C. 1960 --

MR. POLEMENI:  Objection.

THE COURT:  Let her finish the question and I'll sustain the objection.

Q    Appears nowhere on this form; is that right?

MR. POLEMENI:  Objection.

THE COURT:  Sustained.

Q    Could we please turn to page 2 and look at box 26.  Could you zoom in there?

Mr. Vlahakis, these are some of the different types of businesses that are required to fill out this form; is that right?

---

*Vlahakis - Cross - Layden*     1918

A    Yes.

Q    So that might include an issuer of traveller's checks, for example, it might include a check casher or it might include a money transmitter, among other businesses; is that right?

A    Yes.

Q    Could we please turn to page 3.  If you could zoom in on the middle column, please.  And these are instructions that are attached to the form, is that right, Mr. Vlahakis?

A    Yes.

Q    And it provides some short definitions of some of these different types of businesses that we were just discussing that are required to register?

A    Yes.

Q    And you don't know whether the definition of check casher in this form has any relevance to the definitions that the jury will have to use in this case pursuant to the judge's instructions?

MR. POLEMENI:  Objection.

THE COURT:  Sustained.

Q    The form states that a check casher is a person engaged in the business of providing cash to persons in return for a check, right?

A    Yes.

Q    Isn't it true that the regulations also state that

---

*Vlahakis - Cross - Layden*     1919

whether someone is a check casher is a matter of facts and circumstances?

A    Yes.

Q    And the regulations also provide certain limitations on who might be a check casher; is that right?

A    That's true for all categories on here.

Q    Thank you.  Could we please zoom in on money transmitter now, please.  You'll see here in paragraph 7 it states that a money transmitter is a person that engages as a business in the transfer of funds through a financial institution, right?

A    Correct.

Q    And it says below that, generally acceptance and transmission of funds as an integral part of the execution and settlement of a transaction, other than the funds transmission itself, for example, in connection with the bona fide sale of securities will not cause a person to be a money transmitter. Correct?

A    Yes.

Q    Does that basically mean that a person is not a money transmitter even if they engage in transactions where some funds are exchanged if there are some other purpose in connection with the transaction?

MR. POLEMENI:  Objection.

THE COURT:  Sustained.

Q    Could we please zoom in on the first column.  That first

---

*Vlahakis - Cross - Layden*     1920

paragraph under who must register.  Now, Mr. Vlahakis, the form states that not all MSBs are required to register; is that correct?

A    Correct.

Q    And it provides one example.  It states that you are not an MSB solely because you're an agent of an another MSB; is that right?

A    Yes.

Q    So the form is talking about people identified as check cashers or money transmitters, and the form is indicating that even if someone might meet say the definition on this form, they may still not have to register, right?  You have to go to the regulations?

A    Yes.

Q    And the form does not explain all those reasons why someone might not be required to register; is that right?

A    It provides examples.

Q    It provides one example, right?

A    May I comment on the agent example here?

THE COURT:  No.  You may answer her questions.  Next question.

Q    Could we just look at the upper left-hand corner of that page?  Mr. Vlahakis, this is REV 7/10.  Do you see that?

A    Yes.

Q    Does that indicate these instructions were last revised

J.A. 715

in July of 2010?

A    On this report, yes.

Q    Great.  I think you told the prosecutors you have been working at FinCEN since 2009; is that right?

A    Yes.

Q    Could we also please go back to the first page of this form.  And if you could zoom in on the upper left-hand corner.  And that says March 2011, right?

A    Yes.

Q    So that indicates that the form itself was last revised in March 2011, and the instructions were last revised in July 2010, correct?

A    On this form, yes.

Q    Now, has FinCEN put out any further guidance regarding the definitions of money service businesses since this form was last updated?

A    Yes, there are updates.

Q    And, in fact, FinCEN provided updates on the regulations in July 2011.  Do you remember that?

A    Yes.

Q    And those regulations address the definition of who was captured in the definition of a money service business, correct?

A    Yes.

Q    And the reason you promulgated those regulations is

because a lot of businesses were coming to FinCEN and expressing confusion about whether or not they were subject to this registration requirement; is that right?

A    That's one reason.

Q    So there are complexities in the regulations pertaining to who is or is not a money service business, and who is or is not required to register that's not reflected in this form; is that right.

A    There may be.  I can't comment on that.

        MS. LAYDEN:  Could I have one moment, please?

        THE COURT:  Of course.

        MS. LAYDEN:  Nothing else.

        THE COURT:  Any redirect?

        MR. POLEMENI:  No, Your Honor.

        THE COURT:  We're going to take our lunch break.  It's five minutes after 1:00.  Can we say we'll be back here at 2:20?  Does that work for you?

        We will have a brief afternoon break and we will continue our hard stop at 5:00 p.m.  I think maybe the candyman will visit while folks are away.  Do not talk about the case and have a good lunch.

        (Jury not present.)

        THE COURT:  The jury has left the courtroom.  Ladies and gentlemen, you may be seated.  The witness has left the stand.  Do we have any issues before.

        MR. POLEMENI:  No Judge.

        THE COURT:  Anything from the defense.

        MR. JACKSON:  No, Your Honor.

        THE COURT:  Enjoy your lunch.  We'll see you back here at 2:20.

        (Lunch recess taken.)

        AFTERNOON SESSION

        (In open court; jury not present)

        THE COURT:  Do we have any issues to discuss before we bring the jury in?

        MR. PAULSEN:  Yes, Your Honor.

        THE COURT:  Fire away.

        MR. PAULSEN:  I just wanted to advise the Court on where we think we are with pacing.

        THE COURT:  I'm all ears.

        MR. PAULSEN:  We have two witnesses that we will present today, a search witness named John Miller, and then one of cooperating witnesses, Phillip Adamou.  Our biggest witness after that is our case agent, who we anticipate will testify tomorrow.

        After that, along with one small witness that we hope the defense does not object to taking out of order tomorrow morning, the government is getting very close to resting.  I wanted to just let the Court know.  We have one witness who could not make it this week, who is available first thing Monday morning.  Otherwise, the government would expect to rest tomorrow or Monday morning.

        THE COURT:  Well, you can't rest until you call your witness, who is not available until Monday morning.

        MR. PAULSEN:  That's right, Your Honor.

        THE COURT:  Are you suggesting that we adjourn early

**J.A. 716**

*Proceedings* 1925

tomorrow and pick up on Monday and then begin the defense case? Is that what you're suggestion is in terms of timing?

MR. PAULSEN: Your Honor, I think it's possible that Mr. Cabane, the case agent, it may be an extended cross-examination. It may eat up much of the day anyway.

THE COURT: When you say today, you mean tomorrow?

MR. PAULSEN: Tomorrow. If it is shorter though, we would ask if we could rest a little or stop --

THE COURT: You can't rest until -- I'm using the technical term, adjourn for the day and then complete your case on Monday.

Is that what you're suggesting in terms of timing?

MR. PAULSEN: Yes, Your Honor. We flag this only because I believe Your Honor scheduled the charge conference for mid next week.

THE COURT: The great thing about being a District Court judge is you make schedules, you break schedules, you modify schedules. I can even imagine a world in which if it made sense I might be in a position to send to all counsel Court 1, Court 2, and Court 3 tomorrow or Monday, and then could have the charge conference at an appropriately scheduled time.

I might be able to do that. Presumably assuming Mr. Jackson doesn't need three weeks to present his case, we might get the case to the jury in less than five weeks. So if you

*Proceedings* 1926

could get the final witness here tomorrow, which I understand you said you can't, but --

MR. POLEMENI: He's out of town. He's coming in from Florida.

THE COURT: The great thing about being out of town is there are lots of flights, planes, boats, marshals who can bring people from all sorts of places. I'm not suggesting we do that, necessarily.

MR. PAULSEN: Regarding your other suggestion, Your Honor, to have the discussion over the jury charge as early as tomorrow or Monday, we're open to whatever the Court can do.

THE COURT: Let me hear from defense counsel. And again, free to say whatever you wish to say about your case, timing. Mr. Jackson, your thoughts? Just 30,000 feet without attribution or locking you in. Just hypothetically speaking about the scheduling going forward.

MR. JACKSON: Thank you, Judge. One, we have no objection to them taking the witness, I believe it's Mr. Unger. They asked if they might interrupt Mr. Adamou in order to squeeze him in at some point. We have no objection to however they want to do that.

THE COURT: Is that the issue, squeezing him in?

MR. PAULSEN: Your Honor, we expect his direct testimony to be about five minutes. He's available tomorrow morning, and just for the convenience of the witness we

*Proceedings* 1927

thought if it was possible to do him very quickly in the morning.

THE COURT: Is that acceptable?

MR. JACKSON: Yes, Judge. To be clear, he mentioned two different witnesses in his initial thing. He mentioned Mr. Unger and he also mentioned Mr. Zwerman. I believe Mr. Zwerman is the one they need for Monday and Mr. Unger is the one they need for tomorrow.

THE COURT: Without locking anyone into a particular time today, at the moment, hypothetically, who would you call today, who would you call tomorrow, who would you call Monday? Let's just sort of talk about that. By you, I mean the government.

MR. PAULSEN: Yes, Your Honor. Our plan right now would be for today to call Jonathan Miller, after that Phillip Adamou.

THE COURT: Right.

MR. PAULSEN: After that we would squeeze in Mr. Unger in the morning. When Mr. Adamou is done, we'd call Special Agent Chris Cabane, and then Monday morning we would call Andrew Zwerman.

THE COURT: Now I have a sense of what the timing is and who the players are. I'm going to go back to you, Mr. Jackson.

What is your sense in terms of the timing, how it

*Proceedings* 1928

fits into your thinking?

MR. JACKSON: All of that is fine for us, Judge. We're completely flexible. Whatever is convenient to the Court in terms of the charge conference as long as, you know, we just need some opportunity to discuss the Court's draft charges. We understand it but we're happy to do whatever is convenient for the Court.

THE COURT: My inclination then would be at the close of business tomorrow, you're going to have a full day tomorrow, go to 5:00?

MR. PAULSEN: Your Honor, we don't know. It's possible depending on the cross-examination of Special Agent Cabane we could end up ending early.

If Mr. Zwerman were available we would call him next, but we may be in a position where there's an extra couple of hours at the end of the day on Friday.

THE COURT: Let's assume that we go until 5:00 on Friday, which is tomorrow. What I might propose then would be to send to you the draft of Court 1, Court 2, and Court 3, the Court's iteration of the jury charge and the verdict sheet and the verdict reached sheet, those three exhibits that I told you we would be circulating, and then have the charge conference to go over in detail your objections to the jury charge on a page by page basis.

Its current iteration is very brief, 146 pages, and

**J.A. 717**

*Proceedings* 1929

I know that there will be no disagreement about anything. So just going page by page, line by line, I'm sure we'll be done expeditiously. That gives you a sense of how much time you should be thinking about.

I don't want to waste the jury's time by having them here when we could profitably go through the documents or charge conference.

MR. PAULSEN: That sounds like a very good plan, Your Honor.

THE COURT: I know you would like to have had the charge six months ago. I've been reading your motions in limine trying to backdoor the charge conference. But you're going to get the draft.

What makes the most sense in terms of the day for us to have the charge conference in light of your presentation of witnesses and when you anticipate the government resting? And then I'll hear from Mr. Jackson.

MR. PAULSEN: Your Honor, if you believe the Court is going to send us a draft tomorrow, on Friday, Monday will be fine for us.

THE COURT: For the charge conference?

MR. PAULSEN: Yes, Your Honor.

THE COURT: Well, we could have the one witness on Monday; is that right?

MR. PAULSEN: Yes, Your Honor. It would not be a

*Proceedings* 1930

lengthy witness.

THE COURT: It would be a short witness. Then we could tell the jury to come back on Tuesday and then have the charge conference on Monday.

Does that makes sense, from the government's point of view?

MR. PAULSEN: Yes.

THE COURT: Monday would be spent essentially going through the page by page in the charge conference. The jury would be all smiles because they would be sent home for a snow day early and wouldn't have to wait around while we go through the charge conference, and then launch into either the defense case or summations and instructions to the jury.

MR. PAULSEN: That seems fine, Your Honor.

THE COURT: Mr. Jackson, again, without committing you one way or another with respect to the defense case, what makes sense to you in terms of scheduling?

MR. JACKSON: Judge, the plan you just described seems like a good plan to us. We're going back through everything and figuring out exactly the scope of the defense case. It will be a relatively short defense case.

It's not going to be a three-week defense case. It's a matter of it will be a short defense case, relatively speaking. We'll figure out exactly what. We're going to try to reach a stipulation with the government to tighten it even

*Proceedings* 1931

more. So having the charge conference on Monday and then the defense case and then summations, have that be the rest of the week makes sense to us.

THE COURT: All right. In terms of giving the jury a full day off as opposed to an early dismissal, what are the thoughts of counsel with respect to that?

MR. PAULSEN: Yes, Your Honor. We're not sure that the witness could do that, but I think that would make sense if he could do it. We will reach out to him at the break today to see if that's possible.

THE COURT: What is the response of defense counsel to that? In terms of scheduling, that's all I'm talking about now.

MR. JACKSON: I certainly don't want to subject the jurors to coming in for five minutes if it's going to be a short direct of Mr. Zwerman. I don't know how long he'll be.

The only concern I have, Judge, is I don't have a full sense of how long Agent Cabane's testimony will be. The case agent is I think for us one of the hardest ones to sort of game out in every case. There's just any number of things that could be the subjects.

So if all that is going to be happening on Monday is Mr. Zwerman, and he could move it to Tuesday, I think that that's -- that's what you're contemplating?

MR. PAULSEN: Yes. And I share Mr. Jackson's sense

*Proceedings* 1932

that it's possible that Special Agent Cabane is testifying Monday morning, in which case that efficiency wouldn't be quite as clear.

Otherwise, if it was only Mr. Zwerman and it was possible, it would seem kindest to the jury to let them stay home entirely, rather than having them come in for a half an hour witness.

THE COURT: Does it make sense, and then we'll get the jury and proceed with witnesses, does it make sense possibly to say to the jury on Friday you're going to have Monday off, don't come in at all on Monday, jurors, and then they will come back on Tuesday? Does that make sense in terms of being respectful of their time?

MR. JACKSON: Yes, Your Honor.

MR. PAULSEN: Your Honor, I think that would make sense with the one contingency that we need to confirm that Mr. Zwerman can be moved from Monday to Tuesday. We're hopeful that he can. I do think that makes more sense.

(Continued on next page.)

J.A. 718

Proceedings 1933

(Continuing.)

THE COURT: All right. So just think about that, make the calls you need to make, talk with them, and then we will be open to the possibility. What I don't want to do is have the jurors waiting around for what might turn out to be an extensive charge conference when it would be better to say to them, we'll see you on Tuesday, as opposed to, we'll see you on Monday. And then they can come in on Tuesday, if there's going to be a brief witness, wrap up the Government case, have the defense put on their case, and then go to summations, having done the charge conference on Monday, if that makes sense.

MR. PAULSEN: Yes, Your Honor.

And we will endeavor to determine Mr. Zwerman's schedule this evening so you can advise the jury tomorrow.

THE COURT: All right. Does that make sense to you, Mr. Jackson?

MR. JACKSON: It's perfect, Judge.

THE COURT: Okay. Why don't we get the jury in, and we'll get the next witness on the stand.

MR. PAULSEN: And Your Honor --

THE COURT: Yes.

MR. PAULSEN: One final thing. The parties discussed the exhibits for this particular witness, Mr. Miller. I don't believe they have any objections --

Proceedings 1934

THE COURT: Well, let's see if they do.

Do you have any objections to the proposed exhibits?

MR. JACKSON: No, Your Honor.

MR. PAULSEN: So we think we can move quickly, Your Honor.

THE COURT: That's nice. I like quickly, in this context.

MR. POLEMENI: Judge, one other thing while we're waiting.

THE COURT: Yes.

MR. POLEMENI: So as you can see, we have some headsets that we brought up. So this is in regards to the recording that was the subject of the motions in limie. So I know we haven't discussed that since the motions in limie, and I don't think we will get to the recording today if we were to introduce it, but I just wanted to put that, you know, on the Court's --

THE COURT: -- on the radar.

What is the response of defense counsel? Hang on.

THE COURTROOM DEPUTY: All rise.

THE COURT: Please rise for the jury.

(Jury enters the courtroom.)

THE COURT: Welcome back, ladies and gentlemen of the jury. Thank you for your promptness. Please be seated.

We're going to have a new witness, at this point.

Proceedings 1935

Can you call the witness forward, please, and we'll have the witness sworn.

MR. PAULSEN: Yes, Your Honor. The Government calls Jonathan Miller.

THE COURT: Please have the witness come forward to be sworn.

Please come forward, sir, to the front. My court deputy will administer the oath, and then you'll be seat in the witness chair.

(The witness takes the stand.)

THE COURT: Please raise your right hand.

THE COURTROOM DEPUTY: Do you solemnly swear or affirm that the answers you're about to give the Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes.

THE COURT: Please be seated, sir. I'm going to ask you to grab hold of the microphone in front of you. It looks like a snake, but it's not. It won't bite you. You're in charge. Twist it right to you. State your name and spell it, and then counsel will inquire, sir.

THE WITNESS: Jonathan Miller, J-O-N-A-T-H-A-N, last name, M-I-L-L-E-R.

THE COURT: Thank you. You may inquire, sir.

MR. PAULSEN: Thank you, Your Honor.

**J.A. 719**

MILLER - DIRECT - PAULSEN 1936

**JONATHAN MILLER,**
    called as a witness by the Government, having been first
    duly sworn/affirmed by the Courtroom Deputy, was examined
    and testified as follows:
DIRECT EXAMINATION
BY MR. PAULSEN:

Q   Good afternoon, Mr. Miller.

A   Good afternoon.

Q   Where do you work?

A   290 Broadway with IRS Criminal Investigation.

Q   How long have you worked with IRS Criminal Investigation?

A   Fifteen years.

Q   What's your position.

A   Supervisory Special Agent.

Q   What does a supervisory special agent do?

A   I oversee a team of approximately 12 special agents, and I participate in their investigations such as search warrants, arrest warrants, surveillance, and interviews.

Q   So you've done search warrants?

A   That's correct.

Q   What kind of places have you searched?

A   Businesses, residences.

Q   Now, about how many searches have you participated in?

A   Dozens.

Q   What positions did you have before working for the IRS?

MILLER - DIRECT - PAULSEN          1937

A    I was an intel analyst employed by the Manhattan District Attorney's office, and I was assigned to anti-money laundering task force in New York.

Q    With the IRS, what sort of training have you received?

A    I received six months of training at our training facility in Georgia.

Q    In the context of your job, are you familiar with check cashing businesses?

A    Yes, I am.

Q    Are you familiar with what sorts of documents they tend to have?

A    Yes, I am.

Q    Now I'm direct your attention to the day of August 24th, 2021.

Now, at that point in time, what was your position?

A    I was an Acting Supervisory Special Agent.

Q    So does that mean you hadn't become a full supervisory special agent yet?

A    That's correct.

Q    What did you do at work that day?

A    I participated in a search warrant in Brooklyn.

Q    What was the search of?

A    A business.

Q    What business was it?

A    Coney Island Payroll.

MILLER - DIRECT - PAULSEN          1938

Q    Was the search done pursuant to a court-authorized warrant?

A    Yes, it was.

Q    What kind of information is included in a warrant like that?

A    The location to be searched and the evidence that we would be searching for.

MR. PAULSEN:  Your Honor, at this point, I would like to move into evidence, Government Exhibits 300 through 308 and it's subcategories .1, .2, and .3.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admit.  You may publish them.

(Government's Exhibits 300 through 308 and its subcategories .1, .2, and .3 were received in evidence.)

MR. PAULSEN:  Thank you, Your Honor.

Now, if I could show Government Exhibit 300 to the witness and jury.

(Exhibit published.)

Q    Do you recognize this location?

A    Yes, I do.

Q    What is this?

A    This is the front entrance to Coney Island Payroll.

Q    At a high level, what was the purpose of the search of Coney Island Payroll?

MILLER - DIRECT - PAULSEN          1939

A    We were looking for evidence, documents, or records related to specific individuals and entities.

Q    Was the search in connection with a pre-existing investigation?

A    Yes, it was.

Q    What was your role in that investigation?

A    I had a very limited role in this investigation before the day of the search warrant.

Q    What was that very limited role?

A    I participated as a secondary on one witness interview, and I also accompanied a special agent to return some personal belongings to someone that was arrested.

Q    And when you say, secondary, do you mean you were the second agent in that interview?

A    Yes, that's what I mean.

Q    So is it fair to say this isn't your case?

A    It is not my case.

Q    How many agents were participating in the search?

A    Approximately 15.

Q    What role were you playing on the search?

A    I was the team lead for the IRS agents that were there that day.

Q    What, if anything, did you and the other agents do in advance of the search?

A    We read the search warrant and we also read -- well, I

MILLER - DIRECT - PAULSEN          1940

read the op plan, and we had a pre-op meeting prior to the day of the search warrant.

Q    Is that to get all your ducks in a row before you do the search?

A    That's correct.

Q    Now, what do you do as the team lead?

What does that entail, as opposed to a regular searcher?

A    So there are other IRS agents were at the location.  If they came across a document or record and had a question as to whether it fell within the scope of the warrant and what we were looking for, they could bring it to me and make a determination.

Q    Okay.  I'd like to discuss the search itself.

MR. PAULSEN:  Ms. Kannan, can you put 300 back on.

Q    Mr. Miller, can you describe the windows in the front of Coney Island Payroll?

A    Sure.  They're glass tinted windows.

Q    So they look black, but because they're tinted?

A    That's correct.

Q    Is there a logo on the front of the building?

A    Yes, there is.

Q    That's that thing with the green dots; is that correct?

A    That's correct.

Q    Now, about what time did you guys enter the facade shown

J.A. 720

MILLER - DIRECT - PAULSEN                    1941

here?

A    It would have been approximately 8:00 a.m.

Q    Can you describe for the jury, just generally, how the search started?

A    Sure.  We waited for an employee of the business to arrive so they could open up the business for us, as opposed to breaching the door.

Q    Why do you do that?

A    There wasn't an immediate need or it wasn't necessary to get in, in that manner.

Q    Is that an easier way to do it?

A    It would have been faster.

Q    Okay.  So what happened once the agents go inside?

A    We conducted a security sweep of the inside to see if anybody else was inside the business.  After that, the rooms were labeled, each room was designated A, B, C., someone took photos, one of the agents took photos of all the rooms inside, and another agent drew a sketch of the inside of the business.

        MR. PAULSEN:  Your Honor, I'd like to show the witness Government Exhibit 441, only the witness, please.

        THE COURT:  Any objection to 441?

        MR. JACKSON:  No objection, Judge.

        THE COURT:  You may publish.  It's admitted.

        (Government's Exhibit 441 was received in evidence.)

        (Exhibit published.)

---

MILLER - DIRECT - PAULSEN                    1942

Q    Mr. Miller, do you recognize this document?

A    Yes, I do.

Q    What is this?

A    This is a sketch of the interior of Coney Island Payroll.

Q    Okay.  Did you draw this sketch?

A    I did not.

Q    Does it faithfully describe the inside of Coney Island Payroll as you knew it?

A    Yes, it does.

Q    Now, at the very bottom, I see the text, front entrance; is that right?

A    Yes.

Q    Is that the tinted windows that we were looking at a moment ago?

A    Yes, it is.

Q    And that arrow, is that the front door?

A    Yes, it is.

Q    Okay.

        MR. PAULSEN:  Now, Ms. Kannan, if we could do a side by side and keep this up to the side, and just put some photos on the other side.  I'd like to put up Government Exhibit 301 next to it.

Q    What is this a picture of, Mr. Miller?

A    That's the front lobby of Coney Island Payroll.

        MR. PAULSEN:  Ms. Kannan, can you zoom in on just

---

MILLER - DIRECT - PAULSEN                    1943

kind of the central part.

Q    What are we looking at there?

        Is that a glass window? A counter? What are we seeing?

A    It's a counter and a glass window that separates the lobby area from the main office.

Q    Okay.

        MR. PAULSEN:  Ms. Kannan can you close that.

Q    Can you point out to the jury where on the map that is by the letter?

A    That would be letter A.

Q    Okay.  Now, off to the left of the photo, I see a door.

        Am I correct?

A    That's correct.

Q    Where would that door be on the map?

A    Letter B.

Q    And can you describe what letter B is on that map?

A    Letter B is a small hallway that has double doors that goes from the lobby to the office area, and you have to go through one set of doors that puts you into the lobby, and then a second door to get to the office area.

Q    Okay.  And there's a -- is there a buzzer of some sort to get through?

A    There's some type of security system.

Q    Is the double doors, it's meant it make it difficult to

---

MILLER - DIRECT - PAULSEN                    1944

get to the back?

A    Normally, you could not get through the second door until the first door behind you is closed.

Q    Okay.

        MR. PAULSEN:  Now, if I could replace Government Exhibit 301 with 302.

        THE COURT:  You may publish.  It's in evidence.

        (Exhibit published.)

Q    What are we looking at here, Mr. Miller?

A    That's Room H.  It's a small office behind the large office.

Q    Okay.

        MR. PAULSEN:  Ms. Kannan, can you color in Room H. I think that's I.  Thank you.

Q    So do I see a sofa or a couch of some sort there?

A    Yes.

Q    And is that sofa or couch on the map?

A    Yes, it is.

Q    Now, what are these -- those silver blocky things in the middle of the picture?

A    Those are safes.

Q    Okay.

        MR. PAULSEN:  Now, I'd like to show -- keeping the map up Ms. Kannan -- can you put Government Exhibit 303.

Q    What are we looking at here, Mr. Miller?

**J.A. 721**

MILLER - DIRECT - PAULSEN          1945

A     That's the top of the desk in Room H.

Q     Okay.  Somewhat messy?

A     Yes.

        MR. PAULSEN:  Ms. Kannan, can you zoom in on the envelope in the bottom left-hand corner.

Q     Mr. Miller, is that the same logo that we saw on the top -- in the front of the building?

A     Yes, it is.

Q     What do you think that envelope is?

A     That's a cash envelope.

Q     Okay.

        MR. PAULSEN:  Now, Ms. Kannan, if you could leave the map you up and go to Exhibit 304, also in evidence.

Q     What are we looking at here, Mr. Miller?

A     That's the large main office which is letter I.

        MR. PAULSEN:  Ms. Kannan, can you color in.  Thank you.  And could you zoom the middle of 304, Ms. Kannan.

Q     What are we looking at here, Mr. Miller?

A     A safe and some currency counters.

Q     All right.  Now, during the search, did the team seize items?

A     Yes.

Q     What -- generally speaking, what sort of items did the team seize?

A     Customer files, check logs, and copies of checks.

---

MILLER - DIRECT - PAULSEN          1946

Q     Were there any electronic devices?

A     Electronic devices were also taken.

Q     Now, when the team finishes the search, what does your team do with the items that it seized?

A     The items are logged on an evidence log, and we box and take the evidence, and a copy of the evidence log is also left at the premises.

Q     Does the log help you know where you got what?

A     Yes, it does.

Q     Now, a number of the items you took were checks; is that right?

A     Copies of checks, yes.

Q     How did your team get the copies of checks?

A     An employee of Coney Island Payroll printed those for us.

Q     Okay.  Can you walk the jury through how that happened?

A     So the search warrant had a list of entities and names that we were searching for records.  Some of those records were stored electronically in the business on their server. They were not physical copies.  An employee printed those checks off of the computer for us.

Q     Okay.  Were you there during part of the time that was happening?

A     I was.

        MR. PAULSEN:  I'd like to first show Government Exhibit 305-1.

---

MILLER - DIRECT - PAULSEN          1947

        THE COURT:  In evidence.  You may publish.

        MR. PAULSEN:  Thank you, Your Honor.

        (Exhibit published.)

        MR. PAULSEN:  If you could rotate this, Ms. Kannan.

Q     Do you recognize this document, Mr. Miller?

A     Yes.

Q     The middle of the check says, Ad on the Go.

        Is that one of the company names you were looking for checks related to?

A     Yes.

Q     And does the top say, one -- check one of 98?  Or -- 98?

A     Yes, it does.

Q     And if I could draw your attention to the bottom left-hand corner.

        What does it say in the bottom left-hand corner?

A     Eudox Systems, Inc.

Q     Is that both the Eudox Systems, Inc. And the check one of a number, was that printed out on the documents as you received it when the Coney Island Payroll printed them out?

A     Yes.

        MR. PAULSEN:  Ms. Kannan, if you can do a side by side between this document and Government Exhibit 111, which is already in evidence.

Q     Now, Mr. Miller, I'm correct in stating that Government Exhibit 111, this is not a document that you seized that day?

---

MILLER - DIRECT - PAULSEN          1948

A     Correct.

        MR. PAULSEN:  Now, Ms. Kannan, can you zoom in the upper right-hand corner of that document.  Upper right-hand corner.

Q     Does that document have the same form, check one of a number?

A     Yes, it does.

        MR. PAULSEN:  And can you do the left-hand corner, as well.  No.  I'm sorry, the bottom left-hand corner of the document on the right, Ms. Kannan.

Q     Does that also say Eudox Systems?

A     Yes, it does.

Q     And it's fair to say this document, 111, has the same form as the documents that the Coney Island Payroll employee ran off for you?

A     Yes.

Q     Okay.

        MR. PAULSEN:  Ms. Kannan, if I could show Government Exhibit 3061, which is in evidence.  And rotate, if you can.

Q     Mr. Miller, do you recognize this document?

A     Yes.

        MR. PAULSEN:  Ms. Kannan, can you zoom in the middle.

Q     Are these more checks that you received for the employee at Coney Island Payroll?

MILLER - DIRECT - PAULSEN                1949

A    Yes.

Q    And the company name, M&M USA Consulting, is that one of the companies that you were looking for records in relation to?

A    Yes.

MR. PAULSEN:  Ms. Kannan, can I skip to Government Exhibit 3071.  Can you please rotate.

Your Honor, if you give us a moment, I don't think our computer returned from lunch.

THE COURT:  Can you use the ELMO or do we have to generate this with the computer?

MR. PAULSEN:  Your Honor, I think given the size of this documents, I think the computer is necessary.  It's done this before.  Let's see if it comes back.

THE COURT:  All right.

MR. PAULSEN:  Your Honor, these items are in evidence.  I think I can just direct the witness verbally on this.

THE COURT:  Well, the jury has to see them since they're the finders of fact.  So how are we going to handle that?  Doesn't do any good for you and the witness to have a chat if the jurors are not seeing what you're chatting about.

Do we need to take a 10-minute -- I hate it say it -- tech break to get the techies up to see if they can fix this, or is this something that is beyond a tech break?

---

MILLER - DIRECT - PAULSEN                1950

MR. PAULSEN:  Your Honor, our very wise paralegal thinks that she needs about two minutes, and it'll start working.  She is often right.

THE COURT:  I'm sure she is.  In my household, it's the yutes that know what's going on.

Off the record.

(Whereupon, an off-the-record discussion was held at this time.)

THE COURT:  Back on the record.

MR. PAULSEN:  We're showing Government Exhibit 307.1.

Q    Mr. Miller, did you seize these documents, as well, along with your team?

A    Yes.

MR. PAULSEN:  Zooming in on the middle, Ms. Kannan.

Q    Do you see a company named Midwood USA Consulting Group?

Was that one of the companies that you were looking for documents?

A    Yes.

MR. PAULSEN:  And now, Ms. Kannan, if I can go to 308.1.  Zooming into the middle, Ms. Kannan.

Q    Are these more checks that you had printed off by the employee at Coney Island Payroll?

A    Yes.

Q    And was the company name in the middle one of the

---

MILLER - DIRECT - PAULSEN                1951

companies you were looking for?

A    Yes.

Q    What's that company name?

A    ZKC NYC, Inc.

Q    Now, finally, Mr. Miller, in addition to the checks for those four companies, did you seize customer profile documents?

A    Yes.

MR. PAULSEN:  Ms. Kannan, can we go back to 441.

Q    M. Miller, could you tell us, the jury, where you got the customer profile documents?

A    Yes.  In Room E which was a file room.

Q    Okay.  That's that long skinny room at the top?

A    Yes.

MR. PAULSEN:  If I could show Government Exhibit 305.

THE COURT:  You may publish.

MR. PAULSEN:  Thank you, Your Honor.

(Exhibit published.)

Q    Is this the customer profile for Advertising on the Go?

A    This was in that customer profile, file.

Q    The circle on the document, that was how it existed when you found it?

A    Yes, it was.

MR. PAULSEN:  If I could now show Government

J.A. 723

---

MILLER - DIRECT - PAULSEN                1952

Exhibit 306.

THE COURT:  You may publish.

(Exhibit published.)

Q    Mr. Miller, I see a pile of document -- a set of documents that says M&M USA Consulting.

Is this the profile information you got for that company?

A    Yes, it is.

MR. PAULSEN:  Now, 307.

Q    Is this the customer profile information you found for Midwood USA?

A    Yes, it is.

MR. PAULSEN:  And then finally, can I show the witness 308 and show the jury 308, please.

THE COURT:  Yes.

Q    Is this the customer profile for ZKC NYC?

A    Yes, it is.

Q    And down to the bottom of this, just showing what the owner and signature is, what's the name there?

A    Name of owner is Reginald J. Garcia and name of company, ZKC NYC, Inc.

MR. PAULSEN:  No further questions, Your Honor.

THE COURT:  Thank you.  You may cross.

MR. JACKSON:  Thank you.

MILLER - CROSS - MR. JACKSON          1953

CROSS-EXAMINATION

BY MR. JACKSON:

Q   Good afternoon, sir.

A   Good afternoon.

Q   Just a few questions for you.

MR. JACKSON:  Can we re-call exhibit GX 441.  Okay.

Q   And this is the map that you went over with the Government, correct?

A   Yes, it is.

Q   Okay.  And this is a rough sketch of exactly of what you went through during the search, right, what you saw in the building?

A   Yes.

Q   And this is about what you expected for a check cashing business like this?

A   Yes.

MR. JACKSON:  Can we look at GX 304.

Q   We took a look at this picture of the safe, right, in your direct examination?

A   Yes.

Q   And I'm right, you were not surprised to find a safe at a check cashing business?

A   Correct.

Q   I'm correct that there are many check cashing businesses in New York City, correct?

---

MILLER - CROSS - MR. JACKSON          1954

A   Yes.

Q   And you expect to find a safe at all of them, right?

A   Sure.  Yes.

Q   Wouldn't be surprised to find multiple safes, since the place deals with cash, right?

A   I would not be surprised.

Q   And I'm correct also that as a person in law enforcement, you're not surprised to see tinted windows on a building where people are dealing with cash exchanges, correct?

A   Not surprised.

Q   Yeah.  One of the reasons businesses like that often have tinted windows is because you don't necessarily want where people come in, if they're handing cash across a counter, for everybody on the street to easily be able to see every transaction, correct?

A   Yes.

Q   And it's also the case that money counters are very common in check cashing places, you would expect to see that?

A   That's right.

Q   And they're also common in a number of other regular businesses that deal with cash, correct?

A   Yes.

Q   Now, just very quickly.  You're aware that this is -- the street --

MR. JACKSON:  We could take that down, Mr. Cepregi.

---

MILLER - CROSS - MR. JACKSON          1955

Thank you.

Q   You're aware that the street that you were on on Coney Island Avenue, it sort of divides the 60 -- it divides two police precincts, right?

A   I was not aware of that.

Q   Okay.  I'm not trying to quiz you on the precinct maps.

But you're generally aware that there are a number of different precincts in Brooklyn?

A   Yes.

Q   Sometimes the IRS coordinates a bit with NYPD, right?

A   Yes.

Q   You've heard of the 66th Precinct and the 70th Precinct?

A   Yes.

Q   Okay.  And you know, generally, those are Brooklyn precincts.  It wouldn't surprise you that the street that would divide the 70th and the 66th Precinct?

A   It would not surprise me.

Q   Okay.  Are you familiar with the NYPD's CompStat system?

A   I'm familiar with it.

Q   You're familiar with what they do, the collection of statistics?

A   Yes.

Q   Okay.  And they collect statistics on how many crimes are committed in particular areas of the City and in the City at large, correct?

---

MILLER - CROSS - MR. JACKSON          1956

A   Yes.

Q   And you're aware that there are -- have been over the years for the '90s to today, in the precincts in Brooklyn, hundreds or thousands of robberies per year?

A   I don't know that.  But I'm not surprised.

MR. JACKSON:  Your Honor, we'd like to offer DX 5021 and 5022 which are CompStat statistics of the 66th and 70th Precinct pursuant to 803(8).

THE COURT:  Any objection?

MR. PAULSEN:  Yes, Your Honor, we object.

THE COURT:  Let's have a sidebar.

(Continued on the next page.)

(Sidebar conference.)

**J.A. 724**

SIDEBAR CONFERENCE 1957

(The following occurred at sidebar).

THE COURT: Let me see the document.

I'm looking at DX 5021 and DX 5022, CompStat reports for the -- 5021 is for the 7-0 Precinct, it covers the period July 1st, 2024 through July 7th of 2024, and 5022 covers the period, July 1st, 2024 through July 7th, 2024. Is this a period that involved the alleged crimes in this case? That is to say, July 1st of 2024 through July 7th of 2024, the crimes that are alleged in the indictment cover this time period?

MR. JACKSON: Your Honor, at the bottom of these exhibits, there's a historical prospectus stat --

THE COURT: But I'm asking about the current stats that are appearing. This is the NYPD -- it shows mayor Adams and Police Commissioner Caban, and the report covers the period, July 1st of this year through July 7th of this year.

So my question is, are these stats that relate to that time period?

MR. JACKSON: The top is not, Your Honor, but the bottom does. The bottom does cover --

THE COURT: Having spent 23 years on the CCRB, I learned a little bit about police statistics and how the NYPD works. I can't imagine admitting a document that deals principally with what happened this month in 2024 for crimes that were alleged to have occurred -- what's the period in the indictment?

---

SIDEBAR CONFERENCE 1958

MR. PAULSEN: 2012 to 2019.

THE COURT: I'm not going to let these documents in. So the objection is sustained.

MR. JACKSON: Just may I ask, Your Honor, if we redacted this with the historical perspective --

THE COURT: Does this deal with the bottom of this --

MR. JACKSON: Yes.

THE COURT: Excuse me. The bottom of this deals with what time period?

MR. JACKSON: It covers 1990 to the present.

THE COURT: These don't cover the period of the alleged crime here. I mean, if you wanted to deal with crimes during the period covered by the indictment, then you should have taken the effort to find statistics that dealt with the period. I was on the CCRB for 23 years, and I assure you that crime is very tremendously happening, not just in these two precincts, but in many precincts throughout the city, and to offer documents for this time period for a financial services alleged crime that occurred at a different time period is just confusing and a waste of time. So the objection is sustained.

MR. PAULSEN: Thank you, Your Honor.

THE COURT: You're welcome.

(End of sidebar conference.)

---

Miller - cross - Mr. Jackson 1959

(Continuing.)

(In open court; jury present.)

THE COURT: Objection sustained.

MR. JACKSON: Thank you, Judge.

THE COURT: You're welcome.

BY MR. JACKSON:

Q Just a couple more questions for you, Agent Miller. One of the things that you described during your direct is that the employees of Coney Island Payroll actually helped you print certain documents of off their system?

A Yes.

Q And I'm correct that without those employees' assistance, as you were there in a search warrant, it would have been a much more complicated matter for you to try to get stuff off of a computer that you didn't necessarily understand the system, correct?

A Not exactly.

Q Well, they did help you get the documents when you asked for them, correct?

A They did.

Q And you didn't have to engage in any threats or anything like that? In order to get them to print the document off, you didn't have to put anybody in a figure four leg lock?

A That's correct.

---

Miller - redirect - Mr. Paulsen 1960

Q And, by the way, when you executed this search, you're aware that the investigation that related to this had been going on, you mentioned the investigation, you're aware it had been going on since 2019?

A I knew it had been going on for quite sometime.

Q And they had subpoenaed various people who had direct connections to Mr. Motovich, correct?

A I don't have direct knowledge of that but I'm sure they did.

Q And while you were there, all the records that we went over, they were right there in Coney Island, they hadn't been destroyed because you found them, correct?

A We found records that were not destroyed, correct.

Q Last question: You have not, yourself, sir, uncovered any records in the search that you, yourself, know to reveal that David Motovich stole money from anyone; I'm correct about that, right?

A Correct.

Q No further questions. Thank you so much, Agent.

THE COURT: Any redirect?

MR. PAULSEN: Yeah, very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. PAULSEN:

Q Mr. Miller, do you remember a moment ago defense counsel asked you about whether the employees were helpful?

J.A. 725

Proceedings 1961

A    Yes.

Q    And they were for a while; is that right?

A    That's right.

Q    Did there come a time when they stopped being as helpful?

A    Yes, there did.

Q    Is that when you asked about ZKC?

A    I don't remember which company in particular but at a certain point, they stopped cooperating and printing off records.

Q    No further questions.

THE COURT:  Thank you.

You may step down, sir.  Thank you very much. Have a good afternoon.

(The witness steps down.)

THE COURT:  Please call your next witness.

MR. POLEMENI:  The Government calls Philippos Adamou.

THE COURT:  Please have the witness come forward to be sworn.

Please come forward to the front.  My court deputy will swear you in and then counsel will inquire.  Please come right up here.  Thank you very much.  Nice to see someone with a real beard.  Go ahead.

THE COURTROOM DEPUTY:  Do you swear or affirm that

Proceedings 1962

the answers you are about to give the Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE COURT:  Thank you, sir.  Please be seated.  I am going to ask you to sit down.  Move the microphone in front of you there.  Grab it.  It looks like a snake but it won't bite you.  You can grab it and move it right in front of you.

Please state your name and spell it and then counsel will inquire.

THE WITNESS:  My name is Philippos Adamou. P-H-I-L-I-P-P-O-S, A-D-A-M-O-U.

THE COURT:  Thank you, sir.

Counsel, you may inquire.

MR. PAULSEN:  Thank you, Your Honor.

(Continued on the following page.)

Adamou - direct - Mr. Polemeni 1963

PHILIPPOS ADAMOU,

called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. POLEMENI:

Q    Good afternoon, sir.

A    Good afternoon.

THE COURT:  You have to answer and keep your voice up.

THE WITNESS:  Okay.

THE COURT:  It will move to you.  I promise it won't bite you.

Go ahead.

Q    Where were you born, Mr. Adamou?

A    I was born in Cypress.

Q    Where is that?

A    Eastern Mediterranean.  It's an island.

Q    When did you come to the United States?

A    1977.

Q    Are you a U.S. citizen?

A    Yes, I am.

Q    When did you become a U.S. citizen?

A    1987.

Q    Did you change your name at some point, Mr. Adamou?

Adamou - direct - Mr. Polemeni 1964

A    Yes.

Q    What was your name originally?

A    Sophocleous, S-O-P-H-O-C-L-E-O-U-S.

Q    Why did you change your name?

A    The real name, I mean the family name is Adamou, but where I was born, in the 50s, they would give out, you know, last names because you are a grandfather with name is Sophocleous, they would say the grandson of Sophocleous -- Sophocleous.

Q    Okay.

A    I mean, we were of four children.  We have four different last names.

Q    Did you change your name when you came to the United States?

A    No, I -- I change it, I believe it was 1992.

Q    So after you had arrived?

A    Yes.

Q    Yes.  And did you change your name legally?

A    Yes.

Q    Where do you currently live?

A    I live in Fresh Meadows.

Q    Who do you live with?

A    With my wife and my youngest daughter.

Q    What do you do for work?

A    I'm in marble business, naturallal stone, quartz.

**J.A. 726**

Adamou - direct - Mr. Polemeni                 1965

Q    For how long have you been doing that?

A    More than 20 years, 25.

Q    Did you do something else when you first came to the U.S.?

A    Yes.  I did busboy, waiter, I did different work, yes.

Q    What's the name of your company?

A    Lithos Marble Works, Inc.

Q    Is Lithos a Greek word?

A    Yes, for stone, Asian word for stone.

Q    When did you form Lithos?

A    I believe it was 2000, 2001.

Q    And where is the business located?

A    Astoria, Queens.

Q    Do you have employees?

A    Yes.

Q    In the past -- since about 2010 or so, how many employees have you had, roughly?

A    Depends how busy we are.  There were times we had 20, 25, 30.  There are times we had 10, 12.

Q    Do any of your family members work?

A    Yes.

Q    Who works with you?

A    My wife, my sister-in-law, but my brother, but he's older, he's retired now.

Q    What type of projects, what type of work does Lithos

---

Adamou - direct - Mr. Polemeni                 1966

do?

A    We do commercial and residential.

Q    Can you give the jury an example of the type of work you do?

A    Apartment buildings, exterior or interior, and houses, I mean, homes, kitchens, bathrooms, countertops.

Q    So do you buy the marble and stone and then install it?

A    Yes, we buy, we fabricate, install.

Q    Mr. Adamou, have you pled guilty to any crimes?

A    Yes, I did.

Q    Have you pled guilty in connection to crimes in connection with your ownership of Lithos?

A    I don't understand what you --

Q    Sure.  What crime have you committed?

A    I -- I evade tax pay -- pay taxes.

Q    Did you pay some of your employees in cash?

A    Yes.

Q    Where did you get the cash to pay your employees?

A    From David.

Q    David who?

A    Motovich.

Q    Do you see Mr. Motovich here today?

A    Yes.

Q    Can you identify him by an item of clothing he's wearing?

---

Adamou - direct - Mr. Polemeni                 1967

A    Blue, what is it -- the middle.

      MR. JACKSON:  We'll stipulate to the identification, Your Honor.

      THE COURT:  The record will reflect that the witness has identified Mr. Motovich by clothing he's wearing and pointing him out.

      Go ahead.

      MR. POLEMENI:  Thank you, Judge.

      BY MR. POLEMENI:
Q    I'm gonna get into a little more detail but can you just generally describe for the jury how did you get cash from Mr. Motovich?

A    I would -- he would give me a company name and write a check on that -- that company name and I would go there, he would keep his cut, it was four percent in the beginning and then it went to six percent, and he would take his cut and I'll get the cash and go do, you know, my payroll.

Q    Pay your workers with the cash?

A    Yes.

Q    And not report the wages to the IRS?

A    Correct.

Q    When did you first meet Mr. Motovich?

A    I would say 2012, 2011, 2012.

Q    Do you recall how you first met him?

      Were you referred to him by someone?

A    Yes.

---

Adamou - direct - Mr. Polemeni                 1968

Q    Who?

A    Shimon Coin.

Q    Who's that?

A    It's a supplier with, you know, stone, marble and granite and he referred -- yes, he -- he sent me there.  I don't think, the first time, I met David.  I met his father.

Q    Okay.  Why did Shimon refer you to Mr. Motovich or his father?

A    I believe I complained to him that, you know, my people are -- they don't want to be paid in, you know, anything else than cash and I said I have a problem, you know, with cash and everything and he says you should go and visit these people.

Q    Okay.  And did you?

A    Yes.

Q    Who did you visit?

A    David's father, I believe, was -- you know, the first night, it was late afternoon, night.  I -- I met -- in the building right across from Midwood Lumber.

Q    Okay.

      MR. POLEMENI:  Ms. Kannan, if you can pull up Government Exhibit 4 in evidence.

      THE COURT:  You may publish.

      (Exhibit published.)

Q    Who is that?

**J.A. 727**

Adamou - direct - Mr. Polemeni        1969

A    His father.

Q    Do you remember his name?

A    No.

Q    It's okay.  What do you recall about that meeting with David's -- Mr. Motovich's father?

A    I mean, they knew why I was there.  I mean, you know, Shimon placed the call from his office, somebody from there or Shimon.  And they said, it's okay.  I mean, we're gonna work.  We gonna come to business.

Q    Did you eventually meet David Motovich?

A    I don't remember it was that night, but could be the day or, you know, few days after, yes.  I met -- yes.

Q    And do you recall that first conversation?

A    I was in the right place that --

Q    What do you mean by that?

A    That, yes, we gonna work together.

Q    Did Mr. Motovich tell you that you were in the right place?

A    Yes.  And, you know, they -- how much they charge, you know, four percent.

Q    Over the period of time that you've known Mr. Motovich, have you met other family members of his?

A    His brothers and his sister, I would see her over there, at the offices.

     MR. POLEMENI:  Can we pull up GX-2, please.

---

Adamou - direct - Mr. Polemeni        1970

Q    Who is that?

A    His brother.

Q    Do you remember his name?

A    No.

     MR. POLEMENI:  Can we pull up GX-9, please.

Q    And who is that?

A    Sister.

Q    Do you remember her name?

A    No.

Q    It's okay.

A    Sorry.

     MR. POLEMENI:  If we could pull up Government Exhibit GX-18.

Q    Who is that?

A    That's me.

Q    Where did you go to get the cash from Mr. Motovich?

A    Usually I would go to his office.

     MR. POLEMENI:  If we can pull up GX-330, please.

Q    What's that?

A    This is David's office.

     MR. POLEMENI:  And if we could pull up 329 -- I'm sorry, 331.

Q    Was -- when you went to Mr. Motovich's office to pick up the --

     THE COURT:  I'm sorry, what's the number you

---

Adamou - direct - Mr. Polemeni        1971

wanted?

     MR. POLEMENI:  330 is fine, Judge.

     THE COURT:  I thought you said 331.

     MR. POLEMENI:  331.  Thank you.

Q    What's 331, Mr. Adamou?

A    Yes, this is David's desk office.

Q    Okay.

A    And at the end of the wall, it's a door there that you can go in, it's a small bathroom, toilet, and you go right, is the safe.

Q    What's in the safe?

A    Cash, money, that he would go and get and there was a machine that counts the money.

Q    Have you been in that room?

A    Yes.

Q    Is that where you -- where Mr. Motovich would give you the cash?

A    Yes.  He would call me, you know, come in and he would count the money, open the safe, count the money, give it to me and I -- I would go.

Q    You said that Mr. Motovich gave you names of companies to write the checks to; is that right?

A    Yes.  Yes.

Q    Do you recall some of the names of the companies?

A    Alaudin, Ago & Alaudin.  There were so many I don't

---

Adamou - direct - Mr. Polemeni        1972

remember right now.

Q    Okay.

     MR. POLEMENI:  If we can show the witness Government Exhibit 740 not in evidence.

A    Yes.  Okay.

Q    Mr. Adamou, have you seen this document before?

A    Yes.

Q    These are checks that you wrote to Mr. Motovich throughout the years?

A    Yes, but -- the building whatever is written there by pen, is not me.

     MR. POLEMENI:  I move into evidence Government Exhibit 740, Your Honor.

     THE COURT:  740.

     Any objection?

     MR. JACKSON:  No objection, Judge.

     THE COURT:  Admitted.  You may publish.

     (Government's Exhibit 740 was received in evidence.)

     (Exhibit published.)

Q    So, Mr. Adamou, if we could take a look at the first page of Government Exhibit 740.  Is that your company on the top, Lithos Marble Works?

A    Yes.

Q    And is the check issued to a company called

**J.A. 728**

Adamou - direct - Mr. Polemeni       1973

SGS Construction Building?

A    Yes, Inc.

Q    Thank you.  Construction Inc. Building.  Is the check for the amount of $14,000?

A    Yes.

Q    Is this one of the companies that Mr. Motovich would have you write checks to?

A    Yes.

Q    Is that your signature on the bottom right?

A    Yes.

Q    And do you see where it says, in the "for" line, who is -- what does it say there?

A    Subcontractor.

Q    Did you write that or type that?

A    Yes.

Q    Why did you do that?

A    It shows that this construction, whatever company, did work for us as a subcontractor.

Q    Is that true?

A    No.

Q    SGS Construction Inc. --

A    Yes.

Q    -- did it ever do work for you as a subcontractor?

A    No.  No.

          THE COURT:  You have to wait until he finishes the

Adamou - direct - Mr. Polemeni       1974

question to answer.

          Put the question again and we'll get the answer.

Q    Did SGS Construction Inc. Ever do work for Lithos Marble?

A    No.  No.

Q    Thank you.  So you brought this check for $14,000 to Mr. Motovich and what did he give you in return?

A    He would keep his four percent he was charging, he would give me the rest, whatever amount it is.

          MR. POLEMENI:  If we can go to page 19 of this exhibit, please.

Q    Is this another check that you wrote to SGS Construction?

A    Yes, sir.

Q    And is this date August 1st -- is this the check dated August 1st, 2012?

A    Yes, sir.

Q    For the amount of $16,000?

A    Yes, sir.

Q    Do you see the posting date on top, what does it say there?  What's the date?

A    Zero one, August 2012.

Q    August 1st, 2012?

A    Yes.

Q    And you also wrote, again, sub C in the bottom?

Adamou - direct - Mr. Polemeni       1975

A    Yes.

          MR. POLEMENI:  Go to page 29, please.  Scroll down.

Q    Is this another check to SGS Construction?

A    Yes.

Q    For $12,000?

A    Yes, sir.

Q    Is that your signature?

A    Yes.

          MR. POLEMENI:  Go to page 32, please.

Q    Is this another check, Mr. Adamou, to SGS Construction?

A    Yes.

Q    For $11,500?

A    Yes, sir.

Q    March 13, 2013?

A    Yes.

          MR. POLEMENI:  Ms. Kannan, if we can put this page, 33, side-by-side, with page 35.

Q    Now, you mentioned this company Ago & Alaudin, correct?

A    Yes.

Q    Was this another company that Mr. Motovich had you write checks to?

A    Yes.

Q    So, page 33, on the left, it's typed out, the name; is that correct?

Adamou - direct - Mr. Polemeni       1976

A    Yes.

Q    Did you -- did you write -- type out that name?

A    Yes.

Q    Page 35, the check that's written out to Ago & Alaudin, whose handwriting is that?

A    It's not mine.  Only the -- the signature is mine.

Q    The signature is yours but the handwriting on the check is not?

A    No.

Q    Would there be times when you would give Mr. Motovich a check for him to fill out?

A    Yes.  There were times that he wasn't sure, he didn't know when -- what company should write it.  I -- I left it there blank and he would fill it out.

Q    Do you see that in the memo line there's no -- there's nothing written there, sub C is not written there.  Why is that?

A    Because I didn't write it.  I just, you know, left the blank check with my signature.

          MR. POLEMENI:  If we can go to page 53, please.

Q    And the last check we saw was dated March of 2013 -- April of 2013, I believe.  This is about a year later? April of 2014?

A    Yes.

Q    And you're still using the company Ago & Alaudin?

**J.A. 729**

Adamou - direct - Mr. Polemeni          1977

A   Yes.

MR. POLEMENI:  Can we go to page 65, please.

Q   Is this check from Lithos to Ago & Alaudin General Construction Corp.?

A   Yes.

Q   Is the amount of the check $42,550?

A   Yes.

Q   Is this one of the checks you gave to Mr. Motovich?

A   Yes.

Q   Is that your handwriting?

A   No.  Only the signature is mine.

MR. POLEMENI:  If we can go to page 83.

Q   Is this about a year later, May 2015?

A   Yes.

Q   And still using the company Ago & Alaudin?

A   Yes, sir.

Q   And this check is for $20,000?

A   Yes.

MR. POLEMENI:  Can we go to page 110, please.

Q   The date of this check is December 24, 2015?

A   Yes, sir.

Q   You're still using Ago & Alaudin?

A   Yes.

Q   This check is for $16,000?

A   Yes.

Adamou - direct - Mr. Polemeni          1978

Q   How often would you go and bring a check to Mr. Motovich?

A   Once a week, usually the end of the week, Fridays.

Q   Fridays.  And that's when you would pay your workers?

A   Yeah, when the payroll.

MR. POLEMENI:  If we can go to page 118, please.

Q   Is this another check dated February 29, 2016 for $25,000?

A   Yes, sir.

Q   Made out to Ago & Alaudin?

A   Yes.

MR. POLEMENI:  Page 119, please.

Q   So we just saw that last check was in February of 2016; is that correct?  If we go back.  And then the following check is now to a different company, ZKC NYC Inc.  Do you see that?

A   Yes.

Q   Is this another one of the companies that Mr. Motovich told you to write checks to?

A   Yes, but I didn't write the -- the company name.

Q   On this check, that's -- that's not your handwriting?

A   No.

Q   So, is that your signature?

A   Is my signature and the 18,000 is mine, is my writing.

Q   But where it says, ZKC NYC Inc., that's not yours?

Adamou - direct - Mr. Polemeni          1979

A   No.

Q   Do you see the date of the check, it's April 1st, 2016?

A   Yes, sir.

Q   Do you recall any times when Mr. Motovich told you that he was having problems with a company?

A   Yes.  I remember once he got --

Q   What did he tell you?

A   Some kind of problem with one of the owner of a company and it was a time he -- he asked me to pause for a little time so I don't know what was the problem, he never told me what exactly but he got a problem with someone.

Q   The date is April 1st of 2016?

MR. POLEMENI:  If we can go to the transit line.

Q   Do you see where it says transit?

A   Yes.

Q   What's the date there?

A   I --

Q   Does it say April 20 --

A   Four 20, 2016.

Q   April 20, 2016?

A   Yes, sir.

MR. POLEMENI:  If we can pull up 120, please -- page 120.

Q   Do you see this next check is also to ZKC NYC?

A   Yes.

Adamou - direct - Mr. Polemeni          1980

Q   And what's the date of this check on top?

A   Four 19 -- 2016.

Q   What's the amount?

A   27,000.

Q   Whose handwriting is on this check?

A   Mine, except the company.

Q   So you signed the check?

THE COURT:  You have to say yes or no.

THE WITNESS:  Sorry.

A   Yes.

Q   And then you wrote in 27,000?

A   Yes, sir.

Q   And you wrote in sub C?

A   Yes.

Q   But the, pay to the order, where it says ZKC NYC Inc., that's not your handwriting?

A   No.

Q   And do you see where it says transit, what's the date listed there?

A   Four 20, 2016.

Q   The same date we saw on the previous check where it said transit; is that correct?

A   Yes, sir.

MR. POLEMENI:  If we can go to page 158.

Q   This is about a year later; is that right, Mr. Adamou?

J.A. 730

Adamou - direct - Mr. Polemeni          1981

A    Yes, sir.

Q    And this check is also made out to ZKC NYC Inc?

A    Correct.

Q    In the amount of $25,000?

A    Yes.

Q    Whose handwriting is on this check?

A    Mine, except where it says the company name.

MR. POLEMENI:  Go to page one sixty nine.

Q    Is the date of this check August 7, 2017?

A    Yes, sir.

Q    Is the check written out to a company called ZKC NY?

A    Yes.

Q    Whose handwriting is on this check?

A    It's not mine --

Q    You signed it?

A    Yes.

Q    But everything else is someone else's handwriting?

A    Yes.  I'm trying to see it but, you know, the -- the amount -- the number, if it's mine, could be mine but the rest, it's -- it's -- it's -- no, it's not mine, only the signature.

MR. POLEMENI:  Can we go to page 172, please.

Q    Is this check dated February 16, 2018?

A    Yes, sir.

Q    It's made out to a company called Midwood Building

Adamou - direct - Mr. Polemeni          1982

Corp; is that right?

A    Yes, sir.

Q    Is this another one of the companies that Mr. Motovich made you write checks to?

A    Yes, sir.

Q    Do you see where it says, supplies?

A    Yes.

Q    Is that your handwriting?

A    Yes.

Q    And do you -- and that's your signature, correct?

A    Yes.

MR. POLEMENI:  If we can go to page 187.

Q    Is this another check to Midwood Building Corp.?

A    Yes, sir.

Q    Dated November 6, 2018?

A    Yes.

Q    In the amount of $16,500?

A    Yes.

Q    Who wrote supplies?  Do you know?

A    I did.

Q    Do you know why you started -- you wrote supplies instead of sub C?

A    Because the name, it says building, Midwood Building, so I can say I bought supplies.

Q    And when you say you can say you bought supplies, who

Adamou - direct - Mr. Polemeni          1983

are you going to say that to?

A    My accountants.  I mean, they would ask, what this is just check, or they -- they would ask what about the other, you know, companies that you write subcontractor, what is their insurance, you know, certificates.  So I had to get certificates from David, insurance.  And for this, I would say it's supplies.  It's Midwood Lumber.

Q    Midwood Building?

A    Building supplies, whatever.

Q    Did you -- in the period of time that we just saw from 2011 through 2018 where you were going to Mr. Motovich once a week to bring him a check, did you ever give the checks that you brought to anyone else?

A    What do you mean anyone else?

Q    Anyone else other than Mr. Motovich?

A    There were a couple of times that I -- we went across the street where is the cashing of -- check-cashing business, I would -- I went there a couple of times by myself and I went few times with David.

Q    Okay.

A    Over there.

Q    And we'll get to that.  I'm going to show you Government Exhibit 12 in evidence.

A    Okay.

Q    Do you know who this is?

Adamou - direct - Mr. Polemeni          1984

A    I don't.

Q    How about Government Exhibit 20?

MR. POLEMENI:  If you can pull that up, please.

Q    Do you know who this is?

A    No.

MR. POLEMENI:  Government Exhibit 19, if we can pull that up.

Q    Do you know who this is?

A    No.

Q    So you just mentioned, Mr. Adamou, that sometimes you would go across the street to the payroll place; is that right?

A    Yes.

Q    When would that happen?

A    I mean, David would tell me, you know, go bring it across the street.  Or couple of times, I don't remember how many times, I went, we work -- we walked across the street with David.

Q    Okay.

MR. POLEMENI:  If we could pull up Government Exhibit 300, please.

Q    What's Government Exhibit 300?

A    This is the entrance for the cashing checks cashing.

MR. POLEMENI:  And if we can pull up Government Exhibit 301.

J.A. 731

Adamou - direct - Mr. Polemeni          1985

Q    What's this?

A    This is the lounge.  The end of the walkway in this place, the cashing -- check-cashing, on the left it was a little lounge place.

MR. POLEMENI:  Can we pull up Government Exhibit 302.

Q    What's this?

A    It was on the right at the end of the walkway, I think it was David's office.

Q    Why did you think it was David's office?

A    Because we went there a couple of times.  This is where I would -- we would wait until they -- they get us the cash, you know, the people in the front.

Q    Would you give the check to anyone here or would you give it to Mr. Motovich?

A    No, to David.

Q    Did you ever -- did Mr. Motovich ever send you or tell you to go to a bank to pick up money?

A    Yes.

Q    Tell us about that?

A    Once.  It was in Brooklyn.  I don't remember what -- what place.  To go and see a lady of the bank.

Q    Can you describe the lady you met?

A    It was an African American woman.  I went there and she had an envelope of cash.

Adamou - direct - Mr. Polemeni          1986

Q    Do you recall what you said to her when you got there?

A    No.

Q    Did it seem like she knew why you were there?

A    Yes.

Q    Now, Mr. Adamou, you've pled guilty to payroll tax evasion, correct?

A    Yes, sir.

Q    And you're cooperating with the Government?

A    Yes.

Q    You've entered into a cooperation agreement with the Government; isn't that right?

A    Yes.

MR. POLEMENI:  If we can pull up Government 3500-PA-2.

We'll do it later.

Q    Why are you cooperating with the Government?

A    In hope that I -- I stay out of jail.

Q    What do you have to do -- what are your obligations under the agreement with the Government?

A    To tell the truth.

Q    Do you know what your sentence will be?

A    I don't remember.  I think it was five years minimum.

Q    Well, is it five years maximum?

A    Or maximum, I don't remember, sorry.

Q    It's okay.  Has anyone told you what your sentence will

Adamou - direct - Mr. Polemeni          1987

be?

A    No.

Q    Who decides your sentence?

A    The judge.

Q    Does the Government decide your sentence, Mr. Adamou?

A    No.

Q    Has the Government made you any promises as to what your sentence will be?

A    Nobody has promised me anything.

Q    Did you know what you were doing was illegal, Mr. Adamou?

A    Yes.

Q    Why did you do it?

A    Why did I do it.  Convenience.  If you go to this cashing check, you know, stores, I will ask them for $20,000, you have to fight, I mean, fill out forms and everything.  I know David, you know, charge more, you know, double of -- I don't know how much more than these people, but it was easier.  It was convenient.  He would provide, you know, the certificate of insurance.  And then there is times that you feel untouchable.  Nobody can touch you. Nobody -- you just go and say I'm good.  Invisible.  Nobody would find out what I'm doing.

(Continued on the following page.)

Adamou - Direct - Polemeni          1988

Q    If you went to Mr. Motovich no one would find out what you were doing?

A    That's what I thought and it was wrong.  I made a mistake.

Q    Are you now paying employees?

A    Yes, I do everything by the book.

Q    You're reporting all your wages?

A    Yes, sir.

Q    How has your business been impacted by now paying your employees in check?  Do you file a W-2 as well now?

A    Yes.

Q    Reporting the full wages?

A    Yes.

Q    Paying the full taxes?

A    I have ADP, that payroll company.  Whatever they ask me, weekly.  And the impact, I lost people, good people, good workers because they didn't want -- they wanted to be paid by cash.  Yes, I lost some of those, and then Covid-19 came and we didn't recover yet.  We're not where we're supposed to be since before the Covid.

But the impact for my paying cash, I mean checks, the work is more.  We're getting back from Covid-19 business.

Q    You said that some employees have left?

A    Yes.

Q    Have some employees stayed?

**J.A. 732**

Adamou - Direct - Polemeni                    1989

A    Yes.

Q    Now that you're reporting all your wages and complying with the tax laws, how do you feel?

A    Relief.

Q    What do you mean?

A    I feel good.  I feel good and I sleep at night.

Q    Was David Motovich your business partner?

A    Business partner?

Q    Yes.

A    No.

Q    You had your business license, right?

A    Yes.

Q    And he had his businesses?

A    Yes.

Q    If we could pull up 3500 PA-2, please.  What is this, Mr. Adamou?

A    The cooperation agreement.  It's a cooperation agreement.

Q    Your cooperation agreement?

A    Yes.

MR. POLEMENI:  The government offers Government 3500 PA-2.

THE COURT:  Any objection?

MR. JACKSON:  No, Your Honor.

THE COURT:  It's admitted.  You may publish.

(Government's Exhibit 3500 PA-2 was received in

---

Adamou - Direct - Polemeni                    1990

evidence.)

(Exhibit published.)

Q    It says you've pled guilty to 26 U.S.C. 7202.  Is that payroll tax evasion, Mr. Adamou?

A    Yes.

Q    And that you face a maximum term of imprisonment of five years; is that right?

A    Yes, sir.

Q    And a minimum term of imprisonment of zero years?

A    Yes, sir.

Q    If you could turn to the next page, please.  If you could go to the restitution.  Do you see there, Mr. Adamou, where it says restitution?

A    Yes.

Q    And that you've agreed to pay $849,000 and a little change?

A    Yes.

Q    To the IRS?

A    Yes.

Q    And that some of that amount represents amounts that you owe in payroll tax liability; is that right?

A    Yes, sir.

Q    503,000 and a little change?

A    Yes.

Q    And the rest is amounts you owed, about $296,000 and a

---

Adamou - Direct - Polemeni                    1991

little change for failure to pay personal income taxes; is that correct?

A    Yes, sir.

Q    Did you use some of the cash that you received from Mr. Motovich not only to pay your workers, but also for your own personal spending?

A    There is one amount, yes.

Q    If we could look at the footnote at the bottom of page 2.  Have you paid $250,000 to the IRS towards your restitution?

A    Yes, sir.

MR. POLEMENI:  You can take that down.

Q    How would you communicate with Mr. Motovich?

A    The phone or text.

Q    Have you been shown some text messages between you and Mr. Motovich prior to your testimony here today?

A    I'm sorry?

Q    Have you been shown text message communications between you and Mr. Motovich prior to your testimony here today?

A    Yes.

Q    I'm going to show you Government's Exhibit 1202, not in evidence.

THE COURT:  Any objection to 1202?

MR. JACKSON:  No objection, Judge.

THE COURT:  You may publish.  It's admitted.

(Government's Exhibit 1202 was received in

J.A. 733

---

Adamou - Direct - Polemeni                    1992

evidence.)

MR. POLEMENI:  Would this be a good time for a break, Your Honor?

THE COURT:  How much longer do you have with this witness?

MR. POLEMENI:  A while.

THE COURT:  Let's take our 15 minute break and we'll continue to have our hard stop at 5:00.  Do not talk about the case.  We're getting there.

(Jury not present.)

THE COURT:  You may step down, sir.  Please wait outside and come back after the 15-minute break.  Do not talk with anyone about the case during break.

The jury has left the courtroom and the witness is leaving the courtroom.  When he leaves, I'll ask counsel, you may be seated now, if you have anything to discuss outside of the presence of the jury?

MR. PAULSEN:  No, Your Honor.

THE COURT:  Anything, n defense?

MR. JACKSON:  No, Your Honor.

THE COURT:  Sure?

MR. JACKSON:  I'm positive.

THE COURT:  Is your colleague positive?  I got a look that said maybe there was something.

MR. JACKSON:  The table gets smarter in this

Adamou - Direct - Polemeni        1993

direction.  So I'll check.

THE COURT:  They're always smarter, like the ones that are sitting in front of us like my law clerks and court deputies.  We'll take our 15 minutes and have a hard stop at 5:00.  Thank you.

(Recess taken.)

THE COURT:  Do we have any issues, timing issues or otherwise, that we need to address before we bring the jury in?

MR. POLEMENI:  Judge, it's now 4:35.  I think I'll be able to get to five without the recording coming up.  I just wanted to make sure.

THE COURT:  We'll go to 5:00.  We're not going to go past 5:00.  It's a hard stop.

MR. POLEMENI:  So if I get to 4:57 --

THE COURT:  You can stop at 4:57 and do the recording tomorrow.  The jury is going to be back tomorrow either way.  That's not going to be an issue in terms of time. If you want to stop a few minutes before 5:00, that works too. Anything else?

MR. POLEMENI:  No.

THE COURT:  From the defense, anything?

MR. JACKSON:  No, Judge.

THE COURT:  Mr. Scott, we can get the jury in. Thank you.  You can get the witness now and have him come back

---

Adamou - Direct - Polemeni        1994

to the stand.

(Witness resumes stand.)

(Jury present.)

THE COURT:  As you see, the candyman has made two trips today.  We appreciate your attention.  We're going to continue to have a hard stop at 5:00, as I pointedly reminded counsel a few minutes ago.

Did you speak to anyone about your testimony when you were off the stand?

THE WITNESS:  No sir.

THE COURT:  Please continue.

BY MR. POLEMENI:

Q    We were about to look at text messages between you and Mr. Motovich.  If you could pull up Government 1202, please.

THE COURT:  It's in evidence.  You may publish.

Q    The participants, Mr. Adamou, is that you?  Phillip TM Marble, is that your phone number?

A    Yes.

Q    If we could go to page four, please.  Do you see that there's an attachment at the top there, Mr. Adamou, sent by Mr. Motovich?

A    Yes.

Q    And I'm going to show the witness Government Exhibit 12012-A, which is not in evidence.  1202-A.  Are these attachments that were to some of the text messages, Mr.

---

Adamou - Direct - Polemeni        1995

Adamou?

A    Yes.

MR. POLEMENI:  The government moves into evidence Government's Exhibit 1202-A with, Your Honor, with the caveat that just defense counsel and I just had a conversation.  We will be redacting two of the attachments, but I don't plan to show them here today.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

MR. POLEMENI:  Thank you, Judge.

(Government's Exhibit 1202-A was received in evidence.)

BY MR. POLEMENI:

Q    What is 1202-A, Mr. Adamou, this page?

A    This is sample of a tile.

Q    Did Mr. Motovich ask you to get tiles for him?

A    Yes, for his pool area in his apartment.

Q    Did you?

A    Yes, I did.

Q    Show the witness Government's Exhibit 154, please, not in evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  It's admitted.  You may publish.

---

Adamou - Direct - Polemeni        1996

(Government's Exhibit 154 was received in evidence.)

Q    What is Government's Exhibit 154, Mr. Adamou?

A    This is an invoice.

Q    For what?

A    For the tile, 12 by 24, blue wood tile.

Q    Blue wood, 12 by 24, honed tiles?

A    Yes, 1800 square feet.

Q    If we could go to the next page, Ms. Kannan.  What is the date of the invoice?

A    3-21-2017.

Q    Ms. Kannan, if we could pull up Government's Exhibit 312, which is in evidence.  Government 412.

Do you see the tiles there, Mr. Adamou?

A    Yes, sir.

Q    Are those the tiles you purchased for Mr. Motovich?

A    Yes, sir.

Q    You can take that down.  He paid you for those tiles, correct, Mr. Adamou?

A    Yes, he did.

Q    Ms. Kannan, if we could go to page 12029, please.  And the bottom text.

Do you see that text message, Mr. Adamou, which is dated May 24, 2017?

A    I don't see anything.

Q    Oh, this is in evidence.  Sorry.

J.A. 734

*Adamou - Direct - Polemeni*　　1997

THE COURT: Any objection?

MR. JACKSON: No objection.

THE COURT: You can publish.

Q    It's the bottom email, the bottom text message. Do you see that?

A    Yes, sir.

Q    Do you write to Mr. Motovich: Yes, I just wanted to thank you for the ins certificate. Is that insurance certificate?

A    Yes.

Q    And ask if I can see you tomorrow. Do you see that?

A    Yes.

Q    And the date is May 24, 2017?

A    Yes.

Q    What are you thanking Mr. Motovich for?

A    For the insurance certificate.

Q    What do you mean?

A    That he provided.

Q    What do you mean by that?

A    He was giving us -- we had to have insurance certificate that when we have audit we show that the subcontractor did work for us. You need the certificate of insurance.

(Continued on next page.)

---

ADAMOU - DIRECT - MR. POLEMENI　　1998

(Continuing.)

MR. POLEMENI: And Ms. Kannan, if we can go to Government Exhibit GX 1137, please, not in evidence.

THE COURT: Any objection?

MR. JACKSON: No objection, Judge.

THE COURT: You may publish.

(Government's Exhibit 1137 was received in evidence.)

(Exhibit published.)

Q    Do you see this e-mail, Mr. Adamou from Lithos Marble Work to your company to ZKCNYInc@Gmail.com?

A    Yes.

Q    What's the date of e-mail?

A    5/22/2017.

Q    Two days before you just sent that text message?

A    Yes.

MR. POLEMENI: And if we can go back out, Ms. Kannan.

Q    Do you see the bottom e-mail?

A    Yes.

Q    Do you know who Marina K. Is?

A    Marina, it was the bookkeeper, I would say, over there.

Q    At Midwood?

A    Yes. David office.

Q    And then Ms. Marina K. Is sending an e-mail to ZKC NY,

---

ADAMOU - DIRECT - MR. POLEMENI　　1999

Inc. Do you see that?

A    Yes.

MR. POLEMENI: If we go to the top of the next e-mail up above.

Q    And then she forwards a message to be LithosNY2?

A    Yes.

Q    Is that an e-mail address that you used?

A    Yes, sir.

MR. POLEMENI: If we can go back up.

Q    Tota Adamou, who is that?

A    My wife.

Q    She writes, Hi Marina. We need the BP Cooling as soon as possible. Can you please send it to us.

What was your wife asking there?

A    Insurance certificate.

Q    Was BP Cooling one of the companies that you wrote checks to?

A    Yes, sir.

MR. POLEMENI: And if we can go to Government Exhibit 138, not in evidence.

THE COURT: Any objection to 138?

MR. POLEMENI: 1138, I'm sorry.

THE COURT: Any objection?

MR. JACKSON: 1138, no objection, Judge.

THE COURT: 1138 admitted.

---

ADAMOU - DIRECT - MR. POLEMENI　　2000

(Government Exhibit 1138 was received in evidence.)

(Exhibit published.)

Q    So we just saw the e-mail that we just looked at was on May 22nd; is that right?

A    Yes, sir.

Q    This e-mail is dated May 23rd; is that correct?

A    Yes, sir.

Q    It's from Marina K. To LithosNY2@AOL.com?

A    Yes, sir.

MR. POLEMENI: And if we can go to the attachment, please.

Q    What was attached to this e-mail?

A    Certificate of insurance.

Q    And if you look at the insured box, who is insured?

A    BP Cooling I-N-C.

MR. POLEMENI: And if we go down, Ms. Kannan, to the certificate holder.

Q    Who is the certificate holder?

A    Lithos Marble Works I-N-C.

Q    Your company?

A    Yes.

Q    Did BP Cooling do any work for Lithos Marble Works?

A    No.

MR. POLEMENI: If we go to Government Exhibit 1140, not in evidence.

**J.A. 735**

ADAMOU - DIRECT - MR. POLEMENI          2001

THE COURT:  Any objection to its admission.

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1140 was received in evidence.)

(Exhibit published.)

Q    Is this an e-mail from Marina K. To LithosNY2@AOL.com?

A    Yes, sir.

Q    And is the date May 23rd, 2017?

A    Yes, sir.

Q    The same date as the prior e-mail we just looked at?

A    Yes, sir.

MR. POLEMENI:  If we could look at the attachment, please.

Q    What's the attachment, Mr. Adamou?

A    Certificate of insurance.

Q    Who is the insured?

A    Ago & Alaudin General Contracting Corp.

MR. POLEMENI:  And if we go down to the bottom where it says, certificate holder.

Q    Who is the certificate holder?

A    Lithos Marble Works I-N-C.

Q    Did Ago & Alaudin General Contracting Corp. Ever do work for Lithos Marble Works?

A    No.

MR. POLEMENI:  If we go back up to producer, please.

---

ADAMOU - DIRECT - MR. POLEMENI          2002

Q    Who is the producer of the certificate?

A    I have no idea.

Q    Well, what does it say?

A    Vukel Group Insurance Agency.

Q    And have you no idea who that is, right?

A    No.

Q    When you received these certificates, did you believe that they were legitimate certificates?

A    Yes.

MR. POLEMENI:  If we go back to Government's Exhibit 1202, Page 11, please.  And look at the top text message.

Q    Do you see where you say, Good morning, David, can I come in an hour?

A    Yes, sir.

Q    What's the date of the text message?

A    6/2/2017.

Q    June 2nd, 2017?

A    Yes.

MR. POLEMENI:  If we can go to Government Exhibit 744, 164, Page 164.  744, Page 164.

Q    What is this, Mr. Adamou?

A    It's a check with my signature.

Q    And the date is June 1st, 2017?

A    Yes.  But this is not my writing, only the signature.

---

ADAMOU - DIRECT - MR. POLEMENI          2003

MR. POLEMENI:  Can we go back to Government's Exhibit 1202-014.  And go to the top text message.

Q    Sir, is that a text message from you, Mr. Adamou, dated June 29th, 2017?

A    Yes.

Q    And you write to Mr. Motovich, I am on my way then?

A    Yes, sir.

Q    He says, Okay, after 1?

A    Yes, sir.

Q    Were you asking, can I bring you a check?

A    Yes.

MR. POLEMENI:  If we can go to Government's Exhibit 740-167.  And I'm sorry, if we can go back to 741 -- 1202-014.

THE COURT:  May I have the number again, please.

MR. POLEMENI:  1202-014.

THE COURT:  In evidence?

MR. POLEMENI:  Yes.

THE COURT:  All right.  You may publish.

(Exhibit published.)

MR. POLEMENI:  And if we can go to that -- if we can blow that all up, the first half of the page.

Q    You see there's an, okay, and then there's a second text message from Mr. Motovich to you, it says, after 1?

A    Yes, sir.

---

ADAMOU - DIRECT - MR. POLEMENI          2004

Q    It was sent on July 6th, 2017; is that right?

A    Yes.

MR. POLEMENI:  Now if we can go back to Government's Exhibit 740-167.

Q    Is that a check dated that same day, July 6th, 2017?

A    Yes, sir.

Q    From Lithos to ZKC NY?

A    Yes, sir.

Q    In the amount of $8,510?

A    Yes, sir.

MR. POLEMENI:  If we can go to Government's Exhibit 1202-028, please.  If we go to the top text message.

Q    You see there's a text message from Mr. Motovich to you dated January 11th, 2018?

A    Yes.

Q    And he says, I'm sending you new name.

A    Yes.

Q    What did Mr. Motovich mean by that?

A    New company.

Q    A new company for you to write checks to?

A    Yes.

Q    And you write, Good?

A    Yes, sir.

Q    And then you also write the following day, Good morning, David.  Can you hold the check until Monday?  Thank you very

**J.A. 736**

ADAMOU - DIRECT - MR. POLEMENI          2005

much.

What were you asking there?

A    To hold the check for day or two because the funds were not available.  Sometimes I would get the check and, you know, I wait to clear.  So I would ask him to hold it for a couple of days, one day, three days, two days, and he would do it.

Q    How often would that happen?

A    Not very often.  Few times it happened, yes.

Q    A few times over the course of eight years?

A    Yes.

MR. POLEMENI:  If we can go to Government's Exhibit 74 -- I'm sorry, Government's Exhibit 1202-032.

You can blow up those top two text messages please.

Q    Is that a text message on the top from David Motovich to you dated February 15th, 2018?

A    Yes, sir.

Q    Hi.  I'm in the city later today if you want or tomorrow, and you respond, tomorrow morning; is that correct?

A    Yes, sir.

Q    And he says, Okay, see you tomorrow?

A    Yes.

MR. MAZUREK:  And if we can go now to Government's Exhibit 740-141, please.  141.  Try 171.

I can't read my own handwriting sometimes.  No, it's not that either.  We'll go back to that.

---

ADAMOU - DIRECT - MR. POLEMENI          2006

If we go to Government's Exhibit 1202-033.  The top two text messages, please.

Q    You write, Should I come now?  It's dated February 22nd, 2018; is that right?

A    Yes, sir.

Q    And then Mr. Motovich says, 11:30?

A    Yes, sir.

Q    What are you asking there?

A    To bring a check.

Q    Mr. Adamou, you mentioned that you would go to Midwood Lumber to drop off checks.

Would you also go to Mr. Motovich's apartment in Manhattan?

A    Yes.  On 57 and 2nd, which is the front of the building or sometimes behind the building.  He would come downstairs outside and bring me the money.  I never went upstairs to get the money.  He would come outside.  On Fridays, usually.

Q    So you would go to his apartment in Manhattan.

Would you wait outside in the car?

A    Yes, sir.

Q    And he would bring down cash?

A    Yes, sir.

Q    And give it to you?

A    Yes, sir.

Q    How often did that occur?

---

Proceedings          2007

A    Fridays, he wouldn't go to Brooklyn and he would ask me to, you know, meet him in the city at his apartment.

THE COURT:  And speaking of meeting in the city, and speaking of 5:00 o'clock, which no one was, but it now is 5:00 o'clock, we're going to adjourn for the day.  Do not talk with anyone about your testimony.  We'll see here tomorrow at 9:30 in the morning.  Ladies and gentlemen, have a good evening, and we'll you tomorrow at 9:30.

We are in the home stretch.  We're adjourned for the day.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Jury exits the courtroom.)

THE COURT:  Thank you, sir.  You may step down.  Have a good evening.  We'll see you tomorrow at 9:30 and finish your testimony.

THE WITNESS:  Thank you.

THE COURT:  Thank you.

You maybe seated, ladies and gentlemen.

The jury has left the courtroom.  The witness is in the process of leaving the courtroom.

(The witness exits the courtroom.)

THE COURT:  And when he does, I will ask the question, are there any issues we need to address in the absence of the jury and in the absence of the witness, beginning with the Government?

**J.A. 737**

---

Proceedings          2008

MR. PAULSEN:  Not an issue, Your Honor, but just to reaffirm, the Government will endeavor to see if Mr. Zwerman can come on Tuesday, and we will find out tonight and report back to Your Honor in the morning.

THE COURT:  Thank you.  Anything else for the Government?

MR. PAULSEN:  No, Your Honor.

THE COURT:  Anything else from defense counsel?

MR. JACKSON:  No.  Thank you, Judge.

THE COURT:  All right.  Have a good evening, everyone.  I'll see you tomorrow at 9:30.

*    *    *    *    *

(Proceedings adjourned at 5:01 p.m. to resume on July 19, 2024 at 9:30 a.m.)

2009

INDEX

WITNESS                                                    PAGE

DANNETTE SULLIVAN-HYATT

  CROSS-EXAMINATION BY MR. JACKSON            1812

  REDIRECT EXAMINATION BY MR. PAULSEN:        1829

YISROEL LESHKOWITZ

  DIRECT EXAMINATION BY MR. SKURNIK:          1838

  CROSS-EXAMINATION BY MR. MAZUREK            1857

  REDIRECT EXAMINATION BY MR. SKURNIK:        1861

RICHARD KIER

  DIRECT EXAMINATION BY MR. PAULSEN:          1870

  CROSS-EXAMINATION BY MR. JACKSON            1887

  REDIRECT EXAMINATION BY MR. PAULSEN:        1894

THEODORE VLAHAKIS

  DIRECT EXAMINATION BY MR. POLEMENI:         1897

  CROSS-EXAMINATION BY MS. LAYDEN             1912

JONATHAN MILLER

  DIRECT EXAMINATION BY MR. PAULSEN:          1936

  CROSS-EXAMINATION BY MR. JACKSON            1952

  REDIRECT EXAMINATION BY MR. PAULSEN:        1960

PHILIPPOS ADAMOU

  DIRECT EXAMINATION BY MR. POLEMENI:         1963

2010

EXHIBITS

Government's Exhibit GX-19                                    1816

Government's Exhibits 700, 700-A, B, D, F,
G, H, I, J, K, L, M, O, P, Q, S, T, U, V and
700-W                                                        1871

Government's Exhibit 236                                      1900

Government's Exhibit 253                                      1906

Government's Exhibit 249                                      1906

Government's Exhibit 250                                      1907

Government's Exhibit 251                                      1908

Government's Exhibit 252                                      1909

Government's Exhibits 300 through 308 and
its subcategories .1, .2, and .3                              1938

Government's Exhibit 441                                      1941

Government's Exhibit 740                                      1972

Government's Exhibit 3500 PA-2                                1989

Government's Exhibit 1202                                     1991

Government's Exhibit 1202-A                                   1995

Government's Exhibit 154                                      1996

Government's Exhibit 1137                                     1998

Government Exhibit 1138                                       2000

Government Exhibit 1140                                       2001

2011

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,     : 21-CR-00497(WFK)
                              :
                              :
     -against-                : United States Courthouse
                              : Brooklyn, New York
                              :
                              : Friday, July 19, 2024
DAVID MOTOVICH,               : 9:30 a.m.
                              :
          Defendant.          :
- - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT JUDGE, and a Jury

A P P E A R A N C E S :

For the Government: BREON PEACE, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
               BY:  ROBERT POLEMENI, ESQ.
                    ERIK D. PAULSEN, ESQ.
                    ANDREW GRUBIN, ESQ.
                    MATTHEW C. SKURNIK, ESQ.
                    Assistant United States Attorneys

For the Defendant:  WACHTELL, LIPTON, ROSEN & KATZ
                    51 West 52nd Street
                    New York, New York 10019-6150
               BY:  RANDALL WADE JACKSON, ESQ.
                    JESSICA LAYDEN, ESQ.

**J.A. 738**

2012

A P P E A R A N C E S : (Continued.)

               MEISTER SEELIG & FEIN, LLP
               125 Park Avenue
               8th Floor
               New York, New York 10017
          BY:  HENRY E. MAZUREK, ESQ.

Court Reporter:  Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                 Official Court Reporter
                 Telephone: (718) 613-2487
                 Facsimile: (718) 613-2694
                 E-mail: Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

*Proceedings* 2013

(In open court.)

THE COURT: Call the case, please.

COURTROOM DEPUTY: Criminal cause on trial, 21-CR-497. United States of America David Motovich.

Attorneys state your name and spell it for the record.

MR. POLEMENI: Good morning, your Honor. Rob Polemeni. Eric Paulsen, Andrew Grubin, and Matthew Skurnik paralegal Kavya Kannan and FBI agent Christopher Cabane.

THE COURT: Good morning, Counsel.

MR. JACKSON: Randall Jackson Jessica Layden and Henry Mazurek on behalf of our client, David Motovich. We are joined by our technology specialist Andy Cepegi.

THE COURT: Let's begin with the scheduling issues that we talked about briefly yesterday. I'll hear first from the Government and then from defense counsel.

What is your understanding of where we are with respect to scheduling?

MR. POLEMENI: Thank you, Judge.

We reached out to the witness, Mr. Zwerman. He is unable to be here on Tuesday so he plans to be here on Monday. I think it's a moot point, Judge, because I think we will carry over until Monday with the rest of the witnesses.

THE COURT: How many witnesses and what witnesses

*Proceedings* 2014

do you envision calling today?

MR. POLEMENI: So we would intend to call David Unger. He is a very brief witness. He will be about ten minutes.

THE COURT: We have the witness that you are finishing up with today who is on the stand, right?

MR. POLEMENI: Correct. We're going to call Mr. Unger, if it's okay with the Court, and I believe the defense has no objection, call him first just to get him out of the way.

THE COURT: That's fine. No problem with that Mr. Jackson?

MR. JACKSON: No problem, Judge.

MR. POLEMENI: Then we have Mr. Adamou finishing up.

THE COURT: How long do you anticipate that taking on your examination?

MR. POLEMENI: 45 minutes to an hour.

THE COURT: Okay. And the cross. What would you anticipate ballpark in terms of length? About the same or longer or a little shorter?

MR. JACKSON: I think the total of this has been a couple hours. I expect to be less, Judge. I expect to be less than that.

THE COURT: Okay. And after that?

*Proceedings* 2015

MR. POLEMENI: Special Agent Cabane who is our summary witness.

THE COURT: Okay. How long do you envision that agent's testimony taking roughly?

MR. POLEMENI: Several hours.

THE COURT: Okay. So that you anticipate going into Monday?

MR. POLEMENI: We may be done with direct but --

THE COURT: I'm talking about all in. You're taking several hours on your examination.

MR. POLEMENI: Correct.

THE COURT: And cross? What do you anticipate, roughly; ballpark?

MR. JACKSON: I'm shocked that he's going to be several hours, Judge. But let me just say three hours then, Judge.

THE COURT: All right. So just, again, ballpark no one has a timer here. This isn't that kind of movie, bro as they say.

So that suggests to me that the possible snow day that we talked about on Monday for the jury has gone by the boards.

MR. POLEMENI: I think that's right.

THE COURT: So we're obviously going to have testimony with the jury here. Not just today but on Monday.

*Proceedings* 2016

So looking forward to Tuesday, it seems to me if the Government figures, I take it, that you will be able to complete your case, all things being equal, which they never are, on Monday; is that right?

MR. POLEMENI: Yes, Judge.

THE COURT: So then the question will become whether or not there is a defense case. If there is a defense case, I would anticipate that starting on Tuesday.

MR. JACKSON: Yes, your Honor.

THE COURT: Do you anticipate and, again, you don't have to put on a case, I want to make that very clear. You don't have to say anything at all.

Do you anticipate putting on a defense case?

MR. JACKSON: Yes, Judge.

THE COURT: So I would suggest that my original Nostradamus-like prediction for having the charge conference on Wednesday makes some sense because it looks to me that that's when we will be in a position to have the charge conference. And to say, as I think I indicated in the original order, that on that day, if it makes sense, we would have the jury come in later that day whether 11:00 or noon or something like that to have the charge conference in the morning. And we can start that at 9:00 rather than 9:30 and go through and you will have the opportunity, since we're going to stick our original promise to you, to send

J.A. 739

*Proceedings* 2017

you the Court 1, Court 2, and Court 3 documents at 5:00 o'clock today. So we will send those to you all electronically so you will have them in your computer, you can talk with your clients and review it between 5:00 o'clock tonight when you get it and the time we have the charge conference which we'll keep on track for Wednesday morning beginning at 9:00 or 9:30. And then that's the day I would anticipate telling the jury to come in a bit later because the charge conference, obviously, is going to take several hours.

Does that make sense in terms of general planning?

MR. JACKSON: Yes, your Honor.

MR. POLEMENI: Yes, your Honor.

THE COURT: So we will proceed on that basis.

Now, we got the scheduling issues addressed, is there anything else that we need to hear about before we bring in the jury from the Government?

MR. POLEMENI: No, your Honor.

THE COURT: Anything else we need to discuss with defense counsel?

MR. JACKSON: I think so, Judge.

THE COURT: Before we bring in the jury?

MR. JACKSON: Yes, Judge.

THE COURT: Go ahead.

MR. JACKSON: I anticipated that the Government

*Proceedings* 2018

was going to raise the question of the recording that they are seeking, I think, a sort of a reconsideration to admit.

This is the recording that your Honor ruled on in the motions in limine order. And, your Honor, this is initially they attempted to introduce this as inextricably intertwined evidence. It's a recording of a meeting between the current witness, Mr. Adamou, and Mr. Motovich that came after the witness was signed up as a cooperating witness. And after he made, at the prompting of the agents, several successive calls to Mr. Motovich to talk about advice about how to deal with this case.

In the recording, when Mr. Motovich meets with Mr. Adamou, the essence of it, some of the language is coarse, the essence of the call is he's saying to him, we can't have any substantive discussion unless you have a lawyer that is willing to meet with me and we can both meet with lawyers. I'm not trying to get in trouble for having a conversation with you without the presence of attorneys. And he does criticize the idea of a lawyer who wouldn't want to have such a discussion, but that's essence of the call. There's a bunch of little stuff.

The problem is it's exactly as your Honor analyzed and in reserving in part and then denying the Government's motion in part. The Court noted that this is not information that is inextricably intertwined with, or

*Proceedings* 2019

necessary, to complete the story of the indictment's witness tampering count.

Count Eighteen, as the Court observed, alleges that Mr. Motovich in or about January and June 2019 attempted to corruptly persuade Kemal Sarkinovic who we already heard about. The evidence against Mr. Sarkinovic that came in was, we think, didn't even rise to the level of the allegation in the indictment in terms of witness tampering.

So now what the Government is attempting to do is go back. The Court said it would reserve decision on the Government's request to other acts evidence under §404(b). And their §404(b) theory is very difficult here because, as the Court's order, I think, is getting at, we're talking about something that is happening after the core events of what is charged in Count Eighteen. They've had a cooperating witness who completely spelled that out. And now, they now want to introduce an entirely separate conversation that your Honor, I submit, is very confusing and introduces several confusing, both factual and legal questions, in what is already, I respectfully submit, an incredibly complicated case where the jury is going to have to deal with a lot of complicated issues.

One problem, and the reason that I think that the Court you saw yesterday brought in headphones that they want

*Proceedings* 2020

to use with the jury, is that this call is almost unintelligible. For months --

THE COURT: Let me stop you right there.

Is there a transcript it go along with the audio?

MR. POLEMENI: There are transcripts of the portions that we intend to play in front of the jury.

THE COURT: Share them with defense counsel.

MR. POLEMENI: Yes.

THE COURT: Mr. Jackson, are the transcripts accurate transcriptions of the audiotape.

MR. JACKSON: Yes and no, Judge.

THE COURT: Tell me the no part.

MR. JACKSON: Two parts to the no.

On the transcript itself, so much of the conversation is UI. I mean, the transcript itself says UI or unintelligible, for much of what is particularly unintelligible for much of what the cooperating witness is saying to Mr. Motovich. Other parts of it, because the UI is situated next to key language, we think that it sounds -- we think that what is being said is slightly different than what the transcript says.

But much of what they're able to get, we think is reflected, actually, the words that you can hear in the transcript, but it's very confusing.

And then that gets to my last legal issue with it,

J.A. 740

*Proceedings* 2021

Judge, because the §404(b) analysis is complicated by the lack of a clear conversation. But the case that we sent over to the Court, your Honor, this morning we sent to Mr. Scott.

THE COURT: Yes, the '21 case that Judge Jacobs decided with the dissent from Judge Sullivan.

MR. JACKSON: So, Judge, that case is getting at the idea that the Circuit was clarifying there is a very burden for the introduction of an entrapment defense in a case like this.

It is, I would submit, judge, extraordinarily rare. I never saw it in all my years as a prosecutor on §404(b) on a witness tampering charge, the Government is going to be introducing a witness' sort of sting operation where he is provoking an attempt to get the person to tamper with him. And then the person is saying, let's meet with lawyers, which creates a complicated legal issue.

And now, what it would require if we bring that in is on top of all the instructions of the Court I know is working very hard on we have to present the jury with an entire entrapment defense which is a complicated inquiry in any context but here it's even mother complicated because it jury not even going to be able to understand what this person was saying to Mr. Motovich. Because I mean Mr. Adamou, he speaks English well enough, but his accent

*Proceedings* 2022

already makes things different to hear. And so, on the conversation at some points, we don't know what the actual conversation is.

So, your Honor, we think for all those reasons, when you look at the fact that it is not direct evidence that the Court already found, it's not inextricably intertwined as the Court already found, it's completely unnecessary to prove up motive or intent or any of the other permissible purposes that the Government would have under §404(b). They just want to introduce it as pure propensity, and it's a very confusing propensity argument. And we have an unintelligible conversation largely. We have inducement by government agent that's going to require complicated additional entrapment issue which is already an 18-count indictment that has complex issues in it. We just think that on §401, §403, and §404(b), your Honor, this ultimately -- the game is not worth the candle.

THE COURT: Thank you. I'll hear from the government.

What is your response to what you just heard.

MR. POLEMENI: So, Judge, just to give you a sense of timing of what happened.

So as your Honor will recollect from Mr. Sarkinovic's testimony, he was stopped at the airport by agents in January of 2019. And, at that time, indicated, at

*Proceedings* 2023

least according to his testimony, that he wanted to cooperate with investigators. Relayed that information that information to Mr. Motovich. Mr. Motovich retained an attorney for him; that, at least according to Mr. Sarkinovic, Mr. Motovich paid for. And, as a result of that retention, Mr. Sarkinovic did not come to the U.S. Attorney's Office and cooperate and did not cooperate until he was ultimately indicted and found another attorney.

THE COURT: Right. So that testimony is already been presented to the jury, as I recall.

MR. POLEMENI: Yes.

THE COURT: Go ahead.

MR. POLEMENI: That's in January of 2019. In around the same time, we had been speaking to Mr. Adamou and he had proffered on a number occasions. Just to correct the record, he was not a cooperating witness at that time; he had not been signed up.

THE COURT: When did he become a cooperating witness in terms of signing the document?

MR. POLEMENI: Sure. Not until, I believe, certainly later, at least a year later.

THE COURT: Let's see if we can get a date on that so we got that clear.

MR. POLEMENI: It's either February 2020 or February 2021.

*Proceedings* 2024

THE COURT: Let's not guess, I mean, let's pull up the document. We got time.

(A brief pause in the proceedings was held.)

MR. POLEMENI: It was in February of 2021, Judge.

THE COURT: Go ahead.

MR. POLEMENI: And so, between January and, I believe, May of 2019, Mr. Adamou recorded conversations he had with Mr. Motovich on a couple of occasions. I believe either three occasions, I believe.

THE COURT: But he was not yet a cooperator.

MR. POLEMENI: That is correct.

THE COURT: All right. Go ahead.

MR. POLEMENI: During one of those conversations, which we hope to play today, Mr. Adamou goes to Mr. Motovich's office. He is sent with, by the agents, with two recording devices. One, his personal phone and another, a recording device that he has in his pocket.

And when he gets there, Mr. Adamou I believe will testify, that Ms. Gail Motovich, Mr. Motovich's sister, asks for his phone before he meets with Mr. Motovich. And so, the reason why the recording, which candidly, is not fantastic is because they took his phone away from him, and so, we only picked up the audio on the device that was in his pocket.

THE COURT: Always good to make sure that there

**J.A. 741**

*Proceedings* 2025

isn't a second gun or a second recording device. But, you know, hindsight is always pretty good. But go ahead.

MR. POLEMENI: And so, during this conversation, they do discuss, and you can see from the transcript it's Mr. Motovich who says to Mr. Adamou, we need to get you another attorney. One who is not going to cooperate with the Government. And that is the gist of this conversation. Whereas, Mr. Motovich saying, fire your attorneys that you have now, they're not going to help you. We're going to get you attorneys that will help you. And very notably, Mr. Motovich tells Mr. Adamou that someone was stopped at the airport, or someone was stopped, and then goes on to say in so many words, I had to pay for a guy who wants to cooperate.

And so, we would argue, Judge, that that is a reference to Mr. Sarkinovic. And it is clear evidence of the obstruction charge. And we would also suggest, Judge, it's not really just §404(b). We would argue direct evidence of the scheme, which is Mr. Motovich's attempts to obstruct justice with this defendant as well.

And so, for all those reasons, Judge, it's close in time. There is clear references to, or at least we would argue, there's references to Mr. Motovich's efforts to obstruct our ability to speak with Mr. Sarkinovic and it's also direct evidence of the underlying crimes.

*Proceedings* 2026

THE COURT: I have the argument. You can respond.

MR. JACKSON: Just two points of charges, Judge.

THE COURT: Okay.

MR. JACKSON: For one, and I don't fault the Government for this because they're public corruption prosecutors. I know they don't deal with entrapment issues as much. I dealt with terrorism cases, international narcotics. For many years, we dealt with this repeatedly. So I've read every case on this.

The question of when someone signs up as a cooperator --

THE COURT: I understand the signing on the dotted line is not the same as when someone quote, unquote, becomes a cooperator, I get that.

MR. POLEMENI: You get that, Judge, I won't belabor the point then.

THE COURT: That's because in 1976, before any of you were born, I was a lowly summer associate in a case called United States against Mohtin and Alvarez in the Southern District of New York. And how long ago was that? A brand new judge named Richard Owen granted $600,000 in bail to a Colombian national accused of heading up a cocaine and heroin trafficking enterprise. And he said, well, since he has ties to the community, I have no problem granting the bail. Mr. Antonio Alvarez was last seen waving good-bye to

*Proceedings* 2027

the federal agent in the Jockey Club in Florida. And I do believe that was the last time the late Judge Richard Owen ever granted bail to an international drug dealer. There were 33 defendants, most of whom were convicted. But I was a mere youth of 26 years old as a summer associate working in the U.S. Attorney's Office in the S.D.N.Y. Made an impression on me with respect to the conditions of release, I get it.

What's your other point?

MR. JACKSON: Other point, Judge, is that the prosecutor, I think, was Mr. Polemeni was not correct. Their own transcript does not say that he, Mr. Motovich, said that he wants the witness to get an attorney who is not going to cooperate. What he's saying is that he should get a lawyer, and remember, he's asking, he's been bugging Mr. Motovich, for advice on what to do. He's been calling him repeatedly.

THE COURT: What does the transcript say?

MR. JACKSON: It says that he wants him to get a lawyer who will cooperate with the other lawyers so that they can have a discussion. He's trying to get him -- he's saying if you want to talk with me, you need a lawyer who will cooperate with the other lawyers. That's what he's talking about.

THE COURT: Well, the language that was used is

*Proceedings* 2028

the language that was used. What it means, lawyers can argue about its meaning. But there's no question, is there, about the words that were said? Is this part of the unintelligible or is part of the intelligible?

MR. POLEMENI: No, I think that's one reading of the --

THE COURT: There are alternate readings.

MR. POLEMENI: Right.

And I would point out there's other sections right off the bat where Mr. Motovich says, at least according to our reading and understanding, for me and you to be safe, get you an attorney for $5,000. Not one who is going to cooperate with them, meaning...

THE COURT: All right. Is there any dispute about those words having been said?

MR. JACKSON: Yes, Judge.

THE COURT: Are they in the transcript or are they not in the transcript?

MR. POLEMENI: They are in the transcript.

THE COURT: I am going to let the jury hear the tapes. Counsel is free to challenge the meaning of the words, but I'm not going to exclude the testimony. I understand the argument and the record is preserved on that point, obviously, for appellate purposes.

Okay. What else do we have to address before we

J.A. 742

*Proceedings* 2029

bring in the jury and continue?

MR. POLEMENI: Nothing from the Government, Judge.

THE COURT: Anything else from defense counsel.

MR. JACKSON: I don't think so, Judge.

THE COURT: All right. You want to take a five-minute comfort break before we bring in the jury and then we'll bring them in.

MR. POLEMENI: Thank you, Judge.

MR. JACKSON: Thank you.

(A brief pause in the proceedings was held.)

THE COURT: May we have the witness brought back to the witness stand and we're going to bring in the jury.

MR. PAULSEN: So, your Honor, this is a new witness. Would you like him on the stand?

THE COURT: We might as well bring in the new witness as well.

MR. PAULSEN: Thank you.

(Witness takes the witness stand.)

COURTROOM DEPUTY: All rise.

THE COURT: Please stand for the jury.

(Jury enters courtroom at 10:27 a.m.)

THE COURT: Good morning, ladies and gentlemen of the jury, please be seated.

Thank you again for your patience. Your eyes do not deceive you, we have a different witness. We are taking

*Proceedings* 2030

this witness out of order. This is a fairly short witness. We will get him on the stand, we will get him off the stand. I have all sorts of judicial tricks to move this case along, that's one of them.

Please stand, sir, my courtroom deputy will give you the oath. I'll ask you to sit down and state and spell your name and counsel will inquire.

COURTROOM DEPUTY: Please raise your right hand.

Do you solemnly swear or affirm that the answers and the testimony that you are about to give to the Court will be the truth, the whole truth, and nothing but the truth.

THE WITNESS: Yes, I do.

**DAVID UNGER**, called by the Government, having been first duly sworn, was examined and testified as follows:

THE WITNESS: Yes, I do.

THE COURT: Thank you, sir. Please sit down.

I'm going to ask you, you see that microphone in front of you, reach out and hold it. You're in charge of it. It looks like a snake, don't be tentative. Move it to you, speak directly into it.

State your name and spell it and then counsel will inquire.

THE WITNESS: David Unger. D-a-v-i-d. U-n-g-e-r.

THE COURT: Thank you, sir, you may inquire

*D. Unger - Direct/Mr. Paulsen* 2031

counsel.

MR. PAULSEN: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. PAULSEN:

Q    Good morning, Mr. Unger?

A    Good morning.

Q    Where do you?

A    I live in Massachusetts.

Q    What is your profession or past profession?

A    I'm a finance, finance -- investor.

Q    Now, did you ever have occasion to come into -- to have a business transaction with an individual named David Motovich?

A    Yes, I did.

Q    What was that transaction?

A    I sold a cooperative apartment to him about ten years ago.

Q    What apartment was that?

A    It was at 303 East 57th Street. It's 47-G.

Q    Okay. Is there anything distinctive about that apartment?

A    It was a very unique apartment. It was a triplex. It had rooftop -- it had 5,000 square feet on the roof. And it was one of only three that had an indoor rooftop pool.

Q    One of only three what?

*D. Unger - Direct/Mr. Paulsen* 2032

A    Apartments in Manhattan.

Q    How did the transaction take place?

A    It was a broker in the building knew of friends of David who had moved into the building and bought the apartment.

Q    Okay. Was it paid through installments, in cash?

A    Total cash transaction at closing.

Q    Now, have you met with the Government to see some photos of the apartment as it appears in recent times?

A    Yes, I did.

Q    And those photos look different than how it was when you -- when you lived there; is that right?

A    Yes, it does.

Q    Based on the time when you lived in this apartment versus seeing what it looks like now, what did you observe?

A    It was dramatically different. The internal staircase had changed dramatically. He had moved the kitchen from where it was to a bedroom area. And the pool area had been dramatically upgraded and a lot of other things were changed.

Q    So, fair to say, fairly significant renovations?

A    Correct.

Q    Now, after you sold the apartment to Mr. Motovich, did you have another financial transaction with him?

A    Yes. We had a big piano in the apartment that we no

J.A. 743

D. Unger - Direct/Mr. Paulsen          2033

longer needed, and so, we asked if he would be interested in buying it and he said yes.

Q    This is a grand piano?

A    It was a baby grand piano, yes.

Q    How much did you sell it for?

A    $5,000.

Q    Now, how did Mr. Motovich pay you for that?

A    He gave me a check.

        MR. PAULSEN:  Your Honor, I'd like to show the witness what's been marked for identification as Government Exhibit 751.

        THE COURT:  Any objection to admission of 751?

        MR. MAZUREK:  No, your Honor.

        THE COURT:  You pay publish.  It's admitted.

        (Government's Exhibit 751 was marked in evidence.)

        (Exhibit published.)

        MR. PAULSEN:  Ms. Kannan, just zoom in on the check.

Q    Mr. Unger is this the check that you received?

A    Yes.

Q    What's the company name that it's?

A    Ago & Auladin Contracting Corp.

Q    Did you know what that company was?

A    No, I did not.

Q    Do you know an individual named Ago Kolenovic?

---

D. Unger - Direct/Mr. Paulsen          2034

A    No, I don't.

Q    The signature says Kamel Sarkinovic.  Do you know who that is?

A    No, I don't.

Q    Is this fair to say this is just how David Motovich paid you?

A    Correct.

        MR. PAULSEN:  No further questions, your Honor.

        THE COURT:  Cross.

        MR. MAZUREK:  No, your Honor.

        THE COURT:  Thank you.  You may step down, sir. Thank you very much.  Appreciate your time.

        (Witness leaves the witness stand.)

        THE COURT:  All right.  Please bring in the next witness.

        MR. POLEMENI:  Yes, Judge.

        THE COURT:  Please come forward to the witness box.  You know where it is and you still have that great beard so come on up.

        (Witness takes the witness stand.)

        THE COURT:  You are under oath, sir.

PHILLIP ADAMOU, called as a witness, having been previously duly sworn, was examined and testified as follows:

        THE COURT:  Did you speak with anyone about your

---

P. Adamou - Direct/Mr. Polemeni          2035

testimony since leaving the witness stand yesterday?

        THE WITNESS:  No, sir.

        THE COURT:  Thank you.  Please be seated.  Please continue your examination.

        MR. POLEMENI:  Thank you, Judge.

DIRECT EXAMINATION

BY MR. POLEMENI:

(Continuing.)

Q    Welcome back, Mr. Adamou.

A    Thank you.

Q    Yesterday, we looked at a few insurance certificates. Do you remember those?

A    Yes.

        MR. POLEMENI:  If we can pull up Government's Exhibit 1137, please, Ms. Kannan.

Q    This is one of the exhibits that we looked at yesterday.  You were asking for a BP Cooling certificate, do you remember that?

A    Yes, sir.

Q    Go to Exhibit 1138.

     This exhibit, do you remember that Marina K that she sent you a certificate?

A    Yes.

Q    And if we can go to the next page.

     This was one of the certificates that we saw.  It was

---

P. Adamou - Direct/Mr. Polemeni          2036

one that was issued to BP Cooling, correct?

A    Yes.

Q    And that, if you look at the bottom, this is for -- you were the certificate holder; correct?

A    Correct.

Q    And BP Cooling never did any work for Lithos Marble Works?

A    No.

        MR. POLEMENI:  If we can pull up in evidence Government's Exhibit 433-7, please.

        Blow up that check, please.

Q    Mr. Adamou, is this a check that you wrote to one -- to BP Cooling?

A    Yes, but the company's writing is not mine.  The rest it's mine.

Q    Right.  So you signed it but the name where is says "pay to the order of," that's someone else's handwriting?

A    Yes.

Q    And this check, this is one of the checks that you gave to Mr. Motovich in exchange for cash?

A    Yes, sir.

Q    Take that down.

     And we also looked at some text messages yesterday.  Do you remember those?

A    Yes.

**J.A. 744**

P. Adamou - Direct/Mr. Polemeni     2037

MR. POLEMENI:  If we can go, Ms. Kannan, to Government Exhibit 1202, Page 36, in evidence.

If we could blow up those first two text messages, please.

You can blow up first two.

Q   And the text message on the left is from you just saying okay on March 15th of 2018.  Do you see that?

A   Yes, sir.

Q   And then the next text message is a couple of weeks later on March 28th.  Do you see that?

A   Yes.

Q   And Mr. Motovich writes to you, I'm leaving today at 12:00 for two weeks.  Do you see that?

A   Yes.

Q   What was Mr. Motovich telling you there?

A   He's going to be away.  And when he was going away, would give him a check to cover me for the time that he's going to be away, two weeks, three weeks, ten days.

Q   You weren't asking him, can I come to see you to deliver a check, right?  He was telling you, I'm going to be away for two weeks --

MR. JACKSON:  Objection.

A   Yes.

Q   -- can we get a check?

MR. JACKSON:  Objection.

---

P. Adamou - Direct/Mr. Polemeni     2038

THE COURT:  Overruled.

Q   Come and get some cash, I meant?

A   Yes.

Q   We also talked about how you would sometimes go to pick up cash outside of Mr. Motovich's apartment in Manhattan, correct?

A   Correct.

MR. POLEMENI:  If we can turn to Page 45, Ms. Kannan.

Q   Do you see that bottom text message.  And you ask him, Is it okay for tomorrow; right?

A   Yes.

MR. POLEMENI:  And if we can turn the page, Ms. Kannan.

Q   Mr. Motovich, he responds "good morning."  Yes?

A   Yes.

Q   And if you go down.

And what do you ask him there?

A   Manhattan or Brooklyn.

Q   What are you asking?

A   Where do I come?  Where should I meet you?  Manhattan or Brooklyn?

Q   Now, were there times during this time period when you were out of the country on vacation?

A   Myself?

---

P. Adamou - Direct/Mr. Polemeni     2039

Q   Yes.

A   Yes.

Q   And when you were on vacation, would you still get cash from Mr. Motovich?

A   Yes.

Q   How would that happen?

A   I had checks signed in my office.  He would -- I would communicate with him that we need cash.  He would send somebody to pick up the check and bring the cash in my office.

Q   So you would tell him you had a check?

A   Yes.

Q   And then you would tell him to give the money to someone else?

A   Yes, my office.

Q   So if we can turn to Page 48, please.

And do you see where -- the third, the middle of the page, that right, yes.  "Hi David"?

A   Yes.

Q   What do you say to Mr. Motovich?

A   Hi David, how are you?  Please don't forget my brother.

Q   What do you mean?

A   To send the money to my brother at the office.

Q   Okay.

And what does he respond if we can go to the next text

---

P. Adamou - Direct/Mr. Polemeni     2040

message.

Does he say hi, text me all info, please?

A   Yes.

Q   And then what do you respond?  Is that your brother's name, Steve?

A   Yes.

Q   Is that his phone number?

A   Yes, sir.

Q   And is that where you were telling Mr. Motovich to bring the cash?

A   Yes.  This is my office, yes.

Q   And if you can turn the page.

And does Mr. Motovich say, Okay, we'll take care of it tomorrow?

A   Yes, sir.

Q   And, in fact, Mr. Motovich -- would Mr. Motovich send someone to deliver the cash to your brother?

A   Yes.

Q   If we can go to Page 57, please.

Do you see that text where it says "good morning"?

It says, Mr. Motovich writes to you, Good morning do you need to see me today?

A   Yes, sir.

Q   Is the prior text on this chain from Mr. Motovich about a week earlier?

**J.A. 745**

P. Adamou - Direct/Mr. Polemeni          2041

This the prior text message that is dated September 7, 2018?

A    Yes.

Q    And the text message we just looked, what's the date of that text message?

A    9/14/2018.

(Continued on the next page.)

---

Adamou - direct - Polemeni          2042

DIRECT EXAMINATION

BY MR. POLEMENI:  (Continuing)

MR. POLEMENI:  Go to page 63, Ms. Kannan, please. If we can blow up the -- yes, right there.

Q    Do you see, Mr. Adamou, that Mr. Motovich is sending you an attachment?

A    Yes.

MR. POLEMENI:  And if we can go --

Q    And what's the date of the attachment?

It's the date that he sends it on 11/27/2018?

A    Yes, sir.

MR. POLEMENI:  If we can go, Ms. Kannan, to Government's Exhibit 1202-A, page 10.

Q    What does Mr. Motovich send you?

A    A Certificate of Insurance.

Q    And who's the insured?

A    RBG Manpower, I-n-c.

Q    Is that R --

A    RHG.

Q    RHG --

A    Yes, sir.

Q    -- Manpower?

A    Yes, sir.

MR. POLEMENI:  And if we can go to the bottom where it says "Certificate Holder."

---

Adamou - direct - Polemeni          2043

Q    Who is the Certificate Holder?

A    This is -- this is my company.

Q    Did RHG Manpower do any work for Lithos Marble?

A    No.

Q    Was this just another one of the companies that Mr. Motovich told you to write a check to in exchange for cash?

A    Yes, sir.

MR. POLEMENI:  If we can go up to the top where it says "Provider."

Q    Do you know who Big Apple Insurance Brokerage is?

A    I have no idea.

MR. POLEMENI:  If we could go to page 70, please.

Q    And yesterday you told us there would be a few occasions where you had asked Mr. Motovich to hold on to the check, don't deposit it yet?

A    Yes.

Q    Because you were waiting to be paid from your customer; correct?

A    Correct.

MR. POLEMENI:  If we can look at the first text message.

Q    What do you write to Mr. Motovich?

A    "Hi, David, can you hold it until Thursday, I just found out that I will get paid tomorrow.  Thank you."

**J.A. 746**

---

Adamou - direct - Polemeni          2044

I was ask him to hold the -- the check until my check clears, you know, from my customer that I will get the check.

Q    Right.  And yesterday you said on a few occasions you did that; correct?

A    Yes, sir.

Q    And I believe you testified that you would ask him to hold it for a day or two?

A    Yes, sir.

MR. POLEMENI:  If we can, just for the witness, show Government's Exhibit -- well, actually, before we do that.

Q    The text message that we just saw, what is the date of the text message, Mr. Adamou?

A    12/18/2018.

Q    Okay.  So, December 18, 2018.

MR. POLEMENI:  And, Ms. Kannan, just for the witness, can we bring up Government Exhibit 274, please.

Actually, Mr. Scott -- yes.  Thank you.  Just for the witness.

Q    What is this, Mr. Adamou?

THE COURT:  Could you swivel the mic.

Q    What is this, Mr. Adamou?

A    It's a calendar.

Q    For the month of December of 20 --

A    December, 2018.

Adamou - direct - Polemeni          2045

MR. POLEMENI:  The Government moves into evidence Government's Exhibit 274, please.

THE COURT:  Any objection?

MR. JACKSON:  No objection.

THE COURT:  Admitted.

You may publish.

(Government's Exhibit 274 received in evidence.)

(Exhibit published.)

Q    So, we just looked at that text message and where you asked Mr. Motovich to hold the check until Thursday; correct?

A    Yes, sir.

Q    And December 18th.  I'm going to mark it with a pen.

THE COURT:  You got to swivel the mic just like everybody else.

MR. POLEMENI:  I'm going to mark it with a pen.

Q    Which day of the week is December 18th?

A    It's Tuesday.

Q    And you had asked Mr. Motovich to hold the check until Thursday?

A    Thursday, yes, sir.

Q    Two days later?

A    Yes, sir.

Q    Did you ever ask Mr. Motovich to hold the check for weeks?

A    Weeks, no.

---

Adamou - direct - Polemeni          2046

Q    How about months?

A    No.

Q    When you were -- when you asked him to hold the check for a couple of days, was he giving you a loan?

A    No.

MR. POLEMENI:  And if we can go to page 72, please.  If we can go to the top three, yeah.

Q    On January 11th of 2019, do you see that top e-mail where Mr. Motovich says:  "Okay, the City"?

A    Yes, sir.

Q    What is he telling you?

A    Come to the City.

MR. POLEMENI:  And if we can go down.

Q    You respond:  "Yes, I'll see you in five on 58"; right?

A    Yes, sir.

Q    What are you telling him there?

A    I'll meet him, you know, in the back of the building, not in the front, 57, behind 58.

I would wait in the car.  He would come downstairs with the cash.

MR. POLEMENI:  And if you go down to the next couple -- the last two texts on this page.

Q    What does Mr. Motovich respond?

A    "Okay."

Q    "Coming down"?

---

Adamou - direct - Polemeni          2047

A    "Coming down."

Q    Now, Mr. Adamou, you are cooperating with the Government; correct?

A    Yes, sir.

Q    We talked about that yesterday?

A    Yes.

Q    When you first started speaking with the Government, were -- did you make several recordings of Mr. Motovich?

A    Yes.

Q    Of your conversations with him?

A    Yes, sir.

Q    And do you recall a conversation that you recorded, that you had with him at Midwood Lumber?

A    Yes.

Q    When you went to have a conversation with Mr. Motovich to record, were you -- did you have listening devices, recording devices on you?

A    I had my phone and a small card.

Q    What do you mean?  Did you have a device that you were provided by eight federal agents to record the conversation?

A    Yes, it was like a small card.

Q    Okay.  And were you intending to record the conversation using both of those devices?

A    Yes, my phone and the card.

Q    And what happened when you first got to Midwood Lumber?

---

Adamou - direct - Polemeni          2048

A    His sister came out of the office and she asked me for my phone.

Q    She asked you --

A    To give her my phone.

Q    And did you?

A    Yes, I did.

Q    Of all the times that you had been at Midwood Lumber from 2011 up until 2018, had you ever been asked by anyone to give them your cellphone before you met with Mr. Motovich?

A    No.

Q    Was this the first time?

A    Yes, sir.

Q    Did you have a conversation with Mr. Motovich that day?

A    Yes, I did.

Q    Where did that take place?

A    Outside his office, his mother office.  And he said, let's go in this office.

Q    So, remind the jury, when you went to deliver checks to Mr. Motovich and he would hand you cash, where would that take place?

A    In his office.  Unless he had other people in his office, and he would ask me, that was couple of times, you know, to go to his mother, to this office, meet him there, if he had people inside his office, other people.

Q    How many times did that occur over the eight years that

J.A. 747

Adamou - direct - Polemeni                    2049

you dealt with him?

A    Very few times.

Q    Where was the office that he led you to?

A    It's right outside his office.  I mean, when you walk up the stairs to go to his office, on the right, right before his office.

Q    And you had a conversation with him in that office?

A    Yes, sir.

Q    And we are going to get to portions of the recording in a bit.  But generally, can you tell the jury what happened during that conversation?

A    He was trying to convince me that drop your lawyers, get rid of them, and come join us, I mean, his team.  He was pushing for that, you know, to have -- fire my lawyers.

Q    So, just so it's clear, when you were meeting with the Government, did you have counsel?

A    Yes, I did.

Q    And during those meetings, was counsel present?

A    Yes.

Q    And, so, you had your own defense attorney at the time?

A    Yes, I did.

Q    Mr. Motovich, was he trying to encourage you to fire your attorneys?

A    Yes.

Q    Why?  What did he tell you?

---

Adamou - direct - Polemeni                    2050

A    That they don't know what they're talking about, you have to come with us.  And one time he says, it's you and the -- I think it was a painter or something, that you didn't join us, you didn't come with us.  It's you and another one.

Q    When he said -- when he said "painter," did you know who he was referring to?

A    I have no idea.  Maybe it was another guy who was cashing checks, I mean, like me.  I don't know.

Q    How did you feel during this conversation?

A    How did I feel?

Q    Were you nervous?

A    Yes, I was nervous, yes.

Q    Why?

A    It -- it never happened to me before.  This is not something that I do every week or every year or every month.  I don't know.  I was scared.  I was nervous.

Q    You've listened to the recording --

A    Yes, sir.

Q    -- recently; correct?

A    Yes.

Q    Is it sometimes difficult to understand what's being said?

A    Yes.

Q    But do you recall the gist of what was said during that conversation?

---

Adamou - direct - Polemeni                    2051

A    Yes, the main idea is to fire your lawyers and come with our team.  It was very clear, he was pushing for that.

Q    And is it fair to say that Mr. Motovich at times spoke quietly during the meeting?

A    Yes.

        MR. POLEMENI:  At this time, your Honor, if I can hand out some headphones?

        THE COURT:  You may.

        MR. POLEMENI:  Thank you.

        Should we have Mr. Scott do it, your Honor?

        THE COURT:  Yes, please.

        These are headphones to enable you, ladies and gentlemen of the jury, to hear the audio that was just testified to by the witness, so...

        MR. POLEMENI:  And, your Honor, we also have draft transcripts marked as 601-T.

        THE COURT:  Yes.

        And, again, as I told you with respect to the other audio and transcripts, it's the audio that's the evidence, the transcripts are just there to assist you in understanding and hearing what's on the audio.  But to the extent there is any discrepancy, it's the audio that you actually hear that is the evidence.

        And you will also see something in the transcript, we talked about this with counsel beforehand, you'll see the

**J.A. 748**

---

Adamou - direct - Polemeni                    2052

letters "UI," which indicates that a portion of the audio is unintelligible.  So, when you see the letters "UI" in the transcript, that's what that means.

        You'll, obviously, be hearing the audio for yourselves and you will decide what you can hear and what you can't hear, but that's what you're about to see with respect to the transcripts.

        And do you have the transcripts to hand out to opposing counsel and to the jury?

        MR. POLEMENI:  Yes, your Honor.

        THE COURT:  Would you please do that now.

        Thank you.

        A lot fancier than the Sony Walkman that I used to have a long time ago.  I'm old.

        The record should reflect the jury has been handed the earphones and are being handed the -- by my court deputy, are being handed the transcripts to facilitate what they are about to hear.  And defense counsel also has earphones and transcripts as well.  And the witness is about to be handed the transcript.

        Do you have headphones for the witness as well?

        MR. POLEMENI:  Yes, your Honor.

        THE COURT:  Please, Mr. Scott, would you hand them to the witness.

        All right.  Counsel, you may proceed with your

Adamou - direct - Polemeni                    2053

examination.

MR. POLEMENI:  Thank you.

And just for the record, Judge, the Government moves into evidence Government Exhibit 600.

THE COURT:  Any objection?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

You may publish.

MR. POLEMENI:  Thank you, Judge.

(Government's Exhibit 600 received in evidence.)

(Exhibit published.)

THE COURT:  And 600-T as well?

MR. POLEMENI:  Yes, your Honor.

THE COURT:  Any objection?

MR. JACKSON:  Your Honor, as an aid --

MR. POLEMENI:  Yes.

MR. JACKSON:  -- with the Court's prior instruction.

THE COURT:  Any objection?

MR. JACKSON:  No objection as an aid.

THE COURT:  All right.  As an aid.  So, it's an aid to the audio, as I described to you.

All right.  Counsel, please proceed.

MR. POLEMENI:  Thank you, your Honor.

And, Ms. Kannan, if we can start at 1:20, please.

(Audio playing.)

---

Adamou - direct - Polemeni                    2054

MR. POLEMENI:  Too loud.  I think if you can -- can we control the volume?

Yes, we will lower it, Judge.

(Audio playing.)

MR. POLEMENI:  Stop right there.  Let's take a break for a moment.

BY MR. POLEMENI:

Q   Mr. Adamou, what was Mr. Motovich telling you there?

A   I mean, to see one of his lawyers.  I mean, if you pay another $5,000, you know, it's worth it.  And I said -- I was saying I paid already, you know, a lot of money to my lawyers, I don't have money to spend.

And this is -- you know, most of it, it was to convince me.  He was pushing, you know, to get rid of my lawyers.

Q   And remind the jury, why is -- it's, obviously, a little difficult to hear.  Why?

A   Because the -- it was the card that I had in this -- in the pocket here.  And he -- he -- a lot of times he spoke, you know, softly, I mean, not loud.  He wasn't -- so, I don't know.  Maybe with the phone it would be better, you know, a recording.  I don't know.

MR. POLEMENI:  We can pick back up.

(Audio playing.)

MR. POLEMENI:  Can we stop it there.

---

Adamou - direct - Polemeni                    2055

Q   Now, Mr. Adamou, you mentioned earlier that there was a reference to the painter?

A   Yes, sir.

Q   Did you just hear it again?

A   Yes, sir.

Q   What was Mr. Motovich telling you there?

A   That it's only you and this guy, the painter, that didn't come with us, I mean, with his team.  The rest, they joined him.

Q   And you mentioned you don't know who he was referring to, the painter; correct?

A   No.

Q   Do you know a man by the name of Roman Kretsula?

A   Roman Kansila?

Q   Kretsula?

A   No, I don't.

Q   Have you ever heard the company Unique Painting?

A   No.

MR. POLEMENI:  We can pick back up, please.

(Audio playing.)

MR. POLEMENI:  You can stop it there.

Q   So, what is Mr. Motovich telling you there, Mr. Adamou?

A   To talk to his lawyer.

Q   And what is going to happen to your attorney, your -- the attorney you had?

J.A. 749

---

Adamou - direct - Polemeni                    2056

A   Get rid of him, I mean, to fire them.  To go with a different lawyer.

Q   Mr. Motovich, did he say that his lawyer will call your lawyer and fire him?

A   For me --

MR. JACKSON:  Objection, leading.

A   For me --

THE COURT:  Overruled.

A   For me to fire my lawyers.

Q   Okay.

MR. POLEMENI:  Ms. Kannan, if we can push ahead to 9:28.

(Audio playing.)

MR. POLEMENI:  Stop it there.

Q   Mr. Adamou, what is Mr. Motovich telling you?

A   It was the same, you know, tone.  I mean, you have to get rid of your -- your lawyers.  We're legitimate, they're business people, we pay tax, and nothing will happen if you join, you know, our team -- his team.

Q   You mentioned yesterday that you sleep better now; right?

A   Yes.

MR. POLEMENI:  I have nothing further, Judge.

THE COURT:  Cross-examine?

MR. JACKSON:  Thank you, Judge.

THE COURT:  Mr. Jackson, does the jury need to hang

Adamou - cross - Jackson                    2057

on to the earphones in terms of your examination?

MR. JACKSON: Your Honor, I think we are going to try and play some things through the speakers that may be -- that I think that should be audible, but...

THE COURT: Why don't you hang on to the earphones for now just in case we need them.

MR. JACKSON: Thank you.

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good morning, Mr. Adamou.

A    Good morning, sir.

Q    Now, Mr. Adamou, we just listened to a recording of a conversation between you and David Motovich; right?

A    Yes, sir.

Q    And I'm correct, this conversation, Mr. Motovich wasn't the one who was begging you to come talk to him; correct?

A    Begging me?

Q    Yes. I'm correct about that; right?

A    I don't know what you mean "begging" him.

Q    You don't know what I mean by the word "begging"?

A    Yes, I know the word "begging."

But did I beg him to meet me, this is what you're saying, and I don't --

Q    Let me pose a different question.

A    Yes.

Adamou - cross - Jackson                    2058

Q    Okay. Before this call happens, you had decided that you did not want to go to jail and, so, you had decided to start cooperating with the Federal Government; correct?

A    Yes, sir.

Q    And the Federal -- the agents came to you and they said, here's a great idea, we want you to wear a recording device and try to get Mr. Motovich to say something to you incriminating; correct?

A    Yes.

Q    And they said, if you go over to him, if you keep telling him, I need advice, I need advice on what to do with my lawyer, I'm not very happy with the lawyer, then you can have a good conversation with him; right?

A    I never complained about my lawyers.

Q    Sir, didn't you text him several different times before this recording to reach out to him?

A    He tried to call me couple of times and I didn't answer him.

Q    I'm just asking you a yes-or-no question.

Didn't you text him?

A    Yes, I did.

Q    Right. Before this recording?

A    Yes.

Q    And you signed your first proffer agreement with the Government on April 2nd, 2019; correct?

Adamou - cross - Jackson                    2059

A    Correct.

Q    And this call is happening in June; right?

A    I don't remember if it was June.

Q    You don't remember when the call was?

A    I mean, it was June or May.

Q    Okay. Whatever the case may be, this is weeks after you started proffering, cooperating with the Government; correct?

A    Yes, sir.

Q    And this is an idea that was dreamed up by the agents; correct?

A    Yes.

Q    And the agents were the ones telling you to text Mr. Motovich; correct?

A    Yes.

MR. JACKSON: I'd like to offer in evidence, your Honor, a document which is marked as DX 3009.

THE COURT: Any objection to DX 3009?

MR. JACKSON: For the record, your Honor, these are text messages produced to us by the Government between this witness and my client.

THE COURT: Any objection?

MR. POLEMENI: No.

THE COURT: I'm sorry. Any objection?

MR. POLEMENI: No, your Honor.

THE COURT: Admitted.

Adamou - cross - Jackson                    2060

You may publish.

(Defense Exhibit DX 3009 received in evidence.)

MR. JACKSON: Thank you, Judge.

THE COURT: You're welcome.

(Exhibit published.)

BY MR. JACKSON:

Q    All right. Now, we already talked about you knew that Phillip T. Marble, this refers to you; right?

We talked about that on your -- the Government talked about that with you; correct?

A    Yes.

MR. JACKSON: And if we can go to page 2 of this. Okay.

And if we could zoom in on the messages in the middle at 1750 and 1751 and 1752. Okay.

Q    Do you see these messages?

A    Yes.

Q    Okay. Now, these are -- again, you've been cooperating throughout all of these messages with the Government, you've been cooperating with the agents; right?

A    Yes.

Q    And they're telling you, you got to contact David Motovich, you got to reach out to him; right?

A    Yes.

Q    And you can see in this message at 1750 David says: "Hi,

J.A. 750

Adamou - cross - Jackson                    2061

my attorney is back. Please have your attorney call Jeremy
Gutman," at a number, right, "to schedule a meeting."

Do you see that?

A   Yes, sir.

Q   And you understood David was saying, I don't want to have
a conversation with you without your attorney and my attorney
present; right?

A   Right.

Q   And you understood Jeremy Gutman was his attorney at the
time; right?

A   Yes, sir.

Q   By the way, you know Jeremy Gutman has not been charged
with anything; correct?

A   Correct.

Q   And, so, Jeremy Gutman -- you talked to the agents and
they were like, no, no, no, we don't want a Jeremy Gutman
meeting, we don't want the attorneys present, we want you to
go in and try to entrap him into some conversation that would
be helpful; right?

A   Right.

Q   And, so, then after he says, let's only have a meeting
with attorneys, with both of our attorneys present -- and
that's not some attorney he is suggesting, he is talking about
your attorney; right?

A   Yes.

---

Adamou - cross - Jackson                    2062

Q   Then you try to skip over that because the agents are
telling you to skip over that; right?

A   Right.

Q   And you say: "Can I call you"; right?

A   Right.

Q   And then you say: "I wanted to talk about my lawyer's
reaction when I told him I met you, and they warned me that
they will resign from my case and they wouldn't call your
attorney."

Do you see that?

A   Yes, sir.

Q   And then David is still saying: "Well, let's meet with
our attorneys"; right?

A   Yes.

Q   And he says he is "with people now"; right?

A   Yeah. Right.

Q   Because he was still trying to run his family business,
you understood that, didn't you, Mr. Adamou?

A   Yes.

Q   In fact, the day of the recording that we talked about,
after you'd been pestering him to have the meeting that the
jury heard in these dance party headphones, you --

MR. POLEMENI: Objection.

THE COURT: Overruled.

They are dance party. I don't dance much, but they

---

Adamou - cross - Jackson                    2063

are dance party.

Go ahead. Overruled.

MR. JACKSON: Thanks, Judge.

Q   The day after -- the day of that, Mr. Motovich, he had
actual business going on in his offices; correct?

A   What day? I mean, the day that he --

Q   The day of the recording.

A   The day I met --

Q   Yeah, the day you met him.

A   -- him?

THE COURT: You can't talk over each other. Do you
see what happens on the transcript when you talk over each
other? All right. So, don't talk over each other.

Put the question, Mr. Jackson, and then the answer.
Put the question, please.

MR. JACKSON: Thank you, Judge.

Q   So, Mr. Adamou, the recording we just listened to, you
remember that happens in June?

A   Yes.

Q   Okay. On that day, when you got there, Mr. Motovich had
other business, regular business of his company going on,
there were other people there; right?

A   I don't know. I mean, his sister came out of the office.
He asked me for my phone.

Q   Right.

---

Adamou - cross - Jackson                    2064

A   And then David came, let's go next -- you know, his
mother office next door.

Q   Right. But you understand, this is all -- David's office
is right there in the Midwood Lumber location; right?

A   Yes, sir.

Q   There are other offices there?

A   Yes, sir.

Q   And there is also the whole store, where they have
various things that they sell to construction customers right
there; right?

A   Yes.

Q   And, so, at some point when he was telling you, don't
talk too loud, as we are discussing, you understood he didn't
want all of his regular customers and business relations to
hear all of this conversation that you were trying to have
with him; correct?

A   I don't think so.

Q   Okay. Well, whatever the case may be, you'd agree with
me, there were other people there that had nothing to do with
all this; correct?

A   I don't know what -- who was in his office or if there
were people in there. I don't know.

Q   Fair enough. We're talking about a conversation that
happened how many years ago now?

A   Five years.

J.A. 751

Adamou - cross - Jackson  2065

Q   So, one of the problems, right, is that as you sit here today, you don't even remember all of the context of that from five years ago; correct?

A   Correct.

Q   In fact, if we look at this transcript that is marked as GX-600-T that the Government just went through, there are many mysteries in this transcript that you can't help us solve; correct?

A   Yes.

Q   Including -- you see where it says "UI" throughout this transcript?  Do you see the "UI"?

A   Yes.

Q   That means unintelligible; right?

A   Yes.

Q   And those are all of the points in the transcript where something was being said and it couldn't be heard; right?

A   Yes, sir.

Q   You have sat with the agents, you all got in a room and put the headphones on and sat and concentrated, and you still haven't been able to figure out what you were saying to Mr. Motovich in some of these parts of the call, and what he was saying to you; correct?

A   Right.

Q   And you don't remember as we sit here; right?

A   I remember what he was trying to do.

Adamou - cross - Jackson  2066

Q   Let me ask --

A   Very well I remember.

Q   Thank you.

MR. JACKSON:  Let me ask you to turn to page 2 of GX-600-T-002.

Okay.  Let's look at page 2, and let's look at the top part here.

Q   Do you see where it says the -- what -- actually -- you see he says -- you see that you -- that Mr. Motovich says to you:  "You need to get -- you need to get a different attorney if he doesn't want to cooperate with"; right?

Do you see that?

A   Where?

MR. JACKSON:  Hold on a second.

(Pause.)

MR. POLEMENI:  Your Honor.

MR. JACKSON:  Sorry.  It's the third page.

MR. POLEMENI:  Your Honor.

THE COURT:  Yes.

MR. POLEMENI:  I would object to --

THE COURT:  It's the third page.  So let's go to the third page.

MR. JACKSON:  Third page, sir.

THE COURT:  Go ahead.

MR. JACKSON:  Thank you.

Adamou - cross - Jackson  2067

Q   Now, you see where it says:  "You need to get a different attorney if he doesn't want to cooperate with"; right?

A   Yes, sir.

Q   You see he's saying:  "You need to get a different attorney if he doesn't want to cooperate with" --

MR. POLEMENI:  Objection.

Q   -- right?

A   Yes.

Q   Okay.  You understood that he's not saying don't be a cooperator right there, is he?  I'm correct about that?

A   Yes.

Q   What he is saying is if your attorney is, for some reason, saying that he doesn't even want to talk to other people's attorneys to understand all the information you gather in determining how to advise you, then that's not a great attorney; right?

That's what he's saying to you; correct?  That's what you understood?

A   Yes, but my attorneys didn't want to talk to anybody, not the agents.

Q   Please, sir, you have a -- you can have your privileged conversations with your attorneys.  You really shouldn't tell us what your privileged conversations are.

A   Okay.

Q   I'm only asking you what you understood about what

Adamou - cross - Jackson  2068

Mr. Motovich was saying.

And I'm correct that Mr. Motovich, you understood, was saying you -- if you have an attorney who doesn't even want to cooperate with other people's attorneys and talk to them to gather information, that's probably not a great attorney, that's what you understood; correct?

A   Yes.

Q   And then you said:  "But then what would be the benefit?"

And then we get to a mystery; right?  Correct?

A   Yes.

Q   What did you say?  What is your best recollection of what you said at this critical point in the conversation where all the jury has is "UI"?

A   I don't know.  Maybe I said --

Q   No, no, no.  No speculation.

MR. POLEMENI:  Objection.

Q   Do you know what you said?

THE COURT:  Overruled.

A   What's the benefit for me?

Q   Are you speculating or do you actually remember what you said?

A   I believe this is what I said.

Q   Okay.  Then what did Mr. Motovich say?

A   I don't know.  I mean, you --

Q   You have no recollection as you sit here, do you, of what

**J.A. 752**

Adamou - cross - Jackson          2069

Mr. Motovich said in response; right?

A    No.

Q    You said that -- let me just ask you this.

Then you said:  "I mean, I paid him so much money"; right?

A    Correct.

Q    And what you're trying to say there, this is one of the things that the agent suggested you could say to try to draw out and entrap Mr. Motovich into saying something helpful; right?

MR. POLEMENI:  Objection.

A    No.

THE COURT:  Overruled.  It's cross-examination.

Q    And Mr. Motovich says something in response when you're saying:  "I paid him so much money," saying that you paid your attorney so much money; right?

A    Yes, sir.

Q    What is he saying?

A    I don't know.

Q    You have zero recollection of what was said at this critical point in the conversation; correct?

A    Correct.

Q    Okay.  Then you're saying:  "I don't have money"; right?

A    Yes, sir.

Q    By the way, that was a lie; right?

Adamou - cross - Jackson          2070

You were saying that because the agent said that was a way you could draw him out; right?

A    No.

Q    So, you were fresh out of money at that point?

A    Yes, sir.

Q    How much money have you made over the last several years in the construction industry?

A    I -- I can't tell you by, you know, my -- I don't know. I have to --

Q    You can't ballpark it?

A    No.

Q    Well, you paid an $800,000 -- you paid some kind of restitution that you talked about; right?

A    I paid $250,000.

Q    But you have agreed to more; right?

A    Yes, sir.

Q    Okay.  Is it safe to say you have made millions of dollars in the construction industry over the years?

A    Yes.

Q    You're telling me that when you met with David here and you were saying:  "I don't have money," that was a genuine heartfelt comment?

A    Yes.

Q    Okay.  Now, then you said -- then --

MR. JACKSON:  If we could go down a little bit.

Adamou - cross - Jackson          2071

Q    You see where David says:  "This is called an accessory, it's throw them in jail, but if your attorney's in the room and my attorney's in the room, then we can talk and we can tell you what's going on."

Do you see that?

A    Yes, sir.

Q    Do you know what Mr. Motovich said in the part that you have marked as "UI" right before that?  Do you know what he said?

A    No.

Q    You can't even give the jury any indication because you have no recollection; correct?  Correct?

A    Correct.  Yes.

(Continued on next page.)

**J.A. 753**

Amadou - cross - Jackson          2072

BY MR. JACKSON:  (Continuing.)

Q    And you would agree with me that it is impossible for someone to actually understand the full context of this conversation with this many critical portions of it completely unintelligible; you agree with that, don't you?

A    Yes.

Q    Now, you understood that when he's talking about "this is called an accessory it's throw them in jail," what he was saying at that point was I can't talk to you without attorneys present; you knew that; right?

A    I didn't know then.

Q    You had no understanding of what he was talking about when he said "it's throw them in jail"?

A    No.

Q    But do you see right after that he says, "but if your attorney is in the room and my attorney is in the room, then we can talk and we can tell you what's going on"; right?

A    Right.

Q    Mr. Motovich repeatedly tried to get you to understand he did not want to obstruct justice, he did not want to have a conversation with you without both of your attorneys present; correct?

A    Correct.

Q    Now, you said in response to that "but they don't want

Amadou - cross - Jackson                2073

UI."  Right?

A    My lawyers don't want me -- they don't want to get -- meet with your lawyers.

Q    That's what you remember you said?

A    Yes.

Q    Okay.  And that was also a lie; right?

A    No.

Q    Sir, are you telling us that at that time your lawyers who were charged with protecting you with the opportunity to get free information from another lawyer about what they know in the investigation, your lawyers were like, no, I don't want to hear about it; that's what you're telling us?

A    Yes.

Q    Okay.  And at that point, Mr. Motovich said then your attorney is in the dark, he's a moron, you should fire him; right?

A    Yes, sir.

Q    That's not him saying that out the blue.  You texted him and told him that you were looking for advice on what to do; right?

A    Right.

Q    And he had already told you, I don't want to have any conversation without both of our attorneys present and you were pressing the conversation because you wanted to please the agents; correct?

---

Amadou - cross - Jackson                2074

A    Correct.

Q    Now, if we go down a little bit and the whispering part here.  Okay, let's just focus on whispering.  Do you see this?

A    Yes.

Q    After you again say "but what the money I spent already with this fucking guy."  That's what you said; right?

A    Yes, sir.

Q    And then, for some reason the agents are giving you a secret recording device -- they basically wired you up; right?

A    There were no wires.

Q    It was better than a wire, it was a secret recording device that was hidden in something that looked like a credit card; right?

A    Yes.

Q    And so you got this secret credit card on you that's recording.  You know that it's a sensitive device.  They told you how to use it; right?

A    I just got it in my pocket.

Q    They didn't give you any instructions?

A    No.

Q    They just said go on in there?

A    Yes.

Q    Okay.  But you know that you got a recording device on you; right?

A    Yes.

---

Amadou - cross - Jackson                2075

Q    For some reason you start whispering; right?

A    David was whispering.

Q    I'm sorry.  Do you see the transcript that you went over repeatedly with the Government -- am I right about that?  You went over this repeatedly with the Government; right?

A    Yes.

Q    And it says "whispering" underneath your name; correct?

A    I don't remember myself whispering.

Q    Okay.  You don't know one way or another if it was you whispering or David Motovich whispering; correct?

A    It was David.

Q    And then David was speaking at an automobile volume and he say, "It's all horse shit.  They're he going mad, they're going crazy."  Right?

A    Right.

Q    And you understood that he was saying that this case is horse shit; right?

A    Yes.

        MR. JACKSON:  Can we go to the next page?

Q    Now, this is another point where my client, Mr. Motovich, is talking to you and do you see the part where it says "this is obstruction" -- he says "but I can't tell you anything." He's like, I can tell you this in front of --

        MR. JACKSON:  Can you highlight that paragraph underneath "talking over each other"?  Thank you.

**J.A. 754**

---

Amadou - cross - Jackson                2076

BY MR. JACKSON:

Q    Now you see here it says, "But I can't tell you anything," right?  Right before that he says, "I can tell you this in front of a normal attorney."  Do you see that?

A    Yes.

Q    You understood what he meant was this is bizarre that your attorney doesn't want to talk to other attorneys and to understand what information he can gather to help you; correct?

A    Yes, sir.

Q    And then he says, "This is obstruction of justice.  It's throw them in jail.  No joke."  Right?

A    Right.

Q    You understood he was not telling you to obstruct justice; correct?

A    Yes.

Q    What you understood he was saying is that if I'm having a conversation with you where I'm providing substantive information or telling you what to do, I can be accused of something I don't want to do, that's what you understood; right?

A    Yes.

Q    And he's saying he does not want to obstruct justice; correct?

A    Correct.

Amadou - cross - Jackson                    2077

Q    He's saying he does not want to be thrown in jail over something like that, so let's get both of our attorneys in the room and make sure that the meeting is conducted appropriately and ethically; correct?

A    Correct.

MR. JACKSON:  We can take that down.

Q    Oh, there's one more thing I want to ask you about this, okay?  Do you know why --

MR. JACKSON:  Can we put that back up?

(Exhibit published.)

Q    If we go to the top of the next page, okay?  Do you know why -- you've listened to this entire recording with your -- your agents and the prosecutors, right?

A    Yes.

Q    Multiple times; correct?

A    Yes, sir.

Q    What is the part that you decided not to play for the jury between 6:30 and 9:28?  What's the substance of that that you guys decided not to play?

MR. POLEMENI:  Objection.

THE COURT:  Overruled.

You may answer.

A    I don't know.

Q    You have no idea.  Do you know why you decided not to play 6:30 to 9:28?  Do you know why?

---

Amadou - cross - Jackson                    2078

A    Why?

Q    No, I'm asking you if you know why.

A    Maybe it wasn't clear.  I don't know.

Q    You have no idea, right?  You just do what the agents tell you to do; correct?

MR. POLEMENI:  Objection.

THE COURT:  Overruled.  It's redirect.

Answer the question, please.

A    I don't think it was clear.  I couldn't say what was said.  This is what I believe.

Q    Isn't it true that during the portion that you decided not to play, one of the things that Mr. Motovich said to you was he's talking to you about the bizarreness of your attorneys not wanting to talk to Jeremy Gutman and you not wanting to talk to Jeremy Gutman, right; his attorney at the time?

A    Yes.

Q    And he asked you, "Do you want to talk to Jeremy"; right?

A    Yes.

Q    And by that you understood he was asking you, not commanding you, just asking you, do you want to talk to my attorney; right?

A    My understanding is that you have to talk to my attorney.

Q    All I'm asking you is in the portion that was not played, Mr. Motovich explicitly asked you -- he's trying to understand

---

Amadou - cross - Jackson                    2079

what your concern is that you texted him about and he says do you want to talk to Jeremy, my attorney, right?  He asked you that, didn't he?  That's a yes or no question, did he ask you that?

A    Yes.

Q    And then your response was "yes"; right?

A    Yes.

Q    And then you said, "but my attorney said no"; right?

A    Right.

Q    So you're communicating to Mr. Motovich he had reason to believe you wanted to do something that your attorneys were preventing you from doing; right?

A    Right.

Q    That's the suggestion that you were making; right?

A    Right.

Q    And that was a lie.  You were lying to him in the conversation; right?

A    No.

Q    Sir, this whole thing was a ruse to try to get incriminating information on David Motovich; correct?

A    Yes.

Q    So there was no real dispute with your attorney where you really wanted to do it and your attorneys were preventing you; that was a ruse that was dreamed up to entrap Mr. Motovich; correct?  That's a yes or no question?

---

Amadou - cross - Jackson                    2080

A    No.

Q    So then, let me just ask you this, let's go to the bottom of that page -- let's just go to the end because we're going to unpack that.  Let's go to the very end of this at 1328.  Do you see -- I'm sorry.

This is the end at, what does it say, 12:04?  Is that what it says after you said, "No, I don't sleep"?  The last page, do you see that?  I'm just asking, do you see on the last page?  It's on the screen too.

A    Yes.

Q    You say -- and this ends at 12:04?

A    Yes, yes, yes.

Q    Okay.  What was actually going on here is that there's additional part of the conversation that you also chose not to play for the jury that happens after that; right?

A    No.

Q    Doesn't Mr. Motovich at that point say to you that he's going to ask his attorney to call your attorneys so that you can all sit in the room together?  Doesn't he say that?

A    Yes.

Q    And doesn't he also say that if you want to get a second opinion if you want to get another attorney just for your peace of mind, you can give somebody a retainer for $5,000 and you get a second attorney, doesn't he say that?

A    Yes.

J.A. 755

Amadou - cross - Jackson                    2081

Q    And then he says, "I'm going to call you from my attorney's office"; right?

A    Right.

Q    And he says it will be a number you don't recognize, but he gives you sort of the digits of Jeremy Gutman's number, so pick up, that's what he told you; right?

A    Right.

Q    He said it will be between 5 and 6; right?

A    Right.

Q    And he says we'll talk to you together because my lawyer knows what to say; right?

A    Right.

Q    And you understood what he was saying is I'm trying not to get into any trouble here.  I'm not a lawyer, but my lawyer can talk to you and he knows what to say that's appropriate; right?

A    Right.

Q    And that call actually happened, didn't it?

A    Yes.

Q    You recorded that call too, didn't you?

A    Yes.

Q    Did you discuss with prosecutors why in the world you would choose not to go over that call with the jury?  Did you discuss that?

A    No.

---

Amadou - cross - Jackson                    2082

Q    Did the prosecutors say that they didn't want the jury to hear that call?

A    No.

        MR. JACKSON:  May I have one moment, Judge?

        THE COURT:  Sure.

        (Pause in proceedings.)

        MR. JACKSON:  At this time we would like to offer a recording of a call between Mr. Adamou, Mr. Gutman and Mr. Motovich marked as DX 4532.

        THE COURT:  Any objection?

        MR. POLEMENI:  No objection.

        THE COURT:  You may publish.  It's admitted.

        (Defense Exhibit 4532 received in evidence.)

        (Exhibit published.)

        MR. JACKSON:  And, your Honor, we have a transcript that's marked as DX 4532-R.  May we distribute it?

        THE COURT:  No, but Mr. Scott will distribute it to the jury if you have copies for the jury and for the Court.

        Do you have copies for the jury and for the Court or no?

        MR. JACKSON:  Yes, yes.

        THE COURT:  That one calls for a yes or no answer.

        MR. JACKSON:  I believe we did, we can confirm it.

        Judge, we were going to put it on the screen.

        THE COURT:  I will tell you what I want is for the

---

Proceedings                    2083

jury to have copies.  Why don't we take a 15-minute break because I know you have the high tech toys.

        Do not talk about the case.  We will continue with the examination.

        Do not talk to anyone about the testimony, sir, while we're on break.

        Thank you, ladies and gentlemen.  Take a 15-minute break now and we'll get copies for you of the transcript.

        THE COURTROOM DEPUTY:  All rise.

        (Jury exits.)

        THE COURT:  You can step down.  Wait outside. Please do not talk to anyone about your testimony.

        THE WITNESS:  Okay.

        (Witness steps down.)

        THE COURT:  Please have a seat, everyone.  The jury is out of the courtroom and the witness is leaving the courtroom.  The witness has left the courtroom.  Do we have any issues to discuss in the absence of the jury and the absence of the witness?

        MR. JACKSON:  No, your Honor.

        MR. POLEMENI:  One thing, your Honor.  We have never seen a copy of the transcript.  So we'd like an opportunity to review it.

        THE COURT:  You're about to have that opportunity.

        MR. POLEMENI:  Thank you.

---

Proceedings                    2084

        THE COURT:  You're welcome.  Anything else?

        MR. POLEMENI:  That's it.

        THE COURT:  Why don't you provide a copy to the Government and we'll see if they have any objection to the transcript and if it marries up to -- what portion of the tape, can you say that again?

        MR. JACKSON:  The entire tape, Judge.

        THE COURT:  And how long is the entire tape?  You have a transcript of the entire tape.  So how long is the entire tape?

        MR. JACKSON:  It's approximately nine minutes, Judge.

        THE COURT:  Nine minutes, okay.  So let's get copies of the transcript for the Court to take a look at before we give it to the jury and see if you have any objection, Government, to the transcript which you haven't seen yet.  I take it you've heard the tape.

        MR. POLEMENI:  Yes.

        THE COURT:  So you will have the transcript.  You'll get to listen to it before we bring the jury back in and I'll rule on any objections that you may have to the transcript.

        Anything else before we take our 15-minute break?

        MR. POLEMENI:  No.

        THE COURT:  Thank you.  See you in 15.

        (Judge exits.)

Proceedings                    2085

(Recess taken.)

THE COURT: Before the break we were discussing the issue of transcripts for the Court, opposing counsel and the jury. Do we have such transcripts available.

MR. JACKSON: Yes, your Honor.

THE COURT: Has the Government had an opportunity to review the proposed transcript.

MR. POLEMENI: Yes, sir.

THE COURT: And how is it marked.

MR. JACKSON: DX-4 532- R.

THE COURT: Any objection to the transcript coming in to evidence as an aide to the audio.

MR. POLEMENI: No, your Honor.

THE COURT: And any objection to it being given to the jurors when they come in.

MR. POLEMENI: No, your Honor.

THE COURT: What is the tape going to be designated as the audio itself.

MR. JACKSON: Through my telepathy with my co-counsel, Ms. Layden, I know the tape is DX 4532-R.

THE COURT: The tape is 4532-R.

Any objection to that coming in?

MR. POLEMENI: No, your Honor.

THE COURT: You'll make that motion and I'll grant it when the jury is back. The transcript is 4532. So we will

Proceedings                    2086

go through that and you have copies that you can give to Mr. Scott who will prove them to the jury. And you have a copy for the Court?

MR. JACKSON: Yes, your Honor.

THE COURT: Do you have a copy for the Court?

MR. JACKSON: Yes, your Honor.

THE COURT: Hand it to Mr. Scott and when the jury is back after we go through the process, we will have it distributed to the jury by my intrepid court deputy.

Is there anything to discuss before we get the jury back and the witness back to the witness box?

MR. POLEMENI: Yes, your Honor.

THE COURT: Yes.

MR. POLEMENI: So it's clear to the Government that the argument seems to be or will be to the jury, if it's not already being made now, that Mr. Motovich was just acting in the best interest of his good friend. And what it really is going on, Judge, is that Mr. Motovich is fully aware that as long as he brings in Mr. Adamou and others into a common interest or a joint defense arrangement, then he has prohibited the ability of the Government to record conversations and to kind of pierce that privilege. And, so, that is a pretty sophisticated legal argument.

And, so, we would ask that the Court at the appropriate time give an instruction as to kind of the

Proceedings                    2087

contours of the joint defense common interest privilege so that the jury is not misled into believing that Mr. Motovich was somehow acting in Mr. Adamou's interest here.

THE COURT: I take it you are suggesting something to be included in the much-anticipated jury charge?

MR. POLEMENI: Yes. That's right, Judge.

THE COURT: And I take it that's something that we will address when we have our charge conference.

MR. POLEMENI: Yes, we will, but I wanted to put it on the Court's radar that this is an issue that I foresee down the road.

THE COURT: And I take it, Mr. Jackson, you have a similar view that this is something that should be addressed one way or another in the jury charge; is that correct?

MR. JACKSON: I believe -- your Honor is right. We need to discuss it --

THE COURT: I am not asking you to adopt the Government's view of what the charge should say. I'm asking a different question. I take it that you are of the belief that the jury charge should in some way, shape or form address the issue.

MR. JACKSON: I think that's right, Judge.

THE COURT: Then what I think is marvelous is that at 5:00 o'clock today, both sides are going to get the Court Exhibit 1, which is the Court iteration of the jury charge and

Proceedings                    2088

you will have gobs of time between now and the middle of next week when we have our charge conference to suggest your objections or your agreement with the proposed jury charge that you will receive at 5 p.m. today electronically.

Now, obviously, to the extent that there's anything new and additional that you wish to add, either side or by agreement, you have time to work that out between now and the charge conference or when we get to the charge conference, if we go page by page, line-by-line, it's like going to the dentist without Novocain only a lot worse, you will then submit it.

I will tell you in advance, however, that it always makes sense for counsel to understand that we're not going to have drafting by committee of lawyers in the Court because, as I said before, a camel is a horse drafted by a committee of lawyers and judges and when you have lawyers and judges drafting it, is a seven-humped camel, not just one or two. So we're going to avoid that, but you will have ample opportunity to go back and forth with respect to what you would propose to each other as well as what you will propose to the Court when we have our charge conference. Does that address the Government's conference on this point?

MR. POLEMENI: Yes judge.

THE COURT: Does this address defense's concerns on this point?

J.A. 757

Proceedings 2089

MR. JACKSON: Yes, your Honor.

THE COURT: Is there anything else we need to discuss before we bring in the jury?

MR. POLEMENI: No, your Honor.

MR. JACKSON: No, your Honor.

THE COURT: Let's get the witness back on the stand and get the jury back.

MR. JACKSON: Your Honor, just FYI, we won't need the headphones for this. We will not need them.

THE COURT: You're going to read it?

MR. JACKSON: No, the audio is pretty clear and the headphones would be a frustration.

THE COURT: Okay.

(Witness takes the stand.)

(Jury enters.)

THE COURT: Welcome back, ladies and gentlemen of the jury. Please be seated.

In your absence during the break, I've been speaking with counsel and we're going to proceed as follows: The next document to be offered into evidence by defense counsel a document that has been marked DX 4532. Defense counsel is going to move its admission, the Government will respond. It is a transcript, but there is no audio that will be played through the headphones. There will be audio, however, that goes with this transcript that you will hear through the

Proceedings 2090

regular speakers and the parties have agreed with that procedure.

So with that being said, Mr. Jackson, would you begin -- the witness is back on the stand.

You're still under oath. Have you spoken with anyone about your testimony?

THE WITNESS: No, sir.

THE COURT: Mr. Jackson, please proceed. Start with making your motion for the admission of DX 4532 which is the transcript, the June 5, 2019.

MR. JACKSON: We offer 4532.

THE COURT: Any objection?

MR. POLEMENI: No, your Honor.

THE COURT: It is admitted.

(Defense Exhibit 4532 received in evidence.)

THE COURT: You can publish to the jury. Mr. Scott has copies of the transcript to hand out to members of the jury. He they will have a copy for me and a copy for the witness as well.

Just hold off on the beginning of your examination on the point until the jury has the transcript before them, Mr. Jackson, and then the bid is to you.

MR. JACKSON: Thank you, Judge.

THE COURT: Do we have enough copies for each member of the jury and for the witness? I hope.

Proceedings 2091

Okay. Every member of the jury has her or his copy of DX 4532.

Government you have your copy?

MR. POLEMENI: Yes, your Honor.

THE COURT: You may proceed, Mr. Jackson.

MR. JACKSON: We offer also the recording DX 4532-R.

THE COURT: Any objection to the recording, DX-4532-R, which you will hear, ladies and gentlemen, but not through the headphones.

Any objection?

MR. POLEMENI: No, your Honor.

THE COURT: All right. It's admitted.

(Defense Exhibit 4532-R received in evidence.)

MR. JACKSON: Thank you, your Honor.

THE COURT: Ladies and gentlemen, you have the transcript in front of you to follow along. Go ahead, sir.

(Video played.)

MR. JACKSON: Pause this.

(Video paused.)

BY MR. JACKSON:

Q Now, I just want to ask you a question about that, Mr. Adamou. Now, you see Mr. Gutman asked you, "and who is that," right? Do you see that he's asking you he you made reference to your attorney and he asked you "who is that" at the top?

Proceedings 2092

A Yes.

Q And the response that you gave was completely unintelligible; correct?

A I told him that they're in Long Island.

Q What was the name that you said?

A I didn't say a name.

Q You didn't say a name?

A No.

Q You were told by the agents to intentionally not give Mr. Gutman the name when he asked; correct?

A No.

Q He's trying to get the name of the attorney so he can reach out and you did not say a name; correct?

A Correct.

Q And then he said, "well, could you just spell that for me" and instead of responding and spelling it, your response was, "my lawyers, they're against even talking to anybody or even getting in touch with you"; right?

A Right.

Q And you were doing that because you wanted to prolong the conversation and avoid Mr. Gutman actually reaching out to your attorney so he can have an attorney-to-attorney conversation; correct?

A No, my attorneys didn't want to talk to anybody.

MR. JACKSON: Let's keep playing.

J.A. 758

Proceedings                    2093

(Video played; video paused.)

BY MR. JACKSON:

Q    Here you mention that you spoke to David after you had texted him and reached out to him; correct?

A    Yes.

Q    And you say to Mr. Gutman that since day one that you got the subpoena, the attorneys didn't want you to talk to anybody; correct?

A    Correct.

Q    And Mr. Gutman said to you "that might have been good advice"; right?

A    Right.

Q    Earlier, just a few moments before that, he was telling you there were ethical restrictions on an attorney in terms of what he can communicate with you and so you understood that he was trying to reach out to your attorney; correct?

A    Yes.

Q    Okay.

        MR. JACKSON:  Let's go back to where we were and keeping playing that.

        (Video played; video paused.)

BY MR. JACKSON:

Q    And you understood here that Mr. Gutman was saying to you when you said -- first of all, when you said "because there could be a day they would ask me to go down there," you were

---

Proceedings                    2094

referring to the possibility that you might go talk to the Government to cooperate, right?

A    Right.

Q    And you heard Mr. Gutman; he didn't say don't do that; that's not something he said; correct?

A    Correct.

Q    He said, "Yeah that's something that could happen and for that you're obviously going to have to have an attorney you feel comfortable with"; right?

A    Yes.

        MR. JACKSON:  Can we continue with the next part?

        (Video played; video paused.)

BY MR. JACKSON:

Q    Now, when you make that recording, where were you, Mr. Adamou?

A    I was home.

Q    Were any of the agents with you?

A    No.

Q    Did the agents know you were making that call?

A    Yes.

Q    How did they record it?

A    I don't know.

Q    Did you record it or did the agents record it?

A    The agent.

Q    And you have no idea how they recorded it?  They weren't

---

Proceedings                    2095

sitting with you?

A    No.

Q    Did they put -- did they give you a device to record it?

A    No.

Q    Did they put a wiretap on your phone that you agreed to for them to record calls?

A    Yes.

Q    Okay.  So they were recording all of your calls and that's how it got recorded; right?

A    Yes.

Q    Okay.  Now, let's back up a bit and unpack a bit.  I wanted to start at the beginning.  Part of the reason that you were not surprised at all that when you reached out to David to ask for some help that he would take your calls, even in this stressful time; correct?

A    He tried to call me twice and I didn't answer.

Q    Let me --

A    He was the first one.

Q    Let me simplify this even more.

A    Yes.

Q    You were never surprised that David answered any call from you; correct?

A    No.

Q    I'm right about that?

A    Yes, because he tried to call me.

---

Proceedings                    2096

Q    Right.  And before that you had been friends for a number of years; correct?

A    Yes.

Q    I want to show you what's marked as --

        MR. JACKSON:  May we show for the witness, your Honor, DX 1700?

        THE COURT:  Any objection to DX 1700 being admitted?

        MR. POLEMENI:  No, your Honor.

        THE COURT:  It is admitted.

        (Defense Exhibit 1700 received in evidence.)

        THE COURT:  You may publish.

        (Exhibit published.)

BY MR. JACKSON:

Q    What are we looking at Mr. Adamou?

A    This is in Cyprus, my island.  He was in Israel and he came to Cypress.  And *filoxenia* (ph), it's a Greek word for hospitality.  So I asked him to take him out.  He was on my island.  We went out.  He was staying in the city.  We went to dinner.  Yes.

Q    You had a nice dinner together?

A    Yes.

Q    Both of your wives?

A    Yes.

Q    And your independent actions over the years were always friendly with Mr. Motovich; correct?

J.A. 759

Proceedings 2097

A    Yes, but not socialize.  We were never -- you know, it was mostly business.

Q    Okay.

MR. JACKSON:  We can take that down.  And I'm direct, aren't I, that you were first introduced to Mr. Motovich by a close friend of Mr. Motovich, a friend of the Motovich family.

A    Yes.

Q    Who was that?

A    Shimon Cohen.

Q    And you understood that Shimon had been a close family friend of the Motovich family for a number of years?

A    I didn't know the relationship.

Q    But you knew they were friends; right?

A    He offered to, you know, to introduce me --

Q    To David?

A    Yes, to do my business; cash checks.

Q    The prosecutors had told you in prep that it's important that you de-emphasize your friendship with David Motovich; correct?

A    No.

Q    They never discussed with you the subject that you might be questioned about the fact that you guys were friends?  Have they discussed that with you, that's yes or no?

A    I don't understand the question.

Proceedings 2098

Q    Okay.  Well let me try to simplify it.

A    Yes.

Q    You have met with the prosecutors?

A    Yes.

Q    Many times; right?

A    Yes.

Q    How many times?

A    I don't know, twelve, fifteen, I don't know.

Q    And sometimes for hours at a time; correct?

A    Yeah.

Q    And during those meetings you're going over the questions that you're going to be asked; right?

A    Yes.

Q    Sometimes they rehearse cross-examination; right?

A    I would say yes, yes.

Q    And one of the questions they practice with you is the defense attorney might say you're friends with David; right?

A    No.

Q    They raised the subject that the defense attorney might ask you about whether you were friends with David; correct?

A    No.  They knew that I had this relationship with David.

Q    Sir, are you saying here under oath that you never discussed with the prosecutors during your prep sessions what your friendship was with David?

A    Yes, it was business mostly.  We didn't socialize.

Proceedings 2099

Q    That's not my question.

A    Yes.

Q    I'm not asking what the nature of the friendship was.

A    Yes.

Q    I'm asking you, yes or no, did you discuss with the prosecutors in prep that you would be asked on the witness stand whether you were friends with David?

A    Yes.

Q    Right.  And they told you it was important that you emphasize that it was just a business relationship?

A    No.

Q    They told you to de-emphasize the friendship?

A    No.

(Continued on the following page.)

P. Adamou - Cross/Mr. Jackson 2100

EXAMINATION BY
MR. JACKSON:
(Continuing.)

Q    Now, one of the things that happened at the beginning of your interactions with David.  How many years ago did this start to happen, sir?

A    I would say 12 years ago maybe.

Q    One of the things that happened is -- you told David you're desperate to have cash in order to keep your business going, correct?

A    Yes, I needed to have cash because I was paying my people with cash, yes.

Q    And there are a lot of different reasons you were paying your people with cash, correct?

A    It was only one reason.  Either they didn't have any papers or they didn't want to get paid, you know, other than cash.

Q    Right.
     Sometimes your workers weren't even telling you why, they just saying, We need cash.  We want cash.

A    Yes.

Q    Right.  Even if they were legally here, correct?

A    Yes.

Q    And this was a serious problem for your business because labor is key for your business; right?

J.A. 760

P. Adamou - Cross/Mr. Jackson          2101

A    It was a problem, yes.

Q    And it was hard, it was getting hard with the competition for workers at that time for you to even keep workers unless you agreed to these demands to have cash, correct?

A    I told I was wrong.  If I don't pay them cash, I'm going to lose them.  But at the end, it didn't work that way.

Q    Okay.

A    Because some left.

Q    Sir, you got to wait for a question.

A    Sorry.

Q    Now, it is the case, it is the case, right, that you had told the prosecutors the main reason you even went to David was because it was convenient; right?

A    Yes.

Q    And you sometimes went to check-cashing places; correct?

A    What places are these.

Q    Check-cashing stores?

A    Other than David?

Q    You went --

A    Or David's across the street.

Q    Did you have go to Coney Island Payroll?

A    Yes, with David a couple of times.

---

P. Adamou - Cross/Mr. Jackson          2102

Q    Couple of times you -- David walked with you over to Coney Island Payroll?

A    Yes.

Q    And you cashed checks there?

A    Yes.

Q    What did Coney Island Payroll charge for you to cash checks?

A    I have no idea.

Q    You don't even know at this point?

A    I don't know.  I was dealing with David.

Q    Okay.  You also had told the agents that there were many times when you would get a float on the money, right?

A    What does that mean, float?

Q    You would tell David, I need you to hold the check for a few days?

A    Yes.  A few times I did, yes.

Q    Do you know exactly how many times that happened?  You don't, do you?

A    Must be three, four times.

Q    You're guessing three or four times but you don't have any record; correct?

A    No.

Q    You have no way even of looking back at the transactions and determining how many times you asked David for a few days before he deposited your check, correct?

---

P. Adamou - Cross/Mr. Jackson          2103

A    Correct.

Q    So, the reality was, actually, can we -- do you remember what the approximate dates were of the few times that you do remember doing that?

A    No, I don't remember.

Q    Do you remember the approximate years?

A    No.

Q    Okay.  So this is going on for years, right?

A    Yes, but there were not many times.

Q    Could it have been more than ten?

A    No.

Q    Zero chance?

A    I don't know but there was --

Q    Mr. Adamou --

A    I'm asking for many times but he didn't have any problem because I was a good customer.

Q    But again, Mr. Adamou --

A    He would do it just like that.

Q    Are you finished with your answer?

A    Yes.

Q    Okay.  Now, I'm correct, this is another subject that you've gone over extensively with the prosecutors in prep, haven't you?

A    Yes.

Q    And the prosecutors have told you, it's really

---

P. Adamou - Cross/Mr. Jackson          2104

important that the jury think that it wasn't a loan.  They told you that, didn't they?

A    Of course, it is not a loan.

Q    I'm not asking you whether it was a loan.  I need you to focus on my question.

     The prosecutors told you that it was really important that the jury not think it was a loan.  They told you that didn't they?

A    They never did.

Q    Sir, that never happened?

A    Never.

Q    You discussed this?

A    No.

          THE COURT:  Don't interrupt his answer.

          MR. JACKSON:  Thank you, Judge.

          THE COURT:  Not again.  Have you finished your answer?

          THE WITNESS:  Yes, sir.

          THE COURT:  Put another question to the witness.

          MR. JACKSON:  Thank you, Judge.

Q    I want to show you a document that is marked -- actually, DX-1202 is already in evidence.

          MR. JACKSON:  May I display that?  It's in evidence.

          THE COURT:  You may display that.

**J.A. 761**

P. Adamou - Cross/Mr. Jackson     2105

MR. JACKSON: Thank you, Judge.

Q   Can we go to Page 20 --

MR. JACKSON: Let's take that down. Please take that down.

GX. And can we go to Page 28 of this document.

Q   And these are the text messages that you were going over with the prosecutors, correct?

A   Yes, sir.

Q   And you see at Page 28 there is a communication where you say, Good morning, David. Can you hold the check until Monday.

Do you see that?

A   Yes, sir.

Q   The reason that you were saying that to him is you did not have the money in your account right at that moment, right?

A   I wanted my check to be clear for two days, yes.

Q   You didn't have the money in your account at that time?

A   It wasn't clear, yes.

Q   Okay. I just want to be clear. You did not have the money in your account at that time, correct?

A   I had the money, it was not clear. The check that I got.

Q   Okay.

A   And I needed a day or two, whatever it takes to clear

P. Adamou - Cross/Mr. Jackson     2106

the funds to be available.

Q   You remember that specifically in this occasion, right?

A   Yes.

Q   So whatever is the case, whether you deposited a check and it hadn't cleared, if David had taken that check, David or anyone had taken the check that you gave them and deposited it, the check would have been bounced; correct?

A   Yes.

Q   And so, you couldn't wait because you needed money to pay your payroll, correct?

A   Yes, sir.

Q   You got some guys that who are working hard, am I right about that?

A   Yes.

Q   I mean, we saw some of those big slabs of marble, right?

A   Yes, sir.

Q   Marble is pretty but it ain't light, right?

A   Right, yes.

Q   It's very heavy, it's kind of heavy, backbreaking some of which you have to do with marble, correct?

A   Correct.

Q   And you, yourself, your younger years, you would pick up marble. You were strong as an ox from doing it, correct?

A   No.

P. Adamou - Cross/Mr. Jackson     2107

Q   So whatever the case may be, you needed that money that day and David gave you the cash, correct?

A   Correct.

Q   How much cash did he give that you on that day?

A   I don't remember.

Q   Wait a minute. You remember exactly what the status was on this particular day of whatever transaction was being paid to you that led to you needing a loan from David for a couple of days, but you don't remember how much money you got on that day?

A   It wasn't a loan.

Q   I understand. That's the thing that's important to you, right. But let's just focus in on my question.

A   Yes.

Q   You don't remember the amount of money that you got on that day?

A   No.

Q   But you remember the precise mechanics of what was going on with the bank transaction?

A   I remember there were times it wasn't available, the funds, and I would ask him to hold the check for one or two days. He never said no, he could say no.

Q   Are you finished with your answer?

A   Yes.

Q   Let's focus.

P. Adamou - Cross/Mr. Jackson     2108

Who was it that paid you that you needed the check to clear on that day, do you remember that?

A   What customer --

Q   Yes.

A   -- of mine?

Q   What customer?

A   I don't.

Q   So you don't remember what customer had paid you that the check hadn't cleared yet but you needed a couple days, right?

A   Yes, sir.

Q   You don't remember the amount of money that you got from David?

A   Yes, sir.

Q   You don't remember, right, correct?

A   No.

Q   When you got there that day, what was David wearing? You don't remember, do you?

A   No.

Q   You don't remember everything except what's necessary for you to testify as the prosecutors want you to; that it was not a loan, right, that's the only thing you remember?

A   It was not a loan with the understanding with David. He encouraged me when you have this problem, you know, don't worry, you are a good customer.

P. Adamou - Cross/Mr. Jackson      2109

Q   Yeah.  He said you're a good customer, and so, when you have problems where you need to bay your hard-working guys and you don't have the money, I'm happy to give you the money and then you can pay me when you have it.  That's what he told you, right?
A   No.
Q   Okay.  On that day, he gave you the money and you needed him to wait multiple days until he deposited the check, correct?
A   Correct.
Q   You understand that that is a loan?
A   No, this is the service he provided.
Q   The service was a loan, correct?
A   Four percent and six percent, this is the service that we got.
Q   Let me ask you --
THE COURT:  Don't interrupt his answer.
MR. JACKSON:  I'm sorry, Judge.
THE COURT:  Don't interrupt his answer.
MR. JACKSON:  I deeply apologize.
THE COURT:  Stop interrupting the answer.  Put a question, get an answer.  That's how we roll.
MR. JACKSON:  Thank you, Judge.
THE COURT:  You're welcome.
A   So this is --

P. Adamou - Cross/Mr. Jackson      2110

Q   Please continue.
A   Yes.  This is a service.  It was -- I could pay less somewhere else, you know, the cashing machine, the stores.  But I went to David, I paid him four percent.  We started with four percent and then we went to six percent after some time and that was the service; the convenience.
Q   Yeah, one of the reasons it was convenient is what you're saying is that he was willing to hold the check for a few days if you needed it, correct?
THE COURT:  I think the jury gets it.  Can we move on to another topic, we're really covered this.
MR. JACKSON:  Absolutely, Judge.  I'm moving on.
Q   Now, I'm correct, right, Mr. Adamou, there was never a day where you told David, my goal is to avoid paying payroll taxes; correct, that never happened?
A   If I told David, you know, the reason I'm coming to you is to avoid paying taxes, this is what you mean?
Q   You never told him, My goal here is to avoid paying payroll taxes.  You never had that conversation, correct?
A   I don't remember.
Q   Okay.  You have no recollection of it as you sit here today, correct?
A   Correct.
Q   You also never had a conversation with David where you said, I want to obstruct the work of IRS agents.  You never

P. Adamou - Cross/Mr. Jackson      2111

had such a conversation, correct?
A   I don't remember.
Q   You have no recollection of ever having a conversation like that as you sit here today, correct?
A   Yes.
Q   Okay.  By the way, you mentioned some certificates of insurance.  Am I correct that at all times you always had actual insurance for your workers, correct?
A   Yes.
Q   Okay.  So there was never a situation where you thought that the certificate that David was giving you there was necessary for your workers to be insured in case something happened, right?
A   No.
Q   You had insurance from a separate company that protected your workers, correct?
A   No, the certificate of insurance that we get from subcontractors that they do work for us.
Q   I understand.  I understand.  Let me clarify my question.
THE COURT:  Let him finish the answer, please.  Go ahead, finish your answer.
A   For the accounting, the checks, I would say this is subcontractor.  They did work for us.  The companies that David was giving me.  So they said, okay, what is the

P. Adamou - Cross/Mr. Jackson      2112

certificate of insurance from these companies.
Q   I understand.
A   And I would --
THE COURT:  Let him finish the answer.  Don't say you understand.
Finish your answer.
A   I would ask David, please, we need the certificate of insurance because we may have an audit.  They're going to ask us for this certificate of insurance if they did work for us.
Q   Okay.  And when you mentioned an audit, you were talking about a workers' compensation audit, correct?
A   Whatever audit had to do with the insurance certificate, yes.
Q   Okay.  And you understood we're talking about workers' compensation insurance, correct?
A   Yes.
Q   You never gave any certificates --
MR. JACKSON:  Let me just back up.
Q   You told the agents, right, that about once a year, you got audited by the Workers' Compensation Board, correct?
A   Yes.  My accountants would, you know, deal with that.
Q   Okay.  What is the maximum amount of time that you are facing in prison, Mr. Adamou?
A   Five years.

J.A. 763

P. Adamou - Cross/Mr. Jackson          2113

Q    One of the things that you said, I think, during your direct examination is the reason that you cooperated is because you don't want to go to jail?

A    I hope I don't go to jail, yes.

Q    And before you decided to cooperate, you weighed with your attorneys what the possibilities were, right?

A    Yes.

Q    And you came to believe in your head that there was a very good chance as a cooperator you could avoid jail altogether, correct?

A    Yes.

Q    And one of the advantages that you understood that you were getting in your proposed plea agreement was that it would have a five-year cap on the maximum sentence that you could get, correct?

A    No, I didn't understand the -- what do you mean by cap?

Q    Sorry, let me use a different word.

You understood that there was a maximum sentence under the agreement of five years and that was one of the real advantages of your plea agreement, correct?

A    Yes.

Q    Because you understood that the Government had the ability, potentially, to charge you with additional crimes and then you would have a higher maximum penalty; correct?

A    Yes.

P. Adamou - Cross/Mr. Jackson          2114

Q    And so, part of the reason that it was so important for you to testify, and you're trying to do the best job that you can for the Government, is that agreement is very important to you; correct?

A    The reason I'm doing it is that I began to sleep at night. It was like a relief that I called up. I said, good, let's do, you know, right from now on. And hopefully, I don't go to jail. There's no guarantee, nobody guarantee me anything. My prosecutors or even my lawyers.

THE COURT: Anything else, Mr. Jackson?

MR. JACKSON: May I have just one moment, Judge.

THE COURT: Yes.

(A brief pause in the proceedings was held.)

MR. JACKSON: Just one more brief thing, Judge. Can we call up already in evidence GX-740.

THE COURT: You may publish. Can.

MR. JACKSON: Can we go to Page 20.

EXAMINATION BY
MR. JACKSON:
(Continuing.)

Q    And these are all checks?

A    Yes.

Q    That you cashed at -- this is a check that you cashed, right?

A    Yes, sir.

P. Adamou - Cross/Mr. Jackson          2115

Q    If we go to the bottom, do you see there where it was cashed?

Do you see that where it says for deposit only, Coney Island Payroll Services. Do you see that?

A    Yes.

Q    That's a time that you went to Coney Island Payroll, correct?

A    Even when I went to David, I would give him the check and then he would do whatever, you know, but he got to do with these people. Coney Island Payroll.

Q    The only question I'm asking you. You said you remembered one time you were with David at Coney Island Payroll. Is it possible there were other times?

A    No, it wasn't one time. It was maybe two, three with David.

Q    Okay. Can we just look at Page 22.

Do you see this one? This is a 10/22/12 check?

A    Yes, sir.

Q    This was another one that was cashed at Coney Island Payroll, correct? Do you see that on the bottom?

A    Yes.

Q    What about Page 26 of 12/21/2012 check. Do you see that?

A    Yes.

Q    Another one that was cashed at Coney Island Payroll,

P. Adamou - Cross/Mr. Jackson          2116

correct?

A    Yes.

Q    I'm only asking?

A    Okay.

Q    Okay. Page 27, do you see that one?

A    Yes.

Q    This is one that was cashed at Reliable check-cashing service. Do you see that?

A    Yes.

Q    That's a check-cashing service that you've been to before?

A    What is Reliable? Who is Reliable?

Q    Page 37.

A    I don't know who Reliable, I've never been there.

Q    Go to Page 37. Do you see that one?

A    Yes.

Q    Do you see there's another one here referencing a check-casher?

A    I can't see, it's not clear.

Q    We'll take it down.

Whatever the case may be, you said that there were a few times as you sit here today you don't have a completely clear recollection of how many times you went with David to a check-casher, correct?

A    No. But David, I don't know what he was doing when I

**J.A. 764**

P. Adamou - Redirect/Mr. Polemeni    2117

left the checks with him, if he was cashing it across the street or not, I don't know. I would give him the check, I would get my cash, he would get his cut and I would get out of there. So I don't know what he did with the checks after, where he cash it, I don't know.

Q    One last question.

A    Yes, sir.

Q    I'm correct that in all of the you said 14 years that you were interacting with David, David Motovich never stole any money from you, correct?

A    Correct.

MR. JACKSON:  No additional questions for this witness, Judge.  Thank you.

THE COURT:  Redirect.

MR. POLEMENI:  Yes, Judge.

REDIRECT EXAMINATION

BY MR. POLEMENI:

Q    Why don't we clarify where we just left off.  Go to Government's Exhibit 740, Page 22, please.

THE COURT:  You may publish.

(Exhibit published.)

Q    So this is a check, right, for $10,000 that you wrote from Lithos to SGS Construction, right?

A    Yes, sir.

Q    And you gave David this check to David Motovich in his

---

P. Adamou - Redirect/Mr. Polemeni    2118

office, right?

A    Yes, sir.

Q    And in exchange for this check, he charged you four to six percent?

A    Yes.  In the beginning it was four and then, after some time, it became -- it went to six percent.

Q    Let's give Mr. Motovich the benefit of doubt and we'll say four percent?

A    Yes.

Q    So you gave him a check for 10,000 -- do you know what a CTR is?

A    No.

Q    Do you remember we were talking about the forms that have to be filed --

A    Yes.

Q    -- for the Government?

A    Yes, that was one of the reasons, the 10,000.

Q    That's one of the reasons why you went to Mr. Motovich, right?

A    Yes.

Q    You understood he would not be filing those forms?

MR. JACKSON:  Leading.

THE COURT:  Overruled.

Q    So you give him the check in his office, he gives you, let's say, $9,600 in cash?

---

P. Adamou - Redirect/Mr. Polemeni    2119

A    Correct.

Q    Whatever four percent is, right?  And that's it, that's the transaction?

A    Yes.

Q    And then, is it fair to say that Mr. Motovich then brought this check to Coney Island Payroll Services?

A    Could be, I don't know.  I would leave the check. Whatever, you know, he does with it, I don't know.

Q    And whatever he does with it maybe he cashes it there and they charge him two percent?

MR. JACKSON:  Leading.

THE COURT:  Overruled.

A    Could be.

Q    And then maybe he brings that cash back to Midwood?

A    Could be, yes.

Q    And then the following week, you bring him a check, right?

A    Yes.

Q    And he has the cash that he just brought from Coney Island?

A    Yes.

Q    And he charges you four percent?

A    Yes.

Q    And this goes on for maybe years and years and years?

A    Yes.

---

P. Adamou - Redirect/Mr. Polemeni    2120

Q    So, not to beat a dead horse, were these loans?

A    No.

Q    And you knew those weren't loans before you met with the Government, right?

A    Yes.

Q    The Government didn't tell you that?

A    No.

Q    To say that these are not loans?

A    No.

Q    We heard a couple of recordings, right?

A    Yes.

Q    We heard the recording that you made between you and Mr. Gutman, Mr. Motovich's attorney; right?

A    Yes.

Q    And we heard Mr. Motovich, he was present for that conversation; right?

A    Yes.

Q    He was in Mr. Gutman's office?

A    Yes.

Q    Do you know what a joint defense agreement is?

A    No.

Q    Do you know what a common interest privilege is?

A    No.

Q    That recording.  That was a pretty clear that recording, wasn't it?

J.A. 765

*P. Adamou - Redirect/Mr. Polemeni*    2121

A    Yes.

Q    You can hear almost every word?

A    Yes, sir.

Q    Is that because no one took your cell phone when you walked into their office?

A    I'm sorry, I didn't --

THE COURT:  Was that because no one took your cell phone when you walked into that office?

THE WITNESS:  Yes.

THE COURT:  Next question.

Q    During call, Mr. Gutman is trying to explain to you why it might be advantageous for him to be able to speak with your attorney, right?

A    Right.

Q    But he's insisting you don't speak to my client alone, right?

A    Correct.

Q    Do you know whether Mr. Motovich told Mr. Gutman that he had spoken with you earlier that day?

A    I don't know.

Q    In his office?

THE COURT:  Do you know one way or the other?

THE WITNESS:  Can you repeat the question.

THE COURT:  Do you know whether they had that conversation?

*P. Adamou - Redirect/Mr. Polemeni*    2122

THE WITNESS:  Maybe they did.

THE COURT:  Maybe they did.  Do you know?

THE WITNESS:  No.

THE COURT:  Next question.

Q    On the recording --

THE COURT:  Which recording.

MR. POLEMENI:  Thank you, Judge.

Q    The recording between Mr. Gutman, you, and Mr. Motovich, we hear Mr. Motovich chimed in on a couple of occasions; is that right?

A    Yes, sir.

Q    If we can pull up DX-4532, Page 3.  And why don't we go to the bottom of Page 2, start there.

This conversation had been going on for a couple of minutes at this time by the time we get to the bottom of Page 2?

A    Yes.

Q    And Mr. Gutman said, Yeah, that could happen.  Just go -- so, bottom of Page 2, and you say, Because there could be a day they may ask me to go there, I mean, and talk to the Government, to these people, I don't know?

A    Yes.

Q    And Mr. Gutman responds:  Yeah, that could happen.  And for that, you're obviously going to have to have an attorney that you feel comfortable with because that's -- when you're

*P. Adamou - Redirect/Mr. Polemeni*    2123

dealing with the Government, you have to have someone who is going to represent you in a way that you -- you're comfortable with, right?

A    Yes, sir.

Q    At the time that you made this recording, were you comfortable with your attorneys?

A    Yes.

Q    And it's at that point for the first time, Mr. Motovich says, If you want to start sleeping well at night.  Who is he talking to there?

A    To me.

Q    You need to have the attorney talk to Jeremy, right?

A    Yes, sir.

Q    Is that the same thing he had said to you earlier in the day?

A    Yes.

Q    Did you notice his tone on the recording?

MR. POLEMENI:  Well, why don't we play it if we can.

(Continued on the next page.)

Adamou - redirect - Polemeni    2124

(Continuing)

MR. POLEMENI:  Give us a second to pull up the right time.

THE COURT:  I will give a second.

MR. POLEMENI:  You know what, it's okay, we don't need it right now.

THE COURT:  I didn't think you did.  That's why I gave you a second.  Let's move on.

MR. POLEMENI:  Then if we can pull up that transcript again,  please.

THE COURT:  GX-4532.

MR. POLEMENI:  Yes.

THE COURT:  What page, Mr. Polemeni?

MR. POLEMENI:  PAGE 3.

THE COURT:  Continue.

The jurors have it, so you can just work with the transcript.

MR. POLEMENI:  Okay.

REDIRECT EXAMINATION

BY MR. POLEMENI:  (Continuing)

Q    So, Mr. Motovich says if you want to start sleeping well at night you need to have the attorney talk to Jeremy.  That's right after you said that you might have to go speak to the Government; right?

A    Yes.

**J.A. 766**

Michele Lucchese, RPR, CRR

Adamou - redirect - Polemeni                2125

Q    And a little further down, the next couple lines down, Mr. Motovich says to you:  You are going to pay a lot more if you make the wrong decision.

A    Yes.

Q    What do you think he meant by that?

A    Wrong decision to cooperate with, you know, talk to the -- to the Government.

Q    Is that because -- do you think that Mr. Motovich was concerned you might be sitting right here?

A    Yes.

MR. JACKSON:  Objection.

THE COURT:  Overruled.

MR. POLEMENI:  No further questions.

THE COURT:  Thank you.  You may step down, sir.  Your testimony is complete.

THE WITNESS:  Thank you.  Thank you very much, your Honor.

(Witness steps down.)

THE COURT:  All right.  Ladies and gentlemen of the jury, we are going to take our luncheon recess.  I apologize for the lateness of the hour.  It is about 1:15.

How's about we get back here -- does 2:30 work for people?  Again, with that hard stop at 5:00.  Maybe even a few minutes before 5:00.  One never knows do one.

We see you all at 2:30.  Thank you.

---

Adamou - redirect - Polemeni                2126

THE COURTROOM DEPUTY:  All rise.

(Jury exits the courtroom.)

THE COURT:  You may be seated, ladies and gentlemen.  The jury has left the courtroom, so has the witness.  Do we have any issues to address before we take our luncheon break?

MR. POLEMENI:  No, your Honor.

THE COURT:  Defense counsel?

MR. JACKSON:  No, your Honor.

THE COURT:  Enjoy your lunch everyone.  We will see you back here at 2:30.

MR. JACKSON:  Thank you.

(Lunch recess.)

---

Proceedings                2127

(In open court; jury not present.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  You may be seated.

Do we have any issues to address before we bring the jury back and have our next witnesses?

Anything from the Government?

MR. POLEMENI:  Only that we are going to read two stipulations, if that's okay with you, Judge, before we put Agent Cabane on.

THE COURT:  Okay.  That's fine.

Anything else for the Government before I turn to defense counsel?

MR. POLEMENI:  No, your Honor.

THE COURT:  Thank you.

Anything else from defense counsel we need to address now?

MR. JACKSON:  I think Mr. Grubin just said he has an issue.

THE COURT:  Ah, Mr. Grubin --

MR. GRUBIN:  Hi.

THE COURT:  -- nice of you to join us.

MR. GRUBIN:  Timing, you know, dramatic.

THE COURT:  It's very good to make a dramatic entry.

MR. GRUBIN:  Exactly, your Honor.

THE COURT:  Go ahead.

J.A. 767

---

Proceedings                2128

MR. GRUBIN:  Thank you.

Just before I -- our next witness is going to be Special Agent Cabane.

THE COURT:  Yes.

MR. GRUBIN:  And just three matters, the first is -- okay.  Just two matters then.

THE COURT:  There you go.

MR. GRUBIN:  My colleague is telling me --

THE COURT:  There you go.  The stipulation is next.  Go ahead.

MR. GRUBIN:  So, the next two are -- it is going to be -- it will likely be a rather lengthy direct examination.  We have thought of different ways to shorten it and be more --

THE COURT:  Okay.  I'm appointed for good behavior and I'm a very lackadaisical fellow.  So, you know, I don't have the energy and the imagination to behave badly enough to get in real trouble.  No one is giving me any free fishing trips.  And, you know, I don't have any -- fly flags in weird positions or anything that, you know, might get us district court judges in trouble.  I'm just sort of a -- you know, a working-day judge here in little ole Brooklyn.

Go right ahead.

MR. GRUBIN:  Thank you, your Honor.

So, one is we sent a rather lengthy list of the exhibits we intend to admit through Special Agent Cabane.  We

Proceedings 2129

might not necessarily -- some of them are just to get into the record. We don't intend to publish all these.

So, I thought one possibility, if the defense doesn't have objections, is maybe just at the start or now, whatever the Court's preference is --

THE COURT: Well, have you spoken with defense about the -- those exhibits?

MR. GRUBIN: I have e-mail -- I have sent several e-mails.

THE COURT: All right. Have you -- you have or you have not?

MR. GRUBIN: I have. I have.

THE COURT: All right. What -- let's just stop with that.

What is your suggestion, Mr. Jackson, as to how we deal with the list of exhibits?

MR. JACKSON: So, your Honor, I think for a number of these exhibits, if there is -- I think we are going to have to take them one by one first.

THE COURT: Okay. That's all I wanted to know. If you are going to take them one by one, we will take them one by one. You will call out the exhibit number and I will ask if there is any objection, the answer will be yes, no or maybe, and then we will see how we roll. Okay?

MR. JACKSON: That's fine.

Proceedings 2130

MR. GRUBIN: That's fine.

And then the second matter, your Honor, is typically once a witness starts their direct examination, we don't really talk to them anymore about the case. Of course, the difference here is Special Agent Cabane is one of the case agents.

So, while, obviously, we're not going to speak with him once cross-examination begins about any -- you know, about any matters pertaining to his testimony, as long as he is on direct, we're still going to be speaking with him about the case.

THE COURT: What is the defense view about the appropriateness or inappropriateness of that?

MR. JACKSON: I'm a little concerned, Judge. I'm not sure -- I mean, there are several different agents. It seems like they could probably speak to him if there are logistical things.

But, I mean, if there is something that only Agent Cabane knows, I'm happy for them to consult with him. But if it's anything else, I would prefer if they didn't.

THE COURT: What is your response to the concern that you discern?

MR. GRUBIN: Yeah, you know, I think it would be -- it -- I'm not exactly quite sure what the concern was precisely, but it -- you know, certainly when

Proceedings 2131

cross-examination begins, we will not speak with him about matters pertaining to the case.

I think if on cross, if they want to ask him, did you speak with the Government, you know, between when you testified and now, I think, you know, they are allowed to do that. And it could go to whatever weight they think that, you know --

THE COURT: Are they allowed to ask what it is you spoke about?

MR. GRUBIN: Um...

THE COURT: Are they allowed to ask and demand the tape recording? If there is no tape recording, are they allowed to say, why on earth didn't you have the integrity to tape the calls that you talked with the agent about?

I mean, there are reasons we have these sort of old school rules about once the witness is testifying the lawyers are not to speak with them, so we don't get into the sort of, I only spoke with them about non-consequential ministerial items.

MR. GRUBIN: I think the response would probably be not about -- you know, certainly not about testimony you've already given. But as one of the primary case agents, I, of course, continue to -- you know, I continue to speak with about matters.

THE COURT: Well, if it's not about substantive

Proceedings 2132

issues in the case, what would you be talking about, other than the Mets versus the Yankees, and isn't it great that Tom Brady finally retired and got his comeuppance, unless you are a Boston fan?

MR. GRUBIN: Well, I think there would be some of that, your Honor. But I think in addition, we would talk about substantive matters, just not about his testimony -- not about things he already testified.

THE COURT: Well, but, you know, that's kind of a slippery slope, a little bit, to use the old-hood phrase, a little zoftig. You know, it's kind of squishy.

MR. GRUBIN: Well, we will give him the weekend off and try and figure it out -- we'll try and figure it out by ourselves.

THE COURT: I think that would be good. Because if I were sitting in Mr. Jackson's seat I would want to explore, however artfully as I could manage, not as artfully as you really bright lawyers do, but I would want to explore what you chattered about.

But I would certainly, perhaps inadvertently, of course, give the jury the impression that what was being testified to was being massaged, enhanced, modified, affected, impacted by the conversations that the Government has declined to share with the defense counsel about what they talked about while the agent was testifying.

**J.A. 768**

Proceedings 2133

I'm not saying Mr. Jackson would do that sort of thing. But I'm just saying perhaps before he became Judge Kuntz, Mr. Kuntz might have thought about doing such things representing clients. Just saying.

And then, of course, you're stuck with how is the Judge going to rule when Mr. Jackson and his colleagues raise the issue. And as I said earlier, one never knows, do one? So, I'd be a little bit careful because the Judge might say, well, tell them what you talked about.

MR. GRUBIN: So, that's -- yeah, that's fine, your Honor. We are giving him the weekend off.

THE COURT: It might be a wise decision. It might be. I don't know. As I'm often fond of saying, and I rarely get any disagreement, whatever else you might think, I didn't get this job just because of my pretty face.

Okay. Now, do we have anything else from the Government that we need to address before we bring the jury in and get the next witness?

MR. GRUBIN: No, your Honor.

THE COURT: Anything we need to address from defense counsel before we bring in the witness?

MR. JACKSON: Just one issue, Judge.

THE COURT: Yes, sir.

MR. JACKSON: So, I think this sort of goes to the first issue that raised by Mr. Grubin about the exhibits.

Proceedings 2134

There is a very long list of exhibits and we have been trying to make sure that we are on top of it. And --

THE COURT: Let me ask it this way: Do you know which exhibits you might have a problem with?

MR. JACKSON: This is what I want to raise and whether this is going to come up today. They have identified several of Mr. Motovich's personal, individual income tax returns, your Honor, as exhibits to be used with --

THE COURT: I take it the personal identification numbers, Social Security Numbers have been redacted, so the jury is not going to see, you know, the social security, obviously, or tax ID numbers?

MR. JACKSON: Yes, your Honor.

THE COURT: That they have been redacted?

MR. JACKSON: They have been redacted, I believe -- I believe so. Well, I see the dependents are redacted. And it looks like all the PII has been redacted.

THE COURT: Okay. So, has the PII -- let me ask the Government, has the PII been redacted?

MR. GRUBIN: On the non -- sir, yes, on what we intend -- what I have expressed that I intend to use it has been redacted.

THE COURT: Or what you intend to offer.

MR. GRUBIN: What I intend to offer, yes, your Honor.

Proceedings 2135

THE COURT: All right. So, the PII issue, Mr. Jackson, I understand that, and that has been addressed.

What are your other concerns?

MR. JACKSON: The core concern we have, Judge, and we don't completely understand what the theory is of how this is relevant --

THE COURT: Yes.

MR. JACKSON: -- we understand that they charged in Count Seventeen a *Klein* conspiracy with their proposed instructions.

THE COURT: You know, the late football coach Bill Parcells --

MR. JACKSON: Yes, your Honor.

THE COURT: -- said to his now ex-wife, don't tell me about your pain, just show me the Goddamn baby.

Okay. Just cut to the chase.

MR. JACKSON: I'm going to cut to the chase.

We don't think that the personal income taxes are relevant to the *Klein* conspiracy in this charge.

THE COURT: Okay. What's your response to that?

MR. GRUBIN: A large -- pretty large important point of the tax, you know, fraud conspiracy is so that Mr. Motovich pays less in taxes. So, the idea that his tax returns are not relevant is, I --

THE COURT: You can say ludicrous. You can say you

Proceedings 2136

don't think that --

MR. GRUBIN: Is incorrect.

THE COURT: Yes. I'm going to let the tax returns in, as long as the personal identification information is out. It is clearly relevant to a case of this nature.

So, that objection, while preserved for the record for my friends on the 17th floor, is overruled.

MR. JACKSON: Completely different issue, Judge. One question on that.

THE COURT: Yes.

MR. JACKSON: If -- because the -- because that is potentially going to impact a couple of other things down the road, I just wanted to note after we get a chance to see the Court's charge at five o'clock today, we may put in a letter to the Court just to set the stage for what we understand may come from that.

THE COURT: Well, let me just, again, back up in terms of how the charge conference works.

At five o'clock you're going to get on ECF, Court 1, the jury charge; Court 2, the we have reached a verdict sheet; and Court 3, the verdict sheet, as we have talked about before. The forms, obviously.

And then in the charge conference we will go page-by-page, line-by-line, dental visit without Novocain and lots of cavities, through everything.

**J.A. 769**

Proceedings                    2137

MR. JACKSON:  Perfect.

THE COURT:  You are perfectly free between now, meaning 5:00 p.m. today and next week, to exchange with the Government and defense counsel, to exchange proposed additional jury charges, competing jury charges, mutually agreed upon jury charges, to deal with issues that -- my law clerks are brilliant, so anything that we have not addressed, it's the failure of yours truly, the Court, that you would like to see included in the jury charge.

You're not bound by the four corners of what the Court has put before you.  So, if you think that there is something that needs to be done in addition to the brilliant work that my law clerks have done, by all means, you should feel free to submit that either as an agreed upon proposal or competing proposals to the Court.

We are going to have the charge conference now, as I originally scheduled it, on Wednesday.  So, you've got time to review what you're going to get today, think about it, talk with your clients and your colleagues about it, and cobble up whatever additional proposed charges you think you need on either side.  You can do it collectively, competitively, however it works for you.

MR. JACKSON:  Thank you, Judge.

THE COURT:  Does that work?

MR. JACKSON:  Perfect.

Proceedings                    2138

THE COURT:  So, you're not constrained by the structure that you receive.  Although, when I go through it we are going to go page-by-page from what I have drafted, and then I will certainly consider anything that you have suggested.

And if it makes sense for you to suggest your proposed changes on page 87, then that's when you will file your -- state your objection and say, we think on page 87 the charge should be modified to read X, and the Government will say they agree, they disagree.  The Government will say it should be Y, and you will say you agree or disagree.  That's how we will go through it.

So, once you have it in front of you it will make sense to think, both individually and collaboratively, as to what changes you might or might not need.

Does that make sense?

MR. JACKSON:  It's great.  Thank you, Judge.

THE COURT:  In another two hours all will be revealed, at least at this level.

All right.  Anything else from the defense?

MR. JACKSON:  No, your Honor.  Thank you.

THE COURT:  Okay.  Anything else from the Government?

MR. GRUBIN:  No, your Honor.

THE COURT:  Okay.  Let's get the jury back in and

Proceedings                    2139

then we will call the next witness.

THE COURTROOM DEPUTY:  All rise.

(Jury enters.)

THE COURT:  Welcome back, ladies and gentlemen of the jury, and may the force be with you.  Please be seated. As you see, the Candy Man has arrived as well.

We are going to have our hard stop at five o'clock, as we always do, especially since it is Friday.  And I want to thank you for your attention and staying focused.

All right.  We have another witness.

MR. GRUBIN:  Yes, your Honor, although I believe we are going to begin with some stipulations.

THE COURT:  Oh, good.  I'm sure the jury can't wait to have the stipulations on a Friday afternoon.  You guys are just so much fun.

Go right ahead.

MR. GRUBIN:  Your Honor, we're going to be starting with what's been marked as Government Exhibit 6008.

THE COURT:  Yes, sir.

MR. GRUBIN:  And I'll read it in.

It reads:  "It is hereby stipulated and agreed by and between the United States of America by its undersigned counsel" --

THE COURT:  Vader.

MR. GRUBIN:  -- "by its undersigned counsel and the

Proceedings                    2140

defendant, David Motovich, by his undersigned counsel, that if called to testify Ago Kolenovic would state that he looked for the contract relating to the work he did at Dunbar Towers in Monticello.  Kolenovic states that he could not find the contract and, thus, did not turn it over to the Government. He further believes that it could have been destroyed in a fire many years before he first spoke to the Government.

"He would add -- he would add that to the extent that he stated differently during his direct testimony, it was because he misspoke or misunderstood the question.

"This stipulation is admissible into evidence as Government Exhibit 6008.

So stipulated."

THE COURT:  Dated today and signed by counsel for both parties.

All right.  So, ladies and gentlemen, as I told you in the preliminary instructions, and you will hear this in the final jury instructions, a stipulation is something you may take into the jury room, if you wish to consider it, when it is something that has been agreed to by the parties.

Next stipulation.

MR. GRUBIN:  Yes, your Honor.  And we would move that in as Government Exhibit --

THE COURT:  Yes.  It's admitted.  Without objection?

MR. JACKSON:  Zero objection, Judge.

J.A. 770

Proceedings                    2141

THE COURT:  There you go.  Thank you.

(Government's Exhibit 6008 received in evidence.)

THE COURT:  Next.

MR. GRUBIN:  Next, your Honor, is what has been marked as Government Exhibit 6009.

And this stipulation reads:  "It is hereby stipulated and agreed by and between the United States of America by its undersigned counsel and the defendant, David Motovich, by his undersigned counsel, that Gail Motovich also goes by the name Gail Kastner.

"This stipulation is admissible into evidence as Government Exhibit 6009.  So stipulated."

THE COURT:  Any objection to that being admitted?

MR. JACKSON:  No objection, Judge.

THE COURT:  Thank you.

It's admitted.

(Government's Exhibit 6009 received in evidence.)

THE COURT:  You may see that, ladies and gentlemen of the jury, as well.

Thank you.

MR. GRUBIN:  Thank you, your Honor.

THE COURT:  Yes.

MR. GRUBIN:  The Government calls Special Agent Christopher Cabane.

THE COURT:  Will the Special Agent please come

Proceedings                    2142

forward and be sworn.  Please get to the top step.

Raise your right hand, sir, and my court deputy will administer the oath.

THE COURTROOM DEPUTY:  Do you swear or affirm that the answers you are about to give in court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes, I do.

THE COURT:  Thank you.  Please be seated, sir.

I'm going to ask you to pull the microphone towards you.  It looks like a snake, it won't bite you.  Just speak directly and clearly into it.

State your name, spell your name for the record, and then counsel will inquire.

THE WITNESS:  Christopher Cabane, C-H-R-I-S-T-O-P-H-E-R.  Last name Cabane, C-A-B-A-N-E.

THE COURT:  Thank you.

You may inquire, Counsel.

MR. GRUBIN:  Thank you, your Honor.

(Continued on next page.)

Proceedings                    2143

CHRISTOPHER CABANE,
    called as a witness, having been first duly
    sworn/affirmed, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. GRUBIN:
Q    Good afternoon.
A    Good afternoon.
Q    Where do you work?
A    The IRS Criminal Investigation.
Q    And does that stand for the Internal Revenue Service?
A    Yes.
Q    What is the IRS Criminal Investigation?
A    IRS Criminal Investigation is a division of IRS that focuses on the criminal enforcement of the Internal Revenue code.
Q    And what's your position there?
A    I'm a special agent.
Q    How long have you been a special agent at the IRS?
A    It's coming up to 17 years.
Q    Where is your office?
A    Brooklyn, New York.
Q    What are some of your responsibilities in that position?
A    As a special agent, I plan and conduct criminal tax investigations; and investigations into related financial crimes, such as money laundering and Bank Secrecy Act

Proceedings                    2144

violations.
Q    And what sorts of things do you do as part of an investigation?
A    Within an investigation we would interview witnesses, do surveillance, financial analysis, participate in undercover activity -- undercover operations.
Q    Have you received training as a special agent?
A    Yes.
Q    What type of training?
A    Initially, we get training at the Federal Law Enforcement Training Center in Brunswick, Georgia for six months.
Q    And can you just generally describe the training?
A    Yes, we go over the ways to conduct a financial investigation, as well as defensive tactics, firearms training, report writing, interviewing skills.
Q    And what did you -- what was your educational background prior to becoming a special agent?
A    I obtained a Bachelor's degree in finance.
Q    Special Agent Cabane, did you participate in an investigation into the defendant, David Motovich?
A    Yes.
Q    And what other agencies, if any, were involved in that investigation?
A    The Department of Justice, U.S. Attorney's Office special agents, as well as FBI.

J.A. 771

Proceedings                                    2145

Q    So, it was a joint investigation among the -- those different agencies?

A    Yes.

Q    And approximately when did that investigation start?

A    In mid-2018.

Q    Did the investigation stem from an existing investigation?

A    Yes.

Q    Was there an interest in the bank account associated with Ago & Alaudin Contracting Corp. that you have heard discussion about throughout this trial?

A    Yes, that's what kicked off this investigation.

Q    And that separate interest led law enforcement to the defendant, David Motovich?

A    Yes.

Q    How long have you been participating in the investigation?

A    Since also around mid-2018.

Q    How did the IRS become involved?

A    The IRS was formally invited by the U.S. Attorney's Office in the Eastern District of New York.

Q    Can you generally tell us, at a high level, what your role is on the investigation or has been?

A    I've been a lead agent for the IRS related to this investigation and a co-case agent with the other agencies that

---

Proceedings                                    2146

I've mentioned.

Q    What are some of the things you have done?

A    I've done financial analysis of bank records, voluminous bank records. Reconciled tax returns with other financial records. Interviewed witnesses. Participated in search warrants and also the arrest warrant.

Q    Did you also trace money between different financial accounts?

A    Yes.

Q    And can you just generally speak how you went about doing that?

A    After receiving the bank records from the institutions we subpoenaed, I would review those and put them in spreadsheets, and analyze them from there.

Q    From your review of the records in this case, were you able to identify a bank account in the name of ZKC New York, Inc.?

A    ZKC NY, Inc., yes.

Q    Thank you.
     Who was the account signatory for the bank account?

A    It was purportedly to be Reginald Garcia.

Q    What does it mean to be an account signatory?

A    It means that you have the authority to make deposits and withdrawals and other transactions in that account.

Q    Do you recall which bank had this account?

---

Proceedings                                    2147

A    Carver Federal Savings Bank.

Q    As just one more example, from your review of the records in this case, were you able to identify a bank account in the name of a company called M&M USA Consulting?

A    Yes.

Q    Who was the account signatory for that bank account?

A    Robert Lovy.

Q    Which bank was that?

A    JP Morgan Chase.

Q    Were there other companies for which you examined similar financial tax and corporate records as part of this investigation?

A    Yes, there was at least six other companies.

Q    What were some of those companies?

A    Ago & Alaudin Contracting Corp., Midwood U.S.A. Consulting Corp., CNBC Construction Corp., Midwood Building Corp., and SGS Construction Building Corp.

Q    Based on your review of the records associated with those bank accounts, did you assist in preparing a summary chart reflecting some of its contents?

A    Yes.

Q    I will show you that chart for -- as what has been marked for identification --

     MR. GRUBIN:  Just for the witness.

Q    -- as Government Exhibit 5000.

---

Proceedings                                    2148

     MR. GRUBIN:  I would also move it into evidence.

     THE COURT:  Any objection to Government 5000?

     MR. JACKSON:  No objection, Judge.

     THE COURT:  It's admitted.
     You may publish.

     (Government's Exhibit 5000 received in evidence.)

     (Exhibit published.)

Q    So, Special Agent Cabane, at a high level, can you just tell us what this chart shows?

A    This shows eight shell companies and their respective bank accounts, and also an individual account in the name of Kemal Sarkinovic.

Q    And let's just -- I just want to go through some of the different columns.
     Starting with the first one on the left, under "Subject Bank Account," what's listed below that?

A    That is the name of the bank accounts.

Q    And the column to the right, which says "Bank."

A    Uh-him.

Q    And then you see a series --

     THE COURT:  You can't say uh-him. You have to say yes or no. Not that you haven't been here the whole time.

     THE WITNESS:  Sorry, Judge.

     THE COURT:  Okay. Really, you? Come on, you know

J.A. 772

Proceedings                2149

about yes or no.

Go ahead.

BY MR. GRUBIN:

Q    What is the information contained under the "Bank" column?

A    That's an abbreviated name of the bank.

Q    And I also notice that Ago & Alaudin Contracting Corp. appears to be listed twice.  Why is that?

A    Yes, there were two business bank accounts for Ago & Alaudin Contracting Corp., one at Astoria Federal Savings Bank and the other at JP Morgan Chase.

Q    Did Astoria go by other -- was Astoria previously called by a different name?

A    Astoria was acquired by Sterling National Bank, and Sterling National Bank was acquired by Webster Bank.

Q    And how many banks are listed overall?

A    There's four banks.

Q    What is the next column over?

A    "Account Number."

Q    What's an account number?

A    The account number is the Unique identifier that the bank assigns to an account.

Q    And under -- in the next column over is "Signatory Listed"; is that right?

A    Yes.

Proceedings                2150

Q    What's that?

A    That is the person that is authorized to make transactions on that account.  All of these accounts have only one signatory.

Q    And what do you notice about the signatories listed, if anything?

A    There's three people, and these individual -- two of these individuals have multiple accounts on this chart.

Q    Who are the three people?

A    Kemal Sarkinovic, Robert Lovy, and Reginald Garcia.

Q    And the next column over, under "Address Listed With Bank," what is that?

A    That's the address that the account reported as the business address or home address of the underlying accountholder.

Q    And are these all in Brooklyn, New York?

A    Yes.

Q    So, are there some similar addresses listed?

A    Yes.

Q    Which ones do you see more than once?

A    1090 Coney Island Avenue appears multiple times.

Q    And is that true, regardless of who the signatory listed is?

A    Yes.

Q    Are there any other at -- well, okay.

Proceedings                2151

Let's talk about a few of the addresses.  I guess we will start with 1090 Coney Island Avenue, have you looked into that address?

A    Yes, I have.

Q    What, if anything, have you learned about that address?

A    That is an address that David Motovich has a financial interest in.

Q    And where is it located?

A    In Brooklyn, New York.

Q    How about in relation to Midwood Lumber?

A    It is across the street and approximately one -- within one block from Midwood Lumber.

Q    Have you learned anything from your investigation about 49071st Avenue Brooklyn, New York?

A    Yes.

Q    What's that?

A    That's a property that David Motovich has an ownership interest in.

Q    What about 1122 Coney Island Avenue, what, if anything, have you learned about that address from your investigation?

A    That is another property that David Motovich has an ownership interest in and also that's the address of Coney Island Payroll Services.

Q    Let's actually pull up, if we can for a moment, Government Exhibit 25, which has already been admitted?

**J.A. 773**

Proceedings                2152

THE COURT:  You may publish.

MR. GRUBIN:  Thank you, your Honor.

(Exhibit published.)

Q    What is this a picture of?

A    That's 1090 Coney Island Avenue.

Q    Which building?  Could you describe the building you're referring to?

A    Can I draw on this?

THE COURT:  Touch the screen.

A    (Indicating).

Q    And what about 1100 Coney Island Avenue?

A    That's to the left, over here.

Q    And 1122?

A    And further to the left.

Q    So they're all across -- they are all in that general vicinity?

A    It looks like one large building, but it's actually multiple buildings that are joined together, multiple addresses, I should say.

Q    Let's turn back to Government Exhibit 5000.  What does the column labeled "business establish date" mean?

A    That's the date that the business acquired its EIN, Employer Identification Number, from the IRS via form SS-4.

Q    And I'm sorry.  What's an EIN number?

A    Employer Identification Number.

Proceedings 2153

Q    What does that mean?

A    That is the equivalent of a social security number for a business and it has a different format, but the same amount of digits, nine digits.

Q    Is there a reason why it says non-applicable or NA next to Kemal Sarkinovic's -- the account purportedly belonging to Kemal Sarkinovic?

A    Yes.  Kemal Sarkinovic is an individual and not a business, so....

Q    What about next column, "Account Open Date"?

A    That is the date that that respective business bank account or individual account for Kemal Sarkinovic, that's when it was opened.

Q    What do you notice about the business statement dates and account open dates for these companies, if anything?

A    Well, two of them were opened on the same day, and there are -- beginning in 2009 through 2018.  Sorry, three of them were opened on the same day.

Q    And what about for the most part -- and what, if anything, do you notice about the business establishment dates in relation to the account open dates --

A    They're --

Q    -- for some of these companies?

A    They're typically shortly after or the next day that after the business is established an account is then opened.

Proceedings 2154

Q    What does the last column to the right mean?

A    Incorporation paperwork filer, that's the individual or company that filed the incorporation documents with the State, with New York State.

Q    And what, if anything, do you notice about this column?

A    It's the same person, Marina Kuyan, for six of the eight companies.

Q    And that's regardless of who the signatory listed is?

A    Yes, regardless of who the signatory is.

Q    Or which bank it is?

A    Yes.

Q    Do you have any idea what USA Corp., Inc., means?

A    USA Corp, Inc., is a legal services business and it would open up a company for you if you enlist their services.

Q    Based on your review of the subject bank accounts on Government Exhibit 5000 here, were you able to determine some of the deposits that went each of these accounts?

A    Yes.

Q    From your review, did you observe checks from bank accounts associated with Lithos Marble to these subject bank accounts?

A    Yes.

Q    And who owned or managed Lithos Marble?

A    Phillipos Adamou.

Q    Did you observe checks from bank accounts associated with

Proceedings 2155

Unique Painting?

A    Yes.

Q    To the subject bank accounts list on Government Exhibit 500?

A    Yes.

Q    Who owned or managed Unique Painting?

A    Roman Kretsula.

Q    Did you observe checks from bank accounts associated with Metro Erectors, Metro Fabrication, Metro Steel Fabricators, Metro Equipment and 5801 Eighth Avenue J Reality into the subject bank accounts?

A    Yes.

Q    Who managed those companies?

A    Joseph Russo was one of the principals of those businesses.

Q    From your review of the records, were the forms of deposits from these companies anything other than paper check?

A    From those three -- from those companies?

Q    Right.

A    They were only checks that were deposited into these accounts.

Q    Did you assist in the preparation of a chart documenting a sample of the checks from the companies you just discussed to the subject bank accounts?

A    Yes.

Proceedings 2156

MR. GRUBIN:  At this time I would move in Government Exhibit 5001-A.

THE COURT:  Any objection to 5001-A?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

You may publish.

(Government's Exhibit 5001-A received in evidence.)

(Exhibit published.)

Q    Special Agent Cabane, did you help prepare this chart here?

A    Yes.

Q    And what does it show?

A    This shows the checks that were written from Lithos Marble Works, Inc., Unique Painting Services and the companies that Joseph Russo had a -- was the operator of to the companies that we just saw in the previous chart to include Ago & Alaudin ZKC, CNBC Construction, Midwood Building Corp., Midwood USA Consulting, and SGS Construction Building Corp.

Q    What's the date range?

A    January 2012 through December 2018.

Q    Were there earlier checks from those companies to the subject bank accounts?

A    Yes.

Q    Later checks?

A    Yes.                  (Continued on next page.)

**J.A. 774**

Cabane - direct - Grubin                    2157

BY MR. GRUBIN:  (Continuing.)

Q    Also during the course of your investigation did you review records from Coney Island Payroll Services?

A    Yes, I did.

Q    What did you observe from those records?

A    There were also checks written to those same subject companies and negotiated at Coney Island Payroll Services.

Q    From Lithos Marble, Unique Painting and the Metro Companies?

A    Yes.

Q    And are those reflected here?

A    No.  These are just deposits into the bank accounts.

Q    At a minimum, how much money by check went from Lithos Marble into the subject bank accounts during the period listed on this chart?

A    2,746,108.

Q    What about from Unique Painting services?

A    2,609,742.

Q    What about Metro -- the Metro companies?

A    $1,018,759.

Q    And approximately how much money is that all together?

A    Approximately -- over $6.3 million.

Q    Did you assist, Special Agent Cabane, in the preparation of a more detailed breakdown of this analysis?

A    Yes, I did, a check spread.

---

Cabane - direct - Grubin                    2158

Q    I'm showing you --

MR. GRUBIN:  And this is just for the witness what is marked for identification as Government Exhibit 5001-B, although I do offer it into evidence, your Honor.

THE COURT:  Any objection to 5001-B, as in boy?  Could you display to the adversary and court.

MR. GRUBIN:  5001-B.  We're having a technical difficulty.

THE COURT:  It must be Microsoft Friday.  What is the exhibit that you are seeking to offer, by number?

MR. GRUBIN:  Government Exhibit 5001-B, your Honor.

THE COURT:  Mr. Jackson, do you have that document in some form?

MR. JACKSON:  We have no objection, your Honor.

THE COURT:  It is admitted.

(Government Exhibit 5001-B received in evidence.)

THE COURT:  You may publish by ELMO or whatever.

MR. GRUBIN:  Thank you, your Honor.

THE COURT:  How can you get this before the jury?  Is there a way to do that.

MR. GRUBIN:  There would be, I think these -- the screens would be helpful for some of these charts.

THE COURT:  That would be nice, but you know me and tech.  It's not exactly a marriage made in heaven.

MR. GRUBIN:  Here we go.

---

Cabane - direct - Grubin                    2159

THE COURT:  Thank you, young lady.  We appreciate you.

Let's keep going, 5001-B.  Continue your examination.

(Exhibit published.)

MR. GRUBIN:  Thank you, your Honor.

BY MR. GRUBIN:

Q    Special Agent Cabane, what is this chart?

A    This is a check spread between the companies Lithos Marble Works, Unique Painting and the Metro companies to the subject bank accounts that we've been discussing.

Q    And so this is a more detailed analysis of what we just saw previously; correct?

A    Yes.

THE COURT:  Who prepared this chart by the way?

THE WITNESS:  I assisted in the preparation of this chart.

THE COURT:  Okay.  Go ahead.

MR. GRUBIN:  Thank you, your Honor.

BY MR. GRUBIN:

Q    Starting from the left what does the first column "Date" represent?

A    That was the date that the check cleared in the bank account.

Q    And how are the rows organized?

---

Cabane - direct - Grubin                    2160

A    In chronological order.

Q    What does the column called "Payer" represent?

A    That is the company that made the check.

Q    And in this case it would be Lithos, Unique Painting and the Metro companies; correct?

A    Yes.

Q    What about the next column, "Check Number"?

A    That's the check number on the check.

Q    And the next item or the next heading I see is subject "Bank Account" and obviously what does the "Amount" column represent?

A    The "Amount" column is the amount of the check.

Q    So, let's just do one example.  Let's take a look at the third row, which is February 10, 2012.

MR. GRUBIN:  Ms. Kannan, can we show what's already been admitted in evidence as Government Exhibit 702?

(Exhibit published.)

Q    First of all, what is this, Special Agent Cabane?

A    This is the signature card, business signature card, for SGF Construction Building Corporation, that bank account held at JPMorgan Chase.

MR. GRUBIN:  And if we could turn to page 533, Ms. Kannan.  Is there any way to put this up next to Government Exhibit 5001-B?

(Exhibit published.)

J.A. 775

Cabane - direct - Grubin                2161

Q    What was the date of the deposit of the check reflected on Government Exhibit 702?

A    The date of the deposit?

Q    The deposit, so above --

MR. GRUBIN:  So sorry, Ms. Kannan.  If you can actually highlight the deposit date.  Thank you.

A    So, the check -- the check posted on February 10, 2012.

Q    And is that the same -- is that what appears in your chart?

A    Yes.

Q    Who's the payer?

A    Lithos Marble Works, Inc.

Q    Is that what appears in your chart?

A    Yes.

Q    Is the check made payable to SGF Construction, Inc.?

A    Yes.

Q    Is that what's reflected on your chart?

A    My chart says SGF Construction and Building Corp. so that's where it was deposited into SGF Construction and Building Corp.

Q    Is the amount $12,000 the same?

A    Yes.

Q    What about the check number 1722?

A    That's also the same.

Q    So would we find similar results --

Cabane - direct - Grubin                2162

MR. GRUBIN:  We can just focus on Government Exhibit 5001-B now Ms. Kannan.  Thank you.

BY MR. GRUBIN:

Q    Would we find similar results if we went down each row here on page one of your chart?

A    Yes, it would reconcile.

Q    And would that be the same if we went to page two?

A    Yes.

Q    What about page three?

A    Yes.

Q    What about page four?

A    Yes.

Q    Page five?

A    Yes.

Q    Page six?

A    Yes.

Q    And page seven?

A    Yes.

Q    And, again, what's the total of the sample listed here?

A    6,374,609.30.

Q    By the way, in each year reflected on this chart from 2012 to 2018, is the amount of money of checks being deposited into the subject bank accounts over $100,000?

A    Yes.

Q    So, aside from Unique Painting, the Metro companies and

Cabane - direct - Grubin                2163

Lithos, did you investigate any other sources of deposits that went into the subject bank accounts listed on Government Exhibit 5000?

A    Yes, I did.

Q    As one example, did you observe any payments or deposits from any bank accounts associated with Antonov Stonework Group?

A    Yes.

Q    Which bank account?

A    The ZKC NY account held at Harvard Federal Savings Bank.

Q    I'm showing you what's already been admitted as Government Exhibit 1197.

MR. GRUBIN:  Permission to publish, your Honor.

THE COURT:  You may publish.

(Exhibit published.)

BY MR. GRUBIN:

Q    What is this?

A    This is the text messages pulled from David Motovich's iCloud.

Q    Pursuant to a court-authorized warrant?

A    Yes.

Q    And who are the participants in this conversation?

A    This is David Motovich and someone listed in his phone as Anton Marble.

Q    And what does Mr. Motovich write on August 31, 2017?

Cabane - direct - Grubin                2164

A    "Make to ZKC NY."

Q    I'm showing you what's already been admitted as Government Exhibit 774.

THE COURT:  You may publish.

(Exhibit published.)

Q    Who is this an e-mail from?

A    Rosa Schwartz, Rosa@MidwoodLumber.com.

Q    And who is it addressed to?

A    To Mkuyan1031.

Q    And is the date June 28, 2016?

A    Yes.

Q    Is the subject "Certificate"?

A    Yes.

Q    Let's turn to the attachment on page two.  What is this document?

A    This is an Accord certificate of insurance.

Q    And who is listed as the producer?

A    Vukel Group Insurance Agency.

Q    Who listed under insured?

A    ZKC NY Inc.

Q    Who is the certificate holder here?

A    Antonov Stonework Corp.

Q    Did you prepare or help prepare a chart documenting check payments from Antinov Stonework Group to ZKC NY, Inc.'s bank account at Harvard Bank?

J.A. 776

Cabane - direct - Grubin          2165

A     Yes.

MR. GRUBIN:  So I'm showing just the witness what's been marked for identification as Government Exhibit 5002 and we would offer it for evidence, your Honor.

THE COURT:  Any objection to Government Exhibit 5002?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government Exhibit 5002 received in evidence.)

THE COURT:  You may publish.

(Exhibit published.)

BY MR. GRUBIN:

Q     What does this chart show?

A     This is a check spread of checks made payable from Antonov Stonework Group to ZKC NY, Inc.

Q     And we see the same date, the same date column; correct?

A     The date column is the date that the check was cleared.

Q     And it's, again, arranged chronologically?

A     Yes.

Q     And the payer in each case here is Antonov Stonework Group Corp. because that's what you were looking for; correct?

A     Yes.

Q     And we again have the column "Check Number"?

A     Yes.

Q     And "Payee" and in this case each one was ZKC; correct?

---

Cabane - direct - Grubin          2166

A     Yes.

Q     So let's again look at one example.  I'm showing you what's already been admitted as Government Exhibit 707.

THE COURT:  You may publish.

(Exhibit published.)

Q     And are these the ZKC bank records?

A     Yes.

Q     Let's turn to page 756.  What is this check?

A     This check is a check from Antonov Stonework Corp. check number 4631 made payable to ZKC NYC, Inc. for $53,486.

MR. GRUBIN:  And is there a way, Ms. Kannan, to pull this up next to Government Exhibit 5002?  And if we could look at the third row up from the bottom, beginning with July 24, 2017.

(Exhibit published.)

Q     Is that the same date we saw on the check?

A     Yes, July 24, 2017.

Q     And you see the check number is 4631.  Is that the same on both?

A     Yes.

Q     And the amount, 53,486, the same on both?

A     Yes.  The -- the July 24, 2017 is from the "Clear Date." That's listed next to "Transit" on the bottom of the check.

Q     Understood, thank you.  And would this be the case -- would we see similar result if we went through each of the

---

Cabane - direct - Grubin          2167

rows on your chart?

A     Yes.

Q     Also, we previously looked at a text message on Government Exhibit 1074 between Motovich and a contact called Anton Marble; is that right?

A     Yes.

Q     And is that on August 31, 2017?

A     The e-mail sort or the -- I'm sorry?

Q     The text message.  If we want to go back quickly to refresh your recollection.  If we could look at Government Exhibit 1197.

THE COURT:  You may publish.

(Exhibit published.)

MR. GRUBIN:  Thank you, your Honor.

Q     What's the date of the message that you see here?

A     August 31 -- August 31, 2017.

Q     Okay.  And if we could now go back to 5002?

(Exhibit published.)

Q     Do you see August 31, 2017?

A     Yes, it's the second-to-the-last check.

Q     And how much is that for?

A     40,000 even.

Q     We also saw one of these Marcie Vukel purportedly certificate listing Marcie Vukel on June 28, 2016; correct?

A     Yes.

---

Cabane - direct - Grubin          2168

Q     I'm directing your attention to the first row.  Was there a check around that date?

A     Yes.

Q     For how much?

A     22,000.

Q     And was that the same date as the certificate of insurance purported he from Ms. Vukel?

A     Yes.

Q     Approximately how much money were you able to trace, Special Agent Cabane, going from Antonov Stonework Corp. to ZKC NY Inc.?

A     At least $345,818.22.

Q     And could we do the same exercise with other sources of deposits from different subject bank accounts listed going to Government Exhibit 5000?

A     Yes, multiple, numerous.

Q     Based on your review of the subject bank records, bank account records, in Government Exhibits 701 through 710 did you trace additional deposits into each of these subject bank accounts?

A     Yes.

Q     And did you assist in the preparation of a chart summarizing those deposits?

A     Yes.

Q     I'm showing you --

**J.A. 777**

Cabane - direct - Grubin                2169

MR. GRUBIN:  And this is just for the witness, what has been marked for identification as Government Exhibit 5003 and we would offer it.

THE COURT:  Any objection to 5003?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government Exhibit 5003 received in evidence.)

THE COURT:  You may publish.

(Exhibit published.)

BY MR. GRUBIN:

Q    What does this chart summarize, Special Agent Cabane?

A    This chart summarizes the deposits into the bank accounts for the shell companies between 2012 and 2019, minus any return of deposits or transfers between the companies within this network.

Q    What does that mean, transfers between the companies within this network?

A    For example, if M&M USA Consulting Corp. transferred money to Ago & Alaudin Contracting Corp. that's not included as a deposit for Ago & Alaudin.

Q    I see.  I see that the subject bank accounts we saw previously are listed down in the first column here and then there are a series of column headings by years starting with 2012 along the top.

So, what do these years represent?

Cabane - direct - Grubin                2170

A    These are the years that I analyzed and included on this chart.

Q    Okay.  So just as an example, if we look at the row next to ZKC where you see, I believe, it's 4,733,545.38, what does that number reflect?

A    That's the deposits into ZKC NY, Inc., again minus any transfers into ZKC from the other shell companies minus any return of deposits or miscellaneous fees, return of fees.

Q    I apologize if you said this, for the year 2016?

A    Yes, for the year 2016.

Q    If we look to the far right, that over 9.5 million number, what does that reflect?

A    That's the total between 26 and 27, 2016 and 2017.

Q    That went into -- for what?

A    That was deposited into ZKC NY, Inc.

Q    And what, if anything, did you observe about the activity in these subject bank accounts over the years listed?

A    Basically when certain accounts closed, new accounts opened.

Q    What does the number in green at the bottom right 53,136,795 represent?

A    That is the grand total of deposits into these shell companies.

Q    But did more than 53.1 million flow through the subject bank accounts?

Cabane - direct - Grubin                2171

A    Yes.  This is at least this amount.

Q    So you mentioned, I believe, transactions between the different subject bank accounts; is that right?

A    Yes.

Q    And that's one source that wasn't included on this chart?

A    Yes, that was not included on the total deposits.

Q    Did you assist with the preparation of a chart that included a sample of those transactions between the different accounts?

A    Yes.

MR. GRUBIN:  This is just for the witness, what has been marked for identification is as Government Exhibit 5011.

THE COURT:  Any objection to 5011?

MR. JACKSON:  No, Judge.

THE COURT:  Admitted.

(Government Exhibit 5011 received in evidence.)

THE COURT:  You may publish.

(Exhibit published.)

MR. GRUBIN:  Thank you, your Honor.

BY MR. GRUBIN:

Q    What does this show, Special Agent Cabane?

A    This is a list of transactions, whether it is a checking account transfer or a check between the shell company bank accounts.

Q    And what is the second column "Transferor," what does

Cabane - direct - Grubin                2172

that mean?

A    That is where the funds originated.

Q    What about "Transferee"?

A    The beneficiary of the funds.

Q    And presumably the column "Amount" is the amount of money; correct?

A    Yes.

Q    So at the bottom right of the chart if we can scroll down what does the green number represent?

A    That's the grand total for this chart.

Q    And what -- and here it's $2,591,645 plus change?

A    Yes.

Q    And, what, if anything, do you notice about the list of subject bank accounts here?

MR. GRUBIN:  If we could look -- blow up, sort of, just the different -- there we go, thank you, Ms. Kannan.

A    I'm sorry, repeat the question?

Q    Sure.

MR. GRUBIN:  If you could move out of that.

THE COURT:  Why don't you read the question back. Keep your voice up, Madam Reporter.  Use the microphone.

(Record read.)

THE COURT:  Can you answer that question?

THE WITNESS:  Yes.

A    So, looking at this chart you can see that all of the

**J.A. 778**

Cabane - direct - Grubin                2173

subject bank accounts transacted with each other.

Q    And largely based on this chart, what if anything can you tell us about the money going into the bank account associated or purportedly associated with Kemal Sarkinovic?

A    Kemal Sarkinovic's account was primarily funded by transfer from CNBC Construction Corp., and Midwood Building Corp. which was held at the same bank, Investors Bank.

Q    So let's just look at a few examples.  I'm going to show you what's already been admitted as Government Exhibit 701 at page 721.

        (Exhibit published.)

        THE COURT:  Are we having a Microsoft problem?

        MR. GRUBIN:  Your Honor, we can come back to this chart, I think.  We're going to do back to this one.  We can finish this chart later, when the technical issues have been solved, your Honor.

        THE COURT:  I am sure the jury would appreciate that almost as much as the Court would appreciate that.  Thank you.

BY MR. GRUBIN:

Q    You testified earlier, Special Agent Cabane, that sometimes checks from companies like Lithos and Unique Painting were exchanged for cash at Coney Island Payroll Services rather than deposited at a bank?

A    Yes.

Q    Did you assist in the preparation of a chart showing a

---

Cabane - direct - Grubin                2174

summary of checks made out to the subject companies that were exchanged for cash at Coney Island Payroll Services?

A    Yes.

Q    And is this based on records from Coney Island Payroll Services?

A    Records obtained via by subpoena and also by search warrant.

Q    I'm showing you --

        MR. GRUBIN:  This is just what has been marked for identification as Government Exhibit 5001-C.

        THE COURT:  Any objection to 5001-C?

        MR. JACKSON:  No objection, Judge.

        THE COURT:  Admitted.

        (Government Exhibit 5001-C received in evidence.)

        THE COURT:  You may publish.

        (Exhibit published.)

BY MR. GRUBIN:

        MR. GRUBIN:  And I guess if we could just blow up the top header or the top half of the exhibit?

Q    So, what does this chart show?

A    This is a chart of checks that the shell companies had negotiated at Coney Island Payroll Services.

Q    Looking at the column furthest to the left "Subject Companies," are these the same -- well, why does this one say "Subject Companies" as opposed to "Subject Bank Accounts"?

---

Cabane - direct - Grubin                2175

A    Because these are not the bank accounts that we were -- that we've been discussing.  These are the companies that established that had a check cashing profile established at Coney Island Payroll and checks were later negotiated under those company profiles.

        MR. GRUBIN:  If we could get out of this and just go to the main exhibit.

        (Exhibit published.)

Q    So looking at the bottom row under the year 2013, what does that number 444,600 represent?

A    That's the total -- total in checks that were negotiated at Coney Island Payroll from SGF Construction Building Corp., M&M USA Consulting Corp. and Advertising on the Go Corp.

        THE COURT:  Could you blow it up?  It's very small there.  Thank you.

        Go ahead.

        MR. GRUBIN:  Thank you, your Honor.

        THE COURT:  The jury needs to be able to see it.  Go ahead.

BY MR. GRUBIN:

Q    And if we go to the last column under "Total," is that nearly $5.5 million?

A    Close to it.  That's the grand total.

Q    And what does that number reflect?

A    That's the grand total of checks cashed for these

---

Cabane - direct - Grubin                2176

companies at Coney Island Payroll Services.

Q    And might there have been more checks not reflected here?

A    Yes.

Q    This is what you got back, as you said, from the search warrant?

A    The search warrant and some of the them were via subpoena.

        THE COURT:  Were what?

        THE WITNESS:  Pursuant to a subpoena, a grand jury subpoena.

        THE COURT:  Go ahead.

BY MR. GRUBIN:

Q    Were there at least over $100,000 from checks from Unique Painting the Metro companies and Lithos included here?

A    Yes.

Q    We've been discussing deposits into these different subject bank accounts; is that right?

A    He.

Q    For each would of these bank accounts did you also review payments out of the accounts?

A    Yes, I did.

Q    Did you identify payments from the subject bank accounts to Bloomingdales?

A    Yes.

        (Continued on the following page.)

J.A. 779

C. Cabane - Direct/Mr. Grubin 2177

EXAMINATION BY

MR. GRUBIN:

(Continuing.)

Q   I'm showing you what has already been admitted as Government Exhibit 2002.

MR. GRUBIN:  Permission to publish.

THE COURT:  You have it.

(Exhibit published.)

Q   Are these Bloomingdale's account records?

A   Yes, this is the first page.

Q   And what can you know from this page?

A   This is the profile for Lyudmila Motovich at Bloomingdale's.

Q   Do you see an address there?

A   Yes.

Q   What address is that?

A   303 East 57th Street, Apartment 47G, New York, New York 10022.

THE COURT:  How can you tell it's Bloomingdale's? I don't see the word Bloomingdale's.  Is there some indication?

MR. GRUBIN:  If we can turn to Page 2, your Honor.

THE COURT:  Yes.

Q   What, if anything, do you know about Macy's and Bloomingdale's?

C. Cabane - Direct/Mr. Grubin 2178

A   Macy's is the parent company of Bloomingdale's.

THE COURT:  Is there a reference to it on this -- okay.  Under portfolio, is that the line?

MR. GRUBIN:  Yes, your Honor.

THE COURT:  Point this out to the jury so they get familiar with it and we can move on.

MR. GRUBIN:  Thank you, your Honor.

Q   Who is Lyudmila Motovich?

A   David Motovich's wife.

Q   And so, these are different accounts Bloomingdale's accounts associated with David Motovich and/or his wife; is that fair?

A   That's fair.

Q   Based on your review of these records, did you identify transactions involving the subject bank accounts listed on Government Exhibit 5000?

A   Yes.

Q   Did you assist in the preparation of a summary chart reflecting those transactions?

A   Yes, I did.

Q   I'm showing you, and this is just for the witness, what has been marked as Government Exhibit 5004.

THE COURT:  Any objection to 5004?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

C. Cabane - Direct/Mr. Grubin 2179

(Government's Exhibit 5004 was marked in evidence.)

(Exhibit published.)

MR. GRUBIN:  Thank you, your Honor.

Q   What does this top chart here show?

A   The top part of the chart, sorry, is the total of payments from either the shell company bank accounts or Kamel Sarkinovic's individual account.

Q   So, just as an example, next to the number towards the bottom or in the middle there $11,383.67.  Does that number reflect the amount of money that went from the ZKC New York, Inc., account at Carver Bank with the signatory Reginald Garcia to a Bloomingdale's account associated David Motovich or his wife?

A   Yes.

Q   And what is the total there listed on the bottom of the page?

A   The grand total is $74,710.08.

Q   And then you have a second chart below that.  This chart; is that right?

A   Yes, that's a detailed check spread of all the checks from the shell company bank accounts to Bloomingdale's.

Q   So let's do one example.

MR. GRUBIN:  Ms. Kannan, if there is a way that we can keep this exhibit up but also pull up

C. Cabane - Direct/Mr. Grubin 2180

Government Exhibit 2002, the Bloomingdale's/Macy's records we were looking at Page 91.

Q   So, Special Agent Cabane, what is on this page?

A   This is a check image from the Kamel Sarkinovic account held at Investors Bank to Bloomingdale's for $1,420.44.

MR. GRUBIN:  And, Ms. Kannan, if we can actually blow up the top part as well which will have the posting date of the check.

Q   What date do you see here for the processing date?

A   The processing date is listed as June 11, 2018.

Q   And if we look at your chart next to June 12, 2018, do we see the same check number 117 listed there?

A   Yes.

Q   And is it the same amount?

A   Yes.

Q   Why, if you know, would the date be different, the processing date, June 11th; June 12th?

A   Well, the check date is written and it's very possible that by the time the check arrived at Bloomingdale's, it was processed at a later date.

Q   So, on Government Exhibit 5004, which subject bank account is listed?

A   The Kamel Sarkinovic account.

Q   So is it fair to say that according to these records, the individual account in the name of Kamel Sarkinovic

**J.A. 780**

C. Cabane - Direct/Mr. Grubin                2181

deposited over $1,400 to pay for Motovich's or his wife's account at Bloomingdale's on or about June 12, 2017?

A   Yes, that account sent $1,420.44 to David Motovich's and Lyudmila's Motovich's Bloomingdale's account.

Q   And I'm showing you what has been admitted as Government Exhibit 2002-A?

MR. GRUBIN:  Permission to publish.

Q   Is this a subset of the Bloomingdale's accounts we've just been looking at?

A   Yes.

Q   Are these just different checks?

A   This is another check that I'm looking at.

Q   Let's look, and what is this exhibit?  Does this exhibit consist of different checks?

A   Yes.

Q   Let's look at an example on Page 2.

MR. GRUBIN:  If we could blow up including the top part, too, Ms. Kannan, with the postage date and the check.

Q   So is this a check from SGS Construction Building to Bloomingdale's in the amount $1,011 and it looks like $0.73?

A   Yes.

Q   And you see the signature purported to be Kamel Sarkinovic in the bottom there, in the bottom right?

A   Yes.

Q   Is this reflected on your chart?

C. Cabane - Direct/Mr. Grubin                2182

A   Yes.

Q   And would that be the case, by the way, if we went through each of the rows on your chart, we would see the same information reflected in these records?

A   Yes, that's correct.

Q   Is there a way to pull up page a Page 4, the next page next to this one.  If we could just blow up the two checks. I'm sorry, we can come back to this, I apologize.

Did you also observe payments from the subject bank accounts to Saks Fifth Avenue?

A   Yes, I did.

Q   I'm showing you what's already been admitted as Government Exhibit 2000-A?

THE COURT:  You may publish.

(Exhibit published.)

MR. GRUBIN:  Ms. Kannan, I'm sorry, 2008-A.  And if we could blow up the top half.

Q   What is this account information for, Special Agent Cabane?

A   This is for David Motovich.

Q   And do you see the same apartment we saw before?

A   Yes, Apartment 47G.

Q   And you see the e-mail davidmidwood@gmail.com?

A   Yes.

Q   I want to show you what's already been admitted as

C. Cabane - Direct/Mr. Grubin                2183

Government Exhibit 2008-B.

THE COURT:  You may publish.

Q   If we could blow that up.  And you see whose name is listed for this account?

A   Lyudmila Motovich.

Q   And it's the same apartment we've seen before?

A   Apartment 47G.

Q   And I'm going to show you what's been admitted as Government Exhibit 2008-C.

THE COURT:  You may publish.

(Exhibit published.)

Q   Are these account records Sak's account records associated with David and his wife, David Motovich and his wife Lyudmila?

A   Yes.

Q   Did you assist in the preparation of a summary chart reflecting transactions between the Saks accounts and the subject bank accounts listed on Government Exhibit 5000?

A   Yes, I did.

MR. GRUBIN:  And I'm going to show just the witness, your Honor, what's been marked for identification as Government Exhibit 5005?

THE COURT:  Any objection to 5005?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

C. Cabane - Direct/Mr. Grubin                2184

(Government's Exhibit 5005 was marked in evidence.)

(Exhibit published.)

Q   Special Agent Cabane, what does the top chart show here?

A   That is the total of payments made from the shell company bank accounts to Saks Fifth Avenue.

Q   So, again, just as an example, the number at the bottom, $25,602.32 and is next to the far right of ZKC NY, Inc., what does that number reflect?

A   That's the total amount in check payments to Saks Fifth Avenue from ZKC NY, Inc., which was held at Carver Federal Savings Bank.

Q   That was the bank account that was opened using Reginald Garcia's Social Security Number and other personal identifying information; is that right?

A   Yes.

Q   How much money from the subject bank accounts went to pay for Motovich's Saks accounts?

A   $100,820.90.

Q   As with Bloomingdale's, does the second chart break out some of those transactions in detail?

A   Yes, that's a -- below is a check spread of the individual checks.

Q   This is just one example?

C. Cabane - Direct/Mr. Grubin          2185

MR. GRUBIN:  Ms. Kannan, if we can keep this example up but also pull up Government Exhibit 2008-C at Page 1.

THE COURT:  You may publish.

(Exhibit published.)

Q    First of all, what is this check?

A    This is an Ago & Auladin Contracting Corp. check payable to Saks Fifth Avenue.

Q    For how much?

A    $1,852, I can't see if there is any change, $0.10, sorry.

Q    And if we look at your -- if we look at your chart, is there a row from March 30th, the posting date to Ago & Auladin check 1253?

A    Yes.

Q    And whose Sak's account is it?

A    This goes to David Motovich's Sak's account ending in 5494.

Q    And is it for the same amount we see on the checks $1,852 or, excuse me, and $0.10?

A    Yes.

Q    And can we do this similar analysis for every single row of your chart?

A    Yes, it would reconcile.

Q    What were some of the types of purchases you saw in the

---

C. Cabane - Direct/Mr. Grubin          2186

Sak's accounts?

A    Clothes both for men, women's, and children.

Q    I'm showing you what's been admitted as Government Exhibit 556 at Page 3.

MR. GRUBIN:  Permission to publish, your Honor.

THE COURT:  Permission granted.  It's in evidence.

(Exhibit published.)

Q    Were you here when FBI Special Agent Maegan Rees testified that this was found in David Motovich's office?

A    I was here.

Q    What is this document?

A    This is a receipt from Cartier.

Q    And if we can blow up the top half.  Whose name do you see on this, listed on this receipt?

A    David Motovich.

Q    What is One Kansas Place?  Do you know from your investigation?

A    That's David Motovich's previous primary residence.

Q    Do you see the date June 8th to 16th?

A    Yes.

Q    If we could scroll to the bottom.

THE COURT:  Blow it up a bit more.  It's still a little tough to read.

MR. GRUBIN:  If we could blow up that bottom part next to method of payment.

---

C. Cabane - Direct/Mr. Grubin          2187

Q    What does it say?

A    Saks Fifth Avenue card.

Q    Let's turn now to Government Exhibit 2008-C at Page 320.

What is this document?

A    This is a monthly billing estimate from Saks Fifth Avenue.

Q    What is the date range here, can you see?

A    Looks like June 2, 2016, to July 1, 2016.

Q    Now, let's turn to Page 322 to see some of those charges.  You could stop right there.

What's the first transaction, the first charge you see there next to June, next to June 8, 2016?

A    The first charge is Cartier Jewelry for $43,700.

Q    And what about below that?

A    Delivery fees of zero dollars.  Then Cartier Jewelry for a refund of $10,100.

Q    And then what's the total?

A    The total is $32,703.62.

MR. GRUBIN:  And if we can turn back to Government Exhibit 2008 or, excuse me, if we could turn back to the chart.  I'm sorry, Government Exhibit 356 at Page 3, I apologize.  And can you just pull up the information there.

Q    And what do you see, do you see a return for $10,100?

---

C. Cabane - Direct/Mr. Grubin          2188

A    Yes.  It appears one item was returned for $10,100.

Q    And then another one purchased for $43,700?

A    Yes.

Q    And then a total excluding the sales tax of $33,600, is that fair?

A    Yes, that's correct.

Q    And if we can go back to your chart at Government Exhibit 5005.

And look at the row dated May 16, 2016.  What do you see?

A    This is a check that cleared on May 16, 2016, from Advertising on the Go Corp. to the David Motovich Saks card ending in 1375 for $1,833.

Q    So, is it fair to say, that money from the subject bank account went towards paying that Cartier invoice we saw?

A    Yes, this is the initial payment towards that purchase.

Q    And did you see in the records that the following payments in the account also goes towards that payment?

A    I saw other payments that went towards that purchase, yes.

Q    Let's look now at Government Exhibit.  Well, let me ask you this first.

Did you identify payments going from the different subject bank accounts directly to David Motovich and his relatives?

**J.A. 782**

C. Cabane - Direct/Mr. Grubin          2189

A    Yes, I did.

Q    Did you make a chart summarizing a sample of those payments?

A    Yes.

Q    I'm showing you what has been marked for identification as Government Exhibit 5008?

        THE COURT:  Any objection to 5008 being admitted?

Q    What does this chart show, the top chart?

        MR. JACKSON:  No objection, Judge.

        THE COURT:  No objection.  Admitted.

        (Government's Exhibit 5008 was marked in evidence.)

        (Exhibit published.)

A    The top portion of this chart is the totals of payments made from the subject bank accounts to members of the Motovich family.

        MR. GRUBIN:  And I apologize, your Honor, just so the record is clear.  I said 5008, this is actually Government Exhibit 5009.

        THE COURT:  5009.  Any objection to 5,009.

        MR. JACKSON:  That was my confusion.  No objection.

        THE COURT:  Let's just take a deep breath.  I know it's getting late on a Friday.  What's the exhibit you wish to offer into evidence?

C. Cabane - Direct/Mr. Grubin          2190

        MR. GRUBIN:  Government Exhibit 5009, your Honor.

        THE COURT:  Any objection to 5,009?

        MR. JACKSON:  No objection, Judge.

        THE COURT:  Admitted.  You may publish.

        (Government's Exhibit 5009 was marked in evidence.)

        THE COURT:  And then perhaps we'll take a brief 12-minute break so that people can have another piece of chocolate and get ready for the home stretch to 5:00 o'clock.

        Go ahead.

Q    And so, what does this chart show, Special Agent Cabane?

A    This is a chart of the top portion of the chart shows the total payments from the shell company bank accounts to members of the Motovich family.

Q    You previously said that Lyudmila Motovich is David Motovich's wife?

A    That's correct.

Q    Who is Alex Motovich?

A    David Motovich's brother.

Q    And Boris Motovich?

A    David Motovich's father.

Q    And at least how much money went from the different subject bank accounts to David Motovich and his relatives?

C. Cabane - Direct/Mr. Grubin          2191

A    There were the seven out of the ten accounts.

Q    Can we blow up that number in green?

A    How much money?

Q    What did you see there?

A    $1,543,500.

Q    And to save the jury time.  If we went through each of these rows and we looked at the bank records, would we see the information on this chart reflected in those records?

A    Yes, the checks below would add up to the same amount.

        MR. GRUBIN:  Your Honor, I'm done with this chart if you want to take a break now.

        THE COURT:  Why don't we take a 12-minute break.

        Come back -- maybe 15 minutes -- and then we're going to have our hard stop at 5:00 o'clock.

        So please don't talk about the case as exciting as the charts are and we'll resume in is a minutes.  Thank you, ladies and gentlemen.

        COURTROOM DEPUTY:  All rise.

        (Jury exits courtroom at 4:13 p.m.)

        THE COURT:  Thank you.  You may step down.

        You are here as a corporate representative equivalent; is that right, sir, in terms of ability to stay at counsel table?

        THE WITNESS:  Yes.

        THE COURT:  Let me jest ask defense counsel.

C. Cabane - Direct/Mr. Grubin          2192

        Do you have a problem with the witness has now been sworn but who is the designated representative sitting here during our no-jury-present-colloquy.

        MR. JACKSON:  None at all, Judge.

        THE COURT:  You may resume your seat, sir.  Thank you.

        THE WITNESS:  Thank you.

        THE COURT:  It's a hypertechnical point but an important one.

        Let me ask the Government, is there anything we need to discuss in the absence of the jury?

        MR. GRUBIN:  No, your Honor.

        THE COURT:  Is there anything we need to discuss in the absence of the jury, defense counsel?

        MR. JACKSON:  No, your Honor.

        THE COURT:  Okay, thank you.  We'll taking our 15-minute break and we'll press on to the 5:00 o'clock hard stop.

        MR. JACKSON:  Thank you, Judge.

        (A recess in the proceedings was taken.)

**J.A. 783**

Proceedings                2193

(In open court.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  You may be seated.  Do we have any issues to address before we bring the jury in for the last portion of today's proceedings?

MR. GRUBIN:  Not from the Government.

THE COURT:  Anything from defense counsel?

MR. JACKSON:  No, your Honor.

THE COURT:  Thank you.  You may bring the jury in and get the witness back to the witness stand.

(Witness takes the witness stand.)

THE COURT:  And please remain standing when the jury comes in.

All rise for the jury.

THE COURTROOM DEPUTY:  All rise.

(Jury enters.)

THE COURT:  Welcome back, ladies and gentlemen of the jury.  Thank you for your patience.  Please be seated.

Sir, you are still under oath.  Did you speak with anyone about your testimony during the break?

THE WITNESS:  No.

THE COURT:  All right.

Counsel, you may continue with your examination.

MR. GRUBIN:  Thank you, your Honor.

DIRECT EXAMINATION

---

Cabane - direct - Grubin          2194

BY MR. GRUBIN:

Q    Good afternoon, again.

A    Good afternoon.

Q    Let's pull up Government Exhibit 5009 where we left off.

THE COURT:  In evidence.

MR. GRUBIN:  In evidence.

THE COURT:  You may publish.

(Exhibit published.)

Q    We were discussing payments from the subject bank account to the Motovich family, is that correct?

A    Yes.

Q    Again, the total here at the bottom was what, in green?

A    $1,543,500.

Q    And it's fair to say that these are some of the checks that we went through each of the rows that we have been seeing throughout this trial; correct?

A    Yes.

MR. GRUBIN:  Can we go to Government Exhibit 5006, not in evidence.  Your Honor.

THE COURT:  Any objection to 5006?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 5006 received in evidence.)

(Exhibit published.)

Q    Special Agent Cabane, did you observe payments from the

---

Cabane - direct - Grubin          2195

different subject bank accounts benefiting other members of the Motovich family?

A    Yes, I did.

Q    Who is -- during the course of your investigation, did you identify an individual by the name of Abraham Fridman?

A    Yes, I did.

Q    And who is that?

A    He also goes by Dave Fridman.  He is an employee of Midwood Lumber and the uncle-in-law -- uncle, sorry, of David Motovich.

Q    What types of payments did you see from the subject bank accounts benefiting David Motovich's uncle?

A    Payments from the subject bank accounts payable to either him directly, his immediate family or life insurance premiums for his benefit.

Q    And is this what that chart shows?

A    Yes.

Q    And what total do you see there?

A    $621,657.80.

Q    So, which subject bank accounts contributed or made payments to the benefit of Abe or Dave Fridman?

A    All of the shell company bank accounts.

MR. GRUBIN:  So if we could blow out of that and look at the more detailed chart on the bottom.

Q    Once again, is this just a more detailed check spread, I

---

Cabane - direct - Grubin          2196

believe is the term you used, of different checks to the benefit of Abraham Fridman?

A    Yes.

And just to clarify my answer before, the Kemal Sarkninovic account did not make payments to the benefit of Abraham Fridman.

Q    I see.

So you mentioned, I think one of them was to pay or was one of the benefits was payments towards David Motovich's uncle's condominium.

A    Yes.  That's correct.

Q    Do you know where that was located?

A    In Miami Beach, Florida.

MR. GRUBIN:  Can we turn to Government Exhibit 2003 already in evidence, your Honor?

THE COURT:  You may publish to the jury.

MR. GRUBIN:  If we could just blow up the top half of the page, what is this.

A    This is a document from the Carriage Club North Association of payments that were due for the condominium of Abraham Fridman in Miami Beach, Florida.

Q    You see there it is unit 621 and then Abraham Fridman?

A    Yes.

Q    I want to show you what's already been admitted as Government Exhibit 2003-A.

**J.A. 784**

Cabane - direct - Grubin                    2197

THE COURT:  You may publish.

(Exhibit published.)

MR. GRUBIN:  If we can blow up the top half there.

Q    What is this?

A    This is a transaction report from the Carriage Club North Association.

Q    Is it fair to say these are payments towards Abraham Fridman's unit at the Miami Beach condominium?

A    Yes.

Q    The left page there, do you see Abraham Fridman Unit 621; correct?

A    Yes.

Q    Do you see --

MR. GRUBIN:  If we could go to the May 15th.

THE COURT:  Would you blow it up so it's more legible for the jury please.

MR. GRUBIN:  Yes, your Honor.

THE COURT:  Thank you.

Q    May 15, 2014, if we could see that row.

What number do you see there?

A    There is a payoff made in the amount of $40,665.80.

Q    Can we look back at your chart on Government Exhibit 5006.  If we look at the May 16, 2004, row and blow that up.

Do you see a check?

---

Cabane - direct - Grubin                    2198

Q    Ago & Alaudin to Carriage Club North Condo Association for $40,665.80?

A    Yes, a check from Ago & Alaudin Contracting Corp. to Carriage North Condo Association.

Q    Fair to say one of the bank account associated with Ago & Alaudin paid over $40,665 to Motovich's Miami Beach condominium?

A    Yes.

MR. GRUBIN:  Let's go if we can to -- look at the April 18, 2016, row.

THE COURT:  You can if you can get it done in two minutes because we are going to have a hard stop at 5:00 o'clock for the jury as I promised them.

MR. GRUBIN:  I think I can.

THE COURT:  We will see.

Q    Do you see the April 18, 2016 row there?

A    Yes, I do.

Q    Special Agent Cabane, this is from a different bank account, Midwood USA Consulting Corp.; correct?

A    Yes.

Q    So then this is another payment to Carriage Club North Condo Association; correct?

A    Yes.

Q    Who is this -- who is the Midwood USA Consulting Corp. -- who is the signatory on that account?

---

Cabane - direct - Grubin                    2199

A    Robert Lovy.

Q    And who was the signatory on the Ago & Alaudin account we just looked at?

A    Kemal Sarkninovic.

Q    So it's fair to say that different accounts with different signatories are making payments to David Motovich's uncle's condo in Miami Beach?

A    Yes, that's correct.

THE COURT:  It's also fair to say it's 5:00 p.m. and I keep my promises to my jury.

Ladies and gentlemen of the jury, we are adjourned for the day.  We are adjourned for the weekend.  Have a wonderful weekend.

Do not talk about the case.  We will see you back here bright and early, 9:30 a.m. on Monday.  Enjoy your weekend.  Thank you.  Get home safe.

THE COURTROOM DEPUTY:  All rise.

(Jury exits the courtroom.)

THE COURT:  You may step down, sir.  Thank you.

(Witness steps down.)

THE COURT:  The record should reflect that the jury has left the courtroom and the witness, as the designated representative, is allowed to stay and participate with counsel at the proceeding we are now going to begin.

I would like counsel, just so the record is clear,

**J.A. 785**

---

Cabane - direct - Grubin                    2200

to state their names again on the record as we are going to have our preliminary discussions about how we are now going to proceed to distribute to you electronically the Court 1, Court 2, and Court 3 that we have been discussing.

Just again, would you stand and state your state your appearances for the record everyone, please.

MR. POLEMENI:  Thank you, your Honor.  It's Robert Polemeni, Eric Paulsen, Andrew Grubin, Matthew Skurnik, paralegal Kavya Kannan, and Special Agent Christopher Cabane for the United States.

THE COURT:  Thank you, sir.  Please be seated.

Mr. Jackson, your team.

MR. JACKSON:  Good afternoon, your Honor.  Randall Jackson, Jessica Layden, Henry Mazurek on behalf of Mr. Motovich, and we are joined by Andy Cepregi.

THE COURT:  Thank you very much.  Please be seated.

We are now going to talk first to see if you have any issues you wish to address with the Court, and then we are going to talk about the mechanics or the logistics of the distribution electronically of Court Exhibits 1, 2, and 3, the jury charge, the jury verdict sheet, and the jury reached verdict sheet.

So, first, for the Government, anything we need to discuss today?

MR. POLEMENI:  No, Judge.

Cabane - direct - Grubin                    2201

THE COURT:  Defense counsel, anything we need to discuss today?

MR. JACKSON:  No, your Honor.

THE COURT:  Okay.  What we are going to do is we are going to electronically send to each of you now Court 1, the jury charge; Court 2, the jury verdict reached; and Court 3, the jury verdict form.  I'm going to have my court deputy push the magic button and send that to you now.

I would like you, since you have your electronics with you, to confirm receipt, because if there is any problem, especially since we've had the Microsoft strange doings earlier today, I want to make sure that each side has gotten it because for the last thing I need is for you to go back to your respective shops and find for whatever reason you haven't received the documents and that would not be a good weekend.

MR. GRUBIN:  Your Honor, we just got it.

THE COURT:  State your name again and speak into the record.  I want this very clear for my friends on the 17th Court of Appeals.

MR. POLEMENI:  It's Robert Polemeni.  Yes, we have received the ECF bounce, at least as to Court Exhibit 1.

THE COURT:  Have you received Court Exhibit 2?

MR. GRUBIN:  Not yet.

THE COURT:  Not yet.  Let me ask you, Mr. Jackson, have you received Court 1?

---

Cabane - direct - Grubin                    2202

MR. JACKSON:  Yes, Judge.

THE COURT:  All right.  Has anyone received Court 2 yes or is that something that is still in the ether?

MR. POLEMENI:  It seems to be still in the ether. Oh, it just came through.

THE COURT:  You have Court 2.

MR. POLEMENI:  Yes.

THE COURT:  Defense counsel, do you have Court 2?

MR. JACKSON:  Yes, your Honor.

THE COURT:  Now we turn to Court 3. Government, do you have Court 3?

MR. POLEMENI:  We have all three, Judge, yes.

THE COURT:  Defense, do you have Court 3?

MR. JACKSON:  One moment, Judge.

THE COURT:  Yes, of course, Mr. Jackson.

MR. JACKSON:  We have it, Judge.

THE COURT:  Excellent.

So as I said before, you folks should feel to review it with your respective camps, talk with your clients, your colleagues about it over the weekend, send whatever e-mails, texts, carrier pigeons, however you want to communicate is fine with each other.  And to the extent that there are jury charges that one side or both sides feel need to be added and to the extent you want to give the Court a heads-up about that, feel free to file, on notice to the other side,

---

Cabane - direct - Grubin                    2203

additional requests for additional jury charges.

The use of cyberspace is something that the Sierra Club has accorded me a number of awards for and not just murdering more and more trees, because how long is the Court 1 that you have?

MR. POLEMENI:  140 pages.

THE COURT:  Right.  Well, just think about 140 pages for each you sitting at the table on both the defense side and the Government's side, which is how we did it when I was pointed to the bench sometime ago, and I just thought it would be useful to proceed in this fashion to try to limit the damage to the environment.

All right.  Is there any other issues we need to address before we adjourn for the weekend?

Anything else for the Government?

MR. POLEMENI:  No, your Honor.

THE COURT:  Anything else for defense counsel?

MR. JACKSON:  No, Judge.  Have a good weekend.

THE COURT:  Thank you.  You too.  Have a good weekend.

(Matter adjourned to July 22, 2024 at 9:30 a.m.)

ooo0ooo

**J.A. 786**

---

2204

INDEX

WITNESS:                                           PAGE:

DAVID UNGER

DIRECT EXAMINATION

BY MR. PAULSEN.......................... 2031

PHILLIP ADAMOU

DIRECT EXAMINATION

BY MR. POLEMENI......................... 2035

CROSS-EXAMINATION

BY MR. JACKSON.......................... 2057

REDIRECT EXAMINATION

BY MR. POLEMENI......................... 2117

CHRISTOPHER CABANE

DIRECT EXAMINATION

BY MR. GRUBIN.......................... 2143

DIRECT EXAMINATION

BY MR. GRUBIN.......................... 2193

*****

2205

INDEX OF EXHIBITS

PAGE:

Government's Exhibit 751 ........................... 2033

Government's Exhibit 274........................... 2045

Government's Exhibit 600........................... 2053

Defense Exhibit DX 3009........................... 2060

Defense Exhibit 4532.............................. 2082

Defense Exhibit 4532.............................. 2090

Defense Exhibit 4532-R............................ 2091

Defense Exhibit 1700.............................. 2096

Government's Exhibit 6008.......................... 2141

Government's Exhibit 6009.......................... 2141

Government's Exhibit 5000.......................... 2148

Government's Exhibit 5001-A........................ 2156

Government Exhibit 5001-B.......................... 2158

Government Exhibit 5002............................ 2165

Government Exhibit 5003............................ 2169

Government Exhibit 5011............................ 2171

Government Exhibit 5001-C.......................... 2174

Government's Exhibit 5004 ......................... 2179

Government's Exhibit 5005 ......................... 2184

Government's Exhibit 5008 ......................... 2189

Government's Exhibit 5009 ......................... 2190

Government's Exhibit 5006.......................... 2194

*****

2206

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    21-CR-497(WFK)

    -against-    :    United States Courthouse
                      Brooklyn, New York
DAVID MOTOVICH,    :
                      July 22, 2024
    Defendant.    :    9:30 o'clock a.m.

- - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:    BREON PEACE
                      United States Attorney
                      BY: ROBERT POLEMENI
                          ERIK D. PAULSEN
                          ANDREW GRUBIN
                          MATTHEW C. SKURNIK
                      Assistant United States Attorneys
                      271 Cadman Plaza East
                      Brooklyn, New York  11201

For the Defendant:    WACHTELL, LIPTON, ROSEN & KATZ
                      51 West 52nd Street
                      New York, New York  10019

                      BY: RANDALL WADE JACKSON, ESQ.
                          JESSICA LAYDEN, ESQ.

                      MEISTER SEELIG & FEIN, LLP
                      125 Park Avenue, 8th Floor
                      New York, New York  10017

                      BY:  HENRY R. MAZUREK, ESQ.

Court Reporter:       Charleane M. Heading
                      225 Cadman Plaza East
                      Brooklyn, New York
Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

2207

(In open court; outside the presence of the jury.)

THE CLERK:  Criminal cause on trial, 21-CR-47, United States versus David Motovich.

Will the attorneys please state their names for the record beginning with the government.

MR. POLEMENI:  Good morning, Your Honor.  Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, Paralegal Kavya Kannan, and Special Agent Christopher Cabane for the United States.

THE COURT:  Good morning, Counsel.  Please be seated.

Ladies and gentlemen of the public, please be seated as well.

MR. JACKSON:  Randall Jackson, Jessica Layden and Henry Mazurek on behalf of our client David Motovich along with Mr. Andy Cepregi.  Good morning, Your Honor.

THE COURT:  Good morning.  Please be seated.

I thank you all four your patience.

Do we have any issues to address before we bring in the jury?

Anything from the government?

MR. POLEMENI:  Just in terms of the schedule today, Judge.  So, you know, on Friday, we left off with Agent Cabane still in the middle of his direct examination.  So we have two witnesses that have conflicts and we think it would be best if

J.A. 787

2208

we could put them on now and interrupt Agent Cabane's testimony.

THE COURT:  Have you spoken with your adversary about that?

MR. POLEMENI:  Yes.  In fact, one of the witnesses is a defense witness.

THE COURT:  Okay.  I take it your adversary, and I will follow up, I'll hear from him in a moment, has no objection with taking these two witnesses out of order?

MR. POLEMENI:  That's correct.

THE COURT:  All right.  Mr. Jackson, what is your view, sir?

MR. JACKSON:  That's correct, Judge.  We had asked -- one of the witnesses is an agent that we were planning to call on the defense case.  We asked the government to produce them for tomorrow for the defense case but today works for his schedule.  We appreciate the government making him available and we're fine with taking him before the defense case officially starts today.  It think it makes sense because he likely is unavailable after today and it should be relatively brief testimony and we have no problem with proceeding with their witness to get him out of the way first today and then returning, after those two witnesses, to Agent Cabane.

THE COURT:  Thank you.  I appreciate that.

2209

May I have the name of the two witnesses, please?

MR. POLEMENI: Yes. The first witness will be Andrew Zwerman, Z-W-E-R-M-A-N.

THE COURT: And the second?

MR. POLEMENI: Special Agent Michael Pereless, P-E-R-E-L-E-S-S, with the FBI.

THE COURT: And they're going to be one after another? Is that the plan?

MR. POLEMENI: Yes.

THE COURT: Okay. All right. We'll do that.

If there's nothing -- I'm sorry. Is there anything from the defense that you want to address today before the jury comes in?

MR. JACKSON: Just one issue, Judge.

THE COURT: Yes.

MR. JACKSON: We -- in looking, because -- in looking this morning just at one of the exhibits that's to come in through the next witness, we did want to raise outside of the presence of the jury so we don't have to have a sidebar.

It occurred to us GX-355 --

THE COURT: Could you hand that up? Is it a paper exhibit as well as an electronic exhibit so I can take a look at it?

MR. JACKSON: It's a paper exhibit.

2210

THE COURT: Why don't you hand it up --

MR. JACKSON: Yes, Your Honor.

THE COURT: -- if someone has a copy for the court to take a look at it we'll we're having a discussion about it.

MR. POLEMENI: I believe it's in the binders but I can give you my copy, Judge.

THE COURT: Thank you.

MR. POLEMENI: As long as I get it back.

THE COURT: Thank you.

I'm looking at Government Exhibit 355 which is the Midwood Lumber payroll office document.

Is that the document, Mr. Jackson?

MR. JACKSON: Yes, Your Honor.

THE COURT: What is your issue with respect to this document?

MR. JACKSON: We have two issues, Judge.

First, we do believe that the document is hearsay. It's being offered for its truth. There's no one, I believe, who's going to lay a foundation.

THE COURT: What does it purport to be?

MR. JACKSON: It purports to be -- it is a document that was seized from somewhere at Midwood Lumber. It purports to be a record of payments made to employees of Midwood Lumber, but there's no one who is going to testify to that, I believe.

2211

THE COURT: Hang on. Let's hear from the government then.

I take it you are going to offer this document, is that correct?

MR. POLEMENI: Yes, Your Honor. Just so it's clear, this document is already in evidence. This is a document --

THE COURT: Oh, I'm sorry, I did not understand that. This is a document that's in evidence? I understood from Mr. Jackson it was a document that you were going to offer through one of the agents. Perhaps I misheard or perhaps he misspoke.

But in any event, if this is a document that is in evidence, are you now asking the court to take it out of evidence?

MR. JACKSON: Your Honor, I apologize if I'm mistaken. We didn't believe it was in evidence.

THE COURT: All right. Well, let's clear up the mystery.

When do you believe that it was entered into evidence?

MR. POLEMENI: Unless I'm mistaken, Your Honor, it was entered into evidence through Special Agent Rees during her testimony on the search, on July 10th during her testimony of the search of Midwood Lumber.

THE COURT: Okay. Why don't you take a look for

2212

that, Mr. Jackson, you and your colleagues, and, as they say, you can either confirm or deny.

MR. JACKSON: We're checking right now, Judge.

THE COURT: Good.

(Pause.)

MR. POLEMENI: Judge, it's our confusion. This did come in.

THE COURT: All right. So it's already in evidence. Are you asking me to take it out of evidence? Make it disappear?

Did it come in without objection?

MR. JACKSON: It came in without objection, Your Honor.

THE COURT: All right. Well, unless you want to tell me why I should take it out of evidence, why don't we move on to your next issue.

MR. JACKSON: No, Judge. I'm not -- we're not going to argue that.

THE COURT: All right. Anything else?

MR. JACKSON: No, Judge.

THE COURT: Okay. Anything else from the government?

MR. POLEMENI: No, Your Honor.

THE COURT: Why don't we get the jury in. The witness can retake the stand or the new witness can take the

J.A. 788

2213

stand.

Please come forward, sir, and I'd like you to stand in the witness box. When the jury comes in, you'll be introduced and sworn in. Just stand up, please, and in a minute, we're going to have the jury come in, sir.

THE WITNESS: Your Honor, can I pour myself some water?

THE COURT: Water? Absolutely.

THE WITNESS: Thank you.

THE COURT: Please rise for the jury.

(Jury enters.)

THE COURT: Good morning, ladies and gentlemen of the jury. Please be seated. Thank you for your patience. I'm glad the old adage has proven out that nothing newsworthy happens in July on the weekend, so everything is the same as it was when we were last together.

One thing that has changed though is we have a new witness. The parties have graciously agreed to take two witnesses out of order to help facilitate matters and move things along. The witness who was on the witness stand will resume after we do these two shorter witnesses today and the parties have agreed to that and I commend both counsel for doing that.

So with that, I'm going to ask my courtroom deputy to administer the oath to the new witness.

---

Zwerman - direct - Polemeni          2214

Raise your right hand, sir, and repeat after my court deputy.

(The witness, ANDREW ZWERMAN, was duly sworn/affirmed by the clerk.)

THE COURT: Thank you, sir. Please be seated.

I'm going to ask you to pull that microphone which is in front of you closer to you. It looks like a snake but it won't bite you.

Please state your name and spell it and then counsel will inquire.

THE WITNESS: Andrew Zwerman, Z-W-E-R-M-A-N.

THE COURT: Thank you.

Counsel, you may inquire.

MR. POLEMENI: Thank you, Judge.

DIRECT EXAMINATION
BY MR. POLEMENI:

Q    Good morning, Mr. Zwerman.

A    Good morning.

Q    What do you do, sir?

A    I'm a CPA.

Q    Certified public accountant?

A    Yes.

Q    And where are you a CPA?

A    In the state of New York.

Q    Do you work in New York?

---

Zwerman - direct - Polemeni          2215

A    Currently, I'm in Florida and in New York.

Q    Do you work for your own firm at this time?

A    No, I do not.

Q    Where do you work?

A    A firm called Citrin Cooperman.

Q    Did you at some time have your own firm?

A    I had my own firm.

Q    What was the name of that firm?

A    Wagner & Zwerman.

Q    For how long -- when did you start Wagner & Zwerman?

A    I joined the firm in 1994.

Q    Did you become a named partner at some point at the firm?

A    Around 1998.

Q    And, generally, while you were at Wagner & Zwerman, what did your practice generally consist of?

A    We provided general accounting and tax services for small and medium-sized businesses and the individual owners of those businesses.

Q    Do you know an individual named Boris Motovich?

A    Yes.

Q    How do you know Mr. Motovich?

A    He was a former client.

Q    And when -- do you recall when he first became a client of yours?

A    No, I do not.

---

Zwerman - direct - Polemeni          2216

Q    Okay. And just so we're clear, Mr. Zwerman, are you testifying here pursuant to a subpoena?

A    No.

Q    Well, did you receive a subpoena to testify?

A    Originally, yes, I'm sorry.

Q    Okay.

A    Yes.

Q    And you say Mr. Boris Motovich is a former client. When did he stop becoming a client?

A    We ended services about three years ago.

Q    And, generally, what type of work did you do for Boris Motovich?

A    General accounting and tax preparation services.

Q    For him individually?

A    Yes.

Q    And for certain of his companies that he owned or was a partner in?

A    Yes.

Q    Did you do work for any other members of the Motovich family?

A    Yes.

Q    Who?

A    His two sons, two daughters, and some other family members.

Q    Was one of the sons David Motovich?

J.A. 789

Zwerman - direct - Polemeni          2217

A   Yes.

Q   And, generally, can you describe the type of work you did for David Motovich?

A   We prepared his personal tax return and some businesses that he was involved with.

Q   Did you at times also prepare personal financial statements for Mr. Motovich?

A   Yes, our firm prepared that.

Q   Do you recall when you started working for or doing work for David Motovich?

A   Shortly, a couple of years after his father retained us.

Q   Are you familiar with a company called Midwood Lumber?

A   Yes.

Q   What is Midwood Lumber?

A   It's a lumberyard in Brooklyn.

Q   Did you provide accounting and tax services for that entity?

A   Yes.

Q   Do you recall approximately when you started doing that?

A   Again, it was a long time ago.  I don't remember the actual date or year.

Q   Okay.  But certainly for several years?

A   Yes.

Q   What did you understand David Motovich's role to be at Midwood Lumber?

Zwerman - direct - Polemeni          2218

A   I don't remember the exact position but he was in management.

Q   Did Midwood Lumber provide W-2s for its employees?

A   I assume so.  I was not involved with that.

Q   Okay.  Do you know if Midwood Lumber had a payroll service?

A   Yes, they did.

Q   And do you know what payroll company provided that service?

A   I don't recall.

Q   Okay.  Did Mr. Motovich ever tell you that Midwood employees were paid in cash?

A   No.

MR. POLEMENI:  If we can bring up Government Exhibit 355, please.

THE COURT:  You may publish it.  It's in evidence.

MR. POLEMENI:  Thank you, Judge.

Q   So if we look at the top -- let me ask you first, Mr. Zwerman, do you know if you've ever seen this document?

A   I do not recall seeing this document.

Q   And at the top, it says, Midwood Lumber Payroll.  Do you see that?

A   Yes.

MR. POLEMENI:  And, Ms. Kannan, if we can go to where it says "Names" and "Position."

Zwerman - direct - Polemeni          2219

Q   Do you see where it says, Alex Motovich and David Motovich, Controller.

What is a controller?

A   In general, a controller for a company manages the financial affairs of a company.

Q   Would that include managing accounts payable, for example?

A   In general, yes.

Q   Meaning accounts payable -- well, what does accounts payable mean?

A   Accounts payable is generally a list of money owed to vendors, to suppliers.

Q   And accounts receivable, does a controller of a company usually manage the accounts receivable function of a company?

A   In general, yes.

Q   What's accounts receivable, generally?

A   That is a list of money owed from customers to the business.

Q   Okay.  And in your experience, generally, do controllers typically manage the, kind of the payroll, budget and management of a company?

A   Yes.

MR. POLEMENI:  If we can go now, Ms. Kannan, to "Gross," "Check" and "Cash."

Q   Do you see, Mr. Zwerman, that there's a gross salary, for

**J.A. 790**

Zwerman - direct - Polemeni          2220

example, for $950 on this page?

A   I see $950 under the "Gross" column.

Q   And then there's a column for "Check" where it says $450?

A   I see that.

Q   And a column for "Cash" where it says $500?

A   I see that on the document you're showing me.

Q   Okay.  And just -- now you've testified to this but just so the record is clear, you were not aware and you had not been told by Mr. Motovich or anyone else at Midwood Lumber that employees were being paid in cash, is that correct?

A   From what I recall, no, I was not aware or been told.

MR. POLEMENI:  Ms. Kannan, if we can go to page 4 of this document, and if we see at the bottom, the column for "Cash" and bold the amount.

Q   What is the amount listed there, Mr. Zwerman?

A   I don't see the heading.  I apologize.

Q   Do you not see anything on your screen?

A   I see the bottom part of the spreadsheet but not the top.

Q   Sure.

MR. POLEMENI:  Why don't we go back up to page 1, Ms. Kannan.

Q   And do you see where it says, "4/5 to 4/11" on the bottom in handwriting?

A   Yes.

MR. POLEMENI:  And if we go to page 2, Ms. Kannan.

Zwerman - direct - Polemeni                    2221

Q    Does it appear to be a continuation of the first page?

A    It appears to be.

MR. POLEMENI:  If we can go to page 3, Ms. Kannan.

Q    Does page 3 appears to be a continuation of the first two pages?

A    Yes, it appears to be.

MR. POLEMENI:  And then if we go to page 4, Ms. Kannan.

Q    Does page 4 appear to be a continuation of the first three pages?

A    Yes.

MR. POLEMENI:  And then, Ms. Kannan, if we can just -- thank you.

Q    What is the total amount in the column for cash?  Do you see that number, Mr. Zwerman?

A    Yes.

Q    What is it?

A    $20,508.94.

MR. POLEMENI:  You can take that down.

Just for the witness, please, Government's Exhibit 124.

Q    Do you recognize this document, Mr. Zwerman?

THE COURT:  Any objection to the exhibit being admitted?

MR. MAZUREK:  No, Your Honor.

---

Zwerman - direct - Polemeni                    2222

THE COURT:  It's admitted.  You may publish.

(Government Exhibit 124 so marked.)

A    It appears to be David and his wife's income tax return for 2012.

MR. POLEMENI:  And, Ms. Kannan, if we can go to page 3 of this document, and the bottom of the page where it says, "Third-party designee."

Q    Is that your information, Mr. Zwerman?

A    It appears to be, yes.

Q    Mr. Zwerman, this document is for 2012 or tax year 2012.

Did you also prepare Mr. Motovich's tax returns from 2012 up to tax year 2019?

A    I don't remember the specific years, but it was for 2012 and thereafter, up until we stopped servicing him.

MR. POLEMENI:  Okay.  So, Your Honor, I can show them one at a time, each tax return, and admit them into evidence that way.

THE COURT:  Go ahead and do it.

MR. POLEMENI:  However you prefer.

THE COURT:  However you prefer.

Q    Okay.  I'll show you Government Exhibit 125.

THE COURT:  Any objection to 125?

MR. MAZUREK:  No, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 125 so marked.)

---

Zwerman - direct - Polemeni                    2223

Q    Is this David Motovich and his wife's tax return for 2013?

A    I forgot my glasses.

THE COURT:  Can you see it?

THE WITNESS:  Yes.

THE COURT:  You've got to speak into that microphone.  It will swivel to you.

A    Yes, this appears to be David and his wife's income tax return for 2013.

MR. POLEMENI:  And if we can show Government Exhibit 126, Ms. Kannan.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 126 so marked.)

Q    Mr. Zwerman, is this Mr. Motovich's and his wife's individual tax return for 2014?

A    Yes, it appears to be.

MR. POLEMENI:  Government's Exhibit 127, please.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 127 so marked.)

Q    Is this Mr. Motovich's and his wife's individual tax return for 2015, Mr. Zwerman?

---

Zwerman - direct - Polemeni                    2224

A    Yes, it appears to be.

MR. POLEMENI:  GX-128 for the witness, please.

THE COURT:  Any objection?

MR. MAZUREK:  No.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 128 so marked.)

Q    Is this Mr. Motovich's and his wife's individual tax return for 2016?

A    Yes, it appears to be.

MR. POLEMENI:  GX-129, please.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  It's admitted.  You may publish.

(Government Exhibit 129 so marked.)

Q    Is this Mr. Motovich and his wife's individual tax return for tax year 2017?

A    Yes, it appears to be.

MR. POLEMENI:  GX-130, please.

THE COURT:  Any objection to GX-130?

MR. MAZUREK:  No, Your Honor.

THE COURT:  It's admitted.  You may publish.

(Government Exhibit 130 so marked.)

Q    Mr. Zwerman, is this Mr. Motovich's and his wife's individual tax return for 2018?

A    Yes, it appears to be.

J.A. 791

Zwerman - direct - Polemeni    2225

MR. POLEMENI:  And, finally, Government Exhibit 131.

THE COURT:  Any objection?

MR. MAZUREK:  No, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 131 so marked.)

Q    Mr. Zwerman, is this Mr. Motovich and his wife's individual tax return for tax year 2019?

A    Yes, it appears to be.

Q    Thank you.

I'm not going to go through all of these, Mr. Zwerman, but, generally, what type of information was provided by Mr. Motovich to you and your firm in preparing these tax returns?

A    W-2, W-2s, 1099 or 1099s, things of that nature.

Q    Did Mr. Motovich also provide information on certain businesses that he either owned or was a partner in?

A    Yes.  For flow-through businesses, he provided a K-1.

Q    And, briefly, what is a flow-through business?

A    A flow-through business is a company that's profit is taxed to the individual owners rather than to the business itself.

MR. POLEMENI:  And if we can go just to Government's Exhibit 131, the tax return for 2019, and if you can go to page 181, please.

MR.  Can I have one moment, Judge, just to get the

---

Zwerman - direct - Polemeni    2226

pagination correct?

THE COURT:  Yes.

(Pause.)

MR. POLEMENI:  Page 81.  Thank you.

Q    There we go.  What is this, Mr. Zwerman, on page 81?

A    It is a tax form Schedule C.

Q    For what company?

A    DM Investors LLC.

Q    Do you recall what DM Investors is?

A    Yes.

Q    What is it?

A    It was an LLC that gave out loans to individuals.

Q    Do you know who owned the company?

A    From what I recall, David Motovich.

THE COURT:  What is an LLC?  What does that stand for, if you know?

THE WITNESS:  Yes.  That is a limited liability company.

THE COURT:  Okay.  Go ahead.

MR. POLEMENI:  Thank you, Judge.

If we can go to page 93, Ms. Kannan.

Q    What are we looking at here on page 93, Mr. Zwerman?

A    It appears to be a list of entities that Mr. Motovich owned part of and received a K-1 for his proportionate share of profit or loss.

---

Zwerman - direct - Polemeni    2227

Q    Okay.  And if we look at the top in row A, do you see where it says, 1122 Coney Island Avenue?  Do you know, do you recall what that company was?

A    That was an entity that owned a property at that address.

Q    Owned a property at 1122 Coney Island Avenue?

A    From what I recall, yes.

Q    How about 1169 Coney Island Avenue, do you recall -- I'm sorry -- 1169 Coney Island Avenue, LLC.  Do you recall what that LLC is?

A    Yes, it was a limited liability company.  Again, I think it owned a piece of real estate property at the address in its name.

Q    How about in row D, 1196 Coney Island Avenue, do you recall what that is?

A    Yes.

Q    What is it?

A    It's the limited liability company that owned the property from I recall at the address in its name.

MR. POLEMENI:  And if we go down, Ms. Kannan, if we can highlight row M, as in "Mary," please.

Q    Do you see the entry for AllHealth Home Care LLC?

A    Yes.

Q    Do you recall what that entity is?

A    I don't specifically recall at this time.

Q    That's fine.

---

Zwerman - direct - Polemeni    2228

MR. POLEMENI:  How about if we go down to row R, Ms. Kannan.

Q    Do you see the entry for Midwood Dialysis LLC?  Do you recall what that entity is?

A    It's a limited liability company that David owned, Mr. Motovich owned part of.

Q    Are you familiar with the name Midwood Dialysis?

A    I recall the entity.

Q    What, if anything, do you recall about it?

A    I think it was doing lab testing and work of that nature.

MR. POLEMENI:  If we go down, Ms. Kannan, to row V, as in "Victor."

Q    Do you see the entry for Royal DM LLC?

A    Yes.

Q    Do you know what Royal DM LLC is?

A    It's a limited liability company.

Q    Okay.  Do you know what it does?

A    I don't recall.

Q    Do you know if Mr. Motovich -- do you recall whether Mr. Motovich had any partners in Royal DM?

A    I don't recall.

MR. POLEMENI:  How about if we go down, Ms. Kannan, to row W.

Q    Royal Rehab South LLC, do you know what that is?

A    It is a limited liability company.

J.A. 792

Zwerman - direct - Polemeni          2229

Q    Do you recall what, if anything, Royal Rehab South did?

A    No.

MR. POLEMENI:  If we go down to row X, Ms. Kannan.

Q    Do you see the entry for Sherman-Abrams Laboratory?

A    Yes.

Q    Do you know what Sherman-Abrams Laboratory is?

A    That was a corporation, an S corporation.

Q    Do you know what it did?

A    It did laboratory testing.

Q    We just looked at a bunch of LLCs, Mr. Zwerman.  At any time between 2012 and 2019, did Mr. Motovich tell you that he owned or had any interest in a company called Ago & Alaudin Contracting Corp.?

A    No, I don't recall the company.

Q    How about CNBC Corporation?

A    No.

Q    How about Midwood USA Consulting?

A    I don't recall.

Q    How about SGS Building Corporation?

A    I don't recall that.

Q    Did Mr. Motovich ever tell you that he was a silent partner in a company called Unique Painting?

A    I don't recall that company.

Q    Did he ever tell you that he was a silent partner in a company called Lithos Marble Works?

Zwerman - direct - Polemeni          2230

A    I don't recall that company.

Q    Did he ever tell you that he was a silent partner in a company called Metro Erectors?

A    No.

Q    Now, have you been to Midwood Lumber, Mr. Zwerman?

A    Yes.

Q    Approximately how many times?

A    Years ago?  Twenty.

Q    Okay.  Have you met with Mr. Motovich there?

A    That's approximate.

Q    Sure, of course.  I don't need a precise number.

Have you met with Mr. Motovich there?

A    I did meet with -- David Motovich?

Q    Yes.

THE COURT:  You have to answer, you can't just nod.

THE WITNESS:  Okay.  I apologize.

THE COURT:  What's the answer to the question?

THE WITNESS:  Yes.

THE COURT:  Go ahead.

MR. POLEMENI:  Thank you, Your Honor.

Q    At any time did Mr. Motovich tell you that he was cashing checks for customers from his office at Midwood Lumber?

A    Could you repeat that question?

Q    Sure.

THE COURT:  Read the question back, please.  Keep

Zwerman - direct - Polemeni          2231

your voice up and use the microphone.

THE WITNESS:  Thank you.

Q    At any time --

THE COURT:  No, the reporter.  Not you.

Go ahead.

(Record read.)

THE COURT:  Yes or no, did he tell you that.

A    No.

THE COURT:  Next question.

Q    So he didn't tell you that he was charging customers between 4 and 15 percent to cash checks?

A    He did not tell me.

Q    Had he told you that, would that have impacted how you went about preparing your accounting and tax documents?

A    Could you repeat the question again?

THE COURT:  Had he told you, would that impact how you prepared your tax documents had he told you that?  Would it have had an impact on how you prepared your documents?

A    Well, the business returns, I don't represent that company so I don't know what would have happened on that company.

Q    Okay.  If he was doing it not through his company but individually, if he told you that he was cashing checks and charging customers between 4 and 15 percent, would that possibly have changed how you prepared your tax and accounting

Zwerman - direct - Polemeni          2232

documents?

A    Yes.

Q    Is that because that might be considered income?

A    Correct.

Q    Did Mr. Motovich ever tell you that sometimes, customers would bring him checks and in exchange, he would give them cash?

A    No.

Q    Sort of like a reverse check cashing.  Did he ever tell you that?

A    No.

Q    Mr. Zwerman, you also mentioned that you prepared personal financial statements for Mr. Motovich, correct?

A    Correct.

Q    Can you just generally describe what is a personal financial statement?

A    The personal financial statement is a list of an individual's assets, liabilities, and the net difference which is the net worth.

Q    And why do your clients sometimes ask you for personal, to prepare a personal financial statement for them?

A    In general, clients ask for that to show a bank or some other credit type of company.

Q    And to show them what?

A    The amount of their net worth.

**J.A. 793**

Zwerman - direct - Polemeni          2233

Q    Is it fair to say that personal financial statements are oftentimes prepared to give to a bank in order to obtain a loan?

A    That is correct.

Q    And is it fair to say, Mr. Zwerman, that the personal financial statement, when you're trying to obtain a loan, your clients typically list all their assets to, you know, convince the lender that we are a good risk here?

A    In general, yes.

Q    I'm going to show you, Mr. Zwerman, what's marked for identification as both Government's Exhibit 713 and 714?

THE COURT:  Any objection to 713?

MR. MAZUREK:  No, Your Honor.

THE COURT:  Any objection to 714?

MR. MAZUREK:  No.

THE COURT:  You may publish.  They're admitted.

MR. POLEMENI:  Thank you, Judge.

(Government Exhibits 713 and 714 so marked.)

Q    Now, 713, Mr. Zwerman, do you see on the screen, is this a personal financial statement prepared for David Motovich and his wife dated June 30, 2013?

A    It appears to be.

MR. POLEMENI:  And if we can turn to Government's Exhibit 714.

Q    Is this a personal financial statement for David Motovich

Zwerman - direct - Polemeni          2234

and his wife prepared on December 31, 2018?

A    It appears to be.

Q    Do you recall how often you would prepare financial statements for Mr. Motovich?

A    No.

Q    Okay.  Do you think -- I've shown you two.  Is it possible that there were, you prepared others?

A    Yes.

Q    Do you recall any specific instances of when he asked you to prepare a financial statement?

A    No.

MR. POLEMENI:  Okay.  If we can go to page 2 of 713, Ms. Kannan.

Q    And that's your letterhead, Mr. Zwerman?

A    Yes, that was my letterhead.

Q    For when Wagner & Zwerman still existed?

A    Yes.

MR. POLEMENI:  And if we can turn the page, to page 3, Ms. Kannan.

Q    What are we looking at here, Mr. Zwerman?

A    It appears to be a list of Mr. and Mrs. Motovich's assets on June 30, 2013.

Q    And did you or someone at your firm prepare this list?

A    Yes, somebody at the firm would have prepared this.

Q    And how would your firm receive this information?

Zwerman - direct - Polemeni          2235

A    The clients provide the information.

Q    So Mr. Motovich would tell you:  These are my assets?

A    Correct.

Q    And if we look at investments in closely held businesses, do you see that?

A    Yes.

Q    Is this Mr. Motovich telling you:  This is how much of an interest I have in these entities?

A    It is showing the estimated value of his ownership interest in those entities.

Q    Of Mr. Motovich's ownership interests in those entities?

A    Him or his wife.

Q    Or his wife's.  Thank you.

And there's similar names that we saw in the tax returns, 1196 Coney Island Avenue, LLC, is that right?

Is that right?

A    Yes.

Q    And 1169 Coney Island Avenue, LLC, correct?

A    Yes.

Q    And 1122 Coney Island Avenue, LLC.  Correct?

A    Yes.

Q    And if we go down to Midwood Dialysis, LLC?

A    Yes, correct.

Q    Mr. Zwerman, do you see the name Ago & Alaudin Contracting Company?

Zwerman - direct - Polemeni          2236

A    Could you repeat that name?

Q    Sure.  Do you see the name Ago & Alaudin Contracting Corp.?

A    No.

Q    Is it fair to say that Mr. Motovich did not tell you that he had an interest in that company?

A    Based on my recommendation and based on this document, that is correct.

Q    How about an entity called ZKC NY Inc., did he ever tell you that had an interest in that company?

A    Again, based on this document, it appears no.

Q    SGS Corporation, Building Corporation?

A    It appears no.

MR. POLEMENI:  Okay.  Ms. Kannan, if we can go to Government's Exhibit 714, please, and turn to page 2.

Q    Is that your letterhead again, Mr. Zwerman?

A    Yes.

Q    And if we can go to page 3, is this a similar compilation that we just saw in Government's Exhibit 713?

A    It is similar to the last document.

Q    And so this would be what Mr. Motovich told you he had an interest in as of December 31, 2018, is that correct?

A    It appears to be.

Q    Do you see the name ZKC NY Inc. on this document?

A    No.

**J.A. 794**

Zwerman - direct - Polemeni					2237

Q    How about Ago & Alaudin Contracting Corp., do you see that in this document?

A    No.

Q    How about CNBC Corporation?

A    No.

Q    How about Unique Painting?

A    No.

Q    How about Midwood Building?

A    No.

Q    Midwood Consulting USA?

A    No.

          MR. POLEMENI:  Thank you, Judge.  I have nothing further.

          THE COURT:  Cross?

          MR. MAZUREK:  Yes, Your Honor.

          (Continued on next page.)

---

Zwerman - cross - Mazurek					2238

(Continuing.)

CROSS-EXAMINATION

BY MR. MAZUREK:

Q    Good morning, Mr. Zwerman.

A    Good morning.

Q    My name is Henry Mazurek.  I represent the defendant, David Motovich, and I am going to ask you some questions this morning relevant to the examination that you just had by the prosecutor.  Okay?

A    Okay.

Q    You had said you worked for David Motovich starting with, I think we saw, at least for a tax return that he personally filed, for tax return year 2012, right?

A    From the documents I just saw?

Q    Yes.

A    Yes.

Q    And the work that you did for David Motovich as a CPA was as a tax return preparer, is that accurate?

A    Yes.

Q    And sometimes you also provide bookkeeping services for clients, is that correct?

A    Yes.

Q    Okay.  And bookkeeping, I mean to keep the actual records of an entity for purposes of determining debits and credits and the ledger of the company, right?

---

Zwerman - cross - Mazurek					2239

A    We do that for some clients.

Q    Okay.  You did not do that for David Motovich, right?

A    That is correct.

Q    And we looked at tax returns, or at least tax returns were introduced by the prosecutor, for David and Lyudmila Motovich's personal returns, right?

A    What we just looked at?

Q    Yes.

A    Yes.

Q    You were not asked today any questions about any corporate returns that you did for entities that David Motovich had an interest in, correct?

A    Correct.

Q    And so I understand, there's a real distinction in the tax law between personal taxes and corporate taxes, correct?

A    In general, that is correct.

Q    Okay.  And for purposes of federal tax law, corporations are sort of like people too, is that fair to say?

A    That's kind of vague.

Q    Okay.  Let me -- let me clarify.

          For corporations, for certain corporations, federal taxes have to be filed by the corporation, itself, not the individuals who own the company, right.

A    Correct.

Q    And there are, for tax purposes, federal tax purposes,

---

Zwerman - cross - Mazurek					2240

and I know I'm simplifying a subject that is extremely complicated, but for federal tax purposes you're familiar with two different kinds of corporate taxpayers, there are C corporations and S corporations, right?

A    That is correct.

Q    And the default for federal tax purposes is that corporations are generally C corporations unless the taxpayer does something to elect out of the C corporation designation, right?

A    That is correct.

Q    And a C corporation has to file for its federal income tax returns a form called the 1120 form, is that correct?

A    That is correct.

Q    Now, on direct examination the prosecutor did not ask you to admit into evidence or review any Form 1120s of the federal tax code, right?

A    That is correct.

Q    The form that you reviewed for purposes of admission into evidence on direct examination was something called the Form 1040, correct?

A    What I looked at earlier was Form 1040.

Q    And the Form 1040 is what regular people like you and me have to file each year for our federal taxes for individuals, right?

A    I don't know about regular people, but people in general,

**J.A. 795**

Zwerman - cross - Mazurek 2241

yes.

Q    Okay.  So we are clear, if a corporation is a C corporation, the default designation of corporations for federal tax purposes, they file a separate form called 1120, right?

A    Correct.

Q    And they are taxed based on a calculation of the profits that that corporation has in any given year, correct?

A    Can you repeat that, please?

Q    Yes.

And corporations are taxed for federal income tax purposes based on the profits that they generate in any single year, correct.

A    Yes, based -- yes.

Q    Okay.  And so they pay income tax, a corporation, C corporation pays income tax, not the same rates, perhaps, but that's Congress's decision, but they pay income taxes just as individuals do, correct?

A    In general, they pay taxes on their taxable income.

Q    Okay.

And I think you were asked questions on direct examination about something called the -- a pass-through company.

Do you remember that?

A    Yes.

Zwerman - cross - Mazurek 2242

Q    Okay.  And a pass-through company, you understand, Mr. Zwerman, is not a C corporation, right?

A    That is correct.

Q    It's something under the tax code that's called an S corporation, right?

A    It could be an S corporation or a limited liability company.

Q    Okay.  An S corporation or a limited liability company would pay taxes differently than a C corporation under the federal tax code, correct?

A    Yes.

Q    And what you were asked about these pass-through companies is whether -- withdrawn.  Let me ask you this about pass-through companies.

Pass-through companies do not file the Form 1120 we've been talking about for C corporations, right?

A    That is correct.

Q    S corporations or LLCs, limited liability companies, actually have the profits of a company flow through to the underlying 1040 form for individuals, correct?

A    Partially correct.  They file a separate income tax return, and the K-1s from those separate income tax returns get reported on the individual's personal return.

Q    Okay.  And would the same be true if a company was a C corporation?

Zwerman - cross - Mazurek 2243

A    No, it would not.

Q    If a company were a C corporation, would there be any indication of the profits of that company on an individual's 1040 federal tax return?

A    Could you -- I apologize.

Could you repeat that again?

Q    Of course.

For C corporations, would the profits of a C corporation flow through and be reported on the returns of an individual's 1040 return?

A    No, it would not.

Q    There would be no indication on a 1040 form of any profits or income of a C corporation, correct?

A    That is correct.

Q    Now, in order for a company to be designated as an S corporation or LLC, do the shareholders of that corporation have to file certain forms with the IRS?

A    An S corporation -- in order to be an S corporation, the shareholders of a corporation have to elect to become an S corporation.

Q    And how do they do that?

A    There's a special form they fill out and send to the IRS.

Q    And if they don't fill out that special form to the IRS, can they designate themselves as an S corporation?

A    No.

Zwerman - cross - Mazurek 2244

Q    And what about for LLCs?

A    LLCs, when created, are generally automatically flow-through entities.

Q    Okay.  Now, let me ask you with respect to C corporations, or corporations who don't have that special election.

The only way that information about profits or income could be reported down to an individual's 1040 form would be if the individual derived some kind of income from that corporation, correct?

A    In general, that is correct.

Q    And the ways, for example, that an individual might derive income from a C corporation would be is if the company issued a dividend to that individual as a shareholder, is that one way?

A    That is correct.

Q    Is another way is if the individual received a salary or wages for work done for that corporation?

A    That is correct.

Q    Is another way that income can be generated from a corporation is if the shareholder of that company sold shares and made a profit on the sale of those shares?

A    That is correct.

Q    Okay.  But if a company were simply to make money because they were a construction company and had more profits than

**J.A. 796**

Zwerman - cross - Mazurek          2245

expenses in a year, that would not be reported on an individual's 1040 tax return, right?

A    When you say "company," could you be specific of what type of company?

Q    Yes.  I'm sorry.

If a C corporation were to derive profits as a construction company because it had received more revenues than it did expenses, that information would not be reported on an individual's 1040 return, correct.

A    That is correct.

MR. MAZUREK:  Now, if we could put on the screen — sorry, I didn't use the snake routine.

If we could put on the screen what's been admitted into evidence as GX-131.

THE COURT:  You may publish.

MR. MAZUREK:  Thank you, Your Honor.

(Exhibit published.)

BY MR. MAZUREK:

Q    And this is the individual tax return for David and Lyudmila Motovich for tax year 2019, right, Mr. Zwerman?

A    It appears to be.

Q    Okay.

And you were asked to look at certain pages of this return during direct examination.

MR. MAZUREK:  And if we can turn to page 81, I think

---

Zwerman - cross - Mazurek          2246

that was the correct page.  If we can highlight the top title of this particular page of the return.

(Exhibit published.)

BY MR. MAZUREK:

Q    Do you see this says "Schedule C" all the way to the far left?  Do you see that?

A    Yes.

Q    And then the title of this schedule is Profit or Loss From Business, and underneath in parentheses, Sole Proprietorship.

Do you see that?

A    Yes.

Q    Okay.  And this is page 81 of this document, right, I think we identified it, correct?

A    I don't know the page number.

Q    Okay.

But suffice it to say, Mr. Zwerman, you're familiar that tax returns, especially for people who have a lot of businesses, can be a very lengthy document, right?

A    For individual income tax return?

Q    Yes.

A    In general, an individual who owns a lot of businesses will have a larger return than a person that has no businesses.

Q    Right.  And that's because Congress, in its wisdom, has

---

Zwerman - cross - Mazurek          2247

made a very complicated Internal Revenue Code, is that correct?

MR. POLEMENI:  Objection.

THE COURT:  Overruled.

Q    You may answer.

THE COURT:  You may answer the question.

A    I don't want to speculate about what Congress does —

Q    Fair enough.

A    — these days.

Q    Fair enough.

A    It's pretty scary.

Q    No comment.

I mean one of the things, though, maybe it's a benefit to you, but the complication of the code creates a lot of work for you in determining the calculations and the computations necessary in order to accurately report a person's income tax, is that fair?

A    In general, the tax is complicated.  I have a lot of gray hair to show that.

Q    Thank you.

And we see on this page 81 that's called Schedule C, that there are many schedules or worksheets that are usually connected to the calculations of certain line items on the 1040 form, correct?

A    Correct.

---

Zwerman - cross - Mazurek          2248

Q    And this is just one of many, correct?

A    Correct.

Q    Now, the profit or loss —

MR. MAZUREK:  Again, if we can expand the top portion of Schedule C.

Q    — that was referred to you by the prosecutor, this is for profit or loss for what's called from a sole proprietorship, do you see that?

A    Yes.

Q    So this is not a calculation of profit or loss from businesses that are C corporations, correct?

A    That is correct.

Q    Okay.

And so this is only for — the information that's on this schedule would only include information of business income or loss that was generated from a sole proprietorship?

A    From a sole proprietorship that's on this page, correct.

Q    And what's a sole proprietorship, for the purposes of the jury?

A    A sole proprietorship is a business owned by the individual in his name rather than a corporation; or a LLC that's a hundred percent owned by that individual.

Q    Okay.  So if — a C corporation would not be identified on this schedule, correct?

A    That is correct.

**J.A. 797**

Zwerman - cross - Mazurek      2249

Q    And an LLC that was owned by another individual, not David or Lyudmila Motovich, would not be shown on this schedule, correct?

A    Correct.

Q    Okay.

MR. MAZUREK:  If we can turn to page 93 of the same Government Exhibit, 131.

(Exhibit published.)

Q    You were also shown this document, Mr. Zwerman, by the prosecutor.

MR. MAZUREK:  And if we can highlight the title of this document.

Q    And if you can read that, if you can read it on your screen?

A    Form 1040 Schedule E, Part II, line 28 - Income Or Loss From Partnerships -- Partnership and S Corporations.

Q    Okay.  And this is another schedule that's attached to the individual 1040 tax return form, right?

A    Correct.

Q    And it may or may not apply to an individual taxpayer, depending on whether they own any partnerships or S corporations, right?

A    That is correct.

Q    And this particular schedule --

MR. MAZUREK:  If we can now look at the entire

---

Zwerman - cross - Mazurek      2250

document.

Q    This particular schedule showed a bunch of entities that Mr. Polemeni asked you to review that were filed on the 2020 1040 form of David and Lyudmila Motovich, right?

A    Could somebody make that a little bigger?  There we go. Thank you.  Thank you.

Could you repeat the question?

Q    Yes.  You were asked to read some of the names of these entities that were listed on Schedule E for partnerships and S corporations in which David or Lyudmila Motovich owned an interest, right?

A    Correct.

Q    Okay.

And, again, this schedule would only include partnerships or S corporations based on what this schedule was intended to report, right?

A    Correct.

Q    So if it were a C corporation or a corporation owned by someone other than David and Lyudmila Motovich, it should not be reported here?

A    That is correct.

MR. MAZUREK:  We could take that down.

Q    Now, I just have a few additional questions for you, sir.

We've talked this morning about calculations of income tax, right?

---

Zwerman - cross - Mazurek      2251

A    In general?

Q    In general, yes.

A    Yes.

Q    And that is what is intended to be calculated or computed on the 1040 form, right?

A    Yes.

Q    And that's for purposes of individuals having to pay their annual income tax to the federal government, right?

A    Correct.

Q    And is it fair to say that it's correct generally that not all revenue that is received by a business is reported as income, correct?

A    Could you repeat that question?

Q    Not all revenue that is reported by a business generates income, is that correct?

A    Yeah, it -- you got the calculation wrong.

Revenue gets reported on a tax return, and expenses go against such revenue.

Q    Yes.  So income is only the difference between the two, right?

A    The taxable income is the difference between the two, yes.

Q    Okay.

And sometimes that calculation of net income for purposes of whether there is a tax due can be even a lot more

---

Zwerman - cross - Mazurek      2252

complicated than simply revenue minus expenses, right?

A    Correct.

Q    Depending on the type of business, correct?

A    Type of business and type of entity and -- and type of forms.

Q    Is it fair to say, Mr. Zwerman, that the calculation of income tax for businesses require -- may require looking at many different facets of the company or business?

A    That is correct.

Q    And, for example, are you familiar with something called passive losses?

A    Yes.

Q    What are passive losses to a business?

A    In general, a passive loss to an individual is a individual who doesn't actively manage the affairs of a business.

Q    Okay.  And for -- and let's put this, for example.

For a real -- for a holding in a real estate business, for example, if an individual is collecting rent or a company is collecting rent, simply because that person is collecting rent doesn't mean that they have income on their -- need to report income on their taxes, is that correct?

A    I think you mean taxable income?

Q    Yes, taxable income.

A    Yeah, that is correct.

**J.A. 798**

Zwerman - cross - Mazurek　　2253

Q    Okay.

And are there provisions in the Internal Revenue Code which actually reduce a person's potential taxable income only because -- even if they don't have any tangible expenses, but could have paper expenses under the tax code, is that something that you're familiar with?

A    It's a very vague question.

Q    Yes.

A    I apologize.

Q    Okay.  Let me try to be a little bit more specific.

Are you familiar with the concept in the tax code, for example, called depreciation?

A    Yes.

Q    And depreciation is something that the tax code allows a taxpayer to reduce the potential taxable income, not based on anything that comes out of the taxpayer's pocket at a certain time, but because it's a concept that the tax code allows you to deduct for taxable income, right?

A    Correct.

Q    And so there could be, for example, ways that the tax code allows a taxpayer to reduce its potential taxable income, not because they're spending any money in a year, but because the code allows for certain deductions, right?

A    That is correct.

Q    And depreciation, for example, of a real property that is

Zwerman - cross - Mazurek　　2254

owned — an apartment, for example — allows a taxpayer to take a certain amount each year as a deduction, even though they're not spending any money that year, correct?

A    In general, that is correct.

Q    And, for example, the tax code allows the taxpayer to do that for under -- for depreciation for real property for 27-and-a-half years, is that correct?

A    It depends on what type of property.

Q    Okay.  There are always different exceptions to the code throughout, correct?

A    Correct.

Q    Okay.  And sometimes a taxpayer can reduce their taxable income in a certain tax year based upon losses that they sustained in prior years, right?

A    That is correct.

Q    And that's called carry-forward losses, correct?

A    In general, in simple terms, yes.

Q    And so even if it looks like an individual has taken in a lot of money in one calendar year, say 2019, because they had losses in 2018 or before, they may be able to reduce their taxable income in 2019, right?

A    In general under certain circumstances, correct.

Q    And if you were just looking at someone's bank account statement in 2019 and you see all this money pouring into 2019, it could look to you that the taxpayer has a lot more

Zwerman - cross - Mazurek　　2255

taxable income, but, in fact, under the tax code they do not if they have carry-forward losses from prior years, right?

A    This is a speculative question.  I can't -- I can't comment on somebody's bank accounts and things like that.

Q    Let me ask you then something that is a little bit more specific.

In calculating an individual's taxable income for any certain year, you can't just look at an individual's or a business's bank account statement, is that fair?

A    Yes.

Q    You have to take into account a lot of other things that might not even exist within that calendar year period you're trying to calculate, correct?

A    Sometimes, yes.

Q    Okay.  Did the prosecutors in this case ever ask you to recalculate any tax owed by David or Lyudmila Motovich for the years -- tax years 2012 through 2019?

A    No.

MR. MAZUREK:  Can we put on the screen what has been marked or what has been admitted as Government Exhibit 355, Your Honor?

THE COURT:  How much more do you have for this witness?

MR. MAZUREK:  I have two more topics, which should --

Zwerman - cross - Mazurek　　2256

THE COURT:  Okay.

Why don't we take a 15-minute break and don't talk about the case, and then we'll continue with the witness.

MR. MAZUREK:  Thank you, Your Honor.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Jury exits.)

THE COURT:  You may stand down, sir.  Please wait outside of the courtroom and we'll call you back in about 15 minutes.

THE WITNESS:  May I go to the men's room?

THE COURT:  You certainly may.  In fact, if you don't, you'll have a big problem.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Thank you.  We'll see you in 15 minutes.

You may be seated, ladies and gentlemen.

(Witness steps down and exits courtroom.)

THE COURT:  The jury has left the courtroom and the witness is leaving, and has now left the courtroom.

Do we have any issues to address in the absence of the jury and the absence of this witness, beginning with the Government?

MR. POLEMENI:  No, Judge.

THE COURT:  Defense counsel?

MR. JACKSON:  No, Your Honor.

**J.A. 799**

Proceedings                          2257

THE COURT:  Enjoy your 15-minute break.  Thank you.

MR. JACKSON:  Thank you, Judge.

(Recess taken.)

(In open court; jury not present.)

THE COURTROOM DEPUTY:  All rise.

(Judge Kuntz entered the courtroom.)

THE COURT:  You may be seated.

Do we have any issues to address before we bring the witness back in and the jury back in?

Anything from the Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Anything from defense counsel?

MR. JACKSON:  No, Judge.

THE COURT:  Okay.  Let's get the jury back and let's get the witness back on the stand, please.

(Pause.)

(Witness entered and resumed the stand.)

THE COURT:  Welcome back, sir.

Please remain standing until the jury comes in, because, otherwise, if you sit down you'll just have to pop up and you'll run into the microphone again.

THE WITNESS:  Okay.  Thank you.

(Pause.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please rise for the jury.

---

Zwerman - cross - Mazurek              2258

(Jury enters.)

THE COURT:  Thank you.

Ladies and gentlemen if the jury, please be seated.

You may continue cross-examination.

Please be seated, sir.

Have you spoken with anyone about your testimony since leaving the witness stand?

THE WITNESS:  No.

THE COURT:  No.  Okay, fine.  Pull the microphone to you.

And, counsel, continue your cross.

MR. MAZUREK:  Thank you, Your Honor.

CROSS-EXAMINATION (Continues)

BY MR. MAZUREK:

Q    Mr. Zwerman, again on direct examination you were asked to look at certain 1040 forms that were marked and admitted as GX Exhibits 124 to 131, correct?

A    I can't refer to pages, there's no pages in front of me.

Q    Okay.  But you remember looking at 1040 forms for David and Lyudmila Motovich for the tax years 2012 through 2019, right?

A    Yes.

Q    And prior to coming to court, you had the opportunity to meet with and interview with the prosecutors to prepare for your testimony, is that right?

---

Zwerman - cross - Mazurek              2259

A    Three years ago they questioned me, that was it.

Q    And when they questioned you -- and that was a meeting at their offices, right?

A    Correct.

Q    And when they questioned you, they focused your attention to the tax years 2012 and 2019 like they did here today, correct?

A    We covered a lot of things that day.  I don't specifically remember everything.

Q    Okay.  But you understood from the -- from the prosecutors in preparing your testimony that the relevant period of charges in this case was from 2012 to 2019, correct?

A    I didn't focus on what year the charges were for, so....

Q    Okay.  But those were the years that you focused on in your testimony on direct examination for the 1040 forms for David and Lyudmila Motovich, correct?

A    Today, yes.

Q    Okay.

MR. MAZUREK:  Can we put on the screen what's been admitted into evidence as GX-355?

THE COURT:  You may publish.

(Exhibit published.)

BY MR. MAZUREK:

Q    And this is an exhibit you were asked on direct examination as well, right, Mr. Zwerman?

---

Zwerman - cross - Mazurek              2260

A    Yes.  It looks like what we discussed earlier.

Q    Right.  And this is a document that you said you did not prepare, is that right?

A    Yeah, I don't recall preparing this.

Q    You don't know who prepared this?

A    That is correct.

Q    You don't know for what purpose it was prepared?

A    That is correct.

Q    And the first time that you saw this is when prosecutors showed it to you, correct?

A    From what I recall, I just saw it this morning.

Q    And you were just asked to read from different columns and -- and entries on this document, correct?

A    Yes.

Q    And you have no personal knowledge about anything that's listed here, correct?

A    That is correct.

Q    All right.

MR. MAZUREK:  And if we can turn to page 53 of this document.

(Exhibit published.)

MR. MAZUREK:  Thank you, so much.  Actually, if you could zoom out.

And just on the handwritten portion in the center of the page, if you could highlight that.

J.A. 800

Zwerman - cross - Mazurek                    2261

BY MR. MAZUREK:

Q    Do you see a bunch of dates handwritten on this page, Mr. Zwerman?

A    Yes.

Q    Does that appear to you to be the dates of January 4th, 2021 to January 10th, 2021?

A    It does appear that.

Q    Okay.  And the -- that particular period of time, did you ever use this document to prepare any tax return on behalf of Midwood Lumber?

A    No, that -- not that I recall.

Q    Did you ever use this document for purposes of preparing any tax return for David Motovich?

A    No.

Q    And this period of time, 2021, this was during the global pandemic, is that correct?

A    From what I recall, it was -- it was during the pandemic.

Q    Okay.  The COVID-19 pandemic, right?

A    Yes.

Q    Now, you did work during COVID for clients in terms of preparing tax returns, is that right?

A    In general, yes.

Q    You understood that during that period of time for the Internal Revenue Code there were suspensions of rules and extensions of time that were granted, correct?

---

Zwerman - cross - Mazurek                    2262

A    In general, there was some extensions for some filings.

Q    And just generally in your work as a CPA, during that period of time you also knew that businesses were under extreme pressures and strains as a result of the pandemic, is that fair to say?

A    In general, businesses and a lot of individuals were having bad times.

Q    And in terms of employees having to get paid, businesses had to take extreme or different measures than they would during non-COVID times, is that fair to say?

A    I -- that's too speculative.  I don't know what you're referring to.

Q    Well, generally speaking, were you familiar, based on your work as a CPA during that time, that employers had to take special measures sometimes to pay employees because business just was not happening, correct?

A    Some employers applied for government grants and things of that nature to help, if that's what you're referring to.

Q    And some employers had to take, if they didn't get public assistance, had to take special measures privately to try to keep employees, is that fair to say?

A    I apologize.  I don't know what private measures are.

Q    Okay.  Let me ask you this then:

     In twenty-twenty -- did you file any returns on behalf of Midwood Lumber in 2021 for this time period on this

---

Zwerman - redirect - Polemeni                 2263

document?

A    I think we were no longer representing them at that point in time.

Q    Okay.

A    Like three years ago -- I don't recall, actually, the timeframe.  I apologize.

Q    But you certainly didn't file any returns based on any of these records that you see in Government Exhibit 355, correct?

A    Correct.

          MR. MAZUREK:  I have nothing further, Your Honor.

          THE COURT:  Redirect.

          MR. POLEMENI:  Briefly, Judge.  Thank you.

REDIRECT EXAMINATION

BY MR. POLEMENI:

Q    Hi, Mr. Zwerman.  We'll get you out of here so you can go back to Florida in a minutes.  Okay?

A    Thank you.

Q    There was some discussion about the pandemic in 2021.

     Most people during the pandemic were at home, is that right?

A    In general, more people were at home.  I don't know about most, but....

Q    There was a lot of focus on renovating homes and properties at that time.

     Do you recall that?

---

Zwerman - redirect - Polemeni                 2264

A    In general, yes.

Q    Yes.

     Hardware stores and supplies were -- materials were in great need, in great demand at that time?

A    I don't specifically remember, but....

Q    That's fine.

     You were asked a bunch of questions about the complexities of the tax code, right?

A    Correct.

Q    About passive losses and depreciation and S corps and C corps, right?

A    S corps and C corps, correct.

Q    Is it fair to say that you can't advise your clients about depreciation and the benefits of S corps and rent and royalties if they're not telling you everything, if they're not providing you with accurate and complete information?

A    In general, if we're not given information from a client, we cannot fully advise them of those things we do not know about.

Q    There's a certain amount of trust that you have with your client that they're telling you complete and accurate information, correct?

A    Correct.

Q    And if they don't tell you everything or they don't provide you complete and accurate information, it makes your

**J.A. 801**

Zwerman - redirect - Polemeni    2265

job a lot harder, doesn't it?

A    In general, yes.

Q    You mentioned that you no longer represent or you no longer provide tax services for Mr. Motovich, is that right?

A    That is correct.

Q    Who terminated that relationship?

A    We terminated it.

Q    Meaning your firm terminated the relationship?

A    Yes.

Q    Was that shortly after you met with prosecutors and agents?

A    Yes.

Q    Was that a decision you made on your own?

A    With advice of counsel.

Q    No one at this table told you to terminate that relationship, right?

A    That is correct.

Q    That was a decision you made based on your understanding of --

MR. POLEMENI:  Well, you know what.  I'll withdraw that question.

No further questions, Judge.

THE COURT:  Thank you.

You may step down, sir.  Thank you very much.  Have a good trip back to Florida.

---

Proceedings    2266

THE WITNESS:  Thank you, sir.

THE COURT:  Thank you, sir.

(Witness steps down and exits the courtroom.)

THE COURT:  All right.  Please call your next witness.

MR. JACKSON:  Your Honor, at this time we would request permission to call out of order Special Agent Pereless.

THE COURT:  Yes.

By agreement of the parties, we are now going to have the defense call a witness on their case out of order. And the defense will examine first and then the Government will cross-examine, and then defense will redirect.

So, this is, again, by agreement of the parties to move things along.

Okay.  Have the witness come forward and be sworn, please.

(Witness enters the courtroom.)

THE COURT:  Please come forward, sir, to the front and stand on that top step and my court deputy will administer the oath.

Please raise your right hand when you get there, and we will proceed from there.

THE COURTROOM DEPUTY:  Do you solemnly swear or affirm that the answers you are about to give this Court shall

---

Proceedings    2267

be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

(Witness sworn.)

THE COURT:  Thank you, sir.  Please be seated.

I am going to ask you to pull that microphone in front of you towards you.  It will swivel towards you.  Looks like a snake, but don't worry, it won't bite you.

Please state your name and spell it, and then counsel will inquire.

THE WITNESS:  Yes, Your Honor.

Michael Edward Pereless, P-E-R-E-L-E-S-S.

THE COURT:  Thank you.

You may inquire, counsel.

MR. JACKSON:  Thank you, Judge.

(Continued on the following page.)

---

Pereless - direct - Jackson    2268

**MICHAEL EDWARD PERELESS,**

called as a witness by the Defense, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. JACKSON:

Q    Good morning, Special Agent.

A    Good morning or good afternoon.

Q    Sir, where do you work?

A    I work for the FBI, Northfield office.

Q    And what -- what do you do there?

A    I am a supervisory special agent of the counter-terrorism squad based in the northern part of the state.

Q    Now, you are not one of the primary agents on this case, am I correct about that?

A    I am no longer assigned to the case.  I had been while in New York.

Q    You did have some participation in the case?

A    Yes.

Q    Am I correct that you participated in some meetings of witnesses?

A    Correct.

Q    And for some of those meetings, you were responsible for creating an FBI 302 report, correct?

A    Correct.

J.A. 802

*Pereless - direct - Jackson*　2269

Q    What is an FBI 302 report?

A    A 302 is a documentation of an interview that is transcribed by special agents.

Q    You also took notes during some of the interviews, correct?

A    Yes, sir.

Q    And oftentimes, when you are the person who is responsible for creating an FBI 302 report, you'll take handwritten notes and then you will later transform that into a 302 report, correct?

A    Yes, sir.

Q    And am I correct that before you create a 302 report in final, you would typically confer with the other agents who -- who participated in the meeting?

A    Yes.

Q    You confirm that what you are putting in the 302 report is correct, right?

A    Correct.

Q    And then the 302 reports are often reviewed by supervisors before they're finalized, correct?

A    That is correct.

Q    Now, in some of the meetings you participated in, you did identification procedures, correct?

A    That is correct.

Q    And in order to do those identifications, what you would

*Pereless - direct - Jackson*　2270

do is you would show a photo, typically, to a witness, and then ask the witness, without telling them who it was, who was depicted in the photo, correct?

A    Correct.

Q    You participated in a meeting with a witness named Dannette Hyatt-Sullivan [sic] on December 11th, 2019, correct?

A    Yes, sir.

Q    And during that meeting, in one portion of the meeting, you showed Ms. Hyatt-Sullivan a series of photographs, correct?

A    Yes.

Q    A total of 34 photographs, am I correct?

A    That sounds correct.

Q    And in your notes of the meeting and later in the 302 report that you created, when a -- when Ms. Sullivan-Hyatt made a comment in connection with identification, you recorded that comment, correct?

A    Yes, sir.

Q    And you also recorded whether she was able to identify the person whose photo you were showing or not, correct?

A    Correct.

Q    And when she was able to identify the person, you recorded that it was a positive identification, correct?

A    Yes.

Q    And when she was not able to identify the person, you

*Pereless - direct - Jackson*　2271

recorded it as a negative identification, correct?

A    Negative, correct.  Yeah, I would say, typically would just put NA or a negative sign, if I recall.

Q    And then you recorded the same in your 302 report after making those notes, correct?

A    Correct.

Q    And there were several other agents who participated in the meeting on December 11th, 2019, correct?

A    Yes.

Q    Was one of them Special Agent Cabane, correct?

A    I believe so, correct.

Q    And am I correct that Special Agent Cabane, after you showed Ms. Sullivan -- Ms. Hyatt-Sullivan the first 33 photographs, added a 34th photograph?

A    I would have to look at my notes or the 302 to confirm that.

MR. JACKSON:  Your Honor, I would like to, strictly for refreshing the witness's recollection, I would like to demonstrate -- I would like to display a document marked as 3500-DSH-8B-005 with the Court's permission.

THE COURT:  Yes.  For the witness and for your adversary only.

And the question, sir, is when you look at this document, does this refresh your recollection, so that you can say either yes, it does refresh your recollection or no, it

*Pereless - direct - Jackson*　2272

does not.

But read it to yourself and then let counsel know if it does refresh your recollection or if it does not refresh your recollection.

Take your time.

MR. JACKSON:  And Ms. --

THE COURT:  No, no, let him read it.

MR. JACKSON:  It's just --

THE COURT:  Let him read it.  Let him read it.

And then tell counsel whether or not it refreshes your recollection or it doesn't.

Just read it to yourself.

THE WITNESS:  Okay.  This is the entirety of the document, correct?

THE COURT:  Read the entirety of the document that is in front of you.

THE WITNESS:  Is there a way --

THE COURT:  No, no, just read it.  Just read it.

Try to make it a little more legible.  Blow it up a little bit.

THE WITNESS:  Yes, Your Honor.  If we could go to --

THE COURT:  Or if you have hard copy of it, you can give the hard copy to my court deputy and he can put the hard copy in front of the witness so he can see the document in its entirety, in fairness to the witness, to see whether it

**J.A. 803**

Pereless - direct - Jackson                          2273

refreshes his recollection.

THE WITNESS:  So it's currently on --

THE COURT:  Hang on.  Hang on.

THE WITNESS:  Yes, Your Honor.

MR. JACKSON:  Your Honor --

THE COURT:  Hang on.  Everybody wants to run the show.  I'm wearing the black prom dress.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Okay.

Let's have the document in its entirety.  As I understand it, it's six pages, provided to the witness so he can look through it and see if it refreshes his recollection so he can answer the question that you've asked him.

So, let's have the hard copy.

Would you please, Mr. Scott, get it from -- no, you stay there, Mr. Jackson.  You know the mother-may-I rules.  Everybody --

MR. JACKSON:  Of course, Judge.

THE COURT:  -- is rooted on the podium, as much as they hate it.

Bring it to the witness.

Read it, sir, and after you've read it --

THE WITNESS:  Thank you very much.

THE COURT:  -- let inquiring counsel know whether or not it refreshes your recollection so you can answer his

Pereless - direct - Jackson                          2274

question.

Just read it to yourself.

THE WITNESS:  Yes, Your Honor.

THE COURT:  All of it.

THE WITNESS:  Yes, Your Honor.

Do you mind if I push this aside for the moment?

THE COURT:  Do I mind if you --

THE WITNESS:  Just --

THE COURT:  You can do that.

THE WITNESS:  Okay.  Thank you, Your Honor.

THE COURT:  You're welcome.

(Continued on the following page.)

Pereless - Direct - Mr. Jackson                       2275

DIRECT EXAMINATION (Continuing)

BY MR. JACKSON:

THE COURT:  Have you completed your review of the document?  The question is, does it refresh your recollection?  Either yes, it does or no, it does not.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Next question.

MR. JACKSON:  Thank you.

BY MR. JACKSON:

Q    Now, during the portion of the interview where you showed photographs to Ms. Sullivan-Hyatt, you showed her a photograph of an individual named Reginald Garcia, correct?

A    Yes.

MR. JACKSON:  Your Honor, we would be displaying in evidence GX-19.

THE COURT:  Any objection to GX-19?

MR. PAULSEN:  No, Your Honor.  It's in evidence, I believe.

THE COURT:  You may display it.

MR. JACKSON:  Thank you, Judge.

Q    Agent Pereless, I'm correct this is the photograph of Reginald Garcia that you displayed to Ms. Sullivan-Hyatt?

A    Yes.

Q    And when you displayed this photograph, Ms. Sullivan-Hyatt identified the photograph as Reginald Garcia?

Pereless - Cross - Mr. Paulsen                        2276

A    Yes.

Q    And you recorded that as a positive identification of him, correct?

A    I did.

Q    You didn't hint who it was before you displayed the photograph, correct?

A    No.

Q    And I'm correct that you recorded comments that she made about other photographs during the process of the identification procedure, correct?

A    If provided, yes.

Q    There was no comment that she made at the time that she made the positive identification of Reginald Garcia, correct?

A    If it's not noted in the 302, there were none.

Q    So I'm correct?

A    Correct.

MR. JACKSON:  No additional questions, Judge.

THE COURT:  Any cross?

MR. PAULSEN:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. PAULSEN:

Q    Good afternoon, Mr. Pereless.

A    Good afternoon.

Q    So you were part of this case until you switched offices in New Jersey; is that right?

**J.A. 804**

Pereless - Cross - Mr. Paulsen                    2277

A     That's correct.

Q     Now, defense counsel asked you a moment ago about the photos that you showed the witnesses, including Ms. Hyatt-Sullivan; is that right?  Sullivan-Hyatt.  My apologies.

A     Yes.

        THE COURT:  Don't talk over each other, please.

Q     This was a book of lots of photos, right?

A     It was, correct.

Q     Is it fair to say this photo book kind of grew over time as your team learned more?

A     Correct.

Q     Now, you testified a moment ago that during a December interview with Ms. Hyatt she was shown a photo of Reginald Garcia; is that right?

A     Yes.

Q     And she said that's -- she identified that successfully as Reginald Garcia; is that right?

A     Correct.

Q     Now, during that same meeting, had she already been shown other photos of Reginald Garcia?

A     In the notes and in the 302 it shows that she had been shown a driver's license that had been associated with financial documents.

Q     Is it fair to say that a number of the financial


Pereless - Redirect - Mr. Jackson                  2278

documents in this case that were shown to witnesses had copies of identifications?

A     Yes.

Q     And in this precise meeting, prior to Ms. Hyatt identifying that photo, had she been shown multiple copies of Mr. Garcia's photo identification?

A     Stand by.  Correct.  I could point to number 17 as --

        THE COURT:  It's not in evidence, so just answer the question.

        THE WITNESS:  Sorry, Your Honor.  Thank you.

Q     And you memorialized that, as well, in your report?

A     Correct.

Q     So just in conclusion, she was able to successfully identify Reginald Garcia after seeing several photos of Reginald Garcia with Reginald Garcia's name on the photo?

A     That's correct.

        MR. PAULSEN:  Thank you, Mr. Pereless.

        THE COURT:  Any redirect?

        MR. JACKSON:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. JACKSON:

Q     Now, Special Agent, the photo ID identified as Reginald Garcia, the Maryland driver's license for Garcia was sent -- I'm sorry, was number 17 in the list of photos that you sent to her, correct, that you showed to her?


Pereless - Redirect - Mr. Jackson                  2279

A     Stand by.  Number 17, correct.

Q     And number -- the photograph that you showed her of Reginald Garcia was during a specific set of photographs and it was number eight, correct?

A     Stand by.  Number eight is a positive --

        THE COURT:  Just answer if that's correct.

A     That's correct.

Q     I'm correct, Agent Pereless, that when Ms. Sullivan-Hyatt was shown the driver's license belonging to Mr. Garcia, she stated that those -- that that document had been faxed or emailed to her, correct?

A     Where is that in the 302?  Could you point that out?

Q     I direct you to page 3.

A     Correct.

Q     And I'm also correct that the copy, the faxed copy of the driver's license that was shown to her during this meeting, was almost completely impossible to see the face, am I correct about that?

A     Incorrect.

        MR. JACKSON:  I'd like to, Your Honor, offer a single page marked as GX-3500 DSH 8B-24.

        THE COURT:  Any objection?

        MR. PAULSEN:  Yes, Your Honor.  We would object.

        THE COURT:  Sustained.  It's not coming in.

        MR. JACKSON:  Your Honor, may I display already in


Pereless - Redirect - Mr. Jackson                  2280

evidence GX707-A?

        THE COURT:  Any objection?

        MR. PAULSEN:  No, Your Honor.

        THE COURT:  You may publish.  It's in evidence.

        MR. JACKSON:  Can we go to page 24?  Can we zoom in?

BY MR. JACKSON:

Q     And this is a photo ID that you showed to Ms. Sullivan-Hyatt?

A     It is a copy, correct.

Q     You showed a copy of it, correct?

        THE COURT:  I think he said it is a copy of it.

Q     This is a different photograph, actually, than the one that was shown to her during the course of the meeting.  Am I correct about that?

A     Can you reference that photo, please.

Q     I want to direct your attention to page 24 of your report.  I direct your attention to page 24 of your report.

        THE COURT:  The question is, are you referring him to the 302?

        MR. JACKSON:  Yes, Your Honor.

        THE COURT:  Look at the 302, which is in front of you, and counsel's referring you to what he's described as page 24 of the 302.  Do you have 24 pages of your 302 there, sir, yes or no?

        THE WITNESS:  No.

J.A. 805

*Pereless - Redirect - Mr. Jackson*     2281

MR. JACKSON: If the witness looks in the bottom right-hand corner.

THE COURT: Of what page of the 302?

MR. JACKSON: It's the attachments that are there at 24. You can see at the bottom of 3500 DSH 8B-24.

THE COURT: Do you have that page, sir?

THE WITNESS: Yes.

THE COURT: Go ahead, Mr. Jackson.

MR. JACKSON: Thank you, Your Honor.

Q Now, you agree with me -- no, no, put this -- you agree with me, sir, the version of the driver's license that was shown during the course of the meeting was a different version of the driver's license that's depicted here, correct?

A Could you repeat the question?

THE COURT: Read it back.

(Record read.)

THE COURT: Do you agree with that statement or not?

THE WITNESS: No.

THE COURT: Next question.

Q Sir, as we sit here today, you don't have a clear recollection of what version of the driver's license was shown during the meeting, am I correct about that?

THE COURT: Do you have a clear recollection of what driver's license was shown to that woman in the meeting? Yes or no. As you sit here today, do you have a clear

---

*Pereless - Redirect - Mr. Jackson*     2282

recollection, as you sit here today, of what version of the driver's license was shown to the witness?

THE WITNESS: Yes.

THE COURT: You do?

THE WITNESS: Yes.

THE COURT: Next question.

BY MR. JACKSON:

Q And it is not this version, correct?

THE COURT: What do you mean by this version?

MR. JACKSON: The version I'm referring to is the one that is marked 707A-024. Correct?

THE COURT: Yes or no.

THE WITNESS: Could you repeat, please?

THE COURT: Read it back.

(Record read.)

THE COURT: Either yes, it is, or no, it isn't.

THE WITNESS: It is this version.

THE COURT: Next question.

MR. JACKSON: No additional questions.

THE COURT: Thank you, sir. You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: All right. Ladies and gentlemen of the jury, it's a little past 1:00. I'm sorry for the delayed lunch hour but I told you these witnesses would be relatively short. So why don't we say we'll have our luncheon recess.

---

*Proceedings*     2283

Does 2:30 work for you? We'll see you back at 2:30 and have that hard stop at 5:00. Enjoy your lunch. Do not talk about the case. You want to talk about anything that happened over the weekend, that's up to you, although, you know, I have basically an internet outage of weekend stuff except for sports. You might want to just talk about sports. Thank you and enjoy your lunch.

(Jury not present.)

THE COURT: The jury has left the courtroom and the witness has completed his testimony and left the stand.

Do we have anything before we take the lunch recess? Anything from the government?

MR. POLEMENI: No, Your Honor.

THE COURT: Anything from defense counsel?

MR. JACKSON: No, Your Honor.

THE COURT: Thank you. Enjoy your lunch, everyone.

(Recess taken.)

**J.A. 806**

---

*Proceedings*     2284

AFTERNOON SESSION

(In open court.)

THE COURT: Do we have any issues before we bring the jury in? From the government?

MR. POLEMENI: No, Your Honor.

THE COURT: From the defense?

MR. JACKSON: Briefly, Your Honor. We sent a letter to the Court shortly before the break ended, which we're in the process of filing, which addresses the incorrect testimony that was offered by the witness who was just on the stand.

THE COURT: What do you mean incorrect testimony? Testimony with which you disagree?

MR. JACKSON: No, Your Honor. The government has acknowledged that the witness' testimony was flatly incorrect.

THE COURT: Let me ask the government. Is that true?

MR. PAULSEN: No, Your Honor.

THE COURT: You'll submit the letters. I'll read them. Is there anything else we can deal with before we bring in the jury for this jury trial?

MR. JACKSON: No, Judge.

THE COURT: Let's get the jury back. Get the witness back on the stand. You're still under oath. You're calling the witness you had on the stand last week?

MR. GRUBIN: Yes, Your Honor.

Proceedings 2285

THE COURT: Unless you have more witnesses, out of order witnesses. It's been a strange weekend. You never know what will come out. Take the witness stand again, sir.

(Jury present.)

THE COURT: We're going to resume with the witness that was on the stand last Friday. Sir, you're still under oath. Let me ask you, have you spoken with anyone about your testimony since leaving the witness stand?

THE WITNESS: No, I have not.

THE COURT: Thank you. Please continue your examination.

MR. GRUBIN: Thank you, Your Honor.

(Continued on the following page.)

Cabane - Direct - Mr. Grubin 2286

CHRISTOPHER CABANE,
    called as a witness by the Government, having been
    previously duly sworn/affirmed by the Courtroom Deputy,
    was examined and testified as follows:
DIRECT EXAMINATION
BY MR. GRUBIN:
Q    Good afternoon, Special Agent Cabane.
A    Good afternoon.
Q    I'd like to start with what's already been admitted as Government Exhibit 5000, if we could have that on the screen.
    THE COURT: You may publish.
Q    When we were here on Friday we were discussing the different subject bank accounts; is that right?
A    That's correct.
Q    You testified about three, the three signatories listed on each of these accounts, correct?
A    Yes, that's correct.
Q    Three signatories across the accounts?
A    Yes, that's correct.
Q    There was Reginald Garcia, correct?
A    Yes.
Q    Kemal Sarkinovic?
A    Yes.
Q    Robert Lovy?
A    Yes.

Cabane - Direct - Mr. Grubin 2287

Q    And based on your investigation, who is Robert Lovy?
A    Robert Lovy is an associate of David Motovich.
Q    I'm showing you, this is just for the witness, what has been marked for identification as Government Exhibit 20.
    THE COURT: Any objection to 20?
    MR. JACKSON: No objection, Judge.
    THE COURT: Admitted. You may publish.
    (Government's Exhibit 20 was received in evidence.)
Q    Who is that?
A    That is Robert Lovy.
Q    Special Agent Cabane, what is, based on your experience, what is structuring?
A    Structuring is the practice of conducting transactions to avoid the CTR filing requirement, CTR being currency transaction report.
Q    Can you give an example?
    MR. JACKSON: Objection.
    THE COURT: Overruled.
A    One example would be deliberately writing checks just below the threshold so a CTR would not be filed.
    THE COURT: By threshold you mean $10,000?
    THE WITNESS: Yes.
    THE COURT: Go ahead.
Q    And last Friday we were talking about different payments going from the subject bank accounts to various sources; is

Cabane - Direct - Mr. Grubin 2288

that correct?
A    Yes.
Q    As part of your work on this case, did you observe payments from the different subject bank accounts to any credit cards?
A    Yes, I did.
Q    What sorts of credit cards?
A    American Express, Saks Fifth Avenue, Bloomingdale's, for example.
Q    You mentioned American Express or AmEx. What AmEx cards did you look at or what AmEx accounts?
A    AmEx accounts belonging to David Motovich, his wife, Lyudmila Motovich.
Q    Did you review those records provided by AmEx?
A    Yes, I did.
Q    For those accounts?
A    Yes.
Q    Are these some of the records that Mr. Paulsen reviewed in court with Richard Kier from AmEx?
A    Yes, it was.
Q    And, approximately, if you recall, how much money went from the subject bank accounts to pay the AmEx accounts in David Motovich and his wife's name?
A    Over $10 million.
Q    And to save time, what types of charges did you see in

J.A. 807

*Cabane - Direct - Mr. Grubin* 2289

these AmEx accounts funded by the subject company money?

A   Jewelry, department stores, clothing, Hermes.

Q   Is it fair to say there were some business expenses, as well?

A   There were some expenses that appeared that they could have been business expenses, yes.

Q   Do you recall Special Agent Rees testifying about receipts and invoices found in Motovich's office at Midwood Lumber?

A   Yes.

Q   And, again, to save time, were you able to trace the funding for some of those purchases to AmEx bills that received payments from the subject bank accounts?

A   Yes, I was.

Q   Let's turn back, if we can, to what's been admitted as Government Exhibit 396.

THE COURT:  You may publish, page 6.

Q   This was another document found in Motovich's office, correct?

A   Correct.

Q   And it is a Van Cleef & Arpels invoice dated December 31, 2014?

A   Correct.

Q   And if we scroll down to the bottom, the total with the sales cost it looks like it's $11,663; is that right?

---

*Cabane - Direct - Mr. Grubin* 2290

A   That's the total with the sales tax.

Q   Do you recall Special Agent Ambrosini of FBI stating that a necklace of this type was recovered from Motovich's apartment?

A   Yes.

MR. GRUBIN:  Your Honor, permission to have the court deputy take some items from the agents behind me to the witness.

THE COURT:  Yes.

MR. GRUBIN:  Thank you.

Q   Special Agent Cabane, could you take out what's already been admitted as Government Exhibit 3022, if it's obvious?

A   Okay.

Q   Do you see --

A   Take it out of the bag?

Q   Sure.  Thanks.  Was this that necklace?

A   Yes.  It's a butterfly shaped pendant on a necklace.

Q   Looking at the invoice, do you see the method of payment at the bottom?

A   It says AmEx.

Q   And if we could now turn to Government Exhibit 700-K, one of Motovich's AmEx cards, on page 118.

THE COURT:  In evidence?

MR. GRUBIN:  In evidence.

THE COURT:  You may publish.

---

*Cabane - Direct - Mr. Grubin* 2291

Q   Do you see the same date listed here of the purchase at Van Cleef for that same amount?

A   Yes, December 31, 2014.

Q   And if we could look now at Government Exhibit 704 at page 469.

THE COURT:  In evidence.  You may publish.

Q   Do you see there a January 18, 2015 payment from Ago & Alaudin Contracting Corp. to AmEx in the amount of looks like $39,515.57?

A   Yes, I do.

Q   So is it fair to say that funds from the Ago & Alaudin account at Chase Bank paid down the AmEx bill from Motovich following the invoice for the $11,000 necklace, $11,000 plus necklace?

A   Yes.

Q   Do you recall when Special Agent Ambrosini testified regarding some of the Hermes bags found in Motovich's apartment?

A   Yes.

MR. GRUBIN:  Your Honor, once again, permission to have the court deputy retrieve some items from the special agents.  I believe this should be the last one.

THE COURT:  I hope so.  You want him to bring the necklace back before it disappears somewhere, or are you done with the necklace?

---

*Cabane - Direct - Mr. Grubin* 2292

MR. GRUBIN:  Done with the necklace.

THE COURT:  Why don't you bring it back.

What is the exhibit number?

MR. GRUBIN:  We're looking at what's been admitted as Government Exhibits 3016, 3017, and 3018.

THE COURT:  What is the question?

Q   Let's do one example.  Looking at Government Exhibit 3017, do you see that there?

A   Yes.

Q   Can we turn to the receipt, the Hermes receipt, on what's already been admitted as Government Exhibit 2004 at page 7.

THE COURT:  You may publish.

Q   Can we make that bigger, Ms. Kannan.  Are you able to see the date there, December 24, 2015?

A   Yes, I see it.

Q   And if we could blow up the description --

THE COURT:  Could you use the microphone, Counsel.

MR. GRUBIN:  I apologize, Your Honor.

Q   If we could blow up the description there.  Do you see where it says for the bag color Vermillon?

A   Yes, the top item.

Q   And the total amount, if we could look should be -- if we could look at the total amount between the two for the receipt.  $6,614.15, do you see that?

A   Yes.

**J.A. 808**

Cabane - Direct - Mr. Grubin                    2293

Q    And you see that it's paid for by AmEx?

A    Yes.

Q    Ending in 003?

A    Yes.

Q    If we could look at Government Exhibit 700-F at page 206 already in evidence.

THE COURT:  You may publish.

Q    This is another one of the AmEx accounts that you reviewed, Special Agent Cabane?

A    Yes, it is.

Q    And zooming in on the date December 14th or, excuse me, December 24, 2015, do you see the payment to the Hermes store for that same amount?

A    Yes, $6,614.15.

Q    Again, is this one of the accounts that received subject company money?

A    Yes, it is.

Q    Did you trace the funds for the other two Hermes bags in front of you?

A    Yes, I did.

Q    Were they also paid for by AmEx accounts that received subject company money?

A    Yes.

Q    Were you here previously, Special Agent Cabane, when Special Agent Maegan Rees testified that materials relating to

Cabane - Direct - Mr. Grubin                    2294

a company called Centurion Diamonds were found in Motovich's office at Midwood Lumber?

A    Yes, I was present.

Q    I'm showing you what has been marked for identification as Government Exhibit 5008.

MR. GRUBIN:  And I would move to admit into evidence, Your Honor.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 5008 was received in evidence.)

Q    Is this a chart you participated in creating?

A    Yes, it is.

Q    And what does this chart show?

A    This chart shows payments made from the subject shell bank accounts to Centurion Diamonds and Tawil Diamonds.

Q    And at least how much money went from the subject based bank accounts -- I'm sorry.  What is Centurion Diamonds and Tawil Diamonds?

A    They are wholesale diamond companies.

Q    How much money from the subject bank accounts went to these diamond companies?

A    At least 940,501.82.

Q    If we went through the rows, the different rows on your

Cabane - Direct - Mr. Grubin                    2295

detailed break down below, would those amounts and information be reflected in the different bank statements that you reviewed?

A    Yes.

Q    Do you recall Reginald Garcia's testimony that he worked for Joshua Markovics and Menacham Markovics?

A    Yes, I recall.

Q    Who is Joshua Markovics?

A    Joshua Markovics is an associate of David Motovich and the owner and operator of Royal Home Management and Royal Builders Realty, LLC.

Q    Are you aware by any nicknames he goes by?

A    Yes.  Shia.

Q    You mentioned a few of the companies.  Was another Royal DM, LLC?

A    Yes.  That's another company that he had a financial interest in.

Q    Was David Motovich involved in any of these companies?

THE COURT:  If you know.

Q    If you know.

A    He was involved in Royal DM, LLC.

Q    I'm showing you what has already been admitted as Government Exhibit 393 at page 4.  Permission to publish, Your Honor.

THE COURT:  You may publish.

**J.A. 809**

Cabane - Direct - Mr. Grubin                    2296

Q    Was this one of the documents that Special Agent Rees testified was found at Midwood Lumber?

A    Yes.

Q    And you see the headings there, business name, tax ID, account number, account type and signer?

A    Yes.

Q    Can you remind us, generally, what a signer is?

A    The signer has the authority to make transactions on an account.

Q    And if we -- let's just go down.  Well, let's jump ahead for now to Royal DM, LLC.  Do you see that there?

A    Yes.

Q    Who are the signers for that business?

A    Joshua Markovics and David Motovich.

Q    Quickly while we're here, let's look at a few of the other ones.  Do you see Midwood Lumber at the top?

A    Yes.

Q    Boris Motovich and David Motovich?

A    Yes, for their main account and payroll account.

Q    Boyard Management Corp.; is that right?

A    Yes.

Q    DM Investors?

A    DM Investors is solely David Motovich.

Q    Sherman Abrams Laboratory?

A    Yes.  That is shared with Yakov Leybovich.

Cabane - Direct - Mr. Grubin                    2297

Q    And you see Midwood Dialysis a little further down?

A    Yes.

Q    Who is, again just remind us, who is Menacham Markovics?

A    That is the either half brother or stepbrother of Joshua Markovics.

MR. GRUBIN:  I'm showing the witness what's been marked for identification, Your Honor, as Government Exhibit 735, although I'd offer it into evidence.

THE COURT:  Any objection to 735?

MR. JACKSON:  No objection, Judge.

THE COURT:  It's admitted.  You may publish.

(Government's Exhibit 735 was received in evidence.)

Q    Are these some of the checks from the subject bank accounts to Markovics?

A    Yes.  This is one check in front of me here.

Q    This one --

THE COURT:  Keep your voice up, please.  What was the answer?

THE WITNESS:  This is -- I'm looking at one check to Joshua Markovics from Midwood USA Consulting.

THE COURT:  Go ahead.

Q    From Midwood USA Consulting to Joshua Markovics you said?

A    Yes.

Q    And for $25,000?

A    Yes.

---

Cabane - Direct - Mr. Grubin                    2298

Q    Let's just turn to page 2.  We'll look at a few of them. Is this one from ZKC New York to Menacham Markovics for $8,350?

A    Yes.

Q    And if we could turn to page 3.  Look at that one.  Is this one from ZKC NY, Inc. to Joshua Markovics for $8,350; is that fair?

A    That's correct.

Q    If we could look at page 4.  Is this a check from Midwood USA Consulting Corp. to Joshua Markovics for $13,000?

A    Yes, it is.

Q    Let's look at page 5.  Is this a check from Midwood USA Consulting Corp. to Joshua Markovics for $7,000?

A    Yes.

Q    We'll look at one more, page 6.  Is this a check from Midwood USA Consulting Corp. to M. Markovics for $5,000?

A    Yes, it is.

Q    I'm showing you what's already in evidence as Government Exhibit 707-A at page 4.

THE COURT:  You may publish.

Q    Do you recognize this document?

A    Yes.  It's part of the account opening documents at Carver Federal Savings Bank for ZKC NY, Inc.

Q    Whose name is on the account?

A    Reginald Garcia.

---

Cabane - Direct - Mr. Grubin                    2299

Q    Were you here when he stated his social security number was used here?

A    Yes.

Q    Whose phone number is that, if you know, next to cell phone number?

A    That is Joshua Markovics' cell phone number.

Q    For the record, Your Honor, does that read 917-709-9280?

A    Yes, it does.

Q    How do you know or how are some of the ways or one of the ways that you know that is Joshua Markovics' phone number?

A    It was confirmed multiple ways, but one way was when Reginald Garcia made a recorded call to Joshua Markovics at that number.

Q    Do you recall from Government Exhibit 5000, or the bank records, approximately what date the company, ZKC, was incorporated?

A    It was approximately March, the end of March, March 28th, 2016, I believe.

Q    I'm showing you what's been marked for identification as Government Exhibit 1057, although I'd offer it into evidence.

THE COURT:  Any objection?

MR. JACKSON:  Can I see the next page?  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 1057 was received in

J.A. 810

---

Cabane - Direct - Mr. Grubin                    2300

evidence.)

Q    If we could zoom in on the heading of the email.  Special Agent Cabane, who is this email from?

A    This is from Rosa Schwartz using email address Rose@Midwood Lumber.com.

Q    And it's to M. Kuyan 1031; is that right?

A    Yes.

Q    Is the date March 28, 2016?

A    Yes, it is.

Q    And the subject, "certificate"?

A    Yes.

Q    Can we turn to the attachment on page 2.  What is this?

A    This is the articles of incorporation.

Q    And you see the signature there at the top?

A    It's purportedly Reginald Garcia's signature.

Q    And his personal -- and his home address at the time?

A    Yes, that was an old address of his.

Q    Who is the incorporator?

A    Reginald Garcia.

Q    Sorry.  Who filed the incorporation paperwork?

A    Marina Kuyan.

Q    I'm showing you what's been marked for identification as Government Exhibit 1058 and offer it into evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection.

Cabane - Direct - Mr. Grubin                    2301

THE COURT: Admitted. You may publish.

(Government's Exhibit 1058 was received in evidence.)

Q   Let's start with the first page at the top of the email. Is this another email from Rosa Schwartz to M. Kuyan?

A   Yes.

Q   It's April 1, 2016, so a few days later; is that right?

A   That's correct.

Q   And the subject is IRS?

A   Yes.

Q   Can we look at the attachment? What is this document?

A   That is an IRS form SS-4 used to obtain an EIN, employer identification number.

(Continued on next page.)

---

Cabane - direct - Grubin                    2302

BY MR. GRUBIN: (Continuing)

Q   And if we can look at the attachment on page 4 now. What's this document?

A   This is a printout from the New York State Department of State showing that ZKC NYC Inc. is incorporated within New York State.

Q   And if we could look at page 6, please. This is an identification of Reginald Garcia's?

A   That's a copy of a driver's license.

Q   Do you recall approximately what date Reginald Garcia testified he was brought to what he understood to be a bank to open up an account?

A   I believe that was approximately June 10, 2016, around that date.

Q   So that would be a few months after a bank account was already opened at Carver Bank using his personal identifying information, is that fair?

A   Correct.

MR. GRUBIN: I would like to show what has been marked for identification to the witness as Government Exhibit 1073 and would offer it into evidence.

THE COURT: Any objection to 1073?

MR. JACKSON: No objection, Judge.

THE COURT: Admitted. You may publish.

(Government Exhibit 1073 so marked.)

---

Cabane - direct - Grubin                    2303

Q   Who is this e-mail from?

A   This is from David Motovich using e-mail address DavidMotovich@MidwoodLumber.com.

Q   What is it to?

A   Marina Kuyan and Yanky Richter.

Q   Based on your investigation, who is Yanky Richter?

A   Yanky Richter is also known as Joseph Richter.

Q   Who is that?

A   The owner and operator of Coney Island Payroll Services.

Q   And is the date June 23, 2016?

A   Yes.

MR. GRUBIN: Can we look at the attachment on page 2.

Q   Do you recognize what this is?

A   It's a cover sheet for a fax transmission.

Q   What's the date?

A   June 23, 2016.

Q   And this is being sent to Joseph Richter, you said, from Mr. Motovich?

A   Well, the e-mail was being sent to Joseph Richter and Marina Kuyan, but this fax is, if it's a fax, being faxed somewhere. I don't know where the fax is going to.

Q   Well, let's look back at the e-mail.

A   Yes.

Q   Do you see where it says, "Attachments"?

---

Cabane - direct - Grubin                    2304

A   Yes.

Q   Do you see it says "fax" there?

A   Yes.

Q   If you know, why do you understand that Motovich would be forwarding these documents for ZKC to Coney Island Payroll Services?

A   So that Coney Island Payroll Services could open up a check cashing profile for ZKC.

Q   Did law enforcement search an e-mail account associated with Marina Kuyan pursuant to a court order, court authorized warrant?

A   Yes.

MR. GRUBIN: If we could look at what has been marked for identification as Government Exhibit 1024 and I would offer it for evidence.

THE COURT: Any objection?

MR. JACKSON: No objection.

THE COURT: Admitted. You may publish.

(Government Exhibit 1024 so marked.)

Q   Is this from Marina Kuyan's Yahoo account?

A   Yes, it is.

Q   What's the date?

A   December 18, 2014.

Q   And is the e-mail from MarinaK or MKuyan1031@Yahoo.com?

A   Yes.

J.A. 811

Cabane - direct - Grubin                 2305

Q    To Sveta Kun.  Am I pronouncing that correctly?
A    Yes.
Q    Do you know based on your investigation who Sveta Kun is?
A    She's an employee of Midwood Lumber.
Q    And if we can go back out, do you see earlier in that day, that Motovich forwarded an e-mail?
A    Yes.  It says, "Sent from my iPhone."
Q    And if we could look at the below e-mail that was forwarded, is the date December 18, 2014, with the subject "Insurance needed"?
A    Yes.
Q    Do you see it's from Debra@RoyalBuildersNY.com?
A    Yes.
Q    And what does -- is that an employee of Royal Builders, if you know?
A    I don't know.
Q    Okay.  Well, what does this person write to David Motovich?  Can you read that?
A    The e-mail states:  David, Please send us the liability and workers' comp certificate for Ago & Alaudin Contracting Corp. listing Royal Home Improvements as additional insured. Our info is listed below.  Thank you.  Debra Treitel.
Q    And then it says, in the signature line, "Royal Home Improvements" and some information.
     What's Royal Home Improvements?

Cabane - direct - Grubin                 2306

A    Royal Home Improvements is a real estate development company that's owned and operated by Joshua Markovics and Menacham Markovics.
     MR. GRUBIN:  Can we look at what's already been admitted as Government Exhibit 193, Your Honor?
     THE COURT:  You may.
Q    I believe you mentioned last week that there's a court authorized warrant for David Motovich's iCloud account, is that right?
A    There was a court authorized search warrant for the iCloud account.  I'm not sure if I mentioned that last week.
Q    Okay.  And is this an image or document from that account?
A    Yes, it is.
Q    And do you see where it says, -- this is a check, is that fair?
A    It looks like a picture of a screen of a check, yes.
Q    And what information is on that check?
A    It's a check from CNBC Construction Corp. to Joshua Markovics for $41,666 and I'm not sure if there's any change.
Q    Switching topics, Special Agent Cabane, you were here when Yisroel Leshkowitz testified, is that right?
A    Yes.
Q    And he stated that he performed real estate transactions for David Motovich?

Cabane - direct - Grubin                 2307

A    Yes.
Q    Did he provide the investigative team with some of the real estate transactions he put together for Motovich?
A    Yes, he did.
     MR. GRUBIN:  Your Honor, I don't want -- to save time, I don't want to publish these now but for the record, I'd like to move into evidence a few documents.
     THE COURT:  Call out the documents and let's see if there's any objection to them.
     MR. GRUBIN:  Yes, Your Honor.
     Government Exhibit 159.
     THE COURT:  Any objection?
     Show it to your adversary.
     Any objection to Government Exhibit 159?
     MR. JACKSON:  Is this the only page?
     (Pause.)
     MR. JACKSON:  No objection, Judge.
     THE COURT:  Admitted.  You may publish.
     (Government Exhibit 159 so marked.)
     THE COURT:  What's the next one?
     MR. GRUBIN:  160, Your Honor.
     THE COURT:  Any objection to 160?
     MR. JACKSON:  No objection, Your Honor.
     THE COURT:  Admitted.  You may publish.
     (Government Exhibit 160 so marked.)

Cabane - direct - Grubin                 2308

     MR. GRUBIN:  161, Your Honor.
     THE COURT:  Any objection?
     MR. JACKSON:  No objection, Your Honor.
     THE COURT:  Admitted.  You may publish.
     (Government Exhibit 161 so marked.)
     MR. GRUBIN:  162.
     THE COURT:  Any objection?
     MR. JACKSON:  No objection, Your Honor.
     THE COURT:  Admitted.  You may publish.
     (Government Exhibit 162 so marked.)
     MR. GRUBIN:  163?
     THE COURT:  Any objection?
     MR. JACKSON:  No objection.
     THE COURT:  Admitted.  You may publish.
     (Government Exhibit 163 so marked.)
     MR. GRUBIN:  166.
     THE COURT:  Any objection?
     MR. JACKSON:  No objection, Your Honor.
     THE COURT:  Admitted.  You may publish.
     (Government Exhibit 166 so marked.)
     MR. GRUBIN:  And finally, 167.
     THE COURT:  Any objection?
     MR. JACKSON:  No objection, Judge.
     THE COURT:  Admitted.  You may publish.
     (Government Exhibit 167 so marked.)

J.A. 812

Cabane - direct - Grubin                    2309

MR. GRUBIN:  Thank you, Your Honor.

Q    Special Agent Cabane, did you see payments from the subject bank accounts to Yisroel Leshkowitz?

A    Yes, I did.

Q    And I'm showing you for identification what has been marked as Government Exhibit 5007.

MR. GRUBIN:  I'd offer it into evidence.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 5007 so marked.)

Q    What is this exhibit?

A    This is a chart of payments made from the subject shell bank accounts to Yisroel Leshkowitz either by check or by wire transfer.

Q    And did you help prepare this document?

A    Yes.

Q    What bank accounts did Mr. Leshkowitz get money from?

A    The Ago & Alaudin Contracting Corp. account held at Chase, the Midwood USA Consulting Corp. account held at Carver Federal Savings Bank and the ZKC NY Inc. account held at Carver Federal Savings Bank.

Q    And at least how much did Mr. Leshkowitz get in total?

THE COURT:  If you know.

A    $2,259,335.

---

Cabane - direct - Grubin                    2310

MR. GRUBIN:  And Your Honor, once again, just for the record, I'd like to move in Government Exhibits 1126.

THE COURT:  Any objection to 1126?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1126 so marked.)

MR. GRUBIN:  1127.

THE COURT:  Any objection to 1127?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1127 so marked.)

MR. GRUBIN:  And lastly, 1130.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government Exhibit 1130 so marked.)

Q    Special Agent Cabane, I want to show you what's already been admitted as Government Exhibit 430.

Is it fair to say that these were some of the invoices taken from Motovich's apartment during the search?

A    Yes.

Q    And do you recall FBI Special Agent Ambrosini's testimony about some of these invoices?

A    Vaguely.

Q    Okay.  Well, we're not going to go through each one, but

---

Cabane - direct - Grubin                    2311

were you able to determine the source of payments for some of the invoices?

A    Yes, I was.

Q    And what was the source of those invoices or the payment for the invoices?  Excuse me.

A    The payments came from the shell company bank accounts.

Q    So as just one quick example, let's look at Government Exhibit 430-6 already in evidence.

Is this an invoice for GS Security billed to Motovich's address dated November 17, 2015?

A    Yes, it is.

MR. GRUBIN:  Let's look at Government Exhibit 704 already in evidence, Your Honor.

THE COURT:  You may publish.

Q    At page 1352.

Is that a check from Ago & Alaudin Contracting Corp. to GS security for $6,000?

A    Yes.

Q    Dated February 23, 2016?

A    Yes, that's correct.

Q    Special Agent Cabane, switching gears, on January, on or about January 12, 2019, did you stop Kemal Sarkinovic at the airport?

A    Yes.  JFK Airport.

Q    Why did you do that?

---

Cabane - direct - Grubin                    2312

A    During our investigation, we learned that there were several accounts, a few accounts, I should say, in Kemal Sarkinovic's name that had over $20 million transacted in that account and we wanted to stop him to question about that activity since it was suspicious.

Q    Did you interview him?

A    Yes, we did.

Q    Did he confess to opening some of the subject bank accounts we've been discussing for someone else's use?

A    Yes, he did.

Q    And who is that person?

A    David Motovich.

Q    How did you leave things with Mr. Sarkinovic at the end of that interview?

A    After the interview, we agreed that he would come to the U.S. Attorney's Office that following Monday.  January 12, 2019 was a Saturday and it was in the evening when we interviewed him.  So Monday morning, we agreed, he agreed with us that he would meet us at the office in Brooklyn, New York, and that's how we left it off.

Q    Did he appear interested in coming in?

A    Yes, he was extremely cooperative during the interview and wished to meet with us to continue the interview and the conversation we were having with him and we knew that he had someone outside waiting for him to pick him up from the

J.A. 813

Cabane - direct - Grubin                2313

airport.

Q    Why were you interested in speaking further with him?

A    Because there was a lot of details that we wanted to iron out relating to the activity happening in these accounts.  We pretty much got a broad stroke of what had transpired and we wanted to go into more detail.

Q    Did you end up meeting with Mr. Sarkinovic that Monday?

A    No, we did not.

Q    What happened?

A    I was informed that an attorney contacted the U.S. Attorney's Office stating that Kemal Sarkinovic was not going to be coming in and that he was being represented by that attorney.

Q    I'm just showing you what's been marked for identification as Government Exhibit 723.

          MR. GRUBIN:  I would move it into evidence if there's no objection, Your Honor.

          THE COURT:  Any objection to 723?

          MR. JACKSON:  No objection, Judge.

          THE COURT:  Admitted.  You may publish.

          (Government Exhibit 723 so marked.)

Q    Special Agent Cabane, is this a check from CNBC Construction Corp. to Arthur Gershfeld for $50,000 dated January 14, 2019?

A    Yes, it is.

Cabane - direct - Grubin                2314

Q    Did Arthur Gershfeld come to the U.S. Attorney's Office?

A    On that Monday, he did not.  I believe he called, called in.

Q    Did he ultimately come in?

A    At a later date, he came in, yes.

Q    Was Mr. Sarkinovic with him?

A    No.

Q    Were you present for that meeting?

A    I was not.

Q    Did Kemal Sarkinovic cooperate with the government following that meeting?

A    Not -- no, not until years later.

Q    And when was that years later, about, approximately?

A    Fall of 2021.

Q    And at that time, had he been arrested?

A    Yes.

Q    Did he acquire a different attorney?

A    Eventually, he acquired a different attorney and that's when he began cooperating.

Q    I'm showing you what's already been admitted as Government Exhibit 217.

          THE COURT:  You may publish.

Q    Is this another document or photograph found on David Motovich's iCloud account?

A    Yes, it is.

Cabane - direct - Grubin                2315

          MR. GRUBIN:  And if we can blow up both the two checks in the picture.

Q    Are these two checks from Midwood USA Consulting Corp.?

A    Yes, they are.

Q    Do they have the same date?

A    Yes, they are dated the same.

Q    Do you see on the memo on the, the memos on the bottom?

A    Yes.  It says, "997 Clarkson."

Q    And it says the same thing on the bottom?

A    Correct.

Q    How much are the two checks for?

A    10,000 and 7,500, respectively.

Q    And if you added both of them up, it would be over $10,000?

A    Correct.

Q    I'm showing you what's already been admitted as Government Exhibit 177?

          THE COURT:  You may publish.

Q    Is this another document found on Motovich's iCloud account?

A    Yes.

Q    And under "Recent calls," what's the first call listed?

A    Richter Yanki.

Q    And two entries down -- could you just -- what's the first call you see there?

Cabane - direct - Grubin                2316

A    Richter Yanki, three calls.

Q    And below that?

A    Brooklyn CIP.

Q    Do you know what are the initials of Coney Island Payroll?

A    Coney Island Payroll?  CIP.

Q    And then two calls down, do we see it again?

A    Yes.

Q    And below that, do you see where it says James Kahil or Kahil James?  I apologize.

A    Yes.

Q    Who is James Kahil or Kahil James, if you know?

A    He is an employee of Coney Island Payroll Services.

Q    I'd like to show you what has been marked for identification as Government Exhibit 14.

          MR. GRUBIN:  Not in evidence, Your Honor.

          THE COURT:  Any objection?

          MR. JACKSON:  No objection, Judge.

          THE COURT:  Admitted.  You may publish.

          (Government Exhibit 14 so marked.)

Q    Who is that, if you know?

A    That is James Kahil.

          MR. GRUBIN:  And if we can go back to the call log which was Government -- thank you.

Q    And below Kahil James, do you see another call with

J.A. 814

Cabane - direct - Grubin                    2317

Richter Yanki and two more with Brooklyn CIP?

A    Yes, I do.

MR. GRUBIN:  Once again, to save time, Your Honor, I won't publish these exhibits now but for the record, I would like to move into evidence Government Exhibit 605.

THE COURT:  Any objection to Government Exhibit 605?  Show it to your adversary, please.

MR. JACKSON:  No, Judge, we have no objection.

THE COURT:  All right.  Admitted.

(Government Exhibit 605 so marked.)

MR. GRUBIN:  And 606 as well.

THE COURT:  Any objection to 606?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government Exhibit 606 so marked.)

Q    Special Agent Cabane, I'd like to show you again Government Exhibit 5000 already in evidence.

For these bank accounts listed, are you aware whether the companies associated with these accounts were required to file certain tax documents?

A    Yes.  All of the companies associated with these shell bank accounts were required to file Form 1120s.

Q    And, I'm sorry, what's a Form 1120?

A    A Form 1120 is a U.S. corporation business annual tax return.

---

Cabane - direct - Grubin                    2318

MR. GRUBIN:  So I'm showing, and this is just for the witness, what has been marked for identification, and this is a series of exhibits, as Government Exhibits 238.

THE COURT:  Any objection to Government Exhibit 238?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  It's admitted.

(Government Exhibit 238 so marked.)

MR. GRUBIN:  239.

THE COURT:  Any objection to 239?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government Exhibit 239 so marked.)

MR. GRUBIN:  240.

THE COURT:  Any objection to 240?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government Exhibit 240 so marked.)

MR. GRUBIN:  241.

THE COURT:  Any objection to 241?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  It's admitted.

(Government Exhibit 241 so marked.)

MR. GRUBIN:  242.

THE COURT:  Any objection to 242?

MR. JACKSON:  No objection, Judge.

---

Cabane - direct - Grubin                    2319

THE COURT:  It's admitted.

(Government Exhibit 242 so marked.)

MR. GRUBIN:  243.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government Exhibit 243 so marked.)

MR. GRUBIN:  244.

THE COURT:  Any objection to 244?

MR. JACKSON:  No objection.

THE COURT:  Admitted.

(Government Exhibit 244 so marked.)

MR. GRUBIN:  And 245.

THE COURT:  Any objection to 245?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government Exhibit 245 so marked.)

MR. GRUBIN:  So if we can again pull up Government Exhibit 238 and permission to publish now that it's in evidence.

THE COURT:  Admitted.  You may publish.

Q    Special Agent Cabane, what is this and the other documents that were just admitted into evidence?

A    These are certified business entity transcripts produced by the IRS.

---

Cabane - direct - Grubin                    2320

Q    And what is that, a business entity transcript?

A    It's a transcript listing the business name, address, EIN, established date for that specific entity.

Q    And remind us, what's an EIN again?

A    Employer Identification Number.

MR. GRUBIN:  And if we could blow up the middle here.  Thank you, Ms. Kannan.

Q    Government Exhibit 238, this document, what company specifically is this one for?

A    This is for Ago & Alaudin Contracting Corp.

Q    And is this the company that the bank accounts, the two bank accounts on Government Exhibit 5000 relate to?

A    Yes.

Q    And if we could turn to the second page.

Can you just walk us through what some of the information on this business entity transcript contains?

A    At the top is Request Date, Response Date.  That's when this information was requested.  Below that, you'll see the Employer Identification Number, also known as the EIN, that's listed.  The Primary Name is the name that the corporation was opened using.  The street address is where the company was, listed its address with the IRS.

Q    And what about next to "Filing Requirements," what's that?

A    That is what the company's required to file on an annual

---

J.A. 815

Cabane - direct - Grubin                2321

basis regardless if there was any business activity.

Q    And you see it says what you -- I think you already told us this but we see there, Form 1120, U.S. Corporation Income Tax Return, is that right?

A    That's correct.

MR. GRUBIN:  And if we could scroll to the next page.

Let's turn to Government Exhibit 239 and page 2.

Q    Is this the same document but for Advertising on the Go Corp.?

A    Yes.

Q    And if we go towards the bottom, was this company also required to file a Form 1120?

A    Yes, it was.

Q    Let's turn to Government Exhibit 240.

Is this the same form but for CNBC Construction Corp.?

A    Yes.

Q    And if we could scroll down, was this company also required to file a Form 1120?

A    Yes.

MR. GRUBIN:  If we could jump ahead to Government Exhibit 245 and page 2.

Q    Which company is this for?

A    ZKC NYC Inc.

Cabane - direct - Grubin                2322

Q    And was this company also required to file a Form 1120?

A    Yes.

Q    And to save time and not look at each one, is it fair to say that if we did look at each of these exhibits, M&M USA Consulting, Midwood Building Corp., SGS Construction, each of those were required to file a Form 1120?

A    That's correct.

THE COURT:  All right.  Ladies and gentlemen of the jury, we're going to take our 15 minute break.  It's 3:30, a little past 3:30, and I'll see you back here in 15 minutes and then we'll have our hard stop at 5 o'clock.  All right?

So please do not talk about the case and stay alert and we will see you.

THE CLERK:  All rise.

(Jury exits.)

THE COURT:  You may step down, sir.  Do not talk with anybody about your testimony during the break.

The jury has left the courtroom.

All right.  Please be seated.  Do we have any issues to address outside of the presence of the jury?

MR. GRUBIN:  No, Your Honor.

THE COURT:  Defense counsel?

MR. JACKSON:  Just briefly, Judge.

I'm not asking the Court to do anything.  I just want to note there was a reference made to Mr. Mark -- I'm

Cabane - direct - Grubin                2323

sorry, Mr. Sarkinovic's confession.  We just want to be clear, there should be a limit going forward on --

THE COURT:  I'm sorry.  I'm losing you.

MR. JACKSON:  Sorry, Judge.

THE COURT:  There was a reference to?

MR. JACKSON:  There was a reference made to Kemal Sarkinovic's confession.  We just want to note going forward, there should be caution with the government in questions that implicate testimony, anything that was said to the agents in a confession implicating Mr. Motovich.

We're not asking anything to be done, Judge.  We're just noting for the record we do take an issue with anything that implicates him in his statement in a confession, but --

THE COURT:  Are you talking about a proffer session or are you talking about something else?  I'm sorry.  You're saying a confession.

MR. JACKSON:  They made --

THE COURT:  I'm assuming we're not talking about priest penitence so you have to help me out here.  What confession are you addressing?  And let's see if the government is addressing the same issues.

MR. JACKSON:  Yes, Judge.

So there was a point during the course of this examination where Mr. Grubin asked Special Agent Cabane whether Mr. Sarkinovic confessed when he was arrested.

Cabane - direct - Grubin                2324

THE COURT:  Confessed to what?

MR. JACKSON:  I'm not sure, but the next question was -- the answer said yes and he implicated Mr. Motovich.

THE COURT:  Okay.  We have real-time so let's go to real-time in the absence of the jury.  What was the question?  What was the answer that you're addressing?  Just so I have the page and line and then we'll have the government respond to your concerns, Mr. Jackson.  That's the beauty of real-time.

MR. JACKSON:  Yes, Your Honor.  I can't quite identify the page on real-time.  I don't know if it tells us exactly the page unless Mr. Cepregi can help me where the page number is on this.

THE COURT:  Can you read it?

MR. JACKSON:  Yes, Your Honor.

The question was:  Did you interview him?

Answer:  Yes, we did.

Question:  Did he confess to opening some of the subject bank accounts we've been discussing for someone else's use?

Answer:  Yes, he did.

Question:  And who is that person?

Answer:  David Motovich.

THE COURT:  Okay.  What is your concern or your

J.A. 816

Cabane - direct - Grubin                2325

objection to the question and answer?

MR. JACKSON:  Your Honor, I don't think that -- I think that under Crawford, the government is not permitted to elicit from the agent a confession made to the agent that implicates Mr. Motovich.  So we object to that.

THE COURT:  I'm sorry.  Spell out your argument, please.

MR. JACKSON:  Yes, Your Honor.

Under the Sixth Amendment, we have a right to cross-examine witnesses.  So any testimonial statement that is made to the agents which implicates Mr. Motovich is a violation of, if it's entered in this case as evidence against Mr. Motovich, is a violation of the Sixth Amendment.

THE COURT:  So this is a statement that was made by the -- who made the statement?

MR. JACKSON:  It was Kemal Sarkinovic, Your Honor.

THE COURT:  All right.  And he has testified, correct?

MR. JACKSON:  That's correct.

THE COURT:  So you had an opportunity to cross-examine him, correct?

MR. JACKSON:  We did, Judge.

THE COURT:  Okay.

MR. JACKSON:  And we are not asking for anything additionally be done.  We're only noting that the government

---

Cabane - direct - Grubin                2326

should be very cautious with that.  We do object to questions that implicate a testimonial statement being made, a confession that implicates Mr. Motovich.

THE COURT:  But made by someone who was on the witness stand in the case and whom you not only had an opportunity to cross-examine, but did cross-examine, is that right?

MR. JACKSON:  Correct, Judge.

THE COURT:  Did he state at the time he was here the comments about confession that you now object to or is this something that's newly arisen while Mr. Grubin is questioning now?

MR. JACKSON:  He referenced some of this, Your Honor.

THE COURT:  And did you cross him on it?

MR. JACKSON:  Yes, Judge.

THE COURT:  So where is your inability under the Sixth Amendment to confront the witness with the statement with respect to his alleged confession?

He was on the stand, he stated it, you cross-examined him on it.  Where is the inability to have the constitutional right to confront?  It would be one thing if the gentleman didn't testify, whether he's dead or took the Fifth or crazy, but he was here, he testified, you crossed him on that point and now you're saying that you didn't have an

---

Cabane - direct - Grubin                2327

opportunity to confront the witness under the Sixth Amendment?

You have a case that says that under those facts?  Witness testifies.  You crossed.  Tell me why you didn't have a Sixth Amendment opportunity to cross him with respect to the issue of his confession.

Do you have a case that says that?

(Continued on next page.)

---

Proceedings                2328

(Continuing.)

MR. JACKSON:  No, Judge.

THE COURT:  Under those circumstances?

MR. JACKSON:  No, Judge.

THE COURT:  No, because there is no such case because that's not the law.

Are you making a motion?

MR. JACKSON:  No, Judge, we agree.

THE COURT:  I didn't think so.  Okay.

MR. JACKSON:  We agree.

THE COURT:  Okay.

Look, the witness testified extensively.  You crossed him extensively.  And now you're saying that there's some violation or potential violation of the Sixth Amendment, and I ask you for a case and you don't have one because that's not the law.

All right.  Anything else that we have to address in the absence of the jury?

Anything else from the Government?

MR. GRUBIN:  No, Your Honor.

THE COURT:  Anything else from defense counsel?

MR. JACKSON:  No, Judge.

THE COURT:  All right, let's take our break.

(Recess taken.)

(In open court - jury not present.)

**J.A. 817**

Proceedings                                2329

THE COURTROOM DEPUTY:  All rise.

(Judge Kuntz entered the courtroom.)

THE COURT:  Please be seated.

Do we have any issues to address before we bring the jury in?

Anything from the Government?

MR. GRUBIN:  No, Your Honor.

THE COURT:  Defense counsel?

MR. JACKSON:  No, Judge.  Thank you.

THE COURT:  Let's get the jury back.

(Witness resumed the stand.)

(Pause.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please stand for the jury.

(Jury enters.)

THE COURT:  There are those who think this trial is being secretly sponsored by the American Dental Association because of all the candy we're giving out.  I assure you, there is no sponsorship, no federal funds or funds of any lobbyist have been expended.

Thank you for your responses.  Please be seated, ladies and gentlemen of the jury.  And we are going to continue.

Have you spoken with anyone about your testimony?

THE WITNESS:  No, Judge.

---

Cabane - direct - Grubin                    2330

THE COURT:  All right.

Please continue, counsel.

MR. GRUBIN:  Thank you, Your Honor.

DIRECT EXAMINATION (Continues)

BY MR. GRUBIN:

Q    Special Agent Cabane, we left off the before the break talking about Form 1120s, and I believe you had testified that the various subject companies we had been looking at were required to file these forms with the IRS, is that correct?

A    Yes, that's correct.

Q    Do you know were these whether those companies filed those forms?

A    They did not.

MR. GRUBIN:  I would like to move into evidence what is Government Exhibit 233.

THE COURT:  Any objection?

MR. JACKSON:  No, Your Honor.

THE COURT:  Admitted.

(Government's Exhibit 233 was received in evidence.)

THE COURT:  You may publish.

(Exhibit published.)

Q    What are these documents, Special Agent Cabane?

A    These are Form 3050, Certification of Lack of Record from the IRS.

Q    And just, let's just look at one example.

---

Cabane - direct - Grubin                    2331

Q    Do you see where it says, "To whom it may concern"?

A    Yes, I do.

Q    And let me know if I read this correctly, it says:  I certify that the commissioner of the Internal Revenue has custody of federal tax records filed in or accessible form the office at the following address, is that correct?

A    Yes, that's correct.

Q    And then it lists an address and it says:  The commissioner of the Internal Revenue would have the federal tax records described below or entries pertaining to such records stored at or accessible from this address.  I certify that having made a diligent search of the described records, no such records or entries pertaining to such records was/were found.

Did I read that directly?

A    Yes, you did.

Q    And if we look below for Advertising on the Go Corp. at 1090 Coney Island Avenue, what information was sought or searched for?

A    IRS searched for Form 1065, Form 1120, Form 1120S, Form 940 and Form 941.  However, as we looked at before, only Form 1120 was required to be filed.

Q    And according to this document, according to the IRS none of these records were filed, is that fair?

A    Correct.

---

Cabane - direct - Grubin                    2332

Q    And if you look below under periods, what do you know there, what does that tell you?

A    Those are all the periods that were searched for.

Q    And that includes, among others, years 2012 all the way through 2019 and beyond that, is that fair?

A    It appears that they searched for 2009 through 2021, and then they searched for all the quarters for -- between all of those years.

Q    Now, if we just --

MR. GRUBIN:  Ms. Kannan, we can just scroll down.

Q    There's a number of these lack of records certifications.

MR. GRUBIN:  You can just keep scrolling, Ms. Kannan.

(Scrolling.)

BY MR. GRUBIN:

Q    Is that correct, Special Agent Cabane?

A    Yes, there's one for each of the shell companies we've discussed.

Q    ZKC, CNBC, SGS, Ago & Alaudin Contracting Corp., Midwood USA --

THE COURT:  Slow it down.

MR. GRUBIN:  Sorry, Your Honor.

THE COURT:  Slow it down.

Q    M&M USA Consulting, and Midwood Building Corp.

Is that fair, Special Agent Cabane?

J.A. 818

Cabane - direct - Grubin                    2333

A    Yes.

Q    And what do these records show for those companies?

A    These records show that there were no records found when searching for these individual companies.

Q    And that includes Form 1120s that they're required to file, is that correct?

A    Correct.

Q    Okay.

So you previously testified that there was a search of Motovich's iCloud account, correct?

A    Correct.

Q    I want to show you what's already in evidence as Government Exhibit 191.

THE COURT:  You may publish.

(Exhibit published.)

Q    Special Agent Cabane, do these appear to be -- are these checks from ZKC Construction Corp. and Midwood Building Corp. in the same photograph?

A    Yes, it's one check from each.

Q    And are they blank?

A    Other than the signature, they are blank.

MR. GRUBIN:  And if we could turn to Government Exhibit 211, also in evidence, Your Honor.

THE COURT:  You may publish.

(Exhibit published.)

---

Cabane - direct - Grubin                    2334

BY MR. GRUBIN:

Q    Where is this a check from?

A    The check that we're looking at is from Ago & Alaudin Contracting Corp., which was held at Astoria Federal Savings Bank.  And the check is also blank except for the signature.

Q    And this was also from David Motovich's iCloud account, is that right?

A    Yes, that's correct.

MR. GRUBIN:  And if we could look at now Government Exhibit 1003.

And this is not in evidence, Your Honor.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government's Exhibit 1003 was received in evidence.)

THE COURT:  You may publish.

(Exhibit published.)

Q    Special Agent Cabane, do you see at the top there it's an e-mail from Marina K, MKuyan1031@yahoo.com?

A    Yes.

Q    And it is to Kim X, do you see that?

A    Yes.

Q    Do you have any idea who that is, Special Agent Cabane?

A    I don't know who Kim X is.

---

Cabane - direct - Grubin                    2335

Q    The date is March 12th, 2013, is that right?

A    Yes.

MR. GRUBIN:  Can we now return to the e-mail?

Q    Can you read what Marina Kuyan writes?

A    It reads:  Hi, my name is Marina.  I am from Ago at Alaudin General Contracting.  I need your help to register online.  Can you please call me 718-839-0416?  Thank you.

MR. GRUBIN:  Let's now turn to Government Exhibit 210, which is in evidence.

THE COURT:  You may publish.

(Exhibit published.)

Q    What is this a picture of, Special Agent Cabane?

A    This is a picture of someone holding open a checkbook for M&M USA Consulting Corp., where the check is blank, but the signature line is signed.

Q    And if you recall, who was the account -- authorized account signatory for M&M USA Consulting Corp.?

A    Robert Lovy.

MR. GRUBIN:  Let's go to what is already in evidence, Government Exhibit 213.

(Exhibit published.)

Q    Is this another image from Motovich's iCloud account?

A    Yes.

Q    And what do we see here?

A    These are three sequential blank checks from ZKC NY Inc.,

---

Cabane - direct - Grubin                    2336

which was held at Carver Federal Savings Bank.

Q    And who was the authorized signatory on the ZKC account again?

A    Reginald Garcia.

Q    Special Agent Cabane, what were some of the communications that law enforcement reviewed over the course of the investigation, what were some of the sources of communications?

A    We reviewed communications that we obtained from David Motovich's iCloud account, as well as e-mails from Marina Kuyan's account, and the Midwood Lumber search warrant.

Q    And what about a ZKC account, e-mail account?

A    Yes -- yes, there was a ZKC e-mail account that was -- that Marina Kuyan was the subscriber of.

MR. GRUBIN:  And, again, Your Honor, to save time I would just like to move in, for the record, a number of exhibits.  And I'll go one at a time, if that's acceptable.

THE COURT:  Thank you.  Go ahead.

MR. GRUBIN:  Government Exhibit 1016.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 1016 was received in evidence.)

MR. GRUBIN:  1017?

**J.A. 819**

*Cabane - direct - Grubin*                    2337

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 1017 was received in evidence.)

MR. GRUBIN:  1019.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 1019 was received in evidence.)

MR. GRUBIN:  1020.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 1020 was received in evidence.)

MR. GRUBIN:  1021.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 1021 was received in evidence.)

MR. GRUBIN:  1031.

THE COURT:  Any objection?

---

*Cabane - direct - Grubin*                    2338

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 1031 was received in evidence.)

MR. GRUBIN:  1033.

THE COURT:  Any objection?

MR. JACKSON:  (No response.)

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.  You may publish.

(Government's Exhibit 1033 was received in evidence.)

MR. GRUBIN:  1034.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government's Exhibit 1034 was received in evidence.)

MR. GRUBIN:  1035.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government's Exhibit 1035 was received in evidence.)

MR. GRUBIN:  1043.5.

---

*Cabane - direct - Grubin*                    2339

THE COURT:  Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government's Exhibit 1043.5 was received in evidence.)

MR. GRUBIN:  1044.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government's Exhibit 1044 was received in evidence.)

MR. GRUBIN:  1045.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government's Exhibit 1045 was received in evidence.)

MR. GRUBIN:  1095.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government's Exhibit 1095 was received in evidence.)

MR. GRUBIN:  1114.

THE COURT:  Any objection?

---

*Cabane - direct - Grubin*                    2340

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government's Exhibit 1114 was received in evidence.)

MR. GRUBIN:  1125.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.

(Government's Exhibit 1125 was received in evidence.)

MR. GRUBIN:  1126.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government's Exhibit 1126 was received in evidence.)

MR. GRUBIN:  1130.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

MR. GRUBIN:  1171.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government's Exhibit 1171 was received in evidence.)

**J.A. 820**

Cabane - direct - Grubin                    2341

MR. GRUBIN:  1181.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government's Exhibit 1181 was received in evidence.)

MR. GRUBIN:  And lastly, 1182.

THE COURT:  Any objection?

MR. JACKSON:  No objection, Judge.

THE COURT:  It's admitted.

(Government's Exhibit 1182 was received in evidence.)

MR. GRUBIN:  Thank you, Your Honor.

Let's turn now to what's already been admitted, Government Exhibit 1081.

THE COURT:  You may publish.

(Exhibit published.)

BY MR. GRUBIN:

Q    Do you see the date of the e-mail is August 30th, 2016?

A    Yes.

Q    And who is the e-mail from?

A    From David Motovich using e-mail address davidmotovich@icloud.com.

Q    And it's to someone at the address bmag411@aol.com?

A    Yes.

---

Cabane - direct - Grubin                    2342

Q    And what does Mr. Motovich write?

A    Hi, please make two checks from tnt for 10 each, not in the same order.  The balance can be a few big checks only with Midwood on it, the same for Platinum.  Thank you.  David Motovich.  Sent from my iPhone.

MR. GRUBIN:  If we can now turn to what's already in evidence as Government Exhibit 1198.

Permission to publish?

THE COURT:  You may publish.

(Exhibit published.)

MR. GRUBIN:  Thank you, Ms. Kannan.

BY MR. GRUBIN:

Q    Special Agent Cabane, what are these communications?

A    These are text messages that we obtained from David Motovich's iCloud.

Q    And do they say they're between David Motovich and Gail Kastner?

A    Yes.

Q    And is Gail Kastner, Gail Motovich?

A    Yes.

MR. GRUBIN:  And if we could turn to page 2.

(Exhibit published.)

Q    In the top message, what does David Motovich write to Gail -- to Gail Motovich?

A    Give Yoely 3900.

---

Cabane - direct - Grubin                    2343

Q    And what does Gail say in response?

A    I'm not in yet, only will be there at 10.

MR. GRUBIN:  And if we could scroll down the page.  Actually, if we could jump to the top of Page 3, I apologize.

BY MR. GRUBIN:

Q    What does Gail say to David Motovich?

A    Roman is here for 17k.

Q    And what does Motovich say in response?

A    Yes.

MR. GRUBIN:  Let's turn to page 6.

(Exhibit published.)

Q    In the second text on December 6th, 2016, what does Gail say to David Motovich?

A    I'm sorry, you said the second text?

Q    Do you see where Gail says:  I need 16 for payroll?

A    Yes.

Q    And what does Motovich say?

A    Call Yankee.

Q    And earlier you testified that Yankee was Joseph Richter of Coney Island Payroll, is that correct?

A    Correct.

Q    Then if we could go to the last text on the bottom of the page.

On December 8th, 2016 what does Gail write?

A    David Tawil wants to stop by.  Needs four or five.

---

Cabane - direct - Grubin                    2344

MR. GRUBIN:  If we could go to page 7.

(Exhibit published.)

BY MR. GRUBIN:

Q    What does Motovich say at the top of the page?

A    Ok.

Q    And what does Gail say back?

A    You have by you?

Q    And what does Motovich say in response?

A    Yes.

MR. GRUBIN:  If we could jump to the bottom text on page -- on December 15th, 2016.

Q    What does Gail ask David Motovich?

A    Give Roman a ZKC check?

Q    And what does David Motovich write back?

MR. GRUBIN:  If we could scroll down.

A    Yes.  Stamp in back of me.

Q    And looking at the bottom of that page on December 20th, 2016, what does Motovich ask Gail?

MR. GRUBIN:  If we could scroll up a little bit.  I apologize.  And I apologize.  Scroll down.  Keep going down.

(Scrolling.)

Q    What does Motovich ask here?

A    Did Dato bring you something?

Q    And what does he say next?

A    From Yankees.

**J.A. 821**

Cabane - direct - Grubin     2345

MR. GRUBIN: And if we could turn to page 20.

(Exhibit published.)

Q In the second text, what does Gail Motovich say to her brother David Motovich on January 31st, 2017?

A Only 4200 in safe.

Q And what does Motovich tell her to do?

A Call Yankee.

MR. GRUBIN: Let's turn to page 21 in the top message.

(Exhibit published.)

Q A few days later on February 8th, 2017, what does Gail text?

A Metro is coming.

Q And then?

A Needs 22.

Q Who managed the Metro companies again, Special Agent Cabane?

A Joseph Russo.

Q And what does Motovich say back?

A Ok.

Q And then about an hour later, what does Gail ask?

A Should I give Rosa the checks?

Q And how does Motovich respond?

A Yes.

MR. GRUBIN: Can we turn to page 22 at the top text

Cabane - direct - Grubin     2346

of the page?

(Exhibit published.)

BY MR. GRUBIN:

Q What does Gail ask David Motovich on February 14th, 2017?

A Get -- getting 23 from Yankee.

Q And then what?

MR. GRUBIN: Scrolling down.

A Is that fine?

Q In the second message from the bottom of the page, what does Motovich -- in the second message from the bottom of the page, what does Gail say?

A Metro is here.

Q And what does Motovich say?

A Ok, I have.

MR. GRUBIN: And then if we could turn to page 23 at the top of the page on that same date.

(Exhibit published.)

Q What does Gail ask her brother David Motovich?

A Should I give Rosa the check?

Q And what does Motovich say back?

A Yes.

Q Looking at page 26 in the middle of the page on March 16, 2017, do you see where Gail says: Only got 1500 from the store today?

A Yes.

Cabane - direct - Grubin     2347

Q What does she ask Motovich?

A Should I call Yankee?

Q And how does Motovich respond?

A Also Roofer wife there.

Q "Roofer wife there" you said?

A That's Motovich's response, David Motovich's response.

Q Thank you.

And turning to page 27, at the top of page 27 on March 16th, 2017, what does Gail ask?

A Anyone else coming? I don't have enough. Don't want to send Levan 100 times.

MR. GRUBIN: Can we turn to page 31?

(Exhibit published.)

Q The third text down on April 4th, 2017, what does Gail ask?

A Carver bank?

Q And what does Motovich say?

A Yes.

Q And then what?

A Gail Motovich responds: Robert made the checks blank.

Q You testified before that Robert Lovy was the signatory on some of the Carver, or at least on one of the Carver bank accounts?

A Two of the Carver bank accounts, yes.

MR. GRUBIN: Can we turn to the next page, page 32

Cabane - direct - Grubin     2348

at the top?

(Exhibit published.)

BY MR. GRUBIN:

Q What does Motovich say there?

A David Motovich says: Ok. Make it to Midwood USA Consulting Corp.

MR. GRUBIN: And if we could turn to page 35 and look at the bottom of the page.

(Exhibit published.)

Q On May 9th, 2017, what does Motovich, David Motovich say?

A Send me a copy of ZKC ck for 7K that was deposited last week.

Q And then does she send a photograph, if we scroll down?

A (No response.)

Q Did she send an image?

A Yeah, that -- there's an attachment that Gail Motovich sends.

MR. GRUBIN: Can we turn to that attachment on Government Exhibit 1198-A on page 8?

It's already in evidence.

(Exhibit published.)

Q Is that a check from 800 Dean Developers, LLC made to ZKC NY Inc. for $7,000?

A Yes.

Q Dated March 31st, 2017?

**J.A. 822**

Cabane - direct - Grubin 2349

A Yes.

MR. GRUBIN: And if we could turn back to page 37 or 1198, page 37.

(Exhibit published.)

Q At the top of the page on -- I apologize.

MR. GRUBIN: If we could go to, whatever, June 16, 2017. So it will be a few pages later.

Okay. Well, we could look -- this page. If we could go to page 38. So scroll to the middle.

I apologize, Ms. Kannan.

(Exhibit published.)

BY MR. GRUBIN:

Q On May 24, 2017, what does Gail Kastner or Gail Motovich write?

A Took 28 from Yankee.

Q And what does Motovich say back?

A Ok.

Q Is it fair to say, if we continued going through these messages, we'll see a number of communications from Gail Motovich asking David Motovich if she can go to Yankee for cash?

A Yes. The conversations continued in the same manner.

Q And is it fair to say that on multiple occasions, Motovich, David Motovich, tells Gail to get cash from Yankee?

A Yes.

Cabane - direct - Grubin 2350

Q Okay.

MR. GRUBIN: Can we go to page 60? And the second text from the bottom on March 26, 2018.

(Exhibit published.)

BY MR. GRUBIN:

Q Do you see where Gail says: Niev is here?

A Yes.

Q What does she next?

A Do you have anything by you?

MR. GRUBIN: And if we could scroll down.

(Exhibit published.)

Q How does Motovich respond?

A Yes.

MR. GRUBIN: And if we could keep scrolling down just to the end of this page.

(Exhibit published.)

Q What does Gail Kastner say next?

A Are you coming in?

Q What does she ask next?

A Philli wants to come by.

Q And then she asks: Is that ok?

A Yes.

Q And what does Motovich say?

A Ok, but tell him to Midwood Building Corp.

Q Okay.

Cabane - direct - Grubin 2351

MR. GRUBIN: We could put that exhibit away.

I'd like to go to Government Exhibit 1206, already in evidence.

THE COURT: You may publish.

(Exhibit published.)

BY MR. GRUBIN:

Q Were you here during Joe Russo's testimony, Special Agent Cabane, about texting Motovich when he needed cash?

A Yes, I was present.

Q Okay. Are these more conversations from David Motovich's iCloud?

A Yes.

Q Who are they between?

A David Motovich and Tamaz Roofer.

MR. GRUBIN: Let's just jump to page 2 at the bottom of the page on November 28th, 2016.

(Exhibit published.)

Q What does Tamaz Roofer ask Motovich?

A Can my wife stop by tomorrow?

Q And after that?

A With a check?

MR. GRUBIN: Can we turn to the next page.

(Exhibit published.)

Q What does Motovich say back?

A Yes.

Cabane - direct - Grubin 2352

Q Okay. And then the following day, what does Motovich say?

A Hi, my sister not in today. Can you have your wife come tomorrow?

MR. GRUBIN: And scrolling down, the following --

Q Or what does Tamaz Roofer say?

A Yes.

MR. GRUBIN: And then if we could go to the following day, November 30th, 2016.

Q What does Tamaz Roofer ask?

A Can my wife stop by soon?

Q By the way, is that approximately a week later from the earlier messages we just looked at, November 30th?

A It seems like the next day.

Q Okay, a few days later.

MR. GRUBIN: Scroll up.

Q I apologize. November 28th to November 30th, a few days later?

A Yes.

Q And on the following page -- woops, no, it came back to me.

On November 30th, 2016, he asks again, Can my wife stop by soon, correct?

A Yes.

Q And Motovich says yes?

J.A. 823

Cabane - direct - Grubin                           2353

A    Yes.

MR. GRUBIN:  Can we go to the following page, December 9th, 2016?

(Exhibit published.)

BY MR. GRUBIN:

Q    And Tamaz Roofer says:  Good morning, David, can my wife stop by?

A    Yes.

Q    Now is that fair to say that is about a week later?

A    That is about one week later, yes.

Q    I did the math right this time.  Okay.

And what does Motovich say in response?

A    Monday.

Q    Okay.

And then another week later on December 12th, 2016, if we scroll down, what is -- do you see where Tamaz Roofer says:  David, my wife will stop by today if that's okay?

A    Yes, three days later.

Q    And what does Motovich say back?

A    Yes, she can come now.

Q    Is it fair to say if we kept going through these messages, you would see more communications from Tamaz Roofer to David Motovich asking if he or his wife could stop by?

A    With checks, yes.

MR. GRUBIN:  Let's quickly just jump ahead to

---

Cabane - direct - Grubin                           2354

page 22.

(Exhibit published.)

BY MR. GRUBIN:

Q    In the second text message on the page on May 4th, 2017, what does Tamaz Roofer ask David Motovich?

A    Thanks.  Also, would you be able to send me the insurance certificate?  I send you an e-mail about it or should I send it to your secretary?

Q    Thank you.  And what does Motovich say back?

A    Please call Marina.

Q    You don't have to read the number.

And then there's a phone number there?

A    Yes.

MR. GRUBIN:  Let's just jump ahead to page 34.

(Exhibit published.)

Q    What does Tamaz Roofer ask at the top of the page on September 14th, 2017?

A    Will I be able to go to you next week with a check?

Q    And what does Motovich say?

A    Yes.

Q    And if we go further down the page a little bit, what does Tamaz Roofer ask David Motovich?

A    David, if I get a check this week to ZKC, would it be okay still?

Q    And what does Motovich say back?

---

Cabane - direct - Grubin                           2355

A    Yes.

MR. GRUBIN:  If I could now show you Government Exhibit 1204.

(Exhibit published.)

Q    Who are these communications between?

A    These communications are between David Motovich and Shafir Gilboa.

Q    And what does Shafir Gilboa say to David Motovich?

A    Shafir Gilboa says:  I will get you 57,000 in cash tomorrow.  You can write me a check from my name, right?

Q    And what does David Motovich say back?

A    Yes.  Don't text me please.

Q    Special Agent Cabane, do you know what reverse check cashing is?

A    I'll be speculating.

THE COURT:  Don't speculate.  Say you don't know.

Ask another question.

BY MR. GRUBIN:

Q    Let me show you what's been marked as Government Exhibit, and admitted into evidence as Government Exhibit 706 at page 65.

THE COURT:  You may publish.

(Exhibit published.)

Q    Is this a check from Midwood USA Consulting Corp. on September 27th, 2017 to Shafir Gilboa, the person in that

---

Cabane - direct - Grubin                           2356

communication we were just looking at?

A    Yes.

Q    And the check is for $57,500, is that fair?

A    Yes.

Q    Is that approximately the amount of money that we saw in that text message?

A    Yes, it is.

MR. GRUBIN:  Lastly, I would like to take a look at Government Exhibit 1200, already in evidence.

THE COURT:  You may publish.

(Exhibit published.)

BY MR. GRUBIN:

Q    Who are these communications between, Special Agent Cabane?

A    These communications are between David Motovich and Marina Kuyan.

Q    Let's turn to page 3.

(Exhibit published.)

Q    What does Motovich ask Kuyan at the top on January 30th, 2017?

A    (No response.)

Q    Do you see where Motovich asks -- says:  I need the tax ID for Midwood Consulting?

A    Yes.

Q    And Marina -- and what's a tax ID again?

**J.A. 824**

Cabane - direct - Grubin          2357

A    A tax ID is interchangeable term as an employer identification number, EIN.

Q    And Marina Kuyan responds with a message?

A    Yes.  She responds with what appears to be an EIN.

Q    Later that day, what does Motovich tell Kuyan to do?

A    Send me conf.

Q    And does Kuyan send an image back?

A    Yes.

MR. GRUBIN:  If we could quickly go to Government Exhibit 1200-A, at page 3, in evidence.

THE COURT:  You may.

(Exhibit published.)

BY MR. GRUBIN:

Q    What's this?

A    This is a image of a wire transfer confirmation.

Q    And is the originator ZKC NY Inc.?

A    Yes.

Q    And it's January 30th, 2017?

A    Yes.

Q    Carver bank?

A    Yes.

MR. GRUBIN:  Let's turn back to Government Exhibit 1200.  And if we could look on April 27th, 2017.

(Exhibit published.)

Q    Do you see there where it says in the second text from

---

Cabane - direct - Grubin          2358

Marina Kuyan:  Hi, how much to wire money from Midwood USA?

A    Yes.

MR. GRUBIN:  Can we turn to page 7?

(Exhibit published.)

Q    At the top of the page in the first message on May 22nd, 2017, does Marina Kuyan write:  Hi, Lithos Marble called me.  They having audit tomorrow.  So they asking certificates from BP Cooling, ZKC, Ago, ZKC.  I'll gonna do it.  Can you please talk to them?

Did I read that correctly.

A    Yes, you did.

Q    Lithos is Philip Adamou's company, am I correct?

A    Yes, it is.

Q    What does Motovich say back?

A    Ok.

Q    If we go down to the third message on June 26th, 2017, what does Motovich text Kuyan?

A    Good morning.  I sent you an e-mail.  Please e-mail Dannette the wire instructions not the bank.

Q    And looking further down the page at the bottom text on June 9, 2017, what does Kuyan ask Motovich?

A    David, how much from ZKC?

Q    Looking at page 10 in the second message down, what does Kuyan ask Motovich on September 7th, 2017?

A    What should I put in the purpose of the wire?

---

Cabane - direct - Grubin          2359

Q    And -- and what's Motovich's response?

A    Loan.

MR. GRUBIN:  Let's turn to page 12.

Q    What does Kuyan say to Motovich on November 10, 2017?

A    Hi, Dannette just asked me to send all paper work for a new company.

Q    What does Motovich say back?

A    Ok.  Send it.

MR. GRUBIN:  Can we go to the top or -- excuse me, can we go to page 16?

(Exhibit published.)

BY MR. GRUBIN:

Q    Do you see that Kuyan sends an image to Motovich on May 18, 2018?

A    Yes.

MR. GRUBIN:  Let's quickly look at Government Exhibit 1200-A at page 17.

(Exhibit published.)

Q    What's this?

A    This appears to be an image of Kemal Sarkinovic's accounts or the names -- the accounts that are in his name at Investors Bank.

MR. GRUBIN:  And if we could jump --

Q    And you see there it says:  Welcome -- Welcome Kemal Sarkinovic, do you see that on the screen?

---

Cabane - direct - Grubin          2360

A    Yes.

MR. GRUBIN:  Can we go back to where we were on May 22nd, 2018?

(Exhibit published.)

MR. GRUBIN:  Scroll down.

BY MR. GRUBIN:

And if we could get to around May 22nd, 2018.

Q    And, Special Agent Cabane, I just have about two more questions left.

(Continued on the following page.)

J.A. 825

Cabane - Direct - Mr. Grubin                    2361

MR. GRUBIN:  I have two more questions left.

THE COURT:  Good because you have two more minutes left.

MR. GRUBIN:  Is that May 22, 2018, Ms. Kannan?

DIRECT EXAMINATION (Continuing)

BY MR. GRUBIN:

Q    Do you see where Motovich says, Write a CK from Kemal, personal account, to David Motovich Investors for 50K and put as a loan to David Motovich Investors from Kemal?

A    Yes.

MR. GRUBIN:  No further questions.

THE COURT:  Ladies and gentlemen of the jury, it's a little before 5:00.  We're going to adjourn for the day.  Please do not talk about the case, and we will resume with cross-examination of the witness tomorrow morning.

Have a good night, and remember only significant things happen over the weekend.  So just watch sports.  Don't talk about anything else.  Have a good night, everyone.

(Jury not present.)

THE COURT:  The jury has left the courtroom.  The witness has left the stand.  You may be seated, ladies and gentlemen.

Do we have any issues to address in the absence of the jury, beginning with the government?

MR. GRUBIN:  No, Your Honor, not from the

---

Proceedings                    2362

government.

THE COURT:  Anything from defense counsel?

MR. JACKSON:  No, Your Honor.  Thank you.

THE COURT:  We're adjourned for the day.  Have a good evening, everyone.  Thank you.

(Pause.)

THE COURT:  Let's go back on the record. Exhibit 1130 was proffered.  There was no objection, and I just I want to make it clear it was admitted without objection.

(Government's Exhibit 1130 was received in evidence.)

- - - - - - - - - - - - - - - - - - - -

(Whereupon, the proceedings concluded at 5:03 p.m., to resume Tuesday, July 23, 2024, at 9:30 a.m.)

---

2363

I N D E X

WITNESSES:

ANDREW ZWERMAN

    DIRECT EXAMINATION BY MR. POLEMENI        2214

    CROSS-EXAMINATION BY MR. MAZUREK          2238

    REDIRECT EXAMINATION BY MR. POLEMENI      2263

MICHAEL EDWARD PERELESS

    DIRECT EXAMINATION BY MR. JACKSON         2268

    CROSS-EXAMINATION BY MR. PAULSEN          2276

    REDIRECT EXAMINATION BY MR. JACKSON:      2278

CHRISTOPHER CABANE

    DIRECT EXAMINATION BY MR. GRUBIN (Cont'd)  2286

EXHIBITS:

    Government Exhibit 124               2222
    Government Exhibit 125               2222
    Government Exhibit 127               2223
    Government Exhibit 128               2224
    Government Exhibit 129               2224
    Government Exhibit 130               2224
    Government Exhibits 713 and 714      2233
    Government's Exhibit 20              2287
    Government's Exhibit 5008            2294
    Government's Exhibit 735             2297
    Government's Exhibit 1057            2299
    Government's Exhibit 1058            2301
    Government Exhibit 1073              2302
    Government Exhibit 1024              2304
    Government Exhibit 159               2307
    Government Exhibit 160               2307
    Government Exhibit 161               2308
    Government Exhibit 162               2308
    Government Exhibit 162               2308
    Government Exhibit 163               2308

**J.A. 826**

---

2364

I N D E X (Continued)

EXHIBITS:

    Government Exhibit 166               2308
    Government Exhibit 167               2308
    Government Exhibit 5007              2309
    Government Exhibit 1126              2310
    Government Exhibit 1127              2310
    Government Exhibit 1130              2310
    Government Exhibit 723               2313
    Government Exhibit 14                2316
    Government Exhibit 605               2317
    Government Exhibit 606               2317
    Government Exhibit 238               2318
    Government Exhibit 239               2318
    Government Exhibit 240               2318
    Government Exhibit 241               2318
    Government Exhibit 242               2319
    Government Exhibit 243               2319
    Government Exhibit 244               2319
    Government Exhibit 245               2319
    Government's Exhibit 233             2330
    Government's Exhibit 1003            2334
    Government's Exhibit 1016            2336
    Government's Exhibit 1017            2337
    Government's Exhibit 1019            2337
    Government's Exhibit 1020            2337
    Government's Exhibit 1021            2337
    Government's Exhibit 1031            2338
    Government's Exhibit 1033            2338
    Government's Exhibit 1034            2338
    Government's Exhibit 1035            2338
    Government's Exhibit 1043.5          2339
    Government's Exhibit 1044            2339
    Government's Exhibit 1045            2339
    Government's Exhibit 1095            2339
    Government's Exhibit 1114            2340
    Government's Exhibit 1125            2340
    Government's Exhibit 1126            2340
    Government's Exhibit 1171            2340
    Government's Exhibit 1181            2341
    Government's Exhibit 1182            2341

                    *    *    *    *

2365

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    21-CR-497(WFK)

   -against-    :    United States Courthouse
Brooklyn, New York

DAVID MOTOVICH,    :
        Defendant.    :    July 23, 2024
                       9:30 o'clock a.m.

- - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        BREON PEACE
United States Attorney
BY: ROBERT POLEMENI
    ERIK D. PAULSEN
    ANDREW GRUBIN
    MATTHEW C. SKURNIK
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York  11201

For the Defendant:        WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019

BY: RANDALL WADE JACKSON, ESQ.
    JESSICA LAYDEN, ESQ.

MEISTER SEELIG & FEIN, LLP
125 Park Avenue, 8th Floor
New York, New York  10017

BY:  HENRY R. MAZUREK, ESQ.

Court Reporter:        Charleane M. Heading
225 Cadman Plaza East
Brooklyn, New York
Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

---

2366

(In open court; outside the presence of the jury.)

THE CLERK:  Criminal cause on trial, 21-CR-217. United States of America versus David Motovich.

Will the attorneys please state their names for the record beginning with government.

MR. POLEMENI:  Good morning, Your Honor.  Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, Paralegal Kayva Kannan and Special Agent Christopher Cabane for the United States.

THE COURT:  Good morning, Counsel.  Please be seated.

Ladies and gentlemen of the public, you may be seated as well.  Thank you for your patience.

MR. JACKSON:  Good morning, Your Honor.

THE COURT:  Good morning, sir.

MR. JACKSON:  Randall Jackson, Jessica Layden and Henry Mazurek on behalf of our client David Motovich.  We're also joined by Mr. Andy Cepregi.

THE COURT:  Good morning.  Please be seated.  Thank you all for your patience as well.

Do we have any issues to address before we bring the jury in?

Anything from the government?

MR. GRUBIN:  No, Your Honor, not from the government.

---

Cabane - cross - Jackson        2367

THE COURT:  Anything form defense counsel?

MR. JACKSON:  No, Your Honor.

THE COURT:  All right.  Let's bring the jury in and let's get the witness back on the witness stand, please.

(The witness, CHRISTOPHER CABANE, having been previously sworn, resumed the stand.)

THE COURT:  Please rise for the jury.

(Jury enters.)

THE COURT:  Good morning, ladies and gentlemen. Thank you for your patience.  We're getting to the home stretch.  Please be seated and we're going to have the cross-examination of the witness.

Let me ask you, sir, have you spoken with anyone about your testimony since leaving the witness stand?

THE WITNESS:  No, Your Honor.

THE COURT:  You're still under oath.

All right.  Mr. Jackson, cross-examination.

MR. JACKSON:  Thank you very much, Your Honor.

CROSS-EXAMINATION

BY MR. JACKSON:

Q    Good morning, Special Agent Cabane.

A    Good morning.

Q    Special Agent Cabane, we went through a number of charts that you created during your direct examination with the prosecutors, correct?

---

Cabane - cross - Jackson        2368

A    Yes, we did.

Q    Now, I think when the Court asked you did you create these charts, your answer was you participated in the creation of them, correct?

A    That's correct.

Q    Who actually created the first drafts of these charts?

A    The drafts of the charts were created based on the data, the financial analysis that I had compiled.

Q    Right.  I understand.  My question is who actually created the first drafts of the charts?

A    Myself.

Q    Who else participated?

A    We have a trial illustration specialist that helps in creating the charts to look digestible and pretty.

Q    And the prosecutors worked with you on getting the charts the way that they wanted them?

A    They helped me create the charts to look pretty, like I said.

Q    Right.  They also contributed to what would be in the charts and what would not be in the charts, correct?

A    They provided with constructive criticism and feedback based on what they saw that I created.

Q    Sure.  I'm just saying that they were working with you and creating the charts and deciding what you would use and wouldn't use, correct?

J.A. 827

Cabane - cross - Jackson                    2369

A    That's fair to say.

Q    And can you remind me which of your charts will show the jury which money from what you call the subject accounts my client David stole from some other person?

A    I called them shell company bank accounts, but there are -- there wasn't any physical stealing of money from individuals found during the investigation.

Q    Okay.  So there is no such chart, right?

A    Chart of stealing money?

Q    Yes.

A    The charts just display money that was taken out of accounts that David Motovich did not have signatory authority over.

Q    Right.  My only question is, yes or no, is there a chart that shows how much money David stole from any other person?  Yes or no.

A    No.

     MR. GRUBIN:  Objection, Your Honor.

Q    Now, there's also not a chart that will help the jury see what, if any money, in the subject accounts was not David's money; there's no chart to that effect, correct?

     MR. POLEMENI:  Objection, Your Honor.

     THE COURT:  Overruled.  You can answer it yes or no.

A    Can you rephrase the question?

Q    Sure.

---

Cabane - cross - Jackson                    2370

     Is there a chart that would help the jury see what, if any, money in the subject accounts was not David's money; there's not a chart to that effect, correct?

A    The money in the subject shell bank accounts were not under David Motovich's authority according to the banks.

Q    I understand your theory of authority.  That's not what I'm talking about.

     I'm asking -- you understand that much of the money or all of it in the accounts was David's money, correct?

A    David controlled the accounts but the accounts were, had the sole signatory authority of Kemal Sarkinovic, Reginald Garcia and Robert Lovy.

Q    Right, but we know from their testimony, from your investigation, David's money was in the accounts, correct?

A    David controlled the accounts, yes.

Q    I'm just asking a simple question.  I'm not asking about control.

     You agree with me David's money was in the accounts?  It's a simple question.  Yes or no.

A    I can't say yes or no because the accounts were in other people's names.

Q    Okay.  So throughout your investigation over the last two years, you never tried to figure out whether or not David's money was in the accounts, is that your testimony?

A    We were able to determine that David Motovich controlled

---

Cabane - cross - Jackson                    2371

the accounts and he had the ability to take money, put money in and take money out with the assistance of a corrupt banker, but the accounts were always in the name of other individuals.

Q    We know they were in the names of other individuals, but you agree with me, it wasn't all Reginald Garcia's money, right?

A    The money was not Reginald Garcia's money.

Q    Right.

A    In the sense that --

Q    And you're not saying that Kemal Sarkinovic, all that money was Kemal's; you're not saying that, are you?

A    The accounts were under his name, Kemal Sarkinovic, but he did not conduct the transactions in the account.

Q    Right.  And you're also not saying that all that money belonged to anyone else other than David, correct?

A    David Motovich controlled the accounts and had money transacted within those accounts.

Q    Okay.  You showed charts related to AMEX, right?

A    Yes.

Q    Was there -- did you create a chart that showed us how much money from the subject company money that you mentioned that David Motovich spent on gifts for his wife that was not his money?  Did you create a chart on that?  Yes or no.

A    Can you rephrase the question?

Q    Sure.  Sure.  Let me break it into two pieces.

---

Cabane - cross - Jackson                    2372

A    Please.

Q    Okay?  First, I'm correct that you made reference to subject company money that went into AMEX payments, correct?

A    There were shell company payments that paid AMEX belonging to David Motovich's accounts at AMEX, yes.

Q    Didn't you use the term "subject company money" during your direct examination?

A    I may have used that term.

Q    It's a term you've used before, right?

A    I believe I referenced the accounts as shell company bank accounts.

Q    And you also referred to subject company money, right, when you were talking about the AMEX?

A    I don't recall if I used that term.

Q    That's fine.  Let's use the shell company accounts.  I just want to simplify this.

     The shell company accounts, did you create a chart that will help the jury see what money that David spent on gifts for his wife was not his money?

A    There was no way of telling if a purchase, for instance, at Hermes or Bloomingdale's was a gift to his wife so I want to be able to create a chart based on it.

Q    Right.  And you also didn't create any chart that would help the jury see whether any money at all was spent on the AMEX that was not David's money; you didn't create such a

**J.A. 828**

Cabane - cross - Jackson                2373

chart, did you?

A    All of the AMEX accounts that I reviewed were David Motovich's or Lyudmila Motovich's account.

Q    Yes, and the money that came from the shell company accounts to pay for those were David's money, correct?

A    If they came from accounts that were not in David Motovich's name.

Q    I'm sorry.  I didn't understand that answer.  I'm just asking a simple question.

      Yes or no.  The money that paid the AMEX bills, that was David's money, right?

A    The payments that came from the accounts were from accounts not in David Motovich's name.

Q    Yes.  We can stipulate to that.  I understand.  I'm asking a different question than whose name it was in.

      You conducted a multi-year investigation, correct?

A    Yes.

Q    You've utilized multiple agencies in that investigation, right?

A    It was a multi-agency investigation, yes.

Q    You're the lead case agent, right?

A    I'm a co-case agent, yes.

Q    With Special Agent Dietz, right?

A    He's a co-case agent, yes.

Q    Who's part of DOJ, right?

Cabane - cross - Jackson                2374

A    Correct.

Q    So you had the resources of the FBI, right?

A    Correct.

Q    You had the resources of the U.S. Attorney's Office for the Eastern District of New York, correct?

A    Yes.

Q    You had the resources of the Treasury Department where you work, IRS, right?

A    Correct.

Q    And with all of those resources, the only question I'm asking you was you showed us all these AMEX payments, did you figure out whether David spent anything other than his own money?  Yes or no.

A    The money --

Q    I'm sorry.  It's a yes or no question, sir.

A    The money that was --

Q    It's a yes or no question.

      Did you figure out, yes or no --

A    Can you repeat --

Q    -- whether David spent anything on AMEX other than his own money?  Did you figure that out?  Yes or no.

A    The money that --

Q    Yes or no, sir.  I really have to ask you please to focus in on my question.

      MR. GRUBIN:  Objection, Your Honor.

Cabane - cross - Jackson                2375

      THE COURT:  Can you answer the question as asked "yes" or "no"?

      THE WITNESS:  I'm sorry.  Can you rephrase the question?

      THE COURT:  Can you answer the question that he asked -- he's asking you if you knew whether the money in the shell accounts, subject accounts, was David's money.  Do you know whether it was David's money or not?

      THE WITNESS:  Essentially, he was the beneficiary, yes.

      THE COURT:  Do you know whether it was David's money or not?  That's what he's asking you.

      THE WITNESS:  Yes.

      THE COURT:  He's not asking you who's the beneficiary.

      Do you know whether the money in those accounts was David's money?  Do you know?

      THE WITNESS:  I do know.

      THE COURT:  Okay.  Whose money was it?  Was it David's money or was it somebody else's money?

      THE WITNESS:  It was David's money.

      THE COURT:  Thank you.

      Next question.

      MR. JACKSON:  Thank you, Your Honor.

      THE COURT:  The jury is smart.  He's just asking if

**J.A. 829**

Cabane - cross - Jackson                2376

it was David's money.  Just tell him.

      MR. JACKSON:  Thank you, Judge.

      THE COURT:  You're welcome.

Q    Let's move on to another topic.

      You would agree with me, Special Agent Cabane, that repayment of a loan is not taxable income to the giver, right?

A    Repayment of the loan is not taxable, no.

Q    And just to put this in context for the jurors, if a person were to loan someone $10,000, right, person X loans person Y $10,000, the following week, person Y comes back and says I only have $9,000 to give you, okay, they still owe the loaner $1,000, right?

A    It depends on the terms of their loan agreement.

Q    In the simplest terms.  Assuming everything else I'm saying, assume everything you need to assume, but in the simplest terms, they still owe the loaner $1,000, correct?

A    Assuming that there was no interest and it was truly a loan, then there would be a $1,000 balance.

Q    Right.  Let's just assume for these purposes, keep it very simple, no interest, no other terms.  They still owe that person $1,000, right?

A    Yes.

Q    And there's obviously no taxable income in that situation, correct?

A    Yes.

Cabane - cross - Jackson 2377

Q   Now, let's say these same two people engage the following week and on this occasion, the person is loaned another $10,000 and the person who received the loan, person Y, comes back a week later and says, I'm paying on the second loan that you gave me plus I'm repaying what I paid before so I'm giving you $11,000.  Right?

MR. POLEMENI:  Objection.

THE COURT:  Overruled.

A   I lost you.

Q   Okay.  I'm just going to make it very simple.

A   Okay.

Q   This is a second loan, second loan.  The loaner, person X, gives $10,000 to the recipient.  Right?  You follow?

A   A second $10,000?

Q   Yes.

A   Okay.

Q   Then a week later, that person comes back and says, I'm paying you back for the first loan and the second loan, I'm giving you $11,000.  Right?

A   Now a total of $20,000 has been paid back?

Q   $20,000 has been loaned and $20,000 has been paid back. Right?

A   Yes.

Q   There's no taxable income in that situation, correct?

A   Yes.  Correct.

Cabane - cross - Jackson 2378

Q   And I'm correct, Special Agent Cabane, that with this chart that we went through where you were saying that there was $53 million over all these years that passed through these accounts, you can't say year by year whether there was actually any taxable income to David, correct?

A   That's incorrect.

Q   Okay.  Let's keep going with this.

You don't know, on a year by year basis, how many times David loaned out money to someone and took a loss, do you?

A   There is no evidence that he loaned any money out to anyone.

Q   Okay.  I understand your theory.  You don't want to use the word "loan."  Let's just use the word "gave money."  Okay?

You don't know how many times David Motovich gave cash to someone and they came back to him and said, David, I wanted to pay you back but I don't have it; you don't know that, do you?

A   There's no evidence that that ever occurred.

Q   Right.  But you don't know, one way or the other, do you? Correct?

A   That he loaned any money?

Q   No.  No.  I'm trying to make this very, very simple.

All I'm asking you is, yes or no, you don't know how many times David gave money to people and they weren't able to

Cabane - cross - Jackson 2379

come up with the money to pay back; you don't know it?  Yes or no.

A   No, I don't know if David --

Q   And so without knowing --

A   -- or return it.

Q   So without knowing that answer, looking at what you allege, this business that you allege, all this $53 million that was passing through different checks, different accounts, over the course of many years, you don't know, you can't say with any degree of accuracy how much David purportedly made in taxable income?

A   Well, we know --

Q   No.  No.  No.  I'm just asking you a "yes" or "no" question.  Do you know that?

Do you know how much, on a year by year basis, David purportedly made in taxable income based on the transactions you were describing in your chart?  Yes or no.  Do you know?

A   Yes, we know a minimum --

Q   No.  No.  No.  No.  I'm not talking about a minimum.

I'm asking you do you know, yes or no, on a year to year basis, how much David purportedly owed in taxable income? Yes or no.

A   On the shell accounts?  We don't have a precise figure, no.

Q   You don't have a precise anything, right?

Cabane - cross - Jackson 2380

A   No.

Q   And that's because you haven't even talked to many of the people who are involved in these transactions the way that you've talked to Kemal Sarkinovic and Dannette and the other people who you got to plead guilty, right?

A   We attempted to speak to a lot of people.

Q   Listen --

THE COURT:  Don't interrupt his answer.

You said you attempted to speak to a lot of people. Complete your answer.

A   We attempted to speak to a lot of people in this that had transactions with the shell accounts, with the shell company bank accounts, but they were either uncooperative or when they received a subpoena, they gave us no supporting documentation to underline what the transactions were for.

Q   Okay.  Are you finished with your answer?

A   Yes.

Q   And by the way, I'm glad you brought up no supporting documentation.

You also didn't get any supporting documentation that shows us exactly how much cash Kemal Sarkinovic received, correct?  Yes or no.

A   No, we don't have the exact amount that Kemal Sarkinovic received because checks that he cashed at the direction of David Motovich, he kept a portion of it and most of it went

**J.A. 830**

Cabane - cross - Jackson                 2381

back to David Motovich and other workers.

Q    I'm trying to make this as quick as possible, Agent Cabane.  I'm asking a yes or no question.  I understand your explanations.  You'll have an opportunity on redirect.

Yes or no.  You don't have supporting documentation that can tell us how much cash Kemal Sarkinovic actually received, correct?

A    No, we don't know exactly how much cash Kemal Sarkinovic received.

Q    And just to going back to my point that I'm trying to clarify with you, without knowing how much David lost in the process of giving money to people through these subject accounts as you've been talking about, you can't state definitively whether he lost more or gained more on this business?  Yes or no.

A    I can't state that he made any loans from the subject shell bank accounts.

Q    Okay.  So you agree with me, yes?

A    I can't -- no, I say no, that I can't determine exactly how much, if any, loans did he make from the shell bank accounts.

Q    Now, you also have no idea how much money the Motovich family got in loans over the course of this year from various properties that they hold, correct?

A    Loans against the property?

Cabane - cross - Jackson                 2382

Q    Yes.

A    I, I don't know if they received loans against any properties.

Q    You do know that it's a common thing in America for people, if they own real estate, to take a loan out on that real estate?

A    Like a refinance?  Yes.

Q    Or just a loan that's secured on the real estate, right?

A    Yes, I'm familiar with it.

Q    And in America, you're allowed to spend the money that you take out on loans, right?

A    Sure.

Q    And in your investigation, you did not figure out how much cash David might have had access to or other members of his family might have had access to by taking out loans on real estate?  You didn't figure that out?  Yes or no.

A    We did not see any loans taken on real estate going to the shell company bank accounts.

Q    That's not my question.  I'm not talking about the shell company.  I'm just saying you did not figure out how much money the Motovich family has taken out in loans during the course of these years, correct?

A    No, we don't know.

Q    Okay.  And you also have no idea how much David and his family in total are paying in taxes including state taxes,

Cabane - cross - Jackson                 2383

local taxes, real estate taxes and payroll companies, payroll taxes between the various companies that they operate and employ people in?

A    No, I have no idea.

Q    Okay.  You are aware though that whatever the amount is, it's millions of dollars that the Motovich family is paying in taxes over the years that we're talking about?

MR. POLEMENI:  Objection, Your Honor.

THE COURT:  Do you know?

THE WITNESS:  I don't doubt it.

THE COURT:  You don't doubt it.  Do you know is the question.

THE WITNESS:  I don't know.

THE COURT:  Next question.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

Q    Now, we looked at David's personal tax returns during your direct examination, right?

A    Yes.

Q    And I'm correct, besides his personal tax returns, you understand that he operates various businesses and his family operates various businesses?

A    I'm sorry.  I don't think we looked at David Motovich's tax returns under my direct.  I believe we looked at it under another witness' direct.

Cabane - cross - Jackson                 2384

Q    Thank you.  That's helpful.

Now, during the course of the investigation, you met with a bunch of witnesses, right?

A    Yes, a lot of witnesses.  I would say more than a bunch.

Q    You also conducted some custodial interviews of some of those witnesses?

A    Custodial interviews?  No, we didn't.  I don't recall doing any custodial.  There were noncustodial interviews, yes.

Q    Okay.  People that you Mirandized, right, and interviewed?

A    We may have read noncustodial rights to someone and interviewed them, but they weren't in custody.

Q    Okay.  But you, you did inform them of their rights and that they were being interviewed by, by agents, right?

A    There were times that that occurred, yes.

Q    And you also had a bunch of different proffers, right?

A    More than a bunch, yes.

Q    You might have had hundreds of different proffer meetings, right?

A    Maybe not hundreds, but there was a significant amount of proffer meetings, yes.

Q    Yes.  I'm not trying to overestimate but there are many, many proffer meetings that you had during the course of this, correct?

A    Yes, that's true.

J.A. 831

Cabane - cross - Jackson                    2385

Q    Am I correct that you did not audio or video record a single meeting with any witness during the course of this investigation?

THE COURT:  Him personally?

MR. JACKSON:  Him or any one of the agents.

THE COURT:  Well, which, him personally or anyone else?  Why don't you begin by asking him whether he did or not.

MR. JACKSON:  That's helpful.  Thank you, Judge.

Q    You yourself did not audio or video record a single meeting with any witness, correct?

A    Me, myself, has not audio or video recorded any witness during this investigation.

Q    And you also are aware that none of the other agents in the, who are on the team of the investigation ever recorded a single meeting with any of the witnesses, correct?

THE COURT:  By recorded, you mean audio and visual electronic recording, Mr. Jackson?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  As opposed to making notes in a 302?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Okay.  Do you know whether anybody recorded, audio or visual, any of the interviews?

THE WITNESS:  I'm not aware.

THE COURT:  Okay.  Next question.

---

Cabane - cross - Jackson                    2386

MR. JACKSON:  Thank you, Judge.

Q    You also never -- you know, we also have the court reporter here, the stenographer?

A    Yes.

Q    There was never a time where you brought a stenographer to record what people were saying in your witness meetings, correct?

A    No, that would be out of the ordinary.

THE COURT:  Forget about it.  Did you do?  Did you bring a court stenographer?

THE WITNESS:  No.

THE COURT:  Let's go.  The jury gets it.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

Q    Now, one of the people -- oh, last question on that, Judge.

You are aware that DOJ guidelines --

THE COURT:  No.  No.  No.  We're not going into the DOJ guidelines.

MR. JACKSON:  I'll move on, Judge.

THE COURT:  Yes, move on.

Q    Now, one of the people who testified was a person named Joe Russo?

A    Joseph Russo, yes.

Q    And I'm correct you participated in meetings with Joseph

---

Cabane - cross - Jackson                    2387

Russo, right?

A    Yes.

Q    And you also conveyed in prior statements in this case what Russo said to the grand jury, right?

A    What Russo said to the grand jury?

Q    You conveyed what Russo told you to the grand jury, correct?

A    I don't recall the exact statements I made in the grand jury.

Q    Okay.  Let me just ask you this.

Am I correct that you recall stating to the grand jury when asked why Russo would go to Motovich to cash checks for 10 percent, Russo stated that his business was up and down and, therefore, there were times that the business account did not have the funds in it or the funds had not cleared yet while other times, it was a matter of convenience?  You remember stating that, correct?

A    I don't recall that specific statement.

MR. JACKSON:  Your Honor, may we use the screen just to display something to the witness and I'd like to ask a question about refreshing the witness' recollection.

THE COURT:  You may show it to witness and to opposing counsel.

You remember, ladies and gentlemen, at the beginning, I told you there would be some documents that would

J.A. 832

---

Cabane - cross - Jackson                    2388

be shown to the witness to see whether or not it refreshed his or her recollection.  That's what we're doing now.  This document is not in evidence.  It may or may not come into evidence but, in any event, it's being shown to the witness and he's being asked whether this refreshes his recollection.  He'll answer it yes or no.  This has come up before and it will come up again.  That's how we do it.

All right.  So you may publish it to the witness, opposing counsel and the court, and the question is does this refresh your recollection.

MR. JACKSON:  Thank you, Judge.

Can we display 3500-CC-2, at 12.

THE COURT:  For the witness and opposing counsel and the court, and the question is does this refresh your recollection.

(Pause.)

A    Can you zoom out?

(Pause.)

A    Okay.  I recall.

Q    Having reviewed that document, does that refresh your recollection?

A    Yes.

Q    Okay.  And I'm correct that what you told the grand jury is that when asked why Russo would go to Motovich to cash checks for 10 percent, Russo stated that his business was up

Cabane - cross - Jackson                    2389

and down and, therefore, there were times that the business account did not have funds in it or the funds had not cleared yet while other times, it was a matter of convenience, correct?

A    That was one of his statements, yes.

Q    That was your statement to the grand jury, correct?

A    It was my statement about his statements, why he.

Q    Right.

You also told them that Russo further explained that he could write a check to Motovich and Motovich could hold onto the check before negotiating it to give time for the funds in the Metro entity's business bank accounts to become available, correct?

A    Yes.

Q    And in that portion -- never mind.  I'll move on.

Now, I'm also correct that you identified during the course of your investigation at least $4 million in checks that Kemal Sarkinovic cashed at check cashing places, correct?

A    His name was indicated as cashing it but we don't know if he actually cashed those checks.

Q    Well, you spoke to him and he told you that he cashed many, many checks, correct?

A    Yes, but he never said millions.

Q    Okay.  Did you attempt to tabulate up how many checks he cashed at various check cashing places throughout the City?

---

Cabane - cross - Jackson                    2390

A    There is a difference between the amount of checks that he cashed that his name is on and the amount of checks he actually cashed.

Q    I understand that.

A    And we weren't able to tabulate the amount of checks he actually cashed.

Q    Okay.  So my question is did you attempt to figure out how many checks Kemal Sarkinovic cashed at various check cashing places throughout the City?  Did you attempt?  Yes or no.

A    We attempted, yes.

Q    Okay.  And you figured out that it was at least $4 million in checks, correct?

A    No.

Q    Okay.  How much did he cash at various check cashing places throughout the City?

A    We weren't able to determine the amount of checks he actually cashed himself physically because there were checks that were cashed under his name when he was not in the country.

Q    Did you ask him?

A    Yes, we asked him.

Q    Did he know?

A    He didn't know.

Q    He had no idea how many checks he cashed?

---

Cabane - cross - Jackson                    2391

A    He said many.

Q    Okay.  It could be millions, right?

A    It could be.

Q    You just don't know?

A    We don't know because there were checks cashed when he wasn't present to cash them.

Q    Am I correct that you wrote some internal memos at IRS about this investigation prior to this trial?

A    Internal memos?

Q    Yes.

A    Meaning memos not leaving the agency?

Q    Yes.

A    Yes.

Q    Okay.  And in one of those memos, did you not write that Kemal Sarkinovic had, that you had identified over $4 million in checks cashed at various check cashers by Sarkinovic?

You wrote that, right?

A    Under the name of Kemal Sarkinovic.

Q    No.  No.  That's not what you wrote though, right?  What you wrote is over $4 million in checks cashed at various check cashers by Sarkinovic; that's what you wrote in the memo, correct?

A    I don't recall writing that specifically.

MR. JACKSON:  Your Honor, I'd like to display just for the witness and ask if it refreshes his recollection a

---

Cabane - cross - Jackson                    2392

document marked as DX-2083.

THE COURT:  It may be displayed to the witness and to opposing counsel and the court.

(Pause.)

Q    And go to page 35.

MR. JACKSON:  Sorry.  That may be wrong.  Please take it down.

(Pause.)

MR. JACKSON:  We'll come back to that, Judge.  I want to keep this going.

Q    Now --

THE COURT:  Are you withdrawing the previous question at this point?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Okay.  Go ahead.  Ask another question.

MR. JACKSON:  Thank you, Judge.

Q    Now, I'm also correct -- I am correct, aren't I, that one of the things that Kemal Sarkinovic told you is that Ago Kolenovic gave the company name to David Motovich, correct?

A    You're asking me if he gave the name to David Motovich?

Q    No.  No.  I'm asking you if Kemal Sarkinovic told you that Ago used to buy materials at Midwood Lumber and that he gave the company's name to David Motovich.  He told you that, correct?

A    I don't recall him saying that.

**J.A. 833**

Cabane - cross - Jackson                    2393

MR. JACKSON:  Okay.  Can we display a document just for the witness which is marked as DX-9987.

THE COURT:  For the witness, opposing counsel and the court?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Yes.

MR. JACKSON:  And can we go to page 4 and zoom in on that.

Q    Just look at that, the first part there.

A    Yes.

Q    Okay.  And I'm correct, yes or no, that -- your recollection is refreshed?

A    Yes.

Q    And I'm correct that in an interview, Kemal Sarkinovic told you that Ago used to buy materials at Midwood Lumber and gave the company's name to David Motovich?  Yes or no.

A    Ago --

Q    Yes or no.

A    No.

Q    That's what you wrote in your memo on the meeting, correct?

You wrote:  "Ago used to buy materials at Midwood Lumber and gave the companies name to David Motovich."  I'm just asking you, yes or no, if that's what you wrote?

A    Yes.

---

Cabane - cross - Jackson                    2394

Q    Okay.  We can take that down.

Now, I'm also correct that one of the items of evidence that you identified during the course of this investigation that we haven't gone over during the trial was a bunch of CTRs that were actually filed by Coney Island Payroll on various transactions involving the subject companies, correct?

A    Yes.

Q    Okay.

MR. JACKSON:  Your Honor, at this time, we would like to offer DX-2081 which is a collection of CTRs that were filed by Coney Island Payroll.

THE COURT:  Any objection to Exhibit -- state the number again?

MR. JACKSON:  Yes, Your Honor.  It's DX-2081.

THE COURT:  Any objection?

MR. POLEMENI:  Your Honor, may we have a moment?  We just need to see what it is.

(Pause.)

MR. POLEMENI:  Your Honor, can we have a sidebar for a moment?

THE COURT:  All right.  Sidebar.

Sorry, ladies and gentlemen.

(Continued on next page.)

---

Sidebar                                     2395

(The following occurred at sidebar.)

THE COURT:  May I have the exhibit, please?

MR. GRUBIN:  Sure.

THE COURT:  The exhibit is Defense Exhibit 2081.

And how long is this exhibit, Mr. Jackson?  How many pages?

MR. JACKSON:  It is 436 pages, Your Honor.

THE COURT:  And what is this exhibit?

MR. JACKSON:  This is the document that the government produced to us, I think, mid-trial that we announced, mid-trial that we discussed with Your Honor.  They got it, they said, late from FinCEN and it basically just shows all of the CTRs that were sent on the subject matter companies including ones that referenced Kemal Sarkinovic, Coney Island Payroll, these various companies that are the subject of this trial.

THE COURT:  Just to be clear, this is a document that was submitted by which entities?  Various entities?

MR. JACKSON:  It was -- these, I believe, were submitted by Coney Island Payroll.

THE COURT:  All of them?

MR. JACKSON:  That's my understanding.

THE COURT:  Well, somebody's read these, right?

MR. JACKSON:  Yes, I've read them.

THE COURT:  You've had them for how long now?

J.A. 834

---

Sidebar                                     2396

MR. JACKSON:  Not that long because the government gave them to us in the middle of trial.

THE COURT:  I know you haven't had them as long as you wanted, but the question is when did you get them and what are they and then I'm going to ask the government what their objection is.

MR. JACKSON:  We got them maybe a week ago, two weeks ago.

THE COURT:  Two weeks ago, you were given --

MR. MAZUREK:  It was one week ago.

THE COURT:  I just want to know when were you given this document.

MR. JACKSON:  Approximately ten days ago.

THE COURT:  I see a date of July 3, 2024 on the first page --

MR. MAZUREK:  That's not when we got them.

THE COURT:  -- of this document and I see a date of July 3, 2024 on the last page of this document.  I'm very old school about this.  It's 436 pages.

Is that when you got this document, on or about July 3, 2024?

MR. JACKSON:  No, Judge.

THE COURT:  When did you get the document?

MR. JACKSON:  Ten days ago.

THE COURT:  All right.  Let me ask the government,

Sidebar 2397

what's your objection to the document?

MR. POLEMENI: A couple of things, Judge.

THE COURT: A little slower.

MR. POLEMENI: I'm not sure I necessarily object to this document coming in. I would just ask and just to alert the Court that, as I've alerted to defense counsel, to the extent they attempt to use this document, we would ask to recall a witness from New York State Department of Financial Services to establish that Coney Island Payroll Services has been the subject of various discipline for, among other things, failing to file property CTRs because, for example, they don't take identification when they, when they cash checks.

THE COURT: You haven't rested your case.

MR. POLEMENI: Understood, yes.

THE COURT: If you want to call a witness, I don't know why there would be any reason for you not to be able to call a witness to testify with respect to this document, but the issue before the court is it's being offered in evidence and I want to know if you have any objection to 2081 and all of its, quote, glory coming in evidence.

MR. POLEMENI: No objection. I just wanted to raise it with the Court.

THE COURT: Well, I'm old school. I just wanted to know if you have any objection to the document. It's been

Sidebar 2398

offered by defense counsel. It's being admitted without objection. There you go. And you may call whatever witnesses you shall have the desire to call.

All right. Is there anything else?

MR. JACKSON: No. Thank you, Judge.

THE COURT: Thank you.

(Sidebar conference ends.)

(Continued on next page.)

Cabane - cross - Jackson 2399

(In open court.)

THE COURT: Defense Exhibit 2081 is admitted without objection at the sidebar.

MR. JACKSON: Thank you, Your Honor.

THE COURT: You're welcome.

(Defense Exhibit 2081 so marked.)

Q   We're not going to go through all of the pages of this 436 page document, but just a couple quick questions.

You are aware that this contains various CTRs filed related to the subject matter companies, correct?

A   Yes.

MR. JACKSON: If we can go to page 11 of this, please, Mr. Cepregi.

Q   You see here where it says, "8/28/2014," right? That's the filing date, that's when the CTR was filed?

A   Yes.

MR. JACKSON: Okay. And if we can go down to the middle -- well, first of all, yes, just leave it just like this. Okay.

Q   You can see here that the organization was Ago & Alaudin Contracting Corp., do you see that?

A   Yes, the shell company.

Q   Okay. And then the person who is identified as involved in the transaction is Kemal Sarkinovic, do you see that?

A   Yes, I see it.

Cabane - cross - Jackson 2400

Q   And then if we go to the next page, you see down at the bottom under "Activity Location," you see it's Coney Island Payroll Services, right?

A   Yes, I see that.

Q   So this is a CTR that was generated by Coney Island Payroll Services on Ago & Alaudin and Kemal Sarkinovic, right?

A   That's what it states.

Q   And there are many other examples like this throughout this document involving Midwood Building Corp., CNBC, SGS, correct?

A   Yes.

Q   Okay. So somebody at Coney Island Payroll is sending out CTRs that go directly to law enforcement about this, right?

A   To FinCEN.

Q   Yes. FinCEN is part of law enforcement, right?

A   Yes, this is sent to FinCEN.

MR. JACKSON: All right. We can take that down.

Q   Very quickly, am I correct that the combined payroll tax rate for employers right now is 7.65 percent?

A   The employer portion, yes.

Q   Okay. Did you ever attempt to use an undercover officer to cash a check with David Motovich?

A   An undercover agent, no.

(Continued on next page.)

J.A. 835

Cabane - cross - Jackson                    2401

DIRECT EXAMINATION (Continuing)

BY MR. JACKSON:

Q    And the reason you didn't is because you knew that David Motovich was lending money to friends and would not give money to some stranger off the street, correct?

A    The reason is --

Q    No, no, no, it's a yes-or-no question.

A    Repeat the question.

Q    The reason you did is because you knew that David Motovich would not give money to some stranger off the street, correct?

THE COURT:  No, no, no, you've changed the question.

Originally you asked him that he did not use an undercover because he knew X, and now you changed it to the reason you did such a thing is because he knew X.  You can't sleaze around like that.  You can't change the question like that.

Ask him the question in a way that elicits a clear answer for the jury.

You can ask it either way, that's up to you, but you can't ask for it to be restated and then you do a switch-a-roo.

So, ask him the question.

MR. JACKSON:  Yes, Judge.

THE COURT:  One or the other, but we don't do

---

Cabane - cross - Jackson                    2402

three-card Monty in my court.

Go ahead.

MR. JACKSON:  No attempt, Judge.

BY MR. JACKSON:

Q    I just want to be very simple, Agent Cabane.

THE COURT:  You're welcome.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

Q    Very simple.  The reason that you didn't try to use an undercover --

THE COURT:  Did not?

MR. JACKSON:  Did not.  I think there's the confusion.

Q    -- did not, that you did not -- I said didn't, which sounds confusing -- the reason that you did not attempt to use an undercover is because you knew that David Motovich was loaning money to friends and would not give money to some stranger off the street, correct?

A    Absolutely not.

Q    Okay.

A    No.

Q    But we agree at no point in this investigation did you try to use an undercover, right?

A    Not for the reason you stated.

Q    At no point did you try to use an undercover, correct?

---

Cabane - cross - Jackson                    2403

A    We did not try to use an undercover.

Q    Okay.

And by the way, you saw during the course of this that -- I just want to talk about some of the stuff that you either found or didn't.

You saw during the course of your investigation and participation in this case that Mr. Kolenovic had been sued more than once --

MR. GRUBIN:  Objection, Your Honor.

Q    -- for not paying --

THE COURT:  Whoa, whoa, whoa, whoa, let him ask the question.

Q    You saw that Mr. Kolenovic had been sued more than once for not paying people on his projects, correct?

MR. GRUBIN:  Objection, Your Honor.

THE COURT:  Sustained.

Q    You were one of the agents who was present during the meeting where Dannette Hyatt-Sullivan identified Reginald Garcia in GX-19, correct?

A    That was the third meeting with her.

Q    The question is you were one of the agents who was present in the meeting where he -- where Dannette Hyatt-Sullivan identified Reginald Garcia in his GX-19, correct, you were present?

A    I was present in an interview where Dannette

**J.A. 836**

---

Cabane - cross - Jackson                    2404

Sullivan-Hyatt did not recognize a photo presented to her of Reginald Garcia, the first -- the very first interview of her.

Q    Okay.

You were present at a meeting in December 2019 where she identified GX-19 as Reginald Garcia, correct?

A    Yes, that was the third interview.

Q    Okay.  Again, I'm asking you simple yes-or-no questions.  I want to speed this along.  I'm almost done.

You were present for that, correct?

A    The third interview, yes.

Q    And you also know that at some point in that interview she was shown a driver's license of Reginald Garcia, correct?

A    I don't recall if we showed her a driver's license, like the full image of a driver's license.

Q    Okay.  You were here during Agent Pereless's testimony, correct?

A    Yes.

MR. JACKSON:  May we display, already in evidence, GX-707?

THE COURT:  You may, it's in evidence.

MR. JACKSON:  707-A.

THE COURT:  It's in evidence, you may display.

MR. JACKSON:  Thank you, Judge.

(Exhibit published.)

MR. JACKSON:  You could take that down.  707-A.

Cabane - cross - Jackson                    2405

(Exhibit published.)

MR. JACKSON:  Right.

BY MR. JACKSON:

Q    And this is the image that Agent Pereless said was displayed as the driver's license that was shown to Dannette Hyatt-Sullivan, correct?

A    I don't recall if this was the image that he said.

Q    You don't remember which one he identified in his testimony as you sit here now, right?

A    Correct.

Q    You do agree with me as the case agent you reviewed all of the 302s connected to this case, right?

A    Yes, at some point.

Q    And you agree with me that the driver's license that was attached to the 302 from the December 2019 meeting was a different driver's license than this driver's license, correct?

A    When I reviewed the 302s, I did not see all of the attachments.

Q    Okay.

MR. JACKSON:  Your Honor, may we display -- just one moment, Judge.

(Pause.)

MR. JACKSON:  You can take that down.

Your Honor, may we display just for the witness

Cabane - cross - Jackson                    2406

DSH-8B?

THE COURT:  Is this in evidence?

MR. JACKSON:  No, Your Honor.  Just --

THE COURT:  Is this the document I kept out of evidence the other day?

MR. JACKSON:  I'm not sure, Judge.  I am not offering it.

THE COURT:  I know you're not offering it.

I'm asking if it's the document that I kept out of evidence the other day or not, or if you have moved on to something else?

MR. JACKSON:  This is -- I'm not sure, Judge.  I believe this is -- this is just the report that agents -- that --

THE COURT:  All right.  Any objection to -- what is the exhibit number?

MR. JACKSON:  Your Honor, it's 3500-DSH-8B, for refreshing recollection.

THE COURT:  Okay.  Show it to the witness and to opposing counsel and to the Court.

MR. JACKSON:  Thank you, Judge.

THE COURT:  The question is:  Does this refresh your recollection about... and now you're going to say what you're asking him whether or not it refreshes his recollection about.

MR. JACKSON:  Yes.

Cabane - cross - Jackson                    2407

Q    Whether the driver's license that we previously looked at is a different driver's license with a different date than the one that was identified by Agent Pereless?

THE COURT:  Does this refresh your recollection with respect to that question?

Yes, it does or no, it doesn't.

A    No, it doesn't.

MR. JACKSON:  Okay.

THE COURT:  Next question.

Q    You can see one of the -- you agree with me, one of them says 2013 and --

MR. GRUBIN:  Objection.

THE COURT:  No, no, no, no, no, you're not going to backdoor it in that way.

MR. JACKSON:  Thank you, Judge.

THE COURT:  I may be a clown, but this isn't my first circus.  Okay.

MR. JACKSON:  Agreed, Judge.

THE COURT:  Yes, agreed.  Let's go.

MR. JACKSON:  All right.

THE COURT:  Good try, though.

MR. JACKSON:  I'm not trying.

THE COURT:  I know, I know.

Q    Now, just a couple more questions for you, Agent Cabane.

You were present for Mr. Adamou's operation where he

Cabane - cross - Jackson                    2408

went to go talk to David Motovich, correct?

A    I don't believe I was present for that undercover meeting or consensual monitored meeting, I should say.

Q    Did you participate in any way in it?

A    I was informed of how things were going.

Q    You know that he had some sort of credit card device on him that recorded things?

A    I was informed that he had that type of recording device.

Q    And your understanding was that he didn't have the capability to activate it, it had to be activated by the agents prior to him going to the meeting, correct?

A    Yeah, I'm sorry.  There were two recording devices that he -- that he used.

Q    I understand.  I'm focused on a credit card one.  Okay?

A    One out of the two, yes.

Q    The one whose recording we played in court, right?

A    Correct.

Q    Okay.  That had to be activated by the agents before the meeting, correct?

A    Yes, that's my understanding, but I don't believe I was present when that was activated.

Q    Okay.

You also heard a call that was played by the defense between Jeremy Gutman, the attorney, and Mr. Motovich, right?

A    Jeremy Gutman, Mr. Motovich, and Phillip Adamou, yes.

J.A. 837

Cabane - redirect - Grubin                    2409

Q    Yes.
     Did you participate in the recording of that call?
A    I don't recall being present when that was done.
Q    Okay.
     Do you know how that call was recorded?
A    Not --
     MR. GRUBIN:  Objection, Your Honor.
     THE COURT:  The question is do you know, yes or no?
     THE WITNESS:  No.
     THE COURT:  Next question.
     MR. JACKSON:  Just one moment, Judge.
     THE COURT:  Of course.
     (Pause.)
     MR. JACKSON:  No further questions for this witness.
Thank you, Judge.
     THE COURT:  Any redirect?
     MR. GRUBIN:  Yes, Your Honor.
REDIRECT EXAMINATION
BY MR. GRUBIN:
Q    Hello, Special Agent Cabane.
A    Good afternoon.
Q    Good afternoon.
     Defense counsel asked you about whether the IRS or
the FBI films proffer -- if you filmed proffer sessions
with -- with different witnesses you were meeting, is that

Cabane - redirect - Grubin                    2410

right?
A    Yes, I believe he asked audio or video recorded it.
Q    Yes.  Does the -- does the IRS or the FBI film or audio
record witness meetings with witnesses who are coming in and
providing information to the Government?
A    No.
Q    Why not?
A    Just they would be uncomfortable, number one, because
they're coming in and having to give information about people
they probably don't want to give information on.  So, off the
bat, it would make them apprehensive to be fully forthcoming.
Q    Are you aware of an agent ever doing that?
A    Not -- I'm not aware of an agent doing that.
Q    But agents do take notes, correct?
A    Yes.
Q    And that's how you record these meetings?
A    Notes, yep -- yes.
Q    Special Agent Cabane, do you know with absolute
100 percent certainty whether Motovich does not do ballet in
his spare time?
A    I don't know.
Q    You don't know?
A    No.
Q    But there's no evidence of that, right?
A    There was no evidence of that, correct.

Cabane - redirect - Grubin                    2411

Q    And you focus on what there's evidence for, correct?
A    Yes, and -- and investigating the allegations.
Q    And investigating the allegations.
     So have you seen evidence that any of those check
cash -- the check cashing activity that happened every week
and every other week from multiple witnesses, did you see any
evidence that those were loans?
A    Zero evidence.
Q    Okay.  And that's what you care about, evidence?
A    Yes.
Q    Mr. Jackson also asked you about, about how much -- how
much money Kemal Sarkinovic may have cashed at different check
cashing businesses, correct?
A    Yes.
Q    And it was my understanding from your testimony that
there were a lot of checks out there with his name on it, is
that fair?
A    Yes.
Q    But you said you weren't sure, right, how much he
actually cashed rather than someone else cashing, correct?
A    Correct.
Q    And do you actually know for a fact that it could not
have been Kemal Sarkinovic bringing those checks to
different -- to different check cashing places on at least
certain occasions?

Cabane - redirect - Grubin                    2412

A    Yes, I do know that.
Q    Why is that?
A    Because Kemal Sarkinovic was out of the country when
these checks were cashed at these locations using his
identity.
Q    So, he was in a different country?
A    Exactly.
Q    Mr. Jackson also asked you about your use of undercovers,
right?  Did you ever send an undercover to check to -- to cash
a check with David Motovich, do you recall that?
A    Yes.
Q    Do you need to use -- is it a good use of agency
resources to use an undercover when you have multiple
customers of David Motovich telling you what they've done?
A    No, it wouldn't be good use of.
Q    Do you need an undercover when you have text messages
between David Motovich and his customers saying what they're
doing?
A    No.
Q    Do you need an undercover when you have text messages
between David Motovich and his sister or David Motovich and
his secretary saying what they're doing?
A    No.  We wouldn't need it to do an undercover.
Q    Mr. Jackson asked you about driver's license, Reggie
Garcia's driver's license.

**J.A. 838**

Cabane - redirect - Grubin    2413

Do you recall that?

A   Yes.

Q   And is it fair to say that Dannette Sullivan-Hyatt had seen Reggie Garcia's driver's license because his identity was used on multiple occasions at Carver bank?

A   Yes.  I believe her -- his identity documents were sent to her to have the bank account opened.

Q   By Marina Kuyan, David Motovich's secretary, correct?

A   Yes, that's correct.

Q   So she would have seen his driver's license, is that fair?

THE COURT:  "She" being?

MR. GRUBIN:  Excuse me.  Thank you.

Q   Dannette Hyatt --

MR. GRUBIN:  Thank you, Your Honor.

Q   -- would have seen the driver's license?

A   Yes.

Q   Defense counsel asked you about currency transaction reports, CTRs, right?

A   Yes.

Q   And he showed you ones that Coney Island Payroll Services had filed, right?

A   Yes.

Q   Not David Motovich, correct?

A   Correct.

Cabane - redirect - Grubin    2414

Q   Not Midwood Lumber, right?

A   Correct.

Q   And by the way, are you aware, Special Agent Cabane, that Coney Island Payroll was disciplined repeatedly by government agencies for failing to comply with rules like currency transaction report filings?

A   Yes.

Q   Can you tell us a little bit about that?

A   There was a consent decree that Coney Island Payroll entered in with the New York State Department of Financial Services for conduct you're describing, such as not properly filing CTRs when necessary.

MR. GRUBIN:  Your Honor, I would like to move in Government Exhibit 103.

THE COURT:  Any objection to Government Exhibit 103?

MR. JACKSON:  401, Judge.

THE COURT:  Any objection?

MR. JACKSON:  401, Judge.

THE COURT:  I'm sorry?

MR. JACKSON:  401.

THE COURT:  So you do object?

MR. JACKSON:  Yes, Judge.

THE COURT:  Okay.

Overruled.  Admitted.  You may publish.

MR. GRUBIN:  Thank you, Your Honor.

Cabane - redirect - Grubin    2415

(Government's Exhibit 103 was received in evidence.)

(Exhibit published.)

BY MR. GRUBIN:

Q   Special Agent Cabane, do you recognize this document?

A   Yes.

Q   What is it?

A   This is a consent decree between New York State Department of Financial Services and Coney Island Payroll Services.

Q   Basically, New York State took action against Coney Island Payroll Services, correct?

A   Yes.

Q   For not doing what they were supposed to be doing?

A   Not following the proper New York banking laws.

MR. GRUBIN:  Your Honor, may I have one moment?

THE COURT:  You may.

(Pause.)

Q   Special Agent Cabane, just one more topic.

Defense counsel, I believe, started by asking you a number of questions about whether the 50 million-plus money flowing through the different shell accounts was David Motovich's money or someone else's money, correct?

A   Yes.

Q   Is it fair to say when you -- and it was -- and it was confusing, it didn't -- it's hard to give a yes or no answer,

Cabane - redirect - Grubin    2416

is that fair?

A   Yes.

Q   Is it fair to say that it's pretty complicated to figure out sometimes whose money something is when you're opening a number of different -- nearly a dozen shell accounts in different people's identities and opening them up at different banks?

A   Yes, using nominee -- nominee names makes it difficult for the IRS and any other law enforcement agency to really get to the bottom of who's behind the transactions.

Q   That's kind of the point, right?

A   Yes.  It seems that it was intentional.

Q   And -- but you do know -- were you able to determine that at least a -- a -- a large portion, a large source of those deposits into those accounts came from David Motovich's check cashing customers, is that fair?

A   That's where it originated from, yes.

Q   And that that money, and money going from those accounts, ended up paying for things like David Motovich's AMEX cards, right?

A   Correct.

Q   And David Motovich's penthouse apartment renovations, right?

A   Correct.

Q   And -- and architecture work by Alan Miller for David

**J.A. 839**

Proceedings                                    2417

Motovich, correct?

A    Correct.

Q    That said, once the money was in the banks, you were here for the various bank witnesses, correct, who were testifying?

A    Yes, I was.

Q    And do you recall each of them saying that they had a possessory interest in the funds that were at the banks?

A    Yes.

Q    In those bank accounts?

A    Yes.

Q    Okay.

         MR. GRUBIN:  No further questions.

         THE COURT:  Thank you.  You may step down.

         THE WITNESS:  Thank you.

         (Witness steps down.)

         THE COURT:  All right.

         Ladies and gentlemen, we are going to take our 15-minute comfort break and then we'll go to lunch.

         Okay.  Fifteen minutes.  Thank you.  Do not talk about the case.

         THE COURTROOM DEPUTY:  All rise.

         (Jury exits.)

         THE COURT:  You may be seated.  The jury has left the courtroom.

         Do we have any issues to discuss in the absence of

---

Proceedings                                    2418

the jury, any issues first from the Government?

         MR. PAULSEN:  Your Honor, the Government be expects to rest after this.

         The one issue we would put on Your Honor's radar is that in your in limine decision you noted that you would be making the Geaney findings for the co-conspirator statements when the Government rests.  And so we will expect to rest at this point, and so I don't know when Your Honor would prefer to do that, but we wanted to put that on Your Honor's radar.

         THE COURT:  It's on my radar.

         MR. PAULSEN:  Yes, Your Honor.

         THE COURT:  Let me hear from defense counsel.

         MR. JACKSON:  Your Honor, we are prepared to go forward with the defense case.

         We would just ask if -- if it's appropriate, we could just, when the Government rests, make a nominal motion and reserve for elaboration or whatever the Court prefers.

         THE COURT:  All right.

         What we'll do is we'll bring the jury back after the comfort break and the Government will state its decision to rest in front of the jury.  And then we will send the jury out for lunch.

         And then whatever motions the parties wish to make outside of the presence of the jury will be made.  And then we will proceed from that point.

---

Proceedings                                    2419

         Is there anything else we need to address in the absence of the jury before we take our respective comfort breaks?

         Anything from the Government we need to discuss now?

         MR. PAULSEN:  No, Your Honor.

         THE COURT:  Anything from defense counsel we need to discuss now?

         MR. JACKSON:  No, Judge.

         THE COURT:  Okay.  We will see you in 15 minutes.

         MR. SKURNIK:  Thank you, Your Honor.

         THE COURT:  Thank you.

         (Recess taken.)

         (In open court - jury not present.)

         THE COURTROOM DEPUTY:  All rise.

         (Judge Kuntz entered the courtroom.)

         THE COURT:  You may be seated.

         Do we have any issues to address before we bring the jury in?

         MR. POLEMENI:  No, Judge.

         THE COURT:  From the Government?

         MR. POLEMENI:  No, Your Honor.

         THE COURT:  Defense?

         MR. JACKSON:  No, Judge.

         THE COURT:  Okay.  Let's get the jury in.

         (Pause.)

J.A. 840

---

Proceedings                                    2420

         THE COURTROOM DEPUTY:  All rise.

         THE COURT:  Please rise for the jury.

         (Jury enters.)

         THE COURT:  You may be seated, ladies and gentlemen of the jury.  Again, I thank you for your patience.

         All right.  Will the Government please call its next witness?

         MR. SKURNIK:  Your Honor, at this time the Government rests its case.

         THE COURT:  Ladies and gentlemen of the jury, the Government has rested its case.

         It is now 1 o'clock.  I am going to ask you to return here at 2:30, if that is sufficient time for lunch, and we will continue with the proceedings at that time.

         Please do not discuss the case amongst yourselves. We are, as I said, in the home stretch, but we are not quite across the finish line yet.

         So, again, have a nice lunch.  We were doing some business while you were out.  We'll do some more business while you're having lunch, and I will see you back here at 2:30.  Okay.

         Enjoy your lunch.

         THE COURTROOM DEPUTY:  All rise.

         (Jury exits.)

         THE COURT:  The jury has left the courtroom.  You

*Proceedings* 2421

may be seated, ladies and gentlemen.

The Court is issuing the following Memorandum and Order:

In its July 2nd, 2024 decision on the parties' motions in limine, ECF number 291, the Court conditionally granted (1) the Government's request to admit prior statements of members of the conspiracy as statements in furtherance of the conspiracy pursuant to Federal Rule of Evidence 801(d), as in David, (2)(E), as in Edward, ECF number 291 at 23-24 (citing the Government's motion in limine at 32, ECF number 244), as well as (2) the Government's motion to admit statements made over the course of the charged criminal conspiracy by employees and agents of the defendant, specifying, in particular, statements made by employees of Midwood Lumber, including statements made by Marina Kuyan, Gail Kastner, and Rosa Schwartz, ECF number 291, citing Government motion in limine at 30. With the close of the Government's case-in-chief, which we've just had, the Court now grants both requests in full.

For the co-conspirator statements to be admissible, the Government is required to prove by a preponderance of the evidence that there was a conspiracy involving the declarant and the non-offering party, and that the statement was made during the course and in furtherance of the conspiracy. Under the authority of Bourjaily versus United States, 483 U.S. 171,

*Proceedings* 2422

175, decided in 1987, according to the Federal Rule of Evidence 801(d)(2)(E). Pursuant to United States versus Geaney, G-E-A-N-E-Y, decided at 417 F.2d 1116, at page 1120, the Second Circuit in 1969, a court may conditionally admit co-conspirator statements during the Government's presentation of its case. As decided in United States versus Ferguson, 676 F.3d 260, 273, Note 8, decided by the Second Circuit, in 2011. Then, after the Government rests — the Government has now rested — the Court can make necessary Geaney findings and admit the statements.

The Court is satisfied that the Government has met its burden and demonstrated, by a preponderance of the evidence, that there was a conspiracy and that co-conspirator statements offered were made during the course of, and in furtherance of, the conspiracy. As such, this motion is granted and these statements are admitted.

For the statements of Defendant's agents to be admissible, the Government is required to prove, by a preponderance of the evidence, that the statements in question were made by a party's agent or employee on a matter within the scope of that relationship, against an opposing party pursuant to Federal Rule of Evidence 801(d)(2)(D).

For a statement to fall within the hearsay carveout of 801(d)(2)(D), a party must establish (1) the existence of the agency relationship, (2) that the statement was made

*Proceedings* 2423

during the course of the relationship, and (3) that it relates to a matter within the scope of the agency. As decided in Leser, L-E-S-E-R, versus U.S. Bank National Association, 90-CV-2362, 2012 Westlaw 6738402 at star 4, decided here in the Eastern District of New York on December 29th of 2012 by my sister judge, Matsumoto, quoting Pappas versus Middle Earth Condo Association, 963 F.2d, 534, 537, decided by the Second Circuit in 1992. The United States Court of Appeals for the Second Circuit has explained an agency relationship exists where a declarant is answerable to a defendant. As decided in United States versus Rioux, R-I-O-U-X, 97 F.3d 648 at 660, decided by the Second Circuit in 1996; United States versus Goldstein 21-CR-550, 2023 Westlaw, 3662971, at star 7, decided in the Eastern District of New York on May 25th, 2023 by the Honorable Denny Chin, "a direct reporting relationship is sufficient, but not necessary."

Based on the evidence presented during the Government's case-in-chief, the Court finds the Government has met its burden of establishing the statements were made in the individuals' capacity as the defendant's employees and relate to a matter within the scope of their employment. As such, this motion is also granted and the statements are admitted.

So ordered by the Honorable William F. Kuntz, II, United States District Court Judge, dated today, July 23, 2024, and entered on ECF.

**J.A. 841**

*Proceedings* 2424

So I have now ruled on the item that was raised by the parties before the break.

I am now going to invite any motions in the absence of the jury here in open court.

Mr. Jackson, you indicated that you had a motion to make.

MR. JACKSON: Yes, Your Honor.

We move on all counts generally for -- under Rule 29 for judgment of acquittal.

THE COURT: That's Rule 29 of the Federal Rules of Criminal Procedure?

MR. JACKSON: Yes, Your Honor.

THE COURT: What is the standard under Rule 29 that you're citing for your motion?

And then I'll hear from the Government in response.

MR. JACKSON: Your Honor, the standard we believe is the Government has failed to prove -- has failed to offer evidence that would -- that any rational juror could conclude that the defendant is guilty on any of the 18 counts.

THE COURT: Does that complete your Rule 29 argument?

MR. JACKSON: Yes, Your Honor.

THE COURT: Let me hear from the Government. What is your response?

MR. GRUBIN: Your Honor, viewing the evidence most

Proceedings 2425

favorable to the Government and drawing all inferences in favorable -- in favorable to the Government, as proper during a Rule 29 motion, the Government submits that the overwhelming evidence in this case clearly establishes for a rational, reasonable juror that the defendant committed or so a reasonable juror could find that the defendant committed each of the 18 counts.

THE COURT: Does that complete your response to the motion?

MR. GRUBIN: Yes, Your Honor.

THE COURT: Any reply to the response?

MR. JACKSON: No, Judge.

THE COURT: The motion is denied in its entirety.

All right. You mentioned there would be a defense case. We will begin that at 2:30 if that is acceptable to the parties.

Acceptable to the Government?

MR. GRUBIN: Yes, Your Honor.

THE COURT: Acceptable to defense counsel?

MR. JACKSON: Yes. Excellent, Judge.

THE COURT: Okay. We will see you at 2:30.

MR. JACKSON: Thank you. Have a good lunch, Judge.

THE COURT: Thank you. You, too.

(Luncheon recess taken.)

(Continued on the following page.)

Proceedings 2426

AFTERNOON SESSION

(In open court - jury not present.)

THE COURTROOM DEPUTY: All rise.

(Judge Kuntz entered the courtroom.)

THE COURT: You may be seated.

Do we have any issues to address before we bring the jury in to begin the defense case?

Anything from the Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Anything from defense counsel?

MR. JACKSON: No, Judge.

THE COURT: Okay. Let's get the jury in and we will start the defense case.

(Pause.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Please rise for the jury.

(Jury enters.)

THE COURT: Welcome back, ladies and gentlemen of the jury. I hope you had a nice lunch. Please be seated, and now we are going to begin the case by the defense.

And as I said initially, I will say again, the defense is never required to go forward, but the defense has the absolute right to go forward and we are now going to hear the defense case.

So, please, Mr. Jackson, proceed.

Proceedings 2427

MR. JACKSON: Thank you very much, Your Honor.

THE COURT: Yes.

MR. JACKSON: The defense calls David Motovich.

THE COURT: Please come forward, Mr. Motovich, and come to the witness stand, raise your right hand, and my court deputy will administer the oath.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Do you solemnly swear or affirm that the answers you are about to give the Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I affirm.

(Witness affirmed.)

THE COURT: Thank you, sir. Please be seated.

You've heard me say this before, I'll say it again. The microphone is in front of you. It's not a snake. You can grab it. Move it around. Please state and spell your name. Know that there were no federal funds expended in the cough drop that's before you. Have at it, if you wish. There's water there. Just state and spell your name and then counsel will inquire, sir.

THE WITNESS: David Motovich, D-A-V-I-D, M-O-T-O-V-I-C-H.

THE COURT: Thank you. Counsel, you may inquire.

MR. JACKSON: Thank you, Judge.

J.A. 842

D. Motovich - direct - Jackson 2428

DAVID MOTOVICH, called as a witness by the Government, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. JACKSON:

Q   Good afternoon, David.

A   Good afternoon.

Q   David, you sat through this entire trial.

With regard to all the things that we've talked about during the course of this trial, have you made any mistakes?

A   Yes.

Q   Any things that you regret?

A   Yes.

Q   Did you get an opportunity to reflect on that, any particular opportunity that's important to you?

A   Yes. When I was arrested and detained in the MDC, the Metropolitan Detention Center, for 17 days in isolation and the only thing I was able to look at for 23-and-a-half hours a day were the walls, you begin to think and reflect on the past and your future.

Q   And did you reflect on any of the errors that you've made?

A   Yes.

D. Motovich - direct - Jackson                    2429

Q    David, we've seen a bunch over and over and over again during this case workers' comp certificates, that weren't real workers' comp certificates and some invoices that were fake.

Were you involved in that?

A    Yes.

Q    Did you ask your secretary to prepare those sometimes?

A    Yes.

Q    Were you trying to defraud any insurance companies with that?

A    No.

Q    Were you trying to defraud any banks with that?

A    No.

Q    Were you trying to defraud anyone with that?

A    No.

Q    Have you ever stolen anything from anyone in your entire life?

A    Never.

Q    So why did you do that?

A    I had some friends of mine ask me for a favor, and I do favors.  I did a favor for a client of mine and a friend of mine.

Q    At the time did you think that you were hurting anyone with it?

A    No.

Q    Do you regret it now?

---

D. Motovich - direct - Jackson                    2430

A    Yes.

Q    Was any of this about the type of greed that you heard the prosecutor talking about?

A    No.

Q    I heard during the testimony of Joe Russo that there might have been $2 million over the course of the years that went through the accounts related to money you gave to Joe Russo.

Did you make $2 million from dealings with Joe Russo?

A    No.

Q    Can you explain what you mean?

A    Joe Russo, I was helping him out with cash over a period of seven or eight years.  So if you divide that $2 million into 2012 and 2019, it comes out to 300,000 a year.  So according to the Government, that would be $30,000 that I made off Joe Russo.

Q    Now, in reality, did you make 10 percent on every time you gave people money?

A    No.

Q    Did you lose money often when you loaned people money without security?

A    A lot more.

Q    Let me ask you this, David:  At any point, putting aside we already talked about these certificates, in anything that

---

D. Motovich - direct - Jackson                    2431

you were doing, were you trying to defraud a bank?

A    Never.

Q    Were you trying at any point to act as a financial institution?

A    Never.

Q    Did you believe you, yourself, were a financial institution?

A    No.

Q    Did you try to launder money at any point?

A    No.

Q    Did you ever tamper with a witness?

A    Never.

Q    Did you ever conspire with anyone to impede the work of the IRS?

A    No.

Q    All the 18 crimes that are charged in the Indictment, did you commit any of those crimes?

A    None.

Q    I want to back up and just ask to start at the beginning in terms of how we get here.  Okay.

First, we've heard a lot about Midwood Lumber, your family business.

A    Yes.

Q    Who started Midwood Lumber?

A    My father.

---

D. Motovich - direct - Jackson                    2432

Q    What's your father's name?

A    Boris Motovich.

Q    Where was your father born?

A    My father was born in the U.S.S.R., which is now Ukraine.

Q    And how is it that he ended up in Brooklyn?

A    He wanted a better life for his family.

Q    Do you know when he came to the U.S.?

A    He came to the U.S. in 1974, the year I was born.

Q    When he got here, what was he doing initially?

A    So, when he got here, he became a taxi driver for two months and he got into three accidents.  The third one kept him in the hospital for six months.

Q    So, he's not a great driver?

A    He says he is.

Q    So what did he do after that, did he keep trying to drive a taxi?

A    No.  He went to work for a contractor.  He used to paint kitchens and finish staircases by himself.

Q    And what happened with that work?

A    Well, he was working very hard and taking English classes at night.  And then he became a contractor himself.

Q    And what kinds of stuff was he doing?

A    He started renovating basements, and then he started doing houses and he became a very large contractor.

Q    Did your father, as you understood it, have a particular

J.A. 843

D. Motovich - direct - Jackson    2433

dream about a type of business he wanted to open?

A    Yeah.  His dream was to open a lumberyard.

Q    And was he -- what happened that led to him ultimately being able to do that?

A    In 1982, a close friend of his, Alex Berkowitz, presented him with property on Coney Island Avenue, which was at that time a very good deal — it was a mechanics shop and had all the right bases for a lumberyard — and offered it to my father.

Q    Did your father have the money himself to buy that?

A    No.

Q    How did he get it?

A    He went around to his friends and family and he put together the money and bought the property and opened Midwood Lumber in 1983.

Q    Now, when you were a kid, did you go to Midwood Lumber?

A    A lot.

Q    And can you just tell the jurors a little bit about what kind of business Midwood Lumber is, like what -- what it sells?

A    Midwood Lumber is, as you guys would know, it's like a Home Depot or a Lowe's, but a lot smaller.  It's more of a family business.  We sell everything from dry wall to beams for the house, to screws, doorknobs, stair parts, millwork, moldings, doors.

D. Motovich - direct - Jackson    2434

Q    And when you were a kid, you were a kid in the '80s, '70s -- '70s, '80s, going to the store, what did you see in terms of your father's relationship with customers?

A    He was very close with them.  He would be going out with them for dinner.  They would be coming over to the house on the holidays.  All the events.  It was like family.  He treated his customers like family.

Q    Did you go to high school in Brooklyn?

A    Yes.

Q    When did you graduate?

A    I graduated in 1992.

Q    Did you go to college?

A    I went to Brooklyn College.

Q    Did you graduate?

A    No.  I left Brooklyn College after three years.

Q    Why did you leave?

A    I started working for my father part-time in 1992 when I was attending Brooklyn College, it was five minutes away.  And in 1995, I knew that would be my career.  And I got too busy in the business, so I had to make a decision, and I left college.

(Continued on the following page.)

D. MOTOVICH - DIRECT - MR. JACKSON    2435

BY MR. JACKSON (continuing):

Q    Now, when you first started working for your father in the business, what was the first set of jobs he gave you to do?

A    So I was like his apprentice.  I would pick up checks from customers.  I would go to the banks, deposit the checks, and I would learn the material in the company.

Q    Why was it, in your understanding, your dad was sending you to go out to meet with customers to collect payments?

A    So -- to build a relationship.  He said that's how you build.  When you go to the customer, you see him, he sees you, you ask him what else he needs, how can you help him, he needs earlier deliveries, later deliveries, what type of material does he need?  There's many different types of material.  A lot of customers don't even know what they need.  For instance, a two-by-four.  A two-by-four comes in five different species.  You have doug fir, elm fir, spruce, treated, rough.  And a lot of contractors want to have a premium job, and we are a premium yard.

        MR. JACKSON:  Your Honor, can we display what's already in evidence DX 1079?

        THE COURT:  You may publish.

        (Exhibit published.)

Q    And is this one of the bays that contains -- we are talking about a two-by-four, are these one of the bays at

D. MOTOVICH - DIRECT - MR. JACKSON    2436

Midwood that would contain some of the wood that you guys sell?

A    Yes.  This is metal studs and you have some wood on the top, on the right.  The houses changed a lot more from wood now.  Most people use metal stick framing.

Q    And Midwood Lumber has a number of bays like this with workers working on moving this and sending out for customers?

A    Yes.

        MR. JACKSON:  You can take that down.

Q    Now, at the time that you were learning the business, did people always pay upfront for materials that Midwood Lumber would sell?

A    No.

Q    Can you explain what you mean?

A    So contractors, the biggest edge I had over Home Depot or Lowes is we extend credit to our clients, to our customers.  And otherwise it would be very difficult to compete with Home Depot or Lowes because sometimes they're selling material under my cost, below what I'm buying it for.

Q    What do you mean by that?

A    So a two-by-four, like they have Lowe's leaders, so some two by fours, they will put it on for $4 while it costs me $4.20.  But I explain to the clients when I meet with

J.A. 844

D. MOTOVICH - DIRECT - MR. JACKSON          2437

them, I say, first of all, they're selling you an inferior product, a different product. You see, most clients will just say, oh, a two-by-four, what's the difference between a two-by-four? That's why I brought up the different grades. I'm telling them I'm stocking a premium grade and that's why it's more money. Plus, I'm also extending you credit, which Home Depot is not.

Q  What kinds of credit does Midwood extend to its customers?

A  So we go anywhere from 30 to 90 days.

Q  Now, as stores -- I mean, obviously, I think we've all seen in our lives more and more Home Depots and more Lowes. Did that make it more difficult over time as you were learning the business?

A  Oh, very difficult.

Q  How so?

A  As the internet became a bigger, bigger factor, any customer could just type in the item and come into my office and say, Home Depot's selling it for $10.89, why are you charging me $13?

So you have to build a relationship with the customers and explain to the customers what the service -- Home Depot's not going to tell you the truck's going to be on your job site at 7:00 a.m. Home Depot is just going to give you a window from 7:00 til 5:00. Midwood Lumber's

D. MOTOVICH - DIRECT - MR. JACKSON          2438

going to tell you the truck's going to be there at 7:00, and it's going to be there at 7:00. So I say you're saving a lot of money on labor by that happening.

Q  And through, I guess, fostering those relationships with customers, has Midwood Lumber been able to thrive and survive?

A  Yes. Thank God.

Q  Now, we heard a lot during the course of this case about cash that you provided for the few people they called about this.

Let me ask you: Was there any particular event in your life, as you reflected on all of this, that was sort of critical to the evolution of this cash that you were providing thing?

A  So in 2001, I was approached by a person by the name of Joseph Richter. He was referred to me by my best friend at that time, Abraham Weisbaum. And Abraham, who is a relative of Joseph, asked me if I could help Joseph with referring him some clients to his check cashing business. And I said you're my best friend, whatever you need. Tell me what you need and I'll help Joseph out.

Q  Did you have a relationship with Joseph at that time?

A  I didn't have any relationship with Joseph.

Q  So what happened?

A  So Joseph would come by my office, I would refer some

D. MOTOVICH - DIRECT - MR. JACKSON          2439

clients to him. He was like check casher on wheels at that time. If you needed money -- he was like a broker. You needed money, you call Joseph, he come to your house, he'll give you cash, you'll give him a check. And --

THE COURT: I'm going to ask you to slow it down just a little bit. You know, the Vader as opposed to the Chris Rock. A little bit slower for the court reporter.

THE WITNESS: No problem, Judge, sorry.

THE COURT: Go ahead.

A  And he would, I guess, be a broker for one of these larger companies.

Q  And so did you end up giving money to Joseph Richter?

A  So there was an event in two thousand -- August 11, 2001, where my best friends went to Las Vegas, Abraham and six other people, and they took a helicopter to see the Grand Canyon and the helicopter crashed.

Q  Were you supposed to go on that trip?

A  I was supposed to be there.

Q  What happened?

A  My wife was pregnant with my first son. And if it was the guys only going, I would have joined them, but everybody was taking their wives and I said I'm not going to go without my wife.

Q  And why did that event have an impact on your relationship with Joseph Richter?

D. MOTOVICH - DIRECT - MR. JACKSON          2440

A  So his last wish to me was please help this guy out, he's a family member, he's struggling, he's got a family. See how you can help him build his business.

Q  After you lost your friends in the helicopter crash, was that a difficult time?

A  Very difficult.

Q  Did you end up connecting with Joseph Richter more?

A  Yes. Joseph was -- he was like my new best friend, sitting in my office.

Q  Why do you say that?

A  I was helping with a lot of business and he was trying to help -- you know, we were like getting closer and closer and I was hooking him up with business.

Q  Why? Did you need that?

A  No. I -- but I felt like I gave a promise to my best friend and I wanted to keep my promise.

Q  Did Joseph Richter ever ask you to partner with him in going into check cashing?

A  Yes, many times.

Q  And by the way, just to be clear, this is the person we're talking about who ended up opening up what's called Coney Island Payroll?

A  Yes.

Q  And he asked you to be a partner in Coney Island Payroll?

**J.A. 845**

D. MOTOVICH - DIRECT - MR. JACKSON          2441

A    Yes.

Q    So you could have been one of the owners of Coney Island Payroll?

A    Yes.

Q    Why didn't you do it?

A    First of all, I was very busy with Midwood Lumber. And second of all, I didn't want to have the headache of another business on my head.

Q    How much money do you think over the years you've loaned to Joseph Richter?

A    Millions of dollars.

Q    Now, as this -- you mentioned that you refer people to Joseph Richter.

What do you mean by that?

A    Contractors -- this is a commercial check cashing, and most of the contractors need cash. So he opened up a place, I got him an office and he rented an office in my father's building on the 4th floor and he started to legitimize more and more and more until he got licensed in -- I don't know when -- 2000, middle of 2000s.

Q    And you said your father's building. What building was that?

A    So his first office was in 1100 Coney Island Avenue, on the 4th floor.

Q    And then where from there?

D. MOTOVICH - DIRECT - MR. JACKSON          2442

A    Then he was getting busy and he asked for retail space on the ground floor, which was 1122 Coney Island Avenue.

Q    Now, over the years, between 2001 and the years that followed after that, your family was successful and prosperous?

A    Yes.

Q    Did you open up some other businesses?

A    Yes.

Q    What kind of other businesses?

A    So in the early 2000s, I had a friend of mine, another friend of mine, who lost his business in the plastic world. He was doing plastic molds and China killed his business.

Q    What do you mean by that?

A    They started importing. He used to have a factory with about 50, 60 people making plastic molds, anything you need like for pharmacies and so forth. And they started to give everything to China.

Q    You mean more companies started outsourcing?

A    Outsourcing. They outsourced that. It was impossible for him to compete.

Q    Who was that friend?

A    Steve Golumb.

Q    What happened after that?

A    So I told him, Why don't you go into the construction world? He says, I know nothing about construction. I said,

D. MOTOVICH - DIRECT - MR. JACKSON          2443

I'll help you. So we agreed. He opened the up SGS Construction Corp.

Q    And what happened after that?

A    I started to get him sheetrock job and taping jobs.

Q    Why was it that you were in a position to help him get sheetrock and contracting jobs?

A    I was supplying all these jobs. I know who needed labor. Who needed -- people always ask me. People say, do you have somebody who can put up drywall? Do you have a taper? Do you have a framer? And I refer all the people to one another.

Q    And so you were, it sounds like, with Steve, basically partner with him in some ways?

A    Yes. In the beginning, I was his partner. I just -- I was not on the bank account with him.

Q    Were you loaning him money?

A    I was funding all the jobs, yes.

Q    You were bank rolling the entire thing?

A    Yes.

Q    Why didn't you want to be on the bank account or out front?

A    Many reasons. One of the reasons are if my clients would know that David Motovich is partners with a different contractor, they would get upset. They would think I'm basically undercutting them because I'm the supplier, so I

D. MOTOVICH - DIRECT - MR. JACKSON          2444

can undercut any job. And -- which is not true, because Steve paid the same price. I mean, we paid the same price as all the other customers. But it's a psychological thing for another contractor. They always feel like they have competition. If you go and bid a job against another contractor, it's -- they're like enemies. You know, it's a different -- that's -- that's in their mind.

Q    So basically, you didn't want your customers at Midwood to think of you as a competitor?

A    Correct.

Q    Now, I want to ask you a couple more questions about SGS, but first, let me just ask you: During these years, were there some other businesses that you started?

A    I started a dialysis center.

Q    What made you start a dialysis center?

A    I had a Rabbi who passed away and -- on dialysis in the '90s, and I was watching him always have an issue with getting the right time slot or traveling 45 minutes to the closest dialysis center. He told me there were not enough stations in Brooklyn and he had to sometimes go to a -- get treated at 10:30, it's a three-and-a-half hour treatment, three times a week and it's a big strain on him. So I started looking into the -- to the business.

Q    And did you open up a dialysis business?

A    Yes. In 2006, I applied for the license and I opened

**J.A. 846**

D. MOTOVICH - DIRECT - MR. JACKSON     2445

it in 2010.

Q   What was it called?

A   Neomy Dialysis Center.

Q   Between 2006 and 2010, did you have to invest a lot to get it going?

A   Yes.

Q   Did you take on some business losses during that time?

A   You need to build it. You need to pay rent, even though it was in my father's building. You have -- any business you start, needs money.

Q   Did that end up being a successful business?

A   Very successful.

Q   Now, you were talking about SGS.
    Was there ever a point where you introduced Kemal Sarkinovic to your friend Steve?

A   Yes. So Kemal was a client of Midwood for 25, 30 years. And he was known as one of the top framers in the Midwood area. He would work for all the top contractors.

Q   What does that mean?

A   So for instance, let's say you had, who he was doing work for, MJM or Salcido, what they would do, they are the GCs. The GCs then sub out different parts of that houses. They'll sub out the frame to a guy like Kemal. They'll sub out the drywall to a guy like Steve. They'll sub out the plumbing to a plumber. They'll sub out the electrical to an

D. MOTOVICH - DIRECT - MR. JACKSON     2446

electrical person. But they coordinate everything and they normally keep three laborers on the job to keep it clean. That's what the GC does. And Kemal was known as the top framer in the Midwood area.

Q   What are the years that you're talking about where he had the reputation as the top framer?

A   So late '90s, through the whole 2000s. He still has a good reputation.

Q   And what is framing work, in general?

A   So if you see the outside of the house, when you put up the frame of the house, the roof and the sheath the house around, that's what you would do. That was his specialty.

Q   And you were selling him material during those years?

A   I was selling a lot of material.

Q   Was he successful?

A   Very.

Q   So how did Kemal end up getting involved with you and Steve?

A   So I had a close friend who was redoing his house in, I think, 2003, 2004, and I -- Steve and Kemal started to work together on some jobs and I asked him if you guys want to partner up and GC this house.

Q   What do you mean --

A   That means a general contractor.

Q   Okay, you got to my question. GC the house?

D. MOTOVICH - DIRECT - MR. JACKSON     2447

A   Yes.

Q   Okay.
    MR. JACKSON: Your Honor, I have a photograph marked as Defense Exhibit 1021. May I display it for Counsel and for the witness?
    THE COURT: Any objection to 1021?
    MR. POLEMENI: No.
    THE COURT: Admitted. You may publish.
    (Defense Exhibit 1021 received in evidence.)
    MR. JACKSON: Thank you, Your Honor.
    (Exhibit published.)

Q   What are we looking at here, David?

A   So this is the house. As you can see, this is its current condition. This house was finished in I think 2005. Basically, it looked like, if you look down more to the left, it looked like one of those houses, it was a complete gut and renovation job. That means they changed all the interior beams, they changed all the exterior beams. And then they stuccoed it. And you have a beautiful house.
    MR. JACKSON: We can take that down, Mr. Cepregi.

Q   So what happened?

A   Everything went well. Everybody was happy. Steve was happy. Kemal was happy. And they moved on to the next job.

Q   Now, I guess during the course of the trial, we heard Kemal describe himself as sort of a laborer.

D. MOTOVICH - DIRECT - MR. JACKSON     2448

    Did that match up with your experience of what you saw of his business?

A   No. Kemal had, at certain times, over 50 people working for him.

Q   And what kind of work are we talking about?

A   So in 2005, there were -- there was a very large job in Staten Island. It was called the Bay Street Landing or Bay Street -- it was right by the ferry. And TPD Industries, Ralph Gable, who Kemal was doing multimillion dollar homes for, put Kemal to basically run this job for him. That means he wanted Kemal to work for him exclusively from 2005 to two thousand -- until the job was done.

Q   What kind of impact did that have on Kemal's other business?

A   He was not taking any other jobs in my area, in the Midwood area. He was basically focused on this Staten Island job, which he needed to produce.

Q   And can you explain why this was such a big job for him?

A   I don't think he ever did a commercial job. It was a 12 or 16-story building, I think it was two of them. I was there a couple times. And he had a lot of labor on the job. He had almost 50 people on this job.

Q   And you mentioned Bay Street, but can you describe for the jurors, like what is this 15, 16-story thing that they

**J.A. 847**

D. MOTOVICH - DIRECT - MR. JACKSON          2449

were building?

A    It's -- I think it was a couple hundred apartments, very large.

Q    And why were you down there?  Why did you come to check it out?

A    So Kemal was running most of the show there, so I asked him to give Steve some work, some drywall, if he needed more people.  So yes, he took -- he was happy with Steve and he brought Steve in to this job as well.  And I was supplying all the material.  I mean, you had trailers of material going there every week.  It was one of our largest jobs.

Q    Now, I just want to situate everything we've been talking about in this time period.

As these years are rolling on, did people come to you and ask you to front the money?

A    Many times.

Q    And did you do it?

A    Many times.

Q    Why?

A    To try to help him, that's what I do.  I try to help people.

Q    You talked a little bit about what was going on with Joe Russo and you charged a percentage there, it sounds like, another -- another witness said you charged 4 percent, near 10 percent, near 2 percent.

D. MOTOVICH - DIRECT - MR. JACKSON          2450

Could you have made more money with your money doing anything other than loaning people on these short-term loans, this money on these percentages?

A    Yes.

Q    Why do you say that?

A    First of all, if -- when I loan money, I have collateral.  With Joe and John or other contractors, they give me a check or sometimes they don't even give me a check, I just front them the money.  And sometimes they, unfortunately, aren't good for it.  I'm not saying Joe wasn't.  But I'm saying there were a lot of other situations that were.

Q    And I guess, is one of the reasons that this is sort of, you know, people being good for it sometimes and not, that the construction business can be up and down for contractors?

A    Yeah.  Even for Kemal.  In 2008, as all of us know in this room, we had a big downturn in the economy.  And that project in Staten Island ended up going bankrupt.  The developer lost a lot of money.  Didn't pay some of my bills.  I'm sure he didn't pay the GC some of his bills.  And we went into some difficult times.

Q    What did that mean for Kemal's business?

A    Kemal went from 50 people to five people in a matter of, I think, three months.

D. MOTOVICH - DIRECT - MR. JACKSON          2451

Q    He mentioned a business called Latek.  What do you know about Latek?

A    So --

THE COURT:  I'm sorry, you said he mentioned or you mentioned?

MR. JACKSON:  I'm sorry, Judge.  I should have been more specific.

Q    Kemal mentioned a business called Latek.

THE COURT:  Go ahead.

A    Kemal opened an account, Latek, because Ralph Gable told him he can't continue paying all his labor in cash, and he would have to do something.  And -- so Kemal opened this company and he came to me, I believe, in 2009 with it to help him because he was not working anymore.

Q    And did you try to help him?

A    Yes.

Q    What did you do?

A    I started referring him -- he was a millworker.  He had -- he had a shop, I believe, where he lived.  The super, he was a superintendent.  So he was doing radiator covers.  If you see those fancy covers over the radiators in the house, he was building those.  And I was selling them in my showroom and he was also going and measuring them in houses and doing custom -- custom radiators covers.  And he would also do some custom doors, as well.

D. MOTOVICH - DIRECT - MR. JACKSON          2452

Q    So then what happened next?

A    We were doing business and then he said, listen, I need to get back into the -- you know, I'm used to running 50 people.  I'm not used to running, you know, five people.  Can you hook me up with some real work?  And so I -- there was a very large project that started, I believe, in 2009.  It was called the Regency in Long Island.  This was in the Five Towns, on Central Avenue.  I believe it was 260 Central Avenue.  And it was a very large project.  I knew the developer.  He was a client of mine.  And I asked him if he bid out everything, is there anything left, still, that I have somebody who would like to bid it.  He said I didn't bid out the sub-floors, the floors, the installation of the doors, the closets, some -- and the trim work.  I said perfect, that's Kemal's specialty.  I went with Kemal.  We met over there.  We signed the contract.  I said I would partner up with him on the -- because he couldn't handle -- it was too large, he didn't have the money to -- to put this all together.  So the job was for, I think, a million six or a million six and change was the initial contract without the extras.

Q    And you fronted the money for it?

A    I fronted a lot of money for it, yes.

Q    What ended up happening?

A    Everything was good.  The job was done.  Contractor was

**J.A. 848**

D. MOTOVICH - DIRECT - MR. JACKSON    2453

happy. Everybody -- I mean, I didn't really make money on it because Kemal was living off the job. But I sold a lot of material, so I made money for Midwood Lumber, so I was happy.

Q    Now, I want to come back to a little bit what you talked about with Kemal, but I just want to ask: You were talking about some of the cash that you would front for people. Did anything happen in or around 2013 that led to you having an increased role in Midwood Lumber and, you know, responsibility?

A    Yes, so in 2013, my father was diagnosed with a brain tumor, so it was a very difficult time for the family. And he asked me to step in and start handling his meetings besides my meetings and take a much bigger role in the company.

Q    What happened with your father? Was he hospitalized?

A    He was hospitalized, yeah, at NYU, so he was out for like a year, almost -- a little over a year.

Q    Your father had basically been the head of the company since the beginning?

A    Always.

Q    What did that mean in terms of the way you thought about how you needed to relate to customers?

A    I need to treat them like family, the way he taught me.

Q    Did you ever have concerns during that time period that

D. MOTOVICH - DIRECT - MR. JACKSON    2454

Midwood Lumber could lose customers?

A    I was always afraid. You know, when the boss is not there, people aren't, you know, as we saw.

Q    So at that time did you start fronting money for people more who asked you to front the money?

A    Yes.

Q    And we heard about these certificates that were created.

Let me just ask you: Did you ever, at any point, think that because of those Worker's Comp certificates that people on jobs would be covered by insurance?

A    No. Anybody on the job had insurance. The certificates I gave them, they just wanted to show that -- when they got a workman comp audit, they need to show that if they write a check, that these people had insurance. There was no labor -- had nothing to do with labor.

Q    Now, I want to ask you about some additional people. So we were talk about Kemal, okay. What happened next with Kemal?

A    So Kemal, as we know, the market picked back up in 2013. The Midwood area started to get revitalized. Construction started to boom again. And the owners of the last project called me and said they were very happy and do you want to price something else out. Kemal was coming to Midwood Lumber three times a day. And I said, Kemal, do you

D. MOTOVICH - DIRECT - MR. JACKSON    2455

want to do a job upstate? He told me yes.

Q    What was that job?

A    That job was called Dunbar. It was on 635 Broadway in Monticello.

Q    And basically, in very short fashion, like what was the job? We heard a little bit about it.

A    So the job was a seven-story building. It was a rental, rental apartments. I think it was 90-something units or around a hundred, 96 or a hundred units. And that's the job.

Q    At some point did Kemal -- or did a person named Ago Kolenovic become involved in it?

A    Yes. Kemal told me I'm too busy, I don't want to leave the houses that I'm doing in the Midwood section and you know I have the best name in the neighborhood, there's only one Kemal, everybody wants Kemal, so I have a good friend of mine, his name is Ago Kolenovic. And I said can he do the job, because otherwise let's not get involved. He says, I guarantee he's going to do this job properly.

Q    And did you know Ago at all at that point?

A    First time I ever met him was when Kemal brought him to me.

Q    So what happened next?

A    So Ago comes in and says -- gives a price for the job.

Q    What was the price?

D. MOTOVICH - DIRECT - MR. JACKSON    2456

A    $300,000.

Q    And then what happened?

A    To hang the doors. So I said, okay. I said you need to buy the material. He says, what are you looking for? I said I'm looking for you to buy the material from Midwood Lumber. Kemal says you are a big contractor. My goal is for you to buy not just this job from Midwood Lumber, but to buy all your jobs from Midwood Lumber.

Q    And did you end up paying him money on this contract?

A    So he collected $250,000 on this contract and he did about two floors, two, two-and-a-half floors of work.

Q    Out of how many?

A    Out of seven.

Q    And did he end up walking off the job?

A    He came to my office and he says, Dave, I'm very sorry, I underbid the job, I used the money for the job to pay other jobs. And I said, So what are we going to do? He says, I'm going to pay you back every dollar.

Q    He saw, during his testimony an image of the blank checks that he gave you.

Why did he give you blank checks for Ago & Alaudin?

A    So he dropped me off the checks. He says, Dave, look. I'm giving you checks. When I have money, I'm going to call you and you could deposit the check. Make out the check, I

**J.A. 849**

D. MOTOVICH - DIRECT - MR. JACKSON          2457

trust you. I said you trust me? I trusted you with hundreds of thousands of dollars. And he left me blank checks.

Q   And did he tell you to continue to do business under Ago & Alaudin?

A   He told me you can keep the company, you can do whatever you want to finish this job. I just have no money to complete the job.

Q   So what ended up happening? Were you able to complete the job?

A   Next meeting was with Kemal. I said, Kemal, you brought me this Ago, this is your friend.

Q   And let me ask you, why did you care so much about whether the job was completed apart from the money that you fronted for this, why did you care so much? Like who was the developer?

A   The developer was David Newberg, he was a very large developer who was doing millions of dollars of supplies with him. He was one of Midwood Lumber's top customers. And I said I can't screw over any customer besides my top customers. And I said I gave my word that you were going to complete this job.

Q   So who did you hire to complete the job?

A   So I had a meeting with Kemal. And I said, Kemal, how do you want to complete this job? He says, Let me talk to

D. MOTOVICH - DIRECT - MR. JACKSON          2458

Ago. Kemal went and spoke to Ago and Ago gave us the name of the framer that we found out he subbed out the job to additional -- to an additional framer whose name was Eddie Ruilova, as we saw in evidence. And we ended up making a deal with him to finish the job.

Q   In terms of that entire project, how much money were you out from Ago?

A   I lost, on that job, almost $200,000.

Q   Now, I just want to flash to a company called SGS. We already talked about before. You talked a little bit about this with Kemal, but how did SGS develop?

A   So when Kemal took the job, he had no insurance. And to get a -- so what contractors do is they piggyback off each other sometimes, because insurances are a lot of money. So if they tell the insurance company, cover me -- basically, if he goes partners with Steve, there's nothing wrong, they're partners, they're doing two jobs. So instead of paying an additional $50,000 or whatever it is for insurance, insurance company may only charge him an additional 5,000 or 7,000 for the additional job. So they can save a lot of money. The more jobs you have, the cheaper your insurance rates are. So that's why for the small guys, it's very hard to compete, because insurance, you know, if you gotta charge a customer an additional 50,000, you're going to lose the job.

D. MOTOVICH - DIRECT - MR. JACKSON          2459

Q   And did they end up sharing it? Was the name shared?

A   Yes.

Q   What about ZKC? How did ZKC start?

A   So ZKC is a little bit similar, but I wasn't involved directly with the framer there. One of my partners was, who was a big builder, he had his superintendent, Reginald Garcia. He said he needed a company and he was going to sub out the work to him so he can deal with paying his own workers.

Q   Now, when you say "superintendent," what do you mean?

A   That's what he called him. He was like a superintendent on the job. He would --

Q   Like for construction work?

A   For construction. They were doing large construction jobs, yes.

Q   And were you a part of these early conversations where, you know, your partner was talking to Reginald Garcia about whatever it is that they were going to do?

A   No.

Q   Did you ever meet Reginald Garcia?

A   I met him for 30 seconds when he came to Midwood Lumber to open the account with Dannette Hyatt Sullivan.

Q   And what happened there?

A   So I called Dannette. Dannette's -- we'll get into that soon I assume. But Dannette's a friend of the

D. MOTOVICH - DIRECT - MR. JACKSON          2460

family's, been my banker for, I don't know, 25 years. And I asked her if she wants another account. She said of course. I said, Do you want him to come to the bank or do you want to meet him in his office, my office? She goes, No, Dave, I love coming to your office. Have him come to your office, please.

Q   And what happened?

A   Reginald showed up on time at 10 o'clock. I called Dannette. She goes she's running late. I said, What does late mean? She says, An hour late. I said, Well, the guy can't stay here for an hour. So I said to her, What do you want me to do? She says, Just take -- ask your secretary to take a copy of his license and his Social Security card and then I'll deal with it.

Q   Now, from your limited i interaction with Reginald Garcia and with -- this involved Josh Markovics, right?

A   Yes.

Q   From your limited interaction with him, did it appear that Reginald Garcia understood he was opening up a bank account?

A   Of course.

Q   And after that situation, you never interacted with Reginald Garcia again, right?

A   That's it.

Q   Do you know what all the conversations were between

J.A. 850

D. MOTOVICH - DIRECT - MR. JACKSON          2461

Markovics and Garcia?

A    No.

Q    Do you know one way or the other whether they ever went into Carver Bank?

A    No idea.

Q    Now, at any point -- we heard this call where Reginald Garcia called Markovics and was on the recording saying whatever he was saying to Markovics.

You heard that call in court?

A    Yes.

Q    Did you ever know anything about that call?

A    No.

Q    Did he ever call you like that?

A    Never.

Q    Now, on the call, did you hear when he makes mention of a debit card?

A    Yes.

Q    In your experience, do check cashers give out debit cards?

A    Never.

Q    Did ZKC, did that company do any real work?

A    Yes.

Q    Like what?

A    They did -- I know they did a job, 2950, I believe, the address, 59th Street, in Borough Park, because I was a

---

D. MOTOVICH - DIRECT - MR. JACKSON          2462

partner in that building.

Q    And what was the job, basically?

A    It was a commercial building on 59th Street.

Q    And at some point, was that account closed?

A    Yes.

Q    Why?

A    Reginald asked Markovics to close it.

Q    That was your understanding?

A    Yes.

Q    Were you present for that conversation?

A    No.

Q    You mentioned Dannette Hyatt-Sullivan a second ago. How did you first get to know Dannette?

A    I met Dannette in the '90s, when I was going to the bank for my father. The bank was on Eastern Parkway in Crown Heights. I used to drive from Midwood. And she, at that time, in the '90s, she was the assistant head teller, not even the head teller yet, at Eastern Parkway location.

Q    Banco Popular?

A    Banco Popular.

Q    And did something end up happening with Dannette, having nothing to do with you, that led to her leaving the bank?

A    Yes.

Q    And then where did she go?

---

D. MOTOVICH - DIRECT - MR. JACKSON          2463

A    Then she went to Carver Bank.

Q    Did you continue to bank with her?

A    So she came to me and she says, David, I just moved to Carver Bank. Can you give me some business? Can you give me all your business? I said, How's the bank? She goes, No, bank is great, anything you want, we can take care of. I said, Are you sure, because I'm banking now with the big banks. No, I'm going to personally take care of this account.

So I opened -- I actually opened -- I gave her all my accounts because it was Dannette. She's part of the family. You know, when a family member comes to you, you give them your accounts.

Q    Did Dannette come to your family functions?

A    She was at my wedding. She was at my Bar Mitzvah. She was at my birthday party every year.

Q    Your kids' birthday parties?

A    My kids -- my birthday party, my birthdays, my kids. Not my kids as much as mine, it's Midwood Lumber.

Q    Do you think if you had been involved in some kind of bank fraud scheme with Dannette, you would have been inviting her to family functions?

A    No.

Q    Now, there's another company mentioned called Advertising on the Go involving a guy named Robert Lovy.

---

D. MOTOVICH - DIRECT - MR. JACKSON          2464

MR. JACKSON:  Can we actually display, Judge, in evidence, GX 20?

THE COURT:  You may display.

(Exhibit published.)

Q    Who is this gentlemen?

A    Robert Lovy is a friend of mine for probably 30 years.

MR. JACKSON:  We can take that down.

Q    And how did the advertising on the go account open up?

A    So Robert goes -- before Robert used to have a small place, like you would get plates for your cars or for your trucks, he would help you register all your DMV work, he was like an agent. And that business, that business, once the internet, again, that faded. And he was looking for something new to go into. So I told him, again, we sat, and I said, this is a good idea, why don't you open an advertising company and you can go around to all the contractors, I can get their free billboard space, all the fences, like you see on the construction sites, and you can advertise companies there.

Q    In a nutshell, what happened?

A    I introduced him to the family lawyer, at that time was Harold Stangler and we sat. And Harold advised him also to open a consulting company. And he opened a consulting company. And he opened an advertising company. I set him up with meetings with contractors. I even set him up with

J.A. 851

D. MOTOVICH - DIRECT - MR. JACKSON          2465

people who wanted to advertise, but his mind was somewhere else.

Q    What do you mean by that?

A    He was a professional poker player. He loved to gamble.

Q    So account would open for that, try to run a business, and it basically didn't work out?

A    Correct.

Q    All these accounts we're talking about, did you use these accounts sometimes for the loaning of money we have been talking about?

A    Yes.

Q    Now, let me just ask you, did you ever -- you heard mention of a guy, we heard the testimony of a Mr. Leshkowitz during this trial?

A    Yes. My attorney.

Q    And there were some wires that Mr. Leshkowitz talked about, right?

A    Yes.

Q    Were you trying to launder money with any of those wires?

A    No.

Q    We heard discussion about your uncle.

        MR. JACKSON: If we can show GX 28, Your Honor.

        THE COURT: In evidence, you may publish.

---

D. MOTOVICH - DIRECT - MR. JACKSON          2466

        MR. JACKSON: Thank you, Judge.

        (Exhibit published.)

        MR. JACKSON: You can just zoom in, Mr. Cepregi.

Q    Who is that?

A    That is my uncle. He runs the sales downstairs in the store from Midwood Lumber.

Q    How is he your uncle?

A    He is married to my father's sister.

        MR. JACKSON: Okay, we can take that down.

Q    And why was it that you paid your uncle's life insurance through some of these accounts?

A    My uncle was, very nice of him, when I was buying my first house -- actually, my first house in Mill Basin, I was short some money, and he loaned me the money.

Q    How long ago was that?

A    2002.

Q    And so you paid him back over the years?

A    Yes. With interest.

Q    Was it some calculated interest, or was it just like you felt like more?

A    I didn't calculate interest. I felt like I owed him. I was doing well. And I wanted to take care of him. I love him. And I felt like I owed him and I did.

Q    We also saw a bunch of times, your wife's bags, that came into the courtroom and stuff.

---

D. MOTOVICH - DIRECT - MR. JACKSON          2467

        How long have you been married?

A    I'm married 24 years.

Q    How many kids do you have?

A    Four boys.

Q    Has your wife been a good wife to you?

A    My wife is the best.

Q    Why were you buying her bags?

A    Because I love my wife. I want to show my love to her. I want to buy her -- I had -- I had -- she gave me four beautiful boys and our tradition, you know, we buy birthday gifts, we buy new year's gifts, when they have a kid, we bring them a gift as well.

Q    Did you ever buy any gifts for your wife with anything other than your money?

A    I only used my money for my wife's gifts.

Q    Did you ever pay your AMEX with anything other than your money?

A    I only paid my AMEX with my money.

Q    There was a point where the agent held up that butterfly pendant that you bought for your wife. I think that was purchased, the receipt said December 31st or something close to that.

        What was the reason for that?

A    So my wife also, she was from the U.S.S.R., which today is actually Minsk, and their biggest holiday is new year's,

J.A. 852

---

D. MOTOVICH - DIRECT - MR. JACKSON          2468

that's the only holiday they were allowed to celebrate, so it's a big thing for her, so every new year's I buy her a gift.

        (Continued on the following page.)

Motovich - direct - Jackson          2469

BY MR. JACKSON:  (Continuing)

Q    It was only the holiday that you were allowed to celebrate when it was in the U.S.S.R.?

A    Correct.

Q    Now, we heard some discussions, some allegations of witness tampering.  Did you ever try to tamper with a witness?

A    No.

Q    Did you ever threaten anybody?

A    Never.

Q    Why was it that when Phillip Adamou was reaching out to you asking you to talk, you were willing to talk to him?

A    Phillip was a friend and if somebody calls me, I'll always say please, come talk to me, no problem.

MR. JACKSON:  Can we look at DX-1700 already in evidence, Judge.

THE COURT:  You may publish.

MR. JACKSON:  Thanks.

Q    What was going on here with you and Phillip?

A    So I was having dinner in his hometown, as they say Cyprus.  He invited me to a beautiful dinner.  I was in Israel, he told me jump over, come over, and come see my country.

Q    Was it a nice dinner?

A    Beautiful, beautiful place.

MR. JACKSON:  We can take that down.

Motovich - direct - Jackson          2470

Q    And so let me just ask you, there were a couple of points on that recording that we listened to where you were basically saying to him:  I don't want to be accused of obstruction of justice.  Why were you saying that?

A    Because he kept implying, he kept saying things to me that in my mind would be obstruction.  So I told him we've got to meet with an attorney.  I said:  Anything you want to ask me about anything besides, you know, where you want to have dinner or whatever it is, we've got to talk in front of my attorney.

Q    And is some of the things -- were some of the things that he was saying the unintelligible parts on that conversation?

A    Yes.

Q    There was a point where you talked about, you know, that he would sleep better.  You heard him on the witness stand say that he sleeps really well now.  Is that something that he was saying frequently, that he wanted to sleep better?

A    Yes.

Q    There are also a couple of points in the transcript where you were saying "Shh, shh, shh."  Why were you saying that?

A    He was talking very loud.  I had clients in my other office right next door.  That's why we didn't have the meeting in my office.  We had it in Zella's office in the front.  There's a little small office before you get to my office as you saw in the exhibits.  And I told him:  Keep your voice

Motovich - direct - Jackson          2471

down.  For some reason, he normally talks very low, but at that date, his voice was very high.

Q    Now, there's an allegation in this case that you engaged in money laundering.  Have you ever dealt with anything like a Colombian cartel or anything like that?

MR. POLEMENI:  Objection.

THE COURT:  Sustained.

Q    Okay.  There's been some reference to your taxes.  Does your family own a significant amount of real estate?

A    Yes.

Q    Have you ever taken out loans on that real estate?

A    Yes.

Q    We also saw that in Agent Cabane's charts, there's, like, 55 million that churned through over the years in the accounts.  At any point, were you sitting on $55 million in cash?

A    No.

Q    What is your family's net worth tied up in?

A    My family's net worth is tied up in real estate and Midwood Lumber, some businesses and mostly real estate.

Q    Have you and your family had to work hard to protect the value of that real estate and those businesses?

A    Very hard.

Q    You mentioned, you mentioned Neomy, the dialysis center.  Do you also operate a business called Sherman Abrams?

Motovich - direct - Jackson          2472

A    Yes.

Q    What is Sherman Abrams?

A    We do all different types of testing from, as most people know here, COVID testing all the way down to CBC blood tests.

Q    And in the first several years you opened that business, did you have to invest a lot to get it going?

A    Yes.

Q    Has it become a successful business?

A    Very.

Q    How many employees do you have there?

A    Over 350.

Q    How many employees does Midwood Lumber have?

A    Over 50.

Q    How many employees does -- how many employees did Neomy have?

A    Neomy had also around 50, 60 employees.

Q    Did you end up selling that business?

A    Yes.

Q    And a lot of the profits and income for those businesses, am I correct that they are reflected on other tax returns besides your personal one?

A    Yes.

Q    You also, you also -- we talked a little bit about your personal tax returns.  Did those personal tax returns reflect some of the charitable giving you've done?

J.A. 853

Motovich - direct - Jackson          2473

MR. POLEMENI:  Objection.

THE COURT:  Overruled.

A    Some of them.

Q    Am I right that on those tax returns, there are hundreds of thousands of dollars in charitable giving that became part of a deduction in single years?

A    Yes.

Q    What kinds of charitable giving?

A    I normally look to give to my community religious sites, obviously, synagogues, but I give it to the mosques, to the churches, to, or with cancer for kids.  Many, many charities.

Q    And we talked a little bit about this time period, COVID. During the COVID time period, was that a difficult time to maintain employees?

A    Very difficult.

Q    And were there occasions when you paid employees in cash for some periods additional?

A    Yes.

Q    Have all of your workers overwhelmingly been paid on the books?

A    Yes.

Q    Are you a tax expert?

A    No.

Q    During the years 2012 to 2019, if we talk about all of the taxes that your family has paid and you have paid, are we

---

Motovich - direct - Jackson          2474

talking about millions of dollars in taxes during these years?

A    Yes.

Q    There's an allegation that you tried to impede the IRS. Did you ever, ever try to impede the IRS?

A    Never.

Q    Did anyone from the IRS ever reach out to you to ask you what was going on with any of these companies?

A    Nope.

Q    Did you ever try to plant false evidence with the IRS?

A    No.

Q    I just have a few more questions for you, Mr. Motovich.

We saw from the time that you first learned about the investigation, I understand was in 2019?

A    Yes.

Q    And then what were you talking about at the beginning, when you ended up being arrested in 2021, a couple of years went by, right?

A    Yes.

Q    And during that time, you had all the cash that we saw the agents brought into the courtroom?

A    Yes.

Q    You had all of the evidence that we saw that was displayed that was found at Midwood Lumber, the papers and everything like that, and at your house?

A    Yes.

---

Motovich - direct - Jackson          2475

Q    Am I correct that in those two years, if you had wanted to, you could have gone to any country in the world?

A    Yes.

Q    And you never tried to run away?

A    No.

Q    You never destroyed any of those items that the agents brought into the courtroom?

A    No.

Q    Did you ever steal any money from any banks?

A    No.

Q    Did you know you had made some mistakes like with the worker's comp certificates?

A    Yes.

Q    Did you ever steal a nickel from anybody?

A    Never.

Q    During this entire time that this played out, did you ever think that you were violating any federal laws?

A    No.

Q    Do you still believe that?

A    Yes.

MR. JACKSON:  I don't have any additional questions at this time, Judge.

THE COURT:  Cross-examination?

MR. POLEMENI:  Yes, Judge.

---

Motovich - cross - Polemeni          2476

CROSS-EXAMINATION

BY MR. POLEMENI:

Q    How's it going, Mr. Motovich?

A    Okay.

Q    Good.

So Mr. Jackson asked you has anyone -- had anyone from the IRS ever contacted you about ZKC, for example?

A    No.

Q    How could they?

A    The same way you contacted me.

Q    The same -- that's good.  They didn't have your name, right?

A    The bank had my name.

Q    Who at the bank had your name?

A    Dannette.

Q    The woman you were paying money to facilitate transactions through your account, right?

A    I never paid anybody money to facilitate any transactions.

Q    How about CNBC, could the IRS have contacted you to talk to you about CNBC?

A    Same way.

Q    And which way is that?

A    They could have called the banker.

Q    Which banker?

J.A. 854

Motovich - cross - Polemeni      2477

A    The banker who would have called and would have spoke to Kemal and Kemal could have referred him to me.

Q    SGS Construction?

A    Same way.

Q    Same way?  They would have had to call Kemal, then Kemal would have called you, and you would have just resolved all of this?

A    I don't hide anything in my life.

Q    You don't hide anything in your life?

A    No.

Q    Okay.  Ago & Alaudin?

A    Same way.

Q    Midwood USA Consulting?

A    Same way.

Q    They -- rather than you put your name down on the accounts, it was just easier for the IRS to call the banks and the banks to call Kemal and then Kemal to call you; is that what you're saying?

A    I'm not saying -- that's what you're saying.

Q    Well, what are you saying?

A    I'm saying the same way you found out, they could have found out, and you did find out.  So I wasn't hiding anything. I don't look to hide anything.

Q    Okay.  Mr. Motovich, so let's talk about the check cashing business that you had.  You had one, right?

Motovich - cross - Polemeni      2478

A    No.

Q    You weren't cashing checks for customers from your second floor office at Midwood Lumber for, let's say, at least 8 to 9 years?

A    I was fronting people money for checks.

Q    You were -- okay.  Could you just explain that to us?

A    Somebody, if they wanted to go to a check casher, if they needed to cash a check, I would refer them to Coney Island Payroll.  If they needed a favor like the three people who were sitting here on the stand, these people normally came to me because there was a different reason for not to cash a check.

They needed to cash a check but they didn't need -- they could go to a check casher to cash a check.  They came to me because they needed either an advance, they needed me to front the money or they needed something else.

Q    Okay.  So they could have gone across the street to Coney Island Payroll Services, right?

A    And they did, a lot of them.

Q    Who?

A    Roman.

Q    Roman went to across the street to Coney Island Payroll Services?

A    Roman had an account in Coney Island Payroll Services, yes.

Motovich - cross - Polemeni      2479

Q    And you told us I think you said that he cashed maybe three checks there?

A    I don't know what he cashed.  I'm not the owner of Coney Island Payroll so I don't know what he cashed there.

Q    Was he lying?

        MR. JACKSON:  Objection.

        THE COURT:  Overruled.

A    I don't know if he was lying.  You're the IRS.  You're the government.  I'm sure you know what he cashed.

Q    He cashed, he said, at least over $2 million with you through the years, right?

A    I had a lot of different business dealings with Roman.

Q    Well, are you saying he did not cash checks over $2 million with you?

A    I'm saying I fronted him a lot of money.  Could have been $2 million.

Q    So over the years, you had $2 million in cash in Midwood Lumber and Roman Kretsula walked out of your office with $2 million in cash over the years, is that right?

A    It was over an eight year period.

Q    But it is correct that that's what happened, right?

A    I don't have the exact number in front of me.

Q    Joe Russo?  Similarly, he cashed a lot of checks, millions of dollars worth, right?

A    As you said.

Motovich - cross - Polemeni      2480

Q    Well, he was here.  You heard him.  Was he lying?

A    He said different things.  He says I fronted him, I helped him with his cash flow for his business.

Q    Phillip Adamou?

A    Phillip Adamou was same thing.

Q    Yes, same thing.  Over the years, they walked out of your office with over $6 million in cash, right?

A    Not just my office.

Q    Not just your office?

A    I said they went to Coney Island Payroll and they walked out with money from there as well.

Q    I think they said a couple of times they went when you didn't have cash in your office.  You, you told them to go across the street to Coney Island Payroll and pick up the cash, right?

A    I told them they should go cash the check there, yes.

Q    Well, they didn't cash the check there, right, Mr. Motovich?  They cashed it with you?

A    Normally, their checks weren't good on that same day so they couldn't cash it at Coney Island Payroll.  Otherwise, they wouldn't pay the additional fee to pay me.  Why would they pay the additional fee?

Q    Well, Mr. Motovich, they couldn't bring a check for Ago & Alaudin that they made out to Ago & Alaudin or to ZKC or to CNBC and cash it at Coney Island Payroll Services, could they?

J.A. 855

Motovich - cross - Polemeni                    2481

A    Well, they could have made their check out to their name or one of their other companies or they could have opened, like they got checks -- as Russo said, he was using Bay Street check casher, I believe, out in Staten Island, but he came to me when he needed me to front him some money.

Q    And you told them, Joe Russo, Phillip Adamou, Roman Kretsula and there were others, right?

Mr. Motovich, you had other customers, right?

A    I didn't hear anybody on the stand.

Q    Yes, but that wasn't my question.  You've had other customers, right, Mr. Motovich?

A    I've had other people I've done favors for.

Q    Favors, that's what you call this, a favor?

A    Yes, this was a favor.  It wasn't a business for me.  If I wanted to be in business, I would have been gone, been partners with Joseph Richter in Coney Island Payroll.

Q    But that's not true, right, Mr. Motovich, because you would then have to go through all those pesky regulatory rules that you didn't want to comply with, right?

A    I wouldn't have to do anything.  People, you have compliance officers in these companies.

Q    And you couldn't charge 15 percent, right?

A    I never charged anybody 15 percent.

Q    You didn't charge Roman Kretsula 15 percent to cash his checks?

---

Motovich - cross - Polemeni                    2482

A    I charged -- never charged him.  If he would pay me 15 percent to cash a check, he wouldn't be in business today.

Q    He's lying?

A    Yes, he's lying.

Q    Joseph Russo, did you charge him 10 percent?

A    I charged him 10 percent because he was making me hold checks sometimes more than two weeks.

Q    Is there any evidence of that?

A    Is there any evidence?

Q    Yes.

A    Of course.

Q    Well, you were here the entire time, right, and you saw all these checks, hundreds of checks that were put up on the screen.

Any evidence other than your word that that's what happened?

A    It's my word against his word.

Q    Okay.  So when Mr. Russo walked in with a check for, let's say, $40,000, right, and he walked into your office and you gave him, what, $36,000?

A    I didn't give him 36,000.

Q    In cash?

A    If -- when he brought that check for 40,000, he already owed me probably twenty-something thousand that I fronted him during the time that he brought me the check.

---

Motovich - cross - Polemeni                    2483

We had a different relationship.  I go way back with his, my father and his father.  He did -- actually Russo, they did the buildings for me on Coney Island Avenue.  His father put up the building for my father.

Q    And Mr. Russo, I think, told us about that?

A    Yes.

Q    He wasn't lying about that, right?

A    No.

Q    He's just not telling the truth about the checks, right?

A    No.  He did bring me the checks.  He did bounce checks many times on me because I was holding them and he said deposit the check on Thursday.  The check was deposited Thursday.  The check bounced on Monday, come back, replace it, but he would always replace it.  He was good.

Q    He bounced a lot of checks?

A    Probably bounced three or four checks.

Q    Did you see any of those bounced checks?

A    You --

Q    Did you see any evidence of those bounced checks?

A    You probably have them but you didn't want to show them.  I'm sure you do.  Cabane is very good.  I'm sure he would have made us a chart of those bounced checks.

Q    Do you want to go through the bank accounts?

A    We can go through them.

Q    Okay.  Maybe we will.

**J.A. 856**

---

Motovich - cross - Polemeni                    2484

A    I'm here.

Q    So, Mr. Motovich, when you told Mr. Adamou, for example, to go across the street to pick up money, why were you able to tell him to go across the street to pick up money from Coney Island Payroll Services?

A    Coney Island Payroll Services owed me, still owes me a lot of money.

Q    You control it, right?

A    I don't control anything.  Then you would see my name on it.  If I control something -- that's a licensed business.

Q    I think it's fair to say, Mr. Motovich, that you control a lot of things that you don't like to put your name on, isn't it true?

A    I don't control licensed businesses and I, I have nothing besides loans to them.

Q    It's the licensed part that you don't like, right?  Yes or no.

A    The licensed part?

Q    Being licensed.

A    Actually, I like to be licensed.  I like licensed businesses.  My lab, my dialysis centers, we all need licenses.  Midwood Lumber, we all have licenses.  All the companies have licenses.

Q    Except the check cashing ones?

A    I don't run a check cashing business.  There is one

Motovich - cross - Polemeni          2485

across the street.  It's called Coney Island Payroll.

Q    Okay.  Now, we saw, I believe, and I think you saw too, correct me if I'm wrong if you didn't see it -- there was a, some documents that say Coney Island Payroll?  You showed them and your name was listed a bunch of time for expenses.  Do you remember that?

A    Yes.

Q    Coney Island Payroll owes you expenses, right?

A    No.  They sometimes -- I had a lot of loans, I still have loans by them, so sometimes they gave charity, like they would put a charity and they said, Dave, let's go partners, or Joseph Richter would say, Dave, you're my partner in this charity.  I said, Whatever you want.  So he would list my name so we would deduct it off the interest that he would have to pay me.  So that's why you see expenses.

I also -- I was a close friend of Joseph and I made him an additional credit card.  So he would always owe me money and what he did internally, I don't know.

Q    He owes you a lot of money?

A    Joseph owes me a lot of money, still does.

Q    And that's all memorialized in a loan agreement?

A    Yes, you saw it on, I believe -- you saw it in evidence.

(Continued on next page.)

---

D. Motovich - cross - Polemeni          2486

CROSS-EXAMINATION (Continues)

BY MR. POLEMENI:

Q    We saw a promissory note, I think it was for $1.2 million that Joseph Richter and Coney Island Payroll Services owe you, right?

A    Yes.

Q    There was one for $300,000, is that right?

A    Yes.

Q    And other people owe you loans because -- owe you money because you give them loans, right?

A    Correct.

Q    And those are all reflected in promissory notes, right?

A    Some are.

Q    The loans that you gave Joseph Russo, did you have a promissory note for those?

A    That was I fronted him money and I -- he used to front it with a check.  It works a little different.  Those were, as you say, like payday loans, cash, like small -- not -- not -- he gave me a check and I trusted him.

Q    So, it's a subset of loans, it's a payday loan?

A    I don't know, whatever you want to call it, but --

Q    Well, you called it a payday loan.

A    I said --

THE COURT:  Don't talk over each other.

Put a question.  Get an answer.

---

D. Motovich - cross - Polemeni          2487

BY MR. POLEMENI:

Q    You called it a payday loan, so I'm just trying to figure out what you meant by that.

A    It came to my head, the payday loan business.

Q    What do you mean by that?

A    People get loans.  Then you have those payday loans.

Q    And how does that work?

A    People -- I think it's cash advance.  They borrow money for a short period of time and they pay high interest.

Q    You weren't doing that?

A    No.

Q    Because you were getting a check and you were giving cash in exchange, right?

A    I was getting post-dated checks or I was fronting him money sometimes without a check because I had relationships with my clients and we had a trust.  My father always taught me, a handshake from a real man is his word.  Somebody tells you something --

(Court reporter seeks clarification.)

A    A handshake from a real man is his word.

Q    Are you done?

A    Yes.

Q    We saw a bunch of insurance policies that you paid for for Abe Fridman, correct?

A    Yes.

---

D. Motovich - cross - Polemeni          2488

Q    And Mr. Jackson asked you why did you pay for those insurance policies, and can you tell us why again?

A    He gave me a loan in 2002.

Q    I guess the other question is why did you use money from Ago & Alaudin to pay it?

A    It was my money.

Q    That's -- the money in those accounts is yours?

A    Yes.

Q    All of it?

A    Yes.

Q    All $55 million that we saw on those subject bank accounts?

A    It was 55 -- 53 million went through the accounts, but not all of it, but most of it.

Q    Well, how much was yours?

A    I don't have a -- I don't have the figures.

Q    Why not?

A    Because I don't know.

THE COURT:  Speaking of figures, it's 4:15.  So why don't we take a 15-minute comfort break and we will resume at 4:30.

Do not talk about the case.

And, Mr. Motovich, do not speak with anyone about your testimony during the break.

All right.  Enjoy your break, ladies and gentlemen.

J.A. 857

Proceedings                    2489

The jury will be back at 4:30 and we will continue to have our hard stop at 5 o'clock, as we have throughout the trial.

Thank you.

THE COURTROOM DEPUTY:  All rise.

(Jury exits.)

THE COURT:  The jury has left the courtroom.

You may step down, Mr. Motovich, and return to your table with your counsel.

You may be seated, ladies and gentlemen.

Do we have any issues to discuss in the absence of the presence of the jury?

Anything from the Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Anything from defense counsel?

MR. JACKSON:  Nothing, Judge.  Thank you.

THE COURT:  Okay.  Enjoy your 15-minute comfort break, and then we will resume.

MR. JACKSON:  Thank you, Judge.

THE COURT:  Thank you.

(Recess taken.)

(In open court - jury not present.)

THE COURTROOM DEPUTY:  All rise.

(Judge Kuntz entered the courtroom.)

THE COURT:  Would the witness please return to the

Proceedings                    2490

stand?

(Witness resumed the stand.)

THE COURT:  And we are having the jury brought in.

(Pause.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please stand for the jury.

(Jury enters.)

THE COURT:  Welcome back, ladies and gentlemen of the jury.  Please sit down, and we will proceed.

Ladies and gentlemen in the public, please sit down as well.

We will continue with the cross-examination of the witness.

You are still under oath, Mr. Motovich.

THE WITNESS:  Yes.

MR. POLEMENI:  Thank you, Judge.

CROSS-EXAMINATION (Continues)

BY MR. POLEMENI:

Q    Mr. Motovich, when we broke we were talking about the money in the subject bank accounts that we've discussed at length over the past couple of weeks.

MR. POLEMENI:  Ms. Kannan, can you please put up Government's Exhibit 5003 in evidence, please?

(Exhibit published.)

Q    You've seen, you were here, right, Mr. Motovich, when the

Proceedings                    2491

very able Special Agent Cabane told us about this chart?

A    Yes.

Q    Okay.  So let's start with the top company, SGS Construction Building Corporation.

Do you see that?

A    Yes.

Q    And the deposits in that account are a little more than $4.7 million, right.

A    Yes.

Q    How much money in that account is yours?

A    I don't know.

Q    Well, is it all of it?

A    Most of it.

Q    Most of it.

What -- why is it yours?

A    Because the job, I funded the job.

Q    You funded which job?

A    This was the job 260 Central Avenue.

Q    So this was just for one job, SGS Construction?

A    It may have been for many jobs.

Q    Well, it's your money, so can you tell us what it's for?

A    The 4.7 million went to pay expenses.

Q    Which expenses?

A    I don't know.  I don't have a record in front of me.

Q    Why didn't you file taxes for this company?

Proceedings                    2492

A    It's not my company.

Q    Okay.  So the money in the account is yours, right?

A    Yes.

Q    It belongs to David Motovich?

A    Yes.

Q    Most of it, right?

A    Most of it.

Q    Maybe all of it?

A    Don't know.

Q    But it's not your company?

A    My name is not on it.

Q    Why not?

A    I'm not the owner.

Q    Why not?

A    It's Kemal Sarkinovic, we should ask him.

Q    Well, we did.

You were here for that, right?

A    And I told him to file taxes on it.

Q    You told Kemal Sarkinovic to file taxes on SGS Construction Corp.?

A    I told him to file taxes on all his accounts.

Q    Although all the money was yours?

A    Yes.

Q    Okay.  How about the next one down, Ago -- I'm sorry, M&M USA Consulting Corp., what's the amount there, Mr. Motovich?

J.A. 858

Proceedings 2493

A    2.9 -- $2,941,895.23.

Q    That's all your money, too?

A    Most of it.

Q    Why is that all your money?

A    Because I probably put most of it in it.

Q    What do you mean by that?

A    I gave loans to the company, and the company probably owes me money.

Q    There's a lot of probablies in that statement.
     Why didn't you file taxes for this company?

A    It's not my account, not my responsibility.

Q    Whose responsibility was it?

A    Robert Lovy.

Q    So the first account we looked at was Kemal Sarkinovic's.
     That's his responsibility to file taxes, right?

A    Yes.

Q    And the second account is Robert Lovy's.
     It's his responsibility to file taxes?

A    As I know, yes.

Q    And I assume you had a similar conversation with Robert Lovy:  You should file taxes, Robert?

A    Yes.

Q    Let's go to M&M USA Consulting Corp., the next line down.
     MR. POLEMENI:  Oh, I'm sorry, Ms. Kannan.  Ago & Alaudin Contracting Corp., the third line.

Proceedings 2494

BY MR. POLEMENI:

Q    How much is in that, was deposited into that account?

A    $2,135,435.

Q    All yours?

A    No.

Q    How much is yours?

A    I don't know.

Q    Well, would you say that a lot of it is yours?

A    I would say the company probably did not make $2.1 million, and I've asked Kemal to file taxes on this company.

Q    What do you mean that the company probably didn't make $2.1 million?

A    That's just the money that went into the account.  It doesn't show the expenses.  A company doesn't make $2.1 million by depositing $2.1 million inside the company.

Q    Okay.  What were those deposits for?

A    Jobs.

Q    What type of jobs?

A    Well, I know the one from 635 Dunbar.  He also was partners in many other jobs.

Q    Okay.  But we saw a lot of cash and checks from Mr. Russo and Mr. Adamou and Mr. Kretsula that went into that account, right?

A    Yes.

Proceedings 2495

Q    So that wasn't for jobs, construction jobs, right?

A    No, there were jobs.

Q    Okay.
     Who was supposed to file taxes for that account?

A    The owner --

Q    Who's the owner?

A    -- of the company.

Q    Who's the owner?

A    Kemal Sarkinovic.

Q    And you had a conversation with him about filing taxes for this account --

A    Yes.

Q    -- for this company?

A    Yes.
     MR. POLEMENI:  How about the next row down, Ms. Kannan?

Q    This is another Ago & Alaudin Contracting Corp., this is a different bank, right?

A    Yes.

Q    Do you know why your money is in two Ago & Alaudin accounts at different banks?

A    His partner was working with Chase, who was also using Ago.  And in order to have more control, he decided to move from Astoria to Chase.

Q    Whose partner?

Proceedings 2496

A    Kemal's.

Q    Kemal's partner had -- you'll have to --

A    I don't know if they were partners or he worked for him.

Q    And who's that?

A    Zorro Gobioff.

Q    Zorro?

A    Yeah.

Q    Is that also Zorach?

A    Zorach.

Q    Zorach Gobioff.
     THE COURT:  What did you say, I'm sorry?
     THE WITNESS:  Zorach.
     THE COURT:  Okay.  Go ahead.

Q    So how much money was deposited into this account?

A    $12,740,202.

Q    And that's all your money, right?

A    No.

Q    Oh, what percentage do you think is yours?

A    I asked Kemal's accountant to do a figure, Mohammed Naser, and he was trying to do calculations.  And I said, whatever's my responsibility to the tax issue, I will take it upon myself.  And he was in the midst of preparing taxes.

Q    So this was -- this was -- this account, the deposits were in 2014, 2015 and 2016, do you see that?

A    Yes.

J.A. 859

Proceedings 2497

Q    So when did you have that conversation?

A    Kemal introduced him, I believe, in 20 -- I'm not sure. I don't want to give a date that I'm not sure about.

Q    I'm not going to hold you to a particular date.  Can you approximate?

A    I don't like to approximate.

Q    And so what happened?

A    Kemal brought him as his bookkeeper, his name is Mohammed Naser.  I believe you guys subpoenaed him as well.

Q    I think that's right.

A    And he was Kemal's accountant, and I advised Kemal to pay his taxes.

Q    You advised Kemal -- I'm sorry.

You advised Mr. Naser to pay Kemal's taxes?

A    No.  I advised Kemal to pay his taxes and that's when he brought Mohammed Naser to my office to do the accounting books for Kemal.

Q    Did you file any taxes for this company?

A    It's not my company again.  It's not my name.

Q    But most of the money belongs to you?

A    Yes.

Q    We'll get to the other accounts, but before we do, did you tell -- well, Mr. Zwerman, Andrew Zwerman, he testified here yesterday.  Do you remember that?

A    Yes.

Proceedings 2498

Q    And he had been your accountant for how long?

A    Probably 15 years, maybe longer.

Q    You trusted Mr. Zwerman?

A    Yes.

Q    Your family trusts Mr. Zwerman, right?

A    Yes.

Q    He had been the accountant and the tax preparer for your father, correct?

A    Yes.

Q    Did you ever tell him about Ago & Alaudin Contracting Corp.?

A    I didn't need to.

Q    Why not?

A    Because Kemal said he had his accountant.  He was the owner of the account, he's entitled to use his accountant.

Q    Did you ever tell Mr. Zwerman:  Hey, Andrew, you're not gonna believe it, I have a lot of -- millions of dollars in these accounts, they're not in my name, the accounts, but the money is all mine?  Did you ever tell him that?

A    Again, I -- my accountant gets K-1's.  He's not the accountant for all my companies.  My accountant gets K-1's, so he's responsible to file your tax return.

Q    Who are the accountants for your other companies?

A    For Dialysis I had a firm, what was the healthcare firm, his name was Steve.  I forgot his last name.

Proceedings 2499

Q    Okay.  Steve.  Any other accountants?

A    I used those two accountants.

Q    So you used Mr. Zwerman and Steve?

A    And then I got K-1's from other partners who they used their accountants.

Q    Did you tell Steve about these companies?

A    Again, these companies are not my companies.

MR. POLEMENI:  If we can go to the next row, Ms. Kannan.

Q    This is for Advertising on the Go, do you see that, Mr. Motovich?

A    Yes.

Q    What's the amount there?

A    $1,366,777.22.

Q    It's all your money?

A    Not all.

Q    Well, can you --

A    Most of it.

Q    Most of it, okay.

Did you ever tell your accountants, whether Mr. Zwerman or Steve, about this, about this account?

A    Again, it was not my account.

Q    Did you file any taxes with the IRS or did you even file anything for the IRS in connection with Advertising on the Go?

A    It wasn't my responsibility --

**J.A. 860**

Proceedings 2500

Q    And whose --

A    -- to file it.

Q    Whose responsibility was that?

A    The owner of the account.

Q    And who's the owner?

A    Robert Lovy.

Q    And did you have a similar conversation with Mr. Lovy, that:  Robert, you should really be filing taxes?

A    Yes, I have.

Q    And did he ever say to you:  I am, David, or I'm not?

A    I don't recall.

THE COURT:  But I recall, speaking of on the go, that it is 5 o'clock.  And I recall that that's the promised time we adjourn for the day.

We will resume the cross-examination tomorrow morning at 9:30 promptly.  Have a good night.  Whether you root for the Mets or root for the Yankees, root for New York. That's my advice to you.  It's worth what you paid for it.

Have a good night.  We'll see you tomorrow morning 9:30.  Thank you.

THE COURTROOM DEPUTY:  All rise.

(Jury exits.)

THE COURT:  You may step down, Mr. Motovich.  Thank you.

(Witness steps down.)