# 25-2986

# In the United States Court of Appeals for the Second Circuit

---

UNITED STATES OF AMERICA,
APPELLEE

*v.*

MARINA KUYAN, KEMAL SARKINOVIC, JOSHUA MARKOVICS,
DEFENDANTS,

DAVID MOTOVICH,
DEFENDANT-APPELLANT

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (CRIM. NO. 21-497)
(THE HONORABLE WILLIAM F. KUNTZ, II, J.)*

---

**JOINT APPENDIX
VOLUME IV (PAGES 861-1012)**

---

JOSEPH NOCELLA, JR.
ERIK D. PAULSEN
DYLAN A. STERN
ANDREW D. GRUBIN
MATTHEW SKURNIK
UNITED STATES ATTORNEY'S OFFICE,
  EASTERN DISTRICT OF NEW YORK
*271 Cadman Plaza East
Brooklyn, NY 11201
(718) 254-7000
matthew.skurnik2@usdoj.gov*

KANNON K. SHANMUGAM
MASHA G. HANSFORD
ABIGAIL FRISCH VICE
ANNA J. LUCARDI
KRISTA A. STAPLEFORD
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com*

# TABLE OF CONTENTS

Page

Volume I

District court docket sheet ...................................................................J.A. 1

Indictment, September 22, 2021 (Dkt. 19).......................................J.A. 61

Government's proposed jury instructions,
   May 24, 2024 (Dkt. 248).................................................................J.A. 83

David Motovich's proposed jury instructions,
   May 24, 2024 (Dkt. 251)..............................................................J.A. 148

Order denying motion to suppress and motion to dismiss,
   June 11, 2024 (Dkt. 264) .............................................................J.A. 184

Letter requesting supplemental jury instructions,
   July 24, 2024 (Dkt. 318)..............................................................J.A. 231

Trial transcript, July 8, 2024 .........................................................J.A. 236

Volume II

Trial transcript, July 9, 2024 .........................................................J.A. 298

Trial transcript, July 10, 2024 .......................................................J.A. 349

Trial transcript, July 11, 2024 .......................................................J.A. 408

Trial transcript, July 12, 2024 .......................................................J.A. 467

Trial transcript, July 15, 2024 .......................................................J.A. 521

Volume III

Trial transcript, July 16, 2024 .......................................................J.A. 567

Trial transcript, July 17, 2024 .......................................................J.A. 623

Trial transcript, July 18, 2024 .......................................................J.A. 685

Trial transcript, July 19, 2024 ........................................................J.A. 738

Trial transcript, July 22, 2024 ........................................................J.A. 787

Trial transcript, July 23, 2024 ........................................................J.A. 827

## Volume IV

Trial transcript, July 24, 2024 ........................................................J.A. 861

Trial transcript, July 25, 2024 ........................................................J.A. 901

Trial transcript, July 26, 2024 ........................................................J.A. 943

## Volume V

Government exhibit 1081, email.....................................................J.A. 1013

Government exhibit 1199, extracted text messages.....................J.A. 1014

Government exhibit 5003, summary of deposit accounts............J.A. 1072

Joint letter renewing oral Rule 29 motion and opposition,
    September 12, 2024 (Dkt. 357) ...............................................J.A. 1073

Order denying renewed Rule 29 motion,
    September 16, 2024 (Dkt. 358) ...............................................J.A. 1075

Sentencing transcript, November 19, 2025 ..................................J.A. 1077

Notice of appeal, November 24, 2025 (Dkt. 454)..........................J.A. 1105

Letter revising proposed restitution and forfeiture amounts,
    December 11, 2025 (Dkt. 456).................................................J.A. 1106

*Proceedings* 2501

THE COURT: The jury has left the courtroom.

And you may be seated, ladies and gentlemen in the public. And the witness has left the witness stand.

Do we have any issues to discuss before we adjourn for the evening, beginning with the Government?

MR. POLEMENI: No, Judge.

Look, I should say yes.

THE COURT: Well, yes, no, I mean these are just words. So, you know, pick one.

MR. POLEMENI: I don't know exactly how long the rest of my cross will be, but --

THE COURT: Neither do I.

MR. POLEMENI: -- but I imagine it will be a good portion of the morning.

And so I was just wondering if Your Honor has any -- assuming there is no more defense case.

THE COURT: Well, I wouldn't assume anything because it makes an ass of you and me, and I'm already on record as, perhaps, being a clown or circus clown, so I'm already done, but you're not yet.

So, bottom line, we are going to complete the cross-examination of the witness and any redirect, and that is certainly going to be the case. We have a jury, they will be here tomorrow morning 9:30 ready to go.

MR. POLEMENI: And then, in terms of the charge

---

*Proceedings* 2502

conference, will we go right into the charge conference?

THE COURT: I'll let you know.

MR. POLEMENI: Thank you, Judge. Just wanted to check.

THE COURT: That's the answer.

MR. POLEMENI: Thank you.

THE COURT: You'll know it when you see it.

The Supreme Court justice who said that with respect to obscenity was asked and he said: I know it when I see it. And my law professor, not to drop any names, was Lawrence Tribe, who said that he once asked the justice if he knew it when he saw it, had he ever seen it. And the justice looked at him and said: Yes, Professor, once. And he smiled. He said: Many years ago when I was a very young man in the Navy, off the coast of Algiers, and the class laughed and Professor Tribe, who had zero sense of humor, said: The *off the coast of Algiers* test has proven difficult to apply in the Constitution.

So, Mr. Jackson, anything from you, sir?

MR. JACKSON: No, Judge. Thank you.

THE COURT: All right. Have a good evening, everyone, and we'll see you tomorrow morning at 9:30.

MR. JACKSON: Have a good evening.

THE COURT: Thank you.

(Proceedings adjourned to July 24, 2024 at 9:30 a.m. )

---

2503

I N D E X

WITNESSES:

CHRISTOPHER CABANE

    CROSS-EXAMINATION BY MR. JACKSON    2367

    REDIRECT EXAMINATION BY MR. GRUBIN    2409

DAVID MOTOVICH

    DIRECT EXAMINATION BY MR. JACKSON    2428

    CROSS-EXAMINATION BY MR. POLEMENI    2476

EXHIBITS:

Government's Exhibit 103    2415

Defense Exhibit 2081    2399
Defense Exhibit 1021    2447

\*   \*   \*   \*

---

2504

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 21-CR-497(WFK)

    -against- : United States Courthouse
                Brooklyn, New York
DAVID MOTOVICH, :
                 July 24, 2024
    Defendant. : 9:30 o'clock a.m.

- - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government: BREON PEACE
                     United States Attorney
                     BY: ROBERT POLEMENI
                         ERIK D. PAULSEN
                         ANDREW GRUBIN
                         MATTHEW C. SKURNIK
                     Assistant United States Attorneys
                     271 Cadman Plaza East
                     Brooklyn, New York 11201

For the Defendant: WACHTELL, LIPTON, ROSEN & KATZ
                     51 West 52nd Street
                     New York, New York 10019

                     BY: RANDALL WADE JACKSON, ESQ.
                         JESSICA LAYDEN, ESQ.

                     MEISTER SEELIG & FEIN, LLP
                     125 Park Avenue, 8th Floor
                     New York, New York 10017

                     BY: HENRY R. MAZUREK, ESQ.

Court Reporter: Charleane M. Heading
                     225 Cadman Plaza East
                     Brooklyn, New York
Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

J.A. 861

2505

(In open court; outside the presence of the jury.)

THE CLERK: Criminal cause on trial, 21-CR-497, United States of America versus David Motovich.

Will the attorneys please state their names for the record beginning with the government.

MR. POLEMENI: Good morning, Your Honor. Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, Paralegal Kavya Kannan and Special Agent Christopher Cabane for the United States.

THE COURT: Good morning, Counsel. Please be seated.

Ladies and gentlemen of public, you may be seated as well. Thank you for your patience.

Mr. Jackson.

MR. JACKSON: Good morning, Your Honor. Randall Jackson, Henry Mazurek and Jessica Layden on behalf of our client David Motovich. We're also joined by Mr. Andy Cepregi.

THE COURT: Good morning. Please be seated. I thank you for your patience as well.

Do we have any issues we need to address before the jury is brought back in?

MR. POLEMENI: Just one, Your Honor.

THE COURT: You can use the microphone. Thank you, sir.

I'll hear from the government and then I'll hear

2506

from defense.

MR. POLEMENI: Thank you, Judge.

THE COURT: Yes.

MR. POLEMENI: Just one issue. Prior to trial, the government had raised possibly introducing evidence of fraudulent documents that Mr. Motovich had in his possession bearing his photograph and his name.

THE COURT: Yes.

MR. POLEMENI: And Your Honor correctly excluded those documents as not relevant to the charged crimes.

THE COURT: Yes.

MR. POLEMENI: But now that the defendant has testified and put his credibility at issue --

THE COURT: Yes.

MR. POLEMENI: -- we would seek to introduce those documents, Your Honor, to impeach the witness.

THE COURT: Okay. What is your response to the motion?

MR. JACKSON: Judge, those documents are not fraudulent documents. It's going to create a confusing issue.

All it is is a police chaplain, you know, thing that was given to Mr. Motovich. It was actually given to him by the Police Department, that he acted as a chaplain at some period. We don't think we need to get into all of that.

Another thing is sort of a card that was given by

2507

one of his friends that does not have any photographs on it. He didn't ask for it. Somebody gave it to him as sort of almost like a gag for some reasons. It's like a UBS business card. He has it. There's no evidence anywhere he's held himself out as a UBS employee. It's just a random thing from many years that was in his house.

So I don't think that any of this has any relevance, I think it would be improper confrontation and I think it would have deep 403 problems, Your Honor.

THE COURT: Okay. So what is the document exhibit number that we're talking about?

MR. POLEMENI: Yes, Your Honor.

So the first document is Government's Exhibit 275 which is the UBS document which indicates that David Motovich is the head of mergers and acquisitions at UBS Investment Bank and lists, among other things, his cell phone number.

THE COURT: Right. You said the first document. Are there a series of other ones?

MR. POLEMENI: Yes.

THE COURT: Why don't you just lay them all out.

MR. POLEMENI: The second document is not the police chaplain badge. We don't intend to introduce that document.

THE COURT: Tell me what you do intend to introduce.

MR. POLEMENI: Yes. The second document is Government Exhibit 911. I can provide a copy of that to the

2508

Court and to defense counsel.

That document is a document that says at the top, "United States Government ID." It also bears the New York City Police Department insignia. It has Mr. Motovich's photo and his name and underneath, it says, "Midwood Lumber & Millwork" on it.

THE COURT: Okay. Next document?

MR. POLEMENI: Those are the two documents.

THE COURT: All right. I'm going to admit those two documents.

MR. POLEMENI: Thank you, Judge.

(Government Exhibits 275 and 911 so marked.)

THE COURT: Anything else from the government?

MR. POLEMENI: No.

THE COURT: Anything else from defense counsel.

MR. JACKSON: Very briefly, Judge. I was reluctant to even bring this up. I don't think that this is intentional and I think the most competent member of the government team has been their paralegal. We do have a problem.

Twice yesterday during Mr. Motovich's testimony, interoffice messages with the U.S. Attorney's Office, someone else at the U.S. Attorney's Office appeared on the screen commenting on Mr. Motovich's testimony.

THE COURT: I'm sorry. Wait a minute. Just be very specific about what you are stating occurred because you're a

J.A. 862

2509

little bit elliptical.

What are you saying occurred?

MR. JACKSON: During Mr. Motovich's cross-examination --

THE COURT: Yes.

MR. JACKSON: -- messages appeared on the screen that I --

THE COURT: You say "the screen." What screen are you talking about? The screen in front of the jury?

MR. JACKSON: That's what I understood after court, Judge, the screen in front of the jury, that commented on Mr. Motovich's testimony and the jurors saw it.

THE COURT: What did these screen messages supposedly say?

MR. JACKSON: The first one, I couldn't read quickly enough. The second one said, was commenting on his chewing of the Ricola that the Court gave him into the mic and I think it, you know, it was just sort of, sort of making a joke or light of the fact.

THE COURT: What was said?

MR. JACKSON: I believe it said why is he chewing his Ricola into the mic while he's testifying, words to that effect, Judge, and there was, I think, some reaction, as I understand it, from the jurors. I was focused on Mr. Motovich but that's what I was told.

2510

THE COURT: So the jurors were reacting to a statement that you understand was made by someone in the U.S. Attorney's Office about Mr. Motovich placing his mouth fairly close to the microphone while having a cough drop, is that it?

MR. JACKSON: Yes, Judge.

THE COURT: Okay. Any response to that alleged comment about the witness chewing a cough drop and having his microphone near his mouth?

MR. POLEMENI: Yes, Your Honor, and I agree with Mr. Jackson that Ms. Kannan is the most competent member of our team. And yes, there was -- my understanding, I did not see it, but my understanding is that during the presentation, an e-mail popped up very briefly which reflected that Mr. Motovich was chewing a Ricola cough drop.

That will not happen again, Your Honor. It was just a matter of --

THE COURT: It might be my fault because I gave him the cough drop as I've given every witness. So I apologize to the defendant and to defense counsel.

I will still give you a cough drop because you're testifying and, you know, you can drink water and you can get as close or not as close to the microphone as you wish, sir. That's really up to you.

Look, at the risk of being old school, this is a

2511

trial. We're all human beings. People need to have water. People need to have cough drops. It should not have happened. I'm sure it will not happen again, but it goes to the earlier point I made about the rhinoceros. If I say to the jury don't think about the chewing of a cough drop and getting close to a microphone, that's all they'll think about and, in all candor, it's not, in this court's view, an issue that goes in any way, shape or form to prejudice the jury or anyone else with respect to the defendant.

Goodness knows, I drink plenty of seltzers and cough drops as I try to go through this and wait until I get to the 140 page jury charge that I will be reading where you will hear me drinking seltzer and tea and cough drops and I apologize in advance.

All right?

MR. JACKSON: No, Judge.

THE COURT: I don't see that as any harm but I do think it's appropriate to point it out to the court's attention and the U.S. Attorney apologized for it happening and it's not going to happen again, but welcome to the real world where things like this happen.

So we'll make sure that there's no adverse impact on the proceedings here but as I said, if you start to elevate things in front of the jury, they take on -- as I said before, if you tell people not to think about a rhinoceros, everybody

2512

in this room is now thinking about a rhinoceros. So it doesn't make any sense from that point of view.

You agree, Mr. Jackson?

MR. JACKSON: Couldn't agree more, Judge. My only request, Judge, and I just want to stress I'm very confident that this was an unintentional mistake on the part of the government, I would just ask if the Court could just remind the U.S. Attorney's Office to try to be very careful about that text messaging because I wouldn't want something that's actually prejudicial to pop up.

THE COURT: Right.

Everyone should be very careful about the electronics. In the old days, prosecutors and defense counsel and members of the public were not allowed to bring any electronics into the courtroom and I have no problem going back to those old days if we get even a hint of a whisper of anything like this happening again.

So everyone should put their toys away, keep them a way and tell their friends back at their respective shops not to let it happen again because as you see, I'm very happy going old school and requiring everyone to do it with paper, pen, and tin cans and strings as opposed to cell phones. Okay?

When I started practicing law, we had mag cards to type up documents, followed by Wang, followed by Videk, and

**J.A. 863**

2513

eventually we got to the kinds of computers that were the forerunners of what we have now, but I know how to go back to quill and pen and we will go back to quill and pen if there's any other issues. Okay? So I'm very old school.

Are we clear on this?

MR. POLEMENI: Understood, Judge, yes.

THE COURT: I will take all the toys away.

All right. Anything else from the government?

MR. POLEMENI: No, Your Honor.

THE COURT: Anything else from defense counsel?

MR. JACKSON: No, Judge.

THE COURT: All right. Let's get the jury in, please.

MR. JACKSON: Your Honor, can I ask Mr. Motovich to take the stand?

THE COURT: Yes, of course.

(The witness, DAVID MOTOVICH, having been previously sworn/affirmed, resumed the stand.)

THE COURT: And as promised, sir, your cough drop.

MR. JACKSON: Objection.

THE COURT: Off the record.

(Discussion off the record.)

THE COURT: Please rise for the jury.

(Jury enters.)

THE COURT: Good morning, ladies and gentlemen of

---

Motovich - cross - Polemeni          2514

the jury. Thank you. Thank you for your promptness.

Please be seated.

Oh, I'm sorry?

A JUROR: One more chair?

A JUROR: No, we have it.

THE COURT: Are we good? All right. Thank you. Absolutely. Please be seated.

You may be seated, sir.

We have Mr. Motovich continuing on his cross-examination. I trust everyone had a good night and I'm sure half of you are happy because of the Mets and half you are not happy because of the Yankees and that's why they play the games. So there it is.

You may continue with your cross-examination, sir.

MR. POLEMENI: Thank you.

THE COURT: And you're still under oath, Mr. Motovich, of course.

MR. POLEMENI: Thank you.

CROSS-EXAMINATION (Continuing)

BY MR. POLEMENI:

Q    Good morning, Mr. Motovich.

A    Good morning.

Q    Yesterday, one of the first questions Mr. Jackson asked you, if you recall, was whether you had any regrets.

Do you remember that?

---

Motovich - cross - Polemeni          2515

A    Yes.

Q    And you said something along the lines of when you were arrested and detained at the MDC, you thought about what happened, right?

A    Yes.

Q    Just so it's clear, you were arrested and then detained at the MDC for about two weeks, is that right?

A    Seventeen days.

Q    Seventeen days. And that was because a court had determined that you were not at that time able to post sufficient collateral for your release, is that correct?

A    Yes.

Q    And, in fact, one of the suretors that you had put up to post your collateral, one of them posted a home that that person didn't even own, is that correct?

A    It was his home.

Q    It just took a while for you to gather the resources to post a bond, correct?

A    My lawyers were taking care of that. I was detained.

Q    All right. And since -- and once you posted a sufficient bond, at least one sufficient for the Court to release you, you've been released since then, correct?

A    Correct.

Q    And you've been permitted to consult with your attorneys freely, correct?

---

Motovich - cross - Polemeni          2516

A    Correct.

Q    And you've been permitted to go to work?

A    Correct.

Q    And you've been permitted to consult with financial analysts to prepare for this trial?

A    Correct.

Q    Okay. So what do you regret?

A    I regret making, telling my girls to make fake insurance certificates for some of my customers and some fake bills.

Q    Anything else?

A    At this time, no.

MR. POLEMENI: So if we can put up Government Exhibit 911, please, which I believe is in evidence based on our conversation this morning, Your Honor.

THE COURT: It's admitted. You may publish.

Q    What's this, Mr. Motovich?

A    I had a relationship with the Police Department, the 66 and the 70 in my area, and they issued this to me.

Q    Okay. They issued this document to you?

A    I believe so.

Q    Okay. If we can pull up Government's Exhibit 275, please?

THE COURT: In evidence. You may publish.

Q    What's that?

A    This is -- I don't recall this document.

**J.A. 864**

Motovich - cross - Polemeni    2517

Q    You don't recall having a business card that bears your name from -- well, what's UBS?  You know what that is, right?

A    UBS is a bank.

Q    One of the largest banks in the world, right?

A    Yes.

Q    In fact, I think at some point it was the largest bank in the world, is that right?

A    Yes.

Q    And it said that you are -- it says there that you were the head of mergers and acquisitions, is that right?

A    Yes.

Q    That's not true?

A    No.

Q    It has your cell phone number.  That's 646-330-0861.  Is that right?

A    Yes.

MR. POLEMENI:  So you can take that down, Ms. Kannan.

Q    Mr. Motovich, yesterday, we were talking about taxes.  Do you remember that?

A    Yes.

Q    And during your direct examination, Mr. Jackson asked you about your paying taxes, right?

A    Yes.

Q    And that you and your family have paid millions of

Motovich - cross - Polemeni    2518

dollars in taxes over the years, is that right?

A    Yes.

Q    So let's take a look at some of your tax returns.  Okay?

A    Yes.

MR. POLEMENI:  If you can pull up, Ms. Kannan, Government Exhibit 125.

THE COURT:  You may publish.

MR. POLEMENI:  And if you can just blow up the first page where it says, "Income."  Sorry.  If you can go to the top.

Q    Mr. Motovich, is this your 1040 individual tax return for tax year 2013?

A    Yes.

Q    And it was prepared by Mr. Zwerman?

A    Yes.

Q    And if we can go down where it says your income, it says wage and salaries, do you see that?  It says $104,000?

A    Yes.

Q    And there's some taxable interest?

A    Yes.

Q    And then if you go to the bottom, it says your total income is $207,000 and some change.  Do you see that?

A    Yes.

MR. POLEMENI:  And, Ms. Kannan, if we can go to page 2 of the document -- page 3, my apologies.  Then if we

Motovich - cross - Polemeni    2519

can go to other taxes.

Q    Do you see that, where it says your total taxes, $23,311?  Do you see that, Mr. Motovich?

A    Yes.

MR. POLEMENI:  Then if we can go to where it says refund, please, and line 73.

Q    It says this is the amount you overpaid, $12,678.  Do you see that?

A    Yes.

Q    So you actually received a refund from the IRS in that amount that year, is that correct?

A    I don't remember.

Q    Well, that's what this says, right?

A    Yes.

MR. POLEMENI:  Ms. Kannan, if we can go to Government's Exhibit 126, please.

Q    Is this your tax return for 2014, Mr. Motovich?

A    Yes.

Q    And if we can go to total income, it says $259,000 and a little bit of change.  Is that right?

A    Yes.

Q    And then Mr. Motovich --

MR. POLEMENI:  Ms. Kannan, if we can go to page 3, and if we can go to the line where it says "Refund," again.

Q    Did you get a refund for 2014 as well?

Motovich - cross - Polemeni    2520

A    I don't remember.

Q    Well, it says that you received a refund of $25,160, correct?

A    It says the amount overpaid was $25,160.

Q    Right.

You paid -- if you go the line above, you said $36,000, $36,565 in total taxes that year, right?

A    I -- that's a question for my accountant.

Q    Well, you signed this document, right?

A    Correct.

Q    And you reviewed it before you signed it, right?

A    Correct.

Q    And you provided Mr. Zwerman with all this information, correct?

A    Correct.

Q    So you paid $36,565, correct?  For 2014, right?

A    That's what the document says.

Q    And then the IRS actually said, Oh, you paid too much, Mr. Motovich, I'm going to give you a refund for $25,000, right?

A    Yes.

MR. POLEMENI:  Okay.  So if we can go to Government Exhibit 127, please.

Q    Is this your tax return for 2015, Mr. Motovich?

A    Yes.

J.A. 865

Motovich - cross - Polemeni    2521

Q    Okay.  And if we go to your total income for that year, is it $289,566?

A    Yes.

Q    And just, just to -- I think you've said this but just to be sure, you didn't tell Mr. Zwerman about any of the subject bank accounts that were, we've been talking about for the past two weeks, right?

A    No.

Q    All the millions and millions and millions of dollars that you had in those accounts that belonged to you?

A    No.

MR. POLEMENI:  Okay.  So if we can go to page 3 and if we can go to payments and refund.  Pull that up, please.

Q    You paid the IRS in total payments, tax payments in 2015 $45,810, is that correct?

A    Correct.

Q    And but the IRS said no, you've actually overpaid, Mr. Motovich, we're going to, we're going to refund you $30,000, is that correct?

A    Correct.

MR. POLEMENI:  Pull up Government's Exhibit 128, please.

THE COURT:  In evidence.  You may publish.

Q    If we can look at your total income for that year.  Is it $298,000 and some change, Mr. Motovich?

Motovich - cross - Polemeni    2522

A    Correct.

Q    And then if we go down to the third page, again, where it says "Payments" and "Refunds," did the IRS give you a refund of nearly $33,000 that year?

A    Correct.

MR. POLEMENI:  Government's Exhibit 129, please.

THE COURT:  It's in evidence.  You may publish.

Q    If we go to your total income.  See the $320,000 and some change, Mr. Motovich?

A    Yes.

Q    If we go to page 3.  In that year, the IRS gave you a refund of almost $51,000, is that correct?

A    Correct.

MR. POLEMENI:  Government's Exhibit 130, please, and if we can go to the second page, Ms. Kannan.

My apologies.  The pages seem to be out of order. We can skip ahead to Government's Exhibit 131.

THE COURT:  You may publish.

Q    Do you see, Mr. Motovich, where it says your taxable income for that year is $300,000 at the bottom?

A    Correct.

Q    And then you made total payments of $248,000, is that correct?

A    Correct.

Q    But the IRS said, actually, you overpaid, we're going to

Motovich - cross - Polemeni    2523

refund you $174,000?

A    Correct.

Q    And we looked at these documents with Mr. Zwerman, correct?

A    Correct.

Q    And attached to these documents were a lot of companies that you owned and had an interest in, correct?

A    Correct.

Q    Now, Mr. Motovich, you said that millions of dollars were paid in taxes by you and your family, is that correct?

A    Correct.

Q    Is it fair to say that you did not pay millions of dollars in taxes?

A    My companies.

Q    Which companies are those?

A    The ones Mr. Jackson listed yesterday.

Q    Which ones are those?

A    Midwood Lumber, real estate, dialysis, Sherman Abrams.  I don't remember the whole list off the top of my head but those are four main ones.

Q    So let's talk about -- well, if we go back, I guess, now to the tax returns, Sherman Abrams is actually listed on your tax returns, right?

A    Yes.

Q    And so the taxes that Sherman Abrams paid were already on

Motovich - cross - Polemeni    2524

those tax returns, right?

A    Sherman Abrams is a C corp.

Q    So it's not that you paid the taxes individually, your companies paid them?

A    Yes.

Q    Okay.  You mentioned Midwood Lumber?

A    Yes.

Q    You don't own Midwood Lumber, correct?

A    No, I don't.

Q    You don't have any ownership interest in it, is that correct?

A    No.

Q    And that's, that's a GRAT?  Is Midwood Lumber a GRAT?

A    I --

THE COURT:  Can you keep your voice up a little bit.

THE WITNESS:  Yes.

THE COURT:  Go ahead.

A    I don't know exactly what it's in today or what it was in in those years, but the attorneys, my father's financial advisors, they, he deals with that.

Q    He deals with that?

A    Yes.

Q    He goes to financial advisors and attorneys and sets up GRATs.  What's a GRAT, do you know?

A    I don't know exactly.

**J.A. 866**

Motovich - cross - Polemeni                 2525

Q    Is it kind of like a trust?

A    I believe so.

Q    So your father goes to attorneys, he goes to accountants and he tells them, This is what I have, can you help me kind of set up trusts and LLCs, is that right?

A    You'll have to ask my father that.

Q    Well, do you know if he does?

A    I know he has attorneys and I know he meets with them.

Q    He seeks advice?

A    Always.

Q    He fully discloses his assets?

A    Yes.

Q    He says to his accountant these are all of the things I own and have interests in, right?

A    Again, I'm not my father.

Q    So there was some discussion yesterday, sticking to Midwood, Government's Exhibit 355.

THE COURT:  You may publish.

Q    And what is this, Mr. Motovich?

A    It says Midwood Lumber Payroll.

Q    What is it?

A    These are the workers and it shows their salary.

Q    Did you prepare this?

A    No, I have not.

Q    Who prepared it?

Motovich - cross - Polemeni                 2526

A    I assume the HR office.

Q    Do you know where this was found at Midwood Lumber?

A    In the bookkeeper's office.

Q    Now, it lists you as the controller, both you and Alex Motovich.  That's your brother, right?

A    Yes.

Q    It lists both of you as the controller.  Are you both the controller?

A    Yes.

Q    What is a controller?

A    We make decisions on the company's dealings, daily dealings.

Q    Like what?

A    I mean credit for customers, stock, inventory, many things, anything on a day-to-day business that needs to be discussed.

Q    Okay.  Things like accounts payable?

A    Accounts payable.  Accounts receivable.

Q    Things like payroll taxes?

A    Yes.

Q    Okay.  And so it says that you made $1,000 a week, is that right?

A    No.

Q    Oh.  What did you make?

A    It's on my tax return.

Motovich - cross - Polemeni                 2527

Q    Okay.  So you made not -- so what is this $1,000 check, do you know?

A    I don't know who made this, this paper, but this paper is not right.

Q    It's not right?

A    No, I always made more than $1,000.

Q    Okay.  Well, you understand that this document was found in a safe in your, in an office, right?

A    Yes.

Q    Does that suggest to you that it may have some importance?

A    Again, I don't know who put this down but my salary is not $1,000 and you can, it's reflected on my tax return.

Q    Okay.  Now, who's Marina Kuyan?  We've heard a lot about her.

A    Marina is my bookkeeper.

Q    Do you think she might have prepared this?

A    You need to ask her.

Q    You don't know?

A    I don't know.

Q    And it says that Ms. Kuyan, it says Ms. Kuyan, her weekly salary is $950.  Do you see that?

A    Yes.

Q    Is that accurate?

A    Again, I don't know off the top of my head.  It's been a

Motovich - cross - Polemeni                 2528

while.

Q    Well, does it sound accurate to you?

A    I believe she was making more.

Q    More than $950 a week?

A    Yes.

Q    Is she a valued member or employee?

A    She's a valued member, yes.

Q    She had been with you and your father for how many years?

A    Probably 20.

Q    And you trusted her?

A    Yes.

Q    And do you see where it says next to her name, where it says $950, it says $450 in check and $500 in cash.  Do you see that?

A    Yes.

Q    What does that mean?

A    This chart was created during COVID times and most people did not want to come to work because the government was issuing them more money to stay home than -- and they were nervous because of the pandemic, so we incentivized some people to come in by giving them cash during the COVID period.

Q    Okay.  Was it only for the COVID period that you paid the employees in cash?

A    Yes.

Q    Not before the COVID period?

J.A. 867

Motovich - cross - Polemeni        2529

A    Not that I know of.  There's always --

Q    Do you know if -- well, it looks like a bunch of folks were paid in cash.  Is that right?

A    It looks that way.

Q    Do you -- did you report these wages to the Treasury Department?

A    Again, I am not the owner of Midwood Lumber.

Q    You're not the owner, the GRAT is, right?

A    Yes.

Q    But you are the controller?

A    If this was done in '21, I wasn't part of Midwood Lumber anymore in '21.

(Continued on next page.)

---

D. Motovich - cross - Polemeni        2530

CROSS-EXAMINATION (Continues)

BY MR. POLEMENI:

Q    Why not?

A    After I was arrested, I stopped working at Midwood Lumber.

Q    Okay.  So, you don't know if payroll taxes were paid on those wages, those cash wages, right?

A    I don't know.

Q    And you didn't pay workers in cash prior to the pandemic?

A    Again, not that I know of.

Q    Well, at that time you were the head of Midwood Lumber, right?

A    I was one of the controllers.

Q    Were you the manager of Midwood Lumber?

A    I was controller and Alex was a controller.

Q    Okay.
     Did -- but if people were paid in cash, you would certainly know as the controller that wages were being paid in cash, right?

A    Again, I have over 500 people working for me, and if you have something to show me, I can answer you.

Q    So, Mr. Motovich, we were also -- you were also talking with Mr. Jackson yesterday about your knowledge of the investigation into -- into your finances, correct?

A    Yes.

---

D. Motovich - cross - Polemeni        2531

Q    And that you -- you -- you said you didn't destroy any evidence, right?

A    No.

Q    Okay.  So -- but you took steps to change your behavior, right?

A    You want to show me something?

Q    Okay.  So, we've talked about Kemal Sarkinovic at great length throughout this trial, right?

A    Yes.

Q    And you opened up a bunch of accounts in Kemal's name, right?

A    No.

Q    You didn't open up an account in Kemal's name?

A    Kemal opened up the accounts.

Q    At your direction though?

A    Yes.

Q    Okay.  I mean if you didn't tell him to, then Kemal wouldn't have opened all those accounts, correct?

A    Kemal asked for me to help him open up those accounts so we can have work.

Q    Okay.  So, when you learned about the investigation, you stopped opening accounts in Kemal's name, right?

A    Correct.

Q    Right.  Because you weren't going to continue that, right?

---

D. Motovich - cross - Polemeni        2532

A    The accounts were opened.  We did not close them during the investigation.

Q    But we'll get to what -- what happened with those accounts afterwards, but you didn't open any new accounts in Kemal's name, right?

A    No.

MR. POLEMENI:  If we can pull up Government's Exhibit 428, which I believe is not -- it is in evidence.  It is in evidence, yes.  Thank you.

THE COURT:  You may publish if it's in evidence.

(Exhibit published.)

BY MR. POLEMENI:

Q    What's this?

A    This is a client of mine.  It's Kemal's friend.

Q    Kemal's friend, a client of yours?

A    Yes.

Q    And I'm probably mispronouncing the name, but it's Mehdija Demirovic, is that correct?

A    Yes.

Q    So how do you know him?

A    Kemal brought him to my office to open an account.

Q    And -- and you opened an account for him?

A    Yes.

Q    Where?

A    Midwood Lumber.

J.A. 868

D. Motovich - cross - Polemeni                2533

Q    And did you help him get an American Express business card?

A    Me?

Q    Yes.

A    No.

Q    Why was this in your apartment?

A    He left back to his country of Montenegro and he left with a bill for Midwood Lumber, and he's an Imam and he felt very bad.  He says:  Dave, I owe you money.  I just can't stay in this country anymore.  He had a problem.  He got arrested, I believe.

     And he says, David, I'm gonna pay down this card and then you can charge it.  He felt extremely guilty for leaving me with a balance.

Q    Kind of like Ago Kolenovic, right?

A    Ago, correct.  He gave me blank checks.

Q    Who gave you blank checks?

A    Ago Kolenovic, yes.

Q    Yes.

     MR. POLEMENI:  And if we can go to Government's Exhibit 366, please.

     (Exhibit published.)

Q    If you'll look at just the first page, page 1, please.

     This was recovered from your office in Midwood, right?

---

D. Motovich - cross - Polemeni                2534

A    Correct.

Q    What is this?

A    This is his checkbook that he left me with.

Q    So this individual left you with his checkbook, went back to his home country, and he said:  David, I owe you money, just write checks from this account whenever you can?

A    No.

Q    Okay.  What did he say?

A    He said some clients owe him money.  They made deposited into his account, and he's gonna try to collect it.  And I could write a check to Midwood Lumber to pay for the money that he owes.

     THE COURT:  And when you say "he," just to be clear for the jury --

     THE WITNESS:  Sorry.

     THE COURT:  -- who are you talking about here?

     THE WITNESS:  Mehdija.

     THE COURT:  Thank you.

     Go ahead.

     MR. POLEMENI:  Thank you, Judge.

     And if we can go to page 2.

     (Exhibit published.)

BY MR. POLEMENI:

Q    What's this, Mr. Motovich?

A    That's his company.

---

D. Motovich - cross - Polemeni                2535

Q    That's -- IBAR Construction is his company?

A    That's his company, yes.

Q    And so he left you his checkbook, signed blank checks, and he left it with you?

A    Yes.

     MR. POLEMENI:  And if we can go to page 5, please.

     (Exhibit published.)

Q    And what's this?

A    This is Kemal Sarkinovic.

Q    Was this a -- did Kemal leave you this checkbook for the same reason?

A    That looks like an old bank, I -- must be twenty years old.  I don't --

Q    Do you recall why you have these blank checks signed by Mr. Sarkinovic?

A    I don't recall why I had these -- this account.

     MR. POLEMENI:  If we can go to page 7, please.

     (Exhibit published.)

Q    What's this?

     MR. POLEMENI:  Page 7.  Thank you.

A    So, again, this was his personal check.

Q    Whose personal check?

A    Mehdija.  He told me when he left, if he doesn't collect the money or his clients don't deposit the money into his business account, he will pay me personally from his personal

---

D. Motovich - cross - Polemeni                2536

account.  And he left me his check.

Q    So he left you a check -- his personal checks?

A    And his business.

Q    And his business.  And you can just pick and choose where to take the money from?

A    No.  He was supposed to call me, but, obviously, he left back to his country and I never got paid.

Q    Okay.

     MR. POLEMENI:  Let's go to page 8.

     (Exhibit published.)

Q    Do you see that driver's license?

A    Yes.

Q    Whose is that?

A    That's Mehdija's.

Q    Why do you have that?

A    He left his wallet on my desk when he was leaving with all his business cards.

Q    Why did he do that?

A    He forgot it.

Q    He forgot his wallet?

A    Yes.

Q    And so --

A    That's why it was on my desk.  It was three days after I was arrested.

Q    So, three days before you were arrested or --

D. Motovich - cross - Polemeni     2537

A    Yeah, three days were before I was arrested.

Q    So, is this when you had this conversation with him about: I'm going back to my home country, you can have access to my accounts?

A    This was -- if I recall, he forgot his license. I was supposed to give it to Kemal and all these things to bring back to him to his country.

Q    But just so -- when did you have the conversation with him about: I'm leaving, here are my checkbooks, was it three days before you were arrested?

A    Yes.

Q    And after the -- during this conversation, he took out his wallet at some point and put it on your desk?

A    I assume.

Q    And then he just walked out and forgot his wallet?

A    He forgot his license.

Q    Okay.

     MR. POLEMENI: Well, if we go down a little more.

Q    What's that?

A    Looks like his debit card.

Q    For IBAR Construction?

A    Yes.

Q    So was that also in the wallet that he left on his [sic] desk and forgot to take before he went back to his country?

A    I don't recall, but I assume if it was on my desk he may

---

D. Motovich - cross - Polemeni     2538

have left it there.

Q    Did you try to contact him and say, I have your wallet?

A    Again, he was traveling and then I got arrested.

Q    Okay.

     MR. POLEMENI: If we go back up to the license for one moment.

     (Exhibit published.)

BY MR. POLEMENI:

Q    That's a -- it's an expired license, right, because you were arrested in 2021, is that right?

A    Yes.

Q    It's an expired license, is that right?

A    Yes.

Q    But you're sure that it was three days before you were arrested that this individual left his wallet on your desk?

A    Approximately.

Q    Okay.

A    He was arrested and he was leaving.

Q    He actually just became the new Kemal, right?

A    No.

Q    Because you couldn't use Kemal anymore, right?

A    I don't understand the question.

Q    Well, you couldn't use Kemal to open -- in his name and his identification to open up bank accounts, right?

A    I never opened any accounts without the OK.

---

D. Motovich - cross - Polemeni     2539

     MR. POLEMENI: If we could pull up Government's Exhibit 5006, please, in evidence.

     THE COURT: You may publish.

     (Exhibit published.)

BY MR. POLEMENI:

Q    Agent Cabane created this pretty chart. Do you remember looking at it, Mr. Motovich?

A    Yes.

Q    And it lists all the payments to Abe Fridman, right, your uncle, is that correct?

A    Again, I didn't create this chart.

Q    Do you have any doubt that this chart is accurate?

A    It looks accurate.

Q    Okay.

     So, these are payments to your uncle or, either directly to him or for his benefit to, among other things, life insurance policies, right, John Hancock, Carriage Club North Condo, is that correct?

A    Correct.

Q    And for years you would write checks to John Hancock to pay the premiums on his life insurance policy, right?

A    Correct.

Q    And you wrote those checks from the subject accounts we've been talking about, right?

A    Correct.

---

D. Motovich - cross - Polemeni     2540

Q    And then were you here when the John Hancock representative showed us some documents where after 2019 the payments went from -- to John Hancock directly from Abe Fridman?

A    Correct.

Q    And that's because you became aware of this investigation and you -- you made a conscious intentional decision not to pay from those subject accounts any longer, correct?

A    No, because he was paid back.

Q    Who was paid back?

A    My uncle.

Q    The money that you owed him for the purchase of your first home?

A    Correct.

Q    Okay. So, although from 2012 through 2019 you were paying from the subject accounts to pay his life insurance policies, right?

A    Correct.

Q    It just so happens that at the same time or about the same time you learned of the investigation, he actually happened to be paid back and you no longer had to pay from the subject accounts, correct?

A    He was actually paid back before 2019. I just wanted to take care of him, he's my uncle. And he helped me out and I was doing well, so -- but obviously in 2'19 -- 2019 he was

**J.A. 870**

D. Motovich - cross - Polemeni                    2541

paid back by me.

Q    So you were helping him out, you wanted to pay him back.

Why didn't you write a check from -- I mean you have a bank account, right?

A    Yes.

Q    Why didn't you write the checks from your own bank account?

A    I don't know.

Q    So, you were here when Marcy Vukel testified, do you remember her?

A    Yes.

Q    From the Vukel Insurance Company?

A    Yes.

Q    Do you regret anything you did in connection with her company?

A    Yes.

Q    What do you regret?

A    I regret asking Marina to make some fake workmen's comp certificates.

Q    When you say "some," how many do you think you asked her to make?

A    I don't recall.

Q    A hundred?

A    No.

Q    Less?

---

D. Motovich - cross - Polemeni                    2542

A    Yes.

Q    Well, we saw -- I mean we saw many of them.

Do you agree, Mr. Motovich?

A    We saw a lot.

Q    And each time Ms. Kuyan created one of those fraudulent certificates, it was because you told her to, right?

A    Yes.

MR. POLEMENI:  And so, if we can pull up Government's Exhibit 153-A, please.

(Exhibit published.)

BY MR. POLEMENI:

Q    Do you remember seeing this document, Mr. Motovich?

A    Yes.

Q    This is the fax that Ms. Vukel sent to Marina saying: Stop, please stop forging my signatures or my signature on insurance certificates, right?

A    I see it.

Q    That's what she said, right?

A    Yes.

Q    And what's the date of this fax?

A    12/19/2014.

Q    December 19th, 2014, right?

A    Correct.

Q    And -- but you didn't stop forging her signature and creating fraudulent certificates, right?

---

D. Motovich - cross - Polemeni                    2543

A    No.

Q    Right.

Marina came to you and told you, We just received this fax, David, we need to stop, right?

A    She never came to me with this fax.

Q    Your trusted employee Marina Kuyan did not come to you with this fax and tell you, We have a problem, David?

A    I wasn't -- I don't think I was in town on December 19th, 2014.

Q    Where were you?

A    I'm normally away from -- the last two weeks of the year.

Q    Vacation?

A    Yes.

Q    Europe?

A    No.  I was probably -- I don't know where, but it's 2014. My kids have off and I normally go away.

Q    I see.  Just your regular practice to go away during that time period?

A    Correct.

Q    Okay.

Certainly at some point Ms. Kuyan, your trusted employee, came to you and said:  David, we have a problem, someone found out that we're creating fraudulent insurance certificates and forging her name, right?

A    No.  I don't recall her showing me this document.

**J.A. 871**

---

D. Motovich - cross - Polemeni                    2544

Q    Well, regardless of whether she showed you the document, she certainly told you that?

A    I don't remember her telling me this.

Q    So, you weren't aware of this, is that what you're saying?

A    She may have told me.  It's more than a decade ago.  At this time, I don't remember.

Q    She may have told you?

A    May have.

Q    And if she -- I mean if she had told you, you definitely would have stopped, right?

A    Again, I don't know.

Q    You don't know if you would have stopped?

A    Oh, if she would have told me, I don't know.  I don't know if she told me about this document.  I don't remember what happened exactly ten years ago and on this fax from Marcy, or even if Marina ever received it.

Q    Well, you heard Ms. Vukel say that she spoke with her afterwards, after she sent this fax, right?

A    Correct.

Q    And Ms. Vukel, you don't think she's lying, right?

A    No.

Q    She has no incentive to lie?

A    No.

MR. POLEMENI:  So if we can go to the second page of

D. Motovich - cross - Polemeni          2545

this, please.

(Exhibit published.)

BY MR. POLEMENI:

Q    And I know we've seen a bunch of these, but the certificate of insurance is for Ago & Alaudin General Contracting Corp., right?

A    Yes.

Q    That's Ago Kolenovic's, that's his actual company, the real one, right?

A    Yes.

Q    But this certificate is fake, it's fraudulent, right?

A    Yes.

MR. POLEMENI:  And if we can scroll down.

Q    Who's it issued to?

A    Royal Home Improvements.

Q    That's the company that is owned by your -- one of your business partners, right, Joshua Markovics?

A    Yes.

Q    So you had issued a fake certificate to Mr. Markovics's company, right?

A    Correct.

Q    And this is in 2014?

A    Correct.

Q    Well before the opening of ZKC, correct?

A    Correct.

---

D. Motovich - cross - Polemeni          2546

MR. POLEMENI:  And if you go back to the first page.

BY MR. POLEMENI:

Q    What's Elite Insurance, do you know?

A    Elite Insurance, as I heard from here, it's Menacham's father-in-law's company.

Q    You didn't know that at the time?

A    No.

MR. POLEMENI:  So if we go to Government's Exhibit 1051.

(Exhibit published.)

Q    This is an e-mail that you sent to Marina, right, on February 12th, 2016?

A    No.  That says from David Motovich fax Midwood, that's not from my e-mail.

Q    Oh, sorry.

But you use that fax machine, right?

A    No, that's the company fax machine.  It's just under my name.

Q    I see.  This is dated --

MR. POLEMENI:  If we go to the second page.

(Exhibit published.)

Q    It's another one from another fraudulent certificate, right, from Ago & Alaudin General Contracting Corp.?

A    Who's it made to?

Yes.

---

D. Motovich - cross - Polemeni          2547

Q    Right.  And it's from The Vukel Group?

A    Yes.

Q    And Ms. Vukel's signature is forged again?

A    I never told Marina to forge her signature.

Q    You didn't tell Marina to forge the signature?

A    I never told her to even sign the insurance certificates.

Q    Does it make it better -- would it be better if it wasn't signed, if there was no forgery?

A    I don't -- I don't know.  That's an insurance question.

Q    How is that an insurance question?

A    These are certificates that the -- for instance, Unique has to show if he gives a check to Ago & Alaudin that the company had insurance.  It doesn't mean him not having insurance.

He has -- he has workmen's comp under Unique, so there is no additional charge.  Nobody got hurt in this.

Again, I'm sorry for directing her, for making these insurance certificates.  If I can go back I would correct them, but obviously we can't go back in time.  So I made this mistake.

Q    Well, it wasn't really a mistake, Mr. Motovich, right, it was an intentional conscious decision?

A    I made a mistake.

Q    This is all just one big mistake?

A    Yes.

---

D. Motovich - cross - Polemeni          2548

Q    All of this?

A    This insurance certificates, yes, they were a big mistake.

Q    Only a big mistake because, you know, you eventually got caught doing it, right?

A    No.

Q    If you weren't arrested, you'd still be doing this, right, Mr. Motovich?

A    No.

Q    You would have stopped?

A    Yes.

Q    Why?

A    Because the companies need, Kemal would need real insurance.  He started to do a lot of jobs.  I helped his son in 2018 with many, many jobs, him and his daughter and his family.  And I hooked him up with hundreds of apartments, which we have proof and evidence of pictures, bills to very large companies.  And Kemal was looking to retire from this.  And he was already looking to leave in 2020 to move back to his country.  He was finishing his house in Montenegro.

And his kids, which I was helping set up with his bookkeeper.  His daughter was working for Midwood Lumber, but she was really only working for Kemal making all the bills for his projects.

Q    So if Kemal retired, this would have just -- you would

J.A. 872

D. Motovich - cross - Polemeni                    2549

not have done any more of this?

A    I wasn't looking to do anything besides helping people.

Q    Right.

If Robert Lovy, if he retired, you would have stopped doing it with him too, right?

A    Again, what is the question?

Q    Don't worry about it.

So, we were talking about why you gave these certificates of insurance, right?

THE COURT:  By "don't worry about it," I take it you --

MR. POLEMENI:  I withdraw that question.

THE COURT:  -- I take it you take mean the question is withdrawn.

Why don't we take our 15-minute break, and don't talk about the case, ladies and gentlemen, and we'll see you in 15 minutes.

Thank you.

THE COURTROOM DEPUTY:  All rise.

(Jury exits.)

THE COURT:  You may step down, too.  Thank you.

(Witness steps down.)

THE COURT:  All right.  You may be seated, ladies and gentlemen.  The jury has left the courtroom and witness has left the witness stand.

D. Motovich - cross - Polemeni                    2550

Do we have any issues to address outside the presence of the jury before we take our 15-minute comfort break?

Anything from the Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Anything from defense counsel?

MR. JACKSON:  No, Judge.

THE COURT:  Thank you.  We'll take our 15-minute break and we'll see you in 15.  Thank you.

MR. JACKSON:  Thank you, Judge.

THE COURT:  Thank you.

(Recess taken.)

(In open court - jury not present.)

THE COURTROOM DEPUTY:  All rise.

(Judge Kuntz entered the courtroom.)

THE COURT:  Please be seated.

Do we have any issues to address before we bring the jury back in?

MR. POLEMENI:  No, Your Honor.

THE COURT:  From defense?

MR. JACKSON:  No, Judge.

THE COURT:  Okay.  Let's get the jury back.

(Witness resumed the stand.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please stand for the jury.

D. Motovich - cross - Polemeni                    2551

(Jury enters.)

THE COURT:  Welcome back, ladies and gentlemen of the jury.

Again, appreciate your promptness.  Please be seated.  We'll continue with the cross-examination of the witness.

Mr. Motovich, you are still under oath, sir.

THE WITNESS:  Yes.

MR. POLEMENI:  Thank you, Judge.

BY MR. POLEMENI:

Q    Mr. Motovich, just a couple more questions on IBAR and we'll move to something else.

MR. POLEMENI:  Ms. Kannan, if you can put up Government's Exhibit 2000-A, page 61 in evidence.

THE COURT:  You may publish.

(Exhibit published.)

MR. POLEMENI:  Some technical difficulties, Judge.

THE COURT:  The tech gremlins have returned.  All right.  If they ever left.

MR. POLEMENI:  I can move on to something else.

THE COURT:  Yes.  I was going to suggest you do that, so we don't want to waste the jury's time.

MR. POLEMENI:  Yes.

Q    So, Mr. Motovich, let's talk a little bit about Ago Kolenovic.  Okay?

D. Motovich - cross - Polemeni                    2552

A    Yes.

Q    So, Mr. Kolenovic, you had a -- some sort of agreement with him that he would buy doors from you and then he would install those doors at the Dunbar project, correct?

A    Not just doors.

Q    What else?

A    Moldings, trim, doors, and I don't remember the other things on his contract.

Q    Okay.  And he had been referred to you by Kemal Sarkinovic, correct?

A    Correct.

Q    And so, do you recall him testifying that -- that that project, his work on that project started in around the spring of 2013?

A    Yes.

Q    And it ended in August of 2013, do you recall that?

A    He left in August of 2013.

Q    Right.  But your memory is consistent with his, which is that it went from March through August of 2013, is that right?

A    Correct.

Q    I know you have maybe a different take on what happened, but that was that -- it was that period?

A    Correct.

Q    Okay.  So, Ago Kolenovic's company was called Ago & Alaudin General Contracting Corp., correct?

**J.A. 873**

D. Motovich - cross - Polemeni          2553

A   Correct.

Q   And in 2013 you formed Ago & Alaudin Contracting Corp., correct?

A   Formed with Kemal, yes.

Q   Right.

And you chose the company name, correct?

A   Yes.

Q   Why did you take Mr. Kolenovic's company's name, Ago & Alaudin General Contracting Corp., and then just make another company Ago & Alaudin Contracting Corp.?

A   So, when Ago left the job in 2013, the payments, the remaining payments from the developer was only gonna go to Ago.  And in order to receive the funds from the developer, we needed to have a company or we would have to trust Ago Kolenovic, or whatever his name, Ago, to give us back the money he receives and to pay the material and to pay the labor.

So, Kemal went, because he felt responsible, and he opened the account so we can finish this job and get paid from the developer.

Q   Okay.  The developer you said was a friend of yours, right?

A   The friend was David Neuberg, but he had many investors in his projects.

Q   Okay.  Why was it necessary to create a company that,

D. Motovich - cross - Polemeni          2554

with the exception of one word, so closely resembled Ago & Alaudin General Contracting Corp.?

A   When Ago left the job, he allowed Kemal and myself to keep the insurance on the job.

Q   And so you had to create a new company and you then took his insurance, is that --

A   I didn't take it.  It was on the job.

When Ago started the job, he gave his insurance to the developers and he started to perform work.  When he left the job, because he underbid the job and he stole 250,000 out of 300,000 from the contract, he was willing to give Kemal and myself anything to finish the job as long as we can finish the job and it wouldn't have been a lot of lawsuits started because of his mismanagement.

Q   The contract that you referenced, that contract, it was not with you, right?

A   The contract was between Dunbar and Ago & Alaudin.

Q   Right, not with Midwood Lumber or David Motovich, right?

A   No, correct.

Q   Okay.

And you said that he walked off the job, and who did he owe money to then?

A   So, the way it worked was he signed the contract and he would buy, Ago & Alaudin would buy the material from Midwood Lumber.  He was responsible to pay Midwood Lumber.  He was

D. Motovich - cross - Polemeni          2555

responsible to pay the labor and finish the job.  He was dealing directly with the developer for payments.  The developer gave him $250,000 off his 300-thousand-dollar contract because he said he thought it's David Motovich who's gonna make sure the job is finished.

Q   Okay.

MR. POLEMENI:  If we can go to Government's Exhibit 1004.

THE COURT:  In evidence.  You may publish.

MR. POLEMENI:  Thank you, Judge.

(Exhibit published.)

BY MR. POLEMENI:

Q   So, this is an e-mail from your sister, right, to someone goforkosh@yahoo.com or, sorry, gforkosh@yahoo.com?

A   Yes, sir.

Q   And who is Meilech Saks?

A   Meilech Saks, I know him.

Q   Who is he?

A   He's a friend of the family's.

Q   He's a friend of the Motoviches?

A   Yes.

Q   How is he a friend?

A   He's my parents' friend.

Q   And your sister, Ms. Gail --

MR. POLEMENI:  If we can go to the second page.

D. Motovich - cross - Polemeni          2556

Q   -- attaches an Ago & Alaudin General Construction Corp., do you see that?

A   I see it.

Q   Now, the date of the e-mail is April 16th of 2013, do you see that?

A   I see it.

Q   In April there was no problem at Dunbar, right, Ago Kolenovic, he was doing a good job, right?

A   I believe so.

Q   Right.  There was no reason for you at that point to have created Ago & Alaudin Construction Corp., right?

A   Correct.

Q   So why is this invoice, which says Ago & Alaudin General Construction Corp. signed by -- well, purportedly signed by Ago Kolenovic?  I mean he testified that that's not his signature, do you remember that?

A   Yes.

(Continued on the following page.)

**J.A. 874**

Motovich - Cross - Mr. Polemeni                    2557

CROSS-EXAMINATION (Continued.)

BY MR. POLEMENI:

Q    Is that his signature?

A    I don't know.

Q    Why is this invoice backdated to September 1, 2012?

A    Again, I had nothing to do with this invoice.  I don't recall this invoice.  So I really can't give you an answer on this invoice.

Q    Did your sister create this invoice without any of your input, is that what you're saying?

A    Again, this is almost 12 years ago and I don't recall this invoice.

Q    Is it just a coincidence that this invoice has the letterhead Ago & Alaudin General Construction Corp., and it's backdated September 20, 2012, and Ago Kolenovic's signature is forged but you just don't know anything about this?

A    Again, I don't know.  I don't recall this invoice.

Q    So if we go to Government's Exhibit 1013, please.

        THE COURT:  You may publish.  It's in evidence.

Q    This is about a year later, in February of 2014; is that right?

A    Yes.

Q    And this is now after Mr. Kolenovic has supposedly walked off the job and left you holding the bag, right?

A    Correct.

Motovich - Cross - Mr. Polemeni                    2558

Q    And after he said, David, you know what, just take my company, do whatever you need to do.  Right?

A    He gave me the okay to finish the job, yes.

Q    Was Mr. Kolenovic lying about what happened when he testified here?

A    He didn't lie.  He said he came to my office, he received 250,000 out of a $300,000 contract, and he finished one and a half floors or two floors of the job.

Q    He didn't say that he gave you his company's name and told you to do whatever you wanted with it, did he?

A    He said I could use his insurance for the job.

Q    He testified to that?

A    You didn't ask him that.

Q    Well, I didn't ask him.  Mr. Jackson didn't ask him either.  Is that right?

A    I don't recall.

Q    So this email is to the Merrick RE Group at AOL.com.  We heard a little bit about Merrick RE Group.  Who is that?

A    That is Rich Pesce.

Q    Friend of yours?

A    Yes.

Q    And if we look at the next page, Ago & Alaudin General Construction Corp.  That's your address, 1100 Coney Island Avenue, right, or one of the buildings that you own?

A    Yes.

Motovich - Cross - Mr. Polemeni                    2559

Q    And that's your cell phone number, 646-330-0861?

A    Correct.

Q    And so this is just you using Mr. Kolenovic's company's name because this is what he was going to repay you; is that right?

A    No.

Q    It's for something else?

A    This invoice says proposal.  I may have made a mistake.

Q    Okay.  If we could go to Government's Exhibit 1006.

        THE COURT:  In evidence.  You may publish.

Q    If we could go down to the bottom.  This email is dated June 10th of 2013.  Do you see that Mr. Motovich, the bottom email?

A    Yes.

Q    And Mr. Kolenovic is still at the job site at Dunbar, correct?

A    Correct.

Q    And things are still going well?

A    Correct.

Q    So this individual by the name of Leybman, Mikhail, or I don't know if it's Mikhail Leybman, he sent you an email; is that right?  That's your email address, DaveMidwood@gmail.com?

A    Yes.

Q    And it says subject, Reliable Electric?

A    Yes.

Motovich - Cross - Mr. Polemeni                    2560

Q    If we could zoom out for a moment.  If we could read the text at that bottom email, Ms. Kannan.  Dear David, this is what he writes to you, please arrange the insurance certificate for Reliable Electric and gives the address.  Also please see attached the commercial project list, which was done by our company.  Why is Mr. -- why are you receiving this email, do you know?

A    He's asking me for insurance and he's asking me to sending me his resume.

Q    When you say he's asking you for insurance, what do you mean?

A    He's asking for a certificate of insurance.

Q    A fraudulent one?

        THE COURT:  Did you answer his question?

A    This was in 2013?

Q    Yes.

A    Is there a copy of the insurance certificate?

Q    Well, do you recall whether this is -- he was asking you for a fraudulent one or a legitimate one?

A    I need to see the certificate.

Q    Were there any times when someone was asking you for a legitimate certificate?

A    Yes, during the job period.

Q    In other company names?

A    If Ago was the insurer, he would give insurance to people

J.A. 875

*Motovich - Cross - Mr. Polemeni* 2561

on the job.

Q    Why are they asking you?

A    I don't know.

Q    Reliable Electrical is one of your check cashing customers, right?

A    He was my electrician.

Q    He was one of your check cashing customers, right?

A    I'm not a check casher.

Q    Did he give you checks and then you gave him cash in exchange, Mr. Motovich?

A    Can you show me the check?

Q    I'm just asking you whether that happened.

A    I don't know.

Q    You don't know if that ever happened?

A    No.

Q    You don't know if he was a check cashing customer of yours?

A    Again, check cashing customers went to CIP.

Q    You were just giving loans?

A    Yes.

Q    So if we can go up to the next email, you say to Ms. Kuyan, you're directing her, Make a cert from Ago & Alaudin.  What are you telling her?

A    I asked her to make a certificate of insurance for them.

Q    A fake one, a fraudulent one, correct?

---

*Motovich - Cross - Mr. Polemeni* 2562

A    Again, I don't see the cert.

Q    If we could go up to the next one.  Does Ms. Kuyan forward this to Sveta Kun?

A    Yes.

Q    Is Ms. Kun another one of your employees at Midwood?

A    Yes.

Q    Let's talk about insurance certificates a little more. You touched on this.  Mr. Jackson asked you, you didn't commit any insurance fraud, right?

A    No.

Q    And you were giving the insurance certificates to your check cashing customers because they needed some documentation, right?

A    Again, I did not have any check cashing customers.

Q    You were giving these fraudulent insurance certificates to Joe Russo, Phillip Adamou, Roman Kretsula, and we saw others.

     You were giving them to your customers because they were writing checks to you, you were giving them cash, and they needed to show their auditors, or their accountants, they needed to show why you were writing checks to your companies, right?

A    They needed it for their workmen's comp.

Q    And you knew that, right?

A    Yes.

---

*Motovich - Cross - Mr. Polemeni* 2563

Q    And that was a service that you provided them, right?

A    I helped them with certificates, yes.

Q    It was part of your fee, right?

A    No, I didn't charge.

Q    You didn't charge for that service?

A    No.

Q    It wasn't part of, you know, when you charged 4 percent to Mr. Adamou and Mr. Russo 10 percent and Mr. Kretsula 15 percent, this wasn't part of the service you provided for them?

A    No.

Q    It was -- this was on the house?

A    Never charged Roman 15 percent and I never charged for certificates of insurance.

Q    Okay.  But you knew that the insurance certificates that you were fraudulently creating, you knew that those were going to be provided by your check cashing customers to the workers' compensation board, right?

A    Again, I had no check cashing customers and I knew they would be supplying it if they got audited by workmen's comp.

Q    You knew that?

A    Yes.

Q    And you also knew that they would be providing those documents to their accountants who were preparing their tax returns, right?

---

*Motovich - Cross - Mr. Polemeni* 2564

A    No.

Q    Well, you understood that when they were showing, if they had to, the insurance certificates to the workers' compensation board, they would be telling the workers' compensation board, do you see this check I wrote for $40,000 to ZKC, I have proof that it was for subcontracting work that ZKC did for me.  You understood that, right?

A    Again, I don't go through their audits and their accountants are not my accountants.

Q    I understand, Mr. Motovich, but you understood that's what they were going to do with the documents, right?

A    I did not understand that.  They did not tell me that.

Q    You understood that they would be telling their accountants the same thing, when their accountants asked hey, Joe, why did you write hundreds of thousands of dollars to these companies, ZKC and Ago & Alaudin and CNBC, Joe would say, well, it's subcontracting work and as proof, here is the insurance certificate.

     You understood that, right?

A    Again, I wasn't involved in their meetings with their accountants or with workmen's comp.  I don't know what they were telling them.

Q    And you understood that their accountant would say great, I'll deduct it as an expense and I'll tell the IRS that it was a business expense?  You understood that, right, Mr. Motovich?

**J.A. 876**

Motovich - Cross - Mr. Polemeni                    2565

A    Again, I wasn't part of any of their meetings.

Q    This isn't that complicated, right, Mr. Motovich?

A    Nothing is complicated.

Q    If we could go to Government's Exhibit 1200, page 7.

THE COURT:  In evidence.  You may publish.

Q    This is an text message from Marina Kuyan to you, right, Mr. Motovich?

A    Yes.

Q    And it says, hi, Lithos Marble called me.  They are having audit tomorrow.  So they asking for certificates from BP Cooling, ZKC.  I'm gonna do it.  What was she telling you there?

A    She's saying I'm going to make a certificate from ZKC.

Q    Fraudulent certificates, right?

A    I will go do it.  Can you please talk to them?

Q    She was going to make fraudulent certificates, right?

A    Do you have a copy of the certificates?

Q    Was she going to make legitimate certificates, Mr. Motovich?

A    I don't know.  Do you have a copy to show me?

Q    And you say okay.  Right?

A    Yes.

Q    Because Ms. Kuyan, she doesn't do anything without your approval, right Mr. Motovich?

A    She does make certificates on her own.

Motovich - Cross - Mr. Polemeni                    2566

Q    I mean, she makes them on her own sometimes only because you've told her to make them on her own, right?

A    No.  Her husband has a furniture store, which she was delivering to a lot of buildings, as you saw in your discovery.

Whenever she delivers furniture to a building they need a certificate of insurance, and she would make those on her own and I did not know she was making those certificates.

Q    Okay.  So let's move on to the loans.  I don't want to spend too much time on this.  I want to make sure we have a clear understanding.

So the money you were giving, the transactions between you and Mr. Adamou, Mr. Russo, Mr. Kretsula and others, those were loans you were giving them, right.

A    Correct.

Q    But we don't have any promissory notes reflecting this agreement, right?

A    Correct.

Q    Although you have many other loan promissory notes from other loans you've given out, right?

A    Correct.

Q    If we could go Ms. Kannan to Government's 1203047, please.

THE COURT:  In evidence.  You may publish.

Q    These are text messages between you and Mr. Kretsula.  Do

Motovich - Cross - Mr. Polemeni                    2567

you see that, Mr. Motovich?

A    Yes.

Q    And he's asking you, can I pick up from Yanki, right?

A    Yes.

Q    What is he asking you?

A    He's asking if he can go to Yanki and pick up money.

Q    And why is he asking you that?

A    Because he needs cash.

Q    And you say yes, go to Yanki, right?

A    Yes.

Q    Why were you telling him to go to Yanki?

A    What day was that?  Probably I wasn't around.

Q    How is it that you can just tell Mr. Kretsula to go to Yanki and he can get cash?

A    I don't know if he wrote him a check or Yanki owed me money or I just don't recall.  It's six years ago.

Q    It's possible that Yanki owed you money?

A    A lot of people owe me money.  It's possible.  Yanki still owes me money, yes.

Q    Because he owes you money you can just walk into Coney Island Payroll Services and just take money from the safe, right?

A    No.

Q    That's what you did repeatedly, right, Mr. Motovich?

A    I never did that.

Motovich - Cross - Mr. Polemeni                    2568

Q    You walked in almost like you owned the place, right, Mr. Motovich?

A    They had a lot of my money but I never took money myself from that place.

Q    They also have your money?

A    Coney Island Payroll, I have a loan with Coney Island Payroll.

Q    And the way they paid back that loan was, again, for you to walk into Coney Island Payroll Services where there's all this cash sitting around and just take it, and then bring it back to your office when you felt like it to provide to your check cashing customers and to charge them two times, four times, sometimes five times what they would have paid at Coney Island Payroll Services, right, Mr. Motovich?

A    No.

Q    That's the entire scheme, right, Mr. Motovich?

A    No.

Q    And you just did that over and over and over again for nearly a decade, right?

A    No.

Q    So Mr. Kretsula says, thanks, 30.  And he's telling you that I'm going to get 30,000 from Yanki, right?  Right?

A    I don't know.  He says thanks, 30.

Q    You were here when Mr. Kretsula said he's saying thanks, 30, because you owed him $30,000, right?

J.A. 877

*Motovich - Cross - Mr. Polemeni* 2569

A    Me and Mr. Kretsula had many dealings.  So there was normally he owed me money, not the opposite way.

Q    So sometimes he brought a check to you and you didn't have the cash, right?

A    No.

Q    And he had a balance, you took a check, but he had a balance and sometimes he would have to ask you David, you owe me some money.  Right?

A    The only money I owed him was for work.  Normally he owed me money.

Q    And you say no, 20.  Right?  What are you saying there?

A    He's asking me for money, I don't know, probably for one of my jobs.  And he's asking for a payment of 30,000 and I'm telling him no, I'm only giving you 20,000.

Q    Which job do you think he might have been asking for, do you know?

A    I did many jobs with him.

Q    And so when you're telling him no, 20, it's I'm only going to give you the 20,000 that I owe you, right?

A    I'm only going to give you a payment now of 20 and for now.

Q    It has nothing to do with jobs or construction work or painting.  What it has to do with, Mr. Motovich, is that you owed him $20,000 because he had given you -- you owed him $30,000 because he had given you a check, you didn't have the

*Motovich - Cross - Mr. Polemeni* 2570

money, and now he's saying I want my money, David, the cash you owe me from the check I gave you, right?

A    Again, can you show me the check, please?

Q    That's what Mr. Kretsula said.  Do you remember that?

A    Mr. Kretsula said a lot of things.  He also said I helped him start, my father helped him start his business.

Q    I know your father helped him.  That was very nice of your father.  I agree.  He also said that you would owe him money at times, correct?

A    I don't remember him saying that.

Q    When you owed him money, Mr. Motovich, was he giving you a loan by giving you a check and you owing him money?

A    In my -- he was claiming for work that I would owe him some money when he did my work.  For his checks or for his loans he was always tight.  He always needed money because the contractors and developers wouldn't pay him, and I would be his bank, like I was the bank for Russo and Lithos.

Q    Are you a bank?

A    Not a bank.  I would front people money because they would help me with business for Midwood Lumber.  My goal was one thing, people to buy and pay Midwood Lumber.

Q    You consider yourself a bank, didn't you, Mr. Motovich?

A    No, I did not consider myself a bank.

Q    If we could go to Government Exhibit 1200, page 16, please.

*Motovich - Cross - Mr. Polemeni* 2571

THE COURT:  In evidence.  You may publish.  How much do you have on this exhibit?

MR. POLEMENI:  On this exhibit, a minute, two minutes.

THE COURT:  Go ahead.

Q    If we could scroll down.  See in the middle there, Mr. Motovich, you write, this is to Ms. Kuyan, Write a check from Kemal personal account to David Motovich Investors for 50K and put as a loan to David Motovich Investors from Kemal.

What are you telling Ms. Kuyan to do there?

A    Kemal, one of his accounts, are loaning because his accountants wanted all the return loans and loans going from his personal account so when he files the taxes it will be easier for him to file them.

Q    That is what Kemal Sarkinovic told you?

A    That is what his bookkeeper told us.

Q    What really happened, Mr. Motovich, is that you were moving money around, none of this money belonged to Kemal Sarkinovic, but you had opened an account and deposited hundreds of thousands of dollars of your money into the account, and now in an attempt to document or paper your transactions, you're saying put it in as a loan, right, Mr. Motovich?

A    No.

Q    You just use loan whenever you feel like it, just to

J.A. 878

*Motovich - Cross - Mr. Polemeni* 2572

document it, to paper it over, right, Mr. Motovich?

A    No.

MR. POLEMENI:  I'm done with this document, Judge.

THE COURT:  It's about 12:30.  Why don't we take our lunch break at the agreed upon time at the beginning, closer to 12:30.  Why don't we resume promptly at 1:45.  Does that work?  We'll have a nice lunch break and then we will have our hard stop at 5:00.  Counsel will pick up the pace, I just know they will.  We're going to take our lunch recess.  Do not talk about the case.  Thank you.

(Jury not present.)

THE COURT:  You may be seated.  The ladies and gentlemen of the jury have left the courtroom.  We're going to take our lunch recess.  Is there anything we need to talk about, from the government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Anything from defense counsel?

MR. JACKSON:  No.  Thank you, Your Honor.

THE COURT:  We'll take our lunch recess and see you back here at 1:45.

MR. JACKSON:  Thank you, Judge.

(Lunch recess taken; continued on next page.)

2573

AFTERNOON SESSION

(In open court; outside the presence of the jury.)

THE COURT: You may be seated.

Do we have any issues to address before we bring the jury in, first, from the government and then from defense counsel?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense counsel, do you have any issues before we bring the jury in assuming they're all back from lunch?

MR. JACKSON: Yes, Judge. Just one brief issue. We just conferred with the government.

We have a witness who's a very short character witness named Mohamed Mohamed who we -- he's been here yesterday and today.

THE COURT: He hasn't been in the courtroom, I assume.

MR. JACKSON: He has not. He has not. He's downstairs in the cafeteria.

THE COURT: Okay. I wanted to make sure we don't have that problem.

MR. JACKSON: We warned him to not be in the courtroom.

THE COURT: Okay.

MR. JACKSON: But he's a very short --

---

2574

THE COURT: I don't want to take him out of order. I hear you coming up to that, but I don't want to take him out of order.

How much more time do you have roughly with this witness on your cross, sir? I'm not going to hold you to it.

MR. POLEMENI: I understand.

THE COURT: Use the microphone. Turn it on. Roughly.

MR. POLEMENI: Roughly? Like 45 minutes to an hour.

THE COURT: Forty-five minutes?

And how much do you anticipate you have on your redirect, roughly? I'm not going to hold you to it.

MR. JACKSON: Less than 30 minutes, Judge.

THE COURT: Okay. Well, then you have to tell the witness to wait. I don't want to take him out of order. Let's just plow ahead.

MR. JACKSON: The one thing I would also say, Judge, he has to be at work today at 3 -- oh, he got a reprieve?

MR. MAZUREK: Yes.

MR. JACKSON: That's fine, Judge. I understood he had to be at work by 3:00 p.m., but I guess he got a reprieve. Thank you, Judge.

THE COURT: Okay. Let's do that.

Is the jury back, Mr. Scott? Do we know? Let's go check and see and as soon as they're all back from lunch,

---

2575

we'll bring them in.

(Pause.)

MR. POLEMENI: Your Honor?

THE COURT: Yes.

MR. POLEMENI: While we're waiting for the jury, I understand the character witness or the proposed character witness is Mr. Mohamed.

As Your Honor knows, there are, of course, limitations on what a character witness can testify to.

THE COURT: I've heard rumors to that effect.

MR. POLEMENI: Yes. And so without full disclosure, I would ask if the Court would direct defense counsel to give us some sort of proffer.

THE COURT: No. I didn't make you proffer and I'm no going to make them proffer. This is why I love trials. I'm an equal opportunity judge. I was going to say something more colorful but I'll leave that to you in your sidebars.

Look, that's why they call them trials.

MR. POLEMENI: Okay, Judge. Thank you.

THE COURT: Now, if Mr. Jackson is eager to tell you all about his witness, he can do that, but if not, again, old school.

Mr. Motovich, if you wouldn't mind, you can retake the stand, we're about to bring the jury in, just to save a minute or two.

J.A. 879

---

Motovich - cross - Polemeni          2576

THE WITNESS: Yes, Judge.

(The witness, DAVID MOTOVICH, having been previously sworn, resumed the stand.)

THE COURT: Please rise for the jury.

(Jury enters.)

THE COURT: Thank you for your promptness, ladies and gentlemen of the jury. I appreciate it. Please be seated.

We are going to continue with the cross-examination by Mr. Polemeni.

And, please, remember, sir, you're still under oath.

Counsel you may inquire.

MR. POLEMENI: Thank you, Your Honor.

THE COURT: Thank you.

CROSS-EXAMINATION (Continuing)
BY MR. POLEMENI:

Q    I just want to jump back quickly to the discussion we were having about IBAR?

A    Yes.

Q    And that's the individual you testified he left his wallet on your desk before leaving to go back to his home country, correct?

A    Yes.

MR. POLEMENI: Ms. Kannan, if we can pull up Government's Exhibit 2002-A, Page 61, please.

Motovich - cross - Polemeni          2577

THE COURT:  In evidence.  You may publish.

Q    Mr. Sarkinovic, if you recall, testified that he was approached by agents at JFK in January of 2019, correct?

A    Yes.

Q    And what are we looking at here in Government's Exhibit 2002-A, page 61?

A    I let him use my wife's Bloomingdale's card and he's just paying me back.

Q    So you let the owner of IBAR use your wife's Bloomingdale's card and he's paying you back?

A    Yes.  My wife has a special discount at Bloomingdale's and he asked for a favor and here he is paying it back.

Q    And that's your, that's your handwriting, right?

A    Yes.

Q    All of it?

A    Yes.

Q    Except the signature?

A    Except the signature, yes.

Q    So he's like another Kemal Sarkinovic, right?

A    No.

Q    Another Robert Lovy?

A    No.

Q    Another Reggie Garcia?

A    No.

MR. POLEMENI:  We can take that down.

---

Motovich - cross - Polemeni          2578

Q    Mr. Motovich, let's talk about Reggie Garcia for a little while.

Yesterday you testified, correct me if I'm wrong, that you did not know why Reggie, or you didn't know what Reggie Garcia and Joshua Markovics had agreed to, is that right?

A    Correct.

Q    But you understood that Reggie Garcia had agreed to open up an account?

A    Correct.

Q    Where did you understand Mr. Garcia had agreed to open an account?

A    He came to my office.

Q    Is this Mr. Garcia?

A    Mr. Garcia.  He came to my office to meet Dannette Sullivan, Hyatt Sullivan, to open an account.

Q    So he came to your office to open an account at Carver Bank?

A    Yes.

Q    And you said you spoke with him?

A    I spoke to him very briefly.

Q    What do you remember about that conversation?

A    I said:  Hello.  He said:  Hello.  I said:  Are you from Markovics?  He said:  Yes, I'm Reginald Garcia.  I introduced myself as David.  And he said -- I said, you know -- he goes

---

Motovich - cross - Polemeni          2579

he came to meet the banker.  I said:  Okay, just wait here by the secretary.

Q    And that's it?

A    And that's all that I remember.

Q    Okay.  And do you recall when he testified that he believed that his agreement with Mr. Markovics was that Mr. Markovics would deposit Royal Home wages into this account so that Mr. Garcia could withdraw his wages from that account?

Were you here for that testimony?

A    I was here for it.

Q    Did he tell you that?

A    No, he did not.

Q    Do you understand whether that is accurate or not?

A    I can't talk for Joshua.

Q    Okay.  And so after this what seems to be a very brief conversation with Mr. Garcia, an account at Carver Bank was opened in the name of ZKC, correct?

A    Correct.

Q    And Reggie Garcia was the signatory on the account, correct?

A    Correct.

Q    And you helped facilitate that opening, correct?

A    Correct.

Q    Did you tell Reggie Garcia at that time during this brief conversation that you were going to deposit checks from your

---

Motovich - cross - Polemeni          2580

check cashing customers into this ZKC account?

A    Again, I don't have a check cashing business.  I did not talk to him about anything.  Reginald Garcia was -- didn't work for me.

Q    Did you tell him that you intended to deposit any checks into the account?

A    I did not talk to him about the account at all.

Q    Okay.  And so what were you planning to do with the account, if anything, at that time?

A    At that time, I didn't have any plans.

MR. POLEMENI:  Ms. Kannan, if we can pull up Government's Exhibit 707-A in evidence.

THE COURT:  You may publish.

Q    Mr. Motovich, is this the Carver account opening documents for ZKC?

Does that seem right to you?

A    Yes.

Q    And so if -- you told Ms. Sullivan-Hyatt to open this account in ZKC's name and you provided Reggie Garcia's license and Social Security number, is that correct?

A    I didn't tell Dannette Hyatt anything.  I told Dannette I had a client for her and she came late for the meeting on the day Reginald Garcia was in my office waiting for it.

Q    Who gave Reggie Garcia's information to Carver, do you know?

**J.A. 880**

Motovich - cross - Polemeni    2581

A    Either my bookkeeper or secretary.

Q    Okay. Do you see where --

MR. POLEMENI: If we can go to page 7, Ms. Kannan.

Q    Some site visit observations. The date of this document is April 1, 2016, is that correct?

A    Yes.

Q    And is this the day that you were referring to when Ms. Sullivan-Hyatt came to you, into your office to meet Reggie Garcia?

A    Yes.

MR. POLEMENI: And if can we go to page 707-A, 10, please, Ms. Kannan.

Q    Do you see that this is the corporate authorization resolution for ZKC?

A    Yes.

Q    Were you here when Mr. Garcia testified that that's not his signature?

A    Yes.

MR. POLEMENI: If we can go to 707-A, Ms. Kannan, page 1. I apologize.

Q    This is an e-mail from, internally at Carver Bank. Do you see that?

A    Yes.

Q    And it's dated -- well, the below e-mail is dated April 19th and the title is "ZKC" and it's from a Medrena

Motovich - cross - Polemeni    2582

Williams to, among others, Dannette Sullivan-Hyatt. Do you see that?

A    Yes.

Q    It says, "Please see attached documents for review"?

A    Yes.

Q    And then if we go up to the top e-mail, Ms. Stewart is writing the next day, April 20th at 9:22 p.m., and confirming that the account application for ZKC has been approved, correct?

A    Correct.

Q    Okay.

MR. POLEMENI: So if we can go, Ms. Kannan, now to Government's Exhibit 707-B, 133, please.

Q    Mr. Motovich, is this an account statement for April 2016 for ZKC?

A    Yes.

MR. POLEMENI: And if we go to page 135, Ms. Kannan.

Q    And do you see where it has "Account Activity"?

A    Yes.

Q    And on April 20th, the balance is zero. Do you see that, Mr. Motovich?

A    Yes.

Q    And then that same day, there are two deposits, two credits into the account?

A    Yes.

Motovich - cross - Polemeni    2583

Q    And on the 21st, there's another deposit into the account?

A    Yes.

Q    And those deposits total $164,680?

A    Yes.

Q    Do you know what those deposits were?

A    Can you show me the deposits?

MR. POLEMENI: If we can turn, Ms. Kannan, to Government's Exhibit 707-C, please.

Q    The first page of this document, is it a deposit slip for ZKC dated April 20, 2016?

A    Yes.

Q    In the amount of $111,000 and $200? Let me -- $111,200.

A    Yes.

MR. POLEMENI: If we can turn the page now, Ms. Kannan, to page 2.

Q    What's this check, Mr. Motovich?

A    The check from Unique Painting.

Q    This is a check that Roman Kretsula gave to you that you told him to write to ZKC, correct?

A    Correct.

Q    In the amount of $36,200?

A    Correct.

Q    And the date is April 18, 2016. Do you see that on top?

A    Yes.

Motovich - cross - Polemeni    2584

MR. POLEMENI: If we can turn the page now to page 3, please.

Q    Is this a check, Mr. Motovich, from Lithos Marble to ZKC?

A    Yes.

Q    You told Phillip Adamou to write you a check to ZKC, correct?

A    Correct.

Q    And the amount is $27,000?

A    Correct.

Q    And the date of that is -- the date of this check is 4/19/2016?

A    Yes.

MR. POLEMENI: If we can turn the page, please, Ms. Kannan.

Q    Is this a check, Mr. Motovich, from a company called Pearonty LLC?

A    Yes.

Q    For $12,000?

A    Correct.

Q    Issued to ZKC NYC?

A    Correct.

Q    This is a check that you told the operator of Pearonty to write to ZKC, correct?

A    I don't know this check. I don't recall it.

Q    Do you know what Pearonty is?

J.A. 881

Motovich - cross - Polemeni                    2585

A    I -- it doesn't -- I don't recall the company name, no.
Q    They're another one of your check cashing customers,
right?
A    I don't recall them.
Q    Okay.  If we can turn the page, there is a check dated
April 11, 2016, is that right, Mr. Motovich?
A    Correct.
Q    For $20,000?
A    Correct.
Q    And the company is a company called JC Home Development,
do you see that?
A    Yes.
Q    What's that?
A    No idea.
Q    They're another one of your check cashing customers,
right, Mr. Motovich?
A    No.  Again, I don't have check cashing customers.  I
don't know who JC Home Development is.  It doesn't ring a
bell.
        MR. POLEMENI:  If we can turn the page to page 6,
please.
Q    Is this another check from Pearonty?
A    Yes.
Q    Written to ZKC?
A    Yes.

---

Motovich - cross - Polemeni                    2586

        MR. POLEMENI:  If we can turn the page to page 7,
please.
Q    This is a check from a company called Net Power Electric?
A    Yes.
Q    It's written to ZKC?
A    Yes.
Q    For $6,000?
A    Yes.
Q    This is another one of your check cashing customers,
right?
A    Again, I don't have a check cashing company.
Q    What is Net Power?
A    Net Power is an electrician.  He was an electrician for
me and Royal.
Q    He was an electrician for you and Royal?
A    And also a customer of Midwood Lumber's.
Q    Okay.  So if he was an electrician for you and Royal, why
would he be writing a check to ZKC?
A    He could have been writing it for material.
Q    Net Power is actually a company associated with Abe
Fridman, right?
A    Abe Fridman?
Q    Yes.
A    Which Abe?
Q    Your uncle.

---

Motovich - cross - Polemeni                    2587

A    No.
        MR. POLEMENI:  If we can turn the page to
Government's Exhibit -- I'm sorry, page 9, please.  And
actually -- Ms. Kannan, I'm sorry, if you can go to page 8,
the page right above.
Q    Is this another deposit slip, Mr. Motovich?
A    Yes.
Q    Is this one dated April 20, 2016?
A    Yes.
Q    And there are two entries, two deposits made?
A    Yes.
Q    Totaling $28,480?
A    Yes.
        MR. POLEMENI:  If we can turn the page, Ms. Kannan.
Q    What are we looking at here on page 9, Mr. Motovich?
A    A check from Unique Painting.
Q    To ZKC?
A    Yes.
Q    For $10,480?
A    Yes.
Q    What's the date of the check?
A    April 3, 2016.
Q    And this is a check that you told Roman Kretsula to write
to you, right?
A    Yes.

---

Motovich - cross - Polemeni                    2588

        MR. POLEMENI:  And if we can turn to page 10,
please, the last check.
Q    What's this check, Mr. Motovich?
A    Check from Lithos Marble.
Q    Dated April 1, 2016?
A    Yes.
Q    Made out to ZKC?
A    Yes.
Q    For $18,000?
A    Yes.
Q    You told Mr. Adamou to write this check to you, right?
A    Yes.
Q    And in exchange, you gave him cash, right?
A    Yes.
Q    So there's been some discussion, Mr. Motovich, about the
timing of, you know, the deposits.  You would hold checks for
certain individuals, right?
A    Yes.
Q    This check is dated April 1st as was the one before, is
that right?  And, I'm sorry, and on page 9, the check from
Unique that we just looked at is dated April 3rd, correct?
A    Correct.
Q    Now, if we go to the "Transit," see where it says
"Transit"?  Do you see it says April 20th?
A    Yes.

J.A. 882

Motovich - cross - Polemeni                2589

Q    And you were here when a representative from Carver Bank testified that that's when the checks are deposited into the account, correct?

A    Correct.

Q    Now, is this one of those instances where you, where Phillip Adamou asked you to hold the check?

A    Phillip asked me to hold the check most of the times, almost.  We had an ongoing balance so he probably gave me 18,000 on account --

Q    Okay.  So when he --

A    -- towards his balance, yes.

Q    So when he testified that it happened two or three times, he asked you to hold it a day or two, he was lying?

A    Sometimes he -- I would hold it a day or two.  Sometimes I would hold it two or three weeks or a month.

Q    Isn't it the case that that's not what happened, Mr. Motovich, and what actually happened is that you didn't have the ZKC account opened on April 1st when you were given this check, is that right?

A    No.

Q    And you had to wait until April 20th for the account to be opened, right, Mr. Motovich?

A    No.

Q    And then when the account was opened, you actually deposited the checks into the account, right?

Motovich - cross - Polemeni                2590

A    No.

        MR. POLEMENI:  We can take that down, Ms. Kannan.

Q    Mr. Motovich, you were here when Mr. Sarkinovic testified that you would, you would ask him or tell him to sign blank checks and give them to you.  Okay?

A    Yes.

Q    And that's true, right?

A    Yes.

Q    And the same thing happened with Robert Lovy for the account he opened?

A    Yes.

Q    That's not what happened with Reggie Garcia though, right?

A    No.

Q    You had a stamp of his signature, correct?

A    Correct.

Q    That's because he had no idea what you were doing, right, Mr. Motovich?

A    Again, I didn't meet with Reginald so I don't know what Joshua told him.

Q    Right.  I understand you had no idea of what that agreement was, but the fact of the matter is you had an account in his name that you controlled, right?

A    We had the checkbook and I assumed him and Joshua were on the same page.

Motovich - cross - Polemeni                2591

Q    Right.  And so you assumed that, you didn't ask?

A    I asked Joshua.

Q    And the reason why you had a stamp rather than have Reggie Garcia come into your office every two weeks like you had others is because Reggie Garcia had no idea what you were doing, you had stolen his identity, and you didn't want him to know what was happening, right?

A    No.

Q    I want to switch topics, Mr. Motovich, to talk about Arthur Gershfeld.

A    Okay.

        MR. POLEMENI:  Put up GX-3, please.

        THE COURT:  You may publish.

Q    Who's that?

A    That's Arthur Gershfeld.  He's a criminal attorney.

Q    Criminal defense attorney, right?

A    Yes.

Q    How long have you known Mr. Gershfeld?

A    I know Mr. Gershfeld I would say a good ten years.

Q    Ten years, you said?  I'm sorry.

A    Ten years, yes, maybe more.

Q    Did his father know your father?

A    His father and my father were very close, yes.

Q    What do you mean that they were very close?

A    They did a lot of work together.

Motovich - cross - Polemeni                2592

Q    What type of work?

A    Glass work.

Q    Mr. Gershfeld's father was a glass installer, is that right?

A    Yes.

Q    And your father would give him jobs?

A    Yes.

Q    And, in fact, Mr. Gershfeld's father had given your father a significant sum of money to invest, is that right?

A    Correct.

Q    And over the years, your father would write checks to Mr. Gershfeld's father, correct?

A    Correct.

Q    On a monthly basis?

A    Correct.

Q    And you've seen those checks, right?

A    Yes.

Q    You've signed some of them, correct?

A    Correct.

        MR. POLEMENI:  So if we can pull up Government's Exhibit 803, please.

        THE COURT:  In evidence?

        MR. POLEMENI:  I'm sorry.  It is not in evidence, Judge.

        THE COURT:  Just for the witness?

J.A. 883

Motovich - cross - Polemeni          2593

MR. POLEMENI:  Just for the witness.

THE COURT:  Just for the witness.

Any objection to Government Exhibit 803?

MR. POLEMENI:  And I can provide a copy to defense counsel as well, Judge.

THE COURT:  Any objection to 803?

MR. JACKSON:  Is this the entire exhibit?

MR. POLEMENI:  There are about five pages, six pages.

MR. JACKSON:  May I just look at a copy, please?

THE COURT:  Can you provide him with a hard copy or do you want to scroll down electronically?  Whatever works.

MR. JACKSON:  Thank you.

(Pause.)

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Admitted.  You may publish to the jury.

(Government Exhibit 803 so marked.)

(Continued on next page.)

---

D. Motovich - cross - Polemeni          2594

(Continuing.)

(Exhibit published.)

MR. POLEMENI:  Thank you.

BY MR. POLEMENI:

Q    Mr. Motovich, are these some of the checks that we were just discussing?

MR. POLEMENI:  Ms. Kannan, if you can flip through them for Mr. Motovich.

(Exhibit published.)

A    Yes.

Q    And so Boyard Management, that's a company that your father owns, correct?

A    Correct.

Q    And these checks are checks in the amount of $9,625, correct?

A    Correct.

Q    They're written out to Arthur Gershfeld's mother and father, correct?

A    Correct.

Q    And that's your signature on the bottom right, correct?

A    Yes, it is.

Q    And this check in 803, the first check is dated December 22nd of 2018, is that correct?

A    Yes.

Q    You've invited Mr. Gershfeld to attend family events of

---

D. Motovich - cross - Polemeni          2595

yours, is that right?

A    Yes.

Q    He's gone to your sons' Bar Mitzvahs?

A    I think the two middle ones, yes.

Q    Okay.  He's gone to a birthday party of yours?

A    Yes.

Q    He's gone out for dinner with you on occasion?

A    Yes.

Q    And he's invited you to his family, some of his family events as well, right?

A    Yes.

MR. POLEMENI:  If we can show just the witness Government's Exhibit 805, please.

THE COURT:  Any objection to 805?

MR. JACKSON:  No objection, Judge.

THE COURT:  Admitted.

(Government's Exhibit 805 was received in evidence.)

THE COURT:  You may publish.

MR. POLEMENI:  Thank you, Judge.

(Exhibit published.)

BY MR. POLEMENI:

Q    Do you see the check on the bottom, Mr. Motovich?

A    Yes.

Q    And it says The Law Offices of Arthur Gershfeld, is that right?

---

D. Motovich - cross - Polemeni          2596

A    Yes.

Q    And it's written out to Motovich, is that right?

A    Yes.

Q    The amount is $1,000?

A    Yes.

Q    The date is March 7th of 2020?

A    Yes.

Q    What does the memo line say?  Can you make that out?

A    I can't read that.

Q    Okay.  Do you know if this was some sort of event that you had held?

A    Could be.

Q    Okay.  And just the date is March 7th of 2020, right?

A    Yes.

Q    Okay.

Now, you mentioned that Arthur Gershfeld is a criminal defense attorney, is that right?

A    Yes, he is.

Q    And without telling us what the circumstances were, at some point did you retain him in around 2016?

A    Me, personally?

Q    Yes.

A    I don't recall.  No.

Q    So, Mr. Motovich, Arthur Gershfeld, he's been to your apartment, correct?

**J.A. 884**

D. Motovich - cross - Polemeni                    2597

A    Correct.

Q    And that was in March of 2019, if you recall?

A    March of 2019 --

Q    Well --

A    -- I don't --

MR. POLEMENI:  I'll withdraw that question.

BY MR. POLEMENI:

Q    Kemal Sarkinovic was stopped at the airport in January of 2019, correct?

A    Correct.

Q    And Arthur Gershfeld has been to your apartment, subsequent to that January 2019 date, correct?

A    Yes.

Q    And you and Arthur Gershfeld actually met in Florida in April of 2019, is that correct?

A    I don't recall, maybe.

Q    Were you down -- did you invite him over for cigars to your condo down in Florida one evening in April of 2019?

A    It's possible.

MR. POLEMENI:  If we can show just the witness, Your Honor, Government's Exhibit 814.

THE COURT:  For the witness.

Any objection?

MR. JACKSON:  Could you expand that just a bit?

(Pause.)

---

D. Motovich - cross - Polemeni                    2598

MR. JACKSON:  Is this the entire document?

MR. POLEMENI:  There are several pages.

MR. JACKSON:  Can I have a copy, please?

MR. POLEMENI:  Sure.

THE COURT:  Any objection to 814?

MR. JACKSON:  Your Honor, it's 33 pages.  Perhaps, if there are a couple pages that --

THE COURT:  Well, are you offering the whole document --

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  -- counsel?

All right.  Then take your time and look through it. It could have been done earlier, but you're entitled to look through it.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're welcome.

(Pause.)

MR. JACKSON:  Your Honor, I have no objection to anything except for page 4, one part of it.

THE COURT:  All right.  Do we need to have a sidebar or do you wish to -- why don't you take a look at it and see what his objection is?

MR. POLEMENI:  Sure.

THE COURT:  Just talk with him privately, see if you can agree not to offer that portion of it.  It will probably

---

D. Motovich - cross - Polemeni                    2599

speed this along.  If not, we'll have to have a full bore sidebar.

You know how much I love those, almost as much as you do.

(Pause.)

MR. JACKSON:  Your Honor, we've agreed that this is acceptable with the exception of identified portions of page 4, page 17, page 18 and page 33, which we agree are not relevant.

THE COURT:  All right.  So just so there is no confusion should the jury ask for this document when you begin your deliberations, ladies and gentlemen of the jury, we are going to have a redacted version of that document available to you.  I don't know what it is.  Maybe you'll want to see it later, maybe you won't.  All that is being offered is the document without the redacted portions.  That's what will come into evidence.

Should you ask to see this document, when you get it, it will have redactions.  Don't think that they're hiding the crown jewels.  They've agreed on it.  Okay.

Could they have done this before?  Yes.  But, you know, it's more fun to have everybody sit here while they do it.

Okay.  Let's go.

MR. POLEMENI:  The Government moves into evidence

---

D. Motovich - cross - Polemeni                    2600

Government's Exhibit 814, Judge.

THE COURT:  Admitted with the redactions.

No objection?

MR. JACKSON:  Correct, Judge.

(Government's Exhibit 814 with redactions was received in evidence.)

THE COURT:  All right, let's go.

(Exhibit published.)

BY MR. POLEMENI:

Q    Mr. Motovich, do you see that these are text messages between you and Arthur Gershfeld at the bottom?

A    Yes.

Q    And that's your number, correct?

A    Yes.

Q    And Mr. Gershfeld's number is 718-344-8464, is that correct?

A    That's what it says there.

Q    Okay.

MR. POLEMENI:  So if we can turn, please, Ms. Kannan, to page -- page 20.

(Exhibit published.)

MR. POLEMENI:  And the bottom e-mail, please.

Q    Do you text Mr. Gershfeld your home address on March 5th of 2019?

A    Yes.

**J.A. 885**

*D. Motovich - cross - Polemeni* 2601

Q   And then does Mr. Gershfeld say:  Got it, on the next page?

A   Yes.

Q   And then the following text message is about three weeks later.

Do you see that where Mr. Gershfeld was telling you: I'm in your building?

A   Yes.

Q   And Mr. Gershfeld came up to your apartment that day, correct?

A   Correct.

MR. POLEMENI:  And if we can turn, Ms. Kannan, to page 30, please.

(Exhibit published.)

MR. POLEMENI:  And the bottom two text messages, please.

BY MR. POLEMENI:

Q   Do you see, Mr. Motovich, you write:  9801 Collins Avenue?

A   Yes.

Q   And that's your -- that's a condo you own in Miami, is that correct?

A   Correct.

Q   And the date of this text message is April 25th of 2019?

A   Correct.

*D. Motovich - cross - Polemeni* 2602

Q   And Mr. Gershfeld writes:  OK.  Give me 15 minutes. We'll put them down and come by for a drink.

Do you see that?

A   Yes.

Q   And then the next page, there are some e-mail or text messages at the top where he says:  On my way to you now.  And then:  I'm coming up.

Right?

A   Correct.

Q   And you recall that evening you and he met in your apartment in Miami, correct?

A   Yes.

Q   Now, Mr. Sarkinovic, you heard him testify that he was stopped on January 12th by agents at JFK Airport, correct?

A   Correct.

Q   And then the following day he told you and others that he had been stopped?

A   Yes.

Q   And after being told that he had been stopped by agents at JFK, the first thing you did was reach out to Arthur Gershfeld, is that right?

A   I reached out to Arthur when he asked if we know any attorneys, I know any attorneys.  I referred him to Arthur. Arthur was a good attorney, and I referred him to Arthur Gershfeld.

*D. Motovich - cross - Polemeni* 2603

Q   Well, Mr. Sarkinovic testified that he spoke to Zorach earlier that day and not you, correct?

A   Correct.

Q   And that he later met with you and your father in your father's office on Coney Island Avenue, correct?

A   Correct.

Q   Prior to that meeting, you hadn't spoken to Mr. Sarkinovic, correct?

A   No.  So, I don't recall all the details.  I remember meeting him at night and referring Arthur to him.

Q   Right.  And so, you called Mr. Gershfeld, is that right?

A   Correct.

Q   And you tell him:  You need to come to my father's office, correct?

A   I don't tell him anything.  I ask him.

Q   You ask him to come to --

A   I ask him if he wants --

THE COURT:  Don't interrupt each other, please.

Put the question.  Get the answer.

THE WITNESS:  Sorry, Judge.

THE COURT:  All right.  Put the question again, counsel, and let the witness answer it in its entirety.

Q   You asked Mr. Gershfeld to come to your father's office, correct?

A   Correct.

*D. Motovich - cross - Polemeni* 2604

Q   And you told him -- when you asked him, you told him:  We have a problem; right?

A   No.

Q   You told him:  There's a problem, Kemal was stopped at the airport, and I need you to come help us; right?

A   I asked him to come talk to Kemal.  That's it.

Q   And so he did, Mr. Gershfeld, he did come to your father's office, right?

A   Correct.

Q   And at that meeting it was you, Mr. Gershfeld, Kemal, and your father, right?

A   Correct.

Q   Do you recall -- do you recall if anyone else was there?

A   No.

Q   And at that meeting, Mr. Sarkinovic told you and your father and Mr. Gershfeld that he had been stopped at the airport, right?

A   Correct.

Q   And he told you that they were asking -- the agents had asked questions about CNBC, Ago & Alaudin and ZKC and Midwood USA, correct?

A   I don't recall exactly what he said.

Q   But that was the gist of it, right?

A   He said some things, yes.

Q   And he said that they asked about you, David, right?

**J.A. 886**

D. Motovich - cross - Polemeni                    2605

A    Yes.

Q    And then he told you that he was going to meet with the agents the next morning, correct?

A    Never told me that, no.

Q    He did not tell you that he had an appointment and intended to meet with the agents the next morning, is that your testimony?

A    Yes.  He never told me that.

Q    And you told him, Mr. Motovich:  No, you're not going to that meeting, Arthur Gershfeld, he's your lawyer; right?

A    No.  Arthur took him into a separate room and said:  I can only be one person's attorney.  And he said:  If you want to retain me, you should come to my office tomorrow.

Q    The next day?

A    The next day.

Q    Right.  And how long was that meeting total, do you recall?

A    Around ten minutes.

Q    And then what happened after that meeting?

A    Everybody went home.

Q    And Mr. Gershfeld went back to Midwood Lumber, to your office, right?

A    Arthur Gershfeld?

Q    Mr. Gershfeld, yes.

A    No.  Mr. Arthur Gershfeld went home.

---

D. Motovich - cross - Polemeni                    2606

Q    Okay.

MR. POLEMENI:  Ms. Kannan, if we can bring up again Government's Exhibit 814.

THE COURT:  You may publish.

(Exhibit published.)

BY MR. POLEMENI:

Q    You write on page 15 -- on page 19; do you see where it says January 13th, 2019, the second text message?

A    Who is this other contact?

Q    Mr. Gershfeld is asking you:  Who is this other contact?

A    Yes.

Q    And you respond:  That's my wife's number.  Do you see that?

A    Yes.

Q    And you say:  Just in case.  Right?

A    Yes.

Q    Why did you text Mr. Gershfeld your wife's number just in case?

A    If he can't reach me, he'll be able to reach me with my wife.

Q    Mr. Gershfeld wasn't your attorney, correct?

A    Correct.

Q    He was -- you were hoping that he would represent Mr. Sarkinovic, right?

A    Correct.

---

D. Motovich - cross - Polemeni                    2607

Q    So why were you texting him your wife's number just in case?

A    We're friends, as you said.  He should have my wife's number if he needs to reach me.

Q    Okay.

So, that was the -- that was January 13th.  And Mr. Sarkinovic was supposed to go the next morning to the U.S. Attorney's Office and meet with agents, correct, January 14th?

A    If you say so.

Q    Well, that's what he told you, right?

A    He did not tell me that, no.

Q    He told you that he had an appointment to meet with the agents the next day, correct?

A    I don't recall the whole conversation, but he said he had to not meet with you guys, I think he said he had to call you guys.

Q    Okay.

A    But I'm not sure.  I don't recall.  It's four years ago, five years ago, I don't remember.

Q    There was definitely some communication that was supposed to happen the next day, right?

A    I don't know.

Q    And then you wrote a check for $50,000 to Arthur Gershfeld, right?

A    No.

---

D. Motovich - cross - Polemeni                    2608

MR. POLEMENI:  If I can bring up Government's Exhibit 723, which is already in evidence.

THE COURT:  You may publish.

(Exhibit published.)

Q    This is the check you wrote to Arthur Gershfeld for $50,000 on January 14th of 2019, isn't it, Mr. Motovich?

A    It's not my handwriting on this check.

Q    Okay.  Whose handwriting is it?

A    Not mine.

Q    Mr. Motovich, you wrote or you directed someone to write this check from CNB [sic] Construction Corp., the company that you controlled and that has all your money in it, to Arthur Gershfeld for $50,000, right?

A    No.  Kemal came to me in the morning and said:  I need a check from CNBC.  He took the check.  The check was blank.  And he went to see Arthur.

I didn't negotiate the fee with Arthur.  And I didn't write this check.

Q    This $50,000 isn't Mr. Sarkinovic's, it's yours, right?

A    It was in the account.

Q    It's your money, right, Mr. Motovich?

A    He asked if he could have a check.  It's his money.  And I said he can clean out the bank account whenever he wants.  He's the signer, not David Motovich.  If he wanted to write a check for 111,000, he could write it.  David Motovich cannot

J.A. 887

D. Motovich - cross - Polemeni                    2609

stop him.

Q    This check for $50,000 was your way of ensuring that Mr. Sarkinovic didn't attend that meeting with the U.S. Attorney's Office and agents the next day and that he did not cooperate with the Government, isn't that true, Mr. Motovich?

A    No, sir.

Q    Who is Mohammed Naser?

A    Mohammed Naser is Kemal's accountant.

Q    And you learned at some point that Mr. Naser had also been subpoenaed, correct?

A    Yes.

Q    And then you arranged for him to have an attorney, as well, right?

A    Again, not me.  That was already Arthur and Kemal were part of the case, and Arthur arranged it for Mohammed Naser.

Q    So, Mr. Gershfeld arranged it for Mr. Naser?

A    Something.  He got a subpoena.  Kemal brought the subpoena to his attorney, and I believe Gershfeld referred an attorney to Mohammed Naser.

Q    And did you have any involvement in that?

A    Did I have what?

Q    Any involvement in that.

A    Kemal asked for another check, took another check for his accountant.

Q    And for the accountant to pay the attorney?

D. Motovich - cross - Polemeni                    2610

A    Yes.

Q    And do you recall the name of the attorney?

A    I do not recall.

Q    Christopher Chang?

A    Christopher Chang, okay.

Q    And you've spoken to Christopher Chang on the phone about his representation of Mohammed Naser, correct?

A    We had a joint lawyer meeting with all the attorneys.

Q    But even before that, which we'll get to, but even before that joint lawyer meeting, you've spoken on the phone with Mr. Chang and you spoke to him about how much you were going to pay him for him to represent Mr. Naser, right?

A    It's been a long -- five years ago, I don't remember that conversation.

         MR. POLEMENI:  Well, let's look at Government's Exhibit 708, page 133, please.

         THE COURT:  In evidence?  Is it in evidence?

         MR. POLEMENI:  Yes, it is, Your Honor.

         THE COURT:  Yes, you may publish.

         (Exhibit published.)

         MR. POLEMENI:  If you can blow up that top e-mail -- that top check.

BY MR. POLEMENI:

Q    Is this a check from CNBC Construction Corp. to Christopher Chang?

D. Motovich - cross - Polemeni                    2611

A    Yes.

Q    For $20,000?

A    Yes.

Q    Dated February 6, 2019?

A    Yes.

Q    And you paid Christopher Chang to represent Naser, correct?

A    Again, that's not my handwriting.  And the money in the account was -- could have been mine, yes.

Q    It was yours?

A    It could have been, yes.

         MR. POLEMENI:  And now, if we can go back to the text messages, Ms. Kannan, Government's Exhibit 814.

         (Exhibit published.)

         MR. POLEMENI:  And if we can turn to page 20, please.

         (Exhibit published.)

         MR. POLEMENI:  If we could blow up those.  Yes, thanks.  Starting with Mr. Gershfeld's text on the left.

         (Exhibit published.)

BY MR. POLEMENI:

Q    What is the date of this text, Mr. Motovich?

A    February 5th.

Q    2019?

A    Yes.

D. Motovich - cross - Polemeni                    2612

Q    And this is a day before we saw the date of February 6th on the $20,000 check to Christopher Chang?

A    Yes.

Q    And Mr. Gershfeld writes to you:  We'll call you in a bit, in a meeting; correct?

A    Correct.

Q    And he did that because you were calling him and you were trying to figure out how much do I need to pay Christopher Chang, right?

A    No.

Q    Well, do you recall that there was a check for about $40,000 initially that was going to be paid to Christopher Chang?

A    No.

Q    And there was some disagreement about how much in fees he was going to get?

A    I remember something, but I don't remember the whole conversation.

Q    Something like that though, right?

A    I don't recall the conversation.

Q    And then you -- and then Mr. Gershfeld --

         THE COURT:  Had you completed your answer?

         THE WITNESS:  Yes.

         THE COURT:  I thought you were continuing on.

         THE WITNESS:  No.

J.A. 888

D. Motovich - cross - Polemeni                    2613

THE COURT:  Okay.

What do you have, Madam Reporter?

Could you read the question and back, please, just so the record is clear?

THE WITNESS:  Thank you, Your Honor.

THE COURT:  And keep your voice up.  You've got the microphone there.

(Record read.)

THE COURT:  Did that complete your answer, sir?

THE WITNESS:  Yes.  Thank you, Judge.

THE COURT:  Go ahead.

BY MR. POLEMENI:

Q    And a little while later the same day Mr. Gershfeld writes to you:  Chris said you spoke to him, all good; right?

A    Yes.

Q    And that's because you had spoken to Christopher Chang and negotiated his price, is that right?

A    Yes.

MR. POLEMENI:  And if we can scroll down a little more.

Q    You respond:  Yes, all done; right?

A    Yes.

Q    And then Mr. Gershfeld responds:  Thank God.  He is a good lawyer; right?

A    Yes.

---

D. Motovich - cross - Polemeni                    2614

Q    And just like that $50,000 check that you wrote to Mr. Gershfeld, the $20,000 check that you wrote to Christopher Chang was to ensure that Mohammed Naser did not come in and cooperate with the Government, right?

A    No.

Q    I want to talk a little bit about the joint defense agreement that you mentioned.

What is your understanding of a joint defense agreement?

A    When all the attorneys are in the room, we can talk.

Q    When all the attorneys are in the room and all the clients are in the room, everybody is together, you can have --

A    Talk about the case.

Q    -- you could talk about the case.

And is it your understanding that those communications, the back and forth, they're privileged?

A    Yes.

Q    And what that means is that, you know, someone who is not part of that group can't listen in, right?

A    Yes.

(Continued on the following page.)

---

Motovich - Cross - Mr. Polemeni                    2615

CROSS-EXAMINATION (Continued.)

BY MR. POLEMENI:

Q    And so you want to make sure that everyone is part of the group because you're concerned, right, Mr. Motovich, that if someone -- you're talking to someone and they're not part of the group, they may be cooperating, right?

A    I'm afraid of obstruction.  I don't want to obstruct justice.  So my attorneys explained to me in order to talk, if you know there's an investigation going on the attorneys must be present.

Q    Right.  They explained to you that the government can't record these conversations, David, when we're all in the room together.  But if you're outside talking to Phillip Adamou and he's not part of the group, he might be recording you, right?

A    Correct.

Q    And that's why you were insisting that Mr. Adamou join the group and not be a rat, right?

A    No.  I told Phillip -- Phillip came and he said he wants to talk to me about this and about this.  I said, I cannot talk to you without my lawyer present.  If you want to bring your lawyer, tell him to attend the times.  I didn't know he was wired, but I told him I don't want to obstruct justice, Phillip.  Come with me to my attorney.  Bring your attorney and ask me anything you want.  That's what I told him in my office.

---

Motovich - Cross - Mr. Polemeni                    2616

Q    And that's why when he came to your office you had your sister, Gail, take his cell phone, right?

A    My sister never took his cell phone.

Q    And that's why when he came to your office you didn't have that meeting in your office, right?

A    I had a meeting going on in my office.  I left my meeting in my office to go see Phillip because he seemed very impatient.

Q    You were concerned that your office might be bugged, right?

A    No.

Q    And that's why you moved into the little closet next door, right?

A    I didn't moved into a closet.  I moved into the office that's right up the steps, into an office that Zorach uses.  He wasn't there.  I said let's sit in this office.

Q    Now when Mr. Gershfeld came up to your apartment in March of 2019 after you had given him the $50,000 check to represent Kemal, you discussed the case, right?

A    Again, I did not give Arthur Gershfeld the check for 50,000.  Arthur Gershfeld came to my apartment because he happened to be in the building looking at other apartments.

Q    Another apartment you owned?

A    No.  He was looking at an apartment to buy for himself in the building.

**J.A. 889**

Motovich - Cross - Mr. Polemeni                2617

Q     And you owned that apartment?

A     Not one I owned, no.  I may have seen another apartment there, but he came to see apartments in the building.

Q     Didn't you tell him that you were selling another apartment in the building?

A     My father is selling his apartment, yes.

Q     And when he came to meet with you, you talked about Kemal, you talked about the investigation, and he assured you that Kemal would not be cooperating, right?

A     He didn't assure me about anything.

Q     And when you met with him for cigars in Miami the next month, when he came to your condo, you talked about the investigation, right?

A     I did not talk to him about the investigation.

Q     And he assured you that Kemal would not be cooperating?

A     Again, without all the attorneys present, we did not talk about the case.

Q     You couldn't talk to Mr. Gershfeld about the case because he's not your attorney?

A     Correct.

Q     He got -- he got you your attorney though, right?

A     Yes.

Q     Jeremy Gutman?

A     Yes.

Q     To ensure they could all be part of the same group?

Motovich - Cross - Mr. Polemeni                2618

A     He referred me Jeremy Gutman.  He said he's a qualified attorney, a good attorney, and you should retain him just in case.  So I retained him.

Q     Now, you heard the recording that Mr. Adamou made of a conversation you and he had, right?

A     Yes.

Q     And I'm not going to play it again, but you heard during the recording you told Mr. Adamou that you didn't want him to be a rat, right?

A     Rat is just a neighborhood term that we use, nothing about anything.  It's just our slang in Brooklyn.

Q     What does it mean in your slang in Brooklyn?

A     We say rat.  You say cooperators, we say rat.  It's just a neighborhood word.

        THE COURT:  Kind of like forget about it.  We understand.  We've all seen the movies.  Let's go.  The jury is smart.

Q     And you also told him that you had paid a lot more in attorneys' fees, right?  He was complaining?

A     He was complaining that his attorney was charging him too much and his attorney doesn't want to come sit with my attorney.  He had no more money to pay to the attorney.

        I told him I could refer you different attorneys. Call my lawyer, he's got a list of attorneys.  If you're not happy with your attorney, you're entitled to have another

Motovich - Cross - Mr. Polemeni                2619

attorney.

Q     And you told him that you had covered the fee for a, excuse my language, "fucking cooperator" who wants to talk, right?

A     I never covered any fees for any cooperators.

Q     And that person who wanted to talk was Kemal Sarkinovic, right?

A     No.

Q     And you paid Arthur Gershfeld $50,000 to ensure that didn't happen, right?

A     I did not pay Arthur Gershfeld and I didn't say fucking cooperator.

Q     Roman Kretsula and Phillip Adamou and Joe Russo all came up there on that stand and testified that they gave you checks, you gave them cash, and that's true, right?

A     Yes.

Q     And they all testified those weren't loans.  Are they lying about that?

A     They said I did front the money.  We didn't talk about -- they had a different way of saying things after talking, I guess, with you.

Q     And Ago Kolenovic said that you stole his company's name, right?  Was he wrong about that?

A     Ago should pay me the money he owes me.

Q     And Reggie Garcia said, I had no idea what was going on.

**J.A. 890**

Motovich - Cross - Mr. Polemeni                2620

Is he lying about that?

A     Again, I had 30 seconds of contact with Reginald Garcia in my entire life.

Q     And Marcy Vukel said, my signature was forged on these fraudulent certificates, repeatedly.  Was she lying about that?

A     No.

Q     You paid that $50,000 to ensure that Kemal Sarkinovic was sitting in that seat, right?

A     Again, I did not pay that 50,000.

Q     And testifying against you, right?

A     No.

        MR. POLEMENI:  Nothing further Judge.

        THE COURT:  Ladies and gentlemen, it's exactly 3:00. I told you we would get back to schedule.  We would have a comfort break at 3:15 and then we'll have redirect by defense counsel.  Please do not talk about the case.  As I told you, we're on track.  Thank you.

        (Jury not present.)

        THE COURT:  The jury has left the courtroom and the witness has left the witness stand.  You may be seated, ladies and gentlemen.

        Do we have any issues to discuss in the absence of the jury from the government?

        MR. POLEMENI:  No, Your Honor.

Motovich - Redirect - Mr. Jackson                    2621

THE COURT:  Anything from defense counsel that we need to discuss at this time?

MR. JACKSON:  No Judge.  Thank you.

THE COURT:  Enjoy your 15-minute break and we'll see you at 3:15.

(Recess taken.)

THE COURT:  Do we have any issues before we bring the jury back in, government?

MR. POLEMENI:  No, Judge.

THE COURT:  Defense counsel?

MR. JACKSON:  No, Your Honor.

THE COURT:  Let's get the jury back and the witness can resume the stand.

(Jury present.)

THE COURT:  Welcome back, ladies and gentlemen of the jury.  We're going to have redirect now of the witness.  I have been assured it will be prompt and focused, and whether it's prompt or focused or not, you can be sure we'll adjourn 5:00 for the day.  No worries about that.  You're on, counsel.

MR. JACKSON:  Thank you, Judge.

THE COURT:  You're still under oath, sir.  Go ahead.

REDIRECT EXAMINATION

BY MR. JACKSON:

Q    Good afternoon, David.

A    Good afternoon.

---

Motovich - Redirect - Mr. Jackson                    2622

Q    Now, David, we heard a lot of talk during cross-examination about whether you were -- whatever business you were in where you were giving money trying to help out customers, right?

A    Yes.

Q    And let me just ask you this.  Were you ever operating an unlicensed money transmitting business?

A    No.

Q    Did you ever accept a fee to transfer money for anyone?

A    No.

MR. JACKSON:  Can we call up in evidence, DX-1705.

THE COURT:  You may publish.

MR. JACKSON:  Thank you, Judge.

Q    And, again, where is this picture being taken?

A    This was at a restaurant in Brooklyn called Chateau de Alik.  I was there for Barry Milter's 65th birthday.

Q    Is this a selfie you took with Kemal Sarkinovic?

A    Yes.

Q    Why did you take this selfie?

A    We were good friends.  We took a picture.  You take pictures with your friends.

Q    Now, you heard Mr. Sarkinovic's testimony that he was just a worker, a laborer like all the rest of the guys on the crew.

Were any of those guys at this party at the Chateau,

---

Motovich - Redirect - Mr. Jackson                    2623

whatever it was?

A    No.

Q    Why did you agree to refer to an attorney to Kemal?

A    Kemal is like family.  I want to make sure he had the best representation.

Q    Did you understand that Gershfeld was a very good lawyer?

A    Top.

Q    Now, we could take that down.  Am I correct that in addition to the short-term loans you made to customers, a lot of customers actually bought materials for Midwood Lumber materials through some of the accounts that we've been talking about during this case?

A    Yes.

Q    Why would that be the case?

A    So we go back to 2013 when my father had a brain tumor.  And me and my brother saw things two different, in different ways.  He believed the customers shouldn't be extended a lot of credit.  They should pay their bills within 30 days, maximum 60 days, and I believe we can front them a little bit longer.

Q    How long?

A    Some customers I went up to 120 days, 150 days.  They were having issues at the banks.  At the end of the jobs they get a little tied up.  But these are customers for 20 years.

Q    So did you use some of the accounts sometimes where you

---

Motovich - Redirect - Mr. Jackson                    2624

had money as a way of basically extending credit to customers who wanted to buy material through Midwood Lumber?

A    Yes, I would use those accounts.

Q    And we saw a number of checks from the accounts to Midwood, to your American Express, to OEG, and also some of your family members.

Did some of the money that was used to buy material then, therefore, end up back in Midwood with your family?

A    Yes.

Q    And as a result of that, when Midwood and when family members filed taxes, did some of the money that went into those accounts end up being taxed?

A    Yes.

Q    Now, why would you go all these lengths to help customers just to give them more time?

A    I didn't want to lose the customer.  I didn't want to lose the relationship.  It was really the fight with my brother was very difficult.

Q    You heard Ms. Sullivan-Hyatt say that one of your friends, Robert Lovy, the professional poker player, tried to start the advertising company that you tried to help him out with.

Do you remember that testimony?

A    Yes.

Q    Do you remember her testimony that he could have opened

**J.A. 891**

*Motovich - Redirect - Mr. Jackson*     2625

up as many accounts as he wanted at Carver Bank?  Do you remember her saying that?

A    Yes.

Q    And during your cross there were a bunch of questions posed to you suggesting that you were trying to steal Reginald Garcia's identity.

Do you remember those questions?

A    Yes.

Q    Would it have made any sense, would you have had the ability for Robert Lovy to open up as many accounts as he wants for you to try to use the identity of someone who did not want to have their identity used in an account, would that make any sense?

A    No.

Q    Was his actual name, his actual address, and his actual identification provided to the bank?

A    Yes.

Q    So if you had just used him for no reason, somebody could have contacted him, correct?

A    Of course.

Q    Now, do you remember being asked about certain tax returns and you've been asked about Kemal?

A    Yes.

Q    Am I correct that whenever you referred to your understanding about any taxes being paid, you were referring

---

*Motovich - Redirect - Mr. Jackson*     2626

to the filing of a tax return, if it was necessary?

A    Correct.

Q    Did you ever intend for Kemal or for anyone else to pay taxes on money that you were responsible for?

A    No.

Q    Did you try to help Kemal get going with having a real business and with setting up with his accountant?

A    Yes.

Q    Did you ever try to avoid paying taxes on what you were responsible for?

A    No.

Q    Did you lose a lot of money in some of these years making unsecured short term loans to friends?

A    Yes.

Q    What does it mean that it was unsecured this money that you had given to friends?

A    They would give me a check, the check would bounce, or sometimes they would come and ask me to front them some cash and they would never even bring a check and disappear.

Q    Did you ever sue anybody for that?

A    No.

Q    Why not?

A    They were friends.

Q    You had significant business expenses during some of these years, right, for your various businesses?

---

*Motovich - Redirect - Mr. Jackson*     2627

A    Yes.

Q    And some of your businesses weren't even profitable during the years when you were building them up?

A    Yes.

Q    Were you still paying employees even during the times when your businesses weren't profitable?

A    Yes.

Q    How hard is it to pay hundreds of employees when business isn't profitable?

A    Very difficult.

Q    You were still paying payroll taxes for the employees that you paid, the hundreds of employees, correct?

A    Correct.

Q    Am I correct that just in payroll taxes for one of your companies, Sherman Abrams, between 2012 and 2021 you paid almost $3 million just in payroll taxes?

A    Yes.

Q    And the company for much of that time wasn't profitable, correct?

A    Correct.

Q    Do you remember they asked you a number of questions about your employee, Marina?

A    Yes.

Q    Am I correct that you accept complete responsibility, entirely, for everything that you did having to do with false

---

*Motovich - Redirect - Mr. Jackson*     2628

workers' comp certificates and invoices?

A    Yes.

Q    You regret doing that?

A    Yes.

Q    In many of Mr. Polemeni's questions he referred to those documents as fraudulent.  Now, you acknowledged these were false documents.

Did you ever attempt to commit fraud with any of them?

A    No.

Q    Now, you mentioned that there was some questions posed to you about that big chart of all the deposits that went into all these accounts over the course of the years.

Do you remember that?

A    Yes.

Q    Am I correct that when Mr. Polemeni is pointing at different parts of the chart and asking you is this all your money, that's a complex question because you're talking about deposits on the chart as opposed to specifically what is money that is actually yours, correct?

A    Correct.

Q    You acknowledge that overwhelmingly the money in these accounts is yours, right?

A    Yes.

Q    And you were trying to be technically accurate in your

**J.A. 892**

Motovich - Redirect - Mr. Jackson      2629

testimony and not claiming that every single nickel that was deposited in was yours, right?

A    Right.

Q    These were used for actual deals and transactions?

A    Yes.

Q    Sometimes other people were working on those transactions and doing different things to the accounts?

A    Yes.

Q    To be very clear, every nickel that you spent yourself on your things, your family, that you transferred to you, who did that belong to?

A    Belonged to me.

Q    Did you steal any money from anyone?

A    Not a nickel.

Q    You mentioned that you were friends with Kemal.  Did you give jobs to his children?

A    Yes.

Q    Did you also refer work to Kemal that his kids coordinated with you on?

A    Yes.

Q    I just want to show you, go through a couple of exhibits really quickly with you on that.

MR. JACKSON:  Your Honor, at this time I would like to offer DX-3516 through DX-3531, but I only want to go through a couple of them.

Motovich - Redirect - Mr. Jackson      2630

THE COURT:  Any objection to those exhibits?  Do not show them to the jury inadvertently as you show them to opposing counsel.

Any objection?

MR. POLEMENI:  No.

THE COURT:  You may publish.  Admitted.

MR. JACKSON:  Thank you, Judge.

(Defense Exhibits DX-3516 to DX-3531 were received in evidence.)

Q    Now, you see here this is an email, the subject is 410 East 23rd Street?

A    Yes.

Q    And what is this referring to, 410 East 23rd Street, apartment 5E?

A    So that's a job at 410 East 23rd Street, apartment 5E.

Q    Who was the person, Hako Sarkinovic, that's emailing on Monday, September 19, 2016?

A    Hako is having an email with Minela, his sister, and MidwoodLumber.com.

Q    And you were aware of all these deals and communications?

A    Yes.  I was the one who referred them this business.

Q    What was being referred?

A    So there are a lot builders in Manhattan, a lot of real estate owners, I would say, that have thousands of apartments. And Kemal wanted to set up his kids so they should have a

Motovich - Redirect - Mr. Jackson      2631

career.  So I met with Kemal and Hako at a couple of sites and they started to take on hundreds of apartments to do the work.

Q    Can we just quickly look at page 2 of this.  What is being displayed here?

A    So the way they work a lot of times, some of the owners they would have to take -- they would give them an apartment and Hako would go in and take pictures of the apartment.

Everything he does, it's like if he had to paint or change a kitchen or change a door, he would do the work and then send an invoice through a realty company and then they would pay him.

Q    Can we go to page 4?  What do we see here?

A    You see the floors.  He's showing that he re-sanded the floor, he painted the apartment, he painted the moldings, fixed whatever trim needs to be fixed.

Q    Can we call up DX-3523.

THE COURT:  In evidence.  You may publish.

MR. JACKSON:  Thank you, Judge.

Q    You see here there is an email sent from Minela to you and to Hako?

A    Yes.

Q    Is this more of the pictures of the work that they were doing?

A    More of the pictures.

Q    Can we go to page 2.  Go to page 3.  And you can see

**J.A. 893**

Motovich - Redirect - Mr. Jackson      2632

pictures of the work they're doing there?

A    Correct.

Q    Just one more I want to look at, 3530.

THE COURT:  You may publish.  It's in evidence.

Q    Do you see this email from Minela at Midwood Lumber on May 5, 2017?  Do you see that?

A    Yes.

Q    And you see that she's emailing someone named Dave Waxtel?

A    Yes.

Q    And she said, Dave, I showed my dad the idea you have for your customer's front porch.  Do you see that?

A    Yes.

Q    And he will call you shortly to set up a meeting so you guys can go through all the details?

A    Yes.

Q    He says, again, his number, Kemal, and has details for him?

A    Yes.

Q    It says, If you need to get in touch with me for any questions you can always call the showroom or email me, which I always have access to.  Right?

A    Yes.

Q    Is it correct that she's referring to the showroom at Midwood Lumber?

Motovich - Redirect - Mr. Jackson          2633

A    Yes.

Q    And this is more stuff that you allowed Minela to set up with Kemal for Kemal to do work, right?

A    Yes.

Q    And I'm correct that there were hundreds of apartments that you referred like this, right?

A    Yes.

Q    And there was some discussion earlier about the idea that I think Kemal, you heard what Kemal Sarkinovic described how he would get checks amounting to, over the course of the years, millions of dollars from some of the people he was working for and he would pay his guys and keep a portion for himself, right?

A    Yes.

Q    And you were asked some questions during the course of the cross-examination about what you've seen during the course of the case and discovery?

A    Yes.

Q    Am I correct that based on your review of that you know that there was never a search warrant executed at Kemal's home?

MR. POLEMENI:  Objection.

THE COURT:  Sustained.

Q    And one more thing I want to ask you about.

MR. JACKSON:  Just one moment, Judge.

---

Motovich - Redirect - Mr. Jackson          2634

THE COURT:  Of course.

Q    Do you remember, Mr. Motovich, there were some questions posed to you about if IRS agents or if anybody else wanted to find you how would they find you.

Do you remember those questions?

A    Yes.

Q    Can we pull up in evidence GX-703-A.

THE COURT:  You may publish.

Q    If we could zoom in on the top there.  And this is one of the account opening documents that the government has referenced, right?

A    Yes.

Q    You see where it says business address?

A    Yes.

Q    What is the business address there?

A    1090 Coney Island Avenue, Brooklyn, New York 11230.

Q    For almost all of these accounts that we've looking at, an address 1090 or 1100 Coney Island Avenue was the business address listed for these companies, correct?

A    Correct.

Q    Whose address is that?

A    My address.

Q    If someone had wanted to check out and find out who was actually at the location of these companies and gone to 1090 Coney Island Avenue, who would they have found?

---

Proceedings          2635

A    Me.

Q    If you had been attempting to hide your connection to these accounts, would it make any sense for you to allow them to have 1090 Coney Island Avenue as a business address?

A    No.

Q    Why didn't you lie?

A    I wasn't hiding anything.

MR. JACKSON:  No further questions.

THE COURT:  Thank you, sir.  You may step down.  You may call your next witness.

MR. MAZUREK:  Your Honor, the defense calls Mohamed Mohamed.

THE COURT:  Please have the witness come forward to be sworn.  Please come forward to the top step, sir.  My court deputy will give you the oath as you will affirm or swear.  Please raise your right hand, sir.

(Witness affirmed.)

THE COURT:  Please sit down.  I'll ask you to state and spell your name for the record.  You can see this microphone in front of you.  It will swivel.  It looks like a snake but it won't bite you.  Pull it towards you so the jury can hear you.  Please state and spell your name and then counsel, who is standing over there, will inquire.

THE WITNESS:  Mohamed Hassan Mohamed, M-O-H-A-M-E-D H-A-S-S-A-N  M-O-H-A-M-E-D.

**J.A. 894**

---

Mohamed - Direct - Mr. Mazurek          2636

**MOHAMED HASSAN MOHAMED,**

called as a witness by the Defense, having been first duly sworn/affirmed by the Courtroom Deputy, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MAZUREK:

Q    Good afternoon, Mr. Mohamed.

A    Good afternoon, sir.

Q    How old are you?

A    I'm 47.

Q    Where do you live?

A    Corona, Queens.

Q    How long you have lived there?

A    Most of my life, other than when I was in the Army and when I was in high school, Cleveland, Ohio.

Q    Just if you can slow down because everything is being recorded by the stenographer.

A    Okay.

Q    You said you were -- you're originally from Queens?

A    Yes.  I was born in Somalia but lived in Corona, Queens most of my life.

Q    Where did you go to high school?

A    I went to high school in North Olmsted, Ohio, which is a suburb in Ohio, outside of Cleveland.

Q    Did you attend any college?

*Mohamed - Direct - Mr. Mazurek*          2637

A   Yes.  I graduated out from York CUNY.

Q   What was your degree?

A   Political science and government.

Q   Before you graduated from CUNY, did you enlist in the Army?

A   Yes.  I was in the Army eight years, from 1996 to 2004, active, active reserves and inactive reserves, a total of eight years.

Q   What branch of the army?

A   I was an infantry soldier, 19 Delta.

Q   Where did you do your training?

A   Fort Knox.

Q   Did you see active combat?

A   Yes.  I served in Operation Enduring Freedom in Iraq.

Q   Where specifically in Iraq?

A   Mosul.

Q   Were you in active combat?

A   Yes.

Q   Where do you currently work?

A   I work at the Excelsior, 303 East 57th Street.

Q   Is that residential?

A   Yes, sir.

Q   Is that in Manhattan?

A   Yes, sir.

Q   How long you have worked there?

---

*Mohamed - Direct - Mr. Mazurek*          2638

A   This upcoming February will be 12 years.

Q   What are your duties at the building?

A   I started off as an elevator operator and delivering packages, and now I work the front desk as a concierge.

Q   During your time of your employment at the Excelsior building, did you get to know someone named David Motovich?

A   Yes.

Q   How did you get to know him?

A   Originally he was a tenant, moved in about 8, 9 years ago, and through the course of things, events that happened in my life, my dad passing away about nine years ago, me going through a really stressful, emotional divorce, I've gotten to be great friends with David.  He's like a brother for me.

Q   Let's talk about that.  First, in terms of the work that you've done at the Excelsior, have you had the opportunity to meet David Motovich during the course of your employment?

A   Yes.

Q   And before David Motovich and his family moved into the apartment, did you know David Motovich before they all moved in?

A   No.

        (Continued on next page.)

---

Mohamed - direct - Mazurek          2639

BY MR. MAZUREK:  (Continuing)

Q   So you only learned of them through your relationship at the building?

A   Yes, sir.

Q   Okay.  When David Motovich first purchased the apartment building, apartment unit, was there renovation going on in the building?

A   Yes, I was renovating for quite a bit, more than normal.

Q   And specifically in his unit?

A   Yes, 47-G.

Q   So before he actually started living there with his family, you got to know him during the course of that renovation?

A   Yes, him and his lovely wife and sometimes with their kids would come in the building which is normal to see what the, progress is being, made in their apartment.

Q   And then after the family moved in, do you know approximately when that was?

A   That was closer to, like, had to be about 2015, '16, when they fully moved in, but still stuff was being done there.

Q   Okay.  Did you continue to see David Motovich throughout the time that he was residing at the apartment?

A   Yes.

Q   During the course of your work?

A   Yes, during the course of my work.

---

Mohamed - direct - Mazurek          2640

Q   In addition to seeing him and interacting with him during the course of his employment, did you get to know David Motovich socially?

A   Yes.

Q   Can you explain?

A   He's -- I was going through a really terrible divorce.  I was really stressed out and didn't know how to handle it and he took it upon himself to come talk to me and we've gotten really close from that.  He was there for me in my time of need.  I mean I've got young kids so I didn't want to be divorced.  He was just there for me, emotional support, would call me every day, see how I was doing, whether I was at the job or not and I spent a lot of time in his apartment getting advice and just emotional support more than anything.

Q   So what types of places would you see him socially?

A   In his apartment, I would have Friday night dinners.  He got to meet my kids.  My kids call him "Uncle David."  They love him and his wife and family.  I've been at their son's bar mitzvah.  I've seen them outside in a restaurant.  Things of that nature.

Q   Did Mr. Motovich ever assist in any way financially for your children?

A   Yes.  My son plays, my older son who is 11 plays basketball so they have fundraisers and he and his wife contribute very well to that.

J.A. 895

Mohamed - direct - Mazurek          2641

Q    Did you ever spend time, you and your kids, by the Motovich pool?

A    Yes.  I mean any time they're there, my kids, they love to swim so that's the first thing they ask to do, but that's the normal, par course, if you know David.  If you're in his apartment, it's like an open door policy for people to use the pool, and my kids love that more than anything.

Q    Is it fair to say you've known David Motovich then for the good part of the last decade?

A    Yes.

Q    And based on all these interactions with him, have you formed an opinion as to David Motovich's character?

A    Yes.  I mean --

Q    What is that?

A    Impeccable, in my opinion.  I would do anything for him and I know he would do anything for me and he has.  My kids love him.  The most precious things I have in my life are my kids.  I would trust him with my kids.  I've also seen him do -- just, for example, COVID.  He has a testing lab obviously.

         MR. SKURNIK:  Objection.

         THE COURT:  I think you've made the point that you've experienced his character.

         THE WITNESS:  Okay.

         THE COURT:  So we don't need to go into the COVID

---

Mohamed - direct - Mazurek          2642

examples.

         THE WITNESS:  Yes, Your Honor.

         THE COURT:  Okay.  Next question.

         MR. MAZUREK:  Yes.  Thank you, Your Honor.

Q    And have you ever seen Mr. Motovich dealing with contractors at his apartment?

A    Yes.  I remember the first contractor wasn't, was laid off because he wasn't nice to the workers.  This is from what I've heard from the workers.  He wasn't nice to them.

         THE COURT:  This is what you heard from the workers?

         THE WITNESS:  Yes.

         THE COURT:  Well, I'm going to sustain the objection to the hearsay.  Why don't you go on.

         THE WITNESS:  Okay.

         THE COURT:  Next question.

         MR. MAZUREK:  Yes.

Q    Have you formed an opinion as to David Motovich's character for telling the truth and being an honest person and what is that opinion?

A    He's always been honest with me.  Nothing, I mean, as -- upstanding person.  I love him.

Q    And you know, Mr. Mohamed, that we're sitting in a criminal trial, right?

A    Yes, sir.

Q    And you've been asked to testify, right?

---

Mohamed - cross - Skurnik          2643

A    Yes, sir.

Q    And you know that David Motovich has been accused of multiple federal felony charges?

A    Yes.

Q    Does that fact, the fact that he is here accused of all these federal felony charges, does that change your opinion that you've given this jury about his character?

A    No.  No.

         MR. SKURNIK:  Objection.

         THE COURT:  Overruled.  It doesn't change his opinion.  He knows his views.  It's relevant.  He answered the question that it doesn't change his opinion.

         Anything else?

         MR. MAZUREK:  I have nothing further, Your Honor.

         THE COURT:  Okay.  Any cross?

         MR. SKURNIK:  Yes, Judge.

CROSS-EXAMINATION

BY MR. SKURNIK:

Q    Good afternoon, Mr. Mohamed.

A    Good afternoon, sir.

Q    Have you and I ever met before?

A    No, sir.

Q    But you know Mr. Motovich well, is that right?

A    Yes.

Q    You said he was like a brother?

---

Mohamed - cross - Skurnik          2644

A    Yes.

Q    A great friend?

A    Yes.

Q    You said he's, he lets your kids use his pool sometimes?

A    Yes.

Q    You said he had paid some money for something related to you?

A    Fundraiser.

Q    Okay.

A    For my son's basketball.

Q    Did you and Mr. Motovich meet before today to discuss your testimony?

A    No.

Q    You didn't talk to him at all about your testimony here today?

A    No.

Q    How about his attorneys, did you speak to his attorneys about it?

A    His attorney asked me if I wanted to be a character witness and just told me questions he could ask and couldn't ask.

Q    So you discussed in advance the questions that would be asked --

A    No.  No.

         THE COURT:  Whoa.  Whoa.  He's got to finish the

J.A. 896

Mohamed - cross - Skurnik                    2645

question and then you can answer it.

THE WITNESS:  Yes, sir.

THE COURT:  Complete the question, Counsel.

Q    Did you discuss in advance the questions that you would be asked here today?

A    No, just the types of questions.

THE COURT:  Who was the attorney you spoke with?

THE WITNESS:  Henry.

THE COURT:  I'm sorry?

THE WITNESS:  His attorney, Henry.

THE COURT:  Do you have a full name for the attorney?

THE WITNESS:  Henry Maz.

THE COURT:  How often did you speak with him?

THE WITNESS:  Just when he told me I was going to be a character witness.

THE COURT:  Just one time?

THE WITNESS:  Yes.

THE COURT:  And when did you speak with him?

THE WITNESS:  Two days ago.

THE COURT:  First time?

THE WITNESS:  Yes.

THE COURT:  How long did the conversation last?

THE WITNESS:  No more than five minutes.

THE COURT:  He called you?  You called him?

---

Mohamed - cross - Skurnik                    2646

THE WITNESS:  He called me.

THE COURT:  At home or his cell phone?

THE WITNESS:  Cell phone, sir.

THE COURT:  Okay.  Go ahead.

MR. SKURNIK:  Thank you, Judge.

Q    Do you know what this case is about?

A    Yes, I've heard some of it but I'm not well versed in law, sir.

Q    Have you been sitting in the courtroom during this trial?

A    No.  I was here for opening statements.  That's it.

THE COURT:  You were here for opening statements in this case?  You were in this courtroom?

THE WITNESS:  Yes.

THE COURT:  Let's have a sidebar.

(Continued on next page.)

---

Sidebar                    2647

(The following occurred at sidebar.)

THE COURT:  Mr. Jackson, I specifically asked you if the character witness who is now on the stand had been in this courtroom at all and you specifically told me that he had not been.  He has just testified that he was here for opening statements.

Were you aware that he -- were you aware that he was here for opening statements?

MR. JACKSON:  Judge, I had no idea.  He told --

THE COURT:  Did you mislead the court with respect to that?

MR. JACKSON:  No, Judge.

THE COURT:  Counsel, did you know he was here for opening statements?

MR. MAZUREK:  I didn't.  I didn't ask him that question.

THE COURT:  You didn't see him in this courtroom, Counsel?

I'm asking you, sir.  You are the one who had the conversation with him, correct, on the phone?

MR. MAZUREK:  Yes.

THE COURT:  And you did not see this gentleman here --

MR. MAZUREK:  I don't remember seeing --

THE COURT:  Let me finish.

**J.A. 897**

---

Sidebar                    2648

You did not see this gentleman here in this courtroom during opening statements, is that what you're telling this court?  You didn't see him?

MR. MAZUREK:  I don't remember, Your Honor.

THE COURT:  You don't remember whether or not you saw him?

MR. MAZUREK:  There were a lot of people.

THE COURT:  I know there were a lot of people here.  I'm asking you a very specific question.  Let me finish my question.

Did you see him here in this courtroom during opening statements?

MR. MAZUREK:  I don't remember honestly.

THE COURT:  You don't remember but you may have seen him?

MR. MAZUREK:  I don't remember seeing him.

THE COURT:  Okay.  In light of the fact that this witness who was offered as a character witness has said that he was in this courtroom for opening statements, I'm going to strike his testimony in its entirety.

In my view, Counsel, you misled the court.  I asked the question specifically whether he was here and you know under the federal rules, he is not allowed to be in this courtroom to hear any of the proceedings.  I asked about it.  You misled the court about it.

Sidebar 2649

So I'm now going to go back and I'm going to strike his testimony in its entirety and I'm going to do this in front of the jury and that's why.

I asked you gentleman a straightforward question and you misled the court. Step back.

(Sidebar conference ends.)

(Continued on next page.)

---

2650

THE COURT: Ladies and gentlemen of the jury, there is a Federal Rule of Evidence which governs testimony of witnesses. It's Federal Rule of Evidence 615 and it states as follows.

Excluding witnesses from the courtroom. Presenting -- strike that -- preventing as excluded witnesses access to trial testimony.

Excluding witnesses. At a party's request, the court must order witnesses excluded from the courtroom so that they cannot hear other witnesses' testimony or the court may do so on its own, but this rule does not authorize excluding: A party who is a natural person, such as the defendant here. That's why the defendant has been able to stay here and that's why Mr. Cabane, the designated person for the government has been able to stay here.

Next: One officer or employee of a party that is not a natural person, if that officer or employee has been designated as the party's representative by its attorney.

Three: Any person whose presence a party shows to be essential to presenting the party's claim or defense.

Or, four: Any person authorized by statute to be present. For example, if the Attorney General of the State of New York had an interest in this or some other such person.

Additional orders to prevent disclosing and accessing testimony. An order under, A, operates only to

---

2651

exclude witnesses from the courtroom. But the court may also, by order: One, prohibit disclosure of trial testimony to witnesses who are excluded from the courtroom; and, two, prohibit excluded witnesses from accessing trial testimony.

I specifically asked counsel outside of the presence of the jury whether this witness who is a character witness had been present for any of the trial and I was told by counsel that this witness had not been present. You just heard this witness say he was present for opening statements. Therefore, I am going to do something I hate to do which is the rhinoceros. Okay?

I am going to order you to disregard all of the testimony you just heard from this witness about character and I am striking it from the record because, under the federal rules, he is not allowed to be in this courtroom, and because I asked counsel in advance of his testimony whether he had been in this courtroom and was told outside of your presence but on the record he was not and you just heard this man, who I believe to be an honest citizen, he answered the question honestly that he was here. I don't blame the witness, okay, but he was in this courtroom.

So, sir, you are excused from testimony. Thank you very much. You may step down.

(Witness excused.)

THE COURT: Okay. Does the defense have any other

**J.A. 898**

---

2652

witnesses to call?

MR. JACKSON: No. Thank you, Judge.

At this time, the defense rests.

THE COURT: All right. The defense rests.

Ladies and gentlemen of the jury, I know I told you we would adjourn every day at 5 o'clock. I have to break that promise today and we will adjourn for the day at 4:12. I hope you will forgive me for adjourning a little bit early. I try to keep my promises but there you have it. Do not talk about the case.

Tomorrow, please be here at 10 a.m. because I have a little business to do with the lawyers. And so if you're here at 10 a.m., we will have, as I promised you we would have, summations. They will be followed by the instructions of the court, jury instructions, the final instructions as I told you we would have. They will be followed by my favorite meal of the day, lunch, which we will provide for you which we promised we would, and then after you get the jury charge, summations, charge from the court, lunch, then you will be able to begin your deliberations.

So we will see you tomorrow in the jury room at 10. As I said, I've got some business to do with the lawyers outside the presence of the jury. Get ready for that point. You will get the case tomorrow. Summations from both sides, then the jury charge, then lunch as our guests, and then you

2653

will have the case.

I want to thank you very much for your attention. See you here tomorrow, 10 o'clock, in the jury room and that's how we roll. Okay? Have a good night. Thank you.

THE CLERK: All rise.

(Jury exits.)

THE COURT: The jury has left the courtroom.

You may be seated, ladies and gentlemen.

All right. We're going to have the charge conference tomorrow morning. We'll start at 9 a.m. here.

Both the government and defendant have had several days now to review what we referred to as Court 1 which is the court draft of final jury instructions. Court 2 is the jury verdict sheets and jury verdict reached sheets, 2 and 3. You've had those.

What we are going to do tomorrow, and we do this in open court so everyone who wants to come, bring your No-Doze and we will go page by page through the jury charge, and I will take the following approach which is what I always do. I will begin on page 1 and ask the government if they have any objections to page 1. They'll say yes or no. Then I will ask the defense if they have any objections to page 1 and then, shockingly, I will move to page 2 and we will go page by page.

We're not going to have drafting by committee. I realize that all the lawyers here are far more brilliant than

2654

your lowly judge, but we will take objections. Any objection that you make that is overruled is preserved for the record. You do not have to say "I specifically preserve this for appellate purposes." I will say it again tomorrow. I will say it again at the end of the process, any objections you make that are overruled are preserved for the appellate process so you don't have to burden the record with stating expressly that you're reserving your objections.

At the end of that process, what we will do is incorporate any changes that the court elects to make with respect to Court 1 and that will be deemed, and we'll have a new version for you which you will get electronically, Court 1-A, and we'll do the same with respect to Court 2 and Court 3. So you will have the final version that is admitted. The "A" -- spoiler alert -- means it's admitted into evidence as Court 1, Court 2 or Court 3.

We'll then have summations. So we're doing summations tomorrow. Okay? We will begin with the government and then defense and then rebuttal by the government and then the jury charge. That is the sequence.

Very often, lawyers ask me is there a time limit. The answer to that question is no. A lot of my fellow judges don't think I'm all that bright and when they hear the answer to that question being no, they know I'm not all that bright because I don't put time limits on the time that lawyers have

2655

to sum up.

This is a very important case to both sides. I'm not going to impose time limits. However, you see the jury box over there? They will be listening for a while and if you exceed their time limit, they may have their eyes open but they may have their eyes wide shut. So I say to lawyers, and you are experienced counsel on both sides, use your time wisely but I'm not going to put any artificial constraints with respect to that.

One other thing and you're, both sides, experienced lawyers, honorable counsel, do not make the mistake of referring to any documents or exhibits that are not in evidence in your summations because as I've often said, I may be a clown but the clown may be Pennywise from Stephen King novels. So you just may not want to see Lord Vader morph into Pennywise because we all float down here, Richie. Okay? Get it? Please. No inadvertent mistakes.

All right. Is there anything else we need to address today beginning with the government?

MR. POLEMENI: Yes, Judge, one thing.

In terms of the summation, I just want to make sure I understand. Correctly or not, I will often say, many government lawyers will say, "As I expect the judge or the court will instruct you."

THE COURT: Here's what I would suggest, although

**J.A. 899**

2656

very humbling, for both sides.

MR. POLEMENI: Okay.

THE COURT: If you say, I suspect or I anticipate the judge will instruct you on the law, you'll get a little bit of Vader and Pennywise saying that's why they pay me the big bucks. If you can adopt flexibly to say, Ladies and gentlemen of the jury, the evidence has shown blah, blah, blah, you will have the avuncular telephone salesmen judge as opposed to the one who's interrupting your otherwise brilliant and seamless summation. Okay?

Avoid the phrase "the judge will tell you" or "I expect" or "I anticipate." Just say, "The evidence has shown" and then have at it. That's what I would do if I were not wearing the prom dress and I was sitting where you're sitting, but since I am wearing the prom dress, my suggestion would be just use that phrase "the evidence has shown" and then I will get to sit here and do what a judge should do which is listen intently to both sets of brilliant summations.

MR. POLEMENI: Thank you, Judge.

THE COURT: Is that helpful?

MR. POLEMENI: Yes.

THE COURT: Defense counsel, is that helpful to you?

MR. JACKSON: It is, Judge. Can I ask a follow-up question?

THE COURT: Absolutely.

2657

MR. JACKSON:  I think when I've appeared before Your Honor, we were permitted to, for what the Court has agreed is a final charge, make reference to what the charge is going to be and then make our arguments without saying this is what the, make our arguments just referencing it on, you know, the document, this is what the charge is.

THE COURT:  No.  No.

MR. JACKSON:  No?

THE COURT:  We're not going to put the charge up. Not going to put the charge up.  This he will hear it orally but it's not going to be up on the screen.  That's Ted Wells over Manhattan putting up jury instructions on the chart.  I don't roll this way.  All right?

So the answer to that is no.  You can say the evidence has shown and you can -- anything that's in evidence that you wish to put up, either electronically or the Elmo or snail mail, whatever you want to do in terms of displaying what's in evidence, handbags, jewelry, in other cases, as long as they're not loaded, guns, money, drugs, money, this is evidence you can show, if you want to, to the jury, but not the jury charge and do not invade the providence of Pennywise Vader to mix metaphors.  Okay?

MR. JACKSON:  Understood, Judge.

THE COURT:  Okay.  Anything else from the government?

2658

MR. POLEMENI:  No, Your Honor.  Thank you.

THE COURT:  Anything else from defense counsel?

MR. JACKSON:  Just two quick issues, Judge.

THE COURT:  Yes.

MR. JACKSON:  First, not to belabor it but we do want to apologize, Judge.  I'm sorry, Judge, for the confusion that happened earlier.  We take full responsibility for our screw up.

THE COURT:  Your apology is accepted.  Next?

MR. JACKSON:  Second, Judge, typically, under the understanding that the client doesn't have to be at the charge conference, I'd like to ask if Mr. Motovich can skip it.

THE COURT:  I'm sure Mr. Motovich has things to do with his time than listen to the lawyers go page by page.  I trust you have given him the opportunity to go through the charge and give you the comments.  I have yet to see a client who really wanted to sit through a charge conference.

So, Mr. Motovich, you're welcome to sit here and enjoy the pain.  That's why you pay the lawyers.  I mean, the charge conference, you see the document, you know what we're going to do.  It's page by page.  So you're free to be here or not.

Obviously, the jury is not here during the charge conference so the jury is not going to take the view that you're not interested in the charge.  They know obviously that

2659

you're very much interested in the case for all the obvious reasons.  So no worries about that.

And you will have ample opportunity to reach out to your client in terms of getting him here for the summations and for the charge.  You will be present for that, obviously, but he doesn't have to be here for the dentistry without novocaine, as I like to refer to it, page by page.

MR. JACKSON:  Thank you.

THE COURT:  Necessary, but it is what it is.

MR. JACKSON:  Absolutely, Judge.  Thank you.

THE COURT:  Okay.  And then your second point.

(Continued on next page.)

*Proceedings*  2660

(Continuing.)

MR. JACKSON:  And then final issue, Judge, we -- we've been trying to coordinate with the Government. Obviously, both parties have been very busy trying to wrap the case up.  We've been trying to coordinate with the Government to reach agreement on a couple of final proposed charges.

I'm not sure if we are able to do that in a timely fashion, but --

THE COURT:  Here is how we're going to roll with respect to that.

We are going to do it as I said.  We start at page 1 and go through the end.  If we get to page X and the Government wants to propose a change and the defense wants to propose a change, if you're in agreement or you have competing suggested proposals, I will take them when we get to page X and I will rule with respect to them.  The fact that both sides agree to a proposed change doesn't necessarily mean I will accept it.  I might or I might not.  So, that's how that will be handled.  But we are not going to go from the portions that you folks have no problem with and immediately move to the portions that you may have issues with.

One of the joys of the page-by-page approach is we lock down what there are not fights about as we go through, and then we get to the issues where there may be competing approaches or where there may be a joint approach.

**J.A. 900**

*Proceedings* 2661

So that's why I said to you folks before the weekend, feel free to exchange drafts and if you've got alternative approaches that you agree on when we get to page X, you can tell the Court what those approaches are, whether you agree or whether you disagree, and I will rule and roll as my friend Judge Chin on the Second Circuit says district court judges should do.

MR. JACKSON: Just one last question related to that.

THE COURT: It doesn't have to be one last. You do the Columbo, *just one more thing*, I get it.

Go ahead.

MR. JACKSON: So, Judge, we have a very short letter that we could send in the next thirty minutes previewing just a couple of issues that we'd like to discuss with the Court.

Is it okay if we send that to the Court?

THE COURT: Yes. But, again, we are going to start at 9:00 tomorrow and we are going to start at page 1.

You can send short letters, long letters, competing letters, agreed-upon letters. As you know I have no life, I will read them before I come in here. But when we come here at 9:00, we are going to start with page 1. We are not going to start with your letters.

Okay.

MR. JACKSON: Thank you, Judge.

*Proceedings* 2662

THE COURT: You're welcome.

Anything else?

MR. POLEMENI: No.

MR. JACKSON: No. Thank you, Your Honor.

THE COURT: Anything else from the Government?

MR. POLEMENI: No, Your Honor. Thank you.

THE COURT: Everyone have a good night, and we'll see you tomorrow morning.

(Proceedings adjourned to July 25th, 2024 at 9:00 a.m.)

ooo0ooo

2663

I N D E X

WITNESSES:

DAVID MOTOVICH

CROSS-EXAMINATION BY MR. POLEMENI (Cont'd)    2514

REDIRECT EXAMINATION BY MR. JACKSON:    2621

MOHAMED HASSAN MOHAMED

DIRECT EXAMINATION BY MR. MAZUREK:    2636

CROSS-EXAMINATION BY MR. SKURNIK    2643

EXHIBITS:

Government Exhibits 275 and 911         2508
Government Exhibit 803                  2593
Government's Exhibit 805               2595
Government's Exhibit 814 with redactions  2600

Defense Exhibits DX-3516 to DX-3531    2630

*    *    *    *

2664

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    21-CR-497(WFK)

-against-    :    United States Courthouse
                       Brooklyn, New York
DAVID MOTOVICH,    :
                       July 25, 2024
Defendant.    :    9:30 o'clock a.m.

- - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:    BREON PEACE
                       United States Attorney
                       BY: ROBERT POLEMENI
                           ERIK D. PAULSEN
                           ANDREW GRUBIN
                           MATTHEW C. SKURNIK
                       Assistant United States Attorneys
                       271 Cadman Plaza East
                       Brooklyn, New York  11201

For the Defendant:    WACHTELL, LIPTON, ROSEN & KATZ
                       51 West 52nd Street
                       New York, New York  10019

                       BY: RANDALL WADE JACKSON, ESQ.
                           JESSICA LAYDEN, ESQ.

                       MEISTER SEELIG & FEIN, LLP
                       125 Park Avenue, 8th Floor
                       New York, New York  10017

                       BY:  HENRY R. MAZUREK, ESQ.

Court Reporter:        Charleane M. Heading
                       225 Cadman Plaza East
                       Brooklyn, New York
Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

J.A. 901

Charge Conference                    2665

(In open court; outside the presence of the jury.)

THE CLERK:  Criminal cause on trial, 21-CR-497, United States of America versus David Motovich.

Will the attorneys please state their names starting with the government.

MR. POLEMENI:  Good morning, Your Honor.  Rob Polemeni, Erik Paulsen, Matthew Skurnik and Special Agent Christopher Cabane for the United States.

THE COURT:  Good morning, Counsel.  You may be seated.  Thank you for your patience.

MR. JACKSON:  Good morning, Your Honor.  Randall Jackson, Jessica Layden and Henry Mazurek for the defense.

THE COURT:  Good morning.  And as we discussed yesterday, your client is voluntarily absenting himself from the thrill and joy of the charge conference and the government has no problem with that absenting.

Is that correct?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  And is that correct, Mr. Jackson?

MR. JACKSON:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.  You may be seated.

All right.  As I told you yesterday, the way we proceed with the charge conference is we go page by page through what has been distributed to you and marked as Court

---

Charge Conference                    2666

Exhibit 1 for identification, the jury charge as prepared by the court.

I will take objections on a page-by-page basis.  If you have an objection to an item on a given page, I will ask the government and then defense counsel to state its objections.  I will then rule on the objections.  As I stated repeatedly, we're not here to draft by committee because that is the way that horses turn into camels.

So beginning with page 1 of Court Exhibit 1, any objections?

Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  Your Honor, page 1, do you mean --

THE COURT:  I mean page 1, you know the one that has the "1" on the bottom.

MR. JACKSON:  No objections, Judge.

THE COURT:  Page 2.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No.

THE COURT:  Page 3.  Government?

MR. POLEMENI:  No.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

---

Charge Conference                    2667

THE COURT:  Page 4.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Page 5.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Page 6.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Page 7.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Page 8.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Page 9.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Page 10.  Government?

---

Charge Conference                    2668

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Page 11.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Page 12.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Page 13.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Page 14.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Page 15.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Now, on page 16, the court has struck the insertion that begins with "Defendant's right not to

J.A. 902

Charge Conference                    2669

testify," because the defendant elected to testify. So I'm taking out the item on page 16 that begins, "The defendant's right not to testify," and I have struck the paragraph, carryover paragraph and the first full paragraph on page 17.

So that's out. Any objection to that coming out?

MR. JACKSON: No, Judge.

MR. POLEMENI: No, Judge.

THE COURT: All right. Next we have "Defendant's interest if defendant testifies."

Any objection to page 17? Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 18. Government, any objection?

MR. POLEMENI: No, objection.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 19. Government?

MR. POLEMENI: No, Judge.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 20. Government?

MR. POLEMENI: No, Judge.

THE COURT: Defense?

MR. JACKSON: No, Judge.

Charge Conference                    2670

THE COURT: Page 21. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 22. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Your Honor.

THE COURT: Page 23. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 24. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 25. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, judge.

THE COURT: Page 26. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 27. Government?

Charge Conference                    2671

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 28. Government?

MR. POLEMENI: No, Judge.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 29. Government?

MR. POLEMENI: No. Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 30. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 31. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 32. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 33. Government?

MR. POLEMENI: No, Your Honor.

Charge Conference                    2672

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 34. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 35. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Page 36. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: Yes, Judge.

THE COURT: All right. Which paragraph and how many lines down looking at the top? Tell me where your objection is and what the objection is. Which paragraph?

MR. JACKSON: First paragraph, Judge.

THE COURT: The one that begins, "The government is permitted"?

MR. JACKSON: Yes, Your Honor.

THE COURT: What is your objection?

MR. JACKSON: Your Honor, we are merely requesting a parallel instruction to the instruction where it says, "You, in turn, may accept the testimony of such a witness and

J.A. 903

Charge Conference 2673

convict the defendant on the basis of the testimony" --

THE COURT: Keep your voice up because we are losing you a bit.

MR. JACKSON: I'm sorry, Judge.

THE COURT: That's all right.

MR. JACKSON: You know, Judge, we're going to withdraw the objection.

THE COURT: All right. So no objection on 36 from the defense?

MR. JACKSON: Correct.

THE COURT: All right. Thirty-seven. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Thirty-eight. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Thirty-Nine. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: Yes, Judge.

THE COURT: Okay. What is your objection and point me to where you object on 39?

MR. JACKSON: On 39, in the first, in the carryover

Charge Conference 2674

paragraph from the previous page.

THE COURT: Yes.

MR. JACKSON: It says -- the sentence starts on 38: "There was testimony at trial that the attorneys for the government interviewed witnesses when preparing for and during the course of the trial. You should not draw any unfavorable inferences," and it says "from that testimony."

Your Honor, just to eliminate any possible, even though we think this is, this is a good instruction, just to eliminate any possible confusion that the jurors could have about what that testimony refers to, we would respectfully request that it say, "from the fact that the government attorneys" -- "from the fact that attorneys may have prepared witnesses."

THE COURT: Why don't we -- I think I understand your concern. The way it's drafted, it refers to "attorneys for the government."

Why don't we make it, "There was testimony at trial that attorneys for the government and for the defendant." Would that address your concern because it puts it on an even playing field and makes it clear that both sides interviewed witnesses when preparing and during the course of the trial?

I think that should take care of your concern because it's something that both counsel did and both counsel are entitled to do.

Charge Conference 2675

Does that address your concern.

MR. JACKSON: In part, Judge.

THE COURT: All right.

MR. JACKSON: In part. The only other concern that I have is I think that the Court's instruction is exactly correct, that the mere fact that attorneys are meeting with witnesses is not something that the jurors should draw any unfavorable inferences from.

THE COURT: Right.

So I'm going to insert, on 38, it will now read: "There was testimony at trial that the attorneys for the government and attorneys for the defendant interviewed witnesses when preparing for and during the course of the trial. You should not draw any unfavorable inferences from that testimony. To the contrary, the attorneys were obliged to prepare this case as thoroughly as possible and might have been derelict in the performance of their" -- and I'll even put in the word "respective" to emphasize the fact that it's both sides -- "respective duties if they failed to interview witnesses before the trial began and as necessary throughout the course of the trial."

I think that makes it clear that it's both sides and it's value neutral with respect to the fact that the jury is not to draw any adverse inferences from the fact that you folks were just doing your job as diligent attorneys.

Charge Conference 2676

MR. JACKSON: We appreciate that, Judge, and we think that that's entirely appropriate and fixes the issue.

THE COURT: Do you have any additional concerns with respect to the language on 38 to the carryover on 39?

MR. JACKSON: My one request would be to change "that testimony" to "this practice" or to add a sentence that says, "However, you are entitled to draw any conclusions that you think are appropriate based on the testimony about," "about the credibility" --

THE COURT: Rather than "testimony," why don't we say, "You should not draw any unfavorable inferences from" -- was your suggestion "practice"?

MR. JACKSON: Yes, Your Honor.

THE COURT: Is that acceptable to the government, striking the word "testimony" and inserting the word "practice"?

MR. POLEMENI: That's fine, Judge, or even to make it clear, the fact that the attorneys prepared witnesses or something like that.

THE COURT: I thought that's what we did.

So what I'll do is I'll change it to read: "You should not draw any unfavorable inferences from that practice," strike the word "testimony" and the second line on 39, insert the word "practice."

"To the contrary, the attorneys were obliged to

J.A. 904

Charge Conference                    2677

prepare this case as thoroughly as possible and might have been derelict in the performance of their," and then insert the word "respective duties if they failed to interview witnesses before this trial began and, as necessary, throughout the course of the trial."

Does that address your concerns, Mr. Jackson?

MR. JACKSON:  Yes.  Thank you, Judge.

THE COURT:  And, government, is that acceptable to you as well?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  Okay.  Now we turn to the balance of 39, the charges.

Anything on the balance of 39 from the government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Forty.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Forty-one.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Forty-two.  Government?

---

Charge Conference                    2678

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  Your Honor, yes.  On 42, we have just a request for -- at the very end of the page, it says, "Indeed you may find the defendant guilty of the crime of conspiracy to commit an offense against the United States even though the substantive crime that was the object of the conspiracy was not actually committed."

THE COURT:  Yes.

MR. JACKSON:  Your Honor, we would simply request: "However, if you find that the government has failed to meet its burden, then you must find the defendant not guilty, so as not to leave the jury without what is a very significant instruction in this case, the fact that they have both options depending on how they weigh the evidence."

THE COURT:  What is the government's response to that suggested language?  I'm following Sand here as I'm sure you folks know.

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Okay.

MR. POLEMENI:  I don't think it's necessary, Judge. I think the --

THE COURT:  I don't think it's necessary as well. I'm going to overrule the objection but your objection is preserved as all your objections are preserved for the record

---

Charge Conference                    2679

as I stated yesterday and I'm stating it now and I'll state it at the end.

So that objection is overruled and 42 stands as drafted.

Forty-three.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  Yes, Your Honor.

This is, I believe, the first issue that we highlighted we wanted to discuss with the Court.

THE COURT:  Let's start with the objection that you have for what's on 43 and then we can move to the discussion of the issue.

What is your objection to the language as it now exists on 43?  What do you think is wrong as a matter of law? What do you object to as a matter of law with what's there?

MR. JACKSON:  So, Your Honor, we have no problem with the language.  It starts on 43 and goes into 44.  We're simply asking --

THE COURT:  Well, just to be clear, under "First element," is that what you're down to?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  So you have no objection to anything on 43 before the "First element" line, is that correct?

MR. JACKSON:  That's correct, Judge.

J.A. 905

---

Charge Conference                    2680

THE COURT:  Now let's go to the "First element" line which is captioned, "First element:  Existence of the agreement."

What is your objection to anything you see on 43?

MR. JACKSON:  Nothing there, Judge.

THE COURT:  Okay.  Let's go to 44.

Government, do you have any objections?

MR. POLEMENI:  No, Judge.

THE COURT:  All right.  Defense, do you have an objection on 44?

MR. JACKSON:  Yes, Judge.  We're really just asking somewhere between 44 and 45 in the first element, for something like, if it's acceptable, something like the Sand language that we or we adapted from Sand language that we suggested in the letter that we sent to the Court.

THE COURT:  I read the letter.  I discussed it with my law clerks.  Let me back up and ask you to have the discussion my way.

Do you object to anything on 44 -- do you object to anything on 44?  Let's start with that.

MR. JACKSON:  Your Honor, may I just confer just one moment?

THE COURT:  Sure.

MR. JACKSON:  Thanks.

(Pause.)

Charge Conference                2681

MR. JACKSON: So, Judge, we have no objection to what is here. We simply are asking --

THE COURT: Okay. So you have no objection to what is here. Now, tell me what it is you are asking the Court to add.

MR. JACKSON: Your Honor, we're asking the Court to add either here or at Count Seventeen a multiple conspiracy instruction that just lets the jurors know that that's also something that, in this case, should be considered.

THE COURT: Okay. What is the government's response to the suggestion from defense counsel?

MR. POLEMENI: Judge, I don't think it's necessary. I believe that the charge, as is, clearly states the different conspiracies and clearly articulates the burdens that need to be met by the government to, in order to convict the defendant.

And, candidly, the proposed language in the letter filed last night by defense counsel is very confusing. It seems to add more to the government's burden than is required and it's not necessary and, frankly, very confusing.

THE COURT: The objection is overruled. The record is preserved.

Let's go to 45. Government. Any objections?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

Charge Conference                2682

MR. JACKSON: No, Judge.

THE COURT: Forty-six. Government?

MR. POLEMENI: No, Judge.

THE COURT: Defense?

MR. JACKSON: No, Your Honor.

THE COURT: Forty-seven. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Forty-eight. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Forty-nine. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Fifty. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No judge.

THE COURT: Fifty-one. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

Charge Conference                2683

THE COURT: Fifty-two. Government?

MR. POLEMENI: No, Judge.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Fifty-three. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Fifty-four. Government?

MR. POLEMENI: No, Judge.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Fifty-five. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Fifty-six. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Fifty-seven. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Fifty-eight. Government?

Charge Conference                2684

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Fifty-nine. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Sixty. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Sixty-one. Government?

MR. POLEMENI: So, yes, Judge.

THE COURT: What is the objection to what appears on 61? And point me to where you have the objection.

MR. POLEMENI: I was looking at the wrong page. No objection to 61, Judge.

THE COURT: Sixty-one. Defense?

MR. JACKSON: No, Judge.

THE COURT: Sixty-two. Government?

MR. POLEMENI: Yes, Your Honor.

THE COURT: Tell me what -- point me to where you have the objection, what line, how far down.

MR. POLEMENI: The third paragraph that starts, "In the money transmitting business."

J.A. 906

Charge Conference                    2685

THE COURT: Yes, sir.

MR. POLEMENI: So we have no problem with the language but we would ask for some additional language to be included here.

So what we would propose is: "A money transmitting business is a business that, for a fee, accepts currency," and then add "funds or value that substitutes for currency" and then the remaining is fine.

THE COURT: What is the basis of requesting that addition? Do you have a case? Do you have something from Sand or was it just something you would like added?

MR. POLEMENI: Judge, I think that to the extent that --

THE COURT: I'm asking old school questions.

MR. POLEMENI: Sure, Judge.

THE COURT: Do you have a case to cite to me or Sand?

MR. POLEMENI: We don't, Judge, but we think the language is closer to the language in 31 U.S.C. 5330(d)(2).

It seems that the argument might be made that a check is not currency. It's not a dollar bill and, therefore, there was no money transmitting which seems, which might be confusing to the jury because later on, in the next paragraph, the money transmitting bills is defined as one that provides check cashing, currency exchange and other types of similar

---

Charge Conference                    2686

types of transactions.

So I guess my concern, Judge, is that the jury might be confused where the argument is: Well, you didn't hear any evidence that cash was exchanged or given to Mr. Motovich for him to transfer; what you heard is he was given --

THE COURT: I got it. So you're suggesting that in addition to the word "currency," the word "checks" be added?

MR. POLEMENI: That would be fine, Judge.

THE COURT: Anything other than checks be added or does that address your concern?

MR. POLEMENI: "Funds" or "value" that substitutes, but "checks" would be fine with us.

THE COURT: I think I'm prepared to go as far as "for a fee accept currency, checks," but I don't want to open it up to goats and chickens. All right?

MR. POLEMENI: Yes.

THE COURT: So let's just consider adding the phrase "currency, checks."

What is your response to that change, Mr. Jackson, adding the word "checks," do you have a problem with that?

MR. JACKSON: We have a vehement objection to that, Judge.

THE COURT: Okay. What's your vehement objection to adding the words "checks" in addition to currency?

Do you think it is not true that a money

---

Charge Conference                    2687

transmitting business is a business that for a fee, accepts currency and/or checks?

MR. JACKSON: I think that is not true, Judge.

THE COURT: Okay. Tell me why you think it is not true that a money transmitting business is a business that, for a fee, accepts currency and/or checks.

MR. JACKSON: Judge, I think that the Court got it right in terms of the separation between what is within 31 U.S.C. 5330 in terms of the requirement to register which is a separate matter, it is related, than the definition that is provided in 18 U.S.C. 1960 of what a money transmitting business is and there is nothing in the money transmitting business statute that says "accepts checks."

THE COURT: Well, let's look further down on 62. The language reads: "To satisfy this element, the money transmitting business must be licensed. I instruct you that under the federal statute Title 31, United States Code, Section 5330, a business that meets the following requirements is required to register with the Secretary of the Treasury: One, provides check cashing, currency exchange, or money transmitting or remittance of services or issues or redeems money orders, travelers checks and other similar instruments for other persons who engaged as a business."

So that clearly is the definition. I don't understand why you would vehemently object to the adding the

---

Charge Conference                    2688

word "checks" when it's clearly envisioned and encapsulated in the language that we have below which comes directly from the statute and the regs.

MR. JACKSON: Judge, I think that the Court has it right the way that it has it now and this is exactly the issue that was raised by Judge Raggi in Mazza-Alaluf. There are two separate issues.

There are two separate issues that are raised which the Court has appropriately addressed in this instruction as it is, not the way that the government is suggesting.

One of them is what is the definition of a money transmitting business under 18 U.S.C. 1960, and the Court addresses this first. Then there's a question of an entirely separate question of what businesses are required to register under 31 U.S.C. Section 5330. And the Second Circuit in Mazza-Alaluf said that it is not appropriate to substitute the definitions that are in 31 U.S.C. Section 5330 for the definitions that are in 18 U.S.C. 1960 and that's exactly what the government is asking the Court to do.

THE COURT: Okay. I hear the argument. I've read it. I'm going to add the word, after "currency," I'm going to add the word "and/or checks." Okay? And your objection is noted and preserved.

All right. So that's all I'm adding on 62, the words "and/or checks" after the language "accepts currency

**J.A. 907**

Charge Conference                2689

and/or checks for transfer within." So I'm adding that.

Anything else from the government? Do you object to anything else on 62?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense counsel, in addition to what you said, and, again, your objections are preserved, anything else you object to on 62?

MR. JACKSON: Yes, Judge. This is the second issue that we highlighted in our letter. The statutory definition includes the words "on behalf of the public" in 18 U.S.C. 1960.

THE COURT: Point me to the language on 62 that you're objecting to.

MR. JACKSON: It's the same paragraph, Your Honor.

THE COURT: Okay. Then I have the same ruling. All right. Overruled and preserved.

Sixty-three. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense? Same objection?

MR. JACKSON: Your Honor, we would ask somewhere on 63 to include the language on the statute on behalf of the public.

THE COURT: Okay. Same ruling, overruled, but it's preserved.

Anything else on 63, Mr. Jackson?

Charge Conference                2690

MR. JACKSON: No, Judge.

THE COURT: Sixty-four. Government, objections?

MR. POLEMENI: One moment, Judge. I'm flipping my pages over incorrectly.

Yes, Judge.

THE COURT: Tell me where.

MR. POLEMENI: It's the last paragraph starting with, which leads into 65, Judge.

THE COURT: The last paragraph that begins "Third element"?

MR. POLEMENI: Yes.

THE COURT: Okay. What is your objection to "Third element affecting interstate commerce," that paragraph, what's your objection?

MR. POLEMENI: We would ask Your Honor that the language Your Honor has on page 102 --

THE COURT: No. No. We're on page 64.

MR. POLEMENI: Right. No objection to the language as is. We would just ask for --

THE COURT: Hang on. We have to do it my way. I'm sorry.

Any objection to the language on 64 as it now exists?

MR. POLEMENI: No.

THE COURT: Defense, any objection to the language

Charge Conference                2691

on 64 as it now exists?

MR. JACKSON: No, Your Honor.

THE COURT: Sixty-five. Government, any objection to the language?

MR. POLEMENI: To the language, no. We would ask for an addition.

THE COURT: Okay. Tell me where the addition and what the addition is on 65.

MR. POLEMENI: Thank you, Judge. So we would ask that the language on page 102, that --

THE COURT: Go back to 65 and tell me where you would like the language that you're now going to give me ought to be inserted.

We're now back on 65. Where on 65 would you like the language that you're now going to suggest be inserted?

MR. POLEMENI: At the end of the first full paragraph, Your Honor.

THE COURT: Okay. There we go. The end of the first full paragraph, tell me the language that you're suggesting the Court add and read it slowly.

MR. POLEMENI: Yes, Your Honor.

So it is on page 102 and it reads as follows. "You may find that" -- it's the second full paragraph.

THE COURT: You're killing me. You're killing me.

MR. POLEMENI: I'm just trying.

Charge Conference                2692

THE COURT: You've got to do it my way. That's how we roll and we get through this. Go to page 102, go to page 1005 in the Federal Register, go anywhere you want, but tell me the language that you want inserted on page 65 wherever you pull it from.

MR. POLEMENI: Thank you, Judge.

THE COURT: Okay.

MR. POLEMENI: "You must find" --

THE COURT: Slowly. "You must find," go ahead.

MR. POLEMENI: -- "that the transaction" --

THE COURT: "That the transaction."

MR. POLEMENI: -- "affected interstate commerce" --

THE COURT: Hang on. "The transaction affected," with an "E" or an "A"?

MR. POLEMENI: "A."

THE COURT: That's what I thought but you never know. "Affected interstate commerce."

MR. POLEMENI: -- "in some way" --

THE COURT: "In some way."

MR. POLEMENI: -- "however minimal."

THE COURT: "However minimal."

Okay. Let me just read that back. "You must find that the transaction affected interstate commerce in some way however minimal." That's your suggested insertion of the language at the end of the first full paragraph on 65?

J.A. 908

Charge Conference                                    2693

MR. POLEMENI:  I would ask for additional language too, Judge.

THE COURT:  There?

MR. POLEMENI:  Yes.  "This effect," with an "E," "on interstate commerce" --

THE COURT:  Slowly.  "This effect on interstate commerce" --

MR. POLEMENI:  "Commerce."

THE COURT:  Yes.

MR. POLEMENI:  -- "can be established" --

THE COURT:  "Can be" or "maybe can be."  "Can be established."  Go ahead.

MR. POLEMENI:  -- "in several ways."

THE COURT:  Go ahead.

MR. POLEMENI:  "First, any monetary transaction" --

THE COURT:  Go ahead.

MR. POLEMENI:  -- "with a financial institution" --

THE COURT:  Go ahead.

MR. POLEMENI:  -- "insured by the Federal Deposit Insurance Corporation" --

THE COURT:  Go ahead.

MR. POLEMENI:  -- "commonly known as the FDIC" --

THE COURT:  Go ahead.

MR. POLEMENI:  -- "affects interstate commerce."

THE COURT:  What is the basis of that request?

---

Charge Conference                                    2694

MR. POLEMENI:  Judge, it is the instruction that is given on page 102.  There is case law to support the notion that depositing, withdrawing, from a financial institution that is federally insured necessarily affects interstate commerce.

THE COURT:  Right.  So you're telling the court the court has this language but just not where you want it, right?

MR. POLEMENI:  Right, Judge.

THE COURT:  Okay.  What is your response to that, Mr. Jackson?

MR. JACKSON:  It's already in the charge, Judge.

THE COURT:  I agree.  The objection is overruled so we're not going to add it here.

Okay.  Anything else from the government on 65?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense on 65?

MR. JACKSON:  No, Judge.

THE COURT:  Sixty-six.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Sixty-seven.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

---

Charge Conference                                    2695

THE COURT:  Sixty-eight.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Sixty-nine.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Seventy.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  This is very minor, Judge.  One objection.

THE COURT:  Okay.  On 70?

MR. JACKSON:  Yes, Judge.

THE COURT:  Okay.  Point me to the place.

MR. JACKSON:  Second paragraph on page 70.

THE COURT:  The one that begins, "A financial institution" or the carryover?

MR. JACKSON:  "A financial institution," Judge.

THE COURT:  Okay.  What is the objection?

MR. JACKSON:  I believe that where it says, "Any time" in the third, I'm sorry, in the third line of that paragraph.  It says "involving $10,000 or more in United States currency."  I think it needs to say "involving more

J.A. 909

---

Charge Conference                                    2696

than $10,000."

THE COURT:  I think you're correct.

Does the government agree?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  Okay.  "More than" -- so we're inserting the words "more than" in front of "$10,000."

That's acceptable to you, Mr. Jackson?

MR. JACKSON:  Yes, Judge.

THE COURT:  That's acceptable to the government?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  Okay.  Anything else on 70 from the government?

MR. POLEMENI:  No, Judge.

THE COURT:  Defense?

MR. JACKSON:  Yes, Judge, one other thing.

THE COURT:  Okay.

MR. JACKSON:  At the bottom of page 70.

THE COURT:  Yes, sir.

MR. JACKSON:  This is -- it says, "The alleged unlicensed check-cashing business."

THE COURT:  Yes.

MR. JACKSON:  And I believe, because this one is Count Two, it should say, "the alleged domestic financial institution."

THE COURT:  What is the response of the government

Charge Conference 2697

to that requested change?

MR. POLEMENI: I see.

THE COURT: I'm sorry?

MR. POLEMENI: No, Judge. I was just trying to read the language.

THE COURT: As it now reads, it reads, "That the alleged unlicensed check-cashing business." And Mr. Jackson has suggested what language in its place, sir?

MR. JACKSON: Your Honor, I believe it should say, "The alleged domestic financial institution."

THE COURT: Okay. "The alleged domestic financial institution," and strike the phrase "unlicensed check-cashing business."

MR. JACKSON: Yes, Your Honor.

THE COURT: And why do you want that change?

MR. JACKSON: I believe in Count Two, which is the failure to file CTRs, the question for the jury is merely whether there was an unlicensed financial institution that was involved in the transaction alleged in the indictment.

THE COURT: Would it address your concern to say, "The alleged unlicensed check-cashing business," comma, "a domestic financial institution," comma? Would that address your concern?

MR. JACKSON: No, Judge. I think that would make it more difficult for us.

---

Charge Conference 2698

THE COURT: Okay. Then I'm going to overrule the objection and it stays as drafted.

MR. JACKSON: Thank you, Judge.

THE COURT: It's preserved. Your objection is preserved for the record.

Anything else from the government on 70?

MR. POLEMENI: No, Your Honor.

THE COURT: Anything else from the defense on 70?

MR. JACKSON: No, Judge.

THE COURT: Seventy-one. Anything from the government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: Just the --

THE COURT: Same objection?

MR. JACKSON: Same objection, Judge.

THE COURT: Same ruling.

Anything else on 71?

MR. JACKSON: No, Judge.

THE COURT: Seventy-two. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge, other than the same carryover objection.

THE COURT: Same objection? Same ruling.

---

Charge Conference 2699

Seventy-three. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Seventy-Four. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Seventy-five. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Seventy-six. Government?

MR. POLEMENI: Yes, Judge.

THE COURT: Okay. Tell me where.

MR. POLEMENI: And this is our error. In the second paragraph -- sorry -- first full paragraph beginning "Count Three."

THE COURT: Yes.

MR. POLEMENI: Second sentence: "For Count 5, bank three is," and this is our drafting error. It should be "Astoria Bank."

THE COURT: "Astoria"?

MR. POLEMENI: Yes.

THE COURT: "Astoria National Bank" or just "Astoria

---

Charge Conference 2700

Bank"?

MR. POLEMENI: Astoria Bank.

THE COURT: "Astoria Bank."

Do you concur with that correction, defense counsel?

MR. JACKSON: Yes, Judge.

THE COURT: All right. So we're striking the words "Sterling National" and inserting the word "Astoria" on 76.

Is that acceptable to the government?

MR. POLEMENI: Yes, Your Honor. Thank you.

THE COURT: And defense?

MR. JACKSON: Yes, Judge.

THE COURT: Thank you.

Anything else on 76 from the government?

MR. POLEMENI: No, Judge.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Seventy-seven. Government?

MR. POLEMENI: No, Judge.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Seventy-Eight. The government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Seventy-Nine. The government?

J.A. 910

Charge Conference 2701

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Eighty. Government?

MR. POLEMENI: Yes, Your Honor.

THE COURT: Tell me where.

MR. POLEMENI: In the first full paragraph, we would object to the language on the third line that says, "but do not have property interests in potentially valuable economic information which would have enabled the bank to make informed economic decisions about what to do with its money or property."

THE COURT: What is the basis of your objection?

MR. POLEMENI: This is the language, I believe, Judge, that was often used in the Ciminelli line of cases that the government is not, has not advanced as of the time of the indictment or at any point during the trial, and I think by injecting this language and saying what bank fraud is not will certainly or has a potential to confuse the jury into believing that there's something more out there. And so it's not necessary, this language, and it's not anywhere we're advancing and I don't believe that, and would sow confusion so we would ask that it be taken out.

THE COURT: What is your response to the objection?

MR. JACKSON: I believe that is completely wrong. I

Charge Conference 2702

think the Court got it exactly right. This language is now required under Ciminelli and it would sow enormous confusion to not have this language.

THE COURT: I'm overruling the objection. It stands as is.

Anything else from the government on 80?

MR. POLEMENI: No, Your Honor.

THE COURT: And the defense on 780?

MR. MAZUREK: Yes, Your Honor. We would ask that the Court, in addition, after the -- in the title of the second element, that the Court include, after "knowingly," comma, "willfully and with the intent to defraud the financial institution or bank." And that's pursuant to Sand's instruction at 44-11.

THE COURT: What is the response of the government to that suggested change in language?

MR. POLEMENI: Your Honor, we would object to any inclusion of the term "willfully." By definition, the intent, an intent to defraud requires a willful action and so the definition or inclusion of "willfulness" is superfluous and not necessary.

THE COURT: The objection is overruled but maintained.

Anything else from the government on 80?

MR. POLEMENI: No, Your Honor.

Charge Conference 2703

THE COURT: Anything else from the defense on 80?

MR. JACKSON: No, Judge.

THE COURT: Eighty-one. The government?

MR. POLEMENI: No, Judge.

THE COURT: The defense?

MR. JACKSON: No, Judge.

THE COURT: Eighty-two. The government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Eighty-three. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Eighty-four. The government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Eighty-five. The government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Eighty-six. Government?

MR. POLEMENI: Just the same objection on the top, on the first, the Ciminelli language, Judge.

J.A. 911

Charge Conference 2704

THE COURT: Yes, same ruling. Same ruling. You're overruled but preserved.

Anything else on 86, the government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Eighty-seven. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Eighty-eight. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Eighty-nine. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Ninety. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Ninety-one. Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

Charge Conference                    2705

MR. JACKSON:  No, Judge.

THE COURT:  Ninety-two.  Government?

MR. POLEMENI:  Judge, if I can just have one moment.

So this would be, I guess not on 92.

THE COURT:  Then you have nothing on 92?

MR. POLEMENI:  Correct.

THE COURT:  Defense on 92?

MR. JACKSON:  I think I'm anticipating what --

THE COURT:  Don't anticipate.  Just stick with the boring hay-foot, straw-foot plodding Judge Kuntz.

Anything on 92, Counsel?

MR. JACKSON:  Yes, Judge.

THE COURT:  Tell me what your objection is.

MR. JACKSON:  This is very minor.

THE COURT:  That's okay.  I do minor.  I do major.

MR. JACKSON:  I think it should say "the crime."

THE COURT:  Sorry.  Point me to the language.

MR. JACKSON:  Very last line on 92, Your Honor.

THE COURT:  It says "the crimes," plural, "charged in Counts One, Three, Four, Five and Six."

MR. JACKSON:  Yes.

THE COURT:  Are you saying that that's one crime?

MR. JACKSON:  It bleeds into our objection.

THE COURT:  Well, forget bleeding.  Are you telling me that in Counts One, Three, Four, Five and Six, there is

Charge Conference                    2706

only one crime being charged rather than more than one crime?

MR. JACKSON:  I'm definitely not, Judge.

THE COURT:  Okay.  Well, then I'm going to leave the word "crimes," plural.  Your objection is noted on 92 so that language stands.

Now, let's move to 93.  Anything from the government on 93?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  Tell me where and why.

MR. POLEMENI:  So picking up where Mr. Jackson left off, we, the government, has decided not to move as a predicate Counts Three, Four, Five and Six, and we'll rely on Count One as the predicate for the money laundering charge.

THE COURT:  Translation into English for the slow reading judge?

MR. POLEMENI:  So we would now propose, going back to page 92, "The crime charged in," the top of 93, "Count One."

THE COURT:  So you're saying we take "crimes," plural, and turn that into "crime" singular?

MR. POLEMENI:  Correct.

THE COURT:  On the bottom of 92.  And we only have -- we strike the word "Counts" as in more than one count, we strike the letter "S" and leave it just as "Count One."  Is that correct?

Charge Conference                    2707

MR. POLEMENI:  That's correct.

THE COURT:  And then we strike on 93, the words "Three, Four, Five and Six," and then we strike the word "all" and it reads, carryover from 92, "The crime charged in Count One, contrary to Title 18, United States Code, Section 1957(a)."  Is that how you suggest it now read?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  Any objection to that, Mr. Jackson?

MR. JACKSON:  No, Judge.

THE COURT:  All right.  I'll make that change.

Ninety-three.  Anything else on 93 from the government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Ninety-four.  Government?

MR. POLEMENI:  Yes, consistent with what we just discussed.

THE COURT:  So we have to strike "crimes," plural, and make that singular, first line on 94, correct?

MR. POLEMENI:  Correct.

THE COURT:  And then we say "charged in Count One," and we strike the words "Three, Four, Five and Six," strike the word "all."  And it now reads, "The crime charged in Count One contrary to Title 18, United States Code,

J.A. 912

Charge Conference                    2708

Section 1957(a)."  Is that what you're suggesting for 94?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  Is that acceptable to defense counsel?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Okay.  Anything else on 94 from the government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  From defense counsel, anything else on 94?

MR. JACKSON:  No, Judge.

THE COURT:  Ninety-Five.  Government?

MR. POLEMENI:  The same, the same --

THE COURT:  Point me to the language just so we're clear for my friends on the 17th floor.

MR. POLEMENI:  The top of the second line.

THE COURT:  The "crimes," plural, becomes "crime," singular.  We strike the word -- the letter "S" in the word "Count."  And it now reads "Count One," we strike "Three, Four, Five and Six."  We strike the word "all."  And it reads, "The crime charged in Count One contrary to Title 18, U.S. Code, Section 1957(a)."  Is that your suggestion?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  Is that acceptable to defense counsel?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Okay.  Anything else on 95 from the

Charge Conference                    2709

government?

MR. POLEMENI:  No, Judge.

THE COURT:  From defense?

MR. JACKSON:  No, Judge.

THE COURT:  Ninety-six.  Government?

MR. POLEMENI:  Same thing, Judge, on the third line from the top.

THE COURT:  Third line from the top.  "Crimes" becomes singular.  We strike "Counts," the "S" in "Counts," and we get that "One."  We strike "Three, Four, Five and Six." Strike the word "all."  And so it now reads, "The crime charged in Count One contrary to Title 18, U.S. Code Section 1957(a)."

Is that correct?

MR. POLEMENI:  Yes.

THE COURT:  Anything else on 96, government?

MR. POLEMENI:  No, Judge.

THE COURT:  Defense?

MR. JACKSON:  No.

THE COURT:  Ninety-seven.  Government?

MR. POLEMENI:  Same thing on line 4.

THE COURT:  We strike the "S" in "crimes," we strike "Three, Four, Five and Six," and the word "all," and that's the change on 97.

Is that acceptable to the government?

---

Charge Conference                    2710

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  And defense counsel?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Okay.  I'll make the change.

Anything else on 97?

MR. POLEMENI:  No, Judge.

THE COURT:  Defense?

MR. JACKSON:  No, Your Honor.

THE COURT:  Ninety-eight.  Government?

MR. POLEMENI:  Same issue, Judge, starting on line 5.

THE COURT:  1, 2, 3, 4, 5.  Strike the "S" in "crimes."  Make "Counts," plural, singular.  Leave the word "One."  Strike "Three, Four, Five and Six."  Strike the word "all."

Is that acceptable?

MR. POLEMENI:  Yes, Judge.

THE COURT:  Anything else on 98 from the government?

MR. POLEMENI:  No, Judge.

THE COURT:  Is that acceptable to the defense on 98?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Anything else on 98 from defense?

MR. JACKSON:  No, Your Honor.

THE COURT:  Ninety-nine.  The government?

MR. POLEMENI:  Same thing.  Six lines down, Judge.

---

Charge Conference                    2711

THE COURT:  Take the "S" out of "crimes," "Counts" becomes singular, leave "One," strike "Three, Four, Five and Six," and the word "all."

Is that acceptable to the government?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  Is that acceptable to the defense?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Anything else on 99 from the government?

MR. POLEMENI:  No, Judge.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  One hundred.  Government?

MR. POLEMENI:  No, Judge.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  One hundred one.  Government?

MR. POLEMENI:  Yes, Judge.  Similarly, beginning on line 3.

THE COURT:  We take out the "S" in "Counts."  Strike "Three, Four, Five and Six."  So it now reads, "Alleged in Count One of the indictment."  We strike the "S" in "Counts," we take out the words "Three, Four, Five and Six."  Is that correct?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  Is that acceptable to the government?

---

Charge Conference                    2712

MR. POLEMENI:  Yes, Judge.

THE COURT:  To the defense?

MR. JACKSON:  Yes, Your Honor, with one additional bit.  It says "the offenses" and I think it should be "the offense."

THE COURT:  Here, "the offense" or "offenses," what does the government say?  Should that be singular as well?  Is it a singular offense charged in Count One?

MR. POLEMENI:  Yes, Judge.

THE COURT:  We'll take the out.  So it now reads, "Third, that the property was derived under specified unlawful activity," dash, "here, the offense alleged in Count One of the indictment."

Is that acceptable to the government?

MR. POLEMENI:  Yes, Judge.

THE COURT:  Acceptable to the defense?

MR. JACKSON:  Yes, Judge.

THE COURT:  Okay.  Anything else on 101 from the government?

MR. POLEMENI:  No, Judge.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  One hundred two.  The government?

MR. POLEMENI:  No, Judge.

THE COURT:  The defense?

J.A. 913

Charge Conference                    2713

MR. JACKSON:  No, Judge.

THE COURT:  One hundred three.  The government?

MR. POLEMENI:  Yes, Judge.

THE COURT:  Do you care it tell me what it is?

MR. POLEMENI:  Yes.  Just looking for our proposed instructions.  Thank you.

THE COURT:  On 103, what is the language you object to and why?

MR. POLEMENI:  Just give me one moment.

THE COURT:  Of course.

(Pause.)

MR. POLEMENI:  So, Judge, it's not an objection to the language as is.

THE COURT:  Okay.  Let me stop you right there.  Any objection to the language on 103 from defense?

MR. JACKSON:  Your Honor, may I just confer?

THE COURT:  You may confer.

(Pause.)

MR. JACKSON:  No objection, Your Honor.

THE COURT:  Now.  The government, what is your issue on 103?

MR. POLEMENI:  So, Judge, we would request that at the end of the 103, that --

THE COURT:  After the word "criminally derived property"?

Charge Conference                    2714

MR. POLEMENI:  Correct.

THE COURT:  Go ahead.

MR. POLEMENI:  We would ask that there be some language dealing with commingling which is what we had proposed in our initial, our proposal, so I can read that language for you.

THE COURT:  Why don't you read the language that you're proposing.

MR. POLEMENI:  Okay.

THE COURT:  Slowly.

MR. POLEMENI:  "Even so, the government is not required to trace criminal funds that are commingled with legitimate funds to prove a violation of Section 1957.  Because money is fungible, once funds obtained from illegal activity are combined with funds from lawful activity in a single account, the 'dirty' and clean funds cannot be distinguished from each other and the government is not required to establish that each dollar in the transaction is criminally derived."

THE COURT:  What is the basis for your suggested change?

MR. POLEMENI:  So that comes, adapted from United States versus Silver, Judge, in 864 F.3d 102, Second Circuit, 2017, where this was an issue before the court whether the government had to trace funds under 1957 and the court said

Charge Conference                    2715

there:  "The government is not required to trace criminal funds that are commingled with legitimate funds to prove a violation of Section 1957."  And then:  "Because money is fungible, once funds obtained from illegal activity are combined with funds from lawful activity in a single account, the 'dirty' and clean funds cannot be distinguished from each other.  As such, a requirement that the government trace each dollar of a transaction to the criminal as opposed to the noncriminal activity would allow individuals effectively to defeat prosecution for money laundering by simply commingling legitimate funds with criminal proceeds."

THE COURT:  What is your response to the suggested change, Mr. Jackson?

MR. JACKSON:  Three things, Judge.

First, I think that that's a misread of the Silver case.  I think that the Silver case is addressing a sufficiency argument and under sufficiency, the Court is engaged in a very different analysis than what the Court should be instructing the jury.  The sufficiency question was whether or not any reasonable juror could have, under the commingling theory that the government presented in that case, established the guilt of the defendant and the answer to that was yes.  It's a very different question of what should be instructed.  The Court's instruction here is correct.

Secondly, the government was required to put on

Charge Conference                    2716

proof if it wanted to ask for this kind of instruction of how this commingling exactly worked and there was nothing in the proof to support an instruction on this.

And then lastly, Judge, they virtually asserted that all of the funds that are at issue in this case are from the unlicensed money business.  So it doesn't even make sense that they would need any instruction on commingling.  We think it's legally and factually unsupported.

THE COURT:  I'm going to overrule the objection.  The language stands as drafted.  Your objection is noted.

Anything else on 103 from the government?

MR. POLEMENI:  No, Judge.

THE COURT:  From defense?

MR. JACKSON:  No, Judge.

THE COURT:  One hundred four.  Government?

MR. POLEMENI:  No, Judge.

THE COURT:  Defense?

MR. JACKSON:  No, Your Honor.

THE COURT:  One hundred five --

MR. JACKSON:  I'm sorry, Judge.  We do have.

THE COURT:  Okay.  One hundred five?

One hundred Four?

MR. JACKSON:  Yes, Judge.

THE COURT:  What is your objection?

MR. JACKSON:  At the bottom of the second paragraph,

J.A. 914

Charge Conference                     2717

it says, "I instruct you as a matter of law that operating an unlicensed money transfer business as alleged in Count One," and we believe -- it says, "and bank fraud as alleged in Counts Three through Six," we believe "and bank fraud as alleged in Counts Three through Six" should be struck and the word "are" should be changed to "is a criminal offense," singular.

THE COURT: So let's just go through it again. You're suggesting that we strike -- take me through it again, please?

MR. JACKSON: Yes, Judge. So this relates to the same issue we were discussing previously.

THE COURT: Just give me the language change you want.

MR. JACKSON: Yes, Judge. We believe the words "and bank fraud as alleged" --

THE COURT: Should be struck?

MR. JACKSON: Should be struck.

THE COURT: All right. And "bank fraud as alleged" should be struck?

MR. JACKSON: "In Counts Three through Six." All of that should be struck.

THE COURT: All of that language should be struck. What is the government's response?

MR. POLEMENI: No objection, Judge.

Charge Conference                     2718

THE COURT; so it's striking everything after "Count One" in that paragraph and it now reads, "As alleged in Count One," period. Is that correct?

The last full paragraph on page 104 now ends with the words, "transmitting business as alleged in Count One," period. Is that correct?

MR. JACKSON: I believe, Your Honor, we should keep the language on the sentence underneath, but it should change to "is a criminal offense."

THE COURT: Okay. So it will now read: "Transmitting business as alleged in Count One," strike "and bank fraud as alleged in Counts Three through Six," and strike the word "are," insert the word "is," "a criminal offense," singular.

Is that your objection?

MR. JACKSON: Yes, Your Honor.

THE COURT: Is that acceptable to the government?

MR. POLEMENI: That's fine, Judge.

THE COURT: Okay. We'll make that change. Anything else from 104 from the government?

MR. POLEMENI: No.

THE COURT: Defense?

MR. JACKSON: Just one additional thing. In the very last line there, it says, "One of these underlying offenses." We believe it should say, "For the underlined

Charge Conference                     2719

offense."

THE COURT: "For" -- strike the words "are all elements for the underlying offense," singular?

MR. JACKSON: Yes. I believe it should say -- it should strike -- it should say "all elements for the alleged underlying offense."

THE COURT: "All elements for the" --

MR. JACKSON: "Alleged."

THE COURT: -- "alleged" --

MR. JACKSON: "Underlying offense," singular.

THE COURT: -- "underlying offense."

Is that acceptable to the government?

MR. POLEMENI: Yes, Judge.

THE COURT: All right. We're making that change. Okay. Anything else from 104 from the government?

MR. POLEMENI: No, Judge.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: One hundred five. Government?

MR. POLEMENI: Judge, can we go back -- may I ask if we can go back to the commingling instruction?

THE COURT: What page?

MR. POLEMENI: On page -- we just had the discussion about commingling of funds.

THE COURT: What page?

Charge Conference                     2720

MR. POLEMENI: One hundred three.

THE COURT: Thank you. Go ahead. Point me to the language.

MR. POLEMENI: It was the language that we had asked to be included that Your Honor --

THE COURT: That I've already ruled on?

MR. POLEMENI: Yes.

THE COURT: Okay. You want to ask me to reconsider my ruling?

MR. POLEMENI: No. I just would ask for some clarification if that's okay, Judge.

THE COURT: What do you mean clarification? What do you not understand about "no"?

MR. POLEMENI: No, I understand "no."

THE COURT: Okay.

MR. POLEMENI: My concern, Judge, is that defense counsel will now argue to the jury that the government hasn't proven --

THE COURT: Oh, as soon as they start to argue the law, they're going to get that Judge Vader-Pennywise interruption. That's kind of what I've been subtly saying to both sides ever since you tried to hijack the jury charge with your motions in limine, very skillfully attempted to hijack.

As I once said to some of my law partners when they were trying to take more money from some of us than others,

J.A. 915

Charge Conference                          2721

where's the ski mask and where's the Uzi?  Without the ski mask and Uzi, you're just not going to have much luck in hijacking.  So I hear you.

MR. POLEMENI:  Thank you, Judge.

THE COURT:  One hundred four.  Anything other than what we talked about on 104, from the government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  One hundred five, the government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  Yes, Judge.

THE COURT:  Okay.

MR. JACKSON:  On 105, it says, in the fifth line --

THE COURT:  That begins, "Unlicensed money transmitting business"?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Okay.

MR. JACKSON:  It says, "charged in Count One."

THE COURT:  Yes.

MR. JACKSON:  And the words after that, "and" and then in the next line, "the alleged bank fraud charged in Counts Three through Six," we believe should all be struck.

THE COURT:  All right.  So it should have a period

---

Charge Conference                          2722

after "Count One" and strike the balance of that sentence?

MR. JACKSON:  No, Your Honor.

THE COURT:  No?

MR. JACKSON:  I think we should keep it, the comma, and then it should say, "Then you must find Mr. Motovich not guilty of Counts Eight through Fourteen."

THE COURT:  Okay.  So then it would read, "Transmitting business charged in Count One," comma, you're suggesting striking the phrase, "and the alleged bank fraud charged in Counts Three through Six"?

MR. JACKSON:  Yes.

THE COURT:  And then it continues on:  "Then you must find Mr. Motovich is not guilty of Counts Eight through Fourteen."  Is that correct?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Is that acceptable to the government?

MR. POLEMENI:  Yes, Your Honor.

THE COURT:  So that's how that will read.

Anything else on 105 from the government?

MR. POLEMENI:  No, Judge.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  One hundred six.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

---

Charge Conference                          2723

MR. JACKSON:  Your Honor, it's on line 6 of 106.

THE COURT:  Yes, sir.

MR. JACKSON:  For this element, I believe it should say -- I'm sorry.  I'm sorry, Your Honor.  May I just confer one moment?

THE COURT:  Sure.  Absolutely.

(Pause.)

MR. JACKSON:  Your Honor, we don't have an objection on 106.

THE COURT:  All right.

One hundred seven.  Government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense --

MR. POLEMENI:  Sorry, judge.  The bottom.

THE COURT:  What is your objection?

MR. POLEMENI:  Just to correct the last two lines.

THE COURT:  It says, "The crimes charged in Counts One, Three, Four, Five, Six."  So we make "crimes," plural, singular, we strike the "S" in the word "Counts," we leave the word "One" in place and we strike "Three, Four, Five and Six."  It says the word "all" then gets struck.  And it now reads, "The crime charged in Count One, contrary to Title 18, U.S. Code Section 1957(a)."

Is that correct?

MR. POLEMENI:  Yes, Your Honor.

---

Charge Conference                          2724

THE COURT:  Is that acceptable to defense?

MR. JACKSON:  Yes, Judge.

THE COURT:  Anything else from the government on 107?

MR. POLEMENI:  No.

THE COURT:  Anything from the defense on 107?

MR. JACKSON:  No, Judge.

(Continued on next page.)

J.A. 916

*Charge Conference* 2725

(Continuing.)

THE COURT: 108. Government.

MR. POLEMENI: No, Judge.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: 109. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: No, Your Honor.

THE COURT: 110. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 111. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 112. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 113. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: May I have just one moment, Judge?

*Charge Conference* 2726

THE COURT: Yes, of course.

(Pause.)

MR. JACKSON: No, Judge.

THE COURT: 114. Government.

MR. POLEMENI: No, Judge.

THE COURT: Defense.

MR. JACKSON: No, Your Honor.

THE COURT: 115. Government.

MR. POLEMENI: No, Judge.

MR. JACKSON: No, Your Honor.

THE COURT: 116. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 118. Government.

MR. POLEMENI: Yes, Judge.

THE COURT: What is your objection?

MR. POLEMENI: So, the one, two, the third line down beginning with "reasonable doubt."

THE COURT: The third line in the first full paragraph?

MR. POLEMENI: I'm sorry. The second line in the first full paragraph.

THE COURT: The second line that begins "reasonable doubt"?

*Charge Conference* 2727

MR. POLEMENI: Yes.

THE COURT: So, what is your objection?

MR. POLEMENI: So, Judge, we would ask that it read: Reasonable doubt for Count Seventeen is that at least one overt act.

THE COURT: Rather than "one of the overt acts"?

MR. POLEMENI: Correct.

And we would also ask that "charged in the Indictment" be deleted.

THE COURT: What is the basis of requesting this change?

MR. POLEMENI: The Second Circuit in U.S. v. Fassoulis, 445 F.2d, 13, Second Circuit 1971, has held, and district courts, I believe, follow this rule, that there's no need for the jury to find that the overt act be specified in the Indictment. At least as long as there's an overt act in furtherance of the conspiracy and it closely relates to the ones that are specified in the Indictment, that is sufficient.

THE COURT: So you're suggesting it read: The third element the Government must prove beyond a reasonable doubt for Count Seventeen is that... go ahead.

MR. POLEMENI: "At least one overt act."

THE COURT: "At least one" strike "of the" and read, "overt act" singular?

MR. POLEMENI: Correct.

*Charge Conference* 2728

THE COURT: "At least one overt act" singular.

MR. POLEMENI: "Was," strike "charged in the Indictment."

THE COURT: Correct.

MR. POLEMENI: And then reads, "one overt act was knowingly committed."

THE COURT: All right.

Any objection to that change from Defense?

MR. JACKSON: Your Honor, I think that the language that the Court has should be the correct -- should be the language that is instructed.

THE COURT: Do you have a problem with the proposed change?

MR. JACKSON: Yes, Judge.

THE COURT: Tell me your problem.

MR. JACKSON: So, there are two problems.

Just in my -- my memory of the case that the prosecutor is citing, and I haven't just reviewed it, but I think that the issue in that case was that the overt acts were instructed, one of them was proven, at least one of them was proven, but there were additional overt acts that were -- that were alleged.

And the question that I recall was whether the jury's potentially find -- that potentially rely upon additional overt acts beyond the one, at least, that was

J.A. 917

Charge Conference                    2729

proven indicated error.

But here, the problem really comes down to the fact that this is a very wide-ranging allegation in the Indictment, and the overt acts the Government chose to put in -- it didn't put into the Indictment ground the conspiracy. And if we remove the requirement that the jury find at least one of the overt acts charged in the Indictment was knowingly committed by at least one of the conspiracy -- one of the conspirators, we're inviting -- we're inviting an understanding that there was potentially a significant prejudicial variance, if not a constructive indictment.

THE COURT: All right.

Well, I think since it is limited to a reference to Count Seventeen, then I don't have a problem with the change. So your objection is noted, but I will make the change and this will now read as follows:

The third element the Government must prove beyond a reasonable doubt for Count Seventeen is that at least one overt act -- singular -- was knowingly committed by at least one of the conspirators at or about the time or place alleged.

Your objection is noted and reserved for the record.

MR. JACKSON: Thank you, Judge.

THE COURT: Anything else on 118 from the Government?

MR. PAULSEN: Yes, Your Honor.

Charge Conference                    2730

In light of the change Your Honor just made, the second full paragraph.

THE COURT: The one that begins "the indictment alleges"?

MR. PAULSEN: Yes, Your Honor.

THE COURT: What change do you suggest making or what's your objection?

MR. PAULSEN: We would not change the language, but ask for an addition.

THE COURT: All right. What is the addition you're asking for?

MR. PAULSEN: The addition would be is at the end of where it states "overt acts" at the end of that paragraph.

THE COURT: Right.

MR. PAULSEN: We would add the phrase "any one of which would be sufficient."

And then the next sentence: "However, the jury is not limited to the following overt acts."

THE COURT: I am going to overrule that objection. It will stand as it is.

Anything else on 118 from the Government?

MR. PAULSEN: Your Honor, in light of the change Your Honor made, we believe there is a modification that would need to be made on page 116, going back two pages.

THE COURT: What change do you now believe needs to

Charge Conference                    2731

be made on 116?

MR. PAULSEN: The second-to-last paragraph, which begins with the word "third."

THE COURT: Yes.

MR. PAULSEN: It reads, "one of the members of the conspiracy committed at least one of the overt acts charged in the Indictment."

THE COURT: Yes.

MR. PAULSEN: I believe it should read instead "one of the members of the conspiracy committed at least one overt act."

THE COURT: Rather than "at least one of the overt acts charged in the Indictment"?

MR. PAULSEN: Yes, Your Honor.

THE COURT: Why?

MR. PAULSEN: For the reason noted before, that the Government is not limited by merely the overt acts as specified in the Indictment.

THE COURT: I don't understand.

MR. PAULSEN: The change Your Honor made on striking --

THE COURT: I don't understand why that occasions a need to change the language here.

MR. PAULSEN: Because the element is broader than the way it's described, Your Honor. The Government can -- can

Charge Conference                    2732

prove conspiracy through those overt acts, but the jury may find other overt acts of a similar character.

THE COURT: It says "one of the members of the conspiracy committed at least one of the overt acts charged in the Indictment."

What's your problem with that language?

MR. PAULSEN: It's that the conspiracy can be proved by finding an overt act that's not in the Indictment.

THE COURT: What is the response of defense counsel to that concern?

MR. JACKSON: We take our same position, Judge. We think the Court had it right in the original language.

THE COURT: So does the Court. The objection is overruled.

Anything else on 118?

MR. POLEMENI: No, Judge.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 119. Government.

MR. POLEMENI: No, Judge.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 120. Government.

MR. POLEMENI: No -- no, Your Honor.

THE COURT: Defense.

J.A. 918

*Charge Conference* 2733

MR. JACKSON: No, Judge.

THE COURT: 121. Government.

MR. POLEMENI: Yes, Judge.

One, two, three, four, the fourth full line beginning "Carver Federal Savings Bank."

THE COURT: Yes, sir.

MR. POLEMENI: John Doe 4 should read John Doe 4 is Dannette Sullivan-Hyatt.

THE COURT: John Doe 4 is.

MR. POLEMENI: Dannette Sullivan-Hyatt.

THE COURT: Any objection to that insertion of the John Doe 4 witness's name?

MR. JACKSON: No, Judge.

THE COURT: Okay. We'll make that change.

Anything else on 121 from the Government?

MR. POLEMENI: No, Your Honor.

THE COURT: From the defense?

MR. JACKSON: No, Judge.

THE COURT: 122. Government.

MR. POLEMENI: No objection.

THE COURT: Defense.

MR. JACKSON: No, Your Honor.

THE COURT: 123. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

*Charge Conference* 2734

MR. JACKSON: No, Judge.

THE COURT: 124. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 125. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 126. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: I'm sorry, Judge.

THE COURT: Okay, 125. 125?

MR. JACKSON: Yes, Your Honor.

On 125 --

THE COURT: Point me to the language.

MR. JACKSON: On 125, Your Honor, we request the addition of the language we suggested in our letter from United States v. Crim, 451, Federal Appendix 196, and United States v Sorenson, 801 F.3d 1217.

THE COURT: So the record is clear, what language are you requesting --

MR. JACKSON: Yes, Your Honor.

THE COURT: -- and where?

*Charge Conference* 2735

MR. JACKSON: We are requesting --

THE COURT: First tell me where and then tell me what on 125.

MR. JACKSON: It's just, for example --

THE COURT: I'm sorry, where on 125?

MR. JACKSON: I'm sorry, Judge. After --

THE COURT: Which paragraph?

MR. JACKSON: After the first paragraph, which is carrying over.

THE COURT: The carryover paragraph. Go ahead. How many lines down?

MR. JACKSON: One, two, three, four, five -- seven lines down.

THE COURT: It says "took place here"?

MR. JACKSON: "Took place here."

THE COURT: "That is for you to decide," you want language added after that or before that?

MR. JACKSON: Actually, Judge, it's one more line. It's -- two more lines down from that where it says "not all conduct that impedes the lawful function of a government agency is illegal."

THE COURT: Yes.

MR. JACKSON: We would just ask that it say, "for example, the simple failure to file a required tax return" --

THE COURT: "It's okay not to burden or to burden

*Charge Conference* 2736

the IRS," that language?

MR. JACKSON: Yes, Your Honor.

THE COURT: Okay. I am not putting that in. Your objection is noted and maintained for the record.

MR. JACKSON: Thank you, Judge.

THE COURT: Anything else on 125 from the Government?

MR. PAULSEN: No, Your Honor.

(Pause.)

THE COURT: Anything else on 125 from the Government?

MR. POLEMENI: No, Judge.

THE COURT: Anything else from defense counsel?

MR. JACKSON: No, Your Honor.

THE COURT: 126. Government.

MR. POLEMENI: No, Judge.

THE COURT: Defense counsel.

MR. JACKSON: No, Your Honor.

THE COURT: 127. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense counsel.

MR. JACKSON: No, Judge.

THE COURT: 128. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense counsel.

J.A. 919

*Charge Conference* 2737

MR. JACKSON: No, Judge.

THE COURT: 129. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense counsel.

MR. JACKSON: No, Judge.

THE COURT: 130. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense counsel.

MR. JACKSON: Yes, Judge.

THE COURT: On 130, okay. What is it?

MR. JACKSON: At the very last line, Judge.

THE COURT: On 130?

MR. JACKSON: Yes, Your Honor.

We believe that after the word "knowingly," the word "corruptly" should be added.

THE COURT: Okay. I saw that. I'm not doing that. Your objection is noted.

MR. JACKSON: Thank you, Judge.

THE COURT: You're welcome.

Anything else on 130?

MR. JACKSON: No, Judge.

THE COURT: 131.

MR. POLEMENI: No, Judge.

THE COURT: Defense.

MR. JACKSON: Your Honor, we would ask for the

*Charge Conference* 2738

carryover paragraph, at the end of the first carryover paragraph after the words "or possible commission of a federal offense."

THE COURT: I'm sorry, you're at the top of 131?

MR. JACKSON: Yes, Your Honor.

THE COURT: Okay. "The intent to hinder, delay or prevent the communications to a law enforcement officer," that language?

MR. JACKSON: Yes, Your Honor.

THE COURT: All right. What are you suggesting?

MR. JACKSON: We're asking for the words after the -- the sentence that ends there, "This means that the defendant must not only act with wrongful intent, but also with a consciousness that the conduct in question is wrongful."

THE COURT: What is the response of the Government to that suggested addition?

MR. POLEMENI: I don't believe it's necessary here, Judge.

THE COURT: I don't believe it's necessary either. Your objection is overruled and noted for the record.

MR. JACKSON: Thank you, Judge.

THE COURT: Anything else on 131? Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

*Charge Conference* 2739

MR. JACKSON: No, Judge.

THE COURT: 132. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: Yes, Judge.

The defense would like to withdraw our request for the Affirmative Defense of Truth-Seeking Lawful Conduct.

THE COURT: So you would like me to strike the affirmative defense language that starts on 132, and goes through 133, you would like all that language struck, is that correct?

MR. JACKSON: That's correct, Judge.

THE COURT: And then over to 134, you would like that language struck in its entirety?

MR. JACKSON: Yes, Judge.

THE COURT: And you would like the first line on 135 to be stricken as well, is that correct?

MR. JACKSON: Yes, Your Honor.

THE COURT: All right. Let me ask the Government: What is your response to the request to strike the affirmative defense language beginning on 132 through the top line on 135, any objection to that?

MR. POLEMENI: No, Judge.

THE COURT: Okay. 135. Any objection from the Government?

*Charge Conference* 2740

MR. POLEMENI: No, Your Honor.

THE COURT: Defense. Against general rules?

MR. JACKSON: So, Judge, we have something that is slightly before that because we struck 134, but it's -- it would be just before we get to the General Rules.

THE COURT: What is your suggestion?

MR. JACKSON: Judge, this is where I think the parties have discussed, and agreed with the Court, that some instruction needs to be given on the joint defense and common interest. And we suggested some language. I know the Government has thought through some potential language. But we thought this would potentially be a good place, but we defer to the Court.

THE COURT: What is the suggested language with respect to joint defense that the defense would like to propose?

And then I'll hear from the Government.

MR. JACKSON: So, Judge, this is -- this is a few sentences. It's on page 4 of our letter, and I'm going to read it.

THE COURT: Slowly.

MR. JACKSON: Yes, Your Honor.

It says: The Sixth Amendment guarantees the right of a criminal defendant to adequate and effective representation by an attorney. Essential to that right is the

*Charge Conference*     2741

attorney-client privilege, which encourages full and frank communication between attorneys and their clients. The joint defense privilege is an extension of the attorney-client privilege that protects the compelled disclosure of communications between two or more parties and/or their respective counsel when the parties share a common legal interest. Like the attorney-client privilege, this privilege is designed to allow the free flow of information among parties and/or their attorneys. There is nothing improper about the attorney-client privilege or the joint defense privilege, rather these rules of confidentiality recognize that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed.

THE COURT: What is the Government's response to that proposed language?

MR. SKURNIK: Your Honor, we oppose that proposed language for a couple reasons.

The first is that there's been no evidence at the trial that there was a joint defense agreement in place at the time the alleged obstruction and witness tampering took place. So that's the first general reason for which the instruction as the defense has framed it is -- we think it's unnecessary.

We also disagree with the line in the defense's instruction that there is nothing improper about the

*Charge Conference*     2742

attorney-client privilege or the joint defense privilege. That may be true as a general matter, but I think as the evidence in the trial showed, Mr. Motovich was, we allege, attempting to use the common interest privilege as part of a scheme to tamper with a witness by having that witness join in a proposed joint defense agreement to prevent the Government from listening or recording conversations among members of that agreement.

So, we would oppose the instruction.

THE COURT: I am not going to give the instruction. I thought about this a lot, and I understand the issue. I heard what the defendant had to say about his activities. I heard what the Government had to say about their view with respect to the activities.

I think it is fair to say the jury has a lot of evidence to consider about the interactions between the defendant and various lawyers who were involved, both representing the defendant and representing others. So, I am not going to give that instruction, but your objections are noted and preserved.

MR. JACKSON: Thank you, Judge.

THE COURT: All right.

Anything else on 135?

MR. JACKSON: No, Judge.

THE COURT: Okay. Anything else on 135 for the

*Charge Conference*     2743

Government?

MR. POLEMENI: No, Judge.

THE COURT: Anything else on 135 from the defense?

MR. JACKSON: (No response.)

THE COURT: On 135, anything else on 135?

MR. JACKSON: No, Judge.

THE COURT: 136. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 137. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 138. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 139. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: No, Judge.

THE COURT: 140. Government.

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

*Charge Conference*     2744

MR. JACKSON: No, Judge.

THE COURT: All right.

And just to be 100 percent clear, would you give me the spelling of the defendant's Carver buddy, Sullivan-Hyatt, give me the full name, the spelling, so we get that right in the jury charge?

MR. POLEMENI: Yes, Your Honor. It's Dannette, D-A --

THE COURT: I'm sorry. D as in David?

MR. POLEMENI: D as in David, A-N-N-E-T-T-E.

THE COURT: Right.

MR. POLEMENI: Sullivan, normal spelling, hyphen Hyatt, H-Y-A-T-T.

THE COURT: Okay. Thank you.

All right. Now that we've completed Court 1, let's turn to Court 2, which is the verdict reached form. The verdict reached form, Court 2, now reads as follows:

Judge Kuntz, we, the jury, have reached a unanimous verdict.

The foreperson of the jury has signed that verdict sheet and will bring that verdict sheet into the courtroom marked as Court Exhibit 3A to be announced in court when we are brought back to court by the court security officer. It will be signed by the foreperson and dated the date of the return.

**J.A. 921**

*Charge Conference* 2745

The reason I have created this verdict reached form is that in at least half the criminal cases I've tried, the first thing that comes out is the verdict sheet and I've had to say, No, we don't do it that way. You are supposed to bring it out.

So just to make it crystal clear, I created this incredibly boring, but I think works, verdict reached form.

So, let me ask the Government first, do you have any objection or change to Court 2, the verdict reached form?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense counsel?

MR. JACKSON: No, Judge.

THE COURT: Okay. Now, let's go to Court Exhibit 3, the verdict sheet.

I suspect in light of the changes we made, we have to make some modifications to Court 3. And let's begin with page 1 of Court 3, the verdict sheet.

From the Government, any changes on page 1 --

MR. POLEMENI: No, Your Honor.

THE COURT: -- or objection?

Defense.

MR. JACKSON: No, Judge.

THE COURT: Page 2. Government.

MR. POLEMENI: No, Judge.

THE COURT: Defense.

*Charge Conference* 2746

MR. JACKSON: Yes, Judge.

In the note it says "if you found," first it says "neither the defendant nor another individual committed all elements," we think it should, based on where we are, it should just say "if you found the defendant did not commit." So change "committed" to "commit all elements of Count One," and then strike "three, four, five and six." And then it should continue with ", do not evaluate Counts Eight through Fifteen."

THE COURT: All right. So you are suggesting "if you found that neither the defendant nor another individual," you are suggesting that language be struck as well?

MR. JACKSON: Yes, Judge.

THE COURT: Which? I asked a poor question. I've been beating up on you guys for asking questions that way.

"If you found neither the defendant"?

MR. JACKSON: So the word "neither," Judge, we think should come out.

THE COURT: Okay. The word "neither" comes out.

Go ahead.

MR. JACKSON: We keep "the defendant."

THE COURT: Right.

MR. JACKSON: And then strike "nor another individual."

THE COURT: Right.

*Charge Conference* 2747

MR. JACKSON: And change that to insert the word, "if you found the defendant did not," change it to --

THE COURT: "If you find the defendant" --

MR. JACKSON: "Did not."

THE COURT: All right. "Did not commit."

MR. JACKSON: "Commit," yes, Your Honor, "all elements of Count One."

THE COURT: Then you strike "Three, Four, Five and Six," is that correct?

MR. JACKSON: Yes, Your Honor.

THE COURT: And then it reads: "Do not evaluate Counts Eight through Fifteen if you found the defendant," and we strike the language referring to "or another individual"?

MR. JACKSON: Yes, Your Honor.

THE COURT: And strike the language "or another individual" -- "did commit"?

MR. JACKSON: I think you could leave it, Judge, as "committed."

THE COURT: All right, "committed."

MR. JACKSON: "All elements of Count One."

THE COURT: "All elements of Count One," make Count One singular and take out the references to Counts Three, Four, Five or Six, is that correct?

MR. JACKSON: Yes, Your Honor.

THE COURT: "Then you should evaluate each of Counts

*Charge Conference* 2748

Eight through Fifteen," is that correct?

MR. JACKSON: Yes, exactly.

THE COURT: So it now will read, just so we're clear, and then I'll hear from the Government:

"If you found the defendant did not commit all elements"?

MR. JACKSON: Yes, Your Honor.

THE COURT: "Of Count" -- singular -- "Count One, do not evaluate Counts Eight through Fifteen. If you found the defendant did commit all elements of Count One, then you should evaluate each of Counts Eight through Fifteen."

Is that what your suggested language now reads, sir?

MR. JACKSON: Yes, Your Honor.

THE COURT: All right.

Government, is that acceptable?

MR. POLEMENI: Judge, I might change it to: "If you found the defendant" and say "did not commit the crime charged in Count One," rather than --

THE COURT: "If you found the defendant did not commit," go ahead.

MR. POLEMENI: "The crime charged in Count One."

THE COURT: All right, hang on.

"Commit the crime charged in Count One," rather than referring to elements?

MR. POLEMENI: Correct.

J.A. 922

*Charge Conference* 2749

THE COURT: I think that's clearer.

Is that acceptable to you, Mr. Jackson?

MR. JACKSON: Yes, Judge.

THE COURT: All right. So it will now read: "If you found the defendant did not commit the crime charged in Count One, do not evaluate Counts Eight through Fifteen. If you found the defendant did commit the crime charged in Count One, then you should evaluate each of Counts Eight through Fifteen."

Is that correct?

MR. POLEMENI: Yes, Judge.

THE COURT: Is that correct, Defense counsel?

MR. JACKSON: Yes, Judge.

THE COURT: All right. So we'll make that change.

Anything else on page 2 of Court Exhibit 3?

MR. POLEMENI: No, Your Honor.

THE COURT: Anything on page 3 of Court Exhibit 3? Government.

MR. POLEMENI: So, I guess similarly, Judge, with the note.

THE COURT: How should it now read?

MR. POLEMENI: It might read: "If you find" or "if you found that" --

THE COURT: "If you found the defendant."

MR. POLEMENI: "Did not commit" --

*Charge Conference* 2750

THE COURT: Well, how about, whoa, whoa, whoa, whoa.

"If you found the defendant not guilty of both Counts Three and Seven, do not evaluate Count Sixteen," are you saying that should come out?

MR. POLEMENI: I'm just -- no, I guess that's fine, Judge.

THE COURT: Okay.

"If you found the defendant guilty of either Counts Three Or Seven, or both, then you should evaluate Count Sixteen."

MR. POLEMENI: That's fine.

THE COURT: "One or the other is sufficient, but you must be unanimous."

All right. That's acceptable to the Government as written?

MR. POLEMENI: Yes, Your Honor.

THE COURT: Is that acceptable to the Defense as written?

MR. JACKSON: Yes, Judge.

THE COURT: Okay.

And page 4 of Court 3, any changes with respect to page 4?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

It says: "The foreperson must sign and date this

*Charge Conference* 2751

verdict form."

MR. JACKSON: No, Judge, no issue.

THE COURT: All right.

Okay. Now, what we are going to do is we are going to put through the changes that I have agreed to.

And, again, I want to say it just for the record, all of your objections on both Government and Defense are preserved for the record. You don't have to go through it again.

We will now make those changes. We will transmit to you electronically Court's -- as revised Court's 1, 2 and 3, and they will be deemed Court 1A, 2A, and 3A. So you'll get those electronically within the next few minutes, as soon as we can crank through the changes.

Once we've completed that, we will come back. I will ask you one last time if there are any other issues we need to address outside of the presence of the jury. And then we will bring the jury in for summations.

As I stated yesterday, the Government goes first, then defense counsel. Then the Government will have rebuttal.

I anticipate, given the time, that we will then have the lunch that the Court and the gracious United States of America has provided for the jurors. They will then have their lunch break. And then after the lunch break, I will give the jury charge, and then I will send the jurors in to

J.A. 923

*Charge Conference* 2752

begin deliberations.

So that is my thought in terms of we will take a comfort break after the Government gives its initial summation. And then we will take a comfort break after defense counsel gives its summation. And then the Government will give its rebuttal. And then we will send the jurors off to have lunch. And then I will bring them back and I will give them the jury charge.

I think, just looking at the time, it's now 11:30. That probably makes the most sense in terms of the time that we utilized today.

Usually, the jurors ask if they can stay after 5:00 if they want to or if they are free to adjourn for the day at 5:00. I've always taken the position that's up to the jury in terms of how late they wish to stay. I don't make them stay late. If they want to leave at 5:00, they can leave at 5:00.

All right. Any other issues before we take our comfort break and we make these changes and get the documents as revised back to you as Court 1A, 2A and 3A?

Anything else from the Government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense.

MR. JACKSON: Just want to ask, Judge, how long do we have?

I do need -- while the Court is working because I

*Charge Conference*                    2753

just wanted to run to the bathroom when we take the break.

THE COURT:  Oh, that's the whole point of the break.

MR. JACKSON:  Oh, thank you, Judge.

THE COURT:  Well, not the whole point of it, certainly, but a major part of it.

Thank you very much, everyone.

MR. JACKSON:  Thank you, Judge.  Thank you.

(Recess taken.)

THE COURTROOM DEPUTY:  All rise.

(In open court; jury not present.)

THE COURTROOM DEPUTY:  All rise.

(Judge Kuntz entered the courtroom.)

THE COURT:  Please call the case.

THE COURTROOM DEPUTY:  Criminal cause on trial, 21-CR-497, United States of America versus David Motovich.

Will the attorneys please state their name for the record, beginning with the Government.

MR. POLEMENI:  Good afternoon, Your Honor, Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, Kavya Kannan and Special Agent Christopher Cabane for the United States.

THE COURT:  Good afternoon, counsel.  You may be seated.

Ladies and gentlemen in the public, you may be seated as well.

---

*Charge Conference*                    2754

MR. JACKSON:  Good afternoon, Your Honor.

Randall Jackson, Jessica Layden, Henry Mazurek on behalf of our client David Motovich.  And we're also joined by Mr. Andy Cepregi.

THE COURT:  Good afternoon, please be seated.  Thank you very much.

Do we have any issues we need to address before we bring the jury in for summations?

MR. POLEMENI:  No, Your Honor.

MR. JACKSON:  No, Judge.

THE COURT:  All right.  Let's bring the jury in for summations.

As I previously stated, we have the *Mother, may I* rule with respect to positioning.  *Mother, may I move from the podium*, the answer is *No, you may not*.  You will deliver your respective summations from the podium.

As I stated previously, the Government goes first.  They have the burden of proof beyond a reasonable doubt.  Then defense counsel will proceed to summation.  And then the Government will have rebuttal.  And then I will give the jury charge.

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Please rise for the jury.

(Jury enters.)

THE COURT:  Good afternoon, ladies and gentlemen of

---

*Summation - Grubin*                    2755

the jury.  Please be seated.  Thank you again for your patience.

As I promised you at the beginning of the trial, we will now have summations.

You have received all the evidence in the case.  The summations are arguments of counsel.  We begin with the Government, which has the burden of proof beyond a reasonable doubt.  You will then have the summation by defense counsel, and we will then have rebuttal from the Government.

Again, you have already received all of the evidence in the case.  You are now hearing summations.

Government, please proceed.

MR. GRUBIN:  Thank you, Your Honor.

Permission to publish the presentation to the jury.

THE COURT:  Absolutely, yes.

MR. GRUBIN:  Thank you, Your Honor.

GOVERNMENT SUMMATION

MR. GRUBIN:  Good afternoon.

David ran a massive financial fraud scheme from Midwood Lumber for the better part of a decade.  Driven by greed, he built an illegal underground check-cashing business, took millions of dollars in, and lied, cheated and stole to keep it quiet.  He did all this for more money, without a care of who got hurt along the way.

As Mr. Skurnik told you at the start of this trial,

**J.A. 924**

---

*Summation - Grubin*                    2756

and we've now proved, David Motovich stole vulnerable people's identities and companies.  He forged signatures.  He stole another person's identification, including their Social Security number.  He exposed people like Marcy Vukel, Ago Kolenovic and Reggie Garcia to financial and reputational harm, even lawsuits.  As part of his fraud, David Motovich fabricated documents.  He bribed a bank manager.  He created phony shell companies and bank accounts and, throughout the years, he was asked to stop.

Motovich stole the name Ago & Alaudin from Ago Kolenovic.  Kolenovic discovered that a name of his own company, him and his son's names were being used to open up bank accounts without him knowing, and he got sued because of things done by a fake company that took his name that he had no idea about.  Ago Kolenovic demanded that it stop.  But Motovich didn't care and he deposited vast sums of money, illegal proceeds, into two bank accounts in his company's name.

Marcy Vukel learned that her signature was being forged over and over and over again.  She sent a fax to Midwood Lumber telling them to stop, to stop using her family company and her signature, but Motovich didn't care and he repeatedly forged her signature over and over and over again for years.

Reginald Garcia discovered a bank account in his

Summation - Grubin                    2757

name using his Social Security number.  He asked Motovich's co-conspirator Joshua Markovics to stop, but Motovich didn't care and he laundered approximately $9 million into a bank account in Garcia's name.

And what did Motovich do with the money from this criminal scheme?

You all know what he did.  He renovated a swimming pool in his penthouse apartment.  He bought expensive designer handbags and jewelry.  He paid millions in AMEX charges, and contributed to his uncle's condominium in Miami Beach.

As Mr. Skurnik told you at the start of this trial, this was all about greed and lies.  Motovich lied over and over and over again to keep his scheme going.  He lied to banks.  He lied to accountants.  He lied to the victims.  And then, Members of the Jury, I submit that he got up on that stand and he lied to you as well, just as he's been doing for years.

Motovich thought he could get away with it, but Reginald Garcia made a recording.  Marcy Vukel sent a fax. Ago Kolenovic made a phone call.  And some of Motovich's -- some of Motovich's partners in this fraud scheme accepted responsibility for their actions, pled guilty, and testified in front of you from Dannette Sullivan-Hyatt, the bank manager he bribed, to Kemal Sarkinovic, who opened up a number of Motovich's shell companies and bank accounts at his direction,

Summation - Grubin                    2758

to three of Motovich's check-cashing customers, Phillip Adamou, Joseph Russo and Roman Kretsula.  And each of these people told you what happened.

Despite Motovich's best efforts, eventually the DOJ, the FBI, the IRS, figured it out.  And even then, even then Motovich tried to keep the scheme going.  He even paid a lawyer $50,000 to keep Kemal Sarkinovic quiet.  But in the end, he failed.

You've heard the evidence.  You've heard the testimony.  You know what he did, and it's time to hold him accountable for his crimes.

Now, my job here today is to summarize the evidence for you.  I'm not going to be able to mention all of it, there was a lot, but what I'm going to do is walk you through some of the key evidence in this case.  And we'll review together the overwhelming evidence of fraud, illegal check-cashing, and greed that you've heard over the last few weeks, and how this evidence proves the defendant, David Motovich, guilty of crimes charged -- of the crimes charged beyond any reasonable doubt.

For Motovich's actions, he's charged with 18 crimes or counts.  They are listed here on this slide, and I'll go through each one and the evidence that supports them.  But at its core, these crimes all relate to Motovich's fraudulent scheme to get richer from his illegal check-cashing business

Summation - Grubin                    2759

and funnel, or launder, that money to himself, his relatives, and his business associates.

So I want to take some time and begin by talking about how this criminal scheme -- about his criminal scheme and how you saw it work over the last few weeks.  It all starts with the federal regulations, the rules that keep our financial system safe.  Several witnesses during this trial told you about how the financial system is protected.

You heard from Robert Tarwacki.  He was the first witness in this trial.  He worked at the New York Department of Financial Services.  His agency regulates and investigates crimes involving places like check-cashing businesses.

You also heard from Ted Vlahakis, who works for the Financial Crimes Enforcement Network or FinCEN.  FinCEN works to disrupt crimes that threaten our financial system, like sanctions evasion, terrorism or financial crimes.

So how do agencies like FinCEN protect the financial system?

Well, the first step is registration.  As Ted Vlahakis told you, financial institutions, like check-cashing businesses, must register with FinCEN.  And Vlahakis explained on pages 1899 and 1900 of the transcript how that worked. Here it is.

Because that's how we conduct investigations.  The registration form is requesting information about the

Summation - Grubin                    2760

business, where it's located, who owns it, where it has its bank account, where it keeps its records, business volumes. All that information is useful for conducting investigations. And it also helps FinCEN keep track of who is conducting these types of activities that are considered under the rubric of financial institutions.

And by the way, registration is easy.  It's a form of a few pages that you could download offline for free. Businesses do it every day.  Vlahakis showed it to you.  It was Government Exhibit 236.

So, what is a check-casher?

Vlahakis told you that, too, on page 1899 of the transcript.

At a high level, he said, a check-casher, according to FinCEN regulations, is someone who cashes checks for more than a thousand dollars for any one person on any one day. And they -- so they're receiving the check and they're returning cash or a combination of cash or monetary instruments.  And it has to be over a thousand dollars for one person in a day.

Does that sound familiar to anything you've seen over the course of this trial?

As multiple witnesses explained, when you're a check-casher, you have to follow certain rules like currency transaction reports or CTRs.  Multiple witnesses told you

J.A. 925

*Summation - Grubin*                    2761

about CTRs and they explained how it works. If you're someone who goes into or you're looking to make a cash transaction at a bank or at a check-cashing business that's over $10,000, whether it's a withdrawal or depositing a check, you walk in and the business must prepare a CTR, or a currency transaction report. That's reported to FinCEN. It uploads identifying information about the customer, recording where the transaction took place, how much it was for, and the purpose.

FinCEN looks at very large transactions to make sure they are not being used for criminal activity. By the way, there is nothing illegal about large cash transactions, that's fine, as long as you don't hide what you're doing.

But here's the thing, some people want to hide what they're doing. Some people don't want FinCEN to know what they're up to. They don't want all these rules. They want to commit crimes, like tax fraud. And these rules make that more difficult.

Those were some of our cooperating witnesses who you heard from. They did not want FinCEN to know about the large amounts of money that they were with -- the large amounts of cash that they were getting.

You heard from some of those people, Motovich's -- some of Motovich's check-cashing customers. The owners of construction businesses, like Joseph Russo of Metro Companies. Roman Kretsula of Unique Painting Services, and Phillipos

*Summation - Grubin*                    2762

Adamou of Lithos Marble Works. There were also a parade of other people of check-cashing customers you didn't hear about from this trial that went to David Motovich, but you know from the evidence exists because you saw them in Motovich's text messages, in checks to the shell companies, and on false insurance documents.

These construction companies did not want to pay payroll taxes for their employees, the taxes that, as you heard, fund Social Security and Medicare. So, as Adamou, Russo and Kretsula all told you, they were willing to pay a lot to David Motovich to get cash in a way that wouldn't be looked at by FinCEN, so they could pay their workers off the books. That was the part -- the point of their scheme.

Now, I submit that David Motovich knew from his intimate knowledge of the construction industry, running a business that sells products to these companies, and his deep involvement in Coney Island Payroll Services down the street, that -- that this -- that that is what these -- these check-cashing customers wanted. It was a lucrative market, an opportunity for him to make a profit, which he knew licensed check-cashing businesses and banks would not provide.

So, how does a corporation evade reporting their employees' wages without getting caught?

Adamou, Russo and Kretsula all told you, they go to David Motovich. They told you other check-cashing businesses

*Summation - Grubin*                    2763

they went to made them sign a form that they're cashing a check for over $10,000, but Motovich never made them sign anything. That's why Russo was willing to pay Motovich 10 percent for cashing a check rather than a couple percent. It's why Roman Kretsula was willing to pay 15 percent to cash a check with David Motovich rather than going to some licensed check-cashing business. It's why Adamou was willing to pay between 4 to 6 percent to cash a check with David Motovich. They told you, and I submit it's also common sense.

Now, defense counsel over the course of the trial suggested several theories for Motovich's high premiums to his check-cashing customers. At several points, defense counsel suggested there was no fee at all. And at other times, the price was about convenience. But as Bob Tarwacki from the New York State Department of Financial Services told you, there's no shortage of check-cashing businesses or banks in New York City. And those places charge something like five times less than David Motovich. A few percent, think about that. These are checks that you saw for $12,000, for $20,000, for $40,000, we're talking about a difference of hundreds or even thousands of dollars a week. So, you know this is not just about convenience.

Motovich knew there were people in the construction industry who wanted to evade paying Social Security and Medicare, and he saw an opportunity for himself to get richer.

*Summation - Grubin*                    2764

So, he opened up his very own check-cashing business on the second floor of Midwood Lumber, which you saw. But David Motovich never registered his check-cashing business with FinCEN. He never got a license from New York State. And he certainly did not file things like CTRs.

So, at a high level, how did Motovich's scheme work?

First, Motovich directed his check-cashing customers to write checks to shell companies. You saw a lot of these checks and you saw information about each of these shell companies, M&M USA Consulting, CNBC, ZKC New York. So, his check-cashing customers, like Roman Kretsula or Joe Russo or Phillip Adamou and others, would take a check, write it out to the company David Motovich told them to write it out to, bring it to David Motovich, they would get cash, minus a fee, a steep fee, and Motovich would take that cash and deposit it into the bank accounts.

And what did Motovich use that cash for?

You know, you saw it. Attorneys, jewelry, Bloomingdale's, Saks Fifth Avenue, American Express, and on and on and on.

And where did he get all the money from?

He got it from down the street, Coney Island Payroll Services. Motovich, himself, got up on the stand and admitted that Joseph Richter, the president of Coney Island Payroll Services, was one of his best friends. He told you that he

**J.A. 926**

*Summation - Grubin*     2765

loaned him millions of dollars, a lot of money. Coney Island Payroll Services was indebted to him. So, when he needed cash, as you saw from those text messages: Call Yankee. Go -- go call Yankee. That's Joseph Richter's nickname. When he wanted cash, he would go there or send someone to go there and get cash, which he could then turn around and sell to his check-cashing customers.

It was a very lucrative business model, entirely illegal, and it lasted for years.

So, let's look a bit more closely at each of these steps.

Motovich's illegal check-cashing business did not have a name. That was the point. But as you learned, millions and millions of dollars ran through it for many years. And as David Motovich admitted to you, most of it, I would submit nearly all of it, was his money. And you know where it came from, his check-cashing customers. So Motovich ran this business from -- from an office equipped with a secret room with safes containing hundreds of thousands of dollars, which you saw in this courtroom. Some of Motovich's check-cashing customers told you how Motovich's illegal, unlicensed business works.

Now, I want to point out before summarizing their testimony that what you -- that -- that what you heard from these cooperating witnesses, some of Motovich's check-cashing

*Summation - Grubin*     2766

customers, you also heard from a corrupt bank teller, Dannette Sullivan-Hyatt, and Kemal Sarkinovic, who committed bank fraud with David Motovich, you should evaluate their testimony carefully. But, but each of these witnesses took responsibility for their roles in David Motovich's scheme. Each of them pled guilty to what they did with David Motovich. And you don't need to rely on Motovich's check-cashing customers' recollection of events or testimony alone.

First, these are people who did not know each other. They couldn't pick each other out of a lineup, but they all told you the same thing, that Motovich cashed hundreds and hundreds of checks for their companies over many years so that they could evade taxes. And you saw the checks. You saw the checks from those witnesses' shell companies supporting exactly what they told you. These are checks from Roman Kretsula at Unique Painting. One -- these two are to Ago & Alaudin, one of the shell companies, for $26,000 and for, it looks like, $24,800. Then he brought them to Motovich, who charged 15 percent.

You saw pictures of Midwood Lumber supporting what they told you, including Motovich's safe and secret room and money counter. You saw text messages between Motovich and these witnesses supporting what they told you.

Remember this one, where they speaking -- where Joe Russo speaks in code with David Motovich? Government

*Summation - Grubin*     2767

Exhibit 1199. And how the amount matched the check, Government Exhibit 734. You saw a lot of examples of that.

You saw fake invoices sent by Motovich and his employees to those witnesses supporting what they told you. And you saw text messages between David Motovich and his sister, Gail Motovich, and his secretary, Marina Kuyan, supporting what they told you. Those are Government Exhibits 1200 and 1198.

So, evaluate the cooperating witnesses's testimony in light of all of the evidence you've seen during the course of this trial.

(Continued on the following page.)

SUMMATION - MR. GRUBIN     2768

(Continuing.)

MR. GRUBIN: So with that, what did these witnesses tell you? Well, they told you that when they needed cash to pay their employees, they called or texted David Motovich. You also saw that in text messages. They explained that David Motovich directed them to see him or his sister, Gail Motovich, and what time to come. You also saw that in the text messages.

Motovich also told them what shell companies to put on the checks. You also saw that in the text messages. And you saw the checks, hundreds of them, a sample of the checks. And you saw where they were made out to. Once given a time, Kretsula, Russo, and Adamou all told you they would go to Midwood Lumber, skip the hardwood store on the first floor, go up the staircase, get through a door through a buzzer, wait by the receptionist. And then Motovich or his sister Gail would call them back, take money out of the safe, and give it to them in exchange for a check, minus a steep transaction fee. Both sides, Motovich and the check-cashing customer, benefited.

There's no dispute that these transactions occurred. When David Motovich testified, he admitted to all of this. He admitted that people like Russo, Adamou, and Kretsula would give him checks and he would give them cash. Now, he tried to call them loans or fronting the money. But

J.A. 927

SUMMATION - MR. GRUBIN                    2769

he could not deny the fundamental fact that he was accepting checks and providing them cash and that his company was not licensed. It was a check-cashing business, pure and simple.

Motovich did not just provide his check-cashing customers with cash so that they could avoid reporting employee wages to the Government. Motovich and his employees, like his sister Gail and his secretaries Marina Kuyan and Rosa Schwartz, provided a full, one-stop-shop service for his criminal scheme. Motovich provided his check-cashing customers with fake invoices to make the checks look like they were for real services, not cash. And when Motovich took the stand, he again admitted that he created fake invoices. He just couldn't really explain why. But you know why.

Joe Russo explained how this worked. Russo or one of the other customers would write a check to one of Motovich's shell companies for cash, sometimes put a phony project in the memo line, and then Motovich would create a false invoice to match that check.

This is one of many examples you saw. Take a look at both Government Exhibit 734, the check, and Government Exhibit 1072, the invoice. As you'll see, the information on the fake invoice and the check match. 5801 Avenue J Realty Corp. ZKC NYC Inc., the shell company that is purportedly here providing a service. They list the fake

SUMMATION - MR. GRUBIN                    2770

service that's being provided. Here, it's waterproofing a building. And then the amounts are the same, $4,975, and the dates are the same.

The customer would give the fake invoice to their company's accountant, so if anyone asked what are all these checks to ZKC, they could give them this invoice. That was a service Motovich provided his customers. That is why he got to charge a premium, because when you go -- as Joe Russo told you, when you go to the bank or you go to another check-cashing business, you don't walk out with a fake invoice along with the cash.

But Motovich went further than fake invoices. As David Motovich admitted on the stand, he also gave his customers fraudulent certificates of liability insurance. Now, you heard a lot at this trial about these certificates of liability insurance. Defense counsel stated at the start of this trial that Motovich is not charged with insurance fraud. That's true. He's charged with and committed multiple other crimes which the insurance certificates were supposed to help conceal, and they did conceal for some time.

I submit that defense counsel, nor David Motovich when he took the stand, coherently explained why they were handing out fake insurance documents. But you don't need them to. You know why. Numerous witnesses told you, this

SUMMATION - MR. GRUBIN                    2771

was another critical service that David Motovich's check-cashing business provided his customers.

Here's how you saw it worked. Construction companies are required to provide these documents, this proof of insurance for real construction projects in case someone gets hurt. And construction companies, when they're the subcontractor, have to give these certificates to the general contractor, this proof of insurance, in order to join the project.

Let's look at Government Exhibit 1051, one of the numerous examples of fake insurance certificates you saw. As you know, this is a fake certificate. At the top right there it's Vukel Group Insurance Agency. As Ms. Vukel told you, none of these certificates were real. And then you see insured, Ago & Alaudin General Contracting Corp., the company that David Motovich stole. Then you see one of his check-cashing clients on the bottom, Unique Painting Services. That's Roman Kretsula.

The way this worked was this was just like the fake invoices, a way to paper over the checks for cash. That way it looked like -- and remember Phillip Adamou told you he sometimes wrote "Sub C" in the checks in the memo line to make it look like it was for subcontracting services rather than cash. These insurance certificates went along with that, to also help cover up the checks to make it look

SUMMATION - MR. GRUBIN                    2772

like they were subcontracting services rather than cash. Of course David Motovich had to forge Marcy Vukel's signature over and over and over again to do it, but as you learned, that didn't seem to stop him. And Motovich couldn't deny that either when he took the stand. He just admitted it, because the evidence is overwhelming.

So Motovich provided his customers with the full service. As much cash that they needed, fake invoices and insurance documents to cover up the scheme. That was why Motovich charged a premium and made vast sums of money and that's why customers were willing to pay that premium and why they kept coming back for years and years and years. Not for convenience. Not because they were friends with David Motovich. But to cheat, make more money, and not get caught.

So that was Motovich's check-cashing business.

But here's the thing. Motovich did not want the checks that his customers were giving to him to be made out to Midwood Lumber or David Motovich or Gail Motovich. If that happened, there would be a record of numerous checks going to Motovich and a business in his name. And as Motovich's former accountant, Andrew Zwerman, told you, that would mean that Motovich would be responsible for paying taxes on the vast amounts of income he was making through this check-cashing business. He would have to report it

**J.A. 928**

SUMMATION - MR. GRUBIN                2773

all; all that money he was making from his check-cashing customers every single week. Motovich didn't want that. Nor, I submit, did he want to be tied too closely to the shell companies he was creating and fake invoices and fake insurance certificates. Remember Ago Kolenovic, who got sued because of this.

So how did Motovich get around the problem? Take a look at Government Exhibit 5000. Remember this chart that Christopher Cabane went over? Motovich had others create or give him control of the shell companies, and then he made bank accounts for each of those shell companies. As you saw in the text messages -- and you saw in the text messages how he directed his customers to make checks out to these different companies, or to these different bank accounts for these shell companies in exchange for cash; not to Midwood Lumber, not to David Motovich, but to these companies. And you can see from Government Exhibit 5001-A, just from a sample, a sample from three customers, of the millions of dollars that flowed into these shell company accounts over the years.

You might remember Motovich struggled to explain where some of the money -- where the money was coming from, the money he admitted was mostly his. This is where. You saw the checks from Phillip Adamou, from Roman Kretsula, from Joe Russo. Over $6 million since January 2012. And

SUMMATION - MR. GRUBIN                2774

this is just a sample.

And this isn't to mention all those customers you didn't hear from, but you saw in the text messages and you saw in the fake insurance documents and you saw on the fake invoice -- on the fake insurance documents and the fake invoices. Like Government Exhibit 5002, Antonov Stonework Corp. or Antonov Marble. Remember the text to him, make it out to ZKC? Over $345,000 to ZKC from this other check-cashing customer of David Motovich's.

Now, you learned that Motovich either directly or through his corrupt business associates, like Joshua Markovics, pressured others to form companies for him. Take people like Reginald Garcia or Kemal Sarkinovic, who relied on those business partners or David Motovich for their livelihoods.

Let's talk about Kemal Sarkinovic for a moment, who was a signatory on at least six of the shell company accounts. Now, you heard from Sarkinovic, how he emigrated from Montenegro. He was a superintendent, he made somewhere between 30,000 and $60,000 a year as a day laborer, supporting his wife and five children. David Motovich took that stand and tried to make it sound like Kemal Sarkinovic was some big-shot construction titan.

Members of the jury, you met Kemal Sarkinovic. He may be a fine craftsman, but he's no genius or big player.

SUMMATION - MR. GRUBIN                2775

He worked for day wages employ he never owned or used a computer. He needed his kids' help to send an email. He's never even written a full check before.

But he wanted to create something. He wanted his own construction company and he wanted to get big projects. So, as he told you, he tried to make his own business, Latek, remember that? But it failed. He told you how he made business cards and tried to hand them out, but no one called him.

So what happened next? David Motovich told him give me your company, Latek, give me the documents that go with it, and I'll give you some big projects. And Sarkinovic did. But as you learned, it didn't end there with Latek. Sarkinovic agreed to commit bank fraud with David Motovich, to open multiple companies and shell bank accounts in his name and give over control of those accounts and companies to David Motovich.

Now, just like the check-cashing customers, Kemal Sarkinovic pled guilty to a crime and you should evaluate his testimony carefully. Not tax evasion, but conspiracy to commit bank fraud. And like the other cooperating witnesses, I submit what he told you is supported by the evidence in this case. Sarkinovic told you that at Motovich's direction, he opened up companies and bank accounts for SGS Construction, one of the Ago & Alaudin

SUMMATION - MR. GRUBIN                2776

accounts, and CNBC Construction and Midwood Building Corp. And you know it was at Motovich's direction. David Motovich himself admitted that he was the one who directed Kemal Sarkinovic when he took the stand. We saw in the paperwork each one of those companies is incorporated by Marina Kuyan, and you learned each one has an address associated with Motovich.

Sarkinovic also told you that at Motovich's direction, he handed him his personal identification; his driver's license. That he handed blank checkbooks and account information for these companies, even a personal investor's account in his name, and that Sarkinovic simply signed at the bottom of the checks when Motovich directed him to do so.

And you saw those checks. You saw them found at Midwood Lumber, Government Exhibit 378, from CNBC Construction Corp. Blank checks with Kemal Sarkinovic's signature. And you saw pictures of blank checks from Ago & Alaudin Contracting with Kemal Sarkinovic's signature on David Motovich's iCloud account. And you also saw that the same thing happened with Robert Lovy, who you heard a little bit about, another person who opened accounts for David Motovich.

Let's be clear about something. Kemal Sarkinovic is listed as the signatory, but David Motovich admitted to

**J.A. 929**

SUMMATION - MR. GRUBIN                    2777

you that he was the one in control. There's no dispute about who's controlling these accounts.

But here's the next issue that David Motovich had. If all the bank accounts are in someone else's name to make it harder for the IRS to find him, how does Motovich access the funds in those accounts? After all, this money wasn't for Kemal Sarkinovic or Reginald Garcia or Robert Lovy. It was for David Motovich. That was the point of the criminal scheme.

As you heard from multiple bank officers and employees, if Motovich's name is not on the account, if he's not a signatory on the account, he cannot get that money. He cannot make transactions in those accounts. He cannot access that money. They do not know who David Motovich is in relation to those accounts. They know Kemal Sarkinovic. They know Reggie Garcia. They know Robert Lovy.

So how does Motovich access the money so he could benefit from this whole criminal scheme? Well, as we discussed, Motovich either had someone like a Kemal Sarkinovic or a Robert Lovy willing to just give him the checkbooks and let Motovich do whatever he wanted in those accounts, or he bribed the bank manager, Dannette Sullivan-Hyatt, the bank manager at Carver Bank.

You heard from Dannette Hyatt. Let's be blunt. She was a corrupt bank manager. She told you about her

SUMMATION - MR. GRUBIN                    2778

relationship with David Motovich. And let's think about what they knew about each other. Hyatt, that Motovich was a center of influence. Do you remember her using that term, "center of influence"? He had all of these companies, she thought he could bring in lots of business. And Motovich knew that Ms. Hyatt was fired from her job at Banco Popular for helping a customer break the rules. And she talked about that on transcript page 1696. Mr. Paulsen asked: Did David Motovich know that you had just been fired for this reason? And she responded: Yes. I did reach out to some of my customers, and he was one of them.

And you know what happened next? Hyatt got a new job as a branch manager at Carver Bank, and Motovich did what I submit he always did. He took advantage of the situation. He brought Dannette Hyatt business. Got her to allow him to open bank accounts and conduct financial transactions in accounts where he wasn't listed as the signatory. This was for three of the shell company bank accounts you've heard of over the course of this trial; ZKC NY Inc., Midwood USA Consulting, Advertising on the Go. Hyatt knew, just like all of you know, it was Motovich controlling those accounts.

Hyatt transacted for Motovich more times than you could count. She told you how it worked. Motovich would have Hyatt open up a bank account, send her the personal

SUMMATION - MR. GRUBIN                    2779

identifying information of Robert Lovy or Reggie Garcia, and once the account was opened, directed Hyatt to make transactions in the accounts. Hyatt did whatever David Motovich asked her to do. She gave Motovich the checkbooks to accounts not in his name. She sent him statement updates. She did all of those wire transactions we looked at, dozens and dozens of them, all those examples of her wiring money in response to David Motovich or his secretary. Bank fraud each and every time.

And when the Government came asking her questions, she broke one more law. A big one. She told him about a secret grand jury subpoena that was given to her by the Government -- that was given to her bank by the Government. Mr. Torres from Carver Bank, if you remember him, who testified after -- or just before Dannette Hyatt, he told you a little bit about these grand jury subpoenas. They're a big deal. They're secret. You do not tell a customer if the Government issues a grand jury subpoena to your bank. Hyatt did that, and she did it for David Motovich.

Now, I think you can use your common sense that a banker's not supposed to be doing any of this. But in case there was any doubt, the representatives from four different banks came here, took the stand, and told you none of that was okay. None of that is consistent with bank policy. And most of that, if not all of that, is against the law. But

SUMMATION - MR. GRUBIN                    2780

Dannette Hyatt told you why she did it. Because David Motovich was a big customer who was giving her money on the side.

Motovich did all this to fund a lifestyle very different from the one he reported to the IRS, well beyond the $200,000 or so that he listed on his tax returns that you saw. That was the whole point behind the scheme. Motovich spent millions of dollars from the shell company accounts on himself and his relatives. Remember some of the examples you saw during the course of this trial?

You heard from multiple people involved with renovations on his penthouse apartment, purchases for David Motovich's apartment. One of those people is David Unger. Remember him? He sold the penthouse to David Motovich. Unger told you that the place was massively renovated after he had sold it. You've seen a lot of records showing shell company money being used for those renovations. The blue tiles and other things. And Unger even sold David Motovich a piano. And how did Motovich pay from it? With a check from Ago & Alaudin Contracting.

You also heard from Allan Miller. I imagine you remember him, the award-winning architect. And how did Motovich pay him? A check from Ago & Alaudin Contracting, $8,000 to Allan Miller. Again, that's Government Exhibit 722-A. Like Unger, Miller had no idea what company

J.A. 930

SUMMATION - MR. GRUBIN          2781

this was, but you all do.

You saw other ways Motovich spent the money, including renovating the area around his swimming pool. Remember this exhibit, Government Exhibit 433-7? Two checks from two different check-cashing companies; Unique Painting Services, Roman Kretsula, Lithos Marble Works, Phillip Adamou, both written out to David Motovich for cash, as they told you, in exchange for a fee. And what's written on the bottom there in writing? "Apply to pool." That pool, Government Exhibit 412.

Motovich also spent the money on real estate transactions. And again, David Motovich admitted to all of this when he took the stand. I submit he had to because the evidence is overwhelming. But remember Yisroel Leshkowitz, his real estate attorney, Government Exhibit 5007, over $2.5 million from three different shell accounts in two different people's names for real estate transactions for David Motovich's benefits?

Motovich also told you himself and he admitted on the stand he purchased designer handbags and jewelry with the money. He purchased diamonds with the money, nearly $1 million. That's Government Exhibit 5008.

And Motovich spent nearly $11 million from the shell company bank accounts on AmEx charges in him and his wife's name. You heard from Richard Kier, the AmEx

SUMMATION - MR. GRUBIN          2782

representative. You saw payments from the nine main shell company accounts in this case going to Motovich's AmEx bills. As Kier agreed on the stand, David Motovich was an awesome customer. Motovich also spent the shell company money on retailers, like Saks Fifth Avenue and Bloomingdale's, as well as just direct taking money out and giving it to himself and his relatives.

And despite every effort Motovich took over the last ten years to hide it, he now confesses that this was all mostly his money. But you've seen all of the evidence and you know why he now is saying, of course, it's his money. I submit he could not give you a coherent answer, though, as to why he needed bank accounts in other people's names. But you don't need him to because you know why. So he could evade paying taxes and his illegal check-cashing business would not be discovered.

By the way, just as an aside, defense counsel asked nearly every witness, from Richard Kier to each of the bank witnesses, did David Motovich ever steal money from you? And they all said no. And I submit that those questions were kind of silly, or a distraction. Motovich isn't charged with bank robbery or larceny. He's charged with bank fraud, money laundering, conspiring with others to cheat on their taxes, among a slew of other crimes. Those are the crimes that you saw.

SUMMATION - MR. GRUBIN          2783

That said, Motovich did steal a lot of things. He stole, as we talked about, Ago Kolenovic's business name. He stole Vukel's reputation and forged her signature, putting her at risk and her company at risk, the company she built with her family. He sold Reggie Garcia's identity, portraying a man who thought his employer, Joshua Markovics, Motovich's co-conspirator, wanted to help him. That was Motovich's criminal scheme.

And by the way, it worked for years, because as long as the people David Motovich was hurting, people like Vukel and Ago Kolenovic and Reggie Garcia, did not know, Motovich could get away with it. The fake invoices, the fake insurance certificates, the fake companies, it all worked for a decade.

Think about how it fell apart for David Motovich. It was largely by chance. Marcy Vukel just happened to be forwarded a fax from another insurance company doing its due diligence, asking is this legitimate. Ago Kolenovic's former subcontractor called him because he was upset that a check he thought was from Ago Kolenovic's company bounced, when of course it was David Motovich's fake company. Reggie Garcia, by chance, exchanges, as a joke, a check with one of his coworkers as they were doing errands and delivering checks, and saw that it was the name of the company that he thought was supposed to be paying him a year ago on that

**J.A. 931**

SUMMATION - MR. GRUBIN          2784

check, with a big amount.

Because of the actions each of these witnesses took in coming and speaking to you, Motovich was caught, and, I submit, should be held accountable for Motovich's massive criminal scheme, for what he did to Reggie Garcia, for defrauding banks, for cheating social security and Medicare out of taxes, for running an illegal, unlicensed check-cashing business, for pressuring witnesses not to cooperate. He's guilty of multiple crimes, and we'll turn to each one.

But just quickly, each crime has something in common: That Motovich was acting knowingly and intentionally rather than by some sort of mistake or accident. Remember at the start of this trial when Mr. Jackson told you that this was like some sort of Franz Kafka novel about a man prosecuted for a crime and he has no idea why he's there, suggesting David Motovich is in the same situation? Members of the jury, after the last few weeks, do you think David Motovich is confused as to why he's in this courtroom? People don't accidentally make fake invoices or fake insurance certificates. People don't mistakenly bribe bank managers to make transactions in bank accounts. Motovich was not confused or mistaken about the actions he was taking. They were intentional.

And how do we know what Motovich was thinking in

SUMMATION - MR. GRUBIN                2785

this case when he was committing each of these crimes?  We have a lot of ways to know.

First, he told you these things when he took the stand.  He admitted that he made fake invoices and fake insurance certificates.

Second, not a single one of the shell companies we looked at, all of which existed to shower money on to Motovich, not a single one was listed in his name or a company -- or was a company on one of his tax returns.  Opening up businesses under other people's names and then bribing a bank manager so you can conduct financial transactions in those accounts isn't normal business practice.  It's a crime.

Third, and on that topic, if you think what you're doing is okay, you don't need to bribe the bank manager by letting her take money out of the accounts.  This is an important point.  She told you that she hid what she was doing from her bosses and her coworkers.  She knew that they couldn't know about this.  And she told Motovich that when she went on vacation, he couldn't do this, he could only transact on accounts in his name.

Fourth, Motovich gave his customers numerous fake documents.  Invoices for nonexistent work, fraudulent insurance certificates.  You heard this from himself; he admitted that.

SUMMATION - MR. GRUBIN                2786

And fifth, people who are conducting normal business transactions don't need to use code words to camouflage their conversations.  Remember, this is that Government Exhibit 1199 again.  And Joe Russo told you about this, and I submit it's obvious from the face of the text messages.  David Motovich says:  Come 12, but not big, please.  And Joe Metro, Joe Russo says:  What size is good?  Ten inches?  And Motovich responds:  Eight inches.  And then you see a check for a little over $8,000, Government Exhibit 734.

Sixth, as we talked about, Motovich was charging a much higher amount to his customers to cash checks than a licensed check-cashing business, and he knew what a regular business charged.  Again, he was very much invested and involved in Coney Island Payroll Services down the street.

Seventh, when Motovich learned he was under investigation, he began to pressure witnesses to keep quiet.  He told Adamou that only he and the painter -- that's Roman Kretsula -- haven't come on board.  He arranged or tried to arrange for attorneys to represent anyone who could testify against him.

I want to briefly touch on conspiracy.

The Government has charged three conspiracy crimes against David Motovich.  Conspiracy to commit bank fraud; conspiracy to commit money laundering; and conspiracy to

SUMMATION - MR. GRUBIN                2787

defraud the United States.  The evidence has shown that David Motovich was part of each of these conspiracies, that he agreed with others to commit each of those crimes.

Also, in addition to the charges on the slide that we looked at previously, the Government has proven venue.  That these crimes took place, at least in part, here in Brooklyn, Staten Island, or Long Island or Queens.  That's not in dispute in this case.  Midwood Lumber was located in Brooklyn.

So let's take a look at some of the evidence that proves beyond a reasonable doubt that David Motovich has committed each of the 18 crimes he's been charged with.

THE COURT:  And we will do that, ladies and gentlemen of the jury, after you have a 15-minute comfort break.  We will come back and we will continue with the summations of the Government, and then we will have summations by defense counsel, and then the rebuttal by the Government.

Do not talk about the case yet.  We're approaching the point where you have the case, and I promise you your lunch will be delivered.  I'm going to keep my word to you.  No worries.

So let's take a 15-minute comfort break and then counsel will continue with his summation for the Government.

THE COURTROOM DEPUTY:  All rise.

SUMMATION - MR. GRUBIN                2788

(Jury exits.)

(In open court; jury not present.)

THE COURT:  The jury's left the courtroom.

Ladies and gentlemen, you may be seated.  We're going to take our 15-minute break and then we will continue with summations.

Anything we need to address in the absence of the jury?

MR. GRUBIN:  No, Your Honor, not from the Government.

THE COURT:  Defense counsel?

MR. JACKSON:  No, Judge.  Thank you.

THE COURT:  Thank you.  We'll take our 15 minutes and we will continue with summations.

(Recess was taken.)

(Continued on the following page.)

J.A. 932

Summation - Grubin                2789

(In open court; outside the presence of the jury.)

THE COURT:  Ladies and gentlemen, we're going to continue with summations.  We'll bring the jury in now unless we have anything to discuss in the absence of the jury.

The government?

MR. POLEMENI:  No, Your Honor.

THE COURT:  The defense?

MR. JACKSON:  No, Your Honor.

THE COURT:  All right.  Let's bring the jury back in, please.

Please stand for the jury.

(Jury enters.)

THE COURT:  You may be seated, ladies and gentlemen of the jury.  Thank you again for your promptness.

We are going to continue with the summation and after the summation of the government, we'll have our luncheon recess.  Lunch will be brought in for you and we'll take our lunch break after Mr. Grubin finishes the first part of the government summation.  Then we'll hear from defense counsel and rebuttal and then you'll get the case after I do the jury charge.  That's the order.

Please continue, sir.

MR. GRUBIN:  Thank you, Your Honor.

Good afternoon again.

Count One, the government proved beyond a reasonable

---

Summation - Grubin                2790

doubt that David Motovich ran an unlicensed check-cashing business.

He took the stand and admitted to you that he took checks from customers and he gave them cash in exchange.  That's check cashing.  What Motovich claimed is that it wasn't a business but, of course, it was a business.  Remember how he conducted hundreds, if not thousands of transactions a year?  Millions of dollars?

Take another look at Government Exhibit 5001-A.  Over $6 million going back at least as far as January 2012.  And that's just three of his check cashing customers.

Also, those customers told you that what they went to Motovich on a weekly or biweekly basis.  They were regular, repeat customers buying a service:  Cash for checks.  It's that simple.

And you heard that Motovich charged a fee for that service.  He was making a profit like any business tries to do.  Motovich didn't cash a check once or twice for one person or two people, but over and over and over again for multiple customers, and Motovich made tremendous amounts of money.  You saw the money going to his penthouse and to AMEX.  He didn't just run a business.  He ran, although illegal, a fairly successful business.

The evidence also showed beyond any reasonable doubt that Motovich controlled that business.

---

Summation - Grubin                2791

It was operated out of his office.  The proceeds went to him and his relatives.  You saw the text messages between him and his sister and him and his secretary.  They didn't do anything without David Motovich's approval.  Motovich on the stand admitted to you that he directed them to do things like make fake invoices.

Next, we also proved that David Motovich's check-cashing business was not registered with FinCEN and that Motovich knew it wasn't registered.

Someone who registers their check-cashing business with FinCEN doesn't give out fake invoices and fake insurance documents to their customers.  Someone who registers their check-cashing business with FinCEN doesn't use code in their communications with customers.  Someone who registers their check-cashing business with FinCEN doesn't open up shell bank accounts in other people's names.

And just in case there was any doubt about whether his check-cashing business was registered, Ted Vlahakis from FinCEN told you that Midwood Lumber nor David Motovich registered to serve, registered to serve as a money services business including as a check casher.  That was Government Exhibits 253 and 249.

Bob Tarwacki from the New York State Department of Financial Services also told you that Motovich didn't have a license from New York State to be a check casher.  And

---

Summation - Grubin                2792

Motovich knew that his check cashing operation did not have a license.  He admitted that when he took the stand.

Finally, we proved that Motovich's check-cashing business affected interstate commerce.  That is not in dispute.  The banks where the checks were being cashed, Carver, Astoria, Chase, Investors, they were all insured by the Federal Deposit Insurance Corporation.  The parties stipulated to that.  That was Government Exhibit 6003.

When Motovich deposited millions of dollars from his criminal scheme into a bank like JPMorgan Chase, it necessarily had at least a minimal affect on interstate commerce.  Not only were the banks deposited federally, but you also -- were not only federally insured, but you also saw fake invoices and fake insurance certificates sent out of state as part of the scheme to places like Connecticut.  Of course, Motovich's conduct at least minimally affected interstate commerce.

We also proved Count Two beyond any reasonable doubt, that Motovich willfully failed to file currency transaction reports or CTRs with FinCEN.  He intentionally did not file them even though he knew the law required it.  That was the entire point of his business model.

Again, as his customers told you, that was the primary reason they went to him as opposed to, say, down the street where they charged much, much less to cash checks so

J.A. 933

Summation - Grubin                    2793

that large transactions would not be flagged by FinCEN.  His customers gave David Motovich dozens and dozens and dozens and dozens of checks, well over $10,000 and no CTRs were ever filed.  Not only did they tell you that but, again, why else would you pay as much as five times as much for the same service.  You wouldn't.  And Roman Kretsula, Phillip Adamou and Joseph Russo also told you they never filled out any paperwork with David Motovich.

And just to take one example, in case there was any doubt, Government Exhibit 251, Ted Vlahakis from FinCEN told you, and as you saw, no CTRs, as just one example, were filed on behalf of Lithos Marble Works, Adamou's company, between January 2012 and May 2024, not after he brought all of those checks to David Motovich in exchange for cash.

We proved that Motovich willfully failed to file CTRs, failed to do so even though he knew he had to in other ways too.

David Motovich knows what a check-cashing business is supposed to do.  Again, Coney Island Payroll Services, a legitimate cash-checking business, it's detailed payroll records were found in David Motovich's order.  David Motovich loaned that business millions of dollars.  He had their money holders in his safe and at his apartment.  Of course David Motovich knew what a check-cashing business does and is supposed to do.

Summation - Grubin                    2794

In fact, on more than one occasion over the course of this trial, you saw that Motovich is sophisticated.

Special Agent Christopher Cabane told you what structuring was.  Do you remember that?  To arrange or structure checks so that they fall below the 10,000-dollar-plus-1-cent threshold for reporting, for making a currency transaction report.

Take another look at Government Exhibit 1081.  This is an e-mail, you saw, from David Motovich to someone on August 30, 2016.

"Hi," David Motovich says, "Please make two checks from TNT for 10 each" -- 10 each, not above 10,000 but 10 each -- "not in the same order."  I submit that means so that the check sequences are not one right after the other to make it more complicated to spot.

David Motovich is telling someone to structure a cash transaction.  There's no reasonable doubt that Motovich doesn't understand what the rules are, understands what the rules are.

Finally, Motovich's check-cashing operation did not just fail to file one or two or three currency transaction reports.  As you learned over the course of this trial, his check-cashing business didn't file them for any checks brought by his customers.  It was a pattern.

As Special Agent Cabane explained, for every single

Summation - Grubin                    2795

year, from 2018 to 2019, more than $100,000 was cashed, checks were cashed at Motovich's office.

And you can take a look at that yourself.  Government Exhibit 5001-B.  Take a look at any year.  Say, 2015.  That's over $1.7 million.  And it's a pattern because it's multiple customers doing the exact same thing.

Finally, we proved beyond any reasonable doubt that Motovich's check-cashing business was a domestic financial institution because that's what a check-cashing business is and it operated here in the United States.

The evidence also showed beyond a reasonable doubt that David Motovich committed four counts of bank fraud, each of the four banks the shell companies were at that you saw over the course of this trial.  He defrauded each of those four banks when he opened shell company accounts under other people's names at those banks.

Before I get into the specifics for each of the four counts, we proved beyond a reasonable doubt that Motovich knowingly executed a scheme to defraud each of those four banks, Motovich participated in a scheme, in a scheme to obtain money under the custody or control of those four banks by making materially false pretenses and representations, and Motovich did so with the intent to obtain or access that money in the bank accounts that wasn't in his name.

As the evidence of this trial overwhelmingly showed,

Summation - Grubin                    2796

and we've already discussed, David Motovich designed a fraudulent scheme to get the money out of nearly a dozen bank accounts not in his name.  He did so by having people like Kemal Sarkinovic or Robert Lovy open accounts in their names and then turn control over those accounts to David Motovich or for ZKC New York or ZKC NY Inc., Motovich just stole another person's identity.  That was the scheme.

The evidence also clearly showed that Motovich was acting knowingly and intentionally.

Again, most people, I submit, who are banking don't bribe the bank manager, they don't create false invoices or false certificates of insurance, and they don't send text messages like this.

Government Exhibit 1200 from David Motovich.  "Good morning.  I sent you an e-mail.  Please e-mail Dannette the wire instructions, not the bank."

Next, the government proved beyond a reasonable doubt that the money in those shell accounts, while controlled by David Motovich, was under the custody and control of the banks.

As four different bank officials came here and explained to you, when money is deposited into a bank account, they have certain property rights in that money.  It allows them to do certain things with that money.  It's the business model of banks.

**J.A. 934**

Summation - Grubin                    2797

The evidence also showed that the way Motovich got access to that money was through lies and not sharing important information with the bank, material omissions.

You know what those lies were. Every time David Motovich stamped Reggie Garcia's name on a document to do a transaction, that was a lie. Every time Motovich opened a bank account in someone else's name, that was a lie. Every time Motovich made a transaction in one of those accounts under someone else's name, that was a lie.

And as each bank official told you when they took that stand at each of the four banks where these shell companies were at, had Motovich walked into the bank and the bank manager wasn't someone he was bribing, and asked to move money in the account that he wasn't a signatory on, the bank would have said no. And Motovich knew why he was lying. He was lying so he could get the money from the bank and spend it on things like Sachs, Bloomingdale's and diamonds.

The only way Motovich's scheme worked or could work was if he lied to the banks. He could not say the proceeds were from my illegal unlicensed check-cashing business because the bank would say, as they told you, We either don't take check-cashing customers, certainly not registered ones, and if we do, we certainly don't take unlicensed ones and it's something we evaluate. He can't say the accounts are in his name because then he's tied to them. The entire scheme was

Summation - Grubin                    2798

one lie after another. And those lies caused the banks to move money in their custody and control for him.

We also proved that those lies that the fraudulent scheme was material to the banks, that it mattered to them.

All of the bank witnesses, each of those bank officials who took that stand explained what you probably already know, that it's important to banks to know who actually is behind those bank accounts. Those are the know-your-customer rules that they talked about. If they don't know and they're not being provided honest information, those rules don't work. Also, it's the law. Four bank officials told you they are required by law to collect that information. If they don't, they're putting their banks at risk.

Finally, we proved that each of the four banks' deposits were insured by the FDIC. Again, the parties stipulated to that and that's not in dispute in this case.

So as I mentioned, David Motovich is charged with four counts of bank fraud and we've proven each one beyond a reasonable doubt.

First, Count Three: Between January 2015 and November 2018, David Motovich did knowingly and intentionally execute schemes to defraud Carver Federal Savings Bank. That's where Dannette Hyatt-Sullivan worked.

As Special Agent Cabane told you and as you saw from

Summation - Grubin                    2799

the bank records, three of the shell bank accounts were at Carver Bank: Advertising on the Go, Midwood Consulting and ZKC NY Inc. If you look at the account opening dates, you see the earliest one was in January 2015. And as you know now, none of those accounts were actually controlled by Robert Lovy or Reginald Garcia. It was a lie.

Count Four: Between January 2012 and January 2017, David Motovich did knowingly and intentionally execute schemes to defraud JPMorgan Chase Bank.

Again, as Special Agent Cabane explained, three of the shell company bank accounts were at Chase: SGS Construction, M&M USA Consulting Corp., and one of the two Ago & Alaudin shell accounts.

And, once again, as you know, none of these accounts were actually controlled by Kemal Sarkinovic or Robert Lovy. Motovich lied to the banks about who was behind those accounts. Motovich was just transacting in those accounts.

Take, just as one example, the Ago & Alaudin shell account. Look how much money went through it based on Motovich's lies. Over $12 million. And it was Motovich directing all the transactions. Each transaction in someone else's name was a lie.

Next, we have Count Five: Between August 2013 and September 2015, David Motovich did knowingly and intentionally execute schemes to defraud Astoria Federal Savings Bank.

**J.A. 935**

Summation - Grubin                    2800

This was Astoria. If you recall, remember, there were two banks, bank accounts Motovich was using for Ago & Alaudin's name. One was at Chase. The other one was here at Astoria.

Take a look and how much money went through the second Ago account. Over $2 million. All those transactions were based on lies.

Finally, Count Six: Between January 2018 and October 2018, Motovich defrauded Investors Bank.

Another three of the shell company bank accounts were at Investors or Citizens Bank: Midwood Building Corp., CNBC Construction Corp., and the supposedly personal account of Kemal Sarkinovic or in Kemal Sarkinovic's name. And once again, as you know, none of these accounts were actually controlled by Kemal Sarkinovic, not even the one in his name. Motovich was transacting in these banks.

Take, as an example, Kemal Sarkinovic's personal bank account at Investors. Recall how he told you that Motovich directed him to open the account in his name and give Motovich control and look at the evidence supporting what Sarkinovic told you.

Look at the image on David Motovich's phone, government Exhibit 606, the Investors Bank profile on their website. "Welcome, Kemal Sarkinovic."

Look at the amount of money that went through one of

Summation - Grubin 2801

those, of those three Investors accounts or any of them. Millions of dollars. Over $6 million from Midwood Building Corp. Nearly $3 million from CNBC Construction Corp. And you all know where the money went: To David Motovich.

The evidence overwhelmingly established that Motovich committed bank fraud at each of these four banks.

The evidence also overwhelmingly established that Motovich committed bank fraud conspiracy.

He agreed with others to defraud each of these banks. Who did he agree with? Multiple people.

His secretary, Marina Kuyan. Each of those e-mails we looked at where David Motovich e-mails her to conduct or to reach out to Dannette Hyatt and conduct the transaction in someone else's name, that's an agreement.

Every time -- who else? Kemal Sarkinovic. Every time Kemal Sarkinovic opened one of those accounts, every time a check was signed from one of those accounts, every time Sarkinovic approved a wire transfer at Motovich's direction, they were working together by lying to the bank to accomplish the same objective: To move money through the accounts without the bank's knowing who truly controlled them. That was the point.

Who else? Well, Dannette Sullivan-Hyatt. Motovich and Hyatt agreed for the Carver Bank accounts to move money through the accounts at Motovich's behest despite him not

Summation - Grubin 2802

appearing on any, as an account signatory on any of the accounts. They agreed to do that, to deceive the banks to commit bank fraud.

Now, both Kemal Sarkinovic and Dannette Hyatt have taken responsibility for their lies, for their deceit, for their fraud. They pled guilty to federal crimes and they told you the person they were working with, the person who was actually in control, and he's sitting right over there.

The government also proved beyond a reasonable doubt that Motovich committed seven counts of money laundering, that Motovich participated in financial transactions using at least $10,000 in proceeds from his check-cashing business.

Essentially, you saw over the course of the trial how Motovich took the proceeds from his check-cashing business, put them in the shell bank accounts, and then moved the money out of the shell bank accounts to pay for things for David Motovich.

In this case, you saw dozens, if not hundreds of transactions like that, but we picked seven examples. Seven counts. It's why you saw, and it probably was tedious at times, why you saw Mr. Paulsen ask Richard Kier from AMEX about specific transactions made by David Motovich and why you saw him ask Dannette Hyatt about certain wires from the ZKC NY Inc. bank account, they were these counts. They were examples of the money laundering transactions.

Summation - Grubin 2803

And for each of the seven counts, we proved that the transaction, again, affected interstate commerce. We already talked about the banks being FDIC insured, where the money was moving through.

We proved that each of these transactions, these seven transactions, involved criminally derived property, criminal proceeds over $10,000, because at least $10,000 flowed into the shell company bank accounts from the illegal check-cashing business before each of the transactions we're going to look at.

Also, the evidence, of course, showed that Motovich knew where the money was coming from: His illegal check-cashing business. Again, that's why the bank accounts are all in someone else's name.

And, finally, each of the transactions we saw that took place took place in the United States.

So let's review each of those transactions. And, disclosure: It's going to be a bit tedious but we'll go through them each together and they all share certain similarities, I submit. So let's take a look at how we proved each one.

Count Eight: On or about February 22, 2017, Motovich transferred or caused the transfer of approximately $72,000 from a bank account ending in 8206 in Brooklyn, New York -- and by the way, that's, if you look at the bank

Summation - Grubin 2804

records as you saw them, that's the ZKC NY Inc. account -- to a bank account ending in 1188 in New York, New York. And that second bank account was, if you recall from the bank records and we'll look at them in a moment, Yisroel Leshkowitz account in Manhattan, bank account.

So, to start, just before that transaction, in the days leading up to it, weeks leading up to it, as you can see, checks from his check-cashing customers flowed into the ZKC NY Inc. bank account. And you can see just from these numbers, almost each one alone is over $10,000. $29,000 from Roman Kretsula on February 14, 2017. On February 3, 2017, 17,000 from Joe Russo. You have something like $60,000 going into that ZKC NY Inc. account. And, remember, once again, these are just the customers you heard from.

And then you see, on Government Exhibit 707, Dannette Hyatt authorizing a wire on February 22, 2017 going to Yisroel Leshkowitz at that bank account for $72,000.

So you know what's funding these transactions: The illegal check-cashing business. You also know that Motovich is engaging in this transaction in a number of ways. And I submit this isn't really in dispute.

First, David Motovich admitted on the stand that he was the one behind these accounts, but you also know because Hyatt told you that when she made this wire for David Motovich, it was for David Motovich, not Reggie Garcia, to

**J.A. 936**

Summation - Grubin                    2805

someone named Yisroel Leshkowitz. And, finally, in case there was any confusion on the matter, Leshkowitz took the stand and told you what was obvious, that the transaction where he got a check or a wire from ZKC was for his client, David Motovich, for a real estate deal.

I apologize, Your Honor. Technical difficulties.

(Pause.)

THE COURT: Would this be an appropriate time for the jury to have lunch?

MR. GRUBIN: I think so.

THE COURT: And then I see some nods from the jury saying yes. And then you will deal with your tech issues and we'll resume.

It's about 2:15, ladies and gentlemen of the jury. I know, ordinarily, I have a much longer lunch break but since lunch is being served to you here, should we aim to resume at 3 o'clock so we can keep this train moving or would you prefer to have a full hour?

A full hour?

A JUROR: Yes, that sounds good.

THE COURT: Full hour. That's what I'm hearing, a full hour. So we'll come back here at 3:20 and we will continue with summations.

Again, do not talk about the case yet. Enjoy your lunch. Mets fans, smile. Yankees fans, whatever. Okay?

---

2806

We'll see you in an hour.

THE CLERK: All rise.

(Jury exits.)

THE COURT: The jury has left the room.

You may be seated, ladies and gentlemen.

Do we have any issues we need to discuss in the absence of the jury? Then we'll take our lunch recess.

From the government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense counsel?

MR. JACKSON: No, Judge. Thank you.

THE COURT: Okay. Enjoy your lunch, everyone. See you in about an hour.

MR. JACKSON: I'm sorry, Judge.

THE COURT: One more thing. The "Columbo" move.

MR. JACKSON: I'm sorry, Judge.

THE COURT: That's all right. Sit down. Sit down, please.

Yes, sir.

MR. JACKSON: I just wanted to, I just want to make a request to the Court. I'm sorry. I'm from Detroit. The temperature has been perfect every day. Here and today, I'm struck a little bit. I wonder if possibly the Court can have the temperature down just a couple of degrees if there's any way for it.

---

2807

THE COURT: I will certainly ask our tech people. Hopefully, they're not the same tech people who are responsible for what just happened with respect to the videos, but I will certainly try to have the temperature lowered a bit and I will refrain from any comments about hot air --

MR. JACKSON: Thank you, Judge.

THE COURT: -- possibly generating the issue.

All right. So I'll see you folks in about an hour. Enjoy your lunch.

MR. JACKSON: Thank you, Judge.

THE COURT: Thank you.

(Luncheon recess.)

---

2808

**A F T E R N O O N   S E S S I O N**

(In open court; jury not present.)

THE COURT: You may be seated. I understand that we're waiting for a jury or two. When they're all here, we will bring them out.

Do we have any issues to address in the absence of all the jurors? Tech? Non-tech? Air conditioning? Global peace? Global warming?

Anything from the Government?

MR. GRUBIN: Nothing on that today, Your Honor.

THE COURT: From defense counsel, anything?

MR. JACKSON: No, Judge.

THE COURT: All right.

Mr. Scott, just check in to see where we are with the jurors' return.

(Pause in proceedings.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Please rise for the jury.

(Jury enters.)

(In open court; jury present.)

THE COURT: Welcome back, ladies and gentlemen of the jury. Thank you very much. Please be seated.

I hope you had a good lunch. Now we'll continue with summations, closing arguments from the Government.

MR. GRUBIN: Thank you, Your Honor.

J.A. 937

SUMMATION - MR. GRUBIN          2809

So again, I know it seems like I'm providing a lot of detail with these money laundering accounts, but I submit that's because when you go back to the jury room and deliberate, these are some of the transactions you're going to be deciding. That's why I want to take this time to walk through each of them.

So we left off at Count Eight, again a $72,000 transaction from the ZKC Inc. bank account to an account ending in 1188. That's, as we discussed before, Yisroel Leshkowitz's account.

Again, we talked about this, you see the money going from the customers, Mr. Motovich's check-cashing customers into the ZKC NY Inc. account, much more than $10,000, ahead of the transaction. And then again, here you see the wires that Dannette Hyatt told you that she did for Motovich, sending money to Yisroel Leshkowitz for David Motovich's real estate transactions. You heard from Yisroel Leshkowitz about this, as well.

So Count Nine is very similar to what we just looked at. On March 1, 2017, Motovich transferred or caused the transfer of approximately $320,000 from a bank account ending in 8206, again the ZKC NY Inc. account if you look at the bank accounts, to a bank account again ending in 1188 in New York, New York. And once again, if you look at the bank records, I submit that's Yisroel Leshkowitz's account at

SUMMATION - MR. GRUBIN          2810

Chase.

And again, if you look ahead of that transaction, on February 24, 2017 alone you see massive amounts -- tens of thousands of dollars going into the ZKC NY Inc. shell account. From Unique Painting Services alone $32,000; from Phillip Adamou $25,000; from Joe Russo at Metro Erectors, over $8,000.

And then you see the transaction. Dannette Hyatt told you about this transaction, as well. If you recall, the wire was so big that they had to break it up into two different transactions. That was both Government Exhibit 707, the two different wire transactions that Dannette Hyatt did for David Motovich that went to Yisroel Leshkowitz.

Count Ten, again very similar, on or about May 3, 2017, Motovich transferred or caused the transfer of approximately $150,000 from an account ending in 8206 in Brooklyn, New York to a bank account ending in 1188 in New York, New York. Again, you see the wire transaction here, and again Dannette Hyatt explains that Kuyan asked her to make this payment for $150,000 from the ZKC New York Inc. account to Yisroel Leshkowitz for the real estate transaction. And once again, you know where the money is coming from. If you look at Government Exhibit 5001-Bs and you look at the dates going ahead of that transaction, you

SUMMATION - MR. GRUBIN          2811

see one after another tens of thousands of dollars going into that account.

Count Eleven, I submit pretty much the same thing, except now it's July 14, 2017, and Motovich is transferring or causing the transfer of approximately $66,166 from a bank account ending in 3476, which I submit if you look at the bank records, that is -- instead of ZKC NY Inc., that's Midwood USA Consulting bank account. Or as the indictment puts it, again a bank account ending in 3476 in Brooklyn, New York. And it is to an American Express account ending in 0370 in New York, New York.

You may remember Richard Kier from AmEx who came in and explained that the different various AmEx card accounts all share sort of -- some of them share a master account or a master code, I believe is how he put it, and that master code was the one ending in 0370, if you want to refer back to his testimony.

And once again, if you take a look at Government Exhibit 706-B, you see the AmEx payment there, same amount, $66,166, and you know whose AmEx account this is. There you see it on July 14, 2017, the same amount of money. And again, as Richard Kier told you, this was one of David Motovich's accounts and you can see it there right on the exhibit.

So we have Count Twelve, on October 11, 2017,

SUMMATION - MR. GRUBIN          2812

Motovich transferred or caused the transfer of approximately $54,033 from a bank account ending in 8206, you know that bank account, ZKC NY Inc., in Brooklyn, going to that same AmEx account ending in 0370 in New York, New York. There it is on Government Exhibit 707-B, you have the AmEx payment of $54,033, and then you see it there, as well, the payment on October 11, 2017 for that same amount there on Government Exhibit 700-J, which is one of the AmEx records.

As you recall, Special Agent Cabane did tracing for us. He explained how the flow of money worked. That said, David Motovich took that stand and he admitted to you that he was in control of these accounts. Oh, and of course, by the way, if you look at the dates leading up to the transaction, you'll see that, once again, the money flowing into that account by tens of thousands of dollars is his check-cashing customers, Government Exhibit 5001-B. So you know what funded the AmEx purchases.

Count Thirteen, on or about December 15, 2017, Motovich transferred or caused the transfer of approximately $33,341 from a bank account ending in 8206 in Brooklyn, New York to an American Express account ending in 0370 in New York, New York. So the same accounts we've been looking at. And here you can see on Government Exhibit 707-B Dannette Hyatt, once again, explained that she did this wire at Carver Federal Savings Bank, you see that at the top, for

J.A. 938

SUMMATION - MR. GRUBIN                    2813

$33,341.32. And if we go to Government Exhibit 700-J, again the AmEx records, you see that same amount listed on December 15, 2017.

And again, if you look at Government Exhibit 5001-B, you will see tens of thousands of dollars from Lithos and Metro -- the different Metro companies going into that ZKC NY Inc. account by tens of thousands of dollars. November 1, 2017, $30,000. Tens and tens and tens of thousands of dollars going into the account and funding those transactions.

Finally, we get to Count Fourteen. On or about April 11, 2018, Motovich wrote or caused a check to be written for $100,000 from a bank account ending in 9896 in Short Hills, New Jersey, to a bank account ending in 2880 in Cherry Hill, New Jersey. This one's a little bit different, but it's the same concept. Kemal Sarkinovic told you about this transaction, or rather that he had no idea what the transaction was. If you recall, it was Government Exhibit 710, it was this check from Kemal -- well, it's purportedly from Kemal Sarkinovic at the Investors Bank account to David Motovich on April 11, 2018 for $100,000. You may recall Kemal Sarkinovic saying I did not give David Motovich $100,000. In fact, Kemal Sarkinovic, he's never had $100,000 at one time.

And then if you look at the back of the check, you

SUMMATION - MR. GRUBIN                    2814

could see it's endorsed. It says, I submit, David Motovich, and underneath that you see the account numbers that appeared -- the last four digits of the account number that appeared in the account.

You may recall, again, that Kemal Sarkinovic signed a bunch of these checks, a bunch of blank checks, and Motovich doled out the funds to himself and his family, and we saw that when Special Agent Christopher Cabane was testifying.

Again, you know where the money is coming from. Take a look at Government Exhibit 5011. Special Agent Cabane talked about this. These are wires between or transactions between the different shell accounts. So you could see in the dates leading up to that transaction from Midwood Building Corp. the money that is funding the account in Kemal Sarkinovic's name; $40,000, $50,000, $60,000. And then if you look on Government Exhibit 5001-B, right before that, what's funding that Midwood Building Corp. account? Well, David Motovich's check-cashing customers.

We also proved that David Motovich committed money laundering conspiracy. That's Count Fifteen. Motovich knowingly agreed to commit all these transactions with Marina Kuyan, his secretary, and others. Remember those emails we saw where Motovich would email Kuyan directing her to make a transaction, and then she would email Dannette

SUMMATION - MR. GRUBIN                    2815

Hyatt? That's an agreement. They agreed to move this money through the accounts. And besides that, David Motovich, once again, admitted while he was on the stand that he directed his secretary to do different things for her, such as make fake invoices and do various transactions. And I submit that all the evidence we went over shows that they agreed to do so intentionally, willfully, and knowingly.

For what David Motovich did to Reginald Garcia, we also proved that David Motovich committed aggravated identity theft. That Motovich used Reggie Garcia's identification without his permission, and used it as part of a criminal scheme for his illegal check-cashing business and for defrauding banks.

Around March 2016, you learned that Motovich decided to open yet another shell company account for his check-cashing proceeds, ZKC NY Inc. Of course, just like the other accounts, he wasn't going to put this one in his name, so Motovich did what you saw him do time and time again. He found someone vulnerable who he didn't think posed a threat: Reggie Garcia.

As Garcia told you, he worked for Joshua, or Shia, Markovics, David Motovich's business associate. Markovics owned multiple companies, like Royal Improvements and Royal Home Builders. And one of them, Royal DM, LLC, he and Motovich shared a financial interest in. Remember this

SUMMATION - MR. GRUBIN                    2816

exhibit, Government Exhibit 393? This was one of the documents that Special Agent Rees testified she recovered from Midwood Lumber. Both Motovich and Markovics were the signers of the Royal DM, LLC account. They were business partners.

And by the way, Joshua Markovics was another person who benefited from David Motovich's criminal scheme. Markovics got shell company money from David Motovich. Lots of it. Government Exhibit 735, long before they stole Reggie Garcia's identity, here's a check from Midwood USA Consulting Corp. to Joshua Markovics, February 14, 2017, for $25,000.

And what else did Motovich give his business partner, Joshua Markovics? Motovich also gave him fake insurance certificates. In fact, take a look at this exhibit, Government Exhibit 153-B. This is the very exhibit, the very document that Marcy Vukel looked at and wrote: "Fraud, not my signature." And look at under the circled -- the company that is circled in red, Royal Home Improvements. That's Joshua Markovics's company.

Now, Reggie Garcia told you that he was an employee of one of Markovics's companies. He did errands for Markovics, like deliver checks. He didn't have much money and he was trying to make ends meet. Now, he told you that in June 2016, Joshua Markovics took him to what he

J.A. 939

SUMMATION - MR. GRUBIN                    2817

thought was a bank to open up an account to get paid and to get a debit card. He didn't know what you know, that it wasn't a bank; it was Coney Island Payroll Services. And he was opening up an account at Coney Island Payroll Services that David Motovich could use when he wanted to have checks from ZKC cashed at Coney Island Payroll Services. He was being taken advantage of. He was being defrauded.

Months earlier, months before he was brought to Coney Island Payroll Services to open up what he thought was a bank account, on March 28, 2016 David Motovich had already formed ZKC NY Inc. On April 1, 2016, Marina Kuyan sends information to Carver Federal Savings Bank to open a business account in ZKC NY Inc. On April 20, 2016, Dannette Sullivan-Hyatt approves the bank account for ZKC NY Inc. And on that exact same date, David Motovich begins depositing checks from his check-cashing customers into the ZKC NY Inc. bank account.

Come May 2016, the false insurance certificates are already being made for ZKC NY Inc., saying that they're insured. By June 23, 2016, an account, that's the account, is opened at Coney Island Payroll Services, long after that March 23, 2016 bank account was opened at Carver Bank account. A year later, May 25, 2017, Reginald Garcia learns about the checks and the company being used, and he confronts Joshua Markovics in that recording you all heard.

SUMMATION - MR. GRUBIN                    2818

So again, these are documents you saw throughout this trial.

But here is Government Exhibit 1059, forming the ZKC NY Inc. company on March 28, 2016. Government Exhibit 1059, here is Marina Kuyan sending to Dannette Sullivan-Hyatt on April 1, 2016 Reggie Garcia's social security card information and his driver's license to Dannette Hyatt to open up the shell company account. And by the way, how do you think that Marina Kuyan and David Motovich had his social security card and his driver's license? I submit because Joshua Markovics, his business partner, gave it to him. It was his employee.

Based on these facts, we proved that David Motovich committed aggravated identity theft. We showed you that he possessed and used Reggie Garcia's social security number, his name, his birth date, his driver's license. We proved Motovich used Garcia's means of identification in deceptive and fraudulent ways. You saw that Motovich used it to open another shell company account so that his check-cashing customers could give him -- could write the cash out or the money out to yet another shell company for Motovich's check-cashing business. You saw that Motovich forged Reggie Garcia's signature over and over and over again and used it to defraud Carver Bank. In fact, David Motovich took that stand and admitted to you that he had a stamp for Reggie Garcia and made stamped transaction after

SUMMATION - MR. GRUBIN                    2819

transaction with a forged Reggie Garcia signature.

Finally, we proved that David Motovich used Garcia's identification without lawful authority. You know that from the evidence. Garcia told you. He took that stand and he told you that he never, ever gave consent to David Motovich or Markovics or anyone else to open up a bank account at Carver Bank that Motovich could use to run millions of illicit proceeds through. He had no idea what was happening. As Garcia told you, he never got his bank account; he never got his debit card. He was lied to.

Now, Motovich took the stand and told you a different story. He said that Reggie Garcia came to Midwood Lumber, for about an hour he sat with him waiting for Dannette Hyatt to show up, and Reggie Garcia, for some unexplained reason, signed a bunch of paperwork to open up a bank account so that Motovich could put millions of dollars through it using his social security number and driver's license and other personal information. That doesn't make any sense, right? It shouldn't. I submit it was nonsense.

Garcia told you what happened when he found out about this. In May 2017, he confronted Joshua Markovics and recorded the conversation that you heard where Markovics lied to him. You listened to that recording. It was Government Exhibit 601. You heard Garcia say tell Markovics to stop what he was doing. I submit you heard him say that

SUMMATION - MR. GRUBIN                    2820

in the recording, to stop using his information. You heard him say: My name, my social is tied to that account. He pled for it to stop. But Motovich didn't stop. The evidence showed beyond any reasonable doubt that Motovich committed aggravated identity theft and used Reggie Garcia's identification to commit additional crimes.

The evidence also established beyond a reasonable doubt that David Motovich participated in one more criminal conspiracy. He agreed with others to obstruct the IRS from accurately collecting taxes. Remember that a major purpose of this entire scheme was to intentionally make it difficult for the IRS to know what anyone in the conspiracy owed in taxes. What Motovich owed, what his employees owed, what Joe Russo owed, what Roman Kretsula owed, what Phillip Adamou and others owed.

That was the goal of everyone involved, to fool their accountants so that they could all cheat. And everyone was in on it. Everyone participated in the arrangement for that purpose. The check-cashing customers like Russo, Kretsula, and Adamou wanted to pay less in taxes, so they went to Motovich, and Motovich agreed to help them. He did so by giving them fake insurance documents, like the invoices and the certificates of insurance, to fool their accountants. Motovich himself didn't pay taxes on any of the immense profits that he made from the check-cashing

J.A. 940

SUMMATION - MR. GRUBIN                    2821

business.

Also, you know for all the reasons we've already spoken about that Motovich fully understood the point of this arrangement. But there's another very important way that shows you he knew exactly what the arrangement was. Government Exhibit 355 found in a safe at Midwood Lumber during the search that Special Agent Maegan Rees testified about. Motovich, I submit, was clearly paying his employees off the books. He was doing the same thing that all of his check-cashing customers were doing.

Finally, for this conspiracy, we proved that its members, including Motovich, Marina Kuyan, Kemal Sarkinovic, and others, took numerous overt actions to advance their goals. Every time one of those conspirators opened an account for a shell company at a bank or one of the accounts at Coney Island Payroll Services, that was an overt act. Every time Motovich and Kuyan conducted wire transactions in those shell company bank accounts, that was an overt act. These were all overt acts in furtherance of Motovich's and the others' criminal agreement.

And lastly, when Motovich learned about the investigation, his solution was to try to obstruct it. Because of that, we proved he is guilty of witness tampering. The evidence showed that David Motovich knowingly, corruptly persuaded Kemal Sarkinovic to keep him

SUMMATION - MR. GRUBIN                    2822

from talking to law enforcement about the crimes he was committing with David Motovich.

Both Kemal Sarkinovic and Special Agent Cabane told you that law enforcement stopped Sarkinovic at the airport on January 12, 2019, at JFK. The agents asked Sarkinovic about the companies and bank accounts that he opened for Motovich. He told the agents -- Sarkinovic told the agents that he opened the companies and accounts for Motovich and that Motovich controlled the accounts. And again, David Motovich took the stand and admitted to the exact same thing; that he controlled those accounts. Kemal Sarkinovic even signed a confession about all of this.

Now, this was a Saturday, as you heard, and Sarkinovic agreed to meet with the agents again two days later, on Monday, at the U.S. Attorney's Office. In the meantime, though, Motovich found out and he immediately arranged a meeting with Kemal Sarkinovic and Arthur Gershfeld, who David Motovich admitted was his good family friend. Sarkinovic then told them what happened, and what does Motovich say? Does he say, oh, well, this has nothing to do with me so I don't have to be worried? No. He tells Sarkinovic that Arthur Gershfeld, my family friend, is your lawyer now, and I submit that Motovich pays for it.

Take a look at this check, Government Exhibit 723. On January 14, 2019, two days later after the stop at the

SUMMATION - MR. GRUBIN                    2823

airport, a check from CNBC Construction, one of the shell companies, to Arthur Gershfeld for $50,000. And by the way, recall when David Motovich took the stand the other day and said, yeah, the majority of the money in all these accounts is mine? Except for that. Except for that money. That wasn't his.

I submit to you that Motovich told Kemal Sarkinovic that Gershfeld would be his attorney and paid him $50,000 from the shell account that David Motovich told you himself these shell accounts he controlled and he had -- and the majority of the money was his because David Motovich was concerned about precisely what happened at this trial: Kemal Sarkinovic taking the stand and telling you all about SGS Construction Corp. and CNBC and Ago & Alaudin. And you know that's exactly what David Motovich was doing.

Recall what you heard from Phillip Adamou. He told you that Motovich pressured him to fire his attorney and hire one that David Motovich wanted. And despite Motovich's best efforts, having Gail Motovich, his sister, take away Adamou's phone before speaking with Motovich, Adamou had a backup recording device.

Let's talk about the recording of Adamou and Motovich, Government Exhibit 600. That was on June 5, 2019, after Kemal Sarkinovic had already been stopped at the airport and grand jury subpoenas had all gone out. Everyone

**J.A. 941**

SUMMATION - MR. GRUBIN                    2824

knew the Government was investigating. So they take his phone away. Motovich was worried about someone recording the conversation.

Motovich admitted on that stand that he knew what a joint defense agreement was. Do you remember what he said? That when all the attorneys are in the room with the clients and they're in the room, you can say whatever you want and law enforcement can't record you. So he wanted Adamou to get one of his attorneys, someone loyal to him, like Arthur Gershfeld, so he couldn't be recorded and Phillip Adamou couldn't testify like he did.

Of course, what Motovich didn't know is Adamou had a backup recorder. But it was in his wallet, so you couldn't get as clear of a recording. But you heard it. Feel free to listen to it again, Government Exhibit 600.

Now, as an aid for your convenience, we have snippets of the transcript on this slide. But remember the recording and the things you heard Motovich say. I submit you heard: For me and you to be safe, get you an attorney for 5,000, not one who's gonna cooperate with them.

And then Motovich said something very important. This is a few months after he wrote the check to Gershfeld for Sarkinovic: I covered the fee for a -- unintelligible, and excuse my language -- fucking cooperator who wants to talk.

SUMMATION - MR. GRUBIN                    2825

Who is he talking about?  Kemal Sarkinovic.  He's talking about Kemal Sarkinovic.  He's saying he paid Arthur Gershfeld $50,000 to keep this cooperator from talking.  Motovich denied that.  But who else do you think Motovich is talking about here?  I covered the fee for a cooperator who wants to talk?  Now, Phillip Adamou has no idea who Kemal Sarkinovic is and Sarkinovic has no idea who Adamou is.  But you, the jury, know who both these people are and what Motovich was saying here.

Here's what else you heard:  One of the guys got picked up at the -- unintelligible.  He's talking about Kemal Sarkinovic again.  I submit he's talking about him getting picked up at the airport.  And then you hear him say:  I -- I don't know why you would pay -- excuse me again -- shit happens, you come to me right at the beginning.  Everybody came to me, mainly you and the painter.  Two people.

Motovich is complaining that Phillip Adamou and a painter, who you all know is Roman Kretsula -- remember David Motovich's phone, "Roman painter"?  David Motovich, I submit, is saying Roman Kretsula and you are the only two people who haven't come into the circle.

And then what does he say?  He says, I submit you heard Motovich say:  You listen, I hope you're gonna be okay, because if it's a whole group, everybody has to join

SUMMATION - MR. GRUBIN                    2826

the group.  Otherwise they're gonna have to turn you into a rat and then there's going to be an issue.

Members of the jury, you don't have to guess what David Motovich meant by that.  He got up on that witness stand and told you that rat meant cooperator.  These are not the words of someone who is simply trying to make sure, as Mr. Jackson suggested, kept suggesting to Adamou, that his friend gets the proper legal counsel that's best for him.  This recording tells you what David Motovich's intentions were with Kemal Sarkinovic when he paid for his attorney.  It was to keep him from telling the Government, and then you, exactly what you heard.

Members of the jury, the evidence of the 18 crimes we looked at in this case is overwhelming.  As Motovich himself told you on the stand yesterday, this isn't complicated.  The defendant committed a massive financial fraud for nearly ten years.  He created fake documents.  The he created fake shell companies.  He stole a person's identity.  And he laundered millions of dollars so he could live a life of luxury.

And as we told you at the start of this trial, you would hear from witnesses, you would see the evidence, you would see and have now seen the fake, the text messages, the checks, and the cash.

Hold David Motovich accountable and return the

SUMMATION - MR. GRUBIN                    2827

only just verdict in this case:  Guilty of all the charges.

Thank you.

THE COURT:  Thank you.

Ladies and gentlemen of the jury, 24 hours ago I apologized for adjourning at 4:12.  It happens to be 4:12 right now.  Rather than make the defense start its summation at 4:12 and have to interrupt him, I'm going to ask you to adjourn until tomorrow morning at 9:30, when we would have defense summation.  We will then have a brief, I'm sure brief, rebuttal.  I will then give you the jury charge, you will have lunch yet again, and then you will get the case.  So that's what we're going to do.  We are going to adjourn right now for the day.

Please do not talk about the case.  Tomorrow morning at 9:30 we will have the summation from defense counsel, and then we'll have rebuttal from the Government, and then I will give you the jury charge giving you the law, and then you will have the case while you're having your lunch.

Thank you.  We're adjourned for the day.

THE COURTROOM DEPUTY:  All rise.

(Jury exits.)

(In open court; jury not present.)

THE COURT:  The jury's left the courtroom.  Ladies and gentlemen, you may be seated.

**J.A. 942**

PROCEEDINGS                    2828

Do we have any issues we need to address in advance of completion of summations and the charge tomorrow?  Anything from the Government?

MR. GRUBIN:  No, Your Honor.

THE COURT:  Anything from defense counsel?

MR. JACKSON:  Just wanted to say thank you, Judge, for giving us a reprieve.  I think the jury was --

THE COURT:  Well, I used to practice law.

MR. JACKSON:  Thank you, Judge.

THE COURT:  All right.  See you tomorrow, folks, 9:30.

(Matter adjourned until Friday, July 26, 2024, at 9:30 a.m.)

*    *    *    *

2829

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - -   X

UNITED STATES OF AMERICA,    :    21-CR-497(WFK)

            -against-       :    United States Courthouse
                                 Brooklyn, New York
DAVID MOTOVICH,             :
                                 July 26, 2024
            Defendant.      :    9:30 o'clock a.m.

- - - - - - - - - - - -   X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        BREON PEACE
                           United States Attorney
                           BY: ROBERT POLEMENI
                               ERIK D. PAULSEN
                               ANDREW GRUBIN
                               MATTHEW C. SKURNIK
                           Assistant United States Attorneys
                           271 Cadman Plaza East
                           Brooklyn, New York  11201

For the Defendant:         WACHTELL, LIPTON, ROSEN & KATZ
                           51 West 52nd Street
                           New York, New York  10019

                           BY: RANDALL WADE JACKSON, ESQ.
                               JESSICA LAYDEN, ESQ.

                           MEISTER SEELIG & FEIN, LLP
                           125 Park Avenue, 8th Floor
                           New York, New York  10017

                           BY:  HENRY R. MAZUREK, ESQ.

Court Reporter:            Charleane M. Heading
                           225 Cadman Plaza East
                           Brooklyn, New York
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

---

2830

(In open court; outside the presence of the jury.)

THE CLERK:  United States of America versus David Motovich, criminal cause for trial.

Please state your appearances for the record.

MR. POLEMENI:  Good morning, Your Honor.  Robert Polemeni, Eric Paulsen, Andrew Grubin, Matthew Skurnik, Paralegal Kavya Kannan, Special Agent Christopher Cabane, for the United States.

THE COURT:  Good morning, counsel.  You may please be seated.

Ladies and gentlemen of the public, you may be seated as well.

Defense counsel?

MR. JACKSON:  Good morning, Your Honor.  Randall Jackson, Jessica Layden, and Henry Mazurek, on behalf of our client David Motovich, and we're also joined by Mr. Andy Cepregi.

THE COURT:  Please be seated.  Thank you for your patience.  Good morning, everyone.

We're going to be bringing the jury in a moment. Are there any issues we need to address before we bring the jury in for the continuation of summations?

MR. POLEMENI:  No, Your Honor.

MR. JACKSON:  No, Judge.

THE COURT:  Okay.  So we can bring in the jury in a

---

Summation - Jackson                        2831

few minutes.

(Pause.)

THE CLERK:  All rise for the jury.

(Jury enters.)

THE COURT:  Good morning, ladies and gentlemen of the jury.  Welcome back.  I thank you for your promptness. Please be seated.

We're going to proceed now, as I promised you yesterday, with summations.  As I said before and will say again, summations are not evidence.  You already have all the evidence.  They are arguments of counsel.

So now you are going to hear from defense counsel. After he finishes, we'll take a brief comfort break, and then you'll have the rebuttal from government.

Again, just argument, not evidence.  You've got all the evidence already.  And then we will have the jury charge and lunch, and the case will finally be with you for deliberations.

So with that, please proceed with your summation, sir.

MR. JACKSON:  Thank you very much, Judge.

Ladies and gentlemen, I don't care what anybody tells you, this country was founded by pirates and gangsters.

Now, some of these people were accused by the British law that existed at the time of being tax cheats,

---

Summation - Jackson                        2832

smugglers, each and every one of them accused of some series of crimes.  A few of them were, were murderers.  These are people who became presidents of the United States.

And I started thinking about this.  I was thinking about how irrelevant, it seemed to me, throughout this entire case.  All the cash that the government was waving around during this case, which they completely conceded was David's money that he earned appropriately, and I was just thinking about how irrelevant it all was.

Listening to a song came to my mind, an old song that I liked that referenced "dead Presidents," referring to money.  And it occurred to me that the money in this case that was waved around did have a bigger significance.

Thinking about that song and thinking about songs, I don't know if any of you saw the play "Hamilton" or if you heard the saying maybe being sung by your kids or your nieces and nephews until you got sick of it, but just thinking about it.  If you did hear that, if you did see that on TV or you did see that, you know that Alexander Hamilton was the first Treasury Secretary.  Now, that's the organization that employs Mr. Cabane, the organization that we talked a lot about in this case that houses the IRS.

And Hamilton, the first head of this, you also know was a notorious person who got himself into various different scandals.  You might know that he had been involved in more

J.A. 943

Summation - Jackson                    2833

than 12 duels, shootouts, basically in the street, with pistols, before the famous one that we all know about that ended with him losing his life to another founding father, Aaron Burr.

We heard about somebody during this case named John Hancock, which pretty much everybody knows the words "John Hancock" from the signature. Now, the real John Hancock is the inspiration for the company that we heard about during this case, the insurance company, where somebody came to testify.

And the real John Hancock, the man that the company is named after, he was a key founding father. He was the very first man to sign the Declaration of Independence. And that's why people refer to a signature to this day as a John Hancock. But John Hancock didn't get a bill. He did get put on the back of the $2 bill when they showed this, when they put this description or this engraving of the signing of the Declaration of Independence. The guy right there in the red circle, that's John Hancock.

And John Hancock, he was, before he was one of the founding fathers, he was known in the colonies as the prince of smugglers. He was pursued aggressively by the British, and they believed that he was smuggling so much merchandise, using supposedly fake documents and other means, it was undermining a bunch of the taxes that people in the colonies were upset

Summation - Jackson                    2834

about. They ended up seizing his ship. They ended up putting him on trial. There was so much outrage about the trial that there was a riot.

John Adams was Hancock's lawyer at the time. John Adams is the guy who is depicted with the blue arrow pointing at him. And this was a highly publicized trial and it was considered an outrage at the time because the British, the King of Britain wanted him so badly that they would not allow a jury and they didn't allow the defense to cross-examine witnesses.

After five months of trial, the prosecution in that case ended up dropping the charges, and Hancock kept on smuggling and he eventually earned the criminal charge of traitor.

Now, why do I bring this up? Because the founding fathers, if you heard anything about that play, if you remember anything from school about them, these men fought intensely. There was not agreement about how this country should be put together. They disagreed about almost every aspect of the way that this country should be organized and run, but there was one thing that all of those men agreed upon and that was the fundamental and critical right of a trial by jury.

Now, Thomas Jefferson, who is also depicted with the other arrow there, talked about this at the time. He said, I

Summation - Jackson                    2835

consider trial by jury as the only anchor ever yet imagined by man by which a government can be held to the principles of his constitution.

John Adams, the guy who defended John Hancock at that trial, said that the jury was the heart of liberty and that it was the key thing that stood between regular citizens and the power of government prosecutors to make completely arbitrary decisions about who they want to punish on the basis of absurd theories of law. He said that --

MR. POLEMENI: Objection.

THE COURT: -- without juries, we have no other fortification against being ridden like horses, fleeced like sheep, worked like cattle, treated like swine.

He was talking about the ability of prosecutors without juries to advance theories that do not match up with the evidence, do not match up with your common sense, and about how critical it is for juries to stand in the way of it and be the conscience of a community that says, no, there is not sufficient evidence and this does not make any sense.

Adams said that at the time of the American Revolution, and he believed it so firmly that he risked his life in war against what at the time was considered the most powerful army in the world.

And that's how we all end up here today. And I'm telling you this, I'm begging you during this incredibly long

Summation - Jackson                    2836

trial that I know each and every one of you has sacrificed for to be here, you sacrificed time that you could be with your work, with your families, with your friends, school, training. I know that you have sacrificed and I cannot tell you how deeply we appreciate that.

And I'm asking you to stay with me a little bit longer as I explain this, because what Thomas Jefferson and John Adams were talking about is so key, it is so key that you not simply listen to the arguments that were put forth by the prosecution but that you hold them to their burden and look at the evidence, the incredible lack of actual evidence in this case, which is your sworn duty and your only duty in this case in terms of determining what is right.

Now, you've heard a lot about the 18 charges in this case. You haven't even gotten to the jury instructions, which I promise you the judge is going to deliver after, as he was saying, we're finished. It's not my job to instruct you on the law. That is only for Judge Kuntz. The jury instructions are going to be, they're going to surprise you in their complexity.

That's for a later moment, but for right now, I just want to focus on the evidence and what it actually showed because it shocked me, and I think it might have shocked a few of you, that as the prosecution went through their case yesterday, they barely addressed the evidence. I just want to

**J.A. 944**

Summation - Jackson                    2837

talk about that because what these men were talking about, John Adams, Thomas Jefferson, all these men, was how important a jury was to prevent prosecutors from gaslighting a jury to death with theories unsupported by evidence.

So I want to talk about, all I want to talk about today is the top ten gaslights of this case, which I think point to clearly, clearly, how they have failed to meet their burden. Before we do that, let's just get a couple of things out of the way to make this simple. Simpler.

I just want to talk about several things that, first of all, are not in serious dispute any more. First, there's no dispute any more that David never stole any money from anyone in the case, not from the banks, not from the cooperators, not from anybody that appeared in the case. The government conceded that.

There's no dispute that the money that David withdrew or used from these so-called shell company accounts was all his money. There's no dispute that it's entirely commonplace to create or use companies for the purpose of executing transactions, keep your name out of business transactions. Remember the GC at Carver Bank told us that.

There's no dispute that none of the cooperators, none of them, can point to any records that actually told you how much cash they received on any occasion, when it was given, other than their own faulty memories. There's no

Summation - Jackson                    2838

dispute that multiple of the government's witness on whom they've asked you to rely to meet their incredible burden, they lied, during the investigation and at trial about critical details of the case.

There's no serious dispute that the government intentionally chose to exclude from what they played for the jury from those recordings you saw, portions containing critical details. Their own witnesses said, yes, this is critical stuff that didn't get played for the jury for some reason.

There's no dispute that the government cannot tell you that David actually failed to pay any taxes. Seven years of investigation, all of these charts, and Agent Cabane admitted on the stand he has no idea. And there's no dispute that no witness in this case ever said that David prevented them or even attempted to prevent them from contacting the authorities. Nobody.

So what is in dispute in this case? What are we even talking about? I submit to you there's only one thing in dispute and that is can this prosecution have even possibly met its incredibly high burden in a criminal prosecution in this case of proving David guilty of fraud and running an unlicensed money transmitting business in a case where not one witness said that David transferred money for them and not one witness said that David stole any money from them, not one

Summation - Jackson                    2839

nickel. I submit to you, ladies and gentlemen, that the simple answer to that question is no. And all we're going to talk about today is why.

New, let's focus on the first gaslight of the government, which has to do with bank fraud. It was in the opening and it was in the summation. We'll count back from ten to one.

The first one is this idea that David ran this massive financial fraud and told lie after lie to keep it secret. And they focused on she sent statement updates, they are talking about Dannette Hyatt, she sent statement updates, she did all these wire transactions, dozens and dozens of them, all of those examples of her wiring money to David Motovich, who instructed her. Bank fraud each and every time, that's what the prosecutor said.

The reality, beyond the fact that nobody pointed to any stolen money, is that no witness in this case described any lie that David told to advance a bank fraud. And there was no evidence, zero evidence in this case that David knew, as they had to prove, that his conduct would likely harm the banks' property interest. We don't even need to go through these.

Just very quickly, it couldn't have been more clear. We asked everyone, Kretsula, Sarkinovic, Adamou, Latchum, Ms. Vukel, Mr. Torres, Mr. Russo, all of them, is there anyone

**J.A. 945**

Summation - Jackson                    2840

who said that David stole any money? And the prosecutors tried to downplay this, as I mentioned earlier, well, you know, stealing money is not really the question.

MR. POLEMENI: Objection, Your Honor.

THE COURT: Overruled. It's just argument. It's not evidence. It's not evidence. It's just argument. And you are going to have a chance.

MR. POLEMENI: Okay.

THE COURT: And you'll take that chance, I'm sure, in your rebuttal.

So it's just argument, ladies and gentlemen of the jury. The lawyers do their thing. I'll give you the law. I will give you the law. All right?

Go ahead. Overruled.

MR. JACKSON: Thank you, Judge.

You heard all of that. And then I submit to you, ladies and gentlemen, your own fundamental notions. We were all surprised probably that they couldn't produce a single witness that said David stole from them and their companies.

Now, there were a couple of things that were even more interesting in terms of what they tried to come up with in terms of how this can be fraud even though David didn't steal any money. And what they said, you heard from Ms. Manzione, the woman at Investors Bank.

We asked her this question: When the bank

Summation - Jackson                    2841

terminates a relationship, if they find out, if they don't like the way you operate, the BSA rules, et cetera, what happens with the money in the account?  Does the bank keep it?  She was surprised by the question.  She said no.

We said:  Well, what does the bank do?  She said:  The client comes in and takes the money.  I said:  Well, why doesn't the bank just keep it?  It's not a trick question.  I'm just asking.  She said:  Why doesn't the bank keep it?  She was shocked.  She was shocked even at the idea that the bank might keep a customer's money after they determined that they didn't like the way that they were following the BSA rules.  They gave it back.  They always give it back.

We asked Ms. Lowis from Chase Bank the exact same question.  When it closes an account, does the bank ever say because this activity seems suspicious we're just going to keep the money?  No.

We also asked Ms. Lowis:  Now, one of the things you talked about is that once it receives the money, sometimes it's investing that money, correct?  She says:  Correct.  We said:  Is it ever the case that when a customer comes to withdraw their money from the bank account, Chase Bank will say, I'm sorry, you can't withdraw the money right now, we're in the process of investing it?  She said no.

It was obvious.  This theory that they come up with, the banks and invest the money and the bank may have been

Summation - Jackson                    2842

harmed by this, first of all, there was absolutely no proof that David had any concept that he might be harming the bank because of some exotic investment of CEO's on the other side of the globe when his own money was being withdrawn, and the bank has no concept of that either.

They got so desperate in trying to come up with the theory of bank fraud, at one point in the government's summation, they said, on that topic, if you think what you're doing is okay, you don't need to bribe the bank manager by letting her take the money out of the accounts.

But what did we actually hear during this case?  Did anyone come into this case and say the bank manager got bribed?  We asked the bank manager, and this is a woman who they are holding a potential 30-year maximum sentence over her head.  She has every incentive to say whatever the government wants her to say.

But when we asked her, we were like we're trying to figure out, where's the bribe.  What was the total over all of these years, almost a decade of money that David gave you out of the accounts?  Now, I assume that this doesn't even include -- I don't even know what we're talking about.  But she said, after working with the prosecutors to figure it all out, less than $2,500 all in.

And the Court asked this question.  The Court asks questions better than me, unsurprisingly.  The Court asked:

Summation - Jackson                    2843

Less than 2500 all in?

The Witness:  Yes.

For all your activities?  Yes.

Then we asked, to further unpack that, the one that they pointed to, one of the times when David was, like, Hey, Dannette, take some money out of the account if you want it.  It was December 20th.  It was right before Christmas.  This is the bribe?

They couldn't even explain what it was that she was supposedly bribed to do.  I mean what exactly did she do?  They have this vague suggestion that never appeared in the testimony that somehow she was helping to, to keep it secret that he had involvement in this account that everyone obviously knew he was involved in.  We'll get to that in a second.

But, you know, we talked about it.  He was the godfather of her daughter and not because of some nefarious relationship.  When we asked her about it, she said:  I asked him to be the godfather of my daughter because he was my friend.

And you heard person after person come into this case, government witnesses, say that David had been a friend to them.  People who were -- that David had helped them over and over.

Just on this bribe, last thing.

Summation - Jackson                    2844

We talked about the fact that David on occasions would say take a few hundred dollars out.

And he asked you to distribute that money to buy lunch for all the bankers at your bank because they were working very hard?  And this woman, who I submit to you, if you listen to her testimony, has no idea why she had to plead guilty to bank fraud but knows that they are holding a 30 year sentence over her head, said yes.

And we asked her:  And so that was not an attempt to bribe you, that was an attempt of him to try to have you help him facilitate doing something nice for the people he thought was working hard?  And she said:  Yes, that could be, yes.

What world, what dimension, what parallel universe in the quantum verse do we live in where a man who's trying to hide his relationship with accounts at the bank is telling Dannette take money out of the accounts?  I hear everybody is, like, working really hard.  It's a tough time.  Spread it around.  Tell them David loves everybody.  What?

This man was one of the most significant clients at the bank.  They all told you that.  The people from the bank who came in, he was one of the centers of influence or whatever they called it.  You really think that people at the bank didn't know that David Motovich was involved in these accounts?  It's ridiculous.

What's the next gaslight?  It's this idea that David

J.A. 946

Sidebar                                          2845

engaged in witness tampering, which is ridiculous.  They talked about it in their opening and in their summation.

The reality, and by the way, just to be clear, as you'll hear from the government, from the Judge's instructions, the witness tampering charge in this case is only about Kemal Sarkinovic.  The additional stuff that you heard about Mr. Adamou, that's just additional fluff that they're adding to try to bolster something.

The charge itself is about Kemal Sarkinovic, who said almost nothing about witness tampering.

MR. POLEMENI:  Your Honor, this is very important.  I'd like a sidebar, please.  There is something -- I'm sorry, Your Honor, but this is very important.

THE COURT:  I don't like the interruption of lawyers in their summation, but we are going to have a sidebar about this, ladies and gentlemen.

All right.  Let's have sidebar.  White noise, please.

(The following occurred at sidebar.)

THE COURT:  Go ahead.

MR. POLEMENI:  Your Honor, the bottom left of that slide says the witness knew, lied about David sister's cell phone.

THE COURT:  A little bit louder?

MR. POLEMENI:  The witness lied about David's sister

Sidebar                                          2846

taking the cell phone and the government knew it.

That is absolutely, utterly false.

I told Mr. Jackson and Mr. Mazurek repeatedly when they asked me about this, I told them that we had a recording where it is clear as day that Ms. Motovich took that phone but we did not listen to that recording and we did not introduce it into evidence because we were advised by Department of Justice Office of Enforcement Operations that we could not listen to it because it might be considered illegal witness --

MR. PAULSEN:  Wiretap.

MR. POLEMENI:  -- wiretap because the phone was left with her and no one was there to consensually record it.

I told them that.  And now they have the audacity, Your Honor, to put that on that screen.  It is -- he should be ashamed of himself.

THE COURT:  Now, let me ask you:  What is your response to that?

MR. JACKSON:  Three things, Judge.

First, I completely disagree with his representation.  I have not heard that in discovery.

MR. POLEMENI:  I told you --

THE COURT:  Whoa.  Whoa.  Calm down.

MR. POLEMENI:  Sorry, Judge.

THE COURT:  Go ahead.

MR. JACKSON:  Secondly, Judge, I have no idea how

Sidebar                                          2847

this prosecutor could represent, when he's claiming he's never heard the supposed recording and he supposedly walled off the recording, which I never heard, how he can possibly represent to the Court that it exists.

THE COURT:  Who has heard it?

MR. JACKSON:  No one.

THE COURT:  So what are you saying about it in your, what are you saying about --

MR. JACKSON:  I don't --

THE COURT:  Excuse me.  Don't interrupt the Court.

What are you saying about it in your summations?  A recording you have not heard, a recording that has not been offered, What are you saying to this jury about it?

MR. JACKSON:  Nothing.

THE COURT:  What are you saying -- what have you said to the jury about it?

MR. JACKSON:  I'm only referring to the recording that's in evidence, Judge.  That's it.

THE COURT:  You're only referring to a recording that's in evidence?

MR. JACKSON:  Yes, Judge.

THE COURT:  What is your response to that comment?

MR. POLEMENI:  He's not.

THE COURT:  Excuse me.

MR. POLEMENI:  Yes.

Sidebar                                          2848

THE COURT:  The recording that you said Mr. Jackson is referring to is not in evidence.  Is that your position?

MR. POLEMENI:  That's correct.

THE COURT:  Okay.  Mr. Jackson, what is your response to that?

MR. JACKSON:  I'm not referring to -- I'm only referring to the recording in evidence.

THE COURT:  Is it referred to in your chart?

MR. JACKSON:  Not at all.  Zero percent.

THE COURT:  Is it referred to in his chart, The recording that -- answer my question.

MR. POLEMENI:  No.

THE COURT:  The recording that is referred to is not a recording that is in evidence?

MR. POLEMENI:  We --

THE COURT:  I'm asking you a question.

MR. POLEMENI:  That recording is not in evidence. That is correct.

THE COURT:  Okay.  Look, take the slide down and move on.

Every time you attack the government for supposed misconduct, you are potentially opening the door, Mr. Jackson, for the government to talk about all sorts of things that you do not want them to talk about in this case.

Now, you have to use some discretion because you are

J.A. 947

Sidebar    2849

going pretty close to the line, and the government has said you're referring to a recording that is not in evidence and you are saying you're not referring to such a recording.

If the government is correct that you are referring to such a recording, I will unleash the kraken and allow them to do what they want to do with respect to this in their rebuttal.

Now, you better back it up. Take the slide down and move on. And I don't want to hear any more where you're crossing that line. You know that you are running a risk, and I don't know that if by attacking the integrity of the government lawyers is worth it to you.

I let lawyers try their cases as they wish to, but I will tell you now you cross that line again, I will unleash the kraken, and you will be very sorry that you crossed the line. I've allowed you great latitude to argue your position, as I'm required to do and as I would do under the Federal Rules of Evidence, Federal Rules of Criminal Procedure, but when lawyers start attacking the integrity of their adversaries, it's not right.

I understand that this is a hard-fought case. I understand that there are issues between counsel, but it's just not right to turn this into a sandbox fight between lawyers. I won't have it.

That slide comes down. I'm going to say move on.

Sidebar    2850

I'm going to remind the jurors that this is just argument. But I'm telling you, keep doing this, keep attacking the prosecutors' integrity, I'm going to shut you down.

As I told you, you had no time limits at the start. That doesn't mean you're not going to have no time limits. I make the rules; I can change rules about that. Don't push your luck.

Is that satisfactory, sir?

MR. POLEMENI: Yes. Thank you, Judge.

THE COURT: All right. Thank you.

(In open court; sidebar ends.)

THE COURT: Ladies and gentlemen of the jury, I told you at the beginning of the case you had all the evidence of the case. I told you arguments of counsel are just arguments.

Every now and then, lawyers who are working hard -- they've been working hard and you've been working hard. I'm not a skier, as you can tell just looking at my body, but there's an expression they get a little over their skis, you know, or they get a little ahead of themselves. And we just had such a moment on both sides.

And I was admitted to law school, started in law school 52 years ago. When I started law school, the librarian said there's a new technology that you may want to learn. It's called Lexis. Maybe we're not going to just look at paper anymore to decide things. It was a little bit after

Sidebar    2851

John Hancock and John Adams, but not that long after John Hancock and John Adams.

So I know about getting all we'd up when you're trying a case, and when I was a lawyer trying to move up the greasy pole, born in Bed-Sty, raised in Harlem, you can probably imagine that I was perhaps, on occasion, a little inclined to push the envelope, to get a little bit aggressive. Not the way I am now, you know, wearing a nice black prom dress, The judge who says calm down, but I was a little bit, on occasion, a little bit out there. So I get it.

My job now as a judge is to say to the lawyers on both sides, to use a technical legal term, chill out, Be zealous advocates but don't attack the integrity of your adversary. These are good lawyers who tried hard, but every now and then, they get a little close to the line.

New, the particulars about this one was there was this one recording that if you looked at it one way, they were talking about something that was in evidence, you looked at it another way, we talked about something that wasn't in evidence. So I have told the lawyers and they have graciously agreed, because they have no choice, that we're not going to talk about that particular item and we're not going to attack the integrity of the lawyers on the other side because, as you have probably gathered, I didn't put any time limits on the summations of the government or the summations of defense

Summation - Jackson    2852

counsel or on the rebuttal yet.

I didn't put any time limits on them yet. But as you can tell looking at me, I like to eat lunch and I know you like to eat lunch. So I told them at sidebar, chillax. I get it. I used to be in the ring as a fighter, to use an analogy that I know one of you at least knows professionally, and I know when to become a referee, but I also know about low blows. Okay? No more attacks on counsel. They're ethical and they're good.

And now we're going to go back to John Hancock, John Adams, and also to the evidence that is in the case because I'm just a referee but I used to be a player. Okay.

MR. JACKSON: Thank you, Judge.

Now, if we could start at slide -- yes, thank you.

Now, I just want to talk a little bit about this alleged witness tampering from Mr. Sarkinovic, what he actually said.

There's a question posed to him about his interactions with Zorach, and I submit to you this sets the stage for understanding Mr. Sarkinovic's testimony. Okay?

They first started by asking him how does Zorach pay you. And his answer was: In cash, he paid me in cash.

The question is: Did he ever pay you in checks?

"Answer: No, he did not.

Then the question: Did he ever ask you to cash any

**J.A. 948**

Summation - Jackson                2853

checks so that you can get your cash?

And the answer is: Yes, He's given me checks to cash. And then he says that he cashed those to pay the workers and pay himself.

So, ladies and gentlemen, the only thing that I think is important for you to take away from this, first, Mr. Sarkinovic admitted that he was conversing with everyone in English throughout the entire time period this is going on. He understood what was going on in terms of all his communications. And then in terms of this question of getting paid in checks, these were obviously checks made out to him. I mean, there's no difference between someone paying you a check and you going to cash it and anything else when they're paying you a check. He's paying in checks.

Now, this gets us to the next day. This is a man who is sophisticated enough to be running a crew, people are trusting him with, over the years, millions of dollars that they're paying him. And when we get to this question of meeting with the agents, okay, he meets the agents, and then by his own choice, ends up meeting with David Motovich, who recommends this lawyer to him, Mr. Gershfeld.

The important point about this is the government asked him: Did -- this is the government's questions.

Did he talk to you about whether the government was interested in you cooperating with them?

Summation - Jackson                2854

Answer, from Mr. Sarkinovic: No, we did not talk about that.

Question: Did you ask Mr. Gershfeld about whether you could still meet with the government?

Answer: No, I did not ask him that.

That is, I submit to you, ladies and gentlemen, pretty much all he said about it. I mean, this is a sophisticated man. He's a father, he runs construction, he is -- he is asked a question of whether he ever asked his own attorney if he could still meet with the government and he says that he never asked him that. If he wanted to meet with the government, he could have asked his attorney that. He says nothing about David suggesting that he can't go meet with them or shouldn't go meet with them. He says absolutely nothing. Ladies and gentlemen, that's far short of what is required.

This other question is, the question is: Did you ever pay Mr. Gershfeld?

Now, this, I believe, I submit to you, ladies and gentlemen, became a question of who's on first, because they said: Do you know who paid him? He said: Yes, I do. Who? David Motovich. How much did you pay him? $50,000. How do you know that? Because I brought the check and I took it to Arthur.

So this is important. Okay?

Summation - Jackson                2855

He says that David gave him a check from this account that they both used. And David has fully admitted most of the money that goes into his accounts is his but he also described how he did work on actual projects with Mr. Sarkinovic, with his children, who are working with him on the projects. So it was normal for there also to be involved in it money that belonged to Mr. Sarkinovic.

Now, I submit to you, ladies and gentlemen, it's obvious from this case, the evidence of this case, that these weren't two men who were thinking that hard about the details of, like, who's money it was at this time. But all that he said was written on the check was $50,000. That's it. An amount.

And he signed it. He said his signature was on it.

(Continued on next page.)

*Summation - Jackson*                2856

(Summation Continuing.)

MR. JACKSON: Then the question, and this is a very important question, was asked: Do you recall if the recipient was filled out on the check?

And he said there was no name.

If Mr. Motovich was trying to force Mr. Sarkinovic to use Mr. Gershfeld, he could have paid Mr. Gershfeld directly himself. He could have written the check out completely himself. He could have done a number of things.

He handed a check to him, according to Mr. Sarkinovic's memory. And remember this is years ago, but Mr. Sarkinovic remembers this clearly. The check had no recipient, so he could have taken it to any lawyer he wanted. He could have done anything he wanted to do. And when they asked him: What did you do with it? He says that he went and took it to Arthur Gershfeld. He didn't have to do that. Mr. Motovich didn't go with him.

This is a grown man. And I submit to you, ladies and gentlemen, the Government is asking you to accept the idea that this man had no volition, no ability to appreciate something that I think we all could appreciate, that if you don't want to go talk to a lawyer, you don't have to. That if you've got a check for $50,000, you could go talk to someone else. And no one has said anything that Mr. Gershfeld did wrong.

*Summation - Jackson*                    2857

And this is the whole case.

There was this information introduced about Mr. Adamou, which is this other issue here. And Mr. Adamou on the recording that we heard in evidence admitted there were UI's throughout the transcript. We can't hear what's actually being said. Many, many unintelligibles. And I submit to you, ladies and gentlemen, in a call like that, that's just not real proof that you can rely on where the burden is like this.

And on the call he also admitted that throughout the call there were parts that he could not actually explain or remember what was actually being said during critical parts of the conversation.

He also admitted that he did not understand Mr. Motovich to be saying don't be a cooperator. He agreed with me.

He also said that he understood that David was saying repeatedly that he wanted him to understand David was saying: I don't want to be accused of obstruction of justice, so we need to have attorneys present. And it turns out that he was right because Mr. Adamou, unbeknownst to him, was wearing a wire.

Now, they suggested, they suggested that the reason that David Motovich is saying some of these things is because he understands he's being recorded. Ladies and gentlemen, if Mr. Motovich understood he was being recorded, there was a

---

*Summation - Jackson*                    2858

very simple solution that Mr. Motovich could have -- could have engaged in, which is just not to talk to Mr. Adamou. He could have said: No, I'm not gonna meet with you. He only agreed to meet with him because they were friends. You saw the picture of them together with their wives.

And Mr. Adamou admitted that he texted him multiple times telling him that he was looking for advice on what to do, and Mr. Motovich is trying to be a friend to him and answer his questions. He's pressing him. And a lot of it you can't hear because it's unintelligible on the recording, but I submit to you it's very clear that that is what is going on in the recording, and there is nothing like evidence that Mr. Motovich engaged in witness tampering.

We also heard on that, I'll go through that, it's the same point, but we heard this recording that the defense played where Mr. Gutman, you heard, very professional, hasn't been charged with any crimes, came onto the call with David and very professionally said that he was -- wanted to do this ethically. He needed to have Mr. Adamou's lawyers on the phone. And Mr. Adamou admitted that he spoke to the agents and they said: No, we don't want a Jeremy Gutman meeting. We don't want the attorneys present. We want you to go in and try to entrap him into some conversation that would be helpful. Right. And he agreed that that's what happened. That was the conversation they had before. This is not

---

*Summation - Jackson*                    2859

evidence of witness tampering, ladies and gentlemen. Another gaslight.

Some of the witnesses the Government has described as having pled guilty, okay, and they claimed in their opening statement that you would see that it was supported by other evidence. Now, the word corroboration, I submit to you, ladies and gentlemen, you didn't hear yesterday from the Government. You barely heard the word supported. I think it was one time said the -- the word supported was said during the Government's summation because the reality is they leaned very hard on these people, you heard about that. And there's almost no corroboration of anything that matters.

When we asked Mr. Sarkinovic: To be very clear, you've got no records memorializing exactly how much cash you're making?

He's like: No. I don't have it.

And we ask him:

So we have to take your word for it?

He said: Yes.

We asked the same question of Mr. Adamou. You have no recollection as you sit here of what Mr. Motovich said in response to some parts of it, only speculation.

We asked Mr. Russo: We're completely dependent on your memory to figure out which ones of these times when Mr. Motovich helped you out were -- were loans and which ones

---

*Summation - Jackson*                    2860

were something else?

And he said: Yeah, we're completely relying on my memory.

We're going back to 2012, ladies and gentlemen.

We also asked Mr. Torres, the GC at Carver bank, and he agreed, you can't look at a check and figure out when a check was written. And it is not surprising at all, I submit to you, from your common experience, ladies and gentlemen, that these people who wanted float time as they said again and again and again. Would write a date out in the future when they expected to have it, ask Mr. Motovich to hold onto the check which could be days, which could be weeks, and then they would -- and then they would cash it.

Mr. Adamou admitted it. All the witnesses did.

Now, this is number 7. The Government submits that Mr. Motovich was running an illegal money transmitting business because he was cashing checks.

Now, I submit to you, ladies and gentlemen, the evidence in this case has not shown that Mr. Motovich was cashing checks. I think the evidence shows that whenever somebody just wanted a check cashed, he was saying go over to Coney Island Payroll. You heard Mr. Sarkinovic, the cooperator say, he went to check-cashing places all over the city.

Why in the world, if David Motovich, who he dealt

**J.A. 950**

Summation - Jackson                    2861

with all the time, ran a check-cashing business, would Mr. Sarkinovic be going to a random check-cashing places in Staten Island, in Queens, all over the world.

The reason is people were going to David, close friends, not, you know, people off the street, close friends, cherished customers, business partners, when they needed time. That's a very different issue. Okay. And the Government -- the other point to this that I'm just gonna ask you to listen closely to Judge's instructions, because I submit to you, the question in this case isn't even was he check cashing, the question is was he running an unlicensed money transmitting business. And --

THE COURT: Let's not go there.

MR. JACKSON: Thank you, Judge.

THE COURT: I'll tell them what the law is. I know you're jonesing to do it, but let me earn the 20 cents I make compared to all the money you guys are making.

MR. JACKSON: Thank you, Judge.

THE COURT: Just finish up, talk about the evidence, and then we'll have rebuttal and then I'll tell the jury what the law is. That's why they pay me the big bucks.

I promise I'll tell you what the law is. I know these guys from the beginning, just let me do that thing. And they're gonna do it. They don't want to do it, but they're gonna do it.

Summation - Jackson                    2862

Let's go.

MR. JACKSON: Thank you, Judge.

THE COURT: You're welcome.

MR. JACKSON: Okay.

No witness said that David was transferring money from them, we asked them that. Okay.

Let's keep going.

Now, just an important point here, Mr. Cabane admitted that Joe Russo when they asked him why he would go to Mr. Motovich, Mr. Cabane told this even in the Grand Jury, he said Russo stated that his business was up and down and, therefore, there were times that the business account did not have funds in it or the funds had not cleared yet, while other times it was a matter of convenience. And he told you about that. It was just closer to come to David than it was to go across the world. But he said repeatedly that he didn't have the funds. There's nothing in there about tax fraud or anything like that.

What's 6? The idea that he was a check-casher.

We've already talked about this a bit. I'm not going to go through all these, but you heard from Mr. Russo. All these people admitting -- sorry -- all these people admitting that David was holding checks for them, essentially giving them the loans. He said: That's a loan, correct? You can say that. Okay. So, there's really no question about

Summation - Jackson                    2863

that.

Fifth, it's this idea that David Motovich was a financial institution, okay.

I submit to you, ladies and gentlemen, there is no evidence that supports the idea that Mr. Motovich was operating as a financial institution, that he was, essentially, like JP Morgan Chase. Everybody who came into this trial to testify had a real relationship with him. Okay.

Also, no evidence that David willfully failed to file any CTRs, no evidence he knew anything about it. And I'll just point out to you, the form that they put into evidence, this form separates the idea of check-cashers and money-transmitters, but it doesn't matter. The FinCEN regulations, you need to listen to the judge. Not look at that in terms of what you determine, what you need to determine on Count One and Two.

This is number 4.

It's this idea that the Government suggested that David was attempting to exploit people and steal Reginald Garcia's identity.

Now, there are just a few things I want to talk about. And I think it's important what the Government said yesterday in their summation about how -- about what supposedly happened with Reggie Garcia. They said that in June 2016 Josh Markovics took him to what he thought was a

Summation - Jackson                    2864

bank to open up an account to get paid and to get a debit card.

Now, first of all, ladies and gentlemen, the reason I submit that the Government, after we went through this on Mr. Motovich's testimony, which I submit to you was clear, credible, he explained everything, he admitted what he did wrong and what he didn't do, but the reason that they brought this up is because we pointed out in that testimony that there was discussion with Mr. Garcia about him getting a debit card, which is inconsistent with the first idea that I think we heard during the testimony of Mr. Garcia, the questions they would be asking about this idea that he was going to a check-cashing place. Everyone knows you can't get a debit card at a check-cashing place. The whole point is that they give you cash for the check right then.

And the Government said yesterday he didn't know what, you know, that it wasn't a bank. It was Coney Island Payroll and he was opening up an account at Coney Island Payroll Services that David Motovich could use. Now -- and they say he was being taken advantage of and being defrauded. Now, I just want to linger on this for a moment because this is important.

I don't know if any of you ever worked construction. I did. Okay. Construction is not, if you ever worked on it, you know from your own experience, it is not a casual

J.A. 951

*Summation - Jackson*　　　　2865

business. When you're on a construction site, details matter. These are dangerous situations. People can get hurt if you're not carefully paying attention to every detail. People can get killed if you're not carefully paying attention to every detail.

When I worked construction there was a protocol for everything in terms of keeping each other safe. There's a device called a Hilti gun, which is a high-powered nail gun. If you ever worked on a construction site, you'd know it. It's high-powered nail gun that takes a .22 caliber bullet to fire a nail or a bolt through metal, something very hard that you can't use a regular air nail gun for. And on a site, when we were on the site, when somebody was going to use a Hilti gun, every day, every time you were supposed to yell out, "Hilti" before you fired that off. And the reason for that is it's an extremely loud sound that could jar somebody and they could be doing something, fall off of a ladder, be thrown, not be aware that that's coming and you could compromise people's safety. There are protocols all over for safety, for people paying attention to detail.

And he was referred to, Mr. Garcia was referred to as a superintendent. Just to be very clear, he was not a super of a building. He was a superintendent, a manager on serious construction sites. That's what he was talking about. And the idea here is that when he walked into Coney Island

*Summation - Jackson*　　　　2866

Payroll Services, he was so oblivious that he didn't recognize that he was not in a bank.

Now, ladies and gentlemen, by the way, this is just a couple of people. All of these witnesses admitted, David tried to help them repeatedly — Kemal, all of them. All the work that he was doing with Kemal's family, advancing them jobs.

But just to come back to this, first, Mr. Garcia admitted he had no recollection of interaction with David Motovich. This is the person who the identity theft charge is focused on. Okay. He had no interaction. So right there already Mr. Motovich, even though Mr. Garcia said that he has no recollections of any interaction, Mr. Motovich freely admitted because he was telling the truth on the witness stand, he remembered a very brief interaction with him where he came into his company. He was not trying to shape his testimony around what Mr. Garcia said, he was trying to tell the truth. He's like, I met the guy for 30 seconds. I didn't have real interaction with him. He was interacting with Josh Markovics and I didn't have -- know what all their conversations were. But, you know, Mr. Garcia, it was clear whatever was going on was between him and Mr. Markovics.

But if you get to this, this is the Government's exhibit of 301, what the front of Coney Island Payroll looks like. And the idea is they want -- that they're suggesting

*Summation - Jackson*　　　　2867

that Mr. Garcia came into this space, which says Coney Island Payroll all over it. It has all these check cashing signs. No ATMs. No bank tellers. No name of any bank that people have heard of. And he thought that he was in a bank with the water bottles here and the signs about what you're supposed to do in English and Spanish.

I submit to you, ladies and gentlemen, that Mr. Garcia worked as a supervisor in the construction world for years before any of this. It's literally impossible that he doesn't know what a check-cashing place looks like or what a bank looks like. Nobody would walk into this and think that they were at Chase or Carver bank. It didn't look anything like a bank. I'm not saying that Mr. Garcia lied, I don't know what Mr. Garcia remembers accurately. I don't know what is going on, but I know that you can't rely on that testimony because that story is just not accurate.

It's pretty obvious that Mr. Garcia at some point understood by mention of his debit card, by the description of the places that he went to, by the fact that Ms. Hyatt-Sullivan was able to identify him. And, ladies and gentlemen, it wasn't from her looking at a copy of a driver's license years ago that was completely illegible.

At some point Mr. Garcia and Mr. Markovics, it's clear, had interactions with the bank. And that was evident, would have been evident and you have the ability to look at

*Summation - Jackson*　　　　2868

anything in this case, okay, that's in evidence. If you go back and look at the portions of the call that were not played for the jury, okay, he talks about a couple of things that are important.

First, this is the part about the debit card where he talks about the idea that he says here, and I was -- he said: So I picked up the check and I didn't really pay it much attention and they didn't put it in an envelope. I made a joke with them. I said, you know what, I said take my check.

And then he says: He looked at it, though, and it was saying ZKC New York NYC Incorporated.

And Mr. Markovics says: Right.

And he says: Oh, I was like, well, this is the business account that we created.

So just think about that. This is sometime later Mr. Garcia was able to look at one check, and he wasn't talking about some time that he went to a check-cashing place for Reginald Garcia. He knew looking at ZKC this was the business account that they created for some separate business that he was agreeing to engage in with Mr. Markovics, okay. He knew ZKC was that, and he was wondering why this particular check was going out.

And then he says: You know, I'm confused. How come we're getting checks when I thought I was supposed to use

**J.A. 952**

Summation - Jackson                                    2869

it -- money in an account and then I was gonna get a card to pull out my salary.

Now, he already had a salary from the company, and what's clear is he's talking about a separate business that he's setting up with Mr. Markovics where he's going to do additional work setting him up with something, and he agrees to do that and he's aware of that. And Mr. Markovics says something like, that's basically what I'm doing, blah, blah, blah.

And there's another portion of the call where Mr. Markovics says: If it makes you feel uncomfortable, I'll tell him to shut it down.

And he says: Yeah, I'm not comfortable with that. He's like, I didn't know it would be something like that. And on top of that, since you messaged about Moshe — we don't know who Moshe is. And then it says, he says at some point, you know, he's talking about -- he's talking about whatever interaction they're having there. It's clear that they have had this.

Now, I submit to you, ladies and gentlemen, this is Government Exhibit 1059 that they put on the screen yesterday. Okay. You can't even see who he is. And by the way, I submit to you she has thousands of customers. What are the odds that years before she's ever dealing with the Government she looked at and recorded to her memory some identification, and then

Summation - Jackson                                    2870

when they showed her an actual photo of Reginald Garcia that she was able to identify, oh, that's the guy that barely appeared?

Again... now, I'm just gonna submit to you quickly, this is Number 3.

The Government's opening was about the idea that, you know, to hide his fraud he stole the name of this company. Just a couple of points on this, ladies and gentlemen.

The idea that David, that -- you know, that David was attempting to do something wrong to Ago Kolenovic, I submit to you doesn't make sense for one of the reasons that the Reginald Garcia doesn't make sense. Okay. Why in the world would David use Reginald Garcia and steal his identity when Mr. Lovy, when various other people were willing to open up accounts? And why would he use Ago & Alaudin without Mr. Kolenovic's, at least his understanding that Mr. Kolenovic was okay with it, when he could use any company name that he wanted? I mean he could have used any company name.

You heard the bank. The people at the bank don't care. Okay. The reason he did, Mr. Kolenovic admitted he provided the checkbook for Ago & Alaudin granting them authority. Mr. Kolenovic couldn't remember everything. There were things he couldn't remember, but it was clear that there was some sort of understanding between them about after Mr. Kolenovic admitted that he had cheated David out of

Summation - Jackson                                    2871

hundreds of thousands of dollars by doing two floors on a contract and then walking off. And remember, he also said that he told the agents that it was almost completely done. Remember, he said he stopped working on it when it was almost done, but in reality he completed one or two floors, and he admitted that, out of seven floors.

So there was no question, okay, there was a huge amount of money that Ago Kolenovic owed to David Motovich and he was trying to work something out when he's handing him the check. And Mr. Sarkinovic told the agents that he understood that Ago had given the company name. There was no incentive for Mr. Motovich to use a company name that he didn't think that Ago Kolenovic was okay with.

And by the way, there was some reference to, in the Government's summation, to a lawsuit. There's absolutely no evidence in the record that Mr. Kolenovic was ever sued as a result of what was going on in any of this. Okay.

Now, he said that he never sued David Motovich. Okay. He denied that he owed him, but then he said: I just say you don't owe him. It was very confusing. And he admits he never sued him, even though this was going on. It doesn't make any sense.

Second, this idea that David entered into an illegal agreement to impede the work of the IRS. Okay. There has not been one bit of evidence in this case about a lie that was

**J.A. 953**

Summation - Jackson                                    2872

told to an IRS agent. They haven't shown one false document that David created that was sent to the IRS. They can't even show that David under reported his income. And most importantly, you've got to listen to the Judge's instructions because this is a case where what is charged is an agreement, an agreement --

THE COURT: Now, now, let's not talk about the Judge's instructions.

Why don't you go on, sir.

MR. JACKSON: Thank you, Judge.

THE COURT: You're welcome.

MR. JACKSON: There's no evidence that David agreed with anyone, conspired to engage in obstructing the work, impeding the work of the IRS personnel.

If you look at the testimony of Phillip Adamou, he says that he never said to David: My goal was to avoid payroll taxes. They never had that conversation. He's like, he has no recollection of ever having a conversation like that.

He also never had a conversation with David where he said: I want to obstruct the work of IRS agents. He said he never had such a conversation.

Now, this was a point where the Court was asking a question I think is really important, just in terms of both the IRS case and in terms of the bank fraud. We were asking

*Summation - Jackson* 2873

whose money was it that was involved in these accounts. And the Court ended up going back and forth with Special Agent Cabane and, ultimately, the Court said: Whose money was it? Was it David's money or was it somebody else's money?

And Mr. Cabane finally then said: It was David's money. Okay. Now, I submit to you, ladies and gentlemen, that the reason this is such a difficult question for the Government is because the fact that all the money that David spent, all the money he's using in these accounts, is his own money, really undermines almost every aspect of this case. The money laundering charge that you will see in the -- the money laundering charge, there's been no evidence to support the idea of money laundering whatsoever. No evidence that there was any money laundering connected in furtherance of Count One. It's all his own money.

And then if you think about even this idea, in terms of what it means. I mean just think about in terms of both the banks and the IRS. Under part of the idea that they're advancing, okay, if -- if -- if a father, okay, opened up a bank account for his daughter and said, Put your name on it. Okay. I'll put money into it. You put your name on it. And then the daughter ends up withdrawing money. Under the theory that they're talking about, the father could somehow, if he doesn't list himself as a beneficial owner on the account, be accused of engaging in bank fraud.

*Summation - Jackson* 2874

That's not what's going on here, okay. The lie that has to be told, the lie that is told has to be a lie that advances the supposed fraud. The documents that they focus on mostly throughout the case, they had absolutely no relevance to what was going on in terms of the bank. Okay. They had absolutely no relevance to what's going on in the IRS case.

We also talked to Mr. Cabane about the fact that he had no idea what the taxable income situation even was. Okay. He admitted repayment of a loan is not taxable income. We went through the hypothetical where we were talking about what happens if you lose a thousand bucks on a loan this week, you gain a thousand bucks on a loan the next week. He admits there's no taxable income in that situation.

And we only heard about three people who were David's customers and friends. They have no idea how much money he made. They can't tell you anything about the idea that he is holding back on it. All we heard about that we know for sure is that David and his family paid millions and millions of dollars in taxes over the years in question. Same point.

Now, this brings me to the last of the points that I submit to you these are Government -- this is the Government advancing an idea that is in conflict with your common sense, and it's this idea that David committed bank fraud by making false statements that are important to these charges.

*Summation - Jackson* 2875

All of the people who testified said that they don't even look at the memo line when a check comes in. They don't care what's on the memo line. So the idea that some of these checks, there was some important -- putting aside the fact that David's only taken out of it his own money, the idea that the bank was deceived by some of these checks that had a memo line that they didn't agree with makes absolutely no sense or that the Government thinks wasn't a complete and accurate memo line, it makes no sense. There's no lie that's being told to remove money from the bank that David didn't have a right to.

Now, it is also the case, okay, that they talk about the fact that the bank admitted in their agreements that they are authorized -- that the bank is authorized to honor and pay all checks, drafts and orders when so signed or endorsed, without inquiring into the circumstances of issue or disposition of the proceeds.

They answered yes. That's the policy of the bank.

We also talked about, with Ms. Manzione, no matter what, they're allowed to withdraw their money.

The same thing with Ms. Lowis; no matter what, the customer is allowed to withdraw their money.

Now, just a quick point on this because there's this idea that it was completely impossible for anyone to figure out, even though David was identified and was engaging with all the employees at the bank. One of the most important

*Summation - Jackson* 2876

persons there. He was asking to pay for people's lunches out of the accounts. That no one could have identified him.

Why in the world when he could have put any post office box, any home, anywhere, do you really think that anyone, even if it had been a completely fake address, would have cared? Nothing you've heard in the evidence suggests they would have cared.

David repeatedly allowed people who opened these up to put Coney Island Avenue, his own business address, right on these accounts. So anyone who really wanted to look could have easily figured that out. It wouldn't have taken some crack team of investigators to go in and look at that. There was not an attempt to hide.

By the way, I mentioned a little bit earlier the payroll taxes are only 7.65 percent. I believe Agent Cabane testified as to that. So just think about that in terms of the tax issue because what they want you to believe is that payroll tax was the key to all of this. But people, some of these people because they were getting loans from David were paying more than that, more than the payroll tax just to get the loan. It doesn't make any sense.

There were also numerous checks coming out of these accounts directly to David Motovich, directly to his family members, directly to Midwood Lumber, and that's because, as you heard, people were buying actual material. They were

**J.A. 954**

*Summation - Jackson* 2877

engaging in a number of different transactions that related to the Motovich family's business and they were sending it right to them. You would not put your name on checks with money coming back to you if you were attempting to hide that.

Ladies and gentlemen, I am getting ready to wrap up, but there are just a few more things I want to point out.

First of all, you heard during some portion of this case, and I submit to you there were a couple of things in this case that were submitted in an attempt to distract you from what I'm asking you to focus on and what I think the Judge's instructions will ask you to focus on. Okay. One of them were a bunch of these bags. Some of them, you know, were where my client lived, et cetera. There is no evidence whatsoever that any of that was purchased with anything other than David's money, and I think that's something you should take into consideration.

The second thing is they during the cross-examination of David brought out an NYPD ID. I submit there's literally no testimony about it in evidence. Mr. Motovich explained that it was given to him. And I submit to you, you know from your own personal experience, NYPD gives out civilians stuff for all kinds of stuff, community liaisons, other civilian roles people have. They didn't call anyone from NYPD to suggest there was anything inappropriate, and that was their burden and they had complete ability to do

*Summation - Jackson* 2878

so if that's what they wanted to do.

They also pulled out a UBS card that had been lingering in David's apartment forever. Zero evidence that that that was ever used. And I submit to you from your own personal experience, you know people make gag cards. You know people do all kinds of things. He didn't even remember what that's from, but you're going through what's in a guy's apartment from years and years and years. He has friends in different places. He had no reason to ever try to pretend to be a mergers-and-acquisitions employee at UBS. And there's absolutely no testimony in the record about it. It's just something thrown in there to try to suggest something inappropriate. But if they had any use of it, I submit to you you would have heard about it.

Now, one more thing I want you to keep in mind is that the only thing, this idea that the Government has advanced that somehow through a series of different events something that was created might have ended up in front of the IRS through some method, that is not, that is not proof sufficient for what's actually charged when you hear the instructions.

THE COURT: Which you will shortly.

MR. JACKSON: Very shortly. Very shortly.

And the only thing, the only additional thing, there's a couple additional things I'll ask you, ladies and

*Summation - Jackson* 2879

gentlemen.

First of all, you heard a little bit from the Judge throughout the course of the case about reasonable doubt. All there is to that is just questioning yourselves as to whether or not looking at this entire case, do you have any doubt about this entire case and is it --

THE COURT: I will instruct the jury about reasonable doubt, as I have told you throughout.

Could you get to your next point, please?

MR. JACKSON: Ladies and gentlemen, I would just ask you, as you're considering all of this, just think about it from the perspective of what you understand, your own common sense, about all these charges. If you were looking at proof like this, if it was in your life, somebody, your family member who was on trial, is that something -- is this proof that would be of a sufficient character that you would think that this was an appropriate and fair case, that it met the high, the incredibly high burden. I submit to you it's not.

And I would ask you also to remember each and every one of these accounts is important, and please listen closely to the instructions on each and every count. Sometimes I know juries come up with compromised verdicts. Please, your duty is not to compromise because a finding of guilty on any count is just as bad as on all the counts.

I need you to look very closely at each of the

*Summation - Jackson* 2880

counts and hold the Government to their burden on each --

THE COURT: I will instruct the jury about their obligations in the jury charge.

Do you have anything else to say to the jury before we take our 15-minute break and we have the rebuttal?

MR. JACKSON: Yes, Judge. Just one last thing.

David has admitted to making huge mistakes with regard to those workers' comp certificates, with regard to some of the stuff that he tried to help his customers out just to back up the loans that he was giving them. If you look very closely at the evidence of how those relate, there is no proof of the actual things that are charged in this case sufficient to meet the Government's burden. So I ask you to look very seriously at that and understand that.

The founders of this country fought so that we would not be in a situation where a person could simply have pointed at them, some mistake they made, and that we would skip past everything that needs to be looked at in terms of the detail of what is actually required, the actual burden, put on the Government to do something as serious as convicting a man of very serious federal felonies.

So I'm just asking you to take that into consideration and please, please approach this with the same seriousness that we've seen you here in court have every single day.

J.A. 955

Summation - Jackson                    2881

We deeply, deeply appreciate your service. My client and his family deeply, deeply appreciate your service. I appreciate your service. I know how hard this has been.

And I hope if you ever see me again, I haven't been able to talk to you, you understand that's because I wasn't trying to be rude, I was trying to be like my dog who can't speak, but has enormous, I think, respect for me, I think.

Please approach your jury deliberations with that same seriousness we've seen every day. We deeply appreciate it.

And with that, thank you.

And thank you, Judge.

THE COURT: Ladies and gentlemen of the jury, we are now going to have our comfort, 15-minute comfort break. We will then have summations from the Government, which will also be, as I've said repeatedly, just argument. Then I will give you the law, and then you will make the decision.

So, thank you. Fifteen minutes. See you back at 11:30, thereabouts. Thank you.

(Jury exits.)

THE COURT: The jury has left the courtroom. You may be seated, ladies and gentlemen.

Do we have anything we need to address in the absence of the jury before we take our 15-minute comfort break and return for the rebuttal summation of Government?

Summation - Jackson                    2882

Anything from the Government?

MR. POLEMENI: Yes, Your Honor.

There were an incredible number of misstatements of law in that closing, and I understand Your Honor will give, obviously, the instructions.

I would ask, though, for two supplemental instructions to be added to your charge. They deal with the bank fraud counts. It is clear that Mr. Jackson is trying to suggest to the jury that because a bank employee was aware of the fraud and participated in the fraud, there was no bank fraud. He is, basically, saying that Ms. Sullivan-Hyatt is the bank, which she is not, and he -- the defense said on multiple occasions, I believe, that they were not going to make that argument.

I would also ask that the Court instruct the jury that negligence of a victim is not a defense to bank fraud or any fraud, for that matter. Mr. Jackson clearly is suggesting to the jury, in hope they somehow believe, that the fact that the banks didn't inquire and could have simply called and picked up the phone, but didn't, and, therefore, Mr. Motovich can't be guilty of bank fraud is just incorrect as a matter of law. And that is another thing that defense counsel told this Court that they would not be arguing.

And so, for those reasons, Judge, there's many misstatements of law, but we would certainly ask for those two

Summation - Jackson                    2883

instructions to be added to the charge.

THE COURT: All right. I'll tell you what I am going to direct you to do, counsel for the Government.

I want you to submit in writing on notice to the other side your proposed additional jury instructions. When the jury comes back at 11:30, you will give your rebuttal summation, and then I will go into the actual jury charge and will consider adding the supplemental jury instruction that you have requested.

I want you to put it in writing on notice to the other side.

MR. POLEMENI: Thank you.

THE COURT: And I want the other side during this period of time to indicate their response to the proposed supplemental instruction.

I don't want to hear from them now about it. I don't want to get into a back-and-forth about the proposed instruction without having the written proposed supplemental instructions before me and before the other side.

After you give your rebuttal, we will take another brief break, and then I will rule with respect to the proposed supplemental instruction.

MR. POLEMENI: Thank you, Judge.

THE COURT: Anything else from the Government?

MR. POLEMENI: No, Your Honor.

Summation - Jackson                    2884

THE COURT: All right.

Anything else from defense counsel?

MR. JACKSON: No, Judge.

THE COURT: Okay. Thank you. We'll take our 15-minute break.

MR. JACKSON: Thank you.

THE COURTROOM DEPUTY: All rise.

(Judge Kuntz exited the courtroom.)

(Continued on the following page.)

J.A. 956

Rebuttal - Polemeni                    2885

(Continuing.)

THE COURT:  Do we have any issues to address before we bring the jury back in for the Government's rebuttal summation?

MR. POLEMENI:  No, Your Honor.

THE COURT:  Defense?

MR. JACKSON:  No, Judge.

THE COURT:  Okay.  Let's get the jury in.

(Jury enters.)

THE COURT:  Welcome back, ladies and gentlemen of the jury.  Please be seated.  I appreciate your promptness. As we promised you, we are now going to have rebuttal summation from the Government.  Spoiler alert, it's still just argument.  After they finish their rebuttal summation we will have a brief fifteen-minute comfort break and then I will give you the thing they have been Jones'ing to give you all along: The law.  Then you will have the case together with your lunch.  That's the schedule.

We're going to have rebuttal summation, just argument, and then a brief comfort break and then I will give you the law and then you will decide the case and we will thank you in advance for your wise decision and then you will get back to the real life you were living before we got you involved in the interesting, but not exactly Judge Judy, world of real cases.

Rebuttal - Polemeni                    2886

With that, I thank you in advance for your time and attention.  We'll hear from the Government in rebuttal.

MR. POLEMENI:  Thank you, Your Honor.

Good afternoon.  I've given quite a few of these rebuttal summations in my career and it's always difficult to predict or anticipate what defense counsel is going to argue in their summation.  I will say, this is the first time that I've had -- I've spent ten to fifteen minutes learning all about the founding fathers.  I think David Motovich, though, missed the most important lesson of our most revered founding father, which is George Washington's statement, "I cannot tell a lie."  David Motovich for years told lie after lie after lie.  And I submit to you that he lied to you straight in the face when he got on that stand two days ago and he lied and he lied and he lied.

Mr. Jackson, he implored you to listen very carefully and very closely to Judge Kuntz's jury charge when he tells you what the law is.  I'm asking you to do the same thing and I think what you will find is that when you hear what Judge Kuntz has to say about the law, it doesn't match up with what Mr. Jackson told you about the law.  Listen very closely to what Judge Kuntz tells you about the law.

The evidence in this case is overwhelming.  You heard from several cooperating witnesses.  They told you that they committed crimes with David Motovich.  You heard from

Rebuttal - Polemeni                    2887

innocent victims, Marcy Vukel, Ago Kolenovic.  They told you -- Reggie Garcia.  They told you of their interactions with David Motovich and how he victimized them.  Ask yourself, were they lying?  Were all of these people who don't know each other, have never met, were they all lying about this?  I submit to you that the answer is no and that their testimony was corroborated by e-mail messages, text messages, the fraudulent insurance certificates.

Time and time again they got on that stand and they told you of their interactions with David Motovich.  The defense has tried to distract you from what this case is about.  This case is not about insurance fraud.  David Motovich is not charged with insurance fraud and that's why when he got on the stand and I asked him, do you have any regrets, Mr. Motovich; he said, yeah, I regret -- It took him a while to think about what he regrets, but he regrets creating fraudulent insurance certificates.  And I asked him, is that it, and he said, yeah, that's it.

I submit to you he doesn't even regret doing that. But he said it because that's -- he's not charged with creating fake insurance certificates.  But you know that those certificates were critical, were crucial, for him to carry out his illegal schemes.  Now you know that.

Let's talk about loans for a moment.  And this is another distraction.  It is look over here, ladies and

Rebuttal - Polemeni                    2888

gentlemen.  The defense wants you to look over here and not focus on the evidence.  They called these hundreds, if not thousands, of times that Joe Russo, Phillip Adamou, Roman Kretsula and others, you saw that there were others, walked into David Motovich's second floor office, handed him a check, for 15, 20, 40,000, $50,000 and then walked out of his office that same day with cash minus his 15 percent fee, his ten percent fee, his 6 percent fee.

That's not a loan.  When the witnesses were asked is that a loan, they laughed, because it's not a loan.

When I asked Mr. Motovich, was it a loan, he said, yeah, it was a loan.  I asked him, well, how would you define it.  I don't know -- he's trying to think of something on the stand; he's trying to come up with something -- a payday loan. What's a payday loan, Mr. Motovich; I don't know it's just something I came up with.

He's coming up with things.  The defense is coming up with things right now.  They're still trying to come up with an argument to defend his actions.  Loan didn't work, right?  That's absurd.  So then you heard he started fronting money.  They tried to -- it went from a loan to fronting money.  It wasn't fronting money either.  He was exchanging cash for checks.  He was transferring cash in exchange for checks.  It's that simple.

You heard a lot about Mr. Motovich and his family

Rebuttal - Polemeni                    2889

paying millions and millions of dollars in taxes. Defense counsel came up here and he told you that again, just now. There's no evidence of any of that. To the contrary. We went through Mr. Motovich's tax returns from 2012 through 2019. He didn't pay millions and millions of dollars in taxes. Each year he got a refund.

Well, it's my -- it's Midwood Lumber. My company pays taxes. He doesn't own Midwood Lumber. He couldn't even acknowledge that he managed Midwood Lumber. He kept saying, I was the controller, the controller of Midwood Lumber. Well, he paid millions of dollars in payroll taxes for his other companies. Okay, where is the evidence of it?

The Government bears the burden of establishing the defendant's guilt beyond a reasonable doubt at all times, but that doesn't mean when the defense makes an argument that you just accept it. You get to evaluate it. You get to assess it. You get to say where is the evidence backing up this argument. There's no evidence whatsoever that David Motovich or any of his companies paid millions of dollars of payroll taxes. To the contrary; you saw the off-the-book payroll sheet where his employees are being paid in cash.

Now, the argument was, first, I don't know anything about this. I mean, someone else must have done it, although he's the controller, the person responsible for paying payroll taxes, but he didn't know anything about it. It must have

Rebuttal - Polemeni                    2890

been Marina Coonan who prepared this. And then it's, well, it's 2021. It's the middle of the pandemic. We had to incentivize people to come work at Midwood Lumber. So we had to pay them in cash. You know that's not true.

You know he's been paying his employees off the books in cash and not paying payroll taxes for years, just like his check cashing customers do. That's the reason why they go to him. For him to tell you otherwise is absurd.

Well, it's all legitimate work. Don't you understand, ladies and gentlemen? SGS Construction, ZKC Construction, CNBC Construction, Midwood Building. All of these companies were providing legitimate contracting work. Where is the evidence of that? Not one person got up on the stand and told you that. Not one person got on the stand and said David Motovich, great contractor. He and his employees at ZKC, they did a great job constructing a commercial building of mine. I paid them $2 million to do it; a fantastic contractor. Not one person. Because it's not the truth.

Instead, what you got was, remember, the e-mails that were shown with some photos of a stove. There was a window. There were from Kemal's daughter. First of all, did look at those e-mails? They weren't even real-looking e-mails. The subject line was above the to line. You have no idea where they came from.

Rebuttal - Polemeni                    2891

And instead of a contractor, you know who got on that stand, and I know his testimony was stricken, but David Motovich's doorman. He's a big time contractor. Where are all the contractors telling you about all of this work he did? None of those companies did any legitimate work. They were used solely for David Motovich's illegal check cashing business and that's the evidence before you.

Let's talk about Ago Kolenovic for a minute. Ago Kolenovic got on that stand and he told you about the job Dunbar Estates. David told him if you do the job you have to buy the doors from me and he started -- Algo started doing construction on the doors and that was in March, remember, of 2013, he told you and he worked for a few months and then in August of '13 David Motovich kicked him off the site.

There's no dispute about that timing, March to August of 2013. There's no dispute. And then David Motovich got on that stand and he told you, oh, I didn't kick him off. He just left. He got up and left. Ago Kolenovic got up and left. He owed me $250,000. So the arrangement we came up with was that I would take his company's name and he would give me checks and that's how he would pay me back the $250,000 he owed me.

Okay. There's a lot of problems, though, with that story. First, it doesn't make any sense. No one in their right mind would actually do that. But, second, David

Rebuttal - Polemeni                    2892

Motovich had opened up Ago & Alaudin Contracting Corp. long before August of 2013 when this blowup supposedly happened. He had stolen Ago Kolenovic's name well before that. You saw the documents. He was creating fake invoices in Ago Kolenovic's name in Ago & Alaudin General Construction Corp. in April of 2013, well before the blowup, and then backdating those invoices to September of 2012.

What Mr. Motovich told you is simply not the truth. He stole the company. And it lasted for years. He just kept on depositing money into the account over and over, millions of dollars. At some point you think maybe Ago Kolenovic could have asked, can we stop now, if it were the truth. I think I've paid you back now. Oh, well, why do we need these insurance certificates in Ago & Alaudin's name. That's the point. See, when Ago Kolenovic agreed to do the job in Monticello, he had to give David Motovich a real insurance certificate, in Algo & Alladin's General Contracting Corp.'s name.

You heard both Ago and Marcy Vukel tell you that. They said that's the one that Marcy Vukel prepares for Ago Kolenovic. And, so, David Motovich knew that, okay, now I have a name. I have a Vukel Insurance Group policy. I can change the numbers around a little. It looks legitimate enough so if anyone asks, an auditor from the Worker's Compensation board, I give these to my check cashing

J.A. 958

Rebuttal - Polemeni                    2893

customers. If they get asked it looks legitimate. No one is really going to check.

That's the point of the insurance certificate. That's why they used Ago & Alaudin General Contracting Corp. That's why he stole Ago's company's name.

Let's talk about Reggie Garcia. Just make sure that we have the timeline right. Reggie Garcia told you that he went to Coney Island Payroll Services in June of 2016 and he went there with Motovich's accomplice, coconspirator, Joshua Markovics, his business partner, and Markovics told Reggie, hey, I need you to open up a business. We're going to open up an account. I'm going to deposit your wages into that account. I'm going to give you a debit card and you can withdraw your wages from the account. And like Kemal Sarkinovic and Robert Willoughby, Reggie Garcia was beholden. He needed this job. So he said, sure, no problem boss. And the notion that Reggie Garcia is a sophisticated construction manager; Reggie Garcia is a very nice man and I submit to you was honest on that stand and was backed up by all the documents that you saw.

But Reggie Garcia told you his job was to get coffee for the workers. I asked him, did you do any construction work at any of the sites. He said, no, not really. Every once in a while I did a couple of things. He's not managing the construction sites. He's bringing checks, he's delivering

Rebuttal - Polemeni                    2894

checks and he's bringing coffee. That's what he told you.

And so when he was brought to Coney Island Payroll Services, I think it's probably reasonable for Reggie Garcia to believe, oh, I'm going to a payroll place because I'm going to get my wages deposited into an account and that's how I'm going to be paid. That's what it says, Coney Island Payroll Services. What Reggie Garcia didn't know was that months before, he, Mr. Motovich, had opened up a bank account at Carver Bank in Reggie's name.

And you would have thought during this conversation that supposedly took place at Midwood Lumber between Mr. Motovich and Reggie where they met for an hour waiting for Dannette Sullivan-Hyatt having a conversation -- by the way, Reggie Garcia said he never met Mr. Motovich. You would have thought that during this conversation Mr. Motovich might have said more than just hi, which is what he told you he said. He said hi. You would have thought, hey, Reggie, you know I'm really glad you let me open up that business -- that bank account at Carver Bank because I just deposited $5 million into it. You would have thought that that would have been the conversation. But no, he said hi.

And then after Reggie found out fortuitously, it just happened to be a check. It wasn't another business as Mr. Jackson suggested. It was the name of the company that Markovics had told him would be the company into which his

Rebuttal - Polemeni                    2895

wages were being deposited and it hadn't happened at that point. It had been a year. When he saw the check for $7,000 to ZKC he said, what is going on and he went to Markovics and said, stop, please. You're using my name. You didn't tell me this is going on. You're using my Social Security number. You didn't tell me what's going on. Stop.

And his business partner said, sure, no problem. Sure. I understand why this would make you upset. I understand why it would make you anxious for your name and social security number to be associated with this account. I'll stop. I promise. I'll tell him. I'll tell him. I'll tell David Motovich to stop. It must be the case that, just like Marina Coonan didn't tell David Motovich that Marcy Vukel had found out that her signature was forged, I guess Joshua Markovics just didn't pick up the phone and tell David Motovich, hey, Reggie Garcia is complaining.

I'm guess David Motovich just doesn't know anything about these things. And, instead, they didn't close the account. David Motovich just deposited another $3 million into it. He has no regrets. Do you know what he regrets; getting caught. He even told you. I asked him, would you -- if Marcy Vukel -- if you knew that Marcy Vukel had complained that her signature was forged. He couldn't even tell you that he would have stopped. He was like, I don't know, maybe.

Rebuttal - Polemeni                    2896

And this notion that -- because so much time was spent on Dannette Sullivan-Hyatt and whether she knew Reggie Garcia and whether she met him. It's a complete waste of time. It doesn't matter. What matters is what he did. Not what Dannett Sullivan-Hyatt did. The same thing Boris Motovich. His father. You spent so much time hearing about Boris Motovich and how much good he's done; how he emigrated from the Ukraine and tried to give his family a better life. That's great. That's fantastic. He's built up Midwood Lumber. Fantastic. I don't know if it's true, but fantastic if it is.

But Boris Motovich isn't on trial and even if he were on trial, it still wouldn't matter about his background. But David Motovich is on trial not Boris and David Motovich very clearly said, I'm not my father. This nonsense about how Joe Russo said it was convenient for him to go to David Motovich as opposed to other check cashers and Special Agent Cabane said that in grand jury too. Yeah, it's convenient. The convenience is not being able to go to David Motovich and save some time driving instead of going to another check casher.

The convenience is that David Motovich gives you cash with no questions asked. He doesn't care what you're doing -- I mean, with the money. He knows what you're doing with it. He knows you're not paying the employees -- he knows

J.A. 959

Rebuttal - Polemeni                    2897

you're paying your employees in cash and not reporting the wages, but at the end of the day he doesn't really care. All he cares about is his fee.

So, when Joe Russo walks in with a check for $40,000 and David Motovich makes $4,000 on that deal, a deal that takes five to ten seconds, David Motovich doesn't care what you're doing with the money when you walk out the door. And this notion that, well, it was convenient for the customers. Just think about that for a moment. They're paying David Motovich, in Joe Russo's case, $4,000. They could have gone across the street to Coney Island Payroll Services and paid -- let's give David Motovich the benefit of the doubt again, 3 percent. I don't know what that math is, $1,200?

So, Joe Russo was willing to pay an additional $2,800 so that he didn't have to go across the street to Coney Island Payroll Services and he did that every week for seven years? It's absurd.

Let's talk about Arthur Gershfeld and what happened there. You know that David Motovich gave Arthur Gershfeld that $50,000. It's his money; except, of course, when he doesn't want it to be. All of a sudden after eight years on Kemal Sarkinovic's bank account, that Kemal Sarkinovic opened for David Motovich, all of a sudden after telling you the money in all of these accounts is his, well, all of a sudden it's really Kemal Sarkinovic's money. He can do whatever he

Rebuttal - Polemeni                    2898

wants with the money David Motovich paid Arthur Gershfeld $50,000 to keep Kemal Sarkinovic quiet. It's clear as day. David Motovich says that in Government Exhibit 600 on that recording. Listen to it. He says it. It's clear. I paid a lot of attorney fees so a fucking cooperator didn't cooperate, or something along those lines. I'm paraphrasing.

He's talking about Kemal Sarkinovic. And you know that he and Gershfeld had conversations about other attorneys; Christopher Channing and that was to make sure that Kemal Sarkinovic's accountant was also represented. This notion that Kemal Sarkinovic is a big boy. He can do whatever he wants. Not really, because Kemal Sarkinovic is, again, beholden to David. He relies on him. He relies on him for his work. He's not a big contractor. He works with his hands. He's a laborer. He makes 30 to $60,000 a year. Any suggestion otherwise, there's no evidence of it.

Defense counsel says the Government didn't play the entire recording. There's a lot of things on that recording that -- you just listen to it, ladies and gentlemen of the jury, a lot of things that the Government didn't play. You know who could have played the recording if they wanted you to listen to those parts? Defense counsel. It was right here. They could have played it any time they wanted for you to listen to those really important portions of the recording, those portions where it's unintelligible.

Rebuttal - Polemeni                    2899

It's unintelligible, you know why, because David Motovich had his sister take Philip Adamou's cellphone before he went into the meeting. He told you that and he's whispering because he knows that maybe or he thinks that maybe Philip might be recording him. He doesn't bring him into his office where Phil has been going for years every week. No. He brings him to the little closet, the little office next door and they have their conversation.

What do you -- what does defense counsel think is going to be on this recording, the unintelligible part? That must be where David Motovich says, I'm just kidding, go and cooperate, it's no big deal. That's maybe what he's saying. That part is the unintelligible part. There's nothing on that recording -- there's nothing more on that recording that you needed to hear. You heard him say -- David Motovich, you heard him say, you don't want to be a fucking rat because if you are it's going to be a problem for you Philip. And then defense counsel made a big deal about, well, the Government didn't want to play that second recording with Jeremy Gutman.

Jeremy Gutman, you can tell from that recording, did not want to be a part of that conversation. He was very careful with his words. You know who wasn't careful with his words? David Motovich. He chimed in on two occasions. The first time within thirty seconds of talking to each other. It was when the first time Philip Adamou talked about going in

Rebuttal - Polemeni                    2900

and meeting with the U.S. Attorney's Office and he immediately chimed in, you don't want to do that Philip. You'll be making a fucking mistake. You want to sleep better at night? The same thing he had said earlier in the day, you want to sleep better. He couldn't help himself even in front of his attorney, he couldn't help but threaten Philip and you hear his attorney say, David -- If you don't hear you but you know that's what happened. You know that they were in that office together and Jeremy Gutman said, stop.

This whole notion that no one was harmed here, there's no victims, David Motovich didn't steel any money from anyone, the banks weren't harmed. Listen to what Judge Kuntz tells you about the law. I submit to you that that doesn't matter. Listen closely to what Judge Kuntz tells you about the law. And people were harmed here. Marcy Vukel was harmed. Ago Kolenovic was harmed. Reggie Garcia was harmed. The banks were harmed. Maybe they didn't lose any money, but that doesn't matter for the charges. Listen to the Judge's instructions. Don't be distracted by the noise that the defense counsel is trying to cloud this case with. That's not what this case is about.

Mr. Jackson suggested that this -- if you find my client guilty, you're just going to be opening the door, this is no different than if a father walks into a bank and opens up an account in the daughter's name, but the father really

**J.A. 960**

Rebuttal - Polemeni                    2901

transacts to the account. Are you kidding me? If the father was running a multimillion, decades long, illegal check cashing operation and then used his daughter's name to hide that fact, that would be fraud. That's what happened here. It's not when a father deposits $500 into his daughter's savings account and makes occasional withdrawals from the account. It's absurd. It's an absurd analogy. Don't fall for it.

Mr. Jackson suggested that you don't see them writing to each other about, hey, let's defraud the IRS. You don't see that in a text message or e-mail. Yeah, listen to the Judge's instructions. He'll explain why that's not necessary. Look, the evidence in the case is overwhelming. David Motovich is guilty beyond in a reasonable doubt. Hold him accountable for the serious crimes that he's committed. Hold him accountable for his lies, hold him accountable for causing harm to victims and convict him on all counts.

THE COURT: Ladies and gentlemen of the jury. It is now 12:30. Why don't we take our fifteen-minute comfort break. When you come back, I will give you the law and, more importantly, after that you will have your lunch because after I give you the law you will be able to begin deliberating. Fifteen minutes. I will not leave this space. We will start in fifteen minutes. Thank you.

THE COURTROOM DEPUTY: All rise.

Proceedings                    2902

(Jury exits.)

THE COURT: The jury has left the courtroom. Ladies and gentlemen, you may be seated.

Do we have any issues to address during the 15-minute break before the jurors come back? For the Government?

MR. GRUBIN: I wanted to let you know I e-mailed the proposed two instructions that Mr. Polemeni had requested in the last break both to defense counsel and also to your court deputy.

THE COURT: Yes, I've seen them.

Any response to the requested supplemental instructions Mr. Jackson?

MR. JACKSON: Yes, thank you, Judge. A few things. First, we did not argue. We disagree with the assertion of the prosecution that we argued what they claim that we argued. Every one of the arguments that we made were directed towards -- and the Court's instruction already properly instructed the jury on the requirement of a finding of either a scheme to defraud the bank -- the requirement of a finding of a scheme to defraud the bank concerning a material matter.

Now, we did not instruct the jury on that, but we only made appropriate arguments that are targeted towards the materiality determination that the Court has very adequately already included in the instruction. We submit, Judge, that

Proceedings                    2903

included an instruction on negligence in this context which has not been an argument that's been made. We made no arguments about negligence. It has the potential to seriously confuse the jury about the interplay with the materiality charge which the Court has carefully crafted and which is already quite adequate.

The Government was able to make, in their rebuttal summation, every argument that they wanted to make, that they're entitled to make in response in light of the Court's instructions that we already went through. So, Your Honor, we submit that those requested additional instructions are both unnecessary and improper.

THE COURT: Any response to what you just heard?

MR. POLEMENI: Yes, Judge. Mr. Jackson clearly suggested to the jury, he made a clear suggestion to the jury and what they might believe is that because Dannett Sullivan-Hyatt was in on this bank fraud scheme, the banks could not possibly have been harmed or could not possibly be the subject of fraud. That was the clear implication from his argument.

And, second, it was a clear implication from his argument, and he made the same argument with the IRS, Judge, that because the banks didn't do their due diligence, they could have tracked Mr. Motovich down if only someone had gone to 1100 Coney Island Avenue and because they didn't do it, how

Proceedings                    2904

could he be held accountable for committing bank fraud. That's the clear implication. They said they wouldn't do it. They told Your Honor they wouldn't do it and they did it.

THE COURT: What is your response, Mr. Jackson?

MR. JACKSON: That's not what we argued, Your Honor. They introduced into the case a factual question of whether or not based on the information they specifically asked the agents whether or not there is anything they could have done in order to try to track down Mr. Motovich. We responded in a factual argument, not a legal argument, that there was information that was within -- and they also asked materiality questions that were targeted to the bank witnesses about what information they had.

We were only making the appropriate factual argument that there was information in the Government exhibits that were submitted to the -- to the Court that were admitted in evidence in this case that didn't -- that could have allowed the determinations that the Government has charged Mr. Motovich prevented the IRS from making.

The specific charge is that he impeded the IRS from going forward in this client conspiracy with whatever it was and so we're pointing out only factually that to the contrary; that there was no evidence of him impeding and we pointed out the information. It's in the record that identified that there was plenty of information that would have allowed

**J.A. 961**

Proceedings                    2905

exactly what they are claiming that they impeded.

So we believe, Your Honor, that they're engaging in what is functionally burden shifting as well and, so, we don't believe any of this is necessary. We think the Court's instruction as already crafted adequately addresses all of these issues.

THE COURT: What is your response?

MR. POLEMENI: Using the term "burden shifting" doesn't make it so, Judge. I have no other response other than to say, Judge, it is clear what the argument is and it's clear the impression that Mr. Jackson was trying to leave with the jury. It wasn't just a factual allegation. It was him suggesting to the jury that because Dannett Sullivan-Hyatt was in on this bank fraud, that the bank cannot be a victim and because the bank didn't go and investigate, that the bank can't be a victim because it was negligent. And that is the clear implication that he was attempting for the jury to -- to believe or infer. I can't think of the word. But that's the argument, Judge.

THE COURT: What is your response?

MR. JACKSON: Your Honor, there is nowhere in the transcript where I said anything like negligence on the part of the bank or anything like that. I only made reference to the information that was available as it related to the materiality concerns and the awareness of the bank of the

Proceedings                    2906

information that the Government put into the record.

It goes -- all of this information goes directly to Mr. Motovich's intent and to his knowledge in terms of his attempt, allegedly, to defraud the bank. And, so, this is very standard information and I'm not even sure what aspect -- what specifically I said that Mr. Polemeni is even talking about. But, at bottom, I think the Court very adequately addressed these issues. The Government had an opportunity on rebuttal to address each and every one of them and to make whatever arguments they wanted to make about how this did not show materiality and this is an attempt, I think, to cloud the issues and create confusion about whether the negligent standard is what the jury should be looking at or whether they should be looking at materiality. It's going to confuse the jury on what is a very well-crafted charge on a series of incredibly complicated matters already, 147 pages.

I don't understand why the Government would want to add additional complexity and confusion to what is already going to be a difficult thing for the jurors to wrap their minds around, as well-crafted as the charge currently is. So, Your Honor, for those reasons we do oppose.

THE COURT: What is your response?

MR. POLEMENI: It's only difficult, Your Honor, because Mr. Jackson has played it so. I disagree. This is a very simple case, but when Mr. Jackson continues to misstate

Proceedings                    2907

the law, then I think the Government is entitled to the correct law. This is not something that's -- these instructions are not something that are so out of left field. They're standard instructions that are given in many fraud cases. The whole, you can't blame the victim defense; the whole, you can't say that the bank was negligent or the fraud victim was negligent. It's not a defense. These are actually pretty standard instructions, Your Honor.

And they're not included, I believe, because Mr. Jackson said he would not be arguing that. He told this court very clearly, in no uncertain terms. In our motions in limine, Judge, we moved because we know this was going to be an issue and Mr. Jackson said we do not intend to make these arguments and, as a result, we didn't put them in our proposed jury instructions.

Judge, I don't see why Mr. Jackson is so hesitant, so vehemently is objecting to these standard instructions if it's not a big deal.

(Continued on the following page.)

2908

THE COURT: What is your response?

MR. JACKSON: I still have no idea, Judge, what he is claiming I said that implicates that. I've been back through the transcript. I did not make any instruction on the law on this issue and I did not make any argument that is in conflict, that suggested negligence on the part of the bank.

If he's making that determination on -- whatever analysis he's making that determination, I respectfully submit, Judge, he should identify for the Court specifically what I said that indicates that I was arguing negligence. It was only materiality and the issues that relate to Mr. Motovich's intent and knowledge as it relates to all of the crimes that are at issue here.

THE COURT: In light of what I've heard, the objection to the supplemental instructions is overruled. You opened the door, Mr. Jackson, by your discussion and I warned you before to stay away from that danger zone, nevertheless, you created the issue and to avoid confusing the jury, I'm going to issue the supplemental instructions which are well supported by Second Circuit authority. Your objection to my ruling is, as always, preserved as a matter of law.

Now, we're going to get the jury back in in about 5 to 10 minutes to receive the jury charge and instructions and then we will break for our lunch and they will break for their lunch with the instructions at approximately 2 o'clock.

J.A. 962

2909

So if you want to have a comfort break now because the instructions, obviously, if everyone agrees, are lengthy, you can do that, but we'll get the jury back in here in about five minutes. All right?

MR. POLEMENI: Thank you, Your Honor.

THE COURT: Thank you.

MR. JACKSON: Thanks, Judge.

(Recess taken.)

(In open court; outside the presence of the jury.)

THE COURT: Back on the record briefly in the absence of the jurors, in light the Court's ruling with respect to the supplemental charge, we have added the supplemental charge item and we have now put on ECF the revised jury charge which is now captioned Court Exhibit 1AA to reflect the fact, nothing to do with Alcoholics Anonymous, but reflects the fact that this is the iteration that includes the supplemental charges that were requested. No other changes have been made.

So you can pull that off if you want to follow along the uploaded version which is now on ECF as Court Exhibit 1AA.

MR. POLEMENI: Thank you, Judge.

MR. JACKSON: Your Honor?

THE COURT: Yes.

MR. JACKSON: Just asking.

THE COURT: And this is the version that will go in

2910

to the jury room with the jurors. They will have one hard copy of the jury charge because as my late colleague -- late because he now makes a zillions of dollars in private practice, not late as in dead -- colleague John Gleeson said if you don't give the jury the charge, the first note you get is may we have a copy of the charge. So now it's appropriate especially for the Court to do so and I will do so. However, spoiler alert, I don't tell them that until I've finished delivering it because, otherwise, they'll zone out the way some people when they know that the homilist is going to give a copy of the homily at the end. I've heard.

MR. JACKSON: Judge, just curious, am I correct the Court sends back a copy of the charge but not all the exhibits?

THE COURT: That is correct. The way we proceed is the jurors will be given one copy of the jury charge. They will also be given the jury verdict reached sheet, obviously, Court Exhibit 2A, and the verdict sheet, Court Exhibit 3A, to take back with them.

In terms of anything else that goes in, they will have to send a note requesting whatever it is, if anything, they wish to see. I will then mark that as the next Court Exhibit, make copies for counsel, call you back into this space, I will read their notes verbatim, and I will give you copies of the notes verbatim. I will ask counsel how you wish

2911

to proceed.

So, for example, if they say they want the testimony of X, I will ask counsel if they agree that I should send in the testimony of X. That's the easy part. Then I will say all right, what are the pages, and you will have to agree on what the pages are that ought to be sent to the jury.

We do that old school hard copy so you'll have to print them out and if there's a dispute about whether it's pages 1 through 12 or pages 1 through 15 and you can't agree, I will resolve the dispute and send back either pages 1 through 12 or 1 through 15, together with a covering order that explains you received the note, I talked to counsel and this is what the court has ordered to go back to the jury.

So we may get no notes, we may get a hundred notes, but in response to every note, I make a copy of it, give you copies of it, I read it out loud into the record, and then I ask counsel what they believe is responsive and sometimes there's immediate agreement as to the pages and lines. Other times, there's a dispute as to what the jury is, quote, unquote, really asking for and I will resolve any disputes and make the decision and to the extent anyone disagrees with what I send back, obviously, your objections are preserved for the record.

Yes?

MR. JACKSON: Your Honor, I deeply apologize, but I

2912

Charge of the Court

did just realize there's one instruction that is implicated by everything we talked about that should probably be given which is simply that the recordings that were played are evidence and not the transcripts.

THE COURT: I gave that instruction at least five times.

MR. JACKSON: That's great, Judge.

THE COURT: At least five times. I said the evidence is the recording. The transcript is just an aid should you wish to utilize it.

MR. JACKSON: That's fine, Judge.

THE COURT: Yes. Anything else from either side while we wait?

MR. POLEMENI: No, Your Honor.

MR. JACKSON: No, Judge.

THE COURT: All right. Let's see if we're ready to go with the jury.

(Pause.)

THE CLERK: All rise.

(Jury enters.)

THE COURT: Welcome back, ladies and gentlemen of the jury. Please be seated. Again, I thank you for your patience and your attention to detail. You're now about to get the law. Thank you for your patience and your attention.

Ladies and gentlemen of the jury, you are now about

Charge of the Court 2913

to enter your final duty in this case which is to decide the factual issues in this case. Before you do that, I will instruct you on the law. You must pay close attention to me now. I will go as deliberately and methodically as I can and be as clear as I can.

I told you at the very start of this trial your principal function during the taking of testimony would be to listen carefully and to observe each witness who testified. It has been obvious to me, to the parties, and to counsel that you have faithfully discharged your duty in this regard. Your interest never lagged, and it is evident you followed the testimony with close attention. I now ask you to give me that same careful attention you gave throughout the trial as I instruct you on the law you are to apply in this case.

Now that the evidence in the case has been presented and the attorneys for the United States of America and for the defendant, Mr. David Motovich, have concluded their closing arguments, it is my responsibility as the court to instruct you as to the law that governs this case. My instructions will be in three parts.

First, I will instruct you regarding the general rules that define and govern the duties of a jury in a criminal case and the way in which you are to review the evidence.

Secondly, I will instruct you as to the legal

Charge of the Court 2914

elements of the claims in this case, that is to say what the government must prove beyond a reasonable doubt.

And, third, I will give you some final rules of the road regarding your deliberations.

The general rules are as follows. I begin with the role of the court.

You have now heard all of the evidence in the case as well as the final arguments of law lawyers for the parties presented to you.

My duty at this point is to instruct you as to the law. It is your duty to accept these instructions of law and to apply them to the facts as you determine them, just as it has been my duty to preside over the trial and to declare what testimony and evidence is relevant under the law for your consideration.

On these legal matters, you must take the law as I give it to you. If any attorney has stated a legal principle different from any that I now state to you in my instructions, it is my instructions that you must follow.

You should not single out any instruction as alone stating the law, but you should consider my instructions as a whole when you retire to deliberate in the jury room.

You should not, any of you, be concerned with the wisdom of any rule that I state. Regardless of any opinion that you may have as to what the law may be or ought to be, it

Charge of the Court 2915

would violate your sworn duty to base a verdict upon any other view, upon any other view of the law other than that which I give you.

I now turn to the most important part of this which is the role of the jury.

Your final role is to determine and to decide the fact issues that are in this case. As members of the jury, you are the sole and exclusive judges of the facts, you pass judgment upon the evidence, you determine the credibility of the witnesses, you resolve any conflicts in the testimony, you draw whatever responsible and reasonable inferences you decide to draw from the facts as you have determined them, and you determine the weight of the evidence.

In determining the facts, you must rely upon your own recollection of the evidence. What the lawyers have said in their opening statements, in their closing arguments, in their objections, or in their questions is not evidence. Furthermore, what I may have said, or what I may say in these instructions about a fact, is not evidence. In this context, you should bear in mind that a question put to a witness is never evidence. It is only the answer which is evidence. Moreover, you may not consider any question I directed you to disregard or that I directed to be stricken from the record. You may also consider the stipulations, as we talked about and which you've seen a few of, of the parties as evidence.

Charge of the Court 2916

Since you are the sole and exclusive judges of the facts, I do not mean to indicate any opinion as to the facts or what your verdict should be. The rulings I have made during the course of the trial are not any indication of my views of what your decision should be as to whether or not the guilt of the defendant has been proven beyond a reasonable doubt.

I also ask you to draw no inference from the fact that upon occasion, I asked questions of certain witnesses. These questions were only intended for clarification or to expedite matters and certainly were not intended to suggest any opinions on my part as to the verdict you should render, or whether any of the witnesses may have been more credible than any other witnesses. You are expressly to understand that this court has no opinion as to the verdict you should render in this case.

As to the facts, ladies and gentlemen, you are the exclusive judges. You are to perform the duty of finding the facts without bias or prejudice to any party. It would be improper for you to consider any personal feelings you may have about any of the parties' race, religion, national origin, gender or age. It also would be improper for you to be swayed by sympathy.

In determining the facts, you are reminded you took a solemn oath to render judgment impartially and fairly,

J.A. 964

Charge of the Court                    2917

without prejudice or sympathy, and without fear or favor, solely upon the evidence presented in this case and the applicable law as I now give it to you. I know you will do this and reach a just and true verdict.

You are to perform your duty of finding the facts without bias or prejudice as to any party. You are to perform your final duty by an attitude of complete fairness and impartiality.

This case is important to the government, for the enforcement of criminal laws is a matter of prime concern to the community. It is equally important to the defendant, who is charged with serious crimes.

The fact that the prosecution is brought in the name of the United States of America entitles the government to no greater consideration than that accorded to any other party to a litigation. By the same token, it is entitled to no less consideration. All parties, whether government or individual, stand as equals at the bar of justice.

I want to address the conduct of counsel.

It is the duty of the attorneys for each side of the case to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible. Counsel also have the right and duty to ask the court to make rulings of law and to request conferences at the sidebar out of the hearing of the jury. All those questions

Charge of the Court                    2918

of law must be decided by me, the court. You should not show any prejudice against any attorney or his client because the attorney objected to the admissibility of evidence, or asked for a conference outside of the hearing of the jury or asked the court for a ruling on the law.

As I already indicated, my rulings on the admissibility of evidence do not indicate any opinion about the weight or effect of such evidence. You are the sole judges of the credibility of all witnesses and the weight and the effect of all evidence.

Let me address the issue of improper considerations.

Your verdict must be based solely upon the evidence developed at trial or the lack of evidence.

It would be improper for you to consider, in reaching your decision as to whether the government sustained its burden of proof, any personal feelings you may have about the defendant's race, religion, national origin, sex, age or any other improper consideration. All persons are entitled to the presumption of innocence and the government has the burden of proof, as I will discuss in a moment.

It would be equally improper for you to allow any feelings you might have about the nature of the crime charged to interfere with your decisionmaking process.

To repeat what I have said, your verdict must be based exclusively upon the evidence or the lack of evidence in

Charge of the Court                    2919

this case.

With respect to the issue of sympathy, under your oath as jurors, you are not to be swayed by sympathy. You are to be guided solely by the evidence in this case. And the crucial, hard core question that you must ask yourselves as you sift through the evidence is this: Has the government proven the guilt of this defendant beyond a reasonable doubt?

It is for you alone to decide whether the government has proven that the defendant is guilty of the crime charged solely on the basis of the evidence and subject to the law as I charge you. It must be clear to you that once you let fear or prejudice, or bias or sympathy interfere with your thinking, with your judgment, there is a risk that you will not arrive at a true and just verdict.

If you have a reasonable doubt as to the defendant's guilt, you should not hesitate for any reason to find a verdict of acquittal. But, on the other hand, if you should find that the government has met its burden of proving the defendant's guilt beyond a reasonable doubt, you should not hesitate because of sympathy or any other reason to render a verdict of guilty.

With respect to the burden of proof, the defendant has pled not guilty to the charge in the indictment. To convict the defendant, the burden is on the prosecution to prove the defendant guilty of each element of the charge

Charge of the Court                    2920

beyond a reasonable doubt. This burden never shifts to the defendant, for the simple reason that the law presumes a defendant to be innocent and never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence at all.

In other words, the defendant starts with a clean slate and is presumed innocent of each charge until such time, if ever, that you, as a jury, are satisfied that the government has proven the defendant guilty of a given charge beyond a reasonable doubt.

Let me address reasonable doubt.

Since, in order to convict the defendant of a given charge, the government is required to prove that charge beyond a reasonable doubt, the question then is: What is a reasonable doubt? The words almost define themselves. It is a doubt based upon reason. It is doubt that a reasonable person has after carefully weighing all of the evidence. It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life. Proof beyond a reasonable doubt must, therefore, be proof of a convincing character that a reasonable person would not hesitate to rely upon in making an important decision.

A reasonable doubt is not caprice or whim, however. It is not speculation or suspicion. It is not an excuse to avoid the performance of an unpleasant duty. The law does not

J.A. 965

Charge of the Court          2921

require that the government prove guilt beyond all possible doubt. Proof beyond a reasonable doubt is sufficient to convict.

If, after fair and impartial consideration of the evidence, you have a reasonable doubt as to the defendant's guilt with respect to a particular charge against him, you must find the defendant not guilty of that charge. On the other hand, if after fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of the defendant's guilt with respect to a particular charge against him, you should find the defendant guilty of that charge.

The defendant's interest if the defendant testifies as he did in this case.

In a criminal case, as you know, the defendant cannot be required to testify but, if as he or she chooses to testify, he is, of course, permitted to take the witness stand on his own behalf. In this case, the defendant decided to testify. That was his right. You should examine and evaluate his testimony just as you would the testimony of any witness with an interest in the outcome of the case.

With respect to other persons not on trial.

You heard evidence about the involvement of other individuals in the crimes charged in the indictment against this defendant. You may not draw any inference, favorable or

Charge of the Court          2922

unfavorable, toward the government or the defendant on trial from the fact that a certain person or persons are not on trial before you. Your concern is solely the defendant on trial before you. That another individual is not on trial before you is not a matter of concern to you. You should not speculate as to why another individual is not on trial. The fact that only one defendant is on trial before you should not confront -- strike that -- should not control or influence your verdict. You must only consider whether the government has proven beyond a reasonable doubt whether this defendant is guilty of the crimes charged.

Punishment.

The question of possible punishment of the defendant is of no concern to the jury. The question of possible punishment of the defendant is of no concern to the jury and should not, in any sense, enter into or influence your deliberations. The duty of imposing sentence rests exclusively upon the court. Your function is to weigh the evidence in the case and to determine whether or not the defendant is guilty beyond a reasonable doubt solely upon the basis of such evidence. Under your oath as jurors, you cannot allow a consideration of punishment that may or may not be imposed upon the defendant if he is convicted, to influence your verdict, in any way, or in any sense, enter into your deliberations.

Charge of the Court          2923

With respect to evidence, let's briefly discuss what is and what is not evidence.

The evidence in this case, as you know, is the sworn testimony of the witnesses, the exhibits received in evidence, the stipulations of the parties, and judicially noticed facts.

By contrast, the questions asked by the lawyers are not to be considered by you as evidence. It is the witnesses' answers that are evidence, not the questions. At times, a lawyer on direct or cross-examination may have incorporated into a question a statement which assumed certain facts to be true and asked the witness if the statement was true. If the witness denied the truth of a statement and if there is no direct evidence in the record proving that assumed fact to be true, then you may not consider it to be true simply because it was contained in the lawyer's question.

Testimony that has been stricken or excluded is not evidence and may not be considered by you in rendering your verdict.

That's the rhinoceros point. It only happened once with one witness, in particular, but that's what we're talking about. Okay? Can't consider that.

Also, if certain testimony was received for a limited purpose, such as for the purpose of assessing the witness' credibility, you must follow the limiting instruction I have given.

Charge of the Court          2924

Arguments by lawyers are not evidence because the lawyers are not witnesses. What they have said to you in their opening statements and in their summations is intended to help you understand the evidence to reach your verdict. However, if your recollection of the facts differs from the lawyers' statements, it is your recollection which controls.

To constitute evidence, exhibits must be received in evidence. However, exhibits marked for identification but not admitted are not evidence, nor are materials brought forth only to refresh a witness' recollection.

For example, a witness is shown something about a prior statement they made and they say now that I see it, I remember I said that.

Finally, statements I may have made concerning the quality of the evidence do not constitute evidence.

It is for you alone to decide the weight, if any, to be given to the testimony you have heard and the exhibits you have seen and heard.

Let me talk briefly about direct and circumstantial evidence.

There are two types of evidence which you may properly consider in reaching your verdict.

One type of evidence is direct evidence. Direct evidence is evidence that proves a disputed fact directly. For example, direct evidence is when a witness testifies about

**J.A. 966**

Charge of the Court                    2925

something he or she knows by virtue of the witness' own senses, something seen, felt, touched or heard. Direct evidence may also be in the form of an exhibit where the fact to be proven is its present existence or condition.

Circumstantial evidence is evidence which tends to prove a disputed fact by proof of other facts. There is a simple example of circumstantial evidence which is often used in this courthouse by my brother and sister judges.

Assume when you came into the courthouse this morning the sun was shining and it was a nice day. As you were sitting here, someone walked in with an umbrella which was dripping wet. Then a few minutes later, another person entered with a wet umbrella. You cannot look outside of this particular courtroom and you cannot see whether or not it is raining so you have no direct evidence on that fact, but on the combination of facts which I have asked you to assume, it would be reasonable and logical for you to conclude that it had, in fact, been raining.

That is all there is to circumstantial evidence. You infer on the basis of reason, experience, and common sense from one established fact the existence or nonexistence of some other fact.

The law makes no distinction between direct and circumstantial evidence. Circumstantial evidence is of no less value than direct evidence. And you may consider either

Charge of the Court                    2926

or both and may give them such weight as you, as the jury, conclude is or is not warranted.

The indictment is not evidence.

The defendant, David Motovich, has been charged with various crimes about which I will instruct you shortly. Each charge is called a count. I will refer to each count by the number assigned to it in the charging instrument which, as you know, is called an indictment, however, you will not be furnished with the indictment itself because an indictment is merely a statement of the charge and is not itself evidence.

They've used the phrase throughout this trial "dates approximate."

The indictment charges that each count was committed "on or about" a certain date or "between" certain dates. Although the government must prove beyond a reasonable doubt the offense was committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove the offense was committed precisely on the date charged.

With respect to venue about which you've heard, in addition to the elements of each offense, you must also find whether the crimes charged in the indictment took place at least, in part, within the Eastern District of New York, that is to say within the boroughs of Queens, Brooklyn, also known as Kings County, Staten Island, also known as Richmond County,

Charge of the Court                    2927

and the counties of Suffolk and Nassau, New York.

In this regard, the government need not prove that the crime itself was committed in this district or that the defendant himself was present here. It is sufficient to satisfy this particular element if any act in furtherance of the crime you are considering occurred within this district. If you find the government has failed to prove that any act in furtherance of the crime occurred within this district, or if you have a reasonable doubt on this issue, then you must acquit.

Stipulated facts of which we've had some.

The attorneys for the government and the attorneys for the defendant have stipulated to certain facts as you know. A stipulation is an agreement among the parties that a certain fact is true. You should regard such agreed facts as established to be true beyond a reasonable doubt.

All available evidence, however, need not be produced in this case.

Although the government bears the burden of proof, and although a reasonable doubt can arise from lack of evidence, I instruct you the law does not require the government to call as witnesses all persons who may appear to have some knowledge of the matters in issue at this trial. Nor does the law require that all things mentioned during the course of this trial be produced as exhibits.

Charge of the Court                    2928

The law does not require law enforcement authorities to use any particular investigative techniques to uncover or prosecute a crime. This is not a TV show or CSI. This is real life. Law enforcement techniques are not your concern. Your concern is to determine whether or not, based upon all the evidence presented in the case, the government has proven the defendant is guilty beyond a reasonable doubt.

With respect to summary evidence which you've seen, some evidence addresses the issue of some exhibits which were admitted into evidence in the form of charts and summaries. Those charts and summaries were admitted to save the time of reviewing even more voluminous records and to avoid inconvenience. You should consider these charts and summaries the same way you would any other evidence.

Now, with respect to witness credibility, it must be very clear to you by now that the government and the defendant are asking you to draw very different conclusions about various factual issues in the case. Deciding these issues will involve making judgments about the testimony of the witnesses you have listened to and observed. In making these judgments, you should carefully scrutinize all the testimony of each witness, the circumstances under which each witness testified, and any other matters in evidence that may help you to decide the truth and the importance of each witness' testimony.

**J.A. 967**

Charge of the Court                    2929

How do you determine where the truth lies? Well, you watched each witness testify. Everything a witness said or did on the witness stand counts in your determination. How did the witness impress you? Was the witness candid, frank and forthright, or did the witness seem to be evasive or fidgety as if hiding something? How did the way the witness testified on direct compare with how the witness testified on cross-examination? Was the witness consistent or contradictory? Did the witness appear to know what he or she was talking about? Did the witness strike you as someone who was trying to report his or her knowledge accurately? How did the witness appear to you? What was his or her demeanor to you, that is to say his or her carriage, behavior, bearing, manner and appearance while testifying? As you well now, it is not what people say, but how they say it that often moves and informs us in real life.

You should use all the tests for truthfulness you would use in determining matters of importance that you do in your own everyday real lives. You should consider any bias or hostility the witness may have shown for or against any party, as well as any interest the witness has in the outcome of the case. You should consider the opportunity the witness had to see, to hear, and to know the things about which he or she testified, the accuracy of his or her memory, candor or lack of candor, the reasonableness and probability of his or her

Charge of the Court                    2930

testimony, its consistency or lack of consistency and its corroboration or lack of corroboration with other credible testimony.

It is your duty to consider whether the witness has permitted any such bias or interest to color his or her testimony. In short, if you find a witness is biased, you should view that witness' testimony with caution, weigh it with care, and subject it to close and searching scrutiny.

You should also consider whether a witness had an opportunity to observe the facts he or she testified about. Also, you should consider whether the witness' recollection of the facts stands up in light of the other evidence in the case.

In other words, what you must try to do in deciding credibility is to size up a person first just as you would in any important matter when you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection.

Let me address the question of discrepancies in testimony.

You have heard of discrepancies in the testimony of certain witnesses, and counsel have argued that such discrepancies are a reason for you to reject the testimony of those witnesses.

You are instructed that evidence of discrepancies

Charge of the Court                    2931

may be a basis to disbelieve a witness' testimony. On the other hand, discrepancies in a witness' testimony, or between that testimony and the testimony of others, do not necessarily mean that the witness' entire testimony should be disregarded.

Some people forget things and even the truthful witness may be nervous or contradict themselves or herself. It is also a fact that two people witnessing an event will see it or hear it differently. And if you were married, you know that that's true. You talk about what you saw with your spouse and you have different versions, I guarantee it. If you want to get married, stick around, it will happen.

Whether or not a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance. However, a willful falsehood is always a matter of importance and should always be considered seriously.

It is for you to decide, based on your total impression of the witness, how to weigh the discrepancies in his or her testimony. You should, as always, use common sense and your own good judgment.

With respect to the number of witnesses, the fact that one party called more witnesses and introduced more evidence than the other does not mean that you should necessarily find the facts in favor of the side offering the most witnesses. By the same token, you do not have to accept

**J.A. 968**

Charge of the Court                    2932

the testimony of any witness who has not been contradicted or impeached, if you find the witness not to be credible. You also have to decide which witnesses to believe and which facts are true. To do this, you must look at all the evidence, drawing upon your own common sense and personal experiences.

After examining all the evidence, you may decide that the party calling the most witnesses has not persuaded you because you do not believe its witnesses, or because you do believe the fewer witnesses called by the other side. Because the entire burden of proof beyond a reasonable doubt is on the government and the defendant is presumed to be innocent, the defendant does not have any obligation to call any witnesses or offer any proof at all.

With respect to uncalled witnesses equally available to both sides, there are several persons whose names you have heard during the course of this trial but who did not appear here to testify. I instruct you as a matter of law that each party had an equal opportunity or an equal lack of opportunity to call any of these witnesses. Therefore, you should not draw any inference or reach any conclusions as to what they would have testified to had they been called. Their absence should not affect your judgment in any way.

You should, however, remember my instruction that the law does not impose on a defendant in a criminal case the burden or the duty of calling any witnesses or producing any

*Charge of the Court* 2933

evidence.

I want to address now the cooperating witnesses' plea agreements.

You have heard from witnesses who testified that they were involved in the crimes charged in the indictment and crimes charged by the government in other cases.

(Continued on next page.)

*Charge of the Court* 2934

(Continuing.)

THE COURT: There has been a great deal of testimony and a great deal said about these so-called cooperating witnesses in the summations of counsel and whether or not you should believe them.

The Government argues, as it is permitted to do, that it must take the witnesses as it finds them and that only people who themselves take part in criminal activity have the knowledge required to show criminal behavior by others.

For those very reasons, the law allows the use of cooperating witness testimony. Indeed, it is the law in federal courts that such testimony may be enough in itself for conviction, if the jury finds the testimony establishes guilt beyond a reasonable doubt.

However, it is also the case that cooperating witness testimony is of such a nature that it must be scrutinized with great care and viewed with particular caution when you decide how much of that testimony to believe.

I have given you some general considerations on credibility, I will not repeat them here, nor will I repeat all the arguments made on both sides. However, let me say a few things you will may want to consider during your deliberations on the subject of cooperating witnesses.

You should ask yourselves whether these witnesses would benefit more by lying or more by telling the truth. Was

*Charge of the Court* 2935

their testimony made up in any way because they believed or hoped they would somehow receive favorable treatment by testifying falsely? Or did they believe their interest would be best served by testifying truthfully?

If you believe the witness is motivated by hopes of personal gain, was the motivation one would cause them to lie, or was it one that would cause them to tell the truth? Did this motivation color his or her testimony?

In sum, you should look at all the evidence in deciding what credence and what weight, if any, you will want to give to the cooperating witnesses.

The cooperating witnesses who testified in this case pled guilty after entering into an agreement with the Government to testify. There is evidence the Government agreed to dismiss some charges against the witnesses and agreed not to prosecute them on other charges in exchange for the witnesses' agreement to plead guilty and to testify at this trial against this defendant. The Government also promised to bring the witnesses' cooperation to the attention of the sentencing Court.

The Government is permitted to enter into this kind of agreement. You, in turn, may accept the testimony of such a witness and convict the defendant on the basis of this testimony alone, if it convinces you of the defendant's guilt beyond a reasonable doubt.

*Charge of the Court* 2936

However, you should bear in mind that a witness who has entered into such an agreement has an interest in the case different from an ordinary witness. Witnesses who realize they may be able to obtain their own freedom or receive a lighter sentence by giving testimony favorably to the prosecution have a motive to testify falsely. Therefore, you must examine their testimony with caution and weigh it with great care. If, after scrutinizing their testimony, you decide to accept it, you will may give it whatever weight, if any, you find it deserves.

You should note, when someone cooperates with the Government, the Government does not determine what sentence they are going to get, nor does the Government typically make a recommendation to the sentencing judge as to how much time they are going to get. What the Government will do, if it is satisfied with the level of cooperation, is write the sentencing judge what is known, as you heard testimony about, as a 5K letter. The 5K letter sets forth the cooperating witness's criminal acts, as well as the substantial assistance the witness has provided. I instruct you that the 5K letter does not guarantee the cooperating witness a lower sentence. This is because the sentencing Court may, but is not required, to take the 5K letter into account when imposing sentence on the cooperating witnesses. The Court has discretion, whether or not a 5K letter is written, to impose any reasonable

**J.A. 969**

*Charge of the Court* 2937

sentence the Court deems appropriate up to the statutory maximum. The final determination as to the sentence to be imposed rests with the Court, not with the Government. In sum, you should look at all the evidence in deciding what credence and what weight, if any, you would want to give the cooperating witness and the 5K letter.

Should we keep going or do you want to take a quick break?

Keep going? I'll keep it rolling. All right.

Law enforcement witnesses.

You have heard the testimony of law enforcement officials. The fact that a witness may be employed by the federal government as a law enforcement official does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of ordinary witnesses.

At the same time, it is quite legitimate for defense counsel to try to attack the credibility of a law enforcement witness on the grounds that his or her testimony may be colored by a personal or professional interest by the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement witnesses and to give to that testimony whatever weight, if any, you find it deserves.

*Charge of the Court* 2938

With respect to Interviewing Witnesses.

There was testimony at trial that the attorneys for the Government and the attorneys for the defendant interviewed witnesses when preparing for, and during the course of, the trial. You should not draw any unfavorable inference from that practice. To the contrary, the attorneys were obliged to prepare their case as thoroughly as possible and might have been derelict in their performance of their respective duties if they failed to interview witnesses before the trial began and as necessary throughout the course of the trial.

With respect to The Charges.

Members of the jury, the Government charges Mr. Motovich in an Indictment. The Indictment contains eighteen counts as you know, which are separate charges or offenses, on which each of you will be called upon to render a verdict.

Specifically, the Indictment charges Mr. Motovich with operating an unlicensed money transmitting business, that's Count One; failure to file currency transaction reports, the CTRs, Count Two; bank fraud, Counts Three through Six; conspiracy to commit bank fraud, Count Seven; money laundering, Counts Eight through Fourteen; conspiracy to commit money laundering, Count Fifteen; aggravated identity theft, Count Sixteen, conspiracy to defraud the United States, Count Seventeen; and witness tampering, Count Eighteen. Each

*Charge of the Court* 2939

count charges the defendant with a different crime. You must consider each count separately and return a separate verdict of guilty or not guilty for each. Whether you find the defendant guilty or not guilty as to what offense should not affect your verdict as to any other offense charged unless otherwise stated. Your verdict as to each count must be unanimous.

There is a concept called mens rea.

The charges in this case implicate the concepts of knowledge, intent and willfulness.

Knowingly.

A person acts "knowingly" if he intentionally and voluntarily and not because of ignorance, mistake, accident or carelessness. Whether the defendant acted knowingly may be proven by the defendant's conduct and by all of the facts and circumstances surrounding the case.

Intentionally.

A person acts "intentionally" when he acts deliberately and purposefully. That is, a defendant's acts must have been the product of his conscious, objective decisions rather than the product of a mistake or an accident.

Willfully.

"Willfully" means to act with knowledge that one's conduct is unlawful and with the intent to do something the law forbids, that is to say with the bad purpose to disobey or

**J.A. 970**

*Charge of the Court* 2940

disregard the law.

The defendant's conduct is not "willful" if it was due to negligence, inadvertence or mistake.

The Law of Conspiracy.

Some of the charges in the Indictment allege the defendant participated in various criminal conspiracies. Therefore, I instruct you now on the elements of conspiracy generally. Later I will give you instructions on the various laws that the Indictment charges the defendant conspired to violate.

In this case, the defendant is accused of having been a member of a conspiracy to violate certain federal laws. A conspiracy is a kind of criminal partnership — a combination or agreement of two or more persons to join together to accomplish some unlawful purpose. The crime of conspiracy to violate federal law is an independent offense. It is separate and distinct from the actual violation of any specific federal law, which the law refers to as "substantive crimes." Indeed, you may find the defendant guilty of the crime of conspiracy to commit an offense against the United States even though the substantive crime that was the object of the conspiracy was not actually committed.

The United States Congress has deemed it appropriate to make conspiracy, standing alone, a separate crime even if the conspiracy is not successful. This is because collective

*Charge of the Court* 2941

criminal activity poses a greater threat to the public's safety and welfare than individual conduct, and increases the likelihood of success of a particular criminal venture.

To prove the crime of conspiracy, the Government must prove two elements beyond a reasonable doubt:

First, that two or more persons entered into an unlawful agreement; and

Second, that the defendant knowingly and willfully became a member of the conspiracy.

The first element, the Existence of the Agreement, I address as follows:

The first element the Government must prove beyond a reasonable doubt to establish the offense of conspiracy is that two or more persons entered the unlawful agreement charged in the Indictment.

In order for the Government to satisfy this element, you need not find the alleged members of the conspiracy met together and entered into any express or formal agreement. Similarly, you need not find the alleged conspirators stated, in words or writing, what the scheme was, its object or purpose, or every precise detail of the scheme or the means by which its object or purpose was to be accomplished. What the Government must prove beyond a reasonable doubt is that there is a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to accomplish

*Charge of the Court* 2942

an unlawful act.

You may, of course, find the existence of an agreement to disobey or to disregard the law has been established by direct proof. But since, by its very nature, a conspiracy is characterized by secrecy, you may infer its existence from the circumstances of the case and the conduct of the parties involved.

In a very real sense, then, in the context of conspiracy cases, actions often speak louder than words. In this regard, you may, in determining whether an agreement existed here, consider the actions and statements of all those you find to be participants in the conspiracy as proof that a common design existed on the part of the person charged to act together to accomplish an unlawful purpose.

The second element addresses Membership in the Conspiracy.

The second element the Government must prove beyond a reasonable doubt to establish the offense of conspiracy is that the defendant knowingly, willfully, and voluntarily became a member of the conspiracy. If you are satisfied the conspiracy charged in the indictment existed, you must next ask yours who the members of that conspiracy were. In deciding whether the defendant whom you are considering was, in fact, a member of the conspiracy, you should consider whether the defendant knowingly and willfully joined the

*Charge of the Court* 2943

conspiracy. Did he participate in it with knowledge of its unlawful purpose and with the specific intention of furthering its business or objectives?

In that regard, it has been said in order for a defendant to be deemed a participant in a conspiracy, he must have had a stake in the venture or its outcome. You are instructed that, although proof of a financial interest in the outcome of a scheme is not essential, if you find that the defendant you are considering had such an interest, that is a factor you may properly consider in determining whether or not the defendant was a member of the conspiracy charged in the indictment.

Before a defendant can be found to have been a conspirator, you must first find he knowingly joined in the unlawful agreement or plan. The key question, therefore, is whether the defendant joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.

It is important for you to note a defendant's participation in the conspiracy must be established by independent evidence of his own acts or statements, as well as those of the other alleged co-conspirators, and the reasonable inferences that may be drawn from them.

A defendant's knowledge may be inferred from the facts proved. In that connection, to become a member of the

*Charge of the Court* 2944

conspiracy, a defendant need not have known the identities of each and every other member, nor need he have been apprised of all of their activities. Moreover, a defendant need not have been fully informed as to all the details or the scope of the conspiracy in order to justify an inference of knowledge on his part. Furthermore, a defendant need not have joined in all the unlawful activities of the conspiracy.

The extent of a defendant's participation has no bearing on the issue of his guilt. A conspirator's liability is not measured by the extent or duration of his participation. Indeed, each member may perform separate and distinct acts and may perform them at different times. Some conspirators play major roles, while others play minor parts in the scheme. An equal role is not what the law requires. Even a single act may be sufficient to draw the defendant within the ambit of the conspiracy.

I caution you, however, mere association with one or more members of the conspiracy does not automatically make the defendant a member. A person may know, or be friends with, a criminal, without being a criminal himself. Mere similarity of conduct or the fact that they may have assembled together and discussed common aims and interests does not necessarily establish membership in the conspiracy.

I also want to caution you that mere knowledge or acquiescence, without participation, in the unlawful plan is

**J.A. 971**

*Charge of the Court* 2945

not sufficient. Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member. More is required under the law. What is necessary is that the defendant must have participated with the knowledge of at least some of the purposes or objectives of the conspiracy and with the intention of aiding in the accomplishments of those unlawful ends.

In sum, the defendant, with an understanding of the unlawful character of the conspiracy, must have intentionally engaged, advised or assisted in it for the purpose of furthering the illegal undertaking. He thereby becomes a knowing and willing participant in the unlawful agreement — that is to say, a conspirator.

You will see as I continue with these instructions that some kinds of conspiracy charges require proof of an additional element as well, but all conspiracy charges have at least these two elements in common; that is to say, the existence of a conspiracy and the defendant's willing participation in it.

Let me address Aiding and Abetting.

The Indictment alleges that the defendant aided and abetted and willfully caused the commission of certain crimes charged in the Indictment. In particular, the Indictment alleges the defendant aided and abetted the crimes charged in

*Charge of the Court* 2946

Counts Three, Four, Five, Six and Sixteen of the Indictment. The Indictment further alleges the defendant willfully caused the crime charged in Count Two. I will instruct you on the law of aiding and abetting before addressing the specific crimes in the Indictment.

With respect to aiding and abetting, aiding and abetting is defined under federal law in Title 18 United States Code, Section 2(a), which provides that whoever commits an offense against the United States of America or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

Under the aiding and abetting statute, it is not necessary for the Government to show that a defendant himself physically committed the crime with which he is charged in order for the Government to sustain its burden of proof. A person who or aids or abets another to commit an offense is just as guilty of that offense as if he committed it himself.

Accordingly, you may find a defendant guilty of an offense charged if you find beyond a reasonable doubt that the Government has proven that another person actually committed the offense with which a defendant is charged, and that the defendant aided or abetted that person in the commission of the offense.

As I have noted, the first requirement is that you find that another person has committed the crime charged. No

*Charge of the Court* 2947

one can be convicted of aiding and abetting the criminal acts of another if no crime was committed by the other person in the first place. But if you do find that a crime was committed, then you must consider whether the defendant aided or abetted the commission of that crime.

In order to aid or abet another to commit a crime, it is necessary that the defendant knowingly associate himself in some way with the crime, and that he participated in the crime by doing some act to help make the crime succeed.

To establish that a defendant knowingly associated himself with the crime, the Government must establish that the defendant intentionally aided a person or persons with the intent to engage in the crime charged in the alleged counts of the Indictment.

To establish that a defendant participated in the commission of a crime, the Government must prove the defendant engaged in some affirmative conduct or overt act for the specific purpose of bringing about that crime.

The mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or merely associating with others who were committing a crime is not sufficient to establish aiding and abetting. One who has no knowledge that a crime is being committed or is about to be committed but inadvertently does something that aids in the commission of

*Charge of the Court* 2948

that crime is not an aider and abettor. An aider and an abettor must know that the crime is being committed and act in a way that is intended to bring about the success of the criminal venture.

In determining whether a defendant aided or abetted the commission of the crime with which he is charged, ask yourself these questions:

Did he participate in the crime charged as something he wished to bring about?

Did he knowingly associate himself with the criminal venture?

Did he seek, by his actions, to make the criminal venture succeed?

With respect to Willfully Causing.

Section 2(b), as in boy, of the aiding and abetting statute reads as follows:

"Whoever willfully causes an act to be done which, if directly performed by him, would be an offense against the United States, is punishable as a principal."

In this case, the Government does not contend that the defendant actually committed the crime charged in Count Two of the Indictment. Instead, it contends that the defendant caused another to physically commit the crime.

What does the term "willfully caused" mean? It does not mean that the defendant himself need have physically

J.A. 972

*Charge of the Court* 2949

committed the crime or supervised or participated in the actual criminal conduct charged in the Indictment.

The meaning of the term "willfully caused" can be found in the answers to the following questions:

Did the defendant will that a domestic financial institution would fail to file currency transaction reports as alleged in Count Two?

Did the defendant intentionally cause a domestic financial institution to fail to file currency transaction reports as alleged in Count Two?

If you are persuaded beyond a reasonable doubt that the answer to both those questions is yes, then the defendant is guilty of the crime charged, just as if he had himself actually committed it.

With respect to Accomplice Liability.

I have instructed you that the defendant is charged with bank fraud in Counts Three through Six; conspiring to commit bank fraud in Count Seven; money laundering in Counts Eight through Fourteen; and conspiring to commit money laundering in Count Fifteen. I will go over the specific elements that the Government must prove with respect to each of these counts in a few moments. However, I am instructing you now that with respect to Counts Three through Six and Eight through Fourteen, if you do not find that the Government has satisfied its burden of proving that the defendant is

*Charge of the Court* 2950

guilty as a principal or as an aider and abettor, there is another method by which you may evaluate his possible guilt. If you find, beyond a reasonable doubt, the defendant was a member of the conspiracy to commit bank fraud, as alleged in Count Seven, and thus guilty of the conspiracy count, then you may also find the defendant guilty of the substantive bank fraud crimes alleged in Counts Three through Six. Similarly, if you find beyond a reasonable doubt that the defendant was a member of the conspiracy to commit money laundering as alleged in Count Fifteen, and thus guilty on the conspiracy count, then you may also find the defendant guilty of the substantive money laundering crimes alleged in Eight through Fourteen. In order to find the defendant guilty through accomplice liability, you must find each of the following elements is proven beyond a reasonable doubt for the count you are considering:

First, that the substantive crime charged in the counts you are considering was committed;

Second, that the person or persons who committed that substantive crime were members of the applicable conspiracy alleged in Count Seven or Count Fifteen of the Indictment;

Third, that the crime charged in the count that you are considering was committed pursuant to a common plan and understanding you found to exist among the conspirators in the

*Charge of the Court* 2951

applicable conspiracy alleged in Count Seven or Count Fifteen;

Fourth, the defendant was a member of the applicable conspiracy at the time that the substantive crime charged in the count you were considering was committed;

Fifth, that the defendant could have reasonably foreseen that the substantive crime charged in the count you were considering might be committed by his co-conspirators in the conspiracy alleged, the applicable conspiracy alleged in Count Seven or Count Fifteen.

If the Government has proven all five of these elements beyond a reasonable doubt for Counts Three, Four, Five, Six, Eight, Nine, Ten, Eleven, Twelve, Thirteen or Fourteen, then you may find the defendant guilty of counts Three, Four, Five, Six, Eight, Nine, Ten, Eleven, Twelve, Thirteen, Fourteen, even if he did not participate in the acts constituting the substantive crime or did not have actual knowledge of it.

The reason for this rule is simply that a co-conspirator who commits a substantive crime pursuant to a conspiracy is deemed to be the agent of the other conspirators.

Therefore, all of the co-conspirators must bear criminal responsibility for the commission of the foreseeable substantive crimes.

If, however, you are not satisfied as to the

*Charge of the Court* 2952

existence of any of these five elements, then you may not find the defendant guilty under this particular theory of the substantive crimes charged in Counts Three through Six and Eight through Fourteen. You can, however, still find the defendant guilty of the substantive crimes in Counts Three through Six and Eight through Fourteen if the Government proves beyond a reasonable doubt that the defendant personally committed, or aided and abetted the commission of, those crimes.

How you holding up?

Need a break?

A JUROR: Yes.

THE COURT: You need a break?

A JUROR: I do.

THE COURT: We'll take a ten-minute break. Do not talk about it. We are closing in on the home stretch. So let's take our ten-minute break. I'll stay here.

THE COURTROOM DEPUTY: All rise.

(Jury exits.)

THE COURT: We are on our 10-minute comfort break. See you in ten minutes.

MR. JACKSON: Thank you, Judge.

(Recess taken.)

(In open court - jury not present.)

THE COURTROOM DEPUTY: All rise.

J.A. 973

*Charge of the Court* 2953

(Judge WILLIAM F. KUNTZ, II entered the courtroom.)

(Pause.)

THE COURTROOM DEPUTY: All rise.

(Jury enters.)

THE COURT: Thank you, ladies and gentlemen of the jury. Appreciate your attention — and please be seated — and your promptness after our comfort break. We continue with the jury charge.

I am now going to address, Count One: Operating an Unlicensed Money Transmitting Business.

Count One of the Indictment charges Mr. Motovich with operating an unlicensed money transmitting business. It reads that: In or about and between January 2012 and February 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally conduct, control, manage, supervise, direct and own all or part of an unlicensed money transmitting business which affected interstate and foreign commerce,... and while doing so failed to comply with the money transmitting business regulations and registration requirements under Title 31, U.S. Code Section 5330, specifically by failing to register such business with the United States Department of Treasury, as required by law.

The relevant statute for this count is 18 U.S.C.

*Charge of the Court* 2954

Section 1960. Subsection A of that section which provides:

That whoever knowingly conducts, controls, manages, supervises, directs or owns all or part of an unlicensed money transmitting business, shall be guilty of a crime.

In order to prove that the defendant conducted an unlicensed money transmitting business, the Government must establish beyond a reasonable doubt each of the following elements of the offense:

First, that there was an unlicensed money transmitting business;

Second, that the defendant knowingly controlled, conducted, managed, supervised, directed, or owned that business; and

Third, that the money transmitting business affected interstate commerce.

The first element: Affecting the issue of unlicensed money transmitting business.

The first element the Government must prove beyond a reasonable doubt is that there was an unlicensed money transmitting business.

A "business" is a commercial enterprise that is regularly carried on for profit. Thus, a single isolated transmitting of money is not a business under this definition.

A "money transmitting business" is a business that, for a fee, accepts currency and/or checks for transfer within

*Charge of the Court* 2955

or outside the United States.

To satisfy this element, the money transmitting business must be unlicensed. I instruct you that under the federal statute Title 31, U.S. Code Section 5330, a business that meets the following requirements is required to register with the Secretary of the Treasury.

1. Provides check cashing, currency exchange or money transmitting or remittance services, or issues or redeems money orders, Travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;

2. Is required to file reports under Title 31 U.S. Code Section 5313; and

3. Is not a depository institution as defined by Title 31 U.S. Code Section 5313(g).

It is for you to determine whether the money transmitting business was licensed as required.

To satisfy this element, the Government must prove the defendant knew that the business was unlicensed. However, the Government does not have to prove that the defendant knew

*Charge of the Court* 2956

that federal law required the business to be licensed.

The second element, the defendant controlled the business.

The second element the Government must establish beyond a reasonable doubt is that the defendant knowingly controlled, conducted, managed, supervised, directed, or owned that business.

To prove that the defendant knowingly controlled the money transmitting business, the Government must establish that the defendant was involved in the management of the business and not merely an employee of that business.

An act is done knowingly when it is done voluntarily and intentionally and not because of accident, mistake or some other innocent reason.

Third element: Affecting Interstate Commerce.

The third element the Government must establish beyond a reasonable doubt is that the money -- is that the money transmitting business affected interstate or foreign commerce.

Interstate or foreign commerce simply means the movement of goods, services, money or individuals between states or between the United States and a foreign state or nation.

The Government must prove that the money transmitting business affected interstate or foreign commerce

**J.A. 974**

*Charge of the Court* 2957

in any manner, no matter how minimal.

Count Two: Failure to File Currency Transaction Reports, the CTRs.

Count Two of the Indictment charges Mr. Motovich with failure to file Currency Transaction Reports or the CTRs you've heard so much about. Count Two reads as follows:

In or about and between January 2012 and February 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a) and the regulations prescribed thereunder, did knowingly and willfully cause and attempt to cause one or more domestic financial institutions to fail to file one or more reports required by Title 31 U.S. Code Section 5153(a) and the regulation also prescribed thereunder when involved in one or more transactions for the payment, receipt, and transfer of United States coins and currency in the amounts the Secretary of the Treasury prescribed by regulation, as part of a pattern of illegal activity involving more than one-hundred-thousand dollars in a twelve-month period.

Title 31, U.S. Code Section 5313(a) provides:

When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United

*Charge of the Court* 2958

States coins or currency (or other monetary instruments of the Secretary of the Treasury) prescribes in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person for whom the transaction is being made.

The current regulations promulgated by the Secretary of the Treasury governing the filing of such reports is Title 31 Code of the Federal Regulations Section 1010.311, which provide in relevant part:

Each financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000.

Title 31 U.S. Code Section 5322(b), as in boy, further provides:

A person willfully violating this subchapter or a regulation prescribed under this subchapter... while violating another law of the United States or as part of a pattern of any illegal activity involving more than a hundred-thousand

*Charge of the Court* 2959

dollars in a twelve-month period, shall be guilty of a crime.

In order to prove the crime of failure to file a Currency Transaction Report in violation of Title 31 U.S. Code Sections 5313(a) and 5322(b), the Government must prove beyond a reasonable doubt each of the following elements:

First, that the alleged unlicensed check-cashing business at the time alleged in the Indictment was a domestic financial institution;

Second, that the alleged unlicensed check-cashing business failed to report a transaction for the payment, receipt, or transfer of United States coins or currency in excess of $10,000, as required by law;

Third, that the defendant willfully caused the alleged unlicensed check-cashing business to fail to file those reports; and

Fourth, the alleged unlicensed check-cashing business's failure to file Currency Transaction Reports was part of a pattern of illegal activity involving more than $100,000 in a twelve-month period.

The first element: Domestic Financial Institution.

The first element the Government must prove beyond a reasonable doubt is that the alleged unlicensed check-cashing business was, at the time alleged in the Indictment, a domestic financial institution.

For the purposes of this statute, Congress has

**J.A. 975**

*Charge of the Court* 2960

defined the term "financial institution" to include an issuer, redeemer or cashier of Travelers' checks, checks, money orders or similar instruments. A "domestic financial institution" is a financial institution, as I just defined it, involved in transactions in the United States of America.

Second. Failure to Report Transaction.

The second element the Government must prove beyond a reasonable doubt is that the alleged unlicensed check-cashing business failed to report a transaction for the payment, receipt or transfer of United States coin or currency in excess of $10,000, under circumstances the Secretary of the Treasury has required by regulation must be reported.

A financial institution is required to file a report with the federal government any time that it is involved in a transaction involving more than $10,000 in United States currency. This is known, as you know, as a Currency Transaction Report, or CTR. In order to prove this element, the Government must prove beyond a reasonable doubt that the alleged unlicensed check-cashing business was involved in the transaction alleged in the Indictment and the transaction involved more than $10,000 in currency, and that the alleged unlicensed check-cashing business failed to file the CTR as required by law.

Third element, Willfully Causing.

Section 2(b) of the aiding and abetting statute

Charge of the Court                2961

reads as follows:

Whoever willfully causes an act to be done which, if directly performed by him, would be an offense against the United States, is punishable as a principal.

In this case, the Government does not contend that the defendant actually committed the crime charged in Count Two of the Indictment. Instead, the Government contends that the defendant caused another to physically commit the crime.

What does the term "willfully caused" mean? It does not mean that the defendant, himself, need have physically committed the crime or supervised or participated in the actual criminal conduct charged in the Indictment.

The meaning of the term "willfully caused" can be found in the answer to the following questions:

Did the defendant will that the alleged unlicensed check-cashing business would fail to file Currency Transaction Reports as alleged in Count Two?

Did the defendant intentionally cause the alleged unlicensed check-cashing business to fail to file Currency Transaction Reports as alleged in Count Two?

If you are persuaded beyond a reasonable doubt that the answer to both of these questions is yes, then the defendant is guilty of the crime charged just as if he himself had actually committed it.

Charge of the Court                2962

The fourth element addresses the Pattern of Illegal Activity.

The fourth element the Government must prove beyond a reasonable doubt is that the alleged unlicensed check-cashing business failure to report this transaction was part of a pattern of illegal activity involving more than $100,000 in a twelve-month period.

To prove this element, the Government must prove beyond a reasonable doubt that the alleged unlicensed check-cashing business engaged in a series of repeated failures to file required reports on these transactions, all related to each other and together involving more than a hundred-thousand dollars over a twelve-month period. No single transaction has to be greater than $100,000, so long as the total of the transactions in the twelve-month period is greater than $100,000.

(Continued on the following page.)

Charge of the Court                2963

(continuing.)

THE COURT: With respect to Count Three through Six, bank fraud. Counts Three Through Six charge Mr. Motovich with four separate instances of bank fraud. Count Three charges Motovich with bank fraud. Its reads as follows: In or about and between January 2015 and November 2018 both dates being approximate and inclusive within the Eastern District of New York and elsewhere, the defendant David Motovich together with others did knowingly and intentionally execute a scheme to defraud bank one and obtain monies, funds, credits at other property owned by and under the control -- under the custody and control of bank one by means of materially false and fraudulent pretenses, representations and promises.

Count Four charges Mr. Motovich with bank fraud. Count Four reads as follows: In or about and between January 2012 and January 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally execute a scheme to defraud bank two, two, and to obtain moneys, funds, credits and other property owned by, and under the custody and control of, bank two by means of materially false and fraudulent pretenses, representations and promises.

Count Five charges Mr. Motovich with bank fraud. Count Five reads as follows:

Charge of the Court                2964

In or about and between august 2013 and September 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally execute a scheme to defraud bank three and to obtain moneys, funds, credits and other property owned by, and under the custody and control of, bank three by means of materially false and fraudulent pretenses, representations and promises.

Count Six charges Mr. Motovich with bank fraud. Count Six reads as follows: In or about and between January 2018 and October 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally execute a scheme to defraud bank four and to obtain moneys, funds, credits and other property owned by, and under the custody and control of, bank four by means of materially false and fraudulent pretenses, representations and promises.

As to Count Three, bank one is Carver Federal Savings Bank. For Count Four, Bank two is J.P. Morgan Chase. For Count Five bank three is Astoria Bank and count six bank four is Investors Bank.

The relevant statute involving bank fraud is section 1344 of Title 18 in the United States Code which provides

J.A. 976

Charge of the Court                    2965

whoever knowingly executes or attempts to execute a scheme or artifice, one, to defraud a financial institution or, two, to obtain any of the monies, funds, credits, assets, securities or other property owned by or under the control or custody of a financial institution by means of false or fraudulent pretenses representations or promises shall be guilty of a crime.

The statute thus sets out two different forms of bank fraud. One, a scheme to defraud a bank and, two, a scheme to obtain money under the bank's control by means of false representations. Counts three, four, five and six of the indictment charge both forms of bank fraud. I will instruct you separately on each one.

You may find Mr. Motovich guilty of bank fraud if you find all the elements of one form of bank fraud proven. You do not need to find both forms proven, but to find Mr. Motovich guilty, you must by unanimous as to which theory of -- you must be unanimous as to which theory of bank fraud you find and you must find every element of that theory proven beyond a reasonable doubt.

Theory one, scheme to defraud a financial institution. In order to prove Mr. Motovich guilty of knowingly executing a scheme to defraud a bank under Section 1344(1), the Government must prove each of the following elements beyond a reasonable doubt. First, that there was a

Charge of the Court                    2966

scheme to defraud a bank. Second, that the defendant executed or attempted to execute the scheme knowingly and, third, that at the time of the execution of the scheme, the bank had its deposits insured by the Federal Deposit Insurance Corporation, the FDIC.

First elements, existence of a scheme or artifice to defraud. The first element the government must prove beyond a reasonable doubt is that there was a scheme to defraud. A scheme or artifice is simply a plan for the accomplishment of an object. A scheme to defraud is defined as a pattern or course of conduct concerning a material matter designed to deceive a federally-insured bank into releasing property with the knowledge that course of conduct would likely harm the bank's property interest.

Because the government need only show that a scheme to defraud existed, not that it succeeded, it is not necessary for the government to prove that the banks actually lost money or property as a result of the scheme. The scheme to defraud need not result in, nor be intended to cause, financial loss to the bank. For you to find Mr. Motovich guilty, however, the government must prove that he did more than merely deceive the banks. To carry its burden, the government must prove that he knew his conduct would likely harm the bank's property interest. The scheme or artifice must relate to the bank's money or property.

Charge of the Court                    2967

You are instructed that banks have property rights in their customers' bank accounts, but do not have property interests in potentially valuable economic information which would enable the bank to make informed economic decisions about what to do with its money or property. However, the defendant need not have actual knowledge of whether the bank had property interests in the property sought.

The second element. The defendant executed or attempted to execute the scheme knowingly. The second element the government must prove beyond a reasonable doubt is that the defendant executed or attempted to execute the scheme knowingly. To act knowingly means to act voluntarily and deliberately, rather than mistakenly or inadvertently. Furthermore, this element requires that the defendant engaged in, or participated in, the scheme alleged with an understanding of its fraudulent or deceptive character and with an intention to help it succeed.

It is not required that the defendant participate in or have knowledge of all the operations of the scheme. The guilt of the defendant is not governed by the extent of his participation. It also is not necessary that the defendant originated the scheme, or that the defendant participated in the alleged scheme from the beginning. A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and

**J.A. 977**

Charge of the Court                    2968

intentionally acts in a way to further the unlawful goals, becomes a member of the scheme and is legally responsible for all that may have been done in the past in furtherance of the criminal objective and all that is done thereafter. Even if the defendant participated in the scheme to a lesser degree than others, he is nevertheless guilty, so long as the defendant became a member of the scheme to defraud with knowledge of its general scope and purpose.

The government must specifically prove that the defendant knew the scheme would likely harm the bank's property interest. The question of whether the defendant knew his course of conduct would likely harm the bank's property interest is a question of fact for you to determine, like any other fact question. This question involves one's state of mind. Direct proof of knowledge is almost never available. It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past he committed an act with unlawful knowledge. Such direct proof is not required.

The ultimate facts of knowledge, though subjective, may be established by a person's outward manifestations, his words, his conduct, his acts and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom. Circumstantial evidence, if believed, is of no less value than

Charge of the Court                    2969

direct evidence. In either case, the essential elements of the crime must be established beyond a reasonable doubt. In determining whether the defendant acted knowingly, you may also consider whether he believed in good faith that he was acting properly. If a defendant believed in good faith that he was acting properly, even if he was mistaken in that belief, this element cannot be established because a defendant who acted in good faith cannot be found to have acted knowingly and with the unlawful intent required in this element. The burden of establishing knowledge and lack of good faith rests upon the government. Mr. Motovich is under no burden to prove his good faith; rather, the government must prove Mr. Motovich's knowing and willful participation beyond a reasonable doubt.

The third element: Bank was federally insured or chartered. The last element the government must prove beyond a reasonable doubt is that the financial institutions identified in the indictment were insured by the federal deposit insurance corporation at the time of the execution of the alleged scheme. It is not necessary for the government to prove that the defendant knew the identity of the particular financial institution or that the defendant knew that the institution was insured by the federal deposit insurance corporation. It must prove, however, that the defendant intended to defraud the bank.

Charge of the Court                    2970

Theory two: Scheme to obtain money or property under bank's control. In order to prove Mr. Motovich guilty of knowingly executing a scheme to obtain money or property owned by or under the bank's custody or control under section 1344(2), the government must prove each of the following elements beyond a reasonable doubt: First, that there was a scheme to obtain money or property owned by or under the custody or control of a bank by means of materially false or fraudulent pretenses, representations or promises as charged in the indictment; second, that the defendant executed or attempted to execute the scheme knowingly and with the intent to obtain money or property owned by or under the custody or control of the bank; and third, that at the time of the execution of the scheme, the bank had its deposits insured by the FDIC.

The first element: Existence of a scheme to obtain bank money or property. The first element that the government must prove beyond a reasonable doubt is that there was a scheme to obtain money or property owned by or under the custody or control of a bank by means of false or fraudulent pretenses, representations or promises as described in the indictment. As I previously instructed you, banks have property rights in their customers' bank accounts, but do not have property interests in potentially valuable economic information which would enable the bank to make informed

Charge of the Court                    2971

economic decisions about what to do with its money or property. The government need not prove the scheme created a risk of financial loss to the bank.

I have instructed you on the meaning of scheme and you should follow that instruction here. For the scheme to obtain money by means of false or fraudulent pretenses, representations or promises, a false statement must be the thing that causes the bank to part with money in its control. If a false statement is not the reason the bank parts with money in its control, this element is not satisfied. A representation is fraudulent if it was falsely made with the intent to deceive.

Deceitful statements of half-truth, the concealment of material facts where that concealment makes an affirmative statement misleading, and the expression of an opinion not honestly entertained may constitute false or fraudulent representations under the statute. The deception need not be premised upon spoken or written words alone, however. The arrangement of the words, or the circumstances in which they are used may convey a false and deceptive appearance. If there is intentional deception, the manner in which it is accomplished does not matter.

The fraudulent representation must relate to a material fact or matter. A material fact is one you would reasonably expect to be of concern to a reasonable and prudent

Charge of the Court                    2972

person in relying upon the representation or statement in making a decision. This means that if you find a particular statement of fact to have been false, you must also determine whether that statement was one that a reasonable person would have considered important in making his or her decision. It does not matter whether the bank actually relied on the misrepresentation; however, the misrepresentation had to be capable of influencing the bank.

The same principle applies to fraudulent half-truths or the concealment of material facts where that concealment makes an affirmative statement misleading.

Second element: The defendant executed or attempted to execute the scheme knowingly.

The second element the Government must prove beyond a reasonable doubt is that the defendant executed or attempted to execute a scheme knowingly and with the intent to obtain money or funds owned by or under the custody or control of the bank. I instructed you on knowingly, good faith and that the ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence in the previous instruction. You should follow those instructions here.

Third element, the bank was federally chartered. The third element the government must prove beyond a reasonable doubt is that the financial institutions identified

**J.A. 978**

Charge of the Court                 2973

in the indictment were insured by the federal deposit insurance corporation at the time of the execution of the alleged scheme to obtain money or property under the custody or control of a financial institution.

It is not necessary for the government to prove that the defendant knew the identity of the particular financial institution or that the defendant knew that the institution was insured by the federal deposit insurance corporation. It must prove, however, that the defendant intended to obtain money or property under the custody or control of a financial institution.

A bank employee's participation in a scheme to commit bank fraud is not a defense to the bank fraud charges because a bank may be defrauded even if its employees allow or participate in the fraudulent practices. A bank's alleged negligence in detecting fraud is also not a defense to bank fraud charges. Further, the defendant is charged with aiding and abetting in counts three, four, five, and six. Thus, my instructions on aiding and abetting apply to those counts as well.

Count Seven, conspiracy to commit bank fraud. Count seven charges Mr. Motovich with conspiracy to commit bank fraud. In or about and between January 2012 and February 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant

Charge of the Court                 2974

David Motovich, together with others, did knowingly and intentionally conspire to execute a scheme to defraud financial institutions, and to obtain moneys, funds, credits and other property owned by, and under the custody and control of, such financial institutions by means of materially false and fraudulent pretenses, representations and promises.

I have already instructed you on the crime of conspiracy. Those instructions apply here. In order to prove the defendant committed conspiracy to commit bank fraud, the government must prove each of the following elements beyond a reasonable doubt: First, a conspiracy to commit bank fraud existed; and second, the defendant knowingly and willfully became a member of the conspiracy. Again, these are the first and second elements.

I already explained those to you previously, and those same instructions apply here. I have also previously instructed you on the crime of bank fraud, which is alleged to be the object of the conspiracy charged in count seven. I remind you that count seven charges bank fraud conspiracy, not the substantive crime of bank fraud. Accordingly, to convict the defendant on the bank fraud conspiracy count in this case, you must find beyond a reasonable doubt that there was an agreement to commit bank fraud. It is the conspiracy the government must prove, not the successful completion of the conspiracy's objectives.

Charge of the Court                 2975

Counts eight through fourteen, money laundering. Counts eight through fourteen charge Mr. Motovich with seven separate instances of money laundering. Count eight charges Mr. Motovich with money laundering. Count eight reads as follows: In or about and between February 2017 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally engage in one or more monetary transactions, in and affecting interstate commerce, in criminally derived property that was of a value greater than $10,000.00, and that was derived from specified unlawful activity, to wit: The crime charged in count one, contrary to Title 18, United States Code, section 1957(a).

Specifically, count eight alleges that on or about February 22, 2017, the defendant David Motovich transferred or caused the transfer of approximately $72,000.00 from a bank account ending in 8206 in Brooklyn, New York to a bank account ending in 1188 in New York, New York. Count nine charges Mr. Motovich with money laundering. Count nine reads as follows: In or about and between February 2017 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally engage in one or more monetary transactions, in

Charge of the Court                 2976

and affecting interstate commerce, in criminally derived property that was of a value greater than $10,000.00, and that was derived from specified unlawful activity, to wit: The crime charged in count one, contrary to Title 18, United States Code, Section 1957(a).

Specifically, count nine alleges that on or about march 1, 2017, the defendant David Motovich transferred or caused the transfer of approximately $320,000.00 from a bank account ending in 8206 in Brooklyn, New York to a bank account ending in 1188 in New York, New York. Count ten charges Mr. Motovich with money laundering. Count ten reads as follows: In or about and between February 2017 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally engage in one or more monetary transactions, in and affecting interstate commerce, in criminally derived property that was of a value greater than $10,000.00, and that was derived from specified unlawful activity, to wit: The crime charged in count one, contrary to Title 18, United States Code, section 1957(a).

Specifically, count ten alleges that on or about may 3, 2017, the defendant David Motovich transferred or caused the transfer of approximately $150,000.00 from a bank account ending in 8206 in Brooklyn, New York to a bank account ending

**J.A. 979**

Charge of the Court 2977

in 1188 in New York, New York. Count eleven charges Mr. Motovich with money laundering. Count eleven reads as follows: In or about and between February 2017 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally engage in one or more monetary transactions, in and affecting interstate commerce, in criminally derived property that was of a value greater than $10,000.00, and that was derived from specified unlawful activity, to wit: The crime charged in count one, contrary to Title 18, United States Code, section 1957(a).

Specifically, count eleven alleges that on or about July 14, 2017, the defendant David Motovich transferred or caused the transfer of approximately $66,166.00 from a bank account ending in 3476 in Brooklyn, New York to an American Express account ending in 0370 in New York, New York. Count twelve charges Mr. Motovich with money laundering. Count twelve reads as follows: In or about and between February 2017 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally engage in one or more monetary transactions, in and affecting interstate commerce, in criminally derived property that was of a value greater than

Charge of the Court 2978

$10,000.00, and that was derived from specified unlawful activity, to wit: The crime charged in count one, contrary to Title 18, United States Code, section 1957(a).

Specifically, count twelve alleges that on or about October 11, 2017, the defendant David Motovich transferred or caused the transfer of approximately $54,033.00 from a bank account ending in 8206 in Brooklyn, New York to an American Express account ending in 0370 in New York, New York.

Count thirteen charges Mr. Motovich with money laundering. Count thirteen reads as follows: In or about and between February 2017 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally engage in one or more monetary transactions, in and affecting interstate commerce, in criminally derived property that was of a value greater than $10,000.00, and that was derived from specified unlawful activity, to wit: The crime charged in count one, contrary to Title 18, United States Code, section 1957(a). Specifically, count thirteen alleges that on or about December 15, 2017, the defendant David Motovich transferred or caused the transfer of approximately $33,341.00 from a bank account ending in 8206 in Brooklyn, New York to an American Express account ending in 0370 in New York, New York.

Count fourteen charges Mr. Motovich with money

Charge of the Court 2979

laundering. Count fourteen reads as follows: In or about and between February 2017 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally engage in one or more monetary transactions, in and affecting interstate commerce, in criminally derived property that was of a value greater than $10,000.00, and that was derived from specified unlawful activity, to wit: The crime charged in count one, contrary to Title 18, United States Code, section 1957(a). Specifically, count fourteen alleges that on or about April 11, 2018, the defendant David Motovich wrote or caused to be written a check for $100,000.00 from a bank account ending in 9896 in Short Hills, New Jersey to a bank account ending in 2880 in Cherry Hill, New Jersey.

Title 18 United States Code section 1957 makes it a crime to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000.00. Specifically, section 1957 provides: Whoever knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000.00 and is derived from specified unlawful activity and does so either in the United States or in the special maritime and territorial jurisdiction of the United States or outside the United States and such special

Charge of the Court 2980

jurisdiction, but the defendant is a United States person shall be guilty of a crime.

In order to prove the crime of engaging in monetary transactions in property derived from specified unlawful activity in violation of section 1957, the government must establish beyond a reasonable doubt each of the following elements: First, that the defendant engaged in a monetary transaction in or affecting interstate commerce; second, that the monetary transaction involved criminally derived property of a value greater than $10,000.00; third, that the property was derived from specified unlawful activity—here, the offense alleged in count one of the indictment; fourth, that the defendant acted knowingly, that is, with knowledge that the transaction involved proceeds of a criminal offense; and fifth, that the transaction took place in the United States.

First element: Engaging in a monetary transaction the first element that the government must prove beyond a reasonable doubt is that the defendant engaged in a monetary transaction in or affecting interstate commerce. The term monetary transaction means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution. I am instructing you that the term financial institution includes banks.

The term interstate or foreign commerce means

J.A. 980

Charge of the Court                    2981

commerce between any combination of states, territories or possessions of the United States, or between the United States and a foreign country. You must find that the transaction affected interstate commerce in some way, however minimal. This effect on interstate commerce can be established in several ways. First, any monetary transaction with a financial institution insured by the federal deposit insurance corporation, commonly known as the FDIC, affects interstate commerce, so if you find that one of the transactions alleged in counts eight through fourteen was with a financial institution insured by the FDIC, that is enough to establish that the transaction affected interstate commerce.

Second, if you find that the source of the funds used in the transaction affected interstate commerce, that is sufficient as well. Third, if you find that the transaction itself involved an interstate transfer of funds, that would also be sufficient.

The second element, transaction involved criminal derived property. The second element that the government must prove beyond a reasonable doubt is that the monetary transaction involved criminally derived property having a value in excess of $10,000.00. The term criminally derived property means any property constituting, or derived from, proceeds obtained from a criminal offense. The term proceeds means any property derived from or obtained or retained,

Charge of the Court                    2982

directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity. The government is not required to prove that all of the property involved in the transaction was criminally derived property. However, the government must prove that more than $10,000.00 of the property involved was criminally derived property.

The third element, property derived from specified unlawful activity. The third element that the government must prove beyond a reasonable doubt is that the defendant knew that the property involved in the financial transaction was the proceeds of some form of unlawful activity. I instruct that this element refers to a requirement that the defendant knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a criminal offense under state or federal law.

I instruct you as a matter of law that operating an unlicensed money transmitting business as alleged in count one is a criminal offense. If you do not find that Mr. Motovich or another individual committed all elements for the alleged underlying offense, you must find Mr. Motovich not guilty of counts eight through fourteen. If you find that the government has failed to prove beyond a reasonable doubt that the transactions alleged in the indictment involved criminally derived property from the alleged unlicensed money

Charge of the Court                    2983

transmitting business charged in count one, then you must find Mr. Motovich not guilty of counts eight through fourteen.

If you find that the government proved beyond a reasonable doubt that one or more of the transactions alleged in the indictment did involve criminally derived property from such specified unlawful activity, then you must consider the remaining elements with respect to the relevant count. Fourth element: Knowledge the fourth element that the government must prove beyond a reasonable doubt is that the defendant knowingly engaged in an unlawful monetary transaction, as defined above.

I instruct you that in a prosecution for an offense under this section, the government is not required to prove that the defendant knew the particular offense from which the criminally derived property was derived. However, the government must prove beyond a reasonable doubt that the defendant knew that the transaction involved criminally derived property, which, I remind you, means any property constituting, or derived from, proceeds obtained from a criminal offense. If you find that the government has established, beyond a reasonable doubt, that the defendant knew that the transaction involved property derived from a criminal offense, then this element is satisfied.

Fifth element: Transaction took place in the United States the fifth element that the government must prove beyond

Charge of the Court                    2984

a reasonable doubt is that the transaction took place in the United States.

Count fifteen, Conspiracy to commit money laundering. Count fifteen of the indictment charges Mr. Motovich with conspiracy to commit money laundering. Count fifteen reads as follows: In or about and between February 2017 and April 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, did knowingly and intentionally conspire to engage in monetary transactions, to wit: Deposits, withdrawals and transfers of funds and monetary instruments, in and affecting interstate commerce, by, through and to one or more financial institutions, in criminally derived property that was of a value greater than $10,000.00 and that was derived from specified unlawful activity, to wit: The crime charged in count one, contrary to Title 18, United States Code, section 1957(a).

I have already explained the law of conspiracy to you. Those instructions apply equally to count fifteen. Thus, in order to prove the crime of money laundering conspiracy charged in count fifteen, the government must establish the following elements of the crime beyond a reasonable doubt: First, two or more persons entered into an agreement to launder money. Second, the defendant knowingly

**J.A. 981**

Charge of the Court          2985

and willfully became a member of the conspiracy.

I have also previously instructed you on the crime of money laundering, which is alleged to be the object of the conspiracy charged in count fifteen. I remind you that count fifteen charges money laundering conspiracy, not the substantive crime of money laundering. Accordingly, to convict the defendant on the money laundering conspiracy count in this case, you must find beyond a reasonable doubt that there was an agreement to commit money laundering. It is the conspiracy the government must prove, not the successful completion of the conspiracy's objectives.

Count Sixteen, aggravated identify theft. Count sixteen of the indictment charges Mr. Motovich with aggravated identity theft. Count sixteen reads as follows: In or about and between April 2016 and December 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant David Motovich, together with others, during and in relation to the crimes charged in count three and count seven, did knowingly and intentionally possess and use, without lawful authority, means of identification of another person, to wit: John Doe 1, knowing that the means of identification belonged to John Doe 1.

John Doe 1 is Reginald Garcia. Section 1028a(1) of Title 18 of the United States Code provides in relevant part:

Charge of the Court          2986

Whoever, during and in relation to any enumerated felony violation knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall be guilty of a crime.

In order to find the defendant guilty of aggravated identity theft, the government must prove the following elements beyond a reasonable doubt: First, that the defendant knowingly used or possessed a means of identification of another person; second, that the defendant used the means of identification during and in relation to the offense of bank fraud charged in count three or the offense of conspiracy to commit bank fraud charged in count seven; and third, that the defendant acted without lawful authority.

First element: Use of means of identification the first element that the government must prove beyond a reasonable doubt is that the defendant knowingly used or possessed a means of identification of another person. The means of identification must be specifically used in a manner that is fraudulent or deceptive. The term means of identification means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any name, social security number, date of birth, official state or government issued driver's license or identification number, alien registration number, government passport number, or employer

Charge of the Court          2987

or taxpayer identification number.

(Continued on the following page. )

Charge of the Court          2988

THE COURT: (Continuing)  In addition, the government must prove both the means of identification was that of an actual person, and that the defendant knew that the means of identification was that of an actual person. To act knowingly means to act voluntarily and intentionally and not by mistake.

Second element: Commission of predicate offense.

The second element that the government must prove beyond a reasonable doubt is that the defendant used or possessed the means of identification during and in relation to the offense of bank fraud charged in Count Three or the offense of conspiracy to commit bank fraud charged in Count Seven.

If you find the defendant not guilty on both Counts Three and Seven, you must find him not guilty on Count Sixteen. However, if you find the defendant guilty on Count Three or Count Seven, you may find him guilty on Count Sixteen. One or the other is sufficient but you must be unanimous as to which one.

During in and in relation to the offense of bank fraud as alleged in Count Three or bank fraud conspiracy as alleged in Count Seven means that the possession or use of the means of identification of another was the core of what made the underlying conduct unlawful. To be at the core of what made the alleged unlawful bank fraud or bank fraud conspiracy

J.A. 982

Charge of the Court 2989

counts unlawful is the use or possession of the means of identification must have done more than facilitate or enable the offense. Instead, the means of identification must be used or possessed in a manner that is fraudulent or deceptive. Such fraud or deceit going or going to identity can often by succinctly summarized as going to who is involved.

Third element: Without lawful authority.

The third element that the government must prove beyond a reasonable doubt is that the defendant acted without lawful authority.

To act without lawful authority means to act without the authorization of the issuing governmental entity to use the means of identification.

For this element, the government must -- strike that.

For this element the government is not required to show that the defendant stole or illegally obtained the means of identification. All that is necessary is that the defendant possessed or used the means of identification of another person without lawful authority during and in relation to the offense of bank fraud charged in Count Three or the offense of conspiracy to commit bank fraud charged in Count Seven. Without lawful authority includes a situation in which the defendant comes into a lawful possession of identifying information and had the lawful authority to use

Charge of the Court 2990

the information for a lawful purposes, but then used the information for an unlawful purpose.

Further, the defendant is charged with aiding and abetting in Count Sixteen. Thus, my instructions on aiding and abetting apply to this count.

Count Seventeen: Conspiracy to defraud the U.S.

Count Seventeen of the indictment charges Mr. Motovich with conspiracy to defraud the U.S. Count Seventeen reads as follows.

In or about and between January 2012 and February 2019, both dates being approximate and inclusive, within the EDNY of New York and elsewhere, the defendant Motovich, together with others, did knowingly and intentionally conspire to defraud the U.S. by impeding, impairing, obstructing and defeating the lawful government functions of the IRS or the Department of Treasury in ascertaining, computing, assessment and correction of revenue, to wit, payroll taxes collected pursuant to the FDIC Contributions Act and income taxes.

The relevant statute on this subject is 18 U.S.C. Section 371 which provides: If two or more persons conspired to defraud the U.S. or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each is guilty of a crime.

Charge of the Court 2991

I have already instructed you on conspiracy generally. There are some additional instructions I will provide briefly that relate to the conspiracy to defraud the U.S. as set forth in Count Seventeen.

To prove the crime of conspiracy to defraud the U.S. charged, the government must prove four elements beyond a reasonable doubt.

First, two or more persons --

Are you okay?

A JUROR: Yes.

THE COURT: First: Two or more persons entered into an agreement to defraud the U.S.

Second: The defendant knowingly and willfully became a member of the conspiracy.

Third: One of the members of the conspiracy committed at least one of the overt acts charged in the indictment.

And, fourth: At least one overt act was in furtherance of some object or purpose of the conspiracy, as charged in the indictment.

The government need not prove that the defendant actually defrauded the U.S., The unlawful act charged as the object of the conspiracy in Count Seventeen. However, you must find beyond a reasonable doubt that the defendant conspired with one or more individuals to defraud the

Charge of the Court 2992

United States.

First element: Existence of the agreement.

The government must prove beyond a reasonable doubt for Count One -- strike that -- for Count Seventeen that two or more persons entered into the charged agreement to defraud the U.S. I have previously explained to you what it means to enter into an agreement for purposes of a conspiracy.

Second element: Membership of the conspiracy.

The second element the government must prove beyond a reasonable doubt for Count Seventeen is that the defendant knowingly, willfully, became a member of the charged conspiracy. I have previously explained that to you.

Third: Overt acts.

The third element the government must prove beyond a reasonable doubt for Count Seventeen is that at least one overt act was knowingly committed by at least one of the conspirators at or about the time or place alleged.

The indictment alleges in furtherance of the conspiracy and to effect its objects, within the EDNY and elsewhere, the defendant Motovich together with others to commit and cause the commission of, among others, the following overt acts.

On or about February 4, 2014, Sarkinovic opened an account at the licensed check-cashing business to negotiate checks on behalf of a shell company, the identity of which is

J.A. 983

Charge of the Court                    2993

known to the grand jury. Sarkinovic provided incorporation documents and an IRS form SS-4 for Shell Company 2.

On or about March 4, 2014, an employee of the predecessor bank, the bank employee, an individual whose identity is known to the grand jury, contacted Sarkinovic to question him regarding certain transactions that had occurred in the Shell Company 2 bank account. During that conversation, Sarkinovic misrepresented the true purpose of the transactions to the bank employee.

C: On or about October 20, 2015, Motovich e-mailed Kuyan instructing her to make two wire transfers in the amounts of $15,000 and $85,000 from a shell company called bank account. Later that day, Kuyan e-mailed John Doe 4 and requested that a wire transfer in the amount of $15,000 be made from a shell company bank account maintained at Bank 1.

D: On or about November 11, 2015, Motovich mailed Kuyan with the subject "FWD: 70K wire." That evening, Kuyan e-mailed John Doe 4 and requested that a wire transfer in the amount of $70,000 be made from a shell company bank account maintained at Bank 1.

E: On or about November 21, 2017, Motovich e-mailed Kuyan with the subject line "Forward wiring instructions." In the body of the e-mail, Motovich stated "Please wire 50." That evening, Kuyan e-mailed John Doe 4 and requested that a wire transfer in the amount of $50,000 be made from the Shell

Charge of the Court                    2994

Company 1 bank account to an account maintained at Bank 2 for the benefit of an attorney trust account.

On or about February 7, 2018, Sarkinovic opened an account at the licensed check-cashing business to negotiate checks on behalf of Shell Company 3, the identity of which is known to the grand jury. Sarkinovic provided incorporation documents and IRS form SS-4 for Shell Company 3.

The licensed check-cashing business referenced in A is Coney Island Payroll Services. Shell Company 2 is Ago & Alaudin Contracting Company. Bank 3 is Sterling National Bank. Bank 1 is Carver Federal Savings Bank. John Doe 4 is Dannette Sullivan-Hyatt. Shell Company 1 is ZKC NY Inc. Bank 2 is JPMorgan Chase. Shell Company 3 is CNBC Construction Corp.

To establish the third element the government need not prove all of the overt acts alleged the indictment. Similarly, you need not find that the defendant himself committed the overt act. It is sufficient for the government to show one of the conspirators knowingly committed an overt act in furtherance of the conspiracy since, in the eyes of the law, such an act becomes the act of all the members of the conspiracy.

You are further instructed that the overt act need not have been committed at precisely the time alleged in the indictment. It is sufficient if you are convinced beyond a

Charge of the Court                    2995

reasonable doubt that it occurred at or about the time and place stated.

Finally, you must find either the agreement was formed or an overt act was committed in the EDNY.

Fourth element: In furtherance of some objective.

The fourth and final element the government must prove beyond a reasonable doubt is that the overt act or acts were committed for the purpose of carrying out the unlawful agreement.

In order for the government to satisfy this element, it must be proven beyond a reasonable doubt that at least one overt act was knowingly and willfully done by at least one conspirator, in furtherance of some object or purpose of the conspiracy, as charged in the indictment. In this regard, you should bear in mind the overt act, standing alone, may be an innocent lawful act. Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding or assisting the conspiratorial scheme. Therefore, you are instructed the overt act does not have to be an act which, in and of itself, is criminal or constitutes an objective of the conspiracy.

The object the defendant is alleged to have agreed to accomplish is to defraud the U.S. by impeding, impairing, obstructing and defeating the lawful government functions of the IRS of the Department of Treasury ascertaining -- excuse

Charge of the Court                    2996

me -- computing, assessment and collection of the revenue, specifically, payroll taxes collected pursuant to the FDIC and FICA and income tax laws.

A conspiracy to defraud the U.S. does not mean that one of the illegal objects must be to cause the government to suffer a loss of money or property as a consequence of the conspiracy. The statute also includes conspiracies to obstruct, interfere with, impair, impede or defeat the legitimate functioning of the government through fraudulent or dishonest means. I instruct you that the IRS is an agency of the U.S. Government. The term "conspiracy to defraud the U.S." therefore means that the defendant is accused of conspiring to impede, impair, obstruct or defeat, by fraudulent or dishonest means, the lawful functions of the IRS to ascertain taxes and to collect lawfully due and owing tax revenue.

Only conduct that is both intended to impede the lawful functions of a government agency and is fraudulent or dishonest will support a charge of conspiracy to defraud a government agency. A conspiracy to impede the functions of a government agency by fraudulent or dishonest means may include such things as altering documents after they have been demanded by the government agency, creating false documents, destroying records, making false statements, attempting to induce others to make false statements, or engaging in any

**J.A. 984**

Charge of the Court                    2997

other fraudulent or deceptive conduct that would have the effect of impairing the ability of the government agency to determine material aspects of a transaction.

By giving you these examples, ladies and gentlemen, I do not mean to suggest that they are the only actions that could impede the IRS by fraudulent or dishonest means, nor am I expressing any views as to whether conduct similar to these examples actually took place here. That is for you to decide as the jury.

Not all conduct that impedes the lawful function of a government agency is illegal. To be unlawful, that conduct has to entail fraud, deceit and other dishonest means. It's not illegal simply to make the IRS's job harder. Only an agreement to engage in conduct that tends to impede the IRS, and also involves fraudulent, deceitful or dishonest means, constitutes an illegal agreement to defraud the U.S.

It's not necessary that the government or the IRS actually suffer a financial loss from a scheme. A conspiracy to defraud exists when there is an agreement to impede, impair, obstruct, or defeat, in any fraudulent or dishonest manner the lawful functions of the IRS. One cannot use deception or dishonest means to impede, impair, defeat, or obstruct the IRS, even to protect a legitimate tax position.

Where, however, there is an agreement to impede, impair, obstruct or defeat the lawful functions of the IRS by

Charge of the Court                    2998

fraudulent, deceptive or dishonest means, this element is satisfied regardless of whether the means of doing so in that particular instance are or are not unlawful in and of themselves.

Count Eighteen: Witness tampering.

Count Eighteen of the indictment charges Motovich with witness tampering. Count Eighteen reads as follows.

In or about and between January 2019 and June 2019, both dates being approximate and inclusive, within the EDNY and elsewhere, Defendant Motovich, together with others, did knowingly, intentionally and corruptly persuade and attempt to do so, and engage in misleading conduct toward Kemal Sarkinovic, with intent to hinder, delay and prevent the communication to a law enforcement officer of the United States information -- of the United States information relating to the commission and possible commission of one or more federal offenses, to wit, the crimes charged in Counts One, Two, Four, Five, Six and Seven.

The relevant statute on the subject is 18 U.S.C. Section 1512(b)(3) which provides, in relevant part:

Whoever knowingly, corruptly persuades another person or attempts to do so, or engages in misleading conduct toward another person, with intent to hinder, delay or prevent the communication to a law enforcement officer or judge of the U.S. of information relating to the commission or possible

Charge of the Court                    2999

commission of a federal offense shall be guilty of a crime.

The statute is designed to protect persons who are victims of federal crimes, persons who may be called upon to testify or other give evidence in a federal proceeding, civil or criminal, and persons who have information about federal crimes. The integrity of the federal system of justice depends upon the cooperation of such victims and potential witnesses. If persons with such information do not come forward, produce evidence, and appear when summoned, the criminal justice system will be significantly impaired. This statute was devised to make it unlawful for anyone to tamper with such a witness in the manner described by the statute.

In order to prove the defendant guilty of tampering with a witness by corrupt persuasion, the government must prove each of the following elements beyond a reasonable doubt.

First, on or about the date charged, the defendant knowingly, corruptly, persuaded Kemal Sarkinovic or attempted to do so, or engaged in the misleading conduct towards Sarkinovic and, the defendant acted knowingly and with intent to hinder, delay or prevent the communication to a law enforcement officer or judge of the U.S. of information relating to the commission or possible commission of a federal offense.

First element: Defendant used corrupt persuasion or

Charge of the Court                    3000

engaged in misleading conduct.

The first element the government must prove beyond a reasonable doubt is that the defendant knowingly corruptly persuaded Sarkinovic or attempted to do so or engaged in misleading contact toward him.

To "corruptly persuade" means to act knowingly with a wrongful or evil purpose to corrupt or induce another person to engage in certain conduct.

"Misleading conduct" means knowingly made a false statement, or intentionally omitting information from a statement and thereby causing a statement to be misleading, or intentionally concealing a material fact and thereby creating a false impression by such statement or with intent to mislead, knowingly submitting or inviting reliance on a writing or recording that is false, forged, or altered or otherwise lacking in authenticity or with the intent to mislead, knowingly submitting or inviting reliance on a sample, specimen, map, photograph, boundary, mark, or other object that is misleading in a material respect, or knowingly using a trick, scheme or device with the intent to mislead.

Second element: Intent to hinder communication to law enforcement.

The second element the government must prove beyond a reasonable doubt is that the defendant acted knowingly and with intent to hinder, delay, prevent communication to a law

**J.A. 985**

Charge of the Court                3001

enforcement officer or judge of the U.S. of information relating to the commission or possible commission of a federal offense.

If you find that the defendant acted with the intent to hinder or prevent communication by Sarkinovic to a specific law enforcement officer or group of officers, this element is satisfied if that officer or one of the group of officers was a federal law enforcement officer. A federal law enforcement officer is an officer or employee of the Federal Government who is authorized to act on behalf of the Federal Government in the prevention, detection, investigation, prosecution of federal crimes. The government is not required to prove that the defendant knew that the officer was a federal law enforcement officer.

I instruct you that Special Agents of the IRS, members of the U.S. Attorney's Office for the EDNY are federal law enforcement officers.

On the other hand, if you find that the defendant was not acting with the intent to prevent communication to a particular officer or group of officers, then this element is satisfied only if the government proves beyond a reasonable doubt that there was a reasonable likelihood that had Kemal Sarkinovic been able to communicate with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer.

Charge of the Court                3002

And now we get to the general rules regarding deliberations, the true home stretch, and I will zip through this and then you get the case and you get your lunch.

(Continued on next page.)

Charge of the Court                3003

(Continuing.)

THE COURT: General rules regarding deliberations.

This brings me to the final part of these instructions, praise the Lord. Some general rules regarding your deliberations.

You are about to go to the jury room to begin your deliberations. If you want any of the testimony provided to you, you may request that. Please remember it is not always easy to locate what you want right away. Please be as specific as you can possibly be in requesting the exhibits or portions of the testimony. I will send them back to you in the jury room.

Please print the request. The Jury Foreperson signs the form, but print the request. I'm sure your handwriting is better than mine, but print it so we can read it.

Your requests for exhibits or testimony — in fact, any communication with the Court — should be made to me in writing, signed by your Jury Foreperson, and then handed to the Court Security Officer who is stationed outside of the jury room. I will respond to any questions or requests you have as promptly as possible. In any event, do not tell me, do not tell anyone else, how the jury stands on any issue until after a unanimous verdict is reached by the jury.

The Government, to prevail, must prove the essential elements by the required degree of proof, as I already

Charge of the Court                3004

explained in these instructions. If it succeeds, your verdict should be guilty; if it fails, your verdict should be not guilty. To report a verdict, it must be unanimous.

Your function is to weigh the evidence in the case and determine whether or not the defendant is guilty, solely upon the basis of such information.

Each juror is entitled to his or her opinion; each should, however, exchange views with his or her fellow jurors. That is the very purpose of jury deliberation — to discuss and consider the evidence; to listen to the arguments of fellow jurors; to present your individual views; to consult with one another respectfully; and to reach an agreement based solely and wholly on the evidence — if you can do so without violence to your own individual judgment.

Each much you must decide the case for yourself, after consideration, with your fellow jurors, of the evidence in this case.

You should not hesitate to change an opinion that, after discussion with your fellow jurors, appears erroneous.

However, if, after carefully considering all the evidence and the arguments of your fellow jurors, you entertain a conscientious view that differs from the others, you are not to yield your convictions simply because you are outnumbered.

Your final vote must reflect your conscientious

J.A. 986

*Charge of the Court* 3005

conviction as to how she is issues should be decided. Your verdict, whether guilt or not guilty, must be unanimous.

Again, each of you must make your own decision about the proper outcome of this case based on upon your considerations of the evidence and your discussions with your fellow jurors. You should, and I'm sure you will, treat each other with respect.

When you retire to the jury room, you will begin your deliberations. You should select someone to be the foreperson of your jury. The foreperson will be responsible for signing all communications to the Court and for handing them to the Court Security Officer who will be seated directly outside of the door to secure your safety and your confidentiality to your jury room during your deliberations.

When you start deliberations, do not talk to me or any of my court staff, to anyone else, except to one another about this case. You may not use any electronic devices or social media in your deliberations. You may only use them after the Court has publicly announced your verdict and after you, the members of the jury, have been discharged with the thanks of the Court.

Remember, in your deliberations, the dispute between the United States of America and Mr. Motovich, for them, is no passing matter. It is no passing matter for any of us. They and the Court rely upon you to give full and conscientious

*Charge of the Court* 3006

deliberation and consideration to the issues and evidence before you. By so doing, you carry out to the fullest your oath as a juror to try well and to try truly the issues of this case and to render a true and just verdict. I and the parties in this case and their counsel are confident you will and we thank you.

I am now sending you into the jury room with one copy of these instructions, which has been marked as Court Exhibit 1AA. I am also sending a sheet to be sent out notifying the Court that you have reached a decision and a copy of the final verdict sheet, both of which must be signed and dated by the Jury Foreperson once you have reached your unanimous decision.

I now have the Court Security Officer please come forward to be sworn. The Court Security Officer will then escort the jurors in seats numbered 1 through 12 into the main jury room associated with the court, the one you've been in. And the balance of the jurors, the remaining three, into the adjacent jury room. Jurors 1 through 12 will now begin their deliberations in the room. The balance of the jurors will be kept in the adjacent room until the Jurors 1 through 12 have reached their unanimous verdict.

Please swear the Court security officer.

Please raise your right hand.

THE COURTROOM DEPUTY: Do you solemnly swear or

*Charge of the Court* 3007

affirm that you will keep these jurors together in some private place and convenient place and not permit any person to speak to them or communicate with them, nor do so yourself unless by order of Court, nor ask whether they have agreed on a verdict, and that you will you return them to court when they have signed and so agreed, or when you are ordered to do so, so help you God?

THE COURT SECURITY OFFICER: I will.

(Court Security Officer sworn/affirmed.)

THE COURT: Thank you.

Now escort the jurors to their appropriate room assisted by my court deputy.

(The jury exits to begin deliberations at 4:00 p.m.).

THE COURT: All right. The jurors have left the courtroom.

Please be seated, ladies and gentlemen.

Are there any issues to address while we are awaiting the jury verdict?

First, from the Government.

MR. POLEMENI: No, Your Honor. Thank you.

THE COURT: Defense.

MR. JACKSON: Just one, Judge.

I think I previously, previously provided your deputy with our contact information, but should we provide

*Charge of the Court* 3008

contact information?

THE COURT: Yes, that's a good question.

Everyone should provide my court deputy and my law clerks with your cell phone numbers. You are welcome to stay here waiting for notes to come out.

I think I've explained several times now my process for informing you of what any notes that come out say and, of course, I'll inform you when we have the verdict reached. And then we'll bring the jury back to read the verdicts out loud.

But yes, you should provide cell phone contact information to my law clerks and my court deputy. We will call you back.

You're welcome to stay here. You're welcome to go back to your respective spaces and we will call you as soon as we have a note. And, obviously, as soon as we have a verdict from the jury.

MR. JACKSON: Thank you, Judge.

THE COURT: Anything else?

MR. JACKSON: No, Judge.

THE COURT: Anything else from the Government?

MR. POLEMENI: No, Your Honor, thank you.

THE COURT: Okay, thank you.

(Recess taken.)

(Continued on the following page.)

J.A. 987

3009

(Court resumes at 5:10 p.m. outside the presence of the jury.)

THE COURT: We have the defendant present and counsel of record present.

We have our first note which I had marked as Court Exhibit 4 for identification. It's captioned "Judge Questions." I'm going to read it out loud and give you each a copy of the note.

"One: We would like Post-its and a whiteboard, please.

"Two: We would like as many full transcripts as possible up to 12.

"Three: Are we able to see the closing argument presentations in here? If so, we'd like those.

"Four: We would like both the Adamou recording transcripts.

"Thank you." Signed by the jury foreperson identified as Juror No. 6.

Please give a copy of the, of Court 4 to each of the lawyers, please, Mr. Scott.

And I'm going to begin by asking, now that you've heard it and now that you have copies of the exhibit which is marked as Court 4 for identification captioned "Judge's Questions," beginning with the government, we'll take each one ad seriatim, what is the government's suggested response to 1

3010

which says, "We would like Post-its and a whiteboard, please?"

What does the government suggest we respond to that?

MR. POLEMENI: That's fine, Judge.

THE COURT: Defense?

MR. JACKSON: That's fine, Judge.

THE COURT: All right. I will direct my court deputy to hand Post-its and a whiteboard to the court security officer. The court security officer will bring it into the jury room. Just to be clear, no one else is going into that jury room.

Secondly, "We would like as many full transcripts as possible up to 12."

What do you understand that request to be addressed to, government, and then I'll ask defense counsel? When they say, and this is their language, "We would like as many full transcripts as possible up to 12," what do you understand them to be requesting? And then I'll ask defense counsel.

You have the entirety of their request in front of you.

MR. POLEMENI: Judge --

THE COURT: What do you understand --

MR. POLEMENI: I'm trying to --

THE COURT: Hang on. Hang on.

What do you understand this request to be seeking and then I will ask defense counsel what they understand the

3011

request to be seeking.

So, government, what do you understand this request to be seeking?

MR. POLEMENI: Twelve copies of the full --

THE COURT: Let's stop with "transcripts."

What do you understand them to be seeking with respect to the word "transcripts"?

MR. POLEMENI: I imagine witness testimony, witness transcripts.

THE COURT: Okay. Let me ask defense counsel: What do you understand them to be seeking when they say they want as many full transcripts as possible up to 12?

MR. JACKSON: I understand them also to be asking for witness transcripts, Your Honor.

THE COURT: So you understand them to be asking for the entirety of the trial transcripts, obviously excluding, from our point of view, obviously excluding sidebars and discussions that were held outside the presence of the jury. Is that what the government understands them to be seeking?

Is that what the government understands --

MR. POLEMENI: Yes, Judge.

THE COURT: -- them to be seeking?

MR. POLEMENI: It's not entirely clear to me but that's one interpretation of it, yes.

THE COURT: Well, is that your interpretation?

J.A. 988

3012

MR. POLEMENI: Yes.

THE COURT: Defense counsel, what is your interpretation of what the jury is seeking?

MR. JACKSON: My best interpretation is, yes, Judge, that they're asking for full transcripts of all the witness testimony.

THE COURT: All right. Another possible interpretation would be that they're asking for 12 copies of the jury charge. That is another possible interpretation, however, it is also a possible interpretation that they are asking for 12 full transcripts of the entirety of the trial testimony excluding, as I said, sidebars.

So one approach would be for the court to send in 12 copies of the jury charge and then see if we get a note back saying, What do you not understand about the word "transcripts," and then a request to get 12 copies of the thousands of pages of transcripts or for them to say nothing and proceed with what they get.

My inclination, and not because I'm a chartered member of the Sierra Club, but my inclination would be to send in 12 copies of the jury charge, they have one copy of the jury charge, and see if that satisfies them or if we get a note back saying, What do you not understand about the word "transcripts."

So my ruling -- and I hear both of you, and both of

3013

your positions is perfectly reasonable. I asked my law clerks just to ballpark how many pages of transcript they understand have been generated in this trial which is going on, as you know, for three weeks and their ballpark estimate was several thousands of pages.

Is that the government's understanding as well?

MR. POLEMENI: Yes, Your Honor.

THE COURT: Is that defense counsel's understanding as well?

MR. JACKSON: Yes, Judge.

THE COURT: So we'll send in my ruling. We'll send in 12 copies of the jury charges unless the government has a problem with that.

Do you have a problem with that?

MR. POLEMENI: No, Judge.

THE COURT: Do you have a problem with that, defense counsel? They already have one copy of the jury charge and if they want more, trust me, they're a jury, they'll let us know.

MR. JACKSON: No, Judge.

THE COURT: So that will be my ruling. Your responses, respective responses on the record are fine. If they ask for 12 copies of the thousands of pages of transcript, then I will make a ruling with respect to that.

Next, "Are we able to get the closing argument presentations in here? If so, we would like those."

3014

What is the government's response to that?

MR. POLEMENI: I think the answer is no to that.

THE COURT: What is the defense response to that request?

MR. JACKSON: We have no objection to them having them.

THE COURT: All right. I'm going to not send in the closing arguments because closing arguments are not evidence and I'm not sending in material that's not evidence.

So I'm going to, in the order, deny that request. They asked, "Are we able to get the closing argument presentations in here?" I'm going to make the ruling that the answer to that question is no, but your objection is noted for the record that you think they should be allowed to get the closing arguments, defense counsel, if that's your position.

Is that your position Mr. Jackson?

MR. JACKSON: No, Judge, only we had no objection if the Court wanted to do so.

THE COURT: All right. This is what I'm sending in and your position is as stated.

MR. JACKSON: Thank you, Judge.

THE COURT: All right.

Next, "We would like both the Adamou recordings transcripts."

What do you understand that to be a request for,

3015

beginning with the government?

MR. POLEMENI: The transcripts, Government's Exhibit, I believe, 600-A and 601-A or 600-T and 601-T.

THE COURT: They said, "We would like both the Adamou transcripts." What are the numbers on that?

MR. POLEMENI: 600-T and then the defense has their exhibit, their transcripts.

THE COURT: I just want to know what -- they asked for the recording transcripts. So it's the government's position they're asking for the transcripts of the recording and not for the recordings themselves, is that correct?

MR. POLEMENI: That's my understanding, Judge.

THE COURT: Let me ask defense counsel now.

What is your understanding of what the jury has requested?

MR. JACKSON: It sounds to me, Judge, like they are requesting some version of multiple recording transcripts.

THE COURT: Right. They say, "We would like both the Adamou recording transcripts."

So my ruling, at least initially, will be to send in the transcripts and not the audio, though as I told them repeatedly, the audio is, in fact, the evidence, the transcripts are there to assist them.

If they send out a note saying they want the audio back, that's fine, but they heard the audio at the same time

3016

they had the transcript. It's not as if there's a huge disconnect there, in my view. Obviously, if they want the audio back, then we'll send them back the audio as well but they've asked for the transcripts.

Yes?

MR. JACKSON: Your Honor, we would request that the recordings that are on the computer be sent back and not the transcripts since the transcripts are not evidence. They're only an aid.

THE COURT: Well, they're an aid to that and they have asked for transcripts. They have not asked for recordings. They've asked for recording transcripts. "Recording" is the adjective. "Transcript" is the noun.

So I hear you. I'm going to overrule you on that and I'm going to send in the transcript. They are perfectly free to send out a note saying now we want the audio as well. So that's my ruling.

So we're going to draft the order which I will sign.

The order will say that we're sending in the Post-its and whiteboard through the CSO and that will be Court 4-A for your records, we're sending in 12 copies of the jury charge, I'm denying their request to have copies of the closing arguments, and I will state the closing arguments are not evidence and that's the reason I'm not sending it in. They can request evidence but not items that are not evidence.

**J.A. 989**

3017

And I am going to send in the Adamou transcripts.

That's my ruling. That will be reflected in the order which I'm going to sign and enter and give to each of you as well.

All right. So I'm going to ask counsel now to make copies and hand up to my court deputy the Adamou transcripts. Will you hand those up, please, to my deputy? Thank you.

And, again, what are the exhibit numbers? We're going to put those in the order. Read it out loud, please. My court deputy, my law clerk is writing up the order even as we speak.

MR. POLEMENI: GX-600-T.

THE COURT: Go ahead.

MR. POLEMENI: GX-600-T and, I'm not sure, it's a defense exhibit. I'm not sure exactly.

THE COURT: We just need to know what the numbers are for my written order.

So, Counsel, what is the number of the transcripts that we're sending in?

MR. JACKSON: DX-4532, Your Honor.

THE COURT: Okay. Mr. Scott, would you rustle up now the whiteboard and the Post-its.

THE CLERK: Will do, Judge.

THE COURT: And I like to send, if we can, everything in one fell swoop to the jury through the CSO. So

3018

let's get the written order done. I'll read it out loud to you folks so you know what I'm sending in. Your objections are preserved to the extent you would have done something different.

Make sure there's nothing else on the whiteboard, please, underneath. It's just one sheet? Sometimes there are multiple layers. Old school. Okay. That's fine. So we're going to send in the whiteboard. Please put it right there for now.

Do you have Post-its?

THE CLERK: I do.

THE COURT: So you will hand those to the CSO. Who's going to print out these 12 copies?

THE LAW CLERK: I have 11 copies currently printing.

THE COURT: So when they're done, we'll have them handed to the CSO to go in as well.

We have the -- we're not going to give them closing arguments.

And we have the Adamou transcripts. Yes?

MR. JACKSON: We have it coming in now, Judge.

And just FYI, Your Honor, we prepared redacted transcripts to the extent that it becomes necessary of all of the witness testimony that we shared with the government and we've printed out one copy of that in case it's requested just so the Court is aware.

3019

THE COURT: So let me read out loud to you what I'm proposing to send in as Court Exhibit 4-A, my order.

On July 26th, the jury began their deliberations in the above captioned case. During their deliberations, the jury sent out a note which has been marked as Court Exhibit 4. The jury's note reads as follows.

"Judge Questions.

"We would like Post-its and a whiteboard, please.

"We would like as many" -- "Number 2: We would like as many full transcripts as possible up to 12.

"Are we able to get the closing argument presentations in here? If so, we'd like those."

And item 4: "We would like both the Adamou recordings transcripts."

As to request 1, the Court grants the jury request and orders Post-It notes and a whiteboard to be delivered into the jury room by the court security officer.

As to request 2, upon conferring with the parties, the court has determined the jury is requesting to review what the court has admitted into evidence as Court Exhibit 1-AA. The court grants the jury request and has attached 11 copies of Court 1AA to this order.

Now, they requested, they said up to 12 so let's give them 12. All right?

THE LAW CLERK: Okay.

**J.A. 990**

3020

THE COURT: And we'll change the word "11" to "12" in this order.

As to request 3, the court denies the jury request since closing arguments are not evidence.

As to request 4, upon conferring with the parties, the court has confirmed the jury is requesting permission to review -- requesting to review what the court has admitted into evidence as Government's Exhibit 600-T and Defense Exhibit 4532. The court grants the jury's request and has attached Government Exhibit 600-T and Defense Exhibit 4532 to this order.

So ordered by yours truly.

So that is the order. And that is the order 4-A that I'm now signing and this is what will go into the jury room. So they're going to get 4-A, they're going to get the whiteboard, the Post-its, the 12 copies of the jury charge, they're not getting closing arguments and they are getting the two transcripts.

And we'll give multiple copies to the lawyers of what I just signed.

(Pause.)

THE COURT: We're back on the record.

We have another note which my court deputy is going to copy and bring out and I will read it to you. I haven't seen it yet and I'll give you copies as well. We're in the

3021

process of completing the photocopying of the earlier documents that we've discussed with respect to the request under 4.

(Pause.)

THE COURT: Note 4 is followed by note 5 which I have.

Note 5 reads as follows.

"To Quadri," who is my court deputy. "We really want to leave. Please let us leave.

"Two: If we're being held here because of our last note to the judge, then please disregard. We were just trying to get ahead start on Monday.

"Three: I have a train to catch."

This note is unsigned but we will still make it part of the record and my response is going to be note 5-A which we're going to type up right now is: "You may leave. Have a good safe weekend and we are sending the materials that you requested in to the jury room through the court security officer."

Is that acceptable -- and here's a copy of the note for counsel.

Is that acceptable to counsel?

The government?

MR. POLEMENI: Yes.

THE COURT: Defense counsel?

3022

MR. JACKSON: Yes, Judge, okay.

Judge, may I make one potential suggestion on that?

THE COURT: You may make as many suggestions as you wish.

MR. JACKSON: I don't know -- is the Court going to instruct them in a note that they can begin deliberating when they come back in or does the Court want them to come back here first?

THE COURT: No, I don't want them to come back here. We're not going to see them again until they come back with a verdict. This isn't state court. So we're going to write a note that says they may leave for the night and they should return on Monday morning to resume their deliberations at 9:30 a.m. in the jury room.

MR. JACKSON: Perfect, Judge.

THE COURT: And this, again, will be note 5-A that we're referring to the text of now.

Do we have note 4 that we can send into the jury so they're not wondering if they're all complete?

THE LAW CLERK: We have not sent 4A in because we do not a have all of the exhibits.

THE COURT: Why don't you send 4.A with the poster board and Post-its. And we have the other exhibits ready to go or no?

THE LAW CLERK: We do not have anything ready to go

3023

in because the copies of the jury charge are still printing.

THE COURT: So why don't we send in the Post-its and the board right now. Give this to the court security officer.

Do we have the note itself, the order itself?

THE LAW CLERK: I believe I gave it to Quadri.

THE COURT: Let's get that into the jury so they don't -- all right. It's okay if we get the rest exhibits -- I like to get everything in at once but since it's Friday and they're already about sending notes about catching trains, let's do that. Can we do that now?

THE LAW CLERK: Yes.

THE COURT: Off the record.

(Discussion off the record.)

THE COURT: So I'm now signing another duplicate original 4-A and having Quadri take that into the CSO who will give it to the jury. Okay?

And then we're working on 5-A so they know they can go home and also tells them to be back and report directly to the jury room at 9:30 a.m. and continue their deliberations on Monday morning.

Off the record.

(Discussion off the record.)

THE COURT: Court 5-A, I'm going to sign and enter, reads as follows.

"On July 26, 2024, the jury began their

J.A. 991

3024

deliberations on the above captioned case. During their deliberations, the jury sent out a note which has been marked as Court 5. The jury's note reads as follows.

"To Quadri, the court deputy: We really want to leave. Please let us leave.

"If we're being held here because of our last note to the Judge, then please disregard. We were just trying to get a head start on Monday.

"I have a train to catch."

The court directs the jury to report to the jury room at 9:30 on Monday morning to continue their deliberations. We will send you the materials previously requested to the jury room by the court security officer."

Let me make copies of this. You can give it to the CSO, you can give it to the jurors now so they know they're free to leave. And just print out another one if you wouldn't mind for me so I can sign it and we'll make copies for the lawyers and that will be entered as both 4 and 4-A and 5 and 5-A so we have everything on the record so you've got contemporaneous records of it on ECF.

Okay. Is there anything else we need to address?

We're going to give you folks the copies now.

Katelyn, maybe you can make copies of this and hand it to the lawyers. Thank you so much.

Anything else we need to address tonight before we

3025

folks go home?

MR. POLEMENI: No, Judge. Have a good weekend.

THE COURT: Thank you.

Anyone else?

MR. JACKSON: Judge, I just want to make sure. I know the jury is not coming. You don't expect us to be here. We were planning to be in the courthouse but just wait until the Court calls us.

THE COURT: I'm the one who has no life. I mean you folks are full of vim and vigor. So I will certainly be here bright and early to take whatever notes they start firing out, whether they start firing them out at 9:30 or not. We have your cell numbers so we will call you as soon as any notes come out or reach a verdict or anything like that that requires your presence.

So I would just suggest that you be, as I said when my kids grew up, we like to have them in the hood, not necessarily in the house. So just be nearby so that we can call you and we don't have to wait unduly long periods of time for you to have --

MR. JACKSON: No, we'll be in the courthouse, Judge. Some judges want us to check in in the morning so we're just, we just want to make sure that the Court didn't want that.

THE COURT: I went to Catholic school growing up. I don't run a Catholic school. Trust me. The nuns who raised

3026

me, William, you will be here at 9:30 or else, but that's back in the '50s.

MR. JACKSON: Same except Jesuits.

THE COURT: The Jesuits were a little more flexible.

MR. JACKSON: Terrified to imagine.

THE COURT: So what else you got?

MR. JACKSON: Nothing else, Judge. Thank you.

MR. POLEMENI: Nothing. Thank you, Judge.

THE COURT: Well, go with God.

MR. JACKSON: Thanks, Judge.

MR. MAZUREK: Thank you, Judge.

(Matter adjourned to July 26, 2024 at 9:30 a.m.)

3027

```
            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,      : 21-CR-00497(WFK)
                               :
                               :
     -against-                 : United States Courthouse
                               : Brooklyn, New York
                               :
DAVID MOTOVICH,                : Monday, July 29, 2024
                               : 9:30 a.m.
          Defendant.           :
                               :
- - - - - - - - - - - - - - - - X
          TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
       BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
         UNITED STATES SENIOR DISTRICT COURT JUDGE
               A P P E A R A N C E S :
For the Government: BREON S. PEACE, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY:  ROBERT POLEMENI, ESQ.
                     ERIK D. PAULSEN, ESQ.
                     ANDREW GRUBIN, ESQ.
                     MATTHEW C. SKURNIK, ESQ.
                     Assistant United States Attorneys

For the Defendant:   WACHTELL, LIPTON, ROSEN & KATZ
                     51 West 52nd Street
                     New York, New York 10019-6150
                 BY: RANDALL WADE JACKSON, ESQ.
                     JESSICA LAYDEN, ESQ.
```

**J.A. 992**

3028

```
            APPEARANCES - Continued

For the Defendant: MEISTER SEELIG & FEIN, LLP
                   125 Park Avenue
                   8th Floor
                   New York, New York 10017
              BY:    HENRY R. MAZUREK, ESQ.
```

Court Reporter: Nicole J. Sesta, RMR, CRR, RPR

Official Court Reporter

E-mail: NSestaRMR@gmail.com

Proceedings recorded by computerized stenography. Transcript produced by Computer-aided Transcription.

*Proceedings* 3029

THE COURTROOM DEPUTY: Criminal cause on trial, 21-CR-497, United States of America versus David Motovich. Will the attorneys state their name for the record.

MR. POLEMENI: Good morning, Your Honor. Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, Paralegal Kavya Kannan, and Special Agent Christopher Cabane for the United States.

THE COURT: Good morning, counsel. Please be seated.

MR. JACKSON: Good morning, Judge. Randall Jackson, Jessica Layden, Henry Mazurek on behalf of our client, David Motovich.

THE COURT: Good morning. Please be seated.

Do we have any issues to address while we continue to await deliberations?

THE COURT: Anything from the government?

MR. POLEMENI: No, Your Honor.

THE COURT: Anything from defense? You might want to close the door to the outside. Go ahead.

MR. JACKSON: Judge, I'm not sure if this needs to be discussed right at this moment, but I did want to alert the Court, I sent this morning to our filing clerks a letter that will appear on ECF this morning at some point for the Court. Just raising a discovery issue that at some point we would like to discuss with the Court.

*Proceedings* 3030

I'll preview it, Judge. Essentially, during -- as the Court will recall, during the testimony -- I'm sorry -- during the summation there was a point at which Mr. Polemeni objected. We had a sidebar and there was discussion about a recording that Mr. Polemeni mentioned of a second recording of Mr. Adamou's meeting at Midwood Lumber.

Without getting into all the detail and the back and forth on that, this first came up about a week before that during Mr. Adamou's testimony. And at the time we asked Mr. Polemeni where is this recording that Mr. Adamou referenced, the second recording that he made on an iPhone that apparently was separated from him, according to his testimony.

Mr. Polemeni at that time told us you have it, we don't, indicating that it had been produced to us by some component of the government but not the pros team and saying the pros team never reviewed it.

So we set about looking for it in discovery. There are tens of thousands, obviously we came on later in the case than prior counsel at Reed Smith, and so have thoroughly -- we had thoroughly reviewed the discovery, but we weren't sure if there was something we had missed. We went through all the discovery again to try to locate this item. We weren't able to locate it. It came up in the summations. And on Friday after court we sent a letter to the government asking them to help us identify what the location is of this second recording

*Proceedings* 3031

that was purportedly produced to us, was in the discovery, what the Bates number was, when it was produced, what discovery letter.

We didn't hear anything all weekend. This morning Mr. Polemeni e-mailed us and said that it, in fact, had not been produced to us and that the Office of Enforcement Operations had told the government not to produce it to us because it constituted an improper Title 3 bug, effectively, at Midwood. So as a result, the prosecution team had not reviewed it, but Mr. Polemeni indicated that regardless, it wasn't discoverable and so they were not going to produce it to us.

So, Your Honor, we respectfully believe it raises a number of issues. We think that this is something that we're clearly entitled to under Rule 16, under Giglio, under Brady. I've never heard of a case where there was anything like approaching a Title 3 conducted at a location in a case and the government failed to produce it.

I've never heard of a case where there was a body wire that was done by one of the cooperating witnesses who is going to testify about a second body wire where it was not produced to us. It's difficult for us to understand how the government could have determined that there was no Brady or Giglio information on the recording if they've never produced it.

J.A. 993

*Proceedings* 3032

So the filing you're receiving this morning, Judge, is just a request to have this produced. And, frankly, Your Honor, because we think this is a serious discovery violation, to evaluate the appropriate sanction for it, which we believe should be tossing out the testimony that is now compromised by this and the charge that is compromised by it, potentially, which is the witness tampering charge since we've had no opportunity at this point to fix this problem.

We should have had the opportunity to litigate before Your Honor the propriety of the recording scheme that went into place, as well as have the benefit of the recording for the interrogation of the witness on cross-examination.

THE COURT: Why don't you write a motion?

MR. JACKSON: That's the motion we filed now.

THE COURT: You made a motion?

MR. JACKSON: Yes, Judge. We filed it this morning.

THE COURT: You filed it this morning. It's not the two motions that came in that were pretty much identical yesterday for reconsideration, which I denied.

Different from those motions?

MR. JACKSON: Completely separate.

THE COURT: Different conversation or same conversation? My question is, is the subject of the motion you just made the same conversation that you made the motion with respect to yesterday, twice, that I denied? That same

*Proceedings* 3033

conversation?

MR. JACKSON: I think --

THE COURT: Or is it a different conversation? What conversation are you talking about?

MR. JACKSON: I think it's a different conversation, Judge.

THE COURT: A different conversation. What conversation are you talking about in your letter, your letter motion? I haven't seen it yet, you just filed it. Your letter motion you just filed, what is the conversation?

Can you give me a date and who the participants of the conversation were?

MR. JACKSON: The recording.

THE COURT: The conversation that you say there is a recording of that you ought to have had, I'm asking what is the conversation, what is the date of the conversation, and who were the participants? You ought to know that.

MR. JACKSON: Sort of, Judge.

THE COURT: Sort of? Sort of? The jury has the case. The government rested, you rested, the defendant testified. I want to know if there is a conversation that you are stating there's a recording of that you should have had a copy and didn't.

I'm asking you, okay, put up or shut up. What is the conversation, between whom and whom and on what date? You

---

*Proceedings* 3034

should know that before you come into federal court and say there is a conversation and a tape and there ought to be sanctions.

What is the conversation?

Who was in the conversation, Mr. Jackson? Do you know? Yes or no, do you know who?

MR. JACKSON: We know Mr. Adamou is part of the conversation.

THE COURT: Who was?

MR. JACKSON: Mr. Adamou, the witness.

THE COURT: Who else? Who was he conversing with?

MR. JACKSON: We haven't been produced the conversation.

THE COURT: When did this conversation occur?

MR. JACKSON: The same day as the conversation that was played in evidence, Your Honor.

THE COURT: Is it a different conversation or the same conversation?

MR. JACKSON: The government has told us --

THE COURT: What do you understand it to be? A different conversation or the same conversation?

MR. JACKSON: I understand only from the government that it is a slightly different conversation that's happening on the same day.

THE COURT: A different conversation with Mr. Adamou

---

*Proceedings* 3035

on the same day? That's what you understand you're talking about, is that what you're telling me?

MR. JACKSON: That is what the government has informed.

THE COURT: Is that what you're telling me?

MR. JACKSON: I can't make a representation.

THE COURT: What is your understanding? As you sit here today talking about sanctions in a case that's gone to the jury, what is your understanding about this conversation?

MR. JACKSON: My understanding is that Mr. Adamou had a separate recording device on him. When he walked into Midwood Lumber he had a conversation with some woman that is not captured, according to the government --

THE COURT: Whoa, whoa. Some woman? A woman who owns cats? Does this woman have a name?

MR. JACKSON: The government has told us that they believe it's the defendant's sister.

THE COURT: Does the defendant's sister have a name?

MR. JACKSON: Yes, Your Honor.

THE COURT: What is the name?

MR. JACKSON: Gail Motovich.

THE COURT: So you're telling me that there is supposedly a conversation between Mr. Adamou and the defendant's sister that you think you should have had access to?

**J.A. 994**

---

*Proceedings* 3036

Did you talk to his sister about this? Just yes or no. I'm not going to ask about your work product. Did you talk to his sister about a conversation she might have had with Mr. Adamou?

Did that come up before or are you shocked to find out that she talked with him on the same day? Yes, I know, you don't know. You make a motion. I'll review it and decide it.

Government, have you seen this motion?

MR. POLEMENI: I have not, Judge.

THE COURT: When you see it, respond to it and I'll rule on it. Anything else?

MR. JACKSON: No, Judge. Oh, Judge, we brought --

THE COURT: Boxes. I see them. Can't fool me. It's like Raiders of the Lost Ark. I see the boxes.

MR. JACKSON: I don't know if we'll need them, but we wanted the Court to know we brought additional copies of the trial transcript that we prepared redacted in case they're requested.

THE COURT: You went through the entire trial transcripts and redacted out all the sidebars, everything that the jury could not hear?

MR. JACKSON: Yes, Judge.

THE COURT: That's pretty good. Did you give a copy to the government?

*Proceedings* 3037

MR. JACKSON: Yes, Judge.

THE COURT: If the jury sends out a note saying thank you for the 12 copies of the jury charge, I read their note asking for a transcript of the jury charge, and that's why they wanted 12 copies. But if they say they want 12 copies of the 1, 2, 4, 5, 6, 7, 8, 9, 10 Bankers' boxes, let's see, my math isn't always that good, but 12 Bankers' boxes and 12 jurors, could you do the math on that?

How many Bankers' boxes would that require, government or defense?

MR. PAULSEN: I believe it's a lot, Your Honor.

THE COURT: Like 144, give or take. If you think that the jurors are asking for 144 Bankers' boxes of transcripts, they might be asking for it but I'm still asking for my 40 acres and a mule. I will deny that request. Spoiler alert.

If the jury says we would like the testimony of Mr. X or Ms. Y or Ms. Z who testified, I will ask the government their response, I will ask defense their response, and then the portions of the testimony that is responsive to their request for witness X, Y, or Z, we will pull and the government and defense counsel will review it and we'll attach it and it will go in, the way I've done it for the last 50 years when I've tried cases.

But if they send out another saying they want 144

*Proceedings* 3038

Bankers' boxes of documents, the answer, like God answered to many of my prayers, is going to be no, you're not entitled to that. If they're asking for the testimony of the AmEx custodian of documents, maybe they are. I don't know.

MR. JACKSON: We wanted the Court to know that if the Court --

THE COURT: Loses its mind. Let me tell you something off the record.

(Off the record discussion.)

THE COURT: Is there anything else?

MR. JACKSON: No, Judge.

THE COURT: We have your cell numbers if the jury sends out notes, and we will deal with whatever happens and I'll call you back in. Luckily the walls are still intact.

(Recess taken.)

THE COURT: Back on the record. We have a note from the jury, which I will distribute in a minute. I will read out loud and we'll mark it as a Court Exhibit 6 for identification and I'll admit it into evidence.

(Court's Exhibit 6 was received in evidence.)

THE COURT: To the office of Judge Kuntz:

One, we would like to request a legal dictionary. If this request cannot be granted, we'd like to know whether we can ask your office for definitions on an ad hoc basis. If so, we'd like to start with the definition of "commercial

*Proceedings* 3039

enterprise".

Two, we would like to request tape and a stapler.

Three, we would like to request a list of all stipulations.

Four, we would like to request photocopies of all checks involving Carver Bank, JPMorgan Chase, Astoria Bank, and Investors Bank.

Five, we would like to request the texts, plural, between Marina Kuyan and David Motovich.

Six, we would like to request more highlighters.

Let me go back. I want you to distribute it to the lawyers so they can have it in front of them, this being Court Exhibit 6, which is now in evidence. And we'll talk about your responses beginning first with the government. We'll do it on a point by point basis, then defense counsel.

So first item, we would like to request a legal dictionary. What is the government's response to that request?

MR. POLEMENI: I don't think that would be appropriate, Judge.

THE COURT: What is defense counsel's response to that request?

MR. JACKSON: We agree, Judge.

THE COURT: So I'm not going to send that in.

Secondly, if this request cannot be granted, we'd

*Proceedings* 3040

like to know whether we could ask your office for definitions on an ad hoc basis. What is your response to that request, government?

MR. POLEMENI: Again, Judge, I don't believe that would be appropriate.

THE COURT: What is the response of defense counsel?

MR. JACKSON: We agree, Judge.

THE COURT: All right. On the third point, it says, if so, we'd like to start with the definition of commercial enterprise.

Let me ask counsel, is there in the jury charge a definition provided, you can do a word search, if you want, of commercial enterprise?

MR. POLEMENI: I don't believe so. We're just double checking.

THE COURT: Defense counsel, you double check, as well. My preference whenever jurors send out a note saying we'd like a definition, whether it's beyond a reasonable doubt or anything else, is to respectfully refer them to pages X through Y of the jury charge, which they have now 12 copies of before them, rather than cobble up a definition on the fly.

So if we have something to point them to in the jury charge that defines commercial enterprise, I would suggest that we take that approach. Is that acceptable as an approach to the government and defense counsel?

J.A. 995

*Proceedings* 3041

You would have to look at it and see what you think is responsive and cobble that out, but I don't think it's appropriate to try and cobble together new definitions at this point in the proceeding.

Government, what is your view?

MR. POLEMENI: That's fine, Judge. I'll just note that the term commercial enterprise is used and found in the jury instructions at page 61.

THE COURT: I'm going to make a note of this. Page 61?

MR. POLEMENI: Yes.

THE COURT: Anywhere else?

MR. POLEMENI: I believe that's it, Judge.

THE COURT: Mr. Jackson, is that your view, as well.

MR. JACKSON: That's correct.

THE COURT: I can respectfully refer them. Again, I'll put this in the order, respectfully refer the jury to page 61 of the jury charge. We know they each have a copy of the jury charge in front of them.

MR. POLEMENI: So the record is clear, Your Honor, the term is not defined. Commercial enterprise is not defined in the jury charge. It is the definition for the term "business". So the charge itself says a "business is a commercial enterprise".

THE COURT: I'll say I will respectfully refer them

*Proceedings* 3042

to page 61 to address the issue of "commercial enterprise". I'll use some sort of vague reference in that way so it points them to the right page, but it's as far as we can go. Is that acceptable?

MR. POLEMENI: Yes, Judge.

THE COURT: Is that acceptable to defense?

MR. JACKSON: Yes, Judge.

THE COURT: The next one we would like to request tape and a stapler. Is that acceptable to send that in, from the government?

MR. POLEMENI: Yes, Your Honor.

THE COURT: Defense?

MR. JACKSON: Yes.

THE COURT: Next. We would like to request a list of all stipulations. My old school approach is, since we've already put ourselves on the hit list for the Sierra Club, let's just send them all the stipulations.

How many stipulations do we have in this case, about 10?

MR. POLEMENI: 10 to 15, Judge.

THE COURT: Any problem with sending the stipulations in to the jury?

MR. JACKSON: No, Judge.

MR. POLEMENI: No, Your Honor.

THE COURT: We'll send in the stips, rather than a

*Proceedings* 3043

list of all stipulations.

Next, we would like to request photocopies of all checks. They say "all", as you can read, all checks involving Carver Bank, JPMorgan Chase, Astoria Bank and Investors Bank. It seems to me since those checks were introduced in evidence, they're entitled to see them and my inclination would be to have you folks pull them together and we'll send in photocopies of all checks involving Carver Bank, JPMorgan Chase, Astoria Bank, and Investors Bank.

You folks will put it together and agree on what the corpus of that thrust is. Let me ask the government, is that acceptable?

MR. POLEMENI: Yes, Judge.

THE COURT: Defense? It's a pretty clear request.

MR. JACKSON: I completely agree, Judge. The request is clear. I do want to say, this does raise the Bankers' box problem, again, I think.

THE COURT: I think it's a question of checks. It is not a question of texts. It is not a question of transcripts.

They have asked for all checks involving Carver Bank, JPMorgan Chase, Astoria Bank, and Investors Bank. The question presented to you folks is, do you have any problem with me sending in all those checks? That's what they want.

Any problem with sending that in, government?

**J.A. 996**

*Proceedings* 3044

MR. POLEMENI: No, Judge.

THE COURT: Any problem sending that in, defense?

MR. JACKSON: No, Judge.

THE COURT: Next, we would like to request the texts, plural, between Marina Kuyan and David Motovich.

Those texts were in evidence. Any problem culling those and sending those into the jury as they request from the government?

MR. POLEMENI: No, Judge.

THE COURT: Any problem from the defense?

MR. JACKSON: No, Judge.

THE COURT: So you'll put that packet together. And then we would like to request more highlighters. I'm inclined to send them in. Any problem with doing that from the government?

MR. POLEMENI: No, Your Honor.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: That's how we will proceed with respect to Court's 6. I'll draft the order up with my law clerks and that will be 6A.

I will read it to you before I sign it and send it into the jury. You guys have to pull together, you have to do the heavy lifting on not the tape. The tape and stapler, I'll do that heavy lifting. You'll pull together the packet of

*Proceedings* 3045

stipulations. You'll pull together the packet of all checks involving Carver, JPMorgan Chase, Astoria Bank, and Investors Bank, and you'll pull together the texts between Marina Kuyan and David Motovich. I'll take care of the highlighters. That's why they pay me the big bucks. I'll do that.

MR. JACKSON: Thank you, Judge.

THE COURT: Get to work guys. Thank you.

(Recess taken.)

THE COURT: I'm going to read outside Court's Exhibit 6A, which memorializes the response to the jurors contained in Court 6. I'm also admitting 6A into evidence.

(Court's Exhibit 6A was received in evidence.)

THE COURT: On July 26, 2024, the jury began their deliberations in the above-captioned case. During their deliberations, the jury sent out a note, which has been marked as Court's Exhibit 6. The jury note reads as follows:

To the office of Judge Kuntz, one, we would like to request a legal dictionary. If this request cannot be granted we would like to know whether we can ask your office for definitions on an ad hoc basis. If so, we would like to start with the definition of commercial enterprise.

Two, we would like to request tape and stapler.

Three, we would like to request a list of all stipulations.

Four, we would like to request photocopies of all

*Proceedings* 3046

checks involving Carver Bank, JPMorgan Chase, Astoria Bank, and Investors Bank.

Five, we would like to request the texts between Marina Kuyan and David Motovich.

Six, we would like to request more highlighters.

As to request one, the Court denies the jury's request for a legal dictionary. As to the jury's question regarding legal definitions, the jury is certainly able and encouraged to ask the Court to identify specific portions of the jury charge that addressed any particular questions they may have.

The Court respectfully refers the jury to page 61 of the jury charge, which the Court has admitted as Court Exhibit 1-AA, where the Court addresses the term "commercial enterprise".

As to request two, the Court grants the jury's request and orders tape and a stapler be delivered to the jury room by the court security officer. As to request three, the Court grants the jury's request and orders packet containing photocopies of all stipulations prepared by the parties to be delivered into the jury room by the court security officer.

As to request four, the Court grants the jury's request and orders a packet containing photocopies of all checks involving Carver Bank, JPMorgan Chase, Astoria Bank, and Investors Bank prepared by the parties to be delivered

*Proceedings* 3047

into the jury room by the court security officer.

As to request five, the Court grants the jury's request and orders a packet containing photocopies of the texts between Marina Kuyan and David Motovich prepared by the parties be delivered into the jury room by the court security officer.

As to request six, the Court grants the jury's request and orders highlighters be delivered into the jury room by the court security officer. So ordered, signed William F. Kuntz, July 29, 2024.

So that's the order that I'm signing. I'm sending it into the jury room so they know that we're working on their request. Some of them have been sent in already, the stapler, and that sort of thing. The other, you will continue to put the packet together and when it's fully together you'll let my law clerks and CSO know and they'll send it in. Thank you. Make sure the jury gets this as soon as possible and copies for the counsel.

Is there anything else we need to address as you continue to put together the packets?

MR. POLEMENI: No, Your Honor.

MR. JACKSON: No, Judge.

THE COURT: We'll be back in chambers. Thank you.

(Recess taken.)

THE COURT: I have another note I will read to you

*Proceedings* 3048

and I will admit in evidence, and I will solicit responses. It's Court Exhibit 7, admitted in evidence.

(Court's Exhibit 7 was received in evidence.)

THE COURT: It reads as follows. This is request number four from the jury. To the office of the judge, in this case we, the jury, would like to request the texts between Gail Motovich and David Motovich, the text of Title 31, United States Code, Section 5313, the tables and spreadsheets shown during the testimony of IRS Special Agent Christopher Cabane, transcripts of the full witness testimony of Agent Cabane and David Motovich, including direct, cross-examinations, and redirect.

So beginning with the government, what is your response to the request for the texts, obviously we're talking about what's in evidence, the texts between Gail Motovich and David Motovich?

MR. POLEMENI: No objection.

THE COURT: Any objection?

MR. JACKSON: No objection, Your Honor.

THE COURT: Next. The text of Title 31, United States Code, Section 5313, government?

MR. POLEMENI: I believe the relevant instruction is in the jury charge, Your Honor. We can refer them to that.

THE COURT: They've asked for the text, though. Is there a problem with giving them the text? They obviously

J.A. 997

Proceedings                    3049

have the jury charge. They've now asked for the texts. Any objections to them getting the texts?

MR. POLEMENI: Yes, Judge.

THE COURT: What is your objection?

What is the basis of your objection?

MR. POLEMENI: Yes, sure. Your Honor provides the law, and I believe --

THE COURT: Yes, but having done that, the jury says we want the texts of 31 U.S.C. 5313. I have the power to say no, but do I also have the power to say yes?

MR. POLEMENI: If I recall 5313, it's a rather lengthy and perhaps confusing statute, Judge.

THE COURT: I didn't write it and I don't criticize Congress. I just try to read the chicken end trails that they sometimes leave us with.

One of the reasons we took so long to come out is we looked at the statute that Congress drafted in its wisdom and enacted into law. I'm not disputing your characterization. I'm just not adopting your characterization because I like my day job.

That being said, do you have an objection, other than it is what it is?

MR. POLEMENI: No.

THE COURT: All right. Let me turn to defense on this. A response to the request for the text of 31 U.S.C.

Proceedings                    3050

5313, any objection to sending it in unadorned to the jury?

MR. JACKSON: No, Judge.

THE COURT: All right. I'm going to send it in.

Next, they've asked for the tables and spreadsheets shown during the testimony of Special Agent Christopher Cabane. Any objection to the tables and spreadsheets, again, what was shown to the special agent, going into the jury, government?

MR. POLEMENI: No, Judge.

THE COURT: Defense, any objection?

MR. JACKSON: No, Judge.

THE COURT: Last point, transcripts of full witness testimonies of Agent Cabane and David Motovich, including direct, cross, and redirect.

Any objection from the government?

MR. POLEMENI: No, Judge.

THE COURT: Defense?

MR. JACKSON: No, Judge.

THE COURT: Back to work. Pull it together and we'll draft an order that says we're sending those items in. That will be order 7A from the Court.

MR. JACKSON: Judge, you don't need anything from us on 5313, the Court is going to take care of that?

THE COURT: No, I need it from you guys. You put it together.

Proceedings                    3051

MR. JACKSON: You want us to pull together a copy of the statute?

THE COURT: Absolutely.

MR. JACKSON: Absolutely. We'll do that, Judge.

THE COURT: That's why you get paid the big bucks.

(Recess taken.)

THE COURT: I'm going to read out loud to you my memorandum, which is admitted into evidence, memorandum and order of the Court Exhibit 7A.

(Court's Exhibit 7A was received in evidence.)

THE COURT: On July 26, 2024 the jury began their deliberations in the above-captioned case. During their deliberations, the jury sent out a note, which has been marked as Court Exhibit 7.

The jury note reads as follows: Request number four from the jury to the office of Judge Kuntz, in the case of United States of America versus Motovich.

We, the jury, would like to request the texts between Gail Motovich and David Motovich, the texts of Title 31, United States Code 5313, the tables and spreadsheets shown during the testimony of IRS Special Agent Christopher Cabane, transcripts of the full witness testimonies of Agent Cabane and David Motovich, including direct, crosses, and redirect.

As to request one, the Court grants the jury's

**J.A. 998**

Proceedings                    3052

request and orders a packet containing photocopies of texts between Gail Motovich and David Motovich prepared by the parties be delivered into the jury room by the court security officer.

As to request two, the Court grants the jury's request and orders a packet containing a photocopy of the text of Title 31 United States Code 5313, prepared by the parties be delivered in the jury room by the court security officer.

As to request three, the Court grants the jury's request and orders a packet containing photocopies of the tables and spreadsheets shown during the testimony of IRS Special Agent Christopher Cabane, again, prepared by the parties, be delivered into the jury room by the court security officer.

As for request four, the Court grants the jury's request and orders a packet containing photocopies of the full witness testimonies of Agent Cabane and David Motovich, including direct, crosses, and redirects prepared by the parties be delivered into the jury room by the court security officer.

I'm signing it and dating it today's date, July 29, 2024, and the original will go into the jury room. There will be copies here. Thank you. We're going to print out the copies for you.

Is there anything else we need to address while that

Proceedings                    3053

is being done and you're continuing to pull the documents together?  Anything else from the government.

MR. SKURNIK:  No, Your Honor.

THE COURT:  Anything else from defense?

MR. JACKSON:  No.  Thank you, Judge.

THE COURT:  Thank you.

(Recess taken.)

THE COURT:  We're back on the record.  Everyone is present.  We have what I've marked as Court Exhibit Number 8, and admitting into evidence, which is request number five from the jury.

(Court's Exhibit 8 was received in evidence.)

THE COURT:  It reads as follows:  We humbly and gratefully request first, a transcript of the full witness testimony, direct, cross, and redirect of Dannette Sullivan-Hyatt.

Secondly, permission to leave at 5:00 p.m. today, leaving any pending requests for Tuesday.

Let me first give the government, is that acceptable to send in the full witness testimony, direct, cross, and redirect of Ms. Sullivan-Hyatt?

MR. POLEMENI:  Yes, Judge.

THE COURT:  Defense counsel, is that acceptable?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  With respect to leaving at 5:00 p.m., is

---

Proceedings                    3054

that acceptable to the government?

MR. POLEMENI:  Yes, Judge.

THE COURT:  And defense?

MR. JACKSON:  Yes, Judge.

THE COURT:  Let's give them copies of Court Exhibit 8, which is in evidence, and we'll do an 8A memorializing the Court's order response granting the request.

Will you folks pull together the testimony, please?

MR. GRUBIN:  Yes, Judge.

THE COURT:  Share it with the other side and agree what's to go in.  Thank you.

(Pause.)

MR. JACKSON:  Your Honor, we've provided to Mr. Scott a copy that the parties agreed upon of the direct, cross, and redirect of Ms. Dannette Sullivan-Hyatt.

THE COURT:  Thank you.  That will go into the jury room.  That indicates that is what they're receiving and also states on the record that they are permitted to leave at 5:00 p.m. today.  That will be Court Exhibit 8A admitted into evidence.  As soon as that's printed out I'll sign it and give copies to you folks and put it on ECF, of course.

MR. JACKSON:  Thank you, Judge.

THE COURT:  I have Court Exhibit 8A, which I now admit into evidence.

(Court's Exhibit 8A was received in evidence.)

---

Proceedings                    3055

THE COURT:  It is my order that reads as follows:  On July 26, 2024, the jury began their deliberations in the above-captioned case.  During their deliberations, the jury sent out a note, which has been marked as Court Exhibit 8, which is now in evidence.  The jury's note reads as follows:

Request five from the jury to the office of William F. Kuntz in the case of United States of America versus David Motovich.

We humbly and gratefully request a transcript of the full witness testimony, direct, cross, and redirect of Dannette Sullivan-Hyatt.

Next, to be permitted to leave at 5:00 p.m. today, leaving any pending requests for Tuesday.  As to request one, the Court grants the jury's request and orders a packet containing a copy of the full witness testimony, direct, cross, redirect of Dannette Sullivan-Hyatt prepared by the parties to be delivered into the jury room by the court security officer.  A copy is attached to this order.

As to request two, the Court grants the jury's request to leave at 5:00 p.m.  The Court directs the jury to report to the jury room at 9:30 a.m. on Tuesday morning to continue its deliberations.  So ordered.  I'm signing it.

Any objections to that from the government?

MR. POLEMENI:  No, Judge.

THE COURT:  From defense, any objections?

**J.A. 999**

---

Proceedings                    3056

MR. JACKSON:  No, Your Honor.

THE COURT:  Okay.  Thank you.  Give them the original now with the attachment.  We'll give you copies.  We're also uploading it, obviously, 8A, on ECF.

MR. JACKSON:  Thank you, Judge.

(Recess taken.)

THE COURT:  We have another note from the jury that we will read to you and then we will distribute.  Admitting the note into evidence as Court Exhibit 9 in evidence.

(Court's Exhibit 9 was received in evidence.)

THE COURT:  It reads as follows:  We, the jury, request Government Exhibits 1059, 1068, and 707-A, and Kemal Sarkinovic's witness testimony including direct, cross, and redirect.  Thank you, foreperson et al.  Exhibit Number 9 is admitted.

How do you suggest we respond, government?

MR. POLEMENI:  I suggest we give them what they want, Judge.

THE COURT:  Give them what they want.  Defense?

MR. JACKSON:  Agreed, Judge.

THE COURT:  Do we have a draft of the order?

THE LAW CLERK:  Almost.

THE COURT:  I'll give you copies now of Court Exhibit 9, which is the jury request in evidence, and we're going to read to you 9A.

*Proceedings* 3057

Do you have the document?

MR. GRUBIN: We should be able --

THE COURT: Hand them up to the court deputy. Make sure everybody is on the same page.

While you're still assembling the document, let me read my memorandum and order, which I'm admitting in evidence Court Exhibit 9A.

(Court's Exhibit 9A was received in evidence.)

THE COURT: On July 26, 2024, the jury began their deliberations in the above-captioned action. During their deliberations the jury sent out a note, which has been marked as Court Exhibit 9.

The jury's note reads as follows: Judge Kuntz, jury request number six. We, the jury, request Government Exhibits 1059, 1068, and 707-A and Kemal Sarkinovic's witness testimony, including direct, cross, and redirect. Thank you, foreman, et al.

As to request one, the Court grants the jury's request and orders a packet containing a photocopy of Government Exhibits 1059, 1068, and 707-A prepared by the parties be delivered into the jury room by the court security officer. The copy is attached to this order.

As to request two, the Court grants the jury's request and orders a packet containing a copy of Kemal Sarkinovic's witness testimony, including direct, cross, and

*Proceedings* 3058

redirect prepared by the parties be delivered into the jury room by the court security officer. The copy is attached to this order.

Is that acceptable to the government?

MR. POLEMENI: Yes, Your Honor.

THE COURT: Defense counsel?

MR. JACKSON: Yes, Your Honor.

THE COURT: I am signing the order and it will be accompany the documents that will be submitted to the jury through the court security officer. Mr. Scott, here is the original and please make copies and upload onto ECF for counsel. Thank you.

The parties have agreed on what's to go in and Mr. Scott is giving that to the CSO, that being the order and the accompanying documents. The CSO is delivering them to the jury now.

MR. GRUBIN: Yes, Your Honor.

MR. JACKSON: Yes, Your Honor.

THE COURT: Is there anything else we need to address at the moment?

MR. POLEMENI: No, Judge.

MR. JACKSON: No, Your Honor.

THE COURT: Thank you.

(Recess taken.)

THE COURT: Could we have appearances, please? Call

*Proceedings* 3059

the case and have appearances.

THE COURTROOM DEPUTY: Criminal cause on trial, 21-cr-497, United States of America versus David Motovich. Will the attorneys please state their name for the record, beginning with the government.

MR. POLEMENI: Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, Paralegal Kavya Kannan, and Special Agent Christopher Cabane for the United States. Good afternoon, Judge.

THE COURT: Good afternoon. Please be seated. Those in the public may be seated, as well.

MR. JACKSON: Good afternoon, Judge. Randall Jackson, Jessica Layden, Henry Mazurek on behalf of our client, David Motovich.

THE COURT: Good afternoon. Please be seated everyone. Thank you for returning. The jury, as you know, had requested permission through its notes sent out to leave at 5:00 p.m. The jury has left for the day. They will resume their deliberations tomorrow morning at 9:30.

The reason I asked you all to come back here was one, to put that, again, on the record; and two, to see if there is anything we need to address, beginning with the government and then I'll hear from defense counsel.

MR. POLEMENI: I can do it now or I can do it tomorrow.

J.A. 1000

*Proceedings* 3060

THE COURT: Do it now since we're here.

MR. POLEMENI: Sure. Why don't we do it now and get it out of the way. I've had a chance to look at defense counsel's motion from earlier today, and I wanted to have an opportunity to respond to that.

THE COURT: You may do that. I asked you to do it in writing, but you can also do it orally.

MR. POLEMENI: I can do it in writing tonight, Judge, if you prefer writing.

THE COURT: Do it orally, do it in writing, do it sideways. As Ginger Rogers said, do it backwards wearing high heels. Whatever works.

MR. POLEMENI: How about I do it orally now and if there's more necessary I'll submit something today, tonight.

THE COURT: That's fine. Go ahead.

MR. POLEMENI: Judge, just in terms of --

THE COURT: I'm going to ask you to slow it down for the court reporter. I know it's a lot of caffeine today, but chillax. Go ahead.

MR. POLEMENI: In terms of the sequence of events, and to kind of put everything in context, so as Your Honor is aware, Mr. Adamou testified that he was sent in with two recording devices to record his conversations with Mr. Motovich.

The first device was his cell phone, and the second

*Proceedings* 3061

device was a device the agents had given him that he had secreted into a pocket. When he got to Midwood Lumber, Gail Motovich, instructed him, meaning Mr. Adamou, to hand over his cell phone.

THE COURT: To whom?

MR. POLEMENI: To her, which he did. And then he went in, had a conversation with Mr. Motovich.

THE COURT: While he went in, I take it the cell phone, spoiler alert, had not been turned off.

MR. POLEMENI: That is correct.

THE COURT: See, I can figure this out from reading crime novels. Go ahead.

MR. POLEMENI: So the cell phone is recording in a separate room Ms. Motovich and others as they're talking about Midwood Lumber.

THE COURT: To be clear, the others do not include David Motovich because he's not in the room; is that right?

MR. POLEMENI: That's my understanding, Judge.

THE COURT: And it does not include Mr. Adamou, who is not in the room, right? Because he handed it over.

MR. POLEMENI: He handed it over.

THE COURT: So this cell phone is recording conversations not with the defendant and not with the gentleman who was wearing the government issued recording device because he wasn't in the room where it happened.

*Proceedings* 3062

MR. POLEMENI: Correct.

THE COURT: So now you have a cell phone that is in another room with other people, none of them knows that there's a cell phone that is on recording whatever it's recording, correct?

MR. POLEMENI: Correct.

THE COURT: So that is what we're talking about when we're talking about the possible unreviewed and unauthorized wire. Is that really what it comes down to?

MR. POLEMENI: That's right.

THE COURT: Okay. Go ahead.

MR. POLEMENI: And so we -- when Mr. Adamou was testifying, I conveyed this information to defense counsel and I told them that we had not produced it to them because we had been told by OEO that there's a concern that this could be construed, not intentional, of course, but this could be construed as some sort of impermissible interception.

THE COURT: Just to be clear, whatever was recorded is something that this prosecution team has not heard; is that correct?

MR. POLEMENI: None of the people at this table have heard it.

THE COURT: None of the people at this table have heard, and the defendant was not on that recording because he wasn't in the room.

*Proceedings* 3063

MR. POLEMENI: That's my understanding, yes.

THE COURT: And the witness who testified, Mr. Adamou, was not in the room.

MR. POLEMENI: Correct.

THE COURT: Some other people were in the room.

MR. POLEMENI: Correct.

THE COURT: Okay. Go ahead.

MR. POLEMENI: And so I conveyed that information while Mr. Adamou was on the stand. And that's the last that we had discussed with defense counsel up until it came up during summations the other day.

THE COURT: Go ahead.

MR. POLEMENI: Just so the record is clear, I did not tell defense counsel that we had disclosed this in discovery at some point, because we hadn't. And at no point between Mr. Adamou's testimony and summations on Friday did defense counsel say to us hey, you told us that you disclosed it, where is it, because we did not tell them we had disclosed it.

And so just to clarify that point, maybe there's a miscommunication, but we did not tell them that we had disclosed it.

THE COURT: Go ahead.

MR. POLEMENI: And in terms of the significance of this recording, I guess defense counsel is claiming that

*Proceedings* 3064

there's some sort of potential Brady exculpatory material on this. I don't see how there could be any exculpatory or Brady information on a recording of Ms. Motovich.

It does -- it won't exculpate Mr. Motovich's conduct in any way, and as Your Honor correctly pointed out, Ms. Motovich was available for the defense to speak to and to call in anytime if they felt that was the case.

So we reject the assertion that there's been any sort of discovery violation, and certainly reject the argument that there should be sanctions in the form of motions -- a motion granting the dismissal of the indictment.

THE COURT: I hear your argument. I will take it under advisement. I suggest in dotting the Is and crossing the Ts, especially for my incredibly bright colleagues on the 17th floor, they actually have a written submission from the U.S. Attorney's Office that memorializes your position and what you just said.

Yes, they do read transcripts, but just to make things crystal clear for my friends on the 17th floor, it would be helpful to have your response and I will then rule once I have your response.

Mr. Jackson, you've heard what the government has to say. Do you have anything to say in response to what they've just said? Obviously they will be putting in a written submission, as well. Go ahead.

**J.A. 1001**

*Proceedings* 3065

MR. JACKSON: Judge, I think you've seen our submission.

THE COURT: Yes, I have.

MR. JACKSON: We have some disagreements, but I think that it probably will be best, I think the Court's suggestion makes a lot of sense, if they put in a written submission and if there's anything that we would have to say that's small in response, we would let the Court know but I think the Court has our position.

THE COURT: That's fine. Given where we are, we're awaiting the jury's verdict. They have asked for additional information to be sent in in the course of the day. They asked earlier in the day to adjourn at 5:00, which we all agreed they could do, and they will resume their deliberations tomorrow at 9:30. So if the parties wish to avail themselves of the fact that as I've repeatedly said I have no life, feel free to submit your responsive papers, government, to what Mr. Jackson has submitted, and Mr. Jackson, since I have no life, whenever you get their papers then you and your colleagues can respond in writing.

And to the extent that it's appropriate, I will render my decision whenever I receive the government's papers and you submit whatever it is, if anything, you wish to submit in response. But I will try to get that done sooner, rather than later, obviously.

---

*Proceedings* 3066

I do think it's important with the issue having come up. My view is it's the equivalent of if you had a James Bond like recording device in a cue designed umbrella and put it in the umbrella stand and then went in for the meeting, the umbrella stand picks up whatever conversations it picks up but not with the defendant and not with the person who is wearing the other cue card in his vest. That's how I look at it. Again, a low rent approach to all matters of juris prudence. Anything else from the government?

MR. POLEMENI: No, Your Honor.

THE COURT: Anything else from defense counsel?

MR. JACKSON: No. Thank you, Judge.

THE COURT: Thank you, everyone. See you tomorrow at 9:30. Thank you.

(Proceedings adjourned until July 30, 2024 at 9:30 a.m.)

---

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,  : 21-CR-00497(WFK)
                           :
    -against-              : United States Courthouse
                           : Brooklyn, New York
                           :
DAVID MOTOVICH,            : Tuesday, July 30, 2024
                           : 9:30 a.m.
    Defendant.            :

- - - - - - - - - - - - - X  :

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government: BREON S. PEACE, ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY:  ROBERT POLEMENI, ESQ.
     ERIK D. PAULSEN, ESQ.
     ANDREW GRUBIN, ESQ.
     MATTHEW C. SKURNIK, ESQ.
     Assistant United States Attorneys

For the Defendant:  WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019-6150
BY: RANDALL WADE JACKSON, ESQ.
    JESSICA LAYDEN, ESQ.

MEISTER SEELIG & FEIN, LLP
125 Park Avenue, 8th Floor
New York, New York 10017
BY:  HENRY R. MAZUREK, ESQ.

Court Reporter:  Andronikh M. Barna, CRR, RPR, OCR
E-mail:  ambarna.crr@gmail.com
Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

**J.A. 1002**

---

*Proceedings* 2

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

Criminal cause on trial, 21-CR-497, United States of America versus David Motovich.

Will the attorneys please state their name for the record, beginning with the Government.

MR. POLEMENI: Good morning, Your Honor

Robert Polemeni, Erik Paulsen, Andrew Grubin, Matthew Skurnik, Paralegal Kavya Kannan.

We seem to be missing Special Agent Cabane this morning.

Good morning, Judge.

THE COURT: Good morning.

Please be seated.

MR. JACKSON: Good morning, Your Honor.

Randall Jackson, Jessica Layden and Henry Mazurek on behalf of our client, David Motovich.

THE COURT: Good morning.

Please be seated everyone. Thank you.

Thank you for being here so promptly.

We are assembled just to continue to await the jury's verdict and to see if there are any issues we need to address while awaiting that verdict.

So, I will start with the Government and then Defense Counsel.

Proceedings 3

Is there anything we need to address?

MR. POLEMENI: No, Your Honor. Thank you.

THE COURT: Okay.

Are you going to submit a written response to the motion?

MR. POLEMENI: Yes.

THE COURT: Okay.

Mr. Jackson, any issues on your side.

MR. JACKSON: Not really, Judge.

I just wanted to give you an FYI. In our last filing, we mentioned an exhibit and --

THE COURT: The one that just came in starting with the Benjamins and the Hamiltons and the 78 --

MR. JACKSON: Yes.

THE COURT: -- cents?

MR. JACKSON: Yes.

THE COURT: I told you I have no life. I have already read it.

I have not tried to spend the currency, nor will I, but it is very nice to see it there.

MR. JACKSON: Yes.

And that's only -- we were only filing that, Judge, because it was supposed to be an exhibit to our last filing and somehow in our process we made a mistake and it wasn't attached.

Proceedings 4

THE COURT: As I said, I have practiced law for 33 years, so I understand that. And I started with Wang and Videk machines that you only see in old editions of iRobot.

Okay. Anything else?

MR. JACKSON: No, Judge. Thank you.

THE COURT: All right.

Well, you are welcome to stay here or welcome to go back or to your respective spaces. I do not have any additional notes from the jury, but I just wanted to make sure we had all checked in and made sure that there are no issues we need to address while we are waiting. Okay?

So, thank you all. We will call you when we have something to report.

MR. JACKSON: Thank you, Judge.

(Recess taken.)

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: You may be seated.

We have a note from the jury.

The note is Court 10, which I am admitting into evidence.

(Court Exhibit 10 received in evidence.)

THE COURT: The note from the jury reads as follows: We would like all the photographs taken by Reginald Garcia in evidence. Thank you.

Proceedings 5

Beginning with the Government, how do you suggest we respond to Exhibit 10?

MR. POLEMENI: We give them what they want, Judge.

THE COURT: Defense Counsel.

Would you like me to read it again?

MR. JACKSON: Could you one more time, please, Judge.

THE COURT: We would like all the photographs taken by Reginald Garcia in evidence. Thank you.

MR. JACKSON: Well, I agree, Your Honor, with the Government, we should give them what their request is. It's not 100 percent clear to me whether they're asking for all the photos of Mr. --

THE COURT: If the jury wants photos of someone, they say they want photos of someone.

Do you confuse the word "of" with "by," Mr. Jackson, or do you just think the jury is stupid?

MR. JACKSON: Neither, Judge.

I defer to the Court then.

THE COURT: Do you really think there is some ambiguity with this note?

Why don't you give him a copy of it.

The question to you is not whether you defer to the Court or not as to my decision as to what goes in.

The question is do you object to sending in what the

Proceedings 6

jury has clearly asked for, which is all the photographs taken by -- the word b-y -- by Reginald Garcia in evidence.

Do you object to that or not?

MR. JACKSON: I don't object to it, but I don't know what it means.

THE COURT: Oh, that is ridiculous.

Okay. We are going to send in the -- you know, you do have a good-faith obligation when you make statements like "I don't know what it means," Mr. Jackson.

In any event, we are going to send in all the photographs taken by Reginald Garcia in evidence. I am going to sign the order.

MR. POLEMENI: Thank you, Judge.

MR. JACKSON: Judge, I'm attempting to reply by my good-faith obligation, I promise the Court. I just would like to --

THE COURT: You can promise the Court anything, but if you say you don't understand in a case where a witness has testified that he took photos, those photos are in evidence and a jury says they want the photos that the man took and you say you don't know what that means, I find that hard to believe.

MR. JACKSON: I'm perfectly happy with it, Judge.

THE COURT: Well, good for you.

I'm perfectly happy to send you a copy of Rule 11.

J.A. 1003

Proceedings 7

Maybe you'll read it.

Okay. Court Exhibit 10-A. William F. Kuntz II, United States District Judge. On July 26, 2024, the jury began their deliberations in the above-captioned case. During their deliberations, the jury sent out a note, which has been marked as Court Exhibit 10.

The jury note reads as follows: Judge Kuntz, we, the jury, we would like all the photographs taken by Reginald Garcia in evidence. Thank you.

The Court grants the jury's request and orders a packet containing photographs of all the photographs taken by Reginald Garcia in evidence, prepared by the parties, be delivered into the jury room by the court security officer. So ordered. I'm signing it, admitting it as Court Exhibit 10-A.

All right. Make copies of this please and give it to counsel.

MR. GRUBIN: Yes, Your Honor.

(Court Exhibit 10-A received in evidence.)

THE COURT: You have a full set of the documents, Counsel?

MR. SKURNIK: We do, Your Honor.

THE COURT: Please hand it to my law clerk. Thank you.

We will submit it along with Court 10-A, which is in

Proceedings 8

evidence, to the jury so they will have the requested photographs.

MR. SKURNIK: Thank you, Judge.

MR. JACKSON: May we just ask if the Government could note for the record which photos those are, which exhibits?

THE COURT: Did you see them, Mr. Jackson?

MR. JACKSON: Yes, Judge.

THE COURT: The ones that you saw are the ones that are going in.

MR. JACKSON: Thanks, Judge.

THE COURT: Are they marked with exhibit numbers?

MR. POLEMENI: Yes, Judge.

THE COURT: All right. Why don't you read them since Counsel wants them for the record.

MR. POLEMENI: GX 155 --

THE COURT: Why don't you use the microphone, please.

MR. POLEMENI: Sorry.

THE COURT: It's okay.

MR. POLEMENI: GX 155, 156, 157 and 158.

THE COURT: Is that what Defense has agreed to?

MR. JACKSON: Yes, Judge.

THE COURT: Okay. Thank you.

MR. JACKSON: Thank you.

Proceedings 9

THE COURT: Would you please take them into the court security officer's hands and he will bring them into or she will bring them into the jury, accompanied by the order, 10-A. Okay?

(Pause in proceedings.)

THE COURT: That has been done, Mr. Scott?

THE COURTROOM DEPUTY: Yes.

THE COURT: Is there anything else we need to address before we repair to our respective corners?

MR. POLEMENI: No, Your Honor. Thank you.

MR. JACKSON: No, Judge.

(Recess taken.)

(In open court; jury not present.)

THE COURTROOM DEPUTY: All rise.

THE COURT: Would you call the case, please. Take appearances.

THE COURTROOM DEPUTY: Criminal cause on trial, 21-CR-497, United States of America versus David Motovich.

Will the attorneys please state their name for the record, beginning with the Government.

MR. POLEMENI: Good afternoon, Your Honor.

Robert Polemeni, Eric Paulsen, Andrew Grubin, Matthew Skurnik, Paralegal Kavya Kannan, Special Agent Christopher Cabane for the United States.

THE COURT: Good afternoon. Please be seated.

Proceedings 10

MR. JACKSON: Good afternoon, Judge.

Randall Jackson, Jessica Layden and Henry Mazurek on behalf of our client David Motovich.

THE COURT: Good afternoon, folks.

MR. JACKSON: Good afternoon, Judge. Thank you.

THE COURT: We are back. I hope you all had a nice lunch. Please be seated.

We have a note from the jury. It is Court Exhibit 2-A, which is now in evidence.

(Court Exhibit 2-A received in evidence.)

THE COURT: Judge Kuntz, we, the jury, have reached a unanimous verdict.

The Foreperson of the jury has signed the verdict sheet and will bring that verdict sheet into the courtroom, marked as Court Exhibit 3-A, to be announced in court when we are brought back to court by the court security officer. The Foreperson must sign and date this form.

The Jury Foreperson signed today's date July 7th -- July 30th of 2024.

Is it the wish of the parties that I bring the jury back into the courtroom?

Government.

MR. POLEMENI: Yes, Your Honor.

THE COURT: Defense.

MR. JACKSON: Yes, Judge.

J.A. 1004

Jury Verdict                                     11

THE COURT:  Okay.

Mr. Scott, will you tell the CSO to bring the jury in, please.

(Jury enters at 3:19 p.m.)

THE COURTROOM DEPUTY:  All rise for the jury, please.

THE COURT:  Good afternoon, Ladies and Gentlemen of the Jury.

I understand that you have reached your verdict.  I am going to ask the Foreperson of the jury to read the verdict out loud and then I will poll the jurors individually with respect to the verdict.

So, Mr. Foreperson, would you please read the -- Ladies and Gentlemen, you can be seated for now.  Thank you.

I am going to ask the Foreperson of the jury to remain standing and to read out loud in its entirety, count by count, the verdict that the jury has reached.

And keep your voice up, sir.

THE FOREPERSON:  We, the jury, hereby unanimously render the following verdicts:

Count One:  Operating an unlicensed money transmitting business.  Guilty.

Count Two:  Failure to file currency transaction reports.  Guilty.

Count Three:  Bank fraud.  Guilty.

---

Jury Verdict                                     12

Count Four:  Bank fraud.  Guilty.

Count Five:  Bank fraud.  Guilty.

Count Six:  Bank fraud.  Guilty.

Count Seven:  Conspiracy to commit bank fraud.  Guilty.

Count Eight:  Money laundering.  Guilty.

Count Nine:  Money laundering.  Guilty.

Count Ten:  Money laundering.  Guilty.

Count Eleven:  Money laundering.  Guilty.

Count Twelve:  Money laundering.  Guilty.

Count Thirteen:  Money laundering.  Guilty.

Count Fourteen:  Money laundering.  Guilty.

Count Fifteen:  Conspiracy to commit money laundering.  Not guilty.

Count Sixteen:  Aggravated identity theft.  Guilty.

Count Seventeen:  Conspiracy to defraud the United States.  Guilty.

Count Eighteen:  Witness tampering.  Not guilty.

THE COURT:  Thank you, sir.

Would you please hand that to my court deputy, to Mr. Scott, who will hand it to me.

I will now poll the jurors individually.

Thank you.

And I am going to ask you to stand when you respond to this.

---

Jury Verdict                                     13

Juror Number 1, is this your verdict?

JUROR NUMBER 1:  Yes.

THE COURT:  Juror Number 2 --

JUROR NUMBER 2:  Yes.

THE COURT:  -- is this your verdict?

Juror Number 3, is this your verdict?

JUROR NUMBER 3:  Yes.

THE COURT:  Juror Number 4, is this your verdict?

THE FOREPERSON:  They were excused.

THE COURT:  Juror Number 5, is this your verdict?

JUROR NUMBER 5:  Yes.

THE COURT:  Juror Number 6, is this your verdict?

JUROR NUMBER 6:  Yes.

THE COURT:  Juror Number 7, is this your verdict?

JUROR NUMBER 7:  Yes, sir.

THE COURT:  Juror Number 8, is this your verdict?

JUROR NUMBER 8:  Yes.

THE COURT:  Juror Number 9, is this your verdict?

JUROR NUMBER 9:  It is.

THE COURT:  Juror Number 10, is this your verdict?

JUROR NUMBER 10:  Yes.

THE COURT:  Juror Number 11, is this your verdict?

JUROR NUMBER 11:  Yes.

THE COURT:  Juror Number 12, is this your verdict?

JUROR NUMBER 12:  Yes.

---

Proceedings                                     14

THE COURT:  Okay.

Is this your verdict, sir?

JUROR NUMBER 13:  Yes.

THE COURT:  Okay.

Ladies and Gentlemen of the Jury, I know it seems that it was a hundred years ago, but it was only three-and-a-half weeks ago that you came to this courtroom and I asked you if you would be willing to serve on this jury and I said to you something that I knew you knew better than I did at the time, that each of you had someplace else you wanted to be and something else you wanted to be doing.  But I also said to you that you are about to embark in a service that make each of us proud to be an American.

You have honored, honored the best of our tradition.  What makes our legal system the best is not the lawyers -- though they are very good and very grateful -- the Court staff -- though they are very good and they are very grateful -- or the judges or the CSOs.  What makes our system the best is you; because you came here as citizens and devoted your time and your attention to this case, you knew how important it was and is and will always be to the Defendant, to the Government, to everyone involved.  I am so proud to have served as your judge and honored that you have blessed us with your time and your attention.  This is what makes the American justice system work.

**J.A. 1005**

Proceedings                    15

Behind me there is a seal of the United States of America. It is the eagle. In one talon the eagle holds a peace offering and in the other talon the eagle holds the 13 arrows representing the original 13 colonies. And that eagle is looking out over the entirety of our country and the entirety of our history with peace and strength. But it is not the symbol, it is you that make it real.

I thank you on behalf of all of the judges of the Eastern District. I thank you on behalf of the lawyers for the Government, the lawyers for the Defendant, for the Defendant himself, and for the people of the United States that the Government in this action represents. There is nothing that is more important to our system than what you have done. You not only make it real, Ladies and Gentlemen of the Jury, you keep it real. And I want to thank you for your service.

You are now released to go back to the second floor and check out with our distinguished Jury Clerk's Office. They will give you all of the necessary paperwork that you need to do that.

But know how much I truly value what you have done. And I hope when people say to you what was it like, you will say it was focused, it was serious and it was real. And you don't have to say that the judge looked like Denzel Washington because, truth be told, I know I don't look like Denzel

Proceedings                    16

Washington. And I won't tell you I look better than Denzel, because I don't.

But I want to thank you so much.

We are adjourned. Thank you. Please return to the second floor.

And thank you alternates out there. We know that you were there and ready. Thank you.

(Jury excused at 3:26 p.m.)

THE COURT: Thank you. That applies to the alternates as well. You should come around and retrieve your materials and go back to the second floor.

And I thank you again for your service as well.

(Alternate jurors excused 3:27 p.m.)

THE COURT: All right. Ladies and Gentlemen, please be seated.

What we will now do is, I will have copies of Court Exhibit 2-A, which is in evidence, the verdict-reached sheet, and Court Exhibit 3-A, the verdict sheet, made for you. They will -- obviously, they are in evidence and they will be uploaded on ECF and I will have hard copies made for you in a few minutes. And I would just like you to sit tight while I have that done.

(Court Exhibit 3-A received in evidence.)

THE COURT: Do we have any statements or any motions to be made at this time?

Proceedings                    17

First from the Government and then from Defense Counsel.

MR. POLEMENI: Yes, Your Honor. Thank you.

At this time the Government would move pursuant to 18 U.S.C. 3163 for the Defendant to be remanded into custody.

THE COURT: All right. What is the basis of your motion, sir? You cited a statute, but why don't you just flesh that out a bit and then I will hear from Defense Counsel with respect to your motion.

MR. POLEMENI: Yes, Your Honor. Thank you.

Now that the Defendant has been --

THE COURT: And I am going to ask you to slow it down, as I always do.

MR. POLEMENI: Yes.

THE COURT: Make sure the microphone is on.

We still do the whole Vader, Chris Rock, Woody Allen schtick, so slow it down.

Go ahead.

MR. POLEMENI: Yes. Thank you, Judge.

Now that the Defendant has been convicted of multiple charges, the presumption of bail is switched. It is now his presumption to establish that by clear and convincing evidence he is not a flight risk or a danger to the community.

Given the charges in this case, Judge, and given what we know about the Defendant's wealth, he clearly has

Proceedings                    18

significant access to a significant amount of resources, including resources that are not in his name. He has a net worth on paper exceeding $30 million. His family has a net worth on paper exceeding nearly $300 million.

As Your Honor saw throughout this trial, and I think the jury reached the correct verdict, much of the wealth that the Defendant has is actually not on paper, it is in other people's names. It is in bank accounts under the names of other people.

As Your Honor also is aware, the Defendant has significant access to cash, which is a useful resource for one who might be attempting to flee undetected.

A significant part of the fraudulent and many fraudulent schemes that the Defendant undertook for a series -- a decade, if not longer, involves the use of fraudulent identification and fraudulent documents, including Your Honor saw what can only be described as a fake U.S. -- United States Department of State/NYPD/employer card bearing his photograph.

What is concerning is that the Defendant testified that he received that from the 66th Precinct, which suggests that he has connections with individuals in public -- in law enforcement and others who, if it is true, might be willing to provide fraudulent documents for him.

I'll note, Judge, that while the Defendant -- while the jury, of course, came back with a not-guilty verdict on

Case: 25-2986, 04/07/2026, DktEntry: 48.1, Page 150 of 155

Proceedings 19

the obstruction count, it is clear to the Government that the Defendant attempted to obstruct these proceedings, including by paying off a significant amount of money to an attorney in order to silence witnesses against him. The recording that was introduced into evidence through Mr. Adamou makes very clear that the Defendant was going to great lengths to ensure that individuals did not cooperate with the Government and to testify against him.

The Defendant testified. I think there were many things that he said that were not true. He doesn't seem to show much remorse for his actions and, quite honestly, Judge, doesn't seem to understand the severity of the errors he has made. There is no acceptance of responsibility here, Judge, and it's just an indication that the Defendant does not appreciate the consequences of his actions.

I'll note, Judge, that there are -- this case, as Your Honor is aware, involves members of the Defendant's family. I'm not going to comment on who was involved and the -- how much they were involved and how much they knew, but at the very least Mr. Motovich used family members extensively as part of his scheme, whether knowingly or unknowingly. Meaning, whether they knew what they were doing was illegal, he certainly did. He had no qualms in using them in his schemes.

Finally, Judge, the Defendant faces a significant

Proceedings 20

term of imprisonment. Back at the Guidelines, at a minimum, back at the Guidelines estimates are 188 to 235 months' imprisonment, of which 24 months must be ordered to be served following his conviction for the aggravated identity theft charge.

I'll also note, Judge, that Mr. Motovich and his family have extensive ties to other countries. I don't know if Your Honor is aware, but the Motovich Family has donated at least $5 million to a university in Tel Aviv, Ariel University, at which, in light of that donation, a building on the campus of Ariel University is named after the Motovich Family. At the ground-breaking ceremony for that event, the Israeli Foreign Minister as well as the Israel Defense Minister were present.

And so we would argue, Judge, that the Defendant has the means, the wherewithal and the ties to travel to foreign countries if he so desires.

As Your Honor is aware, during the course of discovery and during the pretrial suppression motion hearing, we established that the Defendant has access to private jets. He has paid a significant amount of money to companies for the use of private jets in the past. We have photographs of the Defendant from his wife's Facebook page in which they are on the tarmac of an airport getting onto a private jet. Mr. Boris Motovich, Mr. Motovich's father, has a private yacht

Proceedings 21

that is docked in Miami Beach. So he has, again, the resources and the ability to flee if he desires.

So, Judge, for all of those reasons, the Government would request that the Defendant be remanded into custody.

THE COURT: I take it because you have said nothing about, quote/unquote, dangerousness that that is not part of your application; is that correct?

MR. POLEMENI: That's correct, Judge.

THE COURT: Okay.

I will hear from Defense Counsel.

MR. JACKSON: Thank you very much, Your Honor.

First, Your Honor, under 18 U.S.C. 3143, the question is whether or not there is evidence, clear and convincing evidence that could indicate that the Defendant will appear.

I would note first, Your Honor, that the Defendant has been aware of the investigation for five years. He has been on bail for approximately, I believe, three and a half years. At no point has there been any indication throughout that time period that the Defendant ever intended to flee.

And, in fact, it would be completely inconsistent with the Defendant's connections, deep connections to the community. He has four sons, who I think that the evidence has indicated and who I think by their very presence here the Court knows that his ties to his family and to his community

Proceedings 22

are extremely strong. He's very close to his children, who are here. He's extraordinarily close to his wife, who is here. He is extraordinarily close to his father, who is a person who is here and who the Defendant has been involved over the years in his healthcare, including, you heard during the testimony --

THE COURT: I am going to ask you to slow it down, too.

MR. JACKSON: Thank you, Judge.

THE COURT: Go ahead.

MR. JACKSON: I think you heard during the testimony that Boris Motovich has had health challenges at different points throughout the years and my client, David Motovich, has been deeply invested in helping him work through those, including when he was hospitalized at NYU for his cancer care.

He has no -- I submit, Judge, that, as the Court knows, in this situation many, many judges have found that where there has been a clear appearance by the Defendant over the course of years, including multiple years before there were any bail conditions put in place, that alone is clear and convincing evidence that there is no indication that the Defendant intends to flee.

On top of that, Your Honor, his connection -- there was mention made of private jets. He owns no private jets. He has no more access to private jets than anyone who

**J.A. 1007**

Proceedings                      23

theoretically might have money and could theoretically reach them. But there has been no indication that he has ever attempted to do so in connection with any allegation that there might be any attempt to flee.

The current bail conditions include possession by the Government of his children's and wife's passports, which are all held by U.S. Pretrial Services, as well as his own. He is under constant monitoring as a result of his ankle monitor, which is secured to him. He has checked in every day with Pretrial Services during this trial, throughout the trial, and Pretrial Services reported no problems with his checking in.

I would also just note, Your Honor, that substantial security has been put up in connection with his bail and there is no indication that the Defendant would ever want to imperil people who have cosigned on behalf of him in connection with his bail.

The reference to -- the reference to his connection to Israel is in the form of some charity donations and, you know, the kinds of connections that, frankly, Judge, a vast number of Jewish people in the United States have who have contributed to universities abroad. It's not -- this is not the kind of situation where you have someone who is connected to a country like Venezuela that doesn't have relationships with the United States.

Proceedings                      24

THE COURT: Or Lebanon.

MR. JACKSON: Or Lebanon, Your Honor. Correct.

So this is a very different situation.

When you combine those factors, as well as the fact that I would push back on a suggestion that there hasn't been any acceptance of responsibility. I think unlike many defendants, when Mr. Motovich testified he freely admitted that he knew that he had falsified certain documents and that he took responsibility for that. He -- I understood that the Government has a difference of opinion and the jury's verdict reflects a difference of opinion in terms of his guilt as a result of -- in connection with some of the other charges, but I would submit, Your Honor, that that in no way negates the fact that he, on the stand, answered every one of the questions that was posed to him and admitted his involvement in what was now years ago, in some cases as much as 14 years ago, the creation of those Workers' Compensation documents and invoices that were false.

I think the Government made mention of the ID that was given to him as a community liaison. While that may have been hastily put together by the NYPD, the Government hasn't submitted anything to suggest that that testimony was incorrect or that there was any fraudulent intent in whatever -- whoever at the NYPD issued him that. Mr. Motovich has always tried to be a partner with the police departments

Proceedings                      25

in his neighborhood. That doesn't indicate any nefarious connections. He is a person, like many of the business owners in the area, who simply has been someone who has tried to be friendly to the police departments and help them out.

So right now we have a $20 million bond that's fully secured by property with 14 cosigners, Your Honor.

And we would submit that based on all those factors, there is clear and convincing evidence that Mr. Motovich, as he has for the last several years, will continue to honor his obligations under the bail conditions that have been imposed.

THE COURT: What is your response to the Government -- and I will go back to the Government -- on the fact that is he now a convicted felon?

MR. JACKSON: Your Honor, the fact that he is now a convicted felon, Your Honor, I think it's a factor. I think that the vast majority of white-collar defendants like him who have been convicted, the courts have allowed to remain on bail through sentencing. And I think that there is nothing in the statute that requires him to be remanded unless there is something that is in conflict with the clear and convincing evidence that we've been talking about, Judge.

And in this situation, the information that led to him being a convicted felon has been information that's been in his possession for years. At no point did Mr. Motovich attempt to flee, at no point has the Government referenced any

Proceedings                      26

suggestion that he had an intention to flee, et cetera.

And so, Your Honor, I think that while the circumstances have changed and we need to prepare for sentencing in connection with the -- this, in terms of the question of how it impacts the likelihood that Mr. Motovich will flee, Mr. Motovich has been well aware of the fact that these are very serious charges and that there's very significant evidence facing him for years. We've had thousands of pages of discovery. And his approach has been to fully participate in the criminal justice process, to appear every single time, as Your Honor has ordered, in court. And I believe that's because Mr. Motovich has a deep commitment to following all of the Court's orders and to follow through with the process.

And I think that's what all the evidence indicates, Your Honor.

THE COURT: Let me hear from the Government.

What is your response?

MR. POLEMENI: Thank you, Judge.

The moment that a jury renders convictions on 16 of 18 counts, the presumption flips. And so while it is great that Mr. Motovich attended court when he was supposed to up until today, his incentives to flee, his incentive has greatly changed. And so, that is why the rule requires that the Defendant be remanded into custody unless he can prove that he

J.A. 1008

Proceedings 27

is not a flight risk by clear and convincing evidence.

I will say that -- Judge, a few things in response to what Mr. Jackson said.

THE COURT: And you will say them slowly.

MR. POLEMENI: Yes, Judge.

Mr. Jackson notes that there is a $20 million bond secured by some properties, and that is true. That amount pales in comparison to the Defendant's overall wealth and that of his family. It's a drop in the bucket, quite honestly.

And I also note that that $20 million package took a very long time for Mr. Motovich to come up with. And so the reason for that is because he could not find suretors who he did not -- who could come before this Court and represent to the Court that they were not involved in any illegal business transactions with the Defendant. It took him nearly three weeks to come up with that package.

I will also note, Judge, that to the extent that we -- there's some suggestion that white-collar criminals, you know, should not be put into custody because they always come back, that's just not the case. There have been plenty of white-collar criminals who, because they have the resources, because they have the ability to flee, in fact, do. And I would say that if -- you know, this is anecdotal, but to the extent that we're talking about white-collar criminals, they're the ones who flee to jurisdictions that we can't get

Proceedings 28

them back from.

THE COURT: When I was in private practice many years ago, among my clients were Robert Vesco and Marc Rich.

MR. POLEMENI: I'm sorry?

THE COURT: Go ahead.

MR. POLEMENI: I'm sorry, Judge. I missed that part.

THE COURT: I said when I was in private practice many years ago, among my clients were a gentleman named Robert Vesco and another gentleman named Marc Rich.

MR. POLEMENI: Yes. Got it, Judge.

In terms of -- and along that note, this was not put into evidence, but I believe it's part of the 3500 material that was provided to Defense Counsel. When Mr. Motovich and Mr. Adamou were having dinner in Cyprus, there was some discussion about how much it would cost for Mr. Motovich and his family to get passports issued by Cyprus because they are freely -- not freely given away. You can pay -- you can get them with a significant amount of money if you're willing to pay for it. And so while that was not introduced into evidence, I think it goes to show you the Defendant's mindset in terms of his -- perhaps his willingness to pay money to get a passport that would maybe allow him to travel across the world.

THE COURT: Again, your argument with the citation

Proceedings 29

to a statute, would you give that to the Court again, please.

MR. POLEMENI: It's 31 U.S.C. 3143, Judge.

THE COURT: 31 U.S.C.?

MR. POLEMENI: 3143.

THE COURT: 3143.

Do you agree, Mr. Jackson, that that is the governing statute with respect to the issues before the Court?

MR. JACKSON: Your Honor, I believe it's 18 U.S.C. 3143.

THE COURT: Let's have the full citation. What is the full citation?

Government.

MR. POLEMENI: 18 U.S.C. 3143.

THE COURT: 18 U.S.C. 3143.

Do you agree that that is the citation, Mr. Jackson?

MR. JACKSON: Yes, Your Honor.

THE COURT: Okay.

Is there anything else from the Government on this point?

MR. POLEMENI: No, Your Honor. Thank you.

THE COURT: All right.

Let me hear from you, Mr. Jackson. What is your response?

MR. JACKSON: Thank you, Judge.

First, I don't believe that -- while any

Proceedings 30

conversation that the Government is referencing happened years ago, there is no -- there was no testimony about such a conversation and we have no indication from any 3500 or anything that Mr. Motovich ever made any statements about seeking any passports from other countries like Cyprus. And, indeed, over the last several years there has been absolutely no evidence of any attempt to do that. He's never attempted to do that. His bond is secured by some of the people who are the closest to him. We're talking about his neighbors, we're talking about his rabbi's home, his family, life-long friends.

And Your Honor, I would just submit that the reason that it took -- I was not on the case at the time. But my understanding of the reason that why it took so long -- and I don't think three weeks is a particularly long time. But the reason it took some time for him to secure bail was because we're talking about a substantial amount of money. And this is a case that has been very wide-ranging. Many, many people have gotten subpoenas in the course of the case and that may have created some of the issues that the prosecutors are talking about. But Mr. Motovich was actually detained during a period of that and so it was difficult for him, I think, to have some of the conversations that one would need to have with people. But ultimately, he did secure a situation where you had 14 different people who exercised an enormous amount of moral suasion over Mr. Motovich, including his rabbi, close

**J.A. 1009**

Proceedings 31

family members, life-long friends.

And I would just submit, Your Honor, that I certainly understand what the Court is saying with regard to the Marc Rich situation I'm deeply familiar with, but that's the opposite of what happened here. With Marc Rich, he left the moment that he became aware that he may be indicted and became a felon. Mr. Motovich has done the exact opposite. The moment he became aware of the investigation, he did not flee. He has not fled throughout the time period for years leading up to the point where he was under bail condition, at no point did he ever attempt to flee and at no point would he. This is his home. He has the deepest of connections to this place. His family is all here. And I would submit, Judge, that he has just -- he's demonstrated, through his appearance over the last several years and his complete compliance with bail conditions, that he has every intention of honoring the Court's requirements under bail and continuing to do so.

THE COURT: I will hear the response from the Government to what you have just heard.

MR. POLEMENI: No response, Judge. I will rely on what I said previously.

THE COURT: All right.

I think the record is clear in this case that the Defendant, in fact, does constitute a flight risk. He has a means to do so. He has the assets to do so. And now having

Proceedings 32

been convicted on these multiple counts, he has the incentive to do so. It is very clear under the standards of 18 U.S.C. Section 3143 that it is appropriate and indeed required to have him immediately remanded into custody and I order the remand at this time.

MR. POLEMENI: Thank you, Judge.

THE COURT: Please come forward and take the Defendant into custody.

I am entering the following order which I have just signed. It will be on. ECF:

United States of America versus David Motovich, Defendant, 21-CR-497(WFK), William F. Kuntz, II, United States District Judge. The Court hereby orders the immediate remand of David Motovich. USM number given. The Defendant David Motovich is hereby immediately remanded to the custody of the United States Marshal Service. So ordered. The Honorable William F. Kuntz, II, United States District Judge. Dated today's date, July 30, 2024. Brooklyn, New York.

And I have two signed copies of the order.

We will make copies available, obviously, to all counsel of record. And it will be, of course, on ECF as well.

And as I stated earlier, I am going to put on ECF, and we are going to make photocopies for counsel to have as well, Court Exhibit 2-A, which is the verdict-reached form, which I read out loud earlier and is in evidence, and Court

Proceedings 33

Exhibit 3-A, which is the verdict sheet, which was read out loud and is in evidence as well.

U.S. MARSHAL: Your Honor, can we?

THE COURT: You most certainly may.

(Defendant exits the courtroom.)

THE COURT: The Defendant has been taken into custody. He has left the courtroom.

Is there anything else we need to address?

I realize the Defendant is no longer present. He is in custody. He is no longer in the courtroom. He is in the custody of the United States Marshals.

Is there anything else we need to address today?

From the Government.

MR. POLEMENI: No, Your Honor. Thank you.

THE COURT: Anything else from Defense Counsel?

MR. JACKSON: Yes, Your Honor.

We would normally have 14 days under Rule 29 to file any posttrial briefing. Because of the complexity that we will be coordinating with Mr. Motovich while he's detained and because of the complexity of the trial, we would request some additional time, if it's acceptable to the Court.

THE COURT: How much time would you request?

You are correct under the statute and governing rules you have 14 days, as you indicated.

Let me ask the Government. What is your view about

Proceedings 34

additional time, which the Court has the discretion to grant, as you well know?

MR. POLEMENI: No objection, Your Honor.

THE COURT: Okay. Let's talk about how much time, because I like to have these -- and I will put it in the written order, obviously, which I will file on ECF.

Let me hear first from Defense Counsel as to how much time you think you will need and then I will hear from the Government as to their response.

MR. JACKSON: Your Honor, we would ask for a total of 45 days.

THE COURT: 45 days from today, which is when? Why don't we get an exact date that you are asking for and then we will get a response from the Government. If it lands on a weekend, obviously push it out. Or in the middle of the holidays, which we are fast-approaching when we get into the 45-day range, seems to me.

MR. JACKSON: It would be September 12th, we believe, Your Honor.

THE COURT: September 12th. Does that avoid any of the Jewish holidays? I want to make sure that we don't have any problems with respect to that. Does September 12th work?

MR. JACKSON: I'm actually not sure, Judge. I will just verify very quickly.

THE COURT: Of course.

**J.A. 1010**

Proceedings 35

MR. JACKSON: No holidays.

THE COURT: All right. September 12th.

And what day of the week is that, sir?

MR. JACKSON: It's a Thursday, Judge.

THE COURT: Thursday. All right.

Is that acceptable to the Government?

MR. POLEMENI: Yes, Judge.

THE COURT: And how much time would you require to respond to any such motions?

MR. POLEMENI: I would ask for the same amount of time, so --

THE COURT: 45 days.

Which would take us to what? I like to have the dates.

MR. POLEMENI: Yeah. October 25th.

THE COURT: October 25th. Is that any holiday issue there?

MR. POLEMENI: Nothing I'm aware of, Judge.

THE COURT: Okay.

And now let me put the bid back to you for response to the Government's reply, Mr. Jackson. How much time would you require?

MR. JACKSON: Maybe two weeks, Judge.

THE COURT: What does that take us to, sir?

MR. POLEMENI: November 8th.

Proceedings 36

THE COURT: That is before Thanksgiving comfortably, I think.

MR. JACKSON: Yes, Judge.

THE COURT: Does that work?

MR. JACKSON: Yes, Judge.

THE COURT: What day of the week is that?

MR. POLEMENI: That's a Friday, Judge.

THE COURT: Okay. Let's call out the dates. Mr. Scott, you are on calling out the dates that we have just heard from Counsel.

And I will put that, obviously, in the written order on ECF just so there is no confusion about when the posttrial motions are due and responses.

THE COURTROOM DEPUTY: The following proposed briefing, posttrial motion briefing schedule:

The Defendant shall file its posttrial motions Thursday, September 12, 2024 by 5:00 p.m. on ECF.

The Government shall file its response on October 25th. Friday, October 25th, 2024 by 5:00 p.m. on ECF.

The Defendant shall file its reply, if any, on ECF by Friday, November 8th, 2024.

THE COURT: Is that acceptable to the Government?

MR. POLEMENI: It is, Judge.

THE COURT: Is that acceptable to Defense Counsel?

MR. JACKSON: Yes, Your Honor.

Proceedings 37

THE COURT: Thank you.

I want to commend all the lawyers in this case for excellent representation of their respective clients. It is a very tough case, a very complicated case and a very demanding case. As someone who practiced law for 33 years, I am delighted that I do not have to face adversaries anymore as skilled and as ferocious as "youz guys" are, as we say in Brooklyn. You did a terrific job on both sides and I think your respective clients can be grateful and pleased of the hard work that you did. I know as your judge it was an honor to preside in this trial and you really give the personification of the best in the legal tradition. It is hard-fought and fairly fought. And I think it is very important for everyone here, the litigants, the parties, members of the public, to know from someone who was admitted to law school 52 years ago this year and who has grown up in the law that this is when it is at its best, hard-fought to a jury fairly and impartially by great, great lawyers dedicated to justice. I am proud of all of you for the role that you played and I commend you.

MR. POLEMENI: Thank you.

THE COURT: We are adjourned. Thank you.

I am going to make copies, as I promised, of Court 2-A. I am going to ask everyone to remain while we give you copies of Court 2-A and Court 3-A, the verdict-reached

Proceedings 38

sheet and the verdict sheet. Just sit tight while we make the copies.

MR. JACKSON: Judge, I just want to say --

THE COURT: And also the remand order as well, all of which will be on ECF. I know we live in the electronic world, but I am old-school enough, as you know, to want to make sure the lawyers actually walk out of the courtroom with the paper in their hands for their respective offices and clients.

Yes, go ahead.

MR. JACKSON: Judge, we appreciate the comment and we thank the Court and its staff for its work on the case.

MR. POLEMENI: Likewise, Judge.

THE COURT: I want to thank you all. Hard-fought and well-thought. Thank you.

My court deputy will be back in a moment with the copies and then you can proceed.

(Pause in proceedings.)

THE COURT: I am also signing and entering on ECF the order, the scheduling order. I might as well read it out loud now that we have it in writing, but it will be on ECF.

The Court orders the following briefing schedule for posttrial motions:

Defendant shall file posttrial motions on ECF by Thursday, September 12, 2024 at 5:00 p.m.

J.A. 1011

Proceedings                                      39

The Government shall file its response on ECF by Friday, October 25, 2024 at 5:00 p.m.

And Defendant shall file its reply, if any, on ECF by Friday, November 8, 2024 at 5:00 p.m.

So ordered by William F. Kuntz, II, U.S. District Judge.  July 30, 2024.  Brooklyn, New York.

Is that acceptable to the Government?

MR. POLEMENI:  Yes, Judge.

THE COURT:  Defense Counsel?

MR. JACKSON:  Yes, Your Honor.

THE COURT:  Thank you very much.

All right.  We will enter this.  And we will have copies for you momentarily of the verdict reached and the jury verdict sheets.

(Pause in proceedings.)

THE COURT:  My court deputy is back.  He will now distribute to you copies of Court Exhibit A, the verdict-reached form; Court Exhibit 3-A, the verdict sheet; and the order I just entered ordering the immediate remand of the defendant, David Motovich.

We are also going to give you copies, if we haven't already, of the scheduling order.

Have we done that?

We will put that on ECF.  I take it you probably do not need that with the same immediacy, although it will be up

Proceedings                                      40

on ECF within the hour for the dates that what we have just agreed to.

All right.  The counsel have now been handed copies of Court Exhibit 2-A, verdict reached; 3-A, verdict sheet; and the order, all of which are in evidence on the record, the order remanding Mr. David Motovich.

Is there anything else that we need to address today?

From the Government.

MR. POLEMENI:  No, Judge.  Thank you very much.

THE COURT:  From Defense Counsel, anything else?

Anything else?

MR. JACKSON:  No, Judge.

THE COURT:  Okay.

Thank you.  We are adjourned everyone.  Stay safe.

MR. JACKSON:  Thank you, Judge.

(Matter concluded.)

                                                 41

**E X H I B I T S**

Court Exhibit 10                          4

Court Exhibit 10-A                        7

Court Exhibit 2-A                         10

Court Exhibit 3-A                         16

J.A. 1012