# 25-2986

## In the United States Court of Appeals for the Second Circuit

UNITED STATES OF AMERICA,
APPELLEE

*v.*

MARINA KUYAN, KEMAL SARKINOVIC, JOSHUA MARKOVICS,
DEFENDANTS,

DAVID MOTOVICH,
DEFENDANT-APPELLANT

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE EASTERN DISTRICT OF NEW YORK (CRIM. NO. 21-497)*
*(THE HONORABLE WILLIAM F. KUNTZ, II, J.)*

**REPLY BRIEF OF DEFENDANT-APPELLANT**

CANDICE J. YANDAM RIVIERE
EMILY S. SHIRE
DAVIS POLK &WARDWELL LLP
*450 Lexington Avenue*
*New York, NY 10017*

KANNON K. SHANMUGAM
MASHA G. HANSFORD
DAVIS POLK &WARDWELL LLP
*1050 17th Street, N.W.*
*Washington, DC 20036*
*(202) 962-7000*

## TABLE OF CONTENTS

Page

Introduction ........ 1

Argument ........ 4

I. The government failed to demonstrate that Mr. Motovich operated a 'money transmitting business' ........ 4

II. The Section 5322 conviction should be vacated because the district court omitted the required willfulness instruction ........ 12

III. The *Klein* conspiracy conviction should be vacated because of the substantial risk of a non-unanimous verdict ........ 18

IV. The bank fraud convictions should be reversed because they are premised on depriving banks of information, not property ........ 24

Conclusion ........ 31

## TABLE OF AUTHORITIES

### CASES

*Ciminelli* v. *United States*, 598 U.S. 306 (2023) ........ *passim*

*Kousisis* v. *United States*, 605 U.S. 114 (2025) ........ 24, 27, 28

*Ratzlaf* v. *United States*, 510 U.S. 135 (1994) ........ *passim*

*Shaw* v. *United States*, 580 U.S. 63 (2016) ........ 26

*Thornley* v. *Penton Publishing, Inc.*, 104 F.3d 26 (2d Cir. 1997) ........ 17

*United States* v. *Bah*, 574 F.3d 106 (2d Cir. 2009) ........ *passim*

*United States* v. *Bankman-Fried*, 179 F.4th 104 (2d Cir. 2026) ........ 28

*United States* v. *Bankman-Fried*, 680 F. Supp. 3d 289 (S.D.N.Y. 2023) ........ 28

Page

Cases—continued:

*United States* v. *Bernstein*, 533 F.2d 775 (2d Cir.), *cert. denied*, 429 U.S. 998 (1976) ....19, 20

*United States* v. *Estevez*, 961 F.3d 519 (2d Cir.), *cert. denied*, 592 U.S. 960 (2020) ....22

*United States* v. *Ferguson*, 676 F.3d 260 (2d Cir. 2011)....14, 18, 24

*United States* v. *Gambone*, 167 F. Supp. 2d 803 (E.D. Pa. 2001)....20, 21

*United States* v. *Gambone*, 314 F.3d 163 (3d Cir.), *cert. denied*, 540 U.S. 815 (2003) ....20, 21

*United States* v. *Goklu*, 173 F.4th 16 (2d Cir. 2026) ....*passim*

*United States* v. *Griffin*, 76 F.4th 724 (7th Cir. 2023) ....29

*United States* v. *Helmsley*, 941 F.2d 71 (2d Cir. 1991), *cert. denied*, 502 U.S. 1091 (1992) ....18, 21, 22

*United States* v. *Lapier*, 796 F.3d 1090 (9th Cir. 2015)....23

*United States* v. *Lauria*, 70 F.4th 106 (2d Cir. 2023) ....15

*United States* v. *Lebedev*, 932 F.3d 40 (2d Cir. 2019), *cert. denied*, 589 U.S. 1224 (2020) ....28

*United States* v. *Mazza-Alaluf*, 621 F.3d 205 (2d Cir.), *cert. denied*, 562 U.S. 1035 (2010) ....*passim*

*United States* v. *Ness*, 565 F.3d 73 (2d Cir. 2009)....30

*United States* v. *Rosenblatt*, 554 F.2d 36 (2d Cir. 1977)....*passim*

*United States* v. *Silver*, 864 F.3d 102 (2d Cir. 2017), *cert. denied*, 583 U.S. 1091 (2018) ....15

Page

Cases—continued:

*United States* v. *Taylor*, 816 F.3d 12 (2d Cir. 2016) ....................16

*United States* v. *Wilkerson*, 361 F.3d 717 (2d Cir.), *cert. denied*, 543 U.S. 908 (2004) ....................10

*Wisconsin Central Ltd.* v. *United States*, 585 U.S. 274 (2018)....................5

**STATUTES**

18 U.S.C. § 1960 ....................*passim*

18 U.S.C. § 1960(b)....................6

18 U.S.C. § 1960(b)(1)(A) ....................7

18 U.S.C. § 1960(b)(1)(B) ....................5, 6, 7

18 U.S.C. § 1960(b)(2)....................6

26 U.S.C. § 7201 ....................19

26 U.S.C. § 7202 ....................19

31 U.S.C. § 5313 ....................16

31 U.S.C. § 5322 ....................12, 13, 15

31 U.S.C. § 5330 ....................5, 6, 7

31 U.S.C. § 5330(d)....................6

31 U.S.C. § 5330(d)(1)(A) ....................5

## INTRODUCTION

On each disputed count of Mr. Motovich's convictions, the government substitutes a broad label for an element it failed to prove. It calls an on-the-spot exchange of a check for cash "money transmitting," even though no customer's funds went to another person or place. It calls an intent that currency transaction reports not be filed "willfulness," even though *Ratzlaf* v. *United States*, 510 U.S. 135 (1994), requires specific knowledge that avoiding the reporting requirement was unlawful. It calls payroll-tax and income-tax obstruction a single object of conspiracy, even though the indictment identified both and the jury was never required to agree on either. And it calls information about who controlled bank accounts "bank property," even though *Ciminelli* v. *United States*, 598 U.S. 306 (2023), holds that information used to make economic decisions is not property. The convictions on all of these counts were deficient.

Count 1 illustrates the point. The government concedes that whether Mr. Motovich operated a "money transmitting business" presents a legal question reviewed de novo, yet it repeatedly invokes the deference owed to a jury's factual findings. *See* Br. 24. And this Court's decision in *United States* v. *Goklu*, 173 F.4th 16 (2d Cir. 2026), does not bridge the gap. *Goklu* involved bitcoin moving electronically between digital wallets. The government concedes that no customer here designated a third-party recipient or asked Mr.

Motovich to send funds to another account or location. *See* Br. 35. The government proved that customers handed Mr. Motovich checks and received cash back on the spot. That is receipt and exchange—not transmission. *United States* v. *Bah*, 574 F.3d 106 (2d Cir. 2009), and *United States* v. *Mazza-Alaluf*, 621 F.3d 205 (2d Cir.), *cert. denied*, 562 U.S. 1035 (2010), therefore remain dispositive, and the government's insistence that "*Goklu* controls, not *Bah*," Br. 34, cannot make it so.

The errors on several other counts likewise warrant reversal. On the currency-reporting count, the government relies on portions of the charge stating that Mr. Motovich "will[ed]" and "intentionally caused" currency transaction reports not to be filed. *See* Br. 45. But *Ratzlaf* rejected precisely that substitute for the required knowledge: a defendant's purpose to circumvent a bank's reporting obligation does not suffice, and the jury must find that he *knew* that avoiding the reporting requirement, including by structuring the transactions to fall below the threshold, was itself unlawful. *See Ratzlaf*, 510 U.S. at 136-138, 146-147. The count-specific charge never required that finding. *See* J.A. 975-976. And on the *Klein* conspiracy, the government defines the object as frustrating the IRS's ability to assess and collect tax revenue. *See* Br. 58-59. That framing pitches the object at too high a level of generality: *United States* v. *Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977), requires agreement on the essential nature of the alleged fraud, and the indictment and proof here

identified two tax-specific ends—customers' payroll-tax evasion and concealment of Mr. Motovich's own income. *See* J.A. 73-74, 324, 450, 454, 727, 793-795.

Nor can the fraud convictions stand. The government tries to recast the theory of fraud it presented at trial as aimed at bank property, but its own summation identified the "objective" as moving money through accounts "without the bank[] knowing who truly controlled them." J.A. 936. Under *Ciminelli*, "potentially valuable economic information" needed to make discretionary economic decisions is not a traditional property interest and cannot sustain a fraud conviction. 598 U.S. at 309, 314-316. Nor does the government identify any other cognizable theory of interfering with a traditional property right. While a bank may have property rights in deposited funds, it does not have those rights as against the account owner, and here the government's theory was that Mr. Motovich controlled the funds in the accounts, not that he obtained funds from a third-party bank customer.

The Court should reject the government's efforts to broaden federal criminal laws to compensate for its failures of proof, reversing or, at a minimum, vacating the disputed convictions.

# ARGUMENT

## I. THE GOVERNMENT FAILED TO DEMONSTRATE THAT MR. MOTOVICH OPERATED A 'MONEY TRANSMITTING BUSINESS'

A check-cashing business does not transmit a customer's money. The customer arrives with a check and leaves with the same value—minus a fee—in a different form; no funds are sent to another person or place. That transmission-free exchange falls outside the criminal prohibition on "money transmitting" in 18 U.S.C. § 1960, as both the statutory text and this Court's decisions in *United States* v. *Bah*, 574 F.3d 106 (2d Cir. 2009), and *United States* v. *Mazza-Alaluf*, 621 F.3d 205 (2d Cir.), *cert. denied*, 562 U.S. 1035 (2010), make clear. Yet that on-the-spot exchange is, at most, what the government proved at trial. The government's argument in defense of that conviction thus depends entirely on relabeling receipt and exchange as transmission. Its lead authority, *United States* v. *Goklu*, 173 F.4th 16 (2d Cir. 2026), does not justify that maneuver. The conviction should be reversed or, at a minimum, vacated.

1. The government acknowledges, as it must, that the question turns on the statutory text. *See* Br. 25. The text unequivocally requires "transmitting" money: *i.e.*, conveying it onward to another person or place. *See* Motovich Br. 26-27. As discussed below, the government proved no customer-directed transmission here. *See* J.A. 330, 457-459, 732.

The government resists that requirement by invoking 31 U.S.C. § 5330(d)(1)(A), which defines a money transmitting business to include check-cashing for purposes of the civil definition. *See* Br. 26. And it emphasizes that the legislative history of that civil provision reflects Congress's intent to capture a check-cashing business. *See* Br. 26-27. But congressional intent as to the registration requirements in Section 5330 does not help the government expand the criminal prohibition in Section 1960. In the latter provision—the one actually at issue here—Congress did not define money transmission to include check-cashing. That means the ordinary meaning controls. *See*, *e.g.*, *Wisconsin Central Ltd.* v. *United States*, 585 U.S. 274, 277-278 (2018).

Indeed, this Court has already rejected efforts to expand Section 1960 through broader definitions found in Section 5330. In *Mazza-Alaluf*, the Court held that Section 5330(d)'s definitions apply only "[f]or purposes of this section," and declined to import them into Section 1960. 621 F.3d at 210. And *Bah* confirms that Section 1960 requires transmission, not merely receipt—there, the Court held that even receipt for the purpose of later transmission was not enough. *See* 574 F.3d at 114.

The government tries to escape those decisions by emphasizing that Mr. Motovich was charged under Section 1960(b)(1)(B), which cross-references Section 5330's registration requirements. *See* Br. 31-34. But that confuses what makes a money transmitting business *unlicensed* with what makes the

business *money transmitting*. Section 1960(b)(1)(B) identifies failure to register as one way an otherwise qualifying money transmitting business becomes unlicensed; it does not erase Section 1960(b)(2)'s separate requirement of "transferring funds." And *Mazza-Alaluf* rejects the wholesale importation of Section 5330(d)'s definitions into Section 1960, because doing so would render Section 1960's own definition superfluous. *See* 621 F.3d at 210; *see also Goklu*, 173 F.4th at 24 (recognizing that the Court could not "simply import" a regulatory definition from the Section 5330 implementation context into Section 1960(b) if it did not otherwise fit the text).

More broadly, the government's argument that check-cashing qualifies as money transmitting cannot be squared with this Court's decision in *Bah*. There, the Court vacated a Section 1960 conviction because the government's proof did not satisfy the statute's transmission requirement. In *Bah*, customers had handed the defendant currency in exchange for a receipt and the defendant's promise that the funds would be transmitted to recipients in Africa. *See* 574 F.3d at 110. The Court held that these exchanges did not fall within Section 1960 because the exchange of money for a promise to transmit constituted only "the *receipt* of money for transmission." *Id.* at 112. *Bah* thus confirms that neither the receipt of funds nor the exchange of funds for something else of value itself qualifies as the transmission Section 1960 requires. Here,

each customer handed over a check and received cash back on the spot, without directing funds onward to another person or place. *Bah*'s receipt-versus-transmission distinction governs the check-for-cash exchange here.

The government attempts to distinguish *Bah* as turning on "the interpretation of a state statute." Br. 33. That is wrong. To be sure, *Bah* addressed Section 1960(b)(1)(A), which defines the licensing requirement with respect to *state* law, and the provision here, Section 1960(b)(1)(B), defines it with respect to *federal* law. But the basic point is identical: New York law was broad enough to require registration by any business receiving funds for transmission, and Section 5330 broadly requires registration, including by check-cashing businesses. The holding of *Bah* is that the scope of the predicate registration statute does not dictate the scope of the federal criminal prohibition in Section 1960; the latter requires actual movement of funds, and that was missing in *Bah*, just as it is missing here. *See* 574 F.3d at 112-113.

The government further contends that Mr. Motovich did more than "receiv[e] money for transmission" because he also provided cash for those funds to the customers. *See* Br. 34. But *Bah* treated the receipt of cash from customers for later transmission as distinct from the transmission itself. *See* 574 F.3d at 112, 114. Just as receiving checks does not suffice (even though those checks can later be used to transmit money from the customers' accounts to the recipients), providing cash to customers on the spot does not transmit

funds to another person or location. The service Mr. Motovich provided to the customers involved no transmission at all. Under *Bah*, Mr. Motovich's Count 1 conviction cannot stand.

2. This Court's recent decision in *Goklu* does not alter that conclusion. Its holding turned on features of virtual currency that a check-for-cash exchange does not share. An undercover agent "electronically moved funds from his bitcoin wallet to [the defendant's]," and the Court treated those "[e]lectronic signals" as "the means by which funds [were] transported" to "another location." 173 F.4th at 25 (citation omitted). The electronic movement of bitcoin supplied the transmission that the statute requires. A paper check handed across a counter does not similarly move funds between distinct locations. Tellingly, the *Goklu* jury was instructed that "money transmitting" includes "transferring funds on behalf of the public by any and all means," *id.* at 21—an instruction that Mr. Motovich requested and was denied, *see* pp. 11-12, *infra*. And illustrating the bitcoin-specific nature of the case, the court also instructed the jury that "exchanging Bitcoin for U.S. currency can qualify as a transfer within the meaning of the statute." *Id.* at 22.

Even the government acknowledges "the complications of virtual currency" in *Goklu*. Br. 31. But it nonetheless endeavors to apply *Goklu* here, outside the bitcoin context. In doing so, the government reads *Goklu* far too

broadly. It contends that *Goklu* announced a categorical rule that all "businesses that either physically hand currency to a customer or are specifically listed in Section 5330 are money transmitting businesses." Br. 30. But *Goklu* adopted no such rule. Its holding was tied to the specific facts before it—a two-way, bitcoin-for-cash exchange in which value moved electronically between digital wallets as part of the transaction offered to the customer. *See* 173 F.4th at 25-26.

The government does not appear to dispute that, in this case, it "presented no evidence that any customer designated a third-party recipient for its funds[;] . . . came to Mr. Motovich to convey money to a third party; or . . . asked him to send money to another account or location." Br. 35 (quoting Motovich Br. 31). Each transaction instead began and ended with the same customer at the same counter: the customer handed over a check and received cash minus a fee; Mr. Motovich later deposited the check into an account he controlled. *See* J.A. 330, 457-459, 732. That sequence does not show a transmission service performed for the customer. The customer paid for immediate cash, while the later deposit was undertaken by Mr. Motovich for his own account. Treating that deposit as the relevant transmission would extend Section 1960 to any business that accepts and later deposits a customer's check.

*Goklu* itself disclaimed the government's reading. The panel explained that its holding does not reach "a person in the business of buying bitcoin to

hold in their own account," because Goklu "made money by providing exchange services to customers in return for a commission." 173 F.4th at 26 n.4. So too here: the service Mr. Motovich sold was immediate cash, and his later deposit of the checks was a step for his own account, not a transmission performed for the customer. *See* J.A. 330, 457-459, 732. The panel's reliance on agency guidance was likewise specific to virtual currency. *See* 173 F.4th at 26 (invoking guidance from the Treasury Department's Financial Crimes Enforcement Network (FinCEN) for persons "Administering, Exchanging, or Using Virtual Currencies"). That guidance does not address a check-cashing service in which the customer receives immediate cash and designates no recipient or destination.

The government's broad reading of *Goklu* cannot be reconciled with this Court's precedents. *See* pp. 5-8, *supra*. Faced with that conflict, the government declares that "*Goklu* controls, not *Bah*." Br. 34. But that cannot be correct, because even if *Goklu* conflicted with *Bah* or *Mazza-Alaluf*, it did not purport to overrule them. Instead, it cited *Mazza-Alaluf* and affirmed the conviction only after finding actual transmission of bitcoin. *See Goklu*, 173 F.4th at 24-26; *see also United States* v. *Wilkerson*, 361 F.3d 717, 732 (2d Cir.), *cert. denied*, 543 U.S. 908 (2004). Properly read, the decisions do not conflict, and the government's reliance on *Goklu* is therefore misplaced.

Further, Mr. Motovich's reading accords with Section 1960's purpose. As *Bah* explains, the statute targets "the movement of funds in connection with drug dealing and terrorism." 574 F.3d at 112. A bitcoin transfer falls at the heartland of that concern because transferring bitcoin between digital wallets is well suited for laundering proceeds of drug dealing and similar activities. *See Goklu*, 173 F.4th at 21. Check-cashing, by contrast, is not a feasible means of moving large proceeds of unlawful enterprises. It thus is a mismatch for the statutory objective, as well as for the statutory text. Because the government did not present evidence from which the jury could conclude that Mr. Motovich's business provided transmission services, the conviction on Count 1 should be reversed.

3. At a minimum, the erroneous jury instruction requires a new trial on Count 1. The district court defined a "money transmitting business" as one that "accepts currency and/or checks for transfer." J.A. 974. But "for transfer" describes why funds were accepted; it did not require the jury to find that Mr. Motovich's business actually provided a transfer service to the customers. *Bah* vacated a conviction in similar circumstances. 574 F.3d at 114-116; *see* pp. 6-8, *supra*. The instruction Mr. Motovich requested repeated the transmission requirement this Court adopted in *Bah*: it would have required the jury to find that Mr. Motovich's business itself engaged in transmission. J.A. 154-155. Tellingly, for all the weight the government places on *Goklu*, the instruction

in that case *did* require the jury to find that the defendant "transferr[ed] funds on behalf of the public"—language materially identical to the actual-transmission requirement in Mr. Motovich's proposed instruction. 173 F.4th at 21; Motovich Br. 28, n.4. If the Court does not reverse, therefore, it should vacate the Count 1 conviction and remand for a new trial.

## II. THE SECTION 5322 CONVICTION SHOULD BE VACATED BECAUSE THE DISTRICT COURT OMITTED THE REQUIRED WILLFULNESS INSTRUCTION

As appellant has explained, binding Supreme Court precedent establishes that the Section 5322 conviction at issue in Count 2 requires the government to prove both that the defendant knew about the reporting requirement *and* that the defendant knew that it was unlawful to avoid the report's filing, including by structuring transactions in a way that would avoid triggering that requirement. *See* Motovich Br. 34-36. Under *Ratzlaf* v. *United States*, 510 U.S. 135 (1994), intentionally failing to file the reports is not enough. Yet that is all that the jury instructions required here.

The government's primary effort to rehabilitate the Count 2 conviction is to argue that, overall, the jury instructions were clear enough. Far from it: the specific *Ratzlaf* requirement is famously confusing, and the government itself repeatedly misstates it. In all events, any salutary effect of the general mens rea instructions was undone by the Count 2-specific instruction, which

expressly authorized conviction based only on a finding that Mr. Motovich intentionally caused a financial institution not to file the report. Given the dearth of evidence that Mr. Motovich knew that not filing (including by avoiding triggering the reporting requirement) was *itself* unlawful, the government cannot establish that this instructional error was harmless beyond a reasonable doubt.

1. Section 5322 has a particularly stringent definition of "willfully," 31 U.S.C. § 5322: to obtain a conviction, the government must prove that "the defendant knew not only of the bank's duty to report cash transactions in excess of $10,000, but also of his duty not to avoid triggering such a report." *Ratzlaf*, 510 U.S. at 146-147; Motovich Br. 35. Mr. Motovich requested an instruction that conveyed that requirement, but the court instead instructed the jury that intentionally causing a financial institution to fail to file the reports is enough. J.A. 975-976. That was erroneous.

Rather than defending the instruction specific to Count 2, the government primarily argues that other instructions about willfulness were sufficient. It cites the references to "purpose" and acting "knowingly and willfully" in the indictment, which was read to the jury without explanation. *See* Br. 45 (emphasis omitted) (quoting J.A. 975). And it invokes the instructions' general statement that "willfully" means acting "with the bad purpose to disobey or disregard the law." *Id.* (quoting J.A. 970). But nothing about those general

instructions informed the jury of the required bad purpose for Count 2: namely, knowledge that causing the business not to file the report, including by avoiding triggering the reporting requirement, was itself unlawful. A general reference to a bad purpose does not fill that gap. Indeed, the Supreme Court held in *Ratzlaf* that "a defendant's purpose to circumvent a bank's reporting obligation" does not suffice, without more, to sustain a conviction. 510 U.S. at 136. Without the requested instruction, the jury might well have concluded that a purpose to circumvent the reporting requirement was a "bad purpose" that satisfied the government's burden. J.A. 970.

Moreover, even if the non-count-specific instructions would have satisfied *Ratzlaf*, a general definition cannot cure the "superseding definition provided" in a count-specific instruction. *United States* v. *Ferguson*, 676 F.3d 260, 276 (2d Cir. 2011). Here, the count-specific instruction supplied a plainly inadequate definition of "willfully caused." That instruction told the jury that it would be sufficient to find that Mr. Motovich "will[ed] that the alleged unlicensed check-cashing business would fail to file the Currency Transaction Reports" and that he "intentionally cause[d] the alleged unlicensed check-cashing business to fail to file Currency Transaction Reports." J.A. 976. It specifically informed the jury that, if "the answer to both of these questions is yes," then the "willfully caused" requirement was satisfied. *Id.* The government

appears to think that is enough, Br. 45-46, and, so instructed, the jury doubtless thought so, too. But intentionally failing to file a report is insufficient under *Ratzlaf* even where the defendant "know[s] that a financial institution must report currency transactions in excess of $10,000 and . . . inten[ds] to avoid such reporting." 510 U.S. at 138.

The government's resistance is understandable. The "willfulness" requirement in Section 5322 as interpreted in *Ratzlaf* is unusually demanding. It is a rare circumstance where Congress has "decree[d]" that knowledge of the law is required. 510 U.S. at 149. The Count 2-specific instruction relieved the government of that obligation, and no other part of the instructions restored it.

2. The instructional error was not harmless. For an instructional error, vacatur is warranted unless it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States* v. *Silver*, 864 F.3d 102, 119 (2d Cir. 2017), *cert. denied*, 583 U.S. 1091 (2018); *see United States* v. *Lauria*, 70 F.4th 106, 133 (2d Cir. 2023).

The government cannot meet that demanding standard. To the contrary, there is serious doubt that a properly instructed jury would have convicted Mr. Motovich. The government cites evidence that "supported [Mr. Motovich's] knowledge of the [reporting] requirement," Br. 47-48, and emphasizes the prosecution's argument in closing that Mr. Motovich "evaded" that

requirement, *see* Br. 50. Again, however, neither the knowledge of the reporting requirements nor the purpose to evade them suffices under *Ratzlaf*. *See* 510 U.S. at 137-138. Instead, the government needed to prove that Mr. Motovich "*knew*" that avoiding the reporting requirement "was *unlawful*." *Id.* at 138 (emphases added). Knowing that a report is required for payments over $10,000 is different from knowing, for example, that it is unlawful to avoid payments over $10,000 so as to avoid triggering the requirement. Indeed, the whole point of structuring is that no transaction over $10,000 occurs.

Notably, even as to knowledge of the reporting obligation and intent to evade it, the evidence was far from overwhelming: Mr. Motovich repeatedly cashed checks exceeding $10,000 (including checks for $12,225, $13,800, and $14,895), and thus repeatedly triggered the very reporting requirement he supposedly designed his business to evade. *See* J.A. 496-498. This Court has previously vacated convictions for structuring transactions to evade Section 5313's reporting requirements where the defendant made several split deposits below $10,000 but also made multiple deposits above $10,000 during the same period. *See United States* v. *Taylor*, 816 F.3d 12, 25-26 (2d Cir. 2016). The government, this Court explained, failed to demonstrate "*consistent* behavior" from which intent to evade could rationally be inferred. *Id.* at 26. Mr. Motovich's repeated above-threshold transactions similarly undercut even an

intent to evade, let alone an inference that Mr. Motovich evaded while knowing that doing so was itself unlawful.

Unable to meet the harmlessness standard, the government argues that the plain-error standard of review applies because Mr. Motovich did not adequately preserve an objection to the instruction. Br. 43-44. But Mr. Motovich proposed an instruction that would have avoided the error by requiring the jury to find that the alleged business "knew of [the reporting requirements] and acted with specific intent to violate" them, "with the bad purpose to disobey or disregard the law by not filing the report as required." J.A. 158. And the court rejected that proposal but repeatedly assured the parties that overruled positions were preserved and need not be restated. *See* J.A. 295, 899. On that record, a further objection would have been a "mere formality." *Thornley* v. *Penton Publishing, Inc.*, 104 F.3d 26, 30 (2d Cir. 1997).

In any event, even if plain-error review applies, that standard is met here because the error was plain and affected Mr. Motovich's substantial rights. *See* Br. 47. The instructions specifically told the jury that it could find the willfulness requirement satisfied for Count 2 as long as it found that Mr. Motovich had intentionally caused the report not to be filed. *See* J.A. 973, 976. Just as in *Ratzlaf*, the government only "had to prove defendant's knowledge of the banks' reporting obligation and his attempt to evade that obligation, but did not have to *prove defendant knew the structuring was unlawful*." 510 U.S.

at 137-138 (emphases added). The instructions thereby plainly misstated the *Ratzlaf* willfulness requirement, and nothing in the instructions taken as a whole remedied that error.

On this record, the jury would not have "necessarily found" that Mr. Motovich knew that avoiding triggering the reporting requirement was itself unlawful. *Ferguson*, 676 F.3d at 277; *see* pp. 15-17, *supra*. Accordingly, even under plain-error review, the instruction "sufficiently tainted the defendant[']s trial to require that the verdict be set aside." *Id.*

## III. THE *KLEIN* CONSPIRACY CONVICTION SHOULD BE VACATED BECAUSE OF THE SUBSTANTIAL RISK OF A NON-UNANIMOUS VERDICT

A single conspiracy may encompass multiple objects, but when the government presents multiple objects to the jury, the jury must unanimously agree on the object the conspirators agreed to pursue. *See United States* v. *Rosenblatt*, 554 F.2d 36, 38, 40-42 (2d Cir. 1977); *United States* v. *Helmsley*, 941 F.2d 71, 91 (2d Cir. 1991), *cert. denied*, 502 U.S. 1091 (1992). Here, the government's theory on Count 17 presented a conspiracy with two objects: an effort to obstruct the IRS's collection of payroll and other taxes from Mr. Motovich's customers, and an effort to obstruct the IRS's collection of income taxes from Mr. Motovich. *See* J.A. 73-74. But the jury instructions did not require the jurors to agree on a single object or otherwise guard against the

possibility of a non-unanimous verdict. *See* J.A. 983-985. For that reason, the Count 17 conviction should be vacated.

1. The government's primary argument is that the conspiracy it proved had only a single object—frustrating the IRS's ability to assess and collect tax revenue—and that payroll taxes and income taxes were merely means to that end. *See* Br. 58-64. But that wide-angle approach is impermissible under this Court's precedents. To be sure, at a high level, any multi-object *Klein* conspiracy can be described as an effort to "defraud the United States" or an effort "to defraud a [particular agency]." But two different ways of obtaining an advantage by defrauding a particular government agency constitute "different crimes" in furtherance of a "common goal." *United States* v. *Bernstein*, 533 F.2d 775, 792 (2d Cir.), *cert. denied*, 429 U.S. 998 (1976). Here, it is particularly easy to see that the two aims constitute distinct objects, because they involve different types of taxes owed by different taxpayers, which would have been charged as separate offenses if the government had chosen to proceed under the offense clause. *See Rosenblatt*, 554 F.2d at 39-41. That is because the customers' failure to pay employment taxes would be punishable under 26 U.S.C. § 7202, while Mr. Motovich's concealment of his own income for purposes of evading income tax would be punishable under 26 U.S.C. § 7201. *See* Motovich Br. 48. That offense-specific view is the correct level of generality under *Rosenblatt*. *See* 554 F.2d at 39-42.

In nonetheless contending that the conspiracy had a single object, the government emphasizes that both the alleged evasion of customer payroll tax and the alleged evasion of income tax relied on a "system of shell companies." Br. 59. But it is of no moment that the shell companies were a tool in accomplishing both objects. In *Rosenblatt*, for example, fraudulently obtained checks served two distinct objects: Brooks profited from the unauthorized checks, while Rosenblatt profited from laundering them and from helping payees evade taxes and conceal kickbacks. *See* 554 F.2d at 37-38. And in *Bernstein*, the Court held that the different steps for obtaining mortgage insurance (bribery of some officials and making false statements to others) constituted distinct objects within a single conspiracy. *See* 533 F.2d at 791. In short, overlap as to tools and methods is unsurprising within one alleged conspiracy. The question is not whether the conduct is related; instead, it is whether different crimes were committed in furtherance of a single overarching goal. *See* Motovich Br. 44.

The government's primary legal authority is an out-of-circuit district-court decision that was affirmed on other grounds. *See* Br. 58-59 (citing *United States* v. *Gambone*, 167 F. Supp. 2d 803, 809-810 (E.D. Pa. 2001), *aff'd*, 314 F.3d 163 (3d Cir.), *cert. denied*, 540 U.S. 815 (2003)). In that case, the district court referred to the evasion of different taxes as "means (prongs) of carrying out the conspiracy" in the course of addressing the sufficiency of the

government's evidence. *Gambone*, 167 F. Supp. 2d at 809. But the district court was not even addressing a unanimity objection: the defendants challenged only the sufficiency of the evidence, and the Third Circuit accordingly asked whether the proof supported "one of the three alleged prongs of the conspiracy." *Gambone*, 314 F.3d at 176. That inquiry says nothing about whether jurors must agree on the object they found.

The government endeavors to distinguish *Rosenblatt* because that case involved conspirators who did not agree on the type of fraud. *See* Br. 61-62. But the conspirators' lack of agreement was relevant only *because* the conspiracy comprised distinct objects. *See Rosenblatt*, 554 F.2d at 39-42. In *Rosenblatt*, the problem was the lack of agreement among conspirators as to a single object; here, the problem is the distinct but equally fundamental requirement of jury unanimity as to each object.

The government contends that this Court's decision in *Helmsley*, 941 F.2d at 90, supports its position that Mr. Motovich was properly charged and convicted of a single-object conspiracy. *See* Br. 63-64. But that case undisputedly involved multiple objects, and the defendant did not argue that the conspiracy to defraud the IRS itself comprised multiple objects. *Helmsley*, 941 F.2d at 91; Br. of Appellant at 57, 59-60, *United States* v. *Helmsley*, 941 F.2d 71 (2d Cir. 1991) (No. 90-1554). Instead, the defendant relied on the argument that "some jurors may have convicted for offense clause violations and other

jurors for a defraud clause violation"—an argument the Court rejected because the district court's "careful charge" warned the jury about the need to "*all agree on the specific object the defendant agreed to try to accomplish.*" 941 F.2d at 91. Because this case involves two objects and no cautionary instruction, Mr. Motovich's conviction should be vacated.

2. The government's evidentiary presentation created a real risk of a non-unanimous jury verdict here, and that risk, which was not remedied by a cautionary instruction, warrants vacatur. Under *United States* v. *Estevez*, 961 F.3d 519, 527 (2d Cir.), *cert. denied*, 592 U.S. 960 (2020), a general unanimity instruction ordinarily suffices to guard against that risk, except where complexity or other factors create a persistent danger of jury confusion. But here, the court did not give a unanimity instruction, so the risk was entirely unabated.

The government contends that no risk was present because its evidence on each theory was "overwhelming." *See* Br. 64. But the government made the strategic judgment to submit both theories to the jury and did not ask the jury to rest its verdict exclusively on either one. *See* Motovich Br. 49. Presenting both theories without an object-specific instruction created the risk that different jurors relied on different objects. That "genuine danger of jury confusion" warrants relief. *Estevez*, 961 F.3d at 527 (internal quotation marks and citation omitted).

The government again asserts that plain-error review applies. *See* Br. 58. That is incorrect: Mr. Motovich expressly asked that the jury be told that it must "unanimously agree which object of the conspiracy the members agreed to commit." J.A. 176. After the district court rejected it, Mr. Motovich asked for an alternative instruction that would alert the jury to the multiple conspiracies involved and require them to find that the conspirators agreed as to the "essential nature" of the plan. J.A. 231-232, 905-906. The district court again declined. *See* J.A. 906. The government contends that the later charge-conference request focused on multiple conspiracies and was "materially different." *See* Br. 52-54, 58. But the written request identified the object-unanimity issue; the final charge omitted it; and the district court told counsel that overruled positions were preserved and need not be restated. *See* J.A. 295, 899.

In any event, as the government appears to recognize, whether plain-error review applies is immaterial in this context. *See* Br. 64-65 (addressing prejudice without invoking the plain-error standard). Where, as here, an indictment is broad and the evidence is complex, a district court is "required to give a specific unanimity instruction *sua sponte*." *United States* v. *Lapier*, 796 F.3d 1090, 1097 (9th Cir. 2015). Because there is no fair assurance that every member of the jury "necessarily found" either the payroll tax scheme or the income tax scheme beyond a reasonable doubt, the omission had a substantial

and injurious effect on the verdict, and the "error is plain enough" to require vacatur. *Ferguson*, 676 F.3d at 276-277.

## IV. THE BANK FRAUD CONVICTIONS SHOULD BE REVERSED BECAUSE THEY ARE PREMISED ON DEPRIVING BANKS OF INFORMATION, NOT PROPERTY

Under *Ciminelli* v. *United States*, a scheme to deprive a bank of "potentially valuable economic information necessary to make discretionary economic decisions" does not constitute fraud. 598 U.S. 306, 310 (2023). The government endeavors to muddy that principle, relying on cases in which a scheme operated to deprive a bank's customer of funds. That type of scheme can reach a traditional property interest, but that is not the scheme the government alleged or endeavored to prove here. And because the government did not present sufficient evidence that the scheme it proved at trial aimed to deprive the banks of a traditional property interest, rather than merely undermining their "right to control the use of [their] assets," *Kousisis* v. *United States*, 605 U.S. 114, 134 (2025) (quoting *Ciminelli*, 598 U.S. at 311), the convictions on Counts 3-7 and 16 should be reversed.

1. Mr. Motovich agrees with the government that the dispute between the parties is one of "statutory interpretation" and that "de novo review" applies. Br. 67. But the government fails to come to terms with the statutory interpretation reflected in recent Supreme Court precedents. In *Ciminelli*, the Court made clear that "only traditional property interests" suffice

for federal fraud convictions, and it explicitly provided that "potentially valuable economic information that [a party] would consider valuable in deciding how to use its assets" does not qualify. 598 U.S. at 311, 316. The Court therefore held that the "right to control" theory of liability was no longer a viable path for conviction. *See id.* at 308.

The government's theory in this case, however, was exactly that: it sought to establish that Mr. Motovich lied to the banks about who would really control the accounts, depriving the banks of the ability to decide whether to let Mr. Motovich use their services. The government's questioning of bank witnesses repeatedly focused on how a bank decides to open an account. *See*, *e.g.*, J.A. 642-643, 646. In its summation, the government emphasized that Mr. Motovich worked with his alleged co-conspirator "by lying to the bank to accomplish the same *objective*: [t]o move money through the accounts *without the bank[] knowing who truly controlled them*." J.A. 936 (emphases added). And it accused Mr. Motovich not of stealing other customers' funds, but of "not sharing important information with the bank." J.A. 935.

In its appellate brief, the government doubles down on that theory, emphasizing that, "when a bank agrees to open an account, it does so with the understanding that the person or entity whose name is on the account will also be controlling the account." Br. 70. True enough, but that deception deprives a bank of the ability to make the discretionary economic decision of whether

to make its services available to a particular customer—exactly the type of harm that is not actionable under *Ciminelli*. *See* 598 U.S. at 316.

Faced with this Supreme Court precedent, the government doggedly contends that a proprietary interest was nonetheless involved because, "when money is deposited in a bank account, the bank can use the funds (for example, to make loans)." Br. 70. However, that still does not rise to the level of a property interest. The Supreme Court has recognized banks' property interests in accounts where a defendant accessed another customer's account, not where a defendant accessed his own funds that he deposited in a bank account that he controlled. *See Shaw* v. *United States*, 580 U.S. 63, 67 (2016). When a defendant takes money from a different customer, the bank, along with the customer, is deprived of property. That is because a bank is like a bailee, who "can assert the right to possess the deposited funds against all the world but for the bailor (or, say, the bailor's authorized agent)." *Id.* at 66. But here, the government presented no evidence that Mr. Motovich sought to obtain money or property in *anyone else's* accounts. The government contends that the money belonged to other customers: the shell companies named on the accounts. *See* Br. 74. But that ignores the government's own efforts, from the indictment through the trial, to establish that the shell companies were, in fact, owned and controlled by Mr. Motovich. *See*, *e.g.*, J.A. 524 ("Q: Mr. Sarkinovic, who controlled this bank account? A: David did."); *see also*, *e.g.*, J.A. 65-67,

299-300, 663, 929-930, 931-934, 935. Indeed, in its summation, the government argued that Mr. Motovich "truly controlled" the accounts. J.A. 936. Even assuming that the reasons for listing the shell companies were to deceive the banks and to avoid detection of an otherwise unlawful scheme, the banks lacked a traditional property interest in the funds in those accounts vis-à-vis their true owner.

In any event, "because money or property must be an *object* of the defendant's fraud, the traditional property interest at issue must play more than some bit part in a scheme." *Kousisis*, 605 U.S. at 122 (quotation marks and citation omitted). "Obtaining the victim's money or property must have been the 'aim,' not an 'incidental byproduct,' of the defendant's fraud." *Id.* Accordingly, even if the government could establish some bank property rights vis-à-vis Mr. Motovich, the effect that opening and using the accounts had on any bank property interest was at most an "incidental byproduct." *Id.* Under the government's own theory at trial, any harm to the banks' property rights in the deposit accounts was at most "downstream of [Mr. Motovich's] 'object' to line [his] pockets." *Kousisis*, 605 U.S. at 133.

The government cites *Kousisis* for the proposition that it was not required to prove a "pecuniary loss" by the banks. Br. 74. That is correct, but it is also irrelevant. The problem with the government's theory here is that it has not identified a scheme to obtain a traditional property interest, not that

the banks received equivalent value in return. The Supreme Court's decision in *Kousisis*, by contrast, addressed a scheme to obtain what was undisputedly a property interest—contractual payments—and held that the fact that the victims received equivalent value in a fair-market sense was no defense. *See* 605 U.S. at 124.

2. The government cites several non-precedential decisions in support of its argument. *See* Br. 75-77. It points to the district court's opinion in the Bankman-Fried prosecution, but that case involved allegations that accounts were used to receive other customers' deposits and that the defendant regularly took those customer funds from bank custody for activities the customers never authorized. *See United States* v. *Bankman-Fried*, 680 F. Supp. 3d 289, 304-305 (S.D.N.Y. 2023). Misappropriating *third-parties'* funds presents a classic theory of property fraud that remains cognizable after *Ciminelli*, as this Court recently reiterated in affirming that conviction. *See United States* v. *Bankman-Fried*, 179 F.4th 104, 111, 116 (2d Cir. 2026). This case is not *Bankman-Fried*; it is *Lebedev*. *See* Motovich Br. 54; *United States* v. *Lebedev*, 932 F.3d 40, 48-49 (2d Cir. 2019), *cert. denied*, 589 U.S. 1224 (2020) (upholding wire-fraud liability where front companies concealed the true party in interest so banks "would be more likely to process and approve" transactions, "depriv[ing] the financial institutions of the right to control their assets"), *abrogated in relevant part by Ciminelli*, 598 U.S. at 313, 316.

Nor does the Seventh Circuit's decision in *United States* v. *Griffin*, 76 F.4th 724 (2023), help the government's cause. *See* Br. 76. *Griffin* involved loan guarantees that "committed the SBA to stand behind a significant portion of the loan amount in case of default," and those guarantees, which resulted in the SBA paying out millions of dollars, "are most certainly 'property' as required by the wire fraud statute." 76 F.4th at 739. A loan guarantee is a traditional property interest; the bank's decision to allow someone to open an account is not.

The government also cites a smattering of other district court cases that have not been reviewed by this Court or blessed by the Supreme Court. *See* Br. 75-76. None establishes that the informational object proved here constituted bank property.

3. Nor can the jury instructions save the convictions. It is true that the district court instructed the jury that banks "do not have property interests in potentially valuable economic information." J.A. 977-978. But any salutary effect of that instruction was undone because the jury was also instructed that "banks have property rights in their customers' bank accounts," directing the jury to find such rights even as against the particular account's beneficial owner. J.A. 977. In any event, a jury instruction cannot cure a legally insufficient evidentiary theory: because the government's proof and argument showed only informational deprivation, no rational jury could

find that bank property was the object of the scheme. This Court does not hesitate to overturn a conviction when "the evidence . . . was legally insufficient even if the instruction was correct." *United States* v. *Ness*, 565 F.3d 73, 78 (2d Cir. 2009).

In short, the government cannot turn information into traditional property. Its proof and argument at trial identified concealment of account control as the scheme's objective; it did not establish that Mr. Motovich set out to obtain bank money or another customer's deposits. That is the right-to-control theory that the Supreme Court rejected in *Ciminelli*. *See* 598 U.S. at 313-316. Because no rational jury could find the required property object on this record, the Court should reverse the bank-fraud convictions, as well as the related convictions for bank-fraud conspiracy and aggravated identity theft predicated on bank fraud.

## CONCLUSION

The district court's judgment should be reversed and remanded with instructions to enter a judgment of acquittal. In the alternative, the judgment should be vacated and the case remanded for a new trial.

Respectfully submitted,

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM
MASHA G. HANSFORD
DAVIS POLK & WARDWELL LLP
*1050 17th Street, N.W.*
*Washington, DC 20036*
*(202) 962-7000*

CANDICE J. YANDAM RIVIERE
EMILY S. SHIRE
DAVIS POLK &WARDWELL LLP
*450 Lexington Avenue*
*New York, NY 10017*

AUGUST 27, 2026

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellant and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4)(A), that the attached Reply Brief of Defendant-Appellant is proportionately spaced, has a typeface of 14 points or more, and contains 6,990 words.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

AUGUST 27, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on August 27, 2026, a copy of the foregoing brief was filed through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM